HEARING DATE AND TIME: February 29, 2012 at 10:00 a.m. (Eastern Time)
OBJECTION DEADLINE: February 22, 2012 at 4:00 p.m. (Eastern Time)

Harvey R. Miller
Stephen Karotkin
Alfredo R. Pérez
Stephen A. Youngman
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------x
                                          :
In re                                     :        Chapter 11 Case No.
                                          :
AMR CORPORATION, et al.,                  :        11-15463 (SHL)
                                          :
                          Debtors.        :        (Jointly Administered)
                                          :
----------------------------------------------------------x
```

**NOTICE OF HEARING ON APPLICATION OF DEBTORS PURSUANT TO 11 U.S.C.
§§ 327(a) AND 328(a) AND FED. R. BANKR. P. 2014 FOR AUTHORITY TO EMPLOY
AND RETAIN THE BOSTON CONSULTING GROUP, INC. AS STRATEGIC
CONSULTANTS FOR THE DEBTORS NUNC PRO TUNC TO JANUARY 9, 2012**

PLEASE TAKE NOTICE that a hearing on the annexed application, dated

February 15, 2012 (the "**Application**"), of AMR Corporation, American Airlines, Inc., AMR

Eagle Holding Corporation, and certain of their subsidiaries, as debtors and debtors in possession

(collectively, the "**Debtors**"), will be held before the Honorable Sean H. Lane, United States

Bankruptcy Judge, in Room 701 of the United States Bankruptcy Court for the Southern District

of New York (the "**Bankruptcy Court**"), One Bowling Green, New York, New York 10004, on

**February 29, 2012 at 10:00 a.m. (Eastern Time)**, or as soon thereafter as counsel may be

heard.

PLEASE TAKE FURTHER NOTICE that any responses or objections to the

Application (the "**Objections**") must be in writing, shall conform to the Federal Rules of

Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York,

and shall be filed with the Bankruptcy Court (a) by registered users of the Bankruptcy Court's

case filing system, electronically in accordance with General Order M-399 (which can be found

at http://nysb.uscourts.gov) and (b) by all other parties in interest, on a 3.5 inch disk, in text-

searchable portable document format (PDF) (with a hard copy delivered directly to Chambers),

in accordance with the customary practices of the Bankruptcy Court and General Order M-399,

to the extent applicable, and served in accordance with General Order M-399 and on (i) the

attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New

York 10153 (Attn: Alfredo R. Pérez, Esq.), (ii) the Debtors, c/o AMR Corporation, 4333 Amon

Carter Boulevard, MD 5675, Fort Worth, Texas 76155 (Attn: Kathryn Koorenny, Esq.), (iii) the

Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street,

21st Floor, New York, New York 10004 (Attn: Brian Masumoto, Esq.), (iv) the attorneys for the

statutory committee of unsecured creditors, Skadden, Arps, Slate, Meagher & Flom LLP, 155

North Wacker Drive, Chicago, Illinois 60606 (Attn: John Wm. Butler, Jr., Esq.) and Four Times

Square, New York, New York 10036 (Attn: Jay M. Goffman, Esq.), (v) The Boston Consulting

Group, Inc., One Beacon Street, 10th Floor, Boston, Massachusetts 02108 (Attn: Birgitta

Dickerson) and DLA Piper, 6225 Smith Avenue, Baltimore, Maryland 21209 (Attn: Richard M.

Kremen and Dale K. Cathell), and (vi) all entities that requested notice in these chapter 11 cases

under Fed. R. Bankr. P. 2002 so as to be received no later than **February 22, 2012 at 4:00 p.m.**

**(Eastern Time)** (the "**Objection Deadline**").

PLEASE TAKE FURTHER NOTICE that if no Objections are timely filed and

served with respect to the Application, the Debtors may, on or after the Objection Deadline,

submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed

to the Application, which order may be entered with no further notice or opportunity to be heard.

Dated:    New York, New York
          February 15, 2012

                                   */s/ Alfredo R. Pérez*                          
                                   Harvey R. Miller
                                   Stephen Karotkin
                                   Alfredo R. Pérez
                                   Stephen A. Youngman

                                   WEIL, GOTSHAL & MANGES LLP
                                   767 Fifth Avenue
                                   New York, New York 10153
                                   Telephone: (212) 310-8000
                                   Facsimile: (212) 310-8007

                                   Attorneys for Debtors
                                   and Debtors in Possession

Harvey R. Miller
Stephen Karotkin
Alfredo R. Pérez
Stephen A. Youngman
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile:   (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                        :
In re                                   :        Chapter 11 Case No.
                                        :
AMR CORPORATION, et al.,                :        11-15463 (SHL)
                                        :
                      Debtors.          :        (Jointly Administered)
                                        :
-------------------------------------------------------------x
```

**APPLICATION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 327(a) AND 328(a)**
**AND FED. R. BANKR. P. 2014 FOR AUTHORITY TO EMPLOY AND**
**RETAIN THE BOSTON CONSULTING GROUP, INC. AS STRATEGIC**
**CONSULTANTS FOR THE DEBTORS NUNC PRO TUNC TO JANUARY 9, 2012**

TO THE HONORABLE SEAN H. LANE,
UNITED STATES BANKRUPTCY JUDGE:

AMR Corporation, American Airlines, Inc., AMR Eagle Holding Corporation,

and certain of their subsidiaries, as debtors and debtors in possession in the above-captioned

chapter 11 cases (collectively, the "**Debtors**," and together with their non-Debtor subsidiaries,

"**AMR**"), respectfully represent:

<u>**Background**</u>

1.      On November 29, 2011 (the "**Commencement Date**"), the Debtors each

commenced with this Court a voluntary case under chapter 11 of title 11, United States Code (the

"**Bankruptcy Code**").   The Debtors are authorized to continue to operate their business and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.   No trustee or examiner has been appointed in these chapter 11 cases.

2.      Information regarding the Debtors' business, capital structure, and the

circumstances leading to the commencement of these chapter 11 cases is set forth in the

Affidavit of Isabella D. Goren Pursuant to Rule 1007-2 of the Local Bankruptcy Rules of the

Southern District of New York (the "**Local Rules**"), sworn to on November 29, 2011 (ECF No.

4).

### Jurisdiction

3.      The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and

1334.   This is a core proceeding under 28 U.S.C. § 157(b).   Venue is proper in this district

under 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

4.      The Debtors submit this Application, pursuant to sections 327(a) and 328(a)

of the Bankruptcy Code, Rules 2014(a) and 2016(a) of the Federal Rules of Bankruptcy Procedure

(the "**Bankruptcy Rules**"), and Local Rules 2014-1 and 2016-1, for authority to employ and retain

The Boston Consulting Group, Inc. ("**BCG**") as strategic consultants, *nunc pro tunc* to January 9,

2012, in accordance with the terms and conditions of the Consulting Services and Confidentiality

Agreement between American Airlines, Inc. ("**American Airlines**") and BCG, effective as of May

13, 2008 (the "**Consulting Agreement**"), and a Statement of Work, dated January 9, 2012, for a

management cascade project issued pursuant to the Consulting Agreement (the "**Management

Cascade SOW**") (collectively, the "**BCG Agreements**").   A copy of the BCG Agreements are

annexed hereto as **Exhibits "A"** and **"B**."

2

5.      In support of this Application, the Debtors submit the Declaration of Ken Keverian, a Senior Partner and Managing Director at BCG (the "**Keverian Declaration**"), annexed hereto as **Exhibit "C."**   A proposed order approving the retention and employment of BCG is annexed hereto as **Exhibit "D."**

**BCG's Qualifications**

6.      BCG is recognized as one of the most prestigious management consulting firms in the world, which, in combination with its affiliates, has 74 offices in 42 countries.   BCG partners with clients, such as the Debtors, to deliver customized solutions that resolve significant issues and create lasting competitive advantages for its clients.   Utilizing decades of industry experience and functional expertise, BCG looks beyond standard solutions to develop new insights, mobilize organizations, drive tangible results, and make companies more capable and competitive.   BCG also has extensive experience consulting financially troubled companies from a broad range of industries in complex operational restructurings, both in and out-of-chapter 11.   Moreover, BCG's Organizational Practice Area and Travel & Tourism Practice Area have significant expertise on matters involving aviation strategy, organization and operations.

7.      As described in the Keverian Declaration, BCG provided consulting services to the Debtors on certain strategic advisory matters prior to, and after, the Commencement Date.   As a result, BCG has acquired relevant experience and expertise concerning the Debtors' business operations and management that assist it in providing effective and efficient services to the Debtors.   Accordingly, the Debtors submit that BCG is both well qualified and uniquely able to assist them in these chapter 11 cases.

**Proposed Services**

8.      Pursuant to the terms and conditions set forth in the BCG Agreements,[1]

BCG has agreed to facilitate a dedicated project to help the Debtors redesign and realign their

current management structure (the "**Cascade Project**").[2]    The Cascade Project will enable the

Debtors to, among other things, (i) ensure that the right management teams are working on the

right tasks; (ii) design a management structure that fosters accountability and high performance,

adaptability, and fast, effective decision making; and (iii) create an efficient cost structure.

9.      The Cascade Project is a collaborative effort, with BCG team leaders

working with Tom Horton, the Debtors' new Chairman, CEO and President, and management to

create an effective organizational structure.    Specifically, BCG will work directly with Mr.

Horton and senior management to create an organizational "top layer" (structure, activities, and

executive selection) and design a layer of organizational management below the "top layer"

applying established rules and defined objectives.    The management team in the second layer, in

turn, designs and staffs the third layer.    This cascading process continues until a base layer is

established.

10.      The Debtors anticipate that the Cascade Project will take approximately 32

weeks to complete for all layers of management, which consists of approximately 6-7 weeks of

diagnostic and planning work, followed by approximately 4-5 weeks of work on separate

cascaded layers.    The diagnostic step often identifies opportunities where spans of control may

be low, banding levels are over-stated, activities may be in the "wrong" place, and/or the number

---

[1]  The summaries of the BCG Agreements contained in this Application are provided for purposes of convenience
only.   In the event of any inconsistency between the summaries contained herein and the terms and provisions of
the BCG Agreements, the terms of the BCG Agreements shall control.   To the extent the Debtors request that BCG
perform additional services not described in the BCG Agreements, the Debtors shall seek further order of the Court.

[2]  AMR Eagle Holding Corp. and its management will not participate in the Cascade Project.

4

of management layers is high.   The planning step, in turn, sets up "principles and design rules" for a redesign to address opportunities and other strategic objectives for the Debtors.   BCG will then support and advise the Debtors on a redesign of their organizational structure—layer by layer— consistent with the established "principles and design rules."

11.      The Debtors believe that in order to have the right management structure in place, BCG's services are essential.   On the Commencement Date, the Board of Directors of AMR Corporation accepted the resignation of Gerard Arpey, former Chairman and CEO, and appointed Mr. Horton as the new Chairman, CEO and President to lead the Debtors through their restructuring.   Mr. Horton acted decisively in making several initial management changes at very senior levels, and has since further reduced the senior management team from a starting size of fourteen to its current size of ten members to ensure that he has the right team and size of team in place to lead the Debtors.[3]

12.      The Debtors believe that BCG is uniquely positioned to support and consult the Debtors on the Cascade Project.   BCG has extensive experience in facilitating cascading projects for large corporations that produce a more focused and dynamic management team and important cost-savings.   As such, BCG has developed a proven methodology that will help avoid obstacles that could delay the Cascade Project or dilute the Debtors' intended outcome.   In addition to having a proven track record of success using the cascade methodology, BCG is uniquely positioned to support the Debtors given the depth of its understanding of the Debtors' organization.   Indeed, BCG has worked with the Debtors for many years –at the corporate headquarters and in the field, with both management and frontline employees.   Most

---

[3] A recent example of Mr. Horton's statements concerning necessary changes to successfully reorganize is found in his February 2, 2012 letter to American Airlines employees, which is available at http://aa.mediaroom.com/index.php?s=43&item=3448.

recently, BCG assisted the Debtors' efforts to enhance revenue by providing analytical support to

pinpoint short-term and long-term revenue enhancement opportunities and by recommending

specific initiatives to capture value.[4]

       13.     Finally, BCG's work on the Cascade Project is not duplicative of any

services performed or to be performed by the Debtors' other retained professionals.[5]   If the

Debtors were required to retain consultants other than BCG to assist with the Cascade Project,

the Debtors and their estates would be unduly prejudiced by the time and expense necessary to

replicate BCG's existing familiarity with the Debtors' organization and management.

Accordingly, the Debtors believe that BCG's retention pursuant to the terms of the BCG

Agreements is in the best interests of their estates, creditors, and other parties in interest.

### Professional Compensation

       14.     Subject to Court approval, and in accordance with the applicable

provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, any applicable orders

of the Court, the Amended Order Pursuant to 11 U.S.C. §§ 105(a) and 331 Establishing

Procedures for Interim Compensation and Reimbursement of Expenses of Professionals (ECF

No. 958), the Amended Guidelines for Fees and Disbursements for Professionals in Southern

District of New York Bankruptcy Cases M-389 (Nov. 25, 2009), and the United States Trustee

Guidelines (the "**Fee Guidelines**"), the Debtors propose to pay BCG for services rendered in

---

[4] As detailed in the Keverian Declaration, prior to the Commencement Date and through January 2012, BCG rendered consulting services to the Debtors in the ordinary course of business in connection with ongoing efforts to enhance revenues and certain base and line maintenance projects, and currently holds outstanding prepetition invoices totaling approximately $6.5 million for work on those projects.   Subject to and contingent upon the Court's approval of the Application, BCG has agreed to waive all prepetition claims relating to those projects.   BCG's efforts in connection with revenue and base maintenance projects continued postpetition at the request of the Debtors.   As a result, BCG has invoiced the Debtors $1,867,600 for postpetition services relating to the revenue project and $812,000 for postpetition services relating to the base maintenance project.   The Debtors have not paid these postpetition amounts but understand that BCG expects to be paid in the ordinary course.

[5] Nevertheless, BCG will also use reasonable efforts to coordinate with the Debtors' other retained professionals to avoid any unnecessary duplication of services.

connection with the Cascade Project as follows: a flat fee of $254,500 per week (with a team of approximately 8.8 full time employees ("**FTEs**") for the first six weeks and a flat fee of $392,500 per week for the final twenty-six weeks (with a team of approximately 13.5 FTEs), with the total cost not to exceed $11,732,000 for the scope of work described in the Management Cascade SOW.   BCG's rates include any costs for reasonable expenses that BCG may incur. The Debtors believe that this proposed compensation arrangement is reasonable and consistent with, and typical of, arrangements entered into by BCG and other professional consulting firms that render comparable services, both in and outside of bankruptcy.

15.    The Debtors request that BCG be permitted to submit monthly invoices for services rendered and expenses incurred in connection with the Cascade Project.   Although the work to be done by BCG is on a fixed fee basis, BCG will keep time records in one-half hour increments and maintain records of any actual and necessary costs and expenses incurred for services performed, although it will not charge any additional amounts for any such costs or expenses.   BCG intends to file interim and final fee applications for the allowance of compensation incurred on the Cascade Project in accordance with the Fee Guidelines.

## BCG's Disinterestedness

16.    To the best of the Debtors' knowledge, and except to the extent disclosed in this Application or the Keverian Declaration:   (i) BCG does not have a connection with the Debtors, their significant creditors, the United States Trustee (the "**U.S. Trustee**"), any person known to be employed in the Office of the U.S. Trustee, or any other party with an actual interest in these cases or the Debtors' respective attorneys or accountants; (ii) BCG is not a creditor (upon the waiver of its prepetition claims), equity security holder, or insider of any of the Debtors; (iii) neither BCG, nor any of its members is or was, within two years of the Commencement Date, a director, officer, or employee of the Debtors; and (iv) BCG does not

have an interest materially adverse to the Debtors, their respective estates or any class of

creditors or equity security holders by reason of any direct or indirect relationship to, connection

with, or interest in the Debtors, or for any other reason.   Accordingly, the Debtors believe that

BCG is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code,

as modified by section 1107(b) of the Bankruptcy Code.

### Basis For Relief Requested

17.    Section 327 of the Bankruptcy Code provides that a debtor is authorized to

employ professional persons "that do not hold or represent an interest adverse to the estate, and

that are disinterested persons, to represent or assist the [Debtors] in carrying out their duties

under this title."   11 U.S.C. § 327(a).   Section 1107(b) of the Bankruptcy Code elaborates upon

section 327(a) of the Bankruptcy Code in cases under chapter 11 of the Bankruptcy Code and

provides that "a person is not disqualified for employment under section 327 of [the Bankruptcy

Code] by a debtor in possession solely because of such person's employment by or

representation of the debtor before the commencement of the case."   11 U.S.C. § 1107(b).

18.    Furthermore, section 328(a) of the Bankruptcy Code, provides, in relevant

part, that the Debtors "with the court's approval, may employ or authorize the employment of a

professional person under section 327 . . . on any reasonable terms and conditions of

employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on

a contingent fee basis."   11 U.S.C. § 328(a).   Accordingly, section 328 permits the

compensation of professionals on flexible terms that reflect the nature of their services and

market conditions.

19.    The Debtors believe that BCG's compensation for the Cascade Project is

reasonable in light of industry practice and market rates charged for comparable services and

should be approved under section 328(a) of the Bankruptcy Code.   In addition, as noted above,

BCG is "disinterested" and all of its fees and expenses are subject to approval of the Court.

Accordingly, the Court should approve the employment and retention of BCG pursuant to the

terms and conditions set forth in BCG Agreements.

### Notice

20.    Notice of this Application has been provided to parties in interest in

accordance with the Order Pursuant to 11 U.S.C. §§ 105(a) and (d) and Bankruptcy Rules

1015(c), 2002(m), and 9007 Implementing Certain Notice and Case Management Procedures,

dated December 23, 2011 (ECF No. 453).   The Debtors submit that, in view of the facts and

circumstances, such notice is sufficient and no other or further notice need be provided.

21.    No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated: Fort Worth, Texas
      February 15, 2012

 

AMR CORPORATION
(for itself and on behalf of its affiliated
Debtors and Debtors in Possession)


*/s/ Kathryn Koorenny*         
NAME:   Kathryn Koorenny
TITLE:   Associate General Counsel

## **EXHIBIT A**

**CONSULTING AGREEMENT**

# CONSULTING SERVICES

## AND

# CONFIDENTIALITY AGREEMENT

## BETWEEN

# AMERICAN AIRLINES, INC.

## AND

# THE BOSTON CONSULTING GROUP, INC.

# TABLE OF CONTENTS

| Section | Page |
|---|---|
| 1. DEFINITIONS | 1 |
| 2. AGREEMENT; TERM | 2 |
| 2.1 Nature of Services and Engagement | 2 |
| 2.2 Term | 2 |
| 3. ACCEPTANCE OF DELIVERABLES | 2 |
| 3.1 Procedures | 2 |
| 3.2 Non-Acceptance | 2 |
| 4. OBLIGATIONS OF CONSULTANT. | 3 |
| 4.1 Personnel | 3 |
| 4.2 Conduct of Employees and Subcontractors | 3 |
| 5. AMERICAN'S OBLIGATIONS. | 4 |
| 5.1 Fee | 4 |
| 5.2 Payment | 4 |
| 6. TAXES. | 4 |
| 6.1 Sales Taxes | 4 |
| 6.2 Other Taxes | 4 |
| 7. STATEMENT OF WORK AMENDMENTS | 4 |
| 8. RIGHTS IN INTELLECTUAL PROPERTY | 5 |
| 9. WARRANTIES. | 5 |
| 9.1 Product and Services Warranty | 5 |
| 9.2 General Warranties | 5 |
| 10. INDEMNIFICATION | 6 |
| 10.1 Indemnity | 6 |
| 10.2 Indemnification Procedures | 6 |
| 11. LIMITATION OF LIABILITY | 7 |
| 12. CONFIDENTIAL INFORMATION. | 7 |
| 12.1 Treatment and Protection | 7 |
| 12.2 No Publicity | 7 |
| 12.3 Remedies Upon Breach | 7 |
| 12.4 Exclusions | 7 |
| 12.5 Disclosures Required by Law | 8 |
| 12.6 Return or Destruction | 8 |
| 13. TERMINATION | 8 |
| 13.1 Termination | 8 |
| 13.2 Termination Upon Material Change | 8 |
| 13.3 Effect of Termination | 9 |
| 13.4 Surviving Obligations | 9 |
| 14. NON-SOLICITATION; NON-COMPETITION | 9 |
| 14.1 Non-Solicitation | 9 |
| 14.2 Non-Competition | 9 |
| 15. MISCELLANEOUS | 10 |

i

Confidential

15.1     Scope of Rights.................................................................................................10
15.2     Relationship of Parties....................................................................................10
15.3     No License or Other IP Rights Granted..........................................................10
15.4     Subcontractors.................................................................................................10
15.5     Successors and Assigns...................................................................................10
15.6     Notices.............................................................................................................10
15.7     Governing Law; Interpretation.......................................................................11
15.8     Headings..........................................................................................................11
15.9     Counterparts; Execution.................................................................................11
15.10    Compliance with Law......................................................................................11
15.11    Severability.....................................................................................................11
15.12    Entire Agreement; Amendment......................................................................11
15.13    Waiver.............................................................................................................11
15.14    Insurance.........................................................................................................12
15.15    Force Majeure.................................................................................................12
15.16    Electronic Self-Help.......................................................................................12
15.17    MBE/WEB Participation.................................................................................12
15.18    Order of Precedence........................................................................................12

Confidential

# CONSULTING SERVICES AGREEMENT

This Consulting Services and Confidentiality Agreement (this "**Agreement**") is entered into as of May 13, 2008 (the "**Effective Date**"), by and between American Airlines, Inc., a Delaware corporation, having its principal office at 4333 Amon Carter Boulevard, Fort Worth, Texas ("**American**"), and The Boston Consulting Group, Inc. a Massachusetts corporation, having its principal office at 53 State Street, Boston, Massachusetts 02109 ("**Consultant**").  American and Consultant are referred to herein individually as a "**Party**" and collectively as the "**Parties**".  For and in consideration of the mutual promises contained herein, the Parties hereby agree as follows:

1. **DEFINITIONS.**  As used in this Agreement, the terms set forth in this Section 1 will have the meanings provided herein.  Other terms used in this Agreement but not defined in this Section 1 shall have the meanings ascribed thereto or otherwise defined in the context in which they are used and will have the meanings therein indicated.

"**Affiliate**" means, with respect to any entity, any other entity directly or indirectly controlling or controlled by, or under common control with, such entity.  For purposes of this Agreement, "control" (including the terms "controlled by" and "under common control with") shall mean the power, directly or indirectly, to direct or cause the direction of the management and policies of such entity, whether through the ownership of voting securities or otherwise.

"**Airline Associate**" means any entity that has a codeshare, frequent flyer or alliance, or other similar marketing relationship with American and/or its Affiliates.

"**Client Content**" means any information, data, or material that is provided by American to Consultant for inclusion in the Deliverables, whether contained in tangible media or in electronic form, including any existing applications of American, its Affiliates or its licensors which (a) are to be converted by Consultant into a different format pursuant to this Agreement, and/or (b) will interface with the Deliverables.

"**Confidential Information**" means any confidential or proprietary information of a Party that is disclosed in any manner and in any media to the other Party in connection with or as a result of discussions related to this Agreement, and which at the time of disclosure either (a) is marked as being "Confidential" or "Proprietary", (b) is otherwise reasonably identifiable as the confidential or proprietary information of the disclosing Party, or (c) under the circumstances of disclosure should reasonably be considered as confidential or proprietary information of the disclosing Party.  Specifically, Confidential Information includes (i) the existence, terms and conditions of this Agreement; (ii) all types of proprietary technical or business information, including but not limited to data, know-how, formulas, algorithms, processes, methodologies, designs, drawings, schematics, plans, strategies, specifications, requirements, standards and documentation, reports, pricing, market, marketing or demographic information, software, trade secrets, research, analyses, inventions, ideas and other types of nonpublic information..  With respect to American, Confidential Information shall also include any and all information transmitted to or stored by Consultant in connection with performance of its obligations under this Agreement, including, but not limited to, personally identifiable information ("**PII**") of employees or customers of American or its Affiliates and Airline Associates, including name, address, phone number, e-mail address, date of birth, social security number, credit card information, drivers license number, account numbers, PINs and/or passwords, and any other information that could reasonably identify a person.

"**Deliverables**" means all materials, reports and presentations prepared by Consultant for delivery to American.

Confidential

"**IP Rights**" means any and all rights that may exist under patent law, copyright law, publicity rights law, moral rights law, trade secret law, trademark law, unfair competition law or other similar protections, whether or not such rights are registered or perfected.

"**Project**" means a specific project, engagement or assignment for which Consultant will be providing Services to American under this Agreement.

"**Services**" means the consulting, installation and/or support activities that will be provided by Consultant pursuant to this Agreement as set forth in any Statement of Work.

"**Statement of Work**" means (a) Exhibit A to this Agreement, and (b) any subsequent document in substantially the form of Exhibit A to this Agreement which describes the Project and which, upon signing by both Parties, will be deemed a part of this Agreement.

## 2.    AGREEMENT; TERM.

2.1    <u>Nature of Services and Engagement</u>.  Consultant is an independent contractor engaged to perform the Services on American's behalf and/or to provide certain Deliverables as set forth in any Statement of Work.  Both Parties acknowledge that this Agreement is non-exclusive, in that American may utilize the services of others, and Consultant may provide services to others so long as those services are not inconsistent with this Agreement.

2.2    <u>Term</u>.  Subject to the provisions and conditions of this Agreement, the term of this Agreement (the "**Term**") shall commence on the Effective Date and continue until terminated in accordance with Section 13 of this Agreement.

## 3.    ACCEPTANCE OF DELIVERABLES

3.1    <u>Procedures</u>.  In accordance with the schedule set forth on any Statement of Work, American will perform user acceptance testing of any Deliverables to confirm conformity with the requirements identified in the Statement of Work.  American will, within 5 days of receipt of each Deliverable (or as otherwise specified in the applicable Statement of Work), notify Vendor of any non-conformities between the Deliverable and the specifications or functionality described in the Statement of Work relating to such Deliverable.  Such notice will be in writing, and will provide any available information in American's possession regarding such non-conformity, including all documentation reasonably requested by Vendor to evaluate and correct such non-conformity.  Vendor will correct the non-conformities identified hereunder and will thereafter re-submit any such previously non-conforming Deliverable for re-testing within seven days of American's notice of non-conformance, or as otherwise agreed between American and Vendor.    Acceptance of a Deliverable ("**Acceptance**") will take place when American provides written notice to Vendor of the conformance of such Deliverable to the specifications and functionality identified in the Statement of Work.  If no notice of non-conformities or Acceptance is received by BCG within 5 days of American's receipt of a Deliverable, Acceptance will be deemed to have occurred.

3.2    <u>Non-Acceptance</u>.  In the event that Vendor fails to deliver a Deliverable which meets the specifications or functionality described in the applicable Statement of Work on the due date specified in such Statement of Work, American may, in its sole discretion, either (a) reject the Deliverable in its entirety and recover amounts previously paid hereunder; (b) issue a "partial Acceptance" of the applicable Deliverable with an equitable adjustment in the price to account for such deficiency; or (c) conditionally accept the applicable Deliverable while reserving its right to revoke Acceptance if timely correction is not forthcoming.

Confidential

4.   **OBLIGATIONS OF CONSULTANT.**

4.1   <u>Personnel</u>. American and Consultant will mutually agree upon the level of skill required, and the personnel to be assigned, to perform the Services. As soon as reasonably practicable after the Effective Date of each Statement of Work, American and Consultant will mutually identify the key positions (each, a "**Key Position**") within Consultant's organization that will be dedicated to the performance of the Services pursuant to that Statement of Work and that are deemed critical to the success of American's information technology operations. During the Term, Consultant will cause each of the personnel filling the Key Positions to devote substantially full time and effort to the provision of the Services pursuant to the applicable Statement of Work. In no event will Consultant remove any personnel from a Project without American's prior written approval, except in the event of death, illness, disability, termination of employment or personal (non-business) circumstances of importance to an individual (e.g., terminal illness of a family member, etc.). Further, before assigning an individual to replace any person in a Key Position, Consultant will notify American of the proposed assignment, introduce the individual to appropriate American representatives (and, upon request, provide those representatives with the opportunity to interview the individual) and provide American with a résumé and any other information about the individual that American reasonably requests. If American in good faith objects to the proposed assignment, Consultant and American will resolve American's concerns on a mutually agreeable basis.

4.2   <u>Conduct of Employees and Subcontractors</u>. Consultant will be solely responsible for the conduct of its employees and subcontractors and will ensure that such employees and subcontractors comply with American's site security, information security and personnel conduct rules, as well as applicable federal, state and local laws, executive orders and regulations issued with respect to FAA regulated premises. American reserves the right to require the immediate removal from American's premises of any employee, subcontractor or agent of Consultant who American believes has failed to so comply or whose conduct or behavior is unacceptable or unprofessional or results in a security or safety breach.

4.3   <u>Invoices</u>. Consultant will invoice American for any amounts due pursuant to this Agreement at the address set forth in the Statement of Work.

4.4   <u>Security</u>.

(a)   Consultant shall provide a secure environment for all of American's Confidential Information and any hardware and software (including servers, network and data components) to be provided or used by Consultant as part of its performance under this Agreement. Consultant represents that the security measures it takes in performance of its obligations under this Agreement are, and will at all times remain, at the highest of the following (collectively referred to herein as "**Security Best Practices**"): (i) Privacy & IT Security Best Practices (as defined by ISO 17799); (ii) the security requirements, obligations, specifications and event reporting procedures set forth in Exhibit B to this Agreement; and (iii) any security requirements, obligations, specifications and/or event reporting procedures set forth in the applicable Statement of Work. Failure by Consultant to comply with Security Best Practices in fulfilling its obligations hereunder shall constitute a breach of this Agreement. Additionally, Consultant shall contractually require any subcontractors or agents with access to American's Confidential Information to adhere to such Security Best Practices.

(b)   American (or its designated representatives) shall have the right on an annual basis as reasonably requested by American, at American's expense, to conduct an audit to verify Supplier's security, confidentiality, and privacy practices and standards; disaster recovery capabilities; and fail-over planning with respect to the Services provided hereunder is

Confidential

operating in accordance with Security Best Practices. Consultant will cooperate with American in conducting any such audit, and shall allow American reasonable access, during normal business hours and upon reasonable notice, to all pertinent records, documentation, personnel and processing areas as American deems necessary to accurately and effectively complete such audit. American will take reasonable steps to ensure that such audit will not materially impact Consultant's business or operations. Consultant shall promptly correct any deviations from Security Best Practices that are identified in any security audit. Any third parties performing an audit under this subsection must execute a nondisclosure agreement reasonably satisfactory to Consultant. Nothing herein shall obligate Consultant to disclose to American any documents or other material relating to the profitability or internal profit and loss/balance sheets associated with Consultant's business, payroll information, or information or material that constitute, in the opinion of Consultant's legal counsel, legally privileged documents or information that Consultant is bound to maintain as confidential by written obligation to a third party.

5.    **AMERICAN'S OBLIGATIONS.**

5.1    <u>Fee</u>. American will pay Consultant a fee for the Services (inclusive of expenses) as provided in each Statement of Work or any attached or otherwise incorporated price list (the "**Fee**"). The Fee (a) will be complete and inclusive of expenses, and no additional charges may be added without American's written consent including, but not limited to, transportation, packaging, customs, duties, storage and insurance expenses; and (b) will not be increased prior to the completion of the Statement of Work.

5.2    <u>Payment</u>. American will pay Consultant within 30 days of receipt of a correct invoice all undisputed charges, and will promptly notify Consultant in writing of any disputed amount. Consultant will supply American with documentation to support the validity of any disputed charge. American may require credit for, or repayment of the amount of, any billing errors.

6.    **TAXES.**

6.1    <u>Sales Taxes</u>. Any charges paid hereunder in exchange for products or Services provided by Consultant are exclusive of any sales taxes and other similar taxes and governmental charges, imposed upon or made payable and arising out of sales under this Agreement, and American shall pay all such taxes imposed upon American or Consultant. In the event any such taxes are imposed upon and paid by Consultant, American shall reimburse Consultant within 30 days of receipt of an invoice from Consultant together with any records documenting such payment as may be reasonably requested by American.

6.2    <u>Other Taxes</u>. American shall not be liable for the payment or reimbursement to Consultant of any franchise taxes or fees, or any taxes measured by or against Consultant's income or property. American will not withhold taxes or Social Security payments from any sum paid to Consultant under this Agreement. Consultant acknowledges and agrees that Consultant is solely responsible for the payment of Consultant's federal, state, and local employment and other taxes. Consultant agrees to indemnify American for all such tax liability, including any related interest and penalties. Additionally, Consultant will honor any tax-exempt certificates provided by American.

7.    **STATEMENT OF WORK AMENDMENTS.** Consultant and American will develop and may periodically review each Statement of Work and, if deemed necessary and agreed to by both Parties, make amendments thereto. In addition to the requirements of Sections 15.12 and 15.13, any amendments to a Statement of Work will (a) refer to this Agreement; (b) identify any applicable Deliverables, Services,

Confidential

and fees; (c) be executed in writing by authorized representatives of Consultant and American; and (d) be included as part of such Statement of Work and attached as an exhibit to this Agreement.

8.    **RIGHTS IN INTELLECTUAL PROPERTY.    Consultant agrees all materials, reports and presentations prepared by Consultant for delivery to American (the "Deliverables") shall be owned exclusively by and be the property of American.    American agrees that it will not, without first obtaining Consultant's approval, which Consultant will not unreasonably withhold, redistribute the Deliverables outside of its organization in any manner that makes attribution of the Deliverables to Consultant.    Consultant will retain ownership of any drafts, notes, analyses, and other workpapers prepared or generated by Consultant during the course of providing the Services.    Consultant shall also retain ownership of its underlying intellectual property, including its knowledge of business principles, and those analytical concepts, approaches, methodologies, models, processes, discoveries, ideas, and formats developed by Consultant staff in the course of our work for Americans, or during our own research ("Consultant Intellectual Property").    In the course of providing the Services, Consultant may also develop or enhance its collective knowledge. Consultant may sanitize such knowledge of all confidential information and/or competitively sensitive information related to American or the Services, and may share that sanitized knowledge with its consulting staff to permit the continuing growth of Consultant Intellectual Property. Consultant hereby assigns to American a perpetual, world-wide, limited, non-transferable license to use Consultant Intellectual Property to the extent necessary to enable American to implement the ideas and recommendations provided by Consultant in the course of providing the Services.**

9.    **WARRANTIES.**

9.1    <u>Product and Services Warranty</u>. Consultant represents and warrants as follows:

(a)    All Services will be performed with care, skill and diligence, consistent with or above applicable professional standards currently recognized in its profession, and that Consultant will be responsible for the professional quality, technical accuracy, completeness and coordination of all plans, information, specifications, computer programs, software, Deliverables and Services furnished under this Agreement.

(b)    The Services and any Deliverables (i) are owned by Consultant, or Consultant otherwise has all necessary rights to provide, sell, distribute or license them hereunder; and (ii) when used as contemplated hereunder, will not infringe upon or violate any IP Right of any third-party.

9.2    <u>General Warranties</u>.

(a)    Consultant represents and warrants to American that (i) Consultant is a corporation, duly organized, validly existing and in good standing under the laws of Massachusetts and has all rights and power necessary to execute, deliver and perform its obligations under this Agreement, and (ii) the execution, delivery and performance of this Agreement by Consultant (A) has been approved by any necessary company action and (B) is not knowingly contrary to, or in conflict with, the formation and governance documents of Consultant, any material agreement by which Consultant is bound or any applicable law.

(b)    American represents and warrants to Consultant that (i) American is a corporation, duly organized, validly existing and in good standing under the laws of the State of Delaware and has all rights and power necessary to execute, deliver and perform its obligations under this Agreement; and (ii) the execution, delivery and performance of this Agreement by American (A) has been approved by any necessary company action and (B) is not contrary to, or in conflict with, the formation and governance documents of American, any material agreement by which American is bound or any applicable law.

                                                            Confidential

10.    **INDEMNIFICATION.**

10.1    Indemnity.

(a)    Consultant shall indemnify, defend and hold harmless American and its Affiliates, and each of their officers, shareholders, directors, and employees (collectively, the **"American Indemnified Parties"**), from and against any and all third party claims, demands, proceedings, suits and actions, including any related liabilities, obligations, losses, damages, fines, judgments, settlements, expenses (including reasonable attorneys' fees) and costs (each, a **"Claim"** and collectively, **"Claims"**), incurred by, borne by or asserted against any of the American Indemnified Parties to the extent such Claim arises directly out of: (i) any intentional or willful conduct or gross negligence of any employee or subcontractor of Consultant, (ii) uncured breach of any representation or warranty of Consultant contained in Section 9.2(a) above; or (iii) any actual or alleged infringement or misappropriation of any third party's IP Rights by any of the Deliverables or Services.

(b)    American shall indemnify, defend and hold harmless Consultant and its Affiliates and licensees, and each of their officers, shareholders, directors, and employees (collectively, the **"Consultant Indemnified Parties"**), from and against any and all Claims incurred by, borne by or asserted against any of the Consultant Indemnified Parties to the extent such Claims arise directly out of: (i) any intentional or willful conduct or gross negligence of any employee or subcontractor of American, or (ii) uncured breach of any representation or warranty of American contained in Section 9.2(b) above.

(c)    In the event of a Claim pursuant to Section 10.1(a)(iii), and in addition to all other obligations of Consultant in this Section 10, Consultant will at its expense and option, either (i) procure for American the right to continue use of such infringing products or services, or any component thereof; or (ii) replace or modify such infringing products or services, or any component thereof, with non-infringing products or services satisfactory to American, provided that Consultant will provide American with a comparable temporary replacement product or reimburse American for the reasonable costs incurred by American in obtaining an alternative product in the event American cannot use the affected Product; provided that such remedy, together with the indemnity obligations hereunder, shall be American's sole recourse against Consultant for any such allegation of infringement.

10.2    Indemnification Procedures.

(a)    Promptly after a party seeking indemnification pursuant to this Section 10 obtains knowledge of the existence or commencement of a Claim, the Indemnified Party will notify the indemnifying Party of such Claim in writing; provided, however, that any failure to give such notice will not waive any rights of the Indemnified Party except to the extent that the rights of the indemnifying Party are actually prejudiced thereby. The indemnifying Party will assume the defense and settlement of such Claim with counsel reasonably satisfactory to the Indemnified Party at the indemnifying Party's sole risk and expense; provided, however, that the Indemnified Party (i) may join in the defense and settlement of such Claim and employ counsel at its own expense, and (ii) will reasonably cooperate with the indemnifying Party in the defense and settlement of such Claim. The indemnifying Party may settle any Claim without the Indemnified Party's written consent unless such settlement (A) does not include a release of all covered claims pending against the Indemnified Party; (B) contains an admission of liability or wrongdoing by the Indemnified Party; or (C) imposes any obligations upon the Indemnified Party other than an obligation to stop using any infringing items.

Confidential

(b) Upon a determination of liability in respect of Section 10, the indemnifying Party will pay the amount so determined within 10 business days after the date of such determination or, if such amount was paid by the Indemnified Party, reimburse the Indemnified Party within 10 business days of such payment. If there should be a dispute as to the amount or manner of determination of any indemnity obligation owed under this Agreement, the indemnifying Party will nevertheless pay when due such portion, if any, of the obligation that is not subject to dispute.

11.    **LIMITATION OF LIABILITY. EXCEPT WITH REGARD TO CLAIMS (I) ARISING UNDER SECTION 4 OR SECTION 12, (II) FOR PROPERTY DAMAGE OR PERSONAL INJURY, OR (III) RELATING TO INDEMNIFICATION OBLIGATIONS CONTAINED IN THIS AGREEMENT, WITH RESPECT TO EACH OF WHICH LIABILITY WILL NOT BE LIMITED PURSUANT TO THIS SECTION 11, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY (OR THE INDEMNIFIED PARTIES OF SUCH PARTY) FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, INCLUDING (WITHOUT LIMITATION) LOSS OF PROFIT, INCOME OR SAVINGS, EVEN IF ADVISED OF THE POSSIBILITY THEREOF.**

12.    CONFIDENTIAL INFORMATION.

12.1    <u>Treatment and Protection</u>. Each Party agrees (a) to hold in strict confidence all Confidential Information of the other Party, (b) to use such Confidential Information solely to perform or to exercise its rights under this Agreement, and (c) not to transfer, display, convey or otherwise disclose or make available all or any part of such Confidential Information to any third party. The receiving Party agrees to comply with any confidentiality agreements between the disclosing Party and any third party related to confidential or proprietary information of such third party. Each Party shall take all measures necessary to protect against the disclosure or use of the Confidential Information as it takes to protect its own proprietary or confidential information (but in any case no less than reasonable measures). In addition, Consultant shall safeguard all of American's Confidential Information, including PII, in accordance with Security Best Practices.

12.2    <u>No Publicity</u>. Neither Party will issue a press release, advertisement or public statement concerning the existence of this Agreement, its contents or the transactions contemplated by it without the express written consent of the other. In addition, because of the nature of the risk involved, except as required by law, no reference may be made to Consultant in any prospectus, proxy statement, offering memorandum or comparable document, or materials prepared for public distribution.

12.3    <u>Remedies Upon Breach</u>. Each Party agrees that the other Party shall have no adequate remedy at law if there is a breach or threatened breach of this Section 12 and, accordingly, that either Party shall be entitled (in addition to any legal or equitable remedies available to such Party) to seek injunctive or other equitable relief to prevent or remedy such breach.

12.4    <u>Exclusions</u>. The term "Confidential Information" shall not include information that is:

(a) in the public domain through no fault of the receiving Party or of any other person or entity that is similarly contractually or otherwise obligated;

(b) obtained independently from a third party without an obligation of confidentiality to the disclosing Party and without breach of this Agreement; or

(c) independently developed by the receiving Party without reference to the Confidential Information of the disclosing Party.

7

12.5 <u>Disclosures Required by Law</u>.   The receiving Party may disclose the Confidential Information of the other in response to a valid court order, law, rule, regulation (including any securities exchange regulation), or other governmental action provided that (a) the disclosing Party is notified in writing prior to disclosure of the information, and (b) the receiving Party assists the disclosing Party, at the disclosing Party's expense, in any attempt by the other to limit or prevent the disclosure of the Confidential Information.

12.6 <u>Return or Destruction</u>.   Upon the termination or expiration of this Agreement or upon the earlier request of the disclosing Party, the receiving Party shall (a) at its own expense, (i) promptly return to the disclosing Party all tangible Confidential Information (and all copies thereof) of the disclosing Party, or (ii) upon written request from the disclosing Party, destroy such Confidential Information and provide the disclosing Party with written certification of such destruction, and (b) cease all further use of the other Party's Confidential Information, whether in tangible or intangible form.   Notwithstanding the foregoing, Consultant may retain, for its internal, confidential records, one (1) copy of each final proposal or Deliverable prepared by Consultant. Unless otherwise requested by American, Consultant will also retain information to be used in any ongoing work with American and one (1) copy of materials necessary to explain the analysis contained in Consultant presentations and reports.   Except upon request by American, Consultant will not retain any drafts of its work for American.


13.   **TERMINATION.**

13.1 <u>Termination</u>.

(a)   Either Party may terminate this Agreement, or any Statement of Work, for cause in the event that the other Party fails to cure a material breach of this Agreement within 30 days after receiving written notice thereof.

(b)   In addition to the foregoing, American may terminate this Agreement, or any Statement of Work, at any time (i) for any reason upon 30 days prior written notice to Consultant or (ii) immediately (A) if Consultant merges with or into or is acquired, in whole or in part, by another entity or sells substantially all of its assets; or (B) in the event American receives any complaint or other objection from any governmental authority that regulates air transportation, including the Department of Transportation, that this Agreement or any part hereof, whether considered by itself or taken together with other agreements to which American or its Affiliates are a party, places American or its Affiliates in breach of such regulations.

13.2 <u>Termination Upon Material Change</u>.   In the event that there is (i) any material change in the applicable rules, regulations, or orders of the U.S. Department of Transportation, or of any other agency or department of the United States or any other government having jurisdiction over air transportation or the sale thereof, or (ii) a significant adverse change generally impacting the airline industry, due to causes beyond the Parties' commercially reasonable control, which material change causes a substantial diminution in either Party's reasonably expected economic benefits under this Agreement, or substantially increases the burden of either Party's performance under this Agreement, then, unless the Parties are able to agree after no more than 30 days of consultation on what, if any, changes to this Agreement are necessary or appropriate to restore an equitable benefit of the bargain, the Party adversely affected by such change may terminate this Agreement upon 5 days written notice to the other Party.

                                          Confidential

13.3    <u>Effect of Termination</u>.  In the event this Agreement is terminated pursuant to this Section 13, (a) the non-terminating Party may pursue any and all remedies available to it under this Agreement, at law or in equity (excluding Electronic Self-Help, as defined in Section 15.16), as the remedies stated herein are cumulative and in addition to any remedies available at law or equity; (b) Consultant shall (i) promptly provide to American all Deliverables for which American has paid and (ii) immediately stop the affected work hereunder and cause any of its suppliers or subcontractors to cease such work; (c) American's liability shall be limited to the price for all products and services delivered to and accepted by American prior to the effective date of termination; and (d) Consultant will reasonably cooperate with American for an orderly transition of the services and/or products contemplated by this Agreement to American.  Notwithstanding the foregoing, except in the event of termination by Consultant pursuant to Section 13.1(a) above, American may, at its option, elect to continue any Statement of Work in effect after such termination to the extent necessary to complete the work thereunder, in which case this Agreement will remain in effect solely for the purpose of completing such Statement of Work.  Unless otherwise specified by American, the termination by American of a single Statement of Work will not affect the terms of any other Statements of Work or this Agreement.

13.4    <u>Surviving Obligations</u>.  Section 8 (Rights in Intellectual Property), Section 9 (Warranties), Section 10 (Indemnification), Section 11 (Limitation of Liability), Section 12 (Confidential Information), Section 14 (Non-Solicitation; Non-Competition), Section 15 (Miscellaneous) and this Section 13.4 (Surviving Obligations), will survive the termination of this Agreement, regardless of the reason for such termination.

14.    **NON-SOLICITATION; NON-COMPETITION.**

14.1    <u>Non-Solicitation</u>.  During the Term and for a period of one year thereafter, each Party agrees that it shall not solicit, entice, persuade or induce any individual who is then, or has been within such period, an employee of the other Party or its Affiliates to terminate employment with such Party or its Affiliates or to become employed by or enter into contractual relations with any other individual or entity.  However, either party shall have the right to hire any individual employed by the other who, without other solicitation, responds to employment advertising in newspapers, trade publications, or other public commercial media or to any unsolicited walk-in candidates not related to this Agreement.

14.2    <u>Non-Competition</u>.

(a)    The Consultant agrees to take certain precautions when serving clients in the same industry.  Specifically, the Consultant shall not assign consultants who have worked with American to serve a competitor on projects similar to that which the Consultant has undertaken for American for one year following the conclusion of the individual's work with American.  Notwithstanding the above, where the team providing services to American includes senior professionals who serve as the Consultant's Practice Area Leaders ("PALs") or topic experts who specialize in an industry or a specific business discipline, the involvement of such PALs or topic experts on an assignment with American will not preclude them from working with other clients in the same industry as American, <u>provided</u> that these individuals, like all employees of the Consultant, will at all times maintain the confidentiality of American's proprietary information and the recommendations the Consultant makes to American.

(b)    The Parties agree that a breach or threatened breach of this Section 14.2 would cause irreparable injury to American for which there would be no adequate remedy at law.  Therefore, American will be entitled to seek injunctive relief restraining and preventing

Confidential

Consultant from any violation thereof. Nothing herein will be construed as prohibiting American from pursuing any other remedies available for any such breach or threatened breach, including the recovery of damages from Consultant.

## 15. MISCELLANEOUS.

15.1   Scope of Rights. Subject to the restrictions contained in this Agreement, each of American and its Affiliates will have the right to use the Services for the benefit of itself and its Affiliates, customers and Airline Associates as identified in the applicable SOW under which Services are to be rendered.

15.2   Relationship of Parties. Nothing in this Agreement is intended or will be construed to create or establish any agency, partnership or joint venture relationship between the Parties. The Parties expressly disclaim such relationship, agree that they are acting solely as independent contractors hereunder and agree that the Parties have no fiduciary duty to one another or any other special or implied duties that are not expressly stated herein. Consultant has no authority to act as agent for, or to incur any obligations on behalf of or in the name of, American or its Affiliates or Airline Associates.

15.3   No License or Other IP Rights Granted. Except as specially provided by this Agreement, nothing herein will be construed as granting or conferring, expressly, implied or otherwise, any licenses or other IP Rights which American now owns or may later acquire.

15.4   Subcontractors. Except for the contractors Consultant may use for production of its reports and presentations, no part of this Agreement may be subcontracted, directly or indirectly, by Consultant without American's prior written approval. In the event that American approves of Consultant's use of a subcontractor, Consultant will remain responsible for the performance, obligations and acts of such subcontractors to the same extent as if such performance, obligations and acts were of Consultant's employees.

15.5   Successors and Assigns. This Agreement will be binding upon, and will inure to the benefit of, the permitted successors and assigns of each Party hereto. Consultant may not assign, delegate or otherwise convey this Agreement, or any of its rights and obligations hereunder, to any other entity without the prior written consent of American, and any attempted assignment or delegation without such consent will be void. American may assign this Agreement to any Affiliate or any successor in interest to all or any part of American's operations, so long as the assignee agrees in writing to be bound by the terms and conditions of this Agreement. American may, from time to time, by written notice to Consultant, delegate one or more of American's duties hereunder to an Affiliate of American.

15.6   Notices. All notices, reports and other communications required or permitted hereunder to be given to or made upon either Party in writing will be addressed as provided below and will be considered as properly given if (a) sent by an express courier delivery service which provides signed acknowledgments of receipt; or (b) deposited in the U.S. certified or registered first class mail, postage prepaid, return receipt requested. All notices will be effective upon receipt. For the purposes of notice, the addresses of the Parties will be as set forth below; provided, however, that either Party will have the right to change its address for notice hereunder to any other location by giving not less than 5 days' prior written notice to the other Party in the manner set forth above.

Confidential

If to American:
American Airlines, Inc.
4333 Amon Carter Boulevard, MD 5358
Fort Worth, TX 76155
Attn:      Manager, IT Vendor Management
Phone:     817-963-5045
Fax:       817-931-9270

If to Consultant:
Boston Consulting Group, Inc.
One Beacon Street
Boston, MA 02108
Phone:     + 1 (617) 850-3700
Fax:       + 1 (617) 850-3903

15.7    Governing Law; Interpretation.  This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, excluding its choice of law provisions; provided, however, that during the Term, the Uniform Computer Information Transaction Act will not apply even if adopted as part of the laws of the State of Texas.  Both Parties hereby consent and submit to the jurisdiction of the state and federal courts in Tarrant County, Texas in all questions and controversies arising out of this Agreement.  The Parties expressly disclaim the application of the United Nations Convention on the International Sale of Goods to this Agreement.

15.8    Headings.  The headings appearing in this Agreement are inserted for convenience only, and will not be used to define, limit or enlarge the scope of this Agreement or any of the obligations herein.

15.9    Counterparts; Execution.  This Agreement may be executed in any number of counterparts, each of which will be an original, and such counterparts together will constitute one and the same instrument.  Execution may be effected by delivery of facsimiles of signature pages (and the Parties will follow such delivery by prompt delivery of originals of such pages).

15.10   Compliance with Law.  Each Party agrees to comply with all federal, state and local laws and regulations applicable to this Agreement.  Each Party represents and warrants that it is qualified to do business in the geographies in which it will perform its obligations under this Agreement, and will obtain all necessary licenses and permits, and satisfy any other legal, regulatory and administrative requirements, necessary to its performance hereunder.

15.11   Severability.  If any one or more of the provisions of this Agreement, or the application thereof in any circumstance, is held to be invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and the remaining provisions of this Agreement will be unimpaired, and this Agreement will continue in full force and effect, unless the provisions held invalid, illegal or unenforceable will substantially impair the benefits of the remaining provisions hereof.

15.12   Waiver.  The failure of either Party to insist upon strict performance or to seek remedy for breach of any term or condition of this Agreement, or to exercise any right, remedy or election set forth herein or permitted by law or equity, shall not constitute nor be construed as a waiver or relinquishment in the future of such term, condition, right, remedy or election.  Any consent, waiver or approval by either Party of any act or matter shall only be effective if made in writing and signed by an officer of the consenting, waiving or approving Party.

15.13   Entire Agreement; Amendment.  This Agreement and any Exhibits and Attachments hereto constitute the entire agreement between the Parties with respect to the subject matter and

Confidential

supersede any prior or contemporaneous agreement or understanding, whether written or oral, if any, between the Parties. The Parties specifically agree that any language or provisions contained on either Party's website or product schedule, or contained in any shrinkwrap or "clickwrap" agreement, shall be of no force and effect and shall not in any way supersede, modify or amend this Agreement. This Agreement is the result of both Parties' review, discussion and negotiation; therefore, any uncertainties or ambiguities will not be interpreted against a Party by virtue of its actual role in preparing this Agreement. This Agreement may be modified only by a further written agreement signed by both Parties.

15.14  Insurance. Consultant shall purchase from and maintain with a company or companies with a rating of "A" or better and lawfully authorized and/or licensed to do business in the jurisdiction in which American is located insurance in at least the following amounts and coverages: (a) Workers' Compensation insurance as required by law, and Employer's Liability coverage with a minimum limit of $500,000 each accident, $500,000 disease-each employee and $500,000 disease-policy limit; (b) General Liability insurance with a minimum limit of $1,000,000 each occurrence and $2,000,000 annual aggregate bodily injury and property damage, which insurance shall be written on a comprehensive form and include coverage for (i) premises and operations, including coverage for independent contractors liability; (ii) products and completed operations; (iii) personal injury liability; (iv) broad form property damage liability and (v) contractual liability to cover liability assumed under this Agreement; (c) commercial umbrella/excess liability insurance with a minimum limit of $2,000,000 each occurrence and annual aggregate; and (d) Professional Liability insurance with a minimum limit of $1,000,000 and, if applicable, Automobile Liability insurance in a minimum amount of $1,000,000. All such insurance shall cover the acts and omissions of Consultant and its employees, agents performing services hereunder, and this Section 15.14 shall not be construed as limiting in any way the extent to which Consultant may be held liable for payment for damages to persons or property resulting from its activities under this Agreement or the activities of any of Consultant's employees or other persons for which Consultant is otherwise responsible. With the exception of Worker's Compensation and Professional Liability insurance, coverage under such policies shall be primary without any right of contribution from any insurance maintained by the additional insureds and, American and its employees, directors and officers thereof shall be included as additional insureds. Such insurance shall (A) be maintained in full force and effect without interruption during the Term, (B) insurers will endeavor to given American 30 days prior written notice of any cancellation or adverse material change in such policies. Consultant will provide American with evidence of such insurance coverage upon execution of this Agreement.

15.15  Force Majeure. Unless otherwise specified in this Agreement, neither Party will be liable for delays or failure in its performance hereunder to the extent that such delay or failure is caused by an event beyond the reasonable control of that Party, including but not limited to acts of God, war, natural disaster, strike, lockout, labor dispute, work stoppage, fire, third-party criminal act, quarantine restriction or act of government (a "**Force Majeure Event**"). In the event a Force Majeure Event continues for more than 30 days within any 6 month period, the other Party shall have the right, at its option, to immediately terminate this Agreement by giving the Party whose performance is so delayed or fails written notice of such election to terminate. In addition, American's payment obligations hereunder shall be suspended for any period that Consultant's performance hereunder is delayed or fails due to a Force Majeure Event.

15.16  Electronic Self-Help. Notwithstanding any rights granted under this Agreement or at law, Consultant hereby waives under any and all circumstances any right it may have or may hereafter have to exercise Electronic Self-Help (as hereinafter defined) prior to the effective

12

date of termination or expiration of this Agreement.  For purposes of this Agreement, **"Electronic Self-Help"** is defined as any use of electronic means to exercise Consultant's rights upon breach of this Agreement.  Consultant agrees that American may pursue all remedies provided under law in the event of a breach or threatened breach of this Section 15.16, including injunctive or other equitable relief.

15.18    <u>Order of Precedence</u>.  In the event of a conflict of terms in this Agreement, the following is the order of precedence in interpretation:  (i) these terms and conditions and (ii) any Exhibits or Attachments, including any Statement of Work.

**THE PARTIES HERETO** have caused the Agreement to be executed by their duly authorized representatives as of the Effective Date.

CONSULTANT                                                 AMERICAN AIRLINES, INC.

By:    _____                  By:    _____

Name:  Raj Varadarajan                           Name:  MONTE FORD

Title:  Partner + Managing Director              Title:  SRVP / CIO

Date:  5/13/08                                   Date:  5-13-2008

Confidential

**EXHIBIT A**
**INITIAL STATEMENT OF WORK**

This Project Agreement (this **"Project Agreement"**), which is issued under the Consulting and Confidentiality Agreement (the **"Agreement"**) dated as of May 13, 2008 between American Airlines, Inc. (**"American"**) and the Boston Consulting Group (**"Consultant"**), is made effective as of May 13, 2008. The terms and conditions of the Agreement are incorporated into and made a part of this Project Agreement. This Project Agreement includes specific terms for the Project (defined below) and the attached Project Description Document, and any related Project Agreement Supplement as mutually agreed between the Parties from time to time (together, the **"Project Agreement"**), which details the Services to be performed. Capitalized terms used in this Project Agreement and not otherwise defined shall have the meaning assigned to such term under the Agreement.

1.      Key Personnel. As applicable for strategic projects..

| **Names of Key Personnel** |
| --- |
| List names or NA |

Project Description
*Task 1. Define and set up governance structure for the project*

Consultant to propose a detailed review of all of American's current PSS plans to primarily understand:
- What are the different parts of the organization whose involvement is critical to the success of the effort?
- How best can stakeholders be engaged – i.e., how to optimize the need for input and buy-in with the need to have lean, empowered project teams which can move and make decisions quickly?
- What governance process would the PSS team use to ensure that decisions reflect key stakeholders' input, and are escalated when appropriate?

The consultant will draw heavily on experience (within and outside of American) to propose a specific project team and governance structure, including:
- Clear identification of key stakeholders and their required level of support
- Rules and guidelines for decision making, including escalation scenarios
- Interdependencies, required communication linkages
- Individual responsibilities and functional implications

In accordance with the PSS project timeline, the Consultant will work on an appropriate governance structure proposal to be finalized by March 14th. Gaining senior buy-in for the governance structure, roles and responsibilities may take some time, but the Consultant will continue to incorporate these activities in parallel with the proposal iterations.

Deliverables:
- Specific team composition reflecting required capabilities and representation
- Map of governance structure and links to existing organization structure

- Published roles and responsibilities, tailored to department (e.g., field operations, HQ function, etc.), and to level of governance structure
- Published governance process including discussion frequency, membership, and likely scope of discussion
- Framework and process for conducting and prioritizing discussions, decisions and conflict resolution
- Detailed escalation process
- List of best practices and key success factors to ensure project success
- Communication detailing governance structure to be provided to key stakeholders/departments

*Task 2. Refine the project plans and set up the PMO structure for this project*

Consultant will provide a PMO proposal based on best practices and experience. This step, requires the American project team to work with the Consultant to articulate the following specific questions:
- Which guiding principles govern establishing project teams?
- Which framework helps identify critical path issues?
- What framework or process should govern interventions, either through escalate or expedite processes?
- What process to ensure stakeholder alignment?
- What would be a good process for managing, reporting, progress tracking mechanisms, and monitoring each project/workstream? The entire program? How would it evolve over time?

Deliverables:
- Recommended capabilities of project managers, and composition and role of PMO
- Recommended capabilities of project team members, from BU and ITS
- Framework for normal, escalate and expedite decisions, which the PMO will facilitate
- Framework to ensure stakeholder alignment, which the PMO will facilitate
- Recommended update process: content, schedule and format, reflecting needs of key stakeholders (governance and organization structure)
- Process to periodically evaluate and realign PMO composition to ensure required capabilities, with the support of HR

2.    Description of Pricing.

| Staff Name | Role | Start and End Dates | Project Length (weeks) | Fixed Weekly Fee | Total Fixed Fees |
|---|---|---|---|---|---|
| Pappudu Sriram Principal | Consultant | 2/4/08 to 3/14/08 | | | |
| Raj Varadarajan Partner | Lead Consultant | 2/4/08 to 3/14/08 | | | |
| Guy Gilliland Partner | Project Management | 2/4/08 to 3/14/08 | | | |
| | | | | $28,000 | |
| **TOTAL** | | | 6 weeks | | $168,000 |

Confidential

3.    <u>Description of Payment and Invoicing schedule</u>.  Per the terms of the Agreement.

4.    <u>Project Coordinators</u>.

| Name of Project Coordinators | Telephone No. | Address |
|---|---|---|
| American | | |
| Consultant | 214-849-1593 | 500 N. Akard, Ste 2600, Dallas, TX 75201 |

In consideration of the mutual covenants in the Agreement, authorized signatories of the Parties have signed below to evidence their agreement to be bound by its terms and conditions of this Project Agreement.

**VENDOR**                                      **AMERICAN AIRLINES, INC.**

By: _____        By: _____

Name: Raj Varadarajan                    Name: Monte Ford

Title: Partner + Managing Director      Title: Sr VP / CIO

Date: 5-14-08                                   Date: 5-13-2008

## EXHIBIT B
## AMERICAN'S SECURITY POLICIES AND PROCEDURES

The following is not intended to be an all inclusive list of security services and obligations necessary to comply with Security Best Practices, but is intended to capture key elements of such a program. American reserves the right to modify the obligations set forth in this Exhibit B or add new obligations, and any such modified or new security requirement, specification or event reporting procedures shall become effective 30 days after written notice thereof from American.

1.      As used in this Exhibit B, the terms set forth in this Section 1 will have the meanings provided herein.

"**Security Policies**" means statements of direction for securing company information pertaining to Security Best Practices and mandating compliance with applicable laws and regulations. Typically, Security Policies are high level instructions to management on how the organization is to be run with respect to Security Best Practices.

"**Security Procedures**" means statements of the step-by-step actions taken to achieve and maintain compliance with Security Best Practices.

"**Security Technical Controls**" means any specific hardware, software or administrative mechanisms necessary to enforce Security Best Practices in accordance with the terms of this Agreement as methods for addressing security risks to information technology systems and relevant physical locations, or implementing related policies. Security Technical Controls specify technologies, methodologies, implementation procedures, and other detailed factors or other processes to be used to implement Security Policy elements relevant to specific groups, individuals, or technologies.

2.      **Information Security Policy.**   Consultant specifically represents and warrants that it has established and during the Term it will at all times enforce:

   (a)      an ongoing program of Security Policies, Security Procedures, and Security Technical Controls;

   (b)      a security incident management program;

   (c)      a security awareness program;

   (d)      business continuity and recovery plans, including regular testing;

   (e)      rigorous change control procedures; and

   (f)      procedures to conduct periodic independent security risk evaluations to identify critical information assets, assess threats to such assets, determine potential vulnerabilities, and provide for timely remediation.

2.      **Physical Access.**   Consultant specifically represents and warrants that it has established and during the Term it will at all times enforce:

   (a)      physical protection mechanisms for all information assets and information technology to ensure such assets and technology are stored and protected in appropriate data centers;

   (b)      appropriate facility entry controls are in place to limit physical access to systems that store or process data;

   (c)      processes to ensure access to facilities is monitored is and restricted on a "need to know" basis; and

    (d)    controls to physically secure all Confidential Information and to properly destroy such information when it is no longer needed;

4.    **Logical Access.** Consultant specifically represents and warrants that it has established and during the Term it will at all times enforce:

    (a)    appropriate mechanisms for user authentication and authorization in accordance with a "need to know" policy;

    (b)    controls to enforce rigorous access restrictions for remote users, contractors and service providers;

    (c)    timely and accurate administration of user account and authentication management;

    (d)    processes to ensure assignment of unique IDs to each person with computer access;

    (e)    processes to ensure Consultant-supplied defaults for passwords and security parameters are changed and appropriately managed ongoing;

    (f)    mechanisms to track all access to Confidential Information by unique ID;

    (g)    mechanisms to encrypt or hash all passwords; and

    (h)    processes to immediately revoke accesses of inactive accounts or terminated/transferred users.

5.    **Security Architecture and Design.** Consultant specifically represents and warrants that it has established and during the Term it will at all times maintain:

    (a)    a security architecture that reasonably assures delivery of Security Best Practices;

    (b)    documented and enforced technology configuration standards;

    (c)    processes to encrypt Confidential Information in transmission and storage;

    (d)    processes to ensure regular testing of security systems and processes;

    (e)    a system of effective firewall(s) and intrusion detection technologies necessary to protect Confidential Information; and

    (f)    database and application layer design processes that ensure web site applications are designed to protect the information data that is collect, processed, and transmitted through such systems.

6.    **System and Network Management.** Consultant specifically represents and warrants that it has established and during the Term it will at all times maintain:

    (a)    mechanisms to keep security patches current;

    (b)    processes to monitory, analyze, and respond to security alerts;

    (c)    appropriate network security design elements that provide for segregation of data;

    (d)    use and regular update anti-virus software; and

    (e)    processes to regularly verify the integrity of installed software.

                   Confidential

## **EXHIBIT B**

## **CASCADE PROJECT STATEMENT OF WORK**



January 9, 2012


Tom Horton
Chairman, President, and CEO
AMR Corporation
4333 Amon Carter Blvd.
Fort Worth, TX 76155

Dear Mr. Horton,

The following statement of work, entered into and governed by the terms of the Consulting Services and Confidentiality Agreement between American Airlines, Inc. and The Boston Consulting Group, Inc. effective May 13, 2008, recaps the management restructuring effort and lays out the objectives, work approach and BCG resource support.


## 1   The Management Cascade

American has advised BCG that it would like to redesign its management structure to ensure it is well positioned for a successful future. In particular, American has advised BCG that it wants to create:

- The right team for the job ahead

- A management structure that fosters accountability and high performance, adaptability, and fast, effective decision making

- An efficient cost structure that makes American competitive

BCG will be launching a process to redesign the organization against these objectives, utilizing a unique, well tested and proven methodology which it has developed over time.  The process is a "cascade"– which starts with the top layer of the organization and "cascades" down.  As each layer is designed, the managers in that layer design the next, and so on.  The overall concept of the approach is:

| Cascade-redesign typically motivated by combination of objectives | <ul><li>*Responsiveness:* Flatten the pyramid, increase spans of control, structure for more agile decision making</li><li>*Talent:* Ensure that our best people are in the right roles</li><li>*Cost:* Meaningful streamlining of management</li></ul> |
| --- | --- |
| A   fact-based,   disciplined | • Key to achieving transformational and enduring results |



| process and fair/objective process | • Fair and objective<br>• Rooted in facts on roles, reporting and shape of pyramid |
|---|---|
| The process starts at the top and cascades down | • Top layer designs and staffs the next layer ... cycle continues<br>– Everyone participates<br>– the top layers set the direction for the "outcome"<br>– the new team owns the structure and selection that results |
| Hard work, but important and unifying | • Steering Team working together<br>• Important to "wire in" ongoing progress |

BCG's methodology incorporates key steps that have been refined over the years and consistently proven necessary to achieving the objectives American has defined for this effort:

- The diagnostic step involves gathering a detailed fact-base for the current organization. This step often surfaces opportunities where spans of control may be low, banding levels are over-stated, activities may be in the 'wrong' place, and/or the number of layers is high.

- The planning step then sets up "principles and design rules" for a redesign to address these opportunities as well as other strategic objectives for the company

- Finally, the cascade redesign does the actual redesign of the organization (structure and people) – layer by layer – consistent with these "principles and design rules."

The cascade redesign is a well coordinated set of activities that allows each manager to create an effective and efficient organization. Each manager is given the responsibility to determine how his/her work should be organized (i.e., "what boxes should be below them") and whom to staff in those "boxes" as his/her direct reports. This begins the process of putting the strongest talent in the top positions, and instilling principles of accountability and performance.

The redesign of the organization – structure and talent – requires a high degree of thoughtfulness and work activity. The CEO will decide on how best to organize the work and staffing for his direct reports (layer 2). The CEO's direct reports will then need to do this for their direct reports (layer 3). Those individuals will need to do the same. This process repeats until all managers in the organization have gone through this process.

At each layer, BCG will use the following process:
- **Launch and baseline:** The manager reviews current organizational baseline for all responsibilities – old and newly acquired – to determine how the work is being done today. It is also at this point that the manager is informed of the budget he/she has for headcount and any other rules that would affect design and staffing.

- **Design:** In this step, the manager designs the positions in the immediate layer below him/her. At this point, the manager will organize work to optimize output. Unneeded work



activities will also be identified and eliminated. Job descriptions may need to be rewritten. The level of each job may also need to be reviewed to ensure consistency across the organization. Recognizing this cannot be done "in a silo," there is a peer-review to ensure that the organization, as newly structured, will better support each other. If one manager objects to how another would like to design his/her organization, those issues are surfaced, discussed, and the best outcome agreed on. In BCG's experience, it has been observed that sub-groups sometimes form across the company tasked with similar outputs – if these exist, the associated work is eliminated at this point in the process. Questions of centralization and decentralization are also addressed and changes to historical precedent can be made.

- **Staff:** Once the manager has determined the best design for his/her team, he/she now reviews and selects candidates to be on the team. Managers will need to know 1) who is available to be staffed, 2) the historical job performance of those candidates, and 3) the future potential of those candidates. Managers will also need to consider the potential to hire candidates into American when the newly defined roles require expertise and knowledge not currently available inside the organization. As in the previous step, selections are subject to a peer review where conflicts are resolved (e.g., two managers would like to staff the same candidate).

- **Communicate:** In this final step, the manager communicates to all affected employees, first individually and then as a team.

Once announcements are made to the organization, this newly staffed employee will begin the process of designing his/her organization with the "launch and baseline" step and the cascade continues.

Each cycle takes ~4-5 weeks and the timeline is noted below (timing may be a bit longer in more complex cycles).

The process begins with one manager designing his direct reporting structure in the first cycle (the CEO designing layer 2), but quickly grows to 8-10 managers designing their direct report structures for layer 3, and ultimately many managers designing their direct reporting structures in parallel for the lower layers. The complexity and need for coordination become critical throughout this "multi-tasked" process.

## 2. Project governance

BCG recommends that the cascade be governed by a Steering Team made up of the CEO and his direct reports. This Steering Team will be formed after going through the first cycle of the cascade. The Steering Team will be responsible for overall leadership of the effort and addressing conflicts that arise during peer reviews for both the Design and Staff phase of the cascade.

BCG also recommends putting in place an Operating Team that will be responsible for day-to-day program management of the entire effort. This team will also be responsible for ensuring that



process discipline is maintained throughout the effort and that the agreed-to objectives are being met at each layer.

## 3  Timeline

The timing for the management cascade follows a typical rhythm of ~6-7 weeks of planning/ diagnostic, followed by ~4-5 weeks for each cascaded layer.  BCG will push to a "clocked" timetable, recognizing that events within the company may add a few weeks to the total.  The approximate timeline BCG will be working towards (which includes 4 weeks per layer) is shown below:



## 4  Deliverables

At the end of this effort, American should expect the following

- An organization that has been redesigned with respect to the future of American.  The organization will be focused on the future and on creating competitive advantages that benefit American in the current and anticipated industry structure.

- A learning organization that is agile enough to take calculated risks and be more responsive to industry changes

- The removal of duplication that has come to exist over the course of time



- More complete job descriptions and appropriate job leveling that will serve as a tighter control over the ongoing evolution of organizational structure and design

- The removal of low-value adding activities and work products which consume time and resource today, but will not going forward

- The best "talent" in American's key managerial roles, giving renewed energy and thinking to their responsibilities, including the identification of talented individuals who American would like to elevate into more senior roles

- Each team member vested with a sense of ownership of the organization which they designed and accountability for its performance

## 5  Why BCG is uniquely positioned to support this cascade

BCG's role is to work with the American team to facilitate and drive a successful cascade process. BCG will provide deep experience in this type of work, an outside/objective perspective, analytical contributions to the design, and tools that help run an efficient process. BCG and American will work very closely together on each of these activities because it is important that the ultimate organizational decisions, while arrived at by a BCG-facilitated process, are American's decisions.

Over time BCG has developed a unique, proven methodology to move as efficiently as possible and to steer clear of potential obstacles that can delay the process or dilute the intended outcome. BCG will deploy this methodology while "customizing" to the realities of American's specific situation.

In addition to having a track record of success using the cascade methodology, BCG is also uniquely positioned to support American given BCG's long history with the company and the resulting depth of understanding of American's organization. BCG has worked with American since 1994, across headquarters and in the field, with both management and frontline employees, and in the most recent years with the Commercial team, Operations, Maintenance, HR, Airports and others. This in-depth understanding of American will help the cascade process get traction very rapidly, and ensures that BCG can support American in making decisions grounded in the realities of the business.

Finally, BCG will be leveraging the full strength of BCG and specifically its Organizational Practice Area and Travel & Tourism Practice Area for relevant tools and benchmarks.

Please find a more complete set of BCG credentials in the attached appendix.

## 6  Working Together and Resourcing

It is critical that this be an American-led redesign. BCG will serve as an objective advisor and catalyst, and will provide process support and leadership.



On the American side, it will want to form the Steering Team (the CEO and his direct reports) plus an Operating Team (co-led ideally by two steering team members, but including Officers from different functions).

On behalf of BCG, Ken Keverian, Raj Varadarajan, Vikrant Bhatia and Kevin Kelly are each experienced with this uniquely BCG type of redesign work and will provide overall leadership. In addition BCG will field a team of dedicated consultants to work through all phases of the cascade (diagnostic, planning, cascade redesign).

In terms of resourcing, BCG will start with a somewhat smaller team during diagnostic and planning, and ramp to a larger team during cascade redesign (which must support design activities across the entire organization).

BCG's rate will be a flat fee of $254,500 per week for the first 6 weeks (with a team of ~8.8 Full Time Equivalents, or FTEs) and a flat fee of $392,500 per week for the final 26 weeks (team of ~13.5 FTEs) – with the total cost of the effort not to exceed $11,732,000 for the scope of work outlined. This includes both professional fees plus expenses.

Note that while for these types of efforts it is common for work weeks to exceed 50 hours per FTE – BCG has conservatively budgeted assuming ~50 hour work-weeks for the effort. Also note that the precise project duration and team size may vary from the estimates stated above – though the effort will remain within the "not-to-exceed" cost for the scope of work outlined.

\* \* \*

BCG understands this is a historic time for American – a time to rebuild the company to be the very best in its industry.

Regards,

Ken Keverian
Senior Partner &
Managing Director

Raj Varadarajan
Partner &
Managing Director

Vikrant Bhatia
Partner &
Managing Director

Agreed to: _____



**Appendix: Firm qualifications and experience**

BCG is a global management consulting firm, founded by Bruce Henderson in 1963. It has 74 offices in 42 countries, and its current CEO is Hans-Paul Bürkner. We partner with clients in all sectors and regions to identify their highest-value opportunities, address their most critical challenges, and transform their businesses.



Today, BCG has more than 4,800 consultants, and >$3B in revenues. Since 1990, our growth has exceeded that of competitors by 1.5-2.0x. Moreover, greater than 75% of our revenues are derived from clients that we have served for more than five years. This attests to the value we create for our clients and their satisfaction in our work.

BCG prides itself on its employee-focused culture, and over the last four years has been the only top-tier consulting firm to appear in Fortune magazine's 'Best companies to work for' report. In the 2011 list, BCG is listed as the 2nd best company to work at, and is the only top-tier consulting firm to appear in the top 100.

BCG is a private partnership with over 600 partners worldwide. BCG is organized in a matrix structure, with both industry-oriented Practice Areas and functionally-oriented Practice Areas. Our partners and many of our more senior consultants typically 'specialize' in specific topic areas (either industry or functional or both). This specialization allows BCG to bring the deep domain expertise to



bear in solving many of our client problems. Our structure and working style are especially amenable to leveraging the broader capabilities that BCG possesses (domain expertise, geographical expertise, client relationships, etc.) as needed in any client engagement. This organization is illustrated in the following figure.



**Our Heritage**

Since its inception in 1963, BCG has been at the forefront of business management. Many of our ideas and concepts — such as time-based competition, the growth/share matrix, capabilities-based competition, and the experience curve — have had such a fundamental impact on the success of corporations that they have become central to the business lexicon. BCG continues to lead the way on issues at the vanguard of management thinking and practice, such as organizational effectiveness, global advantage, value management, sustainability, and networks. We take pride in seeing our ideas successfully implemented. Many of our deepest client relationships have been with companies that transformed their industries. This tradition of transforming businesses continues to motivate us today.

We have been recognized for our global impact:
- "The Boston Consulting Group is the most influential source of strategic advice worldwide" — *Financial Times*



- "The most profound conceptual innovation in management consulting over the last decades was initiated by Bruce Henderson, founder of The Boston Consulting Group in 1963" — *The Economist*

- "I like some consultants: those who make you think. The Boston Consulting Group is the most interesting of the consulting companies, because they question fundamentally what's going on" — *Tom Peters, author of "In Search of Excellence"*

**Overview of BCG's Travel, Tourism, Transportation, and Infrastructure Practice**

BCG's Travel, Tourism, Transportation, and Infrastructure practice works with companies in the transportation spectrum, as well as with companies in related industries. Our practice has dozens of expert partners worldwide with significant experience and deep expertise in the sector. In addition we can access hundreds of consulting professionals worldwide to draw upon any needed expertise (e.g., functional, geographical, etc.) that may be needed.

We have considerable experience and expertise across the travel and tourism sector, with hundreds of projects completed for clients in the past five years. Much of the work of this practice focuses on aviation strategy, organization and operations.

BCG has an extensive and impressive set of clients, including:
- 10 of the world's busiest airports.
- Two of the three largest global travel agencies.
- 6 of the world's largest hotel groups.
- Two of the five largest air freight and logistics companies (by traffic).
- Three of the four largest airframe manufacturers and two of the world's largest aerospace and defense corporations.
- More than 15 rail companies (passenger and cargo) globally.
- Numerous private equity companies with travel and tourism interests.

Each year, the practice invests in sector R&D, some of which is turned into industry publications (a sample of which is displayed below).









**Overview of BCG's Organization Practice**

BCG believes that people, working together, are the basis of competitive advantage. We help clients to achieve competitive advantage through a focus on their people and the financial performance of the company. We strive to improve employee engagement and company performance in all our client work. Without focusing on the two in tandem, real change and sustainable competitive advantage cannot be achieved.

Our organization practice has hundreds of partners and principals worldwide with significant experience and deep expertise in different areas – ranging from organizational psychology, to change management, to engagement, to talent development.

Our value proposition is focused on levers that are top issues for CEOs. A significant portion of our focus is placed on building leadership, designing the organization for alignment / accountability, hiring and developing the "right" people and driving a sustained change (see next figure).



We have considerable experience and expertise across the organization practice, with over a thousand projects done for clients in the past three years. Many of these projects have focused deeply on organizational design and the cascade process. Many of these efforts have been organization projects with airlines.



In addition to these efforts, BCG has invested in R&D to further our capability and credentials in the Organization practice.   This has resulted in several internal and external publications (see next figure).



Throughout the course of this effort, we will draw on the expertise from two Practice areas, as well as from the broader BCG population as needed, to ensure we are addressing any and all of your needs.

## EXHIBIT C

**KEVERIAN DECLARATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re | Chapter 11 |
| **AMR CORPORATION, *et al.*,** | Case No. 11-15463 (SHL) |
| Debtors. | (Jointly Administered) |

### DECLARATION OF KEN KEVERIAN IN SUPPORT OF EMPLOYMENT AND RETENTION OF THE BOSTON CONSULTING GROUP, INC., AS STRATEGIC CONSULTANTS TO AMERICAN AIRLINES, INC., *NUNC PRO TUNC* TO THE COMMENCEMENT DATE

I, KEN KEVERIAN, under penalty of perjury, declare as follows:

1.      I am a Senior Partner and Managing Director at The Boston Consulting Group, Inc. ("**BCG**"), a consulting services firm, which has offices located at 53 State Street, Boston, Massachusetts 02109.  I am duly authorized to make this Declaration on behalf of BCG in support of the application (the "**Application**")[1] of AMR Corporation, American Airlines, Inc., AMR Eagle Holding Corporation, and certain of their subsidiaries (collectively, the "**Debtors**" or "**American**") for entry of an order authorizing the employment and retention of BCG as strategic consultants for American, *nunc pro tunc* to the Commencement Date, under the terms and conditions set forth in the Statement of Work attached hereto as Exhibit 1.  I submit this Declaration in accordance with Sections 327(a) and 328(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2014(a), 2016 and 5002 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rules 2014-1 and 2016-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "**Local Bankruptcy Rules**").

---

[1]      All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Application or the Statement of Work, as appropriate.

2.    Except as otherwise noted, the statements set forth herein are as a result of my employment position and diligence undertaken by me or by persons working under my direction and, if called and sworn as a witness, I would testify competently thereto.

A.    **BCG's Qualifications**

3.    Founded in 1963, BCG is a global management consulting firm and the world's leading advisor on business strategy.  BCG is a private company, which, in combination with its various affiliates, has seventy-four offices in forty-two countries.[2]  BCG's 4,800 consultants come from a wide variety of backgrounds, holding diplomas in all disciplines, from business administration and economics to engineering and law.

4.    BCG's consultants have substantial expertise and extensive experience in the transportation industry, within which BCG has played a significant role in improving corporate strategy, brand development and management, as well as operational effectiveness and sustainability.  Through these projects, BCG has helped its clients create competitive advantages by enhancing their operating performance and building strategic capabilities.

5.    Further, BCG has worked with American on major assignments over many years and holds substantial institutional knowledge of its operations, organization, strategy and management.    Most recently, with regard to American's effort to improve heavy maintenance operations, BCG helped to identify drivers and opportunities for longer term operational performance improvement, as well as initiatives that should result in measurable improvement.  With regard to American's effort to maximize revenue, BCG provided analytical support to pinpoint short-term and long-term revenue enhancement opportunities, and recommended specific initiatives, including product enhancements, to capture maximum value.

---

[2]    BCG's foreign affiliates are separate corporate entities that will not be working on this engagement.

EAST\47982999.1

These assignments and others have provided an invaluable foundation for continuing to serve American.

6. BCG has been approached by American to assist on a new assignment. This assignment will assist American in implementing a new management restructuring strategy. This program is aimed at helping American redesign the organization of management to foster greater accountability, high performance, adaptability, as well as fast and effective decision-making. BCG also will help design a more efficient management cost structure.

7. Accordingly, BCG has the skills, qualifications and expertise necessary to assist American in an efficient and cost-effective manner.

**B. Proposed Services[3]**

8. As described in the Statement of Work, BCG will provide, among other things, services to launch a "cascade" program, helping to create a management structure that fosters greater accountability, high performance, adaptability, as well as fast and effective decision-making. The program starts at the top and cascades down from there. In essence, the program will result in redesigning the management structure at American so that it is more focused, efficient, and competitive. BCG's program is a methodology which BCG has uniquely utilized that has resulted in successful redesigns of management structures at companies in various industries.

9. The cascade process includes several key steps:

● The initial diagnostic step involves gathering a detailed fact-base for the current organization. This step often surfaces opportunities where spans of control may be low,

---

[3] The summary of the Statement of Work contained in this declaration is provided for purposes of convenience only. In the event of any inconsistency between the summary contained herein and the terms and provisions of the Statement of Work, the terms of the Statement of Work shall control.

3

banding levels are over-stated, activities may be in the wrong place, and/or the number of layers is high.

- The next step is the planning step. The planning step sets up principles and design rules for a redesign to address the opportunities as well as other strategic objectives for the company.

- The final step is the cascade redesign. This step involves the actual redesign of the organizational structure at all management layers.

10.    BCG estimates that the cascade engagement will take approximately thirty-two (32) weeks to complete for all layers of management at American.

11.    To the extent that American requests additional services in the future other than those detailed in the Statement of Work, American shall seek further application for an order of approval by the Court for a supplement to the retention and any related modifications to the Statement of Work and such application shall set forth, in addition to the additional services to be performed, the additional fees sought to be paid.

12.    The services that BCG provides will help overall organization effectiveness. To the best of my knowledge, the services will not duplicate the services of any other professional that the Debtors have retained in these cases. In addition, BCG will use reasonable efforts to coordinate its services with the Debtors and their other professionals.

C.    **Compensation**

13.    Subject to Court approval, and in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, the Fee Guidelines and any other applicable procedures and orders of this Court, American will

EAST\47982999.1

compensate and reimburse BCG in accordance with the terms and conditions of the Statement of Work.

14.    In the ordinary course of its business, BCG normally bills on its engagements based on a project basis which takes into consideration the resources and duration associated with each engagement. In determining its compensation structure, BCG's proposed fees include all expenses associated with this engagement. American and its estate, therefore, will incur no additional charges for the reimbursement of actual, necessary expenses incurred by BCG in performing its services under the Statement of Work. American will compensate BCG in accordance with the terms and conditions of the Statement of Work, which provide a compensation structure as follows: American will pay BCG a flat fee of $254,500 per week (with a team of approximately 8.8 FTEs) for the first six (6) weeks and $392,500 per week for the final twenty-six (26) weeks (with a team of approximately 13.5 FTEs), with the total cost of the effort not to exceed $11,732,000.[4] On average, BCG's consultants, when on a project such as this, work approximately sixty (60) hours per week. To cost-out this effort, BCG has used a conservative estimate of fifty (50) hours. BSG estimates that during the course of this engagement in excess of 15 consultants will work on this engagement. BCG will not be utilizing any subcontractors or employees of foreign affiliates for the proposed engagement.[5] Again, fees are inclusive of expenses. This flat fee was developed based on analyzing the total persons working on the engagement and the amount of hours that BCG estimates will be spent on this engagement utilizing a blended rate of $580 per hour per person. BCG intends to apply for

---

[4] BCG has agreed to notify the United States Trustee when the scope of work is completed.
[5] Prior to the filing of the application for approval of the Cascade Engagement, BCG used a subcontractor on a limited basis for word processing matters. Pursuant to communications with the United States Trustee, BCG will not use this subcontractor on the Cascade Engagement going forward.

5

compensation periodically but not more frequently than monthly for professional services rendered in connection with these cases.

15.    To the best of my knowledge, the compensation arrangement reflected herein is consistent with, and typical of, arrangements entered into by other similarly situated consulting firms rendering similar services for clients such as American.

16.    Although it is not BCG's normal practice to keep detailed time records for its engagements, for this engagement BCG will maintain time records in half-hour (0.50) increments setting forth, in a summary format, a description of the services rendered by each professional and the amount of time spent on each date by each such individual in rendering services on behalf of American.  For purposes of fee applications, BCG intends to rely on the blended rate of $580 per hour per person.

17.    In light of the foregoing, and to the best of my knowledge, information and belief, I believe BCG's fee structure is market-based and fair and reasonable.

18.    BCG has not shared or agreed to share any of its compensation or reimbursement from American with any other person.  BCG has not shared or agreed to share any compensation or reimbursement received by another person from the Debtors.

**D.    Indemnification and Contribution Provisions**

19.    As part of the overall compensation payable to BCG under the terms of the Statement of Work, American has agreed to certain indemnification and contribution provisions described in Consulting Services and Confidentiality Agreement between American Airlines, Inc. and BCG, effective as of May 13, 2008 (the "**Consulting Agreement**") which is attached as an exhibit to the Statement of Work (the "**Indemnification Provisions**").   The Indemnification Provisions, in part, provide that American shall indemnify, defend and hold

6

harmless BCG and its Affiliates and licensees, and each of their officers, shareholders, directors, and employees (collectively, the "**Consultant Indemnified Parties**"), from and against any and all Claims incurred by, borne by or asserted against any of the Consultant Indemnified Parties to the extent such Claims arise directly out of (i) any intentional or willful conduct or gross negligence of any employee or subcontractor of American, or (ii) unsecured breach of any representation or warranty of American contained in Section 9.2(b) of the Agreement.

20.     The terms of the Statement of Work, including the Indemnification Provisions, were fully negotiated between American and BCG at arm's length and BCG respectfully submits that the Indemnification Provisions are reasonable and in the best interests of American, its estate and creditors.

**E.     BCG's Disinterestedness**

21.     During the ninety (90) day period prior to the Debtors' bankruptcy filing, BCG received one payment from the Debtors in the amount of $1,160,000 on September 14, 2011 for work performed in July 2011 and invoiced on August 12, 2011.  Prior to the Debtor's bankruptcy filing, BCG also invoiced American for work in the aggregate amount of $6,503,200 for which it has not been paid.  This amount remains outstanding and relates solely to amounts owed pre-petition under the Revenue Improvement Project (as defined below), the Base Maintenance Project (as defined below) and the Line Maintenance Project.[6]  Subject to entry of an order approving this retention, BCG agrees to waive this prepetition claim.

22.     Between September 2011 and January 2012, BCG provided services relating to the Debtors' base maintenance organization (the "**Base Maintenance Project**"). Between June 2011 and January 2012, BCG also rendered services that enhanced the Debtors'

---

[6] The Line Maintenance Project involved non-bankruptcy related work by BCG seeking to improve the line maintenance operations of American to reduce delays and cancelations.

EAST\47982999.1

overall efforts to maximize revenues (the "**Revenue Improvement Project**"). The services provided under these agreements was rendered in the ordinary course of the business of the parties. Both engagements were non-bankruptcy assignments totally unrelated to the administration of the Debtors' estate. Both engagements were initiated prior to the proposed Cascade Project and were completed shortly after the Debtors' bankruptcy filing. With respect to the Base Maintenance Project, BCG identified certain operations at the Debtors where performance was declining. BCG also identified what could be done to improve performance for these operations. With respect to the Revenue Improvement Project, BCG assisted American to develop steps to improve its revenue performance by understanding both positive and negative historical revenue issues and to develop initiatives to enhance the positive revenue drivers and to address the negative revenue issues. After the Debtors' bankruptcy filing, the Debtors requested BCG to continue working on the Base Maintenance Project and the Revenue Improvement Project in the ordinary course of business. This work has been fully completed and accepted by the Debtors. As set forth above, BCG is not seeking any compensation for any pre-petition amounts owed under these agreements. The Debtors currently owe $1,867,600 (Revenue Improvement Project) and $812,000 (Base Maintenance Project) for post-petition work and BCG has been advised by the Debtors that these amounts will be paid in the ordinary course of business.[7]

23.     The Debtors have numerous creditors, equity holders and other parties with whom they maintain business relationships. In connection with its proposed retention by American in its chapter 11 case, BCG undertook to determine whether it had any conflicts or other relationships that might cause it not to be disinterested or to hold or represent an interest

---

[7] These projects were also flat fee compensated matters staffed by BCG employees with blended rates comparable to those being assigned to the Cascade Project.

EAST\47982999.1

adverse to American. BCG obtained from the Debtors and/or its representatives a conflicts checklist with the names of individuals and entities that may be parties in interest in these chapter 11 cases ("**Potential Parties in Interest**"). A categorized summary of the conflicts checklist is provided on Exhibit 2 annexed hereto. Specifically, BCG searched the list of Potential Parties in Interest against a list of BCG's current and former clients during the last two (2) years. Pursuant to the terms of the contracts with its current and former clients, the identities of BCG's current and former clients are confidential.

24.    To the best of my knowledge and belief, insofar as I have been able to ascertain after reasonable inquiry, neither I, nor BCG, nor any of its professional employees has any "connection"[8] with American, its creditors, or any other Potential Parties in Interest in these chapter 11 cases, except as follows:

(a)    Before the Commencement Date, BCG rendered prepetition services to American for which fees and expenses remain outstanding. Upon entry of the order approving this Application, BCG will waive its claim for such prepetition amounts.

(b)    BCG is a large consulting firm and it and its affiliates have provided and are currently providing consulting services to various Potential Parties in Interest. To the best of my knowledge, information and belief, BCG's services to such Potential Parties in Interest were and are on unrelated matters wholly unrelated to these chapter 11 cases and such representation does not constitute an interest materially adverse to American.

(c)    A few of the employees of BCG working on this engagement are also working on an engagement for an entity which American has advised is an affiliate of American. To the best of my knowledge, information and belief, BCG's representation of that entity is wholly unrelated to the proposed engagement and such representation does not constitute an interest materially adverse to American.

---

[8]    Neither the term "connection," as used in Bankruptcy Rule 2014, nor the proper scope of a professional's search for "connection" has been defined, and I am therefore uncertain as to what this Court may consider a "connection" requiring disclosure. Out of an abundance of caution, I am disclosing that BCG has or has had engagements with Potential Parties in Interest, but, to my understanding, no such engagement is disqualifying or problematic under either the Bankruptcy Code or the applicable standards of professional ethics.

(d)    BCG has, in the ordinary course of its business, purchased and is expected to
continue to purchase, goods and services and has banking, insurance and other
commercial relationships with various organizations, including professionals, on
the list of Potential Parties in Interest. To the best of my knowledge, information
and belief, these relationships in no way create a conflict which would in any way
disqualify BCG from working for American.

(e)    Furthermore, based upon responses received, a few employees of BCG and its
affiliates have immediate family members that are related to employees of the
Debtors, are employed by the Debtors, or have business relationships with the
Debtors. To the best of my knowledge, information and belief, none of these
individuals will be connected with this proposed engagement. Moreover, none of
the persons who have such connections with BCG are insiders of the Debtors.

(f)    In addition, to the best of my knowledge, information and belief, a few employees
of BCG may hold equity securities of the Debtors. To the best of my knowledge,
information and belief, each individual, however, holds a *de minimis* amount of
securities. Moreover, to the extent that any of these employees are consultants
(not administrative/staff personnel), subject to entry of the Order approving such
retention, such employees shall sell such equity securities as requested by the
United States Trustee.

25.    To the best of my knowledge, information and belief, six Potential Parties

in Interest are current or former clients whose revenues (for each client) accounted for more than

one percent of BCG's gross annual revenue on a consolidated basis in the years 2010 and/or

2011. None of these Potential Parties in Interest accounted for more than four percent of BCG's

gross annual revenue on a consolidated basis in 2010 or 2011.[9]  BCG's work for these clients

involved advice with respect to strategy and operations services, general business consulting

services, and management consulting services. Other than the work provided to American, the

work for these clients does not relate in any way to American (or any other Airline) or these

Chapter 11 cases.

26.    I am not related or connected to and, to the best of my knowledge after

reasonable inquiry, no other professional of BCG who will work on this engagement is related or

connected to any United States Bankruptcy Judge for the Southern District of New York, the

---

[9] American is one of these entities.

EAST\47982999.1

U.S. Trustee for the Southern District of New York or any employee in the Office of the U.S. Trustee for the Southern District of New York except for the following connections (the BCG personnel related to the connections described below will not be working on the proposed engagement):

      a.    A BCG employee's husband served as a law clerk to the Honorable Allan L. Gropper; and

      b.    A BCG employee serves on a board of a school with the Honorable Allan L. Gropper.

      27.    To the best of my knowledge, information and belief, insofar as I have been able to ascertain after reasonable inquiry, BCG has not been retained to assist any entity or person other than American on matters relating to, or in direct connection with, the chapter 11 cases. If the Court approves American's proposed retention of BCG, BCG, during the duration of this engagement, will not accept any engagement or perform any service for any entity or person other than American in these chapter 11 cases. BCG will, however, continue to provide professional services to entities or persons that may be creditors of American or Potential Parties in Interest in the chapter 11 cases, *provided* that such services do not relate to, or have any direct connection with, the chapter 11 cases and/or the services to be provided by BCG to the Debtors.

      28.    In addition, BCG and its affiliates, consistent with practice across BCG entities that provide client services, serve clients across a broad range of industries, functions, and geographies, and, within industries, serve competitors and do so in a manner that protects the confidentiality of each client's information (including the confidentiality of the engagement itself). Thus, BCG and certain of its affiliates may have in the past provided services for, may presently be providing services for, and may in the future provide services for entities that are

11

determined to be creditors, lenders, shareholders, insurers, customers, competitors, vendors, contract counterparties, or otherwise Potential Parties in Interest; however, to the best of my current knowledge, information and belief, subject to the caveats set forth herein, such services do not focus on direct commercial relationships or transactions between such companies and American. BCG and its affiliates do however, from time to time provide overall strategic analysis and advice to companies that operate in the airline, transportation or other fields in which American operates, which analysis and advice could include, *inter alia*, review and comment on publicly available information which may mention American, as well as other companies.[10]    Similarly, certain members of BCG and its affiliates may have business associations with certain of American's creditors or other Potential Parties in Interest, or interests adverse to such creditors or Potential Parties in Interest herein, which associations to the best of my knowledge and information have no connection with these proceedings.

29.    To the best of my knowledge and belief, insofar as I have been able to ascertain after reasonable inquiry, none of the employees of BCG working on this engagement on American's behalf has had, or will have in the future, direct contact concerning the chapter 11 cases with American's creditors, other Potential Parties in Interest, the U.S. Trustee or anyone employed in the Office of the U.S. Trustee other than in connection with performing consulting services on behalf of American.

30.    Accordingly, except as otherwise set forth herein, and insofar as I have been able to determine after reasonable inquiry, none of BCG, I, nor any employee of BCG who will work on this engagement holds or represents any interest adverse to American or its estate,

---

[10] To the extent that BCG is requested to perform engagements for any competitors of American on unrelated matters, BCG will immediately implement an ethical wall so as to assure that none of the employees assigned to this matter work on these other engagements and that the employees working on those other engagements do not work on the American engagement. This will ensure that the confidentiality of BCG's work for American is fully protected.

12

and BCG is a "disinterested person" as that term is defined in Section 101(14) of the Bankruptcy Code, as modified by Section 1107(b) of the Bankruptcy Code, in that BCG, its professionals and employees:

(a)     are not creditors, equity security holders or insiders of American;

(b)     were not, within two years before the date of filing of the American's chapter 11 petition, a director, officer or employee of American; and

(c)     do not have an interest materially adverse to American, its estate or any class of creditors or equity security holders by reason of any direct or indirect relationship to, connection with, or interest in American, or for any other reason.

31.     If any new relevant facts or relationships are discovered or arise during the pendency of these chapter 11 cases, BCG will use reasonable efforts to identify such further developments and will promptly file a supplemental affidavit as required by Bankruptcy Rule 2014.

13

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Dated:        Boston, Massachusetts
              February **14**, 2012

_Ken Keverian_
_____
Ken Keverian
Senior Partner and Managing Director
The Boston Consulting Group, Inc.

14

**Exhibit 1 to the Declaration**

**Statement of Work**

15

EAST\47982999.1

**Exhibit 2 to the Declaration**

**Retention Checklist**

- Debtors
- Trade Names
- Affiliates
- Top 50 Unsecured Creditors
- Largest Unsecured Funded Debt Creditors
- Top 100 Trade Creditors
- Top 5 Secured Creditors
- Officers and Directors (current and former up to last three years)
- Affiliations of Officers and Directors
- Beneficial Holders (5% or more)
- Unions
- Financial Institutions
- Aircraft Lenders and Lessors
- Financial Derivative Counterparties
- Landlords
- Major Competitors
- Bankruptcy Judges for the Southern District of New York
- United States Trustees for the Southern District of New York
- Major Litigation Claimants
- Insurance Providers
- Taxing Authorities
- Utilities
- Professionals

16

# EXHIBIT D

**PROPOSED ORDER**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
                                                    :
In re                                               :          **Chapter 11 Case No.**
                                                    :
**AMR CORPORATION**, *et al.*,                      :          **11-15463 (SHL)**
                                                    :
                            **Debtors.**            :          **(Jointly Administered)**
                                                    :
------------------------------------------------------------x

**ORDER PURSUANT TO 11 U.S.C. §§ 327(a) AND 328(a) AND FED. R.**
**BANKR. P. 2014 AUTHORIZING THE EMPLOYMENT AND RETENTION OF**
**THE BOSTON CONSULTING GROUP, INC. AS STRATEGIC CONSULTANTS**
**FOR THE DEBTORS NUNC PRO TUNC TO JANUARY 9, 2012**

Upon the application, dated February 15, 2012 (the "**Application**"),[1] of AMR

Corporation, American Airlines, Inc., AMR Eagle Holding Corporation, and certain of their

subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, the "**Debtors**"), for entry of an order authorizing the Debtors to employ and retain

The Boston Consulting Group, Inc. ("**BCG**") as strategic consultants under the terms and

conditions set forth in the BCG Agreements, annexed to the Application as **Exhibits "A"** and

**"B,"** *nunc pro tunc* to January 9, 2012, pursuant to sections 327(a) and 328(a) of the Bankruptcy

Code, Bankruptcy Rules 2014(a) and 2016, and Local Rules 2014-1 and 2016-1; and upon the

Declaration of Ken Keverian of BCG in support of the Application (the "**Keverian**

**Declaration**"); and the Court having jurisdiction to consider the Application and the relief

requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and Amended Standing Order

of Reference M-431, dated January 31, 2011 (Preska, C.J.); and consideration of the Application

and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in
the Application.

venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

proper notice of the Application having been provided, and it appearing that no other or further

notice need be provided; and a hearing having been held to consider the relief requested in the

Application (the "**Hearing**"); and upon the record of the Hearing and all of the proceedings had

before the Court; and the Court having found and determined that the relief sought in the

Application is in the best interests of the Debtors, their estates, creditors, and all parties in

interest, and that the legal and factual bases set forth in the Application establish just cause for

the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Application is granted as provided herein; and it is further

ORDERED that the Debtors are authorized pursuant to sections 327(a) and 328(a)

of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016, and Local Rules 2014-1 and 2016-

1 to employ and retain BCG to provide consulting services on the Cascade Project in accordance

with the terms and conditions set forth in the BCG Agreements, *nunc pro tunc* to January 9, 2012

as modified herein; and it is further

ORDERED that notwithstanding anything to the contrary in the BCG

Agreements, the Application or the Keverian Declaration, to the extent that the Debtors request

BCG to perform any services other than (i) those detailed in the BCG Agreements, and (ii) such

other services directly related to services detailed in the Management Cascade SOW, the Debtors

shall seek further approval by the Court, including any related modifications to the Management

Cascade SOW, and the application seeking such approval shall set forth, in addition to the

additional services to be performed, the additional fees sought to be paid; and it is further

ORDERED that BCG's total compensation for services rendered pursuant to the

Management Cascade SOW shall not exceed $11,732,000; and it is further

ORDERED that, with respect to the Cascade Project, BCG shall be compensated in accordance with, and will file, interim and final fee applications for allowance of its compensation and expenses and shall be subject to the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, any applicable orders of the Court, the Amended Order Pursuant to 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals (ECF No. 958), the Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases M-389 (Nov. 25, 2009), and the United States Trustee Guidelines (the "**Fee Guidelines**"); and it is further

ORDERED that BCG shall include in its fee applications time records setting forth a summary description of the services rendered by each professional, and the amount of time spent on each date by each such individual in rendering services on behalf of the Debtors in one-half hour increments, but BCG shall not be required to provide or conform to any schedule of hourly rates; and it is further

ORDERED that notwithstanding to the contrary in this Order, the fees and expenses payable to BCG relating to the Cascade Project shall be subject to review only pursuant to the standards set forth in section 328(a) of the Bankruptcy Code and shall not be subject to the standard of review set forth in section 330 of the Bankruptcy Code; and it is further

ORDERED that notwithstanding anything to the contrary contained herein, the U.S. Trustee retains all rights to respond or object to BCG's interim and final applications for compensation and reimbursement of expenses on all grounds including, but not limited to, reasonableness pursuant to section 330 of the Bankruptcy Code; and, in the event the U.S.

Trustee objects, the Court retains the right to review the interim and final applications pursuant to section 330 of the Bankruptcy Code; and it is further

ORDERED that all requests by BCG for the payment of indemnification pursuant to any of the BCG Agreements shall be made by means of an application to the Court and shall be subject to review by the Court to ensure that payment of such indemnity conforms to the terms of the BCG Agreements and is reasonable under the circumstances of the litigation or settlement in respect of which indemnity is sought; *provided*, *however*, that in no event shall BCG be indemnified in the case of its own bad faith, self-dealing, breach of fiduciary duty (if any), gross negligence, or willful misconduct; and it is further

ORDERED that in no event shall BCG be indemnified if the Debtors or a representative of the estate, asserts a claim for, and a court determines by final order that such claim arose out of, BCG's bad faith, self-dealing, breach of fiduciary duty (if any), gross negligence, or willful misconduct; and it is further

ORDERED that in the event BCG seeks reimbursement from the Debtors for attorneys' fees and expenses in connection with the payment of an indemnity claim pursuant to a BCG Agreement, the invoices and supporting time records from such attorneys shall be included in BCG's own applications, both interim and final, and such invoices and time records shall be subject to the Fee Guidelines and the approval of the Bankruptcy Court pursuant to sections 330 and 331 of the Bankruptcy Code without regard to whether such attorneys have been retained under section 327 of the Bankruptcy Code and without regard to whether such attorneys' services satisfy section 330(a)(3)(C) of the Bankruptcy Code; and it is further

ORDERED that BCG shall not be entitled to reimbursement by the Debtors for any fees, disbursements, or other charges of BCG's attorneys, other than those incurred in connection with a request of BCG for payment of indemnity; and it is further

ORDERED, that, notwithstanding anything in the Application or the BCG Agreements to the contrary, BCG shall (i) to the extent that BCG uses the services of independent contractors, subcontractors or employees of foreign affiliates or subsidiaries (collectively, "**Contractors**") in these chapter 11 cases, BCG shall pass-through the cost of such Contractors to the Debtors at the same rate that BCG pays the Contractors; (ii) seek reimbursement for actual costs only; and (iii) ensure that the Contractors are subject to the same conflict checks as required for BCG and (iv) shall file with the Court such disclosures required by Bankruptcy Rule 2014; and it is further

ORDERED that, upon entry of a final order approving the Application, all prepetition claims of BCG against any of the Debtors, in excess of amounts already paid to BCG, shall be waived; and it is further

ORDERED that, as soon as reasonably practicable after the completion of BCG's services rendered pursuant to the Management Cascade SOW, the Debtors shall file a notice with the Court stating that such services are completed; and it is further

ORDERED that BCG shall use its best efforts to avoid any duplication of services provided by any of the Debtors' other retained professionals in these chapter 11 cases; and it is further

ORDERED that to the extent that there may be any inconsistency between the terms of the BCG Agreements, the Application, the Keverian Declaration and this Order, the terms of this Order shall govern; and it is further

ORDERED that the terms and conditions of this Order shall be immediately

effective and enforceable upon its entry; and it is further

ORDERED this Court retains jurisdiction with respect to all matters arising from

or related to the implementation of this Order.

Dated:  New York, New York
        [_____], 2012


_____
United States Bankruptcy Judge