**HEARING DATE AND TIME: September 12, 2012 at 10:00 a.m. (Eastern Time)**
**OBJECTION DEADLINE:  September 5, 2012 at 4:00 p.m. (Eastern Time)**

Harvey R. Miller
Stephen Karotkin
Alfredo R. Pérez
Stephen A. Youngman
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

John J. Gallagher*
Scott M. Flicker*
Jon A. Geier*
Neal D. Mollen*
Todd C. Duffield
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, DC 20005
Telephone:  (202) 551-1700
Facsimile:  (202) 551-1705

*admitted *pro hac vice*

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                            :
In re                                                       :        **Chapter 11 Case No.**
                                                            :
**AMR CORPORATION**, *et al.*,                              :        **11-15463 (SHL)**
                                                            :
                                    **Debtors.**            :        **(Jointly Administered)**
                                                            :
------------------------------------------------------------x

**NOTICE OF HEARING ON MOTION OF DEBTORS FOR ENTRY OF ORDER**
**PURSUANT TO 11 U.S.C. §§ 363(b) AND 105(a) AND FED. R. BANKR. P. 9019(a)**
**AUTHORIZING ENTRY INTO COLLECTIVE BARGAINING AGREEMENT,**
**SETTLEMENT LETTER, AND LETTER AGREEMENT WITH THE ASSOCIATION**
**OF PROFESSIONAL FLIGHT ATTENDANTS AND APPROVING CERTAIN**
**COMPROMISES AND SETTLEMENTS IN CONNECTION THEREWITH**

PLEASE TAKE NOTICE that a hearing on the annexed Motion, dated August 24,

2012 (the "**Motion**"), of AMR Corporation and its related debtors, as debtors and debtors in

possession (collectively, the "**Debtors**"), will be held before the Honorable Sean H. Lane, United

States Bankruptcy Judge, in Room 701 of the United States Bankruptcy Court for the Southern

District of New York (the "**Bankruptcy Court**"), One Bowling Green, New York, New York

10004, on **September 12, 2012 at 10:00 a.m. (Eastern Time)**, or as soon thereafter as counsel

may be heard.

PLEASE TAKE FURTHER NOTICE that any responses or objections to the

Motion (the "**Objections**") must be in writing, shall conform to the Federal Rules of Bankruptcy

Procedure and the Local Bankruptcy Rules for the Southern District of New York, and shall be

filed with the Bankruptcy Court (a) by registered users of the Bankruptcy Court's case filing

system, electronically in accordance with General Order M-399 (which can be found at

http://nysb.uscourts.gov) and (b) by all other parties in interest, on a 3.5 inch disk, in text-

searchable portable document format (PDF) (with a hard copy delivered directly to Chambers),

in accordance with the customary practices of the Bankruptcy Court and General Order M-399,

to the extent applicable, and served in accordance with General Order M-399 and on (i) the

attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New

York 10153 (Attn: Stephen Karotkin, Esq.), (ii) the Debtors, c/o AMR Corporation, 4333 Amon

Carter Boulevard, MD 5675, Fort Worth, Texas 76155 (Attn: Kathryn Koorenny, Esq.), (iii) the

Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street,

21st Floor, New York, New York 10004 (Attn: Brian Masumoto, Esq.), (iv) the attorneys for the

statutory committee of unsecured creditors, Skadden, Arps, Slate, Meagher & Flom LLP, 155

North Wacker Drive, Chicago, Illinois 60606 (Attn: John Wm. Butler, Jr., Esq.) and Four Times

Square, New York, New York 10036 (Attn: Jay M. Goffman, Esq.), (v) the attorneys for the

Section 1114 Committee of Retired Employees, Jenner & Block LLP, 353 North Clark Street,

US_ACTIVE:\44077177\9\14013.0139

Chicago, Illinois 60654 (Attn:  Catherine L. Steege, Esq. and Charles B. Sklarsky, Esq.) and 919

Third Avenue, 37th Floor, New York, New York 10022 (Attn:  Marc B. Hankin, Esq.), (vi) the

attorneys for the Association of Professional Flight Attendants, Guerrieri, Clayman, Bartos &

Parcelli, P.C., 1625 Massachusetts Avenue, NW, Suite 700, Washington, DC 20036 (Attn:

Robert S. Clayman, Esq.), and (vii) all entities that requested notice in these chapter 11 cases

under Fed. R. Bankr. P. 2002 so as to be received no later than **September 5, 2012 at 4:00 p.m.**

**(Eastern Time)** (the "**Objection Deadline**").

US_ACTIVE:\44077177\9\14013.0139

PLEASE TAKE FURTHER NOTICE that if no Objections are timely filed and

served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to

the Bankruptcy Court an order substantially in the form of the proposed order annexed to the

Motion, which order may be entered with no further notice or opportunity to be heard.

Dated: New York, New York
      August 24, 2012

    /s/ Stephen Karotkin

    Harvey R. Miller
    Stephen Karotkin
    Alfredo R. Pérez
    Stephen A. Youngman

    WEIL, GOTSHAL & MANGES LLP
    767 Fifth Avenue
    New York, New York 10153
    Telephone:  (212) 310-8000
    Facsimile:  (212) 310-8007

    John J. Gallagher*
    Scott M. Flicker*
    Jon A. Geier*
    Neal D. Mollen*
    Todd C. Duffield

    PAUL HASTINGS LLP
    875 15th Street, N.W.
    Washington, DC 20005
    Telephone:  (202) 551-1700
    Facsimile:  (202) 551-1705

    Attorneys for Debtors
    and Debtors in Possession

    *admitted *pro hac vice*

4

Harvey R. Miller
Stephen Karotkin
Alfredo R. Pérez
Stephen A. Youngman
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

John J. Gallagher*
Scott M. Flicker*
Jon A. Geier*
Neal D. Mollen*
Todd C. Duffield
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, DC 20005
Telephone: (202) 551-1700
Facsimile: (202) 551-1705

*admitted *pro hac vice*

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                              :
In re                                         :    Chapter 11 Case No.
                                              :
AMR CORPORATION, et al.,                      :    11-15463 (SHL)
                                              :
                      Debtors.                :    (Jointly Administered)
                                              :
------------------------------------------------------------x
```

**MOTION OF DEBTORS FOR ENTRY OF ORDER PURSUANT TO**
**11 U.S.C. §§ 363(b) AND 105(a) AND FED. R. BANKR. P. 9019(a)**
**AUTHORIZING ENTRY INTO COLLECTIVE BARGAINING AGREEMENT,**
**SETTLEMENT LETTER, AND LETTER AGREEMENT WITH THE ASSOCIATION**
**OF PROFESSIONAL FLIGHT ATTENDANTS AND APPROVING CERTAIN**
**<u>COMPROMISES AND SETTLEMENTS IN CONNECTION THEREWITH</u>**

TO THE HONORABLE SEAN H. LANE,
UNITED STATES BANKRUPTCY JUDGE:

AMR Corporation and its related debtors, as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully represent:

### Background

1.      On November 29, 2011 (the "**Commencement Date**"), each of the Debtors commenced a voluntary case under chapter 11 of title 11, United States Code (the "**Bankruptcy Code**").  The Debtors have continued to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

2.      On December 5, 2011, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed the Official Committee of Unsecured Creditors (the "**UCC**").

3.      Information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the Affidavit of Isabella D. Goren Pursuant to Rule 1007-2 of the Local Bankruptcy Rules of the Southern District of New York, sworn to on November 29, 2011.  (ECF No. 4)

### Jurisdiction

4.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### Relief Requested

5.      The Debtors request, pursuant to sections 363(b) and 105(a) of the Bankruptcy Code and Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), entry of an order, substantially in the form annexed hereto as **Exhibit "A,"** (i) authorizing American Airlines, Inc. ("**American**" or the "**Company**") to enter into a new collective bargaining agreement (the "**New CBA**") with the Association of

US_ACTIVE:\44077177\9\14013.0139

Professional Flight Attendants ("**APFA**") pursuant to the terms of that certain American Airlines

Last Best and Final Offer to the Association of Professional Flight Attendants (the "**LBFO**"),

dated July 19, 2012, a copy of which is annexed hereto as **Exhibit "B,"** that certain letter

agreement, dated August 22, 2012 on Settlement Consideration and Bankruptcy Protections (the

"**Settlement Letter**"), substantially in the form annexed hereto as **Exhibit "C,"** and that certain

letter agreement on certain additional provisions, dated August 10, 2012 (the "**Letter**

**Agreement**"), a copy of which is annexed hereto as **Exhibit "D,"** and approving certain

compromises and settlements in connection therewith, and (ii) authorizing  American and the

other Debtors to perform all their obligations thereunder and to take such actions as may be

necessary or desirable in connection with or in furtherance thereof.

## <u>Overview</u>

6.     After an extensive proceeding under section 1113 of the Bankruptcy Code

and with the invaluable assistance of the Court-designated mediator, American and the APFA

have reached agreement on the six-year New CBA that will provide American with, among other

benefits, the labor costs reductions and work rule changes it needs to operate its business

competitively.  The New CBA addresses all of the key areas encompassed in American's initial

section 1113 proposal to the APFA, while at the same time providing for annual pay increases,

an early out incentive, and enhanced 401(k) contributions.

7.     The negotiations between American and the APFA were protracted,

extremely hard fought, and at times contentious.  As a result of countless hours of negotiations,

the urging of this Court, and the assistance of the Honorable James M. Peck, as mediator, APFA

agreed to submit American's LBFO to the flight attendants for a ratification vote.  The flight

attendants ratified the LBFO, which resulted in American and APFA entering into the New

CBA.  American is anxious to have the New CBA approved by the Court and promptly

3

implemented so that the significant benefits thereof can be realized for all of the parties in

interest.

8.       American has sought new, consensual collective bargaining agreements

with its unions since long before the commencement of these chapter 11 cases.  Even while

pursuing its motion under section 1113 of the Bankruptcy Code, American's primary goal

remained forging consensual agreements with its unionized employee groups.  Through the hard

work of all parties, a consensual agreement with the APFA has been achieved.

9.       The New CBA consensually resolves numerous issues and provides for

the implementation of a collective bargaining agreement that American believes appropriately

recognizes the concerns of American's flight attendants while providing the Debtors with the

necessary savings and work rule flexibility that are key to their long-term viability.

10.      Indeed, under these circumstances, the New CBA and the settlement with

the APFA clearly are in the best interests of the Debtors and their estates, easily satisfy the

standards for approval of a compromise and settlement under Bankruptcy Rule 9019, and should

be approved in all respects.

**Terms of the New CBA, Settlement Letter, and Letter Agreement**

11.      The following briefly summarizes some of the major terms of the New

CBA for the flight attendants:[1]

(i)      Duration

- Six years from the date of signing, provided that at any time
  following the fourth anniversary of the New CBA and with
  sixty days advance notice, either party has the right to
  commence negotiations in accordance with section 6 of the
  Railway Labor Act.

---

[1]The information below is intended as a summary and is qualified in its entirety by the terms of the New
CBA.

US_ACTIVE:\44077177\9\14013.0139

(ii)     Medical Benefits

- Preserves medical benefits in line with those offered to other employees of the Debtors, including the amount of employee contributions. Future retirees will have access to retiree medical coverage or Medicare supplement coverage at their cost.

(iii)    Retirement Benefits

- Provides new retirement defined contribution benefits in line with those provided to peers at other network carriers, but provides for a freeze of the existing defined benefit retirement plans.

(iv)    Compensation

- Provides for a lump sum payment of $1,500 to every active flight attendant on the date of signing.

- Provides for an early out program for eligible flight attendants (15 plus years of Company service). Payout under this program will be $40,000 for an acceptance. The Company will have discretion to determine when a flight attendant can separate based on operational requirements.

- Provides for structural base pay rate increases in each year of the agreement.

- Provides for pay rates to be increased to industry average at the mid-point of the term of the agreement.

- Funds improvements by reducing profit sharing to 5%, rather than the 15% first-dollar profit sharing program that was incorporated in the Company's initial section 1113 proposal.

(v)     Operating Efficiencies

- Provides an adjusted aggregate cost savings of $195 million per year or 17% of total costs with respect to the flight attendants.

- Modifies overtime, vacation, and sick leave provisions.

- Implements changes to existing work rules to increase the efficiency of the Debtors' operations.

5

12.     In view of the significant modifications to the existing collective

bargaining agreement with the APFA, including the substantial savings attributable to pension

benefits and work rules, the agreement with the APFA also provides for certain additional

provisions relating to the administration of the Debtors' chapter 11 cases and a proposed plan of

reorganization (the "**Plan**").  These understandings are reflected in the Settlement Letter and the

Letter Agreement.

13.     The material terms of the Settlement Letter are summarized as follows:[2]

(i)     Settlement Consideration

- In full and complete satisfaction of the APFA Claims (as
defined in the Settlement Letter), APFA will receive under the
Plan 3.0% of all of the equity of the reorganized entity issued
to holders of allowed prepetition general unsecured claims
(subject to dilution under certain circumstances).  The APFA
Claims shall not include discipline and termination grievances
and grievance SS-2006-APFA-003 (the "**Excluded Claims**");
such Excluded Claims shall be administered and resolved
pursuant to the claims administration process in these chapter
11 cases with all parties reserving their rights with respect
thereto.  APFA shall have the right to vote on a chapter 11 plan
based upon a claim estimated for voting purposes related to the
percentage of equity to be distributed set forth above.

(ii)    Administrative Claim

- The APFA shall have an allowed administrative expense claim
as of the effective date of the Settlement Letter[3] in an amount
sufficient to pay the actual reasonable fees and expenses
(including attorneys, experts, and financial advisors) incurred
by APFA in connection with the New CBA, the Settlement
Letter, and the Debtors' motion under section 1113 of the
Bankruptcy Code, not to exceed $5 million.  In addition, on the
effective date of the Settlement Letter, the APFA shall have an
allowed administrative expense claim in an amount of up to $2

---

[2]This summary is qualified in its entirety by the terms of the Settlement Letter.

[3]The "Effective Date" of the Settlement Letter is the date the New CBA and the Settlement Letter are approved by
an order of the Bankruptcy Court, which order has not been stayed.

US_ACTIVE:\44077177\9\14013.0139

million for APFA's payment of the reasonable fees and
expenses of its investment banker (Jefferies & Co.). Such
administrative expense claims shall not include any fees or
expenses incurred in connection with the pursuit of any third
party purchaser of the Debtors or a merger partner.

(iii)    <u>Indemnification</u>

- The Debtors will indemnify APFA and its members, officers,
  directors, advisors and other representatives for 50% of all
  costs and liabilities (including attorneys' fees) relating to
  claims or lawsuits arising in connection with the New CBA.
  The 50% sharing agreement shall exist until the APFA's
  financial exposure reaches $5 million, after which any
  additional exposure will be the full responsibility of the
  Debtors.

(iv)    <u>Exculpation</u>

- The Debtors will not propose or support any plan of
  reorganization that does not contain an exculpation or release
  provision for APFA and its members, officers, directors,
  advisors and other representatives at least as favorable as any
  exculpation or release provisions provided for the Debtors'
  officers, directors, employees, advisors, and representatives.

(v)    <u>New 1113 Motion</u>

- For a period of three years from the date of signing, the
  Debtors and their successors will not file or support any motion
  under section 1113 of the Bankruptcy Code seeking rejection
  or modification of the New CBA, provided that, the Debtors
  and their successors may do so in the event of a material
  deterioration in the Debtors' financial condition or prospects.

(vi)    <u>Court Approval</u>

- The APFA will support the Debtors' Motion authorizing entry
  into the Settlement Letter. Both the Debtors and the APFA
  will use their reasonable best efforts to obtain support for the
  New CBA and the Settlement Letter by the UCC and other
  parties in interest.

- The Settlement Letter shall not become effective until the New
  CBA and the Settlement Letter are approved by an order or
  orders of the Bankruptcy Court, which order(s) has not been
  stayed.

7

14.     The material terms of the Letter Agreement are summarized as follows:[4]

(i)     Continuing Negotiations/Actions

- The Company will continue to seek approval to implement, through binding agreement and/or implemented by legal unilateral authority, revisions to (i) the labor contracts of the Company's other non-APFA unionized employees, (ii) the wages, benefits, and working conditions of the Company's non-union hourly employees, and (iii) the wages, benefits, and working conditions of the Company's non-union salaried and management employees so that the aggregate revisions in (i), (ii), and (iii) for each individual non-APFA union and non-union employee group are reasonably projected by the Company to produce the targets for labor cost savings specified in the Company's section 1113 motion.

(ii)    Proportionate Labor Cost Savings

- To the extent the Company does not implement modifications to (i) the Company's collective bargaining agreements with its non-APFA unionized employee groups, (ii) the wages, benefits, and working conditions of the Company's non-union hourly employees, and (iii) the wages, benefits, and working conditions of the Company's non-union salaried and management employees such that the aggregate modifications to each of (i), (ii), and (iii) are reasonably projected by the Company to produce the labor cost savings described in the Company's section 1113 motion, then the Company will meet with APFA to discuss and agree upon a proportionate reduction in the projected labor cost savings under the New CBA.  This provision shall expire upon the earlier of (i) six months after the effective date of the Plan and (ii) when the changes described in (i), (ii), and (iii) of this paragraph, or other changes that are reasonably projected by the Company to achieve equivalent proportionate labor cost savings, are implemented for all non-APFA union or non-union employee groups.

(iii)   Potential Credits from New CBA

- To the extent the Company obtains modifications to the collective bargaining agreements with its non-APFA union employee groups that result in additional reductions in APFA

---

[4]This summary is qualified in its entirety by the terms of the Letter Agreement.

8

employees, then the Company will meet with APFA to discuss and agree upon an appropriate credit to APFA.

**Entry into the Compromises and Settlements under the New CBA Meets the
Legal Standard Established Pursuant to Bankruptcy Rule 9019(a)
and is in the Best Interests of the Debtors' Estates**

15.    The proposed New CBA, Settlement Letter, and Letter Agreement are in the best interests of the Debtors and their stakeholders, and should be approved pursuant to Bankruptcy Rule 9019.  Bankruptcy Rule 9019 provides, in part, that "[o]n motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).  This Rule empowers Bankruptcy Courts to approve settlements "if they are in the best interests of the estate."  *Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).  A decision to accept or reject a compromise or settlement is within the sound discretion of the Court.  *Id.; see also* 10 *Collier on Bankruptcy* ¶ 9019.02 (15th ed. rev. 2009).  The settlement need not result in the best possible outcome for the debtor, but must not "fall beneath the lowest point in the range of reasonableness."  *Drexel Burnham Lambert Group*, 134 B.R. at 505 (citing *In re W.T. Grant & Co.*, 699 F.2d 599, 608 (2d Cir. 1983)).

16.    Relying on the guiding language of *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968), Courts in this Circuit have set forth the following factors regarding the reasonableness of settlements:

(i)    the probability of success in the litigation;

(ii)    the difficulties associated with collection;

(iii)    the complexity of the litigation, and the attendant expense, inconvenience, and delay; and

(iv)    the paramount interests of the creditors.

9

*Sec. Exch. Comm'n v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 960 F.2d 285, 292 (2d Cir. 1992); *Air Line Pilots Assoc. Int'l v. Am. Nat'l Bank & Trust Co. of Chicago (In re Ionosphere, Inc.)*, 156 B.R. 414 (S.D.N.Y. 1993); *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993).  As stated, the decision to approve a particular settlement lies within the sound discretion of the Bankruptcy Court.  *Mach. Terminals, Inc. v. Woodward (In re Albert-Harris, Inc.)*, 313 F.2d 447 (6th Cir. 1963).  It is the responsibility of the Court to examine a settlement and determine whether it "falls below the lowest point in the range of reasonableness."*In re Dow Corning*, 198 B.R. 214, 222 (Bankr. E.D. Mich. 1996).  Moreover, the form of consideration provided in the settlement is only one of the factors to be considered when determining whether a settlement is reasonable.  *In re Tower Auto., Inc.*, 342 B.R. 158, 162 (Bankr. S.D.N.Y.) *aff'd*, 241 F.R.D. 162 (S.D.N.Y. 2006).

17.    Based on these factors, the compromises and settlements provided for under the New CBA, Settlement Letter, and Letter Agreement should be approved for several reasons.  First, the New CBA, Settlement Letter, and Letter Agreement resolve contentious and complex litigation under section 1113 of the Bankruptcy Code, the outcome of which is uncertain.  Although the Debtors firmly believe that their 1113 motion is completely justified and supported by the facts and applicable law, litigation is unpredictable.  The resolutions embodied in the New CBA provide certainty and will enable the Debtors to implement a labor agreement that achieves the savings targets and work rule flexibility necessary for their long-term viability.  Moreover, the settlement avoids the potential labor unrest and disruption that might be occasioned by a contract abrogation, and the obvious loss of value arising therefrom.

18.    Second, there is no doubt that the flight attendants, represented by the APFA, are important to the Debtors' business enterprise and their successful reorganization

10

under chapter 11.  A compromise with the APFA is, therefore, a significant step toward

confirmation and resolution of these chapter 11 cases.  *See In re Drexel Burnham Lambert*

*Group*, 130 B.R. 910, 926-27 (S.D.N.Y. 1991), *aff'd*, 960 F.2d 285 (2d Cir. 1992) (approving

pre-plan settlement of multi-billion dollar class action security fraud claim and rejecting

contentions that settlement was a *sub rosa* plan).

19.     The New CBA, Settlement Letter, and Letter Agreement are the product

of arm's length, protracted, and hard fought negotiations between the Debtors and the APFA.

They were achieved through good faith negotiations facilitated by Judge Peck as mediator, and

American believes they represent a fair and balanced resolution of extremely difficult issues and

long-term relationships and that the magnitude of this achievement cannot be overstated.

American believes that the New CBA will allow the Debtors to improve their market

competitiveness and reduce a significant labor cost.  To maintain the loyalty and morale of their

employees, the Debtors' goal always has been to reach consensual agreements with their

unionized employee groups, not a set of imposed terms.  American believes that the New CBA,

Settlement Letter, and Letter Agreement strike a fair balance between the Debtors' need for

significant, long-term cost savings important to a successful reorganization, and fairness to the

flight attendants, who have made painful sacrifices in consenting to the modifications reflected in

the New CBA.

20.     Further, the Settlement Letter and the Letter Agreement constitute an

integral part of the resolution of the section 1113 motion as it relates to the APFA and the ability

to achieve the New CBA.  The terms of the Settlement Letter and the Letter Agreement are fair

and reasonable and consistent with similar settlements approved in other major airline chapter 11

cases.  The Settlement Letter contemplates the distribution of equity in the reorganized Debtors

11

to the APFA as additional settlement consideration.  This provision in the Settlement Letter was heavily negotiated and represents appropriate compensation for, *inter alia*, very significant work rules and pension concessions made by the flight attendants.  Notably, the contemplated equity consideration should serve to motivate the flight attendants to maximize the value of the reorganized enterprise for the benefit of all parties in interest.  Moreover, the savings resulting from the ability of the Debtors to implement work rule changes and freeze the pension plan are important to their long-term viability.

21.     The New CBA, Settlement Letter, and Letter Agreement are fair and justified by the level of concessions and other restructuring benefits granted by the flight attendants.  The New CBA will generate significant annual cost savings to the Debtors (approximately $195 million, annually), coupled with many other provisions that substantially strengthen the Debtors' operational and corporate flexibility.

22.     The settlements embodied in the New CBA, Settlement Letter, and Letter Agreement unequivocally satisfy all of the requirements of Bankruptcy Rule 9019 and the applicable authority in this Circuit.  The terms of the settlements are reasonable, resolve complex litigation, will promote the successful administration of these cases, strike a fair balance between the parties to the dispute, and will serve to maximize value for all stakeholders.  Under these circumstances the New CBA, Settlement Letter, and Letter Agreement and all of their terms should be approved.

US_ACTIVE:\44077177\9\14013.0139

**American's Entry into the New CBA, Settlement Letter, and Letter Agreement**
**Should be Approved Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code**

23.    Ample authority also exists for approval of the New CBA, Settlement

Letter, and Letter Agreement under sections 363 and 105(a)[5] of the Bankruptcy Code.  Section

363 provides, in relevant part, "[t]he trustee, after notice and a hearing, may use, sell, or lease,

other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).

Although section 363 of the Bankruptcy Code does not set forth a standard for determining when

it is appropriate for a Court to authorize the sale, disposition or other use of a debtor's assets,

Courts in the Second Circuit and others, in applying this section, have required that it be based

upon the sound business judgment of the debtor.  *See Comm. of Unsecured Creditors of LTV*

*Aerospace & Defense Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141 (2d Cir. 1992)

(holding that a judge reviewing a section 363(b) application must find from the evidence

presented a good business reason to grant such application); *Comm. of Equity Sec. Holders v.*

*Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983) (same); *In re Chrysler LLC*, 405

B.R. 84 (Bankr. S.D.N.Y. 2009), *aff'd Ind. State Police Pension Trust v. Chrysler LLC (In re*

*Chrysler LLC)*, 576 F.3d 108 (2d Cir. 2009) (same); *In re Gen. Motors Corp.*, 407 B.R. 463

(Bankr. S.D.N.Y. 2009) (same).

24.    Moreover, applicable principles of law attach to a debtor's business

decision a strong presumption that it "acted on an informed basis, in good faith and in the honest

belief that the action taken was in the best interests of the company."  *Official Comm. of Sub.*

*Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y.

1990) (holding that the Delaware business judgment rule has "vitality by analogy" in chapter

---

[5]Section 105 of the Bankruptcy Code provides in pertinent part that "[t]he court may issue any order, process, or
judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

11); *see also In re Pilgrim's Pride Corp.*, 401 B.R. 229, 237 (Bankr. N.D. Tex. 2009) ("[I]f a

valid business reason is shown for the transaction, the transaction is presumed appropriate.").

The business judgment rule is "a presumption that in making a business decision the directors of

a corporation acted on an informed basis, in good faith and in the honest belief that the action

taken was in the best interest of the company." *Integrated Res., Inc.*, 147 B.R. at 656 (citations

omitted).  Courts are loath to interfere with corporate decisions absent a showing of bad faith,

self-interest, or gross negligence.  *Id.*

   25. This exceedingly complex, hard-fought agreement to amend significant

contract provisions with a critical and valued employee group clearly meets the requirements of

section 363 of the Bankruptcy Code.  For all of the reasons set forth above, the Debtors' decision

to enter into the New CBA, Settlement Letter, and Letter Agreement is in the best interests of the

Debtors and all of their economic stakeholders.  The decision plainly reflects the sound business

judgment of the Debtors.  From the moment the New CBA, Settlement Letter, and Letter

Agreement become effective, these agreements will save the Debtors' approximately $195

million a year and create significant operational efficiencies, which are vital to the Debtors'

transformation and long-term viability.  Just as importantly, the New CBA, Settlement Letter,

and Letter Agreement achieve the goals of American's business plan, all in the context of a

consensual agreement, and avoid the uncertainty, cost, and expense of ongoing litigation.

   26. Accordingly, the Debtors submit that the New CBA, Settlement Letter,

and Letter Agreement should be approved under section 363(b) of the Bankruptcy Code and

Bankruptcy Rule 9019(a), as a sound exercise of the Debtors' reasonable business judgment and

as being in the best interest of the Debtors' estates and all parties in interest.

## **Waiver of Bankruptcy Rules 6004(a) and (h)**

27.     To implement the foregoing immediately and to the extent applicable, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## **Notice**

28.     Notice of this Motion has been provided to parties in interest in accordance with the Amended Order Pursuant to 11 U.S.C. §§ 105(a) and (d) and Bankruptcy Rules 1015(c), 2002(m), and 9007 Implementing Certain Notice and Case Management Procedures, dated August 8, 2012 (ECF No. 3952).  Pursuant to the Case Management Order, the Debtors have consulted with the attorneys for the UCC regarding the scheduling of the hearing on this Motion on a non-omnibus hearing date and have been advised that the UCC does not object to such scheduling.  In view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

29.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

15

WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated: New York, New York
August 24, 2012

/s/ Stephen Karotkin
Harvey R. Miller
Stephen Karotkin
Alfredo R. Pérez
Stephen A. Youngman

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile: (212) 310-8007

John J. Gallagher*
Scott M. Flicker*
Jon A. Geier*
Neal D. Mollen*
Todd C. Duffield

PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, DC 20005
Telephone:  (202) 551-1700
Facsimile:   (202) 551-1705

Attorneys for Debtors
and Debtors in Possession

*admitted *pro hac vice*

16

**Exhibit "A"**

**Proposed Order**

US_ACTIVE:\44077177\9\14013.0139

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                                 :

In re                               :             **Chapter 11 Case No.**
                                   :

**AMR CORPORATION**, *et al.*,           :             **11-15463 (SHL)**
                                   :

                   **Debtors.**        :             **(Jointly Administered)**
                                   :

----------------------------------------------------------------x

### ORDER PURSUANT TO 11 U.S.C. §§ 363(b) AND 105(a) AND FED. R. BANKR. P. 9019(a) AUTHORIZING ENTRY INTO COLLECTIVE BARGAINING AGREEMENT, SETTLEMENT LETTER, AND LETTER AGREEMENT WITH THE ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS AND APPROVING CERTAIN <u>COMPROMISES AND SETTLEMENTS IN CONNECTION THEREWITH</u>

Upon the Motion, dated August 24, 2012 (the "**Motion**"),[1] of AMR Corporation and its related debtors, as debtors and debtors in possession (collectively, the "**Debtors**"), pursuant to sections 363(b) and 105(a) of title 11, United States Code (the "**Bankruptcy Code**") and Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), authorizing entry into the New CBA, Settlement Letter, and Letter Agreement with the APFA and approving certain compromises and settlements in connection therewith, and authorizing the Debtors to perform all their obligations thereunder and to take such actions as may be necessary or desirable in connection with or in furtherance thereof, all as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431 dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Motion and the Hearing (as defined below) having been provided in accordance with this

Court's Order, dated August 24, 2012, and it appearing that no other or further notice need be

provided; and a hearing having been held to consider the relief requested in the Motion on

September 12, 2012 (the "**Hearing**"); and upon the record of the Hearing and all of the

proceedings had before the Court; and the Court having found and determined that the relief

sought in the Motion is in the best interests of the Debtors, their estates, creditors, and all parties

in interest, and that the legal and factual bases set forth in the Motion establish just cause for the

relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted as provided herein; and it is further

ORDERED that the New CBA, Settlement Letter, and Letter Agreement and all

of the terms and provisions thereof are hereby approved in their entirety, and the Debtors are

authorized to perform all their obligations thereunder and to take such actions as may be

necessary in connection with or in furtherance thereof; and it is further

ORDERED that nothing contained herein or in the New CBA, Settlement Letter,

and Letter Agreement shall constitute an assumption of any agreement described herein,

including without limitation the New CBA, Settlement Letter, or Letter Agreement nor shall

anything herein be deemed to convert a prepetition claim into a postpetition claim or an

administrative expense claim; and it is further

ORDERED that if the Debtors seek authorization to reject the New CBA,

Settlement Letter, or Letter Agreement subsequent to entry of this Order and after the New CBA,

Settlement Letter, or Letter Agreement become effective, upon such rejection any claims arising

from the Debtors' inability to perform under the terms of the New CBA, Settlement Letter, or

2

Letter Agreement shall be treated as prepetition claims and not as administrative expense claims,

except to the extent that such claims arose postpetition and prior to such rejection, in which case

such claims shall be accorded administrative expense claim status to the full extent permitted by

law.  The Debtors reserve the right to argue against the nature, extent, and validity of any

asserted claims, including, without limitation, that no claims for damages arise as a result of

rejection of the New CBA, Settlement Letter, or Letter Agreement and the APFA reserves all of

its rights with respect to any such defenses or arguments and to defend the claims asserted; and it

is further

ORDERED that the requirements set forth in Bankruptcy Rule 6004(a) are hereby

waived; and it is further

ORDERED that pursuant to Bankruptcy Rule 6004(h), the terms and provisions

of this Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from the interpretation and/or implementation of this Order.

Dated: New York, New York
_____, 2012


_____
United States Bankruptcy Judge

3

# EXHIBIT "B"

**American Airlines**
**Last Best and Final Offer to the**
**Association of Professional Attendants**
**July 19, 2012**

AMERICAN AIRLINES LAST, BEST AND FINAL OFFER TO
THE ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS
JULY 19, 2012

**The terms of this offer are contingent upon APFA's acceptance and membership ratification on or before August 19, 2012.**

### I. EARLY OUT

Provide an early out program for eligible flight attendants.  Eligibility based on having 15+ years of Company service.  Payout of program will be as follows:

$40,000 for all acceptances

Company will have discretion to limit maximum number of acceptances and determine when flight attendant can separate based on operational requirements.  Flight Attendants will provide preference for Company separation by quarter:  4Q2012, 1Q2013, 2Q2013, 3Q2013.

See Attachment A:  "Voluntary Early Out Program"

### II. COMPENSATION

1. **DOS Lump Sum Payment:**
   Provide a lump sum payment of $1,500 to every active Flight Attendant on the date of signing.

2. **Hourly Pay Rates:**
   Eliminate International pay rates and replace with a single base rate for Domestic and International.  The base rate will be the current Domestic hourly base rate of pay.  Base Pay Rate increases:

   DOS:                  3.0%
   DOS + 12 months: 2.0%
   DOS + 24 months: 1.5%
   DOS + 36 months: 1.0% or Industry Pay Rate Adjustment* whichever is greater
   DOS + 48 months: 1.0%
   DOS + 60 months: 1.0%

   * See Attachment B: "Industry Comparable Pay Rates – Flight Attendants"

   See Attachment C: "Base Pay Rates – Flight Attendants"

3. **International Pay Rates:**
   Pay a $3.00 hourly override only for International segments flown, including deadheading and pay & credit.

4. **Expenses:**
   Amend Article 4 A. to reflect time away from base expenses as follows:

   | DOS: | Domestic: | $1.65 |
   |---|---|---|
   |  | International: | $1.90 |
   | DOS + 36: | Domestic: | $1.80 |
   |  | International: | $2.00 |

AMERICAN AIRLINES BEST AND FINAL OFFER TO
THE ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS
JULY 19, 2012

5. **Incentive Pay Rates:**
   Discontinue the incentive rates of pay that apply to paid hours above 70.

6. **ATC Hold/Code 59:**
   Current practice. No change.

7. **Premium Pay:**
   Discontinue Domestic aft galley pay of 63-cents per hour.

8. **Critical Coverage Pay:**
   Institute a premium pay provision with a single premium rate of fifty (50) percent (total is base rate plus 50% of base rate) on any Company designated critical sequences for Flight Attendants.

9. **Profit Sharing:**
   Implement the New Profit Sharing Plan
   See Attachment D: "Enhanced Profit Sharing Plan – Flight Attendants"

   Current Profit Sharing Plan and the Annual Incentive Plan (AIP) are eliminated. Beginning at the first dollar of pre-tax income, the new Profit Sharing plan would pay awards equal to 5% of all pre-tax income, prorated to take into account any groups of frontline employees who do not participate in the plan. Pre-tax income for the purposes of these awards will be calculated prior to the effects on income of any special, unusual, and non-recurring items or incentive pay.

10. **Sequence Pay Protection:**
    - Protection to 100 hours (to commence upon implementation of PBS)
    - Prior to PBS, implement an interim protection solution (70 hour guarantee for AVBL, bid line guarantee for lineholders)
    - Replace current seventy (70) hour guarantee with sequence protection for value of line, including carry-in time from previous month, at time of bid initialization (guarantee will be pro-rated if mid-month return to work)
    - Each flight attendant will have unique guarantee based on the trip sequences on his/her schedule
    - Additional time picked up through trip trading and additional trips picked up from the Company will increase guarantee to a maximum of 100 hours
    - Pay for involuntary loss of time up to 100 hours
    - To qualify for protection, a flight attendant must bid and/or be assigned trip(s) that originate within the footprint of the original trip, but terminate within one (1) calendar day of original scheduled termination, unless assigned comparable days later in the month
    - If Dual Qualified, a flight attendant may be awarded/assigned to Domestic or International flying
    - If protected for turn-around, flight attendant may be assigned airport stand-by duty. Stand by assignment must be in open time at time of bidding
    - This protection does not apply to Reserves (no change to reserve guarantee)
    - Last 5 days protection will apply
    - Current HVBL rules apply when above 100 hours
    - All other Article 9.P. rules will apply

AMERICAN AIRLINES LAST, BEST AND FINAL OFFER TO
THE ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS
JULY 19, 2012

## III. WORK RULES

1. **Schedule Max:**
   Produce a monthly line average of 80-90 hours by increasing the current monthly schedule max from 77:00
   Domestic / 82:00 International to 100:00 hours for all regularly scheduled flight attendants.

   Increase current monthly actual max from 80:00 Domestic / 85:00 International to 100:00 hours for all regularly
   scheduled flight attendants. Eliminate current option system. Flight attendants will have the option to exceed
   100 hour max.

   - Ten (10) 24-hour DFPs with FA option to waive 2 for a minimum of 8 24-hour DFPs.
   - Over 85 hours - cap of 16 On-Duty periods scheduled; 18 in actual operation with FA option to exceed.
   - Monthly line average at each Base must be a minimum of 80 hours with a maximum of 90 hours.

2. **30-in-7:**
   Eliminate 30-in-7 limitation.

3. **On-Duty Limitations:**
   Modify current Domestic schedule on-duty maximum hours of 10:00, 11:00 and 13:00 hours (based on
   departure time diurnals). Increase scheduled on-duty maximum hours to 14:00 hours for trips departing 0600-
   2059 and 12:00 hours for trips departing 2100-0559.

   Delete actual on-duty maximum hours of 12:00, 13:00 and 15:00 hours (based on departure time diurnals).
   Increase actual on-duty maximum hours to 16:00 hours for trips departing 0600-2059 and 14:00 hours for trips
   departing 2100-0559.

   | Departure | Scheduled/Rescheduled On-Duty Max | Operational On-Duty Max |
   |-----------|-----------------------------------|-------------------------|
   | 0600-2059 | 14 hours | 16 hours |
   | 2100-0559 | 12 hours | 14 hours |

   Diurnal Restriction: Duty periods with a west to east coast all-nighter leg and trans-con turnaround sequences
   with an all-nighter leg (departures after 2100 local time) will be governed by the night time diurnal (12:00 hours
   scheduled / 14:00 hours maximum).

4. **Duty Aloft:**
   Eliminate current duty aloft (scheduled flight hours) restriction of 8:59 hours for Domestic flight attendants.
   Hours aloft, plus sign- in and debrief, will not exceed on-duty limitations.

5. **Minimum Pay and Credit:**
   Current book. No change.

AMERICAN AIRLINES LAST BEST AND FINAL OFFER TO
THE ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS
JULY 19, 2012

6. **Preferential Bidding System (PBS):**
   Implement a preferential bidding system (PBS) to replace current company-built bid lines.  A PBS builds individual custom work schedules based on crew member preferences, avoiding conflicts with carry-over trips, vacation, training and other known events.

   The Company agrees to meet and confer with APFA prior to choosing a PBS vendor and will consider APFA's input prior to making a selection.  The Company may require that any vendor be the same for both flight attendants and pilots.  The Company will make the final determination.

   The Joint Scheduling Committee (JSC) will meet and confer as needed during the development and implementation of the PBS.  After implementation, the committee will continue to meet and review PBS performance.

   Revise/eliminate all provisions of the Agreement that are inconsistent with preferential bidding, included but not limited to the following:

   - Modify the requirement to provide five (5) separate forty-eight (48) hour duty free periods to ten (10) separate periods of twenty-four (24) hours free from all duty.
   - Eliminate Regular Replacement (vacation relief) and Open Replacement (no pre-planned flying assignments plotted) flight attendant schedules. Replacement flight attendants are not necessary with a PBS system.

7. **Combined Operations:**
   Combine the Domestic and International Operations, including a combined Reserve pool.  A dual qualified flight attendant will be over water trained, may be required to be trained on all equipment flown, and all service requirements.

   A dual qualified flight attendant may fly both Domestic and International trip sequences.  Dual qualification training will be mandatory for all flight attendants subject to Reserve.  All other dual qualification training will be provided as operationally necessary.

8. **Reserve:**
   Maintain current Reserve rotation system for current flight attendants.

   Accept 5/29/09 Article 10 TA and 1/6/2011 Outstanding Reserve Issues Agreement.

   New hire flight attendants will have a block(s) of reserve days on monthly schedule. Reserve days may be a block(s) of 3-6 days.  Total monthly R-days will be between 6 – 9 days.  Reserve blocks will be awarded in a PBS system based on bid preference and in seniority order.

   - An R-Day block will be treated as a sequence and will carry a guaranteed value, such that a flight attendant will be paid the greater of the R-Day block value or trips flown.
   - Any unused R-Day block may be pay protected above the normal 70 hour guarantee, but no more than 85:00 hours.
   - No value for an R-Day block that is dropped or traded.
   - AM/PM preference will not apply to R-day blocks.
   - Permit assignment of R-day Flight Attendants prior to full month reserves.
   - Pay "R-Day" sick: Pay the greater of "R-day" block value or trips flown.

AMERICAN AIRLINES' BEST AND FINAL OFFER TO
THE ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS
JULY 19, 2012

- Percentage of pay according to proposed sick policy.
- Revise/eliminate all provisions of the Agreement that are inconsistent with new reserve system.

The Joint Scheduling Committee (JSC) will meet and confer prior to the implementation of Reserve R-days for new hires.

### 9. Staffing:
Eliminate current staffing language and replace with:

The Company will establish from time to time and make available to the APFA the standards being used to determine the number of flight attendants required on flights to which a variable complement will be applied. Prior to implementing any changes to these standards, the Company will advise the APFA President or his/her designee. Every reasonable effort will be made to monitor and staff consistent with these standards.

The Company agrees to meet with Union representatives at their request at mutually agreeable times to afford them the opportunity to make recommendations concerning the staffing of Company aircraft with flight attendants. If the APFA President brings to the Company's attention a situation where in his/her opinion, due to the type of service required, serving time and number of passengers, the crew complement creates a marginal service condition (i.e., if the flight attendant crew cannot complete their work assignments as per standard practices within the allotted times), the Company will act expeditiously to investigate the problems. If, in its investigation, the Company does not agree that the addition of a flight attendant is justified, the Company will provide the APFA President with the reasons therefore.

The APFA President may request a review of this determination by the Vice President-Flight Service. The decision made by the Vice President- Flight Service will be final and binding and not subject to the provisions of Article 28.

### 10. Sick Accrual:
Change minimum annual paid hour threshold for sick accrual from 420 hours to 600 hours.

### 11. Sick Leave:
See Attachment E: "Sick Leave – Flight Attendants"

Replace the maximum sick leave accrual methodology with a short-term / long-term split-bank concept.

### 12. Sick Clearance Time:
Establish 1200 local base time as the sick clearance time.

### 13. Vacation Pay:
Upon implementation of PBS, pay vacation at a daily rate of 3:00 hours/day instead of trips missed.

Upon implementation of PBS, a flight attendant may split his/her vacation provided the vacation award is fourteen (14) days or greater (net PVDs). And in no case shall a split result in a vacation period of less than seven (7) days. For example:

8 days vacation – no split, would result in 7/1
14 days vacation – split, would result in 7/7
15 days vacation – no two splits, would result in 7/7/1
15 days vacation – split, would result in 7/8

AMERICAN AIRLINES BEST AND FINAL OFFER TO
THE ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS
JULY 19, 2012

**14. Personal Vacation Days (PVDs):**
Effective DOS, pay PVDs at the daily rate of 3:00 hours/day instead of trips missed.  Reduce PVDs from maximum accrual (based on vacation accrual rate) to a limit of six (6) per calendar year.

**15. Vacation Accrual Threshold:**
Change minimum annual paid hour threshold from 420 hours to 600 hours.

**16. Hotels:**
Eliminate the requirement to consider mutually acceptable facilities. Modify to give preference to airport hotels.

**17. Copies of Agreement:**
Eliminate requirement to distribute paper copies of the collective bargaining agreement and instead allow for electronic copies.

**18. Minimum Hours to Maintain Employment:**
In order to maintain employment, a flight attendant must be paid: 1) a minimum of 420 hours, or 2) be paid an average of 35 hours per active month if the flight attendant has been inactive due to unpaid status during the preceding 12 months.  The annual look back period for employment will be consistent with the medical benefits look back.

**19. 787 Crew Bunk Parameters:**
Execute a letter of agreement - 787 crew rest parameters

## IV. BENEFITS

**1. Pension:**
Amend the Basic Agreement so that the Company is not required to provide for future benefit accruals under the defined benefit pension plan.

Amend the Basic Agreement so that the Company is not required to maintain or fund or provide benefits under a defined contribution pension plan, except as provided below.

Amend the Basic Agreement to provide that the Company will provide a defined contribution plan benefit in the form of a 5.5% Company match of employee contributions, based on the employee's eligible compensation. Employees will automatically be enrolled (with an option to opt out) at an employee pre-tax contribution of 3% of eligible compensation per payroll period.

Eligible Compensation – for the purposes of determining any Matching Contribution or Company Contribution, eligible compensation will be the sum of all 401(k) deferrable compensation, except for the following:

- Approved expense allowances
- Benefit pay
- Company paid employee expenses
- Company paid life insurance premiums
- Co-Terminal Expenses
- Disability/Workers' Compensation payments
- Expense reimbursements

AMERICAN AIRLINES LAST, BEST AND FINAL OFFER TO
THE ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS
JULY 19, 2012

- Gain Sharing payments
- Overtime Meal Allowance
- Pre-tax flexible benefit plan contributions
- Severance pay
- Sick Bank Payout
- Termination Vacation Pay
- Tips
- Uniform Cleaning Allowance
- Value of NRSA passes

2. **Active Medical & Life:**
   Modify provisions of Article 35.
   Change minimum annual paid hour threshold from 420 to 600 for active medical.
   See Attachment F: "Active Medical & Life – Flight Attendants"

3. **Retiree Medical & Life:**
   Modify provisions of Article 35.
   See Attachment G: "Retiree Medical & Life – Flight Attendants"

4. **Article 30:**
   Modify to eliminate retiree medical and life insurance.

## V. DURATION

Six (6) years from date of signing (DOS).  At any time following DOS plus forty-eight (48) months, but prior to DOS plus seventy-two (72) months, with sixty (60) days prior written notice by either party, the parties will commence negotiations in accordance with Section 6, Title I of the Railway Labor Act, as amended.

## VI. SETTLEMENT CONSIDERATION

The Company will support before the Unsecured Creditors Committee a claim by the Flight Attendants in an amount of 3.0% of New Corporation equity or equivalent under the terms and conditions of Attachment I.

## VII. TENTATIVE AGREEMENTS

The Company agrees to incorporate the Tentative Agreements listed in Attachment H subject to modifications due to terms or language outlined in and/or in conflict with this proposal.

AMERICAN AIRLINES LAST, BEST AND FINAL OFFER TO
THE ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS
JULY 19, 2012

## Index of Appendixes

| | |
|---|---|
| Attachment A | Voluntary Early Out Program |
| Attachment B | Industry Comparison |
| Attachment C | Pay Rates |
| Attachment D | Profit Sharing |
| Attachment E | Sick Policy |
| Attachment F | Active Medical |
| Attachment G | Retiree Medical |
| Attachment H | Tentative Agreement Summary |
| Attachment I | Settlement Consideration and Bankruptcy Protections |

AMERICAN AIRLINES BEST AND FINAL OFFER TO
THE ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS
JULY 19, 2012

## ATTACHMENT A
## VOLUNTARY EARLY OUT PROGRAM – FLIGHT ATTENDANTS

July x, 2012

Laura R. Glading
President
Association of Professional Flight Attendants
1004 West Euless, TX  76040

**Re:  Voluntary Early Out Program (VEOP)**

Dear Laura,

The following represents the understanding between the parties with respect to a one time offered "Voluntary Early Out Program" reached in conjunction with the consensual agreement dated July XXXX, 2012.

1) All Flight Attendants, including those on a leave of absence and those on the furlough list who have at least fifteen (15) years of Company seniority as of July 1, 2012, shall be eligible to participate in the VEOP.

2) Separation from the Company under this program shall be permanent.  Those Flight Attendants on the furlough list who elect to participate in the VEOP shall forfeit any recall rights.

3) A lump sum pre-tax payment of $40,000 shall constitute severance.

4) An election window shall open on August XX, 2012 and will close at midnight August XX, 2012

5) A Flight Attendant may not elect to take both this VEOP and Article 30.

6) Flight Attendants will be able to proffer for a specific separation period to include the fourth quarter, 2012; the first quarter 2013; the second quarter 2013 or the third quarter 2013, but the Company's acceptance is subject to paragraphs 8 below.

7) Once a Flight Attendant has elected to separate under the terms of the VEOP, such election shall be irrevocable.

8) Separation dates shall be at the discretion of Flight Service subject to operational needs.

9) This one-time, limited agreement shall not constitute a precedent for any purpose.  Furthermore, it does not change, alter, or modify the provisions of the Collective Bargaining Agreement, except as provided herein. In addition, it will not be construed against either party nor will it prejudice the parties' respective positions for purposes of any other matter between the parties, including, but not limited to, any grievance, arbitration, and/or litigation.

AMERICAN AIRLINES BEST AND FINAL OFFER TO
THE ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS
JULY 19, 2012

Sincerely,


Taylor M. Vaughn
Managing Director
Employee Relations


Agreed to and accepted:


_____ Date: _____
Laura R. Glading
President, APFA


Cc:    Denise Lynn
       Laura A. Einspanier
       Lauri Curtis
       Cathy Scheu
       Marcus Gluth

AMERICAN AIRLINES BEST AND FINAL OFFER TO
THE ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS
JULY 19, 2012

### ATTACHMENT B
### INDUSTRY COMPARABLE PAY RATES – FLIGHT ATTENDANTS

1) Effective the first day of the contractual month following DOS + 36 months[1], for the fourth year of the Agreement, domestic base pay rates shall receive an Industry Comparable Pay Rate Adjustment, to be determined according to the procedures and standards set forth in Paragraph 2 below. The comparators to be used in determining the Industry Comparable Pay Rate Adjustment are Delta Airlines, United Airlines, Continental Airlines, US Airways, and America West (or their successors) as long as their flight attendants continue to operate under separate flight attendant contracts ("the Industry Comparators").

2) Industry Comparable Pay Rate Adjustment procedures and standards:

a) Industry Comparable Pay Rates shall be determined by calculating the simple average of the top of scale domestic hourly base pay rates (excluding premiums, per diems, etc.) that will be in effect on DOS + 36 months at the Industry Comparators.

b) After determining the average Industry Comparable Pay Rate, the parties or interest arbitration panel will calculate a percentage rate increase to be applied to the Company's equivalent hourly base pay rate to bring it up to the determined average Industry Comparable Pay Rate ("Industry Comparable Pay Rate Adjustment"). This Industry Comparable Pay Rate Adjustment will then be applied to the hourly base pay rates for all of the Company's Flight Attendants pay steps.

c) On or before DOS + 30 months, the parties shall meet and confer for a period of up to 30 days to determine if they can achieve a voluntary agreement for an Industry Comparable Pay Rate Adjustment.

d) If by DOS + 31 months, the parties are unable to achieve a voluntary agreement according to the procedures set forth in (2)(a) and (b) above, they shall submit the issue of an Industry Comparable Pay Rate Adjustment to interest arbitration under the procedures of Section 7 of the Railway Labor Act.

   i) The parties shall mutually agree on or before DOS + 31 to the selection of three neutral arbitrators. In the absence of an agreement on the selection, the parties shall solicit the National Academy of Arbitrators for a list of fifteen (15) arbitrators. Using an alternate strike methodology, or any other agreed to by the parties, a panel of three neutral arbitrators will be selected from that list.

   ii) In order to facilitate the interest arbitration, the parties may enter an interest arbitration agreement setting forth ground rules for the interest arbitration. In the absence of such interest arbitration agreement, the interest arbitration shall be conducted according to the provisions of this Agreement and whatever ground rules the panel shall deem appropriate.

   iii) The parties shall share equally all costs of interest arbitration.

   iv) The interest arbitration shall begin on or before DOS + 32 months and a hearing shall be concluded and a decision issued on or before DOS + 35 months.

---

[1] Company agrees if DOS is the first day of the month, the Industry Comparable Pay Rate Adjustment will be effective on DOS + 36 months.

AMERICAN AIRLINES LAST BEST AND FINAL OFFER TO
THE ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS
JULY 19, 2012

**ATTACHMENT C**

**BASE PAY RATES - FLIGHT ATTENDANTS**

| | | DOS | DOS +12 | DOS +24 | DOS +36 | DOS +48 | DOS +60 |
|---|---|---|---|---|---|---|---|
| | Increase: | 3.0% | 2.0% | 1.5% | 1.0% | 1.0% | 1.0% |

| Paystep | Current | DOS | DOS +12 | DOS +24 | DOS +36 | DOS +48 | DOS +60 |
|---|---|---|---|---|---|---|---|
| 1 | $ 20.24 | $ 20.85 | $ 21.26 | $ 21.58 | $ 21.80 | $ 22.02 | $ 22.24 |
| 2 | $ 21.98 | $ 22.64 | $ 23.09 | $ 23.44 | $ 23.67 | $ 23.91 | $ 24.15 |
| 3 | $ 23.81 | $ 24.52 | $ 25.01 | $ 25.39 | $ 25.64 | $ 25.90 | $ 26.16 |
| 4 | $ 25.04 | $ 25.79 | $ 26.31 | $ 26.70 | $ 26.97 | $ 27.24 | $ 27.51 |
| 5 | $ 27.97 | $ 28.81 | $ 29.39 | $ 29.83 | $ 30.12 | $ 30.43 | $ 30.73 |
| 6 | $ 32.32 | $ 33.29 | $ 33.96 | $ 34.46 | $ 34.81 | $ 35.16 | $ 35.51 |
| 7 | $ 34.95 | $ 36.00 | $ 36.72 | $ 37.27 | $ 37.64 | $ 38.02 | $ 38.40 |
| 8 | $ 36.83 | $ 37.93 | $ 38.69 | $ 39.27 | $ 39.67 | $ 40.06 | $ 40.46 |
| 9 | $ 38.37 | $ 39.52 | $ 40.31 | $ 40.92 | $ 41.33 | $ 41.74 | $ 42.16 |
| 10 | $ 39.89 | $ 41.09 | $ 41.91 | $ 42.54 | $ 42.96 | $ 43.39 | $ 43.83 |
| 11 | $ 41.20 | $ 42.44 | $ 43.28 | $ 43.93 | $ 44.37 | $ 44.82 | $ 45.27 |
| 12 | $ 42.65 | $ 43.93 | $ 44.81 | $ 45.48 | $ 45.94 | $ 46.39 | $ 46.86 |
| 13 | $ 43.83 | $ 45.14 | $ 46.05 | $ 46.74 | $ 47.21 | $ 47.68 | $ 48.15 |
| 14 | $ 44.90 | $ 46.25 | $ 47.17 | $ 47.88 | $ 48.36 | $ 48.84 | $ 49.33 |
| 15 | $ 46.00 | $ 47.38 | $ 48.33 | $ 49.05 | $ 49.54 | $ 50.04 | $ 50.54 |

**ATTACHMENT D**
**ENHANCED PROFIT SHARING PLAN – FLIGHT ATTENDANTS**

Implementation of the Enhanced Profit Sharing Plan:

1. Current profit sharing plan and the Annual Incentive Plan (AIP) would be eliminated.

2. Beginning at the first dollar of pre-tax income, the new Profit Sharing plan would pay awards equal to 5% of all pre-tax income, prorated to take into account any groups of frontline employees who do not participate in the plan. Pre-tax income for the purposes of these awards will be calculated prior to the effects on income of any special, unusual, and non-reoccurring items or incentive pay.

3. The Enhanced Fund would be distributed equitably to all eligible employees based on each employee's eligible earnings. Profit sharing is eligible for 401K matching funds.

4. Individual Enhanced Awards will be distributed no later than March 15 of the following year for employees who meet the eligibility requirements as long as minimum funding provisions are met.

AMERICAN AIRLINES BEST AND FINAL OFFER TO
THE ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS
JULY 19, 2012

## ATTACHMENT E
## SICK LEAVE – FLIGHT ATTENDANTS

The Company proposes the following changes and clarifications to sick leave policy:

- Replace the maximum sick leave accrual methodology with a short-term / long-term split-bank concept.
- Accrual remains at three (3) hours per active month (maximum thirty-six (36) hours per year)
- A flight attendant's current sick bank will be distributed into a short term and long term bank.
- On January 1, 2013, the short term bank will be created using her/his existing sick balance or five (5) hours times the number of calendar months remaining in the year, whichever is less. Thereafter, the short-term bank will be capped at sixty (60) hours effective each January 1.
- Any remaining balance becomes the beginning balance of the flight attendant's long term sick balance. Thereafter, the long term bank will be capped at nine hundred forty (940) hours.
- At the beginning of each year, a flight attendant's prior years' sick accrual will be applied to the flight attendant's short-term bank, up to a maximum of sixty (60) hours.
    - o Any remaining hours in excess of sixty (60) hours will be paid or applied to the long term bank in the following manner: 50% of hours will be applied to the long term bank and 50% will be paid out at the flight attendant's base rate. The payout will also apply those F/As who have a max sick bank.

Sick Verification/Proof of Illness:

- A flight attendant may only access her/his long-term sick bank in the event of an illness or injury that will exceed ten (10) consecutive calendar days, and is authorized by the Corporate Medical Director or a company approved Absence Management Vendor (AMV), as applicable.
    - o A flight attendant's long-term sick bank will be available to cover an authorized illness or injury that will exceed ten (10) consecutive calendar days at such time as the Company receives the authorization.
    - o A flight attendant with a documented severe and recurring medical condition (i.e. cancer) may access his/her long-term bank for illnesses of less than ten (10) days with concurrence of the AA Medical Department or AVM, in the event the flight attendant's short term bank has been exhausted.

**Attendance Policy**

The Flight Attendant's Attendance Policy as determined by the Company, applies to all paid, unpaid, substantiated and unsubstantiated time away from work for illness or injury.

**Active Medical while on Paid or Unpaid Sick or Injury**

1. Flight attendants may remain on active medical coverage paying active medical contributions for up to 12 months per injury/illness as defined below:
    a. On the 10th day of a continuous absence due to injury/illness, the flight attendants' 12 months of active medical coverage will begin. Flight attendants will pay their monthly active medical contributions through the direct bill process established by the company. If payment is not received, medical benefits will terminate and the flight attendant will be solicited for COBRA continuation if eligible at the normal COBRA rates.
    b. A flight attendant, who continues with the same absence due to illness/injury beyond 12 months, will be solicited for COBRA continuation if eligible at the normal COBRA rates.

AMERICAN AIRLINES BEST AND FINAL OFFER TO
THE ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS
JULY 19, 2012

## ATTACHMENT F
## ACTIVE MEDICAL & LIFE – FLIGHT ATTENDANTS

1. With the exception of the Standard plan design features in the chart and changes noted in #3 below, all other plan provisions are subject to change at Company discretion. Plan design features and other plan provisions in the Core medical option may change at Company discretion and advance notice of any changes will be provided prior to implementation. To the extent the Company is offering the Value medical option in any Plan Year to employees, employees eligible to enroll in the Standard and Core medical options will be eligible to enroll in the Value option; the Company, at its discretion may change plan design and contributions in the Value option or otherwise amend or eliminate the Value option.

2. Aggregate employee contributions for the Standard and Core medical options for 2013 will be 18%, 2014 will be 19%, 2015 will be 20% and 2016 and thereafter will be 21% of the total projected cost of each forecasted year of healthcare expenses (which include medical/Rx and administrative expenses). Contributions for the Standard and Core medical options will increase with inflation for these two (2) medical options with cost share set as explained above. The Value medical option inflation will be calculated separately.

3. The Standard medical option annual deductible will increase $50 in 2015 and 2017 until the deductible reaches $850 for employee only coverage, $2,550 for family coverage.

4. Current coverage tiers for contributions will be replaced, as follows:

| Current Coverage Tiers | New Coverage Tiers | Multiplier |
|---|---|---|
| Employee Only | Employee Only | 1.0 |
| Employee + 1 | Employee + Spouse/Domestic Partner | 2.6 |
|  | Employee + Child(ren) | 1.8 |
| Employee + 2 or more | Employee + Family | 3.5 |

5. The $150, $250, $500, $1000 standard medical options in the current CBA will be eliminated including the elimination of the current inflation formula used to determine future contributions.

6. New employees eligible for healthcare coverage will default to the Core option, which is the Health Savings Account-compatible medical option, for Employee Only coverage on their eligibility date, should another option or level not be elected during their initial enrollment.

7. To the extent the Company is offering incentives in any Plan Year to employees for participating in the Healthmatters wellness program, employees enrolled in the Standard and Core Plans will be eligible for those incentives provided they meet the criteria (as established by the Company at its discretion) for earning the incentive.

8. The letter of agreement between the Company and APFA regarding administration of benefits will be withdrawn.

9. Change minimum annual hour threshold of 420 hours to 600 hours with an annual twelve (12) months "look-back" from August 1st of the current calendar year to determine eligibility for Company paid health benefits for the following calendar year. Flight Attendants who do not meet the 600 hours threshold will have the option to maintain health benefits by assuming the Company's applicable portion of the cost in addition to their applicable employee contributions. (35.B.). Medical premiums must be paid current (each month) to maintain active coverage.

> Example: August 1, 2012 to July 31, 2013 is the look back period; the annual enrollment for the 2014 calendar year will be in the fall. Flight Attendants not meeting the minimum threshold during the look back period will be able to enroll in benefits for calendar year 2014 and pay the Company's applicable portion of the health benefits cost in addition to their applicable employee contributions.

## AMERICAN AIRLINES BEST AND FINAL OFFER TO
## THE ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS
### JULY 19, 2012

| | Value | Standard | Core |
|---|---|---|---|
| **Plan Design Features** | Non-Contractual | **Contractual Features** | Non-Contractual |
| Health Spending Accounts | N/A | **HRA** | **HSA Compatible** |
| Spending Account Funding (2013 only) | $0 | **$375 ee & $375 sp** | $0 |
| In Network Deductible (Single/Family) | $300/$900 | **$750/$2,250** | $2,000/$4,000** |
| Out of Network Deductible (Single/Family) | $1500/$4500 | **$3,000/$9000** | $4,000/$8,000** |
| Coinsurance (In/Out) | 20%/40% | **20%/40%** | 30%/50% |
| In Network Out of Pocket Max (Single/Family) | $1,750/$4,375 | **$2,000/$5,000** | $6,000/$12,000** |
| Out of Network Out of Pocket Max (Single/Family) | $6,000/$15,000 | **$6,000/$15,000** | $12,000/$24,000** |
| Primary Care Physician Copay (In/Out) | $20* | **$30*** | 30%/50% |
| Specialist Copay (In/Out) | $40* | **20%/40%** | 30%/50% |
| Retail Clinics Copay (In/Out) | $40* | **20%/40%** | 30%/50% |
| Preventive Care (in network only)* | $0 | **$0** | $0 |
| Emergency Room | Ded/Coins/$100 CoPay | Ded/Coins/$100 CoPay | Ded/Coins |
| **Pharmacy (Retail)** | | | |
| Generic | $10 | 20% ($10 min/$40 max) | subject to deductibles and coinsurance*** |
| Formulary Brand | 30% ($20 min/$75 max) | 30% ($30 min/$100 max) | |
| Non-Formulary Brand | 50% ($35 min/$90 max) | 50% ($45 min/$150 max) | |
| **Pharmacy (Mail)** | | | |
| Generic | 20% ($0 min/$80 max) | 20% ($5 min/$80 max) | subject to deductibles and coinsurance*** |
| Formulary Brand | 30% ($40 min/$150 max) | 30% ($60 min/$200 max) | |
| Non-Formulary Brand | 50% ($70 min/$180 max) | 50% ($90 min/$300 max) | |
| **2013 Monthly Contributions** | | | |
| EE Only | $112.50 | $70.69 | $57.40 |
| EE + Spouse/DP | $292.50 | $183.81 | $149.25 |
| EE + Child(ren) | $202.50 | $127.25 | $103.33 |
| EE + Family | $393.75 | $247.43 | $200.91 |

*Not subject to deductible if in network; deductible and co-insurance apply if out of network

** Core - each deductible (single/family) is an aggregate that needs to be satisfied in total before coinsurance applies

** Core - the deductible is calculated as satisfying a portion of the OOP Max

** Core - each (single/family) OOP Max is an aggregate that needs to be satisfied in total before receiving 100% coverage

***Preventive Rx not subject to deductible, coinsurance still applies

Value, Standard, and Core coinsurance amounts (Medical and Rx) apply towards OOP maximums

OOP amounts do not include the deductibles for Value or Standard

For the Standard Option, pharmacy co-insurance is applied toward the
out-of pocket maximums but not the annual deductibles.

AMERICAN AIRLINES LAST, BEST AND FINAL OFFER TO
THE ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS
JULY 19, 2012

## ATTACHMENT G
### RETIREE MEDICAL & LIFE – FLIGHT ATTENDANTS

1.      Amend the collective bargaining agreement, any letter agreements and any ancillary documents so that the Company is not required to maintain, fund, or provide for retiree medical or retiree life benefits, including elimination of the retiree medical and retiree life insurance references.

2.      Early retirees age 55 – 64 will have access to a company sponsored retiree medical option. Contributions for this coverage will be 100% of projected annual expenses (which includes administrative expenses) using data, assumptions, and methodologies for calculating future retiree healthcare costs. For 2012, the Company will offer the pre-65 plan design (which includes a provider network) offered to management employees.

3.      Retiree medical option for age 65 and over will cease. Retirees will be offered access to purchase a guaranteed issue Medicare supplement plan through a third party administrator to the extent available.

4.      A participant who currently prefunds for retiree medical will be refunded the employee's prefunding account (which reflects investment experience).

5.      Contingent on the successful resolution of the Section 1114 process, as soon as practicable after termination of the Trust Agreement for the Group Life and Health Benefits Plan for Employees of Participating AMR Corporation Subsidiaries (Union Employees), the Company prefunding contributions for each participating active employee, and investment earnings attributable thereto, will be distributed to the employee (subject to applicable tax withholdings), excluding employees who have already received refunds of their employee prefunding accounts.

6.      Although it is the Company's intention to continue to make available access to early retiree medical coverage (age 55 – 64), the Company will reserve the right to modify, amend, or terminate the plan at any time.

7.      Retiree life insurance benefit will be discontinued.

AMERICAN AIRLINES BEST AND FINAL OFFER TO
THE ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS
JULY 19, 2012

**ATTACHMENT H**
**TENTATIVE AGREEMENT SUMMARY**

| Art Number | Tentative Agreement | Agreed to Date |
| --- | --- | --- |
| 1 | Recognition & Merger/Acquisition Protection | 7/24/09 |
| 5 | Uniforms & Accessories | 2/13/08 |
| 10 | Reserve | 5/29/09 |
| 11 | Language | 4/2/09 |
| 12 | Filling of Vacancies | 11/20/08 |
| 14 | Seniority List | 10/14/08 |
| 15 | Period of Probation | 10/8/08 |
| 16 | Reduction in Force | 7/24/09 |
| 17 | Transfer to Non-Flying or Supervisory Duties | 10/8/08 |
| 18 | Moving Expenses | 12/16/08 |
| 19 | Leaves of Absence | 12/16/08 |
| 20 | Medical Appeals / Arbitration | 4/2/09 |
| 22 (Old) | Joint Scheduling Committee | 11/18/08 |
| 22 (New) | Training & Meetings | 7/23/09 |
| 23 | Emergency Assignments | 11/18/08 |
| 24 | Copies of the Agreement | 12/12/08 |
| 25 | Exchange of Trips | 7/31/09 |
| 27 | Bereavement | 2/12/09 |
| 28 | Dispute Resolution & Grievance | 10/8/08 |
| 29 | System Board of Adjustment | 10/8/08 |
| 30 | General | 4/2/09 |
| 31 | Union Security | 2/11/09 |
| 32 | Health & Safety Committee | 4/2/09 |
| 33 | No Strike, No Lock Out | 10/14/08 |
| 34 | Purser | 4/2/09 |
| 37 | Effect on Prior Agreements | 7/23/09 |

August 22, 2012

Laura R. Glading, President
Association of Professional Flight Attendants
1004 West Euless Blvd.
Euless TX 76040

Subject:    Settlement Consideration and Bankruptcy Protections

Dear Laura:

The modifications to the collective bargaining agreement between American Airlines, Inc. ("Company") and the Association of Professional Flight Attendants ("APFA") reached in connection with the Company's Chapter 11 Restructuring embodied in the Last Best & Final Offer dated July 19, 2012 were agreed to in furtherance of the Company's effort to restructure its capital structure and operations, and in consideration of the terms of the Last Best & Final Offer and this Letter of Agreement. This Letter of Agreement will be binding on any Chapter 11 trustee that may be appointed in the Company's present bankruptcy cases, *In re AMR Corporation, et al.*, Chapter 11 Case No. 11-15463(SHL), or other entity operating with the equivalent authority of a Chapter 11 trustee.

The Company and APFA agree as follows:

**1. Settlement Consideration.** In full and complete satisfaction of any and all claims APFA has or might arguably have, on behalf of itself or the flight attendants represented by APFA pursuant to the Railway Labor Act ("RLA") and the terms of the CBA, against the Debtors (or any of them) in the jointly administered Chapter 11 Case No. 11-15463 (SHL) (hereafter "Bankruptcy Cases"), and subject to the approval of the Court, APFA will receive under a plan or plans of reorganization of the Debtors equity in the reorganized entity (the "APFA Settlement Consideration") equal to 3.0% of such equity issued to the holders of allowed prepetition unsecured claims (including APFA) against the Debtors (including any equity issued with respect to other unions) (collectively the "Unsecured Claims"). The APFA Settlement Consideration fully, finally, and completely extinguishes any and all claims, interests, causes or demands (including any and all pending grievances, excluding grievance SS-2006-APFA-003, and discipline and termination cases) APFA has or might arguably have, on behalf of itself or the flight attendants represented by APFA pursuant to the RLA and the terms of the CBA, against the Debtors arising prior to the effective date of this Letter of Agreement as described herein. The APFA Settlement Consideration will not be diluted by any subsequent events other than (1) equity consideration given to holders of interests in another entity in the event of a merger or consolidation as provided below; (2) an equity offering approved by the Bankruptcy Court in conjunction with confirmation of a plan of reorganization; (3) equity consideration granted to management in connection with incentive plans approved by the Bankruptcy Court; and (4) any post-emergence equity issuance.

1

Subject to the foregoing, in the event of a reorganization plan for the Debtors that provides for the consolidation of the Debtors with a third party, the APFA Settlement Consideration shall be equal to 3.0% of the total consideration distributed with respect to the Unsecured Claims, and shall be issued contemporaneously with the consideration distributed under the plan with respect to the other Unsecured Claims.

The APFA Settlement Consideration will confer upon APFA all statutory rights to vote on any plan or plans of reorganization presented by the Company or any other entity.  In the event that the APFA Settlement Consideration has not yet been actually issued, it will be estimated for voting purposes as if the APFA held allowed unsecured claims in an amount that would entitle it to the APFA Settlement Consideration.   Neither the APFA Settlement Consideration nor any rights under this Letter of Agreement may be assigned or transferred (including the granting of any participation) prior to the effective date of a plan of reorganization, except with the express written consent of the Company exercised in its sole discretion.

Debtors and APFA will discuss in good faith whether, and if so on what terms, a portion of the APFA Settlement Consideration shall be in the form of cash or debt (based on the value of the equity otherwise to be received).

The APFA agrees that it will recommend the Last Best & Final Offer and this Letter of Agreement to its membership for ratification.

**2. Effective date.**  This Letter of Agreement shall not become effective until the last-occurring of these events:

> (1)  The Last Best & Final Offer is ratified by the flight attendant membership pursuant to procedures determined by the APFA Board of Directors;

> (2)  The Last Best & Final Offer and this Letter of Agreement are approved by an order of the United States Bankruptcy Court for the Southern District of New York which order has not been stayed.

It is expressly understood and agreed that if the Last Best & Final Offer does not become effective, all of the terms contained in this Letter of Agreement are inapplicable and will be of no force or effect.  At such time as the Last Best & Final Offer becomes effective, but prior to the approval of any Plan of Reorganization in these cases, this Letter of Agreement shall constitute a binding and enforceable post-petition agreement between APFA and the Company.

**3. Administrative claim for fees and expenses.**  APFA shall have an allowed administrative expense claim as of the Effective Date in an amount sufficient to pay the actual reasonable fees and expenses (including attorneys, experts and financial advisors) incurred by APFA in connection with the negotiation and effectuation of the Debtors' motion under section 1113 of the Bankruptcy Code, of the Last Best & Final Offer, and of the Letter of Agreement, not to exceed $5 million.  In addition, on the Effective Date, APFA shall have an allowed administrative expense claim in the amount of up to $2 million for the reasonable fees and expenses of the APFA's investment banker (Jefferies & Co.).  The fees and expenses payable hereunder shall not include fees or expenses incurred in connection with the pursuit of any third party purchaser of the Debtors or a merger partner (including but not limited to US Airways).

**4. Indemnification.**  The Company will indemnify and hold harmless APFA and its current or former (a) members, (b) officers, (c) directors, (d) committee members, (e) employees, (f) advisors, (g) attorneys, (h) accountants, (i) investment bankers, (j) consultants, (k) agents, (l) actuaries, (m) financial advisors, (n) professionals, (o) agents and (l) other representatives its

2

officers, agents, employees, counsel, and representatives (each an indemnitee) from fifty percent of any liability, loss, damages, fines, penalties, taxes ,expenses, and costs (not including any income or excise taxes or similar amounts imposed by any governmental agency) relating to, concerning or resulting from any and all third party claims, lawsuits, or administrative charges of any sort whatsoever, including fifty percent of the reasonable attorney's fees and costs, arising in connection with matters relating to, concerning or connected to the negotiation or establishment of (a) the Last Best & Final Offer and this Letter of Agreement, (b) any amendment of any benefit plan or program concerning flight attendants or other participants in such plan made pursuant to or as a result of the Last Best & Final Offer and this Letter of Agreement, and (c) any other document or agreement forming part of the Last Best & Final Offer and this Letter of Agreement. This fifty-percent sharing arrangement will exist until APFA's financial exposure reaches $5 million. Any exposure exceeding $5 million will be the responsibility of the Company.

Such indemnification and hold harmless obligation will not apply to: 1) any claim, lawsuit or administrative charge resulting from the willful or intentional conduct of any indemnitee; 2) any claim, lawsuit or administrative charge asserting that APFA violated its By-Laws or other organizational requirements by entering into the Last Best & Final Offer and this Letter of Agreement; 3) any claim, lawsuit or administrative charge resulting from any statement made by any indemnitee that incorrectly describes the Last Best & Final Offer or Letter of Agreement or the modifications made thereby; 4) any claim, lawsuit or administrative charge related to allocation among American flight attendants represented by APFA of any claim or any proceeds or distribution received in connection with the APFA Settlement Consideration or 5) any claim, lawsuit or administrative charge related to any disposition by APFA or flight attendants represented by APFA to third parties of the APFA Settlement Consideration or any proceeds or distribution received in connection therewith.

An indemnitee seeking to be indemnified and held harmless pursuant to this paragraph must provide to the Company written notice within seven business days of the indemnitee learning of the claim, lawsuit or administrative charge as to which the indemnitee seeks to be indemnified and held harmless. The Company will have the right to conduct the defense of such matter with counsel of the Company's choosing and enter into a settlement of such matter. The Company will give reasonable consideration to the wishes of the indemnitee in connection with the matters described in the foregoing sentence.

**5. Exculpation.** The Company agrees that it will not propose or support any Plan of Reorganization that does not contain an exculpation or release provision for APFA and each of their current or former members, officers, directors, committee members, employees, advisors, attorneys, accountants, actuaries, investment bankers, consultants, agents and other representatives at least as favorable as any exculpation or release provisions provided for the Company's officers, directors, employees, advisors, attorneys, accountants, actuaries, investment bankers, consultants, agents and other representatives.

**6. Bankruptcy protection.** From the date of this Letter of Agreement until a date three years from the date of this Letter of Agreement, the Debtors will not file or support any motion ("Motion") pursuant to 11 U.S.C. Sections 1113, 1113(e), or any other relevant provision of the Bankruptcy Code, seeking rejection or modification of, or relief or interim relief from, the Last Best & Final Offer or this Letter of Agreement and the finalized documents implementing the Last Best & Final Offer or this Letter of Agreement. The Debtors will actively oppose any such Motion if filed by another party.

3

Notwithstanding the foregoing, the Debtors reserve the right to file or support any Motion if there is a material deterioration in the Company's financial condition or financial prospects, whether because of general economic conditions or otherwise. All requirements and provisions of section 1113 will also remain applicable to any such Motion. APFA reserves its right to object to such Motion and nothing in this Letter of Agreement shall be construed as an agreement by the APFA to such modifications or relief.

**7.  Court approval.**  With the full and active support of APFA, the Company will file and prosecute a motion for approval and assumption of the CBA as modified by the Last Best & Final Offer and this Letter of Agreement under sections 363 and 1113 of the Bankruptcy Code and any other applicable sections thereto if the conditions set forth in Paragraphs 2(1) and 2(2) are satisfied.  Both the motion and the proposed order attached thereto (the 363 Order) shall be in form and substance reasonably acceptable to APFA.  Both the Company and APFA will use their reasonable best efforts to obtain the support of the Official Committee of Unsecured Creditors and other parties and stakeholders for the Last Best & Final Offer, including this Letter of Agreement, and to seek entry of the 363 Order.

**9.  Issuance of equity.**  Subject to the foregoing, APFA agrees not to object to or contest the issuance of equity or other consideration in the Bankruptcy Cases to the Company's non-union and management employees, in respect of the sacrifices made by them in furtherance of the Company's effort to restructure or as incentive for the non-union and management employees' future service to the Company.

**10.  Damages.**  Other than the APFA Settlement Consideration and the claims reserved in Section 1 above, the APFA shall not have any claims as a result of the Company's requests for relief under Section 1113 of the Bankruptcy Code or the parties' entry into the Last Best & Final Offer or this Letter of Agreement.

Sincerely,


Laura A. Einspanier
Vice President - Employee Relations


Agreed:



Laura Glading
President
Association of Professional Flight Attendants

**Exhibit "C"**

**Letter Agreement on
Settlement Consideration
and Bankruptcy Protections
August 22, 2012**

August 22, 2012

Laura R. Glading, President
Association of Professional Flight Attendants
1004 West Euless Blvd.
Euless TX 76040

Subject:     <u>Settlement Consideration and Bankruptcy Protections</u>

Dear Laura:

The modifications to the collective bargaining agreement between American Airlines, Inc. ("Company") and the Association of Professional Flight Attendants ("APFA") reached in connection with the Company's Chapter 11 Restructuring embodied in the Last Best & Final Offer dated July 19, 2012 were agreed to in furtherance of the Company's effort to restructure its capital structure and operations, and in consideration of the terms of the Last Best & Final Offer and this Letter of Agreement. This Letter of Agreement will be binding on any Chapter 11 trustee that may be appointed in the Company's present bankruptcy cases, *In re AMR Corporation, et al.*, Chapter 11 Case No. 11-15463(SHL), or other entity operating with the equivalent authority of a Chapter 11 trustee.

The Company and APFA agree as follows:

**1. Settlement Consideration.** In full and complete satisfaction of any and all claims APFA has or might arguably have, on behalf of itself or the flight attendants represented by APFA pursuant to the Railway Labor Act ("RLA") and the terms of the CBA, against the Debtors (or any of them) in the jointly administered Chapter 11 Case No. 11-15463 (SHL) (hereafter "Bankruptcy Cases"), and subject to the approval of the Court, APFA will receive under a plan or plans of reorganization of the Debtors equity in the reorganized entity (the "APFA Settlement Consideration") equal to 3.0% of such equity issued to the holders of allowed prepetition unsecured claims (including APFA) against the Debtors (including any equity issued with respect to other unions) (collectively the "Unsecured Claims"). The APFA Settlement Consideration fully, finally, and completely extinguishes any and all claims, interests, causes or demands (including any and all pending grievances, excluding grievance SS-2006-APFA-003, and discipline and termination cases) APFA has or might arguably have, on behalf of itself or the flight attendants represented by APFA pursuant to the RLA and the terms of the CBA, against the Debtors arising prior to the effective date of this Letter of Agreement as described herein. The APFA Settlement Consideration will not be diluted by any subsequent events other than (1) equity consideration given to holders of interests in another entity in the event of a merger or consolidation as provided below; (2) an equity offering approved by the Bankruptcy Court in conjunction with confirmation of a plan of reorganization; (3) equity consideration granted to management in connection with incentive plans approved by the Bankruptcy Court; and (4) any post-emergence equity issuance.

1

Subject to the foregoing, in the event of a reorganization plan for the Debtors that provides for the consolidation of the Debtors with a third party, the APFA Settlement Consideration shall be equal to 3.0% of the total consideration distributed with respect to the Unsecured Claims, and shall be issued contemporaneously with the consideration distributed under the plan with respect to the other Unsecured Claims.

The APFA Settlement Consideration will confer upon APFA all statutory rights to vote on any plan or plans of reorganization presented by the Company or any other entity. In the event that the APFA Settlement Consideration has not yet been actually issued, it will be estimated for voting purposes as if the APFA held allowed unsecured claims in an amount that would entitle it to the APFA Settlement Consideration. Neither the APFA Settlement Consideration nor any rights under this Letter of Agreement may be assigned or transferred (including the granting of any participation) prior to the effective date of a plan of reorganization, except with the express written consent of the Company exercised in its sole discretion.

Debtors and APFA will discuss in good faith whether, and if so on what terms, a portion of the APFA Settlement Consideration shall be in the form of cash or debt (based on the value of the equity otherwise to be received).

The APFA agrees that it will recommend the Last Best & Final Offer and this Letter of Agreement to its membership for ratification.

**2. Effective date.** This Letter of Agreement shall not become effective until the last-occurring of these events:

> (1) The Last Best & Final Offer is ratified by the flight attendant membership pursuant to procedures determined by the APFA Board of Directors;

> (2) The Last Best & Final Offer and this Letter of Agreement are approved by an order of the United States Bankruptcy Court for the Southern District of New York which order has not been stayed.

It is expressly understood and agreed that if the Last Best & Final Offer does not become effective, all of the terms contained in this Letter of Agreement are inapplicable and will be of no force or effect. At such time as the Last Best & Final Offer becomes effective, but prior to the approval of any Plan of Reorganization in these cases, this Letter of Agreement shall constitute a binding and enforceable post-petition agreement between APFA and the Company.

**3. Administrative claim for fees and expenses.** APFA shall have an allowed administrative expense claim as of the Effective Date in an amount sufficient to pay the actual reasonable fees and expenses (including attorneys, experts and financial advisors) incurred by APFA in connection with the negotiation and effectuation of the Debtors' motion under section 1113 of the Bankruptcy Code, of the Last Best & Final Offer, and of the Letter of Agreement, not to exceed $5 million. In addition, on the Effective Date, APFA shall have an allowed administrative expense claim in the amount of up to $2 million for the reasonable fees and expenses of the APFA's investment banker (Jefferies & Co.). The fees and expenses payable hereunder shall not include fees or expenses incurred in connection with the pursuit of any third party purchaser of the Debtors or a merger partner (including but not limited to US Airways).

**4. Indemnification.** The Company will indemnify and hold harmless APFA and its current or former (a) members, (b) officers, (c) directors, (d) committee members, (e) employees, (f) advisors, (g) attorneys, (h) accountants, (i) investment bankers, (j) consultants, (k) agents, (l) actuaries, (m) financial advisors, (n) professionals, (o) agents and (l) other representatives its

officers, agents, employees, counsel, and representatives (each an indemnitee) from fifty percent of any liability, loss, damages, fines, penalties, taxes ,expenses, and costs (not including any income or excise taxes or similar amounts imposed by any governmental agency) relating to, concerning or resulting from any and all third party claims, lawsuits, or administrative charges of any sort whatsoever, including fifty percent of the reasonable attorney's fees and costs, arising in connection with matters relating to, concerning or connected to the negotiation or establishment of (a) the Last Best & Final Offer and this Letter of Agreement, (b) any amendment of any benefit plan or program concerning flight attendants or other participants in such plan made pursuant to or as a result of the Last Best & Final Offer and this Letter of Agreement, and (c) any other document or agreement forming part of the Last Best & Final Offer and this Letter of Agreement. This fifty-percent sharing arrangement will exist until APFA's financial exposure reaches $5 million. Any exposure exceeding $5 million will be the responsibility of the Company.

Such indemnification and hold harmless obligation will not apply to: 1) any claim, lawsuit or administrative charge resulting from the willful or intentional conduct of any indemnitee; 2) any claim, lawsuit or administrative charge asserting that APFA violated its By-Laws or other organizational requirements by entering into the Last Best & Final Offer and this Letter of Agreement; 3) any claim, lawsuit or administrative charge resulting from any statement made by any indemnitee that incorrectly describes the Last Best & Final Offer or Letter of Agreement or the modifications made thereby; 4) any claim, lawsuit or administrative charge related to allocation among American flight attendants represented by APFA of any claim or any proceeds or distribution received in connection with the APFA Settlement Consideration or 5) any claim, lawsuit or administrative charge related to any disposition by APFA or flight attendants represented by APFA to third parties of the APFA Settlement Consideration or any proceeds or distribution received in connection therewith.

An indemnitee seeking to be indemnified and held harmless pursuant to this paragraph must provide to the Company written notice within seven business days of the indemnitee learning of the claim, lawsuit or administrative charge as to which the indemnitee seeks to be indemnified and held harmless. The Company will have the right to conduct the defense of such matter with counsel of the Company's choosing and enter into a settlement of such matter. The Company will give reasonable consideration to the wishes of the indemnitee in connection with the matters described in the foregoing sentence.

**5. Exculpation.** The Company agrees that it will not propose or support any Plan of Reorganization that does not contain an exculpation or release provision for APFA and each of their current or former members, officers, directors, committee members, employees, advisors, attorneys, accountants, actuaries, investment bankers, consultants, agents and other representatives at least as favorable as any exculpation or release provisions provided for the Company's officers, directors, employees, advisors, attorneys, accountants, actuaries, investment bankers, consultants, agents and other representatives.

**6. Bankruptcy protection.** From the date of this Letter of Agreement until a date three years from the date of this Letter of Agreement, the Debtors will not file or support any motion ("Motion") pursuant to 11 U.S.C. Sections 1113, 1113(e), or any other relevant provision of the Bankruptcy Code, seeking rejection or modification of, or relief or interim relief from, the Last Best & Final Offer or this Letter of Agreement and the finalized documents implementing the Last Best & Final Offer or this Letter of Agreement. The Debtors will actively oppose any such Motion if filed by another party.

3

Notwithstanding the foregoing, the Debtors reserve the right to file or support any Motion if there is a material deterioration in the Company's financial condition or financial prospects, whether because of general economic conditions or otherwise. All requirements and provisions of section 1113 will also remain applicable to any such Motion. APFA reserves its right to object to such Motion and nothing in this Letter of Agreement shall be construed as an agreement by the APFA to such modifications or relief.

**7. Court approval.** With the full and active support of APFA, the Company will file and prosecute a motion for approval and assumption of the CBA as modified by the Last Best & Final Offer and this Letter of Agreement under sections 363 and 1113 of the Bankruptcy Code and any other applicable sections thereto if the conditions set forth in Paragraphs 2(1) and 2(2) are satisfied. Both the motion and the proposed order attached thereto (the 363 Order) shall be in form and substance reasonably acceptable to APFA. Both the Company and APFA will use their reasonable best efforts to obtain the support of the Official Committee of Unsecured Creditors and other parties and stakeholders for the Last Best & Final Offer, including this Letter of Agreement, and to seek entry of the 363 Order.

**9. Issuance of equity.** Subject to the foregoing, APFA agrees not to object to or contest the issuance of equity or other consideration in the Bankruptcy Cases to the Company's non-union and management employees, in respect of the sacrifices made by them in furtherance of the Company's effort to restructure or as incentive for the non-union and management employees' future service to the Company.

**10. Damages.** Other than the APFA Settlement Consideration and the claims reserved in Section 1 above, the APFA shall not have any claims as a result of the Company's requests for relief under Section 1113 of the Bankruptcy Code or the parties' entry into the Last Best & Final Offer or this Letter of Agreement.

Sincerely,




Laura A. Einspanier
Vice President - Employee Relations


Agreed:




Laura Glading
President
Association of Professional Flight Attendants

4

**Exhibit "D"**

**Letter Agreement**

# AmericanAirlines

August 10, 2012

Laura R. Glading
President
Association of Professional Flight Attendants
1004 West Euless Blvd.
West Euless, TX  76040

    RE: "Me Too" Provision

Dear Laura,

  During the negotiations that led to the Last, Best and Final Offer ("LBFO") between American Airlines, Inc. ("AA" or "the Company") and the Association of Professional Flight Attendants ("APFA") covering Flight Attendants, the Company and the APFA agreed to the following, effective upon ratification:

  1) Notwithstanding any provision to the contrary in this LBFO, the Company will continue to seek approval to implement, through binding agreement, and/or implemented by legal unilateral authority, revisions to (i) the labor contracts of the Company's other non-APFA unionized employees and (ii) the wages, benefits and working conditions of the Company's non-union hourly employees and (iii) the wages, benefits and working conditions of the non-union salaried and management employees so that the aggregate revisions in (i),(ii) and (iii) for each individual non-APFA union and non-union employee group are reasonably projected by the Company to produce the targets for labor cost savings specified in the Company's Section 1113(c) motion.

  2) The Company agrees that if the Company fails to implement the changes described in paragraph 1 for any other non-APFA union or non-union employee group, without implementing other changes that are reasonably projected by the Company to achieve equivalent labor cost savings, the Company will meet with APFA to discuss and agree upon a proportionate reduction in projected labor cost savings under the Agreement. This paragraph shall expire upon the earlier of 1) six (6) months after the date the Company emerges from the bankruptcy process; or 2) when the changes described in paragraph 1, or other changes that are reasonably projected by the Company to achieve equivalent labor cost savings, are implemented for all non-APFA union or non-union employee groups.

3) The Company further agrees that if it obtains modifications to agreements with other non-APFA union groups that result in labor cost savings to the Company from reduction in APFA-represented employees working under the APFA agreement, it will meet with APFA to discuss and agree upon an appropriate credit to the APFA based on the level of labor cost savings realized by the Company from that reduction.

4) The Company will provide APFA with sufficient relevant information reasonably necessary for APFA to determine compliance with the terms of this agreement.

5) Any alleged violation of these provisions will be resolved pursuant to the grievance and arbitration procedures of the applicable APFA Agreement.

Sincerely,

Laura A. Einspanier
Vice President – Employee Relations