1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 11-15463(SHL)

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5

6    In the Matter of:

7

8    AMR CORPORATION,

9

10            Debtors.

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   BENCH RULING RE: (1) RENEWED MOTION OF DEBTORS FOR ENTRY OF

13      ORDER PURSUANT TO 11 U.S.C. 1113 AUTHORIZING DEBTORS TO

14     REJECT COLLECTIVE BARGAINING AGREEMENT WITH THE ALLIED

15   PILOTS ASSOCIATION, AND (2) MOTION IN LIMINE TO LIMIT SCOPE

16    OF HEARING ON THE RENEWED MOTION PURSUANT TO 11 USC 1113

17      AUTHORIZING DEBTORS TO REJECT COLLECTIVE BARGAINING

18                        AGREEMENT

19                   U.S. Bankruptcy Court

20                   One Bowling Green

21                   New York, New York

22

23                   September 4, 2012

24                   1:12 PM

25

```
 1   B E F O R E :

 2   HON SEAN H. LANE

 3   U.S. BANKRUPTCY JUDGE

 4

 5   Transcribed by:  Dawn South, William Garling, and Sherri L.

 6   Breach

 7   A P P E A R A N C E S :

 8   PAUL, HASTINGS, JANOFSKY & WALKER, LLP

 9        Attorneys for the Debtor

10        875 15th Street, NW

11        Washington, D.C. 20005

12

13   BY:  NEAL D. MOLLEN, ESQ.

14        JACK GALLAGHER, ESQ.

15        SCOTT M. FLICKER, ESQ.

16

17   PAUL, HASTINGS, JANOFSKY & WALKER, LLP

18        Attorney for the Debtor

19        191 North Wacker Drive, Thirtieth Floor

20        Chicago, Illinois 60606

21

22   BY:  MARK D. POLLACK, ESQ.

23

24

25
```

```
 1    JAMES & HOFFMAN

 2         Attorneys for Allied Pilots Association (APA)

 3         1130 Connecticut Avenue, NW

 4         Suite 950

 5         Washington, D.C. 20036

 6

 7    BY:  KATHY L. KRIEGER, ESQ.

 8         EDGAR N. JAMES, ESQ.

 9         DANIEL ROSENTHAL, ESQ.

10         DAVID P. DEAN, ESQ.

11

12    SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

13         Attorneys for Official Committee of Unsecured Creditors

14         155 North Wacker Drive

15         Chicago, Illinois 60606

16

17    BY:  JOHN WM. BUTLER, JR., ESQ.

18

19    STEPTOE & JOHNSON, LLP

20         Attorney for APA

21         1330 Connecticut Avenue, NW

22         Washington, D.C. 20036

23

24    BY:  JOHSUA R. TAYLOR, ESQ.

25
```

```
 1    HIGHSAW, MAHONEY & CLARKE, P.C.

 2         Attorney for TWA American Pilots

 3         4142 Evergreen Drive

 4         Fairfax, VA 22032

 5

 6    BY:  JOHN O'B. CLARKE, JR., ESQ.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2          Before the Court is debtor, American Airlines'

3    renewed motion to reject the collective bargaining agreement

4    of the Allied Pilots Association (the "APA"), under Section

5    1113 of the Bankruptcy Code.  The APA is the authorized

6    collective bargaining agent for pilots employed at American.

7          American's renewed Section 1113 application as to

8    the pilots is opposed by the APA, the Supplement B Pilot

9    Beneficiaries, and certain TWA/American pilots that make

10   arguments related to Supplement CC (the "Supplement CC

11   Pilots").

12         Also before the Court is American's related motion

13   *in limine* seeking to limit the evidence that I should

14   consider in this Section 1113 motion.  The motion *in limine*

15   is also opposed by the APA and the Supplement CC Pilots.

16         For reasons that I'll explain in more detail in a

17   moment, the Court grants American's Section 1113 motion and

18   authorizes American to reject its current collective

19   bargaining with the APA.

20         I agree with the Committee that this present

21   application has to be reviewed in the context of what has

22   previously occurred in this case.  While it is not

23   dispositive, it is, nonetheless, informative and shapes what

24   the discussion is today.  Thus, central to the Court's

25   ruling today is the history in this case to date regarding

1    Section 1113 matters.

2           On March 27, 2012, American filed a prior motion

3    under Section 1113 seeking authority to reject its

4    collective bargaining agreement with its pilots, flight

5    attendants and transportation workers.  These workers were

6    represented by the APA, the APFA and the TWU, respectively.

7    The Court held a three-week trial on this first Section 1113

8    motion, starting on April 23, 2012 and ending on May 25,

9    2012.

10          During the trial, the three unions and American

11   all engaged in additional negotiations outside the auspices

12   of the Court, including mediation.  These negotiations

13   continued after the conclusion of the trial.  No evidence

14   was presented to the Court as to the substance of these

15   negotiations other than the parties expressing their

16   collective desire that the Court refrain from ruling on the

17   Section 1113 application in the -- until the parties had a

18   chance to conclude any meaningful negotiations.  As a

19   result, the Court abstained from ruling on the Section 1113

20   application.

21          In July, all three unions -- the APA, the APFA and

22   the TWU -- sent out potential agreements to their membership

23   for a ratification vote.  None of the substance of these

24   potential new agreements was presented to the Court as part

25   of the Section 1113 proceeding and the potential new

1    agreements constituted the parties efforts at settling their

2    disputes without court intervention.  Thus, it seemed

3    obvious to all parties and the Court at the time that such

4    discussions were covered by Federal Rule of Evidence 408,

5    which, generally speaking, prohibits a party from proffering

6    to a Court evidence of settlement discussions.

7            Indeed, the APA took a strict view as to what was

8    appropriately before the Court for purposes of Section 1113.

9    For example, in the pleading filed at ECF Docket Number 2577

10   the APA maintained that for purposes of satisfying the

11   requirements under Section 1113(b)(1)(A), the Court could

12   only consider a proposal made by American prior to the

13   filing of the application for rejection.

14           In any event, the ratification votes of the union

15   members resulted in new collective bargaining agreements

16   between American and the TWU and between American and the

17   APFA, but it did not result in a new agreement between

18   American and the APA.

19           At that point in August, both American and the APA

20   agreed that it was appropriate for the Court to issue its

21   decision on American's Section 1113 application as to the

22   pilots.  Accordingly, the Court issued a decision on August

23   15, 2012 ruling on American's Section 1113 application as to

24   the pilots.  *See In re AMR Corp.*, 2012 WL 3422541 (Bankr.

25   S.D.N.Y. Aug. 15, 2012).

1          Generally speaking, the Court concluded that

2     American had established that significant changes were

3     necessary to the APA's collective bargaining agreement for

4     reorganization and the Company had met almost all the

5     requirements of Section 1113.  The Court ruled on each

6     element of the statute.  These elements included, among

7     other things, the substance of American's proposed

8     modifications and the information provided regarding the

9     proposal.  These requirements included the key component of

10    assessing whether the proposed changes were necessary to

11    American's ability to reorganize.

12         In ruling on this initial Section 1113

13    application, the Court addressed numerous objections raised

14    by the APA and overruled the APA objections on a host of

15    matters.  These included, but were not limited to, the APA's

16    claim that American must first engage in a merger

17    transaction before being granted relief under Section 1113,

18    and that the business plan that American relied upon was

19    fatally flawed and an improper basis for seeking Section

20    1113 relief.

21         The Court also rejected the APA's view that the

22    total labor ask of the pilots was not necessary for

23    reorganization and that the Company's costs were converging

24    with industry costs.  Additionally, the Court rejected the

25    claim that a number of American's specific proposals

1   relating to the APA were not necessary for reorganization

2   and that the Company's proposal had not been based on the

3   most complete and reliable information available to the

4   Company at that time.

5        Notably, the Court found that American's business

6   plan provided a sufficient basis for establishing the

7   necessity of the vast majority of the changes sought by the

8   Company.  That business plan featured a 20 percent labor

9   cost reduction for each of American's unions, including the

10  APA.

11       In its decision, however, the Court found that two

12  elements of American's proposal were not consistent with the

13  requirements of Section 1113.  More specifically, the Court

14  found that the proposed changes would give American

15  unrestricted use of furlough and codesharing, but such

16  unrestricted and unfettered discretion in those two areas

17  had not been justified as necessary either in American's

18  business plan or by the practices of American's competitors.

19  Given the potential impact of those two proposed changes on

20  the pilots, the Court denied American's motion to reject the

21  pilot contract.

22       But the Court's August 15th decision specifically

23  stated that such denial was "without prejudice to American

24  seeking relief in the future with a new proposal as to the

25  APA that remedies these deficiencies." *In re AMR Corp.*,

1   2012 WL 3422541, at *2.

2          On August 17, 2012, American filed its renewed

3   motion under Section 1113, once again seeking authority to

4   reject its collective bargaining agreement with the APA.  In

5   light of the Court's decision, the renewed motion addressed

6   two matters and two matters only, the issues of furlough and

7   codesharing.  As to the first, American dropped in its

8   entirety its request to provide the contractual provision

9   regarding furlough.  As to the second, American presented a

10  revised codesharing proposal that limits the Company's

11  discretion on codesharing.  The revised proposal features a

12  specific proposal with certain partners and has limitations

13  tied to the amount of overall flying done by American.  *See*

14  Corrected Decl. of Dennis Newgren in Supp. of Renewed Mot.

15  for Entry of Order Pursuant to 11 U.S.C. § 1113 Authorizing

16  Debtor to Reject Collective Bargaining Agreement, dated

17  August 17, 2012, ¶¶ 10, 13.

18         The APA, in fact, notes that the revised

19  codesharing proposal is the same as the codesharing proposal

20  in the proposed agreement sent out to APA members for the

21  vote in July.  *See* Revised Decl. of Neil Roghair in Opp'n to

22  Debtors' Renewed Mot. for Entry of Order Pursuant to 11

23  U.S.C. § 1113 Authorizing Rejection of Collective Bargaining

24  Agreement, dated Sept. 3, 2012, ¶ 23 (the "Roghair Decl.").

25         With the exception of these changes, American's

1    revised proposal for which it seeks approval is identical to

2    the one proposed by American on April 19, 2012, which was

3    the last proposal made by American prior to the start of the

4    trial on April 23rd.  *See* Roghair Decl., ¶ 12.  Having

5    addressed the two problematic items that were identified by

6    the Court in its decision on the prior Section 1113

7    proposal, American now requests that the Court grant its

8    renewed motion to reject.

9         Section 1113 generally provides that a Court may

10   authorize a debtor to reject a collective bargaining

11   agreement if certain requirements are met.  These

12   requirements include that before seeking court relief, the

13   debtor must (1) make a proposal to a union that provides for

14   modifications that are necessary to the debtors' ability to

15   reorganize; (2) that treats creditors, debtors, and affected

16   parties fairly and equitably; and (3) is based on the most

17   complete and reliable information available.  *See* 11 U.S.C.

18   § 1113(b)(1)(A).

19        The statute also requires that the debtor have

20   shared such relevant information with the union as is

21   necessary to evaluate the proposal; (2) that it has

22   conferred in good faith to reach an agreement; (3) that its

23   proposal has been rejected by the authorized representative

24   of the employees without good cause; and (4) that the

25   balance of equity clearly favors rejection.  See 11 U.S.C.

1    §§ 1113(b)(1)(B),(b)(2),(c).

2         As the authorized collective bargaining

3    representative to the pilots, the APA filed an objection to

4    American's renewed Section 1113 application.  Notably, it

5    does not raise any objection to the revised proposals on

6    furlough and codesharing.  This is in stark contrast to the

7    APA's position in the first Section 1113 proceeding where it

8    spent considerable time detailing the alleged deficiencies

9    of American's proposals on both subjects.

10        But the APA does raise three objections to the

11   renewed motion.  First, the APA argues that the Company has

12   revised its target for labor cost savings of all employee

13   groups from 20 percent to 17 percent.  They therefore argue

14   that American's continuing request for $370 million in labor

15   cost savings from the pilots, which is based on that 20

16   percent ask, does not constitute a modification that is

17   necessary to permit reorganization.

18        The evidentiary basis for this argument, which has

19   been the subject of most of today's proceeding, appears to

20   be communications associated with the settlement

21   negotiations between American and the APA, the APFA and the

22   TWU, which, as noted above, began during the trial and

23   concluded with agreements that were ultimately voted on by

24   each of the unions.  The APA also cites to certain

25   statements made regarding the negotiations and their

1    results, as well as information related to the negotiations,

2    including the tentative agreement itself that was reached

3    between the APA and the Company.

4            Moving on to the second objection, the APA again

5    raises the issue of convergence, in which it argues that

6    American's cost and labor practices for its pilots are in

7    the process of reaching parity with the rest of the

8    industry.  It claims that the Company's analysis regarding

9    labor costs for pilots and the industry standards of

10   competing carriers is outdated.  The APA cites specifically

11   to a new Delta pilot collective bargaining agreement

12   finalized in July of 2012 and a "agreement in principle"

13   reached at United for which the terms are confidential and

14   not currently known.

15           The third argument raised by APA is consolidation,

16   namely the notion that American should not be granted

17   Section 1113 relief now because a merger is inevitable.

18   They argue that since the close of the trial, the Company's

19   focus on consolidation has become more concrete and the

20   range of likely partners has narrowed.

21           Two of the APA's objections can be dispatched

22   fairly easily.  With respect to convergence with competing

23   carriers, the APA previously made a convergence argument and

24   presented evidence at trial regarding the terms of the Delta

25   collective bargaining agreement.  *See, e.g.*, Trial Tr.

1    111:7-18, May 21, 2012 (Kasper); Trial Tr. 51:11-55:21 May

2    22,2012 (Glass).

3          The Court has already reviewed the evidence

4    submitted by the APA regarding the terms of Delta's new

5    collective bargaining agreement and has overruled the APA's

6    convergence arguments.  To the extent that this "new Delta

7    evidence" was not previously put before the Court, it could

8    have been and should have been offered prior to the Court

9    rendering its decision.  *See Matthew Bender & Co. v. West*

10    *Publ'g Co.*, 158 F.3d 674, 679 (2d Cir. N.Y. 1998) (noting

11    that a court's "decision to reopen the proof to allow a

12    party to submit additional evidence is subject to sound

13    discretion.")

14          As to United, the APA itself admits that the terms

15    of any deal are confidential and, therefore, unknown and

16    instead relies on news articles for the alleged details of

17    this agreement.  The danger of relying on such news

18    articles, however, is clear when considering that the most

19    recent articles on this subject describe those negotiations

20    as stalled, with allegations made by the unions of bad faith

21    bargaining on the part of the company.

22          In any event, the allegations and the evidence

23    provided on convergence are subject to the same defect that

24    was identified in the Court's prior decision, namely that it

25    is anecdotal and does not provide an industry-wide

1    comparison with American's costs.  And as noted in the prior

2    decision, it is also inconsistent with the fact that

3    American has lost more than $1 billion in 2011 and that the

4    pilots admitted during the prior trial that the status quo

5    was not sustainable.

6         As to the second issue of consolidation, the Court

7    has already acknowledged in its prior decision that there is

8    no merger for the Court to consider.  That has not changed

9    today.  "While American has begun the process of considering

10   strategic alternatives to its business plan, that process

11   has not yet been completed."  *In re AMR Corp.*, 2012 WL

12   3422541, at *18.

13        While that process has continued since the

14   issuance of the Court's decision, there is still no fixed

15   outcome for the Court to take into consideration.  Thus, as

16   nothing has changed on this subject since the issuance of

17   the Court's opinion on August 15th, the Court rejects the

18   arguments on consolidation for the same reasons set forth in

19   its prior decision.

20        The third argument centers on the 17 percent

21   figure discussed by American and its unions during

22   settlement negotiations.  The APA's position here is flawed

23   for several reasons, which are worth discussing in detail.

24        First and foremost, the APA seeks to set a

25   precedent that would drag the Court into parties' settlement

1    discussions.  The parties here tried, but failed to reach a

2    new agreement.  The 17 percent cited was the number

3    presented to the APA and American's two other unions as a

4    compromise with the hope of avoiding the Court issuing a

5    ruling on American's rejection motion.  The APA now seeks to

6    use those discussions and that figure as a weapon in this

7    litigation.

8         While the APA says this is not a settlement, that

9    contention is contrary to the vast weight of the evidence.

10   One need only look at the Declaration of Neil Roghair, which

11   is attached to the APA's opposition.  In paragraph 4 it lays

12   out Mr. Roghair's testimony, which includes a detailed

13   examination of the differences between American's current

14   proposal that is the subject of this renewed 1113

15   proceeding, and what's referred to in the Declaration as the

16   tentative agreement with the APA that was the subject of the

17   settlement discussions outside of the Court's purview and

18   was presented to the APA members for a ratification vote.

19        It then goes through an extensive comparison of

20   the tentative agreement against the current proposal and

21   what American seeks in each.  And, in fact, it relies on

22   evidence that does exactly the same.  So, for example, in

23   paragraph 20 of the Roghair Declaration, it notes and relies

24   upon a chart that is entitled "APA Term Sheet and Tentative

25   Agreement Comparison, (Roghair Decl., Ex. 2), which does

1    nothing more than compare the APA term sheet that was

2    provided by American for the 1113 proceeding and a tentative

3    agreement which is what was worked out by the parties and

4    then presented to the members for a vote.

5         And this continues throughout the entire

6    Declaration.  Paragraphs 24 and 25 talk about regional jets

7    and codesharing and discuss the terms of the tentative

8    agreement.  Paragraph 36 makes the conclusion that the

9    tentative agreement is far more favorable than the August

10   16th proposal of American.   The heading on page 11 of the

11   Declaration says, "By American's own admission, the terms of

12   the tentative agreement would be sufficient to enable the

13   company to reorganize successfully."  And I could go on and

14   on.

15        The Court finds the testimony of Ms. Goulet to be

16   credible in explaining that the genesis of the 17 percent

17   figure was a compromise that American struck with the TWU,

18   the APFA and the APA this summer, which compromises were

19   ratified by union membership except for the APA.  The Court

20   is unwilling to fault or punish American for then updating

21   its own business numbers based on the results of such

22   successful settlement negotiations.

23        It is equally clear, however, that the number that

24   will ultimately be chosen as the labor savings in any

25   business plan will affect the results of these proceedings

```
1    and the ultimate agreement with the pilots.

2            Based on all the evidence, then, the Court

3    concludes that the 17 percent figure appears to fall clearly

4    within the ambit of Federal Rule of Evidence 408, which

5    prohibits statements made during settlement negotiations

6    from being introduced as evidence.   The Rule is intended to

7    promote "the public policy favoring compromise and

8    settlement of disputes."   1972 Advisory Committee Notes to

9    Fed. R. Evid. 408.

10           The APA argues that Rule 408 does not apply to

11   Section 1113, but that's belied by the fact that the APA

12   expressly stated to its members that "[t]he terms of the

13   'last, best final offer,' (LBFO) which represent a

14   significant improvement over the term sheet" -- that is

15   American's term sheet for purposes of Section 1113 -- "will

16   not be taken into consideration by the Court."  (Allied

17   Pilots Association, Unknown Unknowns (July 3, 2012),

18   https://public.alliedpilots.org/apa/AboutAPA/APAPublicNews/t

19   abid/843/ctl/ArticleView/mid/1983/articleId/1409/Tentative-

20   agreement-QA.aspx).

21           The quote continues:  "Management's LBFO is

22   technically a section 408 'settlement offer' and separate

23   from the 1113 process."  Id.

24           Indeed, the APA explicitly agreed that "[a]ny

25   negotiations between American and APA subsequent to the
```

1   beginning of the 1113 hearing on April 23rd are confidential

2   and constitute settlement discussions which are not

3   admissible in evidence under Rule 408 of the Federal Rule of

4   Evidence."  (Debtors' Motion in Limine, Exh. C).

5           The applicability of Rule 408 was specifically

6   acknowledged by the Court during trial and was not corrected

7   or qualified by the APA or any other party at that time.

8   (*See* Trial Tr., 91:23-92:4, May 14, 2012(Roghair)).  Thus,

9   it is disingenuous at this point to take a contrary

10  position.

11          The APA also argues that Rule 408 isn't applicable

12  because certain statements were made publicly and the

13  settlement agreements were released to the public.  However,

14  these statements relate to negotiations and their results

15  and, therefore, constitute evidence related to negotiations

16  and are covered by the Rule.  Indeed, it would be impossible

17  for the unions to vote on whether to accept a settlement

18  offer without releasing it to its members.

19          The case of *Steede v. Gen. Motors LLC*, 2012 U.S.

20  Dist. LEXIS 81292, *10-*11 (W.D. Tenn. Apr. 3, 2012) is

21  applicable to the situation at hand.  In *Steede*, the Court

22  held that the fact that a party had settled on a certain

23  date "likely would be inadmissible because it would be

24  evidence of [in that case] GM offering 'valuable

25  consideration in compromising or attempting to compromise

1    [a] claim'" and it would be offering that evidence to

2    establish liability for damages.   *Id.*

3         For support, that court cited the comments to the

4    1972 Proposed Rule 408 which stated that "[w]hile the rule

5    is ordinarily phrased in terms of offers to compromise, it

6    is apparent that a similar attitude must be taken with

7    respect to completed compromises when offered against a

8    party thereto.  This latter situation will not, of course,

9    ordinarily occur except when a party to the present

10   litigation has compromised with a third person."  *Id.*

11   (*quoting* Fed. R. Evid. 408 (1972 Comments to the Proposed

12   Rule)).

13        The APA also argues that because negotiations had

14   already concluded, certain of the statements made by the

15   Company are not covered by Rule 408.  The APA cites to

16   *S.E.C. v. Pentagon Capital Mgmt. PLC*, 2010 U.S. Dist. LEXIS

17   25092, *12-*13 (S.D.N.Y. Mar. 11, 2010).

18        But *SEC v. Pentagon* is clearly distinguishable

19   from the case at hand.  In that case, the Court dealt with

20   an order of the SEC that makes findings pursuant to facts

21   discovered in its investigatory authority.  The Court held

22   that such findings "are presumed reliable and admissible

23   under Rule 803."  *Id.*  We have no such situation here.

24        The APA also relies on a case called *Blu-J, Inc.*

25   *v. Kemper C.P.A. Group*, 916 F.2d 637, 642 (11th Cir. 1990),

1    but it is similarly unhelpful.  The case simply reiterates

2    that the Eleventh Circuit test for whether statements fall

3    under the rule is "whether the statements or conduct were

4    intended to be part of the negotiations towards compromise."

5    *Id.* at 642.

6         *Blu-J* deals with a report made by an accounting

7    firm in connection with negotiations and testimony related

8    thereto, and the Court, in fact, held that the materials

9    fell under the ambit of Rule 408.  *See id.*  There is simply

10   no discussion of the issue or any facts that would provide

11   support for the APA's position in this case.

12        The APA further argues that evidence of the

13   Company's business plan is distinguishable from its labor

14   proposals.  But the Court believes, based on the totality of

15   the evidence that I've received, both in declarations and

16   live testimony here today, that such changes are the result

17   of and, therefore, inextricably linked to the settlements

18   with the various unions.

19        The Court notes that the use of settlement

20   discussions and the parties' positions on settlement would

21   be particularly damaging in the context of Section 1113.  As

22   noted in the Court's August 15th decision, "The language and

23   history of Section 1113 made clear that the preferred

24   outcome under Section 1113 is a negotiated solution rather

25   than contract rejection."  *In re AMR Corp.*, 2012 WL 3422541,

1   at *1 (quoting Collier on Bankruptcy ¶ 1113.01 (Alan N.

2   Resnick & Henry J.Somner eds., 16th eds)).  As the Second

3   Circuit has recognized, "the entire thrust of Section 1113

4   is to ensure that well-informed and good faith negotiations

5   occur in the market place, not as part of the judicial

6   process." *Maxwell Newspapers, Inc. v. New York*

7   *Typographical Union No. 6*, 981 F.2d 85, 90 (2d Cir. 1992).

8       Thus, the Court concludes that the introduction of

9   such conversations in court proceedings would have a

10  significant chilling effect on the parties' attempts to

11  reach negotiated solutions to the problems of Section 1113.

12  This would add yet another obstacle to what all agree is

13  already an exceedingly difficult process.

14      The Court further notes that the 17 percent figure

15  relied upon by the APA here was well known before the Court

16  issued its August 15th decision.  If those discussions and

17  that figure were truly relevant on the issue of necessity,

18  one would have expected that it would have been brought to

19  the Court's attention prior to issuing the August 15th

20  decision.  But they weren't and that's no surprise.  It just

21  further confirms that those negotiations were part of

22  efforts to reach a negotiated solution with American's

23  unions.

24      The APA's reliance on these communications is

25  troubling for several other reasons.  By relying on

1  settlements proposed and ultimately reached with American's

2  other unions, the APA now seeks to gain a benefit from being

3  the last holdout from among the three unions.  This is

4  inconsistent with Section 1113 jurisprudence.  In the

5  Section 1113 proceeding in *Delta Air Lines*, 342 B.R. 685,

6  694 (Bankr. S.D.N.Y. 2006), Judge Hardin rejected the so-

7  called last man standing argument as inappropriate.

8       But even assuming the admissibility and truth of

9  these communications, the notion that a three percent

10  difference by itself dooms American's present application is

11  misguided.  It is well-established that the necessity test

12  under Section 1113 is not a bare minimum needed for

13  reorganization.  "Necessity should not be equated with

14  'essential' or bare minimum" as noted by the Second Circuit

15  in *Truck Drivers Local 807 v. Carey Transp., Inc.*, 816 F.2d

16  82, 89 (2d Cir. 1987); *see also New York Typographical Union

17  No. 6 v. Royal Composing Room, Inc. (In re Royal Composing

18  Room, Inc.)*, 848 F.2d 345, 350 (2d Cir. 1988), which notes

19  that "[a] debtor's proposal need not be limited to the bare

20  bones relief that will keep it going."

21       Simply put, these cases all stand for the

22  proposition that necessity is not a but-for test.  *See Delta

23  Airlines*, 342 B.R. 694.  Indeed, the Second Circuit has

24  specifically rejected the Third Circuit's requirement that

25  necessity "be construed strictly to signify only

1    modifications that the trustee is constrained to accept."

2    *Wheeling-Pittsburgh Steel Corp. v. United Steelworkers of*

3    *America*, 791 F.2d 1074, 1088 (3d Cir. 1986).

4            Such a requirement would make it impossible for

5    the debtor to show it negotiated in good faith since "an

6    employer who initially proposed truly minimal changes would

7    have no room for good faith negotiating, while one who

8    agreed to any substantive changes would be unable to prove

9    that its initial proposals were minimal."  *Carey Transp.*,

10   816 F.2d at 89.

11           Here, the communications sought to be introduced

12   by the APA mean only that American might be able to succeed

13   with a bare minimum of a 17 percent labor cost reduction,

14   when that 17 percent is coupled with a consensual labor

15   agreement.  That would be true because such consensual

16   agreements bring their own benefits to a debtor seeking to

17   reorganize.

18           As counsel for the Committee noted at today's

19   hearing, consensual agreements constitute labor peace and

20   stability, and Section 1113 does not provide either, even if

21   a debtor prevails during the proceeding.  And here, no such

22   consensual agreement exists between American and the APA.

23   Thus the 17 percent figure, without more, does not

24   necessarily invalidate the notion of seeking a 20 percent

25   reduction from the pilots and, in fact, the APA at today's

```
 1    hearing suggested a policy whereby unions would be offered a
 2    progressively less beneficial deal depending on where they
 3    settled in the order of the ongoing process.
 4            The Court does not adopt that position, but does
 5    note that it was something proposed by the very party that's
 6    objecting to the 20 percent ask.
 7            The Court notes that rejection is particularly
 8    appropriate here where the Court has received extensive
 9    evidence of the 20 percent figure, and based on a
10    substantial evidentiary record during the three-week trial
11    found that American has established that figure as necessary
12    for purposes of Section 1113.
13            Indeed, the Court would be greatly concerned about
14    establishing a bright line numerical necessity rule of the
15    type advocated here by the APA.  It would leave little to no
16    negotiating room for the parties to conduct meaningful
17    discussions outside the Court's presence, once again,
18    defeating the congressional purpose behind the statute.
19            On a side note, it may be true that there has been
20    some recent positive developments on revenue and/or overall
21    business performance in this case.  But this is merely a
22    snapshot looking at nothing more than a two or three-month
23    period at most since the end of the last hearing.  It says
24    little about what is needed for reorganization, which is a
25    much more long-term inquiry into viability.
```

1           As for Ms. Clark's testimony on this question, the

2   Court finds that the communications referenced from the

3   August 16, 2012 meeting do not change the result here.

4   These comments occurred only one week after the pilots had

5   actually rejected the tentative agreement and only one day

6   after the Court's decision on August 15th.  The Court

7   further notes that these communications did nothing more

8   than refer, again, to the settlements that had been worked

9   out between American and the unions and that they must be

10  understood in the overall context of the business plan as

11  provided by Ms. Goulet in her testimony here today.

12          For all these reasons and considering this as a

13  new Section 1113 application within the context of the

14  Court's prior ruling, the Court finds that American's

15  current proposal contains modifications that are necessary

16  to permit American's reorganization and that it satisfies

17  the requirements of Section 1113.  And for the reasons

18  stated above, the Court overrules the APA's substantive

19  objections to American's renewed Section 1113 motion.

20          But even putting aside the fatal substantive flaws

21  in the APA's objection, the Court disagrees with the premise

22  that as a procedural matter, a debtor is prohibited from

23  presenting a new Section 1113 proposal that addresses only

24  defects in its prior proposal without going back to

25  readdress all the aspects of its proposal that a Court has

1    already found to pass muster under the statute.

2         Where a debtor has made a Section 1113 proposal

3    that has been found lacking in some way, the Court must

4    consider the facts and circumstances of each case to

5    determine what is an appropriate way to proceed.  The Court

6    notes that other courts have exercised their discretion in

7    such a fashion in appropriate circumstances to allow a

8    debtor to seek relief by remedying specific defects in a

9    prior Section 1113 proposal.

10         In *Mesaba Aviation, Inc.*, Transcript of

11    Proceedings, Case No. 05-39258 (Bankr. D. Minn. Oct. 5,

12    2006), for example, the debtor sought to remedy defects in

13    its Section 1113 proposal that had been identified by the

14    District Court on appeal.  On remand, the debtor updated its

15    proposal on two discreet issues, but the union sought to

16    reopen the door to a broader necessity inquiry because the

17    revised proposal reduced the savings sought from labor.

18         The Bankruptcy Court stated that "the present law

19    of the case binds not only me but all the parties to

20    determinations that now are twice settled by my [earlier]

21    decision and [the district court's] affirmance", *id.* at

22    57:20-23, and this is true notwithstanding the passage of

23    time from the Court's original decision.  Here, very little

24    time has passed since the Court's August 15th decision –

25    only 20 days.

1          Most recently, in In re *Hostess Brands, Inc.*,

2     Transcript of Proceedings, Case No. 12-22052 (Bankr.

3     S.D.N.Y. May 14, 2012), Judge Drain identified specific

4     issues in the debtors' Section 1113 proposal that needed to

5     be fixed and indicated that the Court "would . . . be

6     receptive to a motion that makes a proposal along the lines

7     . . . outlined," and told the parties that he was "perfectly

8     prepared on short notice to consider an amended proposal."

9     *Id.* at 130:25-131:2, 133:3-4.

10         Such an approach recognizes that a Court's prior

11    decision remains the law of the case.  Here, that decision

12    held that American's business plan established, with the two

13    exceptions noted above, the need for the changes sought by

14    the Company.  And this included a finding that the monetary

15    goals sought by the Company were necessary, even though they

16    took a very difficult toll on American's employees, a sad

17    fact that is common to Section 1113 proceedings in

18    bankruptcy.  Those findings were based on an extensive

19    factual record, particularly on the issue of necessity over

20    the course of the three-week trial.

21         Indeed, such a proposal and procedure would be

22    immensely appropriate here given that the only new evidence

23    presented by the union is a single number, namely a

24    percentage discussed between the parties after the Section

25    1113 trial, but before the Court issued its August 15th

1    decision.

2          I am not using that procedure for purposes of

3    making my decision, but I will also say that I don't think

4    it would be inappropriate to use that procedure in this

5    particular case.

6          And, again, I would note that the use of such a

7    procedure would not be appropriate in all circumstances.

8    For example, if there was a major catastrophic event that

9    affected all of the airline industry, then, clearly, there

10   would be a significant change in factual circumstances that

11   would need to be addressed by the parties and the Court.

12         Finally, the Court notes that two other objections

13   have been filed to the request for Section 1113 relief:

14   One, by the Supplement CC Pilots and the second by the

15   Supplement B Pilot Beneficiaries.  They both claim to

16   represent a minority of American pilots who claim separate

17   contractual rights by virtue of Supplement B and Supplement

18   CC to the collective bargaining agreement that exists

19   between American and the APA.

20         During the course of the original Section 1113

21   proceedings, representatives of Supplement B and Supplement

22   CC Pilot Beneficiaries objected to American's application.

23   The Court overruled these objections for the reasons stated

24   in the August 15th decision.  There have been no new facts

25   on this issue presented today to the Court and nothing that

1     changes the Court's decision in that ruling.

2           As to the motion *in limine*, that motion is granted

3     in part and denied in part consistent with the Court's

4     ruling today that precludes evidence of the parties'

5     settlement positions under Federal Rule of Evidence 408.

6           Let me just say one last thing.  Just because this

7     is a renewed motion doesn't mean that it's any less

8     difficult for purposes of employees.  I have a lot of

9     sympathy for the employees, the pilots, just as I did when

10    we had our original trial.  It's a set of circumstances that

11    nobody is happy about.  And I wish you all good luck in

12    trying to work out an agreement and hope that the good faith

13    that was evident in earlier discussions carries over to any

14    discussions moving forward.

15          And so I hope that all the parties can move beyond

16    my ruling today to do what they're going to have to do,

17    whether I rule for American, for the pilots, for anyone,

18    which is come up with an agreement and that is something

19    that's got to happen.  And in some ways I'm the most

20    important person here, because I have to issue a ruling, and

21    in some ways I'm the least important person here because I

22    have no ability to actually work out an agreement between

23    American Airlines and the APA, and that's something that you

24    all have to do and I have no power to do it for you.

25