UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re:                                              Chapter 11

AMR CORPORATION, *et al.*,                          Case No. 11-15463 (SHL)

                            Debtors.                  (Jointly Administered)
-----------------------------------------------------------------x

# MEMORANDUM OF DECISION

**A P P E A R A N C E S :**

**WEIL, GOTSHAL & MANGES LLP**
*Counsel for the Debtors*
767 Fifth Avenue
New York, New York 10153
  By:    Harvey R. Miller, Esq.
           Stephen Karotkin, Esq.
           Alfredo R. Pérez, Esq.

**TRACY HOPE DAVIS**
**UNITED STATES TRUSTEE**
33 Whitehall Street, 21st Floor
New York, New York 10004
  By:    Susan Golden, Esq.
           Brian S. Masumoto, Esq.
           Michael T. Driscoll, Esq.

**SKADDEN ARPS SLATE MEAGHER & FLOM LLP**
*Counsel for the Official Committee of Unsecured Creditors*
Four Times Square
New York, New York 10036
  By:    Jay M. Goffman, Esq.

-and-

155 North Wacker Drive
Chicago, Illinois 60606
  By:    John Wm. Butler, Jr., Esq.
           Albert L. Hogan III, Esq.
           John K. Lyons, Esq.
           Felicia Gerber Perlman, Esq.

**MILBANK, TWEED, HADLEY & MCCLOY LLP**
*Counsel for the Ad Hoc Committee of AMR Corporation Creditors*
1 Chase Manhattan Plaza
New York, New York 10005
By:   Gerard Uzzi, Esq.
      Eric K. Stodola, Esq.

**LATHAM & WATKINS LLP**
*Counsel for US Airways*
885 Third Avenue
New York, New York 10022
By:   D.J. (Jan) Baker, Esq.

**STEPTOE & JOHNSON LLP**
*Counsel for the Allied Pilots Association*
1330 Connecticut Ave., NW
Washington, DC 20036
By:   Filiberto Agusti, Esq.
      Joshua R. Taylor, Esq.

**JAMES & HOFFMAN, P.C.**
*Counsel for the Allied Pilots Association*
1130 Connecticut Ave., NW, Suite 950
Washington, DC 20036
By:   Edgar N. James, Esq.
      Kathy Krieger, Esq.
      David P. Dean, Esq.
      Darin M. Dalmat, Esq.
      Daniel M. Rosenthal, Esq.

**CAPLIN & DRYSDALE, CHARTERED**
*Counsel for the US Airline Pilots Association*
One Thomas Circle, NW, Suite 1100
Washington, DC 20005
By:   James P. Wehner, Esq.
      Kevin C. Maclay, Esq.
      Todd E. Phillips, Esq.

**DAVIS POLK & WARDWELL LLP**
*Counsel for Citibank, N.A.*
450 Lexington Avenue
New York, New York 10017
By:   Marshall S. Huebner, Esq.
      Timothy E. Graulich, Esq.
      Natasha Tsiouris, Esq.

**MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO, P.C.**
*Counsel for U.S. Bank National Association*
One Financial Center
Boston, Massachusetts 02111
By:    William W. Kannel, Esq.
         Ian A. Hammel, Esq.

**CHAPMAN AND CUTLER LLP**
*Counsel for U.S. Bank National Association and U.S. Bank Trust National Association*
111 West Monroe Street
Chicago, Illinois 60603
By:    James E. Spiotto, Esq.
         Franklin H. Top III, Esq.

-and-

330 Madison Avenue, 34th Floor
New York, New York 10017-5010
By:    Craig M. Price, Esq.
         Laura E. Appleby, Esq.

**SHIPMAN AND GOODWIN LLP**
*Counsel for U.S. Bank National Association and U.S. Bank Trust National Association*
One Constitution Plaza
Hartford, Connecticut 06103
By:    Ira H. Goldman, Esq.
         Kathleen M. LaManna, Esq.
         Corrine L. Burnick, Esq.

**FOLEY & LARDNER LLP**
*Counsel for U.S. Bank National Association and U.S. Bank Trust National Association*
90 Park Avenue
New York, New York 10016
By:    Mark L. Prager, Esq.
         Douglas E. Spelfogel, Esq.

**SIDLEY AUSTIN LLP**
*Counsel for U.S. Bank Trust National Association*
787 Seventh Avenue
New York, New York 10019
By:    Michael G. Burke, Esq.
         Andrew P. Propps, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

  Before the Court is the Debtors' motion under Sections 363, 503(b), and 105(a) of the Bankruptcy Code for approval of an agreement to merge the Debtors and US Airways Group, Inc. ("US Airways"), and related relief. (ECF Doc. No. 6800) (the "Motion"). The merger would create the world's largest airline and has the wide support of stakeholders in this case, as demonstrated by the statements filed in support by the Official Committee of Unsecured Creditors (the "UCC"), an Ad Hoc Committee of AMR Corporation Creditors, and the unions for the pilots at both American Airlines and US Airways. In addition to combining the operations of the two airlines, the merger proposes certain employee arrangements, including a proposed severance payment of $20 million to Thomas Horton, the Chief Executive Officer of Debtor AMR Corporation ("AMR").

  The U.S. Trustee ("UST") objects to the Motion. While raising no objection to the merger transaction itself, the UST argues that the proposed employee arrangements do not meet the requirements of Section 503(c) of the Bankruptcy Code, which places restrictions upon compensation paid to insiders during a bankruptcy case. The Debtors contend that Section 503(c) does not apply because these employee arrangements are conditioned on the closing of the merger and will be paid by the new enterprise created by the merger ("Newco"), not the Debtors. For the reasons stated below, however, the Court finds that Section 503(c) prohibits the authorization of the $20 million severance payment to Mr. Horton.

4

**BACKGROUND**

The merger is an agreement among AMR, AMR Merger Sub, Inc., and US Airways. Under the terms of the Agreement and Plan of Merger, dated February 13, 2013 (the "Merger Agreement"), AMR Merger Sub, Inc., a wholly owned subsidiary of AMR that was formed to effectuate the merger, will be merged into US Airways. US Airways will continue to survive as a direct, wholly owned subsidiary of AMR. Upon the effective date of the merger, AMR will be named "American Airlines Group Inc." and the combined company will operate under the "American Airlines" name.

As consideration for the merger, the shareholders of US Airways will receive 28% of the diluted equity of the merged enterprise. The remaining 72% will be distributed to the Debtors' stakeholders pursuant to a plan of reorganization. The value of the aggregate diluted equity of the parent of the merged airlines to be distributed to the stakeholders of the Debtors as a result of the merger is approximately $8 billion, based upon the implied equity value of US Airways' stock as of February 13, 2013.

The merger is subject to and effective upon the confirmation and consummation of the Debtors' chapter 11 plan of reorganization.[1] Specifically, the merger will be implemented by the plan and the value achieved by the merger will be distributed through the plan. The closing of the merger and the effective date of the plan will occur at the same time. Neither a disclosure statement nor a plan of reorganization has yet been filed, and the Motion explicitly states that all parties in interest reserve all of their rights with respect to such plan. While the consummation

---

[1] The Debtors have entered into a Support and Settlement Agreement, dated February 13, 2013 (the "Support Agreement"), with certain members of the Ad Hoc Committee and other large creditors holding approximately $1.2 billion of prepetition unsecured claims against the Debtors (the "Consenting Creditors"). The parties to the Support Agreement have agreed to support a plan of reorganization that implements the merger, incorporates a settlement of certain issues and guarantees a minimum distribution of 3.5% of the common equity of the parent of the merged airlines to the holders of AMR's existing equity interests, with the potential to receive additional shares. Approval of the Support Agreement is not currently before the Court.

of the merger remains subject to the Debtors' plan being confirmed and consummated and satisfaction of the conditions in the Merger Agreement, approval of the Merger Agreement by the Court will bind the Debtors to its terms retroactive to its execution date of February 13, 2013.

The merger is the culmination of many months of negotiations between the Debtors, the UCC, US Airways and numerous other constituencies. It has the overwhelming support of the UCC, the Consenting Creditors, the Ad Hoc Committee and the Debtors' labor unions.

**Employee Arrangements**

In connection with the merger, the Motion seeks approval of certain employee compensation and benefit arrangements─referred to as the "Employee Arrangements"─contained in Section 4.10 of the Merger Agreement and Section 4.1(o) of the American Disclosure Letter.[2] These fall into three categories: (i) Ordinary Course Changes; (ii) Employee Protection Arrangements; and (iii) the CEO severance payment.

The first category of Ordinary Course Changes provides for base wage increases for non-union employees as set forth in Section 4.1(o) of the American Disclosure Letter.[3] Eligible employees include: (i) AA agents, reservation and planners, AA support staff, and Eagle support staff; (ii) Eagle agents; (iii) management levels 9 through 11 (Vice Presidents, Senior/Executive Vice Presidents, and President); and (iv) front line management at AA and AMR Eagle. The Debtors state that all of these changes are being made in the ordinary course of business. They will become effective immediately and will be paid by the Debtors prior to the closing of the merger.

---

[2] Unless otherwise specified, capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion or the American Disclosure Letter.

[3] AMR's Chief Executive Officer is specifically excluded from these Employee Arrangements.

The second category of Employee Protection Arrangements is also set forth in Section 4.1(o) of the American Disclosure Letter.[4] These include Short-Term Incentive Plans, 2013 Long-Term Incentive Plans, Alignment Awards, Severance Arrangements, a Key Employee Retention Program, and a Level 5/6 Long-Term Incentive Program. While the Motion states that these Employee Protection Arrangements will be instituted prior to the consummation of the merger (Motion ¶ 76), the Debtors have clarified that they are subject to and will only become effective upon consummation of the merger, and thus they will be paid by Newco and not the Debtors. *See* Hr'g Tr. 13:5-11. These Employee Protection Arrangements are designed to achieve pay and benefit parity between the Debtors' employees and those of US Airways.

The details for the individual programs within this second category vary. The Short-Term Incentive Plans, for example, include a profit sharing arrangement in 2013 for those employees that are level 5 and below, which covers analysts, supervisors, and managers. In lieu of profit sharing, these employees may receive an increase in base wages or similar compensation. Also included is a short-term incentive plan effective for 2013 for managers at level 6 and above (the "STI"), which covers senior managers or directors, managing directors, vice presidents, senior/executive vice president, and president. Eighty percent of the STI is based on a sliding scale of performance objectives linked to 2013 pre-tax profit margins. The remaining twenty percent of the STI is not specifically outlined, but is instead based on operational performance metrics that are to be determined by AMR.

Another Employee Protection Arrangement, the 2013 Equity LTIP Award, is a long-term incentive program award ("LTIP") that will be made to approximately 60% of level 6 managers (senior managers or directors) and 100% of level 7 managers and above in amounts that are equal to the dollar amounts to be awarded to similarly situated US Airways managers. The 2013

---

[4]    AMR's Chief Executive Officer is also specifically excluded from these Employee Arrangements.

7

Equity LTIP will be in the form of stock-settled restricted stock units, but may be in the form of cash awards under certain circumstances.  The vesting schedule is in accordance with that of similarly situated US Airways managers, with the first vesting date in April 2014.  Similar to the LTIP, the Alignment Award is a long-term incentive program award that will be available to approximately 60% of level 6 managers and 100% of level 7 managers and above.  The amount of the award will be calculated based on a multiple of the prepetition target award value applicable to the recipient's position.  One third of the award will vest upon each of the closing of the merger, 12 months after closing, and 24 months after closing.  The alignment awards for 2013 will be in the form of stock-settled restricted stock units, but may be in the form of cash awards under certain circumstances.

The third category of Employee Arrangements is the severance payment to Mr. Horton. The payment is provided for in a letter agreement attached as Exhibit G to the Merger Agreement (the "American CEO Letter Agreement").  The American CEO Letter Agreement provides, among other things, that upon closing of the merger, the employment of Mr. Horton as AMR's Chief Executive Officer will terminate and he will be appointed as the Chairman of the Board of Directors for Newco.  It further states that, at the closing of the merger, Mr. Horton will be paid "severance compensation" of $19,875,000, which will be paid 50% in cash and 50% in Newco common stock.  *See* Merger Agreement, Exh. G.  The proposed severance of $20 million is "in recognition of Mr. Horton's effort in leading the Debtors' restructuring and his role in enhancing the value of the Debtors and overseeing the evaluation and assessment of the potential strategic alternatives that culminated in the [m]erger, at the [c]losing, [and] subject to the execution of a standard release by Mr. Horton against AMR and its [s]ubsidiaries."  *See* Motion ¶ 89.  The terms of the American CEO Letter Agreement are conditioned on closing of the

8

merger, and it specifically states that "[i]f the [c]losing does not occur, this Agreement shall be null and void *ab initio* and of no force and effect." *See* Merger Agreement, Exh. G.

### Relevant Procedural History

The Debtors filed this Motion on February 22, 2013. On March 15, 2013, the UST filed a blunderbuss objection to all the proposed Employment Arrangements. With their reply brief filed March 22, 2013, the Debtors submitted three declarations in support of the Motion. The first declaration from Beverly K. Goulet[5] provides a general overview of the merger and its projected benefits, as well as background on the process leading to the formulation of the merger. The second declaration from Denise Lynn[6] explains the negotiation and formulation of the Employee Arrangements. The third declaration of Douglas J. Friske[7] addresses the formulation of the Employee Arrangements.

In a sur-reply filed on the evening of March 25, 2013, the UST dropped its objections to the first category of Ordinary Course Changes and to all but four of the Employee Protection Arrangements.

A hearing on the Motion was held on March 27, 2013. At the hearing, counsel to the Debtors and the UCC described in detail the terms of the Employee Protection Arrangements. In addition to the testimony provided in their three declarations, the Debtors' counsel confirmed by proffer that the purpose of all these Employee Protection Arrangements is to move towards compensation parity between employees of the Debtors and those of US Airways. *See* Hr'g Tr.

---

[5]  Ms. Goulet currently serves as the Senior Vice President and Chief Integration Officer of American Airlines, Inc.

[6]  Ms. Lynn currently serves as the Senior Vice President - People of American Airlines, Inc.

[7]  Mr. Friske is the Global Line of Business Leader for Executive Compensation for Towers Watson Pennsylvania Inc., a professional services firm engaged by the Debtors as an executive compensation consultant.

90:15-17, 117:1-10, March 27, 2013.[8] On that basis, the UST withdrew its objections to all of the Employee Protection Arrangements subject to the Court's determination that they did not violate Section 503(c) of the Bankruptcy Code. For the reasons stated at the hearing, the Court found these Employee Protection Arrangements to be permissible because there is a legitimate business reason for seeking similar pay arrangements among employees at Newco that perform similar tasks. *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also* Declaration of Denise Lynn ¶ 6 ("Additionally, both senior management teams of American and US Airways, as well as the UCC and its retained professionals, have agreed that, to the extent possible, it is essential to treat managers of the Debtors fairly and with parallel compensation structures relative to managers of US Airways in order to ensure a smooth transition. Indeed, in my opinion, for similarly situated employees of the two carriers to be treated differently would be an untenable circumstance and value destructive.").

Given the developments at the hearing, the sole remaining UST objection was to the CEO severance payment.[9] In light of that fact, and based on the evidence before the Court, the Court

---

[8] In fact, the proposed changes to compensation will not achieve such pay parity now, although it would constitute a significant step in that direction. *See* Hr'g Tr. 91:1-11, March 27, 2013 (As noted by Mr. Butler, counsel to the UCC, "[t]hey actually don't bring them to exact parity with Airways. . . . So they bring them up towards parity but it's not actual parity. It's something less than actual parity.").

[9] Several *pro se* individuals filed letters objecting to the Motion: Scott Cmajdalka (ECF Doc. No. 6852), HG Plog (ECF Doc. Nos. 6947, 7159), John L. Cheek (ECF Doc. No. 7057), Bahir Browsh (ECF Doc. No. 7056), Robert Steven Mawhinney (ECF Doc. No. 7052), Yaniris Diaz (ECF Doc. No. 7051), Robert Mueller (ECF Doc. No. 7050), Willie Ray Williams (ECF Doc. Nos. 7055, 7117, 7257), Joan Hoffman (ECF Doc. No. 7049), Leo Brandon Farnsworth (ECF Doc. No. 7076), Glen E. Simmerly (ECF Doc. No. 7126), Wayne Tremble (ECF Doc. No. 7128), a group of American Airlines Agents (ECF Doc. No. 7161), Dan Lee Davis (ECF Doc. No. 7158), Lawrence G. D'Oench (ECF Doc. No. 7254), Gail Allen (ECF Doc. No. 7255), Roise Kennedy (ECF Doc. No. 6849), Joyce A. Mueller (ECF Doc. No. 6853), Patricia A. Landrum (ECF Doc. No. 6856), Clyde W. Loveless (ECF Doc. No. 7127) and Richard Kijewski (ECF Doc. No. 7260). Edward E. Anderson filed an objection through counsel (ECF Doc. No. 7132). Additionally, Robert Pagoni appeared at the hearing *pro se* to voice his objection to the Motion. Many of these filings raise objections to the proposed severance payment for Mr. Horton. *See, e.g.*,

at the hearing approved the merger in all respects except for Mr. Horton's severance and informed the parties that the Court would issue this decision to address that question.

## DISCUSSION

### Applicable Legal Standard

Debtors seek approval of all aspects of the merger under Section 363, which provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale, disposition, or other use of a debtor's assets, courts in the Second Circuit and elsewhere have required that it be based upon the sound business judgment of the debtor. *See Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp. (In re Chateauguay Corp.)*, 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a Section 363(b) application must find from the evidence presented a good business reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983) (same); *In re Chrysler LLC*, 405 B.R. 84 (Bankr. S.D.N.Y. 2009), *aff'd Ind. State Police Pension Trust v. Chrysler LLC (In re Chrysler LLC)*, 576 F.3d 108 (2d Cir. 2009) (same); *In re Gen. Motors Corp.*, 407 B.R. 463 (Bankr. S.D.N.Y. 2009) (same).

---

ECF Doc. Nos. 6852, 7056, 7049, 7128, 7161, 7254 and 7260. Other than the objections to the proposed severance, these filings raised a variety of objections to the merger that are unrelated to the merger itself and that do not provide a basis for denial of the merger. *See, e.g.*, ECF Doc. No. 7255 (requesting exercise of stock options), ECF Doc. Nos. 6947, 7159 (plan objections), ECF Doc. No. 7132 (requesting a position on UCC or, in the alternative, that the stay be lifted). Accordingly, the Court overruled these objections at the hearing. *See* Hr'g Tr. 151:6-13.

Three other parties, specifically Citibank N.A. (ECF Doc. No. 7120), U.S. Bank National Association (ECF Doc. No. 7121) and U.S. Bank Trust National Association (ECF Doc. Nos. 7133, 7137), filed reservations of rights in connection with the Motion. The Debtors have indicated that all parties' rights are reserved with respect to any support agreement, disclosure statement, or plan filed by the Debtors.

The present dispute concerns the applicability of Section 503 to the proposed severance payment. Generally, Section 503 has "two overriding policy objectives: (i) to preserve the value of the estate for the benefit of its creditors and (ii) to prevent the unjust enrichment of the estate at the expense of its creditors." *In re Journal Register Co.*, 407 B.R. 520, 535 (Bankr. S.D.N.Y. 2009). Section 503(c) curtails payment of retention incentives or severance to insiders of a debtor. *Id.* at 536. The section states:

> Notwithstanding subsection (b), there shall neither be allowed, nor paid –
>
> (1) a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that–
>
> > (A) the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;
> >
> > (B) the services provided by the person are essential to the survival of the business; and
> >
> > (C) either –
> >
> > > (i) the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or
> > >
> > > (ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;
>
> (2) a severance payment to an insider of the debtor, unless—
>
> > (A) the payment is part of a program that is generally applicable to all full-time employees; and

    (B) the amount of the payment is not greater than 10 times the amount of the mean severance pay given to nonmanagement employees during the calendar year in which the payment is made; or

  (3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

  Section 503(c) was added to the Bankruptcy Code in 2005 as part of the BAPCPA amendments to "eradicate the notion that executives were entitled to bonuses simply for staying with the [c]ompany through the bankruptcy process." *In re Velo Holdings, Inc.*, 472 B.R. 201, 209 (Bankr. S.D.N.Y. 2012) (citing *In re Global Home Prods., LLC*, 369 B.R. 778, 783-84 (Bankr. D. Del. 2007)). When Senator Edward Kennedy proposed the amendment, he expressed concern over the "glaring abuses of the bankruptcy system by the executives of giant companies like Enron Corp. and WorldCom, Inc. and Polaroid Corporation, who lined their own pockets, but left thousands of employees and retirees out in the cold." *In re Dana Corp.*, 358 B.R. 567, 575 (Bankr. S.D.N.Y. 2006) (citing Statement of Senator Edward Kennedy on the Bankruptcy Bill (March 1, 2005)). The effect of adding the section was to put in place "a set of challenging standards" and "high hurdles" for debtors to overcome before such payments could be paid. *Global Home Prods.*, 369 B.R. at 784-85.

  Notably, prior to the enactment of Section 503(c), a debtor needed only to satisfy the business judgment standard under Section 363 to authorize retention or severance payments to insiders. *See Dana*, 358 B.R. at 576 (citing *In re Nobex Corp.*, 2006 WL 4063024 (Bankr. D. Del. Jan. 19, 2006) (noting courts previously authorized transfers outside the ordinary course of business based on the business judgment of the debtor). Courts now apply the business judgment standard to motions seeking to pay employees pursuant to Section 503(c)(3) for payments that do not concern retention or severance payments to insiders. *Dana Corp.*, 358 B.R. at 576. But "to

13

the extent a proposed transfer falls within sections 503(c)(1) (*citation omitted*) or (c)(2) (*citation omitted*), then the business judgment rule does not apply, irrespective of whether a sound business purpose may actually exist." *In re Dana Corp.*, 351 B.R. 96, 101 (Bankr. S.D.N.Y. 2006)) ("*Dana I*"). Given the history and intent of Section 503(c), courts disfavor attempts to bypass the requirements of section 503(c). *Velo Holdings*, 472 B.R. at 209.

It should be noted, however, that "Section 503(c) was not intended to foreclose a Chapter 11 debtor from *reasonably* compensating employees, including 'insiders,' for their contribution to the debtors' reorganization." *Dana Corp.*, 358 B.R. at 575 (emphasis in original) (citations omitted). "Accordingly, [S]ection 503(c)(3) gives the court discretion as to bonus and incentive plans, which are not primarily motivated by retention or in the nature of severance." *Id.* at 576.

As used in Section 503, the term "insider" covers directors, officers, general partners, and persons in control of a corporate debtor. *See* 11 U.S.C. § 101(31); *In re Borders Group, Inc.*, 453 B.R. 459, 467-68 (Bankr. S.D.N.Y. 2011). Courts evaluate who is an insider on a case-by-case basis from the totality of the circumstances, including whether the individual has "at least a controlling interest in the debtor or . . . exercise[s] sufficient authority over the debtor so as to qualifiably dictate corporate policy and disposition of corporate assets." *In re Velo Holdings Inc.*, 472 B.R. 201, 208 (Bankr. S.D.N.Y. 2012) (quoting *In re Babcock Dairy Co.*, 70 B.R. 657, 661 (Bankr. N.D. Ohio 1986)).

### The Proposed Severance to Mr. Horton

The UST objects to Mr. Horton's severance payment as violating Section 503(c)(2), which specifically covers any "severance payment to an insider of the debtor . . . ." If covered by Section 503(c)(2), a severance payment is permissible only if it satisfies the two pronged test of Section 503(c)(2)(A) and (B): (i) the payment is part of a program that is generally applicable

14

to all full-time employees; (ii) the amount of the payment is not greater than 10 times the amount of the mean severance pay given to non-management employees during the calendar year in which the payment is made.

There is no dispute that Mr. Horton qualifies as an insider. There also can be little doubt that the proposed payment to Mr. Horton is "severance." It is identified as such in both the Debtors' Motion and in the American CEO Letter Agreement. The American CEO Letter Agreement specifically states that Mr. Horton "shall be paid at the [c]losing severance compensation of $19,875,000." *See* Merger Agreement, Exh. G.[10] Moreover, the Debtors do not argue that the severance payment meets the requirements of Section 503(c). Rather, the Debtors contend that Mr. Horton's severance payment is not subject to the requirements of that section because the payment will be paid by Newco and not the Debtors' estate. Given that Section 503 is titled "Allowance of Administrative Expenses," the Debtors argue that it cannot apply to funds being paid after the effective date of the plan because those funds will no longer be part of the Debtors' estate, but instead will be funds of Newco. In support of their position, the Debtors rely on two cases from this court: *In re Journal Register Co.*, 407 B.R. 520 (Bankr. S.D.N.Y. 2009) and *In re Dana Corp.*, 358 B.R. 567 (Bankr. S.D.N.Y. 2006).

It is true that the court in *Journal Register* found that post-emergence incentive payments need not comply with Section 503(c). But the Debtors ignore the context for that conclusion. The court in *Journal Register* was presented with a proposed plan of reorganization, with the post-emergence incentive payments to be made pursuant to the plan. As the court noted, "[b]y including the [i]ncentive [p]lan in their [p]lan of [r]eorganization, the [d]ebtors have subjected

---

[10] At the hearing, the UCC stated that the payment to Mr. Horton is an aggregate payment that included not only severance, but also other types of remuneration. But there is no evidence on that issue from the Debtors, and there is also no dispute that the payment includes severance. Hr'g Tr. 47:6-25 March 27, 2013. Thus, the Court does not believe it is necessary or appropriate to look behind the Debtors' characterization of this payment as severance for purposes of this decision.

15

11-15463-shl    Doc 7587    Filed 04/11/13    Entered 04/11/13 15:22:29    Main Document
Pg 16 of 20


the [i]ncentive [p]lan to the heightened disclosure, notice, and hearing requirements of the [p]lan confirmation process, and they have given the affected parties the opportunity to vote on it." *Journal Register*, 407 B.R. at 536-37. As the payments were to be made under the confirmation order itself, the court concluded that they did not fall under Section 503(c) which covers only expenses to be paid as an administrative expense of the case. *Id.* at 535-36. As the court explained, "a confirmed plan takes on the attributes of a contract," (citing *Charter Asset Corp. v. Victory Markets, Inc. (In re Victory Markets, Inc.*, 221 B.R. 298, 303 (2d Cir. BAP 1998)) "by which the estate ceases to exist, [and] 'a reorganized debtor' comes into being . . . ." *Id.* at 536. (citing *In re Cottonwood Canyon Land Co.*, 146 B.R. 992 (Bankr. D. Colo. 1992); *Blumenthal v. Clark (In re Hiller)*, 143 B.R. 263 (Bankr. D. Colo. 1992)).

Rather than being governed by Section 503, the court in *Journal Register* observed that "there is a subsection of [Section] 1129 [governing the confirmation of a plan] that is directly applicable" to such payments, with Section 1129(a)(4) setting forth requirements for "any payment made or to be made by the proponent, by the debtors . . . for services or for costs and expenses in or in connection with the case . . . . " *Id.* at 537. By presenting their request as part of a proposed plan of confirmation, the debtors in *Journal Register* took the proposed incentive payments outside of the coverage of Section 503 and placed them within the confines of Section 1129(a)(4).

The result in *Journal Register* is consistent with the decision in *Dana*. In *Dana*, the debtors proposed a $3 million post-emergence bonus to their CEO through an employee incentive plan. They made a nearly identical argument as the Debtors in this case, stating that because the proposed payment would be made after emergence from Chapter 11, the payment was not subject to Section 503(c). In declining to approve the post-emergence payment, the

16

*Dana* court noted that "to the extent that the $3 million payment is subject to further review and must be passed upon as a provision in a disclosure statement and plan of reorganization, the [c]ourt cannot, at this early point in the cases, guarantee that the payment will be ultimately approved." *Dana Corp.*, 358 B.R. at 579.

In contrast to *Journal Register* and *Dana*, the Debtors here seek the Court's approval of this severance payment now, notwithstanding the fact that the Debtors' expected effective date of the merger (and plan) is some six months away. *See* Hr'g Tr. 26:3-7. Indeed, a plan and disclosure statement have yet to be filed. And there is a real consequence to such approval today: the UCC conceded at the hearing, and the Debtors did not contest, that approval now would resolve this issue for purposes of this bankruptcy case and preclude any challenge to the merits of the severance payment during the confirmation hearing on a plan of reorganization. Hr'g Tr. 63:24-25; 64:1-2.

Moreover, during the hearing on the Motion, the Debtors conceded that Mr. Horton's payment—as part of the larger employee payments being sought under the merger—was essentially an expense necessary to preserve and realize value for the Debtors' estates.[11] S*ee Journal Register*, 407 B.R. at 535 (noting that Section 503 is designed to "preserve the value of the estate for the benefit of its creditors") (citing *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.,* 789 F.2d 98, 101 (2d Cir.1986)). The Debtors hang their hat, however, on the fact that the payment will be paid by Newco. Of course, the Debtors are correct in noting that the payment technically will not come from the Debtors' estate. But that is somewhat of a legal

---

[11] *See* Hr'g Tr. 35:20-25; 36: 1-6 (Mr. Karotkin: "I will tell you from the standpoint of the [D]ebtors' board of directors, they were deeply concerned, as we indicated in our pleadings that, about affecting this merger and realizing the value and how critical it was to have these employees focused on them, and that they, they were not under the circumstances in a position to agree to that transaction, and put at risk the ability to achieve the value that everybody believes can be achieved. And that is why these employee arrangements are in the agreement, that is why they are a condition to moving forward with the agreement . . . .").

17

fiction. It is clear that the severance payment relates to Mr. Horton's employment at AMR, where he currently serves as CEO, and not from Newco, which does not yet exist and where Mr. Horton will take on a new position only after the merger is finalized and the proposed severance is paid.[12] As a practical matter, moreover, the proposed severance would be paid without any action from Newco, an entity that will consist of 72% of the property of the reorganized Debtors.[13] In any event, the Debtors' argument fails because the statute speaks in terms of "allowance" of a payment. If the Court's approval today means anything—and all parties seem to agree that it does—the request for approval fits comfortably within the notion of a severance that would be "allowed" as contemplated by the first sentence of Section 503(c).[14]

During the hearing, the Debtors offered to amend the Merger Agreement to require that the board of Newco vote on the severance payment before such a payment could be made. But that suggestion only highlights the fact that, once created, Newco can make a severance payment

---

[12] The Court recognizes the unique nature of this merger serving as a basis for the plan and the proposed severance. But there is almost always a "newco" once a Chapter 11 debtor emerges from bankruptcy. One can think of other circumstances where a severance payment might be structured to be authorized – but not paid – during a bankruptcy case, which counsels strongly against the creation of an exception to Section 503(c) here.

[13] Although not cited by any of the parties, the Court did find one case where a court approved retention bonuses to a debtor's insiders during the course of a Chapter 11 case. *See In re Airway Industries, Inc.*, 354 B.R. 82 (Bankr. W. D. Pa. 2006). But that case is easily distinguishable. In *Airways Industries*, the funding for the insider bonuses came from an outside third-party, and it was uncontested that the third-party would have no claim against the debtor's estate on account of the bonuses. The payments to insiders here will come from Newco, which is comprised of 72% of the reorganized Debtors' assets. Moreover, in *Airway Industries*, the third-party providing funding for the bonuses had entered into the bonus agreements before the bankruptcy was filed and before the 2005 BAPCPA changes went into effect. As the court in that case recognized, "the timing of the sale, the bankruptcy filing, and the changes in the Bankruptcy Code created a unique situation likely never to occur again." *Id.* at 86.

[14] The terms "allow" and "allowed" are not defined in Section 503 or in Bankruptcy Code definitions found in Section 101 of the Bankruptcy Code. But Merriam-Webster defines the term "allow" as a transitive verb in five different ways, with the most applicable definition being to "permit." *See* Merriam-Webster.com. 2013. http://www.merriam-webster.com (April 13, 2013). Thus, the Court is persuaded that the circumstances here are covered by the plain language of Section 503. *See Anderson v. Conboy*, 156 F.3d 167, 178 (2d Cir. 1998) (judicial inquiry is complete where the words of the statute are unambiguous). But even to the extent that the language of the statute is unclear in these circumstances, the clear intent of Congress supports the Court's conclusion. *See United States v. Ron Par Enterprises, Inc.*, 489 U.S. 235, 242 (1989) ("The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'"); *accord Anderson*, 156 F.3d at 178.

18

to Mr. Horton without any approval from this Court. Although the Court is constrained by Section 503's requirements in considering the proposed severance now, Newco will not have such restrictions and instead will answer only to its shareholders. It is unclear what purpose would be served by the Court's approval of the severance if Newco could later veto the severance through a vote of its board. Indeed, under this proposed amendment, there is little reason for the Court to be involved at all.

Seeking to avoid the strictures of Section 503, the Debtors contend that Section 363 provides a basis for immediate approval of this severance payment. But that scenario is exactly what Congress sought to prevent by enacting Section 503(c) of the Bankruptcy Code. As noted above, prior to the enactment of Section 503(c), compensation payments outside the ordinary course were governed by the business judgment standard of Section 363(b). *Dana*, 358 B.R. at 576. Section 503(c) was specifically enacted to change that practice by establishing a higher standard to justify retention or severance payments to insiders during the pendency of bankruptcy cases. *Velo Holdings*, 472 B.R. at 209. Given this clear legislative intent, the Debtors' reliance on the business judgment standard to justify approval of this severance payment must fail. *See id*. at 209 (courts disfavor attempts to bypass the requirements of section 503(c) given its legislative history) (citing *Dana I*, 351 B.R. at 102 (Bankr.S.D.N.Y.2006)); *id*. at 209 (noting that Section 503 was added to "eradicate the notion that executives were entitled to bonuses simply for staying with the [c]ompany through the bankruptcy process") (citing *In re Global Home Prods., LLC*, 369 B.R. 778, 783-84 (Bankr. D. Del. 2007)).

Finally, the Debtors argue that the payments they propose for Horton are customary in situations analogous to the one now before the Court, citing the payments made pursuant to mergers of United and Continental Airlines and of Delta and Northwest. This argument misses

the point. Both of those mergers occurred outside of the Chapter 11 context where parties are not subject to the requirements of the Bankruptcy Code.[15] Although these two examples may inform the Court as to market salaries for a severance payment in major airline mergers, they do nothing in the way of satisfying Section 503(c)'s requirements.

## **CONCLUSION**

For the reasons stated above, the Court grants the Debtors' Motion in all respects except for denying the proposed severance to Mr. Horton.[16]

Dated: New York, New York
      April 11, 2013

                                                 */s/ Sean H. Lane*
                                                 UNITED STATES BANKRUPTCY JUDGE

---

[15] *See* Hr'g Tr. 68:20-23 (Mr. Baker, counsel to US Airways: "I too have never seen this set of facts occur in this way, i.e., the merger of two public companies to be effectuated through confirmation of a [C]hapter 11 plan.").

[16] To the extent that the Debtors subsequently invoke Section 1129(a)(4) as a basis to justify a post-emergence payment to Mr. Horton, the Court today does not have a view on that issue. It is premature to consider such a request without a proposed plan of reorganization and an appropriate record.