**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------x
                                                              :
In re                                                         :          Chapter 11 Case No.
                                                              :
AMR CORPORATION, *et al.*,                                    :          11-15463 (SHL)
                                                              :
                                  Debtors.                    :          (Jointly Administered)
                                                              :
--------------------------------------------------------------x

## PROPOSED DISCLOSURE STATEMENT
## FOR DEBTORS' JOINT CHAPTER 11 PLAN

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

Attorneys for the Debtors and
Debtors in Possession

Dated: New York, New York
       April 15, 2013

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT TO DATE.**

# TABLE OF CONTENTS

I.    Introduction ................................................................................................................. 1
      A.    Definitions and Exhibits............................................................................... 1
      B.    Notice to Creditors ...................................................................................... 1
      C.    Rationale Underlying the Plan ..................................................................... 3
            1.    Merger with US Airways ................................................................. 3
            2.    Plan Compromises ........................................................................... 5
            3.    Distribution Mechanics ................................................................... 8
      D.    Table Summarizing the Classification and Treatment of Claims and
            Equity Interests Under the Plan.................................................................... 9
      E.    Disclosure Statement Enclosures ................................................................ 18
            1.    Disclosure Statement Approval Order ............................................. 18
            2.    Confirmation Hearing Notice........................................................... 19
            3.    Ballots ............................................................................................. 19
      F.    Inquiries....................................................................................................... 19
II.   Overview of the Debtors Prior to the Commencement
      of the Chapter 11 Cases .............................................................................................. 20
      A.    Corporate Structure ..................................................................................... 20
      B.    Business Operations ..................................................................................... 21
      C.    Capital Structure.......................................................................................... 22
            1.    Equity Ownership ........................................................................... 22
            2.    AMR Debt Financing and Other Obligations .................................. 23
            3.    American Debt Financing and Other Obligations............................. 23
            4.    Capital Lease Obligations and Trade Payables ................................ 25
      D.    Events Leading to Commencement of the Chapter 11 Cases ....................... 25
            1.    Airline Industry Experiences Fundamental Changes........................ 25
            2.    Continued Financial Burdens ........................................................... 26
III.  Overview of the Chapter 11 Cases .............................................................................. 27
      A.    Commencement of Chapter 11 Cases .......................................................... 27
      B.    Stabilization of Operations.......................................................................... 27
      C.    Significant Restructuring Activities During the Chapter 11 Cases.............. 28
            1.    American Labor Cost Restructuring ................................................ 28
            2.    Eagle Labor Cost Restructuring ...................................................... 33
            3.    Executory Contracts and Unexpired Leases .................................... 35
            4.    Citi AAdvantage Program............................................................... 35
            5.    Airport and Facility Restructuring ................................................... 38
            6.    Fleet Restructuring .......................................................................... 38
      D.    Merger Agreement with US Airways............................................................ 45
            1.    Exploration of Strategic Alternatives............................................... 45
            2.    US Airways ...................................................................................... 46
            3.    Negotiations with US Airways ........................................................ 46
            4.    Negotiations with Labor................................................................... 47
            5.    The Merger Agreement .................................................................... 48
            6.    The New American Airlines ............................................................. 52

i

|  |  | 7. | Support and Settlement Agreement | 54 |
|  | E. |  | Other Events During the Chapter 11 Cases | 56 |
|  |  | 1. | First Day Motions | 56 |
|  |  | 2. | Appointment of Creditors' Committee | 57 |
|  |  | 3. | Appointment of Retiree Committee | 57 |
|  |  | 4. | Appointment of Fee Examiner | 57 |
|  |  | 5. | Requests for Appointment of Committee of Equity Security Holders | 58 |
|  |  | 6. | Protection of Tax Benefits/AMR Trading Order | 58 |
|  |  | 7. | Reclamation Claims and 503(b)(9) Claims | 62 |
|  |  | 8. | Claims Process | 63 |
|  |  | 9. | Exclusivity | 64 |
|  |  | 10. | Retiree Health and Welfare Benefits | 65 |
|  |  | 11. | GDS Litigation | 66 |
| IV. |  |  | Overview of the Plan of Reorganization | 67 |
|  | A. |  | General | 67 |
|  | B. |  | Classification and Treatment of Claims and Equity Interests Under the Plan | 67 |
|  |  | 1. | The AMR Debtors | 68 |
|  |  | 2. | The American Debtors | 72 |
|  |  | 3. | The Eagle Debtors | 79 |
|  | C. |  | Reservation of "Cram Down" Rights | 81 |
|  | D. |  | Administrative Expenses and Priority Tax Claims | 82 |
|  | E. |  | Provisions Governing Distributions Under the Plan | 84 |
|  |  | 1. | Distribution Record Date | 84 |
|  |  | 2. | Disbursing Agent | 84 |
|  |  | 3. | Timing of Distributions | 84 |
|  |  | 4. | Delivery of Distributions and Undeliverable Distributions | 85 |
|  |  | 5. | Withholding and Reporting Requirements | 86 |
|  |  | 6. | Cash Payments | 87 |
|  |  | 7. | Distributions on Behalf of Subsidiaries | 87 |
|  |  | 8. | Allocation of Plan Distribution Between Principal and Interest | 87 |
|  |  | 9. | Time Bar to Cash Payments | 88 |
|  |  | 10. | Minimum Distributions and Fractional Shares | 88 |
|  |  | 11. | Setoff and Recoupment | 88 |
|  |  | 12. | Transactions on Business Days | 89 |
|  |  | 13. | Surrender of Existing Publicly-Traded Debt Securities | 89 |
|  |  | 14. | Class Proofs of Claim | 89 |
|  |  | 15. | Conversion of Convertible Notes | 89 |
|  | F. |  | Means for Implementation and Execution of the Plan | 90 |
|  |  | 1. | Continued Corporate Existence | 90 |
|  |  | 2. | Merger | 91 |
|  |  | 3. | The 9019 Settlement | 91 |
|  |  | 4. | Distributions to Non-Union Employees | 92 |
|  |  | 5. | Substantive Consolidation | 92 |

6.   Confirmation in the Event of Partial or No Plan Consolidation ........................... 94
7.   Claims Against Multiple Consolidated Debtors .................................................. 94
8.   Issuance of Plan Shares.................................................................................... 95
9.   Nonconsensual Confirmation............................................................................ 95
10.  Issuance of Plan Shares; Execution of Related Documents................................ 95
11.  Section 1145 Exemption .................................................................................. 96
12.  Hart-Scott-Rodino Compliance......................................................................... 97
13.  Listing ............................................................................................................ 97
14.  Cancellation of AMR Common Stock ............................................................... 97
15.  Cancellation of Existing Notes and Aircraft Securities ...................................... 98
16.  Intercompany Claims ..................................................................................... 100
17.  Exit Facility................................................................................................... 100
18.  Equity Interests in Subsidiaries Held by the Debtors........................................ 100
19.  Board of Directors.......................................................................................... 100
20.  Corporate Action............................................................................................ 101
21.  New AAG 2013 Incentive Award Plan............................................................ 103
22.  Anti-Dilution Adjustments.............................................................................. 103
23.  Effectuating Documents and Further Transactions............................................ 103
24.  Creditors' Committee Member Fees ................................................................ 103
25.  Chairman Letter Agreement ............................................................................ 103
G.   Procedures for Disputed Claims................................................................................ 104
1.   Objections to Claims ...................................................................................... 104
2.   Resolution of Disputed Administrative Expenses and Disputed
     Claims ........................................................................................................... 104
3.   Payments and Distributions with Respect to Disputed Claims........................... 104
4.   True-Ups ....................................................................................................... 105
5.   Distributions After Allowance ........................................................................ 106
6.   Estimation ..................................................................................................... 107
7.   Interest and Dividends.................................................................................... 107
H.   Treatment of Executory Contracts and Unexpired Leases .......................................... 107
1.   Executory Contracts and Unexpired Leases ..................................................... 107
2.   Schedules of Executory Contracts and Unexpired Leases.................................. 108
3.   Categories of Executory Contracts and Unexpired Leases to be
     Assumed......................................................................................................... 110
4.   Other Categories of Agreements and Policies .................................................. 112
5.   Pension Plans ................................................................................................. 113
6.   Assumption and Rejection Procedures and Resolution of Treatment
     Objections ..................................................................................................... 114
7.   Rejection Claims ............................................................................................ 116
8.   Assignment..................................................................................................... 116
9.   Approval of Assumption, Rejection, Retention, or Assignment of
     Executory Contracts and Unexpired Leases ..................................................... 116
10.  Modifications, Amendments, Supplements, Restatements, or Other
     Agreements .................................................................................................... 117

| | | |
|---|---|---|
| I. | Releases Granted Pursuant to the Plan | 117 |
| | 1. Exculpation | 117 |
| | 2. Release | 118 |
| J. | Conditions Precedent to Effectiveness of Plan | 119 |
| | 1. Condition Precedent to Confirmation of Plan | 119 |
| | 2. Conditions Precedent to Effective Date | 119 |
| | 3. Satisfaction and Waiver of Conditions | 121 |
| K. | Effects of Confirmation of Plan | 121 |
| | 1. Vesting of Assets | 121 |
| | 2. Discharge of Claims and Termination of Equity Interests | 121 |
| | 3. Release and Discharge of Debtors | 122 |
| | 4. Term of Injunctions or Stays | 122 |
| | 5. Injunction Against Interference with Plan | 122 |
| | 6. Injunction | 123 |
| | 7. Avoidance Actions | 123 |
| | 8. Retention of Causes of Action/Reservation of Rights | 123 |
| L. | Retention of Jurisdiction by Bankruptcy Court | 124 |
| M. | Dissolution of Committees | 126 |
| N. | Substantial Consummation | 127 |
| O. | Exemption From Transfer Taxes | 127 |
| P. | Expedited Tax Determination | 128 |
| Q. | Sell-Down Procedures | 128 |
| R. | Payment of Statutory Fees | 128 |
| S. | Plan Modifications and Amendments | 128 |
| T. | Revocation or Withdrawal of Plan | 129 |
| U. | Courts of Competent Jurisdiction | 129 |
| V. | Severability | 129 |
| W. | Governing Law | 130 |
| X. | Successors and Assigns | 130 |
| Y. | Time | 130 |
| V. | Alternatives to the Plan | 130 |
| A. | Continuation of the Chapter 11 Cases | 130 |
| B. | Liquidation Under Chapter 7 of the Bankruptcy Code | 131 |
| VI. | Certain U.S. Federal Income Tax Consequences of the Plan | 131 |
| A. | Consequences to the Debtors | 133 |
| | 1. Cancellation of Debt | 133 |
| | 2. Potential Limitations on NOL Carryforwards and Other Tax Attributes | 134 |
| | 3. Alternative Minimum Tax | 137 |
| | 4. US Airways Merger | 137 |
| B. | Consequences to U.S. Holders of Certain Claims and AMR Common Stock | 137 |
| | 1. Exchanges of Claims Under the Plan | 138 |
| | 2. Ownership of New Mandatorily Convertible Preferred Stock | 143 |

|  |  | 3. | Exchanges of AMR Common Stock Under the Plan | 143 |
|  |  | 4. | Disposition of New Common Stock and New Mandatorily Convertible Preferred Stock | 144 |
|  |  | 5. | Disputed Claims Reserve | 144 |
|  |  | 6. | Information Reporting and Backup Withholding | 145 |
| VII. | | | Voting Procedures and Requirements | 146 |
|  | A. | | Ballots and Voting Deadline | 146 |
|  | B. | | Holders of Claims and Equity Interests Entitled to Vote | 147 |
|  | C. | | Votes Required for Acceptance by a Class | 147 |
|  | D. | | Voting Procedures | 147 |
|  |  | 1. | Holders of Claims and Equity Interests in Classes Entitled to Vote | 147 |
|  |  | 2. | Withdrawal of Ballot or Master Ballot | 147 |
| VIII. | | | Factors to Consider Before Voting | 148 |
|  | A. | | Risks Associated with the Merger | 148 |
|  |  | 1. | Conditions to Consummation of Merger | 148 |
|  |  | 2. | Loss of Senior Management and Key Employees | 149 |
|  |  | 3. | Integration After Merger | 149 |
|  |  | 4. | Registration of Plan Securities on a National Exchange | 150 |
|  |  | 5. | Factors Affecting Price of New Common Stock | 150 |
|  |  | 6. | Dilution From Future Stock Issuance | 151 |
|  | B. | | Additional Risks Associated With the Debtors' and New AAG's Business Operations and Financial Condition | 151 |
|  |  | 1. | Fuel Costs | 151 |
|  |  | 2. | Labor | 151 |
|  |  | 3. | Environmental Regulation | 151 |
|  |  | 4. | Increased Insurance Costs and Reduced Coverage | 152 |
|  |  | 5. | Increased Pilot Retirements | 152 |
|  |  | 6. | Delivery of Aircraft | 152 |
|  |  | 7. | Disruption at Primary Market | 152 |
|  |  | 8. | Substantial Indebtedness and Other Obligations | 152 |
|  |  | 9. | Reserve Requirements | 153 |
|  |  | 10. | Dependence on Technology | 153 |
|  |  | 11. | Seasonality and Exogenous Events | 153 |
|  |  | 12. | Global Economic Downturn | 154 |
|  |  | 13. | Highly Competitive Industry | 154 |
|  |  | 14. | Extensive Domestic and International Regulation | 154 |
|  |  | 15. | Domestic and Foreign Taxes and Fees | 155 |
|  | C. | | Additional Risks Associated with the Bankruptcy Process | 156 |
|  |  | 1. | Non-Confirmation of Plan | 156 |
|  |  | 2. | Non-Consensual Plan Confirmation | 156 |
|  |  | 3. | Inaccuracy of Projected Financial Results | 156 |
|  |  | 4. | Potential Dilution From Claims | 157 |
|  |  | 5. | U.S. Federal Income Tax Risks | 157 |
| IX. | | | Confirmation of the Plan | 157 |

|     | A. | Acceptance of the Plan | 157 |
|     | B. | Confirmation in the Event a Class Fails to Accept the Plan | 158 |
|     | C. | Best Interest Test | 159 |
|     | D. | Valuation Analyses | 161 |
|     | E. | Feasibility | 163 |
|     | F. | Confirmation Hearing | 164 |
| X.  |    | Conclusion | 165 |

## EXHIBITS

EXHIBIT A    Debtors' Joint Chapter 11 Plan
EXHIBIT B    Illustrative Recovery Based on Various Stock Prices
EXHIBIT C    Liquidation Analysis
EXHIBIT D    Projected Financial Information

I.    **INTRODUCTION**

This is the disclosure statement (the "**Disclosure Statement**") of:  (i) AMR Corporation ("**AMR**"), Americas Ground Services, Inc. ("**AGS**"), PMA Investment Subsidiary, Inc. ("**PMA**"), and SC Investment, Inc. ("**SCI**") (collectively, the "**AMR Debtors**"); (ii) American Airlines, Inc. ("**American**"), American Airlines Realty (NYC) Holdings, Inc. ("**American Realty**"), Admirals Club, Inc. ("**Admirals Club**"), Reno Air, Inc. ("**Reno Air**"), AA Real Estate Holding GP LLC ("**AA Holding GP**"), AA Real Estate Holding L.P. ("**AA Holding LP**"), American Airlines Marketing Services LLC ("**American Marketing**"), American Airlines Vacations LLC ("**American Vacations**"), American Aviation Supply LLC ("**American Supply**"), and American Airlines IP Licensing Holding, LLC ("**American Licensing**") (collectively, the "**American Debtors**"); and (iii) AMR Eagle Holding Corporation ("**Eagle Holding**"), American Eagle Airlines, Inc. ("**Eagle**"), Executive Airlines, Inc. ("**Executive**"), Eagle Aviation Services, Inc. ("**EAS**"), Business Express Airlines, Inc. ("**Business Express**"), and Executive Ground Services, Inc. ("**EGS**") (collectively, the "**Eagle Debtors**," and together with the AMR Debtors and the American Debtors, the "**Debtors**"), in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**") pending in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), filed pursuant to section 1125 of chapter 11, title 11, United States Code (the "**Bankruptcy Code**"), and in connection with the Debtors' Joint Chapter 11 Plan, dated [_____  __, 2013] (the "**Plan**"), a copy of which is annexed to this Disclosure Statement as **Exhibit "A."**

A.    **Definitions and Exhibits**

**Definitions**.  Unless otherwise defined herein, capitalized terms used in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan.

**Exhibits**.  The following exhibits to this Disclosure Statement are incorporated as if fully set forth herein and are part of this Disclosure Statement:

- **Exhibit "A"** – Plan
- **Exhibit "B"** – Illustrative Recovery Based on Various Stock Prices
- **Exhibit "C"** – Liquidation Analysis
- **Exhibit "D"** – Projected Financial Information

B.    **Notice to Creditors**

The purpose of this Disclosure Statement is to set forth information that (i) summarizes the Plan and alternatives to the Plan, (ii) advises holders of Claims and Equity Interests of their rights under the Plan, (iii) assists parties entitled to vote on the Plan in making informed decisions as to whether they should vote to accept or reject the Plan, (iv) assists the Bankruptcy Court in determining whether the Plan complies with the

provisions of chapter 11 of the Bankruptcy Code and should be confirmed, and (v) specifies the dates by which holders of Claims must, in accordance with the AMR Trading Order (defined below), file a Notice of Substantial Claim Ownership (as defined therein).

IN ACCORDANCE WITH THE AMR TRADING ORDER, AND *NOT* DEPENDENT UPON THE BANKRUPTCY COURT'S PRIOR APPROVAL OF THIS DISCLOSURE STATEMENT, THE INITIAL DATE BY WHICH HOLDERS OF UNSECURED CLAIMS IN EXCESS OF A SPECIFIED AMOUNT MUST FILE A NOTICE OF SUBSTANTIAL CLAIM OWNERSHIP IS MAY 31, 2013 (THE "**INITIAL REPORTING DEADLINE**").  Such notice must reflect a holder's beneficial ownership of unsecured Claims as of May 24, 2013 (the "**Initial Determination Date**").  The AMR Trading Order is discussed more fully in Section III.E.6 of this Disclosure Statement.

By Order dated [_____ __, 2013] (the "**Approval Order**"), the Bankruptcy Court approved this Disclosure Statement, finding that it contains "adequate information," as that term is used in section 1125(a)(1) of the Bankruptcy Code.  The Bankruptcy Court's approval of this Disclosure Statement is not an endorsement of the Plan.  Holders of Claims and AMR Equity Interests should carefully read this entire Disclosure Statement before voting on the Plan.

**IT IS THE OPINION OF THE DEBTORS THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES, CREDITORS, AND EQUITY INTEREST HOLDERS. THEREFORE, THE BOARD OF DIRECTORS OF AMR AND THE DEBTORS RECOMMEND THAT CREDITORS AND AMR EQUITY INTEREST HOLDERS VOTE TO ACCEPT THE PLAN.**

IN ADDITION, AS REFLECTED IN THE LETTER DATED_____, FROM _____, THE STATUTORY COMMITTEE OF UNSECURED CREDITORS (THE "**CREDITORS' COMMITTEE**") SUPPORTS THE PLAN AND RECOMMENDS THAT HOLDERS OF UNSECURED CLAIMS VOTE TO ACCEPT THE PLAN.

**BALLOTS FOR VOTING TO ACCEPT OR REJECT THE PLAN MUST BE RECEIVED BY [_____ __, 2013] (THE "VOTING DEADLINE").**

**THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS AND AMR EQUITY INTERESTS MAY VOTE ON THE PLAN IS [_____ __, 2013] (THE "RECORD DATE").**

**A HEARING TO CONSIDER CONFIRMATION OF THE PLAN (THE "CONFIRMATION HEARING") WILL BE HELD BEFORE THE HONORABLE SEAN H. LANE, UNITED STATES BANKRUPTCY JUDGE, IN ROOM 701 OF THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, ONE BOWLING GREEN, NEW YORK, NEW YORK**

**10004, ON [_____ \_\_, 2013 AT \_\_:\_\_ \_\_.M.] (EASTERN TIME), OR AS SOON THEREAFTER AS COUNSEL MAY BE HEARD.  THE BANKRUPTCY COURT HAS DIRECTED THAT OBJECTIONS, IF ANY, TO CONFIRMATION OF THE PLAN BE SERVED AND FILED ON OR BEFORE [_____ \_\_, 2013 AT \_\_:\_\_ \_\_.M.] (EASTERN TIME).**

> **PLEASE READ THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN, IN ITS ENTIRETY.  A COPY OF THE PLAN IS ANNEXED HERETO AS EXHIBIT "A."  THE DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ALL SUCH SUMMARIES.  ACCORDINGLY, IF THERE EXISTS ANY INCONSISTENCY BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.**

The Plan Supplement will be filed with the Bankruptcy Court no later than 10 days prior to the Voting Deadline.  The Plan Supplement will include, among other things: (1) the New AAG Board members, (2) the New AAG Certificate of Incorporation, (3) the New AAG Bylaws, (4) certain other Plan related documents, and (5) lists of executory contracts that will be assumed or rejected pursuant to the Plan.  The financial and other information included in this Disclosure Statement is provided solely for purposes of soliciting votes on the Plan.

> **IRS CIRCULAR 230 NOTICE:  TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT:  (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

### C.    Rationale Underlying the Plan

#### 1.    Merger with US Airways

The Plan will be implemented and become effective in conjunction with the consummation of a merger pursuant to the Agreement and Plan of Merger (the "**Merger Agreement**"), dated February 13, 2013, by and among AMR, AMR Merger Sub, Inc., ("**Merger Sub**") and US Airways Group, Inc., ("**US Airways**").  As discussed more fully in Section III.D of this Disclosure Statement, after due consideration and consultation with

the Debtors' management and legal and financial advisers, AMR's Board of Directors determined that the Merger Agreement, and the transactions contemplated thereunder, were in the best interests of the Debtors and their stakeholders and unanimously approved the Merger Agreement based upon, among other reasons:

- the belief that, after careful consideration of alternatives to the Merger (including the continuation as an independent airline and merger discussions with certain parties), the Merger is expected to yield greater benefits to the Debtors' estates, creditors, and stakeholders;

- the fact that the Merger is expected to generate more than $1 billion in annual net synergies by 2015, resulting predominantly from increased passenger traffic, taking advantage of New AAG's improved schedule and connectivity, an improved mix of high-yield business, and the redeployment of a combined fleet to better match capacity to customer demand;

- the fact that the Debtors' stakeholders, as future stockholders of the combined company, New AAG (defined below), will have the opportunity to participate in the benefits that are expected to result from the Merger, including the expected enhanced competitive and financial position, increased size and scale, and greater diversity of geographic scope of New AAG;

- the increased value expected to be created by the Merger would enable the filing of a proposed plan of reorganization by the Debtors providing for the potential for a full recovery by creditors of the Debtors and a distribution to holders of AMR Equity Interests of 3.5% of the aggregate ownership stake in New AAG with the potential for such Equity Interest holders to receive additional shares of New AAG (the implementation of such a plan of reorganization is subject to confirmation and consummation in accordance with the provisions of the Bankruptcy Code and the closing of the Merger);

- the fact that the Creditors' Committee and the Ad Hoc Committee preferred a plan of reorganization that provided for a business combination with US Airways, therefore improving the likelihood of plan confirmation;

- the fact that the Merger helps mitigate future labor uncertainty, in that it has support from both American's and US Airways' labor groups, including the fact that (i) the American Unions (defined below) and the USAPA (defined below), the representative of US Airways' pilots, had agreed to terms for collective bargaining agreements that will address certain financial and operational issues, effective upon the closing of the Merger, (ii) the AFA, the representative of US Airways' flight attendants, had reached a tentative agreement that includes support for the Merger, and (iii) both American's and US Airways' pilot and flight attendant unions were working together to determine representation and single agreement protocols;

4

- the fact that, based on current operations and data, New AAG's share of current market capacity (as measured by available seat miles) would (i) make it more competitive with other large network carriers and (ii) bring **one**world® alliance's market share in line with that of Star Alliance and SkyTeam Alliance;

- the fact that the expected operational and financial strength of New AAG should enable continued investment in new products and technologies and new opportunities for its employees;

- the fact that New AAG will benefit from an experienced, highly motivated management team selected from skilled executives at both AMR and US Airways;

- the fact that New AAG will maintain the iconic American Airlines brand, one of the most recognized brands in the world;

- the nature of the closing conditions included in the Merger Agreement, and the likelihood of satisfying all conditions to consummation of the Merger;

- AMR's right to engage in negotiations with, and provide information to, a third party that makes an unsolicited written acquisition proposal, if such negotiations are consistent with its fiduciary duties;

- the belief that the necessary regulatory approvals and clearances would likely be obtained without any material cost or burden to New AAG; and

- the expectation that all of the foregoing factors will allow New AAG to better respond to the economic and competitive challenges of the airline industry.

### 2.  Plan Compromises

The Plan incorporates and reflects a compromise and settlement of issues relating to (i) the validity, enforceability, and priority of certain Intercompany Claims (defined below) held by and among AMR, American, and Eagle, (ii) the validity and enforceability of guarantee Claims held by certain creditors, (iii) Claims that creditors have with respect to the marshaling of assets and liabilities of AMR, American, or Eagle Holding, and (iv) potential Avoidance Actions based on prepetition transfers made, and obligations incurred, between certain Debtors.

(a)   *Disputed Issues*

(i)    Intercompany Claims

Prepetition intercompany payables and receivables that arose in connection with the operation of the Debtors' businesses and the centralized cash management system utilized by the Debtors purportedly constitute Claims between the Debtors (collectively, the

5

"**Intercompany Claims**").  Pursuant to the Bankruptcy Code, claims among co-debtors are generally treated similar to other claims; however, courts often examine such claims to determine whether they are properly characterized as debt obligations or equity contributions.  When making such a determination, courts consider the facts and circumstances surrounding the transactions that gave rise to the obligations.  Those factors include, among others:  (i) the names given to the documents memorializing the obligations; (ii) the presence or absence of a specified maturity date, interest rate, and/or payment schedule, (iii) the source of funds used for repayment; (iv) whether payments made by a shareholder were in proportion to its equity interest in the entity that received such payments; (v) the capitalization of the entity receiving the funds and its ability to obtain outside financing; (vi) whether amounts owed were contractually subordinated to the claims of outside creditors; (vii) the extent to which contributions were used to acquire capital assets; and (viii) the presence or absence of a sinking fund for repayment.

An analysis of whether intercompany claims are properly characterized as debt or equity contributions is a very fact intensive undertaking.  Although the Debtors believe that while several of the relevant factors would support a conclusion that the Intercompany Claims are debt obligations, the issue is hardly free from doubt and there are countervailing arguments that the Intercompany Claims should be recharacterized.  The Plan and the distribution scheme provided therein, including the initial distribution to AMR Equity Interests, incorporate a compromise of these complex issues and avoid the delay, expense, and uncertainty attendant to a litigation of these issues pursuant to a settlement that is in the best interests of the Debtors' economic stakeholders.

(ii)      Guarantee Claims

Under the Bankruptcy Code, claims based upon guarantees issued by a debtor are generally allowed.  Section 502(b)(1) of the Bankruptcy Code, however, provides that a court may allow a claim, "except to the extent that," among other things, such claim is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law."  11 U.S.C. § 502(b)(1).  Further, Bankruptcy Rule 3007(d)(1) states that a debtor may object to a claim on the basis that the claim is duplicative of another.  The Debtors have assessed the enforceability of certain guarantees issued by AMR in connection with certain direct obligations of American, and vice versa.  The assessment revealed that certain guarantees may be unenforceable because they either (i) guarantee a Debtor's own direct obligations, (ii) may have been issued without valid consideration, and/or (iii) are duplicative of other Claims.  Again, to avoid the time, expense and uncertainty with respect to litigation in connection with these issues, the Plan incorporates a compromise and settlement in the distribution scheme with respect to the various classes of Claims and Equity Interests.

(iii)      Eagle Aircraft Transaction

In August 2011 American entered into the Eagle Aircraft Transaction (defined below) with Eagle and Executive, whereby Eagle and Executive transferred 263 aircraft

6

(collectively, the "**Eagle Aircraft**") and other related assets to American in exchange for, inter alia, American's assumption of the outstanding debt obligations related to the Eagle Aircraft. Certain parties have asserted that such transfers are potentially subject to Avoidance Actions. Generally, a transfer (including the incurrence of an obligation) may be avoided as a fraudulent transfer where a debtor did not receive reasonably equivalent value in exchange for such transfer and the debtor was insolvent or rendered insolvent at the time the transfer was made.

In connection with the Eagle Aircraft Transaction, American agreed to assume $2.26 billion of Eagle's outstanding debt obligations in exchange for the Eagle Aircraft— valued at $1.8 billion at the time of the transaction—and the cancellation of approximately $450 million in intercompany obligations American owed Eagle. Accordingly, the Debtors have concluded that the likelihood of successfully prosecuting an Avoidance Action related to the Eagle Aircraft Transaction is remote because, among other things, (i) neither American nor Eagle appear to have been insolvent on the date, or rendered insolvent as a result, of the Eagle Aircraft Transaction and (ii) the underlying transfers appear to have been supported by reasonably equivalent value. If such an Avoidance Action were ultimately pursued, however, the Bankruptcy Court could determine that the value of the Eagle Aircraft was materially higher or lower than $1.8 billion, and therefore, Eagle or American did not receive reasonably equivalent value in exchange for the transfers made or obligations incurred in connection with the Eagle Aircraft Transaction. Moreover, pursuant to a Bankruptcy Court order dated November 9, 2012, American and Eagle expressly reserved their respective rights to assert Claims against each other based on an Avoidance Action related to the Eagle Aircraft Transaction, which, if Allowed, could be offset against otherwise valid prepetition Claims held between American and Eagle (including certain Intercompany Claims). The Claims reserved by American and Eagle also are compromised by reason of the distribution scheme provided in the Plan and will not be pursued if the Plan is consummated.

(b)    *9019 Settlement*

Contemporaneous with the execution of the Merger Agreement, the Debtors entered into the 9019 Settlement (defined in Section IV.F.3 of this Disclosure Statement) to timely resolve the disputed issues and garner significant and timely support from holders of General Unsecured Claims to implement the Merger Agreement pursuant to the Plan. Pursuant to Bankruptcy Rule 9019 and section 363 of the Bankruptcy Code, as more fully described in this Disclosure Statement, the Plan and the distributions to be made to holders of Allowed General Unsecured Claims and holders of AMR Equity Interests incorporate and reflect the 9019 Settlement (defined in Section IV.F.3 of this Disclosure Statement). Among other things, the 9019 Settlement resolves: (i) all Claims or controversies relating to the contractual, legal, and subordination rights that a holder of a Claim may have with respect to any other Claim or any distribution on account thereof, including with respect to rights of parties holding guarantees against any Debtor and any Claims with respect to the marshaling of assets of any Debtor and (ii) any Claims held by one Debtor against another

7

Debtor, including with respect to the validity, enforceability, or priority of the Intercompany Claims, and including whether any transfer is subject to avoidance for any reason.  Thus, as part of the 9019 Settlement, and as reflected in the Plan, no distributions shall be made on any Intercompany Claims owing by American to AMR or owing by American to Eagle and vice versa, and any potential Avoidance Action against such entities shall be extinguished on the Effective Date.

### 3.    Distribution Mechanics

In order to implement the compromise and settlement of the Claims and related issues described above, the Plan provides a mechanism for certain holders of Allowed General Unsecured Claims and AMR Equity Interests to receive a distribution based on the market value of the New Common Stock.  Pursuant to the Plan, holders of AMR General Unsecured Guaranteed Claims and American General Unsecured Guaranteed Claims will initially receive New Mandatorily Convertible Preferred Stock with a face amount equal to the Allowed amount of their Claims (including postpetition interest at the non-default rate).  Holders of AMR Other General Unsecured Claims, American Other General Unsecured Claims, and Eagle General Unsecured Claims—which are not guaranteed by any other Debtor—will receive (i) the remaining New Mandatorily Convertible Preferred Stock and (ii) a right to receive additional shares of New Common Stock on the 120th day following the Effective Date.  One quarter of such New Mandatorily Convertible Preferred Stock shall be mandatorily convertible into shares of New Common Stock on each of the 30th, 60th, 90th, and 120th days following the Effective Date (the "**Mandatory Conversion Dates**").  The conversion price will equal 96.5% of the VWAP (as defined in Section 1.250 of the Plan) of the New Common Stock, subject to a cap and a floor price.

Shares of New Common Stock also will be distributed to holders of the American Union Claims and certain other non-union employees of the Debtors, with such number of shares equal to 23.6% of the total shares issued to holders of General Unsecured Claims under the Plan.  Furthermore, the Plan provides holders of AMR Equity Interests with (i) a guaranteed initial distribution of New Common Stock equal to 3.5% of the total shares of New Common Stock issued under the Plan and (ii) a right to receive additional shares of New Common Stock on each of the Mandatory Conversion Dates, all subject to dilution for post-Effective Date AMR employee equity awards.

As set forth in the Plan, the amount of additional shares of New Common Stock that will be issued on the Mandatory Conversion Dates to holders of (i) AMR Other General Unsecured Claims, American Other General Unsecured Claims, and Eagle General Unsecured Claims, and (ii) AMR Equity Interests is determined by the VWAP of the New Common Stock.  Specifically, the amount of additional shares of New Common Stock distributable to the holders of such Claims and Equity Interests depends on whether the price of the New Common Stock as of the relevant Mandatory Conversion Date exceeds the value at which there would be sufficient New Common Stock distributable to holders of General Unsecured Claims to effectively pay such Claims in full, including postpetition interest.  For illustration purposes only, a table reflecting various potential

8

recovery estimates based upon numerous assumptions and a range of prices for the New Common Stock is annexed hereto as **Exhibit "B."**

The estimates set forth on **Exhibit "B"** are based upon, but not limited to, the following assumptions (which are not predictive of anticipated results, but are utilized solely for convenience and ease of illustration):

  i.     the New Common Stock will have a constant share price between the Effective Date and 120 days after the Effective Date;

 ii.     no holder of New Mandatorily Convertible Preferred Stock will make an optional conversion;

iii.     no holder of a Double-Dip General Unsecured Claim will elect to be treated as a Single-Dip General Unsecured Claim in accordance with the procedures set forth in Plan;

 iv.     the amount of the Single-Dip General Unsecured Claims is $2.63 billion; and

  v.     there is no dilution for AMR employee equity awards contemplated by the Plan and the Merger Agreement. The aggregate value of such awards is approximately $140 million, which includes vested and unvested portions. The actual number of shares of New Common Stock represented by these AMR employee equity awards and the dilutive impact of such shares are subject to the terms of the Merger Agreement and the Plan and will vary depending upon the share price of US Airways common stock as of the Share Determination Date.

While **Exhibit "B"** is useful for illustrative purposes, the Debtors cannot determine actual recoveries for holders of Claims and Equity Interests because they are based on variables that cannot be predicted. The actual recoveries for holders of Claims and Equity Interests may vary and could be lower than reflected on **Exhibit "B"** because, among other things, the ultimate Allowed amount of Single-Dip General Unsecured Claims may exceed the estimated $2.63 billion and recoveries will be diluted by the AMR employee equity awards.

**D.     Table Summarizing the Classification and Treatment of Claims and Equity Interests Under the Plan**

The following table provides a summary of the classification and treatment of Claims and Equity Interests under the Plan and is qualified in its entirety by reference to the Plan.

9

The Plan is premised on the limited and separate substantive consolidation of (i) the AMR Debtors with one another, (ii) the American Debtors with one another, and (iii) the Eagle Debtors with one another. The AMR Debtors will not be consolidated with either the American Debtors or the Eagle Debtors.

Solely for voting, confirmation, and distribution purposes of the Plan, (i) all assets and all liabilities of the AMR Debtors shall be treated as though they were merged, (ii) all guaranties of any AMR Debtor of the payment, performance, or collection of obligations of another AMR Debtor shall be eliminated and cancelled, (iii) any obligation of any AMR Debtor and all guaranties thereof executed by one or more of the other AMR Debtors shall be treated as a single obligation, and such guaranties shall be deemed a single Claim against the consolidated AMR Debtors, (iv) all joint obligations of two or more AMR Debtors and all multiple Claims against such entities on account of such joint obligations shall be treated and allowed as a single Claim against the consolidated AMR Debtors, (v) all Claims between the AMR Debtors shall be cancelled, and (vi) each Claim filed in the Chapter 11 Case of any AMR Debtor shall be deemed filed against the consolidated AMR Debtors and a single obligation of the consolidated AMR Debtors.

The American Debtors and the Eagle Debtors shall likewise be substantively consolidated and their assets and liabilities treated accordingly.

The independent consolidation of each of the AMR Debtors, the American Debtors, and the Eagle Debtors is solely for purposes of the Plan and shall not constitute an event of default under any financing agreement to which any Debtor is a party, nor shall it affect (i) the legal or organizational structure of the Debtors, except as provided in the Merger Agreement, (ii) any prepetition or postpetition liens or security interests, (iii) any prepetition or postpetition guarantees that are required to be maintained under the Plan, (iv) defenses to any Causes of Action or requirements for any third party to establish mutuality to assert a right of setoff, or (v) distributions out of any insurance policies or proceeds of such policies.

The 9019 Settlement and the distributions provided for in the Plan are intended to provide holders of Allowed Single-Dip General Unsecured Claims and Allowed Double-Dip General Unsecured Claims with the potential for a full recovery (*i.e.*, par plus accrued interest thereon, at the nondefault contract rate or federal judgment rate (as appropriate) from the Commencement Date through the Effective Date, including interest on overdue interest) prior to any additional distribution being made with respect to AMR Equity Interests. Moreover, because the consideration to be provided to holders of Allowed Single-Dip General Unsecured Claims and Allowed Double-Dip General Unsecured Claims is in securities that will not be fully issued, or in some cases convertible, for 120 days following the Effective Date, such consideration includes protection to address, among other things, market volatility and liquidity concerns during the 120-day post-Effective Date period. This protection includes: (i) dividends on the New Mandatorily Convertible Preferred Stock at the rate of 6.25% per annum during the 120-day period and (ii) conversion of the New Mandatorily Convertible Preferred Stock into New Common

10

Stock at a discount to the VWAP of 96.5%. This protection also includes a 12% per annum accretion on the amount of the Allowed Single-Dip General Unsecured Claims not satisfied with New Mandatorily Convertible Preferred Stock during such 120-day period, which must be satisfied before any additional distributions are made with respect to AMR Equity Interests.

The following table sets forth the estimated Allowed amount, the estimated recovery, and/or the impairment status for each of the separate Classes of Claims and Equity Interests provided for in the Plan.

**FOR PURPOSES OF CALCULATING THE ESTIMATED RECOVERIES SET FORTH IN THE FOLLOWING TABLE, CERTAIN OF THE ASSUMPTIONS USED IN EXHIBIT "B" ANNEXED HERETO ARE LIKEWISE EMPLOYED HEREIN, INCLUDING (I) THAT THE ALLOWED SINGLE-DIP GENERAL UNSECURED CLAIMS WILL BE NO MORE THAN $2.63 BILLION AND (II) NO DILUTION FOR AMR EMPLOYEE EQUITY AWARDS. THE ESTIMATED RECOVERY ALSO ASSUMES A PRICE PER SHARE OF $16.97 FOR US AIRWAYS COMMON STOCK (BASED ON THE SHARE PRICE AS OF MARCH 28, 2013) FOR THE PERIOD FROM THE EFFECTIVE DATE THROUGH THE 120TH DAY SUBSEQUENT TO THE EFFECTIVE DATE. IT SHOULD BE NOTED THAT THE CLOSING SHARE PRICE FOR US AIRWAYS COMMON STOCK ON APRIL 15, 2013 WAS $15.59.**

| Class Number | Description of Class | Estimated Allowed Amount / Estimated Recovery / Impairment | Treatment Under the Plan | Entitlement to Vote |
|---|---|---|---|---|
| N/A | Administrative Expenses | $290,400,000<br><br>Recovery: 100% | Except to the extent that New AAG and a holder of an Allowed Administrative Expense against any of the Debtors agree to a different treatment, on the Effective Date, or as soon thereafter as reasonably practicable, each holder of an Allowed Administrative Expense shall receive, in full satisfaction of such Allowed Administrative Expense, an amount in Cash equal to the Allowed amount of such Administrative Expense; *provided, however*, that Allowed Administrative Expenses against any of the Debtors representing liabilities incurred in the ordinary course by the Debtors, as debtors in possession, or liabilities arising under loans or advances to or other obligations incurred by any of the Debtors, as debtors in possession, whether or not incurred in the ordinary course, shall be paid by New AAG in the ordinary course, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions. | N/A |

| Class Number | Description of Class | Estimated Allowed Amount / Estimated Recovery / Impairment | Treatment Under the Plan | Entitlement to Vote |
|---|---|---|---|---|
| N/A | Priority Tax Claims | $0<br><br>Recovery: 100% | Except to the extent that New AAG and a holder of an Allowed Priority Tax Claim against any of the Debtors agree to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Debtors, (i) Cash in an amount equal to such Allowed Priority Tax Claim on the Effective Date, or as soon thereafter as reasonably practicable, as to any Allowed Priority Tax Claim or (ii) in Cash, in equal semi-annual installments commencing on the first Business Day following the Effective Date (or if later, the first Distribution Date after such Claim becomes an Allowed Priority Tax Claim) and continuing over a period not exceeding five years from and after the Commencement Date, together with interest accrued thereon at the applicable nonbankruptcy rate as of the Confirmation Date, subject to the sole option of the Reorganized Debtors to prepay the entire amount of the Allowed Priority Tax Claim.  All Allowed Priority Tax Claims against any of the Debtors that are not due and payable on or before the Effective Date shall be paid in the ordinary course as such obligations become due. | N/A |
| AMR Class 1 | AMR Secured Claims | $0<br><br>Recovery: 100%<br><br>Unimpaired | Except to the extent that a holder of an Allowed Secured Claim against any of the AMR Debtors agrees to a different treatment of such Claim, each holder of an Allowed Secured Claim against any of the AMR Debtors shall receive, at the option of the AMR Debtors, and in full satisfaction of such Claim, either (i) Cash in an amount equal to 100% of the unpaid amount of such Allowed Secured Claim, (ii) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Claim, net of the costs of disposition of such Collateral, (iii) the Collateral securing such Allowed Secured Claim, (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of such Allowed Secured Claim is entitled, or (v) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.  In the event a Secured Claim against any of the AMR Debtors is treated under clause (i) or (ii) of this Section, the liens securing such Secured Claim shall be deemed released immediately upon payment of the Cash or proceeds as provided in such clauses.  Any distributions made pursuant to this Section shall be made on or as soon reasonably practicable after the first Distribution Date occurring after the latest of (i) the Effective Date, (ii) at least 20 calendar days after the date such Secured Claim becomes Allowed, and (iii) the date for payment provided by any agreement between the applicable AMR Debtor(s) and the holder of such Secured Claim. | No<br><br>(Deemed to Accept) |
| AMR Class 2 | AMR Priority Non-Tax Claims | $0<br><br>Full Recovery<br><br>Unimpaired | Each holder of an Allowed Claim in AMR Class 2 that has not already been paid will receive, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim on, or as soon as reasonably practicable after, the later of (i) the Effective Date, (ii) the date such Priority Non-Tax Claim becomes Allowed, and (iii) the date for payment provided by any agreement between the applicable AMR Debtor(s) and the holder of such Allowed Priority Non-Tax Claim, except to the extent that New AAG and the holder of such Claim agrees to a different treatment. | No<br><br>(Deemed to Accept) |

| Class Number | Description of Class | Estimated Allowed Amount / Estimated Recovery / Impairment | Treatment Under the Plan | Entitlement to Vote |
|---|---|---|---|---|
| **AMR Class 3** | AMR General Unsecured Guaranteed Claims | $967,129,000<br><br>Full Recovery<br><br>Impaired | Each holder of an Allowed AMR General Unsecured Guaranteed Claim shall receive on the Initial Distribution Date (for AMR General Unsecured Guaranteed Claims that are Allowed as of the Effective Date) a number of shares of New Mandatorily Convertible Preferred Stock equal to the quotient of such Claim's pro rata share of the Double-Dip Full Recovery Amount divided by the per share Initial Stated Value.  Each holder of an Allowed AMR General Unsecured Guaranteed Claim shall receive a distribution under the Plan only on account of its Allowed AMR General Unsecured Guaranteed Claim as set forth in Section 4.3 of the Plan and will not receive any distribution thereunder on account of such holder's Claim against American for American's guaranty of such AMR General Unsecured Guaranteed Claim. | Yes |
| **AMR Class 4** | AMR Other General Unsecured Claims | $700,000<br><br>Full Recovery<br><br>Impaired | Each holder of an Allowed AMR Other General Unsecured Claim as of the Effective Date shall receive (i) on, or as soon as reasonably practicable after, the Initial Distribution Date, its Initial Pro Rata Share of (A) a number of shares of New Mandatorily Convertible Preferred Stock equal to the quotient of (x) the Total Initial Stated Value, less the Double-Dip Full Recovery Amount, divided by (y) the per share Initial Stated Value and (ii) as soon as reasonably practicable after the Final Mandatory Conversion Date, its Initial Pro Rata Share of a number of shares of New Common Stock equal to (I) the Creditor New Common Stock Allocation, less (II) the number of shares of New Common Stock issued upon conversion of all of the shares of New Mandatorily Convertible Preferred Stock, less (III) the Labor Common Stock Allocation.  In connection with each Interim True-Up Distribution, each holder of an Allowed AMR Other General Unsecured Claim shall receive its Interim Pro Rata Share of the distribution allocated to Allowed Single-Dip General Unsecured Claims pursuant to Section 7.4(a) of the Plan.  In connection with the Final True-Up Distribution, each holder of an Allowed AMR Other General Unsecured Claim shall receive its Final Pro Rata Share of the distribution allocated to Allowed Single-Dip General Unsecured Claims pursuant to Section 7.4(b) of the Plan.  The right of a holder of an Allowed AMR Other General Unsecured Claim to receive any distribution on a Final Mandatory Conversion Date, an Interim Distribution Date, or a Final Distribution Date shall not be Transferable; *provided, however,* that this sentence shall not apply to any shares of New Mandatorily Convertible Preferred Stock or the right to receive shares of New Common Stock pursuant to the conversion thereof. | Yes |
| **AMR Class 5** | AMR Equity Interests | Recovery: $1,416,240,000<br><br>Impaired | Each holder of an Allowed AMR Equity Interest shall receive its pro rata share (i) on the Effective Date, or as soon as thereafter as reasonably practicable, of the Initial Old Equity Allocation and (ii) on each Mandatory Conversion Date, or as soon thereafter as reasonably practicable, of the Market-Based Old Equity Allocation.  In connection with each Interim True-Up Distribution, each holder of an Allowed AMR Equity Interest shall receive its pro rata share of the Market-Based Old Equity Allocation pursuant to Section 7.4(a) of the Plan.  In connection with the Final True-Up Distribution, each holder of an Allowed AMR Equity Interest shall receive its pro rata share of the Market-Based Old Equity Allocation pursuant to Section 7.4(b) of the Plan.  The right of a holder of an Allowed AMR Equity Interest to receive any distribution on a Mandatory Conversion Date, an Interim Distribution Date, or a Final Distribution Date shall not be Transferable. | Yes |
| **AMR Class 6** | AMR Other Equity Interests | Recovery: N/A<br><br>Unimpaired | Subject to the Roll-Up Transactions, the AMR Other Equity Interests shall not be cancelled, but shall be reinstated for the benefit of the respective Reorganized Debtor that is the holder thereof. | No<br><br>(Deemed to Accept) |

13

| Class Number | Description of Class | Estimated Allowed Amount / Estimated Recovery / Impairment | Treatment Under the Plan | Entitlement to Vote |
|---|---|---|---|---|
| **American Class 1** | American Secured Aircraft Claims | $6,775,557,000<br><br>Full Recovery<br><br>Unimpaired | Except to the extent that a holder of an Allowed Secured Aircraft Claim against any of the American Debtors agrees to a different treatment of such Claim (including, without limitation, pursuant to a Postpetition Aircraft Agreement), each holder of an Allowed Secured Aircraft Claim against any of the American Debtors shall receive, at the option of the American Debtors, and in full satisfaction of such Claim, either (i) Cash in an amount equal to 100% of the unpaid amount of such Allowed Secured Aircraft Claim, (ii) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Aircraft Claim, net of the costs of disposition of such Collateral, (iii) the Collateral securing such Allowed Secured Aircraft Claim, (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of such Allowed Secured Aircraft Claim is entitled, or (v) such other distribution as is necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.  In the event a Secured Aircraft Claim against any of the American Debtors is treated under clause (i) or (ii) of this Section, the liens securing such Secured Aircraft Claim shall be deemed released immediately upon payment of the Cash or proceeds as provided in such clauses.  Any distributions made pursuant to this Section shall be made on, or as soon as reasonably practicable after, the first Distribution Date occurring after the later of (a) the Effective Date, (b) at least 20 calendar days after the date such Secured Aircraft Claim becomes Allowed, and (c) the date for payment provided by any agreement between the applicable American Debtor(s) and the holder of such Secured Aircraft Claim. | No<br><br>(Deemed to Accept) |
| **American Class 2** | American Other Secured Claims | $3,470,852,000<br><br>Full Recovery<br><br>Unimpaired | Except to the extent that a holder of an Allowed Other Secured Claim against any of the American Debtors agrees to a different treatment of such Claim, each holder of an Allowed Other Secured Claim against any of the American Debtors shall receive, at the option of the American Debtors, and in full satisfaction of such Claim, either (i) Cash in an amount equal to 100% of the unpaid amount of such Allowed Other Secured Claim, (ii) the proceeds of the sale or disposition of the Collateral securing such Allowed Other Secured Claim, net of the costs of disposition of such Collateral, (iii) the Collateral securing such Allowed Other Secured Claim, (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of such Allowed Other Secured Claim is entitled, or (v) such other distribution as is necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.  In the event an Other Secured Claim against any of the American Debtors is treated under clause (i) or (ii) of this Section, the liens securing such Other Secured Claim shall be deemed released immediately upon payment of the Cash or proceeds as provided in such clauses.  Any distributions made pursuant to this Section shall be made on, or as soon as reasonably practicable after, the first Distribution Date occurring after the later of (a) the Effective Date, (b) at least 20 calendar days after the date such Other Secured Claim becomes Allowed, and (c) the date for payment provided by any agreement between the applicable American Debtor(s) and the holder of such Other Secured Claim. | No<br><br>(Deemed to Accept) |
| **American Class 3** | American Priority Non-Tax Claims | $356,700,000<br><br>Full Recovery<br><br>Unimpaired | Each holder of an Allowed Claim in American Class 3 that has not already been paid will receive, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim on, or as soon as reasonably practicable after, the later of (i) the Effective Date, (ii) the date such Priority Non-Tax Claim becomes Allowed, and (iii) the date for payment provided by any agreement between the applicable American Debtor(s) and the holder of such Priority Non-Tax Claim, except to the extent that New AAG and the holder of such Claim agrees to a different treatment. | No<br><br>(Deemed to Accept) |

14

| Class Number | Description of Class | Estimated Allowed Amount / Estimated Recovery / Impairment | Treatment Under the Plan | Entitlement to Vote |
|---|---|---|---|---|
| **American Class 4** | American General Unsecured Guaranteed Claims | $1,970,383,000<br><br>Full Recovery<br><br>Impaired | Each holder of an Allowed American General Unsecured Guaranteed Claim shall receive on the Initial Distribution Date (for American General Unsecured Guaranteed Claims that are Allowed as of the Effective Date), a number of shares of New Mandatorily Convertible Preferred Stock equal to the quotient of such Claim's pro rata share of the Double-Dip Full Recovery Amount divided by the per share Initial Stated Value. Each holder of an Allowed American General Unsecured Guaranteed Claim shall receive a distribution under the Plan only on account of its Allowed American General Unsecured Guaranteed Claim as set forth in Section 4.1 of the Plan and will not receive any distribution on account of such holder's Claim against AMR for AMR's guaranty of such American General Unsecured Guaranteed Claim. | Yes |
| **American Class 5** | American Other General Unsecured Claims | $2,598,946,000<br><br>Full Recovery<br><br>Impaired | Each holder of an Allowed American Other General Unsecured Claim as of the Effective Date shall receive (i) on, or as soon as reasonably practicable after, the Initial Distribution Date, its Initial Pro Rata Share of a number of shares of New Mandatorily Convertible Preferred Stock equal to the quotient of (x) the Total Initial Stated Value, less the Double-Dip Full Recovery Amount, divided by (y) the per share Initial Stated Value, and (ii) as soon as reasonably practicable after the Final Mandatory Conversion Date its Initial Pro Rata Share of a number of shares of New Common Stock equal to (I) the Creditor New Common Stock Allocation, less (II) the number of shares of New Common Stock issued upon conversion of all of the shares of New Mandatorily Convertible Preferred Stock, less (III) the Labor Common Stock Allocation. In connection with each Interim True-Up Distribution, each holder of an Allowed American Other General Unsecured Claim shall receive its Interim Pro Rata Share of the distribution allocated to Allowed Single-Dip General Unsecured Claims pursuant to Section 7.4(a) of the Plan. In connection with the Final True-Up Distribution, each holder of an Allowed American Other General Unsecured Claim shall receive its Final Pro Rata Share of the distribution allocated to Allowed Single-Dip General Unsecured Claims pursuant to Section 7.4(b) of the Plan. The right of a holder of an Allowed American Other General Unsecured Claim to receive any distribution on a Mandatory Conversion Date, an Interim Distribution Date, or a Final Distribution Date shall not be Transferable; provided, however, that this sentence shall not apply to any shares of New Mandatorily Convertible Preferred Stock or the right to receive shares of New Common Stock pursuant to the conversion thereof. | Yes |

| Class Number | Description of Class | Estimated Allowed Amount / Estimated Recovery / Impairment | Treatment Under the Plan | Entitlement to Vote |
|---|---|---|---|---|
| **American Class 6** | American Union Claims | Recovery: $1,719,760,000<br><br>Impaired | The APA shall receive, in full satisfaction of the APA Claim, shares of New Common Stock constituting 13.5% of the Creditor New Common Stock Allocation in accordance with the APA Section 1113 Agreement as follows:  On the Initial Distribution Date, or as soon thereafter as reasonably practicable, the APA shall receive its pro rata share of the Initial Labor Common Stock Allocation.  On each Mandatory Conversion Date, or as soon thereafter as reasonably practicable, the APA shall receive its pro rata share of the applicable Incremental Labor Common Stock Allocation.  In connection with each Interim True-Up Distribution, the APA shall receive its pro rata share of the distribution made on account of the American Labor Allocation pursuant to Section 7.4(a) of the Plan.  In connection with the Final True-Up Distribution, the APA shall receive its pro rata share of the distribution made on account of the American Labor Allocation pursuant to Section 7.4(b) of the Plan.  The right of the APA to receive any distribution on a Mandatory Conversion Date, an Interim Distribution Date, or a Final Distribution Date shall not be Transferable.<br><br>The APFA shall receive, in full satisfaction of the APFA Claim, shares of New Common Stock constituting 3% of the Creditor New Common Stock Allocation in accordance with the APFA Section 1113 Agreement as follows:  On the Initial Distribution Date, or as soon thereafter as reasonably practicable, the APFA shall receive its pro rata share of the Initial Labor Common Stock Allocation.  On each Conversion Date, or as soon thereafter as reasonably practicable, the APFA shall receive the applicable Incremental Labor Common Stock Allocation.  In connection with each Interim True-Up Distribution, the APFA shall receive its pro rata share of the distribution made on account of the American Labor Allocation pursuant to Section 7.4(a) of the Plan.  In connection with the Final True-Up Distribution, the APFA shall receive its pro rata share of the distribution made on account of the American Labor Allocation pursuant to Section 7.4(b) of the Plan.  The right of the APFA to receive any distribution on a Mandatory Conversion Date, an Interim Distribution Date, or a Final Distribution Date shall not be Transferable.<br><br>The TWU shall receive, in full satisfaction of the TWU American Claim, shares of New Common Stock constituting 4.8% of the Creditor New Common Stock Allocation in accordance with the TWU American Section 1113 Agreement as follows:  On the Initial Distribution Date, or as soon thereafter as reasonably practicable, the TWU shall receive its pro rata share of the Initial Labor Common Stock Allocation.  On each Mandatory Conversion Date, or as soon thereafter as reasonably practicable, the TWU shall receive its pro rata share of the applicable Incremental Labor Common Stock Allocation.  In connection with each Interim True-Up Distribution, the TWU shall receive its pro rata share of the distribution made on account of the American Labor Allocation pursuant to Section 7.4(a) of the Plan.  In connection with the Final True-Up Distribution, the TWU shall receive its pro rata share of the distribution made on account of the American Labor Allocation pursuant to Section 7.4(b) of the Plan.  The right of the TWU to receive any distribution on a Mandatory Conversion Date, an Interim Distribution Date, or a Final Distribution Date shall not be Transferable. | Yes |

| Class Number | Description of Class | Estimated Allowed Amount / Estimated Recovery / Impairment | Treatment Under the Plan | Entitlement to Vote |
|---|---|---|---|---|
| **American Class 7** | American Convenience Class Claims | $7,500,000

100% Recovery

Impaired | Except to the extent that a holder of an Allowed Convenience Class Claim against any of the American Debtors agrees to a different treatment of such Claim, each holder of an Allowed Convenience Class Claim against any of the American Debtors shall receive on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date (for Claims that are Allowed as of the Effective Date) and (ii) the Distribution Date that is at least 20 calendar days after such Convenience Class Claim becomes an Allowed Convenience Class Claim, Cash in the amount of 100% of the amount of its Allowed American Convenience Class Claim as of the Commencement Date; *provided, however,* that if the aggregate amount of Allowed American Convenience Claims in American Class 7 and Allowed Eagle Convenience Class Claims in Eagle Class 4 exceed $25, the percentage Cash distribution to each holder of an Allowed American Convenience Class Claim shall be reduced so that the aggregate amount of Cash distributable with respect to all Allowed American Convenience Class Claims and Allowed Eagle Convenience Class Claims does not exceed $25 million. | Yes |
| **American Class 8** | American Equity Interests | Recovery: N/A

Unimpaired | Subject to the Roll-Up Transactions, the American Equity Interests shall not be cancelled, but shall be reinstated for the benefit of the respective Reorganized Debtor that is the holder thereof. | No

(Deemed to Accept) |
| **Eagle Class 1** | Eagle Secured Claims | $0

Full Recovery

Unimpaired | Each holder of an Allowed Secured Claim against any of the Eagle Debtors shall receive, at the option of the Eagle Debtors, and in full satisfaction of such Claim, either (i) Cash in an amount equal to 100% of the unpaid amount of such Allowed Secured Claim, (ii) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Claim, net of the costs of disposition of such Collateral, (iii) the Collateral securing such Allowed Secured Claim, (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of such Allowed Secured Claim is entitled, or (v) such other distribution as is necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.  In the event a Secured Claim against any of the Eagle Debtors is treated under clause (i) or (ii) of this Section, the liens securing such Secured Claim shall be deemed released immediately upon payment of the Cash or proceeds as provided in such clauses.  Any distributions made pursuant to this Section shall be made on, or as soon as reasonably practicable after, the first Distribution Date occurring after the later of (a) the Effective Date, (b) at least 20 calendar days after the date such Secured Claim becomes Allowed, and (c) the date for payment provided by any agreement between the applicable Eagle Debtor(s) and the holder of such Secured Claim. | No

(Deemed to Accept) |
| **Eagle Class 2** | Eagle Priority Non-Tax Claims | $0

Full Recovery

Unimpaired | Allowed Claims in Eagle Class 2 that have not already been paid will receive, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim on, or as soon as reasonably practicable after, the later of (i) the Effective Date, (ii) the date such Priority Non-Tax Claim becomes Allowed, and (iii) the date for payment provided by any agreement between the applicable Eagle Debtor(s) and the holder of such Priority Non-Tax Claim, except to the extent that New AAG and the holder of such Claim agrees to a different treatment. | No

(Deemed to Accept) |

17

| Class Number | Description of Class | Estimated Allowed Amount / Estimated Recovery / Impairment | Treatment Under the Plan | Entitlement to Vote |
|---|---|---|---|---|
| **Eagle Class 3** | Eagle General Unsecured Claims | $20,200,000<br><br>Full Recovery<br><br>Impaired | Each holder of an Allowed Eagle General Unsecured Claim as of the Effective Date shall receive (i) on or as soon as reasonably practicable after, the Initial Distribution Date, its Initial Pro Rata Share of a number of shares of New Mandatorily Convertible Preferred Stock equal to the quotient of (x) the Total Initial Stated Value, less the Double-Dip Full Recovery Amount, divided by (y) the per share Initial Stated Value, and (ii) as soon as reasonably practicable after the Final Mandatory Conversion Date, its Initial Pro Rata Share of a number of shares of New Common Stock equal to (I) the Creditor New Common Stock Allocation, less (II) the number of shares of New Common Stock issued upon conversion of all of the shares of New Mandatorily Convertible Preferred Stock, less (III) the Labor Common Stock Allocation. In connection with each Interim True-Up Distribution, each holder of an Allowed Eagle General Unsecured Claim shall receive its Interim Pro Rata Share of the distribution allocated to Allowed Single-Dip General Unsecured Claims pursuant to Section 7.4(a) of the Plan. In connection with the Final True-Up Distribution, each holder of an Allowed Eagle General Unsecured Claim shall receive its Final Pro Rata Share of the distribution allocated to Allowed Single-Dip General Unsecured Claims pursuant to Section 7.4(b) of the Plan. The right of a holder of an Allowed Eagle General Unsecured Claim to receive any distribution on a Mandatory Conversion Date, an Interim Distribution Date, or a Final Distribution Date shall not be Transferable; *provided, however*, that this sentence shall not apply to any shares of New Mandatorily Convertible Preferred Stock or the right to receive shares of New Common Stock pursuant to the conversion thereof. | Yes |
| **Eagle Class 4** | Eagle Convenience Class Claims | $2,500,000<br><br>100% Recovery<br><br>Impaired | Each holder of an Allowed Convenience Class Claim against any of the Eagle Debtors shall receive on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date (for Claims that are Allowed as of the Effective Date) and (ii) the Distribution Date that is at least 20 calendar days after such Convenience Class Claim becomes an Allowed Convenience Class Claim, Cash in the amount of 100% of the amount of its Allowed Eagle Convenience Class Claim as of the Commencement Date; *provided, however*, that if the aggregate amount of Allowed American Convenience Claims in American Class 7 and Allowed Eagle Convenience Class Claims in Eagle Class 4 exceed $25 million, the percentage Cash distribution to each holder of an Allowed Eagle Convenience Class Claim shall be reduced so that the aggregate amount of Cash distributable with respect to all Allowed American Convenience Class Claims and Allowed Eagle Convenience Class Claims does not exceed $25 million. | Yes |
| **Eagle Class 5** | Eagle Equity Interests | Recovery: N/A<br><br>Unimpaired | Subject to the Roll-Up Transactions, the Eagle Equity Interests shall not be cancelled, but shall be reinstated for the benefit of the respective Reorganized Debtor that is the holder thereof. | No<br><br>(Deemed to Accept) |

## E.    Disclosure Statement Enclosures

The following three enclosures accompany this Disclosure Statement:

### 1.    Disclosure Statement Approval Order

A copy of the Approval Order that, among other things, approved this Disclosure Statement, established procedures for voting on the Plan (the "**Voting Procedures**"), and

scheduled the Confirmation Hearing and the deadline for objecting to confirmation of the Plan.

### 2.    Confirmation Hearing Notice

A copy of the notice of the Voting Deadline and, among other things, the date, time, and place of the Confirmation Hearing and the deadline for filing objections to confirmation of the Plan (the "**Confirmation Hearing Notice**").

### 3.    Ballots

One or more Ballots (and return envelopes) for voting to accept or reject the Plan unless you are not entitled to vote because you are (i) not impaired under the Plan and are deemed to accept the Plan or (ii) a holder of a Claim subject to an objection filed by the Debtors, which Claim is temporarily disallowed for voting purposes. *See* Section VIIof this Disclosure Statement for an explanation of which parties are entitled to vote and a description of the Voting Procedures.

The Bankruptcy Code provides that only the holder of Claims and AMR Equity Interests who are entitled to vote on the Plan will be counted for purposes of determining whether the requisite acceptances have been attained. Failure to timely deliver a Ballot by the Voting Deadline will constitute an abstention. Any Ballot that is executed and timely delivered but does not indicate an acceptance or rejection will not be counted as either an acceptance or rejection.

### F.    Inquiries

If you have any questions about the packet of materials you have received, please contact GCG, Inc., the Debtors' voting agent (the "**Voting Agent**"), at 1-888-285-9438 (domestic toll-free) or 1-440-389-7498 (international).

Additional copies of this Disclosure Statement or copies of the Plan Supplement are available upon written request made to the Voting Agent at the following addresses:

| **If by overnight or hand delivery:** | **If by standard mailing:** |
| --- | --- |
| GCG, Inc. | GCG, Inc. |
| 5151 Blazer Parkway, Suite A | P.O. Box 9852 |
| Dublin, OH  43017 | Dublin, OH 43017-5752 |
| Attn:  AMR Corp. Balloting Center | Attn:  AMR Corp. Balloting Center |

Copies of this Disclosure Statement which includes the Plan, and the Plan Supplement (when filed) are also available on the Voting Agent's website, www.amrcaseinfo.com.

19

II.    OVERVIEW OF THE DEBTORS PRIOR TO THE COMMENCEMENT
OF THE CHAPTER 11 CASES

A.    Corporate Structure

AMR was formed in February 1982.  AMR is the direct parent company and owns 100% of the issued and outstanding stock of American, Eagle Holding, AGS, PMA, and SCI.  AMR is also the indirect parent company of American Realty, AA Holding GP, AA Holding LP, Reno Air, American Marketing, American Vacations, Admirals Club, American Supply, American Licensing, Eagle, Executive, EGS, EAS, and Business Express.[1]

American was formed in 1934.  American owns 100% of the issued and outstanding common stock of American Realty, Reno Air, and Admirals Club.  In addition, American owns 100% of the membership interests in American Marketing, American Vacations, American Supply, American Licensing, and AA Holding GP (a general partner of AA Holding LP).  American also owns 99.5% of the membership interests in AA Holding LP.[2]

Eagle Holding is the direct parent company and owns 100% of the issued and outstanding stock of Eagle, Executive, EAS, and Business Express.  Eagle is also the indirect parent company of EGS.  Executive is the direct parent company and owns 100% of the issued and outstanding common stock of EGS.

A chart depicting the organizational structure of AMR, including direct and indirect subsidiaries, is set forth below:

---

[1]    AMR is also (i) the direct parent company and owns 100% of the issued and outstanding stock of Avion Assurance, Ltd. and (ii) the indirect parent company of AA 2002 Class C Certificate Corporation ("**2C Corp.**"), AA 2002 Class D Certificate Corporation 1 ("**2D Corp.**"), AA 2003-1 Class C Certificate Corporation ("**3C Corp.**"), AA 2003-1 Class D Certificate Corporation ("**3D Corp.**"), AA 2004-1 Class B Note Corporation ("**4B Corp.**"), AA 2005-1 Class C Certificate Corporation ("**5C Corp.**"), American Airlines de Mexico, S.A. ("**AA Mexico**"), American Airlines de Venezuela, S.A. ("**Venezuela**"), Aerodespachos Colombia, S.A. AERCOL S.A. ("**Aero Columbia**"), Caribbean Dispatch Services Limited ("**Caribbean DSL**"), Dominicana de Servicios Aeroportuarios (DSA), S.R.L. ("**DSA**"), and International Ground Services, S.A. de C.V. ("**IGS**"), none of which are debtors in the Chapter 11 Cases. AGS is the direct parent company and owns 100% of the issued and outstanding stock of Aero Columbia, Caribbean DSL, DSA, and IGS.

[2]    American also owns 100% of the issued and outstanding common stock of 2C Corp., 2D Corp., 3C Corp., 3D Corp., 4B Corp., 5C Corp., and AA Mexico.



## B.    Business Operations

Virtually all of AMR's business operations are within the global airline industry. AMR's principal subsidiary, American, has long been a premier airline in the United States.  American operates on a hub-and-spoke traffic model by which American and partner airlines connect passengers to American's main airport facilities, allowing American to service a broader geographical region.  American concentrates its operations in five domestic markets:  Dallas/Fort Worth (DFW), Chicago O'Hare, Miami, New York City, and Los Angeles.  In addition to its domestic service, American provides international service to Latin America, Europe, Asia, the Caribbean, and Canada. American's cargo network is one of the largest in the world.  During 2011 American Airlines Cargo, a division of American, transported over 100 million pounds of cargo each week.

In addition to American, Eagle Holding, another AMR direct subsidiary, owned two regional airlines—Eagle and Executive—doing business as "**American Eagle**." American Eagle provides service throughout the United States, Canada, Mexico, and the Caribbean.  American also contracted with an independently-owned regional airline doing business as "**AmericanConnection**."  Both American Eagle and AmericanConnection fed passenger traffic to American's hub facilities.

Prior to the November 29, 2011 commencement of the Chapter 11 Cases (the "**Commencement Date**"), American, Eagle, and AmericanConnection served more than

21

270 cities in approximately 50 countries with approximately 3,400 flights daily. The combined network fleet totaled approximately 900 aircraft. American is also a founding member of the **one**world® alliance, whereby member airlines may offer their customers more services and benefits than any member airline can provide individually, including (i) a broader route network, (ii) opportunities to earn and redeem frequent flyer miles across the combined **one**world® network, and (iii) access to a greater number of airport lounges and clubs. As of the Commencement Date, the **one**world® member airlines collectively served more than 750 destinations in approximately 150 countries, with approximately 8,500 daily departures.

As of the Commencement Date, the Debtors employed more than 88,000 employees worldwide. Domestically, the Debtors employed approximately 65,000 employees, the majority of whom were represented by various labor unions. The bulk of American's unionized employees, approximately 50,000, were represented by (i) the Allied Pilots Association ("**APA**"), (ii) the Association of Professional Flight Attendants ("**APFA**"), and (iii) the Transport Workers Union of America, AFL-CIO ("**TWU**," and together with the APA and APFA, the "**American Unions**"). While the TWU also represents certain American Eagle employees, American Eagle's pilots and flight attendants are represented by the Air Line Pilots Association, International ("**ALPA**") and the Association of Flight Attendants-CWA ("**AFA**," and together with the TWU and ALPA, the "**Eagle Unions**"), respectively.

As of September 30, 2011, the Debtors had consolidated reported assets and liabilities of approximately $24.7 billion and $29.5 billion, respectively. For the year ended December 31, 2011, global consolidated revenues totaled approximately $24 billion.

### C.   Capital Structure

#### 1.   Equity Ownership

AMR and American are public reporting companies under section 12(b) of the Securities and Exchange Act of 1934. AMR's shares of common stock, par value $1 per share ("**AMR Common Stock**"), were publicly traded under the ticker symbol "AMR" on the New York Stock Exchange ("**NYSE**"). As of October 13, 2011, there were 335,227,024 shares of AMR Common Stock outstanding. Trading in AMR Common Stock and certain debt securities on the NYSE was suspended on January 5, 2012, and AMR Common Stock and such debt securities were delisted by the SEC from the NYSE on January 30, 2012. On January 5, 2012, AMR Common Stock began trading under the symbol "AAMRQ" on the OTCQB marketplace, operated by OTC Markets Group.

American's shares of common stock, par value $1, are not publicly traded. There are 1,000 shares of American common stock outstanding, all of which are owned by AMR. Eagle Holding's shares of common stock, par value $1, are not publicly traded. There are 1,000 shares of Eagle Holding common stock outstanding, all of which are owned by AMR.

### 2.    AMR Debt Financing and Other Obligations

As of the Commencement Date, AMR had approximately $850 million in obligations accounted for as debt on the Debtors' consolidated balance sheet. Additionally, AMR had issued guarantees covering approximately $9.3 billion of American's debt financing and other obligations.

(a)    *Unsecured Debt Financing*

As of the Commencement Date, AMR had approximately:  (i) $460 million in 6.25% senior convertible notes outstanding, with a final maturity in 2014 (the "**6.25% Convertible Notes**"); (ii) $200,000 in 4.5% senior convertible notes outstanding, with a final maturity in 2024 (the "**4.5% Convertible Notes**"); (iii) $150 million in publicly traded 7.875% public income notes outstanding, with a final maturity in 2039 (the "**PINES**"); (iv) $16.4 million in publicly traded medium term notes outstanding in multiple issues, with a final maturity in 2021 and effective interest rates ranging from 9.14% to 10.55% per annum (the "**MTNs**"); and (v) $220 million in publicly traded debentures outstanding in multiple issues, with a final maturity in 2021and effective interest rates ranging from 9.0% to 10.2% per annum (the "**Debentures**").

(b)    *Other AMR Obligations*

As of the Commencement Date, AMR was obligated under guarantees covering approximately:  (i) $2.9 billion of American's Special Facility Revenue Bond debt (and interest thereon); (ii) $6.4 billion of American's secured debt (and interest thereon); and (iii) $115 million of American's leases of certain Super ATR aircraft, which were subleased to Eagle.

### 3.    American Debt Financing and Other Obligations

As of the Commencement Date, American had approximately $10.2 billion in debt obligations accounted for as debt on the Debtors' consolidated balance sheet. Additionally, American had approximately $2.35 billion of other obligations, including off balance sheet financing and guarantees covering certain AMR debt.

(a)    *Debt Financing*

(i)    Secured Debt

As of the Commencement Date, American had approximately:  (i) $6.6 billion of variable and fixed rate indebtedness outstanding, including debt underlying certain issuances of enhanced equipment trust certificates (the "**EETCs**"), secured primarily by Aircraft Equipment, with maturities through 2023, and effective interest rates ranging from 1.0% to 13.0% per annum; and (ii) $1 billion of 7.50% senior secured notes outstanding, with a final maturity in 2016 (the "**Senior Secured Notes**") and secured by certain route

authorities, airport landing and takeoff slots, and rights to use or occupy space in airport terminals.

(ii)     Citibank Arrangement

As discussed more fully in Section III.C.5 of this Disclosure Statement, pursuant to certain agreements between American and Citibank, N.A. ("**Citibank**"), as successor-in-interest to Citibank (South Dakota), N.A., Citibank paid $1 billion to American in order to pre-purchase AAdvantage® Miles™ (the "**Advance Purchase Miles**") under the AAdvantage® frequent flyer program (the "**AAdvantage Program**").  As of the Commencement Date, approximately $890 million of the proceeds from the sale of the Advance Purchase Miles was accounted for by American as a loan from Citibank, with the remaining $[110] million recorded as deferred revenue and credits.  To secure certain obligations of American to Citibank, including obligations under the agreements, Citibank asserts a first priority lien on certain of American's AAdvantage Program assets and a subordinated lien on certain route authorities, airport landing and takeoff slots, and rights to use or occupy space in airport terminals.

(iii)     Special Facility Revenue Bonds

As of the Commencement Date, American had approximately $1.7 billion of Special Facility Revenue Bonds accounted for as debt, of which approximately $1.5 billion was secured, with maturities through 2036 and effective interest rates ranging from 6.0% to 8.5% per annum.  The Special Facility Revenue Bonds were issued by certain municipalities or other governmental authorities primarily to purchase equipment and/or improve airport facilities that are leased or otherwise used by American or its affiliates. Neither the full faith and credit, nor the taxing power, if any, of the respective governmental issuer of each such series of bonds is pledged to the payment of the principal of, premium, if any, or interest on the Special Facility Revenue Bonds.  The Special Facility Revenue Bonds are payable solely from certain revenues derived from certain payments to be made by American, AMR, or both.

(b)     *Other American Obligations*

(i)     Off Balance Sheet Financings

As of the Commencement Date, American had approximately $1.5 billion in off balance sheet Special Facility Revenue Bonds, with maturities through 2035 and effective interest rates ranging from 5.40% to 9.05% per annum.  Approximately $200 million was secured, $1.3 billion was unsecured, and $940 million was expensed and accrued in other liabilities, deferred gains, and deferred credits.  These off balance sheet Special Facility Revenue Bonds have characteristics similar to other Special Facility Revenue Bonds; however, the accounting treatment of the off balance sheet bonds is similar to an operating lease.

24

(ii)    Guarantees

As of the Commencement Date, American was obligated under guarantees covering approximately $850 million of AMR's unsecured debt and interest thereon.

### 4.    Capital Lease Obligations and Trade Payables

As of the Commencement Date, American had approximately $600 million in capital lease obligations.  The Debtors also had unsecured trade payables aggregating approximately $[600] million.

### D.    Events Leading to Commencement of the Chapter 11 Cases

### 1.    Airline Industry Experiences Fundamental Changes

As described more fully below, prior to the Commencement Date, several factors undermined the Debtors' ability to generate sufficient revenue and adequately control operating costs, which ultimately forced the Debtors to seek relief under chapter 11 of the Bankruptcy Code, including, among others:

- **Increased Competition**.  The Airline Deregulation Act of 1978 triggered a massive transformation of the U.S. airline industry by allowing carriers to expand into markets from which they previously had been excluded, creating price competition on many routes, and facilitating the growth of low-cost carriers ("**LCCs**") within the industry.  In addition, since deregulation, every other large domestic network carrier commenced a case under chapter 11 of the Bankruptcy Code at least once.  By shedding debt, cutting operating expenses, freezing and/or terminating pension obligations, and modifying collective bargaining agreements ("**CBAs**") with unionized employees, these restructured airlines emerged from chapter 11 with renewed financial strength and increased operational flexibility, which improved their competitive position relative to the Debtors.  Moreover, a number of the restructured airlines subsequently merged with another airline, further expanding their competitive advantage.

- **Increased Price Transparency**.  Internet-based airfare search engines greatly increased the ability of consumers to quickly compare fares across most carriers and contributed to increased commoditization of airline travel, especially for price-sensitive customers.

- **External Events**.  The past decade was marked by various events that negatively impacted both the demand for air travel and the operating costs borne by airlines, including, among other things:  U.S. wars in Iraq and Afghanistan; outbreaks of both SARS and H1N1 influenza; the terrorist attacks of September 11th; devastating natural disasters, including

25

Hurricane Katrina, a volcanic blast that closed European air space, and a tsunami off the coast of Japan; record high oil prices; the European debt crisis; and a severe economic downturn that affected economies across the globe.

### 2.    Continued Financial Burdens

Despite broad initiatives to reduce labor and fuel costs—initiatives that ultimately yielded annual savings of more than $6 billion between 2001 and 2011—the Debtors incurred aggregate losses exceeding $10 billion during the same period. In addition to facing relentless competition from LCCs and restructured large network carriers with dramatically improved balance sheets and substantially reduced costs, the Debtors faced certain challenges that undermined their competitive position.

(a)    *Fuel Costs*

In 2011 fuel was American's largest single cost and constituted approximately 30% of its total operating costs. Despite successfully reducing fuel consumption by approximately 19% between 2000 and 2011, rising fuel prices increased American's fuel cost by approximately 211% over the same period.

(b)    *Salary and Benefits Costs*

American's largest controllable cost—salary and benefits—constituted approximately 25% of American's total operating costs in 2011. As a percentage of revenue, American's labor costs were 27% higher than the average for other large network carriers and 66% higher than that of LCCs—the highest in the industry. One factor driving the Debtors' relatively high labor costs was the required contribution to four defined benefit pension plans (collectively, the "**Pension Plans**"), including: The Retirement Benefit Plan of American Airlines, Inc. for Agent, Management, Specialists, Support Personnel and Officers; American Airlines, Inc. Pilot Retirement Benefit Program – Fixed Income Plan (the "**Pilot A Plan**"); The Retirement Benefit Plan of American Airlines, Inc. for Employees Represented by the Transport Workers Union of America, AFL-CIO; and The Retirement Benefit Plan of American Airlines, Inc. for Flight Attendants. During 2011 the Debtors contributed approximately $518 million to the Pension Plans. Moreover, the Debtors' plans were underfunded by approximately $4.7 billion, and maintaining the plans would have required average annual contributions of approximately $450 million between 2012 and 2018.

(c)    *Continued Losses*

An examination of the Debtors' prepetition operating results demonstrates the impact of the Debtors' inability to limit their operating costs in a manner commensurate with their competitors. In 2011 AMR was the only large network carrier that failed to operate at a profit, recording an operating loss in excess of $1 billion. In fact, AMR

experienced losses of more than $1 billion in three of the four years from 2008 through 2011.  In light of its continued losses, assets that were virtually fully encumbered, high fuel costs, and exceptionally high labor costs, AMR was unable to make the necessary investments to remain competitive and was forced to seek relief under chapter 11 of the Bankruptcy Code.

**III.    OVERVIEW OF THE CHAPTER 11 CASES**

    **A.    Commencement of Chapter 11 Cases**

        On November 29, 2011, the Debtors commenced the Chapter 11 Cases.  The Debtors continue to manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

    **B.    Stabilization of Operations**

        Shortly after the Commencement Date, the Debtors formulated the principal terms of an initial business plan designed to restore American to industry leadership, profitability, and growth (the "**Business Plan**").  As originally formulated, the Business Plan called for the Debtors to generate $3.1 billion in annual Cash improvements by the year 2017, including (i) revenue and network enhancements, (ii) savings achieved through the restructuring of debt and other obligations, and (iii) reduction of vendor, fuel, and salary and benefit costs.  Notable achievements since the Commencement Date—many of which are discussed more fully in Section III.C of this Disclosure Statement—include:

- Achieved annual operating revenues of approximately $24.8 billion during 2012—the highest in the Debtors' history.

- Added new and expanded routes in international markets that have strong growth prospects, including:  Manaus and São Paulo, Brazil; Roatan, Honduras; Asuncion, Paraguay; Puebla, Mexico; Bogotá, Colombia; Dusseldorf, Germany; Dublin, Ireland; and Seoul, South Korea.

- Continued to develop joint business agreements ("**JBAs**") with British Airways, Iberia, Qantas, and Japan Airlines.

- Added two new members—Air Berlin and Malaysia Airlines—to the **one**world® alliance and two new members-elect—SriLankan Airlines and Qatar Airways.  In addition, LAN Colombia and TAM Linhas Aereas (including its subsidiary TAM Paraguay) will join the **one**world® alliance as airline affiliates in 2013 and 2014, respectively, bringing all of LATAM Airlines Group under a single global alliance.

- Took delivery of 46 new aircraft, including 41 B737-800 aircraft and five B777-300ER aircraft.

- Rejected 32 mainline aircraft leases and eight spare engine leases, surrendered one aircraft subject to a mortgage, and renegotiated financing terms for more than 400 mainline and regional aircraft.

- Implemented, or began implementing, new onboard services to enhance customers' travel experience, including, among others, universal in-seat entertainment, Main Cabin Extra seating, in-flight Wi-Fi, expanded availability of tablet devices for entertainment in premium cabins, international premium dining offerings, and fully lie-flat seats in premium cabins in American's widebody fleet.

- Obtained Bankruptcy Court approval of a consensual agreement with the APA that permits additional large regional jets to be operated on behalf of American and allows American to engage in increased codesharing.

- Entered into capacity purchase agreements with (i) SkyWest Airlines, Inc. and ExpressJet Airlines, Inc. to provide 50-seat regional jet flying and (ii) Republic Airline Inc. to provide 76-seat regional jet flying.

- Implemented personnel changes that reduced the number of positions across all workgroups, including approximately 1,500 management positions.

- Obtained Bankruptcy Court approval to enter into consensual agreements with each of the American Unions and Eagle Unions, that are expected to yield significant average annual savings.

- Effectuated a freeze of the Pension Plans and obtained Bankruptcy Court approval of an amendment to the Pilot A Plan that eliminated the lump-sum payment option.

- Evaluated and/or negotiated more than 700 facility leases and over 9,000 vendor and supplier agreements.

- Achieved balance sheet improvements of approximately $2.5 billion resulting in estimated principal and interest savings of approximately $1.3 billion over five years.

### C.   Significant Restructuring Activities During the Chapter 11 Cases

#### 1.   American Labor Cost Restructuring

##### (a)   *Non-Union Employees*

As of the Commencement Date, approximately 30% of American's employees were not unionized (collectively, the "**American Non-Union Employees**"), including Agents, Representatives, and Planners ("**ARPs**") and Management and Support Staff ("**MSS**"). The Business Plan required all employees, including American Non-Union Employees, to equally share additional cost reductions in connection with the Chapter 11

28

Cases. Accordingly, American implemented benefit reductions and other changes designed to reduce aggregate labor costs attributable to ARPs and MSS by 17%—approximately $220 million annually. To achieve the required cost savings, American took steps to reduce the number of American Non-Union Employees, including a program to reduce MSS headcount by approximately 15%. Additional cost saving measures affecting American Non-Union Employees include, among others, reductions in the number of benefit plans provided to employees, increased employee contributions to medical and early retiree medical benefit programs, revised pay bands, and reduced holiday and vacation benefits.

In light of the benefit reductions referenced above, American Non-Union Employees will receive under the Plan 2.3% of the Creditor New Common Stock Allocation.

(b)    *Unionized Employees*

The Bankruptcy Code provides a process for modification and/or rejection of CBAs. In particular, section 1113 of the Bankruptcy Code ("**Section 1113**") permits a debtor to reject a CBA if the debtor satisfies a number of statutorily prescribed substantive and procedural prerequisites and obtains Bankruptcy Court approval. American commenced the Section 1113 process with the American Unions on February 1, 2012, and negotiated in good faith toward consensual agreements that would achieve the necessary level of labor cost reductions. On March 27, 2012, because consensual agreements had not been reached, the Debtors filed a motion pursuant to Section 1113 to reject the CBAs with the American Unions (the "**1113 Motion**").

The Bankruptcy Court hearing regarding the 1113 Motion began on April 23, 2012, and concluded the week of May 21, 2012. American continued negotiating with each of the American Unions to achieve consensual agreements while the Bankruptcy Court considered whether to grant the 1113 Motion. By mid-August 2012, American reached new consensual agreements with the APFA and all seven workgroups represented by the TWU. As of September 12, 2012, all of the new agreements with the TWU and APFA had been approved by the Bankruptcy Court. American, however, was not able to reach a new consensual agreement with the APA.

(i)    Allied Pilots Association

On August 15, 2012, the Bankruptcy Court issued a decision on the merits of the 1113 Motion, solely with respect to the APA. Although the Bankruptcy Court determined that two of American's proposed modifications to the pilot CBA failed to satisfy the standards required by Section 1113 and denied the 1113 Motion, the Bankruptcy Court invited the Debtors to modify and renew their motion. Accordingly, on August 17, 2012, the Debtors filed a renewed motion to reject the pilot CBA that included revised proposals addressing the two narrow deficiencies identified by the Bankruptcy Court in its August 15

decision.  A hearing on the renewed motion was held on September 4, 2012, and the Bankruptcy Court granted the Debtors' renewed request to reject the pilot CBA.

On December 7, 2012, after additional negotiations between American and the APA regarding the terms of a new consensual agreement, the APA announced that its membership voted to ratify a new CBA.  On the same day, the Debtors filed a motion with the Bankruptcy Court seeking, among other things, approval to enter into the new CBA and a related letter agreement, dated November 16, 2012 (collectively, the "**APA Section 1113 Agreement**").  By order dated December 19, 2012, the Bankruptcy Court approved the Debtors' motion.

The changes included in the APA Section 1113 Agreement are expected to yield approximately $315 million in annual labor cost reductions.  In addition, the APA Section 1113 Agreement improves American's competitive position by permitting American to increase the number of large regional jets in its fleet and expand code-sharing relationships.

In full satisfaction and extinguishment of any and all Claims, interests, causes, or demands that the APA has or might arguably have, on behalf of itself or the pilots represented by the APA (with certain exceptions), the APA will receive, on behalf of the pilots represented by the APA, the APA Claim entitling it to receive under the plan 13.5% of the Creditor New Common Stock Allocation.  The APA also received two Allowed Claims for Administrative Expenses, each subject to a $5 million cap, to reimburse the reasonable fees and expenses incurred by (i) the APA and (ii) the APA's investment banker in connection with the APA Section 1113 Agreement, the Plan, and the 1113 Motion.

(ii)    Transport Workers Union

The TWU is the collective bargaining representative of certain American employees that are divided into the following workgroups (collectively, the "**TWU Workgroups**"):  (i) Flight Dispatchers and Dispatcher's Assistants ("**Dispatch**"); (ii) Fleet Service Employees and Ground Service Employees ("**Fleet Service**"); (iii) Ground School and Pilot Simulator Instructors ("**Instructors**"); (iv) Maintenance Control Technician Employees ("**MCT**"); (v) Flight Simulator Technicians, Associate Simulator Technicians, and Technical Coordinators ("**Sim Techs**"); (vi) Mechanics and Related ("**M&R**"); and (vii) Stock Clerks ("**Stores**").  On May 15, 2012, the TWU announced that five of the TWU Workgroups (Dispatch, Fleet Service, Instructors, MCT and Sim Techs) voted to ratify the proposed CBAs.  Accordingly, on June 14, 2012, the Debtors filed a motion with the Bankruptcy Court seeking approval to enter into the proposed CBAs.  That motion was granted on June 28, 2012.  A few weeks later, after continued negotiations with the TWU, the remaining TWU Workgroups (M&R and Stores) also voted to ratify new CBAs.  On August 22, 2012, the Debtors filed a motion with the Bankruptcy Court seeking approval to enter into (i) the letter agreement, dated August 12, 2012, between American and the TWU, (ii) letters of memorandum on certain additional provisions between American and

30

the TWU (together, the "**TWU American Section 1113 Agreement**"), and (iii) the proposed CBAs with M&R and Stores.  By order dated September 12, 2012, the Bankruptcy Court granted the Debtors' motion.

The terms of the new CBAs between American and the TWU (the "**New TWU CBAs**") are expected to generate approximately $330 million in annual labor cost reductions.  Although each of the TWU Workgroups is party to a separate CBA that includes terms specific to that workgroup, the New TWU CBAs generally provide substantial operating efficiencies.  Furthermore, each of the New TWU CBAs contains common provisions providing for, among other things:  (i) "early out" incentives to mitigate involuntary layoffs; (ii) a profit sharing program; and (iii) a new defined contribution retirement benefit.

In full satisfaction and extinguishment of any and all Claims, interests, causes, or demands that the TWU has or might arguably have, on behalf of itself or the employees of American represented by the TWU (other than any proofs of Claim filed in the Chapter 11 Cases by or on behalf of TWU-represented employees), the TWU will receive, on behalf of the transport workers represented by the TWU, the TWU American Claim entitling it to receive under the Plan 4.8% of the Creditor New Common Stock Allocation.  The TWU also received two Allowed Claims for Administrative Expenses to reimburse reasonable fees and expenses incurred by (i) the TWU, subject to a $5 million cap, and (ii) the TWU's investment banker, subject to a $2 million cap, in connection with the TWU Section 1113 Agreement, the New TWU CBAs, the Plan, and the 1113 Motion.

(iii)    Association of Professional Flight Attendants

The APFA is the collective bargaining representative of the flight attendants employed by American.  On August 19, 2012, the APFA announced that its membership voted to ratify the proposed CBA.  On August 24, 2012, the Debtors filed a motion with the Bankruptcy Court seeking approval to enter into (i) the letter agreement on settlement consideration and bankruptcy protection, dated August 22, 2012, between American and the APFA, (ii) the letter agreement, dated August 10, 2012, between American and the APFA, and (iii) the new CBA with the APFA (collectively, the "**APFA Section 1113 Agreement**").  By order dated September 12, 2012, the Bankruptcy Court approved the Debtors' motion.

The changes included in the APFA Section 1113 Agreement are expected to yield approximately $195 million in annual labor cost reductions.  The APFA Section 1113 Agreement provides a lump sum payment of $1,500 to every active employee, an early out program for employees with 15 or more years of service, annual base rate pay increases, and a new defined contribution retirement benefit.

In full satisfaction and extinguishment of any and all Claims, interests, causes, or demands that the APFA has or might arguably have, on behalf of itself or the flight attendants represented by the APFA (with certain exceptions), the APFA will receive, on

31

behalf of the flight attendants represented by the APFA, the APFA Claim entitling it to receive under the Plan 3% of the Creditor New Common Stock Allocation. The APFA also received two Allowed Claims for Administrative Expenses to reimburse reasonable fees and expenses incurred by (i) the APFA, subject to a $5 million cap, and (ii) the APFA's investment banker, subject to a $2 million cap, in connection with the APFA Section 1113 Agreement and the 1113 Motion.

(c)    *Pension Issues*

As of the Commencement Date, American sponsored and administered the Pension Plans as well as the American Airlines, Inc. Pilot Retirement Benefit Program – Variable Income Plan (the "**Pilot B Plan**"). On February 1, 2012, American announced its intention to terminate each of the four Pension Plans. The American Unions and the PBGC objected to the proposed termination, and American began working with each group to develop alternatives that would allow American to freeze, rather than terminate, the Pension Plans. On March 7, 2012, American announced its intention to (i) freeze the Pension Plans (other than the Pilot A Plan) and (ii) terminate the Pilot A Plan and Pilot B Plan. American subsequently froze all Pension Plans, effective November 1, 2012, and terminated the Pilot B Plan, effective November 30, 2012. The Pilot B Plan assets will be liquidated and distributed to participating pilots in or around June 2013.

American's proposed termination of the Pilot A Plan was the result of a provision included in the Pilot A Plan that permitted pilots to retire without notice and to receive their pension benefit in a single lump-sum payment or other optional benefit forms substantially similar to a lump-sum payment (together, the "**Lump Sum Benefit**"). As of January 1, 2013, approximately 2,400 pilots were eligible to retire, with an average Lump Sum Benefit of $500,000. Both American and the APA acknowledged that the retirement incentive created by the Lump Sum Benefit could create a significant impairment of American's operations if, as was likely, a large number of pilots were to exercise the Lump Sum Benefit option during a short period of time.

American, the APA, and the United States Treasury Department ("**Treasury**") worked together to find a solution to this problem. On November 8, 2012, Treasury issued 26 C.F.R. § 1.411(d)-4, A-2(b)(2)(xii) (the "**Final Regulation**") that established a process for American to seek PBGC and Bankruptcy Court approval to amend the Pilot A Plan to remove the Lump Sum Benefit, thereby eliminating the threat to American's operations and the need to terminate the Pilot A Plan. Shortly thereafter, American applied to the PBGC for a determination that it met the standard required to amend the Pilot A Plan. In addition, on November 23, 2012, American filed a motion with the Bankruptcy Court seeking approval to amend the Pilot A Plan. On December 13, 2012, the PBGC issued its determination that American met the standard for amendment set forth in the Final Regulation. After a hearing on December 19, 2012, the Bankruptcy Court granted the Debtors' motion to amend the Pilot A Plan. Shortly thereafter, the Pilot A Plan was amended, with such amendment applicable to all retirements occurring on or after December 31, 2012.

### 2.    Eagle Labor Cost Restructuring

For several years, Eagle had attempted to lower its labor costs with very little success.  In 2006 with input from the Eagle Unions, Eagle retained certain professionals (the "**Eagle Professionals**") to conduct a benchmarking analysis of Eagle's competitive position relative to other regional airlines.  The benchmarking analysis revealed significant labor cost disadvantages compared to other regional airlines.

Following the Commencement Date, Eagle requested an update of the benchmarking analysis.  The Eagle Professionals analyzed the profit margins achieved and costs incurred by other regional airlines during the five years preceding the Commencement Date.  Based on the information derived from the benchmarking analysis, Eagle determined it had to reduce its annual labor costs by $75 million across all workgroups (collectively, the "**Eagle Workgroups**"), including pilots, flight attendants, aircraft maintenance technicians and related ("**Maintenance**"), fleet service ("**FSC**"), dispatch ("**Dispatch**"), ground school instructors ("**GSI**"), management and support staff ("**Management**"), agents, and EAS employees.

#### (a)    *Non-Union Employees*

As of the Commencement Date, approximately 40% of Eagle's employees, including agents, Management, and EAS employees, were not unionized.  Eagle committed to reducing Management labor costs by $7 million annually.  To achieve such savings, Management headcount was reduced by 10%, including a 15% reduction among officer positions.  With respect to its agents, Eagle decreased annual labor costs by an estimated $2 million through reduced vacation and holiday benefits and tighter eligibility requirements for company-provided health and welfare plans.  Further, Eagle estimates an additional $1.5 million in annual labor cost savings will result from changes specific to EAS employees including, among other things, (i) reductions in vacation benefits, overtime pay, and contributions to defined contribution retirement plans and (ii) elimination of paid holidays and certain shift premiums.

#### (b)    *Unionized Employees*

Eagle commenced the Section 1113 process with the Eagle Unions on March 21, 2012, and negotiated in good faith toward consensual agreements that would achieve the required level of labor cost reductions.  By early September 2012 both the AFA and FSC (represented by the TWU) had voted to ratify new CBAs, and Eagle reached an agreement in principle with the ALPA regarding the terms of a new CBA for Eagle's pilots.  On September 7, 2012, having failed to reach agreements with the remaining Eagle Workgroups represented by the TWU—Maintenance, Dispatch, and GSI—Eagle filed motions with the Bankruptcy Court, pursuant to Section 1113, to reject the CBAs with those groups (the "**Eagle TWU 1113 Motions**").  After filing the Eagle TWU 1113 Motions, however, Eagle continued to negotiate with Maintenance, Dispatch, and GSI toward consensual agreements.  Because negotiations ultimately resulted in new

consensual agreements between Eagle and each of Maintenance, Dispatch, and GSI, the Eagle 1113 TWU Motions were subsequently withdrawn.

(i)      Transport Workers Union

The TWU is the collective bargaining representative of FSC, Maintenance, Dispatch, and GSI.  The TWU Eagle Section 1113 Agreements with FSC, Maintenance, Dispatch, and GSI are expected to generate annual savings of approximately $4.8 million, $7 million, $400,000, and $10,000, respectively.  Such cost reductions are the result of various changes to compensation, benefits, and work rules.  Separate motions to approve the TWU Eagle Section 1113 Agreements with (i) FSC, Maintenance, and GSI and (ii) Dispatch were filed with the Bankruptcy Court on December 14, 2012 and December 17, 2012, respectively.  The Bankruptcy Court granted both motions on December 21, 2012.

In satisfaction and full extinguishment of any and all Claims, interests, causes, or demands that the TWU has or might arguably have, on behalf of itself or the transport workers represented by the TWU, the TWU will receive, on behalf of the transport workers represented by the TWU, the TWU Eagle Claim—an Allowed American Other General Unsecured Claim in the amount of $6.105 million.  The TWU also received an Allowed Claim for Administrative Expenses totaling $700,000 to reimburse the TWU for reasonable fees and expenses incurred in connection with negotiations related to the TWU Eagle Agreements and the Plan.

(ii)      Association of Flight Attendants

The AFA is the collective bargaining representative of the flight attendants employed by Eagle.  On September 7, 2012, after months of negotiations, the AFA announced that its membership voted to ratify a new CBA with Eagle.  Within three years of implementation, the new CBA and related letter agreements (collectively, the "**AFA Agreement**") are expected to generate annual savings of approximately $9.2 million through various changes to compensation, benefits, and work rules.  A motion to approve the AFA Agreement was filed with the Bankruptcy Court on December 14, 2012 and granted on December 21, 2012.

In satisfaction and full extinguishment of any and all Claims, interests, causes, or demands that the AFA has or might arguably have, on behalf of itself or the flight attendants represented by the AFA, the AFA will receive, on behalf of the flight attendants represented by the AFA, the AFA Claim—an Allowed American Other General Unsecured Claim in the amount of $4.6 million.  The AFA also received an Allowed Claim for Administrative Expenses, subject to a $500,000 cap, to reimburse the AFA for reasonable fees and expenses incurred in connection with the AFA Agreement and the Plan.

34

(iii)    Air Line Pilots Association

The ALPA is the collective bargaining representative of the pilots and pilot instructors employed by Eagle.  On October 8, 2012, the ALPA announced that its membership voted to ratify a new CBA with Eagle.  The new CBA and related letter agreements (collectively, the "**ALPA Agreement**") are expected to generate annual savings of approximately $43.1 million through various changes to compensation, benefits, and work rules.  The ALPA Agreement also includes several provisions that establish certain processes and procedures in the event of a merger.  A motion to approve the ALPA Agreement was filed with the Bankruptcy Court on December 14, 2012, and granted on December 21, 2012.

In satisfaction and full extinguishment of any and all Claims, interests, causes, or demands that the ALPA has or might arguably have, on behalf of itself or the pilots and pilot instructors represented by the ALPA, the ALPA will receive, on behalf of the pilots and pilot instructors represented by the ALPA, the ALPA Claim—an Allowed American Other General Unsecured Claim in the amount of $21.6 million.  The ALPA also received an Allowed Claim for Administrative Expenses, subject to a $1 million cap, to reimburse the ALPA for reasonable fees and expenses incurred in connection with the ALPA Agreement and the Plan.

### 3.    Executory Contracts and Unexpired Leases

As of the Commencement Date, the Debtors were parties to over 28,000 executory contracts and unexpired leases of non-residential real property and personal property.  Under section 365 of the Bankruptcy Code, the Debtors may assume, assume and assign, or reject executory contracts and unexpired leases, subject to the approval of the Bankruptcy Court and certain other conditions.  Secured financing and leases of Aircraft Equipment are afforded special treatment under section 1110 of the Bankruptcy Code ("**Section 1110**") and are discussed separately in Section III.C.6(c) of this Disclosure Statement.

By order dated March 23, 2012, the initial 120-day period for the Debtors to assume, assume and assign, or reject unexpired leases of non-residential real property was extended through June 26, 2012.  As of February 28, 2013, the Bankruptcy Court had entered orders granting the Debtors' motions to assume 532 and reject 12 unexpired leases of non-residential real property.  Further, the Bankruptcy Court had entered orders granting consensual extensions of the period within which the Debtors must assume or reject an additional 29 unexpired leases of non-residential real property.

### 4.    Citi AAdvantage Program

American and Citibank are parties to that certain AAdvantage Participation Agreement, dated June 10, 2008 (as amended from time to time, the "**Participation Agreement**" and, collectively with the other Citi AAdvantage Program documents,

the "**Initial Agreements**"), in respect of Citibank's participation in the AAdvantage Program (the "**Citi AAdvantage Program**").  In September 2009, Citibank and American amended the Participation Agreement and entered into an arrangement under which Citibank paid $1 billion to the Debtors to pre-purchase AAdvantage® Miles™ (the "**Advance Purchase Arrangement**" and, together with the Initial Agreements, the "**Agreements**").  As of February 28, 2013, substantial majority of the $1 billion was still outstanding.  Moreover, Citibank has asserted that the Agreements provide that if they are breached or rejected by American, Citibank would also have a damages claim, which Citibank claims would be in excess $2 billion (also secured by the Collateral, as described below) in addition to the acceleration of the prepaid mileage balance.

On the Commencement Date, the Debtors filed the Motion of Debtors for Entry of Order Pursuant to 11 U.S.C. § 365(a) and Fed. R. Bankr. P. 6006 Approving Assumption of Certain Executory Credit Card and Payment Agreements, dated November 29, 2011 (ECF No. 23) (the "**Assumption Motion**"), seeking entry of an order approving the Debtors' assumption of , *inter alia*, the Agreements.  On November 30, 2011, the Bankruptcy Court entered an Interim Order Pursuant to 11 U.S.C. § 365(a) and Fed. R. Bankr. P. 6006 Approving Assumption of Certain Executory Credit Card and Payment Agreements (ECF No. 68) (the "**Interim Order**"), which granted the relief requested in the Assumption Motion with respect to the Agreements on an interim basis.  The relief requested in the Assumption Motion with respect to the Agreements has not been granted on a final basis.

American's obligations under the Agreements (including any damage claim sustained thereunder by Citibank) are secured by Citibank's assertion of a second priority security interest in the following assets relating to the Scheduled Services:[3]  (a) American's right and operational authority to conduct a take-off or landing at a specific time or during a specific period at certain slot constrained U.S. airports and all foreign airports, in each case used as an origin or destination point for the Scheduled Services (collectively, the "**Slots**"); (b) the right to occupy space at U.S. and foreign airports used for the Scheduled airports used for the Scheduled Services (other than JFK and LAX) (the "**Gate Leaseholds**"); (c) the right to operate scheduled air service between the airports used for the Scheduled Services (the "**Route Authorities**"); (d) certain deposit accounts (and amounts on deposit therein) holding sale proceeds of other collateral; and (e) all proceeds of the foregoing ((a) through (e), collectively the "**SGR Collateral**").  The most recent appraisal, dated as of November 30, 2012, appraised the SGR Collateral at $2.58 billion.

At the time Citibank and American amended the Participation Agreement in September 2009, American granted Citibank a first priority security interest in a subset of the SGR Collateral—*i.e.*, (a) slots at Heathrow and Narita; (b) Gate Leaseholds at

---

[3]    Scheduled Services means non-stop air service between:  (a) any U.S. airport and Narita (Japan); (b) any U.S. airport and Haneda (Japan); (c) any U.S. airport and London, Heathrow; (d) Chicago, O'Hare and Beijing Capital (China); and (e) Chicago, O'Hare and Shanghai Pudong (China).

Heathrow and Narita; (c) the route authorities associated with American's service from (i) JFK, DFW, LAX and BOS to Narita and (ii) all U.S. airports to Heathrow; and (d) all proceeds of the foregoing ((a) through (d), collectively the "**Initial SGR Collateral**"). However, this initial grant was subject to an agreement that Citibank subordinate its security interest in the Initial SGR Collateral if American could obtain alternative financing secured by such collateral. American subsequently entered into an Indenture dated March 15, 2011 pursuant to which American issued approximately $1 billion of the Senior Secured Notes, secured, on a first priority basis, by the SGR Collateral.

In addition, American's obligations to Citibank under the Agreements (including any damage claim sustained thereunder by Citibank) are secured by a first priority security interest in (a) accounts receivable, chattel paper, instruments and documents, in each case solely with respect to obligations of other participants in the AAdvantage Program; (b) equipment located in the United States, general intangibles, intellectual property and inventory located in the United States, in each case to the extent used exclusively in, required to operate, or primarily related to, the AAdvantage Program; and (c) all proceeds and all books and records relating to (a) and (b), but in each case excluding among other things (i) contracts between American and participants in the AAdvantage program; (ii) goods located outside of the United States; (iii) foreign intellectual property; (iv) information relating to members of the AAdvantage Program located outside the United States; and (v) certain other assets (collectively, the "**Program Collateral**" and, together with the SGR Collateral, the "**Collateral**").[4]

On March 6, 2012, the Bankruptcy Court entered the Order Pursuant to 11 U.S.C. §§361, 362(d), 363(e), 506(c), and 507(b) and Fed. R. Bankr. P. 4001(a) Granting Adequate Protection and Other Related Relief (ECF No. 1623) (the "**Adequate Protection Order**"). Pursuant to the Adequate Protection Order, Citibank was granted a super-priority administrative claim to the extent of any diminution in the value of its interest in the Collateral post February 15, 2012 (subject to certain carve-outs and reservations of rights of various parties, including Citibank, as set forth therein).

At this time, the Debtors have not made a final determination as to whether they intend to assume or reject the Agreements under section 365 of the Bankruptcy Code. If the Debtors were to reject or breach the Agreements, Citibank has indicated that such rejection would result in a substantial claim being asserted by Citibank against American, secured by the Collateral, which, whether such Claim is valid or not, will have to be addressed under the Plan, and such Claim could have an impact on the ability of the Debtors to confirm the Plan and consummate the Merger. If the Debtors elect to assume

---

[4]   In addition, Citibank has been granted an irrevocable, exclusive, sublicenseable, royalty free and fully paid-up license through December 31, 2017 to use, reproduce and otherwise exploit American's proprietary customer information and customer lists relating to the AAdvantage Program in connection with any and all credit card solicitations or the operation or administration of any credit card program in the U.S.

the Agreements, they will continue in accordance with their existing terms and will be ongoing obligations of reorganized American subsequent to the Effective Date of the Plan. It is also possible that the Debtors and Citibank could agree to modifications of the existing Agreements that the Debtors would then assume under the provisions of the Bankruptcy Code, and, as such, those agreements, as modified, would be ongoing obligations of Reorganized American subsequent to the Effective Date of the Plan.

### 5.    Airport and Facility Restructuring

As of the Commencement Date, the Debtors were party to 576 leases governing the Debtors' use and occupancy rights at various airport facilities.  During the Chapter 11 Cases, the Debtors undertook various initiatives to restructure their operations and obligations at many of those facilities in order to reduce costs and establish an airport footprint that serves the Debtors' future network plans.  Such initiatives have been implemented in the Chapter 11 Cases and are projected to generate approximately $30 million savings.

### 6.    Fleet Restructuring

The Debtors developed a comprehensive fleet restructuring plan designed to generate increased revenue while reducing operating costs by accelerating the replacement of older, less efficient aircraft, restructuring current financing arrangements, providing increased flexibility to acquire large regional jets, and investing in premium service enhancements.

(a)    *Modernizing American's Fleet*

At the end of 2011 the average age of American's fleet was approximately 14.9 years—one of the oldest fleets in the industry.  Operating aging aircraft dramatically increases American's fuel and maintenance costs and undermines American's ability to provide its customers a premium in-flight experience.  To address the inefficiencies of its aging fleet, American entered into prepetition agreements with The Boeing Company ("**Boeing**") and Airbus, S.A.S. ("**Airbus**") whereby American placed orders for more than 500 new aircraft and purchased options to acquire a similar number of additional new aircraft.

Pursuant to the prepetition agreements with Boeing (the "**Boeing Agreements**"), American has recently acquired, or plans to acquire, approximately 300 new aircraft, including B737, B777, and B787 aircraft, with deliveries scheduled between 2012 and 2022.  The Boeing Agreements also provide American with options to acquire approximately 150 additional Boeing aircraft, which, if exercised, would be delivered between 2020 and 2025.  In connection with the prepetition agreement with Airbus (the "**Airbus Agreement**," and together with the Boeing Agreements, the "**Purchase Agreements**"), American committed to (i) lease 130 current generation A320-Family aircraft, with deliveries scheduled between 2013 and 2017, and (ii) purchase 130 A320-

Family neo aircraft,[5] with deliveries scheduled between 2017 and 2022.  American also acquired options to purchase or purchase rights for more than 350 additional Airbus aircraft, which, if exercised, would be delivered between 2014 and 2025.

(i)    Periodic Pre-Delivery Payments

Although the Purchase Agreements require periodic pre-delivery payments ("**PDPs**") on account of the aircraft ordered from Boeing and Airbus, American temporarily ceased making PDPs after the Commencement Date.  To maintain the delivery schedule and assure timely manufacture of the aircraft, however, the Debtors sought authority to resume paying PDPs in April 2012.  By order dated May 17, 2012, the Bankruptcy Court authorized the Debtors to resume making PDPs in connection with the Purchase Agreements, including all PDPs scheduled, but not paid, after the Commencement Date.

(ii)    Amended Purchase Agreements

Following the Commencement Date, the Debtors engaged in extensive discussions with Boeing and Airbus with respect to the Purchase Agreements, the claims associated therewith, and their ongoing relationships with both manufacturers.  As a result, the Debtors entered into a new agreement (the "**Boeing Restructuring Agreement**") with Boeing and certain affiliates of Boeing (the "**Boeing Affiliates**") that provides for a comprehensive settlement of the relationship among the Debtors, Boeing, and the Boeing Affiliates.  Pursuant to the Boeing Restructuring Agreement, the Debtors:  (i) assumed, subject to certain amendments, the Boeing Agreements and other related, prepetition agreements with Boeing; (ii) entered into certain new agreements with Boeing related to the purchase and financing of aircraft; (iii) assumed, and entered into, agreements with the Boeing Affiliates; and (iv) resolved various Claims of, and exchanged releases with, Boeing and the Affiliates.  The Debtors also entered into an amended agreement with Airbus (the "**Amended Airbus Agreement**," and together with the Boeing Restructuring Agreement, the "**Amended Purchase Agreements**").

On January 2, 2013, the Debtors filed two separate motions with the Bankruptcy Court seeking approval of the Amended Purchase Agreements.  By separate orders, each dated January 23, 2013, the Bankruptcy Court approved both motions.  The Debtors estimate that the Amended Purchase Agreements will result in aggregate savings of approximately $300 million through 2017—which could increase based upon the number of options to purchase aircraft that are exercised by the Debtors—and $120 million in 2018 and beyond.

---

[5]    Airbus 320-Family neo aircraft are to be equipped with new, more fuel efficient engines.

      (b)    *"Right-Sizing" the Debtors' Regional Fleet*

As of the Commencement Date, approximately 80% of the Debtors' regional fleet consisted of aircraft with seating capacity for 50 or fewer passengers. Over the past decade, however, the Debtors' major competitors have replaced many of their 50-seat regional jets with larger regional jets that will accommodate 70 or more passengers. To improve their competitive position, the Debtors need to increase the proportion of larger regional jets in their fleet thereby maximizing efficiency and revenue in regional markets through improved matching of aircraft capacity with passenger demand. Although restrictions imposed by the prior CBA with the APA prohibited American from using or acquiring additional regional jets with more than 50 seats, the new CBA with the APA expands American's ability to acquire additional regional jets with more than 50 seats. Accordingly, the Debtors plan to accelerate the retirement of smaller regional aircraft—those with 50 seats or less—thereby increasing their ability to acquire a significant number of larger regional jets with 51 to 76 seats.

      (c)    *Section 1110*

As of the Commencement Date, American and American Eagle maintained a combined fleet of over 900 aircraft, substantially all of which were leased or subject to various secured financing arrangements. Under Section 1110 of the Bankruptcy Code, beginning 60 days after filing a petition under chapter 11 of the Bankruptcy Code, certain secured parties, lessors, and conditional sales vendors have a right to take possession of certain qualifying Aircraft Equipment that is leased, or subject to a security interest or conditional sale contract, unless the Debtors, subject to approval by the Bankruptcy Court, agree to perform under the applicable agreement and cure certain defaults as provided in Section 1110. Any such action on the part of the Debtors will not preclude the Debtors from later rejecting the applicable lease or abandoning the Aircraft Equipment subject to the related security agreement or from later seeking to renegotiate the terms of the related financing. The Debtors may extend the 60-day period, with Bankruptcy Court approval, by agreement with the relevant financing party. The 60-day period under Section 1110 in the Chapter 11 Cases expired on January 27, 2012. In accordance with the Bankruptcy Court's Order Authorizing the Debtors to (i) Enter into Agreements Under Section 1110(a) of the Bankruptcy Code, (ii) Enter into Stipulations to Extend the Time to Comply with Section 1110 of the Bankruptcy Code, and (iii) File Redacted Section 1110(b) Stipulations (the "**Section 1110 Order**"), dated December 23, 2011, the Debtors have entered into agreements to extend the automatic stay or agreed to perform and cure defaults under financing agreements with respect to substantially all Aircraft Equipment in their fleet.

With respect to certain Aircraft Equipment, the Debtors have reached agreements on, or agreements on key aspects of, renegotiated terms of the related financings, and the Debtors are continuing to negotiate terms with respect to certain of their Aircraft Equipment. The ultimate outcome of these negotiations cannot be predicted with certainty. To the extent the Debtors are unable to reach definitive agreements with the financing parties, those parties may seek to repossess the subject Aircraft Equipment. The loss of a

40

significant number of aircraft could result in a material adverse effect on the Debtors' financial and operating performance.

As of January 31, 2013, and in accordance with the Section 1110 Order, the Debtors had (i) rejected 40 leases relating to 32 mainline aircraft and eight spare engines; (ii) relinquished one aircraft that was subject to a mortgage; (iii) made elections under Section 1110(a) to retain 340 mainline aircraft and 87 spare engines; and (iv) reached agreement on revised economic terms of the financing of 155 mainline aircraft (which agreements are generally subject to certain conditions, including reaching agreement on definitive documentation).  In addition, the Debtors reached an agreement with the lessor to modify the leases of 39 Super ATR aircraft.  As of December 31, 2012, 30 of the Super ATR aircraft had been returned to the lessor as allowed under the modified agreement, and the remaining Super ATR aircraft are expected to be returned to the lessor during 2013.

(d)    *Key Restructurings*

(i)    Embraer Fleet Restructuring

On August 31, 2011, American entered into a Master Purchase Agreement (the "**Eagle Aircraft Purchase Agreement**") with Eagle and Executive, whereby Eagle and Executive agreed to transfer certain aircraft and related assets to American in exchange for American's assumption of Eagle's outstanding debt obligations related to such aircraft (the "**Eagle Aircraft Transaction**").  More specifically, Eagle and Executive transferred, among other things, the Eagle Aircraft—comprised of 47 CRJ-700 aircraft (collectively, the "**CRJ Aircraft**") and 216 Embraer aircraft, comprised of 39 ERJ-135s, 59 ERJ-140s, and 118 ERJ-145s (each, an "**Embraer Aircraft**," and collectively, the "**Embraer Aircraft**"), to American in exchange for American's assumption of Eagle's outstanding debt obligations relating to both the CRJ Aircraft and the Embraer Aircraft (the "**Embraer Aircraft Obligations**") and certain other consideration.

The Embraer Aircraft were originally financed through certain prepetition mortgage financing arrangements with Agência Especial de Financiamento Industrial, as lender ("**FINAME**"), Banco Nacional de Desenvolvimento Econômico e Social ("**BNDES**," and together with FINAME, the "**Financing Parties**") and The Bank of New York Mellon Trust Company, N.A., as security trustee (the "**Security Trustee**").  Shortly after the Commencement Date, the Debtors and the Financing Parties began negotiating the restructuring of the Embraer Aircraft Obligations or the return of the Embraer Aircraft. The Debtors and the Financing Parties, while continuing negotiations for a long-term restructuring of the Embraer Aircraft Obligations, also reached an interim agreement, whereby the parties agreed, among other things, that the Debtors will (i) surrender 18 ERJ-135s (the "**Parked ERJ-135 Aircraft**") that were parked and not necessary to the Debtors' operations and (ii) make monthly security deposit payments with respect to the remaining Embraer Aircraft that will be credited toward payments in respect of Embraer Aircraft Obligations relating to such Embraer Aircraft.  Pursuant to such interim agreement, the

41

Debtors surrendered the Parked ERJ-135 Aircraft and transferred title to such Parked ERJ-135 Aircraft to the Security Trustee on June 21, 2012.

To facilitate a long-term restructuring of the remaining Embraer Aircraft Obligations, AMR, American and Eagle, along with the Financing Parties, the Security Trustee and certain other parties (collectively, the "**Restructuring Parties**"), agreed to enter into certain transactions (the "**Embraer Restructuring Transactions**"), the terms of which were embodied in the Master Restructuring Term Sheet Relating to 21 ERJ135, 59 ERJ140 and 118 ERJ145 Aircraft (the "**Master Term Sheet**") and the Lease Term Sheet Relating to 21 ERJ135 Aircraft (the "**Lease Term Sheet**" and together with the Master Term Sheet, the "**Term Sheets**"), each dated as of September 3, 2012.

The Embraer Aircraft Restructuring Transactions provided for in the Term Sheets include, among other things, the following:

- **Restructuring the Embraer Aircraft Obligations**.

  ➢ American will transfer and lease back, subject to the terms and conditions set forth in the Lease Term Sheet (including reaching agreement on definitive documentation), the 21 remaining ERJ-135s (the "**Remaining ERJ-135 Aircraft**"), whereby American will pay $40,000/month under leases that will expire between January 1, 2013 and December 31, 2013 and, upon consummation of such transfer and lease back transaction with respect to a Remaining ERJ-135 Aircraft, American will no longer have any payment obligations in respect of the Embraer Aircraft Obligations relating to such Remaining ERJ135 Aircraft;

  ➢ American will make payments, including monthly security deposit payments, in respect of the Embraer Aircraft Obligations relating to all 59 ERJ-140s as if such Embraer Aircraft Obligations have been reduced by 49%, *provided, however*, such Embraer Aircraft Obligations will not be formally reduced until existing financing documents relating to such ERJ-140s are amended to implement such reduction in accordance with, and subject to, the terms and conditions (including reaching agreement on definitive documentation and the Debtors' emergence from the Chapter 11 Cases) set forth in the Master Term Sheet;

  ➢ American will make payments, including monthly security deposit payments, in respect of the Embraer Aircraft Obligations relating to 68 of the ERJ-145s (the "**Newer ERJ-145 Aircraft**") as if such Embraer Aircraft Obligations have been reduced by 34%, *provided, however*, such Embraer Aircraft Obligations will not be formally reduced until existing financing documents relating to such Newer ERJ-145 Aircraft are amended to implement such reduction in accordance with, and subject to, the terms and conditions (including reaching agreement on definitive

42

documentation and the Debtors' emergence from the Chapter 11 Cases) set forth in the Master Term Sheet; and

➢ American will make payments, including monthly security deposit payments, in respect of the Embraer Aircraft Obligations relating to the remaining 50 ERJ-145s without any reduction of such Embraer Aircraft Obligations.

- **Fees, Costs, and Security Deposits**.  American will (i) pay certain fees and expenses of the Restructuring Parties, (ii) make monthly security deposit payments with respect to each Remaining ERJ-135 Aircraft until the consummation of the transfer and lease back with such Remaining ERJ-135 Aircraft and (iii) make monthly security deposit payments with respect to each of the ERJ-140s and ERJ-145s until existing financing documents relating to such Embraer Aircraft are amended in accordance with, and subject to, the terms and conditions (including reaching agreement on definitive documentation and the Debtors' emergence from the Chapter 11 Cases) set forth in the Master Term Sheet.

- **Bankruptcy Claims**.  The Security Trustee will receive an Allowed General Unsecured Claim against both AMR and American in a stipulated amount related to the value of each Embraer Aircraft (i) in the case of a Parked ERJ-135 Aircraft, upon approval of the Term Sheets by the Bankruptcy Court, (ii) in the case of a Remaining ERJ-135 Aircraft, upon consummation of the transfer and lease back transaction with respect to such Remaining ERJ-135 Aircraft and (iii) in the case of each of the remaining Embraer Aircraft, upon amendment of the existing financing documents associated with such Embraer Aircraft in accordance with, and subject to, the terms and conditions (including reaching agreement on definitive documentation and the Debtors' emergence from the Chapter 11 Cases) set forth in the Master Term Sheet, totaling approximately $650 million in the aggregate.

On October 9, 2012, the Debtors filed a motion with the Bankruptcy Court (the "**Embraer Restructuring Motion**") seeking authority to enter into the Embraer Restructuring Transactions pursuant to Bankruptcy Rule 9019.  By order dated November 9, 2012, the Bankruptcy Court approved the Embraer Restructuring Motion (the "**Embraer Restructuring Order**").  On November 9, 2012, the Restructuring Parties entered into the Amended and Restated Master Restructuring Term Sheet Relating to 21 ERJ135, 59 ERJ140 and 118 ERJ145 Aircraft, which amended and restated the Master Term Sheet to reflect the requirements of the Embraer Restructuring Order while preserving the terms of the Embraer Restructuring Transactions described above.  The Debtors estimate that the Embraer Restructuring Transactions (including the transfer and lease back of the 21 Remaining ERJ-135 Aircraft as described above, all of which were consummated in December 2012) will reduce the Embraer Aircraft Obligations by approximately $670 million.  In addition, by entering into the Embraer Restructuring Transactions, the Debtors are able to (i) avoid costly litigation regarding the value of the

43

Embraer Aircraft; (ii) liquidate the amount of the Financing Parties' claims; and (iii) obtain the flexibility required to "right-size" their regional fleet in connection with the Business Plan.

<div align="center">(ii)    EETC Refinancing</div>

American's prepetition debt obligations include, among other things:  (i) the secured notes issued in July 2009, with an interest rate of 13% and a final maturity in 2016 (the "**2009-2 Secured Notes**"); (ii) the EETC issued in July 2009, with an interest rate of 10.375% and a final maturity in 2019 (the "**2009-1 EETC**"); and (iii) the EETC issued in October 2011, with an interest rate of 8.625% and a final maturity in 2019 (the "**2011-2 EETC**," and together with the 2009-2 Secured Notes and 2009-1 EETC, the "**Prepetition Notes**").  Each of the Prepetition Notes is secured by different groups of Aircraft Equipment (the "**Aircraft**") and certain other assets.  In addition to certain unpaid interest, fees, costs, and expenses owed in connection with the Prepetition Notes, as of September 30, 2012, the principal amount outstanding under each of the Prepetition Notes was $445,618,425 for the 2009-1 EETCs, $174,163,156 for the 2009-2 Secured Notes and $703,645,330 for the 2011-2 EETCs.

During the second half of 2012, interest rates available in the EETC financing market were at historic lows.  As a result, the Debtors determined that obtaining new EETC financing was in the best interest of the Debtors, their estates, and their creditors.  On October 9, 2012, the Debtors filed a motion (the "**EETC Motion**") with the Bankruptcy Court seeking an order that, among other things:  (i) authorized the Debtors to obtain postpetition financing in an amount up to $1.5 billion secured on a first priority basis by the Aircraft as part of a new EETC financing (the "**New EETC**"); (ii) authorized the Debtors to use Cash on hand, including proceeds of the New EETC, to indefeasibly repay certain existing prepetition obligations secured by the Aircraft, including obligations under the Prepetition Notes, without the payment of any make-whole amount or other premium or prepayment penalty; and (iii) authorized and directed the release of the liens on the Aircraft and other assets that secured the Prepetition Notes and approved the grant of new liens in connection with the New EETC.

By Order dated February 1, 2013, the Bankruptcy Court granted the EETC Motion (the "**EETC Order**").  Shortly thereafter, certain parties in interest (the "**Appellants**") appealed the EETC Order and judgments rendered in certain related adversary proceedings.  To avoid the expense of a multi-level appellate process, the Debtors filed a motion for certification for direct appeal to the United States Court of Appeals for the Second Circuit (the "**Second Circuit**") on February 14, 2013.  On February 28, 2013, the Bankruptcy Court granted the motion.  The Debtors subsequently filed a petition for authorization of the direct appeal and a motion for expedited appeal with the Second Circuit.  On April 2, 2013, the Second Circuit granted the Debtors' petition for direct appeal and granted the Debtors' motion for an expedited appeal.  Briefing of the appeal will be fully submitted by April 30, 2013.

The Appellants also filed separate motions with the Bankruptcy Court seeking a stay of the EETC Order.  On February 22, 2013, The Bankruptcy Court granted a limited stay of the EETC Order until May 1, 2013, provided that the Appellants post a $100 million bond and agree to an expedited briefing schedule (the "**Stay Order**").  Because the Appellants have not posted a bond, there is no stay in effect.  Accordingly, the Debtors may proceed with the EETC Refinancing (either prior to, or in connection with, the consummation of the Plan) unless the Bankruptcy Court's ruling is modified or reversed on appeal.

There can be no assurance that the Debtors will be able to effectuate the New EETC on acceptable terms, or at all.

### D.    Merger Agreement with US Airways

### 1.    Exploration of Strategic Alternatives

Since the Commencement Date, the Debtors' fundamental goal has been to restore their financial condition and operations to achieve a competitive and sustainable cost structure and to preserve and enhance their going concern value.  Accordingly, after consultation with the Creditors' Committee in February 2012, the Debtors adopted a business restructuring plan, a large portion of which has been pursued and successfully implemented during the Chapter 11 Cases.  Specifically, as described above, the Debtors' restructuring efforts have encompassed labor cost savings, managerial efficiencies, fleet reconfiguration, and other economies.

The Debtors, in collaboration with the Creditors' Committee, have also expended significant time and resources thoroughly evaluating and analyzing strategic alternatives for their emergence from chapter 11, including strategic business combinations and a plan of reorganization under which the Debtors would emerge from chapter 11 on a stand-alone basis without entering into a strategic business combination (the "**Independent Emergence Alternative**").  As of May 1, 2012, the Debtors and the Creditors' Committee entered into the Joint Exploration Protocol Agreement, as amended, and, as of July 19, 2012, the Joint Exploration Protocol Side Letter Agreement, as amended (together, the "**Joint Protocol**").  The objective of the Joint Protocol was to identify and comprehensively evaluate strategic alternatives for the Debtors' emergence from chapter 11 as well as the feasibility of each alternative, the financial and legal benefits and risks to the Debtors and their stakeholders of each alternative, and to determine the path that would maximize value for all parties in interest.

In furtherance of this objective, the Debtors were determined to explore each realistic alternative.  Accordingly, in addition to their discussions with US Airways that ultimately culminated in the Merger Agreement, the Debtors and their advisors approached several other airlines to gauge their interest in a strategic combination.  For various reasons, however, discussions with those airlines did not progress because a transaction with any of those airlines was not desirable.  The Debtors and their advisors also had

discussions with credible potential financial investors with experience in the airline industry to consider financing the Independent Emergence Alternative or a total purchase of American.

After evaluating the potential strategic alternatives, it appeared that a business combination with US Airways was the only viable option for American to consider versus the Independent Emergence Alternative.  Notably, a combination with US Airways will, among other things, (i) create a number of synergies with resulting revenue benefits and cost savings to the merged company in an estimated aggregate amount of more than $1 billion in annual net synergies in 2015, (ii) improve traffic flows through, and expand service from, the existing hubs, (iii) increase liquidity and lower leverage as a result of the combined balance sheets of American and US Airways, and (iv) maximize recoveries to the Debtors' economic stakeholders.

### 2.    US Airways

US Airways is a publicly held Delaware holding company, formed in 1982, whose primary business activity is the operation of a major network air carrier through its wholly owned subsidiaries US Airways, Inc., Piedmont Airlines, Inc. ("**Piedmont**"), PSA Airlines, Inc. ("**PSA**"), Material Services Company, Inc., and Airways Assurance Limited. Effective upon its emergence from chapter 11 on September 27, 2005, US Airways merged with America West Holdings Corporation, with US Airways as the surviving corporation.

US Airways operates the fifth largest airline in the United States as measured by domestic revenue passenger miles and available seat miles.  It has hubs in Charlotte, Philadelphia, Phoenix, and Washington, D.C.  US Airways offers scheduled passenger service on more than 3,000 flights daily to approximately 200 communities in the United States, Canada, Mexico, Europe, the Middle East, the Caribbean, and Central and South America.  It also has an established East Coast route network, including the US Airways Shuttle service.

### 3.    Negotiations with US Airways

In January 2012 US Airways began publicly asserting its interest in a combination with the Debtors.  On April 20, 2012, US Airways announced that it had signed conditional agreements with the employees of American represented by the American Unions, the effectiveness of which was contingent upon a business combination involving US Airways and the Debtors in connection with the Chapter 11 Cases.

In early September 2012, with the support of the Creditors' Committee, US Airways and the Debtors commenced formal discussions regarding a potential merger to be effectuated pursuant to a chapter 11 plan of reorganization.  US Airways and the Debtors, in collaboration with the Creditors' Committee, exchanged extensive confidential financial and business information in order to conduct their respective due diligence and assess whether a merger between the two entities was viable and in their respective best

46

interests.  Multiple proposals regarding the business terms of a proposed merger were exchanged among the parties, and numerous meetings, conferences, and negotiations were held.

The Debtors and their advisors engaged in an exhaustive evaluation of a merger with US Airways, including a full analysis of potential synergies to be realized, integration risks, costs attendant to implementation of a merger, and a host of other factors.  The Debtors kept the advisors of the Creditors' Committee informed throughout the process.  On February 13, 2013, after concluding that a merger with US Airways would maximize value for their economic stakeholders and should be expeditiously pursued, AMR, US Airways, and Merger Sub, a Delaware corporation and wholly owned subsidiary of AMR, entered into the Merger Agreement, providing for a business combination of AMR and US Airways.

### 4.    Negotiations with Labor

In order to assist the AMR board of directors in its evaluation of a potential merger transaction with US Airways, senior management from AMR and US Airways engaged in intensive negotiations with the leadership of both the APA and the collective bargaining representative of the pilots of US Airways, the US Airline Pilots Association (the "**USAPA**"), in an effort to reach an agreement, to be effective in the event of a merger, that would mitigate labor uncertainty and cost dis-synergies typically associated with airline mergers and the integration of employee work groups.  These negotiations took place over a two-plus week period in December 2012.  On December 29, 2012, the Debtors and US Airways announced that they had reached a four-party Memorandum of Understanding ("**MOU**") with the APA and USAPA that provided for, among other things, the terms and conditions of employment for the pilots of American and US Airways during the period of separate operations following a merger, processes and timelines for securing a single carrier, and single representative, determinations from the National Mediation Board (the "**NMB**"), and achieving a joint collective bargaining agreement covering the combined pilot group and an integrated pilot seniority list.

The Debtors and US Airways also engaged in discussions with the leaderships of the APFA and TWU in an effort to further minimize labor risks and cost dis-synergies associated with a merger.  Those discussions resulted in a tri-party MOU among the Debtors, US Airways, and the TWU (covering American's ground employees) and a letter of understanding and agreement between US Airways and the APFA (covering American's flight attendants), each of which outlines terms of employment in the event of a merger and processes and timelines for various steps of the integration.  Separately, US Airways entered into a tentative agreement regarding the terms of a new collective bargaining agreement with the AFA (the representative of US Airways' flight attendants) that includes support for a merger, which agreement was recently ratified by the AFA membership.

### 5. The Merger Agreement

(a) *Structure*

As noted above, on February 13, 2013, AMR, US Airways, and Merger Sub entered into the Merger Agreement. The Merger Agreement provides that, upon the terms, and subject to the conditions set forth in the Merger Agreement, Merger Sub will merge with and into US Airways (the "**Merger**"), with US Airways as the surviving corporation and a wholly owned subsidiary of AMR. Following the Merger, AMR will (i) own, directly or indirectly, all of the equity interests of American, Eagle Holding, US Airways and their direct and indirect subsidiaries and (ii) be renamed American Airlines Group Inc. ("**New AAG**"). The Merger is to be effectuated pursuant to, and is conditioned on, the occurrence of the Effective Date under the Plan.

(b) *Consideration*

Subject to the terms and conditions of the Merger Agreement, when the Merger becomes effective (the "**Effective Time**"), existing US Airways stockholders will receive one share of common stock, par value $0.01 per share, of New AAG (the "**New Common Stock**") for each share of US Airways Common Stock. The aggregate number of shares of New Common Stock issuable to holders of US Airways equity instruments (including stockholders, holders of convertible notes, optionees, and holders of restricted stock units) will represent 28% of the diluted equity ownership of New AAG after giving effect to the Plan. The remaining 72% diluted equity ownership of New AAG will be distributable, pursuant to the Plan, to the Debtors' unsecured creditors, labor unions, certain employees, and holders of AMR Equity Interests.

All of the Equity Interests in New AAG will be issued solely pursuant to the Merger Agreement or the Plan. All existing AMR Common Stock and other Equity Interests in AMR will be cancelled pursuant to the Plan, although holders of such Equity Interests will receive a recovery in the form of New Common Stock.

The Merger is intended to qualify, for federal income tax purposes, as a reorganization under the provisions of Section 368(a) of the Internal Revenue Code of 1986, as amended (the "**Tax Code**").

(c) *Board of Directors*

The Merger Agreement provides that, upon consummation of the Merger, the board of directors of the combined company will initially consist of 12 members, composed of (i) five independent directors designated by a search committee comprised of certain members of the Creditors' Committee and certain other creditors, (ii) two independent directors designated by AMR, each of whom will be reasonably acceptable to the search committee, (iii) three independent directors designated by US Airways, (iv) Thomas W. Horton, AMR's current chairman, chief executive officer, and president, who will serve as

chairman of New AAG until the earlier of (A) one year after the occurrence of the Merger Closing and (B) the day immediately prior to the first annual meeting of stockholders of the combined company (provided such meeting will not occur prior to May 1, 2014), and (v) W. Douglas Parker, US Airways' current chief executive officer, who will serve as chief executive officer of New AAG and who will serve as chairman of New AAG following the end of Mr. Horton's term.

        (d)    *Covenants*

        AMR and US Airways have each made customary representations, warranties, and covenants in the Merger Agreement, including, among others, covenants to conduct their businesses in the ordinary and usual course between the execution of the Merger Agreement and the consummation of the Merger.  In addition, the Merger Agreement contains "no shop" provisions that restrict each party's ability to initiate, solicit, or knowingly encourage or facilitate competing third-party proposals for any transaction involving a merger of such party or the acquisition of a significant portion of its stock or assets, although each party may consider competing, unsolicited proposals and enter into discussions or negotiations regarding such proposals, if its board of directors determines that any such acquisition proposal constitutes, or is reasonably likely to lead to, a superior proposal and that the failure to take such action is reasonably likely to be inconsistent with its fiduciary duties under applicable law.

        US Airways has agreed, subject to certain exceptions, to certain additional customary covenants in the Merger Agreement, including, among others, (i) to cause a stockholder meeting to be held to consider adoption of the Merger Agreement and (ii) that its board of directors will recommend adoption of the Merger Agreement by US Airways' stockholders.  AMR has also agreed, subject to certain exceptions, to certain additional customary covenants in the Merger Agreement, including, among others, (i) to pursue confirmation of the Plan and (ii) that its board of directors will include in this Disclosure Statement a recommendation of the acceptance of the Plan by the Debtors' stakeholders who are entitled to vote on the Plan.

        (e)    *Conditions*

        Consummation of the Merger is subject to customary conditions, including, among others: (i) approval of the adoption of the Merger Agreement by the stockholders of US Airways; (ii) expiration or termination of the applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and the receipt of certain other regulatory approvals; (iii) the absence of any order or injunction prohibiting the consummation of the Merger; (iv) entry of the Confirmation Order, which must contain certain specified provisions defined in the Merger Agreement; (v) subject to certain exceptions, the accuracy of representations and warranties with respect to the business of AMR or US Airways, as applicable; (vi) each of AMR and US Airways having performed their respective obligations pursuant to the Merger Agreement; (vii) the shares of New Common Stock having been authorized for listing on the NYSE or NASDAQ upon official

49

notice of issuance; (viii) the form S-4 Registration Statement having become effective under the Securities Act of 1933, as amended, and (ix) receipt by each of the Debtors and US Airways of a customary tax opinion.

(f)    *Termination*

The Merger Agreement contains certain termination rights for AMR and US Airways, and further provides that, upon termination of the Merger Agreement under specified circumstances, (i) AMR may be required to pay US Airways a termination fee of $135 million in the event it terminates the agreement to enter into a superior proposal and $195 million if US Airways terminates the Merger Agreement in the event of a knowing or deliberate material breach of the Merger Agreement by AMR with the actual knowledge of a specified officer of AMR of such breach and (ii) US Airways may be required to pay AMR a termination fee of $55 million in the event it terminates the agreement to enter into a superior proposal and $195 million if AMR terminates the Merger Agreement in the event of a knowing or deliberate material breach of the Merger Agreement by US Airways with the actual knowledge of a specified officer of US Airways of such breach.

(g)    *Employee Arrangements*

In connection with the Merger, the Debtors have entered into certain employee compensation and benefit arrangements (collectively, the "**Employee Arrangements**") affecting certain employees of the Debtors who are not represented by a union.  The Employee Arrangements are designed to, among other things:  (i) motivate the Debtors' managers to contribute to a successful Merger by offering market-appropriate variable compensation opportunities; (ii) unify the management teams of both the Debtors and US Airways by aligning the compensation provided to the Debtors' managers with programs in place for US Airways' managers; and (iii) provide the same severance protections currently in place at US Airways for those managers who will not continue with American following the Merger.

(i)    Ordinary Course Arrangements

Many of the Employee Arrangements will only come into effect upon the occurrence of the Merger Closing (the "**Merger-Contingent Arrangements**"); however, certain limited arrangements will be implemented in the ordinary course (the "**Ordinary Course Arrangements**").  Accordingly, only the Ordinary Course Arrangements will become effective prior to the Merger Closing and be paid by the Debtors.  The Ordinary Course Arrangements encompass normal and customary salary and wage increases of no more than (i) 50 cents per hour or (ii) 1.5% to 3% of the then current base pay rates per individual.

(ii)    Merger-Contingent Arrangements

Subject to both the occurrence of the Merger Closing and the approval of the Bankruptcy Court, the Debtors will adopt and implement the Merger-Contingent Arrangements, including:  (i) a profit sharing plan based on 2013 pre-tax profit; (ii) short term incentive plan awards based on both 2013 pre-tax profit and operational performance metrics to be determined by AMR; (iii) long term incentive plan awards, payable in either stock-settled restricted stock units or cash; (iv) severance arrangements consistent with the terms, conditions, and benefits provided to similarly situated employees of US Airways; and (v) a key employee retention program.

(iii)    Chairman Letter Agreement

Pursuant to that certain letter agreement (the "**Chairman Letter Agreement**"), dated February 13, 2013, a copy of which is annexed as Exhibit G to the Merger Agreement, upon the occurrence of the Merger Closing, Mr. Thomas W. Horton's employment as the Chief Executive Officer of AMR shall terminate, and he will be appointed as chairman (the "**Chairman**") of the board of directors of New AAG.  The Chairman Letter Agreement provides that, subject to the Closing of the Merger, Mr. Horton will be paid compensation of $19,875,000 by New AAG, which will be paid 50% in Cash and 50% in New Common Stock based on the fair market value of the New Common Stock on the Closing Date.  This compensation is reflective of, among other things:  (i) Mr. Horton's leadership of the Debtors through their restructuring and the strategic process that has culminated in the Merger; and (ii) his appointment as Chairman of New AAG following the Closing.  In addition, this compensation is in lieu of any awards Mr. Horton would otherwise have been entitled to under any of the Employee Protection Arrangements as defined and set forth in Section 4.1(o) of the American Disclosure Letter.

The Chairman Letter Agreement also confirms that at the Closing of the Merger, AMR (i) shall recognize all service credited to Mr. Horton under the Supplemental Executive Retirement Plan for Officers of American Airlines, Inc. (the "**SERP**") prior to the Closing; and (ii) Mr. Horton shall be fully vested in his accrued benefits under the SERP.

Pursuant to the Chairman Letter Agreement, Mr. Horton shall serve as the Chairman from the Closing through the earlier of (i) the first anniversary of the Closing and (ii) the day immediately preceding the first annual meeting of the shareholders of New AAG following the Closing (which shall in no event occur prior to May 1, 2014) (the "**Term**").  During the Term, Mr. Horton shall be entitled to receive the same cash and equity compensation established for service on the New AAG board as a non-employee director pursuant to New AAG's policies as in effect from time to time.  In addition, effective as of the Closing, Mr. Horton shall be entitled to lifetime flight and other travel benefits (including spousal and survivor benefits) at a level and on terms and conditions, in each case, that are no less favorable than those to which Mr. Horton was entitled under

51

American's policies in effect prior to the Closing. Legal fees incurred by Mr. Horton in connection with the American Chairman Letter Agreement shall be reimbursed by AMR.

It is a condition precedent to the effectiveness of the Plan and the Merger Agreement that the Chairman Letter Agreement and the proposed payments and benefits to Mr. Horton provided therein be approved by the Bankruptcy Court and be in effect. In connection with confirmation of the Plan, the Debtors are requesting Bankruptcy Court approval of the Chairman Letter Agreement and the payments and benefits provided therein.

(h)     *Merger Support Motion*

On February 22, 2013, the Debtors filed a motion (the "**Merger Support Motion**") with the Bankruptcy Court seeking approval of the Merger Agreement, the Debtors' execution and performance under the Merger Agreement, the Employee Arrangements (as defined therein), termination fees related to the Merger Agreement, and other related relief. On April 11, 2013, the Bankruptcy Court entered a Memorandum of Decision granting the relief sought in the Merger Support Motion, except the Bankruptcy Court denied approval of the $19,875,000 payment to Mr. Horton, without prejudice to the ability to consider such payment in the context of confirmation of the Plan. As stated above, it is a condition precedent to the effectiveness of the Plan and the Merger Agreement that the Chairman Letter Agreement and the proposed payments and benefits to Mr. Horton provided therein be approved by the Bankruptcy Court and be in effect. In connection with confirmation of the Plan, the Debtors are requesting Bankruptcy Court approval of the Chairman Letter Agreement and the payments and benefits provided therein.

### 6.    The New American Airlines

Upon consummation of the Merger, the combined entity will operate under the American Airlines name, one of the most recognized brands in the world. The combined company expects to offer more than 6,700 daily flights to 336 destinations in 56 countries. The Merger will combine American's and US Airways' complementary networks, increasing convenience and efficiency and providing more options for customers, as well as creating a network capable of more effectively competing with the now larger global networks operated by Delta and United and with the extensive domestic network operated by and cost advantage of Southwest Airlines. More specifically, as a result of the Merger, the combined company is expected to:

- Generate more than $1 billion in annual net synergies in 2015. Revenue synergies of $900 million are projected as the result of providing significantly enhanced network connectivity and scheduling to allow more passengers, particularly corporate customers and other business travelers, to use the combined airline for their travel needs; fleet optimization; alliance benefits; enhanced corporate travel share; and enhanced frequent flyer program penetration and scale. Additionally, the Merger is expected to provide cost

synergies through more efficient use of station services and labor at overlapping stations; optimization of airport and office space and services; reducing management and administration; and the creation of purchasing efficiencies that are projected to total $550 million (or net synergies of $150 million after taking into account improved compensation arrangements for employees).  Neither the revenue nor cost synergies would be possible without the Merger.

- As the result of the restructuring of AMR, the profitability of US Airways' business, and those synergies, be a consistently profitable and financially stable company, with the financial strength and liquidity to invest in improved technology, products, services and growth, and better able to compete and respond to the competitive challenges and cyclical business conditions of the airline industry.

- As a result of the increased value expected to be created by the Merger would enable the filing of a proposed plan of reorganization by the Debtors providing for the potential for a full recovery by creditors of the Debtors and a distribution to holders of AMR Equity Interests of 3.5% of the aggregate ownership stake in the combined company with the potential for such Equity Interest holders to receive additional shares of the combined company (the implementation of such a plan of reorganization is subject to confirmation and consummation in accordance with the provisions of the Bankruptcy Code and the closing of the Merger).

- Provide its employees with improved job security, better opportunities for advancement, better pay and a path to compensation and benefits comparable to those enjoyed by their counterparts at Delta and United.

- As a result, have the support of both companies' employees and labor unions. That support for the merger has resulted in agreements with those unions that significantly mitigate the risk of future labor uncertainty.

- Benefit from an experienced and highly motivated management team lead by Doug Parker and assembled from the best executives of American and US Airways.

- Enhance connectivity with, the competitiveness of, and revenues generated by the **one**world® alliance, by expanding joint businesses with British Airways and Iberia across the Atlantic and with Japan Airlines and Qantas across the Pacific and providing the oneworld partner airlines with access to connecting hubs in the Northeastern and Southeastern U.S., creating more opportunities for travel and benefits both domestically and internationally.

- Maintain current hubs of both American and US Airways, and service to all American and US Airways communities, resulting in improved traffic flows, increased service to existing markets and expansion of service to new markets, thus creating improved efficiency and more choices for customers.

53

- As deliveries of new aircraft under American's agreements with Boeing and Airbus and US Airways' agreements with Airbus, operate one of the most modern and efficient fleets in the industry.

- After the combination of the AAdvantage® and Dividend Miles frequent flyer programs, offer the industry's leading loyalty program with improved benefits through expanded opportunities to earn and redeem airline miles.

The combined companies expect to incur approximately $1.2 billion in transition and other one-time costs of integrating the two airlines. These costs include the standardization of the two companies' fleets, airport facility standardization and co-location, information technology integration, employee training, severance and relocation, and other one-time expenses. The integration costs are projected to take place within the first three years of the combination, with the majority of the costs occurring in the first two years.

The combined airline will be headquartered in Dallas-Fort Worth, Texas and will maintain a significant corporate and operational presence in Phoenix, Arizona. Thomas Horton, the current Chairman, CEO and President of AMR will serve as Chairman of the new company's Board of Directors until the new company's annual meeting in 2014. Doug Parker, current Chairman and CEO for US Airways, will serve as the CEO for the combined company, and as Chairman of the new company's Board after Mr. Horton.

### 7. Support and Settlement Agreement

On February 13, 2013, in conjunction with the Merger Agreement, the Debtors entered into the Support and Settlement Agreement with certain members (the "**Consenting Creditors**") of the Ad Hoc Group of AMR Corporation Creditors (the "**Ad Hoc Committee**") and certain other creditors holding approximately $1.2 billion in aggregate prepetition unsecured Claims. Pursuant to the terms of the Support and settlement agreement, each Consenting Creditor has agreed, among other things, and subject to certain conditions, to vote in favor of the Plan, generally support confirmation and consummation of the Plan, and not to support or solicit any plan in opposition to the Plan.

The Support and Settlement Agreement may be terminated upon the occurrence of certain events, including: (a) certain breaches by the Debtors or Consenting Creditors under the Support and Settlement Agreement; (b) termination of the Merger Agreement or the announcement by AMR or US Airways of their intent to terminate the Merger Agreement (in which case the Support and Settlement Agreement would terminate automatically); (c) the failure to meet certain milestones with respect to achieving confirmation and consummation of the Plan; (d) the filing, amendment, or modification of certain documents, including the Plan, in a manner materially inconsistent with the Support and Settlement Agreement and materially adverse to a Consenting Creditor (in which case the Support and Settlement Agreement can be terminated by such Consenting Creditor

solely with respect to itself); (e) the amendment or modification of the Merger Agreement in a manner that is materially adverse to a Consenting Creditor (in which case the Support and Settlement Agreement can be terminated by such Consenting Creditor solely with respect to itself); and (f) if the volume weighted average price of US Airways Common Stock for the 30 trading days ending on the last trading day immediately prior to the date of termination is less than $10.40. Termination of the Support and Settlement Agreement would give the Consenting Creditors the right to withdraw their support of the Plan.

In addition, the Support and Settlement Agreement provides that the Debtors shall reimburse or pay, as the case may be, as allowed administrative expenses pursuant to sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code, (A) all reasonable and documented fees and expenses reasonably incurred by all counsel and the financial advisors to the Ad Hoc Committee (i) prior to February 13, 2013, to the extent not already reimbursed, and (ii) from and after February 13, 2013, so long as either a Majority of the Initial Consenting Creditors (as defined in the Support and Settlement Agreement) that are members of the Ad Hoc Committee are obligated under the Support and Settlement Agreement to support the Plan and have not breached such obligation or a Majority of the Ad Hoc Committee Members (as defined in the Support and Settlement Agreement) are Consenting Creditors and have not breached such obligation, which shall include (a) the reasonable fees and expenses of counsel to the Ad Hoc Committee, and (b) the monthly fees and reasonable expenses of the financial advisors to the Ad Hoc Committee, which shall consist of a monthly fee of $150,000, (B) a deferred fee to the financial advisors to the Ad Hoc Committee, in an amount equal to the lesser of (x) 0.50% of the aggregate recoveries under the Plan to the holders of certain identified funded debt obligations (the "**Noteholder Recoveries**"), and (y) $13 million (the "**Deferred Fee**"), payable within one Business Day following the calculation of the Noteholder Recoveries and pursuant to the Plan, and (C) all reasonable fees and expenses of counsel and the financial advisors to Bank of New York Mellon and certain of its affiliates and Law Debenture Trust Company of New York (in accordance with the terms of their respective engagement letters), from and after November 9, 2012, to the extent such fees and expenses are allocable to negotiations with parties regarding the Plan term sheet, including, with respect to the aforementioned financial advisors, a monthly fee of no more than $200,000, and a completion fee of no more than $700,000 (the "**Completion Fee**") payable on the Effective Date. The Support and Settlement Agreement provides that all of the foregoing fees and expenses other than the Deferred Fee and the Completion Fee shall be paid promptly upon delivery of an invoice to the Debtors, but in no event later than ten Business Days following such delivery and are, once paid, not refundable under any circumstances and will not be subject to counterclaim or set-off for, or be otherwise affected by, any claim or dispute relating to any other matter. The Support and Settlement Agreement further provides that the Completion Fee shall be paid on the Plan Effective Date and the Deferred Fee shall be paid within one Business Day following the calculation of the Noteholder Recoveries.

On [_____ __], 2013, the Debtors filed a motion (the "**Support Agreement Motion**") with the Bankruptcy Court seeking authority to enter into the Support Agreement.  By order dated [_____ __], 2013, the Bankruptcy Court granted the relief requested in the Support Agreement Motion.

###### E.   Other Events During the Chapter 11 Cases

###### 1.   First Day Motions

On the Commencement Date, the Debtors filed certain motions seeking relief intended to ensure a seamless transition between the Debtors' prepetition and postpetition business operations and facilitate the smooth administration of the Chapter 11 Cases (the "**First Day Motions**").  The Bankruptcy Court granted substantially all of the relief requested in the First Day Motions and entered various orders authorizing the Debtors to, among other things:

- Continue paying employee wages and benefits;

- Continue the use of the Debtors' cash management system, bank accounts, and business forms;

- Continue insurance programs and modify the automatic stay as to workers' compensation Claims;

- Continue certain customer programs, including the AAdvantage Program;

- Pay certain prepetition taxes and assessments;

- Pay certain prepetition obligations to foreign creditors;

- Pay certain critical vendors and certain vendors for prepetition orders of goods to be delivered postpetition;

- Pay prepetition Claims of certain contractors and certain Claims related to ongoing improvement projects at certain airport facilities;

- Restrict certain transfers of Claims against, and Equity Interests in, the Debtors' estates;

- Establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service;

- Continue performance under certain derivative contracts, including fuel hedging contracts; and

- Continue letter of credit and surety bond programs.

### 2.    Appointment of Creditors' Committee

On December 5, 2011, the Creditors' Committee was appointed by the Office of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the Chapter 11 Cases.  The Creditors' Committee currently consists of the following nine members:

| | |
|---|---|
| **Allied Pilots Association** | **The Bank of New York Mellon** |
| **Transport Workers Union of America – AFL-CIO** | **Pension Benefit Guaranty Corporation** |
| **Association of Professional Flight Attendants** | **Hewlett-Packard Enterprise Services, LLC** |
| **Manufacturers and Traders Trust Company** | **Boeing Capital Corporation** |
| **Wilmington Trust Company** | |

The Creditors' Committee retained Skadden, Arps, Slate, Meagher & Flom LLP, as its attorneys; Togut, Segal & Segal LLP, as its co-counsel; Mesirow Financial Consulting, LLC, as its financial advisors; Moelis & Company LLC, as its investment banker; Epiq Bankruptcy Solutions, LLC, as its information agent; Collateral Verifications, LLC, as its valuation consultant; and Hay Group, Inc., as its compensation consultant.  The Creditors' Committee has actively participated in all aspects of the Chapter 11 Cases.

### 3.    Appointment of Retiree Committee

On March 23, 2012, the Retiree Committee was appointed by the U.S. Trustee pursuant to section 1114 of the Bankruptcy Code to represent the interests of retired persons in the Chapter 11 Cases.  The Retiree Committee currently consists of the following five members:

| | |
|---|---|
| **James Sovich (member of Allied Pilots Association)** | **Charles MarLett (Non-Union Retirees)** |
| **Transport Workers Union of America – AFL-CIO** | **Rita Kepple (Non-Union Retirees)** |
| **Association of Professional Flight Attendants** | |

The Retiree Committee retained Jenner & Block LLP, as its attorneys, The Segal Company, as its actuarial consultants, and Zolfo Cooper LLC, as its financial advisors.

### 4.    Appointment of Fee Examiner

On May 24, 2012, the U.S. Trustee, the Debtors, and the Creditors' Committee filed a stipulation with respect to the appointment of Robert J. Keach as fee examiner,

which was "so ordered" by the Bankruptcy Court on June 12, 2012, effectuating
Mr. Keach's appointment as the fee examiner in the Chapter 11 Cases.

### 5.    Requests for Appointment of Committee of Equity Security Holders

During the initial stages of the Chapter 11 Cases and in early 2013, the U.S.
Trustee received requests from, or on behalf of, holders of AMR Common Stock for the
appointment of an Official Committee of Equity Security Holders in the Chapter 11 Cases.
Those requests were declined by the U.S. Trustee.

### 6.    Protection of Tax Benefits/AMR Trading Order

(a)    *Entry of AMR Trading Order*

The Debtors' net operating loss ("**NOL**") carryforwards, alternative minimum tax
("**AMT**") credits, and certain other tax attributes are valuable assets of the Debtors'
estates.  As of December 31, 2012, AMR and its domestic corporate subsidiaries (the
"**AMR Group**") had consolidated NOL carryforwards, for U.S. federal income tax
purposes, of approximately $6.6 billion, and AMT credits of approximately $370 million.
These tax attributes are valuable because, for U.S. federal income tax purposes, a
corporation can carry forward NOLs and AMT credits to offset future income or tax,
thereby reducing its tax liability in future periods.  The Debtors believe that, even after
taking account of any cancellation of debt impact of the Plan on the Debtors (which is not
expected to be significant), the Debtors' NOL carryforwards and other tax attributes may
result in significant future tax savings.  These savings would enhance the Debtors' Cash
position and significantly contribute to the successful reorganization of the Debtors.

The ability of the Debtors to use their NOL carryforwards and other tax attributes is
subject to certain statutory limitations.  In particular, section 382 (in coordination with
section 383) of the Tax Code limits a corporation's ability to use its NOLs and certain
other tax attributes after the corporation undergoes a proscribed change of ownership.
Although an ownership change of the Debtors is (and was) expected to occur upon
implementation of the Plan, the limitations imposed by section 382 of the Tax Code upon a
change of ownership pursuant to a confirmed plan are significantly more relaxed than
those otherwise applicable, particularly, under section 382(l)(5) of the Tax Code, if the
plan involves the retention or receipt of at least half of the stock of the reorganized debtor
by its shareholders and/or qualified creditors.

Accordingly, on the Commencement Date, in order to protect the value of their
NOL carryforwards and other tax attributes, the Debtors sought and obtained relief from
the Bankruptcy Court (i) to restrict the accumulation of Equity Interests above a specified
threshold and (ii) to monitor and potentially restrict the accumulation of unsecured Claims
above a specified threshold (subject to adjustment) and, under certain circumstances, upon
a further order of the Bankruptcy Court, require certain large holders of unsecured Claims
to sell all or a portion of any such Claims acquired during the Chapter 11 Cases (as

58

amended, the "**AMR Trading Order**").  A Final Order was entered by the Bankruptcy Court on January 27, 2012 (effective as of the Commencement Date), and amended on April 11, 2013.  The provisions of the AMR Trading Order with respect to Claims (the "**Claims Trading Procedures**") did not originally envision the Merger and, thus, did not contemplate that persons holding Claims also may receive New Common Stock as a result of being a stockholder of US Airways.  Although the original provisions had sufficient flexibility to accommodate the Merger, to rely on the original order without modification would have unduly restricted the amount of Claims that certain parties could accumulate or retain.  Thus, the Debtors sought and obtained an amended trading order in light of the Merger, as well as the potential distribution of New Common Stock to holders of Equity Interests.  The AMR Trading Order is attached as Exhibit "C" to the Plan, which is annexed hereto as **Exhibit "A**."

(b)    *Application of Claims Trading Procedures*

The following summarizes certain aspects of the Claims Trading Procedures, which are set forth in their entirety in the AMR Trading Order, attached as Exhibit "C" to the Plan, which is annexed hereto as **Exhibit "A**."  This summary is qualified in its entirety by reference to the AMR Trading Order, and any defined terms used in this section and not otherwise defined have the meaning set forth in the AMR Trading Order.  **YOU SHOULD READ THE AMR TRADING ORDER IN ITS ENTIRETY BEFORE DETERMINING WHETHER OR NOT THE CLAIMS TRADING PROCEDURES APPLY TO YOU.**

The Claims Trading Procedures establish a process pursuant to which holders of unsecured Claims in excess of a threshold amount are required to file one or more Notices of Substantial Claim Ownership, and, under certain circumstances, may be required to sell all or a portion of any unsecured Claims acquired during the Chapter 11 Cases.  The notification requirements of these procedures apply in the event the Debtors (or any other plan proponent) propose a 382(l)(5) Plan.  The Plan constitutes a 382(l)(5) Plan in that the Debtors have determined that they likely will benefit from the application of section 382(l)(5) of the Tax Code and reasonably anticipate utilizing such section.  For a discussion of the material U.S. federal income tax consequences of the Plan to the Debtors and the potential impact on the Debtors' tax attributes, *see* Section VI of this Disclosure Statement.

***Notice of Substantial Claim Ownership.***  In accordance with the Claims Trading Procedures, any person (or in certain cases, group of persons) that beneficially owns (within the meaning of the AMR Trading Order) a Large Amount (defined below) of unsecured Claims as of the Initial Determination Date must file a Notice of Substantial Claim Ownership on or before the Initial Reporting Deadline.  The Initial Determination Date and Initial Reporting Deadline are required to be set forth in the proposed disclosure statement with respect to the 382(l)(5) Plan.  **Accordingly, as disclosed above (*see* Section I.B. of this Disclosure Statement), all holders of a Large Amount of unsecured Claims as of May 24, 2013 (the Initial Determination Date) must file a Notice of**

**Substantial Claim Ownership no later than May 31, 2013 (the Initial Reporting Deadline).**

In addition, any person (or in certain cases, group of persons) that beneficially owns a Large Amount of unsecured Claims as of the Final Determination Date must file a Notice of Substantial Claim Ownership on or before the Final Reporting Deadline.  As required by the Claims Trading Procedures, the Final Determination Date and the Final Reporting Deadline will be set forth in the disclosure statement approved by the Bankruptcy Court.

In addition to disclosing certain Claim and stock ownership information, any persons required to file a Notice of Substantial Claim Ownership must indicate they agree to refrain from acquiring beneficial ownership of additional Owned Interests (*i.e.*, AMR Equity Interests and US Airways Common Stock), and options to acquire the same, until after the Effective Date, and to dispose of any Owned Interests acquired since February 22, 2013.  If a holder does not so agree, the amount of unsecured Claims that such holder may be required to sell under certain circumstances may be greater than would otherwise be the case.

*All holders of a substantial amount of unsecured Claims are urged to consult their tax advisors in connection with (i) determining whether they beneficially own a Large Amount of unsecured Claims and (ii) completing the Notice of Substantial Claim Ownership (the form of which is an exhibit to the AMR Trading Order).*

A person (or if applicable, group of persons) beneficially owns (directly or indirectly) a Large Amount of unsecured Claims if such person (or group) beneficially owns:  (i) more than $190 million of unsecured Claims <u>or</u> (ii) a lower amount of unsecured Claims which (based on the information set forth below), when taken together with any US Airways Common Stock or Equity Interests beneficially owned by such person(s), would result in such person(s) holding a 4.5% stock ownership in New AAG (*i.e.*, the "Applicable Percentage of Post-Emergence AMR," as defined below).  *See* paragraph (b)(ii)(1) of the Claims Trading Procedures (which describes which holders must file a Notice of Substantial Claim Ownership).

For purposes of determining whether a person (or group of persons) is required to file a Notice of Substantial Claim Ownership (if not otherwise required to do so by reason of beneficially owning more that $190 million of unsecured Claims), such person (or group of persons) must determine whether it beneficially owns a Large Amount of unsecured Claims as of the Initial Determination Date on the basis of the following:

- AMR Equity Interests and US Airways Common Stock shall constitute "Owned Interests".

- The "Applicable Percentage of Post-Emergence AMR" is a 4.5% stock ownership in New AAG, determined based on:

60

> ➢ Each $58.5 million of General Unsecured Claims (excluding postpetition interest) as equal to a one-percent interest in the equity of New AAG.

> ➢ Each 4.3 million shares of US Airways Common Stock as equal to a one-percent interest in the equity of New AAG (with any US Airways convertible debt or options taken into account based on the number of shares of US Airways Common Stock into which they may be converted or for which they may be exercised).

> ➢ Each 5.5 million shares of AMR Common Stock as equal to a one-percent interest in the equity of New AAG (with any AMR options taken into account based on the number of shares of AMR Common Stock for which they may be exercised).

These numbers may be updated for purposes of the Final Determination Date.

For purposes of the Claims Trading Procedures, a "Claim" means any unsecured claim under which any of the Debtors is the obligor, which for this purpose shall include (i) the unsecured portion of any tax-exempt bonds and (ii) all ETCs, PTCs, and EETCs to the extent of their interest in any unsecured claims against the Debtors (other than certain leveraged lease structures). In the case of a secured claim, that portion of the claim (including such portion attributable to accrued and unpaid interest) that exceeds the current fair market value of the security shall be considered an unsecured Claim.

*Please note that a holder of a Large Amount of unsecured Claims may or may not be a "Substantial Claimholder" for purposes of determining whether such holder may, under certain circumstances, be required to sell down all or any portion of an unsecured claim acquired during the Chapter 11 Cases. The standard for having to file a Notice of Substantial Claim Ownership is different than the definition of a Substantial Claimholder.*

***Sell-Down Procedures.*** Following the Final Determination Date, if the Debtors determine that Substantial Claimholders (as defined in the AMR Trading Order) must sell or transfer all or a portion of their beneficial ownership of unsecured Claims in order to reasonably ensure that the requirements of section 382(l)(5) of the Tax Code will be satisfied, the Debtors may request, after notice to the Creditors' Committee and the relevant Substantial Claimholder(s) and a hearing, that the Bankruptcy Court enter an order approving the issuance of a notice (each, a "**Sell-Down Notice**") that such Substantial Claimholder must sell, cause to sell, or otherwise transfer a specified amount of its beneficial ownership of Claims (by class or other applicable breakdown) equal to the excess of (x) the amount of unsecured Claims beneficially owned by such Substantial Claimholder over (y) the Maximum Amount for such Substantial Claimholder (such excess amount, an "**Excess Amount**"). The motion will be heard on expedited notice such that the Bankruptcy Court can render a decision at or before the hearing on confirmation of the 382(l)(5) Plan. If the Bankruptcy Court approves the Debtors' issuance of a Sell-Down

61

Notice, the Debtors will provide the Sell-Down Notice to the relevant Substantial Claimholder.

No Substantial Claimholder will be required to sell, cause to sell, or otherwise transfer any beneficial ownership of unsecured Claims if such sale or transfer would result in the Substantial Claimholder having beneficial ownership of an aggregate amount of unsecured Claims (by class or other applicable breakdown) that is less than such Substantial Claimholder's Protected Amount.

Each Sell-Down Notice will direct the Substantial Claimholder to sell, cause to sell, or otherwise transfer its beneficial ownership of the amount of unsecured Claims specified in the Sell-Down Notice to permitted transferees (the "**Sell-Down**"); *provided, however*, that such Substantial Claimholder shall not have a reasonable basis to believe that any such permitted transferee would own, immediately after the contemplated transfer, an Excess Amount of unsecured Claims; and *provided, further*, that a Substantial Claimholder that has properly notified the transferee of the existence of the AMR Trading Order and its equity forfeiture provisions in the event of a violation will not be treated as having such reasonable basis in the absence of notification or actual knowledge that such transferee would own, after the transfer, an Excess Amount of unsecured Claims.

Each Substantial Claimholder subject to the Sell-Down must, as a condition to receiving any stock of New AAG (or options to acquire stock), serve upon the Debtors, its attorneys, and the attorneys for the Creditors' Committee, a notice (in the form prescribed) that such Substantial Claimholder has complied with the terms and conditions of the Sell-Down and that such Substantial Claimholder does not and will not hold an Excess Amount of Claims as of the Sell-Down Date and at all times through the effective date of the 382(l)(5) Plan.  Any Substantial Claimholder who fails to comply with this provision will not receive any New Mandatorily Convertible Preferred Stock and/or New Common Stock (or options to acquire such stock) with respect to any Excess Amount of its unsecured Claims.  The date by which the Sell-Down must occur, and the described notice must be served, is the later of (i) five (5) Business Days after the entry of an order approving the 382(l)(5) Plan and (ii) such other date specified in the Sell-Down Notice, as applicable, but before the effective date of the 382(l)(5) Plan.

## 7.    Reclamation Claims and 503(b)(9) Claims

During the initial stages of the Chapter 11 Cases, the Debtors received demands from 115 parties (the "**Reclamation Claimants**") asserting the right, pursuant to section 546(c) of the Bankruptcy Code, to reclaim an aggregate of approximately $79 million in goods purportedly delivered to the Debtors prior to the Commencement Date (the "**Reclamation Claims**").  The Debtors believed that only 89 of such Reclamation Claims are valid.

In an effort to avoid costly litigation regarding the Reclamation Claims, the Debtors formulated procedures (the "**Reclamation Procedures**") whereby the Reclamation

Claimants could substantiate, and the Debtors could assess, the validity of such Reclamation Claims. On December 14, 2011, the Bankruptcy Court entered an order approving the Reclamation Procedures, which, among other things, required (i) the Reclamation Claimants to file a written demand asserting their Reclamation Claims in accordance with the procedures and time periods prescribed in section 546(c) of the Bankruptcy Code and (ii) the Debtors to file a notice with the Bankruptcy Court stating the amounts of the timely filed Reclamation Claims that the Debtors determined to be valid. The Reclamation Procedures permitted the Reclamation Claimants to object to the amounts set forth in the notice. Absent an objection, the Reclamation Claims identified in the notice are deemed Allowed in the amounts set forth therein. The Debtors are also authorized to settle any outstanding Reclamation Claims after notice and expiration of an objection period. To date, Reclamation Claims have been Allowed in the aggregate amount of approximately $36.6 million.

In addition to the Reclamation Claims, over 400 parties (the "**503(b)(9) Claimants**") have filed 661 Claims (the "**503(b)(9) Claims**") asserting that the value of any goods sold to the Debtors in the ordinary course of the Debtors' business and received by the Debtors within 20 days prior to the Commencement Date should be allowed as an administrative expense pursuant to section 503(b)(9) of the Bankruptcy Code. The filed 503(b)(9) Claims total over $1 billion.

In order to avoid piecemeal litigation regarding the 503(b)(9) Claims, the Debtors formulated procedures (the "**503(b)(9) Procedures**") whereby the 503(b)(9) Claimants could substantiate their Claims. On December 14, 2011, the Bankruptcy Court entered an order approving the 503(b)(9) Procedures, which set February 13, 2012 as the deadline for the 503(b)(9) Claimants to file their proofs of Claim and granted the Debtors a 75-day period to object to such Claims. In accordance with the 503(b)(9) Procedures, the Debtors filed five omnibus objections seeking to allow, reclassify, and/or disallow certain 503(b)(9) Claims. On September 21, 2012 and March 18, 2013, the Bankruptcy Court entered orders allowing, disallowing, and/or reclassifying approximately 350 those 503(b)(9) Claims, respectively. To date, 503(b)(9) Claims have been Allowed in the aggregate amount of approximately $23 million.

### 8.   Claims Process

On May 4, 2012, the Bankruptcy Court entered an order (the "**Bar Date Order**"), which, among other things, (i) established July 16, 2012 (the "**Bar Date**") as the deadline for certain persons and entities to file proofs of Claim in the Chapter 11 Cases and (ii) approved the form and manner of the Bar Date notice. The Debtors provided notice of the Bar Date as required by the Bar Date Order. To date, approximately 13,500 proofs of Claim have been filed against the Debtors in the aggregate amount of approximately $290 billion. Of those proofs of Claim, approximately 500, aggregating approximately $59 million, were filed after the Bar Date. The Debtors expect new and amended proofs of Claim to be filed in the future, including amended proofs of Claim originally filed with no designated value.

On March 28, 2012, the Bankruptcy Court entered an order authorizing the Debtors to settle certain Claims in accordance with the procedures (the "**Claim Settlement Procedures**") approved therein.  In accordance with the Claim Settlement Procedures, the Debtors are authorized to settle certain Claims for which the aggregate Allowed amount (the "**Settlement Amount**") is less than or equal to $1 million without prior approval of the Bankruptcy Court or any other party in interest.  In addition, with the consent of the Creditors' Committee, the Debtors are authorized to settle Claims for which the Settlement Amount is (a) between $1 million and $10 million or (b) within 10% of the non-contingent, liquidated amount listed on the Debtors' Schedules (so long as the difference in amount does not exceed $1 million and the Settlement Amount is $20 million or less).  The Debtors are also authorized to settle Claims where some or all of the consideration is being provided by a third party and/or where the Debtors are releasing ordinary course Claims against creditors or third parties related to the liquidation of the Claim.  Pursuant to the Claim Settlement Procedures, the Debtors have filed and served quarterly reports of all Claim settlements entered into during the prior quarter, unless such settlements were the subject of a separate motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

On September 21, 2012, the Bankruptcy Court entered an order authorizing the Debtors to object to Claims in accordance with the procedures (the "**Claim Objection Procedures**") approved therein.  In addition to the grounds set forth in Bankruptcy Rule 3007(d), the Claim Objection Procedures authorize the Debtors to file omnibus objections to Claims seeking reduction, reclassification, or disallowance of Claims based on the following grounds: (i) the amount claimed contradicts the Debtors' books and records; (ii) the Claims were incorrectly classified; (iii) the Claims seek recovery of amounts for which the Debtors are not liable; (iv) the Claims do not include sufficient documentation to ascertain the validity of the Claims; (v) the Claims have been waived or withdrawn pursuant to an agreement with the Debtors; and (vi) the Claims are objectionable under section 502(e)(1) of the Bankruptcy Code.

The Debtors continue to review, analyze, and reconcile the filed Claims.  The Debtors have identified many Claims they believe should be Disallowed because they are, among other things, duplicative, without merit, or overstated.  Pursuant to the Claim Objection Procedures, the Debtors have filed 47 omnibus objections to approximately 2,700 Claims.  As of February 27, 2013, the Bankruptcy Court has disallowed approximately $102 billion of Claims and has yet to rule on other objections to Claims, the disputed portions of which aggregate to an additional $16 billion.  Because the process of analyzing and objecting to Claims is ongoing, the amount of disallowed Claims may increase significantly in the future.

## 9.    Exclusivity

Section 1121(b) of the Bankruptcy Code provides for a period of 120 days after the commencement of a chapter 11 case during which time a debtor has the exclusive right to file a plan of reorganization (the "**Plan Period**").  In addition, section 1121(c)(3) of the

64

Bankruptcy Code provides that if the debtor files a plan within the Plan Period, it has a period of 180 days after commencement of the chapter 11 case to obtain acceptances of such plan (the "**Solicitation Period**" and together with the Plan Period, the "**Exclusivity Period**"). Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusivity Period.

The Debtors' Plan Period and Solicitation Period were initially set to expire on March 28, 2012 and May 29, 2012, respectively. During the pendency of the Chapter 11 Cases, the Bankruptcy Court granted six separate motions filed by the Debtors to extend the Plan Period and Solicitation Period pursuant to section 1121(d) of the Bankruptcy Code. By order dated March 27, 2013, the Bankruptcy Court granted the Debtors' latest request, filed on March 13, 2013, to extend the Plan Period and Solicitation Period through and including May 29, 2013 and July 29, 2013, respectively.

### 10.   Retiree Health and Welfare Benefits

As of the Commencement Date, the Debtors provided certain medical and life insurance benefits ("**retiree health and welfare benefits**") to five groups of retired employees: (1) retired non-union employees; (2) retired pilots; (3) retired ground employees who had been employed in a variety of different positions; (4) retired flight attendants; and (5) retired employees of Trans World Airlines ("**TWA Retirees**"). Although the specific benefits vary among retiree groups, the retiree health and welfare benefits in question all are provided under "welfare plans" as defined by section 3(1) of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("**ERISA**").

American provided employees with "pre-65" and "65 and over" medical coverage, funded in whole or in part by American, and with life insurance coverage, funded by American. AMR also provided "pre-65" and "65 and over" medical coverage to the TWA Retirees. Coverage for pre-65 TWA Retirees was funded with a combination of retiree and company contributions, while the 65 and over benefit was funded solely through retiree contributions. Life insurance for the TWA Retirees was paid for by American. Effective November 1, 2012, retiring employees have been, or will be, placed into a new retiree medical program. For those who retire before age 65, two medical options will be available; however, the Debtors will not subsidize any portion of the cost of such programs. Employees who retire at age 65 and over may purchase a guaranteed-issue Medicare supplement plan.

On July 6, 2012, the Debtors commenced an adversary proceeding (the "**Retiree Adversary Proceeding**") against the Retiree Committee seeking declaratory judgment that, among other things, the retiree health and welfare benefits are unvested benefits, which may be modified unilaterally by the Debtors. On August 15, 2012, the Debtors filed a motion in the Retiree Adversary Proceeding seeking a partial summary judgment as a matter of law that the retiree health and welfare benefits are unvested benefits because (i) the governing plan documents reserved the Debtors' rights to modify the benefits,

65

and/or (ii) such documents did not contain a promise of lifetime benefits. The Bankruptcy Court has not yet ruled on the motion. The Debtors intend to continue to prosecute the Retiree Adversary Proceeding. To the extent the Debtors are unsuccessful in whole or in part in obtaining the relief requested in the Retiree Adversary Proceeding, any remaining vested retiree health and welfare benefits will be treated in accordance with the provisions of section 1129(a)(13) of the Bankruptcy Code.

### 11.    GDS Litigation

On January 10, 2011, American filed a lawsuit in Tarrant County, Texas State Court (the "**Texas Action**") against Sabre Inc., Sabre Holdings Corp., and Sabre Travel International, Ltd. d/b/a Sabre Travel Network (together, "**Sabre**"), alleging, among other claims, that Sabre's actions of introducing bias against the display of American's services in its global distribution system ("**GDS**") and substantially increasing the rates that it would charge American for bookings made through the Sabre GDS breached its agreement with American. On July 8, 2011, American filed a new breach of contract and Texas antitrust claims in the Texas Action. On June 8, 2011 and October 7, 2011, Sabre filed counterclaims against American alleging that American has breached its agreement and violated antitrust laws. On October 30, 2012, Sabre and American settled their disputes. Under the terms of the settlement (the "**Sabre Settlement**"), (i) the parties renewed their current distribution agreement for multiple years, (ii) American agreed to negotiate with Sabre for additional technology services in the future, (iii) Sabre agreed to provide a monetary payment to American, and (iv) American may continue to pursue its direct connect initiative. The terms of the Sabre Settlement were approved by the Bankruptcy Court on December 5, 2012.

On April 12, 2011, American filed an antitrust lawsuit against Travelport Limited and Travelport, L.P. (together "**Travelport**") and Orbitz Worldwide LLC ("**Orbitz**") in Federal District Court for the Northern District of Texas (the "**Federal Action**"). On June 1, 2011, Sabre filed a request to intervene in the Federal Action, and American amended its lawsuit to add Sabre as a defendant on June 1, 2011. American's claims against Sabre in the Federal Action were ultimately resolved pursuant to the Sabre Settlement. In addition, American entered into a settlement agreement with each of Travelport and Orbitz in March 2013. Under the terms of the settlement with Travelport, (i) the parties amended their current distribution and content agreements and extended such agreements for multiple years, (ii) Travelport agreed to provide certain monetary payments to American, and (iii) the parties released claims against each other. Under the terms of the settlement with Orbitz, the parties released claims against each other. The settlement agreements with Travelport and Orbitz are subject to approval by the Bankruptcy Court, and hearings to consider the settlement agreements are expected in April 2013.

IV.    OVERVIEW OF THE PLAN OF REORGANIZATION

A.    General

This Section of the Disclosure Statement summarizes the Plan, which is set forth in its entirety as **Exhibit "A"** hereto.  This summary is qualified in its entirety by reference to the Plan.  **YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN**.

In general, a chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the consideration that each class is to receive under the plan and (iii) contains other provisions necessary to implement the plan.  Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and equity interests in more than one class.  Under section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (a) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in such class or (b) provides, among other things, for the cure of certain existing defaults and reinstatement of the maturity of claims in such class.  AMR Classes 3, 4, and 5, American Classes 4, 5, 6, and 7, and Eagle Classes 3 and 4 are impaired under the Plan, and holders of Claims or Equity Interests in such Classes are entitled to vote to accept or reject the Plan unless such Claims or Equity Interests are subject to an objection filed by the Debtors.  Ballots are being furnished herewith to all holders of Claims or Equity Interests in AMR Classes 3, 4, and 5, American Classes 4, 5, 6, and 7, and Eagle Classes 3 and 4 that are entitled to vote to facilitate their voting to accept or reject the Plan.

A chapter 11 plan may also specify that certain classes of claims or equity interests are to have their claims or equity interests remain unaltered by the plan.  Such classes are referred to as "unimpaired," and, because of the treatment accorded to such classes, they are conclusively deemed to have accepted the plan and, therefore, need not be solicited to vote to accept or reject the plan.  Holders of Claims and Equity Interests in AMR Classes 1, 2, and 6, American Classes 1, 2, 3, and 8, and Eagle Classes 1, 2, and 5 are not impaired and such Classes, therefore, are conclusively deemed to accept the Plan.  No Ballot is enclosed for holders of Claims or Equity Interests in such Classes.

The "Effective Date" of the Plan means the date on which the conditions precedent to the occurrence of the Effective Date of the Plan specified in Section 9.2 of the Plan have been satisfied and the Plan is implemented.

B.    Classification and Treatment of Claims and Equity Interests Under the Plan

Claims and Equity Interests are divided into 19 Classes under the Plan, and the proposed treatment of Claims and Equity Interests in each Class is described in the Plan and briefly summarized below.  Such classification takes into account the different nature

and priority of the Claims and Equity Interests.  The Plan consists of four Classes of Secured Claims (AMR Class 1, American Classes 1 and 2, and Eagle Class 1) that are unimpaired, three Classes of unimpaired Priority Non-Tax Claims (AMR Class 2, American Class 3, and Eagle Class 2), five Classes of impaired General Unsecured Claims (AMR Classes 3 and 4, American Classes 4 and 5, and Eagle Class 3), one Class of impaired Union Claims (American Class 6), two Classes of impaired Convenience Class Claims (American Class 7 and Eagle Class 4), one Class of impaired Equity Interests (AMR Class 5), and three Classes of unimpaired Equity Interests (AMR Class 6, American Class 8, and Eagle Class 5).

Unless otherwise indicated, the characteristics and estimated amount of the Claims or Equity Interests in the following Classes are based on the books and records of the Debtors.  Each subclass is treated as a separate Class for purposes of the Plan and the Bankruptcy Code.  However, the following discussion may refer to a group of subclasses as a single Class for ease of reference.

### 1.    The AMR Debtors

#### (a)    *AMR Secured Claims (AMR Class 1)*

(Estimated Amount of Allowed AMR Secured Claims is $0.)

This Class consists of Claims against an AMR Debtor that are (i) secured by Collateral, to the extent of the value of such Collateral (a) as set forth in the Plan, (b) as agreed to by the holder of such Claim and the Debtors, or (c) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code or (ii) secured by the amount of any valid rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

Except to the extent that a holder of an Allowed Secured Claim against any of the AMR Debtors agrees to a different treatment of such Claim, each holder of an Allowed Secured Claim against any of the AMR Debtors shall receive, at the option of the AMR Debtors, and in full satisfaction of such Claim, either (i) Cash in an amount equal to 100% of the unpaid amount of such Allowed Secured Claim, (ii) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Claim, net of the costs of disposition of such Collateral, (iii) the Collateral securing such Allowed Secured Claim, (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of such Allowed Secured Claim is entitled, or (v) such other distribution as is necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.

In the event a Secured Claim against any of the AMR Debtors is treated under clause (i) or (ii) of this Section, the liens securing such Allowed Secured Claim shall be deemed released immediately upon payment of the Cash or proceeds as provided in such clauses.  Any distributions made pursuant to this Section shall be made on, or as soon as reasonably practicable after, the first Distribution Date occurring after the latest of (a) the

Effective Date, (b) at least 20 calendar days after the date such Secured Claim becomes Allowed, and (c) the date for payment provided by any agreement between the applicable AMR Debtor(s) and the holder of such Secured Claim.

(b)    *AMR Priority Non-Tax Claims (AMR Class 2)*

(Estimated Amount of Allowed AMR Priority Non-Tax Claims is $0.)

The Claims in this Class are the types of Claims identified in section 507(a) of the Bankruptcy Code that are entitled to priority in payment (other than Administrative Expenses and Priority Tax Claims). Each holder of an Allowed Claim in AMR Class 2 that has not already been paid will receive, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim on, or as soon as reasonably practicable after, the later of (i) the Effective Date, (ii) the date such Priority Non-Tax Claim becomes Allowed, and (iii) the date for payment provided by any agreement between the applicable AMR Debtor(s) and the holder of such Allowed Priority Non-Tax Claim, except to the extent that New AAG and the holder of such Claim agrees to a different treatment.

(c)    *AMR General Unsecured Guaranteed Claims (AMR Class 3)*

(Estimated Amount of AMR General Unsecured Guaranteed Claims is approximately $967,129,000.)

Claims in this Class include any AMR General Unsecured Claim that is also an American General Unsecured Claim, as set forth on Schedule "1" to the Plan, because the General Unsecured Claim against AMR is guaranteed by American, excluding any such Claim for which a Single-Dip Treatment Election to have such Claim treated as an AMR Other General Unsecured Claim in AMR Class 4 has been made in accordance with the procedures set forth in Section 4.3(b) of the Plan. Each holder of an Allowed AMR General Unsecured Guaranteed Claim shall receive distributions under the Plan only on account of its General Unsecured Claim against AMR in AMR Class 3 (AMR General Unsecured Guaranteed Claims).

Each holder of an Allowed AMR General Unsecured Guaranteed Claim shall receive on the Initial Distribution Date (for AMR General Unsecured Guaranteed Claims that are Allowed as of the Effective Date) a number of shares of New Mandatorily Convertible Preferred Stock equal to the quotient of such Claim's pro rata share of the Double-Dip Full Recovery Amount divided by the per share Initial Stated Value. Each holder of an Allowed AMR General Unsecured Guaranteed Claim shall receive a distribution under the Plan only on account of its Allowed AMR General Unsecured Guaranteed Claim as set forth in Section 4.3 of the Plan and will not receive any distribution thereunder on account of such holder's Claim against American for American's guaranty of such AMR General Unsecured Guaranteed Claim.

69

At any time prior to the fifth Business Day before the Effective Date, a holder of an Allowed AMR General Unsecured Guaranteed Claim may irrevocably elect to have all or any portion of its Allowed AMR General Unsecured Guaranteed Claim treated as an Allowed AMR Other General Unsecured Claim in AMR Class 4. Such election shall be made on the form included in the Plan Supplement and, to be effective, must be actually received by the attorneys for the Debtors prior to such fifth Business Day. Any election not complying with the foregoing shall have no force or effect.

Distributions to holders of AMR Fixed Allowed Guaranteed Note Claims shall be made in accordance with Section 5.2 of the Plan. As provided in Section 5.15 thereof, any holder of an AMR Fixed Allowed Guaranteed Note Claim with respect to a Note that is a Convertible Note may irrevocably elect to have such Convertible Note treated as an Allowed AMR Equity Interest in AMR Class 5 (subject to the terms and provisions of the Revised Final Order Pursuant to 11 U.S.C. §§ 105(a) and 362 Establishing Notification Procedures for Substantial Claimholders and Equity Security Holders and Approving Restrictions on Certain Transfers of Interests in the Debtors' Estates, entered by the Bankruptcy Court on April 11, 2013 (ECF No. 7591)) in an amount that corresponds to the number of shares of AMR Common Stock that would have been issued to such holder if such Convertible Note had been converted into shares of AMR Common Stock as of the Effective Date pursuant to the definitive documentation for such Convertible Note.

(d)    *AMR Other General Unsecured Claims (AMR Class 4)*

(Estimated Amount of Allowed AMR Other General Unsecured Claims is approximately $700,000.)

The Claims in AMR Class 4 consist of AMR General Unsecured Claims that are not AMR General Unsecured Guaranteed Claims. AMR Class 4 does not include Secured Claims, Priority Non-Tax Claims, AMR General Unsecured Guaranteed Claims (unless the holders of such Claims elected to have such AMR General Unsecured Guaranteed Claims be treated as an AMR Other General Unsecured Claims), or Convenience Class Claims.

Each holder of an Allowed AMR Other General Unsecured Claim as of the Effective Date shall receive (i) on or as soon as reasonably practicable after, the Initial Distribution Date, its Initial Pro Rata Share of (A) a number of shares of New Mandatorily Convertible Preferred Stock equal to the quotient of (x) the Total Initial Stated Value, less the Double-Dip Full Recovery Amount, divided by (y) the per share Initial Stated Value and (ii) as soon as reasonably practicable after the Final Mandatory Conversion Date, its Initial Pro Rata Share of a number of shares of New Common Stock equal to (I) the Creditor New Common Stock Allocation, less (II) the number of shares of New Common Stock issued upon conversion of all of the shares of New Mandatorily Convertible Preferred Stock, less (III) the Labor Common Stock Allocation. In connection with each Interim True-Up Distribution, each holder of an Allowed AMR Other General Unsecured Claim shall receive its Interim Pro Rata Share of the distribution allocated to Allowed Single-Dip General Unsecured Claims pursuant to Section 7.4(a) of the Plan. In

connection with the Final True-Up Distribution, each holder of an Allowed AMR Other
General Unsecured Claim shall receive its Final Pro Rata Share of the distribution
allocated to Allowed Single-Dip General Unsecured Claims pursuant to Section 7.4(b) of
the Plan.  The right of a holder of an Allowed AMR Other General Unsecured Claim to
receive any distribution on a Final Mandatory Conversion Date, an Interim Distribution
Date, or a Final Distribution Date shall not be Transferable; *provided, however*, that this
sentence shall not apply to any shares of New Mandatorily Convertible Preferred Stock or
the right to receive shares of New Common Stock pursuant to the conversion thereof.

(e)    *AMR Equity Interests (AMR Class 5)*

The Equity Interests in AMR Class 5 are comprised of (i) the interest of any holder
of an equity security of AMR, including any issued and outstanding shares of common or
preferred stock or other present ownership interest in AMR, whether or not transferable, or
any option, warrant, or right, contractual or otherwise, to acquire any such interest
(including any right to receive any such shares issued or issuable under any plans for the
benefit of employees or directors of any of the Debtors in effect on the Commencement
Date), but excluding any such shares that are held as treasury stock and any debt obligation
relating to a Note that has not been converted into an AMR Equity Interest prior to or as of
the Effective Date, and (ii) any Claim or Cause of Action against AMR (a) arising from
rescission of a purchase or sale of shares of AMR Common Stock, (b) for damages arising
from the purchase or sale of any such shares, (c) for violation of the securities laws,
misrepresentations of any similar Claims related to the foregoing, or otherwise subject to
subordination under section 510(b) of the Bankruptcy Code, (d) for reimbursement,
contribution, or indemnification allowed under section 502 of the Bankruptcy Code on
account of any such Claim, including Claims based upon allegations that the Debtors made
false and misleading statements or engaged in other deceptive acts in connection with the
offer or sale of securities, or (e) for attorneys' fees, other charges, or costs incurred on
account of any of the foregoing Claims or Causes of Action.

Each holder of an Allowed AMR Equity Interest shall receive its pro rata share
(i) on the Effective Date, or as soon as thereafter as reasonably practicable, of the Initial
Old Equity Allocation and (ii) on each Mandatory Conversion Date, or as soon thereafter
as reasonably practicable, of the Market-Based Old Equity Allocation.  In connection with
each Interim True-Up Distribution, each holder of an Allowed AMR Equity Interest shall
receive its pro rata share of the Market-Based Old Equity Allocation pursuant to Section
7.4(a) of the Plan.  In connection with the Final True-Up Distribution, each holder of an
Allowed AMR Equity Interest shall receive its pro rata share of the Market-Based Old
Equity Allocation pursuant to Section 7.4(b) of the Plan.  The right of a holder of an
Allowed AMR Equity Interest to receive any distribution on a Mandatory Conversion
Date, an Interim Distribution Date, or a Final Distribution Date shall not be Transferable.

71

(f)    *AMR Other Equity Interests (AMR Class 6)*

The Equity Interests in AMR Class 6 are comprised of those interests of any holder of an equity security of any of the AMR Debtors other than AMR, including any issued and outstanding shares of common or preferred stock or other present ownership interest in any of the AMR Debtors other than AMR, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest, but excluding any such shares that are held as treasury stock.

Subject to the Roll-Up Transactions, the AMR Other Equity Interests shall not be cancelled, but shall be reinstated for the benefit of the respective Reorganized Debtor that is the holder thereof.

## 2.    The American Debtors

(a)    *American Secured Aircraft Claims (American Class 1)*

(Estimated Amount of Allowed American Secured Aircraft Claims is approximately $6,775,557,000.)

This Class consists of any Claims that are secured by a security interest in, or lien on, any Aircraft Equipment (to the extent such Aircraft Equipment has not been abandoned by the American Debtors without agreeing to re-lease or repurchase such Aircraft Equipment) in which an American Debtors' estate has an interest to the extent of the value of the holder of such Claim's interest in the American Debtors' estate's interest in such Aircraft Equipment.

Except to the extent that a holder of an Allowed Secured Aircraft Claim against any of the American Debtors agrees to a different treatment of such Claim (including, without limitation, pursuant to a Postpetition Aircraft Agreement), each holder of an Allowed Secured Aircraft Claim against any of the American Debtors shall receive, at the option of the American Debtors, and in full satisfaction of such Claim, either (i) Cash in an amount equal to 100% of the unpaid amount of such Allowed Secured Aircraft Claim, (ii) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Aircraft Claim, net of the costs of disposition of such Collateral, (iii) the Collateral securing such Allowed Secured Aircraft Claim, (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of such Allowed Secured Aircraft Claim is entitled, or (v) such other distribution as is necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.

In the event a Secured Aircraft Claim against any of the American Debtors is treated under clause (i) or (ii) of this Section, the liens securing such Secured Aircraft Claim shall be deemed released immediately upon payment of the Cash or proceeds as provided in such clauses.  Any distributions made pursuant to this Section shall be made on, or as soon as reasonably practicable after, the first Distribution Date occurring after the

later of (a) the Effective Date, (b) at least 20 calendar days after the date such Secured Aircraft Claim becomes Allowed and (c) the date for payment provided by any agreement between the applicable American Debtor(s) and the holder of such Secured Aircraft Claim.

(b) *American Other Secured Claims (American Class 2)*

(Estimated Amount of Allowed American Other Secured Claims is approximately $3,470,852,000.)

This Class consists of Secured Claims against an American Debtor, other than Secured Aircraft Claims.  Except to the extent that a holder of an Allowed Other Secured Claim against any of the American Debtors agrees to a different treatment of such Claim, each holder of an Allowed Other Secured Claim against any of the American Debtors shall receive, at the option of the American Debtors, and in full satisfaction of such Claim, either (i) Cash in an amount equal to 100% of the unpaid amount of such Allowed Other Secured Claim, (ii) the proceeds of the sale or disposition of the Collateral securing such Allowed Other Secured Claim, net of the costs of disposition of such Collateral, (iii) the Collateral securing such Allowed Other Secured Claim, (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of such Allowed Other Secured Claim is entitled, or (v) such other distribution as is necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.

In the event an Other Secured Claim against any of the American Debtors is treated under clause (i) or (ii) of this Section, the liens securing such Other Secured Claim shall be deemed released immediately upon payment of the Cash or proceeds as provided in such clauses.  Any distributions made pursuant to this Section shall be made on, or as soon as reasonably practicable after, the first Distribution Date occurring after the later of (a) the Effective Date, (b) at least 20 calendar days after the date such Other Secured Claim becomes Allowed, and (c) the date for payment provided by any agreement between the applicable American Debtor(s) and the holder of such Other Secured Claim.

(c) *American Priority Non-Tax Claims (American Class 3)*

(Estimated Amount of Allowed American Non-Tax Priority Claims is approximately $356,700,000.)

The Claims in this Class are the types of Claims identified in section 507(a) of the Bankruptcy Code that are entitled to priority in payment (other than Administrative Expenses and Priority Tax Claims).  Each holder of an Allowed Claim in American Class 3 that has not already been paid will receive, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim on, or as soon as reasonably practicable after, the later of (i) the Effective Date, (ii) the date such Priority Non-Tax Claim becomes Allowed, and (iii) the date for payment provided by any agreement between the applicable American Debtor(s) and the holder of such Priority Non-Tax

73

Claim, except to the extent that New AAG and the holder of such Claim agrees to a different treatment.

        (d)   *American General Unsecured Guaranteed Claims (American Class 4)*

        (Estimated Amount of Allowed American General Unsecured Guaranteed Claims is approximately $1,970,383,000.)

        Claims in this Class include any American General Unsecured Claim that is also an AMR General Unsecured Claim, as set forth on Schedule "2" to the Plan, because the General Unsecured Claim against American is guaranteed by AMR, excluding any such Claim for which a Single-Dip Treatment Election to have such Claim treated as an American Other General Unsecured Claim in American Class 5 has been made in accordance with the procedures set forth in Section 4.10(b) of the Plan.  Each holder of an Allowed American General Unsecured Guaranteed Claim shall receive distributions under the Plan only on account of its General Unsecured Claim against American in American Class 4 (American General Unsecured Guaranteed Claims).

        Each holder of an Allowed American General Unsecured Guaranteed Claim shall receive on the Initial Distribution Date (for American General Unsecured Guaranteed Claims that are Allowed as of the Effective Date), a number of shares of New Mandatorily Convertible Preferred Stock equal to the quotient of such Claim's pro rata share of the Double-Dip Full Recovery Amount divided by the per share Initial Stated Value.  Each holder of an Allowed American General Unsecured Guaranteed Claim shall receive a distribution under the Plan only on account of its Allowed American General Unsecured Guaranteed Claim as set forth in Section 4.10 of the Plan and will not receive any distribution on account of such holder's Claim against AMR for AMR's guaranty of such American General Unsecured Guaranteed Claim.

        At any time prior to the fifth Business Day before the Effective Date, a holder of an Allowed American General Unsecured Guaranteed Claim may irrevocably elect to have all or any portion of its Allowed American General Unsecured Guaranteed Claim treated as an Allowed American Other General Unsecured Claim in American Class 5.  Such election shall be made on the form included in the Plan Supplement and, to be effective, must be actually received by the attorneys for the Debtors prior to such fifth Business Day.  Any election not complying with the foregoing shall have no force or effect.

        The American Note Claims that are Double-Dip General Unsecured Claims shall be Allowed as American General Unsecured Guaranteed Claims in the respective amounts listed next to each Indenture set forth on Schedule "2" to the Plan (the "**American Fixed Allowed Guaranteed Note Claims**").  The American Fixed Allowed Guaranteed Note Claims shall override and supersede any individual Claims filed by Registered Holders or beneficial owners of debt securities with respect to the American Note Claims.

74

Distributions to holders of American Fixed Allowed Guaranteed Note Claims shall be made in accordance with Section 5.2 of the Plan.

The Unsecured Special Facility Revenue Bond Claims that are Double-Dip General Unsecured Claims against the American Debtors shall be Allowed as American General Unsecured Guaranteed Claims in the respective amounts listed next to each Special Facility Revenue Bond Agreement set forth on Schedule "2" to the Plan (the "**American Fixed Allowed Guaranteed Unsecured Special Facility Revenue Bond Claims**").  The American Fixed Allowed Guaranteed Unsecured Special Facility Revenue Bond Claims shall override and supersede any individual Claims filed by Registered Holders or beneficial owners of debt securities with respect to the Unsecured Special Facility Revenue Bond Claims against the American Debtors.  Distributions to holders of Unsecured Special Facility Revenue Bond Claims against the American Debtors shall be made in accordance with Section 5.2 of the Plan.

Each holder of a Triple-Dip General Unsecured Claim shall receive distributions under the Plan only on account of its Allowed Double-Dip General Unsecured Claim.

(e)    *American Other General Unsecured Claims (American Class 5)*

(Estimated Amount of Allowed American Other General Unsecured Claims is approximately $2,598,946,000.)

The Claims in American Class 5 consist of American General Unsecured Claims that are not American General Unsecured Guaranteed Claims.  American Class 5 does not include Secured Claims, Priority Non-Tax Claims, American Union Claims, American Retiree Claims, American General Unsecured Guaranteed Claims (unless the holders of such Claims elected to have such American General Unsecured Guaranteed Claims be treated as an American Other General Unsecured Claims), or Convenience Class Claims.

Each holder of an Allowed American Other General Unsecured Claim as of the Effective Date shall receive (i) on or as soon as reasonably practicable after, the Initial Distribution Date, its Initial Pro Rata Share of a number of shares of New Mandatorily Convertible Preferred Stock equal to the quotient of (x) the Total Initial Stated Value, less the Double-Dip Full Recovery Amount, divided by (y) the per share Initial Stated Value, and (ii) as soon as reasonably practicable after the Final Mandatory Conversion Date its Initial Pro Rata Share of a number of shares of New Common Stock equal to (I) the Creditor New Common Stock Allocation, less (II) the number of shares of New Common Stock issued upon conversion of all of the shares of New Mandatorily Convertible Preferred Stock, less (III) the Labor Common Stock Allocation.  In connection with each Interim True-Up Distribution, each holder of an Allowed American Other General Unsecured Claim shall receive its Interim Pro Rata Share of the distribution allocated to Allowed Single-Dip General Unsecured Claims pursuant to Section 7.4(a) of the Plan.  In connection with the Final True-Up Distribution, each holder of an Allowed American Other General Unsecured Claim shall receive its Final Pro Rata Share of the distribution

75

allocated to Allowed Single-Dip General Unsecured Claims pursuant to Section 7.4(b) of the Plan. The right of a holder of an Allowed American Other General Unsecured Claim to receive any distribution on a Mandatory Conversion Date, an Interim Distribution Date, or a Final Distribution Date shall not be Transferable; *provided, however*, that this sentence shall not apply to any shares of New Mandatorily Convertible Preferred Stock or the right to receive shares of New Common Stock pursuant to the conversion thereof.

The American Note Claims that are Single-Dip General Unsecured Claims shall be Allowed as American Other General Unsecured Claims in American Class 5 in the respective amounts listed next to each Indenture set forth on Schedule "3" to the Plan (the "**American Fixed Allowed Other Note Claims**"). The American Fixed Allowed Other Note Claims shall override and supersede any individual Claims filed by Registered Holders or beneficial owners of debt securities with respect to the American Note Claims. Distributions to holders of American Fixed Allowed Other Note Claims shall be made in accordance with Section 5.2 of the Plan.

The Unsecured Special Facility Revenue Bond Claims that are Single-Dip General Unsecured Claims against the American Debtors shall be Allowed as American Other General Unsecured Claims in American Class 5 in the respective amounts listed next to each Special Facility Revenue Bond Agreement set forth on Schedule "3" to the Plan (the "**American Fixed Allowed Unsecured Special Facility Revenue Bond Claims**"). The American Fixed Allowed Unsecured Special Facility Revenue Bond Claims shall override and supersede any individual Claims filed by Registered Holders or beneficial owners of debt securities with respect to the Unsecured Special Facility Revenue Bond Claims against the American Debtors. Distributions to holders of Unsecured Special Facility Revenue Bond Claims against the American Debtors shall be made in accordance with Section 5.2 of the Plan.

The DFW 1.5x Unsecured Special Facility Revenue Bond Claims against the American Debtors shall be Allowed as American Other General Unsecured Claims in American Class 5 in the respective amounts listed next to each DFW 1.5x Special Facility Revenue Bond Agreement set forth on Schedule "3" to the Plan (the "**American Fixed Allowed DFW 1.5x Unsecured Special Facility Revenue Bond Claims**"). The American Fixed Allowed DFW 1.5x Unsecured Special Facility Revenue Bond Claims shall override and supersede any individual Claims filed by Registered Holders or beneficial owners of debt securities with respect to the DFW 1.5x Unsecured Special Facility Revenue Bond Claims against the American Debtors. Distributions to holders of DFW 1.5x Unsecured Special Facility Revenue Bond Claims against the American Debtors shall be made in accordance with Section 5.2 of the Plan; *provided, however*, under no circumstances shall the holders thereof receive more (in New Common Stock value based on the formulas provided in the Plan) than a single satisfaction.

The treatment provided under the Plan to holders of Allowed DFW 1.5x Unsecured Special Facility Revenue Bond Claims is the result of a compromise and settlement (the "**DFW 1.5x Settlement**"). The DFW 1.5x Settlement provides that each holder of an

Allowed DFW 1.5x Unsecured Special Facility Revenue Bond Claim shall be treated under the Plan as having (i) an Allowed American Other General Unsecured Claim in an amount equal to the par amount of such Claim plus all nondefault rate interest accrued through the Effective Date and (ii) an Allowed American Other General Unsecured Claim on account of the guarantee by American of such Claim in an amount equal 50% of the par amount of such Claim plus all nondefault rate interest accrued through the Effective Date; *provided, however*, that (A) the amount Allowed on account of the guarantee by American shall not increase the aggregate distributions to holders of Allowed Single-Dip General Unsecured Claims under the Plan or the amount of the Single-Dip Full Recovery Amount, and (B) the distributions to holders of Allowed DFW 1.5x Unsecured Special Facility Revenue Bond Claims shall be not more than a single satisfaction.

(f)    *American Union Claims (American Class 6)*

**APA Claim**.  The APA shall receive, in full satisfaction of the APA Claim, shares of New Common Stock constituting 13.5% of the Creditor New Common Stock Allocation in accordance with the APA Section 1113 Agreement as follows:  On the Initial Distribution Date, or as soon thereafter as reasonably practicable, the APA shall receive its pro rata share of the Initial Labor Common Stock Allocation.  On each Mandatory Conversion Date, or as soon thereafter as reasonably practicable, the APA shall receive its pro rata share of the applicable Incremental Labor Common Stock Allocation.  In connection with each Interim True-Up Distribution, the APA shall receive its pro rata share of the distribution made on account of the American Labor Allocation pursuant to Section 7.4(a) of the Plan.  In connection with the Final True-Up Distribution, the APA shall receive its pro rata share of the distribution made on account of the American Labor Allocation pursuant to Section 7.4(b) of the Plan.  The right of the APA to receive any distribution on a Mandatory Conversion Date, an Interim Distribution Date, or a Final Distribution Date shall not be Transferable.

**APFA Claim**.  The APFA shall receive, in full satisfaction of the APFA Claim, shares of New Common Stock constituting 3% of the Creditor New Common Stock Allocation in accordance with the APFA Section 1113 Agreement as follows:  On the Initial Distribution Date, or as soon thereafter as reasonably practicable, the APFA shall receive its pro rata share of the Initial Labor Common Stock Allocation.  On each Mandatory Conversion Date, or as soon thereafter as reasonably practicable, the APFA shall receive its pro rata share of the applicable Incremental Labor Common Stock Allocation.  In connection with each Interim True-Up Distribution, the APFA shall receive its pro rata share of the distribution made on account of the American Labor Allocation pursuant to Section 7.4(a) of the Plan.  In connection with the Final True-Up Distribution, the APFA shall receive its pro rata share of the distribution made on account of the American Labor Allocation pursuant to Section 7.4(b) of the Plan.  The right of the APFA to receive any distribution on a Mandatory Conversion Date, an Interim Distribution Date, or a Final Distribution Date shall not be Transferable.

**TWU American Claim**.  The TWU shall receive, in full satisfaction of the TWU American Claim, shares of New Common Stock constituting 4.8% of the Creditor New Common Stock Allocation in accordance with the TWU American Section 1113 Agreement as follows:  On the Initial Distribution Date, or as soon thereafter as reasonably practicable, the TWU shall receive its pro rata share of the Initial Labor Common Stock Allocation.  On each Mandatory Conversion Date, or as soon thereafter as reasonably practicable, the TWU shall receive its pro rata share of the applicable Incremental Labor Common Stock Allocation.  In connection with each Interim True-Up Distribution, the TWU shall receive its pro rata share of the distribution made on account of the American Labor Allocation pursuant to Section 7.4(a) of the Plan.  In connection with the Final True-Up Distribution, the TWU shall receive its pro rata share of the distribution made on account of the American Labor Allocation pursuant to Section 7.4(b) of the Plan.  The right of the TWU to receive any distribution on a Mandatory Conversion Date, an Interim Distribution Date, or a Final Distribution Date shall not be Transferable.

(g)  *American Convenience Class Claims (American Class 7)*

(Estimated Amount of Allowed American Convenience Class Claims is approximately $7,500,000.)

This Class consists of Claims, other than Note Claims, Special Facility Revenue Bond Claims, Union Claims, and Retiree Claims, against any of the American Debtors that would otherwise be a General Unsecured Claim and that is (i) greater than $0 and less than or equal to $10,000 in Allowed amount or (ii) irrevocably reduced to $10,000 at the election of the holder of the Claim evidenced on the Ballot submitted by such holder; *provided, however*, that an American General Unsecured Claim may not be subdivided into multiple Claims of $10,000 or less for purposes of receiving treatment as an American Convenience Class Claim.

Except to the extent that a holder of an Allowed Convenience Class Claim against any of the American Debtors agrees to a different treatment of such Claim, each holder of an Allowed Convenience Class Claim against any of the American Debtors shall receive on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date (for Claims that are Allowed as of the Effective Date) and (ii) the Distribution Date that is at least 20 calendar days after such Convenience Class Claim becomes an Allowed Convenience Class Claim, Cash in the amount of 100% of the amount of its Allowed American Convenience Class Claim as of the Commencement Date; *provided, however*, that if the aggregate amount of Allowed American Convenience Class Claims in American Class 7 and Allowed Eagle Convenience Class Claims in Eagle Class 4 exceed $25, the percentage Cash distribution to each holder of an Allowed American Convenience Class Claim shall be reduced so that the aggregate amount of Cash distributable with respect to all Allowed American Convenience Class Claims and Allowed Eagle Convenience Class Claims does not exceed $25 million.

78

(h)    *American Equity Interests (American Class 8)*

The Equity Interests in American Class 9 are comprised of those interests of any holder of an equity security of any of the American Debtors, or any direct or indirect subsidiaries of the American Debtors, including any issued and outstanding shares of common or preferred stock or other present ownership interest in any of the American Debtors, or any direct or indirect subsidiaries of the American Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest, but excluding any such shares that are held as treasury stock.

Subject to the Roll-Up Transactions, the American Equity Interests shall not be cancelled, but shall be reinstated for the benefit of the respective Reorganized Debtor that is the holder thereof.

**3.    The Eagle Debtors**

(a)    *Eagle Secured Claims (Eagle Class 1)*

(Estimated Amount of Allowed Eagle Secured Claims is $0.0.)

This Class consists of Claims against an Eagle Debtor that are (i) secured by Collateral, to the extent of the value of such Collateral (a) as set forth in the Plan, (b) as agreed to by the holder of such Claim and the Debtors, or (c) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code or (ii) secured by the amount of any valid rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

Each holder of an Allowed Secured Claim against any of the Eagle Debtors shall receive, at the option of the Eagle Debtors, and in full satisfaction of such Claim, either (i) Cash in an amount equal to 100% of the unpaid amount of such Allowed Secured Claim, (ii) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Claim, net of the costs of disposition of such Collateral, (iii) the Collateral securing such Allowed Secured Claim, (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of such Allowed Secured Claim is entitled, or (v) such other distribution as is necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.

In the event a Secured Claim against any of the Eagle Debtors is treated under clause (i) or (ii) of this Section, the liens securing such Secured Claim shall be deemed released immediately upon payment of the Cash or proceeds as provided in such clauses. Any distributions made pursuant to this Section shall be made on, or as soon as reasonably practicable after, the first Distribution Date occurring after the later of (a) the Effective Date, (b) at least 20 calendar days after the date such Secured Claim becomes Allowed, and (c) the date for payment provided by any agreement between the applicable Eagle Debtor(s) and the holder of such Secured Claim.

(b)    *Eagle Priority Non-Tax Claims (Eagle Class 2)*

(Estimated Amount of Allowed Eagle Non-Tax Priority Claims is $0.0.)

The Claims in this Class are the types of Claims identified in section 507(a) of the Bankruptcy Code that are entitled to priority in payment (other than Administrative Expenses and Priority Tax Claims).  Allowed Claims in Eagle Class 2 that have not already been paid will receive, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim on, or as soon as reasonably practicable after, the later of (i) the Effective Date, (ii) the date such Priority Non-Tax Claim becomes Allowed, and (iii) the date for payment provided by any agreement between the applicable Eagle Debtor(s) and the holder of such Priority Non-Tax Claim, except to the extent that New AAG and the holder of such Claim agrees to a different treatment.

(c)    *Eagle General Unsecured Claims (Eagle Class 3)*

(Estimated Amount of Allowed Eagle General Unsecured Claims is approximately $20,200,000.)

The Claims in Eagle Class 3 include any Claim against any of the Eagle Debtors that is (i) not an Administrative Expense, Priority Tax Claim, Secured Claim, Priority Non-Tax Claim, or Eagle Union Claim, or (ii) otherwise determined by the Bankruptcy Court to be an Eagle General Unsecured Claim.

Each holder of an Allowed Eagle General Unsecured Claim as of the Effective Date shall receive (i) on or as soon as reasonably practicable after, the Initial Distribution Date, its Initial Pro Rata Share of a number of shares of New Mandatorily Convertible Preferred Stock equal to the quotient of (x) the Total Initial Stated Value, less the Double-Dip Full Recovery Amount, divided by (y) the per share Initial Stated Value, and (ii) as soon as reasonably practicable after the Final Mandatory Conversion Date, its Initial Pro Rata Share of a number of shares of New Common Stock equal to (I) the Creditor New Common Stock Allocation, less (II) the number of shares of New Common Stock issued upon conversion of all of the shares of New Mandatorily Convertible Preferred Stock, less (III) the Labor Common Stock Allocation.  In connection with each Interim True-Up Distribution, each holder of an Allowed Eagle General Unsecured Claim shall receive its Interim Pro Rata Share of the distribution allocated to Allowed Single-Dip General Unsecured Claims pursuant to Section 7.4(a) of the Plan.  In connection with the Final True-Up Distribution, each holder of an Allowed Eagle General Unsecured Claim shall receive its Final Pro Rata Share of the distribution allocated to Allowed Single-Dip General Unsecured Claims pursuant to Section 7.4(b) of the Plan.  The right of a holder of an Allowed Eagle General Unsecured Claim to receive any distribution on a Mandatory Conversion Date, an Interim Distribution Date, or a Final Distribution Date shall not be Transferable; *provided, however*, that this sentence shall not apply to any shares of New Mandatorily Convertible Preferred Stock or the right to receive shares of New Common Stock pursuant to the conversion thereof.

(d)    *Eagle Convenience Class Claims (Eagle Class 4)*

(Estimated Amount of Allowed American Convenience Class Claims is $2,500,000.)

This Class consists of Claims, other than Note Claims, Special Facility Revenue Bond Claims, Union Claims, and Retiree Claims, against any of the Eagle Debtors that would otherwise be a General Unsecured Claim and that is (i) greater than $0 and less than or equal to $10,000 in Allowed amount or (ii) irrevocably reduced to $10,000 at the election of the holder of the Claim evidenced on the Ballot submitted by such holder; provided, however, that an Eagle General Unsecured Claim may not be subdivided into multiple Claims of $10,000 or less for purposes of receiving treatment as an Eagle Convenience Class Claim.

Each holder of an Allowed Convenience Class Claim against any of the Eagle Debtors shall receive on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date (for Claims that are Allowed as of the Effective Date) and (ii) the Distribution Date that is at least 20 calendar days after such Convenience Class Claim becomes an Allowed Convenience Class Claim, Cash in the amount of 100% of the amount of its Allowed Eagle Convenience Class Claim as of the Commencement Date; *provided, however*, that if the aggregate amount of Allowed American Convenience Claims in American Class 7 and Allowed Eagle Convenience Class Claims in Eagle Class 4 exceed $25 million, the percentage Cash distribution to each holder of an Allowed Eagle Convenience Class Claim shall be reduced so that the aggregate amount of Cash distributable with respect to all Allowed American Convenience Class Claims and Allowed Eagle Convenience Class Claims does not exceed $25 million.

(e)    *Eagle Equity Interests (Eagle Class 5)*

The Equity Interests in Eagle Class 5 are comprised of those interests of any holder of an equity security of any of the Eagle Debtors, or any direct or indirect subsidiaries of the Eagle Debtors, including any issued and outstanding shares of common or preferred stock or other present ownership interest in any of the Eagle Debtors, or any direct or indirect subsidiaries of the Eagle Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest.

Subject to the Roll-Up Transactions, the Eagle Equity Interests shall not be cancelled, but shall be reinstated for the benefit of the respective Reorganized Debtor that is the holder thereof.

## C.    Reservation of "Cram Down" Rights

The Bankruptcy Code permits the Bankruptcy Court to confirm a chapter 11 plan over the dissent of any class of claims or equity interests as long as the standards in section 1129(b) are met. This power to confirm a plan over dissenting classes – often referred to

as "cram down" – is an important part of the reorganization process.  It assures that no single group (or multiple groups) of claims or interests can block a restructuring that otherwise meets the requirements of the Bankruptcy Code and is in the interests of the other constituents in the case.

The Debtors reserve the right to seek confirmation of the Plan notwithstanding the rejection of the Plan by any Class entitled to vote.  In the event a Class votes to reject the Plan, the Debtors will request the Bankruptcy Court to rule that the Plan meets the requirements specified in section 1129(b) of the Bankruptcy Code with respect to such Class.

### D.    Administrative Expenses and Priority Tax Claims

In order to confirm the Plan, Allowed Administrative Expenses must be paid in full or in a manner otherwise agreeable to the holders of such Claims.  Administrative Expenses are the actual and necessary costs and expenses of the Chapter 11 Cases.  Those expenses include, but are not limited to, compensation for individuals working on behalf of the Debtors, postpetition rent, amounts owed to vendors providing goods and services during the Chapter 11 Cases, tax obligations incurred after the Commencement Date, 503(b)(9) Claims, management costs, and certain statutory fees and expenses.  Other Administrative Expenses include the actual, reasonable, necessary, and unpaid fees and expenses of the professionals retained by the Debtors, the Creditors' Committee, and the Retiree Committee.

Additionally, the Plan provides that, except as may be otherwise provided in a Final Order of the Bankruptcy Court previously entered in the Chapter 11 Cases, the reasonable prepetition and postpetition fees and expenses of each of the Indenture Trustees, to the extent payable by any of the Debtors pursuant to the terms of the applicable Bond Documents (which includes the reasonable fees and expenses of any counsel and/or other professionals retained by the Indenture Trustees in connection with such duties) shall be deemed Allowed Administrative Expenses and shall be paid in Cash on the Effective Date, or as soon thereafter as reasonably practicable, upon submission of documented invoices (in customary form) to the Debtors and the Creditors' Committee, subject to a review for reasonableness by the Debtors and the Creditors' Committee, without the necessity of making application to the Bankruptcy Court.  The Indenture Trustees shall provide the Debtors and the Creditors' Committee with an estimate of such fees and expenses no later than 30 days prior to the Confirmation Hearing.  Notwithstanding the foregoing, under no circumstances shall any such fees and expenses (including counsel and/or other professionals) include fees and expenses associated with Avoidance Actions.  Subject to Section 6.14 of the Plan, each Indenture Trustee's charging lien, if any, shall be discharged solely upon payment in full of the respective fees and expenses of the Indenture Trustees and termination of the respective Indenture Trustee's duties.  Nothing in the Plan shall be deemed to impair, waive, or discharge the Indenture Trustees' respective charging liens, if any, for any fees and expenses not paid by the Debtors or the Reorganized Debtors, as

applicable.  In addition, upon submission of documented invoices (in customary form) to New AAG and without the necessity of making application to the Bankruptcy Court, New AAG shall pay the reasonable fees and expenses of the Indenture Trustees in connection with making distributions under the Plan.  Any fees and expenses owing under the Support and Settlement Agreement shall be deemed Allowed Administrative Expenses and shall be paid in Cash on the Effective Date or as otherwise provided in the Support and Settlement Agreement to the extent provided in any order of the Bankruptcy Court.

The Debtors estimate that the aggregate amount of Allowed Administrative Expenses as of the Effective Date will be approximately $290,400,000 million.  Consistent with the requirements of the Bankruptcy Code, the Plan generally provides for Allowed Administrative Expenses to be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable, *however*, Allowed Administrative Expenses against any of the Debtors representing liabilities incurred in the ordinary course by the Debtors, as debtors in possession, or liabilities arising under loans or advances to or other obligations incurred by any of the Debtors, as debtors in possession, whether or not incurred in the ordinary course, shall be paid by New AAG in the ordinary course, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.  Administrative Expenses relating to compensation of the professionals retained by the Debtors, the Creditors' Committee, and the Retiree Committee, or for the reimbursement of expenses for certain members of the Creditors' Committee and certain members of the Retiree Committee, will, unless otherwise agreed by the claimant, be paid following entry of an order allowing such Administrative Expenses.

Except to the extent that New AAG and a holder of an Allowed Priority Tax Claim against any of the Debtors agree to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Debtors, (i) Cash in an amount equal to such Allowed Priority Tax Claim on the Effective Date, or as soon thereafter as reasonably practicable, as to any Allowed Priority Tax Claim or (ii) in Cash, in equal semi-annual installments commencing on the first Business Day following the Effective Date (or if later, the first Distribution Date after such Claim becomes an Allowed Priority Tax Claim) and continuing over a period not exceeding five years from and after the Commencement Date, together with interest accrued thereon at the applicable nonbankruptcy rate as of the Confirmation Date, subject to the sole option of the Reorganized Debtors to prepay the entire amount of the Allowed Priority Tax Claim.  All Allowed Priority Tax Claims against any of the Debtors that are not due and payable on or before the Effective Date shall be paid in the ordinary course as such obligations become due.

### E.    Provisions Governing Distributions Under the Plan

#### 1.    Distribution Record Date

Except with respect to any publicly-traded securities as to which distributions shall be treated as set forth in Section 5.13 of the Plan, (i) as of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests, as maintained by the Debtors or their agents, shall be deemed closed, (ii) there shall be no further changes in the record holders of any of such Claims or Equity Interests, and the Debtors shall have no obligation to recognize any transfer of such Claims or Equity Interests occurring on or after the Distribution Record Date, and (iii) the Debtors shall be entitled to recognize and deal for all purposes under the Plan only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

#### 2.    Disbursing Agent

The Disbursing Agent shall make all distributions required under the Plan, except with respect to a holder of a Claim whose distribution is governed by an agreement and is administered by an Indenture Trustee or Servicer, which distributions shall be deposited by the Disbursing Agent with the appropriate Indenture Trustee or Servicer for distribution to holders of Claims in accordance with the provisions of the Plan and the terms of the governing agreement (except with respect to distributions on Claims where the Servicer, the Debtors, and the holder of a Claim may have agreed otherwise).  Distributions on account of such Claims shall be deemed complete upon delivery to the appropriate Indenture Trustee or Servicer; *provided, however*, that if any such Indenture Trustee or Servicer is unable to make such distributions, the Disbursing Agent, with the cooperation of such Indenture Trustee or Servicer shall make such distributions to the extent reasonably practicable.  With respect to holders of the American Union Claims in American Class 6, the Disbursing Agent shall make the distributions required under the Plan to the APA, the APFA, and the TWU, as applicable, and distributions on account of such American Union Claims shall be deemed complete upon delivery to the APA, the APFA, and the TWU, as applicable.

The Debtors shall be authorized, without further Bankruptcy Court approval, to reimburse any Servicer for its reasonable and customary servicing fees and expenses incurred in providing postpetition services directly related to distributions under the Plan. Such reimbursements shall be made on terms agreed to with the Debtors and shall not be deducted from distributions to be made under the Plan to holders of Allowed Claims receiving distributions from such Servicer.

#### 3.    Timing of Distributions

Subject to any reserves or holdbacks established under the Plan, on the appropriate Distribution Date, or as soon thereafter as is practicable, holders of Allowed Claims and

84

Allowed Equity Interests shall receive the distributions provided for in the Plan. Distributions on account of General Unsecured Claims that are Allowed as of the Effective Date shall be made on the Initial Distribution Date, or, other than with respect to distributions of Plan Shares, as soon thereafter as reasonably practicable (and shall receive the additional true-up distributions provided for in Section 7.4 of the Plan at the times provided for therein). Distributions on account of any Disputed Claim as of the Effective Date that subsequently becomes Allowed shall be made on the next Distribution Date that is at least 20 calendar days after the date such Claim becomes Allowed, or as soon thereafter as is reasonably practicable; *provided, however*, that distributions on account of Administrative Expenses and Priority Tax Claims shall be made as set forth in Article II of the Plan. Upon making distributions under the Plan, in no event shall any of the Debtors, the Reorganized Debtors, or the Disbursing Agent be liable for the subsequent acts of third parties regarding such distributions. Notwithstanding compliance by the Debtors or the Reorganized Debtors, as applicable, with their obligations under the Plan, there can be no assurance that an active trading market for the New Common Stock will develop or as to the prices at which the New Common Stock will trade.

### 4.    Delivery of Distributions and Undeliverable Distributions

All distributions to any holder of an Allowed Claim shall be made by the Disbursing Agent at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents or in a letter of transmittal, unless the Debtors have been notified in writing of a change of address, including, without limitation, by the filing of a proof of Claim by such holder that contains an address for such holder different from the address reflected on the Schedules for such holder. In the event that any distribution to any holder is returned as undeliverable, no further distributions to such holder shall be made unless and until such distributions are claimed, at which time all missed distributions shall be made to such holder, without interest. The Disbursing Agent shall make reasonable efforts to locate holders of undeliverable distributions and, if located, assist such holders in complying with Section 5.5 of the Plan. All demands for undeliverable distributions must be made on or before the later to occur of (i) the first anniversary of the Effective Date or (ii) six months after such holder's Claim becomes an Allowed Claim. Thereafter, the amount represented by such undeliverable distribution shall be contributed by the Disbursing Agent to one or more charitable organizations exempt from U.S. federal income tax under section 501(c)(3) of the Tax Code to be selected by, and unrelated to, the Disbursing Agent (provided that the recipient charitable organization is not, and would not become by reason of the contribution, a "Substantial Stockholder" within the meaning of the New AAG Certificate of Incorporation), and any Claim in respect of such undeliverable distribution shall be discharged and forever barred from assertion against the Debtors, the Reorganized Debtors, and their respective property, notwithstanding any federal or state escheat laws to the contrary.

If any shares of New Mandatorily Convertible Preferred Stock or New Common Stock are to be issued in a name other than that in which the holder of an Allowed Claim is identified in the immediately preceding subparagraph, it shall be a condition of such issuance that the Person requesting such name shall pay any transfer or other taxes required by reason of the issuance of shares of New Mandatorily Convertible Preferred Stock or New Common Stock in a name other than that in which such holder is identified in the Plan or shall establish to the satisfaction of New AAG or the Disbursing Agent, as applicable, that such taxes have either been paid or are not applicable.

Any distribution on account of Allowed Claims made to any of the Indenture Trustees or Servicers in accordance with the Plan shall be (i) deemed a distribution to the respective registered holders thereunder, (ii) subject to the applicable Indenture Trustee's or Servicer's right to assert its charging lien against such distributions, and (iii) in accordance with Section 5.10 of the Plan. Each Indenture Trustee and Servicer shall make such distributions, as soon as reasonably practicable after receipt thereof and pursuant to the terms of the applicable Indenture or other governing agreement, in accordance with Section 5.2 of the Plan to the registered holders as of the date of surrender of the debt securities pursuant to Section 5.13 of the Plan.

All distributions to any holder of an Allowed AMR Equity Interest shall be made by the Disbursing Agent to the transfer agent for AMR Common Stock, who shall be responsible for making the appropriate distributions to the registered holders as of the Distribution Record Date.

### 5. Withholding and Reporting Requirements

(a) *Withholding Rights*

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax. Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the foregoing, each holder of an Allowed Claim or Equity Interest or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution. Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    *Forms*

Any party entitled to receive any property as an issuance or distribution under the Plan shall be required to deliver to the Disbursing Agent (or such other Person designated by the Debtors, which Person shall subsequently deliver to the Disbursing Agent any applicable Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8, unless such Person is exempt under the Tax Code and so notifies the Disbursing Agent.  If the holder has not otherwise made a demand for an undeliverable distribution as set forth in Section 5.4 of the Plan and fails to comply with such a request within six months, such distribution shall be deemed an undeliverable distribution.

## 6.    Cash Payments

At the option of the Debtors, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

## 7.    Distributions on Behalf of Subsidiaries

The Disbursing Agent shall make distributions under the Plan on behalf of the applicable Reorganized Debtor.  Where the applicable Reorganized Debtor is a subsidiary of New AAG, New AAG shall make a direct or indirect capital contribution (through the chain of relevant entities) to the applicable Reorganized Debtor of an amount of Plan Shares or Cash to be distributed to holders of Allowed Claims against such Debtor or to be placed in the Disputed Claims Reserve on account of Disputed Claims against such Debtor, but only at such time as the amounts are actually distributed to holders of Allowed Claims or placed into the Disputed Claims Reserve; *provided, however*, that the preceding portion of this sentence shall not apply to any shares of New Common Stock into which the New Mandatorily Convertible Preferred Stock actually converts, which New Common Stock shall be issued and distributed directly by or on behalf of New AAG.  Any distributions of Plan Shares or Cash that revert to New AAG or are otherwise cancelled shall revest solely in New AAG, and no other Reorganized Debtor shall have any ownership interest in the amounts distributed.

## 8.    Allocation of Plan Distribution Between Principal and Interest

Except as otherwise required by law (as reasonably determined by the Debtors), distributions with respect to an Allowed General Unsecured Clam shall be allocated first to the principal portion of such Allowed Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

### 9.    Time Bar to Cash Payments

Checks issued by the Debtors in respect of Allowed Claims shall be null and void if not negotiated within 180 days after the date of issuance thereof.  Requests for re-issuance of any check shall be made to the Debtors by the holder of the Allowed Claim to whom such check originally was issued.  Any Claim in respect of such a voided check shall be made on or before 30 days after the expiration of the 180-day period following the date of issuance of such check.  Thereafter, the amount represented by such voided check shall irrevocably revert to New AAG, and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

### 10.    Minimum Distributions and Fractional Shares

No payment of Cash in an amount less than $25 shall be made to any holder of an Allowed Claim, and no fractional shares of New Mandatorily Convertible Preferred Stock or New Common Stock shall be distributed; *provided, however,* that (i) any fractional shares of New Mandatorily Convertible Preferred Stock shall be rounded down to the next whole number or zero, as applicable and (ii) any fractional shares of New Common Stock shall be rounded up or down to the next whole number or zero, as applicable (with one-half being closer to the next lower whole number for this purpose).  No consideration shall be provided in lieu of fractional shares that are rounded down.

In the event any New Common Stock remains in the Disputed Claims Reserve after the Final Distribution Date and the Disbursing Agent determines that the distribution thereof to holders of Allowed Claims and Allowed AMR Equity Interests is not justified (i) based on the cost of distribution or (ii) because it would contravene Section 5.10(a) of the Plan, the Disbursing Agent shall contribute such New Common Stock to one or more charitable organizations exempt from U.S. federal income tax under section 501(c)(3) of the Tax Code to be selected by, and unrelated to, the Disbursing Agent (provided that the recipient charitable organization is not, and would not become by reason of the contribution, a "Substantial Stockholder" within the meaning of the New AAG Certificate of Incorporation).

### 11.    Setoff and Recoupment

The Debtors and the Reorganized Debtors, as applicable, may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature that the Debtors may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable nonbankruptcy law; *provided, however,* that neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver, abandonment, or release by the Debtors or the Reorganized Debtors, as applicable, of any such claims, rights, and Causes of Action that the Debtors or the Reorganized Debtors, as applicable, may have against the holder of such Claim.

### 12.   Transactions on Business Days

If the Effective Date or any other date on which a transaction may occur under the Plan shall occur on a day that is not a Business Day, the transactions contemplated by the Plan to occur on such day shall instead occur on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 13.   Surrender of Existing Publicly-Traded Debt Securities

On the Effective Date, or as soon thereafter as reasonably practicable, each Registered Holder of debt securities with respect to the Note Claims or the Unsecured Special Facility Revenue Bond Claims, as applicable, shall surrender its debt securities to the applicable Indenture Trustee or, in the event such debt securities are held in the name, or by a nominee, of The Depository Trust Company or other securities depository (each, a "**Depository**"), the Debtors shall seek the cooperation of the Depository to provide appropriate instructions to the applicable Indenture Trustee. No distributions under the Plan shall be made for or on behalf of such Registered Holder unless and until (i) such debt securities are received by the applicable Indenture Trustee or appropriate instructions from the Depository are received by the applicable Indenture Trustee or (ii) the loss, theft, or destruction of such debt securities is established to the reasonable satisfaction of the applicable Indenture Trustee, which satisfaction may require such Registered Holder to submit (a) a lost instrument affidavit and (b) an indemnity bond holding the Debtors, the Reorganized Debtors, and the applicable Indenture Trustee harmless in respect of such debt securities and distributions made with respect thereto. Upon compliance with Section 5.13 of the Plan by a Registered Holder of the debt securities, for all purposes under the Plan, such Registered Holder shall be deemed to have surrendered such debt securities. Any Registered Holder that fails to surrender such debt securities or satisfactorily explain the loss, theft, or destruction of such debt securities to the applicable Indenture Trustee within one year of the Effective Date shall be deemed to have no further Claim against the Debtors, the Reorganized Debtors, or the applicable Indenture Trustee in respect of such Claim and shall not participate in any distribution under the Plan. All property in respect of such forfeited distributions, including interest thereon, shall be promptly returned to the Debtors or the Reorganized Debtors, as applicable, by the applicable Indenture Trustee (notwithstanding any federal or state escheat laws to the contrary), and any such debt securities shall be cancelled.

### 14.   Class Proofs of Claim

If a class proof of claim is Allowed, it shall be treated as a single Claim for purposes of Article V of the Plan.

### 15.   Conversion of Convertible Notes

Subject to the Revised Final Order Pursuant to 11 U.S.C. §§ 105(a) and 362 Establishing Notification Procedures for Substantial Claimholders and Equity Security

Holders and Approving Restrictions on Certain Transfers of Interests in the Debtors' Estates, entered by the Bankruptcy Court on April 11, 2013 (ECF No. 7591), any holder of a Convertible Note Claim may, at any time prior to the fifth (5th) Business Day before the Effective Date, irrevocably elect to have all or any portion of a Convertible Note be treated as an Allowed AMR Equity Interest in AMR Class 5 in an amount that corresponds to the number of shares of AMR Common Stock that would have been issued to such holder if such Convertible Note (or portion thereof) had been converted into shares of AMR Common Stock pursuant to the definitive documentation for such Convertible Note, with such number of shares determined as if such conversion became effective as of the Effective Date.  Such election shall be made on the form included in the Plan Supplement (a "**Conversion Election Notice**") and, to be effective, must be actually received by the attorneys for the Debtors prior to such fifth (5th) Business Day.  Any election not complying with the foregoing shall have no force or effect.  In connection with any election of Convertible Notes (i) with respect to the AMR 6.25% Convertible Senior Notes due 2014, in determining the number of shares of AMR Common Stock that would have been issued upon the conversion of such Convertible Notes, the provisions of Section 8.15 of the Supplemental Indenture, dated as of September 28, 2009, related to such Convertible Notes shall be applied and the conversion ratio applicable to such conversion shall be adjusted pursuant to Section 8.15 of such Supplemental Indenture and, for purposes of computing such adjustment, the Effective Date shall be the "Make Whole Change of Control Effective Date" for purposes of such Supplemental Indenture; and (ii) the amount of Convertible Notes deemed converted shall be equal to the Convertible Note Claim with respect to such Convertible Note.  Upon the effectiveness of any such election, the Convertible Note Claim related to such Convertible Note shall (subject to the following proviso) automatically cease to be an Allowed Claim for any purpose hereunder; *provided, however*, that in the event that the Plan is withdrawn by the Debtors, all Conversion Election Notices shall thereupon automatically be deemed to have been withdrawn and of no force or effect whatsoever, and none of the Convertible Notes with respect to which any such elections were made shall be treated as AMR Equity Interests in AMR Class 5 or as having been converted into shares of AMR Common Stock.

### F.    Means for Implementation and Execution of the Plan

#### 1.    Continued Corporate Existence

Subject to the Merger and the terms of the Merger Agreement, each Debtor shall, as a Reorganized Debtor, continue to exist after the Effective Date as a separate corporate Entity, with all the powers of a corporation, partnership, or limited liability company, as applicable, under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under applicable state law.  Immediately following the Merger Effective Time, the New AAG Certificate of Incorporation shall be amended to change the name of AMR to American Airlines Group Inc.

## 2. Merger

Subject to and in connection with the occurrence of the Effective Date, AMR and US Airways shall take all such actions as may be necessary or appropriate to effect the Merger on the terms and subject to the conditions set forth in the Merger Agreement. Without limiting the generality of the immediately preceding sentence, upon the satisfaction or waiver of each of the conditions set forth in Section 9.2 of the Plan and the applicable conditions of the Merger Agreement, on the Effective Date AMR and US Airways shall cause the Certificate of Merger to be filed with the Secretary of State of the State of Delaware in accordance with the Delaware General Corporation Law and take or cause to be taken all other actions, including making appropriate filings or recordings, that may be required by the Delaware General Corporation Law or other applicable law in connection with the Merger.

New AAG shall issue the New Common Stock in accordance with the Merger Agreement to be distributed under the Plan, and the other transactions contemplated by the Merger Agreement shall occur.

In the event of any conflict whatsoever between the terms of the Plan and the Merger Agreement, the terms of the Merger Agreement shall control, and the Plan shall be deemed to incorporate in their entirety the terms, provisions, and conditions of the Merger Agreement.

## 3. The 9019 Settlement

The distributions provided for under the Plan with respect to Double-Dip General Unsecured Claims, Single-Dip General Unsecured Claims, the DFW 1.5x Unsecured Special Facility Revenue Bond Claim, and AMR Equity Interests incorporate and reflect a compromise and settlement (the "**9019 Settlement**") of (i) certain intercreditor issues relating to the rights and benefits of holders of Double-Dip General Unsecured Claims, Single-Dip General Unsecured Claims, Triple-Dip General Unsecured Claims, and the DFW 1.5x Special Facility Revenue Bond Claim, (ii) the validity, enforceability, and priority of certain prepetition intercompany claims by and among AMR, American, and Eagle, (iii) Claims that creditors have with respect to the marshaling of assets and liabilities of AMR, American, or Eagle Holding in determining relative entitlements to distributions under a plan, and (iv) the rights of holders of AMR Equity Interests to a distribution under a plan.

The Plan shall constitute a motion to approve the 9019 Settlement. Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of the 9019 Settlement pursuant to Bankruptcy Rule 9019 and a finding by the Bankruptcy Court that the 9019 Settlement is in the best interest of the Debtors and their estates. If the Effective Date does not occur, the 9019 Settlement shall be deemed to have been withdrawn without prejudice to the respective positions of the parties.

### 4.    Distributions to Non-Union Employees

The Non-Union Employees shall receive shares of New Common Stock constituting 2.3% of the Creditor New Common Stock Allocation and which shall be distributed by New AAG as follows:  On the Initial Distribution Date, or as soon thereafter as reasonably practicable, New AAG shall distribute the Non-Union Employees' pro rata share of the Initial Labor Common Stock Allocation to participating Non-Union Employees in per employee amounts as determined by the Debtors prior to the Effective Date.  On each Mandatory Conversion Date, or as soon thereafter as reasonably practicable, New AAG shall distribute the Non-Union Employees' pro rata share of the applicable Incremental Labor Common Stock Allocation to participating Non-Union Employees in per employee amounts as determined by the Debtors prior to the Effective Date.  In connection with each Interim True-Up Distribution, New AAG shall distribute to participating Non-Union Employees the Non-Union Employees' pro rata share of the distribution made on account of the American Labor Allocation pursuant to Section 7.4(a) of the Plan in per employee amounts as determined by the Debtors prior to the Effective Date.  In connection with the Final True-Up Distribution, New AAG shall distribute to participating Non-Union Employees the Non-Union Employees' pro rata share of the distribution made on account of the American Labor Allocation pursuant to Section 7.4(b) of the Plan in per employee amounts as determined by the Debtors prior to the Effective Date.  The right of the Non-Union Employees to receive any distribution on a Mandatory Conversion Date, an Interim Distribution Date, or a Final Distribution Date shall not be Transferable.  Any Non-Union Employee who is eligible to receive an Alignment Award or an award under the Chairman Letter Agreement shall not receive any distribution of New Common Stock pursuant to Section 6.4 of the Plan.

### 5.    Substantive Consolidation

#### (a)    *Order Granting Plan Consolidation*

The Plan serves as a motion seeking, and entry of the Confirmation Order shall constitute, the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the AMR Plan Consolidation, the American Plan Consolidation, and the Eagle Plan Consolidation.

#### (b)    *AMR Plan Consolidation*

Solely for voting, confirmation, and distribution purposes under the Plan, and subject to the following sentence, (i) all assets and all liabilities of the AMR Debtors shall be treated as though they were merged, (ii) all guarantees of any AMR Debtor of the payment, performance, or collection of obligations of another AMR Debtor shall be eliminated and cancelled, (iii) any obligation of any AMR Debtor and all guarantees thereof executed by one or more of the other AMR Debtors shall be treated as a single obligation, and such guarantees shall be deemed a single Claim against the consolidated AMR Debtors, (iv) all joint obligations of two or more AMR Debtors and all multiple

Claims against such Entities on account of such joint obligations shall be treated and allowed as a single Claim against the consolidated AMR Debtors, (v) all Claims between the AMR Debtors shall be deemed cancelled, and (vi) each Claim filed in the Chapter 11 Case of any AMR Debtor shall be deemed filed against the consolidated AMR Debtors and a single obligation of the consolidated AMR Debtors.  The substantive consolidation and deemed merger effected pursuant to Section 6.4(b) of the Plan shall not affect (other than for purposes related to funding distributions under the Plan and as set forth in Section 6.3(b) of the Plan) (i) the legal and organizational structure of the AMR Debtors, except as provided in the Merger Agreement, (ii) defenses to any Causes of Action or requirements for any third party to establish mutuality to assert a right of setoff, and (iii) distributions out of any insurance policies or proceeds of such policies.  Notwithstanding the foregoing, prepetition intercompany Claims between and among the AMR Debtors, the American Debtors, and the Eagle Debtors shall be dealt with in accordance with Section 6.15 of the Plan.

(c)    *American Plan Consolidation*

Solely for voting, confirmation, and distribution purposes under the Plan, and subject to the following sentence, (i) all assets and all liabilities of the American Debtors shall be treated as though they were merged, (ii) all guarantees of any American Debtor of the payment, performance, or collection of obligations of another American Debtor shall be eliminated and cancelled, (iii) any obligation of any American Debtor and all guarantees thereof executed by one or more of the other American Debtors shall be treated as a single obligation, and such guarantees shall be deemed a single Claim against the consolidated American Debtors, (iv) all joint obligations of two or more American Debtors and all multiple Claims against such Entities on account of such joint obligations shall be treated and allowed as a single Claim against the consolidated American Debtors, (v) all Claims between the American Debtors shall be deemed cancelled, and (vi) each Claim filed in the Chapter 11 Case of any American Debtor shall be deemed filed against the consolidated American Debtors and a single obligation of the consolidated American Debtors.  The substantive consolidation and deemed merger effected pursuant to Section 6.3(c) of the Plan shall not affect (other than for purposes related to funding distributions under the Plan and as set forth in Section 6.4(c) of the Plan) (i) the legal and organizational structure of the American Debtors, except as provided in the Merger Agreement, (ii) defenses to any Causes of Action or requirements for any third party to establish mutuality to assert a right of setoff, and (iii) distributions out of any insurance policies or proceeds of such policies. Notwithstanding the foregoing, prepetition intercompany Claims between and among the AMR Debtors, the American Debtors, and the Eagle Debtors shall be dealt with in accordance with Section 6.15 of the Plan.

(d)    *Eagle Plan Consolidation*

Solely for voting, confirmation, and distribution purposes under the Plan, and subject to the following sentence, (i) all assets and all liabilities of the Eagle Debtors shall be treated as though they were merged, (ii) all guarantees of any Eagle Debtor of the

93

payment, performance, or collection of obligations of another Eagle Debtor shall be eliminated and cancelled, (iii) any obligation of any Eagle Debtor and all guarantees thereof executed by one or more of the other Eagle Debtors shall be treated as a single obligation, and such guarantees shall be deemed a single Claim against the consolidated Eagle Debtors, (iv) all joint obligations of two or more Eagle Debtors and all multiple Claims against such Entities on account of such joint obligations shall be treated and allowed as a single Claim against the consolidated Eagle Debtors, (v) all Claims between the Eagle Debtors shall be deemed cancelled, and (vi) each Claim filed in the Chapter 11 Case of any Eagle Debtor shall be deemed filed against the consolidated Eagle Debtors and a single obligation of the consolidated Eagle Debtors.  The substantive consolidation and deemed merger effected pursuant to Section 6.4(d) of the Plan shall not affect (other than for purposes related to funding distributions under the Plan and as set forth in Section 6.3(d) of the Plan) (i) the legal and organizational structure of the Eagle Debtors, except as provided in the Merger Agreement, (ii) defenses to any Causes of Action or requirements for any third party to establish mutuality to assert a right of setoff, and (iii) distributions out of any insurance policies or proceeds of such policies.  Notwithstanding the foregoing, prepetition intercompany Claims between and among the AMR Debtors, the American Debtors, and the Eagle Debtors shall be dealt with in accordance with Section 6.15 of the Plan.

### 6.    Confirmation in the Event of Partial or No Plan Consolidation

In the event that the Bankruptcy Court orders partial, or does not order, AMR Plan Consolidation, American Plan Consolidation, or Eagle Plan Consolidation, the Debtors reserve the right to (i) proceed with no or partial Plan Consolidation, (ii) propose one or more Sub-Plans with respect to one or more Debtors, (iii) proceed with confirmation of one or more Sub-Plans to the exclusion of the other Sub-Plans, (iv) withdraw some or all of the Sub-Plans, or (v) withdraw the Plan.  Subject to the immediately preceding sentence, the Debtors' inability to confirm any Plan Consolidation or Sub-Plan, or the Debtors' election to withdraw any Plan Consolidation or Sub-Plan, shall not impair confirmation or consummation of any other Plan Consolidation or Sub-Plan.

In the event that the Bankruptcy Court does not order the AMR Plan Consolidation, the American Plan Consolidation, or the Eagle Plan Consolidation, (i) Claims against the applicable Debtors shall be treated as separate Claims with respect to the estates of such Debtors for all purposes, and such Claims shall be administered as provided in the applicable Sub-Plan and (ii) the Debtors shall not be required to re-solicit votes with respect to the Plan or any applicable Sub-Plan.

### 7.    Claims Against Multiple Consolidated Debtors

If one or more AMR Debtors and one or more American Debtors are obligated for a particular Claim (other than a Double-Dip General Unsecured Claim or a Double-Dip General Unsecured Claims as to which a Single-Dip Treatment Election has been made in accordance with the procedures set forth in Section 4.3(b) or 4.10(b) of the Plan), the

holder of such Claim shall be deemed to have one Claim against the AMR Debtors and one Claim against the American Debtors for purposes of confirmation and distribution.  If one or more AMR Debtors and one or more Eagle Debtors are obligated for a particular Claim, the holder of such Claim shall be deemed to have one Claim against the AMR Debtors and one Claim against the Eagle Debtors for purposes of confirmation and distribution.  If one or more American Debtors and one or more Eagle Debtors are obligated for a particular Claim, the holder of such Claim shall be deemed to have one Claim against the American Debtors and one Claim against the Eagle Debtors for purposes of confirmation and distribution.  If one or more AMR Debtors, American Debtors, and Eagle Debtors are obligated for a particular Claim (other than a Double-Dip General Unsecured Claim), the holder of such Claim shall be deemed to have one Claim against the AMR Debtors, one Claim against the American Debtors and one Claim against the Eagle Debtors for purposes of confirmation and distribution.  Notwithstanding the foregoing, if a holder of a Claim against (i) one or more AMR Debtors and one or more American Debtors, (ii) one or more AMR Debtors and one or more Eagle Debtors, (iii) one or more American Debtors and one or more Eagle Debtors, or (iv) one or more AMR Debtors, one or more American Debtors, and one or more Eagle Debtors by receiving more than one distribution, as set forth in Section 6.5 of the Plan, would receive distributions under the Plan with a value in excess of 100% of such Claim, including any postpetition interest or other amounts sue to such holder pursuant to any provision of the Plan, then the Debtors shall be authorized, without the need for any notice or further order of the Bankruptcy Court, to reduce the distributions under the Plan that would otherwise be made on account of such Claim pro rata based on the relative amounts of such distributions, such that the holder of such Claim shall not receive value in excess of 100% of such Claim.

### 8.    Issuance of Plan Shares

New AAG shall issue the Plan Shares, or have sufficient authorized shares available for issuance, as applicable, in accordance with the Plan and with the Merger Agreement.

### 9.    Nonconsensual Confirmation

In the event any impaired Class of Claims entitled to vote on the Plan does not accept the Plan by the requisite statutory majority under section 1126(c) of the Bankruptcy Code, then the Debtors reserve the right to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code.

### 10.    Issuance of Plan Shares; Execution of Related Documents

On the Effective Date, or as soon thereafter as reasonably practicable, except as otherwise provided in the Plan or in the Merger Agreement, the Reorganized Debtors shall issue all securities, instruments, certificates, and other documents that they are required to issue under the Plan or under any Postpetition Aircraft Agreement, which shall be distributed as provided in the Plan and any such Postpetition Aircraft Agreement;

*provided, however*, that New AAG shall be authorized to issue the New Mandatorily Convertible Preferred Stock and the New Common Stock in accordance with Sections 6.8 and 6.19 of the Plan, the Merger Agreement, and any such Postpetition Aircraft Agreement, as the case may be, without the need for any further corporate action by any Debtor or Reorganized Debtor or their stockholders. New AAG and the Reorganized Debtors, as applicable, shall execute and deliver such other agreements, documents, and instruments in accordance with the Plan, the Merger Agreement, and any such Postpetition Aircraft Agreement, as applicable.

## 11.    Section 1145 Exemption

The offer, issuance, and distribution of all of the shares of New Mandatorily Convertible Preferred Stock and the New Common Stock under the Plan to holders of Allowed Claims against and Allowed AMR Equity Interests in the Debtors, as applicable, and the issuance of all shares of New Common Stock issued pursuant to the conversion of the New Mandatorily Convertible Preferred Stock, and any securities issued or to be issued pursuant to or in connection with a Postpetition Aircraft Agreement, shall be exempt, pursuant to section 1145 of the Bankruptcy Code, from registration under (i) the Securities Act of 1933 (the "**Securities Act**"), as amended, and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer, issuance, or distribution of securities. The exemption from Securities Act registration provided by section 1145(a) of the Bankruptcy Code (as well as any equivalent securities law provisions under state law) also is available for the offer and/or issuance of New Common Stock by New AAG as outstanding Disputed General Unsecured Claims are resolved in accordance with the Plan.

Notwithstanding the foregoing, the exemption from registration that is provided by section 1145(a) of the Bankruptcy Code will not apply if the holder of the applicable securities is an "underwriter," as that term is defined in section 1145(b) of the Bankruptcy Code. Section 1145(b) of the Bankruptcy Code defines an "underwriter" for the purposes of the Securities Act as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim other than in ordinary trading transactions, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (d) is a "Control Person" of the issuer of the securities as defined in section 2(a)(11) of the Securities Act.

For persons deemed to be "underwriters" who receive New Common Stock pursuant to the Plan, including control person underwriters or any securities issued or to be issued pursuant to, or in connection with, a Postpetition Aircraft Agreement (collectively, the "**Restricted Holders**"), resales of New Common Stock or such other securities will not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Restricted Holders, however, may be able, at a future time, and under certain conditions described below, to sell New Common Stock or

other such securities without registration pursuant to the resale provisions of Rule 144 of the Securities Act ("**Rule 144**") or other applicable exemptions therein.

Under certain circumstances, holders of New Common Stock deemed to be "underwriters" may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144, to the extent available, and in compliance with applicable state and foreign securities laws.  Generally, Rule 144 provides that persons who hold securities received in a transaction not involving a public offering or who are affiliates of an issuer who resells securities will not be deemed to be underwriters if certain conditions are met.  These conditions vary depending on whether the seller is a holder of restricted securities or a control person of the issuer and whether the security to be sold is an equity security or a debt security.  The conditions include required holding periods in certain cases, the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold in certain cases, the requirement in certain cases that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker," and that, in certain cases, notice of the resale be filed with the SEC.

IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF NEW COMMON STOCK MAY BE AN UNDERWRITER, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN NEW COMMON STOCK. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF NEW COMMON STOCK CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES OR BENEFICIAL INTERESTS.

### 12.    Hart-Scott-Rodino Compliance

Any shares of New Common Stock to be distributed under the Plan to any Entity required to file a Premerger Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, shall not be distributed until the notification and waiting periods applicable under such Act to such Entity shall have expired or been terminated.

### 13.    Listing

In accordance with the Merger Agreement, the shares of New Common Stock shall be authorized for listing on the NYSE or the NASDAQ Stock Market, upon official notice of issuance, on or prior to the Closing Date.

### 14.    Cancellation of AMR Common Stock

At the Merger Effective Time, all outstanding shares of AMR Common Stock or preferred stock of AMR, all options to purchase shares of AMR Common Stock or

preferred stock of AMR, and all awards of any kind consisting of shares of AMR Common Stock or preferred stock of AMR, that have been or may be granted, held, awarded, outstanding, payable, or reserved for issuance, and all other AMR Equity Interests, including all securities or obligations convertible or exchangeable into or exercisable for shares of AMR Common Stock, preferred stock of AMR, or other AMR Equity Interests, and each other right of any kind, contingent or accrued, to acquire or receive shares of AMR Common Stock, preferred stock of AMR, or other AMR Equity Interests, whether upon exercise, conversion, or otherwise, whether vested or unvested, shall, without any action on the part of the holder thereof, be cancelled and retired and shall cease to exist. Section 6.13 of the Plan does not apply with respect to any New Common Stock, New Mandatorily Convertible Preferred Stock, or any other equity securities or rights to acquire or receive equity securities or any other awards of any kind relating to New AAG that are issued in accordance with or pursuant to the Plan or the Merger Agreement.

## 15.    Cancellation of Existing Notes and Aircraft Securities

Except as otherwise provided in the Plan, on the Effective Date, all notes, instruments, certificates, and other documents evidencing the Notes, the Special Facility Revenue Bonds (excluding the Covered Special Facility Revenue Bonds) and the Aircraft Securities shall be cancelled, and the obligations of the Debtors thereunder and in any way related thereto shall be deemed fully satisfied, released, and discharged; *provided, however*, that (i) with respect to Special Facility Revenue Bonds (excluding the Covered Special Facility Revenue Bonds), the obligations of the Debtors thereunder and in any way related thereto shall be fully terminated, satisfied, released, and discharged in exchange for the treatment provided in the Plan for Allowed Claims and any other treatment provided for by Final Order, if any, arising thereunder, (ii) the cancellations set forth in Section 6.14 of the Plan and the termination, satisfaction, release, and discharge of the Debtors' obligations with respect to the Special Facility Revenue Bonds (excluding the Covered Special Facility Revenue Bonds) shall not alter the obligations or rights of any non-Debtor third parties applicable after the Effective Date vis-à-vis one another with respect to such notes, instruments, certificates, or other documents, (iii) the cancellations set forth in Section 6.14 of the Plan and the termination, satisfaction, release, and discharge of the Debtors' obligations with respect to the Special Facility Revenue Bonds (excluding the Covered Special Facility Revenue Bonds) shall not be deemed to cause a default, termination, waiver, or other forfeiture of the Debtors in any document, instrument, lease, or other agreement (including, but not limited to, that certain Amended and Restated Airport Use Agreement – Terminal Facilities Lease, dated as of January 1, 1985, by and between the City of Chicago and American, as amended from time to time (the "**Chicago Lease**")) pursuant to which the Debtors lease or use land, facilities, improvements, or equipment financed in whole or in part, with the proceeds of any Special Facility Revenue Bonds that have been deemed to be satisfied or cancelled under the Plan or otherwise, and (iv) any provision in any document, instrument, lease, or other agreement (including, but not limited to, the Chicago Lease) that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors or their

98

interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in Section 6.14 of the Plan shall be deemed null and void and shall be of no force and effect, and the Debtors shall be entitled to continue to use (in accordance with the remaining provisions of such document, instrument, lease, or other agreement) any land, facilities, improvements, or equipment financed with the proceeds of Special Facility Revenue Bonds (including, but not limited to, the premises leased pursuant to the Chicago Lease), notwithstanding such cancellations, terminations, satisfactions, releases, or discharges provided in Section 6.14 of the Plan.  Except as otherwise provided in the Plan, on the Effective Date, any indentures or similar agreements relating to any of the foregoing, including, without limitation, the Indentures, the Special Facility Revenue Bond Indentures, and any related notes, guaranties, or similar instruments of the Debtors or otherwise (excluding the Special Facility Revenue Bond Indentures, and any related notes, guaranties, or similar instruments of the Debtors or otherwise, associated with the Covered Special Facility Revenue Bonds) shall be deemed cancelled, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and discharged (a) with respect to all rights of and obligations owed by any Debtor under any such indentures or similar agreements and (b) except as provided in Section 6.14 of the Plan, with respect to the rights and obligations of the Indenture Trustees under any such indentures or similar agreements against (or to) the holders of Note Claims, the holders of the Special Facility Revenue Bond Claims, or any other person.  Solely for the purpose of clause (b) in the immediately preceding sentence, only the following rights of each such Indenture Trustee shall remain in effect after the Effective Date:  (1) rights as trustee, co-trustee, agent, paying agent, distribution agent, authentication agent, guarantee trustee, remarketing agent, bond registrar, and registrar, including, but not limited to, any rights to payment of fees, expenses, and indemnification obligations, including, but not limited to, from property distributed under the Plan to such Indenture Trustee (but excluding any other property of the Debtors, the Reorganized Debtors, or their respective estates), whether pursuant to the exercise of a charging lien or otherwise, (2) rights relating to distributions to be made to holders of Allowed Note Claims or Allowed Special Facility Revenue Bond Claims by such Indenture Trustee from any source, including, but not limited to, distributions under the Plan (but excluding any other property of the Debtors, the Reorganized Debtors, or their respective estates), (3) rights relating to representation of the interests of the holders of Note Claims or Special Facility Revenue Bond Claims by such Indenture Trustee in the Chapter 11 Cases to the extent not discharged or released under the Plan or any order of the Bankruptcy Court, and (4) rights relating to participation by such Indenture Trustee in any proceedings or appeals related to the Plan.  Notwithstanding the continued effectiveness of such rights after the Effective Date, such Indenture Trustee shall have no obligation to object to Claims against the Debtors or to locate certificated holders of Notes, Special Facility Revenue Bonds, or Aircraft Securities who fail to surrender their respective Notes, Special Facility Revenue Bonds, or Aircraft Securities in accordance with Section 5.13 of the Plan.  Nothing contained in the Plan shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any executory contract or lease (including, but not limited to, executory contracts or leases pursuant to which a Debtor leases any land, facilities, improvements, and/or

equipment financed, in whole or in part, with proceeds of Special Facility Revenue Bonds) to the extent such executory contract or lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or under the Plan.

### 16.    Intercompany Claims

The allocation of value based upon prepetition intercompany Claims between and among the AMR Debtors, the American Debtors, and the Eagle Debtors is reflected in the compromise embodied in the Plan and distributions to be made under the Plan.  No separate distributions shall be made under the Plan on account of such prepetition intercompany Claims, including the AMR Intercompany Claim and the Eagle Holding Intercompany Claim, and such Claims may be extinguished or compromised (by distribution, contribution, or otherwise) in the discretion of the Debtors on or after the Effective Date.

### 17.    Exit Facility

The Debtors are authorized to enter into new financing arrangements subject to Bankruptcy Court approval.

### 18.    Equity Interests in Subsidiaries Held by the Debtors

Subject to the terms and conditions set forth in the Merger Agreement, on the Effective Date, each respective Equity Interest in a direct or indirect subsidiary of AMR that is not a Debtor shall be unaffected by the Plan, and the Reorganized Debtor holding such Equity Interest shall continue to hold such Equity Interest.

### 19.    Board of Directors

The initial Board of Directors of New AAG shall consist of 12 members whose names shall be disclosed at or prior to the Confirmation Hearing.  The Board of Directors of New AAG shall be composed of (i) five directors designated by the Search Committee, (A) each of whom shall be an independent director and (B) one of whom shall serve as the initial Lead Independent Director of New AAG in accordance with the New AAG Bylaws, and whom shall be designated to serve in such role by the Search Committee, (ii) two directors designated by AMR, each of whom shall be independent directors reasonably acceptable to the Search Committee, (iii) three directors designated by US Airways, each of whom shall be independent directors, (iv) one director who shall be Mr. Thomas W. Horton, the current Chairman of the Board and Chief Executive Officer of AMR, who shall serve as the initial Chairman of the Board of Directors of New AAG in accordance with the New AAG Bylaws, and (v) one director who shall be Mr. W. Douglas Parker, the current Chairman of the Board and Chief Executive Officer of US Airways.  The identities of the members of the initial Boards of Directors of the other Reorganized Debtors shall be disclosed at or prior to the Confirmation Hearing.

After selection of the initial Board of Directors of New AAG, the holders of the New Mandatorily Convertible Preferred Stock and the New Common Stock shall elect members of the New AAG Board in accordance with the New AAG Certificate of Incorporation, the New AAG Bylaws, and applicable nonbankruptcy law.

### 20.    Corporate Action

(a)    *New AAG*

The New AAG Certificate of Incorporation and the New AAG Bylaws shall be consistent with the terms and provisions of the Merger Agreement.  New AAG shall file the New AAG Certificate of Incorporation with the Secretary of State of the State of Delaware on the Effective Date immediately prior to the Merger Effective Time.  The New AAG Certificate of Incorporation shall prohibit the issuance of nonvoting equity securities, subject to further amendment of such New AAG Certificate of Incorporation as permitted by applicable law.  The New AAG Bylaws shall be deemed adopted by the New AAG Board as of the Effective Date.

The New AAG Certificate of Incorporation will impose certain restrictions on the transferability and ownership of New Common Stock, New Mandatorily Convertible Preferred Stock, warrants, rights or options to purchase New Mandatorily Convertible Preferred Stock or New Common Stock, and certain other equity-type interests (collectively, "**Corporation Securities**") to reduce the possibility that subsequent changes in the ownership of Corporation Securities could result in limitations on the use of the significant NOL carryforwards and other valuable tax attributes of New AAG and its subsidiaries.  Subject to certain exceptions, or the prior approval of the New AAG Board, the New AAG Certificate of Incorporation will restrict (x) any person or entity from directly or indirectly acquiring or accumulating Corporation Securities if such person or entity would become a Substantial Stockholder (as defined below) or if such acquisition would increase the percentage stock ownership (as determined under applicable tax law principles) of a Substantial Stockholder, and (y) for three years and six months after the Effective Date, any person or entity from directly or indirectly disposing of Corporation Securities if such transferor is a Substantial Stockholder or such disposition would result in a decrease in the percentage stock ownership of a Substantial Stockholder.  A "**Substantial Stockholder**" will be a person or entity with a percentage stock ownership of 4.75% or more of New AAG stock.  For purposes of computing the percentage stock ownership of a holder of New Mandatorily Convertible Preferred Stock, such holder's percentage stock ownership will be the greater of the percentage computed (i) based on the ownership of the New Mandatorily Convertible Preferred Stock and (ii) based on the ownership of the maximum amount of New Common Stock into which the New Mandatorily Convertible Preferred Stock of such holder may convert at any time over the life of the New Mandatorily Convertible Preferred Stock.  These restrictions may remain in effect for as long as eight years after the Effective Date, and may be waived by the New AAG Board on a case-by-case basis.

101

(b)    *The Reorganized Debtors*

The Reorganized Debtors (other than New AAG) shall file the Amended Certificates of Incorporation with the Secretary of State of the State of the applicable state of formation on the Effective Date.  The Amended Certificates of Incorporation for each of the Reorganized Debtors (other than New AAG) that are corporations shall prohibit the issuance of nonvoting equity securities, subject to further amendment of such Amended Certificates of Incorporation as permitted by applicable law.  With respect to any Debtor that is a limited liability company or partnership, the respective limited liability company agreement or partnership agreement by which such Debtor is governed shall be similarly amended to prohibit the issuance of nonvoting equity securities.

On the Effective Date, the adoption, filing, approval, and ratification, as necessary, of all corporate or related actions contemplated under the Plan with respect to each of the Reorganized Debtors shall be deemed authorized and approved by each of the Reorganized Debtors, its board of directors, managers, stockholders, members, or partners, as applicable, in all respects, in each case to the extent required by applicable nonbankruptcy law.  Without limiting the foregoing, such actions include (i) the adoption and filing of the New AAG Certificate of Incorporation and the Amended Certificates of Incorporation for each of the other Reorganized Debtors, (ii) the approval of the New AAG Bylaws and the Amended Bylaws for each of the other Reorganized Debtors, (iii) the election or appointment, as the case may be, of directors and officers for the Reorganized Debtors, (iv) the issuance of the Plan Shares, (v) the Merger to be effectuated pursuant to the Plan, (vi) the adoption and implementation of the employee matters set forth in Section 4.10 of the Merger Agreement and Section 4.1(o) of the American Disclosure Letter, including, but not limited to, the New AAG 2013 Incentive Award Plan, the Alignment Awards, and the LTIP 2013 Awards, (vii) the qualification of any of the Reorganized Debtors as foreign corporations, partnerships, or limited liability companies wherever the conduct of business by such Entities requires such qualification, and (viii) the execution, delivery, and performance of each Postpetition Aircraft Agreement and any agreement or instrument provided for in a Postpetition Aircraft Agreement and the issuance of any security to be issued by a Reorganized Debtor pursuant to or in connection with a Postpetition Aircraft Agreement.

All matters provided for in the Plan involving the corporate structure of any Debtor or Reorganized Debtor, or any corporate or related action required by any Debtor or Reorganized Debtor in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders or directors of such Debtor or Reorganized Debtor or by any other stakeholder, and with like effect as though such action had been taken unanimously by the security holders and directors, managers, members, or partners, as applicable, of the applicable Debtor or Reorganized Debtor.

102

### 21.    New AAG 2013 Incentive Award Plan

The New AAG 2013 Incentive Award Plan, the Alignment Awards, and the LTIP 2013 Awards shall become effective immediately upon the occurrence of the Merger Effective Time without any further corporate or other action.

### 22.    Anti-Dilution Adjustments

In the event that any transaction or event of the type contemplated by Sections 6.1, 6.2, or 6.3 of the Certificate of Designations occurs with respect to the New Common Stock, in addition to the actions required under the Certificate of Designations, the Board of Directors of New AAG shall take appropriate action as may be necessary or appropriate, as determined in its reasonable good faith judgment, to protect the rights of holders of New Common Stock consistent herewith.

### 23.    Effectuating Documents and Further Transactions

Each of the officers of each of the Debtors is (and each of the officers of each of the Reorganized Debtors shall be) authorized and directed to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 24.    Creditors' Committee Member Fees

Subject to the occurrence of the Effective Date, the reasonable fees and out-of-pocket expenses (including professionals fees in an amount to be agreed upon by the Debtors and the Creditors' Committee) of the individual members of the Creditors' Committee, in each case, incurred in their capacities as members of the Creditors' Committee, shall, to the extent incurred and unpaid by the Debtors prior to the Effective Date, be Allowed as Administrative Expenses and paid by the Reorganized Debtors without further Bankruptcy Court approval upon the submission of invoices to the Reorganized Debtors.  The foregoing shall not include any such fees and out-of-pocket expenses paid pursuant to Section 2.4 of the Plan.

### 25.    Chairman Letter Agreement

The Chairman Letter Agreement is to be approved by the Bankruptcy Court in connection with confirmation of the Plan and is to be effective on the Effective Date.

### G.    Procedures for Disputed Claims

#### 1.    Objections to Claims

The Reorganized Debtors shall be entitled to object to Claims.  Any objections to Claims shall be served and filed on or before the later of (i) 180 days after the Effective Date and (ii) such date as may be fixed by the Bankruptcy Court (as the same may be extended by the Bankruptcy Court), whether fixed before or after the date specified in clause (i) above.  The Post-Effective Date Creditors' Committee shall have standing to appear and be heard with respect to objections to Claims.

#### 2.    Resolution of Disputed Administrative Expenses and Disputed Claims

On and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Administrative Expenses or Claims and to compromise, settle or otherwise resolve any disputed Administrative Expenses and Disputed Claims without approval of the Bankruptcy Court, other than with respect to Administrative Expenses relating to compensation of professionals.  Notwithstanding the foregoing, the Debtors shall not have the authority to compromise, settle, or otherwise resolve any Claims asserted by any insider of any Debtor or Reorganized Debtor or where the settled amount of such Claim exceeds $1 million.

#### 3.    Payments and Distributions with Respect to Disputed Claims

Notwithstanding anything in the Plan to the contrary, if any portion of a Claim is a Disputed Claim, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim; *provided however*, that no payment or distribution provided under the Plan shall be made to a Disputed Claim that becomes an Allowed Claim until after the occurrence of the Final Mandatory Conversion Date.

There shall be withheld from the New Mandatorily Convertible Preferred Stock and the New Common Stock to be distributed to holders of Allowed Single-Dip General Unsecured Claims (i) the number of such shares that would be distributable with respect to any Disputed Single-Dip General Unsecured Claims had such Disputed Claims been Allowed on the Effective Date and (ii) such additional shares necessary to assure that, if all such Disputed Claims become Allowed Claims in full, sufficient shares are available to satisfy the American Labor Allocation (the "**Disputed Claims Reserve**"), together with all earnings thereon (net of any expenses relating thereto, including any taxes imposed thereon or otherwise payable by the Disputed Claims Reserve).  The Disbursing Agent shall hold in the Disputed Claims Reserve all dividends, payments, and other distributions made on account of, as well as any obligations arising from, property held in the Disputed Claims Reserve, to the extent that such property continues to be so held at the time such distributions are made or such obligations arise, and such dividends, payments, or other

104

distributions shall be held for the benefit of holders of Disputed Claims against any of the Debtors whose Claims are subsequently Allowed and for the benefit of other parties entitled thereto under the Plan.  The Debtors intend to seek a determination by the Bankruptcy Court of the estimated amount (either on an individual or aggregate basis) of Disputed Single-Dip General Unsecured Claims for purposes of determining the amount of the Disputed Claims Reserve attributable to such Disputed Claims.

Any Plan Shares held in the Disputed Claims Reserve pursuant to Section 7.3 of the Plan shall be deemed voted by the Disbursing Agent proportionally in the same manner as the rest of the Plan Shares are voted. The applicable portion of any New Mandatorily Convertible Preferred Stock held in the Disputed Claims Reserve shall be mandatorily converted into shares of New Common Stock as required under the Plan on each Mandatory Conversion Date.

Subject to definitive guidance from the Internal Revenue Service ("**IRS**") or a court of competent jurisdiction to the contrary (including the receipt by the Disbursing Agent of a private letter ruling if the Disbursing Agent so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Disbursing Agent), the Disbursing Agent shall (i) treat the Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including the Disbursing Agent, the Reorganized Debtors, and the holders of Claims and Equity Interests) shall report for United States federal, state, and local income tax purposes consistently with the foregoing.

The Disbursing Agent shall be responsible for payment, out of the assets of the Disputed Claims Reserve, of any taxes imposed on the Disputed Claims Reserve or its assets.  In the event, and to the extent, any Cash in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of the reserve (including any income that may arise upon the distribution of the assets in the Disputed Claims Reserve), assets of the Disputed Claims Reserve may be sold to pay such taxes.

The Disbursing Agent may request an expedited determination of taxes of the Disputed Claims Reserve under section 505(b) of the Bankruptcy Code for all tax returns for all taxable periods through the termination of the Disputed Claims Reserve.

### 4.    True-Ups

(a)    *Interim True-Ups*

On each Interim Distribution Date, or as soon thereafter as reasonably practicable, all shares of New Common Stock in the Disputed Claims Reserve, that have been reserved with respect to all or any portion of a Disputed Single-Dip General Unsecured Claim that

has been disallowed by a Final Order, to the extent such disallowance has not been reflected in such a distribution with respect to any prior Interim Distribution Date, shall be distributed on account of the American Labor Allocation, the Market-Based Old Equity Allocation, and to holders of Allowed Single-Dip General Unsecured Claims, as applicable, based upon how such shares of New Common Stock would have been distributed on the Initial distribution Date and each Mandatory Conversion Date (including, as applicable, the shares issued upon conversion of the shares of New Mandatorily Convertible Preferred Stock reserved with respect to such disallowed Disputed Single-Dip General Unsecured Claim) if on the Effective Date the aggregate estimated amount of all Disputed Single-Dip General Unsecured Claims were reduced by the amount of such disallowed Disputed Single-Dip General Unsecured Claim.

      (b)   *Final True-Up*

On the Final Distribution Date, or as soon thereafter as reasonably practicable, all shares of New Common Stock remaining in the Disputed Claims Reserve (after making all distributions pursuant to Section 7.5(a) of the Plan on account of Disputed Single-Dip General Unsecured Claims that have become Allowed Single-Dip General Unsecured Claims prior such date), shall be distributed on account of the American Labor Allocation, the Market-Based Old Equity Allocation, and to holders of Allowed Single-Dip General Unsecured Claims, as applicable, based upon how such shares of New Common Stock would have been distributed on the Initial Distribution Date and each Mandatory Conversion Date if on the Effective Date the aggregate amount of all Allowed Single-Dip General Unsecured Claims were in the amount of such Claims on the Final Distribution Date and there were no Disputed Single-Dip General Unsecured Claims on the Effective Date.

      **5.**    **Distributions After Allowance**

To the extent that a Disputed Single-Dip General Unsecured Claim becomes an Allowed Claim after the Effective Date, the Disbursing Agent shall, subsequent to the Final Mandatory Conversion Date, distribute to the holder thereof the distribution, if any, of the shares of New Common Stock to which such holder is entitled under the Plan out of the Disputed Claims Reserve, in accordance with Section 7.4 of the Plan.  Subject to Section 7.4 of the Plan, all distributions made under Section 7.5 of the Plan on account of Allowed Claims shall be made together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property, then held in the Disputed Claims Reserve as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to holders of Allowed Claims in the applicable Class, but shall be made net of any expenses relating thereto, including any taxes imposed thereon or otherwise payable by the Disputed Claims Reserve.

To the extent that a Convenience Class Claim becomes an Allowed Claim after the Effective Date, the Disbursing Agent shall distribute to the holder thereof the distribution,

if any, to which such holder is entitled under the Plan in accordance with Sections 5.2 and 7.4 of the Plan.

### 6.   Estimation

The Debtors and the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any of the Debtors or the Reorganized Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount estimated shall constitute either the Allowed amount of such Claim or a maximum limitation of the amount of such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation of the amount of such Claim, the Debtors or the Reorganized Debtors, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim; *provided, however*, that the foregoing is not intended to limit the rights granted by section 502(j) of the Bankruptcy Code.  The objection, estimation, and resolution procedures set forth in Section 7.6 of the Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

For purposes of facilitating distributions under the Plan, the Debtors may, prior to the Effective Date, seek an order of the Bankruptcy Court estimating the aggregate amount of Disputed Single-Dip General Unsecured Claims, which shall serve as a maximum limitation on the Allowed amount of all such Claims.

### 7.   Interest and Dividends

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Effective Date.  In the event that dividend distributions have been made with respect to the New Common Stock distributable to a holder of a Disputed Claim that later becomes Allowed, such holder shall be entitled to receive such previously distributed dividends without any interest thereon (net of allocable expenses of the Disputed Claims Reserve, including taxes).

## H.   Treatment of Executory Contracts and Unexpired Leases

### 1.   Executory Contracts and Unexpired Leases

All executory contracts and unexpired leases to which any of the Debtors are parties automatically shall be deemed rejected as of the Effective Date, except for

executory contracts or unexpired leases (i) that have been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (ii) that are the subject of a separate motion to assume or reject pending on the Confirmation Date, (iii) that are assumed, rejected, or otherwise treated pursuant to Sections 8.3, 8.4, or 8.5 of the Plan, (iv) that are listed on Schedule 8.1 of the Plan Supplement (which will consist of various sub-Schedules), or (v) as to which a Treatment Objection has been filed and served by the Treatment Objection Deadline.  If an executory contract or unexpired lease (a) has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date or (b) is the subject of a separate motion to assume or reject pending on the Confirmation Date, then the listing of any such executory contract or unexpired lease on Schedule 8.1 of the Plan Supplement shall be of no effect.

## 2.    Schedules of Executory Contracts and Unexpired Leases

Schedule 8.1 of the Plan Supplement shall represent the Debtors' then-current good faith belief regarding the intended treatment of the executory contracts and unexpired leases listed thereon; *provided, however*, that executory contracts and unexpired leases related to Aircraft Equipment shall be listed on a separate sub-Schedule of Schedule 8.1 of the Plan Supplement.  Subject to the limitations set forth in Section 8.2(d) of the Plan, the Debtors reserve the right, on or prior to 4:00 p.m. (Eastern Time) on the Business Day immediately prior to the commencement of the Confirmation Hearing to amend (i) Schedule 8.1 of the Plan Supplement to add, delete, or reclassify any executory contract  or unexpired lease or amend a proposed assignment and (ii) the Proposed Cure with respect to any executory contract or unexpired lease listed on the applicable Schedule as an executory contract or unexpired lease to be assumed; *provided, however,* that if the Confirmation Hearing is adjourned for a period of more than two consecutive calendar days, the Debtors' right to amend Schedule 8.1 of the Plan Supplement and the Proposed Cure shall be extended to 4:00 p.m. (Eastern Time) on the Business Day immediately prior to the adjourned date of the Confirmation Hearing, with such extension applying in the case of any and all subsequent adjournments of the Confirmation Hearing; and *further provided*, however, that with respect to Intercompany Contracts and agreements that the Debtors propose to reject as of the deadline set forth above, the Debtors reserve the right to make amendments at any time prior to entry of the Confirmation Order.

Pursuant to sections 365 and 1123 of the Bankruptcy Code, and except with respect to executory contracts and unexpired leases as to which a Treatment Objection is filed and served by the Treatment Objection Deadline, (i) each executory contract and unexpired lease listed on Schedule 8.1 of the Plan Supplement as an executory contract or unexpired lease to be assumed (and assigned, if applicable) shall be deemed assumed (and assigned, if applicable) effective as of the Assumption Effective Date specified thereon, the Proposed Cure specified in the Notice of Intent to Assume mailed to each Assumption Counterparty shall be the Cure Amount and shall be deemed to satisfy fully any obligations the Debtors might have with respect to such executory contract or unexpired lease under section 365(b) of the Bankruptcy Code, and all proofs of Claim on account of

or in respect of any such assumed executory contract and unexpired lease shall be deemed withdrawn on the Effective Date without any further notice to or action by any party or order of the Bankruptcy Court; (ii) each executory contract and unexpired lease listed on Schedule 8.1 of the Plan Supplement as an executory contract or unexpired lease to be rejected shall be deemed rejected effective as of the Rejection Effective Date specified thereon; and (iii) the Reorganized Debtors may assume, assume and assign, or reject any executory contract or unexpired lease relating to Aircraft Equipment that is listed on Schedule 8.1 of the Plan Supplement by filing with the Bankruptcy Court and serving upon the applicable Deferred Party a Notice of Intent to Assume or a Notice of Intent to Reject at any time before the Deferred Agreement Deadline; *provided, however*, that if the Reorganized Debtors do not file a Notice of Intent to Assume or a Notice of Intent to Reject by the Deferred Agreement Deadline with respect to any executory contract or unexpired lease listed on Schedule 8.1 of the Plan Supplement, such executory contract or unexpired lease shall be deemed rejected effective as of the 181st calendar day after the Effective Date.

The Debtors shall file an initial version of Schedule 8.1 of the Plan Supplement and any amendments thereto with the Bankruptcy Court and shall serve all notices thereof only on the applicable Assumption Counterparties, Rejection Counterparties, and Deferred Counterparties.  With respect to any executory contract or unexpired lease first listed on Schedule 8.1 of the Plan Supplement as an executory contract or unexpired lease to be rejected later than the date that is 10 calendar days prior to the Voting Deadline, (A) the Debtors shall use their best efforts to promptly notify the respective Rejection Counterparty of such proposed treatment via facsimile, electronic transmission, or telephone at any notice address or telephone number set forth in the respective executory contract or unexpired lease or as otherwise timely provided in writing to the Debtors by such Rejection Counterparty or its counsel; and (B) the applicable Rejection Counterparty shall have five calendar days from the date of an amendment to Schedule 8.1 of the Plan Supplement to object to confirmation of the Plan.  With respect to any executory contract or unexpired lease first listed on Schedule 8.1 of the Plan Supplement later than the date that is five calendar days prior to the Confirmation Hearing, the respective Rejection Counterparty shall have until the Confirmation Hearing to object to confirmation of the Plan.

The listing of any contract or lease on Schedule 8.1 of the Plan Supplement is not an admission that such contract or lease is an executory contract or unexpired lease.  The Debtors and the Assumption Counterparties, the Rejection Counterparties, or the Deferred Counterparties, as applicable (together with the Debtors, the "**Recharacterization Parties**") reserve the right to assert that any contract or lease listed on Schedule 8.1 of the Plan Supplement is not an executory contract or unexpired lease; *provided, however*, that except with respect to any contract or lease for which a Recharacterization Party (i) expressly reserves such right in a notice filed with the Bankruptcy Court and served on any parties listed thereon no later than 10 calendar days prior to the Voting Deadline and (ii) files an action based on such right prior to the date that is sixty calendar days after the

Effective Date (unless required under the Plan to file such action at an earlier date), each Recharacterization Party shall be deemed to have waived, as of the Effective Date, any rights it may have to seek to recharacterize any contract or lease as a financing agreement.

### 3.    Categories of Executory Contracts and Unexpired Leases to be Assumed

Pursuant to sections 365 and 1123 of the Bankruptcy Code, each executory contract and unexpired lease in the following categories shall be deemed assumed as of the Effective Date (and the Proposed Cure with respect to each shall be zero dollars ($0)), except for any executory contract or unexpired lease (i) that has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (ii) that is the subject of a separate motion to assume or reject pending on the Confirmation Date, (iii) that is listed on Schedule 8.1 of the Plan Supplement, (iv) that is otherwise expressly assumed or rejected under the Plan, or (v) as to which a Treatment Objection has been filed and served by the Treatment Objection Deadline.

>    (a)    *Cash Management Agreements, Confidentiality and Non-Disclosure Agreements, Customer Programs, Debtor Ownership Agreements, Foreign Agreements, Fuel Consortia Agreements, Insurance Plans, Intercompany Contracts, Interline Agreements, Letters of Credit, Revenue Generating Agreements, Surety Bonds, and Workers' Compensation Plans*

Subject to the terms of the first paragraph of Section 8.3 of the Plan, each Cash Management Agreement, Confidentiality and Non-Disclosure Agreement, Customer Program, Debtor Ownership Agreement, Foreign Agreement, Fuel Consortia Agreement, Insurance Plan, Intercompany Contract, Interline Agreement, Letter of Credit, Revenue Generating Agreement, Surety Bond, and Workers' Compensation Plan shall be deemed assumed as of the Effective Date. Nothing in Section 8.3 of the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors may hold against any Entity, including, without limitation, the insurer under any of the Debtors' Insurance Plans. Except as otherwise provided in the immediately preceding sentence, all proofs of Claim on account of or in respect of any Cash Management Agreement, Confidentiality and Non-Disclosure Agreement, Customer Program, Debtor Ownership Agreement, Foreign Agreement, Fuel Consortia Agreement, Insurance Plan, Intercompany Contract, Interline Agreement, Letter of Credit, Revenue Generating Agreement, Surety Bond, or Workers' Compensation Plan automatically shall be deemed withdrawn on the Effective Date without any further notice to or action by any party or order of the Bankruptcy Court.

>    (b)    *Certain Indemnification Obligations*

Each Indemnification Obligation shall be deemed assumed by New AAG as of the Merger Effective Time in accordance with the Merger Agreement. Each Indemnification Obligation that is deemed assumed under the Plan shall continue in full force and effect in

accordance with its terms.  From and after the Merger Effective Time, New AAG shall honor and perform the Indemnification Obligations under all indemnification Contracts (as defined in the Merger Agreement) and organizational documents of the Debtors.  New AAG shall not, directly or indirectly, amend, modify, limit, or terminate, in any manner adverse to the Debtors' current or former directors or officers with respect to the Indemnification Obligations for acts or omissions occurring prior to the Merger Effective Time, any indemnification contracts with the Debtors or any provisions regarding the Indemnification Obligations contained in any organizational documents of the Debtors.  Each Indemnification Obligation that is deemed assumed under the Plan shall be deemed and treated as an executory contract pursuant to sections 365 and 1123 of the Bankruptcy Code regardless of whether or not a proof of Claim has been filed with respect to such Indemnification Obligation.

With respect to current or former employees of any of the Debtors not covered by Section 8.3(b)(i) of the Plan and who were employed by any of the Debtors prior to, on, or after the Commencement Date, each obligation of any Debtor to indemnify such employees with respect to or based upon any act or omission taken or omitted in any such capacity, or for or on behalf of any Debtor, whether pursuant to agreement, the Debtors' respective articles or certificates of incorporation, corporate charters, bylaws, operating agreements or similar corporate documents, or applicable law in effect as of the Effective Date, shall be deemed assumed as of the Effective Date.  Each such indemnification obligation that is deemed assumed under the Plan shall continue in full force and effect in accordance with its terms.  From and after the Merger Effective Time, New AAG shall honor and perform such indemnification obligations under all indemnification contracts and organizational documents of the Debtors.  New AAG shall not, directly or indirectly, amend, modify, limit, or terminate, in any manner adverse to such employees with respect to such indemnification obligations for acts or omissions occurring prior to the Merger Effective Time, any indemnification contracts with the Debtors or any provisions regarding the indemnification obligations contained in any organizational documents of the Debtors.  Each such indemnification obligation that is deemed assumed under the Plan shall be deemed and treated as an executory contract pursuant to sections 365 and 1123 of the Bankruptcy Code regardless of whether or not a proof of Claim has been filed with respect to such indemnification obligation.

(c)    *Collective Bargaining Agreements*

Each of the Collective Bargaining Agreements with the respective Unions shall remain in full force and effect on and after the Effective Date, subject to the respective terms thereof.  The consideration provided for in each of the Section 1113 Agreements shall be in complete settlement and satisfaction of all Claims as provided therein, and each Union shall promptly take all action necessary to withdraw all proofs of Claim with respect to the Claims resolved pursuant to the respective Section 1113 Agreements.  Notwithstanding the foregoing, New AAG and the Reorganized Debtors reserve the right to seek adjudication of any Collective Bargaining Agreement-related disputes between the

111

Debtors and any Union that concerns distributions, claims, restructuring transactions, or other aspects of the Plan in the Bankruptcy Court.

(d)    *Covered Special Facility Revenue Bonds*

Unless otherwise provided in the Plan, in a Special Facility Revenue Bond Agreement, or in an order of the Bankruptcy Court, the Special Facility Revenue Bond Agreements, the respective Special Facility Revenue Bond Indentures, and the respective Special Facility Revenue Bond Documents, in each case relating to Covered Special Facility Revenue Bonds, shall remain in full force and effect in accordance with their original terms and conditions (or as amended by an order of the Bankruptcy Court) and shall not otherwise be altered, amended, modified, surrendered, or cancelled under the Plan, and holders of such Covered Special Facility Revenue Bonds shall continue to receive payments in accordance with the terms and conditions of the Special Facility Revenue Bond Documents relating to the respective Covered Special Facility Revenue Bonds (as such Special Facility Revenue Bond Documents may have been amended by an order of the Bankruptcy Court).  As a result of the assumption of executory contracts and/or leases relating to the Covered Special Facility Revenue Bonds and the prior payment of the related cure amounts by the Debtors, all proofs of Claim on account of or in respect of any Covered Special Facility Revenue Bonds shall be deemed disallowed and expunged without any further notice to or action by any party or order of the Bankruptcy Court.  To the extent any of the foregoing conflicts with the terms of a separate order of the Bankruptcy Court relating to a Covered Special Facility Revenue Bond, the order of the Bankruptcy Court shall govern.

## 4.    Other Categories of Agreements and Policies

(a)    *Employee Benefits*

As of the Effective Date, unless specifically rejected (including, without limitation, by virtue of the Debtors' having been granted the authority to terminate any such plan, policy, program, or agreement or the Bankruptcy Court's determining that the Debtors cannot successfully reorganize absent such termination), each American Compensation and Benefit Plan (as defined in the Merger Agreement) (including all matters set forth in Section 4.10 of the Merger Agreement and Section 4.1(o) of the American Disclosure Letter, but excluding any prepetition equity or equity-equivalent plan or agreement of the Debtors) shall be deemed assumed and shall be fully effective, and New AAG and the Reorganized Debtors shall maintain and perform under such plans and agreements.  To the extent that the American Compensation and Benefit Plans are executory contracts, pursuant to sections 365 and 1123 of the Bankruptcy Code, they shall be deemed assumed.

(b)    *Employee Protection Arrangements*

As of the Effective Date, the Employee Protection Arrangements (as defined in and set forth in Section 4.1(o) of the American Disclosure Letter) shall be fully effective.

112

(c)   *Postpetition Aircraft Agreements*

Subject to the Debtors' right to terminate or reject any Postpetition Aircraft Agreement prior to the Effective Date pursuant to the terms of such Postpetition Aircraft Agreement, (i) each Postpetition Aircraft Agreement shall remain in place after the Effective Date, (ii) the Reorganized Debtors shall continue to honor each Postpetition Aircraft Agreement according to its terms, and (iii) to the extent any Postpetition Aircraft Agreement requires the assumption by the Debtors of such Postpetition Aircraft Agreement and the Postpetition Aircraft Obligations arising thereunder, such Postpetition Aircraft Agreement and Postpetition Aircraft Obligations shall be deemed assumed as of the Effective Date; *provided, however*, that this clause (iii) shall not be deemed or otherwise interpreted as an assumption by the Debtors of any agreement or obligation that is not a Postpetition Aircraft Agreement or Postpetition Aircraft Obligation; *and provided further, however*, that nothing in the Plan shall limit the Debtors' right to terminate such Postpetition Aircraft Agreement or Postpetition Aircraft Obligations in accordance with the terms thereof.  To the extent that, subsequent to the date of the Plan and on or prior to the Effective Date, the Debtors, with the approval of the Bankruptcy Court, enter into new Postpetition Aircraft Agreements for Aircraft Equipment not currently subject to a Postpetition Aircraft Agreement, any Claims or obligations arising thereunder shall be treated as Postpetition Aircraft Obligations under the Plan and such Postpetition Aircraft Agreements shall be deemed assumed as of the Effective Date.

### 5.   Pension Plans

(a)   *Pension Plan Required Contributions*

On the Effective Date, the Reorganized Debtors shall assume and continue the Pension Plans and shall pay in Cash any aggregate unpaid (i) minimum required funding contributions under 29 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083 and (ii) all delinquent PBGC premiums under 29 U.S.C. §§ 1306 and 1307, in each case with interest, for the Pension Plans under ERISA or the Internal Revenue Code, which are estimated by the Pension Plans' enrolled actuary to be approximately $390 million.  Upon such payment, the lien notices perfecting all liens and security interests held by, or in favor of, the PBGC on any assets of the Debtors or their affiliates shall be, and shall be deemed to be, withdrawn.

(b)   *Pension Plan Continuation*

After the Effective Date, the Reorganized Debtors shall (i) satisfy the minimum funding requirements under 29 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083, (ii) pay all required PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307, and (iii) administer the Pension Plans in accordance with the applicable provisions of ERISA and the Internal Revenue Code.

(c)    *Liabilities Preserved*

No provision of the Plan, the Confirmation Order, or section 1141 of the Bankruptcy Code shall be construed to discharge, release, or relieve the Debtors, or their successors, including the Reorganized Debtors, or any other party, in any capacity, from liabilities or requirements imposed under any law or regulatory provision with respect to the Pension Plans or the PBGC.  The PBGC and the Pension Plans shall not be enjoined or precluded from enforcing such liability as a result of any provision of the Plan, the Confirmation Order, or section 1141 of the Bankruptcy Code.

6.    **Assumption and Rejection Procedures and Resolution of Treatment Objections**

(a)    *Proposed Assumptions*

With respect to any executory contract or unexpired lease to be assumed under the Plan or pursuant to a Notice of Intent to Assume or a Notice of Intent to Reject, unless an Assumption Counterparty files and properly serves a Treatment Objection by the Treatment Objection Deadline, such executory contract or unexpired lease shall be deemed assumed and, if applicable, assigned as of the Assumption Effective Date proposed by the Debtors or the Reorganized Debtors, as applicable, without any further notice to, or action by, any party or order of the Bankruptcy Court, and any obligation the Debtors or the Reorganized Debtors, as applicable, may have to such Assumption Counterparty with respect to such executory contract or unexpired lease under section 365(b) of the Bankruptcy Code shall be deemed to be fully satisfied by the Proposed Cure, if any, which shall be the Cure Amount.  Any Treatment Objection that is not timely filed and properly served shall be denied automatically and with prejudice (without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, and without any further notice to, or action by any party or order of the Bankruptcy Court).  Any Claim relating to such assumption or assignment shall be forever barred from assertion and shall not be enforceable against any Debtor or Reorganized Debtor or their respective estates or property, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, and without any further notice to, or action by, any party or order of the Bankruptcy Court, and any obligation the Debtors or the Reorganized Debtors may have under section 365(b) of the Bankruptcy Code (over and above any Proposed Cure) shall be deemed fully satisfied, released, and discharged, notwithstanding any amount or information included in the Schedules or any proof of Claim.

(b)    *Proposed Rejections*

With respect to any executory contract or unexpired lease to be rejected under the Plan or pursuant to a Notice of Intent to Assume or a Notice of Intent to Reject, unless a Rejection Counterparty files and serves a Treatment Objection by the Treatment Objection Deadline, such executory contract or unexpired lease shall be deemed rejected as of the Rejection Effective Date proposed by the Debtors or the Reorganized Debtors, as

114

applicable, without any further notice to, or action by, any party or order of the Bankruptcy Court.  Any objection to the rejection of an executory contract or unexpired lease that is not timely filed and served shall be deemed denied automatically and with prejudice (without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, and without any further notice to, or action by, any party or order of the Bankruptcy Court).

(c)    *Resolution of Treatment Objections*

On and after the Effective Date, the Reorganized Debtors may, in their sole discretion, settle Treatment Objections without any further notice to, or action by, any party or order of the Bankruptcy Court (including by paying any agreed Cure Amount).

With respect to each executory contract or unexpired lease as to which a Treatment Objection is timely filed and served and is not otherwise resolved by the parties after a reasonable period of time, the Debtors or the Reorganized Debtors, as applicable, shall schedule a hearing with the Bankruptcy Court with respect to such Treatment Objection and provide at least 14 calendar days' notice of such hearing to the Assumption Counterparty, the Rejection Counterparty, or the Deferred Counterparty, as applicable; *provided, however*, that if such Treatment Objection is not resolved by the parties after a reasonable period of time, the respective Assumption Counterparty, Rejection Counterparty, or Deferred Counterparty may, with prior notice to the Debtors, request that the Bankruptcy Court schedule such a hearing.  Unless otherwise ordered by the Bankruptcy Court or agreed to by the parties, any assumption or rejection approved by the Bankruptcy Court notwithstanding a Treatment Objection shall be effective as of the Assumption Effective Date or Rejection Effective Date, as applicable, that was originally proposed by the Debtors or specified in the Plan.

Any Cure Amount shall be paid as soon as reasonably practicable following entry of a Final Order resolving an assumption dispute and/or approving an assumption (and assignment, if applicable), unless the Debtors or the Reorganized Debtors, as applicable, seek to reject such executory contract or unexpired lease and file a Notice of Intent to Reject under Section 8.2(b) of the Plan (which, with respect to a Special Facility Revenue Bond Agreement, must be served upon the Indenture Trustee of the applicable Special Facility Revenue Bond Indenture).

No Cure Amount shall be allowed for a penalty rate or default rate of interest to the extent not proper under the Bankruptcy Code or applicable law.

(d)    *Reservation of Rights*

If a Treatment Objection is filed with respect to any executory contract or unexpired lease sought to be assumed or rejected by any of the Debtors or the Reorganized Debtors, the Debtors and the Reorganized Debtors reserve the right (i) to seek to assume or reject such executory contract or unexpired lease at any time before the assumption,

115

rejection, assignment, or Cure Amount with respect to such executory contract or unexpired lease is determined by a Final Order and (ii) to the extent a Final Order is entered resolving a Treatment Objection as to a Cure Amount in an amount different from the Proposed Cure, to seek to reject such executory contract or unexpired lease within 14 calendar days after the date of entry of such Final Order by filing with the Bankruptcy Court and serving upon the Assumption Counterparty or Rejection Counterparty, as applicable, a Notice of Intent to Assume or a Notice of Intent to Reject (which, with respect to a Special Facility Revenue Bond Agreement, must be served upon the Indenture Trustee of the applicable Special Facility Revenue Bond Indenture).

### 7.    Rejection Claims

Any Rejection Claim must be filed with the Bankruptcy Court by the Rejection Bar Date. Any Rejection Claim for which a proof of Claim is not properly filed and served by the Rejection Bar Date shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors, or their respective estates or property. The Debtors or the Reorganized Debtors, as applicable, may contest Rejection Claims in accordance with Section 7.1 of the Plan.

### 8.    Assignment

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned under the Plan shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment. To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable antiassignment provision and is void and of no force or effect.

### 9.    Approval of Assumption, Rejection, Retention, or Assignment of Executory Contracts and Unexpired Leases

Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of the rejections, retentions, assumptions, and/or assignments contemplated under the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease that is assumed pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms as of the applicable Assumption Effective Date, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing or providing for its assumption,

or applicable federal law.  The provisions of each executory contract or unexpired lease assumed and/or assigned under the Plan that are or may be in default shall be deemed satisfied in full by the Cure Amount or by an agreed-upon waiver of the Cure Amount. Upon payment in full of the Cure Amount, any and all proofs of Claim based upon an executory contract or unexpired lease that has been assumed in the Chapter 11 Cases or under the Plan shall be deemed Disallowed and expunged without any further notice to, or action by, any party or order of the Bankruptcy Court.

### 10. Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed, whether or not such executory contract or unexpired lease relates to the use, acquisition, or occupancy of real property, shall include (i) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease and (ii) all executory contracts or unexpired leases appurtenant to the premises, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, and any other interests in real estate or rights in remedy related to such premises, unless any of the foregoing agreements is rejected under the Plan or pursuant to an order of the Bankruptcy Court.

### I. Releases Granted Pursuant to the Plan

#### 1. Exculpation

Notwithstanding anything herein to the contrary, and to the maximum extent permitted by applicable law, neither the Debtors, US Airways, the Creditors' Committee, the Retiree Committee, the Indenture Trustees,  the Unions, the Search Committee, the Ad Hoc Committee, Nuveen Asset Management, LLC (and each of its managed funds and accounts on behalf of which it executed the Support and Settlement Agreement, and OppenheimerFunds, Inc. (and each of its managed funds and accounts that executed the Support and Settlement Agreement), nor any of their respective members (current and former), including counsel and other professionals employed by such members in connection with the Chapter 11 Cases, officers, directors, employees, counsel, advisors, professionals, or agents (collectively, the "**Exculpated Parties**"), shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of the Chapter 11 Cases; negotiations regarding or concerning the Plan, the Merger Agreement, the Merger, and any settlement or agreement in the Chapter 11 Cases; the pursuit of confirmation of the Plan and consummation of the Merger; the consummation of the Plan and of the Merger; the offer, issuance, and distribution of any securities issued or to be issued pursuant to the Plan (including pursuant to or in connection with any Postpetition Aircraft Agreement), whether or not such distribution occurs following the Effective Date or the administration of the Plan or

property to be distributed under the Plan, except for actions found by Final Order to be willful misconduct, gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty (to the extent applicable), and ultra vires acts, and, in all respects, the Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

Following entry of the Confirmation Order, the Bankruptcy Court shall retain exclusive jurisdiction to consider any and all claims against any of the Exculpated Parties involving or relating to the administration of the Chapter 11 Cases, any rulings, orders, or decisions in the Chapter 11 Cases or any aspects of the Debtors' Chapter 11 Cases, including the decision to commence the Chapter 11 Cases, the development and implementation of the Plan and the Merger Agreement, the decisions and actions taken during the Chapter 11 Cases, and any asserted claims based upon or related to prepetition obligations or equity interests administered in the Chapter 11 Cases for the purpose of determining whether such claims belong to the Debtors' estates or third parties. In the event it is determined that any such claims belong to third parties, then, subject to any applicable subject matter jurisdiction limitations, the Bankruptcy Court shall have exclusive jurisdiction with respect to any such litigation, subject to any determination by the Bankruptcy Court to abstain and consider whether such litigation should more appropriately proceed in another forum.

## 2. Release

As of the Effective Date and subject to the occurrence of the Merger Effective Time, the Debtors release (i) all present and former directors and officers of the Debtors and any other Persons who serve or served as members of management of the Debtors, (ii) all post-Commencement Date advisors, consultants, agents, counsel, or other professionals of or to the Debtors, US Airways, the Creditors' Committee, the Retiree Committee, the Indenture Trustees, the Unions, the Search Committee, and the Ad Hoc Committee, and (iii) US Airways, the Indenture Trustees, the Unions, all current and former members (in their capacity as members of such committees) of the Creditors' Committee, the Retiree Committee, the Ad Hoc Committee, the Search Committee, Nuveen Asset Management, LLC (and each of its managed funds and accounts on behalf of which it executed the Support and Settlement Agreement) (in its capacity in negotiating the Support and Settlement Agreement and the Plan), and OppenheimerFunds, Inc. (and each of its managed funds and accounts that executed the Support and Settlement Agreement) (in its capacity in negotiating the Support and Settlement Agreement and the Plan), and their respective officers, directors, agents, and employees (including attorneys and other professionals retained by individual members of such committees) (collectively, the "**Released Parties**"), from any and all Causes of Action held by, assertable on behalf of, or derivative from the Debtors, in any way relating to the Debtors, the Chapter 11 Cases, the Plan, negotiations regarding or concerning the Plan, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, and the ownership, management, and

operation of the Debtors (including, for the avoidance of doubt, any and all claims related to *Pinellas Park Ret. Sys., et al., v. Arpey, et al.*, Cause No. 247999-10 (17th Jud. Dist. Ct., Tarrant County, Tex.)), except for actions found by Final Order to be willful misconduct (including, but not limited to, conduct that results in a personal profit at the expense of the Debtors' estates), gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty (to the extent applicable), and ultra vires acts, which Causes of Action are based on any act, event, or omission taking place before the Effective Date; *provided, however*, that the foregoing (a) shall not operate as a waiver of or release from any Causes of Action arising out of any express contractual obligation owing by any former director, officer, or employee of the Debtors or any reimbursement obligation of any former director, officer, or employee with respect to a loan or advance made by the Debtors to such former director, officer, or employee, and (b) shall not limit the liability of any counsel to their respective clients contrary to Rule 1.8(h)(1) of the New York Rules of Professional Conduct.  The Reorganized Debtors and any newly-formed Entities that will be continuing the Debtors' business after the Effective Date shall be bound by all the releases set forth above to the same extent that the Debtors are bound.

**J.    Conditions Precedent to Effectiveness of Plan**

**1.    Condition Precedent to Confirmation of Plan**

The following are conditions precedent to confirmation of the Plan:

(a)    The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Debtors and US Airways and reasonably satisfactory to the Creditors' Committee and the Majority of the Requisite Consenting Creditors; and

(b)    The Plan Supplement shall have been filed by the Debtors and the documents contained therein shall be in form and substance reasonably satisfactory to the Creditors' Committee.

**2.    Conditions Precedent to Effective Date**

The following are conditions precedent to the Effective Date of the Plan:

(a)    The Confirmation Order shall be in full force and effect, and no stay thereof shall be in effect;

(b)    All actions, documents, and agreements necessary to implement the Plan shall have been effected or executed;

(c)    The Debtors shall have received any authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are necessary to implement the Plan and are required by law, regulation, or order;

(d)    Each of the New AAG Certificate of Incorporation, the New AAG Bylaws, the Certificate of Designations, the Amended Certificates of Incorporation, the Amended Bylaws, and the New AAG 2013 Incentive Award Plan shall be in full force and effect;

(e)    All conditions precedent to consummation of the Merger, pursuant to the Merger Agreement, shall have been satisfied or waived in accordance with the Merger Agreement, and the Merger Closing shall occur contemporaneously with the Effective Date;

(f)    All of the matters set forth in Section 4.10 of the Merger Agreement and Section 4.1(o) of the American Disclosure Letter, including without limitation, the Chairman Letter Agreement, shall have been approved by the Bankruptcy Court and shall be in effect;

(g)    All of the Debtors' defined benefit plans shall have been frozen and the lump sum and installment forms of optional benefit payments for the Debtors' pilots shall have been eliminated; and

(h)    The Bankruptcy Court shall have entered an order finding that the aggregate amount of estimated Allowed Single-Dip General Unsecured Claims plus the amount of Disputed Single-Dip General Unsecured Claims utilized for determining the Disputed Claims Reserve to be established pursuant to Section 7.3 of the Plan shall not exceed $3.2 billion;

120

(i)    The Effective Date shall be no earlier than the sixth Business Day after entry of the Confirmation Order;

(j)    The Debtors shall have filed with the Bankruptcy Court a notice setting forth the proposed Effective Date at least six Business Days in advance of such proposed Effective Date; and

(k)    The global certificate representing the New Mandatorily Convertible Preferred Stock shall have been delivered to The Depository Trust Company pursuant to Section 5.3 of the Plan.

### 3.    Satisfaction and Waiver of Conditions

Except as otherwise provided in the Plan or in the Merger Agreement, any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  If the Debtors determine that any of the conditions precedent set forth in Section 9.2 of the Plan cannot be satisfied and the occurrence of such conditions is not waived or cannot be waived, then the Debtors shall file a notice of the failure of the Effective Date with the Bankruptcy Court.  Notwithstanding the foregoing, the Debtors reserve the right, with the consent of the Creditors' Committee and the Majority of the Requisite Consenting Creditors, to waive the occurrence of the conditions precedent set forth in Section 9.2 of the Plan or to modify any of such conditions precedent.  Any such written waiver of such condition precedents may be effected at any time, without notice or leave or order of the Bankruptcy Court, and without any other formal action other than proceeding to consummate the Plan.

### K.    Effects of Confirmation of Plan

### 1.    Vesting of Assets

Upon the Effective Date, pursuant to section 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors shall vest in the Reorganized Debtors free and clear of all Claims, liens, encumbrances, charges, and other interests, except as otherwise provided in the Plan.  The Reorganized Debtors may operate their businesses and use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as otherwise provided in the Plan.

### 2.    Discharge of Claims and Termination of Equity Interests

Except as otherwise provided in the Plan or in the Confirmation Order, the rights afforded in the Plan and the payments and distributions to be made under the Plan shall

discharge all existing debts and Claims and terminate all Equity Interests of any kind, nature, or description whatsoever against or in the Debtors or any of their assets or property to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as otherwise provided in the Plan, upon the Effective Date, all existing Claims against the Debtors and Equity Interests in the Debtors shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Equity Interests (and all representatives, trustees, or agents on behalf of each holder) shall be precluded and enjoined from asserting against the Reorganized Debtors, or any of their assets or property, any other or further Claim or Equity Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Equity Interest and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

### 3.    Release and Discharge of Debtors

Upon the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise expressly provided in the Plan, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Equity Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Equity Interests, rights, and liabilities that arose prior to the Effective Date.  Upon the Effective Date, all such Persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Equity Interest in the Debtors.

### 4.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or by separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.  For the avoidance of doubt, the Revised Final Order Pursuant to 11 U.S.C. §§ 105(a) and 362 Establishing Notification Procedures for Substantial Claimholders and Equity Security Holders and Approving Restrictions on Certain Transfers of Interests in the Debtors' Estates, entered by the Bankruptcy Court on April 11, 2013 (ECF No. 7591), shall remain in full force and effect beyond the Effective Date.

### 5.    Injunction Against Interference with Plan

Upon entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

### 6.    Injunction

Except as otherwise expressly provided in the Plan, all Persons or Entities who have held, hold, or may hold Claims or Equity Interests and all other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Equity Interest against the Debtors or the Reorganized Debtors or property of any of the Debtors or the Reorganized Debtors other than actions to enforce the Plan or with respect to the allowance of Claims and Equity Interests, (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtors or the Reorganized Debtors or property of any of the Debtors or the Reorganized Debtors, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or the Reorganized Debtors or against property or interests in property of the Debtors or the Reorganized Debtors, or (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtors or the Reorganized Debtors or against property or interests in property of the Debtors or the Reorganized Debtors, with respect to any such Claim or Equity Interest.  Such injunction shall extend to any successors of the Debtors and the Reorganized Debtors and their respective property and interests in property.

### 7.    Avoidance Actions

Other than any releases granted under the Plan, by the Confirmation Order, or by Final Order of the Bankruptcy Court, as applicable, from and after the Effective Date, the Reorganized Debtors shall have the right to prosecute any avoidance, equitable subordination, or recovery actions under sections 105, 502(d), 510, 542 through 551, and 553 of the Bankruptcy Code that belong to the Debtors.

### 8.    Retention of Causes of Action/Reservation of Rights

Except as otherwise provided in Section 10.8 of the Plan, nothing contained in the Plan or in the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or Causes of Action that the Debtors or the Reorganized Debtors may have or which the Reorganized Debtors may choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, (i) any and all Claims against any Person or Entity, to the extent such Person or Entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, the Reorganized Debtors, or their officers, directors, or representatives, and (ii) any cause of action for the turnover of any property of the Debtors' estates regardless of whether any such Claim is scheduled or otherwise disclosed.

Nothing contained in the Plan or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action, right of setoff or other legal or

equitable defense that the Debtors had immediately prior to the Commencement Date, against or with respect to any Claim left unimpaired by the Plan. The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, and other legal or equitable defenses that they had immediately prior to the Commencement Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights with respect to any Claim left unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

**L.    Retention of Jurisdiction by Bankruptcy Court**

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of, or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

1.    To hear and determine motions for the assumption, assumption and assignment, or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

2.    To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced before or after the Confirmation Date, including, without limitation, any proceeding with respect to a Cause of Action or Avoidance Action;

3.    To ensure that distributions to holders of Allowed Claims and Allowed Equity Interests are accomplished as provided under the Plan;

4.    To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim;

5.    To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

6.    To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

7.    To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code and to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

8.    To hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

9.    To hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated under the Plan, or any agreement, instrument, or other document governing or relating to any of the foregoing;

10.    To hear and determine disputes arising in connection with or related to the Disputed Claims Reserve;

11.    To hear and determine all matters as provided in Section 7.6 of the Merger Agreement;

12.    To take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation;

13.    To recover all assets of the Debtors and property of the Debtors' estates, wherever located;

14.    To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

15.    To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

16.    To enforce all orders previously entered by the Bankruptcy Court;

17.    To hear and determine any other matters related to the Plan and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

18.    To determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order, the Plan Supplement, or any contract, instrument, release, or other agreement or document related to the Plan, the Disclosure Statement, or the Plan Supplement, including the Merger Agreement;

19.    To hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

20.    To hear and determine any rights, claims, or causes of action held by or accruing to the Debtors or the Reorganized Debtors pursuant to the Bankruptcy Code or any federal or state statute or legal theory;

21.    To enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases;

22.    To hear any other matter not inconsistent with the Bankruptcy Code;

23.    To hear and determine any disputes arising in connection with the interpretation, implementation, or enforcement of any Postpetition Aircraft Agreement; and

24.    To enter a final decree closing the Chapter 11 Cases.

To the extent that the Bankruptcy Court is not permitted under applicable law to preside over any of the forgoing matters, the reference to the "Bankruptcy Court" in Article XI of the Plan shall be deemed to be replaced by the "District Court."  Nothing in Article XI of the Plan shall expand the exclusive jurisdiction of the Bankruptcy Court beyond that provided by applicable law.

## M.    Dissolution of Committees

On the Effective Date, the Retiree Committee shall dissolve; *provided, however*, that, following the Effective Date, the Retiree Committee shall continue to have standing and a right to be heard with respect to (i) applications for compensation by professionals and requests for allowance of Administrative Expenses for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code and (ii) any adversary proceedings and any appeals (including appeals of the Confirmation Order that remain pending as of the Effective Date) to which the Retiree Committee is a party.  On the date that is 180 days following the Effective Date, the Creditors' Committee shall dissolve (unless such date is extended with the written consent of the Reorganized Debtors or by the Bankruptcy Court for good cause shown); *provided, however*, that, following the Effective Date, the Creditors' Committee's standing and right to be heard shall be limited to (a) applications for compensation by professionals and requests for allowance of Administrative Expenses for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code, (b) participating in court hearings with respect to motions, adversary proceedings, or other actions (I) seeking enforcement or implementation of the provisions of the Plan or of the Confirmation Order, (II) relating to objections to Claims as set forth in Section 7.1 of the Plan, and (III) as otherwise consented to by the Reorganized Debtors or so ordered by the Bankruptcy Court for good cause shown; and (c) any litigation or contested matter to which the Creditors' Committee is a party as of the Effective Date. Notwithstanding the foregoing, following the Effective Date, the Creditors' Committee's membership shall be reduced to three members as selected by the Creditors' Committee prior to the Effective Date and its duties shall be limited to (u) participating in court hearings as provided in Section 12.1 of the Plan; (v) consulting with the Reorganized

126

Debtors with respect to the General Unsecured Claims reconciliation and settlement process conducted by or on behalf of the Reorganized Debtors; (w) consulting with the Reorganized Debtors with respect to appropriate procedures for the settlement of Claims; (x) consulting with the Reorganized Debtors with respect to the maintenance of, the Disputed Claims Reserve; (y) monitoring the distributions to the holders of Allowed Claims by the Disbursing Agent under the Plan; and (z) the matters set forth in Section 7.1 of the Plan.  For so long as the General Unsecured Claims reconciliation process shall continue and the Creditors' Committee has not been dissolved, the Reorganized Debtors shall make regular reports to the Creditors' Committee as and when the Reorganized Debtors and the Creditors' Committee may reasonably agree upon.  Following the Effective Date, the Creditors' Committee may retain professionals to assist it in carrying out its duties as limited above on terms that are reasonably acceptable to the Reorganized Debtors or authorized to be retained by further order of the Bankruptcy Court; *provided further*, that the Creditors' Committee's professional advisors and experts that have been retained by an order of the Bankruptcy Court prior to the Effective Date shall be deemed reasonably acceptable to the Reorganized Debtors.  The Reorganized Debtors shall continue to compensate the Creditors' Committee's professional advisors for reasonable services provided in connection with any of the foregoing post-Effective Date activities. On the Effective Date, the current and former members of the Creditors' Committee and the Retiree Committee, and their respective officers, employees, counsel, advisors, and agents, shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's and the Retiree Committee's respective attorneys, accountants, and other agents shall terminate, except to the extent provided in Section 12.1 of the Plan.

## N.    Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

## O.    Exemption From Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, Transfer, or exchange of Notes or equity securities under the Plan or in connection with the transactions contemplated thereby, the creation, filing, or recording of any mortgage, deed of trust, or other security interest, the making, assignment, filing, or recording of any lease or sublease, the transfer of title to or ownership of any of the Debtors' interests in any Aircraft Equipment, or the making or delivery of any deed, bill of sale, or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, the New Common Stock, any Postpetition Aircraft Agreement, any distribution from the Disputed Claims Reserve, or any agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan or in any Postpetition Aircraft Agreement, shall not be subject to any document

127

recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, Cape Town filing or recording fee, FAA filing or recording fee, or other similar tax or governmental assessment in the United States.  To the maximum extent provided by section 1146(a) of the Bankruptcy Code and applicable nonbankrutpcy law, the transactions pursuant to the Merger Agreement shall not be taxed under any law imposing a stamp tax or similar tax.

### P.    Expedited Tax Determination

New AAG or the Reorganized Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Debtors or the Reorganized Debtors for all taxable periods through the Effective Date.

### Q.    Sell-Down Procedures

In accordance with the Revised Final Order Pursuant to 11 U.S.C. §§ 105(a) and 362 Establishing Notification Procedures for Substantial Claimholders and Equity Security Holders and Approving Restrictions on Certain Transfers of Interests in the Debtors' Estates, entered by the Bankruptcy Court on April 11, 2013 (ECF No. 7591), a copy of which (without exhibits) is annexed to the Plan as Exhibit "C," Paragraphs (b)(iv)(1) through (9) thereto, together with any relevant definitions, are incorporated as part of the Plan.

### R.    Payment of Statutory Fees

On the Effective Date, and thereafter as may be required, the Debtors shall each (i) pay all the respective fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code and (ii) be responsible for the filing of consolidated post-confirmation quarterly status reports with the Bankruptcy Court in accordance with Rule 3021-1 of the Southern District of New York Local Bankruptcy Rules ("**Local Rules**"), which status reports shall include reports on the disbursements made by each of the Debtors.

### S.    Plan Modifications and Amendments

The Plan may be amended, modified, or supplemented by the Debtors or the Reorganized Debtors, as applicable, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct.  In addition, after the Confirmation Date, so long as such action does not materially adversely affect the treatment of holders of Claims or Equity Interests under the Plan, the Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with

respect to such matters as may be necessary to carry out the purposes and effects of the Plan. Prior to the Effective Date, the Debtors may, upon not less than five Business Days' notice to the attorneys for the Creditors' Committee and the Ad Hoc Committee, make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court; *provided, however*, that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests.

### T.    Revocation or Withdrawal of Plan

Subject to the terms of the Merger Agreement, the Debtors reserve the right to revoke, withdraw, or delay consideration of the Plan prior to the Confirmation Date, either entirely or with respect to one or more of the Debtors, and to file subsequent amended plans of reorganization. If the Plan is revoked, withdrawn, or delayed with respect to fewer than all of the Debtors, such revocation, withdrawal, or delay shall not affect the enforceability of the Plan as it relates to the Debtors for which the Plan is not revoked, withdrawn, or delayed. If the Debtors revoke the Plan in its entirety, the Plan shall be deemed null and void. In such event, nothing in the Plan shall be deemed to constitute a waiver or release of any Claim by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any other Person in any further proceedings involving the Debtors.

### U.    Courts of Competent Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

### V.    Severability

If, prior to entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors (with the prior written consent of US Airways, as provided under the Merger Agreement), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding the foregoing, in such case, the Plan only may be confirmed without such term or provision at the request of the Debtors with the consent of the Creditors' Committee, which consent shall not be unreasonably withheld. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or

invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### W.    Governing Law

Except to the extent the Bankruptcy Code or other U.S. federal law is applicable, or to the extent an Exhibit or Schedule to the Plan, a schedule in the Plan Supplement, or the Merger Agreement expressly provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof to the extent they would result in the application of the laws of any other jurisdiction.

### X.    Successors and Assigns

All the rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on, and inure to the benefit of, the heirs, executors, administrators, successors, and/or assigns of such Person.

### Y.    Time

In computing any period of time prescribed or allowed under the Plan, unless otherwise set forth under the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### V.    ALTERNATIVES TO THE PLAN

The Plan reflects discussions held between the Debtors, the Creditors' Committee, the Ad Hoc Committee, and various other parties in interest.  The Debtors have determined that the Plan is the best means to provide maximum recoveries to their stakeholders. Alternatives to the Plan which have been considered and evaluated by the Debtors during the course of the Chapter 11 Cases include, among other things (i) liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code, (ii) strategic combinations with other entities, and (iii) emergence as a stand-alone airline.  As detailed above, the Debtors' thorough consideration of these alternatives has led them to conclude that the Plan, when compared to other courses of action available to the Debtors, provides a greater and more expeditious recovery while minimizing the inherent risks to creditors and shareholders.

### A.    Continuation of the Chapter 11 Cases

If the Plan is not confirmed, then the Debtors may remain in chapter 11 proceedings.  Should this occur, then the Debtors would continue to operate their businesses and manage their properties as debtors in possession, while exploring

alternative consensual resolutions of the Chapter 11 Cases or prosecuting a non-consensual plan. Moreover, because the Exclusivity Period expires on May 29, 2013 and may not be further extended, any other party in interest could thereafter attempt to formulate and propose a competing plan of reorganization. Each of these alternatives would take time and result in an increase in the operating and other administrative expenses of the Chapter 11 Cases.

### B.    Liquidation Under Chapter 7 of the Bankruptcy Code

If the Plan or any other chapter 11 plan for the Debtors cannot be confirmed under section 1129(a) of the Bankruptcy Code, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, in which event a trustee would be elected or appointed to liquidate any remaining assets of the Debtors for distribution to creditors pursuant to chapter 7 of the Bankruptcy Code. A chapter 7 trustee, who would lack the depth of knowledge of the Debtors businesses the Debtors have developed over decades of operation, would be required to invest substantial time and resources to become familiar with the Chapter 11 Cases and investigate the facts underlying the multitude of Claims filed against the Debtors' estates.

As demonstrated below, if a chapter 7 trustee is appointed and the remaining assets of the Debtors are liquidated under chapter 7 of the Bankruptcy Code, all stakeholders would receive less than what they would receive under the Plan because of the (i) value to be realized from the Merger and the continuation of the Debtors' operations as part of a merged enterprise; (ii) additional Administrative Expenses involved in the appointment of a chapter 7 trustee and (iii) additional expenses and Claims, some of which would be entitled to priority treatment, which would be generated during the chapter 7 liquidation and, most importantly, the PBGC would hold significant Claims against all of the Debtors for liability related to the underfunded pension obligations.

## VI.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to holders of certain Claims and AMR Common Stock. This discussion does not address the U.S. federal income tax consequences to holders of Claims who are unimpaired, otherwise entitled to payment in full in cash under the Plan or deemed to reject the Plan.

The discussion of U.S. federal income tax consequences below is based on the Tax Code, Treasury regulations, judicial authorities, published positions of the IRS and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and are subject to significant uncertainties. Other than with respect to the Merger, the Debtors have not requested an opinion of counsel with respect to any of the tax aspects of the contemplated transactions. The Debtors have, however, requested a ruling from the

IRS concerning certain, but not all, of the U.S. federal income tax consequences of the Plan to the Debtors.  There is no assurance that a favorable ruling will be obtained, and the consummation of the Plan is not conditioned upon the issuance of such a ruling.

This summary does not address foreign, state or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (*e.g.*, foreign taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold Claims or AMR Common Stock through, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the AMT or the "Medicare" tax on unearned income, persons holding Claims or AMR Common Stock that are part of a straddle, hedging, constructive sale or conversion transaction, and persons who hold or received AMR Common Stock pursuant to the exercise of any employee stock option or otherwise as compensation).  In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires any of the New Common Stock or New Mandatorily Convertible Preferred Stock in the secondary market.

This discussion assumes that the Claims, the AMR Common Stock, the New Common Stock and the New Mandatorily Convertible Preferred Stock are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code, and that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

***The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances.***

***<u>Internal Revenue Service Circular 230 Notice</u>:  To ensure compliance with Internal Revenue Service Circular 230, holders of Claims and Equity Interests are hereby notified that:  (A) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Equity Interests for the purpose of avoiding penalties that may be imposed on them under the Internal Revenue Code; (B) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (C) holders of Claims and Equity Interests should seek advice based on their particular circumstances from an independent tax advisor.***

132

### A.   Consequences to the Debtors

For U.S. federal income tax purposes, the Debtors are members of an affiliated group of corporations (or disregarded entities wholly owned by members of such group), of which AMR is the common parent, which files a single consolidated U.S. federal income tax return (the "**AMR Group**").

The AMR Group has NOL carryforwards of approximately $6.6 billion and AMT credit carryforwards of approximately $370 million for U.S. federal income tax purposes as of the end of 2012.  The AMR Group currently expects to incur further operating losses through the end of 2013, taking into account the implementation of the Plan, in excess of $3.5 billion.  The amount of any such NOL carryforwards and other losses and AMT credit carryforwards, and the extent to which any limitations might apply, remains subject to audit and adjustment by the IRS.

As discussed below, in connection with the implementation of the Plan, the amount of the AMR Group's NOL carryforwards may be reduced and/or otherwise subject to significant limitations.

### 1.   Cancellation of Debt

In general, the Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes—such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets—by the amount of any cancellation of debt ("**COD**") incurred pursuant to a confirmed chapter 11 plan.  The amount of COD income incurred is generally the amount by which the indebtedness discharged exceeds the value of any consideration given in exchange therefor.  Certain statutory or judicial exceptions may apply to limit the amount of COD incurred for U.S. federal income tax purposes.  If advantageous, the borrower can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes.  Where the borrower joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the borrower and other members of the group also be reduced.  Any reduction in tax attributes in respect of COD income does not occur until after the determination of the borrower's (or group's) income or loss for the taxable year in which the COD is incurred.

The Debtors do not expect to incur a significant amount of COD as a result of the implementation of the Plan or any material reductions in the NOL carryforwards or other tax attributes of the AMR Group as a result thereof.  The amount of COD incurred will depend primarily on the fair market value of the New Common Stock and New Mandatorily Convertible Preferred Stock being issued pursuant to the Plan.

133

### 2.    Potential Limitations on NOL Carryforwards and Other Tax Attributes

Following the Effective Date, the NOL carryforwards, AMT credit carryforwards and certain other tax attributes of the AMR Group (including current year NOLs) allocable to periods prior to the Effective Date (collectively, "**pre-change losses**") will be subject to potential limitation under section 382 of the Tax Code.  Any section 382 limitations apply in addition to, and not in lieu of, the use of attributes or the attribute reduction that results from the COD arising in connection with the Plan.

Under section 382, if a corporation (or consolidated group) undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception in section 382(l)(5) of the Tax Code discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation.  The issuance of the New Common Stock and New Mandatorily Convertible Preferred Stock pursuant to the Merger and the Plan would constitute an "ownership change" of the AMR Group for these purposes.  As discussed below, the Debtors believe that they likely will benefit from the application of section 382(l)(5) and reasonably anticipate utilizing such section.

(a)    *General Annual Limitation*

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change will be subject is equal to the product of (i) the fair market value of the stock of the corporation *immediately before* the ownership change (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (*e.g.,* 2.77% for ownership changes occurring in April 2013).  As discussed below, this annual limitation often may be increased in the event the corporation (or consolidated group) has an overall "built-in" gain in its assets at the time of the ownership change.  For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally determined immediately *after* (rather than before) the ownership change after giving effect to the discharge of creditors' claims, but subject to certain adjustments (including, in certain circumstances, potentially reducing the fair market value of the corporation's stock by the fair market value of the stock of a controlled or consolidated subsidiary, which in this case may potentially require reducing the fair market value of the stock of New AAG by the fair market value of the stock of US Airways); in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.  The Debtors have requested certain rulings from the IRS with respect to the application of the modified annual limitation on a consolidated basis with respect to the Debtors; however, there is no assurance that the IRS will issue a favorable ruling on these matters.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year.  However,

134

if the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's pre-change losses, absent any increases due to recognized built-in gains discussed below.  Generally, NOL carryforwards expire after 20 years.

Section 382 of the Tax Code adjusts, in certain cases, for built-in gain or loss.  If the loss corporation has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized (or, according to an IRS notice, treated as recognized) during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance.  In general, a loss corporation's (or consolidated group's) net unrealized built-in gain will be deemed to be zero unless the actual value is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.  Based upon the valuation analysis referenced in Section IX.D of this Disclosure Statement, the Debtors currently estimate that they have a net unrealized built-in gain of approximately $4.9 billion.  The actual net unrealized built-in gain may be higher or lower depending on the value of the AMR Common Stock immediately before the Effective Date relative to that assumed.

(b)    *Section 382(l)(5) Bankruptcy Exception*

Under section 382(l)(5) of the Tax Code, an exception to the foregoing annual limitation rules generally applies where the shareholders and/or qualified (so-called "old and cold") creditors of a debtor receive or retain, in respect of their claims or equity interests, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan.  If section 382(l)(5) applies, the loss corporation's losses and tax credits will be reduced by the interest deductions claimed during the current and preceding three taxable years with respect to any debt that was exchanged for equity pursuant to the Chapter 11 Cases.  Moreover, if section 382(l)(5) applies and the debtor thereafter  undergoes another ownership change within two years, the debtor's pre-change losses with respect to such ownership change (which would include any pre-change loss as of the effective date of the plan of reorganization to the extent not yet used or otherwise reduced, and any NOLs incurred in the interim) will be subject to a section 382 limitation of zero, which may effectively render such pre-change losses unavailable.

Based in part on the AMR Trading Order and the ability thereunder, under certain circumstances, to require a sell-down of all or a portion of any unsecured claims that a Substantial Claimholder acquired during the Chapter 11 Cases, the Debtors believe that they likely will qualify under section 382(l)(5).  Nevertheless, neither the Tax Code nor the Treasury regulations address whether section 382(l)(5) applies on a consolidated basis or

135

only on a separate company basis.  The IRS has, however, issued one private letter ruling applying section 382(l)(5) on a consolidated basis under certain circumstances.  Although the present circumstances differ somewhat from those in the ruling, the Debtors believe that the consolidated application of section 382(l)(5) in the present context is proper.  The Debtors have requested certain rulings from the IRS with respect to the application of section 382(l)(5) on a consolidated basis with respect to the Debtors; however, there is no assurance that the IRS will issue a favorable ruling on these matters.  Even if the Debtors qualify for this exception, the Debtors may, if they so desire, elect not to have the exception apply and instead remain subject to the annual limitation described above.  Such election would have to be made in the Debtors' U.S. federal income tax return for the taxable year in which the Effective Date occurs.

Based on the Projections annexed hereto as **Exhibit "D"** and the valuation analysis referenced in Section IX.D of this Disclosure Statement, and an assumed Effective Date of August 31, 2013, the Debtors currently believe that, if section 382(l)(5) applies, New AAG would incur significant additional tax savings (on a present value basis using a 14% discount rate) than would otherwise result under an annual section 382 limitation.  Taking into account the additional operating losses that the Debtors project to incur in connection with the implementation of the Plan and the above-described reduction with respect to certain interest deductions, the Debtors currently project NOL carryfowards of approximately $9.7 billion as of the end of 2013 (without regard to any NOL carryfowards of US Airways, which will be subject to a separate annual limitation as a result of the Merger).  Under section 382(l)(5), all of these  NOLs would be available for immediate use without limitations.  In such case, based on the Projections annexed hereto at **Exhibit "D,"** it is anticipated that all available NOL carryforwards (including any available NOL carryforwards of US Airways) will be fully used within five years after the Effective Date.

In contrast, if section 382(l)(5) does not apply (either because the Debtors do not qualify or New AAG decides to elect not to apply it), the Debtors currently project that the resulting annual section 382 limitation (taking into account the adjustment for net unrealized built-in gain and conservatively excluding the fair market value of the stock of US Airways) would be approximately (i) $1.2 billion per year for the first five years after the Effective Date and (ii) $250 million per year thereafter.  The Debtors' project NOL carryforwards in this instance, as of the end of 2013, of approximately $10 billion (a slightly higher number, since there would be no reduction for previously deducted interest on converted debt).  In addition, a portion of the Debtors' NOLs for the year in which the Plan becomes effective may be allocated to the period after the Effective Date.  Such portion of the Debtors' NOL carryforwards would not be subject to such annual limitation.  Based on the above assumptions, among others, the Debtors estimate such portion at approximately $1.3 billion.  Even though a significant portion of the Debtors' NOL carryforwards would be used within the first five years, there would still be a meaningful amount that would be used over the succeeding 15 years, with some amount potentially expiring unused.

136

Because of the significant adverse impact a subsequent ownership change could have on New AAG's ability to use the Debtors' remaining NOL carryforwards and other valuable tax attributes (including at such time any remaining NOL carryforwards of US Airways) whether or not section 382(l)(5) applies, the New Common Stock and New Mandatorily Convertible Preferred Stock will be subject to certain transfer restrictions under the New AAG Certificate of Incorporation. *See* Section IV.F.20.a. of this Disclosure Statement.

### 3.    Alternative Minimum Tax

In general, a U.S. federal AMT is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular U.S. federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, generally only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular U.S. federal income tax liability in future taxable years when the corporation is no longer subject to the AMT.

### 4.    US Airways Merger

The Merger is intended to qualify as a "reorganization" within the meaning of section 368(a) of the Tax Code. In this regard, the Merger is conditioned, among other things, upon (i) US Airways receiving a written opinion from Latham & Watkins LLP, counsel to US Airways, and (ii) AMR receiving a written opinion from Weil, Gotshal & Manges LLP, counsel to the Debtors, in each case dated as of the Effective Date, to the effect that, on the basis of the facts, representations, assumptions, and exclusions set forth in such opinion and certificates to be obtained from officers of US Airways and AMR, the Merger will so qualify. Following approval of the Merger by the stockholders of US Airways, US Airways cannot waive its condition (absent resoliciting approval of the Merger from its stockholders). Regardless of whether the Merger so qualifies, the Merger will be treated for U.S. federal income tax purposes as an acquisition by AMR of all of the US Airways Common Stock.

### B.    Consequences to U.S. Holders of Certain Claims and AMR Common Stock

As used in this section of the Disclosure Statement, the term "**U.S. Holder**" means a beneficial owner of Claims, AMR Common Stock, New Common Stock, or New Mandatorily Convertible Preferred Stock that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof, or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership or other entity taxable as a partnership for U.S. federal income tax purposes holds Claims, AMR Common Stock, New Common Stock, or New Mandatorily Convertible Preferred Stock, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership.  If you are a partner in a partnership holding any of such instruments, you should consult your own tax advisor.

### 1.    Exchanges of Claims Under the Plan

Pursuant to the Plan, and in complete and final satisfaction of their respective Claims, (i) holders of AMR General Unsecured Guaranteed Claims and American General Unsecured Guaranteed Claims will receive New Mandatorily Convertible Preferred Stock, (ii) holders of AMR Other General Unsecured Claims, American Other General Unsecured Claims, and Eagle General Unsecured Claims will receive New Mandatorily Convertible Preferred Stock and possibly (following the mandatory conversion of all New Mandatorily Convertible Preferred Stock or, from the Disputed Claims Reserve, as Disputed Claims are Disallowed) New Common Stock (such contingent rights to receive such New Common Stock are hereinafter referred to as the "**Contingent Rights**"), and (iii) holders of Convenience Class Claims will receive Cash.  *See* "Disputed Claims Reserve" below.

The Plan provides that New Common Stock and New Mandatorily Convertible Preferred Stock to be distributed to the holders of Claims is distributed by the Disbursing Agent on behalf of the applicable Debtor, and that in the case of AMR General Unsecured Guaranteed Claims and American General Unsecured Guaranteed Claims, all distributions shall be made on behalf of the primary obligor of such Claims.  Accordingly, all New Common Stock and New Mandatorily Convertible Preferred Stock to be distributed pursuant to the Plan (other than with respect to the conversion of the New Mandatorily Convertible Preferred Stock) to holders of Claims against a Debtor other than Claims as to which AMR is the primary obligor ("**AMR Primary Claims**") will be contributed by Reorganized AMR (directly or indirectly) to the applicable Debtor and then distributed to the holders of Claims or the Disputed Claims Reserve, as applicable.

An exchange by a U.S. Holder of Claims (other than AMR Primary Claims) for New Common Stock and/or New Mandatorily Convertible Preferred Stock, and an exchange by a U.S. Holder of Convenience Class Claims for Cash, will be treated as a fully taxable transaction, with the consequences described below in "Fully Taxable Exchange."

The U.S. federal income tax consequences of the Plan to a U.S. Holder of AMR Primary Claims will depend on whether such Claims constitute "securities" of AMR for U.S. federal income tax purposes. This determination is made separately for each type of AMR Primary Claim. If an AMR Primary Claim constitutes a security of AMR, then the receipt of New Mandatorily Convertible Preferred Stock and/or New Common Stock in exchange therefor will be treated as a "recapitalization" for U.S. federal income tax purposes, as applicable, with the consequences described below in "Recapitalization Treatment." If, on the other hand, an AMR Primary Claim does not constitute a security of AMR, then the receipt of New Mandatorily Convertible Preferred Stock and/or New Common Stock in exchange therefor will be treated as a fully taxable transaction, with the consequences described below in "Fully Taxable Exchange."

The term "security" is not defined in the Tax Code or in the Treasury regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not. One of the most significant factors considered in determining whether a particular debt obligation is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of less than five years do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten years or more constitute securities. U.S. Holders of AMR Primary Claims are urged to consult their own tax advisors regarding the appropriate status for U.S. federal income tax purposes of their Claims.

(a)   *Recapitalization Treatment – AMR Primary Claims*

If an AMR Primary Claim constitutes a security of AMR, the receipt of New Mandatorily Convertible Preferred Stock and/or New Common Stock (including the receipt of New Common Stock pursuant to the Contingent Rights) in exchange therefor will qualify as a recapitalization for U.S. federal income tax purposes. The classification as a recapitalization generally serves to defer the recognition of any gain or loss by the U.S. Holder. In addition, even within an otherwise tax-free recapitalization exchange, a U.S. Holder will have interest income to the extent of any exchange consideration allocable to accrued but unpaid interest not previously included in income (*see* "Distributions in Respect of Accrued But Unpaid Interest" below) and may have imputed interest income with respect to New Common Stock received after the Effective Date.

139

In a recapitalization exchange, a U.S. Holder's aggregate tax basis in the stock received (including stock received pursuant to the Contingent Rights) will equal such U.S. Holder's aggregate adjusted tax basis in the AMR Primary Claims exchanged therefor, increased by any interest income recognized in the exchange; and the U.S. Holder's holding period in the stock received will include its holding period in the AMR Primary Claims exchanged therefor, except to the extent of any exchange consideration received in respect of accrued but unpaid interest or treated as imputed interest income.

(b)    *Fully Taxable Exchange*

In general, if the exchange of a Claim pursuant to the Plan is a fully taxable exchange, the exchanging U.S. Holder should recognize gain or loss in an amount equal to the difference, if any, between (i) the aggregate fair market value of any New Mandatorily Convertible Preferred Stock and any Contingent Right (or, in the case of a U.S. Holder of a Convenience Class Claim, the amount of Cash) received in respect of its Claim on the Effective Date (other than any exchange consideration received in respect of a Claim for accrued but unpaid interest), and (ii) the U.S. Holder's adjusted tax basis in the Claims exchanged (other than any tax basis attributable to accrued but unpaid interest).  *See* "Character of Gain or Loss" below.  In addition, a U.S. Holder of a Claim will have interest income to the extent of any exchange consideration allocable to accrued but unpaid interest not previously included in income (*see* "Distributions in Respect of Accrued But Unpaid Interest" below).

Generally, a U.S. Holder's adjusted tax basis in a Claim will be equal to the cost of the Claim to such U.S. Holder, increased by any original issue discount ("**OID**") previously included in income.  If applicable, a U.S. Holder's tax basis in a Claim also will be (i) increased by any market discount previously included in income by such U.S. Holder pursuant to an election to include market discount in gross income currently as it accrues, and (ii) reduced by any Cash payments received on the Claim other than payments of qualified stated interest, and by any amortizable bond premium that the U.S. Holder has previously deducted.

In the case of a taxable exchange, a U.S. Holder's tax basis in any New Mandatorily Convertible Preferred Stock or Contingent Right received in respect of its Claim on the Effective Date should equal the fair market value of such stock or right on the Effective Date.  The U.S. Holder's holding period in such stock or right received should begin on the day following the Effective Date.

There is substantial uncertainty regarding the characterization of the Contingent Rights in the context of a taxable exchange, such as whether the Contingent Rights should be treated for U.S. federal income tax purposes as an equity interest or other security of AMR or as a contractual right to receive New Common Stock.  If the Contingent Rights are treated in a manner similar to an equity interest or other security of AMR, the receipt of New Common Stock pursuant to the Contingent Rights may be treated as a tax-free recapitalization, with tax consequences similar to the receipt of New Common Stock upon

140

conversion of the New Mandatorily Convertible Preferred Stock (*see* "Ownership of New Mandatorily Convertible Preferred Stock – Conversion into New Common Stock" below). If the Contingent Rights are not characterized as an equity interest or other security of AMR, a U.S. Holder generally should recognize gain or loss upon the receipt of New Common Stock pursuant to the Contingent Right in an amount equal to the difference, if any, between (i) the aggregate fair market value of any New Common Stock so received (other than any New Common Stock treated as imputed interest income, as discussed below) as determined on the date of receipt of such New Common Stock and (ii) the U.S. Holder's adjusted tax basis in the Contingent Right. If gain or loss is recognized, the holder's tax basis in any New Common Stock received with respect to the Contingent Right should equal the fair market value of such stock on the date received, and the holding period in such stock should begin on the day following the date of receipt. There is no clear guidance on whether any gain or loss recognized on the receipt of New Common Stock in such instance would be capital or ordinary in character.

In addition, a U.S. Holder of a Contingent Right may have imputed interest income with respect to New Common Stock received pursuant to the Contingent Right.

U.S. Holders of Claims are urged to consult their own tax advisors regarding (i) the characterization of the Contingent Rights as possibly an equity interest or other security or as a contractual right to receive New Common Stock and (ii) in the latter event, the possible application of (or ability to elect out of) the "installment method" of reporting any gain that may be recognized by such holders in respect of their Claims due to the receipt of New Common Stock in a taxable year subsequent to the taxable year in which the Effective Date occurs. The discussion herein assumes that the installment method does not apply.

<div align="center">(c) <em>Character of Gain or Loss</em></div>

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction.

A U.S. Holder that purchased its Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) its stated principal amount or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a *de minimis* amount. The *de minimis* amount is equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of

<div align="center">141</div>

remaining whole years to maturity. Generally, qualified stated interest is a stated amount of interest payable in Cash at least annually.

Under these rules, any gain recognized on the exchange of Claims (other than in respect of a Claim for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the U.S. Holder, on a constant yield basis) during the U.S. Holder's period of ownership, unless the U.S. Holder elected to include the market discount in income as it accrued. If a U.S. Holder of Claims did not elect to include market discount in income as it accrued and thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would become deductible at the time of the exchange as long as the exchange is not a recapitalization exchange.

In the case of an exchange of Claims that qualifies as a recapitalization, the Tax Code indicates that any accrued market discount in respect of the Claims should not be currently includible in income under Treasury regulations to be issued. However, such accrued market discount should carry over to any non-recognition property received in exchange therefor (*i.e.*, to the New Mandatorily Convertible Preferred Stock and/or New Common Stock received in the exchange). Any gain recognized by a U.S. Holder upon a subsequent disposition of such New Mandatorily Convertible Preferred Stock or New Common Stock would be treated as ordinary income to the extent of any accrued market discount not previously included in income. To date, specific Treasury regulations implementing this rule have not been issued.

(d)    *Distributions in Respect of Accrued But Unpaid Interest*

In general, to the extent that any consideration received pursuant to the Plan by a U.S. Holder of a Claim is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income). Conversely, a U.S. Holder generally recognizes a deductible loss to the extent any accrued interest claimed or accrued OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current loss with respect to any accrued unpaid OID. Accordingly, it is also unclear whether, by analogy, a U.S. Holder of a Claim that does not constitute a security would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

The Plan provides that, except as otherwise required by law (as reasonably determined by the Debtors), consideration received in respect of a General Unsecured Claim is allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim, including any Claim for accrued but unpaid interest (in contrast, for example, to a pro rata allocation of a portion of the exchange consideration received between principal and

142

interest, or an allocation first to accrued but unpaid interest).  *See* Section 5.8 of the Plan.
There is no assurance that the IRS will respect such allocation for U.S. federal income tax
purposes.  You are urged to consult your own tax advisor regarding the allocation of
consideration and the inclusion and deductibility of accrued but unpaid interest for U.S.
federal income tax purposes.

### 2.    Ownership of New Mandatorily Convertible Preferred Stock

The Debtors believe that the New Mandatorily Convertible Preferred Stock is
participating stock for U.S. federal income tax purposes that generally should not be
subject to the preferred OID rules under section 305 of the Tax Code.  No regulations or
other administrative guidance have been issued addressing an instrument with terms
similar to the New Mandatorily Convertible Preferred Stock and, consequently, there is
uncertainty regarding the application of the preferred OID rules to the New Mandatorily
Convertible Preferred Stock.  Accordingly, you should consult your own tax advisor
regarding the U.S. federal income tax consequences of the acquisition, ownership, and
disposition of the New Mandatorily Convertible Preferred Stock.  The Debtors intend to
treat the New Mandatorily Convertible Preferred Stock as participating stock for U.S.
federal income tax purposes, and the remainder of this discussion assumes the correctness
of the Debtors' position.

**Conversion into New Common Stock**.  The conversion of New Mandatorily
Convertible Preferred Stock into New Common Stock will not be a taxable event.  A U.S.
Holder's tax basis in the New Common Stock received upon a conversion of New
Mandatorily Convertible Preferred Stock will equal the tax basis of the New Mandatorily
Convertible Preferred Stock that was converted.  The U.S. Holder's holding period for the
New Common Stock received will include the U.S. Holder's holding period for the New
Mandatorily Convertible Preferred Stock converted.

**Constructive Dividends**.  The conversion rate of the New Mandatorily Convertible
Preferred Stock will be adjusted in certain circumstances.  Under the Tax Code and
applicable Treasury regulations, adjustments that have the effect of increasing a holder's
interest in New AAG's assets or earnings and profits may, in some circumstances, result in
a deemed distribution to the holder.  Any deemed distribution will be taxed and reported to
the IRS in the same manner as an actual distribution.  U.S. Holders should consult their tax
advisors as to the tax consequences of receiving constructive dividends.

### 3.    Exchanges of AMR Common Stock Under the Plan

Pursuant to the Plan, holders of AMR Common Stock will receive New Common
Stock, and additional distributions may be received as Disputed Claims are disallowed.
*See* "Disputed Claims Reserve" below.  Such exchange will qualify as a recapitalization
for U.S. federal income tax purposes, which generally serves to defer the recognition of
any gain or loss by the U.S. Holder.  In addition, even within an otherwise tax-free
recapitalization exchange, a U.S. Holder may have imputed interest income with respect to

143

New Common Stock received after the Effective Date.  A U.S. Holder's aggregate tax basis in the New Common Stock received will equal the U.S. Holder's aggregate adjusted tax basis in the AMR Common Stock exchanged therefor, increased by any imputed interest income; and the U.S. Holder's holding period in the New Common Stock received will include its holding period in the AMR Common Stock exchanged therefor, except to the extent of any New Common Stock treated as imputed interest income.

### 4.    Disposition of New Common Stock and New Mandatorily Convertible Preferred Stock

Unless a non-recognition provision applies and subject to the discussion above with respect to market discount (*see* "Exchanges of Claims Under the Plan—Character of Gain or Loss") and the discussion below, U.S. Holders generally will recognize capital gain or loss upon the sale or exchange (other than a conversion) of the New Common Stock or New Mandatorily Convertible Preferred Stock in an amount equal to the difference between the U.S. Holder's adjusted tax basis in the New Common Stock or New Mandatorily Convertible Preferred Stock and the sum of the Cash plus the fair market value of any property received from such disposition.  Any such gain or loss generally should be long-term if the U.S. Holder's holding period for its New Common Stock or New Mandatorily Convertible Preferred Stock is more than one year at that time.  A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders.  The deductibility of capital loss is subject to significant limitations.

Any gain recognized by a U.S. Holder upon a subsequent disposition of the New Common Stock or New Mandatorily Convertible Preferred Stock (or any stock or property received for it in a later tax-free exchange) received in exchange for a Claim the primary obligor of which is AMR, a disregarded subsidiary of AMR, a first-tier corporate subsidiary of AMR or a disregarded subsidiary of such corporate subsidiary will be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any ordinary loss deductions incurred upon exchange of the Claim, decreased by any income (other than interest income) recognized by the U.S. Holder upon exchange of the Claim, and (ii) with respect to a Cash basis U.S. Holder and in addition to clause (i) above, any amounts which would have been included in its gross income if the U.S. Holder's Claim had been satisfied in full but which was not included by reason of the Cash method of accounting.

### 5.    Disputed Claims Reserve

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Disbursing Agent of a private letter ruling if the Disbursing Agent so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Disbursing Agent), the Disbursing Agent will treat the Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9.  All parties (including, without limitation, the Disbursing Agent, the Reorganized Debtors, and the holders of Claims and Equity Interests) will be required to report for tax purposes consistently with the foregoing.  The remainder of this

discussion assumes that the Disputed Claims Reserve is treated as a disputed ownership fund.

The Disputed Claims Reserve will be a separate taxable entity for U.S. federal income tax purposes subject to a separate entity-level tax at the maximum rate applicable to trusts and estates, and all distributions from such reserve will be taxable to such reserve as if sold at fair market value.  Any distributions from the Disputed Claims Reserve will be treated for U.S. federal income tax purposes as if received directly by the recipient from the Debtors with respect to the original Claim (or, as may be applicable in the case of a holder of a previously allowed Claim, with respect to the Contingent Rights) or Equity Interest of such recipient.

The Disputed Claims Reserve will be responsible for payment, out of the assets of the Disputed Claims Reserve, of any taxes imposed on such reserve or its assets.  In the event, and to the extent, any Cash in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of such reserve may be sold to pay such taxes.  For example, assume that a Disputed Claim is subsequently allowed and that the holder ordinarily would have received 10,000 shares of New Common Stock, with a value of $10,000 on the Effective Date.  If the shares appreciated in value to $11,000 from the Effective Date to the date such shares are released from the Disputed Claims Reserve, a portion of the shares may be sold to pay any taxes expected to be incurred by the Disputed Claims Reserve on the release of the shares and the distribution to the holder of the subsequently allowed Claim will be reduced as a result.

### 6.    Information Reporting and Backup Withholding

Payments of interest (including accruals of OID) or dividends and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement, or other disposition of the exchange consideration, may be subject to "backup withholding" (currently at a rate of 28%) if a recipient of those payments fails to furnish to the payor certain identifying information, and, in some cases, a certification that the recipient is not subject to backup withholding. Backup withholding is not an additional tax.  Any amounts deducted and withheld generally should be allowed as a credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner.  Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions.  Information also may be required to be provided to the IRS concerning payments, unless an exemption applies. You should consult your own tax advisor regarding your qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. You are urged to consult your own tax advisor regarding these regulations and whether the contemplated transactions under the Plan would be subject to these regulations and require disclosure on your tax return.

## VII. VOTING PROCEDURES AND REQUIREMENTS

### A. Ballots and Voting Deadline

IT IS IMPORTANT THAT THE HOLDERS OF CLAIMS IN AMR CLASSES 3, 4, AND 5; AMERICAN CLASSES 4, 5, 6, and 7; AND EAGLE CLASSES 3 AND 4 TIMELY EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN. All known holders of Claims and Equity Interests entitled to vote on the Plan have been sent a Ballot together with this Disclosure Statement. Such holders should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot that accompanies this Disclosure Statement.

The Debtors have engaged GCG, Inc. as their Voting Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan. **IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT AS SET FORTH IN YOUR BALLOT, AT THE ADDRESS SET FORTH BELOW BEFORE THE VOTING DEADLINE OF [_____ __, 2013 AT _:00 P.M.] (EASTERN TIME).**

IF YOU MUST RETURN YOUR BALLOT TO YOUR BANK, BROKER, OR OTHER NOMINEE, OR TO ITS AGENT, YOU MUST RETURN YOUR BALLOT TO SUCH PARTY IN SUFFICIENT TIME FOR SUCH PARTY TO PROCESS YOUR BALLOT AND RETURN IT TO THE VOTING AGENT AS SET FORTH IN YOUR BALLOT, BEFORE THE VOTING DEADLINE.

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE VOTING AGENT AS SET FORTH IN YOUR BALLOT. ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN SHALL NOT BE COUNTED AS EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AS SET FORTH IN YOUR BALLOT, AT 1-888-285-9438 (DOMESTIC TOLL FREE) OR 1-440-389-7498 (INTERNATIONAL):

**If by overnight or hand delivery:          If by standard mailing:**

146

AMR Corporation, *et al.* c/o GCG          AMR Corporation, *et al.* c/o GCG
5151 Blazer Parkway, Suite A               P.O. Box 9852
Dublin, OH  43017                          Dublin, OH 43017-5752

### B.    Holders of Claims and Equity Interests Entitled to Vote

AMR Classes 3, 4, and 5; American Classes 4, 5, 6, and 7; and Eagle Classes 3 and 4 are the only Classes under the Plan that are impaired and entitled to vote to accept or reject the Plan.  Each holder of a Claim or Equity Interest in such Classes, as of the Record Date established by the Debtors for purposes of this solicitation, may vote to accept or reject the Plan (other than holders of Claims subject to an objection filed by the Debtors).

### C.    Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a chapter 11 plan by a class of claims occurs when holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the allowed claims of that class that cast ballots for acceptance or rejection of the chapter 11 plan vote to accept the plan.  Thus, acceptance of the Plan by AMR Class 3, for example, will occur only if at least two-thirds (2/3) in dollar amount and a majority in number of the holders of AMR Class 3 Claims that actually cast their Ballots, vote to accept the Plan.  A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

### D.    Voting Procedures

#### 1.    Holders of Claims and Equity Interests in Classes Entitled to Vote

All holders of Claims in AMR Classes 3, 4, and 5; American Classes 4, 5, 6, and 7; and Eagle Classes 3 and 4 that are entitled to vote on the Plan should complete the enclosed Ballot and return it to the Voting Agent (or bank, broker, or other nominee) as set forth in the Ballot so that it is received by the Voting Agent before the Voting Deadline.

#### 2.    Withdrawal of Ballot or Master Ballot

Any voter that has delivered a valid Ballot or Master Ballot (as used in the Approval Order) may withdraw its vote, subject to Bankruptcy Rule 3018, by delivering a written notice of withdrawal to the Voting Agent before the Voting Deadline, which notice of withdrawal, to be valid, must be (i) signed by the party who signed the Ballot or Master Ballot to be revoked and (ii) received by the Voting Agent before the Voting Deadline. The Debtors may contest the validity of any withdrawals.

Any holder that has delivered a valid Ballot or Master Ballot may not change its vote, except in accordance with the Approval Order and Bankruptcy Rule 3018.  In the

147

case where more than one timely, properly completed Ballot or Master Ballot is received by the Voting Agent, only the Ballot or Master Ballot that bears the latest date shall be counted unless the holder of the Claim or Equity Interest receives Bankruptcy Court approval to have the Ballot or Master Ballot that bears the earliest date counted; *provided, however*, that in the event the Ballot or Master Ballot is not dated, then only the Ballot or Master Ballot that was received by the Voting Agent on the latest date shall be counted, unless the holder of the Claim or Equity Interest receives Bankruptcy Court approval to have the Ballot or Master Ballot that was received by the Voting Agent on the earliest date counted; and *further provided*, that the foregoing shall not apply to a Master Ballot that merely supplements, rather than amends or supersedes, a previously-delivered Master Ballot.

## VIII. FACTORS TO CONSIDER BEFORE VOTING

Prior to voting to accept or reject the Plan, holders of Claims and AMR Equity Interests should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference thereto. The factors below should not be regarded as the only risks associated with the Plan or its implementation. Documents filed with the SEC may contain important risk factors that differ from those discussed below. Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov.

### A. Risks Associated with the Merger

#### 1. Conditions to Consummation of Merger

The Merger Agreement contains a number of customary conditions precedent to consummation of a merger of the size and complexity of the Merger. The failure to satisfy such conditions may cause the termination of the Merger Agreement. These conditions include, among others, (i) the accuracy of representations and warranties in all material respects, (ii) the fulfillment of obligations set out in covenants, (iii) that certain consents and regulatory approvals have been obtained, (iv) that there are no legal prohibitions against consummation of the Merger, (v) that the approval of US Airways' stockholders has been received, (vi) that the Confirmation Order is in effect, (vii) that the Plan conforms to the requirements set out in the Merger Agreement, and (viii) that secured indebtedness of the Debtors and certain other Claims not exceed specified levels. Further, US Airways has the right to unilaterally terminate the Merger Agreement under certain conditions.

Many of the conditions precedent to consummation of the Merger are not within the Debtors' control and the Debtors cannot predict when or if these conditions will be satisfied. If any of these conditions are not satisfied or waived prior to the termination date set forth in the Merger Agreement (October 14, 2013, as it may be extended), it is possible that the Merger will not be consummated. Failure to consummate the Merger in accordance with the Merger Agreement may result, under certain circumstances, in

termination fees payable by the Debtors, among other things.  In addition, if the Merger is not consummated pursuant to the Plan, the Confirmation Order will be vacated, the Plan shall be null and void, and the administration of the Chapter 11 Cases will continue.

### 2.    Loss of Senior Management and Key Employees

As a result of the Chapter 11 Cases and the proposed Merger, the Debtors' employees are facing considerable uncertainty as to their ongoing employment security and what roles they may have in New AAG.   A material erosion of such employees' commitment or the inability to retain such employees could have a material adverse effect on the Debtors' and New AAG's business, financial condition, and results of operations because of the experience and industry knowledge of certain officers and other key employees.  Therefore, New AAG's success after the Merger may depend in part upon its ability to retain key management personnel and other key employees.  Likewise, if the Merger is not consummated, the Debtors will be dependent on their existing officers and other key employees to develop and execute the Independent Emergence Alternative.  There can be no assurance that such officers and key employees can be retained.

### 3.    Integration After Merger

The Merger involves the combination of two public companies that currently operate independently, each of which operates its own international network airline.  Historically, the integration of separate airlines has proven to be more time consuming and has required more resources than initially estimated.  The Debtors will be required to devote significant management attention and resources to integrating the Debtors' and US Airways' business practices, cultures, and operations.  Potential difficulties New AAG may encounter as part of the integration process include the following:

- The inability to successfully combine the Debtors' business with that of US Airways in a manner that permits New AAG to achieve the synergies and other benefits anticipated to result from the Merger;

- The challenge of integrating complex systems, operating procedures, regulatory compliance programs, technology, aircraft fleets, networks, and other assets of the two companies in a seamless manner that minimizes any adverse impact on customers, suppliers, employees, and other constituencies;

- The challenge of integrating the workforces of the Debtors and US Airways while maintaining focus on providing consistent, high-quality customer service, and efficient operation; and

- Potential unknown liabilities, liabilities that are significantly larger than the Debtors and US Airways currently anticipate, and unforeseen increased expenses or delays associated with the Merger, including one-time Cash costs to integrate the two businesses that may exceed the approximately $1.2

billion of one-time Cash costs that the Debtors and US Airways currently
anticipate.

Accordingly, even if the Merger is consummated, the contemplated benefits may
not be realized fully, or at all, or may take longer to realize than expected.

In addition, both the Debtors and US Airways have operated and, until the
completion of the Merger, will continue to operate independently.  It is possible that the
integration process could result in:

- Diversion of the attention of New AAG's management and other employees;
  and

- The disruption of, or the loss of momentum in, New AAG's ongoing
  business, or inconsistencies in standards, controls, procedures, and policies,
  any of which could materially and adversely affect New AAG's ability to
  maintain relationships with customers, suppliers, employees, and other
  constituencies or its ability to achieve the anticipated benefits of the Merger.

### 4.    Registration of Plan Securities on a National Exchange

As mentioned in Section II.C.1 of this Disclosure Statement, trading in AMR
Common Stock and certain AMR debt securities on the NYSE was suspended and such
securities were ultimately delisted from the NYSE by the SEC.  Subsequently, such
securities began trading under the symbol "AAMRQ" on the OTCQB marketplace.

The current trading price of AMR Common Stock does not reflect the price at
which the New Common Stock will trade.  The Plan contemplates the cancellation of all
outstanding AMR Common Stock and other AMR Equity Interests and the issuance of
New Common Stock under the Plan.  The Debtors cannot predict with any degree of
certainty the price at which the New Common Stock will trade.

It is a condition to the Merger Closing that the New Common Stock be listed on the
NYSE or The NASDAQ Stock Market.  There can be no assurance that this condition can
be satisfied or that it can be satisfied prior to the time that a party would have the right to
terminate the Merger Agreement if the condition is not waived.

### 5.    Factors Affecting Price of New Common Stock

Pursuant to the Plan and the Merger Agreement, holders of Claims and AMR
Equity Interests will receive shares of New Common Stock.  The Debtors' businesses prior
to the Merger differ from those of New AAG, and accordingly the results of operations of
the combined company may be affected by factors different from those currently affecting
the results of operations of the Debtors.  These factors may affect the value of the New
Common Stock.

### 6.    Dilution From Future Stock Issuance

Upon consummation of the Merger and the occurrence of the Effective Date under the Plan, New AAG or the Disbursing Agent, as applicable, will issue New Common Stock to the holders of Claims and AMR Equity Interests and to holders of US Airways Common Stock.  Additionally, the Plan includes, and the Merger Agreement contemplates, an equity-based incentive compensation plan for officers and employees of New AAG.  The amount and dilutive effect of such issuances could be material.

### B.    Additional Risks Associated With the Debtors' and New AAG's Business Operations and Financial Condition

### 1.    Fuel Costs

While the Debtors currently seek (and New AAG may seek) to manage the risk of fuel price increases by using derivative contracts, there can be no assurance that, at any given time, the derivatives in place will provide any particular level of protection against increased fuel costs.  In addition, market factors may negatively affect the ability of the Debtors and/or New AAG to enter into derivative contracts.  Furthermore, dependence on foreign imports of crude oil, limited refining capacity, and the possibility of changes in government policy on jet fuel production, transportation, and marketing make it impossible to accurately predict the future availability of jet fuel or its cost.

### 2.    Labor

The Debtors' business is, and New AAG's business will be, labor intensive, employing significant numbers of pilots, flight attendants, and other personnel.  In connection with the Chapter 11 Cases and the negotiation of the Merger Agreement, the Debtors believe that CBAs and related agreements have been negotiated with their unions, which will facilitate the Merger, mitigate the potential for unanticipated labor costs, and provide a labor cost structure for New AAG that will permit it to compete successfully.  Nevertheless, there is a risk that employees may engage in labor disruptions, with or without union involvement, even if such disruptions are not permitted by the Railway Labor Act.  Any disruption by a labor work group (*e.g.*, sick-out, slowdown, full or partial strike, or other job action) may materially adversely affect the Debtors' and/or New AAG's businesses, financial condition, and results of operations.

### 3.    Environmental Regulation

Many aspects of the Debtors' operations are, and New AAG's operations will be, subject to increasingly stringent environmental regulations, including those relating to emissions, discharges to surface and subsurface waters, safe drinking water, and the management of hazardous substances, oils, and waste materials.  Compliance with such laws and regulations may require significant expenditures.  Further, concerns about climate change and greenhouse gas emissions, in particular, may result in the imposition of

additional legislation or regulation.  It is currently unknown how climate change legislation or regulations, if enacted, would specifically apply to the aviation industry.

### 4.    Increased Insurance Costs and Reduced Coverage

The Debtors and US Airways carry insurance for public liability, passenger liability, property damage, and all-risk coverage for damage to their aircraft.  As a result of the September 11th terrorist attacks, aviation insurers imposed significant increases in the premiums for general aviation insurance and significantly reduced the available liability coverage for claims resulting from acts of terrorism, war, or similar events ("**War-Risk Coverage**"). While commercial insurance premiums have since declined, the Debtors cannot predict whether there will be additional cost increases in the future.  If there are additional increases in premium prices and/or further reductions in available coverage, the Debtors and/or New AAG may be adversely affected.

### 5.    Increased Pilot Retirements

From time to time in the past, the Debtors experienced higher than normal rates of pilot retirements, and the Debtors currently have a higher than normal number of pilots eligible for retirement.  If pilot retirements were to exceed normal levels in the future, it may adversely affect the Debtors and/or New AAG.

### 6.    Delivery of Aircraft

The Debtors' fleet renewal plans are intended to enhance their ability to operate optimum numbers of specific types of aircraft.  In many cases, the aircraft the Debtors intend to operate are not yet in their fleet, but the Debtors have contractual commitments to purchase or lease such aircraft.  If for any reason the Debtors and/or New AAG were unable to take delivery of particular types of new aircraft on contractually scheduled delivery dates, New AAG may be adversely affected.

### 7.    Disruption at Primary Market

The Debtors' and US Airways' businesses are heavily dependent on operations at their hub airport facilities, which include (i) American's hubs in Dallas/Fort Worth, Chicago, Miami, New York City, and Los Angeles, and (ii) US Airways' hubs in Charlotte, Philadelphia, Phoenix, and Washington, D.C.  Each of these operations involves flights that gather and distribute traffic from markets in each hub's geographic region to other major cities.  A significant interruption or disruption in service at one or more hub facilities could adversely impact the Debtors' and/or New AAG's operations.

### 8.    Substantial Indebtedness and Other Obligations

Both the Debtors and US Airways have, and expect New AAG to continue to have, significant amounts of indebtedness and other obligations, including pension obligations,

obligations to make future payments on Aircraft Equipment and property leases, and obligations under aircraft purchase agreements.  Moreover, currently all but a very limited portion of the Debtors' and US Airways' assets are pledged to secure their respective indebtedness.  Although the Debtors have substantially reduced their debt and lease obligations as a result of the Chapter 11 Cases, New AAG expects to incur substantial additional debt (including secured debt) and lease obligations in the future.  This substantial indebtedness and other obligations could have a significant impact on New AAG's business.

### 9.    Reserve Requirements

Both the Debtors and US Airways have agreements with a number of credit card companies and processors to accept credit card payments.  Under certain of these agreements, the related credit card processor may hold back a reserve, which could reach 100% of the applicable receivables due, from the applicable company's credit card receivables following the occurrence of certain events, including the failure of the applicable company to maintain certain levels of liquidity (as specified in each agreement).  As of December 31, 2012, the Debtors were not required to maintain any reserve under such agreements; however, US Airways was subject to certain holdback requirements.  If circumstances were to occur that would allow the credit card processor to require New AAG to maintain a reserve, New AAG's liquidity would be negatively impacted which may materially impact operations.

### 10.    Dependence on Technology

The Debtors heavily depend on, and New AAG will likely continue to heavily depend on, computer systems and other communications technology to operate their business, reduce costs, and enhance customer service.  Such systems could be disrupted by various events beyond the control of the Debtors and/or New AAG, including natural disasters, power failures, terrorist attacks, equipment failures, system implementation failures, software failures, and computer viruses and hackers.  There can be no assurance that the measures taken to prevent, limit, or remedy disruptions of these systems will be adequate.

### 11.    Seasonality and Exogenous Events

The Debtors' operations are, and New AAG's operations will be, affected by many factors beyond their control including, but not limited to, actual or potential changes in international, national, regional, and local economic, business, and financial conditions; changes in consumer preferences, perceptions, spending patterns, or demographic trends; changes in the airline industry, including competitor consolidation and changes in airline alliance affiliations; actual or potential disruptions to air traffic control systems; and weather and other natural disasters.  In addition, due to generally weaker demand for air travel during the winter, the Debtors' and New AAG's revenues in the first and fourth

quarters of the year could be weaker than revenues in the second and third quarters of the year.

### 12.    Global Economic Downturn

Although the demand for air travel has improved from the historical lows of 2008 and 2009, such demand may weaken if there is a stall in the global economic recovery. While the Debtors and US Airways continually adjust their capacity and operations in response to changing trends in demand, there can be no assurance that such efforts will be successful.  Even if successful, any such changes to capacity or operations may result in special charges or other events that negatively impact New AAG's financial condition. Furthermore, any expected benefits from such changes may be diminished by similar adjustments made by other airlines.  If the global economic recovery continues, the Debtors expect industry-wide capacity to increase accordingly.  But if industry capacity outpaces consumer demand, New AAG, and the airline industry as a whole, may be negatively impacted.

### 13.    Highly Competitive Industry

New AAG will face vigorous and increasing competition from other large network carriers, foreign carriers, LCCs and regional airlines, all-cargo and charter carriers, and ground and rail transportation.  New AAG will also face significant competition from marketing and operational alliances formed by their competitors.  Competition with such alliances, and with foreign air carriers, has increased in recent years in part due to the adoption of liberalized "open skies" aviation agreements between the United States and numerous countries across the world.  Moreover, the percentage of routes on which the Debtors and US Airways compete with carriers boasting substantially lower operating costs, such as LCCs and restructured large network carriers, has grown significantly over time.  If New AAG is unable to achieve a competitive cost structure, its business, financial condition, and operating results may be adversely affected.

To remain competitive the Debtors' have implemented transatlantic JBAs and related marketing arrangements with British Airways and Iberia, and antitrust-immunized cooperation with British Airways, Iberia, Finnair, and Royal Jordanian.   In addition, the Debtors have implemented an antitrust-immunized JBA with Japan Airlines and a JBA with Qantas.  No assurances can be given as to any arrangements that may ultimately be implemented or any benefits that the Debtors and/or New AAG may derive from such arrangements.

### 14.    Extensive Domestic and International Regulation

Airlines are subject to extensive domestic and international regulations which carry significant costs.  For example, the Federal Aviation Administration ("**FAA**"), from time to time, issues directives relating to aircraft maintenance and operation, pilot flight schedules, and data security, among others things.  Compliance with regulations at times

requires significant expenditures and may disrupt the Debtors' operations. Further, U.S. carriers that operate international routes are subject to certain arrangements between the U.S. and foreign governments and to the availability of certain international slots or facilities. Any changes to the regulatory landscape in markets where the Debtors operate or where New AAG will operate may adversely impact the value of their international route authorities and related assets.

Additional laws, regulations, taxes, and airport charges have been enacted from time to time that have significantly increased the costs of airline operations, reduced the demand for air travel, or otherwise restricted business operations. The results of the Debtors' or New AAG's operations, demand for air travel, and the manner in which they conduct their business each may be affected by changes in laws and future actions taken by governmental agencies, including:

- Changes in laws that affect the services that can be offered by airlines in particular markets and at particular airports, or the types of fees that can be charged to passengers;

- The granting and timing of certain governmental approvals (including foreign government approvals) needed for codesharing alliances and other strategic arrangements with other airlines;

- Restrictions on competitive practices;

- The adoption of new passenger security standards or regulations that impact customer service standards;

- Restrictions on airport operations such as restrictions on the use of takeoff and landing slots at airports or the auction or reallocation of slot rights currently or previously held by the Debtors; and

- The adoption of more restrictive, locally-imposed noise restrictions.

### 15.    Domestic and Foreign Taxes and Fees

The U.S. airline industry is subject to extensive fees and heavy taxation levied by both domestic and foreign governments. These fees and taxes have increased significantly in the past decade for both domestic and international flights. Under new Department of Transportation regulations, which became effective in January 2012, all government taxes and fees must be included in the fares quoted and advertised to consumers. Based on the competitive revenue environment, airlines have absorbed some of the fee and tax increases rather than passing them on to consumers. Further increases in such fees and taxes may reduce demand for air travel as the airlines may not be able to continue absorbing these costs on behalf of consumers, which may negatively impact the Debtors' and/or New AAG's business.

### C.    Additional Risks Associated with the Bankruptcy Process

#### 1.    Non-Confirmation of Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court in accordance with the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications will not necessitate the re-solicitation of votes.

In the event the Plan is not confirmed or these Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code, the Debtors believe that such action or inaction, as the case may be, will cause the Debtors to incur substantial expenses and otherwise serve only to unnecessarily prolong these Chapter 11 Cases and negatively affect recoveries for holders of Claims and Equity Interests.

#### 2.    Non-Consensual Plan Confirmation

If any impaired Class of Claims or Equity Interests entitled to vote does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Debtors' request if at least one impaired Class has accepted the Plan (such acceptance being determined without including the vote of any "insider" in such Class) and, as to each impaired Class that has not accepted the Plan, if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired Classes.  *See* Section IX.B of this Disclosure Statement.  The Debtors believe that the Plan satisfies these requirements.

#### 3.    Inaccuracy of Projected Financial Results

The Debtors have prepared financial projections for New AAG based on certain assumptions, as set forth in **Exhibit "D"** and incorporated into the estimated creditor recoveries and valuations included herein.  The projections have not been compiled, audited, or examined by independent accountants and neither the Debtors nor their advisors make any representations or warranties regarding the accuracy of the projections or the ability to achieve forecasted results.

Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors and New AAG including, but not limited to, the timing, confirmation, and consummation of the Plan, demand for air travel, the price of fuel, inflation, and other unanticipated market and economic conditions.  Some assumptions may not materialize and unanticipated events and circumstances may affect New AAG's actual financial results.  Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks and the assumptions underlying the projections may be inaccurate in material respects.  In addition, unanticipated events and circumstances occurring

156

subsequent to the approval of this Disclosure Statement by the Bankruptcy Court including, without limitation, any natural disasters, terrorist attacks, or health epidemics may affect the actual financial results achieved. Such results may vary significantly from the forecasts and such variations may be material.

### 4.    Potential Dilution From Claims

Despite the efforts of the Debtors and their professionals to estimate the amounts of Allowed Claims as set forth in this Disclosure Statement, the actual amount of Allowed Claims may differ from such estimates. Because the ultimate extent and value of certain distributions under the Plan are shared ratably based on the aggregate amount of Allowed General Unsecured Claims, if those amounts are greater than the amount currently estimated by the Debtors, the recovery to holders of General Unsecured Claims may be materially reduced. Further, the value of the Plan Shares may be adversely affected by potential dilution from the LTIP 2013 Awards, the Alignment Awards, the New AAG 2013 Incentive Award Plan, and any other shares of New Common Stock that may be issued post-emergence and the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence. Additionally, any future equity financings or other share issuances by New AAG could adversely affect the value of the Plan Shares.

### 5.    U.S. Federal Income Tax Risks

For a discussion of certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to holders of certain Claims and AMR Common Stock, see Section VI of this Disclosure Statement.

## IX.    CONFIRMATION OF THE PLAN

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that the Plan is (i) accepted by all impaired Classes of Claims and Equity Interests entitled to vote or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (ii) feasible; and (iii) in the "best interests" of the holders of Claims and Equity Interests impaired under the Plan.

### A.    Acceptance of the Plan

Under the Bankruptcy Code, a class of creditors accepts a chapter 11 plan if (i) holders of two-thirds (2/3) in dollar amount and (ii) a majority in number of the allowed claims in such class (other than those designated under section 1126(e) of the Bankruptcy Code) vote to accept the plan. Holders of claims or equity interests that fail to vote are not counted as either accepting or rejecting a plan.

**B.    Confirmation in the Event a Class Fails to Accept the Plan**

In the event that any impaired Class of Claims or Equity Interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Equity Interests that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cram down" provisions set forth in section 1129(b) of the Bankruptcy Code.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or equity interests receives more than it legally is entitled to receive for its claims or equity interests.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured; claims versus equity interests) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to the dissenting class, the test sets different standards that must be satisfied in order for the Plan to be confirmed, depending on the type of claims or interests in such class:

- **Secured Creditors**.  Each holder of an impaired secured claim either (i) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred Cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such secured claim, (ii) has the right to credit bid the amount of its claim if its property is sold and retains its lien on the proceeds of the sale, or (iii) receives the "indubitable equivalent" of its allowed secured claim.

- **Unsecured Creditors**.  Either (i) each holder of an impaired unsecured claim receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- **Equity Interests**.  Either (i) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock or (ii) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan.

158

These requirements are in addition to other requirements established by case law interpreting the statutory requirement.

The Debtors believe the Plan satisfies the "fair and equitable" requirement with respect to any potential rejecting Class.

IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.

### C.    Best Interest Test

The Bankruptcy Code requires that each holder of an impaired Claim or Equity Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  This requirement customarily is referred to as the "best interest" test.

The first step in determining whether the Plan satisfies the best interest test is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation.  The gross amount of Cash that would be available for satisfaction of claims and equity interests would be the sum consisting of the proceeds resulting from the disposition of the assets and properties of the Debtors, augmented by the unencumbered Cash held by the Debtors at the time of the commencement of the liquidation case.

The next step is to reduce that gross amount by the costs and expenses of liquidation, the proceeds received from the disposition of encumbered assets which would be distributed to the holders of the liens as such assets, and by the payment of such additional administrative and priority claims arising from the use of chapter 7 for the purposes of liquidation.  Any remaining Cash would be allocated to unsecured creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code.

Finally, the present value of such allocations (taking into account the time necessary to accomplish the liquidation) are compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that the trustee might engage.  Other liquidation costs include the expenses incurred during the Chapter 11 Cases allowed in the chapter 7 cases, such as compensation for attorneys, financial advisors, appraisers, accountants, and other professionals for the Debtors and statutory committees appointed in the Chapter 11 Cases, and costs and expenses of members of such committees, as well as other compensation Claims.  Further,

additional Claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 Cases.  The foregoing types of Claims, costs, expenses, fees and such other Claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition priority and unsecured Claims, or available for distribution to the holders of AMR Equity Interests.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors and holders of AMR Equity Interests in the Chapter 11 Cases, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, and (iii) the substantial increases in Claims that would be satisfied on a priority basis, the Debtors have determined that confirmation of the Plan will provide each holder of an Allowed Claim or Equity Interest with a recovery that is not less than such holder would receive pursuant to liquidation of the Debtors under chapter 7.  For purposes of the best interests test, distributions under a chapter 11 plan that substantively consolidates debtors are compared against distributions in a hypothetical chapter 7 that also substantively consolidates the debtors.

The Debtors also believe that the value of any distributions to holders of Allowed Claims and Equity Interests in a chapter 7 case would be less than the value of distributions under the Plan because such distributions in a chapter 7 case would not occur for a substantial period of time.  It is likely that distribution of the proceeds of the liquidation could be delayed for at least a year after the completion of such liquidation in order to resolve Claims and prepare for distributions.  In the likely event litigation was necessary to resolve Claims asserted in a chapter 7 case, the delay could be prolonged and Administrative Expenses increased.

The AMR Corporation, et al. Liquidation Analysis (the "**Liquidation Analysis**"), annexed hereto as **Exhibit "C,"** provides a summary of the liquidation values of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtors' estates and confirms the conclusions set forth above.  Reference should be made to the Liquidation Analysis for a complete discussion and presentation of the Liquidation Analysis.  The Liquidation Analysis was prepared by McKinsey Recovery & Transformation Services, U.S., LLC, with the assistance of the Debtors' management and other advisors.

Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management and their financial advisors, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Liquidation Analysis is also based on assumptions with regard to liquidation decisions

that are subject to change. Accordingly, the values reflected might not be realized if the Debtors were, in fact, to undergo such a liquidation. The chapter 7 liquidation period is assumed to be a period of at least 12 months, allowing for, among other things, the discontinuation and wind-down of operations within the first few months, compliance with applicable regulatory requirements, the sale of assets, and the collection of receivables.

### D. Valuation Analyses

In connection with the Plan and Disclosure Statement, the Debtors requested that Rothschild Inc. ("**Rothschild**"), the financial advisor and investment banker for the Debtors, estimate the implied value of the New Common Stock to be distributed under the Plan.

In preparing its estimate, Rothschild considered, among other things, the following factors:

(a)   The market price of a publicly traded security in a liquid, established and regulated market is generally accepted by financial advisors and other relevant professionals as a reasonable indicator of the current value for such security;

(b)   US Airways Common Stock currently is listed and traded on the NYSE and is a highly liquid security trading in an established and regulated market;

(c)   Pursuant to and upon consummation of the Merger, holders of US Airways Common Stock are to receive one share of New Common Stock in exchange for each share of existing US Airways Common Stock held by such holders;

(d)   The terms of the Merger have been publicly announced;

(e)   Pursuant to the Plan, the market value of the New Common Stock will be utilized to determine the amount of distributions of New Common Stock with respect to Allowed General Unsecured Claims, the American Labor Allocation and AMR Equity Interests on and after the Effective Date; and

(f)   Shares of New Common Stock are expected to be listed on a national stock exchange where AMR stakeholders will be able to sell shares they receive pursuant to the Plan at the then-market price.

Solely for the purposes of this Disclosure Statement and based upon the foregoing factors and the judgment and professional experience of Rothschild, Rothschild's view is that the trading market price of US Airways Common Stock is the best indicator of value of the New Common Stock. Accordingly, as of the date of this Disclosure Statement, Rothschild estimates the implied value of a share of New Common Stock to be equal to the trading price per share of US Airways Common Stock on the NYSE as of such date. For

reference purposes only, Rothschild notes that the volume weighted average price of US Airways Common Stock on the NYSE during the five trading day period ending on [  ] [  ], 2013 was $[  ] per share.  Rothschild's views do not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan and is limited to the implied value of a share of New Common Stock to be issued pursuant to the Plan on the Effective Date.

Annexed hereto as **Exhibit "B"** is a chart which illustrates potential recoveries with respect to Allowed General Unsecured Claims, the American Labor Allocation and AMR Equity Interests assuming various constant trading prices for the New Common Stock during the 120-day period from and after the Effective Date, and assuming, among other things, that the ultimate amount of Allowed Single Dip General Unsecured Claims does not exceed $2.63 billion.

With the consent of the Debtors, Rothschild's estimate was based on the factors set forth above and was not based upon analysis of financial information or financial projections or forecasts for New AAG, the Debtors or US Airways or traditional valuation methodologies.

The valuation of newly issued securities, such as the New Common Stock, is subject to a number of uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates, conditions in the financial markets and other factors that generally influence the prices of securities and performance of the relevant businesses.  Actual market prices of such securities also may be affected by other factors not possible to predict.  The value of shares of New Common Stock may be materially different than as estimated above.  Accordingly, the implied value estimated by Rothschild does not necessarily reflect, and should not be construed as reflecting, values that will be attained in the public or private markets.

Rothschild's estimate of implied value is not an appraisal and does not conform to the standards of professional appraisal practice.

Rothschild's estimate of implied value does not constitute a recommendation to any party with respect to the Plan, the Merger or any other transaction or a recommendation to any party as to how to vote on the Plan or otherwise act with respect to the Plan or any other matter.

Rothschild's estimate of implied value is given and speaks only as of the date of this Disclosure Statement.  It should be understood that subsequent developments may affect this estimate and the assumptions used in preparing it, and Rothschild does not have any obligation to update, revise or reaffirm this estimate.

The value of the New Common Stock to be distributed under the Plan will be the price at which a holder could sell a share of New Common Stock on and after the Effective

Date.  Such price will depend on a variety of factors, including, among other things: (v) the business performance and prospects of New AAG, the Debtors and US Airways as of the relevant time, (w) the market price of shares of New Common Stock, (x) the dilutive or accretive effect of issuance of shares of New Common Stock from time to time (including the dilutive effects of future issuances under employee or similar compensation programs), (y) the ultimate final amount of Allowed Claims against the Debtors as the Debtors' claims objection and reconciliation process continues, and (z) market liquidity for the New Common Stock.

### E.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code provides that a chapter 11 plan may be confirmed only if the Court finds that such plan is "feasible."  A feasible plan is one which will not lead to a need for further reorganization or liquidation of the debtor.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed the ability to meet the obligations under the Plan.  As part of this analysis, the Debtors, with the assistance of their financial advisors, prepared financial projections for the post-Effective Date period of fiscal year 2013 and each of the fiscal years 2014 through 2017 (the "**Projection Period**") for New AAG.  These projections, and the assumptions on which they are based, are included in the Debtors' Projected Financial Information, annexed hereto as **Exhibit "D."**  Based upon such projections, the Debtors believe that all payments required pursuant to the Plan will be made and, therefore, that that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization.

The financial information and projections appended to the Disclosure Statement include:

- Projected Consolidated Balance Sheets of New AAG as of [December 31, 2013, December 31, 2014, December 31, 2015, December 31, 2016, and December 31, 2017];

- Projected Consolidated Income Statements of New AAG as of [December 31, 2013, December 31, 2014, December 31, 2015, December 31, 2016, and December 31, 2017]; and

- Projected Consolidated Statements of Cash Flow of New AAG as of [December 31, 2013, December 31, 2014, December 31, 2015, December 31, 2016, and December 31, 2017].

The projections are based on the assumption that the Plan will be confirmed by the Bankruptcy Court and, for projection purposes, that the Effective Date under the Plan will occur on August 31, 2013.

The Debtors prepared these financial projections, with the assistance of their financial advisors, based upon certain assumptions that they believe to be reasonable under

163

the circumstances.  Those assumptions considered to be significant are described in the
Projected Financial Information annexed hereto as **Exhibit "D."**  The Projected Financial
Information has not been examined or compiled by independent accountants.  The Debtors
make no representation as to the accuracy of the projections or the ability to achieve the
projected results.  Many of the assumptions on which the projections are based are subject
to significant uncertainties.  Inevitably, some assumptions will not materialize and
unanticipated events and circumstances may affect the actual financial results.  Therefore,
the actual results achieved throughout the Projection Period will vary from the projected
results and the variations may be material.  All holders of Claims and Equity Interests that
are entitled to vote to accept or reject the Plan are urged to examine carefully all of the
assumptions on which the financial projections are based in connection with their
evaluation of the Plan.

### F.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after
appropriate notice, to hold the Confirmation Hearing.  The Confirmation Hearing is
scheduled for [_____  __, 2013 at __:__ _.m.] (Eastern Time), or as soon thereafter as
counsel may be heard, before the Honorable Sean H. Lane, United States Bankruptcy
Judge, in Room 701 of the United States Bankruptcy Court for the Southern District of
New York, One Bowling Green, New York, New York.  The Confirmation Hearing may
be adjourned from time to time by the Debtors or the Bankruptcy Court without further
notice except for an announcement of the adjourned date made at the Confirmation
Hearing or any subsequent adjourned confirmation hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may
object to confirmation of a plan.  Any objection to confirmation of the Plan must be in
writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the
name of the objector and the nature and amount of claims or interests held or asserted by
the objector against the particular Debtor or Debtors, the basis for the objection and the
specific grounds therefor, and must be filed with the Bankruptcy Court (a) electronically in
accordance with General Order M-399 (General Order M-399 and the User's Manual for
the Electronic Case Filing System can be found at http://www.nysb.ucourts.gov, the
official website for the Bankruptcy Court), by registered users of the Bankruptcy Court's
case filing system and (b) by all other parties in interest, on a CD-ROM or 3.5 inch disk, in
text-searchable portable document format (PDF) (with a hard-copy delivered directly to
Chambers), in accordance with the customary practices of the Bankruptcy Court and
General Order M-399, to the extent applicable, and shall be served in accordance with
General Order M-399 and on (i) Weil, Gotshal & Manges LLP, attorneys for the Debtors,
767 Fifth Avenue, New York, New York 10153 (Attn:  Stephen Karotkin, Esq. and
Alfredo R. Pérez, Esq.), (ii) the Office of the United States Trustee for the Southern
District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn:
Brian Masumoto, Esq.), (iii) attorneys for the Creditors' Committee, Skadden, Arps, Slate,
Meagher & Flom, 155 North Wacker Drive, Chicago, Illinois 60606 (Attn: John Wm.

Butler, Jr., Esq.) and Four Times Square, New York, New York 10036 (Attn: Jay M. Goffman, Esq.), and (iv) attorneys for the Retiree Committee, Jenner & Block LLP, 353 North Clark Street, Chicago, Illinois 60654 (Attn: Catherine L. Steege, Esq.) and 919 Third Avenue, 37th Floor, New York, New York 10022 (Attn: Marc B. Hankin, Esq.) so as to be **ACTUALLY RECEIVED** no later than [_____ __, 2013, at __:00 p.m.] (Eastern Time).

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## X.    CONCLUSION

The Debtors believe the Plan is in the best interests of all creditors and equity interest holders and urge the holders of impaired Claims in AMR Class 3 (AMR General Unsecured Guaranteed Claims), AMR Class 4 (American Other General Unsecured Claims), AMR Class 5 (AMR Equity Interests), American Class 4 (American General Unsecured Guaranteed Claims), American Class 5 (American Other General Unsecured Claims), American Class 6 (American Union Claims), American Class 7 (American Convenience Class Claims), Eagle Class 3 (Eagle General Unsecured Claims), and Eagle Class 4 (Eagle Convenience Class Claims) to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received not later than [_____ __, 2013].

165

Dated: New York, New York
         April 15, 2013

                          Respectfully submitted,

                          AMR CORPORATION

                          By:_____
                              Name:  Gary F. Kennedy
                              Title:  Senior Vice President, General Counsel &
                                      Chief Compliance Officer

                          AMERICAN AIRLINES, INC.
                          AMR EAGLE HOLDING CORPORATION
                          AMERICAN AIRLINES REALTY (NYC) HOLDINGS, INC.
                          AMERICAS GROUND SERVICES, INC.
                          PMA INVESTMENT SUBSIDIARY, INC.
                          SC INVESTMENT, INC.
                          AMERICAN EAGLE AIRLINES, INC.
                          EXECUTIVE AIRLINES, INC.
                          EXECUTIVE GROUND SERVICES, INC.
                          EAGLE AVIATION SERVICES, INC.
                          ADMIRALS CLUB, INC.
                          BUSINESS EXPRESS AIRLINES, INC.
                          RENO AIR, INC.
                          AA REAL ESTATE HOLDING GP LLC
                          AA REAL ESTATE HOLDING L.P.
                          AMERICAN AIRLINES MARKETING SERVICES LLC
                          AMERICAN AIRLINES VACATIONS LLC
                          AMERICAN AVIATION SUPPLY LLC
                          AMERICAN AIRLINES IP LICENSING HOLDING, LLC


                          By:  AMR CORPORATION, as agent for each of the
                          foregoing entities

                          By:_____
                              Name:  Gary F. Kennedy
                              Title:  Senior Vice President, General Counsel &
                                      Chief Compliance Officer

                                    166

<u>Counsel</u>:

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

Attorneys for the Debtors
and Debtors in Possession

# **EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
                                                           :
In re                                                      :        **Chapter 11 Case No.**
                                                           :
**AMR CORPORATION**, *et al.*,                             :        **11-15463 (SHL)**
                                                           :
                              **Debtors.**                 :        **(Jointly Administered)**
                                                           :
------------------------------------------------------------------x


**DEBTORS' JOINT CHAPTER 11 PLAN**


WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

Attorneys for Debtors and
Debtors in Possession

## TABLE OF CONTENTS

**Page**

Article I.  Definitions and Interpretation ..................................................................... 1

1.1  Ad Hoc Committee ................................................................................ 1

1.2  Administrative Expenses ....................................................................... 1

1.3  AFA ........................................................................................................ 2

1.4  AFA Claim ............................................................................................. 2

1.5  AFA Section 1113 Agreement ............................................................... 2

1.6  Aircraft Equipment ............................................................................... 2

1.7  Aircraft Securities ................................................................................. 2

1.8  Alignment Awards ................................................................................. 2

1.9  Allowed .................................................................................................. 2

1.10  ALPA ...................................................................................................... 3

1.11  ALPA Claim ........................................................................................... 3

1.12  ALPA Section 1113 Agreement ............................................................ 3

1.13  Amended Bylaws ................................................................................... 3

1.14  Amended Certificate of Incorporation ................................................. 3

1.15  American ................................................................................................ 3

1.16  American Debtors .................................................................................. 3

1.17  American Disclosure Letter ................................................................... 4

1.18  American Equity Interest ...................................................................... 4

1.19  American General Unsecured Claim ..................................................... 4

1.20  American General Unsecured Guaranteed Claim ................................. 4

1.21  American Labor Allocation ................................................................... 4

1.22  American Note Claim ............................................................................ 4

1.23  American Other General Unsecured Claim ........................................... 5

1.24  American Plan Consolidation ................................................................ 5

1.25  American Priority Non-Tax Claim ........................................................ 5

1.26  American Union Claims ........................................................................ 5

1.27  American Unions ................................................................................... 5

1.28  AMR ....................................................................................................... 5

i

# TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| 1.29 | AMR Common Stock | 5 |
| 1.30 | AMR Debtors | 5 |
| 1.31 | AMR Equity Interest | 5 |
| 1.32 | AMR General Unsecured Claim | 6 |
| 1.33 | AMR General Unsecured Guaranteed Claim | 6 |
| 1.34 | AMR Intercompany Claim | 6 |
| 1.35 | AMR Note Claim | 6 |
| 1.36 | AMR Other Equity Interest | 6 |
| 1.37 | AMR Other General Unsecured Claim | 6 |
| 1.38 | AMR Plan Consolidation | 6 |
| 1.39 | AMR Priority Non-Tax Claim | 7 |
| 1.40 | APA | 7 |
| 1.41 | APA Claim | 7 |
| 1.42 | APA Section 1113 Agreement | 7 |
| 1.43 | APFA | 7 |
| 1.44 | APFA Claim | 7 |
| 1.45 | APFA Section 1113 Agreement | 8 |
| 1.46 | Assumption Counterparty | 8 |
| 1.47 | Assumption Effective Date | 8 |
| 1.48 | Avoidance Action | 8 |
| 1.49 | Ballot | 8 |
| 1.50 | Bankruptcy Code | 8 |
| 1.51 | Bankruptcy Court | 8 |
| 1.52 | Bankruptcy Rules | 8 |
| 1.53 | Bond Documents | 9 |
| 1.54 | Business Day | 9 |
| 1.55 | Cash | 9 |
| 1.56 | Cash Management Agreements | 9 |
| 1.57 | Cause of Action | 9 |

ii

## TABLE OF CONTENTS
### (continued)

Page

1.58    Certificate of Designations ...................................................... 9

1.59    Certificate of Merger ............................................................. 10

1.60    Chairman Letter Agreement ...................................................... 10

1.61    Chapter 11 Cases .................................................................. 10

1.62    Claim .............................................................................. 10

1.63    Claim Settlement Procedures ..................................................... 10

1.64    Class .............................................................................. 10

1.65    Closing Date ....................................................................... 10

1.66    Collateral ......................................................................... 10

1.67    Collective Bargaining Agreements ............................................... 10

1.68    Commencement Date ............................................................... 10

1.69    Confidentiality and Non-Disclosure Agreements ............................... 11

1.70    Confirmation Date ................................................................ 11

1.71    Confirmation Hearing ............................................................. 11

1.72    Confirmation Order ............................................................... 11

1.73    Convenience Class Claim ......................................................... 11

1.74    Conversion Period ................................................................. 11

1.74    Conversion Period ................................................................. 11

1.75    Convertible Note Claim ........................................................... 11

1.76    Covered Special Facility Revenue Bonds ........................................ 11

1.77    Creditor New Common Stock Allocation ......................................... 13

1.78    Creditors' Committee .............................................................. 13

1.79    Cure Amount ...................................................................... 13

1.80    Customer Programs ............................................................... 13

1.81    Debtor Ownership Agreements .................................................. 13

1.82    Debtors ............................................................................ 13

1.83    Deferred Agreement Deadline .................................................... 13

1.84    Deferred Counterparty ............................................................ 14

1.85    DFW 1.5x Special Facility Revenue Bond Agreements ........................ 14

iii

# TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| 1.86 | DFW 1.5x Unsecured Special Facility Revenue Bond Claim | 14 |
| 1.87 | DFW 1.5x Special Facility Revenue Bond Documents | 14 |
| 1.88 | DFW 1.5x Special Facility Revenue Bond Indentures | 14 |
| 1.89 | DFW 1.5x Special Facility Revenue Bonds | 15 |
| 1.90 | Disallowed | 15 |
| 1.91 | Disbursing Agent | 15 |
| 1.92 | Disclosure Statement | 15 |
| 1.93 | Disputed | 15 |
| 1.94 | Disputed Claims Reserve | 16 |
| 1.95 | Distribution Date | 16 |
| 1.96 | Distribution Record Date | 16 |
| 1.97 | District Court | 16 |
| 1.98 | Double-Dip Full Recovery Amount | 16 |
| 1.99 | Double-Dip General Unsecured Claims | 16 |
| 1.100 | Double-Dip Hurdle Value | 16 |
| 1.101 | Eagle Debtors | 17 |
| 1.102 | Eagle Equity Interest | 17 |
| 1.103 | Eagle General Unsecured Claim | 17 |
| 1.104 | Eagle Holding | 17 |
| 1.105 | Eagle Holding Intercompany Claim | 17 |
| 1.106 | Eagle Plan Consolidation | 17 |
| 1.107 | Eagle Priority Non-Tax Claim | 17 |
| 1.108 | Eagle Union Claims | 17 |
| 1.109 | Eagle Unions | 17 |
| 1.110 | Effective Date | 17 |
| 1.111 | Encumbrance | 18 |
| 1.112 | Entity | 18 |
| 1.113 | Equity Interest | 18 |
| 1.114 | ERISA | 18 |

iv

# TABLE OF CONTENTS
## (continued)

Page

1.115  Final Distribution Date ................................................................ 18

1.116  Final Mandatory Conversion Date ............................................. 18

1.117  Final Order ................................................................................. 18

1.118  Final Pro Rata Share .................................................................. 19

1.119  Final True-Up Distribution ........................................................ 19

1.120  Foreign Agreements ................................................................... 19

1.121  Fuel Consortia Agreements ........................................................ 19

1.122  GAAP .......................................................................................... 19

1.123  General Unsecured Claim ........................................................... 19

1.124  Incremental Labor Common Stock Allocation .......................... 19

1.125  Indemnification Obligation ........................................................ 20

1.126  Indentures ................................................................................... 20

1.127  Indenture Trustees ...................................................................... 21

1.128  Initial Distribution Date ............................................................. 21

1.129  Initial Labor Common Stock Allocation .................................... 21

1.130  Initial Old Equity Allocation ..................................................... 21

1.131  Initial Pro Rata Share ................................................................. 22

1.132  Initial Stated Value .................................................................... 22

1.133  Insurance Plans .......................................................................... 22

1.134  Intercompany Contract ............................................................... 22

1.135  Interim Distribution Date ........................................................... 22

1.136  Interim Pro Rata Share ............................................................... 22

1.137  Interim True-Up Distribution ..................................................... 23

1.138  Interline Agreements .................................................................. 23

1.139  Labor Claims Hurdle Value ....................................................... 23

1.140  Labor Common Stock Allocation .............................................. 23

1.141  Letter of Credit ........................................................................... 23

1.142  LTIP 2013 Awards ..................................................................... 23

1.143  Majority of the Requisite Consenting Creditors ....................... 23

v

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| 1.144 | Mandatory Conversion Amount | 23 |
| 1.145 | Mandatory Conversion Date | 24 |
| 1.146 | Mandatory Shares in Excess of Cap | 24 |
| 1.147 | Market-Based Old Equity Allocation | 24 |
| 1.148 | Maximum Plan Shares | 24 |
| 1.149 | Merger | 25 |
| 1.150 | Merger Agreement | 25 |
| 1.151 | Merger Closing | 25 |
| 1.152 | Merger Collective Bargaining Agreements | 25 |
| 1.153 | Merger Effective Time | 25 |
| 1.154 | Merger Sub | 25 |
| 1.155 | Merger Sub Certificate of Incorporation | 25 |
| 1.156 | New AAG | 25 |
| 1.157 | New AAG Board | 25 |
| 1.158 | New AAG Bylaws | 25 |
| 1.159 | New AAG Certificate of Incorporation | 26 |
| 1.160 | New AAG 2013 Incentive Award Plan | 26 |
| 1.161 | New Common Stock | 26 |
| 1.162 | New Common Stock Allocation | 26 |
| 1.163 | New Mandatorily Convertible Preferred Stock | 26 |
| 1.164 | Non-Union Employees | 26 |
| 1.165 | Note Claim | 26 |
| 1.166 | Notes | 26 |
| 1.167 | Notice of Intent to Assume | 26 |
| 1.168 | Notice of Intent to Reject | 27 |
| 1.169 | Optional Conversion | 27 |
| 1.170 | Optional Conversion Date | 27 |
| 1.171 | Optional Shares in Excess of Cap | 27 |
| 1.172 | Other Secured Claim | 27 |

vi

## TABLE OF CONTENTS
### (continued)

Page

1.173    Pension Plans ........................................................................................ 27

1.174    Person .................................................................................................... 27

1.175    Plan ....................................................................................................... 27

1.176    Plan Consolidation ................................................................................ 28

1.177    Plan Shares ............................................................................................ 28

1.178    Plan Supplement .................................................................................... 28

1.179    Post-Effective Date Creditors' Committee ........................................... 28

1.180    Postpetition Aircraft Agreement ........................................................... 28

1.181    Postpetition Aircraft Obligation ........................................................... 28

1.182    Preferred Conversion Cap ..................................................................... 29

1.183    Preferred Conversion Floor ................................................................... 29

1.184    Priority Non-Tax Claim ......................................................................... 29

1.185    Priority Tax Claim ................................................................................. 29

1.186    Proposed Cure ....................................................................................... 29

1.188    Registered Holder .................................................................................. 29

1.189    Rejection Bar Date ................................................................................. 29

1.190    Rejection Claim ..................................................................................... 29

1.191    Rejection Counterparty .......................................................................... 29

1.192    Rejection Effective Date ........................................................................ 29

1.193    Reorganized Debtors .............................................................................. 30

1.194    Retiree Committee ................................................................................. 30

1.195    Revenue Generating Agreements .......................................................... 30

1.196    Roll-Up Transaction .............................................................................. 30

1.197    Schedules ............................................................................................... 30

1.198    Search Committee .................................................................................. 30

1.199    Section 1113 Agreements ...................................................................... 30

1.200    Secured Aircraft Claim .......................................................................... 30

1.201    Secured Claim ....................................................................................... 31

1.202    Servicers ................................................................................................ 31

vii

## TABLE OF CONTENTS
### (continued)

Page

1.203   Share Determination Date ................................................................ 31

1.204   Shares in Excess of Cap .................................................................. 31

1.205   Single-Dip Full Recovery Amount ................................................... 31

1.206   Single-Dip General Unsecured Claims ............................................ 31

1.207   Single-Dip Hurdle Value ................................................................. 32

1.208   Single-Dip Non-Preferred Amount ................................................... 32

1.209   Single-Dip Preferred Allocation ..................................................... 32

1.210   Single-Dip Treatment Election ........................................................ 32

1.211   Solicitation Procedures ................................................................... 32

1.212   Special Facility Revenue Bond Agreements .................................... 32

1.213   Special Facility Revenue Bonds ..................................................... 33

1.214   Special Facility Revenue Bond Claims ........................................... 33

1.215   Special Facility Revenue Bond Documents ..................................... 33

1.216   Special Facility Revenue Bond Indentures ...................................... 33

1.217   Stated Value ................................................................................... 36

1.218   Sub-Plan ........................................................................................ 36

1.219   Support and Settlement Agreement ................................................ 36

1.220   Surety Bond ................................................................................... 36

1.221   Tax Code ........................................................................................ 36

1.222   Total Initial Stated Value ................................................................ 37

1.223   Total Preferred Amount ................................................................. 37

1.224   Transfer/Transferable .................................................................... 37

1.225   Treatment Objection ....................................................................... 37

1.226   Treatment Objection Deadline ........................................................ 37

1.227   Triple-Dip General Unsecured Claims ............................................ 38

1.228   TWU ............................................................................................... 38

1.229   TWU American Claim ..................................................................... 38

1.230   TWU American Section 1113 Agreement ........................................ 38

1.231   TWU Eagle Claims ......................................................................... 39

viii

# TABLE OF CONTENTS
## (continued)

1.232    TWU Eagle Section 1113 Agreements ................................................. 39

1.233    Union ...................................................................................................... 39

1.234    Unsecured Special Facility Revenue Bond Claim ................................. 39

1.235    US Airways ............................................................................................ 39

1.236    US Airways 7% Convertible Notes ....................................................... 39

1.237    US Airways 7.25% Convertible Notes ................................................... 40

1.238    US Airways Common Stock .................................................................... 40

1.239    US Airways Disclosure Letter ................................................................ 40

1.240    US Airways Equity Awards .................................................................... 40

1.241    US Airways Fully Diluted Shares ........................................................... 40

1.242    US Airways Options ............................................................................... 40

1.243    US Airways Stock-Settled RSUs ............................................................ 40

1.244    US Airways Stock-Settled SARs ............................................................ 41

1.245    U.S. Trustee ............................................................................................ 41

1.246    Value Hurdle .......................................................................................... 41

1.247    Value Hurdle Price ................................................................................. 41

1.248    Voting Agent .......................................................................................... 41

1.249    Voting Deadline ...................................................................................... 41

1.250    VWAP ..................................................................................................... 41

1.251    Workers' Compensation Plan ................................................................. 41

Article II.    Administrative Expenses and Priority Tax Claims ................................. 42

2.1    Administrative Expenses ........................................................................ 42

(a)    AMR Debtors ............................................................................. 42

(b)    American Debtors ....................................................................... 42

(c)    Eagle Debtors ............................................................................. 43

2.2    Compensation and Reimbursement Claims ............................................ 43

2.3    Priority Tax Claims ................................................................................ 43

(a)    AMR Debtors ............................................................................. 43

(b)    American Debtors ....................................................................... 44

ix

US_ACTIVE:\44195459\15\14013.0139

# TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| | (c) | Eagle Debtors ............................................................................ 44 |
| 2.4 | Special Provisions Regarding Fees and Expenses of Indenture Trustees ....................................................................................... 44 |
| Article III. | Classification of Claims and Equity Interests ........................................ 45 |
| Article IV. | Treatment of Claims and Equity Interests .............................................. 46 |
| 4.1 | AMR Class 1 – AMR Secured Claims .................................................... 46 |
| 4.2 | AMR Class 2 – AMR Priority Non-Tax Claims ..................................... 47 |
| 4.3 | AMR Class 3 – AMR General Unsecured Guaranteed Claims .............. 47 |
| 4.4 | AMR Class 4 – AMR Other General Unsecured Claims ........................ 48 |
| 4.5 | AMR Class 5 – AMR Equity Interests .................................................... 49 |
| 4.6 | AMR Class 6 – AMR Other Equity Interests .......................................... 49 |
| 4.7 | American Class 1 – American Secured Aircraft Claims ......................... 49 |
| 4.8 | American Class 2 – American Other Secured Claims ............................. 49 |
| 4.9 | American Class 3 – American Priority Non-Tax Claims ........................ 50 |
| 4.10 | American Class 4 – American General Unsecured Guaranteed Claims ...................................................................................................... 50 |
| 4.11 | American Class 5 – American Other General Unsecured Claims ........... 51 |
| 4.12 | American Class 6 –American Union Claims ........................................... 53 |
| | (a) | APA Claim ................................................................................. 53 |
| | (b) | APFA Claim .............................................................................. 53 |
| | (c) | TWU American Claim ............................................................... 54 |
| 4.13 | American Class 7 – American Convenience Class Claims ..................... 54 |
| 4.14 | American Class 8 – American Equity Interests ...................................... 54 |
| 4.15 | Eagle Class 1 – Eagle Secured Claims ................................................... 54 |
| 4.16 | Eagle Class 2 – Eagle Priority Non-Tax Claims .................................... 55 |
| 4.17 | Eagle Class 3 – Eagle General Unsecured Claims ................................. 55 |
| 4.18 | Eagle Class 4 – Eagle Convenience Class Claims ................................. 56 |
| 4.19 | Eagle Class 5 – Eagle Equity Interests ................................................... 56 |
| Article V. | Provisions Governing Distributions ....................................................... 56 |
| 5.1 | Distribution Record Date ........................................................................ 56 |

x

# TABLE OF CONTENTS
## (continued)

Page

5.2    Disbursing Agent .................................................................. 56

5.3    Timing of Distributions......................................................... 57

5.4    Delivery of Distributions and Undeliverable Distributions .................... 57

5.5    Withholding and Reporting Requirements ............................. 59

    (a)    Withholding Rights................................................. 59

    (b)    Forms ................................................................ 59

5.6    Cash Payments ................................................................... 59

5.7    Distributions on Behalf of Subsidiaries ................................. 59

5.8    Allocation of Plan Distribution Between Principal and Interest............. 60

5.9    Time Bar to Cash Payments................................................. 60

5.10    Minimum Distributions and Fractional Shares ........................ 60

5.11    Setoff and Recoupment....................................................... 61

5.12    Transactions on Business Days............................................. 61

5.13    Surrender of Existing Publicly-Traded Debt Securities........................ 61

5.14    Class Proofs of Claim ........................................................ 62

5.15    Conversion of Convertible Notes.......................................... 62

Article VI.    Means for Implementation and Execution of the Plan............................. 63

6.1    Continued Corporate Existence ............................................ 63

6.2    Merger............................................................................. 63

6.3    The 9019 Settlement .......................................................... 63

6.4    Distributions to Non-Union Employees.................................. 64

6.5    Substantive Consolidation .................................................. 64

    (a)    Order Granting Plan Consolidation ............................ 64

    (b)    AMR Plan Consolidation ........................................ 65

    (c)    American Plan Consolidation .................................... 65

    (d)    Eagle Plan Consolidation ........................................ 66

6.6    Confirmation in the Event of Partial or No Plan Consolidation .............. 66

6.7    Claims Against Multiple Consolidated Debtors ....................... 67

6.8    Issuance of Plan Shares....................................................... 67

xi

## TABLE OF CONTENTS
### (continued)

Page

6.9      Nonconsensual Confirmation ..................................................... 67

6.10     Issuance of Plan Shares; Execution of Related Documents ..................... 68

6.11     Sections 1145 Exemption ....................................................... 68

6.12     Listing ........................................................................ 68

6.13     Cancellation of AMR Common Stock ............................................... 68

6.14     Cancellation of Existing Notes and Aircraft Securities ......................... 69

6.15     Intercompany Claims ........................................................... 70

6.16     Exit Facility .................................................................. 71

6.17     Equity Interests in Subsidiaries Held by the Debtors ........................... 71

6.18     Board of Directors ............................................................. 71

6.19     Corporate Action ............................................................... 71

         (a)     New AAG .............................................................. 71

         (b)     The Reorganized Debtors ............................................. 72

6.20     New AAG 2013 Incentive Award Plan .............................................. 73

6.21     Anti-Dilution Adjustments ...................................................... 73

6.22     Effectuating Documents and Further Transactions ................................ 73

6.23     Creditors' Committee Member Fees ............................................... 73

6.24     Chairman Letter Agreement ...................................................... 73

Article VII.    Procedures for Disputed Claims ......................................... 73

7.1      Objections to Claims ........................................................... 73

7.2      Resolution of Disputed Administrative Expenses and Disputed
         Claims ......................................................................... 74

7.3      Payments and Distributions with Respect to Disputed Claims ..................... 74

7.4      True-Ups ....................................................................... 75

         (a)     Interim True-Ups ..................................................... 75

         (b)     Final True-Up ........................................................ 76

7.5      Distributions After Allowance .................................................. 76

7.6      Estimation ..................................................................... 76

7.7      Interest and Dividends ......................................................... 77

Article VIII.    Executory Contracts and Unexpired Leases .............................. 77

# TABLE OF CONTENTS
## (continued)

Page

8.1    Executory Contracts and Unexpired Leases ............................................ 77

8.2    Schedules of Executory Contracts and Unexpired Leases ...................... 78

8.3    Categories of Executory Contracts and Unexpired Leases to Be
       Assumed ............................................................................................ 79

       (a)    Cash Management Agreements, Confidentiality and Non-
              Disclosure Agreements, Customer Programs, Debtor
              Ownership Agreements, Foreign Agreements, Fuel
              Consortia Agreements, Insurance Plans, Intercompany
              Contracts, Interline Agreements, Letters of Credit, Revenue
              Generating Agreements, Surety Bonds, and Workers'
              Compensation Plans ................................................................ 80

       (b)    Certain Indemnification Obligations .......................................... 80

       (c)    Collective Bargaining Agreements ............................................ 81

       (d)    Covered Special Facility Revenue Bonds .................................. 81

8.4    Other Categories of Agreements and Policies ........................................ 82

       (a)    Employee Benefits .................................................................... 82

       (b)    Employee Protection Arrangements .......................................... 82

       (c)    Postpetition Aircraft Agreements .............................................. 82

8.5    Pension Plans ...................................................................................... 83

       (a)    Pension Plan Required Contributions ........................................ 83

       (b)    Pension Plan Continuation ........................................................ 83

       (c)    Liabilities Preserved ................................................................. 83

8.6    Assumption and Rejection Procedures and Resolution of
       Treatment Objections .......................................................................... 83

       (a)    Proposed Assumptions .............................................................. 83

       (b)    Proposed Rejections ................................................................. 84

       (c)    Resolution of Treatment Objections .......................................... 84

       (d)    Reservation of Rights ............................................................... 85

8.7    Rejection Claims ................................................................................. 85

8.8    Assignment ......................................................................................... 85

8.9    Approval of Assumption, Rejection, Retention, or Assignment of
       Executory Contracts and Unexpired Leases .......................................... 86

xiii

# TABLE OF CONTENTS
## (continued)

Page

8.10    Modifications, Amendments, Supplements, Restatements, or Other Agreements ............................................................................ 86

Article IX.    Effectiveness of the Plan............................................................ 87

9.1    Conditions Precedent to Confirmation of Plan ........................ 87

9.2    Conditions Precedent to Effective Date ................................... 87

9.3    Satisfaction and Waiver of Conditions .................................... 88

Article X.    Effect of Confirmation ............................................................... 88

10.1    Vesting of Assets ...................................................................... 88

10.2    Discharge of Claims and Termination of Equity Interests....... 89

10.3    Release and Discharge of Debtors ........................................... 89

10.4    Term of Injunctions or Stays.................................................... 89

10.5    Injunction Against Interference with Plan ............................... 89

10.6    Injunction ................................................................................. 90

10.7    Exculpation .............................................................................. 90

10.8    Release ..................................................................................... 91

10.9    Avoidance Actions.................................................................... 92

10.10    Retention of Causes of Action/Reservation of Rights ............ 92

Article XI.    Retention of Jurisdiction ............................................................ 93

11.1    Jurisdiction of Bankruptcy Court............................................. 93

Article XII.    Miscellaneous Provisions........................................................... 95

12.1    Dissolution of Committees ...................................................... 95

12.2    Substantial Consummation ...................................................... 96

12.3    Effectuating Documents and Further Transactions.................. 96

12.4    Exemption from Transfer Taxes ............................................... 96

12.5    Expedited Tax Determination .................................................. 97

12.6    Sell-Down Procedures ............................................................. 97

12.7    Payment of Statutory Fees ....................................................... 97

12.8    Plan Modifications and Amendments....................................... 97

12.9    Revocation or Withdrawal of Plan........................................... 98

12.10    Courts of Competent Jurisdiction ........................................... 98

xiv

**TABLE OF CONTENTS**
**(continued)**

Page

12.11   Severability ............................................................................. 98

12.12   Governing Law ......................................................................... 99

12.13   Exhibits and Schedules ........................................................... 99

12.14   Successors and Assigns............................................................ 99

12.15   Time ......................................................................................... 99

12.16   Notices ..................................................................................... 99

xv

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                            :
In re                                       :          **Chapter 11 Case No.**
                                            :
**AMR CORPORATION**, *et al.*,              :          **11-15463 (SHL)**
                                            :
                        **Debtors.**        :          **(Jointly Administered)**
                                            :
-----------------------------------------------------------------x

## DEBTORS' JOINT CHAPTER 11 PLAN

AMR Corporation; American Airlines, Inc.; AMR Eagle Holding
Corporation; American Airlines Realty (NYC) Holdings, Inc.; Americas Ground
Services, Inc.; PMA Investment Subsidiary, Inc.; SC Investment, Inc.; American Eagle
Airlines, Inc.; Executive Airlines, Inc.; Executive Ground Services, Inc.; Eagle Aviation
Services, Inc.; Admirals Club, Inc.; Business Express Airlines, Inc.; Reno Air, Inc.; AA
Real Estate Holding GP LLC; AA Real Estate Holding L.P.; American Airlines
Marketing Services LLC; American Airlines Vacations LLC; American Aviation Supply
LLC; and American Airlines IP Licensing Holding, LLC, the above-captioned debtors,
propose the following chapter 11 plan pursuant to section 1121(a) of title 11 of the
United States Code:

### ARTICLE I.

#### DEFINITIONS AND INTERPRETATION

**DEFINITIONS.** The following terms used herein shall have the respective meanings
defined below (such meanings to be equally applicable to both the singular and plural):

      **1.1**    **Ad Hoc Committee** means that certain Ad Hoc Committee of
AMR Corporation Creditors consisting of certain holders of substantial General
Unsecured Claims against the Debtors that was formed in connection with the
Chapter 11 Cases, as referenced in the Order Approving Motion for Approval of
"Fee Letter" to Pay Certain Work Fees and Expenses of Professionals Employed
by the Ad Hoc Group of AMR Corporation Creditors, entered by the Bankruptcy
Court on September 21, 2012 (ECF No 4652).

      **1.2**    **Administrative Expenses** means costs or expenses of
administration of any of the Chapter 11 Cases arising on or prior to the Effective
Date and allowed under section 503(b) of the Bankruptcy Code and entitled to
priority pursuant to section 507(a)(2) of the Bankruptcy Code that have not
already been paid by the Debtors, including, without limitation, any actual and

necessary costs and expenses of preserving the Debtors' estates, any actual and necessary costs and expenses of operating the Debtors' businesses, any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the Chapter 11 Cases, including, without limitation, for the acquisition or lease of property or an interest in property or the performance of services, any compensation and reimbursement of expenses to the extent allowed by Final Order under sections 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code.

       1.3      **AFA** means the Association of Flight Attendants-CWA, AFL-CIO.

       1.4      **AFA Claim** means the American Other General Unsecured Claim held by the AFA against American in the amount of $4.6 million that was Allowed pursuant to the order of the Bankruptcy Court entered on December 21, 2012 (ECF No. 5845), which Claim is not subject to reconsideration under section 502 of the Bankruptcy Code or otherwise.

       1.5      **AFA Section 1113 Agreement** means (i) that certain tentative agreement ratified by the membership of the AFA on September 7, 2012, (ii) that certain Letter Agreement on Settlement Consideration and Bankruptcy Protections, and (iii) those certain Letters of Agreement on certain additional provisions, in each case as approved pursuant to the order of the Bankruptcy Court entered on December 21, 2012 (ECF No. 5845).

       1.6      **Aircraft Equipment** means an aircraft, aircraft engine, propeller, appliance, or spare part (each as defined in section 40102 of title 49 of the United States Code) that is subject to a security interest granted by, leased to, or conditionally sold to any of the Debtors, including all records and documents relating to such equipment that are required, under the terms of the security agreement, lease, or conditional sale contract, to be surrendered or returned by any of the Debtors in connection with the surrender or return of such equipment.

       1.7      **Aircraft Securities** means the securities listed on Schedule "4" hereto.

       1.8      **Alignment Awards** means those certain long-term incentive program awards for certain managers of New AAG granted under the New AAG 2013 Incentive Award Plan, described in Section 4.1(o) of the American Disclosure Letter, to be effective on the Effective Date, the terms of which shall be set forth in the Plan Supplement.

       1.9      **Allowed** means, (i) with reference to any Claim, (a) any Claim against any Debtor that has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent

and for which no contrary proof of Claim has been filed, (b) any Claim listed on the Schedules or timely filed proof of Claim, as to which no objection to allowance has been, or subsequently is, interposed in accordance with Section 7.1 hereof or prior to the expiration of such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or as to which any objection has been determined by a Final Order to the extent such Final Order is in favor of the respective holder, or (c) any Claim expressly allowed by a Final Order, pursuant to the Claim Settlement Procedures, pursuant to Sections 4.3(c), 4.10(c), 4.10(d), 4.11(b), 4.11(c), and 4.11(d) hereof, or otherwise and (ii) with reference to any Equity Interest, such Equity Interest is reflected as outstanding (other than any such Equity Interest held by any Debtor or any Subsidiary of a Debtor) in the stock transfer ledger or similar register of the applicable Debtor on the Distribution Record Date.

       **1.10**    **ALPA** means the Air Line Pilots Association, International.

       **1.11**    **ALPA Claim** means the American Other General Unsecured Claim against American held by the ALPA in the amount of $21.6 million that was Allowed pursuant to the order of the Bankruptcy Court entered on December 21, 2012 (ECF No. 5844), which Claim is not subject to reconsideration under section 502 of the Bankruptcy Code or otherwise.

       **1.12**    **ALPA Section 1113 Agreement** means that certain (i) tentative agreement ratified by the membership of ALPA on October 8, 2012, (ii) Letter Agreement on Administrative Expense Claim and Bankruptcy Protections, dated September 16, 2012, and (iii) Supplemental Bankruptcy Protections Letter on the Alternative Dispute Resolution for ALPA Grievances, dated December 14, 2012, in each case as approved pursuant to the order of the Bankruptcy Court entered on December 21, 2012 (ECF No. 5844).

       **1.13**    **Amended Bylaws** means the Bylaws (or equivalent organizational document) of each of the Reorganized Debtors (other than New AAG), in each case as amended and/or restated, if applicable.

       **1.14**    **Amended Certificate of Incorporation** means the Certificate of Incorporation (or equivalent organizational document) of each of the Reorganized Debtors (other than New AAG), in each case as amended and/or restated.

       **1.15**    **American** means American Airlines, Inc., a Delaware corporation, as debtor or debtor in possession, as the context requires.

       **1.16**    **American Debtors** means American; American Airlines Realty (NYC) Holdings, Inc.; Admirals Club, Inc.; Reno Air, Inc.; AA Real Estate Holding GP LLC; AA Real Estate Holding L.P.; American Airlines Marketing Services LLC; American Airlines Vacations LLC; American Aviation Supply

<div align="center">3</div>

LLC; and American Airlines IP Licensing Holding, LLC, whether prior to or on and after the Effective Date.

**1.17** **American Disclosure Letter** means that certain disclosure letter by AMR that was delivered to US Airways pursuant to, and forming part of, the Merger Agreement.

**1.18** **American Equity Interest** means the interest of any holder of an equity security of any of the American Debtors, or any direct or indirect subsidiaries of the American Debtors, including any issued and outstanding shares of common or preferred stock or other present ownership interest in any of the American Debtors, or any direct or indirect subsidiaries of the American Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest, but excluding any such shares that are held as treasury stock.

**1.19** **American General Unsecured Claim** means any Claim against any of the American Debtors that is (i) not an Administrative Expense, Priority Tax Claim, Secured Claim, Priority Non-Tax Claim, or American Union Claim, or (ii) otherwise determined by the Bankruptcy Court to be an American General Unsecured Claim.

**1.20** **American General Unsecured Guaranteed Claim** means any American General Unsecured Claim that is also an AMR General Unsecured Claim, as set forth on Schedule "2" hereto, because the General Unsecured Claim against American is guaranteed by AMR, excluding any such Claim for which a Single-Dip Treatment Election to have such Claim treated as an American Other General Unsecured Claim in American Class 5 has been made in accordance with the procedures set forth in Section 4.10(b) hereof.  Each holder of an Allowed American General Unsecured Guaranteed Claim shall receive distributions hereunder only on account of its General Unsecured Claim against American in American Class 4 (American General Unsecured Guaranteed Claims).

**1.21** **American Labor Allocation** means 23.6% of the Creditor New Common Stock Allocation, of which 13.5% of the Creditor New Common Stock Allocation shall be allocated to the APA, 3% of the Creditor New Common Stock Allocation shall be allocated to the APFA, 4.8% of the Creditor New Common Stock Allocation shall be allocated to the TWU, and 2.3% of the Creditor New Common Stock Allocation shall be allocated to the Non-Union Employees, and which shall be comprised of the Initial Labor Common Stock Allocation and the Incremental Labor Common Stock Allocation.

**1.22** **American Note Claim** means any Claim against any of the American Debtors arising under or in connection with any Indenture and the respective notes, bonds, or debentures issued thereunder, excluding the fees and

4

expenses of the Indenture Trustees to the extent that such fees and expenses have been paid pursuant to the terms of Section 2.4 hereof.

1.23    **American Other General Unsecured Claim** means any American General Unsecured Claim that is not an American General Unsecured Guaranteed Claim.  Each of the Eagle Union Claims shall be an American Other General Unsecured Claim in American Class 5.

1.24    **American Plan Consolidation** means the deemed consolidation of the estates of the American Debtors with one another, solely for purposes of confirmation of the Plan and the occurrence of the Effective Date, including all voting, confirmation, and claims distribution purposes.

1.25    **American Priority Non-Tax Claim** means any Claim against the American Debtors, other than an Administrative Expense or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a)(4), (5), (6), or (7) of the Bankruptcy Code.

1.26    **American Union Claims** means the APA Claim, the APFA Claim, and the TWU American Claim.

1.27    **American Unions** means the APA, the APFA, and the TWU.

1.28    **AMR** means AMR Corporation, a Delaware corporation, as debtor or debtor in possession, as the context requires.

1.29    **AMR Common Stock** means the shares of common stock, par value $1.00 per share, of AMR.

1.30    **AMR Debtors** means AMR; Americas Ground Services, Inc.; PMA Investment Subsidiary, Inc.; and SC Investment, Inc., whether prior to or on and after the Effective Date.

1.31    **AMR Equity Interest** means (i) the interest of any holder of an equity security of AMR, including any issued and outstanding shares of common or preferred stock or other present ownership interest in AMR, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest (including any right to receive any such shares issued or issuable under any plans for the benefit of employees or directors of any of the Debtors in effect on the Commencement Date), but excluding any such shares that are held as treasury stock and any debt obligation relating to a Note that has not been converted into an AMR Equity Interest prior to or as of the Effective Date, and (ii) any Claim or Cause of Action against AMR (a) arising from rescission of a purchase or sale of shares of AMR Common Stock, (b) for damages arising from the purchase or sale of any such shares, (c) for violation of the securities laws, misrepresentations of any similar Claims related to the foregoing, or otherwise

5

subject to subordination under section 510(b) of the Bankruptcy Code, (d) for reimbursement, contribution, or indemnification allowed under section 502 of the Bankruptcy Code on account of any such Claim, including Claims based upon allegations that the Debtors made false and misleading statements or engaged in other deceptive acts in connection with the offer or sale of securities, or (e) for attorneys' fees, other charges, or costs incurred on account of any of the foregoing Claims or Causes of Action.

**1.32** **AMR General Unsecured Claim** means any Claim against any of the AMR Debtors that is (i) not an Administrative Expense, Priority Tax Claim, Secured Claim, AMR Equity Interest, or Priority Non-Tax Claim or (ii) otherwise determined by the Bankruptcy Court to be an AMR General Unsecured Claim.

**1.33** **AMR General Unsecured Guaranteed Claim** means any AMR General Unsecured Claim that is also an American General Unsecured Claim, as set forth on Schedule "1" hereto, because the General Unsecured Claim against AMR is guaranteed by American, excluding any such Claim for which a Single-Dip Treatment Election to have such Claim treated as an AMR Other General Unsecured Claim in AMR Class 4 has been made in accordance with the procedures set forth in Section 4.3(b) hereof.  Each holder of an Allowed AMR General Unsecured Guaranteed Claim shall receive distributions hereunder only on account of its General Unsecured Claim against AMR in AMR Class 3 (AMR General Unsecured Guaranteed Claims).

**1.34** **AMR Intercompany Claim** means the net intercompany receivable  purportedly owed to AMR by American as of the Commencement Date.

**1.35** **AMR Note Claim** means any Claim against any of the AMR Debtors arising under or in connection with any Indenture and the respective notes, bonds, or debentures issued thereunder, excluding the fees and expenses of the Indenture Trustees, to the extent that such fees and expenses have been paid pursuant to the terms of Section 2.4 hereof.

**1.36** **AMR Other Equity Interest** means the interest of any holder of an equity security of any of the AMR Debtors other than AMR, including any issued and outstanding shares of common or preferred stock or other present ownership interest in any of the AMR Debtors other than AMR, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest, but excluding any such shares that are held as treasury stock.

**1.37** **AMR Other General Unsecured Claim** means any AMR General Unsecured Claim that is not an AMR General Unsecured Guaranteed Claim.

**1.38** **AMR Plan Consolidation** means the deemed consolidation of the estates of the AMR Debtors with one another, solely for purposes of confirmation

6

of the Plan and the occurrence of the Effective Date, including voting, confirmation, and distribution.

**1.39**    **AMR Priority Non-Tax Claim** means any Claim against the AMR Debtors, other than an Administrative Expense or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a)(4), (5), (6), or (7) of the Bankruptcy Code.

**1.40**    **APA** means the Allied Pilots Association.

**1.41**    **APA Claim** means the right to receive 13.5% of the Creditor New Common Stock Allocation granted to the APA on behalf of the pilots represented by the APA pursuant to the order of the Bankruptcy Court entered on December 19, 2012 (ECF No. 5800), in satisfaction and full extinguishment of any and all claims, interests, causes, or demands that the APA has or might arguably have, on behalf of itself or the pilots represented by the APA, pursuant to the Railway Labor Act or under or with respect to the abrogated collective bargaining agreement between American and the APA or the existing pilot terms and conditions of employment ("**Green Book**") against the Debtors as provided in that certain Letter Agreement on Settlement Consideration and Bankruptcy Protections, dated November 16, 2012 (the "**Bankruptcy Settlement Letter of Agreement**"), as provided by such order; *provided, however*, that the APA Claim shall not include the claims and grievances or lawsuits (i) set forth in Sections 1, 3, and/or Exhibit 1 of the Bankruptcy Settlement Letter of Agreement and (ii) under that Letter Agreement, dated January 4, 2013 (the "**January 4 Letter**") between American and the APA (collectively, the "**APA Reserved Claims**"). The APA Reserved Claims referred to in clause (i) of the immediately preceding sentence, if Allowed, shall be classified and treated hereunder in accordance with any such allowance.  The APA Reserved Claims referred to in clause (ii) of the immediately preceding sentence shall be subject to the terms and provisions of the January 4 Letter.  For purposes of voting hereunder, the entire APA Claim shall be voted by the APA on behalf of the pilots represented by the APA.

**1.42**    **APA Section 1113 Agreement** means that certain Tentative Agreement with the APA ratified on December 7, 2012, including that certain Letter Agreement on Settlement Consideration and Bankruptcy Protections, dated November 16, 2012, as approved pursuant to the order of the Bankruptcy Court entered on December 19, 2012 (ECF No. 5800).

**1.43**    **APFA** means the Association of Professional Flight Attendants.

**1.44**    **APFA Claim** means the right to receive 3% of the Creditor New Common Stock Allocation granted to the APFA on behalf of the flight attendants represented by the APFA pursuant to the order of the Bankruptcy Court entered on September 12, 2012 (ECF No. 4414), in satisfaction and full extinguishment of any and all claims, interests, causes, or demands that the APFA has or might

7

arguably have, on behalf of itself or the flight attendants represented by the APFA, as provided by such order.  For purposes of voting hereunder, the entire APFA Claim shall be voted by the APFA on behalf of the flight attendants represented by the APFA.

       **1.45**    **APFA Section 1113 Agreement** means that certain (i) Last Best and Final Offer to the Association of Professional Flight Attendants, dated July 19, 2012, (ii) letter agreement on settlement consideration and bankruptcy protection, dated August 22, 2012, between American and the APFA, and (iii) letter agreement on certain additional provisions, dated August 10, 2012, between American and the APFA, each as approved pursuant to the order of the Bankruptcy Court entered on September 12, 2012 (ECF No. 4414).

       **1.46**    **Assumption Counterparty** means a counterparty to an executory contract or unexpired lease to be assumed, or assumed and assigned, by the Debtors hereunder.

       **1.47**    **Assumption Effective Date** means the date on which the assumption of an executory contract or unexpired lease hereunder is deemed effective, which date shall not be later than sixty (60) calendar days after the Effective Date, unless otherwise agreed to by the applicable Debtor or Reorganized Debtor and the applicable Assumption Counterparty.

       **1.48**    **Avoidance Action** means any action commenced, or that may be commenced, before or after the Effective Date pursuant to section 544, 545, 547, 548, 549, 550, or 551 of the Bankruptcy Code.

       **1.49**    **Ballot** means the form(s) distributed to holders of impaired Claims and AMR Equity Interests on which is to be indicated the acceptance or rejection of the Plan.

       **1.50**    **Bankruptcy Code** means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

       **1.51**    **Bankruptcy Court** means the United States District Court for the Southern District of New York, having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

       **1.52**    **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any Local Rules of the Bankruptcy Court.

US_ACTIVE:\44195459\15\14013.0139

**1.53    Bond Documents** means, collectively, the DFW 1.5x Special Facility Revenue Bond Agreements, the DFW 1.5x Special Facility Revenue Bond Documents, the Indentures, the Special Facility Revenue Bond Indentures, and the Special Facility Revenue Bond Documents.

**1.54    Business Day** means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

**1.55    Cash** means legal tender of the United States of America.

**1.56    Cash Management Agreements** means the Debtors' agreements related to the Debtors' cash management system which the Debtors were authorized to continue in the ordinary course of business pursuant to the Final Order Pursuant to 11 U.S.C. §§ 105(a), 345(b), 363(b), 363(c), and 364(a) and Fed. R. Bankr. P. 6003 and 6004 (A) Authorizing Debtors to (i) Continue Using Existing Cash Management System, (ii) Honor Certain Prepetition Obligations Related to the Use Thereof, and (iii) Maintain Existing Bank Accounts and Business Forms; and (B) Extending Time to Comply with 11 U.S.C. § 345(b), dated February 7, 2012 (ECF No. 1052).

**1.57    Cause of Action** means, without limitation, any and all actions, proceedings, causes of action, controversies, liabilities, obligations, rights, rights of setoff, recoupment rights, suits, damages, judgments, accounts, defenses, offsets, powers, privileges, licenses, franchises, Claims, counterclaims, cross-claims, affirmative defenses, and demands of any kind or character whatsoever, whether known or unknown, asserted or unasserted, reduced to judgment or otherwise, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in contract or in tort, in law, in equity, or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Commencement Date or during the course of the Chapter 11 Cases, including through the Effective Date.  Without limiting the generality of the foregoing, when referring to Causes of Action of the Debtors or their estates, Causes of Action shall include (i) all rights of setoff, counterclaim, or recoupment and Claims on contracts or for breaches of duties imposed by law or equity, (ii) Claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code, and (iii) Claims and defenses such as fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code.  A nonexclusive list of Causes of Action shall be set forth in the Plan Supplement.

**1.58    Certificate of Designations** means the Certificate of Designations, Powers, Preferences and Rights of the Series A Convertible Preferred Stock of American Airlines Group Inc., in substantially the form annexed hereto as Exhibit "B."

US_ACTIVE:\44195459\15\14013.0139

**1.59**   **Certificate of Merger** means the certificate of merger to be executed, acknowledged, and filed with the Secretary of State of the State of Delaware in accordance with the Delaware General Corporation Law pursuant to the Merger Agreement.

**1.60**   **Chairman Letter Agreement** means that certain Letter Agreement, dated February 13, 2013, a copy of which is annexed as Exhibit "G" to the Merger Agreement, which provides, among other things, for certain payments to Thomas W. Horton, the current Chairman of the Board and Chief Executive Officer of AMR, subject to the occurrence of the Merger Closing.

**1.61**   **Chapter 11 Cases** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Commencement Date in the Bankruptcy Court and currently styled *In re AMR Corporation, et al.,* Ch. 11 Case No. 11-15463 (SHL) (Jointly Administered).

**1.62**   **Claim** has the meaning set forth in section 101(5) of the Bankruptcy Code.

**1.63**   **Claim Settlement Procedures** means the procedures for settling certain Claims, pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019(b), which were approved pursuant to the order of the Bankruptcy Court entered on March 23, 2012 (ECF No. 1984).

**1.64**   **Class** means any group of Claims or Equity Interests classified herein pursuant to section 1123(a)(1) of the Bankruptcy Code.

**1.65**   **Closing Date** means the date on which the Merger Closing takes place.

**1.66**   **Collateral** means any property or interest in property of the estate of any Debtor subject to a lien, charge, or other encumbrance to secure the payment or performance of a Claim, which lien, charge, or other encumbrance is not subject to avoidance under the Bankruptcy Code.

**1.67**   **Collective Bargaining Agreements** means the respective collective bargaining agreements between (i) American and each of the American Unions and (ii) American Eagle Airlines, Inc. and Executive Airlines, Inc. and each of the Eagle Unions, each as in effect on the Effective Date, including, for the avoidance of doubt, the Section 1113 Agreements and the Merger Collective Bargaining Agreements.

**1.68**   **Commencement Date** means November 29, 2011, the date on which the Debtors commenced the Chapter 11 Cases.

US_ACTIVE:\44195459\15\14013.0139

**1.69** **Confidentiality and Non-Disclosure Agreements** means, including without limitation, (i) agreements for the nondisclosure or nonuse of the Debtors' confidential, proprietary, or sensitive confidential information and trade secrets and (ii) agreements for the protection of personally identifiable information.

**1.70** **Confirmation Date** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

**1.71** **Confirmation Hearing** means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

**1.72** **Confirmation Order** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the transactions contemplated thereby, including, without limitation, the Merger.

**1.73** **Convenience Class Claim** means any Claim, other than a Note Claim, a Special Facility Revenue Bond Claim, an American Union Claim, and the Eagle Union Claims, against any of the Debtors that would otherwise be a General Unsecured Claim and that is (i) greater than $0 and less than or equal to $10,000 in Allowed amount or (ii) irrevocably reduced to $10,000 at the election of the holder of the Claim evidenced on the Ballot submitted by such holder; *provided, however*, that a General Unsecured Claim may not be subdivided into multiple Claims of $10,000 or less for purposes of receiving treatment as a Convenience Class Claim.  The aggregate amount of Cash payable to satisfy Allowed Convenience Class Claims hereunder shall not exceed $25 million.

**1.74** **Conversion Period** has the meaning given to such term in the Certificate of Designations.

**1.75** **Convertible Note** means a Note to which a Convertible Note Claim relates.

**1.76** **Convertible Note Claim** means any AMR Fixed Allowed Guaranteed Note Claim, American Fixed Allowed Guaranteed Note Claim, or American Fixed Allowed Other Note Claim, in each case with respect to a Note that is convertible into an existing AMR Equity Interest.

**1.77** **Covered Special Facility Revenue Bonds** means the Special Facility Revenue Bonds issued pursuant to (i) the Amended and Restated Master Indenture of Trust, dated as of November 1, 2005, between New York City Industrial Development Agency, as issuer, and The Bank of New York Mellon, as successor-in-interest Trustee to The Bank of New York, as such Indenture may have been amended, supplemented, or modified, pursuant to which up to

11

approximately $3 billion of New York City Industrial Development Agency
Special Facility Revenue Bonds, Series 2002A, 2002B, and 2005 (American
Airlines, Inc. John F. Kennedy International Airport Project), due on varying
dates but no later than August 1, 2031, were authorized to be issued; (ii) the Trust
Indenture, dated as of January 1, 2002, between Regional Airports Improvement
Corporation, as issuer, and The Bank of New York Mellon Trust Company, N.A.,
as successor-in-interest Trustee to BNY Western Trust Company, as such
Indenture may have been amended, supplemented, or modified, pursuant to which
$297,075,000 of Regional Airports Improvement Corporation Facilities Sublease
Revenue Bonds, American Airlines, Inc. Terminal 4 Project (Los Angeles
International Airport), Series 2002, due on varying dates but no later than
December 1, 2024, were issued; and (iii) the Bond Indenture, dated as of May 1,
1963, between the Trustees of the Tulsa Municipal Airport Trust, as issuer, and
The Bank of New York Mellon, as successor-in-interest Trustee to Morgan
Guarantee Trust Company of New York, as such Indenture may have been
amended, supplemented, or modified, including by (A) the Eighth Supplemental
Bond Indenture, dated as of November 1, 1992, between Trustees of the Tulsa
Municipal Airport Trust, as issuer, and The Bank of New York Mellon, as
successor-in-interest Trustee to The Bank of New York, as such Indenture may
have been amended, supplemented, or modified, pursuant to which $27,500,000
of Trustees of the Tulsa Municipal Airport Trust Revenue Bonds, Series 1992,
due December 1, 2011, were issued; (B) the Ninth Supplemental Bond Indenture,
dated as of November 1, 1995, between Trustees of the Tulsa Municipal Airport
Trust, as issuer, and The Bank of New York Mellon, as successor-in-interest
Trustee to The Bank of New York, as such Indenture may have been amended,
supplemented, or modified, pursuant to which $97,710,000 of Trustees of the
Tulsa Municipal Airport Trust Revenue Bonds, Series 1995, due June 1, 2020,
were issued; (C) the Tenth Supplemental Bond Indenture, dated as of October 1,
2000, between Trustees of the Tulsa Municipal Airport Trust, as issuer, and The
Bank of New York Mellon, as successor-in-interest Trustee to The Bank of New
York, as such Indenture may have been amended, supplemented, or modified,
pursuant to which $175,355,000 of Trustees of the Tulsa Municipal Airport Trust
Revenue Bonds, Refunding Series 2000A and Refunding Series 2000B, due June
1, 2035, were issued; and (D) the Eleventh Supplemental Bond Indenture, dated
as of April 1, 2001, between Trustees of the Tulsa Municipal Airport Trust, as
issuer, and The Bank of New York Mellon Trust Company, N.A., as successor-in-
interest Trustee to The Bank of New York, as such Indenture may have been
amended, supplemented, or modified, pursuant to which $152,705,000 of Tulsa
Municipal Airport Trust Revenue Bonds, Refunding Series 2001A and Refunding
Series 2001B, due December 1, 2035, were issued; and for the avoidance of
doubt, the Tripartite Agreement, dated as of November 1, 1995, among the
Trustees of the Tulsa Municipal Airport Trust, The Bank of New York Mellon, as
successor-in-interest to The Bank of New York, and BOKF N.A., as successor-in-
interest to Bank of Oklahoma, N.A.

12

**1.78    Creditor New Common Stock Allocation** means the New Common Stock Allocation, less the Initial Old Equity Allocation, less the Market-Based Old Equity Allocation.

**1.79    Creditors' Committee** means the statutory committee of unsecured creditors by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

**1.80    Cure Amount** means a distribution made in the ordinary course of business following the Effective Date pursuant to an executory contract or unexpired lease assumed under section 365 or 1123 of the Bankruptcy Code (i) in an amount equal to the Proposed Cure (including if the Proposed Cure is zero) or (ii) if a Treatment Objection has been filed with respect to a Proposed Cure, then in an amount equal to the unpaid monetary obligations owing by the Debtors and required to be paid pursuant to section 365(b) of the Bankruptcy Code, as may be determined by Final Order or otherwise agreed upon by the parties.

**1.81    Customer Programs** means the Debtors' customer programs and practices as to which the Debtors were authorized to honor prepetition obligations and otherwise continue in the ordinary course of business pursuant to the Final Order Pursuant to 11 U.S.C. §§ 105(a) and 363(c) (I) Authorizing the Debtors to Pay and Honor Prepetition Obligations to Customers and to Otherwise Continue Customer Programs and Practices in the Ordinary Course of Business and (II) Authorizing and Directing the Disbursement Banks to Honor and Process Related Checks and Transfers, entered by the Bankruptcy Court on December 22, 2011 (ECF No. 426).

**1.82    Debtor Ownership Agreements** means warrants, debentures, stock purchase agreements, options, and other similar commitments entitling the Debtors to obtain an ownership, voting, or similar interest in a third party.

**1.83    Debtors** means AMR; American; Eagle Holding; American Airlines Realty (NYC) Holdings, Inc.; Americas Ground Services, Inc.; PMA Investment Subsidiary, Inc.; SC Investment, Inc.; American Eagle Airlines, Inc.; Executive Airlines, Inc.; Executive Ground Services, Inc.; Eagle Aviation Services, Inc.; Admirals Club, Inc.; Business Express Airlines, Inc.; Reno Air, Inc.; AA Real Estate Holding GP LLC; AA Real Estate Holding L.P.; American Airlines Marketing Services LLC; American Airlines Vacations LLC; American Aviation Supply LLC; and American Airlines IP Licensing Holding, LLC, whether prior to or on and after the Effective Date.

**1.84    Deferred Agreement Deadline** means 11:59 p.m. (Eastern Time) on the one hundred eightieth (180th) calendar day after the Effective Date, subject to further extensions or exceptions as may be ordered by the Bankruptcy Court.

13

**1.85    Deferred Counterparty** means a counterparty to an executory contract or unexpired lease that is designated as "Deferred" on Schedule 8.1(c) of the Plan Supplement.

**1.86    DFW 1.5x Special Facility Revenue Bond Agreements** means the agreements governing the Debtors' obligations to make payments on DFW 1.5x Special Facility Revenue Bonds issued to finance or refinance the acquisition or construction of airport and related facilities, improvements, and/or equipment used by the Debtors, as such agreements may have been amended, supplemented, or modified.

**1.87    DFW 1.5x Unsecured Special Facility Revenue Bond Claim** means any Claim against any of the Debtors arising under or in connection with any DFW 1.5x Special Facility Revenue Bond Agreement and the respective notes, bonds, or debentures issued thereunder, excluding the fees and expenses of the Indenture Trustees to the extent that such fees and expenses have been paid pursuant to the terms of Section 2.4 hereof; *provided, however*, that the DFW 1.5x Unsecured Special Facility Revenue Bond Claims shall not include any such Claims held by any of the Debtors (including any Claims held by the Debtors under the DFW 1.5x Special Facility Revenue Bond Documents), which Claims shall be disallowed hereunder.

**1.88    DFW 1.5x Special Facility Revenue Bond Documents** means all documents associated with a DFW 1.5x Special Facility Revenue Bond Agreement (including such DFW 1.5x Special Facility Revenue Bond Agreement) and the corresponding DFW 1.5x Special Facility Revenue Bonds, as such documents may have been amended, supplemented, or modified.

**1.89    DFW 1.5x Special Facility Revenue Bond Indentures** means (i) the Trust Indenture, dated as of September 1, 1999, between Dallas-Fort Worth International Airport Facility Improvement Corporation, as issuer, and Manufacturers and Traders Trust Company, as successor-in-interest Trustee to Chase Bank of Texas, N.A., as such Indenture may have been amended, supplemented, or modified, pursuant to which $209,090,000 of Dallas-Fort Worth International Airport Facility Improvement Corporation American Airlines, Inc. Revenue Bonds, Series 1999, due May 1, 2035, were issued and (ii) the Trust Indenture, dated as of August 1, 2000, between Dallas-Fort Worth International Airport Facility Improvement Corporation, as issuer, and Manufacturers and Traders Trust Company, as successor-in-interest Trustee to The Chase Manhattan Bank, as such Indenture may have been amended, supplemented, or modified, pursuant to which $198,000,000 of Dallas-Fort Worth International Airport Facility Improvement Corporation American Airlines, Inc. Revenue Refunding Bonds, Series 2000A1, 2000A2, and 2000A3, due May 1, 2029, were issued.

US_ACTIVE:\44195459\15\14013.0139

**1.90     DFW 1.5x Special Facility Revenue Bonds** means the respective notes, bonds, or debentures issued under the DFW 1.5x Special Facility Revenue Bond Indentures.

**1.91     Disallowed** means, with reference to any Claim or a portion of a Claim, any Claim against any Debtor that (i) has been disallowed by a Final Order of the Bankruptcy Court, (ii) has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as $0, contingent, disputed, or unliquidated and as to which no proof of Claim has been filed by the applicable deadline or deemed timely filed pursuant to any Final Order of the Bankruptcy Court, (iii) has been agreed to by the holder of such Claim and the applicable Debtor to be equal to $0 or to be expunged, or (iv) has not been listed by such Debtor on the Schedules and as to which no proof of Claim has been filed by the applicable deadline or deemed timely filed pursuant to any Final Order of the Bankruptcy Court.

**1.92     Disbursing Agent** means New AAG (or such other Entity designated by AMR in its sole discretion and without the need for any further order of the Bankruptcy Court) in its capacity as a disbursing agent pursuant to Section 5.2 hereof.

**1.93     Disclosure Statement** means the disclosure statement relating to the Plan, including, without limitation, all exhibits thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

**1.94     Disputed** means, with respect to any Claim that has not been Allowed pursuant to the Plan or a Final Order,

(a)     if no proof of Claim has been filed by the applicable deadline:  a Claim that has been or hereafter is listed on the Schedules as other than disputed, contingent, or unliquidated, but as to which the Debtors or any other party in interest has interposed an objection or request for estimation which has not been withdrawn or determined by a Final Order;

(b)     if a proof of Claim or request for payment of an Administrative Expense has been filed by the applicable deadline:  (i) a Claim for which no corresponding Claim has been or hereafter is listed on the Schedules, (ii) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as other than disputed, contingent, or unliquidated, but the nature or amount of the Claim as asserted in the proof of Claim varies from the nature and amount of such Claim as listed on the Schedules, (iii) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated, or (iv) a Claim for which a timely objection or request for estimation is interposed by the Debtors or other authorized Entity which has not been withdrawn or determined by a Final Order.  Any Claim

15

expressly allowed by a Final Order, pursuant to the Claim Settlement Procedures, or hereunder shall be an Allowed Claim, not a Disputed Claim; or

(c)    a Claim that is subject to disallowance under section 502(d) of the Bankruptcy Code.

For the avoidance of doubt, if no proof of Claim has been filed by the applicable deadline and the Claim has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated, such Claim shall not be valid and shall be disregarded for all purposes.

**1.95    Disputed Claims Reserve** has the meaning set forth in Section 7.3(b) hereof.

**1.96    Distribution Date** means any of (i) the Initial Distribution Date, (ii) each Interim Distribution Date, and (iii) the Final Distribution Date.

**1.97    Distribution Record Date** means (i) the Confirmation Date or (ii) with respect to securities held by The Depository Trust Company, the Initial Distribution Date.

**1.98    District Court** means the United States District Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases.

**1.99    Double-Dip Full Recovery Amount** means an amount equal to the full amount of all Allowed Double-Dip General Unsecured Claims as of the Commencement Date, plus interest thereon (including interest on overdue interest, to the extent provided for in the underlying documents) on all such Claims from the Commencement Date through the Effective Date.  The Allowed amount of each Double-Dip General Unsecured Claim as of the Commencement Date and the postpetition interest rate applicable to each such Claim are set forth on Schedules "1" and "2" hereto.

**1.100    Double-Dip General Unsecured Claims** means the AMR General Unsecured Guaranteed Claims in AMR Class 3 and the American General Unsecured Guaranteed Claims in American Class 4 and are set forth on Schedules "1" and "2" hereto.  Each holder of a Double-Dip General Unsecured Claim shall receive distributions hereunder only on account of one of its Double-Dip General Unsecured Claims as set forth herein.

**1.101    Double-Dip Hurdle Value** means an amount equal to (i) the sum of (a) the per share Initial Stated Value multiplied by the total number of shares of New Mandatorily Convertible Preferred Stock issued to holders of Allowed Double-Dip General Unsecured Claims, plus (b) the aggregate amount of the increase in Stated Value that will accrue on such shares through the Final

16

Mandatory Conversion Date, assuming no Optional Conversion, all as divided by (ii) 0.965.

**1.102    Eagle Debtors** means Eagle Holding; American Eagle Airlines, Inc.; Executive Airlines, Inc.; Eagle Aviation Services, Inc.; Business Express Airlines, Inc.; and Executive Ground Services, Inc., whether prior to or on and after the Effective Date.

**1.103    Eagle Equity Interest** means the interest of any holder of an equity security of any of the Eagle Debtors, or any direct or indirect subsidiaries of the Eagle Debtors, including any issued and outstanding shares of common or preferred stock or other present ownership interest in any of the Eagle Debtors, or any direct or indirect subsidiaries of the Eagle Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest.

**1.104    Eagle General Unsecured Claim** means any Claim against any of the Eagle Debtors that is (i) not an Administrative Expense, Priority Tax Claim, Secured Claim, Priority Non-Tax Claim, or Eagle Union Claim, or (ii) otherwise determined by the Bankruptcy Court to be an Eagle General Unsecured Claim.

**1.105    Eagle Holding** means AMR Eagle Holding Corporation, a Delaware corporation, as debtor or debtor in possession, as the context requires.

**1.106    Eagle Holding Intercompany Claim** means the aggregate intercompany indebtedness owing between Eagle Holding and American as of the Commencement Date.

**1.107    Eagle Plan Consolidation** means the deemed consolidation of the estates of the Eagle Debtors with one another, solely for purposes of confirmation of the Plan and the occurrence of the Effective Date, including all voting, confirmation, and claims distribution purposes.

**1.108    Eagle Priority Non-Tax Claim** means any Claim against the Eagle Debtors, other than an Administrative Expense or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a)(4), (5), (6), or (7) of the Bankruptcy Code.

**1.109    Eagle Union Claims** means the ALPA Claim, the AFA Claim, and the TWU Eagle Claim.

**1.110    Eagle Unions** means the ALPA, the AFA, and the TWU.

**1.111    Effective Date** means a Business Day on or after the Confirmation Date specified by the Debtors on which the conditions to the effectiveness of the Plan specified in Section 9.2 hereof have been satisfied or otherwise effectively

17

waived, which date shall occur contemporaneously with the Closing Date. The Debtors shall file a notice of the Effective Date with the Bankruptcy Court and with the Securities and Exchange Commission.

**1.112** **Encumbrance** means, with respect to any asset, any mortgage, lien, pledge, charge, security interest, assignment, or encumbrance of any kind or nature in respect of such asset (including, without limitation, any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction).

**1.113** **Entity** means an individual, corporation, partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization, government or any political subdivision thereof, or other Person or entity.

**1.114** **Equity Interest** means the interest of any holder of an equity security of any of the Debtors, or any direct or indirect subsidiaries of the Debtors, represented by any issued and outstanding shares of common or preferred stock or other instrument evidencing a present ownership interest in any of the Debtors, or any direct or indirect subsidiaries of the Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest.

**1.115** **ERISA** means the Employee Retirement Income Security Act of 1974, as amended.

**1.116** **Final Distribution Date** means a date selected by the Reorganized Debtors in their sole discretion that is after the Initial Distribution Date and is no later than twenty (20) calendar days after the date on which all Disputed Claims in AMR Class 4 (AMR Other General Unsecured Claims), American Class 5 (American Other General Unsecured Claims), and Eagle Class 3 (Eagle General Unsecured Claims) have become either Allowed Claims or Disallowed Claims.

**1.117** **Final Mandatory Conversion Date** means the one hundred twentieth (120th) day following the Effective Date.

**1.118** **Final Order** means an order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing shall then be pending or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been

18

denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided, however*, that no order or judgment shall fail to be a Final Order solely because of the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure has been or may be filed with respect to such order or judgment. The susceptibility of a Claim to a challenge under section 502(j) of the Bankruptcy Code shall not render a Final Order not a Final Order.

1.119    **Final Pro Rata Share** means, with respect to any Allowed Single-Dip General Unsecured Claim, the ratio (expressed as a percentage rounded to four (4) decimals) of the amount of such Allowed Single-Dip General Unsecured Claim to the aggregate amount of all Single-Dip General Unsecured Claims that are Allowed as of the Final Distribution Date.

1.120    **Final True-Up Distribution** means the final distribution of New Common Stock in accordance with Section 7.4(b) hereof.

1.121    **Foreign Agreements** means all executory contracts and unexpired leases as to which the Debtors were authorized to pay their prepetition debts in the ordinary course of business pursuant to the Final Order Pursuant to 11 U.S.C. §§ 363(b) and 105(a) (I) Authorizing Debtors to Pay Prepetition Obligations Owed to Foreign Creditors, and (II) Authorizing and Directing Financial Institutions to Honor and Process Related Checks, entered by the Bankruptcy Court on December 22, 2011 (ECF No. 425).

1.122    **Fuel Consortia Agreements** means any agreement entered into to become a member, contracting airline, or similar status in a fuel or into-plane consortium, including without limitation, interline agreements and limited liability company agreements among airlines; agreements for maintenance, operation, and management among consortia member airlines and third-party operators; agreements for fuel system access to engage in into-plane fueling; and agreements with noncontracting users to obtain storage rights.

1.123    **GAAP** means U.S. generally accepted accounting principles.

1.124    **General Unsecured Claim** means any Claim against any of the Debtors that is (i) not an Administrative Expense, Priority Tax Claim, Secured Claim, Priority Non-Tax Claim, or American Union Claim or (ii) otherwise determined by the Bankruptcy Court to be a General Unsecured Claim.

1.125    **Incremental Labor Common Stock Allocation** means, with respect to each Mandatory Conversion Date, a number of shares of New Common Stock equal to the difference between (i) 23.6% of the aggregate number of shares of New Common Stock issued (including upon conversion of the New Mandatorily Convertible Preferred Stock) during the period from the Effective

19

Date up to and including the current Mandatory Conversion Date, to holders of Allowed Single-Dip General Unsecured Claims and holders of Allowed Double-Dip General Unsecured Claims, all as divided by 0.764 and (ii) the sum of (a) the Initial Labor Common Stock Allocation, plus (b) the total Incremental Labor Common Stock Allocations from all prior periods; *provided, however*, that in no event shall the number of shares in the Incremental Labor Common Stock Allocation with respect to any Mandatory Conversion Date be less than zero.

   **1.126   Indemnification Obligation** means (i) any obligation of any Debtor to indemnify directors and officers of any of the Debtors who served in such capacity at any time on or after November 29, 2005, with respect to or based upon any act or failure to act in any of such capacities, or for or on behalf of any Debtor, against any costs or expenses (including reasonable attorneys' fees), judgments, fines, losses, claims, damages, or liabilities incurred in connection with any claim, action, suit, proceeding, or investigation, whether civil, criminal, administrative, or investigative, arising out of matters existing or occurring at or prior to the Merger Effective Time, whether asserted or claimed prior to, at, or after the Merger Effective Time (including any matters arising in connection with the transactions contemplated by the Merger Agreement), to the fullest extent permitted by applicable law and (ii) any obligation of any Debtor to indemnify current or former directors or officers of any of the Debtors pursuant to Contracts (as defined in the Merger Agreement) with any of the Debtors, their respective organizational documents, or applicable law.

   **1.127   Indentures** means (i) the Indenture, dated as of December 1, 1998, between AMR, as issuer, and Wilmington Trust Company, as successor Trustee, as such Indenture may have been amended, supplemented, or modified, pursuant to which $150,000,000 of 7.875% Public Income Notes, due July 13, 2039, were issued on July 13, 1999; (ii) the Indenture, dated as of February 1, 2004, between AMR, as issuer, and Wilmington Trust Company, as Trustee, as such Indenture may have been amended, supplemented, or modified, pursuant to which (a) $323,500,000 of 4.5% Senior Convertible Notes, due February 15, 2024, were issued on February 13, 2004, and (b) $460,000,000 of 6.25% Senior Convertible Notes, due October 15, 2014, were issued on September 28, 2009; (iii) the Indenture, dated as of May 1, 1986, between AMR, as issuer, and The Bank of New York Mellon, as successor-in-interest to Commerce Union Bank, as Trustee, as such Indenture may have been amended, supplemented, or modified, pursuant to which (a) $100,000,000 of 9.0% Debentures, due September 15, 2016, were issued on September 19, 1986; (b) $125,000,000 of 10.2% Debentures, due March 15, 2020, were issued on March 15, 1990; (c) $100,000,000 of 9.88% Debentures, due June 15, 2020, were issued on June 25, 1990; (d) $4,250,000 of 10.29% Series B Medium Term Notes, due March 8, 2021, were issued on March 8, 1991; and (e) $4,100,000 of 10.55% Series B Medium Term Notes, due March 12, 2021, were issued on March 12, 1991; (iv) the Indenture, dated as of March 1, 1991, between AMR, as issuer, and Wilmington Trust Company, as successor-in-

20

interest to Citibank, N.A., as Trustee, as such Indenture may have been amended, supplemented, or modified, pursuant to which (a) $350,000,000 of 10.0% Debentures due April 15, 2021, were issued on April 15, 1991; (b) $200,000,000 of 9.75% Debentures, due August 15, 2021, were issued on August 19, 1991; (c) $100,000,000 of 9.8% Debentures, due October 1, 2021, were issued on October 10, 1991; (d) $40,000,000 of 10.125% Series C Medium Term Notes, due June 1, 2021, were issued on June 6, 1991; (e) $8,000,000 of 10.15% Series C Medium Term Notes, due May 15, 2020, were issued on June 11, 1991; (f) $21,000,000 of 9.2% Series C Medium Term Notes, due January 30, 2012, were issued on January 15, 1992; and (g) $15,000,000 of 9.14% Series D Medium Term Notes, due February 21, 2012, were issued on February 21, 1992; and (v) the Indenture, dated as of March 1, 1992, between AMR, as issuer, and Wilmington Trust Company, as successor-in-interest to Morgan Guaranty Trust Company of New York, as Trustee, as such Indenture may have been amended, supplemented, or modified, pursuant to which $350,000,000 of 9.0% Debentures, due August 1, 2012, were issued on July 29, 1992.

**1.128** **Indenture Trustees** means the trustees, co-trustees, agents, paying agents, distribution agents, authenticating agents, registrars, guarantee trustees, remarketing agents, collateral agents, and bond registrars under the respective Indentures or Special Facility Revenue Bond Indentures, as applicable, and any and all successors or predecessors thereto.

**1.129** **Initial Distribution Date** means the Effective Date; *provided, however*, that with respect to distributions to be made hereunder in respect of each of the American Union Claims in American Class 6, the Initial Distribution Date may be a date other than the Effective Date to the extent that (i) New AAG and the holders of the APA Claim agree to a different Initial Distribution Date solely with respect to the APA Claim, (ii) New AAG and the holders of the APFA Claim agree to a different Initial Distribution Date solely with respect to the APFA Claim, or (iii) New AAG and the holders of the TWU Claim agree to a different Initial Distribution Date solely with respect to the TWU Claim.

**1.130** **Initial Labor Common Stock Allocation** means, with respect to the American Labor Allocation, a number of shares of New Common Stock equal to (i) 23.6% of the Total Preferred Amount divided by the Preferred Conversion Cap, all as divided by (ii) 0.764.

**1.131** **Initial Old Equity Allocation** means the number of shares of New Common Stock equal to 3.5% of the product of (i) 3.5714 and (ii) the number of US Airways Fully Diluted Sates, subject to any dilution arising from the number of shares of New Common Stock represented by equity-based awards to be issued to employees of AMR and its subsidiaries (other than US Airways and its subsidiaries) contemplated herein and in the Merger Agreement, determined in accordance with the Merger Agreement.

21

**1.132  Initial Pro Rata Share** means, with respect to any Allowed Single-Dip General Unsecured Claim, the ratio (expressed as a percentage rounded to four (4) decimals) of the amount of an Allowed Single-Dip General Unsecured Claim to the sum of the aggregate amounts of (i) all Single-Dip General Unsecured Claims that are Allowed as of the Effective Date and (ii) all Disputed Single-Dip General Unsecured Claims that, at the Reorganized Debtors' option, either (a) the Reorganized Debtors, with the consent of the Creditors' Committee and US Airways, on the Effective Date, reasonably estimate will be Allowed when the allowance or disallowance of each Disputed Claim is ultimately determined or (b) are estimated based on an order of the Bankruptcy Court prior to the Effective Date.

**1.133  Initial Stated Value** means, with respect to any share of New Mandatorily Convertible Preferred Stock, an amount equal to $25 per share.

**1.134  Insurance Plans** means the Debtors' insurance policies and any agreements, documents, or instruments relating thereto entered into prior to the Commencement Date.

**1.135  Intercompany Contract** means a contract entered into prior to the Commencement Date solely between (i) two or more Debtors or (ii) one or more Debtors and one or more direct or indirect subsidiaries or affiliates of the Debtors that is not a Debtor.

**1.136  Interim Distribution Date** means the last day of each calendar quarter commencing with the second full calendar quarter after the Initial Distribution Date; *provided, however*, that no distribution shall be required to be made on any Interim Distribution Date unless, by the date that is twenty (20) days preceding such date, the amount of New Common Stock that would be distributable from the reserve pursuant to Section 7.4(a) hereof (calculated as of such date) is attributable to the disallowance of Disputed Single-Dip General Unsecured Claims in the aggregate amount of at least $100 million.  If no distribution is made on an Interim Distribution Date because of the failure to meet such $100 million threshold, the amount of disallowed Disputed Single-Dip General Unsecured Claims shall be carried over and used in calculating the threshold for the next ensuing Interim Distribution Date.

**1.137  Interim Pro Rata Share** means, with respect to any Allowed Single-Dip General Unsecured Claim, the ratio (expressed as a percentage) of the amount of such Allowed Single-Dip General Unsecured Claim to the sum of the aggregate amounts of (i) all Single-Dip General Unsecured Claims that are Allowed as of the applicable Interim Distribution Date and (ii) all Disputed Single-Dip General Unsecured Claims that, at the Reorganized Debtors' option, either (a) the Reorganized Debtors, with the consent of the Creditors' Committee and US Airways, on such Interim Distribution Date, reasonably estimate will be Allowed when the allowance or disallowance of each Disputed Claim is

22

ultimately determined or (b) are estimated based on an order of the Bankruptcy Court prior to the applicable Interim Distribution Date.

1.138 **Interim True-Up Distribution** means the distribution of New Common Stock in accordance with Section 7.4(a) hereof.

1.139 **Interline Agreements** has the meaning given to such term in the Motion of Debtors for Entry of Order (I) Pursuant to 11 U.S.C. §§ 105(a) and 365(a) Approving Assumption of Interline Agreements, Clearinghouse Agreements, ARC Agreements, Billing and Settlement Plan Contracts, Cargo Agreements, **one**world Agreements, and Alliance Agreements, (II) Pursuant to 11 U.S.C. §§ 105(a) and 363(b) Authorizing Debtors to Honor Prepetition Obligations Related to Carrier Services Agreements, Connection Carrier Agreement, GDS Participation Carrier Agreements, Travel Agency Agreements, Booking and Online Fulfillment Agreements, Cargo Agency Agreements, ATPCO Agreement, Deeds of Undertaking and Related Agreements, and (III) Pursuant to 11 U.S.C. § 362 Modifying the Automatic Stay to the Extent Necessary to Effectuate the Requested Relief, dated November 29, 2011 (ECF No. 25).

1.140 **Labor Claims Hurdle Value** means an amount equal to (i) 0.236 multiplied by the sum of the Double-Dip Hurdle Value and the Single-Dip Hurdle Value, all as divided by (ii) 0.764.

1.141 **Labor Common Stock Allocation** means, as of any date of determination, the sum of (i) the Initial Labor Common Stock Allocation and (ii) the total Incremental Labor Common Stock Allocations issued on all prior Mandatory Conversion Dates.

1.142 **Letter of Credit** means a documentary or standby letter of credit issued for the account of any of the Debtors and any reimbursement agreement or similar agreement entered into prior to the Commencement Date in connection therewith.

1.143 **LTIP 2013 Awards** means those certain long-term incentive program awards for certain managers of New AAG granted under the New AAG 2013 Incentive Award Plan, described in Section 4.1(o) of the American Disclosure Letter, to be effective on the Effective Date, the terms of which shall be set forth in the Plan Supplement.

1.144 **Majority of the Requisite Consenting Creditors** has the meaning given to such term in the Support and Settlement Agreement.

1.145 **Mandatory Conversion Amount** means, with respect to any Mandatory Conversion Date, a number of shares of New Mandatorily Convertible Preferred Stock equal to the lesser of (i) 25% of the total number of shares of New

23

Mandatorily Convertible Preferred Stock issued hereunder and (ii) the number of shares of New Mandatorily Convertible Preferred Stock outstanding on such Mandatory Conversion Date.

**1.146    Mandatory Conversion Date** means, with respect to the New Mandatorily Convertible Preferred Stock, each of the thirtieth (30th), sixtieth (60th), ninetieth (90th), and one hundred twentieth (120th) days following the Effective Date.

**1.147    Mandatory Shares in Excess of Cap** means, with respect to any Mandatory Conversion Date, a number of shares of New Common Stock equal to (i) the number of shares of New Common Stock issued upon the conversion of all shares of New Mandatorily Convertible Preferred Stock that are converted on the Mandatory Conversion Date at the Preferred Conversion Cap, less (ii) the number of shares of New Common Stock that would have been issued pursuant to the conversion of all shares of New Mandatorily Convertible Preferred Stock that are converted on the Mandatory Conversion Date if the Conversion Price (as defined in the Certificate of Designations) was not subject to the Preferred Conversion Cap, which, for purposes of this clause (ii) shall be a number of shares of New Common Stock equal to the quotient of (x) the aggregate Stated Value of a number of shares equal to the Mandatory Conversion Amount of all shares of New Mandatorily Convertible Preferred Stock that are converted with respect to such Mandatory Conversion Date, divided by (y) 96.5% of the VWAP.  In no event shall the Mandatory Shares in Excess of Cap for any Mandatory Conversion Date be less than zero.

**1.148    Market-Based Old Equity Allocation** means, with respect to any Mandatory Conversion Date, the aggregate number of shares of New Common Stock that New AAG shall ratably distribute (or reserve for distribution) to the holders of Allowed AMR Equity Interests on such Mandatory Conversion Date, or as soon thereafter as reasonably practicable, in an aggregate amount equal to (i) the product of (a) 25% of the difference between the New Common Stock Allocation and the Initial Old Equity Allocation, multiplied by (b) the amount (if any) by which the VWAP for such Mandatory Conversion Date exceeds the Value Hurdle Price, all as multiplied by (c) the reciprocal of such VWAP, less (ii) the Shares in Excess of Cap for such Mandatory Conversion Date; *provided, however*, that in no event shall the number of shares distributed and/or reserved as described in this Section 1.148 with respect to any Mandatory Conversion Date be less than zero.

**1.149    Maximum Plan Shares** means an aggregate number of shares of New Common Stock equal to (i) (a) the number of US Airways Fully Diluted Shares as of the Share Determination Date, multiplied by (b) the quotient (rounded to four (4) decimals) of seventy-two (72) divided by twenty-eight (28) (rounded to the nearest whole share), less (ii) the number of shares of New Common Stock represented by equity-based awards to be issued to employees of

24

AMR and its subsidiaries (other than US Airways and its subsidiaries) contemplated herein and in the Merger Agreement, determined in accordance with the terms of the Merger Agreement.

     **1.150**   **Merger** means the "Merger" as defined in the Merger Agreement.

     **1.151**   **Merger Agreement** means the Agreement and Plan of Merger among AMR, Merger Sub, and US Airways, dated February 13, 2013, a copy of which (without exhibits) is annexed hereto as Exhibit "A," as may be amended from time to time.

     **1.152**   **Merger Closing** means the "Closing" of the Merger as defined in the Merger Agreement.

     **1.153**   **Merger Collective Bargaining Agreements** means (i) the following collective bargaining agreements set forth on section 3.1(o)(i) of the American Disclosure Letter:  American Airlines CBAs APA (2)-(5) and TWU (8); and (ii) the following collective bargaining agreements set forth on section 3.2(o)(i) of the US Airways Disclosure Letter:  Mainline Collective Bargaining Agreements, Pilots East and West – USAPA (126) – (129), TWU (1), and Other (relating to the APFA) (1) – (3).

     **1.154**   **Merger Effective Time** means the "Effective Time" of the Merger as defined in the Merger Agreement.

     **1.155**   **Merger Sub** means AMR Merger Sub, Inc., a Delaware corporation formed as a wholly-owned subsidiary of AMR for the purpose of effecting the Merger and the other transactions contemplated thereby on the terms and subject to the conditions set forth in the Merger Agreement.

     **1.156**   **Merger Sub Certificate of Incorporation** means the Certificate of Incorporation of Merger Sub, which shall be substantially in the form set forth in the Plan Supplement.

     **1.157**   **New AAG** means AMR, as reorganized, on and after the Merger Effective Time, which shall be renamed American Airlines Group Inc. immediately following the Merger Effective Time pursuant to Section 6.1 hereof.

     **1.158**   **New AAG Board** means the Board of Directors of New AAG on the Effective Date and as of the Merger Effective Time, which shall consist of twelve (12) members and shall be selected as provided in the Merger Agreement.

     **1.159**   **New AAG Bylaws** means the Bylaws of AMR, as amended and restated in accordance with the Merger Agreement, which shall be substantially in the form of Exhibit "C" to the Merger Agreement and included in the Plan Supplement.

1.160   **New AAG Certificate of Incorporation** means the Certificate of Incorporation of AMR, as amended and restated in accordance with the Merger Agreement and as further amended in accordance with the Merger Agreement, which shall be substantially in the form of Exhibit "A" to the Merger Agreement and included in the Plan Supplement.

1.161   **New AAG 2013 Incentive Award Plan** means that certain New AAG incentive award plan to be effective on the Effective Date, which shall be substantially in the form of the US Airways Group, Inc. 2011 Incentive Award Plan, except that references to US Airways shall be revised to reflect New AAG and the aggregate number of shares of New Common Stock reserved for issuance thereunder shall be 40,000,000. The terms of the New AAG 2013 Incentive Award Plan shall be set forth in the Plan Supplement.

1.162   **New Common Stock** means the shares of common stock, par value $0.01 per share, of New AAG authorized and issued hereunder and in connection with the Merger Agreement.

1.163   **New Common Stock Allocation** means a number of shares of New Common Stock equal to the Maximum Plan Shares.

1.164   **New Mandatorily Convertible Preferred Stock** means a series of preferred stock, par value $0.01 per share, of New AAG, designated as "Series A Convertible Preferred Stock," authorized and issued hereunder and in connection with the Merger Agreement. The rights, provisions, powers, preferences, and privileges of the New Mandatorily Convertible Preferred Stock are set forth in the Certificate of Designations.

1.165   **Non-Union Employees** means the employees of American who are not represented by a labor union and/or whose employment are not covered by a Collective Bargaining Agreement.

1.166   **Note Claim** means a Claim against any of the Debtors arising under or in connection with any Indenture and the respective Notes issued thereunder, excluding the fees and expenses of the Indenture Trustees, which reasonable fees and expenses shall be paid pursuant to Section 2.4 hereof.

1.167   **Notes** means the respective notes, bonds, or debentures issued under the Indentures.

1.168   **Notice of Intent to Assume** means a notice delivered by the Debtors or the Reorganized Debtors, as applicable, pursuant to Article 8 hereof, stating an intent to assume an executory contract or unexpired lease and setting forth a proposed Assumption Effective Date and a Proposed Cure and/or proposed assignment, if applicable.

26

**1.169   Notice of Intent to Reject** means a notice delivered by the Debtors or the Reorganized Debtors, as applicable, pursuant to Article 8 hereof, stating an intent to reject an executory contract or unexpired lease and setting forth a proposed Rejection Effective Date.

**1.170   Optional Conversion** has the meaning given to such term in the Certificate of Designations.

**1.171   Optional Conversion Date** means, with respect to the New Mandatorily Convertible Preferred Stock, each date on which an Optional Conversion becomes effective as provided in the Certificate of Designations.

**1.172   Optional Shares in Excess of Cap** means, with respect to any Mandatory Conversion Date, a number of shares of New Common Stock equal to (i) the number of shares of New Common Stock issued upon the conversion of all shares of New Mandatorily Convertible Preferred Stock that are converted pursuant to Optional Conversion on each Optional Conversion Date subsequent to the immediately preceding Mandatory Conversion Date, at the Preferred Conversion Cap, less (ii) the number of shares of New Common Stock that would have been issued pursuant to such Optional Conversion of such shares of New Mandatorily Convertible Preferred Stock if the Conversion Price (as defined in the Certificate of Designations) was not subject to the Preferred Conversion Cap, which, for purposes of this clause (ii) shall be a number of shares of New Common Stock equal to the quotient of (x) the aggregate Stated Value of such shares of New Mandatorily Convertible Preferred Stock, divided by (y) 96.5% of the VWAP.  In no event shall the Optional Shares in Excess of Cap for any Mandatory Conversion Date be less than zero.

**1.173   Other Secured Claim** means any Secured Claim other than a Secured Aircraft Claim.

**1.174   Pension Plans** means (i) the Retirement Benefit Plan of American Airlines, Inc. for Agent, Management, Specialists, Support Personnel and Officers, (ii) American Airlines, Inc. Pilot Retirement Benefit Program – Fixed Income Plan, (iii) The Retirement Benefit Plan of American Airlines, Inc. for Employees Represented by the Transport Workers Union of America, AFL-CIO, and (iv) The Retirement Benefit Plan of American Airlines, Inc. for Flight Attendants.

**1.175   Person** has the meaning set forth in section 101(41) of the Bankruptcy Code.

**1.176   Plan** means this chapter 11 plan, as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

27

**1.177    Plan Consolidation** means, collectively, the AMR Plan Consolidation, the American Plan Consolidation, and the Eagle Plan Consolidation.

**1.178    Plan Shares** means (i) shares of New Mandatorily Convertible Preferred Stock and (ii) shares of New Common Stock, including for the avoidance of doubt, shares of New Common Stock that are or may become issuable upon conversion of shares of New Mandatorily Convertible Preferred Stock, each as issued pursuant to the terms hereof; *provided, however*, that the aggregate number of shares of New Common Stock constituting Plan Shares, when taken together with all shares of New Common Stock that are or may become issuable upon conversion or exchange of shares of New Mandatorily Convertible Preferred Stock constituting Plan Shares, shall not exceed the Maximum Plan Shares.

**1.179    Plan Supplement** means the forms of certain documents effectuating the transactions contemplated herein, which documents shall be filed with the Clerk of the Bankruptcy Court no later than ten (10) days prior to the Voting Deadline.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected at the Office of the Clerk of the Bankruptcy Court during normal Bankruptcy Court hours.  Holders of Claims and Equity Interests may obtain a copy of the Plan Supplement upon written request to the undersigned counsel.  Copies of the Plan Supplement also are available on the Voting Agent's website, www.amrcaseinfo.com.

**1.180    Post-Effective Date Creditors' Committee** means the committee established pursuant to Section 12.1 hereof.

**1.181    Postpetition Aircraft Agreement** means a new or renegotiated agreement (including leases, subleases, security agreements, and mortgages and any amendments, modifications, or supplements of or to any lease, sublease, security agreement, or mortgage, and such leases, subleases, security agreements, or mortgages as so amended, modified, or supplemented, and any agreement settling or providing for any Claims or otherwise addressing any matters relating to any lease, sublease, security agreement, or mortgage or any amendment, modification, or supplement of or to any lease, sublease, security agreement, or mortgage) entered into after the Commencement Date by the Debtors relating to Aircraft Equipment and either (i) listed on Schedule "5" hereto or (ii) entered into subsequent to the filing of such Schedule and identified by the Debtors as a Postpetition Aircraft Agreement in a filing with the Bankruptcy Court.

**1.182    Postpetition Aircraft Obligation** means any obligation arising pursuant to a Postpetition Aircraft Agreement; *provided, however*, that an obligation under a Postpetition Aircraft Agreement only shall be deemed a Postpetition Aircraft Obligation to the extent specifically provided in such Postpetition Aircraft Agreement.

US_ACTIVE:\44195459\15\14013.0139

**1.183  Preferred Conversion Cap** means, with respect to the New Mandatorily Convertible Preferred Stock, the greater of (i) $19.00 and (ii) the VWAP calculated as of the Effective Date, less the Preferred Conversion Floor, plus such VWAP.

**1.184  Preferred Conversion Floor** means, with respect to the New Mandatorily Convertible Preferred Stock, a floor of $10.875 per share.

**1.185  Priority Non-Tax Claim** means any Claim, other than an Administrative Expense or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7), or (9) of the Bankruptcy Code.

**1.186  Priority Tax Claim** means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.187  Proposed Cure** means, with respect to a particular executory contract or unexpired lease, the consideration, if any, that the Debtors propose on (i) the notice sent to the Assumption Counterparties listed on Schedule "8.1(a)" or "8.1(d)" of the Plan Supplement or (ii) a Notice of Intent to Assume, in each case as full satisfaction of the Debtors' obligations with respect to such executory contract or unexpired lease pursuant to section 365(b) of the Bankruptcy Code.

**1.188  Registered Holder** means the registered holders (or bearers, if applicable) of the securities issued pursuant to the Indentures or the Special Facility Revenue Bond Indentures.

**1.189  Rejection Bar Date** means the deadline for filing proofs of Claim arising from the rejection of an executory contract or unexpired lease, which shall be thirty (30) calendar days after entry of an order of the Bankruptcy Court approving the rejection of such executory contract or unexpired lease.

**1.190  Rejection Claim** means a Claim under section 502(g) of the Bankruptcy Code.

**1.191  Rejection Counterparty** means a counterparty to an executory contract or unexpired lease to be rejected by the Debtors hereunder.

**1.192  Rejection Effective Date** means the date on which the rejection of an executory contract or unexpired lease hereunder is deemed effective, which date shall not be later than sixty (60) calendar days after the Effective Date, unless otherwise agreed by the applicable Debtor or Reorganized Debtor and the applicable Rejection Counterparty.

US_ACTIVE:\44195459\15\14013.0139

**1.193   Reorganized Debtors** means, collectively, each of the Debtors as reorganized as of the Effective Date in accordance herewith and with the Merger Agreement.

**1.194   Retiree Committee** means the official committee of retired employees appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1114 of the Bankruptcy Code.

**1.195   Revenue Generating Agreements** means agreements entered into by the Debtors with other airlines and third-party entities, pursuant to which the Debtors provide services to the other airline or third-party entity on a fee-for-service basis, including without limitation, passenger handling, ground handling, aircraft maintenance, engine maintenance, repairs, baggage handling, cargo handling, security, deicing, passenger assistance, skycap, wheelchair, staffing services, call transfer, and ticketing services.

**1.196   Roll-Up Transaction** means (i) a dissolution or winding-up of the corporate existence of a Debtor or a Reorganized Debtor, as applicable, under applicable state law, or a consolidation, merger, contribution of assets, or other transaction in which a Debtor or a Reorganized Debtor, as applicable, merges with or transfers substantially all of its assets and liabilities to another Debtor or Reorganized Debtor or one or more of their Affiliates or (ii) a change in form of a Debtor or a Reorganized Debtor.

**1.197   Schedules** means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules as such schedules and statements have been or may be supplemented or amended through the Confirmation Date.

**1.198   Search Committee** means the committee established by the Creditors' Committee to identify and designate the directors pursuant to and as provided in Section 1.8(a)(i) of the Merger Agreement, including, for the avoidance of doubt, the members of such committee (and their designated representatives), each member's professionals, and the professionals assisting such committee, in each case as provided in Section 1.8(b) of the Merger Agreement.

**1.199   Section 1113 Agreements** means the AFA Section 1113 Agreement, the ALPA Section 1113 Agreement, the APA Section 1113 Agreement, the APFA Section 1113 Agreement, the TWU American Section 1113 Agreement, and the  TWU Eagle Section 1113 Agreement.

**1.200   Secured Aircraft Claim** means a Claim that is secured by a security interest in, or a lien on, any Aircraft Equipment (to the extent the Debtors have not abandoned such Aircraft Equipment with no agreement to re-lease or

30

repurchase such Aircraft Equipment) in which a Debtor's estate has an interest to the extent of the value of the holder of such Claim's interest in the applicable Debtor's estate's interest in such Aircraft Equipment, as agreed to by the holder of such Claim and the Debtors, or as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code.

      **1.201**   **Secured Claim** means a Claim (i) secured by Collateral, to the extent of the value of such Collateral (A) as set forth in the Plan, (B) as agreed to by the holder of such Claim and the Debtors, or (C) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code or (ii) secured by the amount of any valid rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

      **1.202**   **Servicers** mean the trustees, co-trustees, owner trustees, pass-through trustees, agents, paying agents, distribution agents, subordination agents, registrars, and bond registrars under an agreement relating to the lease or financing of Aircraft Equipment and any and all successors or predecessors thereto.

      **1.203**   **Share Determination Date** means 11:59 p.m. (Eastern Time) on the sixth (6th) trading day prior to the Merger Closing.

      **1.204**   **Shares in Excess of Cap** means, with respect to any Mandatory Conversion Date, a number of shares of New Common Stock equal to the sum of the Mandatory Shares in Excess of Cap and the Optional Shares in Excess of Cap.

      **1.205**   **Single-Dip Full Recovery Amount** means an amount equal to the full amount of all Allowed Single-Dip General Unsecured Claims as of the Commencement Date, plus accrued interest thereon (i) with respect to all Notes and Special Facility Revenue Bonds that constitute Allowed Single-Dip General Unsecured Claims, at the nondefault contract rate from the Commencement Date through the Effective Date (including interest on overdue interest, to the extent provided for in the underlying documents) or (ii) for all other Allowed Single-Dip General Unsecured Claims, at the federal judgment rate as of March 25, 2013 from the Commencement Date to the Effective Date; *provided, however*, that for purposes of this Section only, "Allowed" shall include the amount of Disputed Single-Dip General Unsecured Claims that are estimated prior to the Effective Date in accordance with Section 7.6 hereof. The Allowed amount of each Single-Dip General Unsecured Claim as of the Commencement Date in clause (i) in the immediately preceding sentence and the applicable postpetition rate as to each such Claim is set forth on Schedule "3" hereto.

      **1.206**   **Single-Dip General Unsecured Claims** means all General Unsecured Claims that are not Double-Dip General Unsecured Claims. The AMR Other General Unsecured Claims in AMR Class 4 (including all Claims that would otherwise constitute AMR General Unsecured Guaranteed Claims in AMR

31

Class 3 as to which a Single-Dip Treatment Election has been made in accordance
with the procedures set forth in Section 4.3(b) hereof), the American Other
General Unsecured Claims in American Class 5 (including all Claims that would
otherwise constitute American General Unsecured Guaranteed Claims in
American Class 4 as to which a Single-Dip Treatment Election has been made in
accordance with the procedures set forth in Section 4.10(b) hereof), and the Eagle
General Unsecured Claims in Eagle Class 3 constitute Single-Dip General
Unsecured Claims.

     **1.207   Single-Dip Hurdle Value** means an amount equal to (i) the sum of
(x) the aggregate Initial Stated Value of the Single-Dip Preferred Allocation, plus
(y) the aggregate amount of the increase in Stated Value that will automatically
accrue thereon through the Final Mandatory Conversion Date, assuming no
Optional Conversion, plus the Single-Dip Non-Preferred Amount (as increased by
a hypothetical dividend calculated thereon, through the Final Mandatory
Conversion Date, at an annual rate of 12%), all as divided by (ii) 0.965.

     **1.208   Single-Dip Non-Preferred Amount** means an amount equal to the
Single-Dip Full Recovery Amount, less the aggregate Initial Stated Value of the
Single-Dip Preferred Allocation.

     **1.209   Single-Dip Preferred Allocation** means a number of shares
(rounded down to the nearest whole share) of New Mandatorily Convertible
Preferred Stock equal to the quotient of (i) the Total Initial Stated Value, less the
Double-Dip Full Recovery Amount, divided by (ii) the per share Initial Stated
Value.

     **1.210   Single-Dip Treatment Election** means any election by the holder
of an Allowed Claim that would otherwise constitute (i) an Allowed AMR
General Unsecured Guaranteed Claim in AMR Class 3 to have all or any portion
of such Claim treated as a Single-Dip General Unsecured Claim in AMR Class 4
(AMR Other General Unsecured Claims), in accordance with the procedures set
forth in Section 4.3(b) hereof, or (ii) an Allowed American General Unsecured
Guaranteed Claim in American Class 4 to have all or any portion of such Claim
treated as a Single-Dip General Unsecured Claim in American Class 5 (American
Other General Unsecured Claims), in accordance with the procedures set forth in
Section 4.10(b) hereof.

     **1.211   Solicitation Procedures** means the procedures relating to the
solicitation and tabulation of votes with respect to the Plan.

     **1.212   Special Facility Revenue Bond Agreements** means the
agreements governing the Debtors' obligations to make payments on Special
Facility Revenue Bonds issued to finance or refinance the acquisition or
construction of airport and related facilities, improvements, and/or equipment

used by the Debtors, as such agreements may have been amended, supplemented, or modified.

**1.213** **Special Facility Revenue Bonds** means the respective notes, bonds, or debentures issued under the Special Facility Revenue Bond Indentures.

**1.214** **Special Facility Revenue Bond Claims** means any Claim against any of the Debtors arising under or in connection with any Special Facility Revenue Bond Agreement and the respective notes, bonds, or debentures issued thereunder, excluding the fees and expenses of the Indenture Trustees, to the extent that such fees and expenses have been paid pursuant to the terms of Section 2.4 hereof; *provided, however*, that the Special Facility Revenue Bond Claims shall not include any such Claims held by any of the Debtors (including any Claims held by the Debtors under the Special Facility Revenue Bond Documents), which Claims shall be disallowed hereunder.

**1.215** **Special Facility Revenue Bond Documents** means all documents associated with a Special Facility Revenue Bond Agreement (including such Special Facility Revenue Bond Agreement) and the corresponding Special Facility Revenue Bonds and Special Facility Revenue Bond Indentures, as such documents may have been amended, supplemented, or modified.

**1.216** **Special Facility Revenue Bond Indentures** means (i) the Trust Indenture, dated as of October 1, 1991, between AllianceAirport Authority, Inc., as issuer, and Manufacturers and Traders Trust Company, as successor-in-interest Trustee to Team Bank, as such Indenture may have been amended, supplemented, or modified, pursuant to which $125,745,000 of AllianceAirport Authority Inc. Special Facilities Revenue Bonds, Series 1991, (American Airlines, Inc. Project), due December 1, 2011,were issued; (ii) the Trust Indenture, dated as of March 1, 2007, between AllianceAirport Authority, Inc., as issuer, and Manufacturers and Traders Trust Company, as Trustee, as such Indenture may have been amended, supplemented, or modified, pursuant to which $357,130,000 of AllianceAirport Authority Inc. Special Facilities Revenue Refunding Bonds, Series 2007 (American Airlines, Inc. Project), due December 1, 2029, were issued; (iii) the Trust Indenture, dated as of November 1, 1995, between Dallas-Fort Worth International Airport Facility Improvement Corporation, as issuer, and Manufacturers and Traders Trust Company, as successor-in-interest Trustee to Texas Commerce Bank National Association, as such Indenture may have been amended, supplemented, or modified, pursuant to which $126,240,000 of Dallas-Fort Worth International Airport Facility Improvement Corporation American Airlines, Inc. Revenue Bonds, Series 1995, due November 1, 2014, were issued; (iv) the Trust Indenture, dated as of August 1, 2000, between Dallas-Fort Worth International Airport Facility Improvement Corporation, as issuer, and Manufacturers and Traders Trust Company, as successor-in-interest Trustee to The Chase Manhattan Bank, as such Trust Indenture may have been amended, supplemented, or modified, pursuant to which $104,715,000 of Dallas-Fort Worth

33

International Airport Facility Improvement Corporation American Airlines, Inc. Revenue Refunding Bonds, Series 2000B, due May 1, 2029, were issued; (v) the Trust Indenture, dated as of August 1, 2000, between Dallas-Fort Worth International Airport Facility Improvement Corporation, as issuer, and Manufacturers and Traders Trust Company, as successor-in-interest Trustee to The Chase Manhattan Bank, as such Indenture may have been amended, supplemented, or modified, pursuant to which $100,000,000 of Dallas-Fort Worth International Airport Facility Improvement Corporation American Airlines, Inc. Revenue Refunding Bonds, Series 2000C, due May 1, 2029, were issued; (vi) the Trust Indenture, dated as of April 1, 2002, between Dallas-Fort Worth International Airport Facility Improvement Corporation, as issuer, and Manufacturers and Traders Trust Company, as successor-in-interest Trustee to JPMorgan Chase Bank, as such Indenture may have been amended, supplemented, or modified, pursuant to which $15,100,000 of Dallas-Fort Worth International Airport Facility Improvement Corporation American Airlines, Inc. Revenue Bonds, Series 2002, due November 1, 2036, were issued; (vii) the Trust Indenture, dated as of June 1, 2007, between Dallas/Fort Worth International Airport Facility Improvement Corporation, as issuer, and Manufacturers and Traders Trust Company, as Trustee, as such Indenture may have been amended, supplemented, or modified, pursuant to which $131,735,000 of Dallas/Fort Worth International Airport Facility Improvement Corporation American Airlines, Inc. Revenue Refunding Bonds, Series 2007, due November 1, 2030, were issued; (viii) the Indenture of Trust, dated as of November 1, 1991, between the New Jersey Economic Development Authority, as issuer, and The Bank of New York, as successor-in-interest Trustee to The Bank of New York, as such Indenture may have been amended, supplemented, or modified, pursuant to which $17,855,000 of New Jersey Economic Development Authority Economic Development Bonds (American Airlines, Inc. Project), due November 1, 2031, were issued; (ix) the Indenture of Trust, dated as of August 1, 1990, between New York City Industrial Development Agency, as issuer, and The Bank of New York Mellon, as successor-in-interest Trustee to the United States Trust Company of New York, as such Indenture may have been amended, supplemented, or modified, pursuant to which $83,930,000 of New York City Industrial Development Agency Special Facility Revenue Bonds, Series 1990 (1990 American Airlines, Inc. Project), due July 1, 2019 and July 1, 2020, were issued; (x) the Indenture of Trust, dated as of August 1, 1994, between New York City Industrial Development Agency, as issuer, and The Bank of New York Mellon, as successor-in-interest Trustee to United States Trust Company of New York, as such Indenture may have been amended, supplemented, or modified, pursuant to which $83,085,000 of New York City Industrial Development Agency Special Facility Revenue Bonds, Series 1994 (1994 American Airlines, Inc. Project), due August 1, 2024, were issued; (xi) the Amended and Restated Master Indenture of Trust, dated as of November 1, 2005, between New York City Industrial Development Agency, as issuer, and The Bank of New York Mellon, as successor-in-interest Trustee to The Bank of New York, as such Indenture may have been amended, supplemented, or

34

modified, pursuant to which up to approximately $3 billion of New York City
Industrial Development Agency Special Facility Revenue Bonds, Series 2002A,
2002B, and 2005 (American Airlines, Inc. John F. Kennedy International Airport
Project), due on varying dates but no later than August 1, 2031, were authorized
to be issued; (xii) the Trust Indenture, dated as of January 1, 2002, between
Regional Airports Improvement Corporation, as issuer, and The Bank of New
York Mellon Trust Company, N.A., as successor-in-interest Trustee to BNY
Western Trust Company, as such Indenture may have been amended,
supplemented, or modified, pursuant to which $297,075,000 of Regional Airports
Improvement Corporation Facilities Sublease Revenue Bonds, American Airlines,
Inc. Terminal 4 Project (Los Angeles International Airport), Series 2002, due on
varying dates but no later than December 1, 2024, were issued; (xiii) the
Indenture of Trust, dated as of June 1, 2007, between City of Chicago, as issuer,
and The Bank of New York Mellon Trust Company, N.A., as successor-in-
interest Trustee to The Bank of New York Trust Company, N.A., as such
Indenture may have been amended, supplemented, or modified, pursuant to which
$108,675,000 of Chicago O'Hare International Airport Special Facility Revenue
Refunding Bonds, Series 2007 (American Airlines, Inc. Project), due on
December 1, 2030, were issued; (xiv) the Trust Agreement, dated as of December
1, 1985, between Puerto Rico Industrial, Medical, Higher Education and
Environmental Pollution Control Facilities Financing Authority, as issuer, and
U.S. Bank National Association, as successor-in-interest Trustee to National
Westminster Bank USA, as such Trust Agreement may have been amended,
supplemented, or modified, pursuant to which $36,160,000 of Special Facility
Revenue Bonds, 1985 Series A (American Airlines, Inc. Project), due December
1, 2025, were issued; (xv) the Trust Agreement, dated as of June 1, 1993, between
Puerto Rico Ports Authority, as issuer, and Law Debenture Trust Company of
New York, as successor-in-interest Trustee to The Chase Manhattan Bank
(National Association), as such Trust Agreement may have been amended,
supplemented, or modified, pursuant to which $39,810,000 of Special Facilities
Revenue Bonds, 1993 Series A (American Airlines, Inc. Project), due June 1,
2023, were issued; (xvi) the Trust Agreement, dated as of May 1, 1996, between
Puerto Rico Ports Authority, as issuer, and Law Debenture Trust Company of
New York, as successor-in-interest Trustee to The Chase Manhattan Bank
(National Association), as such Trust Agreement may have been amended,
supplemented, or modified, pursuant to which $115,600,000 of Special Facilities
Revenue Bonds, 1996 Series A (American Airlines, Inc. Project), due June 1,
2026, were issued; (xvii) the Bond Indenture, dated as of May 1, 1963, between
the Trustees of the Tulsa Municipal Airport Trust, as issuer, and The Bank of
New York Mellon, as successor-in-interest Trustee to Morgan Guarantee Trust
Company of New York, as such Indenture may have been amended,
supplemented, or modified, including by (A) the Eighth Supplemental Bond
Indenture, dated as of November 1, 1992, between Trustees of the Tulsa
Municipal Airport Trust, as issuer, and The Bank of New York Mellon Trust
Company, N.A., as successor-in-interest Trustee to The Bank of New York, as

such Indenture may have been amended, supplemented, or modified, pursuant to which $27,500,000 of Trustees of the Tulsa Municipal Airport Trust Revenue Bonds, Series 1992, due December 1, 2011, were issued; (B) the Ninth Supplemental Bond Indenture, dated as of November 1, 1995, between Trustees of the Tulsa Municipal Airport Trust, as issuer, and The Bank of New York Mellon, as successor-in-interest Trustee to The Bank of New York, as such Indenture may have been amended, supplemented, or modified, pursuant to which $97,710,000 of Trustees of the Tulsa Municipal Airport Trust Revenue Bonds, Series 1995, due June 1, 2020, were issued; (C) the Tenth Supplemental Bond Indenture, dated as of October 1, 2000, between Trustees of the Tulsa Municipal Airport Trust, as issuer, and The Bank of New York Mellon, as successor-in-interest Trustee to The Bank of New York, as such Indenture may have been amended, supplemented, or modified, pursuant to which $175,355,000 of Trustees of the Tulsa Municipal Airport Trust Revenue Bonds, Refunding Series 2000A and Refunding Series 2000B, due June 1, 2035, were issued; and (D) the Eleventh Supplemental Bond Indenture, dated as of April 1, 2001, between Trustees of the Tulsa Municipal Airport Trust, as issuer, and The Bank of New York Mellon Trust Company, N.A., as successor-in-interest Trustee to The Bank of New York, as such Indenture may have been amended, supplemented, or modified, pursuant to which $152,705,000 of Tulsa Municipal Airport Trust Revenue Bonds, Refunding Series 2001A and Refunding Series 2001B, due December 1, 2035, were issued; and for the avoidance of doubt, the Tripartite Agreement, dated as of November 1, 1995, among the Trustees of the Tulsa Municipal Airport Trust, The Bank of New York Mellon, as successor-in-interest to The Bank of New York, and BOKF N.A., as successor-in-interest to Bank of Oklahoma, N.A.; and (xviii) the DFW 1.5X Special Facility Revenue Bond Indentures.

1.217    **Stated Value** has the meaning given to such term in the Certificate of Designations.

1.218    **Sub-Plan** means one or more sub-plans of reorganization described in Article VI hereof with respect to any individual Debtor.

1.219    **Support and Settlement Agreement** means that certain Support and Settlement Agreement, as amended, dated February 13, 2013, by and between the Debtors and certain creditors of the Debtors, including certain members of the Ad Hoc Committee.

1.220    **Surety Bond** means a surety bond issued for the benefit of any of the Debtors prior to the Commencement Date, in each case including any agreement between any of the Debtors and the relevant issuer that requires the Debtors to indemnify the issuer with respect to such surety bond.

1.221    **Tax Code** means title 26 of the United States Code, as amended from time to time.

36

**1.222  Total Initial Stated Value** means an amount equal to the Total Preferred Amount divided by 1.01302.

**1.223  Total Preferred Amount** means an amount equal to (i) the New Common Stock Allocation, less the Initial Old Equity Allocation, less the number of shares of New Common Stock that would be issued pursuant to the Labor Common Stock Allocation if no shares of New Common Stock were issued pursuant to the Market-Based Old Equity Allocation, all as multiplied by (ii) the Preferred Conversion Floor.

**1.224  Transfer/Transferable** means, with respect to any security, or the right to receive a security or participate in any offering of any security, the sale, transfer, pledge, hypothecation, encumbrance, assignment, constructive sale, participation in, or other disposition of such security or the Beneficial Ownership (as defined in this Section 1.224) thereof, the offer to make such a sale, transfer, constructive sale, or other disposition, and each option (including any option within the meaning of Section 382 of the Tax Code), agreement, arrangement, or understanding, whether or not in writing and whether or not directly or indirectly, to effect any of the foregoing; *provided, however*, that, for the avoidance of doubt, a Transfer shall not include the establishment or settlement of any derivative or similar position or security that does not constitute tax ownership or an option to acquire tax ownership, for purposes of Section 382 of the Tax Code, of the claim, equity interest, or the New Common Stock that may be received thereon.  The term "constructive sale" for purposes of this definition means a short sale with respect to such security, entering into or acquiring an offsetting derivative contract with respect to such security, or entering into any transaction that has substantially the same effect as any of the foregoing.  The term "Beneficially Owned" or "Beneficial Ownership" as used in this definition shall include, with respect to any security, the beneficial ownership of such security by a Person and any direct or indirect subsidiary of such Person and the ownership of such security as determined for U.S. federal income tax purposes.

**1.225  Treatment Objection** means an objection to the Debtors' proposed assumption or rejection of an executory contract or unexpired lease hereunder (including an objection to the proposed Assumption Effective Date or Rejection Effective Date, the Proposed Cure, and/or any proposed assignment, but not including an objection to any Rejection Claim) that is filed with the Bankruptcy Court and served by the applicable Treatment Objection Deadline.

**1.226  Treatment Objection Deadline** means the deadline for filing and serving a Treatment Objection, which shall be 4:00 p.m. (Eastern Time) on, (i) with respect to an executory contract or unexpired lease listed on Schedule "8.1" of the Plan Supplement, the fifteenth (15th) calendar day after such Schedule is filed with the Bankruptcy Court and notice thereof is mailed; (ii) with respect to an executory contract or unexpired lease the proposed treatment of which has been altered by an amendment or supplement to Schedule "8.1" of the Plan

Supplement, the fifteenth (15th) calendar day after such amended or supplemental Schedule is filed with the Bankruptcy Court and notice thereof is served; (iii) with respect to an executory contract or unexpired lease for which a Notice of Intent to Assume or a Notice of Intent to Reject is filed, the fifteenth (15th) calendar day after such Notice of Intent to Assume or Notice of Intent to Reject is filed with the Bankruptcy Court and notice thereof is served; (iv) with respect to any executory contract or unexpired lease that is listed on Schedule "8.1"of the Plan Supplement but for which no Notice of Intent to Assume or Notice of Intent to Reject is filed by the Deferred Agreement Deadline, the fifteenth (15th) calendar day after the Deferred Agreement Deadline; and (v) with respect to any other executory contract or unexpired lease, including any executory contract or unexpired lease to be assumed or rejected by category pursuant to Sections 8.3, 8.4, or 8.5 hereof (without being listed on Schedule "8.1" of the Plan Supplement), the deadline for objections to confirmation of the Plan.  Notwithstanding the foregoing, with respect to any Special Facility Revenue Bond Agreement to be assumed or rejected pursuant to Article VIII hereof, the deadline for filing and serving a Treatment Objection shall be 4:00 p.m. (Eastern Time) on (a) the twenty-first (21st) calendar day after the applicable Schedule is filed with the Bankruptcy Court and notice thereof is served; (b) the twenty-first (21st) calendar day after the applicable amended or supplemental Schedule is filed with the Bankruptcy Court and notice thereof is served; or (c) the sixth (6th) calendar day after the deadline for objections to confirmation of the Plan, as applicable.

**1.227**   **Triple-Dip General Unsecured Claims** means General Unsecured Claims based on obligations of American to guarantee guaranteed obligations of AMR.

**1.228**   **TWU** means the Transport Workers Union of America.

**1.229**   **TWU American Claim** means the right to receive 4.8% of the Creditor New Common Stock Allocation granted to the TWU on behalf of the transport workers represented by the TWU pursuant to the order of the Bankruptcy Court entered on September 12, 2012 (ECF No. 4413), in satisfaction and full extinguishment of any and all claims, interests, causes, or demands that the TWU has or might arguably have, on behalf of itself and the transport workers represented by the TWU, as provided by such order; *provided, however*, that the TWU American Claim shall not include Claims asserted in any proofs of Claim filed in the Chapter 11 Cases by or on behalf of TWU-represented employees. For purposes of voting hereunder, the entire TWU American Claim shall be voted by the TWU on behalf of the transport workers represented by the TWU.

**1.230**   **TWU American Section 1113 Agreement** means that certain (i) American Airlines Settlement Proposal to the Transport Workers Union re: Mechanic & Related, dated July 10, 2012, (ii) American Airlines Settlement Proposal to the Transport Workers Union re: Stores, dated July 10, 2012, (iii) Letter Agreement on Settlement Consideration and Bankruptcy Protections, dated

August 22, 2012, between American and the TWU; and (iv) Letters of Memorandum on certain additional provisions between American and the TWU, each as approved pursuant to the order of the Bankruptcy Court entered on September 12, 2012 (ECF No. 4413).

      **1.231**   **TWU Eagle Claims** means (i) the American Other General Unsecured Claim in the amount of $6.105 million held by the Transport Workers Union of America (Dispatchers) that was Allowed pursuant to the order of the Bankruptcy Court entered on December 21, 2012 (ECF No. 5841) and (ii) the American Other General Unsecured Claim in the amount of $5.905 million held by the Transport Workers Union of America (Fleet Service Clerks, Aircraft Maintenance and Related, and Ground School Instructors) that was Allowed pursuant to the order of the Bankruptcy Court entered on December 21, 2012 (ECF No. 5847), which Claims are not subject to reconsideration under section 502 of the Bankruptcy Code or otherwise.

      **1.232**   **TWU Eagle Section 1113 Agreements** means (i) that certain (a) tentative agreement with the TWU Operations Coordinators and Flight Dispatchers ratified by the Dispatchers on December 17, 2012, (b) Letter of Agreement on Settlement Consideration and Bankruptcy Protections, (c) Me-Too Provision Letter, and (d) Profit Sharing Plan Letter, as approved pursuant to the order of the Bankruptcy Court entered on December 21, 2012 (ECF No. 5841) and (ii) that certain (a) tentative agreement with the TWU Fleet Service Clerks ratified by the Fleet Service Clerks on August 24, 2012, (b) tentative agreement with the TWU Aircraft Maintenance Technicians, Inspectors, Ground Support Technicians, Aircraft Cleaners and Inventory Control Specialists ratified by the Aircraft Maintenance and Related on October 2, 2012, (c) tentative agreement with the TWU Ground School Instructors ratified by the Ground School Instructors on October 19, 2012, (d) Letter of Agreement on Settlement Consideration and Bankruptcy Protections, and (e) Me-Too Provision Letters, as approved pursuant to the order of the Bankruptcy Court entered on December 21, 2012 (ECF No. 5847).

      **1.233**   **Union** means each of the APA, the ALPA, the APFA, the AFA, or the TWU.

      **1.234**   **Unsecured Special Facility Revenue Bond Claim** means a Special Facility Revenue Bond Claim that is a General Unsecured Claim.

      **1.235**   **US Airways** means US Airways Group, Inc., a Delaware corporation.

      **1.236**   **US Airways 7% Convertible Notes** means the outstanding US Airways 7% Senior Convertible Notes due 2020.

US_ACTIVE:\44195459\15\14013.0139

**1.237    US Airways 7.25% Convertible Notes** means the outstanding US Airways 7.25% Convertible Senior Notes due 2014.

**1.238    US Airways Common Stock** means the shares of common stock, par value $0.01 per share, of US Airways.

**1.239    US Airways Disclosure Letter** means that certain disclosure letter by US Airways that was delivered to AMR pursuant to, and forming part of, the Merger Agreement.

**1.240    US Airways Equity Awards** means the US Airways Stock-Settled RSUs and the US Airways Stock-Settled SARs.

**1.241    US Airways Fully Diluted Shares** means, as of a given time, a number of shares of US Airways Common Stock equal to the aggregate number of shares of US Airways Common Stock that would be deemed to be outstanding as of such time for purposes of calculating "diluted earnings per share" under GAAP using the treasury stock method (calculated for the purposes hereof as though all US Airways Options and US Airways Equity Awards were vested notwithstanding the vesting requirements of any agreements related thereto and using the as-if converted method with respect to outstanding convertible securities), except that the average market price used in such calculation shall equal the average of the daily closing price of US Airways Common Stock on the New York Stock Exchange for each of the twenty (20) trading days ended on (and including) the Share Determination Date.  Solely for illustrative purposes, if the Share Determination Date were February 11, 2013, the US Airways Fully Diluted Shares would equal 208,570,577 shares of New Common Stock.  US Airways shall deliver to AMR on the Business Day immediately following the Share Determination Date a schedule that sets forth, as of the Share Determination Date, (i) the number of outstanding shares of US Airways Common Stock, (ii) a ledger of the outstanding US Airways Options and US Airways Equity Awards, which ledger includes the applicable exercise price, (iii) the principal amount of the outstanding US Airways 7.25% Convertible Notes and outstanding US Airways 7% Convertible Notes, including the applicable conversion price, (iv) a ledger of any outstanding securities or obligations convertible or exchangeable into or exercisable for US Airways Common Stock, which ledger includes the applicable exercise price or conversion price, and (v) US Airways's determination of US Airways Fully Diluted Shares (for the avoidance of doubt, each of the foregoing items in clauses (i) through (iv) in this Section 1.241 shall be included in the determination of US Airways Fully Diluted Shares).

**1.242    US Airways Options** means stock options to purchase shares of US Airways Common Stock.

**1.243    US Airways Stock-Settled RSUs** means stock-settled restricted stock units that are settled in shares of US Airways Common Stock.

40

**1.244    US Airways Stock-Settled SARs** means stock-settled stock appreciation rights that are settled in shares of US Airways Common Stock.

**1.245    U.S. Trustee** means the United States Trustee for the Southern District of New York.

**1.246    Value Hurdle** means an amount equal to the sum of the Double-Dip Hurdle Value, the Single-Dip Hurdle Value, and the Labor Claims Hurdle Value.

**1.247    Value Hurdle Price** means an amount equal to (i) the Value Hurdle divided by (ii) the difference between the New Common Stock Allocation and the Initial Old Equity Allocation.

**1.248    Voting Agent** means GCG, Inc., the Debtors' voting agent.

**1.249    Voting Deadline** means the date set by the Bankruptcy Court by which all completed Ballots must be received.

**1.250    VWAP** means, with respect to any date, the volume weighted average price of New Common Stock for the five (5) trading days ending on the last trading day immediately prior to such date; *provided, however*, VWAP as of the Effective Date and until the New Common Stock is trading on a nationally recognized stock exchange shall be calculated as the volume weighted average price of US Airways Common Stock for the five (5) trading days ending on the last trading day immediately prior to such date.  The VWAP shall be calculated by using the "VWAP" function on a Bloomberg terminal by typing either "LCC" or the stock symbol for New Common Stock, as applicable, and then pressing the "EQUITY" key, typing "VWAP," and then pressing the "GO" key.  Once directed to the VWAP screen, the beginning time and date shall be entered as 9:30 a.m. (Eastern Time) on the date five (5) trading days prior to the previous trading day and the ending time and date shall be entered as of 4:30 p.m.(Eastern Time) on the last trading date, and then pressing the "GO" key.  For the avoidance of doubt, the "Bloomberg" calculation shall be used for purposes of calculating VWAP.

**1.251    Workers' Compensation Plan** means each of the Debtors' written contracts, agreements, agreements of indemnity, qualified self-insurance workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance entered into prior to the Commencement Date.

### INTERPRETATION; APPLICATION OF DEFINITIONS AND RULES OF CONSTRUCTION.

The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or

41

clause contained therein.  A term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the Plan.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.

It is the intention of the Plan that (i) all Allowed General Unsecured Claims, Allowed American Union Claims, and Allowed AMR Equity Interests shall be fully settled and satisfied only with shares of New Mandatorily Convertible Preferred Stock and shares of New Common Stock, as applicable; *provided, however*, that Convenience Class Claims may be satisfied with up to $25 million in Cash, and (ii) the aggregate number of shares of New Common Stock that are issuable pursuant to the Plan, including those that are or may become issuable upon conversion of shares of the New Mandatorily Convertible Preferred Stock issued hereunder shall not exceed the Maximum Plan Shares.  The Plan shall be interpreted and administered consistent with this intention.

## ARTICLE II.

### ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

### 2.1    Administrative Expenses

(a)    *AMR Debtors*.  Except to the extent that New AAG and a holder of an Allowed Administrative Expense against any of the AMR Debtors agree to a different treatment, on the Effective Date, or as soon thereafter as reasonably practicable, each holder of an Allowed Administrative Expense shall receive, in full satisfaction of such Allowed Administrative Expense, an amount in Cash equal to the Allowed amount of such Administrative Expense; *provided, however*, that Allowed Administrative Expenses against any of the AMR Debtors representing liabilities incurred in the ordinary course by the AMR Debtors, as debtors in possession, or liabilities arising under loans or advances to or other obligations incurred by any of the AMR Debtors, as debtors in possession, whether or not incurred in the ordinary course, shall be paid by New AAG in the ordinary course, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

(b)    *American Debtors*.  Except to the extent that New AAG and a holder of an Allowed Administrative Expense against any of the American Debtors agree to a different treatment, on the Effective Date, or as soon thereafter as reasonably practicable, each holder of an Allowed Administrative Expense shall receive, in full satisfaction of such Allowed Administrative Expense, an amount in Cash equal to the Allowed amount of such Administrative Expense; *provided, however*, that Allowed Administrative Expenses against any of the American Debtors representing liabilities incurred in the ordinary course by any of the American Debtors, as debtors in possession, or liabilities arising under loans or advances to or other obligations incurred by any of the

42

American Debtors, as debtors in possession, whether or not incurred in the ordinary course, shall be paid by New AAG in the ordinary course, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

(c)    *Eagle Debtors*.  Except to the extent that New AAG and a holder of an Allowed Administrative Expense against any of the Eagle Debtors agree to a different treatment, on the Effective Date, or as soon thereafter as reasonably practicable, each holder of an Allowed Administrative Expense shall receive, in full satisfaction of such Allowed Administrative Expense, an amount in Cash equal to the Allowed amount of such Administrative Expense; *provided, however*, that Allowed Administrative Expenses against any of the Eagle Debtors representing liabilities incurred in the ordinary course by any of the Eagle Debtors, as debtors in possession, or liabilities arising under loans or advances to or other obligations incurred by any of the Eagle Debtors, as debtors in possession, whether or not incurred in the ordinary course, shall be paid by New AAG in the ordinary course, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

**2.2**    **Compensation and Reimbursement Claims.**  All Entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code shall (i) file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is sixty (60) days after the Confirmation Date or as may be otherwise provided in the Confirmation Order and (ii) be paid in full in such amounts as are allowed by the Bankruptcy Court (A) on the date on which the order of the Bankruptcy Court relating to any such Administrative Expense is entered, or as soon thereafter as reasonably practicable, or (B) upon such other terms as may be mutually agreed upon between the holder of such an Administrative Expense and the Debtors, or, if on or after the Effective Date, New AAG.  The Debtors and the Reorganized Debtors, as applicable, are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date and until the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

**2.3**    **Priority Tax Claims**

(a)    *AMR Debtors*.  Except to the extent that New AAG and a holder of an Allowed Priority Tax Claim against any of the AMR Debtors agree to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the AMR Debtors, (i) Cash in an amount equal to such Allowed Priority Tax Claim on the Effective Date, or as soon thereafter as reasonably practicable, as to any Allowed Priority Tax Claim or (ii) in Cash, in equal semi-annual installments commencing on the first (1st) Business Day following the Effective Date (or if later, the first Distribution

43

Date after such Claim becomes an Allowed Priority Tax Claim) and continuing over a
period not exceeding five (5) years from and after the Commencement Date, together
with interest accrued thereon at the applicable nonbankruptcy rate as of the Confirmation
Date, subject to the sole option of the Reorganized Debtors to prepay the entire amount of
the Allowed Priority Tax Claim.  All Allowed Priority Tax Claims against any of the
AMR Debtors that are not due and payable on  or before the Effective Date shall be paid
in the ordinary course as such obligations become due.

      **(b)**    ***American Debtors***.  Except to the extent that New AAG and a
holder of an Allowed Priority Tax Claim against any of the American Debtors agree to a
different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the
sole option of the American Debtors, (i) Cash in an amount equal to such Allowed
Priority Tax Claim on the Effective Date, or as soon thereafter as reasonably practicable,
as to any Allowed Priority Tax Claim or (ii) in Cash, in equal semi-annual installments
commencing on the first (1st) Business Day following the Effective Date (or if later, the
first Distribution Date after such Claim becomes an Allowed Priority Tax Claim) and
continuing over a period not exceeding five (5) years from and after the Commencement
Date, together with interest accrued thereon at the applicable nonbankruptcy rate as of the
Confirmation Date, subject to the sole option of the Reorganized Debtors to prepay the
entire amount of the Allowed Priority Tax Claim.  All Allowed Priority Tax Claims
against any of the American Debtors that are not due and payable on or before the
Effective Date shall be paid in the ordinary course as such obligations become due.

      **(c)**    ***Eagle Debtors***.  Except to the extent that New AAG and a holder
of an Allowed Priority Tax Claim against any of the Eagle Debtors agree to a different
treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option
of the Eagle Debtors, (i) Cash in an amount equal to such Allowed Priority Tax Claim on
the Effective Date, or as soon thereafter as reasonably practicable, as to any Allowed
Priority Tax Claim or (ii) in Cash, in equal semi-annual installments commencing on the
first (1st) Business Day following the Effective Date (or if later, the first Distribution
Date after such Claim becomes an Allowed Priority Tax Claim) and continuing over a
period not exceeding five (5) years from and after the Commencement Date, together
with interest accrued thereon at the applicable nonbankruptcy rate as of the Confirmation
Date, subject to the sole option of the Reorganized Debtors to prepay the entire amount of
the Allowed Priority Tax Claim.  All Allowed Priority Tax Claims against any of the
Eagle Debtors that are not due and payable on or before the Effective Date shall be paid
in the ordinary course as such obligations become due.

      **2.4**    **Special Provisions Regarding Fees and Expenses of Indenture
Trustees.**  Except as may be otherwise provided in a Final Order of the Bankruptcy
Court previously entered in the Chapter 11 Cases, the reasonable prepetition and
postpetition fees and expenses of each of the Indenture Trustees, to the extent
payable by any of the Debtors pursuant to the terms of the applicable Bond
Documents (which includes the reasonable fees and expenses of any counsel and/or
other professionals retained by the Indenture Trustees in connection with such
duties) shall be deemed Allowed Administrative Expenses and shall be paid in Cash

44

on the Effective Date, or as soon thereafter as reasonably practicable, upon submission of documented invoices (in customary form) to the Debtors and the Creditors' Committee, subject to a review for reasonableness by the Debtors and the Creditors' Committee, without the necessity of making application to the Bankruptcy Court.  The Indenture Trustees shall provide the Debtors and the Creditors' Committee with an estimate of such fees and expenses no later than thirty (30) days prior to the Confirmation Hearing.  Notwithstanding the foregoing, under no circumstances shall any such fees and expenses (including counsel and/or other professionals) include fees and expenses associated with Avoidance Actions. Subject to Section 6.14 hereof, each Indenture Trustee's charging lien, if any, shall be discharged solely upon payment in full of the respective fees and expenses of the Indenture Trustees and termination of the respective Indenture Trustee's duties. Nothing herein shall be deemed to impair, waive, or discharge the Indenture Trustees' respective charging liens, if any, for any fees and expenses not paid by the Debtors or the Reorganized Debtors, as applicable.  In addition, upon submission of documented invoices (in customary form) to New AAG and without the necessity of making application to the Bankruptcy Court, New AAG shall pay the reasonable fees and expenses of the Indenture Trustees in connection with making distributions hereunder.  Any fees and expenses owing under the Support and Settlement Agreement shall be deemed Allowed Administrative Expenses and shall be paid in Cash on the Effective Date or as otherwise provided in the Support and Settlement Agreement to the extent provided in any order of the Bankruptcy Court.

## ARTICLE III.

### CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

The following table designates the Classes of Claims against and Equity Interests in the Debtors and specifies which of those Classes are (i) impaired or unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to reject the Plan:

US_ACTIVE:\44195459\15\14013.0139

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| AMR Class 1 | AMR Secured Claims | Unimpaired | No (deemed to accept) |
| AMR Class 2 | AMR Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| AMR Class 3 | AMR General Unsecured Guaranteed Claims | Impaired | Yes |
| AMR Class 4 | AMR Other General Unsecured Claims | Impaired | Yes |
| AMR Class 5 | AMR Equity Interests | Impaired | Yes |
| AMR Class 6 | AMR Other Equity Interests | Unimpaired | No (deemed to accept) |
| American Class 1 | American Secured Aircraft Claims | Unimpaired | No (deemed to accept) |
| American Class 2 | American Other Secured Claims | Unimpaired | No (deemed to accept) |
| American Class 3 | American Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| American Class 4 | American General Unsecured Guaranteed Claims | Impaired | Yes |
| American Class 5 | American Other General Unsecured Claims | Impaired | Yes |
| American Class 6 | American Union Claims | Impaired | Yes |
| American Class 7 | American Convenience Class Claims | Impaired | Yes |
| American Class 8 | American Equity Interests | Unimpaired | No (deemed to accept) |
| Eagle Class 1 | Eagle Secured Claims | Unimpaired | No (deemed to accept) |
| Eagle Class 2 | Eagle Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Eagle Class 3 | Eagle General Unsecured Claims | Impaired | Yes |
| Eagle Class 4 | Eagle Convenience Class Claims | Impaired | Yes |
| Eagle Class 5 | Eagle Equity Interests | Unimpaired | No (deemed to accept) |

For convenience of identification, the Plan classifies the Allowed Claims in AMR Class 1, American Class 1, American Class 2, and Eagle Class 1 as single Classes. These Classes are actually a group of subclasses, depending on the underlying property securing such Allowed Claims, and each subclass is treated hereunder as a distinct Class for voting and distribution purposes.

## ARTICLE IV.

### TREATMENT OF CLAIMS AND EQUITY INTERESTS

**4.1   AMR Class 1 – AMR Secured Claims.** Except to the extent that a holder of an Allowed Secured Claim against any of the AMR Debtors agrees to a different treatment of such Claim, each holder of an Allowed Secured Claim against any of the AMR Debtors shall receive, at the option of the AMR Debtors, and in full satisfaction of such Claim, either (i) Cash in an amount equal to one hundred percent (100%) of the unpaid amount of such Allowed Secured Claim, (ii) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Claim, net of the costs of disposition of such Collateral, (iii) the Collateral securing such Allowed Secured Claim, (iv) such treatment that leaves unaltered the legal,

46

equitable, and contractual rights to which the holder of such Allowed Secured Claim is entitled, or (v) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.  In the event a Secured Claim against any of the AMR Debtors is treated under clause (i) or (ii) of this Section, the liens securing such Secured Claim shall be deemed released immediately upon payment of the Cash or proceeds as provided in such clauses.  Any distributions made pursuant to this Section shall be made on or as soon as reasonably practicable after the first Distribution Date occurring after the latest of (i) the Effective Date, (ii) at least twenty (20) calendar days after the date such Secured Claim becomes Allowed, and (iii) the date for payment provided by any agreement between the applicable AMR Debtor(s) and the holder of such Secured Claim.

**4.2    AMR Class 2 – AMR Priority Non-Tax Claims.**  Except to the extent that a holder of an Allowed Priority Non-Tax Claim against any of the AMR Debtors agrees to a different treatment of such Claim, each holder of an Allowed Priority Non-Tax Claim against any of the AMR Debtors shall receive, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date such Priority Non-Tax Claim becomes Allowed, and (iii) the date for payment provided by any agreement between the applicable AMR Debtor(s) and the holder of such Priority Non-Tax Claim.

**4.3    AMR Class 3 – AMR General Unsecured Guaranteed Claims**

**(a)**    Each holder of an Allowed AMR General Unsecured Guaranteed Claim shall receive on the Initial Distribution Date (for AMR General Unsecured Guaranteed Claims that are Allowed as of the Effective Date), a number of shares of New Mandatorily Convertible Preferred Stock equal to the quotient of such Claim's pro rata share of the Double-Dip Full Recovery Amount divided by the per share Initial Stated Value.  Each holder of an Allowed AMR General Unsecured Guaranteed Claim shall receive a distribution hereunder only on account of its Allowed AMR General Unsecured Guaranteed Claim as set forth in this Section 4.3 and will not receive any distribution hereunder on account of such holder's Claim against American for American's guaranty of such AMR General Unsecured Guaranteed Claim.

**(b)**    At any time prior to the fifth (5th) Business Day before the Effective Date, a holder of an Allowed AMR General Unsecured Guaranteed Claim may irrevocably elect to have all or any portion of its Allowed AMR General Unsecured Guaranteed Claim treated as an Allowed AMR Other General Unsecured Claim in AMR Class 4.  Such election shall be made on the form included in the Plan Supplement and, to be effective, must be actually received by the attorneys for the Debtors prior to such fifth (5th) Business Day.  Any election not complying with the foregoing shall have no force or effect.

47

(c)       The AMR Note Claims shall be Allowed as AMR General Unsecured Guaranteed Claims in the respective amounts listed next to each Indenture set forth on Schedule "1" hereto (the "**AMR Fixed Allowed Guaranteed Note Claims**"). The AMR Fixed Allowed Guaranteed Note Claims shall override and supersede any individual Claims filed by Registered Holders or beneficial owners of debt securities with respect to the AMR Note Claims.  Distributions to holders of AMR Fixed Allowed Guaranteed Note Claims shall be made in accordance with Section 5.2 hereof.  As provided in Section 5.15 hereof, any holder of an AMR Fixed Allowed Guaranteed Note Claim with respect to a Note that is a Convertible Note may irrevocably elect to have such Convertible Note treated as an Allowed AMR Equity Interest in AMR Class 5 (subject to the terms and provisions of the Revised Final Order Pursuant to 11 U.S.C. §§ 105(a) and 362 Establishing Notification Procedures for Substantial Claimholders and Equity Security Holders and Approving Restrictions on Certain Transfers of Interests in the Debtors' Estates, entered by the Bankruptcy Court on April 11, 2013 (ECF No. 7591)) in an amount that corresponds to the number of shares of AMR Common Stock that would have been issued to such holder if such Convertible Note had been converted into shares of AMR Common Stock as of the Effective Date pursuant to the definitive documentation for such Convertible Note.

     **4.4**       **AMR Class 4 – AMR Other General Unsecured Claims**.  Each holder of an Allowed AMR Other General Unsecured Claim as of the Effective Date shall receive (i) on or as soon as reasonably practicable after the Initial Distribution Date, its Initial Pro Rata Share of (A) a number of shares of New Mandatorily Convertible Preferred Stock equal to the quotient of (x) the Total Initial Stated Value, less the Double-Dip Full Recovery Amount, divided by (y) the per share Initial Stated Value and (ii) as soon as reasonably practicable after the Final Mandatory Conversion Date, its Initial Pro Rata Share of a number of shares of New Common Stock equal to (I) the Creditor New Common Stock Allocation, less (II) the number of shares of New Common Stock issued upon conversion of all of the shares of New Mandatorily Convertible Preferred Stock, less (III) the Labor Common Stock Allocation.  In connection with each Interim True-Up Distribution, each holder of an Allowed AMR Other General Unsecured Claim shall receive its Interim Pro Rata Share of the distribution allocated to Allowed Single-Dip General Unsecured Claims pursuant to Section 7.4(a) hereof.  In connection with the Final True-Up Distribution, each holder of an Allowed AMR Other General Unsecured Claim shall receive its Final Pro Rata Share of the distribution allocated to Allowed Single-Dip General Unsecured Claims pursuant to Section 7.4(b) hereof.  The right of a holder of an Allowed AMR Other General Unsecured Claim to receive any distribution on a Final Mandatory Conversion Date, an Interim Distribution Date, or a Final Distribution Date shall not be Transferable; *provided, however*, that this sentence shall not apply to any shares of New Mandatorily Convertible Preferred Stock or the right to receive shares of New Common Stock pursuant to the conversion thereof.

48

**4.5** **AMR Class 5 – AMR Equity Interests.**  Each holder of an Allowed AMR Equity Interest shall receive its pro rata share (i) on the Effective Date, or as soon as thereafter as reasonably practicable, of the Initial Old Equity Allocation and (ii) on each Mandatory Conversion Date, or as soon thereafter as reasonably practicable, of the Market-Based Old Equity Allocation.   In connection with each Interim True-Up Distribution, each holder of an Allowed AMR Equity Interest shall receive its pro rata share of the Market-Based Old Equity Allocation pursuant to Section 7.4(a) hereof.  In connection with the Final True-Up Distribution, each holder of an Allowed AMR Equity Interest shall receive its pro rata share of the Market-Based Old Equity Allocation pursuant to Section 7.4(b) hereof.  The right of a holder of an Allowed AMR Equity Interest to receive any distribution on a Mandatory Conversion Date, an Interim Distribution Date, or a Final Distribution Date shall not be Transferable.

**4.6** **AMR Class 6 – AMR Other Equity Interests.**  Subject to the Roll-Up Transactions, the AMR Other Equity Interests shall not be cancelled, but shall be reinstated for the benefit of the respective Reorganized Debtor that is the holder thereof.

**4.7** **American Class 1 – American Secured Aircraft Claims**.  Except to the extent that a holder of an Allowed Secured Aircraft Claim against any of the American Debtors agrees to a different treatment of such Claim (including, without limitation, pursuant to a Postpetition Aircraft Agreement), each holder of an Allowed Secured Aircraft Claim against any of the American Debtors shall receive, at the option of the American Debtors, and in full satisfaction of such Claim, either (i) Cash in an amount equal to one hundred percent (100%) of the unpaid amount of such Allowed Secured Aircraft Claim, (ii) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Aircraft Claim, net of the costs of disposition of such Collateral, (iii) the Collateral securing such Allowed Secured Aircraft Claim, (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of such Allowed Secured Aircraft Claim is entitled, or (v) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.  In the event a Secured Aircraft Claim against any of the American Debtors is treated under clause (i) or (ii) of this Section, the liens securing such Secured Aircraft Claim shall be deemed released immediately upon payment of the Cash or proceeds as provided in such clauses.  Any distributions made pursuant to this Section shall be made on or as soon as reasonably practicable after the first Distribution Date occurring after the latest of (i) the Effective Date, (ii) at least twenty (20) calendar days after the date such Secured Aircraft Claim becomes Allowed, and (iii) the date for payment provided by any agreement between the applicable American Debtor(s) and the holder of such Secured Aircraft Claim.

**4.8** **American Class 2 – American Other Secured Claims**.  Except to the extent that a holder of an Allowed Other Secured Claim against any of the American Debtors agrees to a different treatment of such Claim, each holder of an

49

Allowed Other Secured Claim against any of the American Debtors shall receive, at the option of the American Debtors, and in full satisfaction of such Claim, either (i) Cash in an amount equal to one hundred percent (100%) of the unpaid amount of such Allowed Other Secured Claim, (ii) the proceeds of the sale or disposition of the Collateral securing such Allowed Other Secured Claim, net of the costs of disposition of such Collateral, (iii) the Collateral securing such Allowed Other Secured Claim, (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of such Allowed Other Secured Claim is entitled, or (v) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.  In the event an Other Secured Claim against any of the American Debtors is treated under clause (i) or (ii) of this Section, the liens securing such Other Secured Claim shall be deemed released immediately upon payment of the Cash or proceeds as provided in such clauses.  Any distributions made pursuant to this Section shall be made on or as soon as reasonably practicable after the first Distribution Date occurring after the latest of (i) the Effective Date, (ii) at least twenty (20) calendar days after the date such Other Secured Claim becomes Allowed, and (iii) the date for payment provided by any agreement between the applicable American Debtor(s) and the holder of such Other Secured Claim.

**4.9**    **American Class 3 – American Priority Non-Tax Claims**.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim against any of the American Debtors agrees to a different treatment of such Claim, each holder of an Allowed Priority Non-Tax Claim against any of the American Debtors shall receive, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date such Priority Non-Tax Claim becomes Allowed, and (iii) the date for payment provided by any agreement between the applicable American Debtor(s) and the holder of such Priority Non-Tax Claim.

**4.10**    **American Class 4 – American General Unsecured Guaranteed Claims**

**(a)**    Each holder of an Allowed American General Unsecured Guaranteed Claim shall receive on the Initial Distribution Date (for American General Unsecured Guaranteed Claims that are Allowed as of the Effective Date), a number of shares of New Mandatorily Convertible Preferred Stock equal to the quotient of such Claim's pro rata share of the Double-Dip Full Recovery Amount divided by the per share Initial Stated Value. Each holder of an Allowed American General Unsecured Guaranteed Claim shall receive a distribution hereunder only on account of its Allowed American General Unsecured Guaranteed Claim as set forth in this Section 4.10 and will not receive any distribution on account of such holder's Claim against AMR for AMR's guaranty of such American General Unsecured Guaranteed Claim.

**(b)**    At any time prior to the fifth (5th) Business Day before the Effective Date, a holder of an Allowed American General Unsecured Guaranteed Claim

50

may irrevocably elect to have all or any portion of its Allowed American General Unsecured Guaranteed Claim treated as an Allowed American Other General Unsecured Claim in American Class 5.  Such election shall be made on the form included in the Plan Supplement and, to be effective, must be actually received by the attorneys for the Debtors prior to such fifth (5th) Business Day.  Any election not complying with the foregoing shall have no force or effect.

(c)     The American Note Claims that are Double-Dip General Unsecured Claims shall be Allowed as American General Unsecured Guaranteed Claims in the respective amounts listed next to each Indenture set forth on Schedule "2" hereto (the "**American Fixed Allowed Guaranteed Note Claims**").  The American Fixed Allowed Guaranteed Note Claims shall override and supersede any individual Claims filed by Registered Holders or beneficial owners of debt securities with respect to the American Note Claims.  Distributions to holders of American Fixed Allowed Guaranteed Note Claims shall be made in accordance with Section 5.2 hereof.

(d)     The Unsecured Special Facility Revenue Bond Claims that are Double-Dip General Unsecured Claims against the American Debtors shall be Allowed as American General Unsecured Guaranteed Claims in the respective amounts listed next to each Special Facility Revenue Bond Agreement set forth on Schedule "2" hereto (the "**American Fixed Allowed Guaranteed Unsecured Special Facility Revenue Bond Claims**").  The American Fixed Allowed Guaranteed Unsecured Special Facility Revenue Bond Claims shall override and supersede any individual Claims filed by Registered Holders or beneficial owners of debt securities with respect to the Unsecured Special Facility Revenue Bond Claims against the American Debtors.  Distributions to holders of Unsecured Special Facility Revenue Bond Claims against the American Debtors shall be made in accordance with Section 5.2 hereof.

(e)     Each holder of a Triple-Dip General Unsecured Claim shall receive distributions hereunder only on account of its Allowed Double-Dip General Unsecured Claim.

### 4.11   <u>American Class 5 – American Other General Unsecured Claims</u>

(a)     Each holder of an Allowed American Other General Unsecured Claim as of the Effective Date shall receive (i) on or as soon as reasonably practicable after the Initial Distribution Date, its Initial Pro Rata Share of a number of shares of New Mandatorily Convertible Preferred Stock equal to the quotient of (x) the Total Initial Stated Value, less the Double-Dip Full Recovery Amount, divided by (y) the per share Initial Stated Value, and (ii) as soon as reasonably practicable after the Final Mandatory Conversion Date its Initial Pro Rata Share of a number of shares of New Common Stock equal to (I) the Creditor New Common Stock Allocation, less (II) the number of shares of New Common Stock issued upon conversion of all of the shares of New Mandatorily Convertible Preferred Stock, less (III) the Labor Common Stock Allocation.  In connection with each Interim True-Up Distribution, each holder of an Allowed American Other General Unsecured Claim shall receive its Interim Pro Rata Share of the

51

distribution allocated to Allowed Single-Dip General Unsecured Claims pursuant to Section 7.4(a) hereof.  In connection with the Final True-Up Distribution, each holder of an Allowed American Other General Unsecured Claim shall receive its Final Pro Rata Share of the distribution allocated to Allowed Single-Dip General Unsecured Claims pursuant to Section 7.4(b) hereof.  The right of a holder of an Allowed American Other General Unsecured Claim to receive any distribution on a Mandatory Conversion Date, an Interim Distribution Date, or a Final Distribution Date shall not be Transferable; *provided, however*, that this sentence shall not apply to any shares of New Mandatorily Convertible Preferred Stock or the right to receive shares of New Common Stock pursuant to the conversion thereof.

        **(b)**      The American Note Claims that are Single-Dip General Unsecured Claims shall be Allowed as American Other General Unsecured Claims in American Class 5 in the respective amounts listed next to each Indenture set forth on Schedule "3" hereto (the "**American Fixed Allowed Other Note Claims**").  The American Fixed Allowed Other Note Claims shall override and supersede any individual Claims filed by Registered Holders or beneficial owners of debt securities with respect to the American Note Claims.  Distributions to holders of American Fixed Allowed Other Note Claims shall be made in accordance with Section 5.2 hereof.

        **(c)**      The Unsecured Special Facility Revenue Bond Claims that are Single-Dip General Unsecured Claims against the American Debtors shall be Allowed as American Other General Unsecured Claims in American Class 5 in the respective amounts listed next to each Special Facility Revenue Bond Agreement set forth on Schedule "3" hereto (the "**American Fixed Allowed Unsecured Special Facility Revenue Bond Claims**").  The American Fixed Allowed Unsecured Special Facility Revenue Bond Claims shall override and supersede any individual Claims filed by Registered Holders or beneficial owners of debt securities with respect to the Unsecured Special Facility Revenue Bond Claims against the American Debtors.  Distributions to holders of Unsecured Special Facility Revenue Bond Claims against the American Debtors shall be made in accordance with Section 5.2 hereof.

        **(d)**      The DFW 1.5x Unsecured Special Facility Revenue Bond Claims against the American Debtors shall be Allowed as American Other General Unsecured Claims in American Class 5 in the respective amounts listed next to each DFW 1.5x Special Facility Revenue Bond Agreement set forth on Schedule "3" hereto (the "**American Fixed Allowed DFW 1.5x Unsecured Special Facility Revenue Bond Claims**").  The American Fixed Allowed DFW 1.5x Unsecured Special Facility Revenue Bond Claims shall override and supersede any individual Claims filed by Registered Holders or beneficial owners of debt securities with respect to the DFW 1.5x Unsecured Special Facility Revenue Bond Claims against the American Debtors.  Distributions to holders of DFW 1.5x Unsecured Special Facility Revenue Bond Claims against the American Debtors shall be made in accordance with Section 5.2 hereof; *provided, however*, under no circumstances shall the holders thereof receive more (in New Common Stock value based on the formulas provided herein) than a single satisfaction.

US_ACTIVE:\44195459\15\14013.0139

The treatment provided hereunder to holders of Allowed DFW 1.5x Unsecured Special Facility Revenue Bond Claims is the result of a compromise and settlement (the "**DFW 1.5x Settlement**").  The DFW 1.5x Settlement provides that each holder of an Allowed DFW 1.5x Unsecured Special Facility Revenue Bond Claim shall be treated hereunder as having (i) an Allowed American Other General Unsecured Claim in an amount equal to the par amount of such Claim plus all nondefault rate interest accrued through the Effective Date and (ii) an Allowed American Other General Unsecured Claim on account of the guarantee by American of such Claim in an amount equal 50% of the par amount of such Claim, plus all nondefault rate interest accrued through the Effective Date; *provided, however*, that (A) the amount Allowed on account of the guarantee by American shall not increase the aggregate distributions to holders of Allowed Single-Dip General Unsecured Claims hereunder or the amount of the Single-Dip Full Recovery Amount, and (B) the distributions to holders of Allowed DFW 1.5x Unsecured Special Facility Revenue Bond Claims shall be not more than a single satisfaction.

### 4.12    American Class 6 –American Union Claims

(a)    *APA Claim*.  The APA shall receive, in full satisfaction of the APA Claim, shares of New Common Stock constituting 13.5% of the Creditor New Common Stock Allocation in accordance with the APA Section 1113 Agreement as follows:  On the Initial Distribution Date, or as soon thereafter as reasonably practicable, the APA shall receive its pro rata share of the Initial Labor Common Stock Allocation.  On each Mandatory Conversion Date, or as soon thereafter as reasonably practicable, the APA shall receive its pro rata share of the applicable Incremental Labor Common Stock Allocation.  In connection with each Interim True-Up Distribution, the APA shall receive its pro rata share of the distribution made on account of the American Labor Allocation pursuant to Section 7.4(a) hereof.  In connection with the Final True-Up Distribution, the APA shall receive its pro rata share of the distribution made on account of the American Labor Allocation pursuant to Section 7.4(b) hereof.  The right of the APA to receive any distribution on a Mandatory Conversion Date, an Interim Distribution Date, or a Final Distribution Date shall not be Transferable.

(b)    *APFA Claim*.  The APFA shall receive, in full satisfaction of the APFA Claim, shares of New Common Stock constituting 3% of the Creditor New Common Stock Allocation in accordance with the APFA Section 1113 Agreement as follows:  On the Initial Distribution Date, or as soon thereafter as reasonably practicable, the APFA shall receive its pro rata share of the Initial Labor Common Stock Allocation.  On each Mandatory Conversion Date, or as soon thereafter as reasonably practicable, the APFA shall receive its pro rata share of the applicable Incremental Labor Common Stock Allocation.  In connection with each Interim True-Up Distribution, the APFA shall receive its pro rata share of the distribution made on account of the American Labor Allocation pursuant to Section 7.4(a) hereof.  In connection with the Final True-Up Distribution, the APFA shall receive its pro rata share of the distribution made on account of the American Labor Allocation pursuant to Section 7.4(b) hereof.  The right of the

53

APFA to receive any distribution on a Mandatory Conversion Date, an Interim Distribution Date, or a Final Distribution Date shall not be Transferable.

(c)    ***TWU American Claim***.  The TWU shall receive, in full satisfaction of the TWU American Claim, shares of New Common Stock constituting 4.8% of the Creditor New Common Stock Allocation in accordance with the TWU American Section 1113 Agreement as follows:  On the Initial Distribution Date, or as soon thereafter as reasonably practicable, the TWU shall receive its pro rata share of the Initial Labor Common Stock Allocation.  On each Mandatory Conversion Date, or as soon thereafter as reasonably practicable, the TWU shall receive its pro rata share of the applicable Incremental Labor Common Stock Allocation.  In connection with each Interim True-Up Distribution, the TWU shall receive its pro rata share of the distribution made on account of the American Labor Allocation pursuant to Section 7.4(a) hereof.  In connection with the Final True-Up Distribution, the TWU shall receive its pro rata share of the distribution made on account of the American Labor Allocation pursuant to Section 7.4(b) hereof.  The right of the TWU to receive any distribution on a Mandatory Conversion Date, an Interim Distribution Date, or a Final Distribution Date shall not be Transferable.

**4.13**    __American Class 7 – American Convenience Class Claims__.  Each holder of an Allowed Convenience Class Claim against any of the American Debtors shall receive, on or as soon as reasonably practicable after the later of (i) the Initial Distribution Date (for Claims that are Allowed as of the Effective Date) and (ii) the Distribution Date that is at least twenty (20) calendar days after such Convenience Class Claim becomes an Allowed Convenience Class Claim, Cash in the amount of 100% of the amount of its Allowed American Convenience Class Claim as of the Commencement Date; *provided, however*, that if the aggregate amount of Allowed American Convenience Claims in American Class 7 and Allowed Eagle Convenience Class Claims in Eagle Class 4 exceed $25 million, the percentage Cash distribution to each holder of an Allowed American Convenience Class Claim shall be reduced so that the aggregate amount of Cash distributable with respect to all Allowed American Convenience Class Claims and Allowed Eagle Convenience Class Claims does not exceed $25 million.

**4.14**    __American Class 8 – American Equity Interests__.  Subject to the Roll-Up Transactions, the American Equity Interests shall not be cancelled, but shall be reinstated for the benefit of the respective Reorganized Debtor that is the holder thereof.

**4.15**    __Eagle Class 1 – Eagle Secured Claims__.  Except to the extent that a holder of an Allowed Secured Claim against any of the Eagle Debtors agrees to a different treatment of such Claim, each holder of an Allowed Secured Claim against any of the Eagle Debtors shall receive, at the option of the Eagle Debtors, and in full satisfaction of such Claim, either (i) Cash in an amount equal to one hundred percent (100%) of the unpaid amount of such Allowed Secured Claim, (ii) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured

54

Claim, net of the costs of disposition of such Collateral, (iii) the Collateral securing such Allowed Secured Claim, (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of such Allowed Secured Claim is entitled, or (v) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.  In the event a Secured Claim against any of the Eagle Debtors is treated under clause (i) or (ii) of this Section, the liens securing such Secured Claim shall be deemed released immediately upon payment of the Cash or proceeds as provided in such clauses. Any distributions made pursuant to this Section shall be made on or as soon as reasonably practicable after the first Distribution Date occurring after the latest of (i) the Effective Date, (ii) at least twenty (20) calendar days after the date such Secured Claim becomes Allowed, and (iii) the date for payment provided by any agreement between the applicable Eagle Debtor(s) and the holder of such Secured Claim.

**4.16**   **Eagle Class 2 – Eagle Priority Non-Tax Claims**.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim against any of the Eagle Debtors agrees to a different treatment of such Claim, each holder of an Allowed Priority Non-Tax Claim against any of the Eagle Debtors shall receive, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date such Priority Non-Tax Claim becomes Allowed, and (iii) the date for payment provided by any agreement between the applicable Eagle Debtor(s) and the holder of such Priority Non-Tax Claim.

**4.17**   **Eagle Class 3 – Eagle General Unsecured Claims**.  Each holder of an Allowed Eagle General Unsecured Claim as of the Effective Date shall receive (i) on or as soon as reasonably practicable after the Initial Distribution Date, its Initial Pro Rata Share of a number of shares of New Mandatorily Convertible Preferred Stock equal to the quotient of (x) the Total Initial Stated Value, less the Double-Dip Full Recovery Amount, divided by (y) the per share Initial Stated Value, and (ii) as soon as reasonably practicable after the Final Mandatory Conversion Date, its Initial Pro Rata Share of a number of shares of New Common Stock equal to (I) the Creditor New Common Stock Allocation, less (II) the number of shares of New Common Stock issued upon conversion of all of the shares of New Mandatorily Convertible Preferred Stock, less (III) the Labor Common Stock Allocation.  In connection with each Interim True-Up Distribution, each holder of an Allowed Eagle General Unsecured Claim shall receive its Interim Pro Rata Share of the distribution allocated to Allowed Single-Dip General Unsecured Claims pursuant to Section 7.4(a) hereof.  In connection with the Final True-Up Distribution, each holder of an Allowed Eagle General Unsecured Claim shall receive its Final Pro Rata Share of the distribution allocated to Allowed Single-Dip General Unsecured Claims pursuant to Section 7.4(b) hereof.  The right of a holder of an Allowed Eagle General Unsecured Claim to receive any distribution on a Mandatory Conversion Date, an Interim Distribution Date, or a Final Distribution

US_ACTIVE:\44195459\15\14013.0139

Date shall not be Transferable; *provided, however*, that this sentence shall not apply to any shares of New Mandatorily Convertible Preferred Stock or the right to receive shares of New Common Stock pursuant to the conversion thereof.

4.18    **Eagle Class 4 – Eagle Convenience Class Claims**.  Each holder of an Allowed Convenience Class Claim against any of the Eagle Debtors shall receive, on or as soon as reasonably practicable after the later of (i) the Initial Distribution Date (for Claims that are Allowed as of the Effective Date) and (ii) the Distribution Date that is at least twenty (20) calendar days after such Convenience Class Claim becomes an Allowed Convenience Class Claim, Cash in the amount of 100% of the amount of its Allowed Eagle Convenience Class Claim as of the Commencement Date; *provided, however*, that if the aggregate amount of Allowed American Convenience Claims in American Class 7 and Allowed Eagle Convenience Class Claims in Eagle Class 4 exceed $25 million, the percentage Cash distribution to each holder of an Allowed Eagle Convenience Class Claim shall be reduced so that the aggregate amount of Cash distributable with respect to all Allowed American Convenience Class Claims and Allowed Eagle Convenience Class Claims does not exceed $25 million.

4.19    **Eagle Class 5 – Eagle Equity Interests**.  Subject to the Roll-Up Transactions, the Eagle Equity Interests shall not be cancelled, but shall be reinstated for the benefit of the respective Reorganized Debtor that is the holder thereof.

## ARTICLE V.

### PROVISIONS GOVERNING DISTRIBUTIONS

5.1    **Distribution Record Date.**  Except with respect to any publicly-traded securities as to which distributions shall be treated as set forth in Section 5.13 hereof, (i) as of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors or their agents shall be deemed closed, (ii) there shall be no further changes in the record holders of any of such Claims or Equity Interests, and the Debtors shall have no obligation to recognize any transfer of such Claims or Equity Interests occurring on or after the Distribution Record Date, and (iii) the Debtors shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

5.2    **Disbursing Agent**

(a)    The Disbursing Agent shall make all distributions required hereunder, except with respect to a holder of a Claim whose distribution is governed by an agreement and is administered by an Indenture Trustee, which distribution shall be deposited by the Disbursing Agent with the appropriate Indenture Trustee or Servicer for

US_ACTIVE:\44195459\15\14013.0139

distribution to holders of Claims in accordance with the provisions hereof and the terms of the governing agreement (except with respect to distributions on Claims where the Servicer, the Debtors, and the holder of a Claim may have agreed otherwise). Distributions on account of such Claims shall be deemed complete upon delivery to the appropriate Indenture Trustee or Servicer; *provided, however*, that if any such Indenture Trustee or Servicer is unable to make such distributions, the Disbursing Agent, with the cooperation of such Indenture Trustee or Servicer, shall make such distributions to the extent reasonably practicable.  With respect to holders of the American Union Claims in American Class 6, the Disbursing Agent shall make the distributions required hereunder to the APA, the APFA, and the TWU, as applicable, and distributions on account of such American Union Claims shall be deemed complete upon delivery to the APA, the APFA, and the TWU, as applicable.

**(b)**    The Debtors shall be authorized, without further Bankruptcy Court approval, to reimburse any Servicer for its reasonable and customary servicing fees and expenses incurred in providing postpetition services directly related to distributions hereunder.  Such reimbursements shall be made on terms agreed to with the Debtors and shall not be deducted from distributions to be made hereunder to holders of Allowed Claims receiving distributions from such Servicer.

**5.3**    **Timing of Distributions**.  Subject to any reserves or holdbacks established hereunder, on the appropriate Distribution Date, or as soon thereafter as is practicable, holders of Allowed Claims and Allowed AMR Equity Interests shall receive the distributions provided for herein.  Distributions on account of General Unsecured Claims that are Allowed as of the Effective Date shall be made on the Initial Distribution Date, or, other than with respect to distribution of Plan Shares, as soon thereafter as reasonably practicable (and shall receive the additional true-up distributions provided for in Section 7.4 hereof at the times provided for therein). Distributions on account of any Disputed Claim as of the Effective Date that subsequently becomes Allowed shall be made on the next Distribution Date that is at least twenty (20) calendar days after the date such Claim becomes Allowed, or as soon thereafter as reasonably practicable; *provided, however*, that distributions on account of Administrative Expenses and Priority Tax Claims shall be made as set forth in Article II hereof.  Upon making distributions hereunder, in no event shall any of the Debtors, the Reorganized Debtors, or the Disbursing Agent be liable for the subsequent acts of third parties regarding such distributions.  Notwithstanding compliance by the Debtors or the Reorganized Debtors, as applicable, with their obligations hereunder, there can be no assurance that an active trading market for the New Common Stock will develop or as to the prices at which the New Common Stock will trade.

**5.4**    **Delivery of Distributions and Undeliverable Distributions**

**(a)**    All distributions to any holder of an Allowed Claim shall be made by the Disbursing Agent at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents or

57

in a letter of transmittal unless the Debtors have been notified in writing of a change of address, including, without limitation, by the filing of a proof of Claim by such holder that contains an address for such holder different from the address reflected on the Schedules for such holder.  In the event that any distribution to any holder is returned as undeliverable, no further distributions to such holder shall be made unless and until such distributions are claimed, at which time all missed distributions shall be made to such holder, without interest.  The Disbursing Agent shall make reasonable efforts to locate holders of undeliverable distributions and, if located, assist such holders in complying with Section 5.5 hereof.  All demands for undeliverable distributions must be made on or before the later to occur of (i) the first anniversary of the Effective Date or (ii) six (6) months after such holder's Claim becomes an Allowed Claim.  Thereafter, the amount represented by such undeliverable distribution shall be contributed by the Disbursing Agent to one or more charitable organizations exempt from U.S. federal income tax under section 501(c)(3) of the Tax Code to be selected by, and unrelated to, the Disbursing Agent (provided that the recipient charitable organization is not, and would not become by reason of the contribution, a "Substantial Stockholder" within the meaning of the New AAG Certificate of Incorporation), and any Claim in respect of such undeliverable distribution shall be discharged and forever barred from assertion against the Debtors, the Reorganized Debtors, and their respective property, notwithstanding any federal or state escheat laws to the contrary.

**(b)**    If any shares of New Mandatorily Convertible Preferred Stock or New Common Stock are to be issued in a name other than that in which the holder of an Allowed Claim is identified in the immediately preceding subparagraph, it shall be a condition of such issuance that the Person requesting such name shall pay any transfer or other taxes required by reason of the issuance of shares of New Mandatorily Convertible Preferred Stock or New Common Stock in a name other than that in which such holder is identified herein or shall establish to the satisfaction of New AAG or the Disbursing Agent, as applicable, that such taxes have either been paid or are not applicable.

**(c)**    Any distribution on account of Allowed Claims made to any of the Indenture Trustees or Servicers in accordance herewith shall be (i) deemed a distribution to the respective registered holders thereunder, (ii) subject to the applicable Indenture Trustee's or Servicer's right to assert its charging lien against such distributions, and (iii) in accordance with Section 5.10 hereof.  Each Indenture Trustee and Servicer shall make such distributions, as soon as reasonably practicable after receipt thereof and pursuant to the terms of the applicable Indenture or other governing agreement, in accordance with Section 5.2 hereof to the registered holders as of the date of surrender of the debt securities pursuant to Section 5.13 hereof.

**(d)**    All distributions to any holder of an Allowed AMR Equity Interest shall be made by the Disbursing Agent to the transfer agent for AMR Common Stock, who shall be responsible for making the appropriate distributions to the registered holders as of the Distribution Record Date.

US_ACTIVE:\44195459\15\14013.0139

### 5.5        Withholding and Reporting Requirements

(a)        *Withholding Rights.*  In connection with the Plan and all instruments issued in connection therewith and distributed thereon, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the foregoing, each holder of an Allowed Claim or Equity Interest or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)        *Forms.*  Any party entitled to receive any property as an issuance or distribution under the Plan shall be required to deliver to the Disbursing Agent (or such other Person designated by the Debtors, which Person shall subsequently deliver to the Disbursing Agent any applicable Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8, unless such Person is exempt under the Tax Code and so notifies the Disbursing Agent.  If the holder has not otherwise made a demand for an undeliverable distribution as set forth in Section 5.4 hereof and fails to comply with such a request within six (6) months, such distribution shall be deemed an undeliverable distribution.

### 5.6        Cash Payments.  At the option of the Debtors, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

### 5.7        Distributions on Behalf of Subsidiaries.  The Disbursing Agent shall make distributions hereunder on behalf of the applicable Reorganized Debtor. Where the applicable Reorganized Debtor is a subsidiary of New AAG, New AAG shall make a direct or indirect capital contribution (through the chain of relevant entities) to the applicable Reorganized Debtor of an amount of Plan Shares or Cash to be distributed to holders of Allowed Claims against such Debtor or to be placed in the Disputed Claims Reserve on account of Disputed Claims against such Debtor, but only at such time as the amounts are actually distributed to holders of Allowed Claims or placed into the Disputed Claims Reserve; *provided, however*, that the preceding portion of this sentence shall not apply to any shares of New Common Stock into which the New Mandatorily Convertible Preferred Stock actually

converts, which New Common Stock shall be issued and distributed directly by or on behalf of New AAG. Any distributions of Plan Shares or Cash that revert to New AAG or are otherwise cancelled shall revest solely in New AAG, and no other Reorganized Debtor shall have any ownership interest in the amounts distributed.

**5.8** **Allocation of Plan Distribution Between Principal and Interest**. Except as otherwise required by law (as reasonably determined by the Debtors), distributions with respect to an Allowed General Unsecured Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

**5.9** **Time Bar to Cash Payments.** Checks issued by the Debtors in respect of Allowed Claims shall be null and void if not negotiated within one hundred eighty (180) days after the date of issuance thereof. Requests for re-issuance of any check shall be made to the Debtors by the holder of the Allowed Claim to whom such check originally was issued. Any Claim in respect of such a voided check shall be made on or before thirty (30) days after the expiration of the one hundred eighty (180) day period following the date of issuance of such check. Thereafter, the amount represented by such voided check shall irrevocably revert to New AAG, and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

**5.10** **Minimum Distributions and Fractional Shares.**

**(a)** No payment of Cash in an amount less than $25 shall be made to any holder of an Allowed Claim, and no fractional shares of New Mandatorily Convertible Preferred Stock or New Common Stock shall be distributed; *provided, however*, that (i) any fractional shares of New Mandatorily Convertible Preferred Stock shall be rounded down to the next whole number or zero, as applicable and (ii) any fractional shares of New Common Stock shall be rounded up or down to the next whole number or zero, as applicable (with one-half being closer to the next lower whole number for this purpose). No consideration shall be provided in lieu of fractional shares that are rounded down.

**(b)** In the event any New Common Stock remains in the Disputed Claims Reserve after the Final Distribution Date and the Disbursing Agent determines that the distribution thereof to holders of Allowed Claims and Allowed AMR Equity Interests is not justified (i) based on the cost of distribution or (ii) because it would contravene Section 5.10(a) hereof, the Disbursing Agent shall contribute such New Common Stock to one or more charitable organizations exempt from U.S. federal income tax under section 501(c)(3) of the Tax Code to be selected by, and unrelated to, the Disbursing Agent (provided that the recipient charitable organization is not, and would not become by reason of the contribution, a "Substantial Stockholder" within the meaning of the New AAG Certificate of Incorporation).

US_ACTIVE:\44195459\15\14013.0139

**5.11** <u>**Setoff and Recoupment.**</u>  The Debtors and the Reorganized Debtors, as applicable, may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature that the Debtors may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable nonbankruptcy law; *provided, however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver, abandonment, or release by the Debtors or the Reorganized Debtors, as applicable, of any such claims, rights, and Causes of Action that the Debtors or the Reorganized Debtors, as applicable, may have against the holder of such Claim.

**5.12** <u>**Transactions on Business Days.**</u>  If the Effective Date or any other date on which a transaction may occur hereunder shall occur on a day that is not a Business Day, the transactions contemplated by the Plan to occur on such day shall instead occur on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**5.13** <u>**Surrender of Existing Publicly-Traded Debt Securities**</u>.  On the Effective Date, or as soon thereafter as reasonably practicable, each Registered Holder of debt securities with respect to the Note Claims or the Unsecured Special Facility Revenue Bond Claims, as applicable, shall surrender its debt securities to the applicable Indenture Trustee or, in the event such debt securities are held in the name, or by a nominee, of The Depository Trust Company or other securities depository (each, a "**Depository**"), the Debtors shall seek the cooperation of the Depository to provide appropriate instructions to the applicable Indenture Trustee. No distributions hereunder shall be made for or on behalf of such Registered Holder unless and until (i) such debt securities are received by the applicable Indenture Trustee or appropriate instructions from the Depository are received by the applicable Indenture Trustee or (ii) the loss, theft, or destruction of such debt securities is established to the reasonable satisfaction of the applicable Indenture Trustee, which satisfaction may require such Registered Holder to submit (a) a lost instrument affidavit and (b) an indemnity bond holding the Debtors, the Reorganized Debtors, and the applicable Indenture Trustee harmless in respect of such debt securities and distributions made with respect thereto.  Upon compliance with this Section 5.13 by a Registered Holder of the debt securities, for all purposes hereunder, such Registered Holder shall be deemed to have surrendered such debt securities.  Any Registered Holder that fails to surrender such debt securities or satisfactorily explain the loss, theft, or destruction of such debt securities to the applicable Indenture Trustee within one (1) year of the Effective Date shall be deemed to have no further Claim against the Debtors, the Reorganized Debtors, or the applicable Indenture Trustee in respect of such Claim and shall not participate in any distribution hereunder.  All property in respect of such forfeited distributions, including interest thereon, shall be promptly returned to the Debtors or the Reorganized Debtors, as applicable, by the applicable Indenture Trustee

61

(notwithstanding any federal or state escheat laws to the contrary), and any such debt securities shall be cancelled.

**5.14**    **Class Proofs of Claim**.  If a class proof of Claim is Allowed, it shall be treated as a single Claim for purposes of Article V hereof.

**5.15**    **Conversion of Convertible Notes**.  Subject to the Revised Final Order Pursuant to 11 U.S.C. §§ 105(a) and 362 Establishing Notification Procedures for Substantial Claimholders and Equity Security Holders and Approving Restrictions on Certain Transfers of Interests in the Debtors' Estates, entered by the Bankruptcy Court on April 11, 2013 (ECF No. 7591), any holder of a Convertible Note Claim may, at any time prior to the fifth (5th) Business Day before the Effective Date, irrevocably elect to have all or any portion of a Convertible Note be treated as an Allowed AMR Equity Interest in AMR Class 5 in an amount that corresponds to the number of shares of AMR Common Stock that would have been issued to such holder if such Convertible Note (or portion thereof) had been converted into shares of AMR Common Stock pursuant to the definitive documentation for such Convertible Note, with such number of shares determined as if such conversion became effective as of the Effective Date.  Such election shall be made on the form included in the Plan Supplement (a "**Conversion Election Notice**") and, to be effective, must be actually received by the attorneys for the Debtors prior to such fifth (5th) Business Day.  Any election not complying with the foregoing shall have no force or effect.  In connection with any election of Convertible Notes (i) with respect to the AMR 6.25% Convertible Senior Notes due 2014, in determining the number of shares of AMR Common Stock that would have been issued upon the conversion of such Convertible Notes, the provisions of Section 8.15 of the Supplemental Indenture, dated as of September 28, 2009, related to such Convertible Notes shall be applied and the conversion ratio applicable to such conversion shall be adjusted pursuant to Section 8.15 of such Supplemental Indenture and, for purposes of computing such adjustment, the Effective Date shall be the "Make Whole Change of Control Effective Date" for purposes of such Supplemental Indenture; and (ii) the amount of Convertible Notes deemed converted shall be equal to the Convertible Note Claim with respect to such Convertible Note.  Upon the effectiveness of any such election, the Convertible Note Claim related to such Convertible Note shall (subject to the following proviso) automatically cease to be an Allowed Claim for any purpose hereunder; *provided, however*, that in the event that the Plan is withdrawn by the Debtors, all Conversion Election Notices shall thereupon automatically be deemed to have been withdrawn and of no force or effect whatsoever, and none of the Convertible Notes with respect to which any such elections were made shall be treated as AMR Equity Interests in AMR Class 5 or as having been converted into shares of AMR Common Stock.

US_ACTIVE:\44195459\15\14013.0139

# ARTICLE VI.

## MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN

**6.1**     **Continued Corporate Existence**.  Subject to the Merger and the terms of the Merger Agreement, each Debtor shall, as a Reorganized Debtor, continue to exist after the Effective Date as a separate corporate Entity, with all the powers of a corporation, partnership, or limited liability company, as applicable, under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under applicable state law.  Immediately following the Merger Effective Time, the New AAG Certificate of Incorporation shall be amended to change the name of AMR to American Airlines Group Inc.

### 6.2     **Merger**

**(a)**     Subject to and in connection with the occurrence of the Effective Date, AMR and US Airways shall take all such actions as may be necessary or appropriate to effect the Merger on the terms and subject to the conditions set forth in the Merger Agreement.  Without limiting the generality of the immediately preceding sentence, upon the satisfaction or waiver of each of the conditions set forth in Section 9.2 hereof and the applicable conditions of the Merger Agreement, on the Effective Date AMR and US Airways shall cause the Certificate of Merger to be filed with the Secretary of State of the State of Delaware in accordance with the Delaware General Corporation Law and take or cause to be taken all other actions, including making appropriate filings or recordings, that may be required by the Delaware General Corporation Law or other applicable law in connection with the Merger.

**(b)**     New AAG shall issue the New Common Stock in accordance with the Merger Agreement to be distributed hereunder, and the other transactions contemplated by the Merger Agreement shall occur.

**(c)**     In the event of any conflict whatsoever between the terms of the Plan and the Merger Agreement, the terms of the Merger Agreement shall control, and the Plan shall be deemed to incorporate in their entirety the terms, provisions, and conditions of the Merger Agreement.

### 6.3     **The 9019 Settlement**

**(a)**     The distributions provided for hereunder with respect to Double-Dip General Unsecured Claims, Single-Dip General Unsecured Claims, the DFW 1.5x Unsecured Special Facility Revenue Bond Claim, and AMR Equity Interests incorporate and reflect a compromise and settlement (the "**9019 Settlement**") of (i) certain intercreditor issues relating to the rights and benefits of holders of Double-Dip General Unsecured Claims, Single-Dip General Unsecured Claims, Triple-Dip General Unsecured Claims, and the DFW 1.5x Special Facility Revenue Bond Claim, (ii) the validity,

63

enforceability, and priority of certain prepetition intercompany claims by and among AMR, American, and Eagle Holding, (iii) Claims that creditors have with respect to the marshaling of assets and liabilities of AMR, American, or Eagle Holding in determining relative entitlements to distributions under a plan, and (iv) the rights of holders of AMR Equity Interests to a distribution under a plan.

(b)    The Plan shall constitute a motion to approve the 9019 Settlement. Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of the 9019 Settlement pursuant to Bankruptcy Rule 9019 and a finding by the Bankruptcy Court that the 9019 Settlement is in the best interest of the Debtors and their estates.  If the Effective Date does not occur, the 9019 Settlement shall be deemed to have been withdrawn without prejudice to the respective positions of the parties.

6.4    **Distributions to Non-Union Employees.**  The Non-Union Employees shall receive shares of New Common Stock constituting 2.3% of the Creditor New Common Stock Allocation and which shall be distributed by New AAG as follows:  On the Initial Distribution Date, or as soon thereafter as reasonably practicable, New AAG shall distribute the Non-Union Employees' pro rata share of the Initial Labor Common Stock Allocation to participating Non-Union Employees in per employee amounts as determined by the Debtors prior to the Effective Date.  On each Mandatory Conversion Date, or as soon thereafter as reasonably practicable, New AAG shall distribute the Non-Union Employees' pro rata share of the applicable Incremental Labor Common Stock Allocation to participating Non-Union Employees  in per employee amounts as determined by the Debtors prior to the Effective Date.  In connection with each Interim True-Up Distribution, New AAG shall distribute to participating Non-Union Employees the Non-Union Employees' pro rata share of the distribution made on account of the American Labor Allocation pursuant to Section 7.4(a) hereof in per employee amounts as determined by the Debtors prior to the Effective Date.  In connection with the Final True-Up Distribution, New AAG shall distribute to participating Non-Union Employees the Non-Union Employees' pro rata share of the distribution made on account of the American Labor Allocation pursuant to Section 7.4(b) hereof in per employee amounts as determined by the Debtors prior to the Effective Date.  The right of the Non-Union Employees to receive any distribution on a Mandatory Conversion Date, an Interim Distribution Date, or a Final Distribution Date shall not be Transferable.  Any Non-Union Employee who is eligible to receive an Alignment Award or an award under the Chairman Letter Agreement shall not receive any distribution of New Common Stock pursuant to this Section 6.4.

6.5    **Substantive Consolidation**

(a)    ***Order Granting Plan Consolidation***.  The Plan serves as a motion seeking, and entry of the Confirmation Order shall constitute, the approval, pursuant to

64

section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the AMR Plan Consolidation, the American Plan Consolidation, and the Eagle Plan Consolidation.

(b)    *AMR Plan Consolidation*.  Solely for voting, confirmation, and distribution purposes hereunder, and subject to the following sentence, (i) all assets and all liabilities of the AMR Debtors shall be treated as though they were merged, (ii) all guaranties of any AMR Debtor of the payment, performance, or collection of obligations of another AMR Debtor shall be eliminated and cancelled, (iii) any obligation of any AMR Debtor and all guaranties thereof executed by one or more of the other AMR Debtors shall be treated as a single obligation, and such guaranties shall be deemed a single Claim against the consolidated AMR Debtors, (iv) all joint obligations of two or more AMR Debtors and all multiple Claims against such Entities on account of such joint obligations shall be treated and allowed as a single Claim against the consolidated AMR Debtors, (v) all Claims between the AMR Debtors shall be deemed cancelled, and (vi) each Claim filed in the Chapter 11 Case of any AMR Debtor shall be deemed filed against the consolidated AMR Debtors and a single obligation of the consolidated AMR Debtors.  The substantive consolidation and deemed merger effected pursuant to this Section 6.5(b) shall not affect (other than for purposes related to funding distributions hereunder and as set forth in this Section 6.5(b)) (i) the legal and organizational structure of the AMR Debtors, except as provided in the Merger Agreement, (ii) defenses to any Causes of Action or requirements for any third party to establish mutuality to assert a right of setoff, and (iii) distributions out of any insurance policies or proceeds of such policies.  Notwithstanding the foregoing, prepetition intercompany Claims between and among the AMR Debtors, the American Debtors, and the Eagle Debtors shall be dealt with in accordance with Section 6.15 hereof.

(c)    *American Plan Consolidation*.  Solely for voting, confirmation, and distribution purposes hereunder, and subject to the following sentence, (i) all assets and all liabilities of the American Debtors shall be treated as though they were merged, (ii) all guaranties of any American Debtor of the payment, performance, or collection of obligations of another American Debtor shall be eliminated and cancelled, (iii) any obligation of any American Debtor and all guaranties thereof executed by one or more of the other American Debtors shall be treated as a single obligation, and such guaranties shall be deemed a single Claim against the consolidated American Debtors, (iv) all joint obligations of two or more American Debtors and all multiple Claims against such Entities on account of such joint obligations shall be treated and allowed as a single Claim against the consolidated American Debtors, (v) all Claims between the American Debtors shall be deemed cancelled, and (vi) each Claim filed in the Chapter 11 Case of any American Debtor shall be deemed filed against the consolidated American Debtors and a single obligation of the consolidated American Debtors.  The substantive consolidation and deemed merger effected pursuant to this Section 6.5(c) shall not affect (other than for purposes related to funding distributions hereunder and as set forth in this Section 6.5(c)) (i) the legal and organizational structure of the American Debtors, except as provided in the Merger Agreement, (ii) defenses to any Causes of Action or requirements for any third party to establish mutuality to assert a right of setoff, and (iii)

65

distributions out of any insurance policies or proceeds of such policies. Notwithstanding the foregoing, prepetition intercompany Claims between and among the AMR Debtors, the American Debtors, and the Eagle Debtors shall be dealt with in accordance with Section 6.15 hereof.

(d) ***Eagle Plan Consolidation***. Solely for voting, confirmation, and distribution purposes hereunder, and subject to the following sentence, (i) all assets and all liabilities of the Eagle Debtors shall be treated as though they were merged, (ii) all guaranties of any Eagle Debtor of the payment, performance, or collection of obligations of another Eagle Debtor shall be eliminated and cancelled, (iii) any obligation of any Eagle Debtor and all guaranties thereof executed by one or more of the other Eagle Debtors shall be treated as a single obligation, and such guaranties shall be deemed a single Claim against the consolidated Eagle Debtors, (iv) all joint obligations of two or more Eagle Debtors and all multiple Claims against such Entities on account of such joint obligations shall be treated and allowed as a single Claim against the consolidated Eagle Debtors, (v) all Claims between the Eagle Debtors shall be deemed cancelled, and (vi) each Claim filed in the Chapter 11 Case of any Eagle Debtor shall be deemed filed against the consolidated Eagle Debtors and a single obligation of the consolidated Eagle Debtors. The substantive consolidation and deemed merger effected pursuant to this Section 6.5(d) shall not affect (other than for purposes related to funding distributions hereunder and as set forth in this Section 6.5(d)) (i) the legal and organizational structure of the Eagle Debtors, except as provided in the Merger Agreement, (ii) defenses to any Causes of Action or requirements for any third party to establish mutuality to assert a right of setoff, and (iii) distributions out of any insurance policies or proceeds of such policies. Notwithstanding the foregoing, prepetition intercompany Claims between and among the AMR Debtors, the American Debtors, and the Eagle Debtors shall be dealt with in accordance with Section 6.15 hereof.

## 6.6    Confirmation in the Event of Partial or No Plan Consolidation

(a) In the event that the Bankruptcy Court orders partial, or does not order, AMR Plan Consolidation, American Plan Consolidation, or Eagle Plan Consolidation, the Debtors reserve the right to (i) proceed with no or partial Plan Consolidation, (ii) propose one or more Sub-Plans with respect to one or more Debtors, (iii) proceed with confirmation of one or more Sub-Plans to the exclusion of the other Sub-Plans, (iv) withdraw some or all of the Sub-Plans, or (v) withdraw the Plan. Subject to the immediately preceding sentence, the Debtors' inability to confirm any Plan Consolidation or Sub-Plan, or the Debtors' election to withdraw any Plan Consolidation or Sub-Plan, shall not impair confirmation or consummation of any other Plan Consolidation or Sub-Plan.

(b) In the event that the Bankruptcy Court does not order the AMR Plan Consolidation, the American Plan Consolidation, or the Eagle Plan Consolidation, (i) Claims against the applicable Debtors shall be treated as separate Claims with respect to the estates of such Debtors for all purposes, and such Claims shall be administered as

66

provided in the applicable Sub-Plan and (ii) the Debtors shall not be required to resolicit votes with respect to the Plan or any applicable Sub-Plan.

**6.7    Claims Against Multiple Consolidated Debtors**.  If one or more AMR Debtors and one or more American Debtors are obligated for a particular Claim (other than a Double-Dip General Unsecured Claim or a Double-Dip General Unsecured Claim as to which a Single-Dip Treatment Election has been made in accordance with the procedures set forth in Section 4.3(b) or 4.10(b) hereof), the holder of such Claim shall be deemed to have one Claim against the AMR Debtors and one Claim against the American Debtors for purposes of confirmation and distribution.  If one or more AMR Debtors and one or more Eagle Debtors are obligated for a particular Claim, the holder of such Claim shall be deemed to have one Claim against the AMR Debtors and one Claim against the Eagle Debtors for purposes of confirmation and distribution.  If one or more American Debtors and one or more Eagle Debtors are obligated for a particular Claim, the holder of such Claim shall be deemed to have one Claim against the American Debtors and one Claim against the Eagle Debtors for purposes of confirmation and distribution.  If one or more AMR Debtors, American Debtors, and Eagle Debtors are obligated for a particular Claim (other than a Double-Dip General Unsecured Claim), the holder of such Claim shall be deemed to have one Claim against the AMR Debtors, one Claim against the American Debtors, and one Claim against the Eagle Debtors for purposes of confirmation and distribution.  Notwithstanding the foregoing, if a holder of a Claim against (i) one or more AMR Debtors and one or more American Debtors, (ii) one or more AMR Debtors and one or more Eagle Debtors, (iii) one or more American Debtors and one or more Eagle Debtors, or (iv) one or more AMR Debtors, one or more American Debtors, and one or more Eagle Debtors by receiving more than one distribution, as set forth in this Section 6.7, would receive distributions hereunder with a value in excess of one hundred percent (100%) of such Claim, including any postpetition interest or other amounts due to such holder pursuant to any provision hereof, then the Debtors shall be authorized, without the need for any notice or further order of the Bankruptcy Court, to reduce the distributions hereunder that would otherwise be made on account of such Claim pro rata based on the relative amounts of such distributions, such that the holder of such Claim shall not receive value in excess of one hundred percent (100%) of such Claim.

**6.8    Issuance of Plan Shares**.  New AAG shall issue the Plan Shares, or have sufficient authorized shares available for issuance, as applicable, in accordance herewith and with the Merger Agreement.

**6.9    Nonconsensual Confirmation**.  In the event any Impaired Class of Claims entitled to vote on the Plan does not accept the Plan by the requisite statutory majority under section 1126(c) of the Bankruptcy Code, then the Debtors reserve the right to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code.

US_ACTIVE:\44195459\15\14013.0139

**6.10**    **Issuance of Plan Shares; Execution of Related Documents**.  On the Effective Date, or as soon thereafter as reasonably practicable, except as otherwise provided herein or in the Merger Agreement, the Reorganized Debtors shall issue all securities, instruments, certificates, and other documents that they are required to issue hereunder or under any Postpetition Aircraft Agreement, which shall be distributed as provided herein and therein; *provided, however*, that New AAG shall be authorized to issue the New Mandatorily Convertible Preferred Stock and the New Common Stock in accordance with Sections 6.8 and 6.19 hereof, the Merger Agreement, and any such Postpetition Aircraft Agreement, as the case may be, without the need for any further corporate action by any Debtor or Reorganized Debtor or their stockholders.  New AAG and the Reorganized Debtors, as applicable, shall execute and deliver such other agreements, documents, and instruments in accordance with the Plan, the Merger Agreement, and any such Postpetition Aircraft Agreement, as applicable.

**6.11**    **Sections 1145 Exemption.**  The offer, issuance, and distribution of all of the shares of New Mandatorily Convertible Preferred Stock and the New Common Stock hereunder to holders of Allowed Claims against and Allowed AMR Equity Interests in the Debtors, as applicable, and the issuance of all shares of New Common Stock issued pursuant to the conversion of the New Mandatorily Convertible Preferred Stock, and any securities issued or to be issued pursuant to or in connection with a Postpetition Aircraft Agreement, shall be exempt, pursuant to section 1145 of the Bankruptcy Code, from registration under (i) the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer, issuance, or distribution of securities.

**6.12**    **Listing**.  In accordance with the Merger Agreement, the shares of New Common Stock shall be authorized for listing on the New York Stock Exchange or the NASDAQ Stock Market, upon official notice of issuance, on or prior to the Closing Date.

**6.13**    **Cancellation of AMR Common Stock**.  At the Merger Effective Time, all outstanding shares of AMR Common Stock or preferred stock of AMR, all options to purchase shares of AMR Common Stock or preferred stock of AMR, and all awards of any kind consisting of shares of AMR Common Stock or preferred stock of AMR, that have been or may be granted, held, awarded, outstanding, payable, or reserved for issuance, and all other AMR Equity Interests, including all securities or obligations convertible or exchangeable into or exercisable for shares of AMR Common Stock, preferred stock of AMR, or other AMR Equity Interests, and each other right of any kind, contingent or accrued, to acquire or receive shares of AMR Common Stock, preferred stock of AMR, or other AMR Equity Interests, whether upon exercise, conversion, or otherwise, whether vested or unvested, shall, without any action on the part of the holder thereof, be cancelled and retired and shall cease to exist.  This Section 6.13 does not apply with respect to any New Common Stock, New Mandatorily Convertible

68

Preferred Stock, or any other equity securities or rights to acquire or receive equity securities or any other awards of any kind relating to New AAG that are issued in accordance with or pursuant to the Plan or the Merger Agreement.

   **6.14** <u>**Cancellation of Existing Notes and Aircraft Securities.**</u> Except as otherwise provided herein, on the Effective Date, all notes, instruments, certificates, and other documents evidencing the Notes, the Special Facility Revenue Bonds (excluding the Covered Special Facility Revenue Bonds) and the Aircraft Securities shall be cancelled, and the obligations of the Debtors thereunder and in any way related thereto shall be deemed fully satisfied, released, and discharged; *provided, however*, that (i) with respect to Special Facility Revenue Bonds (excluding the Covered Special Facility Revenue Bonds), the obligations of the Debtors thereunder and in any way related thereto shall be fully terminated, satisfied, released, and discharged in exchange for the treatment provided herein for Allowed Claims and any other treatment provided for by Final Order, if any, arising thereunder, (ii) the cancellations set forth in this Section 6.14 and the termination, satisfaction, release, and discharge of the Debtors' obligations with respect to the Special Facility Revenue Bonds (excluding the Covered Special Facility Revenue Bonds) shall not alter the obligations or rights of any non-Debtor third parties applicable after the Effective Date vis-à-vis one another with respect to such notes, instruments, certificates, or other documents, (iii) the cancellations set forth in this Section 6.14 and the termination, satisfaction, release, and discharge of the Debtors' obligations with respect to the Special Facility Revenue Bonds (excluding the Covered Special Facility Revenue Bonds) shall not be deemed to cause a default, termination, waiver, or other forfeiture of the Debtors in any document, instrument, lease, or other agreement (including, but not limited to, that certain Amended and Restated Airport Use Agreement – Terminal Facilities Lease, dated as of January 1, 1985, by and between the City of Chicago and American, as amended from time to time (the "**Chicago Lease**")) pursuant to which the Debtors lease or use land, facilities, improvements, or equipment financed in whole or in part, with the proceeds of any Special Facility Revenue Bonds that have been deemed to be satisfied or cancelled hereunder or otherwise, and (iv) any provision in any document, instrument, lease, or other agreement (including, but not limited to, the Chicago Lease) that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors or their interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in this Section 6.14 shall be deemed null and void and shall be of no force and effect, and the Debtors shall be entitled to continue to use (in accordance with the remaining provisions of such document, instrument, lease, or other agreement) any land, facilities, improvements, or equipment financed with the proceeds of Special Facility Revenue Bonds (including, but not limited to, the premises leased pursuant to the Chicago Lease), notwithstanding such cancellations, terminations, satisfactions, releases, or discharges provided in this Section 6.14.  Except as otherwise provided herein, on the Effective Date, any indentures or similar agreements relating to any of the foregoing, including, without limitation, the

US_ACTIVE:\44195459\15\14013.0139

Indentures, the Special Facility Revenue Bond Indentures, and any related notes, guaranties, or similar instruments of the Debtors or otherwise (excluding the Special Facility Revenue Bond Indentures, and any related notes, guaranties, or similar instruments of the Debtors or otherwise, associated with the Covered Special Facility Revenue Bonds) shall be deemed cancelled, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and discharged (a) with respect to all rights of and obligations owed by any Debtor under any such indentures or similar agreements and (b) except as provided below in this Section, with respect to the rights and obligations of the Indenture Trustees under any such indentures or similar agreements against (or to) the holders of Note Claims, the holders of the Special Facility Revenue Bond Claims, or any other person. Solely for the purpose of clause (b) in the immediately preceding sentence, only the following rights of each such Indenture Trustee shall remain in effect after the Effective Date: (1) rights as trustee, co-trustee, agent, paying agent, distribution agent, authentication agent, guarantee trustee, remarketing agent, bond registrar, and registrar, including, but not limited to, any rights to payment of fees, expenses, and indemnification obligations, including, but not limited to, from property distributed hereunder to such Indenture Trustee (but excluding any other property of the Debtors, the Reorganized Debtors, or their respective estates), whether pursuant to the exercise of a charging lien or otherwise, (2) rights relating to distributions to be made to holders of Allowed Note Claims or Allowed Special Facility Revenue Bond Claims by such Indenture Trustee from any source, including, but not limited to, distributions hereunder (but excluding any other property of the Debtors, the Reorganized Debtors, or their respective estates), (3) rights relating to representation of the interests of the holders of Note Claims or Special Facility Revenue Bond Claims by such Indenture Trustee in the Chapter 11 Cases to the extent not discharged or released hereunder or any order of the Bankruptcy Court, and (4) rights relating to participation by such Indenture Trustee in any proceedings or appeals related to the Plan. Notwithstanding the continued effectiveness of such rights after the Effective Date, such Indenture Trustee shall have no obligation to object to Claims against the Debtors or to locate certificated holders of Notes, Special Facility Revenue Bonds, or Aircraft Securities who fail to surrender their respective Notes, Special Facility Revenue Bonds, or Aircraft Securities in accordance with Section 5.13 hereof. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any executory contract or lease (including, but not limited to, executory contracts or leases pursuant to which a Debtor leases any land, facilities, improvements, and/or equipment financed, in whole or in part, with proceeds of Special Facility Revenue Bonds) to the extent such executory contract or lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

**6.15    Intercompany Claims**. The allocation of value based upon prepetition intercompany Claims between and among the AMR Debtors, the American Debtors, and the Eagle Debtors is reflected in the compromise embodied

70

herein and distributions to be made hereunder.  No separate distributions shall be made hereunder on account of such prepetition intercompany Claims, including the AMR Intercompany Claim and the Eagle Holding Intercompany Claim, and such Claims may be extinguished or compromised (by distribution, contribution, or otherwise) in the discretion of the Debtors on or after the Effective Date.

**6.16**    **Exit Facility**.  The Debtors are authorized to enter into new financing arrangements subject to Bankruptcy Court approval.

**6.17**    **Equity Interests in Subsidiaries Held by the Debtors.**  Subject to the terms and conditions set forth in the Merger Agreement, on the Effective Date, each respective Equity Interest in a direct or indirect subsidiary of AMR that is not a Debtor shall be unaffected by the Plan, and the Reorganized Debtor holding such Equity Interest shall continue to hold such Equity Interest.

**6.18**    **Board of Directors**

**(a)**    The initial Board of Directors of New AAG shall consist of twelve (12) members whose names shall be disclosed at or prior to the Confirmation Hearing. The Board of Directors of New AAG shall be composed of (i) five (5) directors designated by the Search Committee, (A) each of whom shall be an independent director and (B) one of whom shall serve as the initial Lead Independent Director of New AAG in accordance with the New AAG Bylaws, and whom shall be designated to serve in such role by the Search Committee, (ii) two (2) directors designated by AMR, each of whom shall be independent directors reasonably acceptable to the Search Committee, (iii) three (3) directors designated by US Airways, each of whom shall be independent directors, (iv) one (1) director who shall be Mr. Thomas W. Horton, the current Chairman of the Board and Chief Executive Officer of AMR, who shall serve as the initial Chairman of the Board of Directors of New AAG in accordance with the New AAG Bylaws, and (v) one (1) director who shall be Mr. W. Douglas Parker, the current Chairman of the Board and Chief Executive Officer of US Airways.  The identities of the members of the initial Boards of Directors of the other Reorganized Debtors shall be disclosed at or prior to the Confirmation Hearing.

**(b)**    After selection of the initial Board of Directors of New AAG, the holders of the New Mandatorily Convertible Preferred Stock and the New Common Stock shall elect members of the Board of Directors of New AAG in accordance with the New AAG Certificate of Incorporation, the New AAG Bylaws, and applicable nonbankruptcy law.

**6.19**    **Corporate Action**

**(a)**    *New AAG*.  The New AAG Certificate of Incorporation and the New AAG Bylaws shall be consistent with the terms and provisions of the Merger Agreement.  New AAG shall file the New AAG Certificate of Incorporation with the Secretary of State of the State of Delaware on the Effective Date immediately prior to the

71

Merger Effective Time.  The New AAG Certificate of Incorporation shall prohibit the issuance of nonvoting equity securities, subject to further amendment of such New AAG Certificate of Incorporation as permitted by applicable law.  The New AAG Bylaws shall be deemed adopted by the New AAG Board as of the Effective Date.

(b)    ***The Reorganized Debtors***.  The Reorganized Debtors (other than New AAG) shall file the Amended Certificates of Incorporation with the Secretary of State of the State of the applicable state of formation on the Effective Date.  The Amended Certificates of Incorporation for each of the Reorganized Debtors (other than New AAG) that are corporations shall prohibit the issuance of nonvoting equity securities, subject to further amendment of such Amended Certificates of Incorporation as permitted by applicable law.  With respect to any Debtor that is a limited liability company or partnership, the respective limited liability company agreement or partnership agreement by which such Debtor is governed shall be similarly amended to prohibit the issuance of nonvoting equity securities.

(c)    On the Effective Date, the adoption, filing, approval, and ratification, as necessary, of all corporate or related actions contemplated herein with respect to each of the Reorganized Debtors shall be deemed authorized and approved by each of the Reorganized Debtors, its board of directors, managers, stockholders, members, or partners, as applicable, in all respects, in each case to the extent required by applicable nonbankruptcy law.  Without limiting the foregoing, such actions include (i) the adoption and filing of the New AAG Certificate of Incorporation and the Amended Certificates of Incorporation for each of the other Reorganized Debtors, (ii) the approval of the New AAG Bylaws and the Amended Bylaws for each of the other Reorganized Debtors, (iii) the election or appointment, as the case may be, of directors and officers for the Reorganized Debtors, (iv) the issuance of the Plan Shares, (v) the Merger to be effectuated pursuant to the Plan, (vi) the adoption and implementation of the employee matters set forth in Section 4.10 of the Merger Agreement and Section 4.1(o) of the American Disclosure Letter, including, but not limited to, the New AAG 2013 Incentive Award Plan, the Alignment Awards, and the LTIP 2013 Awards, (vii) the qualification of any of the Reorganized Debtors as foreign corporations, partnerships, or limited liability companies wherever the conduct of business by such Entities requires such qualification, and (viii) the execution, delivery, and performance of each Postpetition Aircraft Agreement and any agreement or instrument provided for in a Postpetition Aircraft Agreement and the issuance of any security to be issued by a Reorganized Debtor pursuant to or in connection with a Postpetition Aircraft Agreement.

(d)    All matters provided for herein involving the corporate structure of any Debtor or Reorganized Debtor, or any corporate or related action required by any Debtor or Reorganized Debtor in connection herewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders or directors of such Debtor or Reorganized Debtor or by any other stakeholder, and with like effect as though such action had been taken unanimously by the security holders and directors, managers, members, or partners, as applicable, of the applicable Debtor or Reorganized Debtor.

72

     **6.20**    <u>New AAG 2013 Incentive Award Plan</u>.  The New AAG 2013 Incentive Award Plan, the Alignment Awards, and the LTIP 2013 Awards shall become effective immediately upon the occurrence of the Merger Effective Time without any further corporate or other action.

     **6.21**    <u>Anti-Dilution Adjustments</u>.  In the event that any transaction or event of the type contemplated by Sections 6.1, 6.2, or 6.3 of the Certificate of Designations occurs with respect to the New Common Stock, in addition to the actions required under the Certificate of Designations, the Board of Directors of New AAG shall take appropriate action as may be necessary or appropriate, as determined in its reasonable good faith judgment, to protect the rights of holders of New Common Stock consistent herewith.

     **6.22**    <u>Effectuating Documents and Further Transactions.</u>  Each of the officers of each of the Debtors is (and each of the officers of each of the Reorganized Debtors shall be) authorized and directed to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

     **6.23**    <u>Creditors' Committee Member Fees</u>.  Subject to the occurrence of the Effective Date, the reasonable fees and out-of-pocket expenses (including professionals fees in an amount to be agreed upon by the Debtors and the Creditors' Committee) of the individual members of the Creditors' Committee, in each case, incurred in their capacities as members of the Creditors' Committee, shall, to the extent incurred and unpaid by the Debtors prior to the Effective Date, be Allowed as Administrative Expenses and paid by the Reorganized Debtors without further Bankruptcy Court approval upon the submission of invoices to the Reorganized Debtors.  The foregoing shall not include any such fees and out-of-pocket expenses paid pursuant to Section 2.4 hereof.

     **6.24**    <u>Chairman Letter Agreement</u>.  The Chairman Letter Agreement is to be approved by the Bankruptcy Court in connection with confirmation of the Plan and is to be effective on the Effective Date.

<div align="center"><b>ARTICLE VII.</b></div>

<div align="center"><u><b>P</b>ROCEDURES FOR <b>D</b>ISPUTED <b>C</b>LAIMS</u></div>

     **7.1**    <u>Objections to Claims.</u>  The Reorganized Debtors shall be entitled to object to Claims.  Any objections to Claims shall be served and filed on or before the later of (i) one hundred eighty (180) days after the Effective Date and (ii) such date as may be fixed by the Bankruptcy Court (as the same may be extended by the Bankruptcy Court), whether fixed before or after the date specified in clause (i) above.  The Post-Effective Date Creditors' Committee shall have standing to appear and be heard with respect to objections to Claims.

<div align="center">73</div>

**7.2**      **Resolution of Disputed Administrative Expenses and Disputed Claims**.  On and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Administrative Expenses or Claims and to compromise, settle, or otherwise resolve any disputed Administrative Expenses and Disputed Claims without approval of the Bankruptcy Court, other than with respect to Administrative Expenses relating to compensation of professionals.  Notwithstanding the foregoing, the Debtors shall not have the authority to compromise, settle, or otherwise resolve any Claims asserted by any insider of any Debtor or Reorganized Debtor or where the settled amount of such Claim exceeds $1 million.

**7.3**      **Payments and Distributions with Respect to Disputed Claims**

     **(a)**      Notwithstanding anything herein to the contrary, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim; *provided however*, that no payment or distribution provided hereunder shall be made to a Disputed Claim that becomes an Allowed Claim until after the occurrence of the Final Mandatory Conversion Date.

     **(b)**      There shall be withheld from the New Mandatorily Convertible Preferred Stock and the New Common Stock to be distributed to holders of Allowed Single-Dip General Unsecured Claims (i) the number of such shares that would be distributable with respect to any Disputed Single-Dip General Unsecured Claims had such Disputed Claims been Allowed on the Effective Date and (ii) such additional shares necessary to assure that, if all such Disputed Claims become Allowed Claims in full, sufficient shares are available to satisfy the American Labor Allocation (the "**Disputed Claims Reserve**"), together with all earnings thereon (net of any expenses relating thereto, including any taxes imposed thereon or otherwise payable by the Disputed Claims Reserve).  The Disbursing Agent shall hold in the Disputed Claims Reserve all dividends, payments, and other distributions made on account of, as well as any obligations arising from, property held in the Disputed Claims Reserve, to the extent that such property continues to be so held at the time such distributions are made or such obligations arise, and such dividends, payments, or other distributions shall be held for the benefit of holders of Disputed Claims against any of the Debtors whose Claims are subsequently Allowed and for the benefit of other parties entitled thereto hereunder.  The Debtors intend to seek a determination by the Bankruptcy Court of the estimated amount (either on an individual or aggregate basis) of Disputed Single-Dip General Unsecured Claims for purposes of determining the amount of the Disputed Claims Reserve attributable to such Disputed Claims.

     **(c)**      Any Plan Shares held in the Disputed Claims Reserve pursuant to this Section 7.3 shall be deemed voted by the Disbursing Agent proportionally in the same manner as the rest of the Plan Shares are voted.  The applicable portion of any New Mandatorily Convertible Preferred Stock held in the Disputed Claims Reserve shall be

74

mandatorily converted into shares of New Common Stock as required herein on each Mandatory Conversion Date.

       **(d)**     Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Disbursing Agent of a private letter ruling if the Disbursing Agent so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Disbursing Agent), the Disbursing Agent shall (i) treat the Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including the Disbursing Agent, the Reorganized Debtors, and the holders of Claims and Equity Interests) shall report for United States federal, state, and local income tax purposes consistently with the foregoing.

       **(e)**     The Disbursing Agent shall be responsible for payment, out of the assets of the Disputed Claims Reserve, of any taxes imposed on the Disputed Claims Reserve or its assets.  In the event, and to the extent, any Cash in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of the reserve (including any income that may arise upon the distribution of the assets in the Disputed Claims Reserve), assets of the Disputed Claims Reserve may be sold to pay such taxes.

       **(f)**     The Disbursing Agent may request an expedited determination of taxes of the Disputed Claims Reserve under section 505(b) of the Bankruptcy Code for all tax returns for all taxable periods through the termination of the Disputed Claims Reserve.

       **7.4**     **True-Ups**

       **(a)**     **Interim True-Ups**.  On each Interim Distribution Date, or as soon thereafter as reasonably practicable, all shares of New Common Stock in the Disputed Claims Reserve, that have been reserved with respect to all or any portion of a Disputed Single-Dip General Unsecured Claim that has been disallowed by a Final Order, to the extent such disallowance has not been reflected in such a distribution with respect to any prior Interim Distribution Date, shall be distributed on account of the American Labor Allocation, the Market-Based Old Equity Allocation, and to holders of Allowed Single-Dip General Unsecured Claims, as applicable, based upon how such shares of New Common Stock would have been distributed on the Initial Distribution Date and each Mandatory Conversion Date (including, as applicable, the shares issued upon conversion of the shares of New Mandatorily Convertible Preferred Stock reserved with respect to such disallowed Disputed Single-Dip General Unsecured Claim) if on the Effective Date the aggregate estimated amount of all Disputed Single-Dip General Unsecured Claims were reduced by the amount of such disallowed Disputed Single-Dip General Unsecured Claim.

(b)    **Final True-Up**.  On the Final Distribution Date, or as soon thereafter as reasonably practicable, all shares of New Common Stock remaining in the Disputed Claims Reserve (after making all distributions pursuant to Section 7.5(a) hereof on account of Disputed Single-Dip General Unsecured Claims that have become Allowed Single-Dip General Unsecured Claims prior to such date), shall be distributed on account of the American Labor Allocation, the Market-Based Old Equity Allocation, and to holders of Allowed Single-Dip General Unsecured Claims, as applicable, based upon how such shares of New Common Stock would have been distributed on the Initial Distribution Date and each Mandatory Conversion Date if on the Effective Date the aggregate amount of all Allowed Single-Dip General Unsecured Claims were in the amount of such Claims on the Final Distribution Date and there were no Disputed Single-Dip General Unsecured Claims on the Effective Date.

### 7.5    Distributions After Allowance

(a)    To the extent that a Disputed Single-Dip General Unsecured Claim becomes an Allowed Claim after the Effective Date, the Disbursing Agent shall, subsequent to the Final Mandatory Conversion Date, distribute to the holder thereof the distribution, if any, of the shares of New Common Stock to which such holder is entitled hereunder out of the Disputed Claims Reserve in accordance with Section 7.4 hereof. Subject to Section 7.4 hereof, all distributions made under this Section 7.5 on account of Allowed Claims shall be made together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property, then held in the Disputed Claims Reserve as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to holders of Allowed Claims in the applicable Class, but shall be made net of any expenses relating thereto, including any taxes imposed thereon or otherwise payable by the Disputed Claims Reserve.

(b)    To the extent that a Convenience Class Claim becomes an Allowed Claim after the Effective Date, the Disbursing Agent shall distribute to the holder thereof the distribution, if any, to which such holder is entitled hereunder in accordance with Sections 5.2 and 7.4 hereof.

### 7.6    Estimation

(a)    The Debtors and the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any of the Debtors or the Reorganized Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount estimated shall constitute either the Allowed amount of such Claim or a maximum limitation of the amount of such Claim, as

76

determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation of the amount of such Claim, the Debtors or the Reorganized Debtors, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim; *provided, however*, that the foregoing is not intended to limit the rights granted by section 502(j) of the Bankruptcy Code. The objection, estimation, and resolution procedures set forth in this Section 7.6 are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**(b)** For purposes of facilitating distributions hereunder, the Debtors may, prior to the Effective Date, seek an order of the Bankruptcy Court estimating the aggregate amount of Disputed Single-Dip General Unsecured Claims, which shall serve as a maximum limitation on the Allowed amount of all such Claims.

**7.7** **Interest and Dividends.** To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Effective Date. In the event that dividend distributions have been made with respect to the New Common Stock distributable to a holder of a Disputed Claim that later becomes Allowed, such holder shall be entitled to receive such previously distributed dividends without any interest thereon (net of allocable expenses of the Disputed Claims Reserve, including taxes).

## ARTICLE VIII.

### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**8.1** **Executory Contracts and Unexpired Leases.** All executory contracts and unexpired leases to which any of the Debtors are parties automatically shall be deemed rejected as of the Effective Date, except for executory contracts or unexpired leases (i) that have been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (ii) that are the subject of a separate motion to assume or reject pending on the Confirmation Date, (iii) that are assumed, rejected, or otherwise treated pursuant to Sections 8.3, 8.4, or 8.5 hereof, (iv) that are listed on Schedule 8.1 of the Plan Supplement (which will consist of various sub-Schedules, or (v) as to which a Treatment Objection has been filed and served by the Treatment Objection Deadline. If an executory contract or unexpired lease (a) has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date or (b) is the subject of a separate motion to assume or reject pending on the Confirmation Date, then the listing of any such executory contract or unexpired lease on Schedule 8.1 of the Plan Supplement shall be of no effect.

US_ACTIVE:\44195459\15\14013.0139

### 8.2    Schedules of Executory Contracts and Unexpired Leases

(a)    Schedule 8.1 of the Plan Supplement shall represent the Debtors' then-current good faith belief regarding the intended treatment of the executory contracts and unexpired leases listed thereon; *provided, however*, that executory contracts and unexpired leases related to Aircraft Equipment shall be listed on a separate sub-Schedule of Schedule 8.1 of the Plan Supplement.  Subject to the limitations set forth in Section 8.2(d) hereof, the Debtors reserve the right, on or prior to 4:00 p.m. (Eastern Time) on the Business Day immediately prior to the commencement of the Confirmation Hearing to amend (i) Schedule 8.1 of the Plan Supplement to add, delete, or reclassify any executory contract  or unexpired lease or amend a proposed assignment and (ii) the Proposed Cure with respect to any executory contract or unexpired lease listed on the applicable Schedule as an executory contract or unexpired lease to be assumed; *provided, however,* that if the Confirmation Hearing is adjourned for a period of more than two (2) consecutive calendar days, the Debtors' right to amend Schedule 8.1 of the Plan Supplement and the Proposed Cure shall be extended to 4:00 p.m. (Eastern Time) on the Business Day immediately prior to the adjourned date of the Confirmation Hearing, with such extension applying in the case of any and all subsequent adjournments of the Confirmation Hearing; and *further provided*, however, that with respect to Intercompany Contracts and agreements that the Debtors propose to reject as of the deadline set forth above, the Debtors reserve the right to make amendments at any time prior to entry of the Confirmation Order.

(b)    Pursuant to sections 365 and 1123 of the Bankruptcy Code, and except with respect to executory contracts and unexpired leases as to which a Treatment Objection is filed and served by the Treatment Objection Deadline, (i) each executory contract and unexpired lease listed on Schedule 8.1 of the Plan Supplement as an executory contract or unexpired lease to be assumed (and assigned, if applicable) shall be deemed assumed (and assigned, if applicable) effective as of the Assumption Effective Date specified thereon, the Proposed Cure specified in the Notice of Intent to Assume mailed to each Assumption Counterparty shall be the Cure Amount and shall be deemed to satisfy fully any obligations the Debtors might have with respect to such executory contract or unexpired lease under section 365(b) of the Bankruptcy Code, and all proofs of Claim on account of or in respect of any such assumed executory contract and unexpired lease shall be deemed withdrawn on the Effective Date without any further notice to or action by any party or order of the Bankruptcy Court; (ii) each executory contract and unexpired lease listed on Schedule 8.1 of the Plan Supplement as an executory contract or unexpired lease to be rejected shall be deemed rejected effective as of the Rejection Effective Date specified thereon; and (iii) the Reorganized Debtors may assume, assume and assign, or reject any executory contract or unexpired lease relating to Aircraft Equipment that is listed on Schedule 8.1 of the Plan Supplement by filing with the Bankruptcy Court and serving upon the applicable Deferred Party a Notice of Intent to Assume or a Notice of Intent to Reject at any time before the Deferred Agreement Deadline; *provided, however*, that if the Reorganized Debtors do not file a Notice of Intent to Assume or a Notice of Intent to Reject by the Deferred Agreement Deadline

78

with respect to any executory contract or unexpired lease listed on Schedule 8.1 of the Plan Supplement, such executory contract or unexpired lease shall be deemed rejected effective as of the one hundred eighty-first (181st) calendar day after the Effective Date.

        **(c)**      The Debtors shall file an initial version of Schedule 8.1 of the Plan Supplement and any amendments thereto with the Bankruptcy Court and shall serve all notices thereof only on the applicable Assumption Counterparties, Rejection Counterparties, and Deferred Counterparties.  With respect to any executory contract or unexpired lease first listed on Schedule 8.1 of the Plan Supplement as an executory contract or unexpired lease to be rejected later than the date that is ten (10) calendar days prior to the Voting Deadline, (A) the Debtors shall use their best efforts to promptly notify the respective Rejection Counterparty of such proposed treatment via facsimile, electronic transmission, or telephone at any notice address or telephone number set forth in the respective executory contract or unexpired lease or as otherwise timely provided in writing to the Debtors by such Rejection Counterparty or its counsel; and (B) the applicable Rejection Counterparty shall have five (5) calendar days from the date of an amendment to Schedule 8.1 of the Plan Supplement to object to confirmation of the Plan. With respect to any executory contract or unexpired lease first listed on Schedule 8.1 of the Plan Supplement later than the date that is five (5) calendar days prior to the Confirmation Hearing, the respective Rejection Counterparty shall have until the Confirmation Hearing to object to confirmation of the Plan.

        **(d)**      The listing of any contract or lease on Schedule 8.1 of the Plan Supplement is not an admission that such contract or lease is an executory contract or unexpired lease.  The Debtors and the Assumption Counterparties, the Rejection Counterparties, or the Deferred Counterparties, as applicable (together with the Debtors, the "**Recharacterization Parties**") reserve the right to assert that any contract or lease listed on Schedule 8.1 of the Plan Supplement is not an executory contract or unexpired lease; *provided, however,* that except with respect to any contract or lease for which a Recharacterization Party (i) expressly reserves such right in a notice filed with the Bankruptcy Court and served on any parties listed thereon no later than ten (10) calendar days prior to the Voting Deadline and (ii) files an action based on such right prior to the date that is sixty (60) calendar days after the Effective Date (unless required hereunder to file such action at an earlier date), each Recharacterization Party shall be deemed to have waived, as of the Effective Date, any rights it may have to seek to recharacterize any contract or lease as a financing agreement.

        **8.3**      **Categories of Executory Contracts and Unexpired Leases to Be Assumed**.  Pursuant to sections 365 and 1123 of the Bankruptcy Code, each executory contract and unexpired lease in the following categories shall be deemed assumed as of the Effective Date (and the Proposed Cure with respect to each shall be zero dollars ($0)), except for any executory contract or unexpired lease (i) that has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (ii) that is the subject of a separate motion to assume or reject pending on the Confirmation Date, (iii) that is listed on Schedule 8.1 of the Plan Supplement, (iv) that is otherwise expressly assumed or rejected hereunder, or

79

(v) as to which a Treatment Objection has been filed and served by the Treatment Objection Deadline.

(a)    *Cash Management Agreements, Confidentiality and Non-Disclosure Agreements, Customer Programs, Debtor Ownership Agreements, Foreign Agreements, Fuel Consortia Agreements, Insurance Plans, Intercompany Contracts, Interline Agreements, Letters of Credit, Revenue Generating Agreements, Surety Bonds, and Workers' Compensation Plans*.  Subject to the terms of the first paragraph of this Section 8.3, each Cash Management Agreement, Confidentiality and Non-Disclosure Agreement, Customer Program, Debtor Ownership Agreement, Foreign Agreement, Fuel Consortia Agreement, Insurance Plan, Intercompany Contract, Interline Agreement, Letter of Credit, Revenue Generating Agreement, Surety Bond, and Workers' Compensation Plan shall be deemed assumed as of the Effective Date.  Nothing in this Section 8.3 shall constitute or be deemed a waiver of any Cause of Action that the Debtors may hold against any Entity, including, without limitation, the insurer under any of the Debtors' Insurance Plans.  Except as otherwise provided in the immediately preceding sentence, all proofs of Claim on account of or in respect of any Cash Management Agreement, Confidentiality and Non-Disclosure Agreement, Customer Program, Debtor Ownership Agreement, Foreign Agreement, Fuel Consortia Agreement, Insurance Plan, Intercompany Contract, Interline Agreement, Letter of Credit, Revenue Generating Agreement, Surety Bond, or Workers' Compensation Plan automatically shall be deemed withdrawn on the Effective Date without any further notice to or action by any party or order of the Bankruptcy Court.

(b)    *Certain Indemnification Obligations*

(i)    Each Indemnification Obligation shall be deemed assumed by New AAG as of the Merger Effective Time in accordance with the Merger Agreement.  Each Indemnification Obligation that is deemed assumed hereunder shall continue in full force and effect in accordance with its terms.  From and after the Merger Effective Time, New AAG shall honor and perform the Indemnification Obligations under all indemnification Contracts (as defined in the Merger Agreement) and organizational documents of the Debtors.  New AAG shall not, directly or indirectly, amend, modify, limit, or terminate, in any manner adverse to the Debtors' current or former directors or officers with respect to the Indemnification Obligations for acts or omissions occurring prior to the Merger Effective Time, any indemnification Contracts with the Debtors or any provisions regarding the Indemnification Obligations contained in any organizational documents of the Debtors.  Each Indemnification Obligation that is deemed assumed hereunder shall be deemed and treated as an executory contract pursuant to sections 365 and 1123 of the Bankruptcy Code regardless of whether or not a proof of Claim has been filed with respect to such Indemnification Obligation.

80

(ii)      With respect to current or former employees of any of the Debtors not covered by Section 8.3(b)(i) hereof and who were employed by any of the Debtors in such capacity prior to, on, or after the Commencement Date, each obligation of any Debtor to indemnify such employees with respect to or based upon any act or omission taken or omitted in any such capacity, or for or on behalf of any Debtor, whether pursuant to agreement, the Debtors' respective articles or certificates of incorporation, corporate charters, bylaws, operating agreements or similar corporate documents, or applicable law in effect as of the Effective Date, shall be deemed assumed as of the Effective Date.  Each such indemnification obligation that is deemed assumed hereunder shall continue in full force and effect in accordance with its terms.  From and after the Merger Effective Time, New AAG shall honor and perform such indemnification obligations under all indemnification contracts and organizational documents of the Debtors.  New AAG shall not, directly or indirectly, amend, modify, limit, or terminate, in any manner adverse to such employees with respect to such indemnification obligations for acts or omissions occurring prior to the Merger Effective Time, any indemnification contracts with the Debtors or any provisions regarding the indemnification obligations contained in any organizational documents of the Debtors.  Each such indemnification obligation that is deemed assumed hereunder shall be deemed and treated as an executory contract pursuant to sections 365 and 1123 of the Bankruptcy Code regardless of whether or not a proof of Claim has been filed with respect to such indemnification obligation.

(c)      *Collective Bargaining Agreements*.  Each of the Collective Bargaining Agreements with the respective Unions shall remain in full force and effect on and after the Effective Date, subject to the respective terms thereof.  The consideration provided for in each of the Section 1113 Agreements shall be in complete settlement and satisfaction of all Claims as provided therein, and each Union shall promptly take all action necessary to withdraw all proofs of Claim with respect to the Claims resolved pursuant to the respective Section 1113 Agreements.  Notwithstanding the foregoing, New AAG and the Reorganized Debtors reserve the right to seek adjudication of any Collective Bargaining Agreement-related disputes between the Debtors and any Union that concerns distributions, claims, restructuring transactions, or other aspects of the Plan in the Bankruptcy Court.

(d)      *Covered Special Facility Revenue Bonds*.  Unless otherwise provided herein, in a Special Facility Revenue Bond Agreement, or in an order of the Bankruptcy Court, the Special Facility Revenue Bond Agreements, the respective Special Facility Revenue Bond Indentures, and the respective Special Facility Revenue Bond Documents, in each case relating to Covered Special Facility Revenue Bonds, shall remain in full force and effect in accordance with their original terms and conditions (or as amended by an order of the Bankruptcy Court) and shall not otherwise be altered,

81

amended, modified, surrendered, or cancelled hereunder, and holders of such Covered Special Facility Revenue Bonds shall continue to receive payments in accordance with the terms and conditions of the Special Facility Revenue Bond Documents relating to the respective Covered Special Facility Revenue Bonds (as such Special Facility Revenue Bond Documents may have been amended by an order of the Bankruptcy Court). As a result of the assumption of executory contracts and/or leases relating to the Covered Special Facility Revenue Bonds and the prior payment of the related cure amounts by the Debtors, all proofs of Claim on account of or in respect of any Covered Special Facility Revenue Bonds shall be deemed disallowed and expunged without any further notice to or action by any party or order of the Bankruptcy Court. To the extent any of the foregoing conflicts with the terms of a separate order of the Bankruptcy Court relating to a Covered Special Facility Revenue Bond, the order of the Bankruptcy Court shall govern.

### 8.4    Other Categories of Agreements and Policies

(a)    *Employee Benefits*. As of the Effective Date, unless specifically rejected, each American Compensation and Benefit Plan (as defined in the Merger Agreement) (including all matters set forth in Section 4.10 of the Merger Agreement and Section 4.1(o) of the American Disclosure Letter, but excluding any prepetition equity or equity-equivalent plan or agreement of the Debtors) shall be deemed assumed and shall be fully effective, and New AAG and the Reorganized Debtors shall maintain and perform under such plans and agreements. To the extent that the American Compensation and Benefit Plans are executory contracts, pursuant to sections 365 and 1123 of the Bankruptcy Code, they shall be deemed assumed.

(b)    *Employee Protection Arrangements*. As of the Effective Date, the Employee Protection Arrangements (as defined in and set forth in Section 4.1(o) of the American Disclosure Letter) shall be fully effective.

(c)    *Postpetition Aircraft Agreements*. Subject to the Debtors' right to terminate or reject any Postpetition Aircraft Agreement prior to the Effective Date pursuant to the terms of such Postpetition Aircraft Agreement, (i) each Postpetition Aircraft Agreement shall remain in place after the Effective Date, (ii) the Reorganized Debtors shall continue to honor each Postpetition Aircraft Agreement according to its terms, and (iii) to the extent any Postpetition Aircraft Agreement requires the assumption by the Debtors of such Postpetition Aircraft Agreement and the Postpetition Aircraft Obligations arising thereunder, such Postpetition Aircraft Agreement and Postpetition Aircraft Obligations shall be deemed assumed as of the Effective Date; *provided, however*, that this clause (iii) shall not be deemed or otherwise interpreted as an assumption by the Debtors of any agreement or obligation that is not a Postpetition Aircraft Agreement or Postpetition Aircraft Obligation; and *provided further, however*, that nothing herein shall limit the Debtors' right to terminate such Postpetition Aircraft Agreement or Postpetition Aircraft Obligations in accordance with the terms thereof. To the extent that, subsequent to the date of the Plan and on or prior to the Effective Date, the Debtors, with the approval of the Bankruptcy Court, enter into new Postpetition

82

Aircraft Agreements for Aircraft Equipment not currently subject to a Postpetition Aircraft Agreement, any Claims or obligations arising thereunder shall be treated as Postpetition Aircraft Obligations hereunder and such Postpetition Aircraft Agreements shall be deemed assumed as of the Effective Date.

### 8.5    Pension Plans

(a)    *Pension Plan Required Contributions*.  On the Effective Date, the Reorganized Debtors shall assume and continue the Pension Plans and shall pay in Cash any aggregate unpaid (i) minimum required funding contributions under 29 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083 and (ii) all delinquent PBGC premiums under 29 U.S.C. §§ 1306 and 1307, in each case with interest, for the Pension Plans under ERISA or the Internal Revenue Code, which are estimated by the Pension Plans' enrolled actuary to be approximately $390 million.  Upon such payment, the lien notices perfecting all liens and security interests held by, or in favor of, the PBGC on any assets of the Debtors or their affiliates shall be, and shall be deemed to be, withdrawn.

(b)    *Pension Plan Continuation*.  After the Effective Date, the Reorganized Debtors shall (i) satisfy the minimum funding requirements under 29 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083, (ii) pay all required PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307, and (iii) administer the Pension Plans in accordance with the applicable provisions of ERISA and the Internal Revenue Code.

(c)    *Liabilities Preserved*.  No provision of the Plan, the Confirmation Order, or section 1141 of the Bankruptcy Code shall be construed to discharge, release, or relieve the Debtors, or their successors, including the Reorganized Debtors, or any other party, in any capacity, from liabilities or requirements imposed under any law or regulatory provision with respect to the Pension Plans or the PBGC.  The PBGC and the Pension Plans shall not be enjoined or precluded from enforcing such liability as a result of any provision of the Plan, the Confirmation Order, or section 1141 of the Bankruptcy Code.

### 8.6    Assumption and Rejection Procedures and Resolution of Treatment Objections

(a)    *Proposed Assumptions*.  With respect to any executory contract or unexpired lease to be assumed hereunder or pursuant to a Notice of Intent to Assume or a Notice of Intent to Reject, unless an Assumption Counterparty files and properly serves a Treatment Objection by the Treatment Objection Deadline, such executory contract or unexpired lease shall be deemed assumed and, if applicable, assigned as of the Assumption Effective Date proposed by the Debtors or the Reorganized Debtors, as applicable, without any further notice to or action by any party or order of the Bankruptcy Court, and any obligation the Debtors or the Reorganized Debtors, as applicable, may have to such Assumption Counterparty with respect to such executory contract or unexpired lease under section 365(b) of the Bankruptcy Code shall be deemed to be fully satisfied by the Proposed Cure, if any, which shall be the Cure Amount.  Any Treatment

83

Objection that is not timely filed and properly served shall be denied automatically and with prejudice (without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, and without any further notice to or action by any party or order of the Bankruptcy Court). Any Claim relating to such assumption or assignment shall be forever barred from assertion and shall not be enforceable against any Debtor or Reorganized Debtor or their respective estates or property, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, and without any further notice to or action by any party or order of the Bankruptcy Court, and any obligation the Debtors or the Reorganized Debtors may have under section 365(b) of the Bankruptcy Code (over and above any Proposed Cure) shall be deemed fully satisfied, released, and discharged, notwithstanding any amount or information included in the Schedules or any proof of Claim.

(b) *Proposed Rejections*. With respect to any executory contract or unexpired lease to be rejected hereunder or pursuant to a Notice of Intent to Assume or a Notice of Intent to Reject, unless a Rejection Counterparty files and serves a Treatment Objection by the Treatment Objection Deadline, such executory contract or unexpired lease shall be deemed rejected as of the Rejection Effective Date proposed by the Debtors or the Reorganized Debtors, as applicable, without any further notice to or action by any party or order of the Bankruptcy Court. Any objection to the rejection of an executory contract or unexpired lease that is not timely filed and served shall be deemed denied automatically and with prejudice (without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, and without any further notice to or action by any party or order of the Bankruptcy Court).

(c) *Resolution of Treatment Objections*

(i) On and after the Effective Date, the Reorganized Debtors may, in their sole discretion, settle Treatment Objections without any further notice to or action by any party or order of the Bankruptcy Court (including by paying any agreed Cure Amount).

(ii) With respect to each executory contract or unexpired lease as to which a Treatment Objection is timely filed and served and is not otherwise resolved by the parties after a reasonable period of time, the Debtors or the Reorganized Debtors, as applicable, shall schedule a hearing with the Bankruptcy Court with respect to such Treatment Objection and provide at least fourteen (14) calendar days' notice of such hearing to the Assumption Counterparty, the Rejection Counterparty, or the Deferred Counterparty, as applicable; *provided, however*, that if such Treatment Objection is not resolved by the parties after a reasonable period of time, the respective Assumption Counterparty, Rejection Counterparty, or Deferred Counterparty may, with prior notice to the Debtors, request that the Bankruptcy Court schedule such a hearing. Unless otherwise ordered by the Bankruptcy Court or agreed to by the parties, any assumption or rejection approved

84

by the Bankruptcy Court notwithstanding a Treatment Objection shall be effective as of the Assumption Effective Date or Rejection Effective Date, as applicable, that was originally proposed by the Debtors or specified herein.

(iii)    Any Cure Amount shall be paid as soon as reasonably practicable following entry of a Final Order resolving an assumption dispute and/or approving an assumption (and assignment, if applicable), unless the Debtors or the Reorganized Debtors, as applicable, seek to reject such executory contract or unexpired lease and file a Notice of Intent to Reject under Section 8.2(b) hereof (which, with respect to a Special Facility Revenue Bond Agreement, must be served upon the Indenture Trustee of the applicable Special Facility Revenue Bond Indenture).

(iv)    No Cure Amount shall be allowed for a penalty rate or default rate of interest to the extent not proper under the Bankruptcy Code or applicable law.

(d)    *Reservation of Rights*.  If a Treatment Objection is filed with respect to any executory contract or unexpired lease sought to be assumed or rejected by any of the Debtors or the Reorganized Debtors, the Debtors and the Reorganized Debtors reserve the right (i) to seek to assume or reject such executory contract or unexpired lease at any time before the assumption, rejection, assignment, or Cure Amount with respect to such executory contract or unexpired lease is determined by a Final Order and (ii) to the extent a Final Order is entered resolving a Treatment Objection as to a Cure Amount in an amount different from the Proposed Cure, to seek to reject such executory contract or unexpired lease within fourteen (14) calendar days after the date of entry of such Final Order by filing with the Bankruptcy Court and serving upon the Assumption Counterparty or Rejection Counterparty, as applicable, a Notice of Intent to Assume or a Notice of Intent to Reject (which, with respect to a Special Facility Revenue Bond Agreement, must be served upon the Indenture Trustee of the applicable Special Facility Revenue Bond Indenture).

8.7    **Rejection Claims**.  Any Rejection Claim must be filed with the Bankruptcy Court by the Rejection Bar Date.  Any Rejection Claim for which a proof of Claim is not properly filed and served by the Rejection Bar Date shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors, or their respective estates or property.  The Debtors or the Reorganized Debtors, as applicable, may contest Rejection Claims in accordance with Section 7.1 hereof.

8.8    **Assignment**.  To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned hereunder shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision

85

in such executory contract or unexpired lease (including those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment.  To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable antiassignment provision and is void and of no force or effect.

**8.9    Approval of Assumption, Rejection, Retention, or Assignment of Executory Contracts and Unexpired Leases**.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of the rejections, retentions, assumptions, and/or assignments contemplated hereunder pursuant to sections 365 and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease that is assumed hereunder shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms as of the applicable Assumption Effective Date, except as modified by the provisions hereof, any order of the Bankruptcy Court authorizing or providing for its assumption, or applicable federal law.  The provisions of each executory contract or unexpired lease assumed and/or assigned hereunder that are or may be in default shall be deemed satisfied in full by the Cure Amount or by an agreed-upon waiver of the Cure Amount.  Upon payment in full of the Cure Amount, any and all proofs of Claim based upon an executory contract or unexpired lease that has been assumed in the Chapter 11 Cases or hereunder shall be deemed disallowed and expunged without any further notice to or action by any party or order of the Bankruptcy Court.

**8.10    Modifications, Amendments, Supplements, Restatements, or Other Agreements**.  Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed, whether or not such executory contract or unexpired lease relates to the use, acquisition, or occupancy of real property, shall include (i) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease and (ii) all executory contracts or unexpired leases appurtenant to the premises, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, and any other interests in real estate or rights in remedy related to such premises, unless any of the foregoing agreements is rejected hereunder or pursuant to an order of the Bankruptcy Court.

US_ACTIVE:\44195459\15\14013.0139

# ARTICLE IX.

## EFFECTIVENESS OF THE PLAN

**9.1**    **Conditions Precedent to Confirmation of Plan.**  The following are conditions precedent to confirmation of the Plan:

(a)    The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Debtors and US Airways and reasonably satisfactory to the Creditors' Committee and the Majority of the Requisite Consenting Creditors.

(b)    The Plan Supplement shall have been filed by the Debtors, and the documents contained therein shall be in form and substance reasonably satisfactory to the Creditors' Committee.

**9.2**    **Conditions Precedent to Effective Date.**  The following are conditions precedent to the Effective Date of the Plan:

(a)    The Confirmation Order shall be in full force and effect, and no stay thereof shall be in effect;

(b)    All actions, documents, and agreements necessary to implement the Plan shall have been effected or executed;

(c)    The Debtors shall have received any authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are necessary to implement the Plan and are required by law, regulation, or order;

(d)    Each of the New AAG Certificate of Incorporation, the New AAG Bylaws, the Certificate of Designations, the Amended Certificates of Incorporation, the Amended Bylaws, and the New AAG 2013 Incentive Award Plan shall be in full force and effect;

(e)    All conditions precedent to consummation of the Merger, pursuant to the Merger Agreement, shall have been satisfied or waived in accordance with the Merger Agreement, and the Merger Closing shall occur contemporaneously with the Effective Date;

(f)    All of the matters set forth in Section 4.10 of the Merger Agreement and Section 4.1(o) of the American Disclosure Letter, including without limitation, the Chairman Letter Agreement, shall have been approved by the Bankruptcy Court and shall be in effect;

(g)    All of the Debtors' defined benefit plans shall have been frozen and the lump sum and installment forms of optional benefit payments for the Debtors' pilots shall have been eliminated;

87

(h)     The Bankruptcy Court shall have entered an order finding that the aggregate amount of estimated Allowed Single-Dip General Unsecured Claims plus the amount of Disputed Single-Dip General Unsecured Claims utilized for determining the Disputed Claims Reserve to be established pursuant to Section 7.3 hereof shall not exceed $3.2 billion;

(i)     The Effective Date shall be no earlier than the sixth (6th) Business Day after entry of the Confirmation Order;

(j)     The Debtors shall have filed with the Bankruptcy Court a notice setting forth the proposed Effective Date at least six (6) Business Days in advance of such proposed Effective Date; and

(k)     The global certificate representing the New Mandatorily Convertible Preferred Stock shall have been delivered to The Depository Trust Company pursuant to Section 5.3 hereof.

**9.3     Satisfaction and Waiver of Conditions.**  Except as otherwise provided herein or in the Merger Agreement, any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  If the Debtors determine that any of the conditions precedent set forth in Section 9.2 hereof cannot be satisfied and the occurrence of such conditions is not waived or cannot be waived, then the Debtors shall file a notice of the failure of the Effective Date with the Bankruptcy Court. Notwithstanding the foregoing, the Debtors reserve the right, with the consent of the Creditors' Committee and the Majority of the Requisite Consenting Creditors, to waive the occurrence of the conditions precedent set forth in Section 9.2 hereof or to modify any of such conditions precedent.  Any such written waiver of such condition precedents may be effected at any time, without notice or leave or order of the Bankruptcy Court, and without any other formal action other than proceeding to consummate the Plan.

## ARTICLE X.

### EFFECT OF CONFIRMATION

**10.1     Vesting of Assets.**  Upon the Effective Date, pursuant to section 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors shall vest in the Reorganized Debtors free and clear of all Claims, liens, encumbrances, charges, and other interests, except as otherwise provided herein.  The Reorganized Debtors may operate their businesses and use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as otherwise provided herein.

US_ACTIVE:\44195459\15\14013.0139

**10.2    Discharge of Claims and Termination of Equity Interests**. Except as otherwise provided herein or in the Confirmation Order, the rights afforded herein  and the payments and distributions to be made hereunder shall discharge all existing debts and Claims and terminate all Equity Interests of any kind, nature, or description whatsoever against or in the Debtors or any of their assets or property to the fullest extent permitted by section 1141 of the Bankruptcy Code.   Except as otherwise provided herein, upon the Effective Date, all existing Claims against the Debtors and Equity Interests in the Debtors shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Equity Interests (and all representatives, trustees, or agents on behalf of each holder) shall be precluded and enjoined from asserting against the Reorganized Debtors, or any of their assets or property, any other or further Claim or Equity Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Equity Interest and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

**10.3    Release and Discharge of Debtors**.  Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided herein, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Equity Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Equity Interests, rights, and liabilities that arose prior to the Effective Date.  Upon the Effective Date, all such Persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Equity Interest in the Debtors.

**10.4    Term of Injunctions or Stays**.  Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.  For the avoidance of doubt, the Revised Final Order Pursuant to 11 U.S.C. §§ 105(a) and 362 Establishing Notification Procedures for Substantial Claimholders and Equity Security Holders and Approving Restrictions on Certain Transfers of Interests in the Debtors' Estates, entered by the Bankruptcy Court on April 11, 2013 (ECF No. 7591), shall remain in full force and effect beyond the Effective Date.

**10.5    Injunction Against Interference with Plan**.  Upon entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

US_ACTIVE:\44195459\15\14013.0139

**10.6    Injunction**.  Except as otherwise expressly provided herein, all Persons or Entities who have held, hold, or may hold Claims or Equity Interests and all other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Equity Interest against the Debtors or the Reorganized Debtors or property of any of the Debtors or the Reorganized Debtors other than actions to enforce the Plan or with respect to the allowance of Claims and Equity Interests, (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtors or the Reorganized Debtors or property of any of the Debtors or the Reorganized Debtors, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or the Reorganized Debtors or against property or interests in property of the Debtors or the Reorganized Debtors, or (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtors or the Reorganized Debtors or against property or interests in property of the Debtors or the Reorganized Debtors, with respect to any such Claim or Equity Interest.  Such injunction shall extend to any successors of the Debtors and the Reorganized Debtors and their respective property and interests in property.

**10.7    Exculpation.**  Notwithstanding anything herein to the contrary, and to the maximum extent permitted by applicable law, neither the Debtors, US Airways, the Creditors' Committee, the Retiree Committee, the Indenture Trustees, the Unions, the Search Committee, the Ad Hoc Committee, Nuveen Asset Management (and each of its managed funds and accounts on behalf of which it executed the Support and Settlement Agreement, and Oppenheimer Funds, Inc. (and each of its managed funds and accounts that executed the Support and Settlement Agreement), nor any of their respective members (current and former), including counsel and other professionals employed by such members in connection with the Chapter 11 Cases, officers, directors, employees, counsel, advisors, professionals, or agents (collectively, the "**Exculpated Parties**"), shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of the Chapter 11 Cases; negotiations regarding or concerning the Plan, the Merger Agreement, the Merger, and any settlement or agreement in the Chapter 11 Cases; the pursuit of confirmation of the Plan and consummation of the Merger; the consummation of the Plan and of the Merger; the offer, issuance, and distribution of any securities issued or to be issued pursuant to the Plan (including pursuant to or in connection with any Postpetition Aircraft Agreement), whether or not such distribution occurs following the Effective Date; or the administration of the Plan or property to be distributed hereunder, except for actions found by Final Order to be willful misconduct, gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty (to the extent applicable), and *ultra vires* acts, and, in all respects, the Exculpated Parties shall be entitled to rely upon the

90

advice of counsel with respect to their duties and responsibilities hereunder. Following entry of the Confirmation Order, the Bankruptcy Court shall retain exclusive jurisdiction to consider any and all claims against any of the Exculpated Parties involving or relating to the administration of the Chapter 11 Cases, any rulings, orders, or decisions in the Chapter 11 Cases or any aspects of the Debtors' Chapter 11 Cases, including the decision to commence the Chapter 11 Cases, the development and implementation of the Plan and the Merger Agreement, the decisions and actions taken during the Chapter 11 Cases, and any asserted claims based upon or related to prepetition obligations or equity interests administered in the Chapter 11 Cases, for the purpose of determining whether such claims belong to the Debtors' estates or third parties.  In the event it is determined that any such claims belong to third parties, then, subject to any applicable subject matter jurisdiction limitations, the Bankruptcy Court shall have exclusive jurisdiction with respect to any such litigation, subject to any determination by the Bankruptcy Court to abstain and consider whether such litigation should more appropriately proceed in another forum.

      **10.8**    **Release.**  As of the Effective Date and subject to the occurrence of the Merger Effective Time, the Debtors release (i) all present and former directors and officers of the Debtors and any other Persons who serve or served as members of management of the Debtors, (ii) all post-Commencement Date advisors, consultants, agents, counsel, or other professionals of or to the Debtors, US Airways, the Creditors' Committee, the Retiree Committee, the Indenture Trustees, the Unions, the Search Committee, and the Ad Hoc Committee, and (iii) US Airways, the Indenture Trustees, the Unions, all current and former members (in their capacity as members of such committees) of the Creditors' Committee, the Retiree Committee, the Ad Hoc Committee, the Search Committee, Nuveen Asset Management (and each of its managed funds and accounts on behalf of which it executed the Support and Settlement Agreement) (in its capacity in negotiating the Support and Settlement Agreement and the Plan), and Oppenheimer Funds, Inc. (and each of its managed funds and accounts that executed the Support and Settlement Agreement) (in its capacity in negotiating the Support and Settlement Agreement and the Plan), and their respective officers, directors, agents, and employees (including attorneys and other professionals retained by individual members of such committees) (collectively, the "**Released Parties**"), from any and all Causes of Action held by, assertable on behalf of, or derivative from the Debtors, in any way relating to the Debtors, the Chapter 11 Cases, the Plan, negotiations regarding or concerning the Plan, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, and the ownership, management, and operation of the Debtors, except for actions found by Final Order to be willful misconduct (including, but not limited to, conduct that results in a personal profit at the expense of the Debtors' estates), gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty (to the extent applicable), and *ultra vires* acts, which Causes of Action are based on any act, event, or omission taking place

91

before the Effective Date; *provided, however,* that the foregoing (a) shall not operate as a waiver of or release from any Causes of Action arising out of any express contractual obligation owing by any former director, officer, or employee of the Debtors or any reimbursement obligation of any former director, officer, or employee with respect to a loan or advance made by the Debtors to such former director, officer, or employee, and (b) shall not limit the liability of any counsel to their respective clients contrary to Rule 1.8(h)(1) of the New York Rules of Professional Conduct.  The Reorganized Debtors and any newly-formed Entities that will be continuing the Debtors' business after the Effective Date shall be bound by all the releases set forth above to the same extent that the Debtors are bound.

**10.9    Avoidance Actions**.  Other than any releases granted herein, by the Confirmation Order, or by Final Order of the Bankruptcy Court, as applicable, from and after the Effective Date, the Reorganized Debtors shall have the right to prosecute any avoidance, equitable subordination, or recovery actions under sections 105, 502(d), 510,  542 through 551, and 553 of the Bankruptcy Code that belong to the Debtors.

## 10.10    Retention of Causes of Action/Reservation of Rights

(a)    Except as otherwise provided in Section 10.8 hereof, nothing herein or in the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or Causes of Action that the Debtors or the Reorganized Debtors may have or which the Reorganized Debtors may choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any Person or Entity, to the extent such Person or Entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, the Reorganized Debtors, or their officers, directors, or representatives and (ii) the turnover of any property of the Debtors' estates.

(b)    Nothing herein or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Commencement Date, against or with respect to any Claim left unimpaired by the Plan. The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, and other legal or equitable defenses that they had immediately prior to the Commencement Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights with respect to any Claim left unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

US_ACTIVE:\44195459\15\14013.0139

# ARTICLE XI.

## RETENTION OF JURISDICTION

**11.1    Jurisdiction of Bankruptcy Court.**  On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of, or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)    To hear and determine motions for the assumption, assumption and assignment, or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

(b)    To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced before or after the Confirmation Date, including, without limitation, any proceeding with respect to a Cause of Action or Avoidance Action;

(c)    To ensure that distributions to holders of Allowed Claims and Allowed Equity Interests are accomplished as provided herein;

(d)    To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(e)    To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)    To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)    To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code and to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)    To hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

(i)    To hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of the Plan, the

US_ACTIVE:\44195459\15\14013.0139

Confirmation Order, any transactions or payments contemplated herein, or any agreement, instrument, or other document governing or relating to any of the foregoing;

    (j)    To hear and determine disputes arising in connection with or related to the Disputed Claims Reserve;

    (k)    To hear and determine all matters as provided in Section 7.6 of the Merger Agreement;

    (l)    To take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation;

    (m)    To recover all assets of the Debtors and property of the Debtors' estates, wherever located;

    (n)    To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

    (o)    To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

    (p)    To enforce all orders previously entered by the Bankruptcy Court;

    (q)    To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

    (r)    To determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order, the Plan Supplement, or any contract, instrument, release, or other agreement or document related to the Plan, the Disclosure Statement, or the Plan Supplement, including the Merger Agreement;

    (s)    To hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

    (t)    To hear and determine any rights, claims, or causes of action held by or accruing to the Debtors or the Reorganized Debtors pursuant to the Bankruptcy Code or any federal or state statute or legal theory;

US_ACTIVE:\44195459\15\14013.0139

(u)    To enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases;

(v)    To hear any other matter not inconsistent with the Bankruptcy Code;

(w)    To hear and determine any disputes arising in connection with the interpretation, implementation, or enforcement of any Postpetition Aircraft Agreement; and

(x)    To enter a final decree closing the Chapter 11 Cases.

To the extent that the Bankruptcy Court is not permitted under applicable law to preside over any of the forgoing matters, the reference to the "Bankruptcy Court" in this Article XI shall be deemed to be replaced by the "District Court."  Nothing in this Article XI shall expand the exclusive jurisdiction of the Bankruptcy Court beyond that provided by applicable law.

## ARTICLE XII.

### Miscellaneous Provisions

**12.1    Dissolution of Committees.**  On the Effective Date, the Retiree Committee shall dissolve; *provided, however*, that, following the Effective Date, the Retiree Committee shall continue to have standing and a right to be heard with respect to (i) applications for compensation by professionals and requests for allowance of Administrative Expenses for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code and (ii) any adversary proceedings and any appeals (including appeals of the Confirmation Order that remain pending as of the Effective Date) to which the Retiree Committee is a party.  On the date that is one hundred eighty (180) days following the Effective Date, the Creditors Committee shall dissolve (unless such date is extended with the written consent of the Reorganized Debtors or by the Bankruptcy Court for good cause shown); *provided, however*, that, following the Effective Date, the Creditors' Committee's standing and right to be heard shall be limited to (a) applications for compensation by professionals and requests for allowance of Administrative Expenses for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code, (b) participating in court hearings with respect to motions, adversary proceedings, or other actions (I) seeking enforcement or implementation of the provisions hereof or of the Confirmation Order, (II) relating to objections to Claims as set forth in Section 7.1 hereof, and (III) as otherwise consented to by the Reorganized Debtors or so ordered by the Bankruptcy Court for good cause shown; and (c) any litigation or contested matter to which the Creditors' Committee is a party as of the Effective Date.  Notwithstanding the foregoing, following the Effective Date, the Creditors' Committee's membership shall be reduced to three (3) members as selected by the

95

Creditors' Committee  prior to the Effective Date and its duties shall be limited to (u) participating in court hearings as provided in this Section 12.1; (v) consulting with the Reorganized Debtors with respect to the General Unsecured Claims reconciliation and settlement process conducted by or on behalf of the Reorganized Debtors; (w) consulting with the Reorganized Debtors with respect to appropriate procedures for the settlement of Claims; (x) consulting with the Reorganized Debtors with respect to the maintenance of the Disputed Claims Reserve; (y) monitoring the distributions to the holders of Allowed Claims by the Disbursing Agent hereunder; and (z) the matters set forth in Section 7.1 hereof.  For so long as the General Unsecured Claims reconciliation process shall continue and the Creditors' Committee has not been dissolved, the Reorganized Debtors shall make regular reports to the Creditors' Committee as and when the Reorganized Debtors and the Creditors' Committee may reasonably agree upon.  Following the Effective Date, the Creditors' Committee may retain professionals to assist it in carrying out its duties as limited above on terms that are reasonably acceptable to the Reorganized Debtors or authorized to be retained by further order of the Bankruptcy Court; *provided further*, that the Creditors' Committee's professional advisors and experts that have been retained by an order of the Bankruptcy Court prior to the Effective Date shall be deemed reasonably acceptable to the Reorganized Debtors.  The Reorganized Debtors shall continue to compensate the Creditors' Committee's professional advisors for reasonable services provided in connection with any of the foregoing post-Effective Date activities.  On the Effective Date, the current and former members of the Creditors' Committee and the Retiree Committee, and their respective officers, employees, counsel, advisors, and agents, shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's and the Retiree Committee's respective attorneys, accountants, and other agents shall terminate, except to the extent provided above in this Section 12.1.

**12.2    Substantial Consummation.**  On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**12.3    Effectuating Documents and Further Transactions.**  Each of the officers of New AAG and the other Reorganized Debtors is authorized, in accordance with his or her authority under the resolutions of the applicable Board of Directors, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be reasonably necessary or appropriate, to effectuate and further evidence the terms and provisions of the Plan and any securities issued hereunder.

**12.4    Exemption from Transfer Taxes**

US_ACTIVE:\44195459\15\14013.0139

(a)     Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, Transfer, or exchange of notes or equity securities hereunder or in connection with the transactions contemplated hereby, the creation, filing, or recording of any mortgage, deed of trust, or other security interest, the making, assignment, filing, or recording of any lease or sublease, the transfer of title to or ownership of any of the Debtors' interests in any Aircraft Equipment, or the making or delivery of any deed, bill of sale, or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, the New Mandatorily Convertible Preferred Stock, the New Common Stock, any Postpetition Aircraft Agreement, any distribution from the Disputed Claims Reserve, or any agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated herein or in any Postpetition Aircraft Agreement, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, Cape Town filing or recording fee, FAA filing or recording fee, or other similar tax or governmental assessment in the United States.

(b)     To the maximum extent provided by section 1146(a) of the Bankruptcy Code and applicable nonbankruptcy law, the transactions pursuant to the Merger Agreement shall not be taxed under any law imposing a stamp tax or similar tax.

**12.5    Expedited Tax Determination**.  New AAG or the Reorganized Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Debtors or the Reorganized Debtors for all taxable periods through the Effective Date.

**12.6    Sell-Down Procedures**.  In accordance with the Revised Final Order Pursuant to 11 U.S.C.§§ 105(a) and 362 Establishing Notification Procedures for Substantial Claimholders and Equity Security Holders and Approving Restrictions on Certain Transfers of Interests in the Debtors' Estates, entered by the Bankruptcy Court on April 11, 2013 (ECF No. 7591), a copy of which (without exhibits) is annexed hereto as Exhibit "C," Paragraphs (b)(iv)(1) through (9) thereto, together with any relevant definitions, are incorporated herein as part of the Plan.

**12.7    Payment of Statutory Fees.**  On the Effective Date, and thereafter as may be required, the Debtors shall each (i) pay all the respective fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code and (ii) be responsible for the filing of consolidated postconfirmation quarterly status reports with the Bankruptcy Court in accordance with Rule 3021-1 of the Southern District of New York Local Bankruptcy Rules, which status reports shall include reports on the disbursements made by each of the Debtors.

**12.8    Plan Modifications and Amendments.**  The Plan may be amended, modified, or supplemented by the Debtors or the Reorganized Debtors, as applicable, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section

97

1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct.  In addition, after the Confirmation Date, so long as such action does not materially adversely affect the treatment of holders of Claims or Equity Interests hereunder, the Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.  Prior to the Effective Date, the Debtors may, upon not less than five (5) Business Days' notice to the attorneys for the Creditors' Committee and the Ad Hoc Committee, make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court; *provided, however,* that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests.

      **12.9**    **Revocation or Withdrawal of Plan.**  Subject to the terms of the Merger Agreement, the Debtors reserve the right to revoke, withdraw, or delay consideration of the Plan prior to the Confirmation Date, either entirely or with respect to one or more of the Debtors, and to file subsequent amended plans of reorganization.  If the Plan is revoked, withdrawn, or delayed with respect to fewer than all of the Debtors, such revocation, withdrawal, or delay shall not affect the enforceability of the Plan as it relates to the Debtors for which the Plan is not revoked, withdrawn, or delayed.  If the Debtors revoke the Plan in its entirety, the Plan shall be deemed null and void.  In such event, nothing herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any other Person in any further proceedings involving the Debtors.

      **12.10**   **Courts of Competent Jurisdiction.**  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

      **12.11**   **Severability.**  If, prior to entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors (with the prior written consent of US Airways, not to be unreasonably withheld), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding the foregoing, in such case, the Plan only may be confirmed without such term or provision at the request of the Debtors with the consent of the Creditors' Committee, which consent shall not be unreasonably withheld.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain

in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and provide that each term and provision hereof, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**12.12   Governing Law.**  Except to the extent the Bankruptcy Code or other U.S. federal law is applicable, or to the extent an Exhibit or Schedule hereto, a schedule in the Plan Supplement, or the Merger Agreement expressly provides otherwise, the rights, duties, and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof to the extent they would result in the application of the laws of any other jurisdiction.

**12.13   Exhibits and Schedules.**  The Exhibits and Schedules to the Plan and the Plan Supplement are incorporated into, and are part of, the Plan as if set forth herein.

**12.14   Successors and Assigns.**  All the rights, benefits, and obligations of any Person named or referred to herein shall be binding on, and inure to the benefit of, the heirs, executors, administrators, successors, and/or assigns of such Person.

**12.15   Time.**  In computing any period of time prescribed or allowed herein, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**12.16   Notices.**  To be effective, all notices, requests, and demands to or upon the Debtors, US Airways, the Creditors' Committee, or the Retiree Committee shall be in writing (including by facsimile or electronic transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered, or in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Debtors or Merger Sub, to:

AMR Corporation
4333 Amon Carter Boulevard
MD 5675
Fort Worth, Texas 76155
Attn:  Gary Kennedy, Esq.
Telephone:  (817) 967-1322
Telecopier:  (817) 967-2501
E-mail:  gary.kennedy@aa.com

-and-

99

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn:    Stephen Karotkin, Esq.
            Alfredo R. Pérez, Esq.
Telephone:  (212) 310-8000
Telecopier:  (212) 310-8007
E-mail:  stephen.karotkin@weil.com
            alfredo.perez@weil.com

If to US Airways, to:

US Airways Group, Inc.
111 West Rio Salado Parkway
Tempe, Arizona  85281
Attn:  Steven L. Johnson, EVP-Corporate and Government Affairs
Telephone:  (480) 693-0800
Telecopier:  (480) 693-5155
E-mail:  stephen.johnson@usairways.com

-and-

Latham & Watkins LLP
140 Scott Drive
Menlo Park, California 94025
Attn:   Peter F. Kerman, Esq.
            D. J. Baker, Esq.
Telephone:  (650) 328-4600
Telecopier:  (650) 463-2600
E-mail:  peter.kerman@lw.com
            dj.baker@lw.com

If to the Creditors' Committee, to:

Skadden, Arps, Slate, Meagher & Flom LLP
155 North Wacker Drive
Chicago, Illinois 60606
Attn:  John Wm. Butler, Jr., Esq.
Telephone:  (312) 407-0730
Telecopier:  (312)  407-8501
E-mail:  jack.butler@skadden.com

-and -

100

Four Times Square
New York, New York 10036
Attn:   Jay M. Goffman, Esq.
Telephone:  (212) 735-2120
Telecopier:  (917) 777-2120
E-mail:  jay.goffman@skadden.com

If to the Retiree Committee, to:

Jenner & Block LLP
353 North Clark Street
Chicago, Illinois 60654
Attn:   Catherine L. Steege, Esq.
        Charles B. Sklarsky, Esq.
Telephone:  (312) 222-9350
Telecopier:  (312) 527-0484
E-mail:  csteege@jenner.com
         csklarsky@jenner.com

-and-

101

919 Third Avenue, 37th Floor
New York, New York 10022
Attn: Marc B. Hankin, Esq.
Telephone: (212) 891-1600
Telecopier: (212) 891-1699
E-mail: mhankin@jenner.com

Dated:        New York, New York
              April 15, 2013

                        Respectfully submitted,

                        AMR CORPORATION
                        By:    /s/ Gary F. Kennedy
                        Name: Gary F. Kennedy
                        Title: Senior Vice President, General Counsel & Chief
                               Compliance Officer

                        AMERICAN AIRLINES, INC.
                        AMR EAGLE HOLDING CORPORATION
                        AMERICAN AIRLINES REALTY (NYC) HOLDINGS, INC.
                        AMERICAS GROUND SERVICES, INC.
                        PMA INVESTMENT SUBSIDIARY, INC.
                        SC INVESTMENT, INC.
                        AMERICAN EAGLE AIRLINES, INC.
                        EXECUTIVE AIRLINES, INC.
                        EXECUTIVE GROUND SERVICES, INC.
                        EAGLE AVIATION SERVICES, INC.
                        ADMIRALS CLUB, INC.
                        BUSINESS EXPRESS AIRLINES, INC.
                        RENO AIR, INC.
                        AA REAL ESTATE HOLDING GP LLC
                        AA REAL ESTATE HOLDING L.P.
                        AMERICAN AIRLINES MARKETING SERVICES LLC
                        AMERICAN AIRLINES VACATIONS LLC
                        AMERICAN AVIATION SUPPLY LLC
                        AMERICAN AIRLINES IP LICENSING HOLDING, LLC

                        BY: AMR CORPORATION, as agent for each of the
                        foregoing Entities
                        By:    /s/ Gary F. Kennedy
                        Name: Gary F. Kennedy
                        Title: Senior Vice President, General Counsel & Chief
                               Compliance Officer

                                    102

**EXHIBIT A**

**Execution Version**

**AGREEMENT AND PLAN OF MERGER**

**among**

**AMR CORPORATION,**

**AMR MERGER SUB, INC.**

**and**

**US AIRWAYS GROUP, INC.**

**Dated as of February 13, 2013**

# TABLE OF CONTENTS

**Page**

ARTICLE I The Merger; Closing; Effective Time................................................................2

   1.1    The Merger................................................................................2

   1.2    Closing......................................................................................2

   1.3    Effective Time...........................................................................3

   1.4    Plan of Reorganization..............................................................3

   1.5    Effects of the Merger...............................................................3

   1.6    Certificate of Incorporation......................................................3

   1.7    By-Laws....................................................................................3

   1.8    Board of Directors....................................................................3

   1.9    Officers....................................................................................4

   1.10   Headquarters; Airline Name.....................................................4

ARTICLE II Effects of the Merger.................................................................................4

   2.1    Effect on Capital Stock............................................................5

   2.2    Exchange of Certificates.........................................................7

   2.3    American Equity......................................................................10

   2.4    No Dissenters' Rights.............................................................10

ARTICLE III Representations and Warranties...............................................................10

   3.1    Representations and Warranties of American..........................10

       (a)    Organization, Good Standing and Qualification............10

       (b)    Capital Structure.......................................................11

       (c)    Corporate Authority; Approval...................................12

       (d)    Governmental Filings; No Violations; Certain Contracts..........................13

       (e)    American Reports; Financial Statements......................14

       (f)    Absence of Certain Changes......................................16

       (g)    Litigation..................................................................16

       (h)    Employee Benefits.....................................................17

       (i)    Compliance with Laws; Licenses...............................19

       (j)    Material Contracts.....................................................20

       (k)    Real Property............................................................21

       (l)    Takeover Statutes......................................................23

       (m)   Environmental Matters...............................................23

       (n)    Taxes.......................................................................25

# TABLE OF CONTENTS

**Page**

|       |     |                                                          |     |
|-------|-----|----------------------------------------------------------|-----|
|       | (o) | Labor Matters                                            | 25  |
|       | (p) | Intellectual Property and IT Assets                      | 26  |
|       | (q) | Foreign Corrupt Practices Act; UK Bribery Act            | 28  |
|       | (r) | Aircraft                                                 | 29  |
|       | (s) | Slots                                                    | 31  |
|       | (t) | Major Airports                                           | 32  |
|       | (u) | U.S. Citizen; Air Carrier                                | 32  |
|       | (v) | Insurance                                                | 32  |
|       | (w) | Brokers and Finders                                      | 32  |
| 3.2   |     | Representations and Warranties of US Airways             | 32  |
|       | (a) | Organization, Good Standing and Qualification            | 33  |
|       | (b) | Capital Structure                                        | 33  |
|       | (c) | Corporate Authority; Approval and Fairness,              | 35  |
|       | (d) | Governmental Filings; No Violations; Certain Contracts   | 35  |
|       | (e) | US Airways Reports; Financial Statements                 | 36  |
|       | (f) | Absence of Certain Changes                               | 38  |
|       | (g) | Litigation                                               | 38  |
|       | (h) | Employee Benefits                                        | 39  |
|       | (i) | Compliance with Laws; Licenses                           | 41  |
|       | (j) | Material Contracts                                       | 42  |
|       | (k) | Real Property                                            | 43  |
|       | (l) | Takeover Statutes                                        | 44  |
|       | (m) | Environmental Matters                                    | 44  |
|       | (n) | Taxes                                                    | 45  |
|       | (o) | Labor Matters                                            | 45  |
|       | (p) | Intellectual Property and IT Assets                      | 46  |
|       | (q) | Foreign Corrupt Practices Act; UK Bribery Act            | 48  |
|       | (r) | Aircraft                                                 | 49  |
|       | (s) | Slots                                                    | 50  |
|       | (t) | Major Airports                                           | 51  |
|       | (u) | U.S. Citizen; Air Carrier                                | 51  |
|       | (v) | Insurance                                                | 51  |

# TABLE OF CONTENTS

**Page**

(w)    Brokers and Finders ...................................................................51

ARTICLE IV Covenants.....................................................................52

4.1    American Forbearances ...............................................................52

4.2    US Airways Forbearances.............................................................56

4.3    American Acquisition Proposals.....................................................61

4.4    US Airways Acquisition Proposals...................................................66

4.5    Information Supplied ...................................................................69

4.6    Stockholders Meeting ..................................................................70

4.7    Filings; Other Actions; Notification .................................................70

4.8    Access and Reports ....................................................................73

4.9    Publicity .................................................................................73

4.10   Employee Matters ......................................................................73

4.11   Expenses .................................................................................78

4.12   Indemnification; Directors' and Officers' Insurance .............................78

4.13   Takeover Statutes ......................................................................81

4.14   Transfer Taxes ..........................................................................81

4.15   Taxation .................................................................................81

4.16   Stock Exchange Listing and De-listing.............................................82

4.17   Reservation of Newco Common Stock .............................................83

4.18   Transition Planning .....................................................................83

4.19   Section 16(b) ...........................................................................83

4.20   Approval of Plan; Confirmation Order .............................................83

4.21   US Airways Equity Plans..............................................................87

4.22   US Airways Convertible Debt. .......................................................89

4.23   Rights of the Creditors' Committee .................................................90

ARTICLE V Conditions .....................................................................90

5.1    Conditions to Each Party's Obligation to Effect the Merger....................90

5.2    Conditions to Obligation of American...............................................91

5.3    Conditions to Obligation of US Airways............................................92

ARTICLE VI Termination....................................................................94

6.1    Termination by Mutual Consent .....................................................94

6.2    Termination by Either American or US Airways ...................................95

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 6.3 | Termination by US Airways | 95 |
| 6.4 | Termination by American | 96 |
| 6.5 | Effect of Termination and Abandonment | 96 |
| 6.6 | US Airways Termination Fees | 96 |
| 6.7 | American Termination Fees | 99 |
| ARTICLE VII | Miscellaneous and General | 101 |
| 7.1 | Effectiveness | 101 |
| 7.2 | Survival | 101 |
| 7.3 | Modification or Amendment | 102 |
| 7.4 | Waiver of Conditions | 102 |
| 7.5 | Counterparts | 102 |
| 7.6 | Governing Law and Venue; Waiver of Jury Trial | 102 |
| 7.7 | Notices | 103 |
| 7.8 | Entire Agreement | 105 |
| 7.9 | Third Party Beneficiaries | 106 |
| 7.10 | Obligations of American and of US Airways | 106 |
| 7.11 | Definitions | 106 |
| 7.12 | Severability | 106 |
| 7.13 | Interpretation; Construction | 106 |
| 7.14 | Assignment | 107 |
| 7.15 | Specific Performance | 107 |

AGREEMENT AND PLAN OF MERGER

AGREEMENT AND PLAN OF MERGER (this "*Agreement*"), dated as of February 13, 2013, among AMR Corporation, a Delaware corporation, and its successors (including, as the context may require, on or after the effective date of the Plan, as reorganized pursuant to the Bankruptcy Code) ("*American*"), US Airways Group, Inc., a Delaware corporation ("*US Airways*"), and AMR Merger Sub, Inc., a Delaware corporation and a wholly-owned subsidiary of American ("*Merger Sub*").  Annex A to this Agreement contains a list of defined terms that are used in this Agreement and the applicable Sections of this Agreement in which each such term is defined.

RECITALS

WHEREAS, on November 29, 2011, American and certain of its direct and indirect domestic Subsidiaries (each, a "*Debtor*", and collectively, the "*Debtors*") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. Sections 101 *et seq.* (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*"), Case No. 11-15463 (SHL) (Jointly Administered) (the "*Cases*");

WHEREAS, American and US Airways have determined to engage in a strategic business combination whereby Merger Sub will be merged with and into US Airways, with US Airways continuing as the surviving entity in such merger as a direct wholly-owned subsidiary of American (the "*Merger*");

WHEREAS, following the commencement of the Cases, American engaged in a deliberative process that explored various strategic alternatives, including a plan of reorganization in which the Debtors would emerge from the Cases without entering into a strategic business combination and without obtaining new equity investments of more than $1 billion (a "*Standalone Plan*"), and has determined, as of the date hereof, that implementation of the Merger pursuant to the Plan will maximize value for the stakeholders of the Debtors;

WHEREAS, the respective Boards of Directors of each of American, US Airways and Merger Sub have, by resolutions duly adopted, declared that the Merger, upon the terms and subject to the conditions set forth in this Agreement, and the other transactions contemplated by this Agreement are advisable, and approved and adopted this Agreement;

WHEREAS, American and the other Debtors, with the support of the Official Committee of Unsecured Creditors of American (the "*Creditors' Committee*"), intend to seek the entry of an order of the Bankruptcy Court (the "*Confirmation Order*") approving the restructuring of the Debtors pursuant to the Plan, including the approval of the Merger contemplated by this Agreement, and the authorization of American to consummate the transactions contemplated hereby and thereby;

WHEREAS, pursuant to and in accordance with the Plan, all allowed prepetition general unsecured claims against the Debtors (other than intercompany claims), all equity interests in American, and all rights of labor groups of the Debtors to receive Newco Common Stock in

1

connection with the Plan, will be fully settled and satisfied with Plan Shares, except as otherwise expressly permitted under this Agreement and the Plan;

WHEREAS, it is intended that, for federal income tax purposes, the Merger in conjunction with the Plan will qualify as a reorganization under the provisions of Section 368(a) of the Internal Revenue Code of 1986, as amended (the "*Code*"), and that this Agreement constitute the adoption of a plan of reorganization within the meaning of Section 368 of the Code;

WHEREAS, American, US Airways and Merger Sub desire to make certain representations, warranties, covenants and agreements in connection with this Agreement;

WHEREAS, following the execution and delivery of this Agreement by each of the parties hereto, American and the other Debtors shall seek the entry of the Merger Support Order, pursuant to which, among other things, the Bankruptcy Court will approve this Agreement and the obligations of American hereunder; and

WHEREAS, pursuant to the terms of Section 7.1 of this Agreement, prior to entry of the Merger Support Order, this Agreement is not effective and is not binding or enforceable with respect to any party hereto.

NOW, THEREFORE, in consideration of the premises, and of the representations, warranties, covenants and agreements contained herein, the parties hereto agree as follows:

ARTICLE I

The Merger; Closing; Effective Time

1.1    The Merger.  Upon the terms and subject to the conditions set forth in this Agreement, and in accordance with the Delaware General Corporation Law (the "*DGCL*"), at the Effective Time, Merger Sub shall be merged with and into US Airways and the separate corporate existence of Merger Sub shall thereupon cease.  US Airways shall be the surviving entity in the Merger (US Airways is hereinafter referred to with respect to post-Effective Time periods as the "*Surviving Corporation*") as a direct wholly-owned subsidiary of American (American, as reorganized pursuant to the Bankruptcy Code, is hereinafter referred to from time to time with respect to post-Effective Time periods as "*American*" or "*Newco*").

1.2    Closing.  The closing of the Merger (the "*Closing*") shall take place (i) at the offices of Weil, Gotshal & Manges LLP, 200 Crescent Court, Suite 300, Dallas, Texas at 9:00 a.m., Dallas time, on a date to be specified by American and US Airways, which shall be no later than the fifth business day following the day on which the last to be satisfied or waived of the conditions set forth in Article V (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions) shall be satisfied or waived in accordance with this Agreement or (ii) at such other place and time or on such other date as American and US Airways may agree (the "*Closing Date*").  As used in this Agreement, "*business day*" means any day of the year on which national banking institutions in

New York are open to the public for conducting business and are not required or authorized to be closed.

1.3    Effective Time.  Upon the Closing, American and US Airways will cause a Certificate of Merger (the "*Certificate of Merger*") to be executed, acknowledged and filed with the Secretary of State of the State of Delaware in accordance with the relevant provisions of the DGCL and shall make all other filings or recordings required under the DGCL.  The Merger shall become effective at such time as the Certificate of Merger shall have been duly filed with the Secretary of State of the State of Delaware or at such later date or time as may be agreed by the parties in writing and specified in the Certificate of Merger (the time at which the Merger becomes effective is referred to herein as the "*Effective Time*").

1.4    Plan of Reorganization.  The Merger shall be effected as a principal component of the Plan.

1.5    Effects of the Merger.  The Merger shall have the effects set forth in the DGCL.

1.6    Certificate of Incorporation.

(a)    Newco.  Immediately prior to the Effective Time, the certificate of incorporation of American shall be amended and restated as set forth on Exhibit A hereto, until thereafter duly amended as provided therein or by applicable Laws (the "*Newco Charter*"), with such changes thereto as may be reasonably agreed between American and US Airways prior to the date the Prospectus / Proxy Statement is initially mailed to US Airways stockholders. Immediately following the Effective Time and pursuant to the Plan, the Newco Charter shall be further amended to change the name of Newco from "AMR Corporation" to "American Airlines Group Inc.".

(b)    Surviving Corporation.  Immediately following the Effective Time, Newco shall cause the certificate of incorporation of US Airways to be amended and restated as set forth on Exhibit B hereto, until thereafter duly amended as provided therein or by applicable Laws.

1.7    By-Laws.

(a)    Newco.  At the Effective Time, the by-laws of American shall be amended and restated in their entirety to read as set forth on Exhibit C hereto until duly amended as provided therein or by applicable Laws (the "*Newco By-Laws*").

(b)    Surviving Corporation.  At the Effective Time, the by-laws of the Surviving Corporation shall be amended and restated in their entirety to read as set forth on Exhibit D hereto until duly amended as provided therein or by applicable Laws.

1.8    Board of Directors.

(a)    The number of directors initially comprising the full Board of Directors of Newco as of the Effective Time shall be 12 directors consisting of: (i) five

3

(5) directors designated by the Search Committee, (A) each of whom shall be Independent Directors and (B) one of whom shall serve as the initial Lead Independent Director of Newco in accordance with the Newco By-Laws, and whom shall be designated to serve in such role by the Search Committee, (ii) two (2) directors designated by American, each of whom shall be Independent Directors and each of whom shall be reasonably acceptable to the Search Committee, (iii) three (3) directors designated by US Airways, each of whom shall be Independent Directors, (iv) one (1) director who shall be Mr. Thomas W. Horton, the current Chairman of the Board and Chief Executive Officer of American, who shall serve as the initial Chairman of the Board of Directors of Newco in accordance with the Newco By-Laws, and (v) one (1) director who shall be Mr. W. Douglas Parker, the current Chairman of the Board and Chief Executive Officer of US Airways.  American shall take all necessary action to cause, effective at the Effective Time, the Board of Directors of Newco to be comprised as set forth in this Section 1.8.  Following the Effective Time, all rights to designate directors set forth in Section 1.8 shall terminate.  An "*Independent Director*" means a person who satisfies the requirements for independence under Rule 303A of the New York Stock Exchange ("*NYSE*") as then in effect.

(b)    Promptly following the date hereof, the Creditors' Committee shall establish a committee (the "*Search Committee*") to identify and designate the directors contemplated by Section 1.8(a)(i) prior to the Effective Date, which shall be comprised of (i) four (4) members designated by the Creditors' Committee and (ii) four (4) members designated by a majority of the initial consenting creditors under that certain support and settlement agreement with American relating to the Plan entered into as of February 13, 2013.  The Search Committee will be assisted by the UCC's Legal Advisor and a nationally recognized search firm retained by the UCC's Advisors.  The Search Committee's mandate shall be to select director designees based on consensus, but in any event by not less than 75% of the voting members of the Search Committee.

1.9    Officers.  American shall take all necessary action to cause Mr. W. Douglas Parker, the current Chairman of the Board and Chief Executive Officer of US Airways, to be the Chief Executive Officer of Newco as of the Effective Time.  Mr. Parker shall designate from the management ranks of American and US Airways the individuals who will be the additional officers of Newco following the Effective Time, subject to approval of the Board of Directors of Newco, and Mr. Parker shall consult with Mr. Horton in connection with such selections.

1.10    Headquarters; Airline Name.  American, US Airways and Merger Sub agree that immediately following the Effective Time the headquarters of Newco and the Surviving Corporation shall be located at 4333 Amon Carter Blvd., Fort Worth, Texas.  The name of the combined airline will be "American Airlines."

ARTICLE II

Effects of the Merger

4

2.1     Effect on Capital Stock.  At the Effective Time, as a result of the Merger and in conjunction with and pursuant to the Plan, and without any further action on the part of American, US Airways, Merger Sub or the stakeholders of the Debtors or the holders of any shares of US Airways Common Stock or any shares of Merger Sub Common Stock:

(a)     Capital Stock of Merger Sub.  Each share of common stock, par value $0.01 per share, of Merger Sub (the "*Merger Sub Common Stock*") issued and outstanding immediately prior to the Effective Time shall be converted into one fully paid and nonassessable share of common stock, par value $0.01 per share, of the Surviving Corporation.

(b)     Cancellation of Shares.  Each share of common stock, par value $0.01 per share, of US Airways (the "*US Airways Common Stock*"), issued and outstanding immediately prior to the Effective Time that is directly owned by US Airways, American or Merger Sub shall no longer be outstanding and shall automatically be canceled and shall cease to exist, and no consideration shall be delivered in exchange therefor.

(c)     Conversion of US Airways Common Stock.  Each share of US Airways Common Stock issued and outstanding immediately prior to the Effective Time (other than shares described in Section 2.1(b)) shall be converted into the right to receive one (1) fully paid and nonassessable share of common stock, par value $0.01 per share, of Newco (the "*Newco Common Stock*") (such shares of Newco Common Stock into which shares of US Airways Common Stock are converted pursuant to this Section 2.1(c), the "*Merger Consideration*").  All shares of US Airways Common Stock converted pursuant to this Section 2.1(c), when so converted, shall no longer be outstanding and shall automatically be canceled and shall cease to exist, and each holder of a certificate that immediately prior to the Effective Time represented any such shares of US Airways Common Stock (each such certificate, whether represented in certificated or non-certificated book-entry form, to the extent applicable, a "*Certificate*") shall cease to have any rights with respect thereto, except the right to receive the Merger Consideration and any dividends or other distributions to which holders become entitled upon the surrender of such Certificate in accordance with Section 2.2(c), without interest.

(d)     For purposes of this Agreement:

(i)     "*Maximum Plan Shares*" means an aggregate number of shares of Newco Common Stock equal to (i)(A) the number of US Airways Fully Diluted Shares as of the Share Determination Date multiplied by (B) the quotient (rounded to four decimals) of 72 divided by 28 (rounded to the nearest whole share) less (ii) the number of shares of Newco Common Stock represented by equity-based awards to be issued to employees of American and its Subsidiaries (other than the Surviving Corporation and its Subsidiaries) as contemplated by this Agreement and the Plan, (1) including in the case of cash awards or cash-settled equity awards made pursuant to paragraph (b) of Section 4.1(o) of the American Disclosure Letter a number of shares of Newco Common Stock determined pursuant to that paragraph, (2) including for this purpose the Newco Common Stock share equivalent of cash awards or cash-settled equity awards contemplated by

5

paragraph (c) of Section 4.1(o) of the American Disclosure Letter that the parties agree to treat as equity-based awards for purposes of this definition, and (3) excluding for this purpose equity-based awards contemplated by paragraph (c) of Section 4.1(o) of the American Disclosure Letter that the parties agree to treat as cash awards or cash-settled equity awards for purposes of this definition.

(ii)    "*Newco Mandatorily Convertible Preferred Stock*" means a series of preferred stock, par value $0.01 per share, of Newco, with respect to which the only rights, powers, preferences or privileges consist of (A) the right to convert the stated amount per share of each outstanding share of such series of preferred stock, together with any accrued dividends thereon, in full solely into shares of Newco Common Stock within 120 days following the effective date of the Plan, (B) the right to vote each such outstanding share on an as-converted to Newco Common Stock basis together with the outstanding shares of Newco Common Stock on matters presented to the stockholders of Newco generally and (C) such other rights that the Newco Common Stock into which such preferred stock is convertible is entitled to under the Newco Charter.  All shares of Newco Mandatorily Convertible Preferred Stock outstanding on the date that is 120 days following the effective date of the Plan shall automatically be converted into shares of Newco Common Stock in accordance with the terms thereof (if then entitled to receive any shares of Newco Common Stock upon conversion), and shall be cancelled and retired and shall not be reissued and shall cease to exist, and all such shares shall return to the status of authorized but unissued shares of preferred stock of Newco.  All shares of Newco Mandatorily Convertible Preferred Stock shall be issued pursuant to the Plan at or promptly following the Effective Time.

(iii)    "*Person*" means any individual, corporation (including not-for-profit), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, Governmental Entity or other entity of any kind or nature.

(iv)    "*Plan Shares*" means shares of Newco Common Stock and Newco Mandatorily Convertible Preferred Stock issued pursuant to the Plan and shares of Newco Common Stock that are or may become issuable upon conversion or exchange of shares of Newco Mandatorily Convertible Preferred Stock; provided that the aggregate number of shares of Newco Common Stock constituting Plan Shares, when taken together with all shares of Newco Common Stock that are or may become issuable upon conversion or exchange of shares of Newco Mandatorily Convertible Preferred Stock constituting Plan Shares, shall not exceed the Maximum Plan Shares.

(v)    "*Share Determination Date*" means 11:59 p.m., New York time, on the sixth trading day prior to the Closing.

(vi)    "*US Airways Fully Diluted Shares*" means, as of a given time, a number of shares of US Airways Common Stock equal to the aggregate number of shares of US Airways Common Stock that would be deemed to be outstanding as of such time for purposes of calculating "diluted earnings per share" under GAAP using the treasury stock method (calculated for the purposes hereof as though all US Airways Options and US Airways Equity Awards were vested notwithstanding the vesting requirements of any

6

agreements related thereto and using the as-if converted method with respect to outstanding convertible securities), except that the average market price used in such calculation shall equal the average of the daily closing price of US Airways Common Stock on the NYSE for each of the twenty (20) trading days ending on (and including) the Share Determination Date.  Solely for illustrative purposes, if the Share Determination Date were February 11, 2013, the US Airways Fully Diluted Shares would equal 208,570,0577 shares of Newco Common Stock.  US Airways shall deliver to American on the business day immediately following the Share Determination Date a schedule that sets forth, as of the Share Determination Date: (i) the number of outstanding shares of US Airways Common Stock, (ii) a ledger of the outstanding US Airways Options and US Airways Equity Awards, which ledger includes the applicable exercise price, (iii) the principal amount of the outstanding US Airways 7.25% Convertible Notes and outstanding US Airways 7% Convertible Notes, including the applicable conversion price, (iv) a ledger of any other outstanding securities or obligations convertible or exchangeable into or exercisable for US Airways Common Stock, which ledger includes the applicable exercise price or conversion price, and (v) US Airways' determination of US Airways Fully Diluted Shares (for the avoidance of doubt, each of the foregoing items in clauses (i) through (iv) shall be included in the determination of US Airways Fully Diluted Shares).

      2.2      <u>Exchange of Certificates</u>.

      (a)      <u>Exchange Agent</u>.  Prior to the Effective Time, a commercial bank, trust company or transfer agent shall be mutually selected by American and US Airways to act as exchange agent (the "<u>*Exchange Agent*</u>") for the delivery of the Merger Consideration.  At or prior to the Effective Time, American shall deposit with the Exchange Agent, for the benefit of the holders of Certificates, for exchange in accordance with this Article II through the Exchange Agent, certificates representing the shares of Newco Common Stock to be delivered as the Merger Consideration (such certificates, whether represented in certificated or non-certificated book-entry form, to the extent applicable, the "<u>*Newco Common Certificates*</u>").  In addition, American shall deposit with the Exchange Agent, from time to time as needed, cash sufficient to pay any dividends or other distributions which holders of Certificates have the right to receive pursuant to Section 2.2(c).  All such Newco Common Certificates and cash deposited with the Exchange Agent pursuant to this Section 2.2(a) is hereinafter referred to as the "<u>*Exchange Fund*</u>".

      (b)      <u>Exchange Procedures</u>.  As soon as reasonably practicable after the Effective Time, Newco shall cause the Exchange Agent to mail to each holder of record of a Certificate whose shares were converted pursuant to Section 2.1(c) into the right to receive the Merger Consideration (i) a letter of transmittal in customary form as reasonably agreed by the parties which (A) shall specify that delivery shall be effected, and risk of loss and title to the Certificates shall pass, only upon delivery of the Certificates to the Exchange Agent and (B) shall have such other provisions as American and US Airways may reasonably specify and (ii) instructions for effecting the surrender of the Certificates in exchange for the Merger Consideration.  Upon proper surrender of a Certificate to the Exchange Agent, together with such letter of transmittal, duly

completed and validly executed in accordance with the instructions thereto, and such other documents as may reasonably be required by the Exchange Agent, the holder of such Certificate shall be entitled to receive in exchange therefor a Newco Common Certificate representing that number of whole shares of Newco Common Stock that such holder has the right to receive in respect of the aggregate number of shares of US Airways Common Stock previously represented by such Certificate pursuant to Section 2.1(c) and a check representing cash in respect of any dividends or other distributions that the holder has the right to receive pursuant to Section 2.2(c), and the Certificate so surrendered shall immediately be canceled.  In the event of a transfer of ownership of US Airways Common Stock that is not registered in the transfer records of US Airways, a Newco Common Certificate representing the proper number of shares of Newco Common Stock pursuant to Section 2.1(c) and a check representing cash in respect of any dividends or other distributions that the holder has the right to receive pursuant to Section 2.2(c) may be delivered to a transferee if the Certificate representing such US Airways Common Stock is presented to the Exchange Agent, accompanied by all documents required to evidence and effect such transfer and by evidence that any applicable transfer Taxes have been paid.  Until surrendered as contemplated by this Section 2.2, each Certificate shall be deemed at any time after the Effective Time to represent only the right to receive upon such surrender the Merger Consideration that the holder of such Certificate has the right to receive in respect of such Certificate pursuant to Section 2.1(c) (and cash in respect of any dividends or other distributions pursuant to Section 2.2(c)). No interest shall be paid or shall accrue on the cash payable upon surrender of any Certificate.

(c)    Treatment of Unexchanged Shares.  No dividends or other distributions declared or made with respect to Newco Common Stock with a record date after the Effective Time shall be paid to the holder of any unsurrendered Certificate with respect to the shares of Newco Common Stock deliverable upon surrender thereof until the surrender of such Certificate in accordance with this Article II.  Subject to escheat or other applicable Law, following surrender of any such Certificate, there shall be paid to the holder of the Certificate, without interest, (i) at the time of such surrender, the amount of dividends or other distributions with a record date after the Effective Time theretofore paid with respect to such number of whole shares of Newco Common Stock that such holder has the right to receive pursuant to Section 2.1(c), and (ii) at the appropriate payment date, the amount of dividends or other distributions with a record date after the Effective Time but prior to such surrender and a payment date subsequent to such surrender payable with respect to such number of whole shares of Newco Common Stock that such holder has the right to receive pursuant to Section 2.1(c).

(d)    No Further Ownership Rights in US Airways Common Stock. The shares of Newco Common Stock delivered and cash paid in accordance with the terms of this Article II upon conversion of any shares of US Airways Common Stock shall be deemed to have been delivered and paid in full satisfaction of all rights pertaining to such shares of US Airways Common Stock.  From and after the Effective Time, (i) all holders of Certificates shall cease to have any rights as stockholders of US Airways other than the right to receive the Merger Consideration and any dividends or other distributions that holders have the right to receive upon the surrender of such Certificate in accordance

with Section 2.2(c), without interest, and (ii) the stock transfer books of US Airways shall be closed with respect to all shares of US Airways Common Stock outstanding immediately prior to the Effective Time.  From and after the Effective Time, there shall be no further registration of transfers on the stock transfer books of the Surviving Corporation of shares of US Airways Common Stock that were outstanding immediately prior to the Effective Time. If, after the Effective Time, any Certificates formerly representing shares of US Airways Common Stock are presented to the Surviving Corporation, Newco or the Exchange Agent for any reason, such Certificates shall be canceled and exchanged as provided in this Article II.

(e)     Termination of Exchange Fund.  Any portion of the Exchange Fund (including any interest or other amounts received with respect thereto) that remains unclaimed by, or otherwise undistributed to, the holders of Certificates for 180 days after the Effective Time shall be delivered to Newco, upon demand, and any holder of Certificates who has not theretofore complied with this Article II shall thereafter look only to Newco for satisfaction of its claim for Merger Consideration and any dividends and distributions which such holder has the right to receive pursuant to this Article II.

(f)     No Liability.  None of Newco, the Surviving Corporation or the Exchange Agent shall be liable to any Person in respect of any portion of the Exchange Fund or the Merger Consideration delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law.

(g)     Investment of Exchange Fund. The Exchange Agent shall invest any cash in the Exchange Fund as directed by Newco on a daily basis, provided that, subject to Section 2.2(e), no such investment or losses will affect the cash payable to holders of Certificates.  Any interest or other amounts received with respect to such investments shall be paid to Newco.

(h)     Withholding Rights.  Newco, Merger Sub, the Surviving Corporation or the Exchange Agent shall be entitled to deduct and withhold from amounts otherwise payable under this Agreement any amounts that it is required to deduct and withhold with respect to such payments under the Code, Treasury Regulations promulgated under the Code, or any provision of state, local or foreign Tax Law.  Any amounts so deducted and withheld will be timely paid to the appropriate Governmental Entity and treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

(i)     Lost Certificates.  If any Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming such Certificate to be lost, stolen or destroyed and, if required by Newco, the posting by such Person of a bond, in such reasonable amount as Newco may direct, as indemnity against any claim that may be made against it with respect to such Certificate, the Exchange Agent (or, if subsequent to the termination of the Exchange Fund and subject to Section 2.2(e), Newco) shall deliver, in exchange for such lost, stolen or destroyed Certificate, the Merger Consideration and any dividends and distributions deliverable in respect thereof pursuant to this Agreement.

2.3     _American Equity_.  At the Effective Time, after giving effect to the Confirmation Order and the Plan, all outstanding shares of common stock, par value $1.00 per share, of American ("_American Common Stock_") or preferred stock of American, all options to purchase shares of American Common Stock or preferred stock, all awards of any kind consisting of shares of American Common Stock or preferred stock, that have been or may be granted, held, awarded, outstanding, payable or reserved for issuance, and all other equity securities of American, including all securities or obligations convertible or exchangeable into or exercisable for shares of American Common Stock, preferred stock or other equity securities of American, and each other right of any kind, contingent or accrued, to acquire or receive shares of American Common Stock, preferred stock or other equity securities of American, whether upon exercise, conversion or otherwise, whether vested or unvested, will, pursuant to the Plan, and without any action on the part of the holder thereof, be cancelled and retired and shall cease to exist.  For the avoidance of doubt, the foregoing paragraph does not apply with respect to any Newco Common Stock, Newco Mandatorily Convertible Preferred Stock or any other equity securities or rights to acquire or receive equity securities or any other awards of any kind relating to Newco that are issued in accordance with or pursuant to this Agreement and the Plan.

2.4     _No Dissenters' Rights_.  In accordance with Section 262 of the DGCL, no appraisal rights shall be available to holders of shares of US Airways Common Stock in connection with the Merger.

## ARTICLE III

### Representations and Warranties

3.1     _Representations and Warranties of American and Merger Sub_.  Except (i) as set forth in the disclosure letter (subject to Section 7.13(c) of this Agreement) delivered to US Airways by American concurrently with the execution and delivery of this Agreement (the "_American Disclosure Letter_"), or (ii) to the extent the qualifying nature of such disclosure with respect to a specific representation and warranty is readily apparent therefrom, as set forth in the American Reports filed on or after January 1, 2012 and prior to the date hereof (excluding any disclosures included in any such American Report that are predictive or forward-looking in nature or included in any "risk factor" disclosure), American and Merger Sub each hereby represents and warrants to US Airways that:

(a)     _Organization, Good Standing and Qualification_.  Each of American and its Subsidiaries is a legal entity duly organized, validly existing and in good standing under the Laws of its respective jurisdiction of organization, has all requisite corporate or similar power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted, and is qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so organized, validly existing, qualified or in good standing, or to have such power or authority, would not, individually or in the aggregate, reasonably be expected to result in an American Material Adverse Effect.  American has made available to US Airways complete and correct copies of (i) American's certificate of incorporation and by-laws, each as amended to date, and (ii) Merger Sub's certificate

of incorporation and by-laws, each as amended to date.  As used in this Agreement, the term: (i) "*Subsidiary*" means, with respect to any Person, any other Person of which at least a majority of the securities or ownership interests having by their terms ordinary voting power to elect a majority of the board of directors or other persons performing similar functions is directly or indirectly owned or controlled by such Person or by one or more of its respective Subsidiaries or by such Person and any one or more of its respective Subsidiaries; (ii) "*Material Adverse Effect*" means, with respect to American or US Airways and their respective Subsidiaries, a material adverse effect on the financial condition, assets, liabilities, business or results of operations of such party and its Subsidiaries, taken as a whole, excluding, in each case, any such effect resulting from (I) changes or conditions generally affecting the economy or financial markets, in each case in the United States or any foreign jurisdiction, (II) changes or conditions generally affecting any of the segments of the airline industry in which such party or any of its Subsidiaries operates, (III) increases in the price of fuel, (IV) changes or conditions resulting from divestiture required in order to satisfy Section 5.1(b) hereof, (V) the execution and delivery of this Agreement or the announcement or consummation of the Merger, (VI) any change in applicable Laws or GAAP (or authoritative interpretation thereof), (VII) geopolitical conditions, the outbreak of a pandemic or other widespread health crisis, the outbreak or escalation of hostilities, any acts of war, sabotage or terrorism, or any escalation or worsening of any such acts of war, sabotage or terrorism threatened or underway as of the date of this Agreement or (VIII) any hurricane, tornado, flood, earthquake, volcano eruption or natural disaster; provided, however, any such effect referred to in clauses (II), (VI) or (VIII) may be taken into account in determining whether a Material Adverse Effect has occurred or is reasonably expected to occur to the extent (but only to the extent) such effect has a materially disproportionate impact on such party or its Subsidiaries relative to other air carriers operating in the airline industry; and (iii) "*American Material Adverse Effect*" means a Material Adverse Effect as applicable to American and its Subsidiaries, taken as a whole.

(b)    Capital Structure.

(i)    Upon the Closing and after giving effect to the Confirmation Order and the Plan, the authorized capital stock of Newco shall consist of 1,750,000,000 shares of Newco Common Stock and 100,000,000 shares of preferred stock, par value $0.01 per share, of Newco.  At the time of issuance, all shares of Newco Common Stock that may be issued pursuant to Article II of this Agreement or upon the exercise or vesting of, or pursuant to, Converted US Airways Options and Converted US Airways Equity Awards or upon the conversion of the Converted US Airways 7.25% Convertible Notes or the Converted US Airways 7% Convertible Notes, will be duly authorized and validly issued and fully paid, nonassessable, and not subject to or issued in violation of any purchase option, call option, right of first refusal, preemptive right, subscription right or any similar right under any provision of the DGCL, the Newco Charter, the Newco By-Laws of Newco or any Contract to which Newco is a party or by which it is otherwise bound.  At the time of issuance, all Plan Shares issued pursuant to the Plan will be issued in compliance with the registration requirements under the Securities Act and any applicable "blue sky" laws or will otherwise be exempt from such registration requirements pursuant to section 1145 of the Bankruptcy Code.

(ii)        Except (A) for the awards to be issued to employees of American and its Subsidiaries as contemplated by Section 4.10(d), (B) for the shares of Newco Common Stock to be issued pursuant to Article II of this Agreement and Plan Shares to be issued pursuant to the Plan, or (C) for the shares of Newco Common Stock to be issued upon the exercise, conversion or vesting of Converted US Airways Options and Converted US Airways Equity Awards or upon the conversion of the Converted US Airways 7.25% Convertible Notes or the Converted US Airways 7% Convertible Notes, upon the Closing and after giving effect to the Confirmation Order and the Plan, (1) there will be no shares of Newco Common Stock, Newco Mandatorily Convertible Preferred Stock or any other shares of capital stock of Newco issued, reserved for issuance or outstanding or held by Newco and (2) there will be no preemptive or other outstanding rights, options, warrants, conversion rights, stock appreciation rights, deferred shares, performance shares, redemption rights, repurchase rights, agreements, arrangements, calls, commitments or rights of any kind that obligate Newco or any of its Subsidiaries to issue or sell any shares of capital stock or other securities of Newco or any of its Subsidiaries or any securities or obligations convertible or exchangeable into or exercisable for, or giving any Person a right to subscribe for or acquire, any securities of Newco or any of its Subsidiaries, and no securities or obligations evidencing such rights will be authorized, issued or outstanding.

(iii)        Except as set forth in Section 3.1(b)(iii) of the American Disclosure Letter, all of the issued and outstanding shares of capital stock or other equity ownership interests of each Subsidiary of American are owned by American, directly or indirectly, all such shares or equity ownership interests are set forth in Section 3.1(b)(iii) of the American Disclosure Letter, and all of such shares or equity ownership interests are duly authorized and validly issued and are fully paid, nonassessable and free of preemptive rights.  Except as set forth in Section 3.1(b)(iii) of the American Disclosure Letter, and except for the capital stock or other equity ownership interests of the Subsidiaries of American, as of the date of this Agreement, American does not beneficially own directly or indirectly any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any Person.

(iv)        Merger Sub.  The authorized capital stock of Merger Sub consists of 1,000 shares of common stock, par value $0.01 per share, of which 1,000 shares are issued and outstanding.  American is, and at the Effective Time will be, the legal and beneficial owner of all of the issued and outstanding shares of capital stock of Merger Sub.  All of the issued and outstanding shares of capital stock of Merger Sub are, and at the Effective Time will be, validly issued, fully paid and non-assessable.  Merger Sub was formed at the direction of American prior to the date hereof, solely for the purposes of effecting the Merger and the other transactions contemplated hereby.  Merger Sub has not conducted any business prior to the date hereof and has no, and prior to the Effective Time will have no, assets, liabilities or obligations of any nature other than those incident to its formation and pursuant to this Agreement and the Merger and the other transactions contemplated by this Agreement.

(c)        Corporate Authority; Approval.

12

(i)        Subject to the entry by the Bankruptcy Court of the Merger Support Order, (x) each of American and Merger Sub have all requisite corporate power and authority and have taken all corporate action necessary in order to execute, deliver and perform its obligations under this Agreement and, subject to the entry of the Confirmation Order and the occurrence of the effective date under the Plan, to consummate the Merger, and (y) this Agreement is a valid and binding agreement of American and Merger Sub enforceable against American and Merger Sub in accordance with its terms.

(ii)        The Board of Directors of American has, as of the date of this Agreement, declared that the Merger and the other transactions contemplated hereby are advisable and in the best interests of American and the stakeholders of the Debtors and has approved and adopted this Agreement, which approval and adoption have not been rescinded or modified.

(iii)        The Board of Directors of Merger Sub has, as of the date of this Agreement, declared that the Merger and the other transactions contemplated hereby are advisable and the Board of Directors and sole stockholder of Merger Sub have approved and adopted this Agreement, which approval and adoption have not been rescinded or modified.

(d)        <u>Governmental Filings; No Violations; Certain Contracts</u>.

(i)        Other than the notices, reports, filings, consents, registrations, approvals, permits or authorizations (A) pursuant to Section 1.3; (B) required under the Hart Scott Rodino Antitrust Improvements Act of 1976, as amended (the "*HSR Act*") and the European Community Council Regulation No. 139/2004 (the "*EU Merger Regulation*"), and any other applicable foreign antitrust, competition or similar Laws; (C) required under the Securities Act of 1933, as amended (the "*Securities Act*"), the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"), any applicable state securities or "blue sky" laws, and the rules and regulations promulgated under any of the foregoing; (D) with, from or to the Federal Aviation Administration (the "*FAA*"), the United States Department of Transportation (the "*DOT*"), the Federal Communications Commission (the "*FCC*"), and the Department of Homeland Security (the "*DHS*"), including the U.S. Transportation Security Administration (the "*TSA*"); (E) with, from or to NYSE, The NASDAQ Stock Market ("*NASDAQ*") or the Financial Industry Regulatory Authority, Inc.; and (F) with, from or to any applicable foreign Governmental Entities regulating any aspect of the airline industry, no notices, reports or other filings are required to be made by American or any of its Subsidiaries with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by American or any of its Subsidiaries from, any domestic or foreign governmental or regulatory authority, agency, commission, body, court or other legislative, executive or judicial governmental entity (each, a "*Governmental Entity*") (subject and after giving effect to any required approvals of the Bankruptcy Court (including to the extent applicable, the Confirmation Order confirming the Plan) and the Plan), in connection with the execution, delivery and performance of this Agreement by American and the consummation by American and Merger Sub of the Merger and the other transactions

13

contemplated hereby, except those that the failure to make or obtain would not, individually or in the aggregate, (i) reasonably be expected to result in an American Material Adverse Effect or (ii) reasonably be expected to prevent, materially delay or materially impair the ability of American and its Subsidiaries to consummate the Merger and the other transactions contemplated hereby.

(ii)    Except as set forth in Section 3.1(d)(ii) of the American Disclosure Letter, and subject to the entry by the Bankruptcy Court of the Merger Support Order and the Confirmation Order, the execution, delivery and performance of this Agreement by American and Merger Sub do not, and the consummation by American and Merger Sub of the Merger and the other transactions contemplated hereby will not, constitute or result in (A) a breach or violation of, or a default under, the certificate of incorporation or by-laws of American or Merger Sub or the comparable governing documents of any other Subsidiaries of American; (B) with or without notice, lapse of time or both, a breach or violation of, a termination (or right of termination) or a default under, or the creation, increase or acceleration of any obligations under any agreement, lease, license, contract, note, mortgage, indenture or other legally binding obligation (a "*Contract*") that (i) was entered into prior to the commencement of the Cases and has been assumed by the Debtors as of the date of this Agreement or as of the Closing Date, (ii) was entered into after the commencement of the Cases and is binding upon the Debtors, (iii) was entered into prior to the commencement of the Cases but is a type of Contract that can neither be assumed or rejected by the Debtors in connection with the Cases but will be binding upon the Debtors upon Closing after giving effect to the Confirmation Order and the occurrence of the effective date under the Plan or (iv) was entered into prior to or after the commencement of the Cases and is binding upon any non-Debtor Subsidiary of American (each of the foregoing, a "*Binding American Contract*") or, assuming (solely with respect to performance of this Agreement and consummation by American and Merger Sub of the Merger and the other transactions contemplated hereby) compliance with the matters referred to in Section 3.1(d)(i), any Law or governmental or non-governmental permit or license to which American or any of its Subsidiaries is subject; or (C) with or without notice, lapse of time or both, the creation of any lien, charge, pledge, security interest, claim or other encumbrance (each, a "*Lien*") on any of the assets of American or any of its Subsidiaries pursuant to any Binding American Contract, including any loan agreement or any other indebtedness agreement or instrument of indebtedness, except, in the case of clause (B) or (C) above, for any such breach, violation, termination, default, creation, increase, acceleration or Lien that would not, individually or in the aggregate, (i) reasonably be expected to result in an American Material Adverse Effect or (ii) reasonably be expected to prevent, materially delay or materially impair the ability of American and its Subsidiaries to consummate the Merger and the other transactions contemplated hereby.

(e)    American Reports; Financial Statements.

(i)    American and each Subsidiary has filed or furnished all forms, statements, schedules, reports and documents required to be filed or furnished by it with the Securities and Exchange Commission (the "*SEC*") pursuant to applicable securities statutes, regulations, policies and rules since December 31, 2011 (the "*American Audit*

14

*Date*") (the forms, statements, schedules, reports and documents filed or furnished with the SEC since the American Audit Date and those filed or furnished with the SEC subsequent to the date of this Agreement and prior to the Effective Time, if any, including any amendments thereto, the "*American Reports*").  Except as set forth in Section 3.1(e)(i) of the American Disclosure Letter, each of the American Reports, at the time of its filing, complied in all material respects with the applicable requirements of the Exchange Act and the rules and regulations thereunder and complied in all material respects with the then applicable accounting standards.  As of their respective dates (or, if amended, as of the date of such amendment), the American Reports did not, and any American Reports filed with the SEC subsequent to the date hereof will not, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading, except to the extent corrected prior to the date of this Agreement by a subsequently filed American Report.  The American Reports included or will include all certificates required to be included therein pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, as amended (the "*SOX Act*"), and the internal control report and attestation of American's outside auditors required by Section 404 of the SOX Act.

(ii)    Each of the consolidated balance sheets included in or incorporated by reference into the American Reports (including the related notes and schedules) fairly presents, or, in the case of American Reports filed after the date hereof, will fairly present, in all material respects, the consolidated financial position of American and any other entity included therein and their respective Subsidiaries as of its date, and each of the consolidated statements of operations, stockholders' equity (deficit) and cash flows included in or incorporated by reference into the American Reports (including any related notes and schedules) fairly presents, or in the case of American Reports filed after the date hereof, will fairly present, in all material respects, the net income, total stockholders' equity and net increase (decrease) in cash and cash equivalents, as the case may be, of American and any other entity included therein and their respective Subsidiaries for the periods set forth therein (subject, in the case of unaudited statements, to the absence of full notes and normal year-end adjustments that are not expected to be material in amount or effect), in each case in accordance with U.S. generally accepted accounting principles ("*GAAP*") consistently applied during the periods involved, except as may be noted therein.

(iii)    The management of American (x) has established and maintains disclosure controls and procedures (as defined in Rule 13a-15(e) of the Exchange Act) designed to ensure that material information relating to American, including its consolidated Subsidiaries, is made known to the management of American by others within those entities, and (y) has disclosed, based on its most recent evaluation, to American's outside auditors and the audit committee of the Board of Directors of American (A) all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act) which are reasonably likely to adversely affect American's ability to record, process, summarize and report financial data and (B) any fraud, whether or not material, that involves management or other employees who have a significant role in

American's internal controls over financial reporting.  Since the American Audit Date, any material change in internal control over financial reporting required to be disclosed in any American Report has been so disclosed.

(iv)     Since the American Audit Date, neither American nor any of its Subsidiaries nor, to American's Knowledge, any director, officer, employee, auditor, accountant or representative of American or any of its Subsidiaries has received or otherwise had or obtained knowledge of any material complaint, allegation, assertion or claim, whether written or oral, regarding the accounting or auditing practices, procedures, methodologies or methods of American or any of its Subsidiaries or their respective internal accounting controls relating to periods after the American Audit Date, including any material complaint, allegation, assertion or claim that American or any of its Subsidiaries has engaged in questionable accounting or auditing practices (except for any of the foregoing which have no reasonable basis).  "*American's Knowledge*" shall mean the knowledge of those individuals listed in Section 3.1(e)(iv) of the American Disclosure Letter, after reasonable inquiry.

(v)     Except as set forth in Section 3.1(e)(v) of the American Disclosure Letter, there are no liabilities or obligations of American or any of its Subsidiaries, whether or not accrued, contingent or otherwise and whether or not required to be disclosed, or any other facts or circumstances that would reasonably be expected to result in any obligations or liabilities of, American or any of its Subsidiaries, other than: (A) liabilities or obligations to the extent (I) accrued and reflected on the consolidated balance sheet of American or (II) disclosed in the notes thereto, in accordance with GAAP, in each case included in American's quarterly report on Form 10-Q for the period ended September 30, 2012 or in American's annual report on Form 10- K for the period ended December 31, 2011; (B) liabilities or obligations incurred in the ordinary course of business since December 31, 2011; (C) performance obligations under Contracts required in accordance with their terms, or performance obligations, to the extent required under applicable Law, in each case to the extent arising after the date hereof; or (D) liabilities or obligations that would not, individually or in the aggregate, reasonably be expected to result in an American Material Adverse Effect.

(f)     <u>Absence of Certain Changes</u>.  Except as set forth in Section 3.1(f) of the American Disclosure Letter, from the American Audit Date to the date of this Agreement, American and its Subsidiaries have conducted their respective businesses only in accordance with, and have not engaged in any material transaction other than in accordance with, the ordinary course of such businesses and the orders of the Bankruptcy Court for the operation of American.  Since the American Audit Date, there has not been any American Material Adverse Effect or any event, occurrence, discovery or development which would, individually or in the aggregate, reasonably be expected to result in an American Material Adverse Effect.

(g)     <u>Litigation</u>.  Other than the Cases and the proceedings therein, or as otherwise disclosed in American Reports filed prior to the date hereof or as set forth in Section 3.1(g) of the American Disclosure Letter, there are no (A) civil, criminal or administrative actions, suits, claims, hearings, arbitrations, investigations or proceedings

16

pending or, to American's Knowledge, threatened against American or any of its Subsidiaries (excluding any claims against the Debtors filed in the Cases) or (B) litigations, arbitrations, investigations or other proceedings, or injunctions or final judgments relating to, pending or, to American's Knowledge, threatened against American or any of its Subsidiaries before any Governmental Entity (excluding any claims against the Debtors filed in the Cases), including the FAA, except in the case of either clause (A) or (B), for those that would not, individually or in the aggregate, reasonably be expected to result in an American Material Adverse Effect.  None of American or any of its Subsidiaries is a party to or subject to the provisions of any judgment, order, writ, injunction, decree or award of any Governmental Entity which would, individually or in the aggregate, (i) reasonably be expected to result in an American Material Adverse Effect or (ii) reasonably be expected to prevent, materially delay or materially impair the ability of American and its Subsidiaries to consummate the Merger and the other transactions contemplated hereby.

(h)     Employee Benefits.

(i)     Section 3.1(h)(i) of the American Disclosure Letter contains, as of the date of this Agreement, a true and complete list of each material American Compensation and Benefit Plan, except with respect to that certain letter agreement, which is attached hereto as Exhibit G.  "*American Compensation and Benefit Plan*" means each employment agreement, and each bonus, deferred compensation, incentive compensation, equity compensation, severance pay, change in control, medical, life insurance, profit-sharing, pension, retirement, retiree medical, fringe benefit and each other material employee benefit plan, program or agreement as to which American or any of its Subsidiaries has any liability, contingent or otherwise, for the benefit of, with or relating to any current or former employee, officer or director of American or any of its Subsidiaries, excluding any governmental plan or program or any statutory obligation.

(ii)     With respect to each of the material American Compensation and Benefit Plans, American has heretofore delivered or made available to US Airways true and complete copies of each of the following documents: (A) the American Compensation and Benefit Plan and most recent trust agreement and insurance contract (including all amendments thereto), if any; (B) the most recent annual report, actuarial report, and financial statement, if any; (C) the most recent Summary Plan Description, together with each Summary of Material Modifications, required under the Employee Retirement Income Security Act of 1974, as amended ("*ERISA*") with respect to such American Compensation and Benefit Plan, if any; and (D) the most recent determination letter received from the Internal Revenue Service (the "*IRS*") with respect to each American Compensation and Benefit Plan that is intended to be qualified under Section 401(a) of the Code.

(iii)     Except to the extent covered by the Plan or as would not, individually or in the aggregate, have an American Material Adverse Effect, and except as set forth in Section 3.1(h)(iii) of the American Disclosure Letter, all obligations in respect of each American Compensation and Benefit Plan have been properly accrued and reflected on the most recent consolidated statement of operations and consolidated

balance sheet filed or incorporated by reference in the American Reports as of the respective dates of such balance sheet or report to the extent required by GAAP.

(iv)    None of the American Compensation and Benefit Plans is a "multiple employer welfare arrangement," as such term is defined in Section 3(40) of ERISA, or single employer plan that has two or more contributing sponsors, at least two of whom are not under common control, within the meaning of Section 4063(a) of ERISA or a "multiemployer plan," as such term is defined in Section 4001(a)(3) of ERISA.  Except as set forth in Section 3.1(h)(iv) of the American Disclosure Letter, the IRS has issued a favorable determination letter in respect of each of the American Compensation and Benefit Plans that is intended to be "qualified" within the meaning of Section 401(a) of the Code and neither American nor any of its Subsidiaries is aware of any circumstances that could reasonably be expected to result in the revocation of such letter.  Each of the American Compensation and Benefit Plans that is intended to satisfy the requirements of Section 125 or 501(c)(9) of the Code satisfies such requirements, except as would not, either individually or in the aggregate, reasonably be expected to have an American Material Adverse Effect.  Each of the American Compensation and Benefit Plans has been operated and administered in accordance with its terms and applicable Laws, including but not limited to ERISA and the Code, except as would not, either individually or in the aggregate, reasonably be expected to have an American Material Adverse Effect.

(v)    As of the date of this Agreement no participants are accruing or will accrue any benefits for service after the date hereof, other than accruing service for purposes of vesting into retirement benefits accrued prior to the date hereof, and eligibility for early retirement subsidies on benefits accrued prior to the date hereof, under any American Compensation and Benefit Plan which is subject to Title IV of ERISA (an "*American DB Plan*").  Each participant in an American DB Plan was provided notice in a timely manner under Section 204(h) of ERISA regarding the cessation of benefit accruals under the American DB Plan.  Except as set forth in Section 3.1(h)(v) of the American Disclosure Letter, the plan assets of each American DB Plan equals or exceeds the benefit liabilities of such American DB Plan assuming each American DB Plan was terminated in a standard termination under Section 4041 of ERISA as of the date of this Agreement. Except as set forth in Section 3.1(h)(v) of the American Disclosure Letter, neither American nor any of its Subsidiaries has any outstanding liability for any minimum required contributions under Sections 412 or 430 of the Code or Sections 302 and 303 of ERISA or any premiums due but unpaid to the Pension Benefit Guaranty Corporation.  Except as set forth in Section 3.1(h)(v) of the American Disclosure Letter, all defined benefit pension plans of the Debtors have been frozen and the pilot pension plan lump sum distribution right has been terminated.

(vi)    Except for claims filed or expunged in connection with the Cases, or as set forth in Section 3.1(h)(vi) of the American Disclosure Letter, there are no claims pending, or, to American's Knowledge, threatened or anticipated (other than routine claims for benefits) against any American Compensation and Benefit Plan, the assets of any American Compensation and Benefit Plan or against American or any of its Subsidiaries with respect to any American Compensation and Benefit Plan.  Except in

connection with the Cases, there is no judgment, decree, injunction, rule or order of any court, governmental body, commission, agency or arbitrator outstanding against or in favor of any American Compensation and Benefit Plan or any fiduciary thereof (other than rules of general applicability).  There are no pending or, to American's Knowledge, threatened audits or investigations by any governmental body, commission or agency involving any American Compensation and Benefit Plan, that would, individually or in the aggregate, reasonably be expected to have an American Material Adverse Effect.

(vii)    Except as set forth in Section 3.1(h)(vii) of the American Disclosure Letter, the transactions contemplated under this Agreement shall not, by themselves or in coordination with any other event or condition, result in (A) any increase in the amount of any payment to any current or former employee, consultant or director of American or any of its Subsidiaries, or (B) accelerate the vesting, time of payment or funding of any compensation or benefits, or right to any compensation or benefits, of any current or former employee, consultant or director of American or any of its Subsidiaries.

(viii)    With respect to each American Compensation and Benefit Plan that primarily provides benefits or compensation to non-U.S. employees and is maintained subject to the Laws of any jurisdiction outside of the United States (the "*American Foreign Plans*"):  (A) such American Foreign Plan complies in all material respects in form and operation in accordance with all applicable Laws; (B) except as could not reasonably be expected to result in a material liability, if an American Foreign Plan is intended to qualify for special Tax treatment, such plan meets all requirements for such treatment; (C) if required under applicable Laws to be funded and/or book-reserved, such American Foreign Plan is funded and/or book reserved, as appropriate, to the extent so required by applicable Laws; and (D) there are no going-concern unfunded actuarial liabilities, past service unfunded liabilities, solvency deficiencies or contribution holidays with respect to any of the American Foreign Plans.

(i)    Compliance with Laws; Licenses.

(i)    The businesses of each of American and its Subsidiaries have not been conducted in violation of any material federal, state, local or foreign law, statute or ordinance, common law, or any rule, regulation, standard, judgment, order, writ, injunction, decree, arbitration award, agency requirement, license or permit, of any Governmental Entity (collectively, "*Laws*") or any applicable operating certificates, common carrier obligations, airworthiness directives ("*ADs*"), Federal Aviation Regulations ("*FARs*") or any other rules, regulations, directives or policies of the FAA, DOT, FCC, DHS or any other Governmental Entity, except for such violations that would not, individually or in the aggregate, reasonably be expected to result in an American Material Adverse Effect.  Except as set forth in Section 3.1(i)(i) of the American Disclosure Letter, no investigation or review by any Governmental Entity with respect to American or any of its Subsidiaries is pending or, to American's Knowledge, threatened, nor has any Governmental Entity indicated an intention to conduct the same, except for any such investigations or reviews that would not, individually or in the aggregate, reasonably be expected to result in an American Material Adverse Effect.  Except as set

19

forth in Section 3.1(i)(i) of the American Disclosure Letter, each of American and its Subsidiaries has obtained and is in substantial compliance with all permits, licenses, certifications, approvals, registrations, consents, authorizations, franchises, variances, exemptions and orders required, issued or granted by the FAA, DOT or any other Governmental Entity applicable to it ("*Licenses*") necessary to conduct its business as presently conducted, except for any failures to have or to be in compliance with such Licenses which would not, individually or in the aggregate, reasonably be expected to result in an American Material Adverse Effect.  The representations and warranties contained in this Section 3.1(i) shall not apply to the following applicable Laws to the extent applicable to American and its Subsidiaries (or Licenses required under such applicable Laws): (i) ERISA and other applicable Laws regarding employee benefit matters, which are exclusively governed by Section 3.1(h), (ii) applicable Laws regarding Taxes, which are exclusively governed by Section 3.1(h) and Section 3.1(n), (iii) Environmental Laws, which are exclusively governed by Section 3.1(m), and (iv) applicable Laws regarding labor matters, which are exclusively governed by Section 3.1(o).

(ii)      Each of American and its Subsidiaries is in compliance with the rules and regulations of the Governmental Entity issuing such Licenses, except in each instance for any failures to be in compliance which would not, individually or in the aggregate, reasonably be expected to result in an American Material Adverse Effect. There is not pending or, to American's Knowledge, threatened before the FAA, DOT or any other Governmental Entity any material proceeding, notice of violation, order of forfeiture or complaint or investigation against American or any of its Subsidiaries relating to any of the Licenses, except for any of the foregoing that would not, individually or in the aggregate, reasonably be expected to result in an American Material Adverse Effect.  The actions of the applicable Governmental Entities granting all Licenses have not been reversed, stayed, enjoined, annulled or suspended, and there is not pending or, to American's Knowledge, threatened, any material application, petition, objection or other pleading with the FAA, DOT or any other Governmental Entity which challenges or questions the validity of or any rights of the holder under any License, except as set forth in Section 3.1(i)(ii) of the American Disclosure Letter and except, for any of the foregoing, that would not, individually or in the aggregate, reasonably be expected to result in an American Material Adverse Effect.

(j)      Material Contracts.  Except, in each case, as listed in Section 3.1(j) of the American Disclosure Letter:

(i)      As of the date of this Agreement, neither American nor any of its Subsidiaries is a party to or bound by any Contract (other than Contracts rejected in connection with the Cases as of the date of this Agreement) required pursuant to Item 601 of Regulation S-K under the Securities Act to be filed as an exhibit to American's Annual Report on Form 10-K for the year ended December 31, 2011, or on any Quarterly Report on Form 10-Q or Current Report on Form 8-K filed by American since December 31, 2011, which has not been so filed.

(ii)     As of the date of this Agreement, neither American nor any of its Subsidiaries is a party to or is bound by any Contract (other than Contracts rejected in connection with the Cases as of the date of this Agreement) that is: (A) a non-competition Contract or other Contract (other than the American CBAs) that (I) purports to limit in any material respect (including pursuant to an exclusivity provision that is material to the operation of the business of American and its Subsidiaries, taken as a whole) either the type of business in which American or its Subsidiaries may engage or the manner or locations in which any of them may so engage in any business, or (II) could require the disposition of any material assets or line of business of American or any of its Subsidiaries; (B) a material joint venture, partnership or business alliance Contract; (C) a capacity purchase, regional carrier or similar Contract; (D) a material co-branded credit card or credit card processing Contract; or (E) a Contract pursuant to which any indebtedness is outstanding or may be incurred (except for any Contract pursuant to which the aggregate principal amount of such indebtedness cannot exceed $200,000,000).

(iii)     All Contracts (other than Contracts rejected in connection with the Cases as of the date of this Agreement or rejected in connection with the Cases after the date hereof in accordance with this Agreement) that have been filed as an exhibit to American's Annual Report on Form 10-K for the year ended December 31, 2011, or on any Quarterly Report on Form 10-Q or Current Report on Form 8-K filed by American since December 31, 2011, and all Contracts listed in Section 3.1(j)(ii) of the American Disclosure Letter, together with all amendments, exhibits and schedules to such Contracts, shall constitute the "*American Material Contracts*."

(iv)     A true and complete copy of each American Material Contract has previously been delivered or made available to US Airways (subject to applicable confidentiality restrictions) and each American Material Contract that is a Binding American Contract is a valid and binding agreement of American or one of its Subsidiaries, as the case may be, and is, or will be, in full force and effect, except to the extent it has previously expired in accordance with its terms or if the failure to be in full force and effect would not, individually or in the aggregate, reasonably be expected to have an American Material Adverse Effect.  Neither American nor any of its Subsidiaries is in default or breach under the terms of any American Material Contract that is a Binding American Contract, which default or breach would, individually or in the aggregate, reasonably be expected to result in an American Material Adverse Effect.

(k)     <u>Real Property</u>.

(i)     Section 3.1(k)(i) of the American Disclosure Letter sets forth, as of the date hereof, the fee owner and address of all material real property owned by American and its Subsidiaries (the "*American Owned Real Property*"). Except as set forth in Section 3.1(k)(i) of the American Disclosure Letter, with respect to such American Owned Real Property, (A) each identified owner thereof has good, marketable, indefeasible fee simple title to such American Owned Real Property, free and clear of any Encumbrance; (B) there are no outstanding options, rights of first offer or rights of first refusal to purchase such American Owned Real Property or any material portion thereof or interest therein; (C) neither American nor any of its Subsidiaries is a party to any

21

Contract or option to purchase any material real property or interest therein; and (D) there does not exist any actual, pending or, to American's Knowledge, threatened condemnation or eminent domain proceedings that affect any American Owned Real Property, and neither American nor any of its Subsidiaries has received any written notice of the intention of any Governmental Entity or other Person to take or use any American Owned Real Property.

(ii)    Section 3.1(k)(ii) of the American Disclosure Letter sets forth, as of the date hereof, the address of each lease, sublease, license, concession and other agreement (written or oral) pursuant to which American or any of its Subsidiaries hold a leasehold or subleasehold estate in real property which requires payments by American or any Subsidiary of American in excess of $25,000,000 per annum (collectively, the "*American Leased Real Property*" and, together with American Owned Real Property, the "*American Real Property*").  True and complete copies of all Contracts (other than Contracts rejected in connection with the Cases as of the date of this Agreement) pertaining to the American Leased Real Property (each, an "*American Lease*") have been made available to US Airways prior to the date hereof.  With respect to American Leased Real Property and each American Lease that is a Binding American Contract, (A) each such American Lease is in full force and effect and is valid and enforceable in accordance with its terms; (B) there is no default under any such American Lease either by American, any of its Subsidiaries or, to American's Knowledge, by any other party thereto; (C) neither American nor any of its Subsidiaries has received or delivered a written notice of default or objection to any party to any such American Lease to pay and perform its obligations, and, to American's Knowledge, no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute a material breach or default, or permit the termination, modification or acceleration of rent under such American Lease; and (D) American or one of its Subsidiaries, as applicable, holds a good and valid leasehold interest in all American Leased Real Property free and clear of all Encumbrances.

(iii)    For purposes of this Section 3.1(k) only, "*Encumbrance*" means any mortgage, lien, pledge, charge, security interest, easement, covenant, or other restriction or title matter or encumbrance of any kind in respect of such asset except for (A) specified encumbrances described in Section 3.1(k)(iii) of the American Disclosure Letter; (B) encumbrances that arise under zoning, land use and other similar Laws and other similar imperfections of title; (C) Liens for Taxes excluded from the Lien representation in Section 3.1(n) or other governmental charges not yet due and payable or not yet delinquent; (D) mechanics', carriers', workmen's, repairmen's or other like encumbrances arising or incurred in the ordinary course of business consistent with past practice relating to obligations as to which there is no default on the part of American, or the validity or amount of which is being contested in good faith by appropriate proceedings; and (E) other encumbrances that do not, individually or in the aggregate, materially impair the continued use, operation, value or marketability of the specific parcel of American Owned Real Property or American Leased Real Property to which they relate or the conduct of the business of American and its Subsidiaries as presently conducted.

(l)    Takeover Statutes.  The Board of Directors of each of American and Merger Sub has approved this Agreement and the transactions contemplated hereby as required to render inapplicable to such agreements and transactions DGCL Section 203, to the extent applicable.  To American's Knowledge, no other state takeover or similar statute or regulation (each, a "*Takeover Statute*") is applicable to the Merger or the other transactions contemplated by this Agreement.

(m)    Environmental Matters.

(i)    Except as set forth in Section 3.1(m) of the American Disclosure Letter, and except for such matters as would not, individually or in the aggregate, reasonably be expected to result in an American Material Adverse Effect: (A) American and its Subsidiaries have complied at all times with all applicable Environmental Laws; (B) no property currently owned, leased or operated by American or any of its Subsidiaries (including soils, groundwater, surface water, buildings or other structures) is contaminated with any Hazardous Substance in a manner that is or could reasonably be expected to require Removal, Remedial or Response Action, that is in violation of any Environmental Law, or that is reasonably likely to give rise to any Environmental Liability; (C) American and its Subsidiaries have no information that any property formerly owned, leased or operated by American or any of its Subsidiaries was contaminated with any Hazardous Substance during or prior to such period of ownership, leasehold, or operation, in a manner that is or could reasonably be expected to require Removal, Remedial or Response Action, that is in violation of any Environmental Law, or that is reasonably likely to give rise to any Environmental Liability; (D) neither American or any of its Subsidiaries, nor, to American's Knowledge, any other Person whose Environmental Liabilities American or its Subsidiaries have retained or assumed, either contractually or by operation of law, has incurred in the past or is now subject to any Environmental Liabilities; (E) in the past five (5) years neither American nor any of its Subsidiaries has received any notice, demand, letter, claim or request for information alleging that American or any of its Subsidiaries may be in violation of or subject to any Environmental Liability; (F) neither American nor any of its Subsidiaries is subject to any order, decree, injunction or agreement with any Governmental Entity, or any indemnity or other agreement with any third party, concerning any Environmental Liability or otherwise relating to any Hazardous Substance or any environmental matter; (G) there is no Removal, Remedial or Response Action being undertaken on any property currently owned, leased or operated by American or any of its Subsidiaries; and (H) there are no other circumstances or conditions involving American or any of its Subsidiaries that could reasonably be expected to result in any Environmental Liability.

(ii)    As used in this Agreement, the term "*Environmental Laws*" means all Laws relating to: (A) the protection, investigation or restoration of the environment, health, safety, or natural resources, (B) the handling, use, presence, disposal, Release or threatened release of any Hazardous Substance or (C) noise, odor, indoor air, employee exposure, electromagnetic fields, wetlands, pollution, contamination or any injury or threat of injury to persons or property relating to any Hazardous Substance.

23

(iii)    As used in this Agreement, the term "*Environmental Liability*" means any obligations or liabilities (including any notices, claims, complaints, suits or other assertions of obligations or liabilities) that are: (A) related to environment, health or safety issues (including on-site or off-site contamination by Hazardous Substances of surface or subsurface soil or water, natural resource damages and occupational safety and health); and (B) based upon (I) any provision of Environmental Laws or (II) any order, consent, decree, writ, injunction or judgment issued or otherwise imposed by any Governmental Entity.  The term "Environmental Liability" includes any: (A) fines, penalties, judgments, awards, settlements, losses, damages (including consequential damages), costs, fees (including attorneys' and consultants' fees), expenses and disbursements relating to environmental, health or safety matters; (B) defense and other responses to any administrative or judicial action (including notices, claims, complaints, suits and other assertions of liability) relating to environmental, health or safety matters; and (C) financial responsibility for (x) cleanup costs and injunctive relief, including any Removal, Remedial or Response Actions, and natural resource damages, and (y) other Environmental Laws compliance or remedial measures.

(iv)    As used in this Agreement, the term "*Hazardous Substance*" means any "hazardous substance" and any "pollutant or contaminant" as those terms are defined in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("*CERCLA*"); any "hazardous waste" as that term is defined in the Resource Conservation and Recovery Act ("*RCRA*"); and any "hazardous material" as that term is defined in the Hazardous Materials Transportation Act (49 U.S.C. § 1801 et seq.), as amended (including as those terms are further defined, construed, or otherwise used in rules, regulations, standards, orders, guidelines, directives, and publications issued pursuant to, or otherwise in implementation of, said Laws); and including, without limitation, any petroleum product or byproduct, solvent, flammable or explosive material, radioactive material, asbestos, lead paint, polychlorinated biphenyls (or PCBs), dioxins, dibenzofurans, heavy metals, radon gas, mold, mold spores, and mycotoxins.

(v)    As used in this Agreement, the term "*Release*" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, placing, discarding, abandonment, or disposing into the environment (including the placing, discarding or abandonment of any barrel, container or other receptacle containing any Hazardous Substance or other material).

(vi)    As used in this Agreement, the term "*Removal, Remedial or Response Actions*" means all actions required to: (1) cleanup, remove, treat or remediate Hazardous Substances in the indoor or outdoor environment; (2) prevent the Release of Hazardous Substances so that they do not migrate, endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (3) perform pre-remedial studies and investigations and post-remedial monitoring and care; or (4) respond to any government requests for information or documents in any way relating to cleanup, removal, treatment or remediation or potential cleanup, removal, treatment or remediation of Hazardous Substances in the indoor or outdoor environment.

24

(n)      Taxes.  Except as would not, individually or in the aggregate, reasonably be expected to result in an American Material Adverse Effect, American and each of its Subsidiaries (i) have prepared in good faith and duly and timely filed (taking into account any extension of time within which to file) all Tax Returns required to be filed by any of them and all such filed Tax Returns are complete and accurate; and (ii) have paid all Taxes that are required to be paid or that American or any of its Subsidiaries are obligated to withhold from amounts owing to any employee, creditor or third party, except with respect to matters contested in good faith for which adequate reserves have been established on the most recent consolidated balance sheet included in or incorporated into the American Reports.  As of the date hereof, except as would not, individually or in the aggregate, reasonably be expected to result in an increase in Taxes that is material to American, there are no audits, examinations, investigations or other proceedings, in each case, pending or threatened in writing, in respect of Taxes or Tax matters.  American has made available to US Airways true and correct copies of the United States federal income Tax Returns filed by American and its Subsidiaries for each of the fiscal years ended December 31, 2011 and 2010.  None of American or its Subsidiaries has been a "distributing corporation" or "controlled corporation" in any distribution occurring during the last 30 months that was purported or intended to be governed by Section 355 of the Code (or any similar provision of state, local or foreign Law).  Neither American nor any of its Subsidiaries has taken any action or knows of any fact, agreement, plan or other circumstance that is reasonably likely to prevent the Merger from qualifying as a "reorganization" with the meaning of Section 368(a) of the Code.  There are no Liens for Taxes on any asset of American or any of its Subsidiaries, except for Liens for Taxes not yet due and payable or not yet delinquent, Liens for Taxes being contested in good faith for which appropriate reserves have been established on the most recent consolidated balance sheet included in or incorporated into the American Reports, and Liens for Taxes that would not, individually or in the aggregate, reasonably be expected to result in an American Material Adverse Effect.

As used in this Agreement, (i) the term "*Tax*" (including, with correlative meaning, the term "*Taxes*") includes all federal, state, local and foreign income, profits, franchise, gross receipts, customs duty, capital stock, severances, stamp, payroll, sales, employment, unemployment, disability, use, property, withholding, excise, escheat, production, value added, occupancy and other taxes, duties or assessments of any nature whatsoever, together with all interest, penalties and additions imposed with respect to such amounts and any interest in respect of such penalties and additions, and (ii) the term "*Tax Return*" includes all returns, reports and other documents (including elections, declarations, disclosures, schedules, estimates and information returns) required or permitted to be supplied to a Tax authority relating to Taxes.

(o)      Labor Matters.

(i)      American has made available to US Airways true and complete copies of all collective bargaining agreements, works council agreements, work rules and practices and other labor union Contracts, terms sheets, memoranda of understanding or similar agreements (including all amendments thereto) applicable to any employees of American or any of its Subsidiaries as of the date of this Agreement with respect to their

employment with American or any of its Subsidiaries (the "*American CBAs*"), each of which is set forth in Section 3.1(o)(i) of the American Disclosure Letter.  Except as set forth in Section 3.1(o)(i) of the American Disclosure Letter, as of the date of this Agreement, none of American or any of its Subsidiaries has breached or otherwise failed to comply with any provision of any American CBA that is a Binding American Contract, except for any breaches or failures to comply that, individually or in the aggregate, have not had and would not reasonably be expected to result in an American Material Adverse Effect.

(ii)    Except as set forth in Section 3.1(o)(ii) of the American Disclosure Letter:

(A)    No labor union, labor organization or group of employees of American or any of its Subsidiaries has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or threatened in writing to be brought or filed with any labor relations tribunal or authority.  To American's Knowledge, there are no labor union organizing activities pending or threatened with respect to any employees of American or any of its Subsidiaries.

(B)    There is no material labor dispute, strike, slowdown, work stoppage or lockout, or to American's Knowledge, threat thereof by or with respect to any employee of American or any of its Subsidiaries.

(C)    There are no arbitrations, written grievances or written complaints outstanding or, to American's Knowledge, threatened against American or any of its Subsidiaries under any American CBAs, except for such matters as would not, individually or in the aggregate, reasonably be expected to result in an American Material Adverse Effect.  Neither American nor any of its Subsidiaries is in receipt of written notice of any material statutory disputes or unfair labor practice charges.

(iii)    The execution, delivery and performance of this Agreement by American and Merger Sub do not, and the consummation by American and Merger Sub of the Merger and the other transactions contemplated hereby will not, constitute or result in a breach or violation of, a termination (or right of termination) or a default under, or the creation, increase, triggering or acceleration of any obligations or rights of any kind (including under any change of control type provisions) or result in any material changes under, or increase in compensation paid under, the American CBAs.

(p)    Intellectual Property and IT Assets.  Except for such matters as would not, individually or in the aggregate, reasonably be expected to result in an American Material Adverse Effect:

(i)    All Patents, patent applications, Trademark and Copyright registrations and applications for registration, and Internet domain name registrations

26

claimed to be owned by American or its Subsidiaries are owned exclusively by American or such Subsidiaries and are subsisting and, to American's Knowledge, valid and enforceable.

(ii)    Except as set forth in Section 3.1(p)(ii) of the American Disclosure Letter, American and/or each of its Subsidiaries owns, or is licensed or otherwise possesses legally enforceable rights to use, all Intellectual Property necessary to conduct the business of American and its Subsidiaries as currently conducted, all of which rights shall in all material respects survive unchanged the execution and delivery of this Agreement and the consummation of the Merger and the other transactions contemplated hereunder.

(iii)    Except as set forth in Section 3.1(p)(iii) of the American Disclosure Letter, the conduct of the business as currently conducted by American and its Subsidiaries does not infringe, misappropriate or otherwise violate the Intellectual Property rights of any third Person and in the three (3) year period immediately preceding the date of this Agreement, there has been no such claim, action or proceeding asserted, or to American's Knowledge threatened against American or its Subsidiaries or any indemnitees thereof.  Except as set forth in Section 3.1(p)(iii) of the American Disclosure Letter, there is no claim, action or proceeding asserted, or to American's Knowledge threatened, against American or its Subsidiaries or any indemnitees thereof concerning the ownership, validity, registrability, enforceability, infringement, use or licensed right to use any Intellectual Property claimed to be owned or held by American or its Subsidiaries or used or alleged to be used in the business of American or its Subsidiaries.

(iv)    Except as set forth in Section 3.1(p)(iv) of the American Disclosure Letter, to American's Knowledge, no third Person has, in the three (3) year period immediately preceding the date of this Agreement, infringed, misappropriated or otherwise violated the Intellectual Property rights of American or its Subsidiaries. Except as set forth in Section 3.1(p)(iv) of the American Disclosure Letter, there are no claims, actions or proceedings asserted or threatened by American, or decided by American to be asserted or threatened, that (A) a third Person infringes, misappropriates or otherwise violates, or in the three (3) year period immediately preceding the date of this Agreement, infringed, misappropriated or otherwise violated, the Intellectual Property rights of American or its Subsidiaries; or (B) a third Person's owned or claimed Intellectual Property interferes with, infringes, dilutes or otherwise harms the Intellectual Property rights of American or its Subsidiaries.

(v)    American and its Subsidiaries have taken reasonable measures to protect the confidentiality of all material Trade Secrets that are owned, used or held by American and its Subsidiaries and, to American's Knowledge, such material Trade Secrets have not been used, disclosed to or discovered by any Person except pursuant to valid and appropriate non-disclosure and/or license agreements which have not been breached.

(vi)    Except as set forth in Section 3.1(p)(vi) of the American Disclosure Letter, the IT Assets of American and its Subsidiaries operate and perform in

27

all material respects in accordance with their documentation and functional specifications and otherwise as required by American and its Subsidiaries for the operation of their respective businesses, and have not malfunctioned or failed within the three (3) year period immediately preceding the date of this Agreement.  To American's Knowledge, no Person has gained unauthorized access to such IT Assets.  Except as set forth in Section 3.1(p)(vi) of the American Disclosure Letter, American and its Subsidiaries have implemented and maintained for the three (3) year period immediately preceding the date of this Agreement reasonable and sufficient backup and disaster recovery technology consistent with industry practices.

As used in this Agreement:

(1)    "*Computer Software*" means all computer software and databases (including, without limitation, source code, object code, and all related documentation).

(2)    "*Intellectual Property*" means, collectively, all United States and foreign (i) trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, internet domain names, logos, symbols, trade dress, assumed names, fictitious names, trade names, and other indicia of origin, all applications and registrations for the foregoing, and all goodwill associated therewith and symbolized thereby, including all renewals of same (collectively, "*Trademarks*"); (ii) inventions and discoveries, whether patentable or not, and all patents, registrations, invention disclosures and applications therefor, including divisions, continuations, continuations-in-part and renewal applications, and including renewals, extensions and reissues (collectively, "*Patents*"); (iii) trade secrets and confidential information and know-how, including confidential processes, schematics, business methods, formulae, drawings, prototypes, models, designs, customer lists and supplier lists (collectively, "*Trade Secrets*"); (iv) all rights in published and unpublished works of authorship, whether copyrightable or not (including without limitation Computer Software and other compilations of information), copyrights therein and thereto, and registrations and applications therefor, and all renewals, extensions, restorations and reversions thereof (collectively, "*Copyrights*"); (v) moral rights, rights of publicity and rights of privacy; and (vi) all other intellectual property or proprietary rights.

(3)    "*IT Assets*" means computers, Computer Software, firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology equipment and elements, and all associated documentation.

(q)    Foreign Corrupt Practices Act; UK Bribery Act.  Except for such matters as would not, individually or in the aggregate, reasonably be expected to result in a material adverse impact on the ability of American and its Subsidiaries to conduct their operations in the ordinary course of business:

28

(i)        American and its Subsidiaries have developed and implemented a compliance program which includes corporate policies and procedures to ensure compliance with the Foreign Corrupt Practices Act, as amended (the "*Foreign Corrupt Practices Act*") and the U.K. Bribery Act 2010, as amended (the "*UK Bribery Act*").

(ii)        In connection with its compliance with the Foreign Corrupt Practices Act and the UK Bribery Act, there are no adverse or negative past performance evaluations or ratings by the U.S. or U.K. governments, or any voluntary disclosures under the Foreign Corrupt Practices Act and/or the UK Bribery Act, any enforcement actions or threats of enforcement actions, or any facts that, in each case, could result in any adverse or negative performance evaluation related to the Foreign Corrupt Practices Act and/or the UK Bribery Act.

(iii)        American and its Subsidiaries have not been notified in writing of any actual or alleged violation or breach of the Foreign Corrupt Practices Act and/or the UK Bribery Act.

(iv)        None of American or its Subsidiaries has undergone and is undergoing any audit, review, inspection, investigation, survey or examination of records relating to American's or any of its Subsidiaries' compliance with the Foreign Corrupt Practices Act and/or the UK Bribery Act, and, to American's Knowledge, there is no basis for any such audit, review, inspection, investigation, survey or examination of records.

(v)        American and its Subsidiaries have not been and are not now under any administrative, civil or criminal investigation, charge or indictment involving alleged false statements, false claims or other improprieties relating to American's or any of its Subsidiaries' compliance with the Foreign Corrupt Practices Act and/or the UK Bribery Act, nor, to American's Knowledge, is there any basis for any such investigation or indictment.

(vi)        American and its Subsidiaries have not been and are not now a party to any administrative or civil litigation involving alleged false statements, false claims or other improprieties relating to American's or any of its Subsidiaries' compliance with the Foreign Corrupt Practices Act and/or the UK Bribery Act, nor, to American's Knowledge, is there any basis for any such proceeding.

(r)        Aircraft.

(i)        Section 3.1(r)(i) of the American Disclosure Letter sets forth a true and complete list of all aircraft owned or leased by American or any of its Subsidiaries as of January 31, 2013 (the "*American Aircraft*"), including a description of the type and registration number of each such American Aircraft and the delivery date, manufacture date or age of such American Aircraft, as the case may be.  All American Aircraft owned or leased by American or any of its Subsidiaries are being maintained according to applicable FAA regulatory standards and the FAA-approved maintenance program of American and its Subsidiaries and, except with respect to American Aircraft in storage or

29

undergoing maintenance, are in airworthy condition.  American and its Subsidiaries have implemented maintenance schedules with respect to their respective American Aircraft and engines that, if complied with, would result in the satisfaction of all requirements under all applicable ADs and FARs required to be complied with in accordance with the FAA-approved maintenance program of American and its Subsidiaries, and American and its Subsidiaries are in compliance with such maintenance schedules in all material respects (except with respect to American Aircraft in storage) and currently have no reason to believe that they will not satisfy any component of such maintenance schedules on or prior to the dates specified in such maintenance schedules (except with respect to American Aircraft in storage).

(ii)     Section 3.1(r)(ii) of the American Disclosure Letter sets forth a true and complete list, as of the date hereof, of all Contracts (other than (x) existing aircraft leases, (y) Contracts that may be terminated by American or its Subsidiaries without penalty or material liability and (z) Contracts rejected in connection with the Cases as of the date of this Agreement)  pursuant to which American or any of its Subsidiaries has an obligation to purchase or lease aircraft, including the manufacturer and model of all aircraft subject to such Contract, the nature of the purchase or lease obligation (*i.e.*, firm commitment, subject to reconfirmation or otherwise) and the anticipated year of delivery of the aircraft subject to such Contract.  American has delivered or made available to US Airways true and complete copies (except as may have been redacted for pricing and other commercially sensitive information and subject to applicable confidentiality restrictions) of all Contracts listed in Section 3.1(r)(ii) of the American Disclosure Letter, including all material amendments, modifications and side letters thereto.

(iii)     Except as would not, individually or in the aggregate, reasonably be expected to have an American Material Adverse Effect:

(A)     each American Aircraft has a validly issued, current individual aircraft FAA Certificate of Airworthiness with respect to such American Aircraft which satisfies all requirements for the effectiveness of such FAA Certificate of Airworthiness;

(B)     each American Aircraft's structure, systems and components are functioning in accordance with its intended use, except for American Aircraft that are undergoing maintenance and temporarily deferred maintenance items that are permitted by American's maintenance programs;

(C)     except with respect to American Aircraft in storage, all deferred maintenance items and temporary repairs with respect to each such American Aircraft have been or will be made in accordance with American's maintenance programs;

(D)     each American Aircraft is registered on the FAA aircraft registry;

(E)      except as set forth in Section 3.1(r)(iii)(E) of the American Disclosure Letter, neither American nor its Subsidiaries is a party to any interchange or pooling agreements with respect to the American Aircraft, other than pooling agreements in the ordinary course of business; and

(F)      no American Aircraft is subleased to or otherwise in the possession of another air carrier or other Person other than American or any of its Subsidiaries, to operate such American Aircraft in air transportation or otherwise.

(s)      Slots.  Section 3.1(s) of the American Disclosure Letter sets forth a true, correct and complete list of all held or owned takeoff and landing slots, operating authorizations from the FAA or any other Governmental Entity and other similar designated takeoff and landing rights held or owned by American or any of its Subsidiaries ("*American Slots*") on the date hereof at any domestic or international airport, and such list shall indicate and identify (i) any held or owned American Slots that have been allocated to another air carrier beyond the end-of-the current International Air Transport Association ("*IATA*") traffic season and in which American and its Subsidiaries hold only temporary use rights, (ii) any American Slots that have been allocated to American and its Subsidiaries from another air carrier beyond the end-of-the current IATA traffic season and in which such other air carrier holds only temporary use rights and (iii) any Contracts, agreements or temporary government orders or decisions concerning specific American Slots or operating authorities.  Except as would not, individually or in the aggregate, reasonably be expected to have an American Material Adverse Effect, (i) American and its Subsidiaries will have complied in all material respects with the requirements of the regulations issued under the Federal Aviation Act and any other Laws, rules or regulations promulgated in the United States or in any country in which American operates by either a civil aviation authority, airport authority or slot coordinator with respect to the American Slots, (ii) neither American nor any of its Subsidiaries has received, as of the date hereof, any notice of any proposed withdrawal of the American Slots by the FAA, the DOT or any other Governmental Entity, (iii)(A) the American Slots have not been designated for the provision of essential air services under the regulations of the FAA, were not acquired pursuant to 14 C.F.R. § 93.219 and have not been designated for international operations, as more fully detailed in 14 C.F.R. § 93.217 and (B) to the extent covered by 14 C.F.R. § 93.227, American and its Subsidiaries have used the American Slots (or the American Slots have been used by other air carriers) either at least 80% of the maximum amount that each American Slot could have been used during each full and partial reporting period (as described in 14 C.F.R. § 93.227(i)) or such greater or lesser amount of minimum usage as may have been required to protect such American Slot's authorization from termination or withdrawal under regulations established by any Governmental Entity or airport authority, (iv) all reports required by the FAA or any other Governmental Entity relating to the American Slots have been filed in a timely manner and (v) except as set forth in Section 3.1(s)(v) of the American Disclosure Letter, as of the date hereof, neither American nor any of its Subsidiaries has agreed to any future American Slot slide, American Slot trade, American Slot purchase, American Slot sale or other transfer of any of the American Slots outside the ordinary course of business consistent with past practice.

31

(t)     <u>Major Airports.</u>  As of the date hereof, no civil aviation authority, airport authority, or slot coordinator at Dallas/Fort Worth International Airport (DFW), John F. Kennedy International Airport (JFK), Los Angeles International Airport (LAX), Miami International Airport (MIA), O'Hare International Airport (ORD), London Heathrow Airport (LHR), Tokyo Narita Airport (NRT), or São Paulo/Guarulhos– Governador André Franco Montoro International Airport (GRU) (each such airport, a "*Major American Airport*") has taken or, to American's Knowledge, threatened to take any action that would reasonably be expected to materially interfere with the ability of American and its Subsidiaries to conduct their respective operations at any Major American Airport in the same manner as currently conducted in all material respects.

(u)     <u>U.S. Citizen; Air Carrier.</u>  American's primary subsidiary, American Airlines, Inc., is a "citizen of the United States" as defined in the Federal Aviation Act and is an "air carrier" within the meaning of such Act operating under certificates issued pursuant to such Act (49 U.S.C. §§ 41101-41112).

(v)     <u>Insurance.</u>  Section 3.1(v) of the American Disclosure Letter lists and briefly describes (including name of insurer, agent or broker, coverage and expiration date), as of the date of this Agreement, each insurance policy maintained by, at the expense of or for the benefit of American or any of the Subsidiaries with respect to its properties, assets and liabilities and describes any material claims made thereunder.  All such insurance policies are in full force and effect and neither American nor any Subsidiary is in default with respect to its obligations under any such insurance policy. The insurance coverage of American and the Subsidiaries is customary for corporations of similar size engaged in similar lines of businesses.  American has not received any notice or other communication regarding any actual or possible (a) cancellation or invalidation of any insurance policy, (b) refusal of any coverage or rejection of any material claim under any insurance policy or (c) material adjustment in the amount of premiums payable with respect to any insurance policy.

(w)     <u>Brokers and Finders.</u>  Neither American nor any of its officers, directors or employees has employed any broker or finder or incurred any liability for any brokerage fees, commissions, finder's fees or financial advisory fees that may be payable in connection with the Merger or the other transactions contemplated in this Agreement, except that American has employed, and is solely responsible for the fees and expenses of, Rothschild Inc., or one of its affiliates, as its financial advisor, and a copy of the engagement letter with such financial advisor has been provided to US Airways prior to the date hereof.  As used in this Agreement, "*affiliate*" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such Person.

3.2     <u>Representations and Warranties of US Airways.</u>  Except (i) as set forth in the disclosure letter (subject to Section 7.13(c) of this Agreement) delivered to American by US Airways concurrently with the execution and delivery of this Agreement (the "*US Airways Disclosure Letter*"), or (ii) to the extent the qualifying nature of such disclosure with respect to a specific representation and warranty is readily apparent therefrom, as set forth in the US Airways Reports filed on or after January 1, 2012 and prior to the date hereof (excluding any disclosures

included in any such US Airways Report that are predictive or forward-looking in nature or included in any "risk factor" disclosure), US Airways hereby represents and warrants to American and Merger Sub that:

(a)        Organization, Good Standing and Qualification.  Each of US Airways and its Subsidiaries is a legal entity duly organized, validly existing and in good standing under the Laws of its respective jurisdiction of organization, has all requisite corporate or similar power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted, and is qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so organized, validly existing, qualified or in good standing, or to have such power or authority, would not, individually or in the aggregate, reasonably be expected to result in a US Airways Material Adverse Effect.  As used in this Agreement, the term "*US Airways Material Adverse Effect*" means a Material Adverse Effect as applicable to US Airways and its Subsidiaries, taken as a whole.  US Airways has made available to American complete and correct copies of US Airways' certificate of incorporation and by-laws, each as amended to date.

(b)        Capital Structure.

(i)        US Airways.  As of the date of this Agreement, the authorized capital stock of US Airways consists of 400,000,000 shares of US Airways Common Stock, of which 162,897,835 shares of US Airways Common Stock were issued and outstanding as of the close of business on February 11, 2013, and zero (0) shares of US Airways Common Stock were held by US Airways as treasury shares as of the close of business on February 11, 2013.  The Subsidiaries of US Airways hold no shares of capital stock of US Airways, or securities or obligations convertible or exchangeable into or exercisable for such capital stock.  As of the close of business on February 11, 2013, there were (A) an aggregate of 512,872 shares of US Airways Common Stock issuable with respect to outstanding stock options to purchase shares of US Airways Common Stock (the "*US Airways Options*"), (B) an aggregate of 5,451,228 shares of US Airways Common Stock issuable with respect to outstanding stock-settled stock appreciation rights (the "*US Airways Stock-Settled SARs*"), as if US Airways Stock-Settled SARs such were settled as of such date at a stock price per share for US Airways Common Stock of $14.46, and (C) an aggregate of 2,227,957 shares of US Airways Common Stock issuable with respect to outstanding stock-settled restricted stock units ("*US Airways Stock-Settled RSUs*"), granted pursuant to the US Airways Group, Inc. 2011 Incentive Award Plan, US Airways Group, Inc. 2008 Equity Incentive Plan, US Airways Group, Inc. 2005 Equity Incentive Plan and America West 2002 Incentive Equity Plan (collectively, the "*US Airways Equity Plans*"), an aggregate of 10,286,076 shares of US Airways Common Stock reserved for issuance pursuant to the US Airways Equity Plans, 37,746,174 shares of US Airways Common Stock issuable upon the conversion of outstanding US Airways' 7.25% Convertible Senior Notes due 2014 (the "*US Airways 7.25% Convertible Notes*") and 199,379 shares of US Airways Common Stock issuable upon the conversion of outstanding US Airways' 7% Senior Convertible Notes due 2020 (the "*US Airways 7% Convertible Notes*").  As of the close of business on February 11, 2013, outstanding cash-

settled stock appreciation rights (the "*US Airways Cash-Settled SARs*" and, collectively with the US Airways Stock-Settled SARs the "*US Airways SARs*") and outstanding cash-settled restricted stock units (the "*US Airways Cash-Settled RSUs*" and, collectively with the US Airways Stock-Settled RSUs, the "*US Airways RSUs*") granted pursuant to the US Airways Equity Plans had an aggregate cash value of approximately $53,856,417 calculated as if such US Airways Cash-Settled SARs and such US Airways Cash-Settled RSUs were settled as of such date at a stock price per share for US Airways Common Stock of $14.46, net of any applicable exercise price.  For purposes of this Agreement, the phrase "*US Airways Equity Awards*" shall refer to, collectively, the US Airways Stock-Settled RSUs and the US Airways Stock-Settled SARs.  As of the Closing Date, between the Share Determination Date and the Effective Time, other than the issuance of shares of US Airways Common Stock upon the exercise or vesting of US Airways Options, US Airways Stock-Settled SARs or US Airways Stock-Settled RSUs or the conversion of the US Airways 7.25% Convertible Notes or the US Airways 7% Convertible Notes, US Airways has not issued, sold, granted or authorized the issuance, sale, or grant of, any shares of capital stock of US Airways, or securities convertible or exchangeable into or exercisable for any shares of such capital stock, or any options, warrants, conversion rights, stock appreciation rights, redemption rights, repurchase rights, agreements, arrangements, calls, commitments or other rights of any kind to acquire any shares of such capital stock or such convertible or exchangeable securities.

(ii)     Except as set forth in Section 3.2(b)(i) above, as of the date of this Agreement, (i) there are no shares of capital stock or other securities of US Airways issued, reserved for issuance or outstanding and (ii) there are no preemptive or other outstanding rights, options, warrants, conversion rights, stock appreciation rights, deferred shares, performance shares, redemption rights, repurchase rights, agreements, arrangements, calls, commitments or rights of any kind that obligate US Airways or any of its Subsidiaries to issue or sell any shares of capital stock or other securities of US Airways or any of its Subsidiaries or any securities or obligations convertible into or exchangeable for, or giving any Person a right to subscribe for or acquire, any securities of US Airways or any of its Subsidiaries, and no securities or obligations evidencing such rights are authorized, issued or outstanding.  All of the issued and outstanding shares of US Airways Common Stock are and, at the time of issuance, all such shares that may be issued upon the exercise or vesting of, or pursuant to, US Airways Options and US Airways Equity Awards or upon the conversion of the US Airways 7.25% Convertible Notes or the US Airways 7% Convertible Notes, will be, duly authorized and validly issued and fully paid, nonassessable, and not subject to or issued in violation of any purchase option, call option, right of first refusal, preemptive right, subscription right or any similar right under any provision of the DGCL, the certificate of incorporation of US Airways, the by-laws of US Airways or any Contract to which US Airways is a party or by which it is otherwise bound.  Neither US Airways nor any of its Subsidiaries is party to any voting agreement with respect to the voting of any capital stock or voting securities of, or other equity interests in, US Airways.

(iii)     Except as set forth in Section 3.2(b)(iii) of the US Airways Disclosure Letter, all of the issued and outstanding shares of capital stock or other equity ownership interests of each Subsidiary of US Airways are owned by US Airways,

directly or indirectly, all such shares or equity ownership interests are set forth in Section 3.2(b)(iii) of the US Airways Disclosure Letter, and all of such shares or equity ownership interests are duly authorized and validly issued and are fully paid, nonassessable and free of preemptive rights.  Except as set forth in Section 3.2(b)(iii) of the US Airways Disclosure Letter, and except for the capital stock or other equity ownership interests of the Subsidiaries of US Airways, as of the date of this Agreement, US Airways does not beneficially own directly or indirectly any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any Person.

<div align="center">(c)      Corporate Authority; Approval and Fairness.</div>

(i)      US Airways has all requisite corporate power and authority and has taken all corporate action necessary in order to execute, deliver and perform its obligations under this Agreement and to consummate the Merger, subject only to the receipt of the Stockholder Approval.  Subject to Section 7.1, this Agreement is a valid and binding agreement of US Airways enforceable against US Airways in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(ii)      The Board of Directors of US Airways has, as of the date of this Agreement, (A) declared that the Merger and the other transactions contemplated hereby are advisable and in the best interests of US Airways and its stockholders and has approved and adopted this Agreement, which approval and adoption have not been rescinded or modified; (B) received an opinion of its financial advisor, Barclays Capital Inc., to the effect that, from a financial point of view, the Merger Consideration in the Merger is fair to the stockholders of US Airways, which opinion has not been amended or rescinded as of the date of this Agreement; (C) resolved to recommend that the holders of US Airways Common Stock vote to adopt this Agreement (such recommendation being the "*US Airways Directors' Recommendation*"); and (D) directed that the adoption of this Agreement be submitted to the holders of US Airways Common Stock entitled to vote for their approval.

(iii)      The matters contemplated by Section 4.6, including the Stockholder Approval, are the only votes of the holders of any class or series of US Airways capital stock necessary to consummate the Merger and the other transactions contemplated hereby.

<div align="center">(d)      Governmental Filings; No Violations; Certain Contracts.</div>

(i)      Other than the notices, reports, filings, consents, registrations, approvals, permits or authorizations (A) pursuant to Section 1.3; (B) required under the HSR Act, the EU Merger Regulation and any other applicable foreign antitrust, competition or similar Laws; (C) required under the Securities Act, the Exchange Act, any applicable state securities or "blue sky" laws, and the rules and regulations promulgated under any of the foregoing; (D) with, from or to the FAA, the DOT, the

<div align="center">35</div>

FCC, and the DHS, including the TSA; (E) with, from or to the NYSE or the principal securities market on which the shares of US Airways Common Stock are then listed or quoted; and (F) with, from or to any applicable foreign Governmental Entities regulating any aspect of the airline industry, no notices, reports or other filings are required to be made by US Airways or any of its Subsidiaries with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by US Airways or any of its Subsidiaries from any Governmental Entity (subject and after giving effect to any required approvals of the Bankruptcy Court (including to the extent applicable, the Confirmation Order confirming the Plan) and the Plan) in connection with the execution, delivery and performance of this Agreement by US Airways and the consummation by US Airways of the Merger and the other transactions contemplated hereby, except those that the failure to make or obtain would not, individually or in the aggregate, (i) reasonably be expected to result in a US Airways Material Adverse Effect or (ii) reasonably be expected to prevent, materially delay or materially impair the ability of US Airways and its Subsidiaries to consummate the Merger and the other transactions contemplated hereby.

(ii)      Except as set forth in Section 3.2(d)(ii) of the US Airways Disclosure Letter, the execution, delivery and performance of this Agreement by US Airways does not, and the consummation by US Airways of the Merger and the other transactions contemplated hereby will not, constitute or result in (A) a breach or violation of, or a default under, the certificate of incorporation or by-laws of US Airways or the comparable governing documents of any of its Subsidiaries; (B) with or without notice, lapse of time or both, a breach or violation of, a termination (or right of termination) or a default under, or the creation, increase or acceleration of any obligations under any Contract binding upon US Airways or any of its Subsidiaries or, assuming (solely with respect to performance of this Agreement and consummation by US Airways of the Merger and the other transactions contemplated hereby) compliance with the matters referred to in Section 3.2(d)(i), any Law or governmental or non-governmental permit or license to which US Airways or any of its Subsidiaries is subject; or (C) with or without notice, lapse of time or both, the creation of a Lien on any of the assets of US Airways or any of its Subsidiaries pursuant to any Contract, including any loan agreement or any other indebtedness agreement or instrument of indebtedness that is binding upon US Airways or any of its Subsidiaries or binding upon its assets, except, in the case of clause (B) or (C) above, for any such breach, violation, termination, default, creation, increase, acceleration or Lien that would not, individually or in the aggregate, (i) reasonably be expected to result in a US Airways Material Adverse Effect or (ii) reasonably be expected to prevent, materially delay or materially impair the ability of US Airways and its Subsidiaries to consummate the Merger and the other transactions contemplated hereby.

(e)      US Airways Reports; Financial Statements.

(i)      US Airways and each Subsidiary has filed or furnished all forms, statements, schedules, reports and documents required to be filed or furnished by it with the SEC pursuant to applicable securities statutes, regulations, policies and rules since December 31, 2011 (the "*US Airways Audit Date*") (the forms, statements, schedules, reports and documents filed or furnished with the SEC since the US Airways Audit Date

and those filed or furnished with the SEC subsequent to the date of this Agreement and prior to the Effective Time, if any, including any amendments thereto, the "*US Airways Reports*").  Each of the US Airways Reports, at the time of its filing, complied in all material respects with the applicable requirements of the Exchange Act and the rules and regulations thereunder and complied in all material respects with the then applicable accounting standards.  As of their respective dates (or, if amended, as of the date of such amendment), the US Airways Reports did not, and any US Airways Reports filed with the SEC subsequent to the date hereof will not, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading, except to the extent corrected prior to the date of this Agreement by a subsequently filed US Airways Report.  The US Airways Reports included or will include all certificates required to be included therein pursuant to Sections 302 and 906 of the SOX Act, and the internal control report and attestation of US Airways' outside auditors required by Section 404 of the SOX Act.

(ii)    Each of the consolidated balance sheets included in or incorporated by reference into the US Airways Reports (including the related notes and schedules) fairly presents, or, in the case of US Airways Reports filed after the date hereof, will fairly present, in all material respects, the consolidated financial position of US Airways and any other entity included therein and their respective Subsidiaries as of its date, and each of the consolidated statements of operations, stockholders' equity (deficit) and cash flows included in or incorporated by reference into the US Airways Reports (including any related notes and schedules) fairly presents, or in the case of US Airways Reports filed after the date hereof, will fairly present, in all material respects, the net income, total stockholders' equity and net increase (decrease) in cash and cash equivalents, as the case may be, of US Airways and any other entity included therein and their respective Subsidiaries for the periods set forth therein (subject, in the case of unaudited statements, to the absence of full notes and normal year-end adjustments that are not expected to be material in amount or effect), in each case in accordance with GAAP consistently applied during the periods involved, except as may be noted therein.

(iii)    The management of US Airways (x) has established and maintains disclosure controls and procedures (as defined in Rule 13a-15(e) of the Exchange Act) designed to ensure that material information relating to US Airways, including its consolidated Subsidiaries, is made known to the management of US Airways by others within those entities, and (y) has disclosed, based on its most recent evaluation, to US Airways' outside auditors and the audit committee of the Board of Directors of US Airways (A) all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act) which are reasonably likely to adversely affect US Airways' ability to record, process, summarize and report financial data and (B) any fraud, whether or not material, that involves management or other employees who have a significant role in US Airways' internal controls over financial reporting.  Since the US Airways Audit Date, any material change in internal control over financial reporting required to be disclosed in any US Airways Report has been so disclosed.

(iv)    Since the US Airways Audit Date, neither US Airways nor any of its Subsidiaries nor, to US Airways' Knowledge, any director, officer, employee, auditor, accountant or representative of US Airways or any of its Subsidiaries has received or otherwise had or obtained knowledge of any material complaint, allegation, assertion or claim, whether written or oral, regarding the accounting or auditing practices, procedures, methodologies or methods of US Airways or any of its Subsidiaries or their respective internal accounting controls relating to periods after the US Airways Audit Date, including any material complaint, allegation, assertion or claim that US Airways or any of its Subsidiaries has engaged in questionable accounting or auditing practices (except for any of the foregoing which have no reasonable basis). "*US Airways' Knowledge*" shall mean the knowledge of those individuals listed in Section 3.2(e)(iv) of the US Airways Disclosure Letter, after reasonable inquiry.

(v)    Except as set forth in Section 3.2(e)(v) of the US Airways Disclosure Letter, there are no liabilities or obligations of US Airways or any of its Subsidiaries, whether or not accrued, contingent or otherwise and whether or not required to be disclosed, or any other facts or circumstances that would reasonably be expected to result in any obligations or liabilities of, US Airways or any of its Subsidiaries, other than: (A) liabilities or obligations to the extent (I) accrued and reflected on the consolidated balance sheet of US Airways or (II) disclosed in the notes thereto, in accordance with GAAP, in each case included in US Airways' quarterly report on Form 10-Q for the period ended September 30, 2012 or in US Airways' annual report on Form 10- K for the period ended December 31, 2011; (B) liabilities or obligations incurred in the ordinary course of business since December 31, 2011; (C) performance obligations under Contracts required in accordance with their terms, or performance obligations, to the extent required under applicable Law, in each case to the extent arising after the date hereof; or (D) liabilities or obligations that would not, individually or in the aggregate, reasonably be expected to result in a US Airways Material Adverse Effect.

(f)    Absence of Certain Changes.  Except as set forth in Section 3.2(f) of the US Airways Disclosure Letter, from the US Airways Audit Date to the date of this Agreement, US Airways and its Subsidiaries have conducted their respective businesses only in accordance with, and have not engaged in any material transaction other than in accordance with, the ordinary course of such businesses.  Since the US Airways Audit Date, there has not been any US Airways Material Adverse Effect or any event, occurrence, discovery or development which would, individually or in the aggregate, reasonably be expected to result in a US Airways Material Adverse Effect.

(g)    Litigation.  Except as otherwise disclosed in US Airways Reports filed prior to the date hereof, or as set forth in Section 3.2(g) of the US Airways Disclosure Letter, there are no (A) civil, criminal or administrative actions, suits, claims, hearings, arbitrations, investigations or proceedings pending or, to US Airways' Knowledge, threatened against US Airways or any of its Subsidiaries or (B) litigations, arbitrations, investigations or other proceedings, or injunctions or final judgments relating to, pending or, to US Airways' Knowledge, threatened against US Airways or any of its Subsidiaries before any Governmental Entity, including the FAA, except in the case of either clause (A) or (B), for those that would not, individually or in the aggregate,

38

reasonably be expected to result in a US Airways Material Adverse Effect.  None of US Airways or any of its Subsidiaries is a party to or subject to the provisions of any judgment, order, writ, injunction, decree or award of any Governmental Entity which would, individually or in the aggregate, (i) reasonably be expected to result in a US Airways Material Adverse Effect or (ii) reasonably be expected to prevent, materially delay or materially impair the ability of US Airways and its Subsidiaries to consummate the Merger and the other transactions contemplated hereby.

(h)    Employee Benefits.

(i)    Section 3.2(h)(i) of the US Airways Disclosure Letter contains, as of the date of this Agreement, a true and complete list of each material US Airways Compensation and Benefit Plan.  "*US Airways Compensation and Benefit Plan*" means each employment agreement, and each bonus, deferred compensation, incentive compensation, equity compensation, severance pay, change in control, medical, life insurance, profit-sharing, pension, retirement, retiree medical, fringe benefit and each other material employee benefit plan, program or agreement as to which US Airways or any of its Subsidiaries has any liability, contingent or otherwise, for the benefit of, with or relating to any current or former employee, officer or director of US Airways or any of its Subsidiaries, excluding any governmental plan or program or any statutory obligation.

(ii)    With respect to each of the material US Airways Compensation and Benefit Plans, US Airways has heretofore delivered or made available to American true and complete copies of each of the following documents: (A) the US Airways Compensation and Benefit Plan and most recent trust agreement and insurance contract (including all amendments thereto), if any; (B) the most recent annual report, actuarial report, and financial statement, if any; (C) the most recent Summary Plan Description, together with each Summary of Material Modifications, required under ERISA with respect to such US Airways Compensation and Benefit Plan, if any; and (D) the most recent determination letter received from the IRS with respect to each US Airways Compensation and Benefit Plan that is intended to be qualified under Section 401(a) of the Code.

(iii)    Except as would not, individually or in the aggregate, have a US Airways Material Adverse Effect, and except as set forth in Section 3.2(h)(iii) of the US Airways Disclosure Letter, all obligations in respect of each US Airways Compensation and Benefit Plan have been properly accrued and reflected on the most recent consolidated statement of operations and consolidated balance sheet filed or incorporated by reference in the US Airways Reports as of the respective dates of such balance sheet or report to the extent required by GAAP.

(iv)    Except as set forth in Section 3.2(h)(iv) of the US Airways Disclosure Letter, none of the US Airways Compensation and Benefit Plans is a "multiple employer welfare arrangement," as such term is defined in Section 3(40) of ERISA, or single employer plan that has two or more contributing sponsors, at least two of whom are not under common control, within the meaning of Section 4063(a) of ERISA or a "multiemployer plan," as such term is defined in Section 4001(a)(3) of

ERISA.  Except as set forth in Section 3.2(h)(iv) of the US Airways Disclosure Letter, the IRS has issued a favorable determination letter in respect of each of the US Airways Compensation and Benefit Plans that is intended to be "qualified" within the meaning of Section 401(a) of the Code and neither US Airways nor any of its Subsidiaries is aware of any circumstances that could reasonably be expected to result in the revocation of such letter.  Each of the US Airways Compensation and Benefit Plans that is intended to satisfy the requirements of Section 125 or 501(c)(9) of the Code satisfies such requirements, except as would not, either individually or in the aggregate, reasonably be expected to have a US Airways Material Adverse Effect.  Each of the US Airways Compensation and Benefit Plans has been operated and administered in accordance with its terms and applicable Laws, including but not limited to ERISA and the Code, except as would not, either individually or in the aggregate, reasonably be expected to have a US Airways Material Adverse Effect.

(v)    Except as set forth in Section 3.2(h)(v) of the US Disclosure Letter, none of the US Airways Compensation and Benefit Plans are subject to Title IV of ERISA.

(vi)    Except as set forth in Section 3.2(h)(vi) of the US Airways Disclosure Letter, there are no claims pending, or, to US Airways' Knowledge, threatened or anticipated (other than routine claims for benefits) against any US Airways Compensation and Benefit Plan, the assets of any US Airways Compensation and Benefit Plan or against US Airways or any of its Subsidiaries with respect to any US Airways Compensation and Benefit Plan.  There is no judgment, decree, injunction, rule or order of any court, governmental body, commission, agency or arbitrator outstanding against or in favor of any US Airways Compensation and Benefit Plan or any fiduciary thereof (other than rules of general applicability).  There are no pending or, to US Airways' Knowledge, threatened audits or investigations by any governmental body, commission or agency involving any US Airways Compensation and Benefit Plan, that would, individually or in the aggregate, reasonably be expected to have a US Airways Material Adverse Effect.

(vii)    Except as set forth in Section 3.2(h)(vii) of the US Airways Disclosure Letter, the transactions contemplated under this Agreement shall not, by themselves or in coordination with any other event or condition, result in (A) any increase in the amount of any payment to any current or former employee, consultant or director of US Airways or any of its Subsidiaries, or (B) accelerate the vesting, time of payment or funding of any compensation or benefits, or right to any compensation or benefits, of any current or former employee, consultant or director of US Airways or any of its Subsidiaries.

(viii)    With respect to each US Airways Compensation and Benefit Plan that primarily provides benefits or compensation to non-U.S. employees and is maintained subject to the Laws of any jurisdiction outside of the United States (the "US Airways Foreign Plans"):  (A) such US Airways Foreign Plan complies in all material respects in form and operation in accordance with all applicable Laws; (B) except as could not reasonably be expected to result in a material liability, if a US Airways Foreign

40

Plan is intended to qualify for special Tax treatment, such plan meets all requirements for such treatment; (C) if required under applicable Laws to be funded and/or book-reserved, such US Airways Foreign Plan is funded and/or book reserved, as appropriate, to the extent so required by applicable Laws, and (D) there are no going-concern unfunded actuarial liabilities, past service unfunded liabilities, solvency deficiencies or contribution holidays with respect to any of the US Airways Foreign Plans.

(i)      Compliance with Laws; Licenses.

(i)      The businesses of each of US Airways and its Subsidiaries have not been conducted in violation of any material federal, state, local or foreign Laws or any applicable operating certificates, common carrier obligations, ADs, FARs or any other rules, regulations, directives or policies of the FAA, DOT, FCC, DHS or any other Governmental Entity, except for such violations that would not, individually or in the aggregate, reasonably be expected to result in a US Airways Material Adverse Effect. Except as set forth in Section 3.2(i)(i) of the US Airways Disclosure Letter, no investigation or review by any Governmental Entity with respect to US Airways or any of its Subsidiaries is pending or, to US Airways' Knowledge, threatened, nor has any Governmental Entity indicated an intention to conduct the same, except for any such investigations or reviews that would not, individually or in the aggregate, reasonably be expected to result in a US Airways Material Adverse Effect. Except as set forth in Section 3.2(i)(i) of the US Airways Disclosure Letter, each of US Airways and its Subsidiaries has obtained and is in substantial compliance with all Licenses necessary to conduct its business as presently conducted, except for any failures to have or to be in compliance with such Licenses which would not, individually or in the aggregate, reasonably be expected to result in a US Airways Material Adverse Effect. The representations and warranties contained in this Section 3.2(i) shall not apply to the following applicable Laws to the extent applicable to US Airways and its Subsidiaries (or Licenses required under such applicable Laws): (i) ERISA and other applicable Laws regarding employee benefit matters, which are exclusively governed by Section 3.2(h), (ii) applicable Laws regarding Taxes, which are exclusively governed by Section 3.2(h) and Section 3.2(n), (iii) Environmental Laws, which are exclusively governed by Section 3.2(m), and (iv) applicable Laws regarding labor matters, which are exclusively governed by Section 3.2(o).

(ii)      Each of US Airways and its Subsidiaries is in compliance with the rules and regulations of the Governmental Entity issuing such Licenses, except in each instance for any failures to be in compliance which would not, individually or in the aggregate, reasonably be expected to result in a US Airways Material Adverse Effect. There is not pending or, to US Airways' Knowledge, threatened before the FAA, DOT or any other Governmental Entity any material proceeding, notice of violation, order of forfeiture or complaint or investigation against US Airways or any of its Subsidiaries relating to any of the Licenses, except for any of the foregoing that would not, individually or in the aggregate, reasonably be expected to result in a US Airways Material Adverse Effect. The actions of the applicable Governmental Entities granting all Licenses have not been reversed, stayed, enjoined, annulled or suspended, and there is not pending or, to US Airways' Knowledge, threatened, any material application,

petition, objection or other pleading with the FAA, DOT or any other Governmental Entity which challenges or questions the validity of or any rights of the holder under any License, except as set forth in Section 3.2(i)(ii) of the US Airways Disclosure Letter and except, for any of the foregoing, that would not, individually or in the aggregate, reasonably be expected to result in a US Airways Material Adverse Effect.

(j)     Material Contracts.  Except, in each case, as listed in Section 3.2(j) of the US Airways Disclosure Letter:

(i)     As of the date of this Agreement, neither US Airways nor any of its Subsidiaries is a party to or bound by any Contract required pursuant to Item 601 of Regulation S-K under the Securities Act to be filed as an exhibit to US Airways' Annual Report on Form 10-K for the year ended December 31, 2011, or on any Quarterly Report on Form 10-Q or Current Report on Form 8-K filed by US Airways since December 31, 2011, which has not been so filed.

(ii)    As of the date of this Agreement, neither US Airways nor any of its Subsidiaries is a party to or is bound by any Contract that is (A) a non-competition Contract or other Contract (other than the US Airways CBAs) that (I) purports to limit in any material respect (including pursuant to an exclusivity provision that is material to the operation of the business of US Airways and its Subsidiaries, taken as a whole) either the type of business in which US Airways or its Subsidiaries may engage or the manner or locations in which any of them may so engage in any business, or (II) could require the disposition of any material assets or line of business of US Airways or any of its Subsidiaries; (B) a material joint venture, partnership or business alliance Contract; (C) a capacity purchase, regional carrier or similar Contract; (D) a material co-branded credit card or credit card processing Contract; or (E) a Contract pursuant to which any indebtedness is outstanding or may be incurred (except for any Contract pursuant to which the aggregate principal amount of such indebtedness cannot exceed $200,000,000).

(iii)   All Contracts that have been filed as an exhibit to US Airways' Annual Report on Form 10-K for the year ended December 31, 2011, or on any Quarterly Report on Form 10-Q or Current Report on Form 8-K filed by US Airways since December 31, 2011, and all Contracts listed in Section 3.2(j)(ii) of the US Airways Disclosure Letter, together with all amendments, exhibits and schedules to such Contracts, shall constitute the "*US Airways Material Contracts*."

(iv)    A true and complete copy of each US Airways Material Contract has previously been delivered or made available to American (subject to applicable confidentiality restrictions) and each US Airways Material Contract is a valid and binding agreement of US Airways or one of its Subsidiaries, as the case may be, and is in full force and effect, except to the extent it has previously expired in accordance with its terms or if the failure to be in full force and effect would not, individually or in the aggregate, reasonably be expected to have a US Airways Material Adverse Effect. Neither US Airways nor any of its Subsidiaries is in default or breach under the terms of any such US Airways Material Contract which default or breach would, individually or in the aggregate, reasonably be expected to result in a US Airways Material Adverse Effect.

(k)    <u>Real Property</u>.

(i)    Section 3.2(k)(i) of the US Airways Disclosure Letter sets forth, as of the date hereof, the fee owner and address of all material real property owned by US Airways and its Subsidiaries (the "*US Airways Owned Real Property*"). Except as set forth in Section 3.2(k)(i) of the US Airways Disclosure Letter, with respect to such US Airways Owned Real Property, (A) each identified owner thereof has good, marketable, indefeasible fee simple title to such US Airways Owned Real Property, free and clear of any Encumbrance; (B) there are no outstanding options, rights of first offer or rights of first refusal to purchase such US Airways Owned Real Property or any material portion thereof or interest therein; (C) neither US Airways nor any of its Subsidiaries is a party to any Contract or option to purchase any material real property or interest therein; and (D) there does not exist any actual, pending or, to US Airways' Knowledge, threatened condemnation or eminent domain proceedings that affect any US Airways Owned Real Property, and neither US Airways nor any of its Subsidiaries has received any written notice of the intention of any Governmental Entity or other Person to take or use any US Airways Owned Real Property.

(ii)    Section 3.2(k)(ii) of the US Airways Disclosure Letter sets forth, as of the date hereof, the address of each lease, sublease, license, concession and other agreement (written or oral) pursuant to which US Airways or any of its Subsidiaries hold a leasehold or subleasehold estate in real property which requires payments by US Airways or any Subsidiary of US Airways in excess of $25,000,000 per annum (collectively, the "*US Airways Leased Real Property*" and, together with US Airways Owned Real Property, the "*US Airways Real Property*").  True and complete copies of all Contracts pertaining to the US Airways Leased Real Property (each, an "*US Airways Lease*") have been made available to American prior to the date hereof.  With respect to such US Airways Leased Real Property, (A) each US Airways Lease is in full force and effect and is valid and enforceable in accordance with its terms; (B) there is no default under any US Airways Lease either by US Airways, any of its Subsidiaries or, to US Airways' Knowledge, by any other party thereto; (C) neither US Airways nor any of its Subsidiaries has received or delivered a written notice of default or objection to any party to any US Airways Lease to pay and perform its obligations, and, to US Airways' Knowledge, no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute a material breach or default, or permit the termination, modification or acceleration of rent under such US Airways Lease; and (D) US Airways or one of its Subsidiaries, as applicable, holds a good and valid leasehold interest in all US Airways Leased Real Property free and clear of all Encumbrances.

(iii)    For purposes of this Section 3.2(k) only, "*Encumbrance*" means any mortgage, lien, pledge, charge, security interest, easement, covenant, or other restriction or title matter or encumbrance of any kind in respect of such asset except for (A) specified encumbrances described in Section 3.2(k)(iii) of the US Airways Disclosure Letter; (B) encumbrances that arise under zoning, land use and other similar Laws and other similar imperfections of title; (C) Liens for Taxes excluded from the Lien representation in Section 3.2(n) or other governmental charges not yet due and payable or

43

not yet delinquent; (D) mechanics', carriers', workmen's, repairmen's or other like encumbrances arising or incurred in the ordinary course of business consistent with past practice relating to obligations as to which there is no default on the part of US Airways, or the validity or amount of which is being contested in good faith by appropriate proceedings; and (E) other encumbrances that do not, individually or in the aggregate, materially impair the continued use, operation, value or marketability of the specific parcel of US Airways Owned Real Property or US Airways Leased Real Property to which they relate or the conduct of the business of US Airways and its Subsidiaries as presently conducted.

(l)     Takeover Statutes.  The Board of Directors of US Airways has approved this Agreement and the transactions contemplated hereby as required to render inapplicable to such agreements and transactions DGCL Section 203, to the extent applicable.  To US Airways' Knowledge, no other Takeover Statute is applicable to the Merger or the other transactions contemplated by this Agreement.  Except as contemplated by Section 4.15(c), US Airways does not have any stockholder rights plan or similar agreement.

(m)     Environmental Matters.  Except as set forth in Section 3.2(m) of the US Airways Disclosure Letter, and except for such matters as would not, individually or in the aggregate, reasonably be expected to result in a US Airways Material Adverse Effect: (A) US Airways and its Subsidiaries have complied at all times with all applicable Environmental Laws; (B) no property currently owned, leased or operated by US Airways or any of its Subsidiaries (including soils, groundwater, surface water, buildings or other structures) is contaminated with any Hazardous Substance in a manner that is or could reasonably be expected to require Removal, Remedial or Response Action, that is in violation of any Environmental Law, or that is reasonably likely to give rise to any Environmental Liability; (C) US Airways and its Subsidiaries have no information that any property formerly owned, leased or operated by US Airways or any of its Subsidiaries was contaminated with any Hazardous Substance during or prior to such period of ownership, leasehold, or operation, in a manner that is or could reasonably be expected to require Removal, Remedial or Response Action, that is in violation of any Environmental Law, or that is reasonably likely to give rise to any Environmental Liability; (D) neither US Airways or any of its Subsidiaries, nor, to US Airways' Knowledge, any other Person whose Environmental Liabilities US Airways or its Subsidiaries have retained or assumed, either contractually or by operation of law, has incurred in the past or is now subject to any Environmental Liabilities; (E) in the past five (5) years neither US Airways nor any of its Subsidiaries has received any notice, demand, letter, claim or request for information alleging that US Airways or any of its Subsidiaries may be in violation of or subject to any Environmental Liability; (F) neither US Airways nor any of its Subsidiaries is subject to any order, decree, injunction or agreement with any Governmental Entity, or any indemnity or other agreement with any third party, concerning any Environmental Liability or otherwise relating to any Hazardous Substance or any environmental matter; (G) there is no Removal, Remedial or Response Action being undertaken on any property currently owned, leased or operated by US Airways or any of its Subsidiaries; and (H) there are no other circumstances or conditions

44

involving US Airways or any of its Subsidiaries that could reasonably be expected to result in any Environmental Liability.

(n)     <u>Taxes</u>.  Except as would not, individually or in the aggregate, reasonably be expected to result in a US Airways Material Adverse Effect, US Airways and each of its Subsidiaries (i) have prepared in good faith and duly and timely filed (taking into account any extension of time within which to file) all Tax Returns required to be filed by any of them and all such filed Tax Returns are complete and accurate; and (ii) have paid all Taxes that are required to be paid or that US Airways or any of its Subsidiaries are obligated to withhold from amounts owing to any employee, creditor or third party, except with respect to matters contested in good faith for which adequate reserves have been established on the most recent consolidated balance sheet included in or incorporated into the US Airways Reports.  As of the date hereof, except as would not, individually or in the aggregate, reasonably be expected to result in an increase in Taxes that is material to US Airways, there are no audits, examinations, investigations or other proceedings, in each case, pending or threatened in writing, in respect of Taxes or Tax matters.  US Airways has made available to American true and correct copies of the United States federal income Tax Returns filed by US Airways and its Subsidiaries for each of the fiscal years ended December 31, 2011 and 2010.  None of US Airways or its Subsidiaries has been a "distributing corporation" or "controlled corporation" in any distribution occurring during the last 30 months that was purported or intended to be governed by Section 355 of the Code (or any similar provision of state, local or foreign Law).  Neither US Airways nor any of its Subsidiaries has taken any action or knows of any fact, agreement, plan or other circumstance that is reasonably likely to prevent the Merger from qualifying as a "reorganization" with the meaning of Section 368(a) of the Code.  There are no Liens for Taxes on any asset of US Airways or any of its Subsidiaries, except for Liens for Taxes not yet due and payable or not yet delinquent, Liens for Taxes being contested in good faith for which appropriate reserves have been established on the most recent consolidated balance sheet included in or incorporated into the US Airways Reports, and Liens for Taxes that would not, individually or in the aggregate, reasonably be expected to result in a US Airways Material Adverse Effect.

(o)     <u>Labor Matters</u>.

(i)     US Airways has made available to American true and complete copies of all collective bargaining agreements, works council agreements, work rules and practices and other labor union Contracts, terms sheets, memoranda of understanding or similar agreements (including all amendments thereto) applicable to any employees of US Airways or any of its Subsidiaries as of the date of this Agreement with respect to their employment with US Airways or any of its Subsidiaries (the "<u>*US Airways CBAs*</u>"), each of which is set forth in Section 3.2(o)(i) of the US Airways Disclosure Letter. Except as set forth in Section 3.2(o)(i) of the US Airways Disclosure Letter, as of the date of this Agreement, none of US Airways or any of its Subsidiaries has breached or otherwise failed to comply with any provision of any US Airways CBA, except for any breaches or failures to comply that, individually or in the aggregate, have not had and would not reasonably be expected to result in a US Airways Material Adverse Effect.

(ii)    Except as set forth in Section 3.2(o)(ii) of the US Airways Disclosure Letter:

(A)    No labor union, labor organization or group of employees of US Airways or any of its Subsidiaries has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or threatened in writing to be brought or filed with any labor relations tribunal or authority.  To US Airways' Knowledge, there are no labor union organizing activities pending or threatened with respect to any employees of US Airways or any of its Subsidiaries.

(B)    There is no material labor dispute, strike, slowdown, work stoppage or lockout, or to US Airways' Knowledge, threat thereof by or with respect to any employee of US Airways or any of its Subsidiaries.

(C)    There are no arbitrations, written grievances or written complaints outstanding or, to US Airways' Knowledge, threatened against US Airways or any of its Subsidiaries under any US Airways CBAs, except for such matters as would not, individually or in the aggregate, reasonably be expected to result in a US Airways Material Adverse Effect.  Neither US Airways nor any of its Subsidiaries is in receipt of written notice of any material statutory disputes or unfair labor practice charges.

(iii)    The execution, delivery and performance of this Agreement by US Airways do not, and the consummation by US Airways of the Merger and the other transactions contemplated hereby will not, constitute or result in a breach or violation of, a termination (or right of termination) or a default under, or the creation, increase, triggering or acceleration of any obligations or rights of any kind (including under any change of control type provisions) or result in any material changes under, or increase in compensation paid under, the US Airways CBAs (including any "snap-back" provisions therein).  That certain Memorandum of Understanding Regarding Contingent Collective Bargaining Agreement among American Airlines, Inc., US Airways, Inc., Allied Pilots Association and US Airline Pilots Association ("_USAPA_") was ratified by the membership of USAPA on February 8, 2013.

(p)    _Intellectual Property and IT Assets_.  Except for such matters as would not, individually or in the aggregate, reasonably be expected to result in a US Airways Material Adverse Effect:

(i)    All Patents, patent applications, Trademark and Copyright registrations and applications for registration, and internet domain name registrations claimed to be owned by US Airways or its Subsidiaries are owned exclusively by US Airways or such Subsidiaries and are subsisting and, to US Airways' Knowledge, valid and enforceable.

(ii)     Except as set forth in Section 3.2(p)(ii) of the US Airways Disclosure Letter, US Airways and/or each of its Subsidiaries owns, or is licensed or otherwise possesses legally enforceable rights to use, all Intellectual Property necessary to conduct the business of US Airways and its Subsidiaries as currently conducted, all of which rights shall in all material respects survive unchanged the execution and delivery of this Agreement and the consummation of the Merger and the other transactions contemplated hereunder.

(iii)     Except as set forth in Section 3.2(p)(iii) of the US Airways Disclosure Letter, the conduct of the business as currently conducted by US Airways and its Subsidiaries does not infringe, misappropriate or otherwise violate the Intellectual Property rights of any third Person and in the three (3) year period immediately preceding the date of this Agreement, there has been no such claim, action or proceeding asserted, or to US Airways' Knowledge threatened against US Airways or its Subsidiaries or any indemnitees thereof.  Except as set forth in Section 3.2(p)(iii) of the US Airways Disclosure Letter, there is no claim, action or proceeding asserted, or to US Airways' Knowledge threatened, against US Airways or its Subsidiaries or any indemnitees thereof concerning the ownership, validity, registerability, enforceability, infringement, use or licensed right to use any Intellectual Property claimed to be owned or held by US Airways or its Subsidiaries or used or alleged to be used in the business of US Airways or its Subsidiaries.

(iv)     Except as set forth in Section 3.2(p)(iv) of the US Airways Disclosure Letter, to US Airways' Knowledge, no third Person has, in the three (3) year period immediately preceding the date of this Agreement, infringed, misappropriated or otherwise violated the Intellectual Property rights of US Airways or its Subsidiaries. Except as set forth in Section 3.2(p)(iv) of the US Airways Disclosure Letter, there are no claims, actions or proceedings asserted or threatened by US Airways, or decided by US Airways to be asserted or threatened, that (A) a third Person infringes, misappropriates or otherwise violates, or in the three (3) year period immediately preceding the date of this Agreement, infringed, misappropriated or otherwise violated, the Intellectual Property rights of US Airways or its Subsidiaries; or (B) a third Person's owned or claimed Intellectual Property interferes with, infringes, dilutes or otherwise harms the Intellectual Property rights of US Airways or its Subsidiaries.

(v)     US Airways and its Subsidiaries have taken reasonable measures to protect the confidentiality of all material Trade Secrets that are owned, used or held by US Airways and its Subsidiaries and, to US Airways' Knowledge, such material Trade Secrets have not been used, disclosed to or discovered by any Person except pursuant to valid and appropriate non-disclosure and/or license agreements which have not been breached.

(vi)     Except as set forth in Section 3.2(p)(vi) of the US Airways Disclosure Letter, the IT Assets of US Airways and its Subsidiaries operate and perform in all material respects in accordance with their documentation and functional specifications and otherwise as required by US Airways and its Subsidiaries for the operation of their respective businesses, and have not malfunctioned or failed within the

47

three (3) year period immediately preceding the date of this Agreement.  To US Airways' Knowledge, no Person has gained unauthorized access to such IT Assets.  Except as set forth in Section 3.2(p)(vi) of the US Airways Disclosure Letter, US Airways and its Subsidiaries have implemented and maintained for the three (3) year period immediately preceding the date of this Agreement reasonable and sufficient backup and disaster recovery technology consistent with industry practices.

(q)  Foreign Corrupt Practices Act; UK Bribery Act.  Except for such matters as would not, individually or in the aggregate, reasonably be expected to result in a material adverse impact on the ability of US Airways and its Subsidiaries to conduct their operations in the ordinary course of business:

(i)  US Airways and its Subsidiaries have developed and implemented a compliance program which includes corporate policies and procedures to ensure compliance with the Foreign Corrupt Practices Act and the UK Bribery Act.

(ii)  In connection with its compliance with the Foreign Corrupt Practices Act and the UK Bribery Act, there are no adverse or negative past performance evaluations or ratings by the U.S. or U.K. governments, or any voluntary disclosures under the Foreign Corrupt Practices Act and/or the UK Bribery Act, any enforcement actions or threats of enforcement actions, or any facts that, in each case, could result in any adverse or negative performance evaluation related to the Foreign Corrupt Practices Act and/or the UK Bribery Act.

(iii)  US Airways and its Subsidiaries have not been notified in writing of any actual or alleged violation or breach of the Foreign Corrupt Practices Act and/or the UK Bribery Act.

(iv)  None of US Airways or its Subsidiaries has undergone and is undergoing any audit, review, inspection, investigation, survey or examination of records relating to US Airways' or any of its Subsidiaries' compliance with the Foreign Corrupt Practices Act and/or the UK Bribery Act, and, to US Airways' Knowledge, there is no basis for any such audit, review, inspection, investigation, survey or examination of records.

(v)  US Airways and its Subsidiaries have not been and are not now under any administrative, civil or criminal investigation, charge or indictment involving alleged false statements, false claims or other improprieties relating to US Airways' or any of its Subsidiaries' compliance with the Foreign Corrupt Practices Act and/or the UK Bribery Act, nor, to US Airways' Knowledge, is there any basis for any such investigation or indictment.

(vi)  US Airways and its Subsidiaries have not been and are not now a party to any administrative or civil litigation involving alleged false statements, false claims or other improprieties relating to US Airways' or any of its Subsidiaries' compliance with the Foreign Corrupt Practices Act and/or the UK Bribery Act, nor, to US Airways' Knowledge, is there any basis for any such proceeding.

48

(r)    <u>Aircraft</u>.

(i)    Section 3.2(r)(i) of the US Airways Disclosure Letter sets forth a true and complete list of all aircraft owned or leased by US Airways or any of its Subsidiaries as of January 31, 2013 (the "<u>*US Airways Aircraft*</u>"), including a description of the type and registration number of each such US Airways Aircraft and the delivery date, manufacture date or age of such US Airways Aircraft, as the case may be.  All US Airways Aircraft owned or leased by US Airways or any of its Subsidiaries are being maintained according to applicable FAA regulatory standards and the FAA-approved maintenance program of US Airways and its Subsidiaries and, except with respect to US Airways Aircraft in storage or undergoing maintenance, are in airworthy condition.  US Airways and its Subsidiaries have implemented maintenance schedules with respect to their respective US Airways Aircraft and engines that, if complied with, would result in the satisfaction of all requirements under all applicable ADs and FARs required to be complied with in accordance with the FAA-approved maintenance program of US Airways and its Subsidiaries, and US Airways and its Subsidiaries are in compliance with such maintenance schedules in all material respects (except with respect to US Airways Aircraft in storage) and currently have no reason to believe that they will not satisfy any component of such maintenance schedules on or prior to the dates specified in such maintenance schedules (except with respect to US Airways Aircraft in storage).

(ii)    Section 3.2(r)(ii) of the US Airways Disclosure Letter sets forth a true and complete list, as of the date hereof, of all Contracts (other than (x) existing aircraft leases and (y) Contracts that may be terminated by US Airways or its Subsidiaries without penalty or material liability) pursuant to which US Airways or any of its Subsidiaries has an obligation to purchase or lease aircraft, including the manufacturer and model of all aircraft subject to such Contract, the nature of the purchase or lease obligation (*i.e.*, firm commitment, subject to reconfirmation or otherwise) and the anticipated year of delivery of the aircraft subject to such Contract.  US Airways has delivered or made available to American true and complete copies (except as may have been redacted for pricing and other commercially sensitive information and subject to applicable confidentiality restrictions) of all Contracts listed in Section 3.2(r)(ii) of the US Airways Disclosure Letter, including all material amendments, modifications and side letters thereto.

(iii)    Except as would not, individually or in the aggregate, reasonably be expected to have a US Airways Material Adverse Effect:

(A)    each US Airways Aircraft has a validly issued, current individual aircraft FAA Certificate of Airworthiness with respect to such US Airways Aircraft which satisfies all requirements for the effectiveness of such FAA Certificate of Airworthiness;

(B)    each US Airways Aircraft's structure, systems and components are functioning in accordance with its intended use, except for US Airways Aircraft that are undergoing maintenance and temporarily deferred maintenance items that are permitted by US Airways' maintenance programs;

49

(C)    except with respect to US Airways Aircraft in storage, all deferred maintenance items and temporary repairs with respect to each such US Airways Aircraft have been or will be made in accordance with US Airways' maintenance programs;

(D)    each US Airways Aircraft is registered on the FAA aircraft registry;

(E)    except as set forth in Section 3.2(r)(iii)(E) of the US Airways Disclosure Letter, neither US Airways nor its Subsidiaries is a party to any interchange or pooling agreements with respect to the US Airways Aircraft, other than pooling agreements in the ordinary course of business; and

(F)    no US Airways Aircraft is subleased to or otherwise in the possession of another air carrier or other Person other than US Airways or any of its Subsidiaries, to operate such US Airways Aircraft in air transportation or otherwise.

(s)    Slots.  Section 3.2(s) of the US Airways Disclosure Letter sets forth a true, correct and complete list of all held or owned takeoff and landing slots, operating authorizations from the FAA or any other Governmental Entity and other similar designated takeoff and landing rights held or owned by US Airways or any of its Subsidiaries ("*US Airways Slots*") on the date hereof at any domestic or international airport, and such list shall indicate and identify (i) any held or owned US Airways Slots that have been allocated to another air carrier beyond the end-of-the current IATA traffic season and in which US Airways and its Subsidiaries hold only temporary use rights, (ii) any US Airways Slots that have been allocated to US Airways and its Subsidiaries from another air carrier beyond the end-of-the current IATA traffic season and in which such other air carrier holds only temporary use rights and (iii) any Contracts, agreements or temporary government orders or decisions concerning specific US Airways Slots or operating authorities.  Except as would not, individually or in the aggregate, reasonably be expected to have a US Airways Material Adverse Effect, (i) US Airways and its Subsidiaries will have complied in all material respects with the requirements of the regulations issued under the Federal Aviation Act and any other Laws, rules or regulations promulgated in the United States or in any country in which US Airways operates by either a civil aviation authority, airport authority or slot coordinator with respect to the US Airways Slots, (ii) neither US Airways nor any of its Subsidiaries has received, as of the date hereof, any notice of any proposed withdrawal of the US Airways Slots by the FAA, the DOT or any other Governmental Entity, (iii)(A) the US Airways Slots have not been designated for the provision of essential air services under the regulations of the FAA, were not acquired pursuant to 14 C.F.R. § 93.219 and have not been designated for international operations, as more fully detailed in 14 C.F.R. § 93.217 and (B) to the extent covered by 14 C.F.R. § 93.227, US Airways and its Subsidiaries have used the US Airways Slots (or the US Airways Slots have been used by other air carriers) either at least 80% of the maximum amount that each US Airways Slot could have been used during each full and partial reporting period (as described in 14 C.F.R. § 93.227(i)) or such greater or lesser amount of minimum usage as may have been required

to protect such US Airways Slot's authorization from termination or withdrawal under regulations established by any Governmental Entity or airport authority, (iv) all reports required by the FAA or any other Governmental Entity relating to the US Airways Slots have been filed in a timely manner and (v) except as set forth in Section 3.2(s)(v) of the US Airways Disclosure Letter, as of the date hereof, neither US Airways nor any of its Subsidiaries has agreed to any future US Airways Slot slide, US Airways Slot trade, US Airways Slot purchase, US Airways Slot sale or other transfer of any of the US Airways Slots outside the ordinary course of business consistent with past practice.

(t)    Major Airports.    As of the date hereof, no civil aviation authority, airport authority, or slot coordinator at Charlotte/Douglas International Airport (CLT), Philadelphia International Airport (PHL), Phoenix Sky Harbor International Airport (PHX) or Ronald Reagan Washington National Airport (DCA) (each such airport, a "*Major US Airways Airport*") has taken or, to US Airways' Knowledge, threatened to take any action that would reasonably be expected to materially interfere with the ability of US Airways and its Subsidiaries to conduct their respective operations at any Major US Airways Airport in the same manner as currently conducted in all material respects.

(u)    U.S. Citizen; Air Carrier.    US Airways' primary subsidiary, US Airways, Inc., is a "citizen of the United States" as defined in the Federal Aviation Act and is an "air carrier" within the meaning of such Act operating under certificates issued pursuant to such Act (49 U.S.C. §§ 41101-41112).

(v)    Insurance.    Section 3.2(v) of the US Airways Disclosure Letter lists and briefly describes (including name of insurer, agent or broker, coverage and expiration date), as of the date of this Agreement, each insurance policy maintained by, at the expense of or for the benefit of US Airways or any of the Subsidiaries with respect to its properties, assets and liabilities and describes any material claims made thereunder. All such insurance policies are in full force and effect and neither US Airways nor any Subsidiary is in default with respect to its obligations under any such insurance policy. The insurance coverage of US Airways and the Subsidiaries is customary for corporations of similar size engaged in similar lines of businesses.  US Airways has not received any notice or other communication regarding any actual or possible (a) cancellation or invalidation of any insurance policy, (b) refusal of any coverage or rejection of any material claim under any insurance policy or (c) material adjustment in the amount of premiums payable with respect to any insurance policy.

(w)    Brokers and Finders.    Neither US Airways nor any of its officers, directors or employees has employed any broker or finder or incurred any liability for any brokerage fees, commissions, finder's fees or financial advisory fees that may be payable in connection with the Merger or the other transactions contemplated in this Agreement, except that US Airways has employed, and is solely responsible for the fees and expenses of, Barclays Capital Inc. and Millstein & Co., LLC, or one of their affiliates, as its financial advisors, and a copy of the engagement letter with each such financial advisor has been provided to American prior to the date hereof.

ARTICLE IV

Covenants

4.1    <u>American Forbearances</u>.  American covenants and agrees as to itself and its Subsidiaries that, after the date hereof and prior to the Effective Time, except (A) as otherwise expressly required by this Agreement or applicable Laws, (B) as US Airways may approve in writing (such approval not to be unreasonably withheld, conditioned or delayed) or (C) as set forth in Section 4.1 of the American Disclosure Letter, (I) its business and that of its Subsidiaries shall be conducted in the ordinary and usual course as such businesses were conducted prior to the commencement of the Cases (it being understood that the fact that the Debtors may seek Bankruptcy Court approval of any matter shall not, in and of itself, constitute a determination that such matter is not in the ordinary and usual course for purposes of this Agreement) and, to the extent consistent therewith, it shall, and shall cause its Subsidiaries to, use their respective reasonable best efforts to preserve their business organizations intact and maintain existing relations and goodwill with Governmental Entities, customers, suppliers, distributors, creditors, lessors, employees and business associates and keep available the services of the present employees and agents of American and its Subsidiaries, provided, that, subject to the limitations on the Debtors set forth in Section 4.20(b)(i), nothing contained in this Section 4.1(I) shall restrict the Debtors from carrying out their fiduciary and statutory responsibilities in the administration of the Cases, including without limitation the assumption and rejection of Contracts, and (II) without limiting the generality of the foregoing clause (I), and in furtherance thereof, American will not and will not permit its Subsidiaries to:

(a)    adopt or propose any change in its certificate of incorporation or by-laws or other applicable governing instruments or amend any term of the shares of American Common Stock;

(b)    merge or consolidate American or any of its Subsidiaries with any other Person, except for any such transactions among wholly-owned Subsidiaries of American that are not obligors or guarantors of third-party indebtedness, or adopt a plan of liquidation;

(c)    acquire or dispose of (including by way of sale-leaseback transactions, operating or capital leases or other similar transactions) any assets, properties, operations or businesses (including the purchase or sale of capital stock of any Person other than American), or make any capital expenditures, except for (i) capital expenditures made pursuant to American's capital expenditure budget (excluding capital expenditures for aircraft, engines and pre-delivery deposits for aircraft and engines) for calendar year 2013 as set forth in Section 4.1(c)(i) of the American Disclosure Letter, (ii) sale-leaseback transactions, operating or capital leases or similar transactions permitted under Section 4.1(i), (iii) acquisitions, dispositions or capital expenditures set forth in Section 4.1(c)(iii) of the American Disclosure Letter, (iv) capital expenditures (including pre-delivery deposits) with respect to any aircraft and engines listed in Section 4.1(c)(iii) of the American Disclosure Letter, (v)(A) acquisitions or dispositions of inventory, intangible assets (including Intellectual Property) and other assets (other than aircraft, engines, American Slots and American Routes), (B) acquisitions of American Slots or

52

American Routes and (C) dispositions of aircraft or engines (excluding sale-leaseback transactions or similar transactions not permitted under Section 4.1(i)), in each case, in the ordinary course of business consistent with past practice, (vi) other acquisitions and dispositions of assets up to $150,000,000 in the aggregate (measured by the value of such assets), and (vii) other dispositions of assets, operations or businesses (including the sale of capital stock of any Person) undertaken in compliance with American's obligations under Section 4.7;

(d)    other than the grant of any awards permitted under Section 4.1(o) and contemplated by Section 4.10(d), and except for the disposition of capital stock of any Person (other than American) as permitted by Section 4.1(c), issue, sell, pledge, dispose of, grant, transfer, lease, license, guarantee, encumber, or authorize the issuance, sale, pledge, disposition, grant, transfer, lease, license, guarantee or encumbrance of, any shares of capital stock of American or any of its Subsidiaries (other than the issuance of shares by a wholly-owned Subsidiary of American to American or another wholly-owned Subsidiary) or of any successor or parent company thereof, or securities convertible or exchangeable into or exercisable for any shares of such capital stock, or any options, warrants, conversion rights, stock appreciation rights, redemption rights, repurchase rights, agreements, arrangements, calls, commitments or other rights of any kind to acquire any shares of such capital stock or such convertible or exchangeable securities;

(e)    create or incur any Lien material to American or any of its Subsidiaries on any assets of American or any of its Subsidiaries having a value in excess of $120,000,000, in the aggregate, other than (A) Liens for current Taxes or other governmental charges not yet due and payable or not yet delinquent or that are being contested in good faith for which appropriate reserves have been made under GAAP; (B) mechanics', carriers', workmen's, repairmen's or other like Liens arising or incurred in the ordinary course of business consistent with past practice relating to obligations as to which there is no default on the part of American, or the validity or amount of which is being contested in good faith by appropriate proceedings; (C) Liens securing indebtedness or guarantees incurred in accordance with Section 4.1(i); and (D) other Liens that do not, individually or in the aggregate, materially impair the continued use, operation, value or marketability of any American Aircraft, American Slots, American Routes, or American Real Property or the conduct of the business of American and its Subsidiaries as presently conducted;

(f)    except for the acquisition of capital stock of any Person (other than American) as permitted by Section 4.1(c), make any loans, advances or capital contributions to or investments in any Person (other than American or any direct or indirect wholly-owned Subsidiary of American) in excess of $140,000,000 in the aggregate;

(g)    declare, set aside or pay any dividend or distribution (whether in cash, stock or property or any combination thereof) on (i) any shares of American Common Stock, or (ii) any shares of capital stock of any Subsidiary (other than wholly-owned Subsidiaries and pro rata dividends payable to holders of interests in non wholly-owned Subsidiaries);

(h)     reclassify, split, combine, subdivide or repurchase, redeem or otherwise acquire, directly or indirectly, any of its capital stock or securities convertible or exchangeable into or exercisable for any shares of its capital stock;

(i)     incur any indebtedness or guarantee such indebtedness of another Person, or issue or sell any debt securities or warrants or other rights to acquire any debt security of American or any of its Subsidiaries, except for (i) indebtedness incurred in the ordinary course of business not to exceed $420,000,000 in the aggregate, (ii) guarantees by American of indebtedness of wholly-owned Subsidiaries of American or guarantees by Subsidiaries of indebtedness of American, (iii) purchase or acquisition financing (including sale-leaseback transactions, operating or capital leases or similar transactions) with respect to any aircraft or engines listed in Section 4.1(c)(iii) of the American Disclosure Letter, or (iv) interest rate swaps on customary commercial terms consistent with past practice and not to exceed $420,000,000 of notional debt in the aggregate in addition to notional debt currently under swap or similar arrangements;

(j)     (i) other than in the ordinary course of business, enter into any Contract that would have been an American Material Contract, an American Lease or an American CBA had it been entered into prior to the date of this Agreement (other than as permitted by Section 4.1(c), (d), (e) or (i)) or (ii) enter into any Contract that (A) is a material co-branded credit card agreement or credit card processing agreement, (B) is a capacity purchase, regional carrier or similar agreement, (C) is any aircraft or engine purchase agreement (including related sale-leaseback transactions, operating or capital leases or similar transactions not otherwise permitted by Section 4.1(i)), (D) relates to or provides for a new, replacement or material enhancement of any reservation system, flight operating system, crew or maintenance system, frequent flyer system or other system, or materially increases American's financial or term commitment to any such system, or (E) is an information technology agreement, other than as described in Section 4.1(j)(ii)(D), with a term of over five years or that would reasonably be expected to require expenditures greater than $25,000,000 over its term;

(k)     make any changes with respect to material accounting policies, except as required by changes in GAAP or by applicable Law or except as American, after consultation with US Airways and with American's independent auditors, determines in good faith is preferable;

(l)     other than with respect to claims that would be exchanged for Plan Shares, settle any litigation or other proceedings before or threatened to be brought before a Governmental Entity except for an amount to be paid by American or any of its Subsidiaries (that is not reimbursed by a third-Person insurer) not in excess of $120,000,000 and which would not be reasonably likely to have a material adverse impact on the operations of American or any of its Subsidiaries;

(m)     (i) other than in connection with indebtedness incurred under Section 4.1(i) or other than in the ordinary course of business, amend or modify in any material respect, or terminate or waive any material right or benefit under, any American Material Contract, American Lease or American CBA or any Contract entered into in

accordance with Section 4.1(j), (ii) amend or modify in any material respect, or terminate or waive any material right or benefit under, any Contract that (A) is a material co-branded credit card or credit card processing agreement, (B) is a capacity purchase, regional carrier or similar agreement, (C) is any aircraft or engine purchase agreement (including related sale-leaseback transactions, operating or capital leases or similar transactions not otherwise permitted by Section 4.1(i)), (D) relates to any existing reservation system, flight operating system, crew or maintenance system, frequent flyer system or other system, which amendment or modification would replace or materially enhance such system or materially increase American's financial or term commitment to such system, or (E) is an information technology agreement, other than as described in Section 4.1(m)(ii)(D), with a term of over five years or that is reasonably expected to require expenditures greater than $25,000,000 over its term, or (iii) cancel, modify or waive any debts or claims held by it or waive any rights having in the aggregate a value in excess of $70,000,000;

(n)     except as required by Law or by any currently effective Tax sharing agreement listed in Section 4.1(n) of the American Disclosure Letter, amend any material Tax Return, make any material Tax election or take any material position on any material Tax Return filed on or after the date of this Agreement or adopt any method therefor that is inconsistent with elections made, positions taken or methods used in preparing or filing similar Tax Returns in prior periods;

(o)     except (A) in connection with the replacement or promotion of any existing employee (including any officer) on compensation terms that are consistent with past practice for the applicable position, (B) as required pursuant to existing written, binding agreements executed and delivered prior to the date of this Agreement that have been provided to US Airways, (C) as contemplated by any American Compensation and Benefit Plan as in effect as of the date of this Agreement or any American CBA, or (D) as otherwise required by applicable Law, (i) other than with respect to any newly-hired employees on terms that are consistent with past practice for the applicable position, enter into any commitment to provide any severance, termination or change in control benefits to (or amend any existing arrangement with) any director, officer or employee of American or any of its Subsidiaries, other than the payment of benefits in the ordinary course of business consistent with past practice for officers or employees of similar seniority, (ii) materially increase the benefits payable under any existing severance, termination or change in control benefit policy or employment agreement, (iii) except with respect to any newly-hired employees on terms that are consistent with past practice for the applicable position, enter into any employment, severance, change in control, termination, deferred compensation or other similar agreement (or materially amend any such existing agreement) with any director, officer or employee of American or any of its Subsidiaries, (iv) establish, adopt, materially amend or terminate any material American Compensation and Benefit Plan, (v) materially increase the compensation, bonus or other benefits of, make any new awards under any American Compensation and Benefit Plan to, or pay any bonus to any director, officer, or employee of American or any of its Subsidiaries, except for increases, new awards or payments in the ordinary course of business consistent with past practice, (vi) take any action to accelerate the vesting or payment of any compensation or benefits under any American Compensation and Benefit

55

Plans, to the extent not already required in any such American Compensation and Benefit Plan, (vii) materially change any actuarial or other assumptions used to calculate funding obligations with respect to any American Compensation and Benefit Plan or materially change the manner in which contributions to such plans are made (notwithstanding any failure to make contributions during the pendency of the Cases and other than with respect to making all minimum required contributions (within the meaning of Section 303 of ERISA) as required under Section 4.10(a)) or the basis on which such contributions are determined, except as may be required by GAAP, or (viii) materially amend the terms of any outstanding equity-based award;

(p)     decrease or defer in any material respect the level of training provided to the employees of American or any of its Subsidiaries or the level of costs expended in connection therewith;

(q)     fail to keep in effect any governmental route authority in effect and used by any Subsidiary of American (the "*American Routes*") as of the date of this Agreement, <u>provided</u> that the restrictions set forth in this Section 4.1(q) shall not apply to any such failure if such failure occurs in the ordinary course of business consistent with past practice;

(r)     fail to maintain insurance at levels at least comparable to current levels or otherwise in a manner inconsistent with past practice;

(s)     take any action, or fail to take action, which action or failure could result in the loss of American Slots with an aggregate value in excess of $60,000,000;

(t)     fail to notify US Airways in writing of any incidents or accidents occurring on or after the date hereof involving any property owned or operated by American that resulted or could reasonably be expected to result in damages or losses in excess of $140,000,000;

(u)     fail to continue, in respect of all American Aircraft, all material maintenance programs consistent with past practice (except as required or permitted by applicable Law), including using reasonable best efforts to keep all such American Aircraft (except with respect to American Aircraft in storage) in such condition as may be necessary to enable the airworthiness certification of such American Aircraft under the Federal Aviation Act to be maintained in good standing at all times;

(v)     knowingly take or permit any of its Subsidiaries to take any action or refrain from taking any action the result of which would be reasonably expected to result in any of the closing conditions set forth in Sections 5.1 and 5.2 not being satisfied; or

(w)     agree, commit or seek Bankruptcy Court approval to do any of the foregoing.

4.2     <u>US Airways Forbearances</u>.  US Airways covenants and agrees as to itself and its Subsidiaries that, after the date hereof and prior to the Effective Time, except (A) as

otherwise expressly required by this Agreement or applicable Laws, (B) as American may approve in writing (such approval not to be unreasonably withheld, conditioned or delayed) or (C) as set forth in Section 4.2 of the US Airways Disclosure Letter, (I) its business and that of its Subsidiaries shall be conducted in the ordinary and usual course and, to the extent consistent therewith, it shall, and shall cause its Subsidiaries to, use their respective reasonable best efforts to preserve their business organizations intact and maintain existing relations and goodwill with Governmental Entities, customers, suppliers, distributors, creditors, lessors, employees and business associates and keep available the services of the present employees and agents of US Airways and its Subsidiaries and (II) without limiting the generality of the foregoing clause (I), and in furtherance thereof, US Airways will not and will not permit its Subsidiaries to:

(a)        adopt or propose any change in its certificate of incorporation or by-laws or other applicable governing instruments or amend any term of the shares of US Airways Common Stock;

(b)        merge or consolidate US Airways or any of its Subsidiaries with any other Person, except for any such transactions among wholly-owned Subsidiaries of US Airways that are not obligors or guarantors of third-party indebtedness, or adopt a plan of liquidation;

(c)        acquire or dispose of (including by way of sale-leaseback transactions, operating or capital leases or other similar transactions) any assets, properties, operations or businesses (including the purchase or sale of capital stock of any Person other than US Airways), or make any capital expenditures, except for (i) capital expenditures made pursuant to US Airways' capital expenditure budget (excluding capital expenditures for aircraft, engines and pre-delivery deposits for aircraft and engines) for calendar year 2013 as set forth in Section 4.2(c)(i) of the US Airways Disclosure Letter, (ii) sale-leaseback transactions, operating or capital leases or similar transactions permitted under Section 4.2(i), (iii) acquisitions, dispositions or capital expenditures set forth in Section 4.2(c)(iii) of the US Airways Disclosure Letter, (iv) capital expenditures (including pre-delivery deposits) with respect to any aircraft and engines listed in Section 4.2(c)(iii) of the US Airways Disclosure Letter, (v)(A) acquisitions or dispositions of inventory, intangible assets (including Intellectual Property) and other assets (other than aircraft, engines, US Airways Slots and US Airways Routes), (B) acquisitions of US Airways Slots or US Airways Routes and (C) dispositions of aircraft or engines (excluding sale-leaseback transactions or similar transactions not permitted under Section 4.2(i)), in each case, in the ordinary course of business consistent with past practice, (vi) other acquisitions and dispositions of assets up to $65,000,000 in the aggregate (measured by the value of such assets), and (vii) other dispositions of assets, operations or businesses (including the sale of capital stock of any Person) undertaken in compliance with US Airways' obligations under Section 4.7;

(d)        other than (i) the issuance of shares of US Airways Common Stock prior to but not after the Share Determination Date, (ii) the grant of any US Airways Stock-Settled RSUs permitted under Section 4.2(o) prior to but not after the Share Determination Date, or (iii) the issuance of shares of US Airways Common Stock upon the exercise or vesting of US Airways Options, US Airways Stock-Settled SARs or US

Airways Stock-Settled RSUs or the conversion of the US Airways 7.25% Convertible Notes or the US Airways 7% Convertible Notes, all of which will be included in the calculation of US Airways Fully Diluted Shares, and except for the disposition of capital stock of any Person (other than US Airways) as permitted by Section 4.2(c), issue, sell, pledge, dispose of, grant, transfer, lease, license, guarantee, encumber, or authorize the issuance, sale, pledge, disposition, grant, transfer, lease, license, guarantee or encumbrance of, any shares of capital stock of US Airways or any its Subsidiaries (other than the issuance of shares by a wholly-owned Subsidiary of US Airways to US Airways or another wholly-owned Subsidiary), or securities convertible or exchangeable into or exercisable for any shares of such capital stock, or any options, warrants, conversion rights, stock appreciation rights, redemption rights, repurchase rights, agreements, arrangements, calls, commitments or other rights of any kind to acquire any shares of such capital stock or such convertible or exchangeable securities;

(e)    create or incur any Lien material to US Airways or any of its Subsidiaries on any assets of US Airways or any of its Subsidiaries having a value in excess of $50,000,000, in the aggregate, other than (A) Liens for current Taxes or other governmental charges not yet due and payable or not yet delinquent or that are being contested in good faith for which appropriate reserves have been made under GAAP; (B) mechanics', carriers', workmen's, repairmen's or other like Liens arising or incurred in the ordinary course of business consistent with past practice relating to obligations as to which there is no default on the part of US Airways, or the validity or amount of which is being contested in good faith by appropriate proceedings; (C) Liens securing indebtedness or guarantees incurred in accordance with Section 4.2(i); and (D) other Liens that do not, individually or in the aggregate, materially impair the continued use, operation, value or marketability of any US Airways Aircraft, US Airways Slots, US Airways Routes, or US Airways Real Property or the conduct of the business of US Airways and its Subsidiaries as presently conducted;

(f)    except for the acquisition of capital stock of any Person (other than US Airways) as permitted by Section 4.2(c), make any loans, advances or capital contributions to or investments in any Person (other than US Airways or any direct or indirect wholly-owned Subsidiary of US Airways) in excess of $60,000,000 in the aggregate;

(g)    declare, set aside or pay any dividend or distribution (whether in cash, stock or property or any combination thereof) on (i) any shares of US Airways Common Stock, or (ii) any shares of capital stock of any Subsidiary (other than wholly-owned Subsidiaries and pro rata dividends payable to holders of interests in non wholly-owned Subsidiaries);

(h)    reclassify, split, combine, subdivide or repurchase, redeem or otherwise acquire, directly or indirectly, any of its capital stock or securities convertible or exchangeable into or exercisable for any shares of its capital stock;

(i)    incur any indebtedness or guarantee such indebtedness of another Person, or issue or sell any debt securities or warrants or other rights to acquire any debt

security of US Airways or any of its Subsidiaries, except for (i) indebtedness incurred in the ordinary course of business not to exceed $180,000,000 in the aggregate, (ii) guarantees by US Airways of indebtedness of wholly-owned Subsidiaries of US Airways or guarantees by Subsidiaries of indebtedness of US Airways, (iii) purchase or acquisition financing (including sale-leaseback transactions, operating or capital leases or similar transactions) with respect to any aircraft or engines listed in Section 4.2(c)(iii) of the US Airways Disclosure Letter, or (iv) interest rate swaps on customary commercial terms consistent with past practice and not to exceed $180,000,000 of notional debt in the aggregate in addition to notional debt currently under swap or similar arrangements;

(j)        (i) other than in the ordinary course of business, enter into any Contract that would have been a US Airways Material Contract, a US Airways Lease or a US Airways CBA had it been entered into prior to the date of this Agreement (other than as permitted by Section 4.2(c), (d), (e) or (i)) or (ii) enter into any Contract that (A) is a material co-branded credit card agreement or credit card processing agreement, (B) is a capacity purchase, regional carrier or similar agreement, (C) is any aircraft or engine purchase agreement (including related sale-leaseback transactions, operating or capital leases or similar transactions not otherwise permitted by Section 4.2(i)), (D) relates to or provides for a new, replacement or material enhancement of any reservation system, flight operating system, crew or maintenance system, frequent flyer system or other system, or materially increases US Airway's financial or term commitment to any such system, or (E) is an information technology agreement, other than as described in Section 4.2(j)(ii)(D), with a term of over five years or that would reasonably be expected to require expenditures greater than $25,000,000 over its term;

(k)        make any changes with respect to material accounting policies, except as required by changes in GAAP or by applicable Law or except as US Airways, after consultation with American and with US Airways' independent auditors, determines in good faith is preferable;

(l)        settle any litigation or other proceedings before or threatened to be brought before a Governmental Entity except for an amount to be paid by US Airways or any of its Subsidiaries (that is not reimbursed by a third-Person insurer) not in excess of $50,000,000 and which would not be reasonably likely to have a material adverse impact on the operations of US Airways or any of its Subsidiaries;

(m)        (i) other than in connection with indebtedness incurred under Section 4.2(i) or other than in the ordinary course of business, amend or modify in any material respect, or terminate or waive any material right or benefit under, any US Airways Material Contract, US Airways Lease or US Airways CBA or any Contract entered into in accordance with Section 4.2(j), (ii) amend or modify in any material respect, or terminate or waive any material right or benefit under, any Contract that (A) is a material co-branded credit card or credit card processing agreement, (B) is a capacity purchase, regional carrier or similar agreement, (C) is any aircraft or engine purchase agreement (including related sale-leaseback transactions, operating or capital leases or similar transactions not otherwise permitted by Section 4.2(i)), (D) relates to any existing reservation system, flight operating system, crew or maintenance system, frequent flyer

system or other system, which amendment or modification would replace or materially enhance such system or materially increase US Airway's financial or term commitment to such system, or (E) is an information technology agreement, other than as described in Section 4.2(m)(ii)(D), with a term of over five years or that is reasonably expected to require expenditures greater than $25,000,000 over its term, or (iii) cancel, modify or waive any debts or claims held by it or waive any rights having in the aggregate a value in excess of $30,000,000;

(n)    except as required by Law or by any currently effective Tax sharing agreement listed in Section 4.2(n) of the US Airways Disclosure Letter, amend any material Tax Return, make any material Tax election or take any material position on any material Tax Return filed on or after the date of this Agreement or adopt any method therefor that is inconsistent with elections made, positions taken or methods used in preparing or filing similar Tax Returns in prior periods;

(o)    except (A) in connection with the replacement or promotion of any existing employee (including any officer) on compensation terms that are consistent with past practice for the applicable position, (B) as required pursuant to existing written, binding agreements executed and delivered prior to the date of this Agreement that have been provided to American, (C) as contemplated by any US Airways Compensation and Benefit Plan as in effect as of the date of this Agreement or any US Airways CBA, or (D) as otherwise required by applicable Law, (i) other than with respect to any newly-hired employees on terms that are consistent with past practice for the applicable position, enter into any commitment to provide any severance, termination or change in control benefits to (or amend any existing arrangement with) any director, officer or employee of US Airways or any of its Subsidiaries, other than the payment of benefits in the ordinary course of business consistent with past practice for officers or employees of similar seniority, (ii) materially increase the benefits payable under any existing severance, termination or change in control benefit policy or employment agreement, (iii) except with respect to any newly-hired employees on terms that are consistent with past practice for the applicable position, enter into any employment, severance, change in control, termination, deferred compensation or other similar agreement (or materially amend any such existing agreement) with any director, officer or employee of US Airways or any of its Subsidiaries, (iv) establish, adopt, materially amend or terminate any material US Airways Compensation and Benefit Plan, (v) materially increase the compensation, bonus or other benefits of, make any new awards under any US Airways Compensation and Benefit Plan to, or pay any bonus to any director, officer, or employee of US Airways or any of its Subsidiaries, except for increases, new awards or payments in the ordinary course of business consistent with past practice, (vi) take any action to accelerate the vesting or payment of any compensation or benefits under any US Airways Compensation and Benefit Plans, to the extent not already required in any such US Airways Compensation and Benefit Plan, (vii) materially change any actuarial or other assumptions used to calculate funding obligations with respect to any US Airways Compensation and Benefit Plan or materially change the manner in which contributions to such plans are made or the basis on which such contributions are determined, except as may be required by GAAP, or (viii) materially amend the terms of any outstanding equity-based award;

(p)     decrease or defer in any material respect the level of training provided to the employees of US Airways or any of its Subsidiaries or the level of costs expended in connection therewith;

(q)     fail to keep in effect any governmental route authority in effect and used by any Subsidiary of US Airways (the "*US Airways Routes*") as of the date of this Agreement, <u>provided</u> that the restrictions set forth in this Section 4.2(q) shall not apply to any such failure if such failure occurs in the ordinary course of business consistent with past practice;

(r)     fail to maintain insurance at levels at least comparable to current levels or otherwise in a manner inconsistent with past practice;

(s)     take any action, or fail to take action, which action or failure could result in the loss of US Airways Slots with an aggregate value in excess of $25,000,000;

(t)     fail to notify American in writing of any incidents or accidents occurring on or after the date hereof involving any property owned or operated by US Airways that resulted or could reasonably be expected to result in damages or losses in excess of $60,000,000;

(u)     fail to continue, in respect of all US Airways Aircraft, all material maintenance programs consistent with past practice (except as required or permitted by applicable Law), including using reasonable best efforts to keep all such US Airways Aircraft (except with respect to US Airways Aircraft in storage) in such condition as may be necessary to enable the airworthiness certification of such US Airways Aircraft under the Federal Aviation Act to be maintained in good standing at all times;

(v)     knowingly take or permit any of its Subsidiaries to take any action or refrain from taking any action the result of which would be reasonably expected to result in any of the closing conditions set forth in Sections 5.1 and 5.3 not being satisfied; or

(w)     agree or commit to do any of the foregoing.

4.3     <u>American Acquisition Proposals</u>.

(a)     American agrees that, except for the sale of any assets, operations, business or capital stock of any Person permitted by Section 4.1, neither it nor any of its Subsidiaries nor any of the officers and directors of it or any of its Subsidiaries shall, and that it shall not authorize or permit its and its Subsidiaries' directors, officers, employees, agents and representatives, including any investment bankers, attorneys or accountants (collectively, "*Representatives*") retained by it or any of its Subsidiaries, to, directly or indirectly, initiate, solicit or knowingly encourage or facilitate any inquiries or the making of any proposal or offer with respect to (1) any merger, consolidation or similar transaction (other than the Merger) pursuant to which any third Person or group of Persons party thereto, or the stockholders of such third Person or Persons, would become the beneficial owner of 10% or more of the outstanding shares of common stock or the

outstanding voting power of American, American Airlines, Inc., AMR Eagle Holding Corporation or American Eagle Airlines, Inc. (as reorganized pursuant to the Bankruptcy Code or prior to such reorganization if acquired to influence acceptance or rejection of the Plan, the management or control of American and its Subsidiaries or the reorganization of the Debtors), or, if applicable, any surviving entity or the parent entity resulting from any such transaction, immediately upon consummation thereof, (2) any purchase of 10% or more of the equity securities or other ownership interests in American, American Airlines, Inc., AMR Eagle Holding Corporation or American Eagle Airlines, Inc. (as reorganized pursuant to the Bankruptcy Code or prior to such reorganization if acquired to influence acceptance or rejection of the Plan, the management or control of American and its Subsidiaries or the reorganization of the Debtors), (3) any purchase of 10% or more of the consolidated assets of American and its Subsidiaries taken as a whole, (4) any purchase of outstanding claims in an amount that would entitle the purchaser of such claims to 10% or more of the equity securities or other ownership interests in American or American Airlines, Inc. (as reorganized pursuant to the Bankruptcy Code), or (5) any plan of reorganization of any Debtor other than the Plan (any such inquiry, proposal or offer being hereinafter referred to as an "*American Acquisition Proposal*").  For the avoidance of doubt, except as provided above, any inquiry, proposal or offer to purchase outstanding American Common Stock during the Cases shall not constitute an American Acquisition Proposal.  American further agrees that, except as permitted by this Section 4.3(a), neither it nor any of its Subsidiaries nor any of the officers and directors of it or any of its Subsidiaries shall, and that it shall cause its and its Subsidiaries' Representatives not to, directly or indirectly, (i) provide any confidential information or data to, or engage in any discussions or negotiations with, any Person relating to an American Acquisition Proposal, (ii) seek authority from the Bankruptcy Court to enter into (or not prosecute in good faith an objection to efforts by any other Person to have American enter into), or enter into, a letter of intent or other agreement or arrangement with respect to any American Acquisition Proposal, or (iii) otherwise knowingly encourage or facilitate any effort or attempt by any Person other than US Airways to make or implement an American Acquisition Proposal.  In addition, except as permitted by this Section 4.3(a), from the date hereof to the earlier to occur of the termination of this Agreement in accordance with its terms or the Effective Time, neither American nor the Board of Directors of American nor any committee thereof shall: (i) withdraw or modify in a manner adverse to US Airways the American Directors' Recommendation; (ii) recommend any American Acquisition Proposal; (iii) fail to include the American Directors' Recommendation in the approved Disclosure Statement; or (iv) take, resolve to take, or permit American or any of its Subsidiaries or Representatives to take, any action described in clauses (i), (ii) or (iii) of this sentence (each of the foregoing actions described in clauses (i) through (iv) being referred to as an "*American Change in Recommendation*").

Notwithstanding the foregoing provisions of this Section 4.3(a), nothing contained in this Agreement shall prevent American or any of its Subsidiaries or Representatives, or its Board of Directors or any committee thereof from:

> (i)      complying with its disclosure obligations under applicable Law (including under Sections 14d-9 and 14e-2 of the Exchange Act) with regard to an

American Acquisition Proposal; <u>provided</u> that any such disclosure (other than a "stop, look and listen" communication or similar communication of the type contemplated by Rule 14d-9(f) under the Exchange Act) shall be deemed to be an American Change in Recommendation unless the American Board of Directors publicly reaffirms the American Directors' Recommendation in such disclosure;

    (ii)    at any time prior to, but not after, the entry of the Confirmation Order by the Bankruptcy Court:

    (A)    providing information in response to a request therefor by the Person who has made an unsolicited bona fide written American Acquisition Proposal;

    (B)    engaging in any discussions or negotiations with any Person who has made an unsolicited bona fide written American Acquisition Proposal (<u>provided</u>, that representatives of the legal and financial advisors retained by the Creditors' Committee in the Cases (the "<u>UCC's Advisors</u>") shall have the right to participate in any such discussions and negotiations to the same extent permitted under the Joint Exploration Protocol Agreement, dated May 1, 2012, as amended, and the Joint Exploration Protocol Side Letter Agreement, dated July 19, 2012, as amended, between American and the Creditors' Committee (to the extent such agreements are then in effect)); or

    (C)    making an American Change in Recommendation (<u>provided</u>, that prior to making any such American Change in Recommendation, American shall have consulted with the UCC's Advisors);

<u>provided</u>, that (w) in each such case referred to in clause (A) or (B) above, (1) American has not breached its obligations under this Section 4.3(a) in connection with the receipt of an unsolicited bona fide written American Acquisition Proposal, (2) American receives from such Person an executed confidentiality agreement (excluding standstill provisions) containing customary terms that are no less favorable in any material respect to American than those contained in the US Airways NDA, (3) the Board of Directors of American reasonably determines that such American Acquisition Proposal constitutes or is reasonably likely to lead to an American Superior Proposal (without having to take the actions referred to in clause (z) below) and (4) the Board of Directors of American reasonably determines, after consultation with its outside legal counsel, that, in light of such American Acquisition Proposal, a failure to take such action is reasonably likely to be inconsistent with its fiduciary duties to the stakeholders of the Debtors under applicable Law; (x) in the case referred to in clause (C) above, if such American Change in Recommendation does not relate to an American Acquisition Proposal, the Board of Directors of American determines in good faith, after consultation with its outside legal counsel, that a failure to take such action is reasonably likely to be inconsistent with its fiduciary duties to the stakeholders of the Debtors under applicable Law, taking into account any revisions to the terms of the transactions contemplated by this Agreement pursuant to Section 4.3(c); (y) in the case referred to in clause (C) above, if such American Change in Recommendation relates to an American Acquisition Proposal,

(1) American has not breached its obligations under this Section 4.3(a) in connection with the receipt of an unsolicited bona fide written American Acquisition Proposal, (2) the Board of Directors of American determines in good faith, after consultation with its financial advisor and outside counsel, taking into account all relevant factors, including legal, financial and regulatory aspects of the proposal, the likelihood of obtaining financing, the likelihood of consummation and the Person making the proposal, that such American Acquisition Proposal is the highest or otherwise best offer available to the stakeholders of the Debtors (to whom fiduciary duties are owed by the Board of Directors of American) as compared to the transactions contemplated by this Agreement and the Plan and (3) the Board of Directors of American determines in good faith, after consultation with its outside legal counsel, that a failure to take such action is reasonably likely to be inconsistent with its fiduciary duties to the stakeholders of the Debtors under applicable Law, taking into account any revisions to the terms of the transactions contemplated by this Agreement pursuant to Section 4.3(c); and (z) in the case referred to in clause (C) above, US Airways shall have had written notice of American's intention to take the action referred to in clause (C) (a "*Notice of American Change in Recommendation*") at least five (5) business days prior to the taking of such action by American and American shall have complied with the provisions of Section 4.3(c);

provided, further, that any American Acquisition Proposal referred to in clause (y) above must involve (A) a merger, consolidation or similar transaction pursuant to which any Person or the stockholders of such Person would become the beneficial owners of at least 30% of the outstanding shares of common stock or the outstanding voting power of American or American Airlines, Inc. (as reorganized pursuant to the Bankruptcy Code) or, if applicable, any surviving entity (if neither American or American Airlines, Inc. is the surviving entity) resulting from any such transaction, immediately upon consummation thereof, (B) the acquisition of at least 30% of the equity securities or other ownership interests in American or American Airlines, Inc. (as reorganized pursuant to the Bankruptcy Code) by any Person or group of Persons, or (C) the acquisition of at least 30% of the consolidated assets of American and its Subsidiaries, taken as a whole, in each case, by a Person other than (1) US Airways or its Subsidiaries or (2) the Debtors or their Subsidiaries (any such American Acquisition Proposal being referred to in this Agreement as an "*American Superior Proposal*").

Notwithstanding the foregoing, in no event shall a Standalone Plan or any plan of reorganization that is substantially equivalent to a Standalone Plan be deemed an American Superior Proposal.

(b)     American agrees that it will immediately cease and cause to be terminated any existing activities, discussions or negotiations with any Person other than US Airways with respect to any American Acquisition Proposal.  American will promptly request each Person that has heretofore executed a confidentiality agreement in connection with its consideration of an American Acquisition Proposal to return or destroy all confidential information furnished prior to the execution of this Agreement to or for the benefit of such Person by or on behalf of American or any of its Subsidiaries. American agrees that it will take the necessary steps to promptly inform its Representatives of the obligations undertaken in this Section 4.3.  American agrees that

any action inconsistent with the restrictions set forth in this Section 4.3 taken by any Representative of American or any of its Subsidiaries will be deemed to be a breach of this Section 4.3 by American (and any willful action or failure to take an action by any of American's Subsidiaries or any of American's or its Subsidiaries' respective Representatives at the direction or request of, or with the consent or approval of, American and with the actual knowledge of an officer of American (who is a knowledge party within the meaning of "American's Knowledge") that the action so taken or omitted to be taken would constitute a material breach of this Section 4.3 will be deemed to be a Deliberate Material Breach of this Section 4.3 by American).

(c)     American agrees that it will notify US Airways (and the UCC's Legal Advisor) as promptly as practicable (and, in any event, within 24 hours) if any inquiries, proposals or offers with respect to any American Acquisition Proposal or potential American Acquisition Proposal are received by, any such information is requested from, or any such discussions or negotiations are sought to be initiated or continued with, it or any of its Representatives, indicating, in connection with such notice, the name of such Person and the material terms and conditions of any proposal or offer and thereafter shall keep US Airways (and the UCC's Advisors) informed, on a current basis, on the status and terms of any such proposal or offer and the status of any such discussions or negotiations.  American agrees that (i) during the five (5) business day period following a Notice of American Change in Recommendation and prior to making an American Change in Recommendation, if requested by US Airways, American and its Representatives (in consultation with the UCC's Advisors) shall negotiate in good faith with US Airways and its Representatives regarding any revisions to the terms of the transaction contemplated by this Agreement proposed by US Airways and (ii) American may make an American Change in Recommendation only if the facts and circumstances that are the basis for such American Change in Recommendation continue to necessitate an American Change in Recommendation in light of any revisions to the terms of the transaction contemplated by this Agreement to which US Airways shall have agreed in writing prior to the expiration of such five (5) business day period. American agrees that it will deliver to US Airways (and the UCC's Legal Advisor) a new Notice of American Change in Recommendation with respect to each American Acquisition Proposal that has been materially revised or modified prior to taking any action to recommend or agreeing to recommend such American Acquisition Proposal to the stakeholders of the Debtors and that a new five (5) business day period shall commence, for purposes of this Section 4.3(c), with respect to each such materially revised or modified American Acquisition Proposal from the time US Airways receives a Notice of American Change in Recommendation with respect thereto.  American also agrees to provide any information to US Airways (and the UCC's Advisors) that it is providing to another Person pursuant to this Section 4.3 prior to or substantially contemporaneous with the time it provides it to such other Person unless American has already provided such information to US Airways or it is advised by outside legal counsel that doing so would violate applicable Law.

(d)     Subject to the termination of this Agreement in accordance with its terms, American agrees that its obligations pursuant to Sections 4.7(a) and 4.20 shall not be affected by the commencement, public proposal, public disclosure or communication

to American or the other Debtors or their stakeholders of any American Acquisition Proposal, by any consideration of or agreement with respect to an American Acquisition Proposal or by any change or proposed change to the American Directors' Recommendation (whether or not permitted by the terms of this Agreement).

4.4     US Airways Acquisition Proposals.

(a)     US Airways agrees that, except for the sale of any assets, operations, business or capital stock of any Person permitted by Section 4.2, neither it nor any of its Subsidiaries nor any of the officers and directors of it or any of its Subsidiaries shall, and that it shall not authorize or permit its and its Subsidiaries' Representatives retained by it or any of its Subsidiaries, to, directly or indirectly, initiate, solicit or knowingly encourage or facilitate any inquiries or the making of any proposal or offer with respect to (1) any merger, consolidation or similar transaction (other than the Merger) pursuant to which any third Person or group of Persons party thereto, or the stockholders of such third Person or Persons, would become the beneficial owner of 10% or more of the outstanding shares of common stock or the outstanding voting power of US Airways or US Airways, Inc., or, if applicable, any surviving entity or the parent entity resulting from any such transaction, immediately upon consummation thereof, (2) any purchase of 10% or more of the equity securities or other ownership interests in US Airways or US Airways, Inc. (other than a public offering of equity securities registered pursuant to the Securities Act) or (3) any purchase of 10% or more of the consolidated assets of US Airways and its Subsidiaries taken as a whole (any such inquiry, proposal or offer being hereinafter referred to as a "*US Airways Acquisition Proposal*").  US Airways further agrees that, except as permitted by this Section 4.4(a), neither it nor any of its Subsidiaries nor any of the officers and directors of it or any of its Subsidiaries shall, and that it shall cause its and its Subsidiaries' Representatives not to, directly or indirectly, (i) provide any confidential information or data to, or engage in any discussions or negotiations with, any Person relating to a US Airways Acquisition Proposal, (ii) enter into a letter of intent or other agreement or arrangement with respect to any US Airways Acquisition Proposal, or (iii) otherwise knowingly encourage or facilitate any effort or attempt by any Person other than American to make or implement a US Airways Acquisition Proposal.  In addition, except as permitted by this Section 4.4(a), from the date hereof to the earlier to occur of the termination of this Agreement in accordance with its terms or the Effective Time, neither US Airways nor the Board of Directors of US Airways nor any committee thereof shall: (i)  withdraw or modify in any manner adverse to American or Merger Sub the US Airways Directors' Recommendation; (ii) recommend any US Airways Acquisition Proposal; (iii) fail to include the US Airways Directors' Recommendation in the Prospectus / Proxy Statement; or (iv) take, resolve to take, or permit US Airways or any of its Subsidiaries or Representatives to take, any action described in clauses (i), (ii) or (iii) of this sentence (each of the foregoing actions described in clauses (i) through (iv) being referred to as a "*US Airways Change in Recommendation*").

Notwithstanding the foregoing provisions of this Section 4.4(a), nothing contained in this Agreement shall prevent US Airways or any of its Subsidiaries or Representatives, or its Board of Directors or any committee thereof from:

(i)        complying with its disclosure obligations under applicable Law (including under Sections 14d-9 and 14e-2 of the Exchange Act) with regard to a US Airways Acquisition Proposal; provided that any such disclosure (other than a "stop, look and listen" communication or similar communication of the type contemplated by Rule 14d-9(f) under the Exchange Act) shall be deemed to be US Airways Change in Recommendation unless the US Airways Board of Directors publicly reaffirms the US Airways Directors' Recommendation in such disclosure;

(ii)        at any time prior to, but not after, the receipt of the Stockholder Approval:

(A)        providing information in response to a request therefor by the Person who has made an unsolicited bona fide written US Airways Acquisition Proposal;

(B)        engaging in any discussions or negotiations with any Person who has made an unsolicited bona fide written US Airways Acquisition Proposal; or

(C)        making a US Airways Change in Recommendation;

provided that, (w) in each such case referred to in clause (A) or (B) above, (1) US Airways has not breached its obligations under this Section 4.4(a) in connection with the receipt of an unsolicited bona fide written US Airways Acquisition Proposal, (2) US Airways receives from such Person an executed confidentiality agreement (excluding standstill provisions) containing customary terms that are no less favorable in any material respect to US Airways than those contained in the American NDA, (3) the Board of Directors of US Airways reasonably determines that such US Airways Acquisition Proposal constitutes or is reasonably likely to lead to a US Airways Superior Proposal (without having to take the actions referred to in clause (z) below) and (4) the Board of Directors of US Airways reasonably determines, after consultation with its outside legal counsel, that, in light of such US Airways Acquisition Proposal, a failure to take such action is reasonably likely to be inconsistent with its fiduciary duties to the stockholders of US Airways under applicable Law; (x) in the case referred to in clause (C) above, if such US Airways Change in Recommendation does not relate to a US Airways Acquisition Proposal, the Board of Directors of US Airways determines in good faith, after consultation with its outside legal counsel, that a failure to take such action is reasonably likely to be inconsistent with its fiduciary duties to the stockholders of US Airways under applicable Law, taking into account any revisions to the terms of the transactions contemplated by this Agreement pursuant to Section 4.4(c); (y) in the case referred to in clause (C) above, if such US Airways Change in Recommendation relates to a US Airways Acquisition Proposal, (1) US Airways has not breached its obligations under this Section 4.4(a) in connection with the receipt of an unsolicited bona fide written US Airways Acquisition Proposal, (2) the Board of Directors of US Airways determines in good faith, after consultation with its financial advisor and outside counsel, taking into account all relevant factors, including legal, financial and regulatory aspects of the proposal, the likelihood of obtaining financing, the likelihood of consummation and the

67

Person making the proposal, that such US Airways Acquisition Proposal is more favorable, from a financial point of view, to US Airways' stockholders than the transactions contemplated by this Agreement and (3) the Board of Directors of US Airways determines in good faith, after consultation with its outside legal counsel, that a failure to take such action is reasonably likely to be inconsistent with its fiduciary duties to the stockholders of US Airways under applicable Law, taking into account any revisions to the terms of the transactions contemplated by this Agreement pursuant to Section 4.4(c); and (z) in the case referred to in clause (C) above, American shall have had written notice of US Airways' intention to take the action referred to in clause (C) (a "*Notice of US Airways Change in Recommendation*") at least five (5) business days prior to the taking of such action by US Airways and US Airways shall have complied with the provisions of Section 4.4(c);

provided, further, that any US Airways Acquisition Proposal referred to in clause (y) above must involve (A) a merger, consolidation or similar transaction pursuant to which any Person or the stockholders of such Person would become the beneficial owner of at least 30% of the outstanding shares of common stock or the outstanding voting power of US Airways or US Airways, Inc., or, if applicable, any surviving entity (if neither US Airways or US Airways, Inc. is the surviving entity) resulting from any such transaction, immediately upon consummation thereof, (B) the acquisition of at least 30% of the equity securities or other ownership interests in US Airways or US Airways, Inc., or (C) the acquisition of at least 30% of the consolidated assets of US Airways and its Subsidiaries, taken as a whole, in each case, by a Person other than (1) American or its Subsidiaries or (2) US Airways or its Subsidiaries (any such US Airways Acquisition Proposal being referred to in this Agreement as a "*US Airways Superior Proposal*").

(b)    US Airways agrees that it will immediately cease and cause to be terminated any existing activities, discussions or negotiations with any Person other than American with respect to any US Airways Acquisition Proposal.  US Airways will promptly request each Person that has heretofore executed a confidentiality agreement in connection with its consideration of a US Airways Acquisition Proposal to return or destroy all confidential information furnished prior to the execution of this Agreement to or for the benefit of such Person by or on behalf of US Airways or any of its Subsidiaries. US Airways agrees that it will take the necessary steps to promptly inform its Representatives of the obligations undertaken in this Section 4.4.  US Airways agrees that any action inconsistent with the restrictions set forth in this Section 4.4 taken by any Representative of US Airways or any of its Subsidiaries will be deemed to be a breach of this Section 4.4 by US Airways (and any willful action or failure to take an action by any of US Airways' Subsidiaries or any of US Airways' or its Subsidiaries' respective Representatives at the direction or request of, or with the consent or approval of, US Airways and with the actual knowledge of an officer of US Airways (who is a knowledge party within the meaning of "US Airways' Knowledge") that the action so taken or omitted to be taken would constitute a material breach of this Section 4.4 will be deemed to be a Deliberate Material Breach of this Section 4.4 by US Airways).

(c)    US Airways agrees that it will notify American as promptly as practicable (and, in any event, within 24 hours) if any inquiries, proposals or offers with

68

respect to any US Airways Acquisition Proposal or potential US Airways Acquisition Proposal are received by, any such information is requested from, or any such discussions or negotiations are sought to be initiated or continued with, it or any of its Representatives, indicating, in connection with such notice, the name of such Person and the material terms and conditions of any proposal or offer and thereafter shall keep American informed, on a current basis, on the status and terms of any such proposal or offer and the status of any such discussions or negotiations.  US Airways agrees that (i) during the five (5) business day period following a Notice of US Airways Change in Recommendation and prior to making a US Airways Change in Recommendation, if requested by American, US Airways and its Representatives shall negotiate in good faith with American and its Representatives regarding any revisions to the terms of the transaction contemplated by this Agreement proposed by American and (ii) US Airways may make a US Airways Change in Recommendation only if the facts and circumstances that are the basis for such US Airways Change in Recommendation continue to necessitate a US Airways Change in Recommendation in light of any revisions to the terms of the transaction contemplated by this Agreement to which American shall have agreed in writing prior to the expiration of such five (5) business day period.  US Airways agrees that it will deliver to American a new Notice of US Airways Change in Recommendation with respect to each US Airways Acquisition Proposal that has been materially revised or modified prior to taking any action to recommend or agreeing to recommend such US Airways Acquisition Proposal to the stockholders of US Airways and that a new five (5) business day period shall commence, for purposes of this Section 4.4(c), with respect to each such materially revised or modified US Airways Acquisition Proposal from the time American receives a Notice of US Airways Change in Recommendation with respect thereto.  US Airways also agrees to provide any information to American that it is providing to another Person pursuant to this Section 4.4 prior to or substantially contemporaneous with the time it provides it to such other Person unless US Airways has already provided such information to American or it is advised by outside legal counsel that doing so would violate applicable Law.

(d)      Subject to the termination of this Agreement in accordance with its terms, US Airways agrees that its obligations pursuant to Sections 4.6 and 4.7(a) shall not be affected by the commencement, public proposal, public disclosure or communication to US Airways or its stockholders of any US Airways Acquisition Proposal, by any consideration of or agreement with respect to a US Airways Acquisition Proposal, or by any change or proposed change to the US Airways Directors' Recommendation (whether or not permitted by the terms of this Agreement).

4.5      Information Supplied.  Each of American and US Airways agrees that the information supplied or to be supplied by it or any of its Subsidiaries for inclusion or incorporation by reference in (i) the Form S-4, and any amendment or supplement thereto, will not, at the time the Form S-4 becomes effective under the Securities Act, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of circumstances under which they were made, not misleading and (ii) the Prospectus / Proxy Statement, and any amendment or supplement thereto, will not, at the date of mailing to stockholders of US Airways and at the time of the Stockholders Meeting, contain any untrue statement of a material fact or omit to state any

material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.  American and US Airways will cause the Form S-4 and the Prospectus / Proxy Statement to comply as to form in all material respects with the applicable provisions of the Securities Act and the Exchange Act and the rules and regulations thereunder.

    4.6  Stockholders Meeting.  US Airways shall take, in accordance with applicable Law and its certificate of incorporation and by-laws, all lawful and reasonable action necessary to call, give notice of, convene and hold a meeting of holders of shares of US Airways Common Stock (the "*Stockholders Meeting*"), which may be the US Airways annual meeting of stockholders, as promptly as practicable after the date of this Agreement, and in any event will use its reasonable best efforts to convene the Stockholders Meeting not more than 45 days after the later of (x) the date the Form S-4 is declared effective or (y) the date on which the Disclosure Statement Order is entered by the Bankruptcy Court, to (a) consider and approve the adoption of this Agreement by the affirmative vote of the holders of a majority of the outstanding shares of US Airways Common Stock at the Stockholders Meeting (the "*Stockholder Approval*") and (b) consider and approve a non-binding, advisory vote on the compensation payable, in connection with the Merger, to each US Airways "named executive officer" (as determined in accordance with Item 402(t) of Regulation S-K) pursuant to arrangements entered into with US Airways.  Subject to Section 4.4, the Board of Directors of US Airways shall make the US Airways Directors' Recommendation, the US Airways Directors' Recommendation shall be included in the Prospectus / Proxy Statement and the Board of Directors of US Airways shall take all lawful and reasonable action to obtain the Stockholder Approval.

    4.7  Filings; Other Actions; Notification.

    (a)  American and US Airways shall promptly after the date of this Agreement prepare, and American shall use its reasonable best efforts to file with the SEC as promptly as practicable thereafter, a registration statement on Form S-4 in connection with the issuance of shares of Newco Common Stock to stockholders of US Airways (the "*Form S-4*"), which Form S-4 will include a prospectus and a proxy statement in connection with the Stockholders Meeting (the "*Prospectus / Proxy Statement*").  Each of American and US Airways, in consultation with the other and, in the case of American, in consultation with the UCC's Advisors, shall use its reasonable best efforts to (i) respond to any comments on the Form S-4 or the Prospectus / Proxy Statement or requests for additional information from the SEC as soon as reasonably practicable after receipt of any such comments or requests and (ii) have the Form S-4 declared effective under the Securities Act by the date that is 120 days after the date of this Agreement, and US Airways shall use its reasonable best efforts to promptly thereafter mail the Prospectus / Proxy Statement to the holders of shares of US Airways Common Stock.  The Form S-4, and any proposed modifications, amendments, supplements, exhibits and other similar documents (collectively, the "*Form S-4 Documents*"), shall be provided to US Airways and the UCC's Advisors prior to being filed with the SEC and shall be in form and substance reasonably acceptable to US Airways (such acceptance not to be unreasonably delayed, conditioned or withheld).  The Prospectus / Proxy Statement, and any proposed modifications, amendments, supplements, exhibits and other similar documents (collectively, the "*Proxy Statement*

*Documents*"), shall be provided to American prior to being mailed to the stockholders of US Airways and shall be in form and substance reasonably acceptable to American (such acceptance not to be unreasonably delayed, conditioned or withheld).  Prior to the date the Prospectus / Proxy Statement is initially mailed to US Airways stockholders, American, US Airways and Merger Sub shall cooperate in good faith to approve a certificate or certificates of designation to the Newco Charter as reasonably necessary to create the Newco Mandatorily Convertible Preferred Stock, which certificate or certificates of designation shall be reasonably acceptable to each of American and US Airways.

(b)    American and US Airways shall cooperate with each other and use (and shall cause their respective Subsidiaries to use) their respective reasonable best efforts to take or cause to be taken all actions, and do or cause to be done all things, necessary, proper or advisable on its part under this Agreement and applicable Laws (i) to consummate and make effective the Merger and the other transactions contemplated by this Agreement as soon as practicable, including preparing and filing as soon as practicable all documentation to effect all necessary notices, reports and other filings (including any required filings under the EU Merger Regulation) and (ii) to obtain as promptly as practicable all material consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any third party and/or any Governmental Entity in order to consummate the Merger or any of the other transactions contemplated by this Agreement.  For the avoidance of doubt, American and US Airways agree that obligations relating to "reasonable best efforts" and "as soon as practicable" in the preceding sentence shall, among other things, mean, with respect to filing of the notification and required form under the HSR Act made by the parties prior to the date of this Agreement, using reasonable best efforts to be prepared to complete a certification of compliance with any request for additional information issued by the Department of Justice or Federal Trade Commission in connection with the transactions contemplated by this Agreement ("*Second Request*") no later than 60 days following the issuance of such Second Request.  Subject to applicable Laws relating to the exchange of information, American and US Airways shall permit the other party to review, in advance, any written communication given by it to, and to the extent practicable consult with each other in advance of any meeting or conference with, any Governmental Entity in connection with the Merger and other transactions contemplated by this Agreement. To the extent permitted by Law, each party shall provide the other with copies of all correspondence between it (or its advisors) and any Governmental Entity relating to the transactions contemplated by this Agreement and, to the extent reasonably practicable, all telephone calls and meetings with a Governmental Entity regarding the transactions contemplated by this Agreement shall include Representatives of American and US Airways.  In exercising the foregoing rights, each of American and US Airways shall act reasonably and as promptly as practicable.

(c)    To the extent permitted by applicable Laws, American and US Airways each shall, upon request by the other, furnish the other with all information concerning itself, its Subsidiaries, directors, officers and stockholders and such other matters as may be reasonably necessary or advisable in connection with the Form S-4, the Prospectus / Proxy Statement or any other statement, filing, notice or application made by

or on behalf of American, US Airways or any of their respective Subsidiaries to any third party and/or any Governmental Entity in connection with the Merger and the transactions contemplated by this Agreement.

(d)    Subject to applicable Laws and the instructions of any Governmental Entity, American and US Airways each shall keep the other apprised of the status of matters relating to completion of the transactions contemplated hereby, including promptly furnishing the other with copies of notices or other communications received by American or US Airways, as the case may be, or any of its Subsidiaries, from any third party and/or any Governmental Entity with respect to the Merger and the other transactions contemplated by this Agreement.  American shall give prompt notice to US Airways of any change, fact or condition which, to American's Knowledge, is reasonably expected to result in an American Material Adverse Effect or of any failure of any condition to US Airways' obligations to effect the Merger.  US Airways shall give prompt notice to American of any change, fact or condition which, to US Airways' Knowledge, is reasonably expected to result in a US Airways Material Adverse Effect or of any failure of any condition to American's obligations to effect the Merger. Notwithstanding the above, the delivery of any notice pursuant to this Section 4.7(d) will not limit or otherwise affect the remedies available hereunder to the party receiving such notice or the conditions to such party's obligation to consummate the Merger.

(e)    American's and US Airways' obligations under this Section 4.7 shall include the obligation to cooperate with each other and use (and cause their respective Subsidiaries to use) their respective reasonable best efforts to defend any lawsuits or legal proceedings, whether judicial or administrative, or any actions by a Governmental Entity, challenging the consummation of the Merger or the other transactions contemplated hereby, including using reasonable best efforts to seek to have any stay or other injunctive relief which would prevent or materially delay or impair the consummation of the transactions contemplated by this Agreement entered by any court or other Governmental Entity reversed on appeal or vacated.  For purposes of this Section 4.7, "*reasonable best efforts*" shall include each of American's and US Airways' agreement to, (i) sell, hold separate or otherwise dispose of its assets or the assets of its Subsidiaries or conduct its business in a specified manner or (ii) permit its assets or the assets of its Subsidiaries to be sold, held separate or disposed of or permit its business to be conducted in a specified manner; *provided*, *however*, that nothing in this Agreement will require, or be deemed to require, American or US Airways to agree to or effect any divestiture or take any other action (x) if doing so would, individually or in the aggregate, reasonably be expected to result in a Newco Material Adverse Effect, (y) if any such sale, holding separate or other disposition of assets or conduct of business in a specified manner would be required to be effected prior to the occurrence of the Effective Time or (z) in the case of American, that is not permitted by the Bankruptcy Court; provided that American has used its reasonable best efforts to, and taken all action reasonably necessary to, promptly obtain permission to take such action from the Bankruptcy Court. "*Newco Material Adverse Effect*" means a material adverse effect on the financial condition, assets, liabilities, business, prospects, consolidated business plan or results of operations of Newco and its Subsidiaries taken as a whole.

(f)     Each party shall give the other party the opportunity to participate in the defense or settlement of any stockholder litigation against such party and/or its directors relating to the Merger and the other transactions contemplated by this Agreement.  For purposes of this paragraph, "participate" means that the non-litigating party will be kept apprised of proposed strategy and other significant decisions with respect to the litigation by the litigating party (to the extent the attorney-client privilege between the litigating party and its counsel is not undermined or otherwise affected), and the non-litigating party may offer comments or suggestions with respect to the litigation but will not be afforded any decision making power or other authority over the litigation of any settlement thereof.

(g)     The provisions contained in this Section 4.7 shall not apply with respect to any filings, motions, orders, authorizations, notices, communications or other interactions of the Debtors with the Bankruptcy Court, which matters are exclusively governed by Section 4.20.

4.8     Access and Reports.  Subject to applicable Law and that certain Agreed Information Exchange Protocol, dated October 25, 2012, among American and certain of its Representatives, US Airways and certain of its Representatives and certain advisors to the Creditors' Committee, upon reasonable notice, each party shall (and shall cause its Subsidiaries and Representatives to) afford the other party and its officers and other authorized Representatives (including environmental consultants) reasonable access, during normal business hours throughout the period prior to the Effective Time, to (a) such party's properties, books, contracts and records and, during such period, such party shall (and shall cause its Subsidiaries and Representatives to) furnish promptly to the other party and its authorized Representatives all information concerning its business, properties and personnel as may reasonably be requested (subject to applicable confidentiality restrictions and provided that neither party shall be required to furnish any information that would be materially harmful to such party's competitive position) and (b) such party's and its Subsidiaries' Representatives to discuss any information furnished by or on behalf of such party and to discuss such party's and its Subsidiaries' businesses, affairs, finances and accounts.

4.9     Publicity.  The initial press release disclosing this Agreement shall be a joint press release and thereafter American and US Airways each shall consult with the other prior to issuing any press releases or otherwise making public announcements with respect to the Merger, the Plan and the other transactions contemplated by this Agreement and prior to making any substantive filings with any third party or any Governmental Entity (including any national securities exchange) with respect thereto, except as may be required by applicable Law or by obligations pursuant to any listing agreement with or rules of any national securities exchange or by the request of any Governmental Entity (and, subject to Sections 4.3 and 4.4, respectively, other than such party's actions in respect of an American Acquisition Proposal or a US Airways Acquisition Proposal, as applicable).

4.10     Employee Matters.

(a)     Prior to the Closing, US Airways shall use best efforts to cause each employee of US Airways that is party to an Executive Change in Control Agreement

to waive his or her rights under such agreement to accelerated vesting of US Airways Options, US Airways Equity Awards, US Airways Cash-Settled RSUs and/or US Airways Cash-Settled SARs, in each case, solely as a result of the consummation of the Merger.

(b)    Prior to the Closing, American and/or its Subsidiaries shall make all minimum required contributions (within the meaning of Section 303 of ERISA) to each American Compensation and Benefit Plan that are required to have been made and were not made prior to the effective time of the Plan.

(c)    Prior to the Closing, American shall adopt and approve, to be effective as of the Effective Time, a Newco 2013 Incentive Award Plan, which shall be substantially in the form of the US Airways Group, Inc. 2011 Incentive Award Plan except that references to US Airways Group, Inc. shall be revised to reflect Newco and the aggregate number of shares of Newco Common Stock reserved for issuance pursuant to the Newco 2013 Incentive Award Plan shall be equal to 40,000,000 shares of Newco Common Stock (the "*Newco 2013 Incentive Award Plan*").

(d)    American shall, or shall cause its Subsidiaries to, adopt or otherwise put into effect (i) prior to the Closing, the Ordinary Course Changes as defined in and set forth in Section 4.1(o) of the American Disclosure Letter and (ii) promptly after the Merger Support Order is entered by the Bankruptcy Court, the Employee Protection Arrangements as defined in and set forth in Section 4.1(o) of the American Disclosure Letter (including but not limited to granting under the Newco 2013 Incentive Award Plan, the alignment equity and long term incentive awards in the amounts and upon the terms and conditions set forth in Section 4.1(o) of the American Disclosure Letter, which awards shall be effective as of the Effective Time).

(e)    Each employee of US Airways, American or any of their respective Subsidiaries as of the Closing (including any employee who is full-time, part-time, temporary, on vacation or on a medical or disability or any other paid or unpaid approved leave of absence) who continues employment with Newco or the Surviving Corporation following the Closing Date (each, a "*Continuing Employee*") who is not represented by a labor union and/or whose employment is not covered by a collective bargaining agreement (collectively, the "*Non-Union Continuing Employees*") shall continue to receive, during the one (1)-year period beginning on the Closing Date, base salary or wages that are no less favorable than the base salary or wages received by such Non-Union Continuing Employee immediately prior to the Closing Date.  During the two (2)-year period beginning on the Closing Date, each Non-Union Continuing Employee shall be entitled to receive severance pay and benefits that are not less favorable than the severance pay and benefits such Non-Union Continuing Employee would have received under the applicable American Compensation and Benefit Plans in effect immediately prior to the Closing Date, including as amended or supplemented in accordance with Section 4.1(o) of the American Disclosure Letter, or any US Airways Compensation and Benefit Plans in effect immediately prior to the Closing Date, including as amended or supplemented in accordance with Section 4.2(o) of the US Airways Disclosure Letter. The employment terms and conditions of each Continuing Employee who is not a Non-

Union Continuing Employee shall be governed by the applicable labor union agreement and/or collective bargaining agreement.

(f)        To the extent permitted by applicable Laws, Newco shall credit, or shall cause the Surviving Corporation and its Subsidiaries to credit, each Non-Union Continuing Employee with his or her years of service with US Airways, American, or any of their respective Subsidiaries and predecessor entities, under any employee benefit plans, programs and arrangements in which such Non-Union Continuing Employee participates following the Closing (the "*Post-Closing Plans*"), to the same extent as such Non-Union Continuing Employee was entitled immediately prior to the Closing to credit for such service under any similar US Airways Compensation and Benefit Plan or American Compensation and Benefit Plan, for purposes of eligibility, vesting and, to the extent applicable, calculation of the amount of vacation, travel and/or severance benefits. Notwithstanding the foregoing, no service prior to the Closing Date shall be credited for the purpose of benefit accrual or eligibility for any defined benefit pension plan, early retirement benefits or subsidies under any defined benefit pension plan, nor for purposes of eligibility under any retiree medical plan, except to the extent required by applicable Laws (and then only to the extent crediting such service would not result in the duplication of benefits).

(g)        In addition, and without limiting the generality of Section 4.10(f), this Section 4.10(g) or any other provisions herein, (i) for purposes of each Post-Closing Plan providing medical, dental, pharmaceutical, vision and/or other health benefits to any Non-Union Continuing Employee and his or her dependents, Newco shall, or shall cause the Surviving Corporation and its Subsidiaries to, cause all pre-existing condition exclusions and actively-at-work requirements of such Post-Closing Plan to be waived for such Non-Union Continuing Employee and his or her covered dependents, to the extent any such pre-existing condition exclusions or actively-at-work requirements were waived or were inapplicable under the comparable US Airways Compensation and Benefit Plan or American Compensation and Benefit Plan and (ii) the Post-Closing Plans shall not deny Non-Union Continuing Employees coverage on the basis of pre-existing conditions and shall credit such Non-Union Continuing Employees for any deductibles and out-of-pocket expenses paid in the year of initial participation in the Post-Closing Plans.

(h)        On the date the employment of any Non-Union Continuing Employee is transferred to Newco or a different Subsidiary of Newco, the accrued and unused vacation and any positive account balance under any medical or dependent care expense reimbursement account of such Non-Union Continuing Employee shall be transferred to such new employer, and such new employer shall be responsible for such obligations at or after the date of such transfer, except in the case of a transfer of such expense reimbursement account balances to a new employer that does not maintain any dependent care or medical expense reimbursement account plan.  Each Non-Union Continuing Employee also shall be permitted to continue to have payroll deductions made as most recently elected by him or her under the applicable FSA Plan.

(i)        Notwithstanding anything in Section 4.10(e) to the contrary, Newco shall, or shall cause the Surviving Corporation and its Subsidiaries to, explicitly

75

assume and hereby agree to perform, or to cause to be performed, the obligations of US Airways or its Subsidiaries under those plans and agreements set forth on Section 4.10(i) of the US Airways Disclosure Letter (which provide severance payments and/or benefits applicable to Non-Union Continuing Employees).

(j)    Without limiting the generality of the foregoing, each Non-Union Continuing Employee who satisfies the eligibility requirements of a US Airways Compensation and Benefit Plan or an American Compensation and Benefit Plan that is a 401(k) plan shall be eligible to participate in a 401(k) plan maintained by Newco or the Surviving Corporation following the Closing (each, a "*Post-Closing 401(k) Plan*") and shall be credited with eligibility service and vesting service for all periods of service with US Airways and American, and their respective Subsidiaries to the extent so credited with such service under the applicable 401(k) plan as of the Closing Date. Additionally, in the event Newco or any of its Subsidiaries terminates a 401(k) plan after the Closing Date, each Non-Union Continuing Employee who participates in such plan shall, following such termination, become eligible to participate in a Post-Closing 401(k) Plan for purposes of making rollover contributions and, at his or her election, be entitled to roll over his or her outstanding participant loan and related promissory note under the terminated 401(k) plan. During the period commencing on the date of such termination and ending at the time of the rollover of such loan and related promissory notes and related account balances, such loans shall continue to be maintained under the applicable 401(k) plan, and Newco shall, or shall cause the Surviving Corporation to, make payroll deductions in respect of required payments under any such loan and timely remit such amounts to the applicable 401(k) plan as payments on such loan. During such period, provided that the participant continues to make all required installment payments with respect to such loan, such loan shall not be placed in default, and Newco (or the Surviving Corporation) and the US Airways or one of its Subsidiaries shall take all necessary action to cause such loan not to be placed in default.

(k)    Except as otherwise required under applicable Laws or to the extent expressly set forth in a binding written agreement with Newco, the Surviving Corporation or any of their respective Subsidiaries, Non-Union Continuing Employees shall be considered to be employed "at will" and nothing shall be construed to limit the ability of Newco, the Surviving Corporation or any of their respective Subsidiaries to terminate the employment of any such employee at any time, subject to any applicable severance and related benefits (including any governmental or statutory severance).

(l)    Notwithstanding the foregoing, with respect to any Continuing Employee who is located in a jurisdiction where local employment Laws provide for an automatic transfer of employees upon transfer of a business as a going concern and such transfer occurs by operation of Law (the "*Automatic Transferred Employees*"), in the event that the applicable Laws of any country require Newco, the Surviving Corporation or any of its Subsidiaries (i) to maintain Terms and Conditions of Employment with respect to any Automatic Transferred Employee following the Closing or (ii) to continue or cause to be continued any employment contract of any Automatic Transferred Employee, Newco shall cause the entity that employs such Automatic Transferred Employee following the Closing to comply with such requirements to the extent required

76

by such applicable Laws; provided, however, that nothing in this Section 4.10(l) shall prevent Newco or the Surviving Corporation from terminating the employment of any Automatic Transferred Employee after the Closing (for which Newco and its Subsidiaries shall be responsible for any costs or liabilities) or otherwise modifying the Terms and Conditions of Employment of any Automatic Transferred Employee to the extent permitted by Law or otherwise agreed with applicable employee(s) or representative(s) thereof.  "*Terms and Conditions of Employment*" shall mean the rights of Automatic Transferred Employees according to their individual terms and conditions of employment with US Airways or its Subsidiaries immediately prior to the Closing and, where applicable, under company or shop agreements, and any arrangements based on works customs and unilateral undertakings, if and to the extent they provide to an Automatic Transferred Employee direct and enforceable causes of action against the employer.

(m)    Newco shall take, and may cause any of its Subsidiaries to take, any and all actions necessary or appropriate (including to the extent necessary under the plan) to, as of the Effective Time, (i) assume and adopt each US Airways Compensation and Benefit Plan and each American Compensation and Benefit Plan (including all matters set forth in this Section 4.10 and Section 4.1(o) of the American Disclosure Letter, but excluding any prepetition equity or equity-equivalent plan or agreement of American and its Subsidiaries) and to maintain and to perform under such plans and agreements to the same extent as US Airways or American or their respective subsidiaries would be required to perform under such plans and agreements if the Merger did not take place, and (ii) to the extent applicable, become, or cause the Surviving Corporation to become, a "participating employer" (as applicable) under such US Airways Compensation and Benefit Plans and American Compensation and Benefit Plans.  Without limiting the generality of the foregoing, Newco shall assume, as of the Effective Time, all of the American Compensation and Benefit Plans which constitute retirement plans, including all such plans subject to Title IV of ERISA and the supplemental employee retirement plan.  US Airways shall cooperate with American and Newco and shall take or cause to be taken any and all actions reasonably necessary or appropriate in order to effect the provisions of this Section 4.10(m).

(n)    This Agreement shall not be interpreted as an amendment to any American Compensation and Benefit Plan or any US Airways Compensation and Benefit Plan or any other compensation and benefits plans maintained for or provided to directors, officers, employees or consultants of American, US Airways, Newco or the Surviving Corporation prior to or following the Effective Time, and nothing in this Agreement shall interfere with or limit Newco's or the Surviving Corporation's right to amend or terminate any individual plan, program, policy or arrangement of US Airways or any of its Subsidiaries, and nothing contained herein shall obligate Newco, the Surviving Corporation or any of their respective Subsidiaries to maintain or continue any individual plan, program, policy or arrangement.

(o)    It is expressly agreed that the provisions of this Section 4.10 are not intended to be for the benefit of or otherwise enforceable by any third Person, including any employee of American or US Airways, or any collective bargaining unit or employee organization. Without limiting the foregoing, nothing contained in this

77

Agreement shall create or imply any obligation on the part of US Airways, American, Newco, the Surviving Corporation or any of their respective Subsidiaries, to provide any continuing employment right to any individual on or after the Closing.

       4.11    <u>Expenses</u>.  Except as otherwise provided in Section 6.5, whether or not the Merger is consummated, all costs and expenses incurred in connection with this Agreement and the Merger and the other transactions contemplated by this Agreement shall be paid by the party incurring such expense; <u>provided</u>, <u>however</u>, that American and US Airways shall each be responsible for half of the filing or similar fees incurred in connection with any filings required to be made under the HSR Act, the EU Merger Regulation and any other applicable foreign antitrust, competition or similar Laws, as contemplated by Sections 3.1(d)(i)(B) and 3.2(d)(i)(B).

       4.12    <u>Indemnification; Directors' and Officers' Insurance</u>.

       (a)    From and after the Effective Time, Newco agrees that it will jointly and severally indemnify and hold harmless each director and officer of American and its Subsidiaries and each director and officer of US Airways and its Subsidiaries, in each case who was a director or officer at any time on or after November 29, 2005 (in each case, for acts or failures to act in such capacity) (the "*Indemnified Parties*"), against any costs or expenses (including reasonable attorneys' fees), judgments, fines, losses, claims, damages or liabilities incurred in connection with any claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative, arising out of matters existing or occurring at or prior to the Effective Time, whether asserted or claimed prior to, at or after the Effective Time (including any matters arising in connection with the transactions contemplated by this Agreement), to the fullest extent permitted by applicable Law, and Newco shall also advance expenses as incurred to the fullest extent permitted under applicable Law; <u>provided</u> that the Person to whom expenses are advanced provides an undertaking to repay such advances if it is ultimately determined that such Person is not entitled to indemnification; and <u>provided</u>, <u>further</u>, that any determination as to whether a Person is entitled to indemnification or advancement of expenses hereunder shall be made by independent counsel selected by Newco and such Person.

       (b)    Any Indemnified Party wishing to claim indemnification under Section 4.12(a), upon learning of any such claim, action, suit, proceeding or investigation, shall promptly notify Newco thereof, but the failure to so notify shall not relieve Newco of any liability it may have to such Indemnified Party except to the extent such failure materially and actually prejudices the indemnifying party.  In the event of any such claim, action, suit, proceeding or investigation (whether arising before or after the Effective Time), (i) Newco shall have the right to assume the defense thereof and Newco shall not be liable to such Indemnified Parties for any legal expenses of other counsel or any other expenses subsequently incurred by such Indemnified Parties in connection with the defense thereof, except that if Newco does not elect to assume such defense or counsel for the Indemnified Parties advises that there are issues which raise conflicts of interest between Newco and the Indemnified Parties, the Indemnified Parties may retain counsel satisfactory to them, and Newco shall be obligated to pay all reasonable fees and expenses of such counsel for the Indemnified Parties promptly as

statements therefor are received; provided, however, that Newco shall be obligated pursuant to this Section 4.12(b) to pay for only one firm of counsel for all Indemnified Parties in any jurisdiction unless the use of one counsel for such Indemnified Parties would present such counsel with a conflict of interest; (ii) the Indemnified Parties will use their reasonable efforts to cooperate in the defense of any such matter, and (iii) Newco shall not be liable for any settlement effected without their prior written consent (such consent not to be unreasonably withheld or delayed); and provided, further, that Newco shall not have any obligation under this Agreement to any Indemnified Party if and when a court of competent jurisdiction shall ultimately determine, and such determination shall have become final, that the indemnification of such Indemnified Party in the manner contemplated hereby is prohibited by applicable Law.

(c)    Unless otherwise agreed by American and US Airways, at or prior to the Effective Time, American shall, and if American is unable to, Newco shall, purchase the six-year "tail" officers' and directors' liability and fiduciary insurance policies described in Section 4.12(c) of the American Disclosure Letter (the "*Preferred American D&O Tail Policy*") or comparable policies from other reputable insurance providers; provided, that the amount paid by American or Newco for such Preferred American D&O Tail Policy shall not exceed 200% of the annual premium for American's then current officers' and directors' liability and fiduciary insurance policies (such premium, the "*American Maximum Premium*").  If the Preferred American D&O Tail Policy has been obtained by American or Newco, Newco shall maintain such policy in full force and effect, for its full term, and continue to honor the obligations thereunder. If American or Newco are unable to obtain the Preferred American D&O Tail Policy, Newco shall maintain officers' and directors' liability insurance covering the same Persons covered or to be covered by the Preferred American D&O Tail Policy (including for acts or omissions occurring in connection with this Agreement and the consummation of the transactions contemplated hereby) issued by insurance carriers with the same or higher financial strength ratings as, and on terms with respect to coverage and amount no less favorable than, those of the Preferred American D&O Tail Policy, for a period of six (6) years from and after the Effective Time; provided, however, that in no event shall Newco be required to expend annually an amount in excess of the American Maximum Premium for such insurance; provided, further, that if the premiums of such insurance coverage exceed such amount, Newco shall be obligated to obtain a policy with the greatest coverage available for a premium not exceeding the American Maximum Premium.

(d)    Unless otherwise agreed by American and US Airways, at or prior to the Effective Time, US Airways shall, and if US Airways is unable to, Newco shall cause the Surviving Corporation to, purchase the six-year "tail" officers' and directors' liability and fiduciary insurance policies described in Section 4.12(d) of the US Airways Disclosure Letter (the "*Preferred US Airways D&O Tail Policy*") or comparable policies from other reputable insurance providers; provided, that the amount paid by US Airways or the Surviving Corporation for such Preferred US Airways D&O Tail Policy shall not exceed 200% of the annual premium for US Airway's then current officers' and directors' liability and fiduciary insurance policies (such premium, the "*US Airways Maximum Premium*").  If the Preferred US Airways D&O Tail Policy has been obtained

by US Airways or the Surviving Corporation, the Surviving Corporation shall, and Newco shall cause the Surviving Corporation to, maintain such policy in full force and effect, for its full term, and continue to honor their respective obligations thereunder.  If US Airways or the Surviving Corporation are unable to obtain the Preferred US Airways D&O Tail Policy, the Surviving Corporation shall, and Newco shall cause the Surviving Corporation to, maintain officers' and directors' liability insurance covering the same Persons covered or to be covered by the Preferred US Airways D&O Tail Policy (including for acts or omissions occurring in connection with this Agreement and the consummation of the transactions contemplated hereby) issued by insurance carriers with the same or higher financial strength ratings as, and on terms with respect to coverage and amount no less favorable than, those of the Preferred US Airways D&O Tail Policy, for a period of six (6) years from and after the Effective Time; provided, however, that in no event shall the Surviving Corporation be required to expend annually an amount in excess of the US Airways Maximum Premium for such insurance; provided, further, that if the premiums of such insurance coverage exceed such amount, the Surviving Corporation shall be obligated to obtain a policy with the greatest coverage available for a premium not exceeding the US Airways Maximum Premium.

(e)     In addition to the rights provided under Section 4.12(a), all rights to indemnification, advancement of expenses and exculpation from liabilities now existing in favor of the current or former directors or officers of American and its Subsidiaries pursuant to Contracts with American or such Subsidiaries or US Airways and its Subsidiaries pursuant to Contracts with US Airways or such Subsidiaries, their respective organizational documents or applicable Law shall survive the Merger and shall be deemed assumed by Newco as of the Effective Time and shall continue in full force and effect in accordance with their terms.  From and after the Effective Time, Newco shall honor and perform under all indemnification Contracts and organizational documents of American and its Subsidiaries and US Airways and its Subsidiaries. Newco shall not, directly or indirectly, amend, modify, limit or terminate, in any manner adverse to the current or former directors or officers of American and its Subsidiaries or US Airways and its Subsidiaries, with respect to their respective rights to indemnification, advancement of expenses and exculpation from liabilities for acts or omissions occurring prior to the Effective Time, any such Contracts with American or its Subsidiaries or US Airways or its Subsidiaries, or any such provisions contained in any of their respective organizational documents.

(f)     The obligations of Newco and the Surviving Corporation under this Section 4.12 shall not be terminated or modified by such parties in a manner so as to adversely affect any Indemnified Party or other Person to whom this Section 4.12 applies without the consent of such affected Indemnified Party or other Person.  If Newco or the Surviving Corporation or any of their respective successors or assigns (i) shall consolidate with or merge into any other corporation or entity and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) shall transfer all or substantially all of its properties and assets to any Person, then, and in each such case, proper provisions shall be made so that the successors and assigns of Newco or the Surviving Corporation, as the case may be, shall assume all of the obligations set forth in this Section 4.12.

(g) From and after the Effective Time, Newco shall, or shall cause its Subsidiaries to, provide: (i) positive space, first class flight privileges to each Person (and such Person's spouse, life partner and dependent children) who as of the date of this Agreement is a non-employee member of the Board of Directors of American or US Airways for personal non-business related travel on substantially the same terms as such flight privileges are provided as of the date of this Agreement to the fully vested members of the Board of Directors of US Airways, and such flight privileges shall continue until the later of the death of such Person or such Person's spouse or life partner, (ii) to each Person who as of the date of this Agreement is a non-employee member of the Board of Directors of American or US Airways, participation in Newco's flight benefit program for directors, as the same may be amended or modified from time to time, with the exception that only Persons then serving as members of the Board of Directors of Newco shall be entitled to a tax gross-up with respect to their flight privileges or any flight benefit plan benefits, and (iii) flight privileges to each Person (and such Person's spouse, life partner and dependent children) who as of the date of this Agreement is a former member of the Board of Directors of American or US Airways on substantially the same terms as such flight privileges are provided to such Person as of the date of this Agreement.

(h) The provisions of this Section 4.12 are intended to be for the benefit of, and shall be enforceable by, each of the Indemnified Parties and the other Persons contemplated by Section 4.12(e) and Section 4.12(g) and their heirs and legal representatives.

4.13 Takeover Statutes. If any Takeover Statute becomes applicable to the Merger or the other transactions contemplated by this Agreement, each of American and US Airways and their respective Board of Directors shall grant such approvals and take such actions as are necessary so that such transactions may be consummated as promptly as practicable on the terms contemplated by this Agreement and by the Merger and otherwise act to eliminate or minimize the effects of such statute or regulation on such transactions.

4.14 Transfer Taxes. Except as provided in Section 2.2(b), each of American, US Airways and Merger Sub shall pay any sales, use, ad valorem, property, transfer (including real property transfer) and similar Taxes imposed on such Person as a result of or in connection with the Merger and the other transactions contemplated hereby (any such Taxes, "*Transfer Taxes*"), except to the extent such Transfer Taxes may not be assessed pursuant to section 1146(a) of the Bankruptcy Code. In addition, the parties shall cooperate in good faith to prepare and timely deliver any certificate or instrument necessary for a party hereto to claim a bulk sale or other exemption from Transfer Taxes otherwise payable.

4.15 Taxation.

(a) The parties intend that the Merger in conjunction with the Plan will qualify as a reorganization within the meaning of Section 368(a) of the Code and shall use their reasonable best efforts (and shall cause their respective Subsidiaries to use their reasonable best efforts) to cause the Merger (together with the Plan) to so qualify. Neither American nor US Airways shall take, cause or permit to be taken, or fail to take,

any action, whether before or after the Effective Time, which action or failure to act would disqualify the Merger (together with the Plan) as a reorganization within the meaning of Section 368(a) of the Code.

(b)    Each of American, US Airways and Merger Sub shall cooperate with each other in obtaining opinions of Latham & Watkins LLP, counsel to US Airways, and Weil, Gotshal & Manges LLP, counsel to American and Merger Sub, to satisfy the conditions set forth in Sections 5.2(d) and 5.3(d).  US Airways and American (on its behalf and on behalf of Merger Sub) shall execute and deliver to each of Latham & Watkins LLP, counsel to US Airways, and Weil, Gotshal & Manges LLP, counsel to American and Merger Sub, certificates substantially in the forms attached hereto as Exhibits E and F at such time or times as reasonably requested by each such law firm in connection with its delivery of the opinion referred to in Section 5.2(d) or Section 5.3(d), as the case may be.  Prior to the Effective Time, none of American, US Airways or Merger Sub shall take or cause to be taken any action that would cause to be untrue any of the representations in such certificates.  The parties will take the position for all Tax purposes that the Merger (together with the Plan) qualifies as a reorganization within the meaning of Section 368(a) of the Code, unless a contrary position is required by a final determination within the meaning of Section 1313 of the Code.

(c)    The parties intend that the "ownership change" of American within the meaning of Section 382 of the Code resulting from the consummation of the Merger and the implementation of the Plan qualify for relief under Section 382(l)(5) of the Code, and shall use their reasonable best efforts to so qualify.  Accordingly, the parties shall utilize the procedures in that certain Bankruptcy Court order establishing notification procedures for substantial claimholders, dated January 27, 2012, as amended or revised prior to or, with the reasonable approval of US Airways, after the date hereof (the "_Notification Procedures Order_"), to obtain Notices of Substantial Claimholder Status (as defined in the Notification Procedures Order) and, if the parties so determine in accordance with such Notification Procedures Order, to seek Bankruptcy Court approval of appropriate Sell Down Notices (as defined in the Notification Procedures Order).  In furtherance of the foregoing and to protect against multiple "ownership changes" of US Airways, US Airways shall adopt, effective upon the execution of this Agreement, a rights plan, in form and substance reasonably satisfactory to American, to minimize the likelihood that any additional Persons or group of Persons acting together become "5% shareholders" of US Airways within the meaning of Section 382 of the Code and that any existing such "5% shareholders" increase their ownership, other than pursuant to the Plan.

4.16    _Stock Exchange Listing and De-listing_.  American shall use its reasonable best efforts to cause the shares of Newco Common Stock to be authorized for listing on the NYSE or NASDAQ upon official notice of issuance, prior to the Closing Date, and American shall use its reasonable best efforts to have Newco's trading symbol reflect the American Airlines brand after the Closing Date.  The Surviving Corporation shall cause the shares of US Airways Common Stock to be no longer listed on the NYSE or the principal securities market on which the shares of US Airways Common Stock are then listed or quoted and de-registered under the Exchange Act as soon as practicable following the Effective Time.

4.17    <u>Reservation of Newco Common Stock</u>.  Effective at such time as the Newco Charter shall have been duly filed with the Secretary of State of the State of Delaware pursuant to Section 1.6(a), Newco shall reserve (free from preemptive rights) out of its authorized but unissued or treasury shares of Newco Common Stock, sufficient shares of Newco Common Stock to effect the issuance of shares of Newco Common Stock under Section 2.1 and upon the exercise of Converted US Airways Options and Converted US Airways Equity Awards or the conversion of the Converted US Airways 7.25% Convertible Notes and Converted US Airways 7% Convertible Notes.

4.18    <u>Transition Planning</u>.  In order to facilitate the integration of the operations of American and US Airways and their respective Subsidiaries and to permit the coordination of their related operations on a timely basis, and in an effort to accelerate to the earliest time practicable following the Effective Time the realization of synergies, operating efficiencies and other benefits expected to be realized by the parties as a result of the transactions contemplated by this Agreement, prior to the Effective Time, American and US Airways shall establish a committee (the "*Transition Committee*") to be managed by the chief executive officers of each of American and US Airways and with such other members as they shall mutually agree, which Transition Committee shall have responsibility for coordinating and directing the efforts of the parties with respect to (a) the integration of operations and fleet plan of American and US Airways and their respective Subsidiaries, (b) obtaining the required consents and approvals from Governmental Entities as contemplated by Section 4.7, (c) communications, public relations and investor relations strategy and approach of the parties regarding the Plan, the Merger and the other transactions contemplated hereby (other than any party's actions in respect of an American Acquisition Proposal or a US Airways Acquisition Proposal, respectively) and (d) other business and operational matters, including the financing needs of Newco and its Subsidiaries following the Effective Time, to the extent not in violation of applicable Laws, including Laws regarding the exchange of information and other laws regarding competition. The Creditors' Committee shall have the right to have up to two designees from the UCC's Advisors attend meetings of the Transition Committee.

4.19    <u>Section 16(b)</u>.  American and US Airways shall take all steps reasonably necessary to cause the transactions contemplated hereby and any other dispositions of shares of US Airways Common Stock or acquisitions of Newco Common Stock in connection with this Agreement by each individual who is a director or officer of US Airways to be exempt under Rule 16b-3 under the Exchange Act.

4.20    <u>Approval of Plan; Confirmation Order</u>.

(a)    <u>Plan and Disclosure Statement</u>.  Unless otherwise consented to in writing by US Airways (such consent not to be unreasonably withheld, conditioned or delayed), American (in consultation with the UCC's Advisors) shall and shall cause each of the other Debtors to:

(i)    (A) by the date that is the seventh (7th) business day following the execution of this Agreement, file a motion (the "*Merger Support Motion*") with the Bankruptcy Court, in form and substance reasonably acceptable to American, US Airways and the UCC's Advisors, seeking approval pursuant to an order of the

Bankruptcy Court in form and substance reasonably acceptable to American and US Airways (the "*Merger Support Order*") of (1) this Agreement and (2) the execution and delivery hereof by American and the performance by American of all of its obligations hereunder (which Merger Support Order shall include authorization and approval of the matters set forth in Section 4.10 and Section 4.1(o) of the American Disclosure Schedule); (B) use reasonable best efforts to include in the Merger Support Order a provision ordering (1) a waiver of Bankruptcy Rule 6004(h) and (2) that the Merger Support Order be effective immediately upon its entry by the Bankruptcy Court; (C) fully support the Merger Support Motion; (D) in the Merger Support Motion, expressly acknowledge that, to American's Knowledge, US Airways has acted in good faith and expended, and will likely continue to expend, considerable time and expense in connection with this Agreement and the negotiation hereof, and that this Agreement provides value to and is beneficial to the Debtors' estates; and (E) use reasonable best efforts to obtain the entry of the Merger Support Order by the date that is the thirtieth (30th) day following the filing of the Merger Support Motion with the Bankruptcy Court and to defend against any appeal, motion to stay or similar action with respect thereto;

(ii)        prepare, as soon as reasonably practicable after the date of this Agreement a draft plan of reorganization under chapter 11 of the Bankruptcy Code proposed by American and the other Debtors pursuant to which, among other things, the Merger shall be consummated (the "*Plan*"; it is understood and agreed that a condition precedent to the effectiveness of the Plan shall be that the matters set forth in Section 4.10 and Section 4.1(o) of the American Disclosure Schedule shall be in effect) and an accompanying disclosure statement under section 1125 of the Bankruptcy Code (the "*Disclosure Statement*"), and after such preparation promptly provide such Plan and Disclosure Statement, in draft form, to US Airways and its legal and financial advisors and the UCC's Advisors for review and comment a reasonable period of time in advance of any filing thereof;

(iii)        (A) subject to Section 4.3, include in the approved Disclosure Statement a statement that the Board of Directors of American has recommended the acceptance of the Plan by the stakeholders of the Debtors who are entitled to vote on the Plan (such recommendation, the "*American Directors' Recommendation*") and (B) include in the approved Disclosure Statement a statement provided by the Creditors' Committee that the Creditors' Committee recommends the acceptance of the Plan by the unsecured creditors holding claims against the Debtors who are entitled to vote on the Plan ("*Creditors' Committee Recommendation*");

(iv)        use reasonable best efforts to file with the Bankruptcy Court the Plan and the Disclosure Statement, in each case, in form and substance reasonably acceptable to US Airways (such acceptance, not to be unreasonably delayed, conditioned or withheld; it being agreed that it would not be reasonable for US Airways to object to any proposed Plan or Disclosure Statement that is consistent with the terms of this Agreement, including the requirements of a Conforming Plan (except that financial projections relating to Newco shall be reasonably acceptable to US Airways without such limitation)), by the date that is the thirtieth (30th) day following the later of (1) the date on which US Airways has provided initial comments pursuant to clause (ii) above and (2)

entry of the Merger Support Order, and thereafter, in consultation with US Airways, use reasonable best efforts to (A) obtain approval of the Disclosure Statement by the Bankruptcy Court pursuant to an order, in form and substance reasonably acceptable to American and US Airways (the "*Disclosure Statement Order*"), by the date that is the seventy-fifth (75th) day following the date on which the Plan and Disclosure Statement are filed with the Bankruptcy Court (the "*Disclosure Statement Approval Date*"); and (B) commence solicitation of the Plan as soon as reasonably practicable after the Disclosure Statement Approval Date and as provided in the Disclosure Statement Order;

(v)     prepare and provide the proposed Confirmation Order, in draft form, to US Airways and its legal and financial advisors and the UCC's Advisors for review and comment a reasonable period of time in advance of any filing thereof and, subject to the prior written consent of US Airways (such consent not to be unreasonably withheld, conditioned or delayed) to the form and substance of the Confirmation Order, and consultation with US Airways, use reasonable best efforts to file with the Bankruptcy Court the proposed Confirmation Order promptly following the end of the period to solicit acceptances of the Plan;

(vi)     subject to the terms and provisions of this Agreement, diligently pursue confirmation and consummation of the Plan;

(vii)     reasonably cooperate with US Airways and its counsel in connection with any discovery and hearings in connection with this Agreement, the Disclosure Statement or the Plan and any transactions contemplated by such documents;

(viii)    use reasonable best efforts to provide US Airways and its counsel with copies of any notices, motions, pleadings, filings or other documents filed by the Debtors or third-parties with the Bankruptcy Court reasonably requested by US Airways;

(ix)     without duplication or limitation of the foregoing, use its reasonable best efforts to provide drafts of any proposed modifications, amendments, supplements, schedules, exhibits and other similar documents related to the Plan or the Disclosure Statement or their terms and conditions (collectively, the "*Plan Related Documents*") to US Airways and its counsel and the UCC's Advisors a reasonable period of time prior to the date on which the Debtors intend to file such documents with the Bankruptcy Court, and any such Plan Related Documents shall be reasonably acceptable to US Airways (such acceptance not to be unreasonably delayed, conditioned or withheld; it being agreed that it would not be reasonable for US Airways to object to any Plan, Plan Related Document or Confirmation Order that is consistent with the terms of this Agreement, including the requirements of a Conforming Plan (except that financial projections relating to Newco shall be reasonably acceptable to US Airways without such limitation)); and

(x)     timely file a formal objection and prosecute in good faith such objection to any motion filed with the Bankruptcy Court seeking the entry of an order (A) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, (B) directing the appointment of an examiner with expanded

powers or a trustee, (C) converting the Cases to cases under chapter 7 of the Bankruptcy Code, or (D) dismissing the Cases.

(b)     Cooperation from American.  Unless US Airways has otherwise consented in writing (such consent not to be unreasonably withheld, conditioned or delayed), American shall, and shall cause each of the other Debtors to, after the date hereof and prior to the Effective Time:

(i)     not move for or support any order authorizing or directing, or provide in the Plan for, the assumption or rejection of any American Material Contract, American Lease or American CBA (and object to efforts by any other Person to have such an order entered), unless the consent of US Airways was previously obtained for any amendment, modification or termination of such American Material Contract, American Lease or American CBA in accordance with the applicable requirements of Section 4.1;

(ii)     not (A) settle, compromise or otherwise agree to resolve any prepetition general unsecured claims against the Debtors or equity interests in American by providing the creditor, equity interest holder or other claimant with any payment of cash or other assets or with any other right or benefit, other than in each case (1) the right to receive Plan Shares pursuant to the Plan, or (2) payments of cash not to exceed $25,000,000 in the aggregate; (B) settle, compromise, amend or otherwise agree to resolve the other post-employment benefits accounted for under ASC 715-60 Defined Benefit Plans- Other Postretirement ("*OPEB*") of the Debtors other than any settlement, compromise or other agreement that satisfies all such OPEB obligations solely in exchange for a right to receive Plan Shares pursuant to the Plan or (C) prepay any prepetition secured indebtedness of any Debtor with any payment of cash or other assets, except (1) as may be required by the existing terms of any Contract governing such indebtedness (excluding a prepayment as a result of any breach of, or default under, the terms of any such Contract), (2) in connection with a refinancing permitted under Section 4.1 or (3) payments of cash not to exceed $25,000,000 in the aggregate;

(iii)     not assert any objection to (and if requested by US Airways, consent in writing to) the standing of US Airways to appear and object before the Bankruptcy Court to any action that would be subject to US Airways' consent pursuant to this Section 4.20, whether individually or in the aggregate, but to which US Airways has not provided such consent; and

(iv)     use reasonable best efforts to include in any release and exculpation provisions of the Plan, that US Airways and (to the extent included for American) its agents, directors, officers, employees, representatives, advisors, attorneys, Subsidiaries and affiliates shall be beneficiaries of such provisions.

(c)     Cooperation from US Airways.  Upon request of American, US Airways agrees to use reasonable best efforts to (x) assist and cooperate with the Debtors in the Plan solicitation process and/or (y) assist the Debtors in obtaining entry of the Confirmation Order.

4.21    US Airways Equity Plans.

(a)    Prior to the Effective Time, the Boards of Directors of US Airways (or, if appropriate, any committee thereof administering the US Airways Equity Plans) and American shall adopt such resolutions or take such other actions as may be required to effect the following as of the Effective Time:

(i)    US Airways Options and US Airways SARs.

(A)    (i) Each US Airways Option and each US Airways Stock-Settled SAR outstanding immediately prior to the Effective Time, whether vested or unvested, shall be converted into an option (each, a "*Converted US Airways Option*") or stock-settled stock appreciation right (each, a "*Converted US Airways Stock-Settled SAR*"), as applicable, to acquire, on the same terms and conditions as were applicable to such US Airways Option or US Airways Stock-Settled SAR immediately prior to the Effective Time, a number of shares of Newco Common Stock equal to the number of shares of US Airways Common Stock subject to such US Airways Option or US Airways Stock-Settled SAR, at an exercise price per share of Newco Common Stock equal to the exercise price per share of US Airways Common Stock under such US Airways Option or US Airway Stock-Settled SAR; provided, however, in the case of any US Airways Option to which Section 421 of the Code applies by reason of its qualification (as an "incentive stock option") under either Section 422 or 424 of the Code, the option price, the number of shares purchasable pursuant to such option and the terms and conditions of exercise of such option shall be determined in a manner that complies with Section 424(a) of the Code.

(B)    Each US Airways Cash-Settled SAR outstanding immediately prior to the Effective Time, whether vested or unvested, shall be converted into a cash-settled stock appreciation right (each, a "*Converted US Airways Cash-Settled SAR*") to acquire, on the same terms and conditions as were applicable to such US Airways Cash-Settled SAR immediately prior to the Effective Time, an amount of cash determined by reference to the number of shares of Newco Common Stock equal to the number of shares of US Airways Common Stock referenced by such US Airways Cash-Settled SAR, at an exercise price per share of Newco Common Stock equal to the exercise price per share of US Airways Common Stock under such US Airways Cash-Settled SAR.

(C)    In each of Sections 4.21(a)(i)(A) and (B) above, each US Airways Option and each US Airways SAR shall be adjusted in a manner which complies with Section 409A of the Code and that causes the resulting Converted US Airways Option, Converted US Airways Cash-Settled SAR or Converted US Airways Stock-Settled SAR not to constitute the grant of a new option or stock appreciation right or a change in the form of payment of an option or stock appreciation right, as provided under Treasury Regulation section 1.409A-1(b)(5)(v)(D).

(ii)   US Airways RSUs.

(A)   Each award of US Airways Stock-Settled RSUs outstanding immediately prior to the Effective Time shall be converted into a number of stock-settled restricted stock units corresponding to shares of Newco Common Stock equal to the number of shares of US Airways Common Stock subject to such US Airways Stock-Settled RSU award, with the same terms and conditions as were applicable to such US Airways Stock-Settled RSU award immediately prior to the Effective Time (each, a "*Converted Stock-Settled US Airways RSU*").

(B)   Each award of US Airways Cash-Settled RSUs outstanding immediately prior to the Effective Time shall be converted into the right to receive an amount in cash, on the same terms and conditions as were applicable to such US Airways RSU award immediately prior to the Effective Time, based on a number of shares of Newco Common Stock equal to the number of shares of US Airways Common Stock referenced under such US Airways Cash-Settled RSU award immediately prior to the Effective Time (each, a "*Converted Cash-Settled US Airways RSU*").

(C)   In each of Sections 4.21(a)(ii)(A) and (B) above, all adjustments made to the US Airways RSUs shall be made in compliance with Section 409A of the Code.

(iii)   ensure that, after the Effective Time, awards under the US Airways Equity Plans shall be granted with respect to Newco Common Stock and make such other changes to the US Airways Equity Plans as it deems appropriate to give effect to the Merger (subject to the approval of American, which shall not be unreasonably withheld, conditioned or delayed).

The Converted US Airways Stock-Settled SARs and the Converted US Airways Stock-Settled RSUs are referred to, collectively, as the "*Converted US Airways Equity Awards*".

(b)   At the Effective Time, Newco shall assume all the obligations of US Airways under the US Airways Equity Plans, each outstanding US Airways Option, each outstanding US Airways Equity Award, each outstanding US Airways Cash-Settled SAR, each outstanding US Airways Cash-Settled RSU and the agreements evidencing the grants thereof. As soon as practicable after the Effective Time, Newco shall deliver to the holders of US Airways Options, US Airways Equity Awards, US Airways Cash-Settled SAR and US Airways Cash-Settled RSU appropriate notices setting forth such holders' rights pursuant to the respective US Airways Equity Plans, and the agreements evidencing the grants of such US Airways Options, US Airways Equity Awards, US Airways Cash-Settled SARs and US Airways Cash-Settled RSUs shall continue in effect on the same terms and conditions (subject to the adjustments required by this Section 4.21 after giving effect to the Merger).

(c)     American shall, or shall cause Newco to, prepare and file with the SEC a registration statement on Form S-8 with respect to the shares of Newco Common Stock issuable upon exercise or vesting of the assumed Converted US Airways Equity Awards on or before the Effective Time and shall maintain the effectiveness of such registration statement thereafter for so long as any such Converted US Airways Equity Awards remain outstanding.

4.22    US Airways Convertible Debt.

(a)     At the Effective Time, American and US Airways and, if necessary or advisable, Merger Sub shall enter into a supplemental indenture in respect of the US Airways 7.25% Convertible Notes containing such provisions as may be required or are advisable as a result of the Merger pursuant to the terms of that certain Indenture, dated as of May 13, 2009, between US Airways and The Bank of New York Mellon Trust Company, N.A., as trustee (the "*7.25% Base Indenture*"), as supplemented by the First Supplemental Indenture, dated as of May 13, 2009, between US Airways and The Bank of New York Mellon Trust Company, N.A., as trustee (the "*7.25% Supplemental Indenture*" and, together with the 7.25% Base Indenture, the "*7.25% Indenture*"). Such supplemental indenture will (i) include the provisions required by Section 5.06 of the 7.25% Supplemental Indenture as a result of the Merger, which may include a provision that requires each outstanding US Airways 7.25% Convertible Note to be convertible solely into the number of shares of Newco Common Stock that the holder of such US Airways 7.25% Convertible Note would have received pursuant to the Merger if such holder had converted such US Airways 7.25% Convertible Note into shares of US Airways Common Stock immediately prior to the Effective Time (each, a "*Converted US Airways 7.25% Convertible Note*") and (ii) provide for the guarantee by Newco of US Airways' obligations under the 7.25% Indenture and the 7.25% Convertible Notes following the Effective Time.

(b)     At the Effective Time, American and US Airways and, if necessary or advisable, Merger Sub shall enter into a supplemental indenture in respect of the US Airways 7% Convertible Notes containing such provisions as may be required or are advisable as a result of the Merger pursuant to the terms of the Indenture, dated as of September 30, 2005, by and between US Airways and U.S. Bank National Association, as trustee (the "*7% Indenture*"). Such supplemental indenture will (i) include the provisions required by Section 4.8 of the 7% Indenture, which may include a provision that requires each outstanding US Airways 7% Convertible Note to be convertible solely into the number of shares of Newco Common Stock that the holder of such US Airways 7% Convertible Note would have received pursuant to the Merger if such holder had converted such US Airways 7% Convertible Note into shares of US Airways Common Stock immediately prior to the Effective Time (each, a "*Converted US Airways 7% Convertible Note*") and (ii) provide for the guarantee by Newco of US Airways' obligations under the 7% Indenture and the US Airways 7% Convertible Notes following the Effective Time.

(c)     Prior to the Effective Time, the Board of Directors of each of American, on the one hand, and Merger Sub and US Airways, on the other hand, will

adopt resolutions approving each of the directors who are elected to the Board of Directors of Newco and the Surviving Corporation, respectively, at the Effective Time in accordance with Section 1.8 so that such directors will be "continuing directors" of Newco and the Surviving Corporation, respectively.

    4.23    <u>Rights of the Creditors' Committee</u>.  Subject to the Protective Order entered by the Bankruptcy Court on January 27, 2012 and amended on March 23, 2012 in connection with the Cases, and the terms of any applicable confidentiality agreement, from the date hereof to the Closing Date, American and US Airways shall (a) keep the UCC's Advisors reasonably apprised of the status of matters relating to completion of the transactions contemplated hereby, (b) furnish the UCC's Legal Advisor with all notices, correspondence and other communications provided to another party pursuant to Section 7.7 of this Agreement, and (c) promptly provide the UCC's Advisors with any information reasonably requested by the UCC's Advisors relating to completion of the transactions contemplated hereby. Without limiting the foregoing, American and US Airways shall give prompt notice to the UCC's Legal Advisor of any change, fact or condition of which, to its knowledge, is reasonably expected to result in any failure of any condition to effect the Merger.  American and US Airways (as applicable) each agrees to negotiate in good faith with the UCC's Advisors with respect to any consent rights requested by the Creditors' Committee under the Plan.

<div align="center">ARTICLE V</div>

<div align="center">Conditions</div>

    5.1    <u>Conditions to Each Party's Obligation to Effect the Merger</u>.  The respective obligation of each party to effect the Merger is subject to the satisfaction or waiver at or prior to the Effective Time of each of the following conditions:

    (a)    <u>US Airways Stockholder Approval</u>.  The Stockholder Approval shall have been obtained.

    (b)    <u>Regulatory Approvals</u>.  (i) The waiting period applicable to the consummation of the Merger under the HSR Act shall have expired or been earlier terminated, and any approval or authorization required to be obtained under the EU Merger Regulation in connection with the consummation of the Merger shall have been obtained, (ii) any approval or authorization required to be obtained from the FAA and DOT in connection with the consummation of the Merger shall have been obtained, (iii) any approval or authorization required to be obtained from any other Governmental Entity for the consummation of the Merger shall have been obtained, and (iv) any approval or authorization required under any other foreign antitrust, competition or similar Laws, in each case in connection with the consummation of the Merger and the transactions contemplated by this Agreement, shall have been obtained, except for those, in the case of clauses (iii) and (iv), the failure of which to obtain would not, individually or in the aggregate, (x) reasonably be expected to result in an American Material Adverse Effect, a US Airways Material Adverse Effect or a Newco Material Adverse Effect or (y) provide a reasonable basis to conclude that American, US Airways or any of their respective directors or officers would be subject to the risk of criminal liability.

<div align="center">90</div>

(c)    No Orders or Restraints; Illegality.  No Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law (whether temporary, preliminary or permanent) that is in effect and restrains, enjoins, makes illegal or otherwise prohibits consummation of the Merger or the other transactions contemplated by this Agreement (each, an "*Order*"), and no Governmental Entity of competent jurisdiction has proposed (and not withdrawn) an Order that (x) could have a Newco Material Adverse Effect or (y) would provide a reasonable basis to conclude that American, US Airways or any of their respective directors or officers would be subject to the risk of criminal liability.

(d)    Listing.  The shares of Newco Common Stock to be issued in the Merger and under the Plan shall have been authorized for listing on the NYSE or NASDAQ upon official notice of issuance.

(e)    Form S-4. The Form S-4 shall have become effective under the Securities Act, and no stop order suspending the effectiveness of the Form S-4 shall have been issued and no proceedings for that purpose shall have been initiated or be threatened by the SEC.

5.2    Conditions to Obligation of American and Merger Sub.  The obligation of American and Merger Sub to effect the Merger is also subject to the satisfaction or waiver by American at or prior to the Effective Time of the following conditions:

(a)    Representations and Warranties.  Each of the representations and warranties of US Airways set forth in this Agreement (without giving effect to any materiality or US Airways Material Adverse Effect qualifications contained therein) shall be true and correct in all respects as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date (except to the extent any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date), except (i) where the failure of such representations and warranties to be true and correct (other than with respect to the representations and warranties contained in Section 3.2(b)(i)) would not, individually or in the aggregate, reasonably be expected to have a US Airways Material Adverse Effect and (ii) where the failure of the representations and warranties contained in Section 3.2(b)(i) to be true and correct is not material.

(b)    Performance of Obligations of US Airways.  US Airways shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing Date.

(c)    Officer's Certificate.  American shall have received a certificate signed on behalf of US Airways by the Chief Executive Officer or Chief Financial Officer of US Airways to the effect that the conditions set forth in Sections 5.2(a) and 5.2(b) have been satisfied.

(d)    Tax Opinion.  American shall have received the opinion of Weil, Gotshal & Manges LLP, counsel to American, in form and substance reasonably

satisfactory to American, dated the Closing Date, substantially to the effect that, on the basis of facts, representations and assumptions set forth or referred to in such opinion that are consistent with the state of facts existing at the Effective Time, the Merger in conjunction with the Plan will be treated for United States federal income tax purposes as a reorganization within the meaning of Section 368(a) of the Code.  In rendering the opinion described in this Section 5.2(d), Weil, Gotshal & Manges LLP may require and rely upon representations contained in certificates of officers of US Airways and American (on behalf of itself and on behalf of Merger Sub) substantially in the forms attached hereto as Exhibits E and F.

(e)    <u>Plan and Confirmation Order</u>.  (i) Any modifications, amendments or supplements to the Plan, the Plan Related Documents or the Confirmation Order that were not filed with the Bankruptcy Court by the Debtors shall be in form and substance reasonably acceptable to American, (ii) the Plan shall have been confirmed by the Bankruptcy Court pursuant to the Confirmation Order, (iii) the Confirmation Order shall be in full force and effect and shall not have been stayed, modified or vacated and (iv) the effective date of the Plan shall occur contemporaneously with the Closing Date.

5.3    <u>Conditions to Obligation of US Airways</u>.  The obligation of US Airways to effect the Merger is also subject to the satisfaction or waiver by US Airways at or prior to the Effective Time of the following conditions:

(a)    <u>Representations and Warranties</u>.  Each of the representations and warranties of American and Merger Sub set forth in this Agreement (without giving effect to any materiality or American Material Adverse Effect qualifications contained therein) shall be true and correct in all respects as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date (except to the extent any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date), except (i) where the failure of such representations and warranties to be true and correct (other than with respect to the representations and warranties in Section 3.1(b)(ii)) would not, individually or in the aggregate, reasonably be expected to have an American Material Adverse Effect and (ii) for failures to be to true and correct with respect to the representations and warranties contained in Section 3.1(b)(ii) by less than 500,000 shares of Newco Common Stock in the aggregate (including shares of Newco Common Stock issuable upon exercise, conversion or exchange).

(b)    <u>Performance of Obligations of American and Merger Sub</u>.  Each of American and Merger Sub shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing Date.

(c)    <u>Officer's Certificate</u>.  US Airways shall have received a certificate signed on behalf of American and Merger Sub by the Chief Executive Officer or Chief Financial Officer of American to the effect that the conditions set forth in Sections 5.3(a), 5.3(b), 5.3(f) and 5.3(g) have been satisfied.

(d)    <u>Tax Opinion</u>.  US Airways shall have received the opinion of Latham & Watkins LLP, counsel to US Airways, in form and substance reasonably satisfactory to US Airways, dated the Closing Date, substantially to the effect that, on the basis of facts, representations and assumptions set forth or referred to in such opinion that are consistent with the state of facts existing at the Effective Time, the Merger in conjunction with the Plan will be treated for United States federal income tax purposes as a reorganization within the meaning of Section 368(a) of the Code.  In rendering the opinion described in this Section 5.3(d), Latham & Watkins LLP may require and rely upon representations contained in certificates of officers of US Airways and American (on behalf of itself and on behalf of Merger Sub) substantially in the forms attached hereto as Exhibits E and F.

(e)    <u>Plan and Confirmation Order</u>.  (i) The Plan, the Plan Related Documents and the Confirmation Order shall be in form and substance reasonably acceptable to US Airways (such acceptance not to be unreasonably delayed, conditioned or withheld; it being agreed that it would not be reasonable for US Airways to object to any Plan, Plan Related Document or Confirmation Order that is consistent with the terms of this Agreement, including the requirements of a Conforming Plan), (ii) the Plan shall have been confirmed by the Bankruptcy Court pursuant to the Confirmation Order, (iii) the Confirmation Order shall be in full force and effect and shall not have been stayed, modified or vacated and (iv) the effective date of the Plan shall occur contemporaneously with the Closing Date.

(f)    <u>Conforming Plan</u>.  The Plan shall include each of the following components (and any Plan that contains the following components, a "<u>*Conforming Plan*</u>"):

(i)    (A) a condition precedent to the occurrence of the effective date under the Plan shall be the occurrence of the Closing under this Agreement and (B) any material conditions in the Plan that are not also conditions to the obligations of American under this Agreement shall be reasonably acceptable to US Airways (provided that US Airways may not object to the inclusion in the Plan of a condition precedent to the occurrence of the effective date under the Plan that the aggregate estimated allowed prepetition general unsecured claims (excluding intercompany claims) against the Debtors shall not exceed $8 billion);

(ii)    all allowed prepetition general unsecured claims against the Debtors (other than allowed "convenience claims" satisfied in cash as provided in clause (iii) below, and other than intercompany claims which shall be extinguished or reinstated), all equity interests in American, and all rights of labor groups of the Debtors to receive shares of Newco Common Stock in connection with the Plan, will be fully settled and satisfied only with Plan Shares;

(iii)    the aggregate amount of cash payable to satisfy allowed convenience claims shall not exceed $25 million; and

(iv)    all equity held by any Debtor in any other Debtor (other than American) shall not be cancelled and shall continue to be owned by or for the benefit of the respective Debtor, as reorganized.

(g)    <u>Other Conditions</u>.

(i)    Immediately prior to the effectiveness of the Plan, secured indebtedness against the Debtors shall not exceed $6.8 billion in aggregate principal amount; <u>provided</u> that such amount shall exclude (A) any secured indebtedness with respect to municipal bonds that are subject to the immediately succeeding clause (ii); and (B) any additional indebtedness incurred in accordance with Section 4.1 (including, for the avoidance of doubt, indebtedness set forth in Section 4.1(i) of the American Disclosure Letter); and (C) any secured indebtedness the issuance of which is approved by US Airways pursuant to Section 4.1 (but excluding, in the case of clauses (B) and (C), the principal amount of any secured indebtedness refinanced in accordance with Section 4.1, as set forth in Section 4.1(i) of the American Disclosure Letter or with the approval of US Airways, which refinanced principal amount shall be included in determining the aggregate principal amount of secured indebtedness set forth in the first clause of this subparagraph (i));

(ii)    Immediately prior to the effectiveness of the Plan, secured indebtedness against the Debtors with respect to municipal bonds (whether on-balance sheet or off-balance sheet) shall not exceed $1.7 billion in aggregate principal amount; <u>provided</u> that such amount shall exclude any additional indebtedness with respect to municipal bonds incurred in accordance with Section 4.1 (including, for the avoidance of doubt, indebtedness set forth in Section 4.1(i) of the American Disclosure Letter, but excluding the principal amount of any secured indebtedness with respect to municipal bonds refinanced in accordance with Section 4.1, as set forth in Section 4.1(i) of the American Disclosure Letter or with the approval of US Airways, which refinanced principal amount shall be included in determining the aggregate principal amount of secured indebtedness with respect to municipal bonds set forth in the first clause of this subparagraph (ii)); and

(iii)    Immediately prior to the effectiveness of the Plan, unpaid (A) administrative expense claims against the Debtors (1) under section 503(b)(9) of the Bankruptcy Code, (2) for professional fees and expenses of retained professionals under the Bankruptcy Code, and (3) for cure amounts payable pursuant to section 365 of the Bankruptcy Code, and (B) claims entitled to priority status under the Bankruptcy Code (other than priority claims related to pensions) shall not exceed $400 million in aggregate principal amount.

<u>ARTICLE VI</u>

<u>Termination</u>

6.1    <u>Termination by Mutual Consent</u>.  This Agreement may be terminated and the Merger may be abandoned at any time prior to the Effective Time, whether before or after

receipt of the Stockholder Approval or the entry of the Confirmation Order, by mutual written consent of American and US Airways by duly authorized action.

6.2     Termination by Either American or US Airways.  This Agreement may be terminated and the Merger may be abandoned at any time prior to the Effective Time by duly authorized action of either American or US Airways if: (a) the Merger shall not have been consummated by October 14, 2013, whether such date is before or after receipt of the Stockholder Approval or the entry of the Confirmation Order, provided, that in the event that, (i) as of October 14, 2013, the condition set forth in Section 5.1(b) has not been satisfied (or waived), the termination date may be extended from time to time by American or US Airways one or more times to a date not beyond December 13, 2013; provided further that in the event that a party fails to certify compliance with any Second Request prior to the 60th day following the issuance of such Second Request, such termination date may be extended by the other party one or more times for an additional number of days beyond December 13, 2013 equal to the number of days that elapsed between such 60th day and the day on which the first party actually certifies compliance with such Second Request, or (ii) as of October 14, 2013, the condition set forth in either Section 5.2(e) or Section 5.3(e) has not been satisfied (or waived), the termination date may be extended from time to time by American or US Airways one or more times to a date not beyond December 13, 2013 (such date, including any such extensions thereof, the "*Termination Date*"); (b) the Stockholder Approval shall not have been obtained at the Stockholders Meeting or at any adjournment or postponement thereof at which the vote was taken; (c) twenty (20) days have elapsed after the Bankruptcy Court enters an order denying confirmation of the Plan; (d) the Merger Support Order shall not have been entered by the Bankruptcy Court on or prior to the date that is the ninetieth (90th) day following the date of this Agreement (provided that if this Agreement has become terminable pursuant to this Section 6.2(d) but has not been terminated, and the Bankruptcy Court enters the Merger Support Order, then this Agreement shall no longer be terminable pursuant to this Section 6.2(d)); or (e) any Order permanently restraining, enjoining or otherwise prohibiting consummation of the Merger shall become final and non-appealable, except for Orders the existence of which would not result in the failure of the condition set forth in Section 5.1(c); provided, however, that the right to terminate this Agreement pursuant to this Section 6.2 shall not be available to any party that has breached its obligations under this Agreement in any manner that shall have been the principal contributing factor to the occurrence of the events giving rise to the right to terminate this Agreement.

6.3     Termination by US Airways.  This Agreement may be terminated and the Merger may be abandoned at any time prior to the Effective Time, whether before or after receipt of the Stockholder Approval, by duly authorized action of US Airways if: (a) there has been a breach of any representation, warranty, covenant or agreement made by American or Merger Sub in this Agreement, or any such representation or warranty shall have become untrue or incorrect after the execution of this Agreement, such that Section 5.3(a) or 5.3(b), as the case may be, would not then be satisfied and such breach or failure to be true and correct is not cured (if curable) within forty-five (45) days of US Airways providing written notice of such breach or failure to American; (b) US Airways is authorized, by duly authorized action of its Board of Directors, to enter into a binding written agreement concerning a transaction that constitutes a US Airways Superior Proposal, subject to complying with the terms of this Agreement; (c) American shall have knowingly, willfully and materially and not inadvertently breached any of

95

its obligations under Section 4.3 of this Agreement; (d) an American Change in Recommendation shall have occurred; or (e) a Creditors' Committee Change in Recommendation shall have occurred. For purposes of this Agreement, a "*Creditors' Committee Change in Recommendation*" shall mean that the Creditors' Committee has: (i) failed to provide to American for inclusion in the approved Disclosure Statement the Creditors' Committee Recommendation; (ii) withdrawn or modified in a manner materially adverse to US Airways the Creditors' Committee Recommendation; (iii) recommended any American Acquisition Proposal; or (iv) taken, resolved to take, or permitted any of its Representatives to take, any action described in clauses (i), (ii) or (iii) of this sentence; provided that any action taken by the Creditors' Committee in order to comply with its disclosure obligations under applicable Law shall not be a Creditors' Committee Change in Recommendation if concurrently with such action the Creditors' Committee publicly reaffirms the Creditors' Committee Recommendation; provided further that a Creditors' Committee Change in Recommendation shall not be deemed to have occurred in any event if prior to the earlier of (i) ten (10) business days after such Creditors' Committee Change in Recommendation or (ii) two (2) business days prior to the end of the solicitation period for acceptances of the Plan, the American Board of Directors publicly reaffirms the American Directors' Recommendation.

6.4    Termination by American.  This Agreement may be terminated and the Merger may be abandoned at any time prior to the Effective Time, whether before or after receipt of the Stockholder Approval, by duly authorized action of American if: (a) there has been a breach of any representation, warranty, covenant or agreement made by US Airways in this Agreement, or any such representation or warranty shall have become untrue or incorrect after the execution of this Agreement, such that Section 5.2(a) or 5.2(b), as the case may be, would not then be satisfied and such breach or failure to be true and correct is not cured (if curable) within forty-five (45) days of American providing written notice of such breach or failure to US Airways; (b) American is authorized, by duly authorized action of its Board of Directors or by order of the Bankruptcy Court, to enter into a binding written agreement concerning a transaction that constitutes an American Superior Proposal, subject to complying with the terms of this Agreement; (c) US Airways shall have knowingly, willfully and materially and not inadvertently breached any of its obligations under Section 4.4 of this Agreement; or (d) a US Airways Change in Recommendation shall have occurred; provided that prior to any such termination of this Agreement pursuant to this Article VI by American, American shall have consulted with the UCC's Advisors.

6.5    Effect of Termination and Abandonment.  In the event of termination of this Agreement and the abandonment of the Merger pursuant to this Article VI, this Agreement (other than as set forth in Section 7.2) shall become void and of no effect with no liability on the part of any party hereto (or of any of its Subsidiaries or affiliates or any of their respective Representatives) under this Agreement or in connection with the transactions contemplated by this Agreement, except for, if applicable, the obligations of US Airways under Section 6.6 and the obligations of American under Section 6.7.

6.6    US Airways Termination Fees.

(a)    In the event this Agreement is terminated by US Airways or American pursuant to Section 6.2(b), if (A) prior to such termination of this Agreement

pursuant to Section 6.2(b), a bona fide US Airways Acquisition Proposal that satisfies the last proviso of Section 4.4(a)(ii) (a "*Covered US Airways Proposal*") shall have been made to US Airways or any of its Subsidiaries or its stockholders and shall have become publicly known or any Person shall have publicly announced an intention (whether or not conditional) to make a Covered US Airways Proposal with respect to US Airways or any of its Subsidiaries (and such Covered US Airways Proposal or publicly announced intention shall not have been withdrawn prior to the time of the Stockholders Meeting), and (B) following such termination of this Agreement pursuant to Section 6.2(b), any Person (other than American) consummates, in one transaction or any series of related transactions within 18 months of such termination, or enters into an agreement with US Airways within 18 months of such termination for, a transaction that is a Covered US Airways Proposal, then US Airways shall promptly, but in no event later than two business days after the date such Covered US Airways Proposal is consummated or such Covered US Airways Proposal is entered into, pay to American a termination fee of $55,000,000 (the "*US Airways No Vote Transaction Fee*"), payable by wire transfer of same day funds.

(b)    US Airways shall, promptly, but in no event later than two business days after the date of termination, pay to American a termination fee of $55,000,000 (the "*US Airways Alternative Transaction Fee*"), payable by wire transfer of same day funds, in the event that:

(i)    this Agreement is terminated by American pursuant to Section 6.4(c) or (d); or

(ii)    this Agreement is terminated by US Airways in accordance with Section 6.3(b).

(c)    US Airways shall, promptly, but in no event later than two business days after the date of termination, pay to American a termination fee of $195,000,000 (the "*US Airways Termination Fee*"), payable by wire transfer of same day funds, in the event that this Agreement is terminated by American pursuant to Section 6.4(a) with respect to any Knowing Material Breach of any representation or warranty made by US Airways or any Deliberate Material Breach of any covenant or agreement by US Airways.

(d)    US Airways and American acknowledge and agree that the agreements contained in this Section 6.6 are an integral part of the transactions contemplated by this Agreement, and that, without these agreements, American and US Airways would not enter into this Agreement. Notwithstanding anything to the contrary in this Agreement, each of US Airways and American acknowledge and agree that (i) the US Airways No Vote Transaction Fee, the US Airways Alternative Transaction Fee or the US Airways Termination Fee, if paid, shall not constitute either a penalty or liquidated damages, (ii) prior to the termination of this Agreement in accordance with its terms, American's right to specific performance under Section 7.15 or its right to terminate this Agreement and receive payment, if payable, of the US Airways No Vote Transaction Fee, the US Airways Alternative Transaction Fee or the US Airways

Termination Fee, as applicable, in accordance with this Section 6.6 shall be the sole and exclusive remedy of American and its Subsidiaries, the Debtors or their estates, or any of their respective affiliates or Representatives against US Airways and its Subsidiaries, and their respective affiliates and Representatives, under this Agreement or arising out of or related to this Agreement (or the termination hereof or thereof) or the Plan or the transactions contemplated hereby or thereby (or the abandonment thereof) or any matter related thereto or forming the basis therefor and (iii) from and after the termination of this Agreement in accordance with its terms, American's right to receive payment, if payable, of the US Airways No Vote Transaction Fee, the US Airways Alternative Transaction Fee or the US Airways Termination Fee, as applicable, in accordance with this Section 6.6 shall be the sole and exclusive remedy of American and its Subsidiaries, the Debtors or their estates, or any of their respective affiliates or Representatives against US Airways and its Subsidiaries, and their respective affiliates and Representatives, under this Agreement or arising out of or related to this Agreement (or the termination hereof or thereof) or the Plan or the transactions contemplated hereby or thereby (or the abandonment thereof) or any matter related thereto or forming the basis therefor.  Upon payment of the US Airways No Vote Transaction Fee, the US Airways Alternative Transaction Fee or the US Airways Termination Fee to American in accordance with this Agreement, (x) none of US Airways or its Subsidiaries, or their respective affiliates or Representatives shall have any liability or obligation relating to or arising out of this Agreement (or the termination hereof or thereof) or the Plan or the transactions contemplated hereby or thereby (or the abandonment thereof) or any matter related thereto or forming the basis therefor, in each case whether based on contract, tort or strict liability, by the enforcement of any assessment, by any legal or equitable proceeding, by virtue of any statute, regulation or applicable Laws or otherwise, and (y) none of American or its Subsidiaries, the Debtors or their estates, or any of their respective affiliates or Representatives shall be entitled to bring or maintain any claim, action or proceeding against US Airways or its Subsidiaries, or their respective affiliates or Representatives arising out of or in connection with any of the foregoing.  For the avoidance of doubt, American's election to terminate this Agreement and receive payment, if payable, of the US Airways No Vote Transaction Fee, the US Airways Alternative Transaction Fee or the US Airways Termination Fee, as applicable, in accordance with this Section 6.6, shall be in lieu of its right to specific performance under Section 7.15.

(e)    If US Airways fails to promptly pay any amount due pursuant to this Section 6.6, and, in order to obtain such payment, American commences a suit which results in a judgment against US Airways for the payment of any such amount due pursuant to this Section 6.6, US Airways shall pay to American the costs and expenses (including attorneys' fees) of American in connection with such suit, together with interest on such amount, and any such costs and expenses, at the prime rate of Citibank, N.A. in effect on the date such payment was required to be made.  In no event shall American be entitled to receive more than one of (i) the US Airways No Vote Transaction Fee, (ii) the US Airways Alternative Transaction Fee or (iii) the US Airways Termination Fee, and in no event shall American be entitled to receive any of the US Airways No Vote Transaction Fee, the US Airways Alternative Transaction Fee or the US Airways Termination Fee on more than one occasion.

(f)    For purposes of this Agreement, (i) a "*Knowing Material Breach*" of a representation and warranty shall be deemed to have occurred only if an officer of US Airways or American, as applicable (who is a knowledge party within the meaning of "US Airways' Knowledge" or "American's Knowledge", respectively), had actual knowledge of such material breach as of the date hereof (without any independent duty of investigation or verification other than an actual reading of the representations and warranties as they appear in this Agreement on subjects relevant to the areas as to which they have direct managerial oversight responsibility) and willfully failed to disclose such breach to the other party and (ii) a "*Deliberate Material Breach*" of any covenant shall be deemed to have occurred only if US Airways or American, as applicable, willfully took or failed to take action with actual knowledge of an officer of US Airways or American, respectively (who is a knowledge party within the meaning of "US Airways' Knowledge" or "American's Knowledge", respectively), that the action so taken or omitted to be taken constituted a material breach of such covenant.

6.7    Underline American Termination Fees.

(a)    In the event that this Agreement is terminated by either American or US Airways pursuant to Section 6.2(c), if (A) prior to such termination of this Agreement pursuant to Section 6.2(c), a bona fide American Acquisition Proposal that satisfies the last proviso of Section 4.3(a)(ii) (a "*Covered American Proposal*") shall have been made to American or any of its Subsidiaries or its creditors and shall have become publicly known or any Person shall have publicly announced an intention (whether or not conditional) to make a Covered American Proposal with respect to American or any of its Subsidiaries (and such Covered American Proposal or publicly announced intention shall not have been withdrawn prior to the time of the solicitation of the votes on the Plan contemplated by Section 4.20), and (B) following such termination of this Agreement pursuant to Section 6.2(c), any Person (other than US Airways) consummates, in one transaction or any series of related transactions within 18 months of such termination, or enters into an agreement with American within 18 months of such termination for, a transaction that is a Covered American Proposal, then American shall promptly, but in no event later than two business days after the date such Covered American Proposal is consummated or such Covered American Proposal is entered into, pay to US Airways a termination fee of $135,000,000  (the "*American No Vote Transaction Fee*"), payable by wire transfer of same day funds.

(b)    American shall, promptly, but in no event later than two business days after the date of termination, pay to US Airways a termination fee of $135,000,000 (the "*American Alternative Transaction Fee*"), payable by wire transfer of same day funds, in the event that:

(i)    this Agreement is terminated by US Airways pursuant to Section 6.3(c) or (d);

(ii)    this Agreement is terminated by American in accordance with Section 6.4(b); or

(iii)    this Agreement is terminated by US Airways pursuant to Section 6.3(e).

(c)    American shall, promptly, but in no event later than two business days after the date of termination, pay to US Airways a termination fee of $195,000,000 (the "*American Termination Fee*"), payable by wire transfer of same day funds, in the event that this Agreement is terminated by US Airways pursuant to Section 6.3(a) with respect to any Knowing Material Breach of any representation or warranty made by American or any Deliberate Material Breach of any covenant or agreement by American.

(d)    American and US Airways acknowledge and agree that the agreements contained in this Section 6.7 are an integral part of the transactions contemplated by this Agreement, and that, without these agreements, US Airways and American would not enter into this Agreement.  Notwithstanding anything to the contrary in this Agreement, each of American and US Airways acknowledge and agree that (i) the American No Vote Transaction Fee, the American Alternative Transaction Fee or the American Termination Fee, if paid, shall not constitute either a penalty or liquidated damages, (ii) prior to the termination of this Agreement in accordance with its terms, US Airways' right to specific performance under Section 7.15 or its right to terminate this Agreement and receive payment, if payable, of the American No Vote Transaction Fee, the American Alternative Transaction Fee or the American Termination Fee, as applicable, in accordance with this Section 6.7 shall be the sole and exclusive remedy of US Airways and its Subsidiaries, or any of their respective affiliates or Representatives against American and its Subsidiaries, the Debtors or their estates, and their respective affiliates and Representatives, under this Agreement or arising out of or related to this Agreement (or the termination hereof or thereof) or the Plan or the transactions contemplated hereby or thereby (or the abandonment thereof) or any matter related thereto or forming the basis therefor and (iii) from and after the termination of this Agreement in accordance with its terms, US Airways' right to receive payment, if payable, of the American No Vote Transaction Fee, the American Alternative Transaction Fee or the American Termination Fee, as applicable, in accordance with this Section 6.7 shall be the sole and exclusive remedy of US Airways and its Subsidiaries, or any of their respective affiliates or Representatives against American and its Subsidiaries, the Debtors or their estates, and their respective affiliates and Representatives, under this Agreement or arising out of or related to this Agreement (or the termination hereof or thereof) or the Plan or the transactions contemplated hereby or thereby (or the abandonment thereof) or any matter related thereto or forming the basis therefor.  Upon payment of the American No Vote Transaction Fee, the American Alternative Transaction Fee or the American Termination Fee to US Airways in accordance with this Agreement, (x) none of American or its Subsidiaries, the Debtors or their estates, or their respective affiliates or Representatives shall have any liability or obligation relating to or arising out of this Agreement (or the termination hereof or thereof) or the Plan or the transactions contemplated hereby or thereby (or the abandonment thereof) or any matter related thereto or forming the basis therefor, in each case whether based on contract, tort or strict liability, by the enforcement of any assessment, by any legal or equitable proceeding, by virtue of any statute, regulation or applicable Laws or otherwise, and (y) none of US Airways or its Subsidiaries, or any of their respective affiliates or

100

Representatives shall be entitled to bring or maintain any claim, action or proceeding against American or its Subsidiaries, the Debtors or their estates, or their respective affiliates or Representatives arising out of or in connection with any of the foregoing. For the avoidance of doubt, US Airways' election to terminate this Agreement and receive payment, if payable, of the American No Vote Transaction Fee, the American Alternative Transaction Fee or the American Termination Fee, as applicable, in accordance with this Section 6.7, shall be in lieu of its right to specific performance under Section 7.15.

(e)     If American fails to promptly pay any amount due pursuant to this Section 6.7, and, in order to obtain such payment, US Airways commences a suit which results in a judgment against American for the payment of any such amount due pursuant to this Section 6.7, American shall pay to US Airways the costs and expenses (including attorneys' fees) of US Airways in connection with such suit, together with interest on such amount, and any such costs and expenses, at the prime rate of Citibank, N.A. in effect on the date such payment was required to be made.  In no event shall US Airways be entitled to receive more than one of (x) the American No Vote Transaction Fee, (y) the American Alternative Transaction Fee or (z) the American Termination Fee, and in no event shall US Airways be entitled to receive any of the American No Vote Transaction Fee, the American Alternative Transaction Fee or the American Termination Fee on more than one occasion.

(f)     American's obligations pursuant to this Section 6.7, including American's obligations to pay the American No Vote Transaction Fee, the American Alternative Transaction Fee and the American Termination Fee, as applicable, shall constitute an allowed administrative expense of American.

## ARTICLE VII

## Miscellaneous and General

7.1     Effectiveness.  Prior to the entry of the Merger Support Order by the Bankruptcy Court, this Agreement shall not be binding or enforceable against American, US Airways or Merger Sub.  Upon (i) execution and delivery by American, US Airways and Merger Sub of counterpart signature pages hereto, and (ii) entry of the Merger Support Order by the Bankruptcy Court, this Agreement shall become effective and binding on, and enforceable against, each of American, US Airways or Merger Sub retroactive to the date hereof as if this Agreement had been in full force and effect from the date hereof; provided that if this Agreement is validly terminated in accordance with Article VI at any time prior to the time of such effectiveness, this Agreement shall not become effective, binding or enforceable against any of American, US Airways or Merger Sub.

7.2     Survival.  This Article VII and the agreements of American, US Airways and Merger Sub contained in Article II and Sections 4.10 (Employee Matters), 4.12 (Indemnification; Directors' and Officers' Insurance) and 4.17 (Reservation of Newco Common Stock) shall survive the consummation of the Merger.  This Article VII and the agreements of American, US Airways and Merger Sub contained in Section 4.11 (Expenses), Section 6.5

(Effect of Termination and Abandonment), Section 6.6 (US Airways Termination Fees) and Section 6.7 (American Termination Fees) and the Non-Disclosure Agreements shall survive the termination of this Agreement.  Except as set forth in this Section 7.2, (a) no representations, warranties, covenants or agreements in this Agreement shall survive the consummation of the Merger or the termination of this Agreement and (b) other than claims made with respect to any such surviving representation, warranty, covenant or agreement by an intended beneficiary thereof under Section 7.9, from and after the earlier of the Effective Time or the termination of this Agreement, no claim shall be brought or maintained by any party hereto, including the Debtors, their successors or their estates, or any other Person, including third-party beneficiaries, with respect to any breach hereof.

       7.3    <u>Modification or Amendment</u>.  Subject to the provisions of the applicable Laws, at any time prior to the Effective Time, the parties hereto (with respect to American, after consultation with the UCC's Advisors) may modify or amend this Agreement, by written agreement executed and delivered by duly authorized officers of the respective parties; <u>provided</u>, <u>however</u>, that any material modification of this Agreement prior to the Effective Time shall be subject to the approval of the Bankruptcy Court; <u>provided</u>, <u>further</u> that (i) any material amendment or modification to Section 1.8 or Section 4.23 of this Agreement or (ii) any amendment or modification to any other provision of this Agreement that materially adversely affects the notice, consent, consultation or participation rights expressly granted to the Creditors' Committee or the UCC's Advisors under this Agreement, shall require the prior approval of the UCC's Legal Advisor.

       7.4    <u>Waiver of Conditions</u>.  The conditions to each of the parties' obligations to consummate the Merger are for the sole benefit of such party and (with respect to American, after consultation with the UCC's Advisors) may be waived by such party in whole or in part; <u>provided</u>, <u>however</u>, that the condition in Section 5.3(d) shall not be waivable after receipt of Stockholder Approval unless further stockholder approval is obtained with appropriate disclosure.

       7.5    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

       7.6    <u>Governing Law and Venue; Waiver of Jury Trial</u>.

       (a)    **THIS AGREEMENT SHALL BE DEEMED TO BE MADE IN AND IN ALL RESPECTS SHALL BE INTERPRETED, CONSTRUED AND GOVERNED BY AND IN ACCORDANCE WITH THE LAW OF THE STATE OF DELAWARE WITHOUT REGARD TO THE CONFLICTS OF LAW PRINCIPLES THEREOF.**  The parties hereby irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court, or if such court will not hear any such suit, the courts of the State of New York and the federal courts of the United States of America located in the State of New York, to interpret and enforce the terms of this Agreement and the documents referred to in this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and any and all proceedings

related to the foregoing shall be filed and maintained only in the Bankruptcy Court or such other court.  The parties hereby irrevocably waive, and agree not to assert, as a defense in any action, suit or proceeding for the interpretation or enforcement hereof or of any such document, that it is not subject thereto or that such action, suit or proceeding may not be brought or is not maintainable in said courts or that the venue thereof may not be appropriate or that this Agreement or any such document may not be enforced in or by such courts, and the parties hereto irrevocably agree that all claims with respect to such action or proceeding shall be heard and determined in such courts.  The parties hereby consent to and grant any such court jurisdiction over the person of such parties and consent to the jurisdiction of any such court over the subject matter of such dispute and agree that mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 7.7 or in such other manner as may be permitted by Law shall be valid and sufficient service thereof.

(b)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.6.

7.7     Notices.  Any notice, request, instruction or other document to be given hereunder by any party to the others shall be in writing and delivered personally or sent by registered or certified mail, postage prepaid, by facsimile, by electronic mail or by overnight courier:

If to American or Merger Sub:

AMR Corporation
4333 Amon Carter Blvd., Mail Drop 5618HDQ
Ft. Worth, Texas 76155
Attention: Gary Kennedy, Senior Vice President and General Counsel
Facsimile: 817- 967-2501
E-mail: gary.kennedy@aa.com

With a copy to (which shall not constitute notice):

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Thomas A. Roberts, Stephen Karotkin
Facsimile: 212-310-8007
E-mail: thomas.roberts@weil.com, stephen.karotkin@weil.com

and

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, TX 75201-6950
Attention: Glenn D. West
Facsimile: 214-746-7777
E-mail: gdwest@weil.com

With a copy to (which shall not constitute notice):

Financial advisor to American:

Rothschild Inc.
1251 Avenue of the Americas, 51st Floor,
New York, NY 10020
Attention: Christopher Lawrence
Facsimile: 212-403-3625
E-mail Christopher.lawrence@rothschild.com

If to the Creditors' Committee:

Counsel to the Creditors' Committee (the "*UCC's Legal Advisor*"), the UCC's Advisors
or the UCC's Legal Advisor:

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
Attention: Eric Cochran, Sean Doyle
Facsimile: 212−735−2000
Email: Eric.Cochran@skadden.com, Sean.Doyle@skadden.com

With a copy to (which shall not constitute notice):

Financial advisor to the Creditors' Committee:

Moelis & Company
399 Park Avenue, 5th floor
New York, NY 10022
Attention: William Q. Derrough

Facsimile: 212-880- 4260
Email: William.Derrough@moelis.com

If to US Airways:

US Airways Group, Inc.
111 West Rio Salado Parkway
Tempe, Arizona  85281
Attention: Stephen L. Johnson, EVP—Corporate and Government Affairs
Facsimile: 480-693-5155
E-mail: stephen.johnson@usairways.com

With a copy to (which shall not constitute notice):

Millstein & Co., L.P.
1717 Pennsylvania Avenue, N.W., Suite 333
Washington, D.C. 20006
Attention: Jim Millstein
Facsimile: 202-974-6119
E-mail: jim@millsteinandco.com

and

Latham & Watkins LLP
140 Scott Drive
Menlo Park, CA 94025
Attention: Peter F. Kerman
Facsimile: 650-463-2600
E-mail: peter.kerman@lw.com

        or to such other persons or addresses as may be designated in writing by the party
to receive such notice as provided above.  Any notice, request, instruction or other document
given as provided above shall be deemed given to the receiving party upon actual receipt, if
delivered personally; three business days after deposit in the mail, if sent by registered or
certified mail; upon confirmation of successful transmission if sent by facsimile (provided that if
given by facsimile such notice, request, instruction or other document shall be followed up
within one business day by dispatch pursuant to one of the other methods described herein);
upon confirmation of successful transmission if sent by electronic mail; or on the next business
day after deposit with an overnight courier, if sent by an overnight courier.

        7.8    Entire Agreement.  This Agreement (including any exhibits hereto), the
American Disclosure Letter, the US Airways Disclosure Letter, the Amended and Restated Non-
Disclosure Agreement, dated as of the date of this Agreement, between US Airways and
American, relating to the information to be provided by American to US Airways (the "US
Airways NDA") and the Amended and Restated Non-Disclosure Agreement, dated as of the date
of this Agreement, between US Airways and American, relating to the information to be
provided by US Airways to American (the "American NDA" and together with the US Airways
NDA, as they may be amended, amended and restated, modified or provisions thereof waived,

105

the "*Non-Disclosure Agreements*") constitute the entire agreement, and supersede all other prior agreements, understandings, representations and warranties both written and oral, among the parties, with respect to the subject matter hereof.

7.9     Third Party Beneficiaries.  Except as provided in Section 4.12 (Indemnification; Directors' and Officers' Insurance), this Agreement is not intended to, and does not, confer upon any Person other than the parties hereto any rights or remedies whatsoever; provided, however, the Creditors' Committee is explicitly named as a third party beneficiary solely as to the provisions of this Agreement expressly granted to the Creditors' Committee or the UCC's Advisors hereunder, with the right to enforce such provisions subject to the terms hereof.

7.10    Obligations of American and of US Airways.  Whenever this Agreement requires a Subsidiary of American to take any action, such requirement shall be deemed to include an undertaking on the part of American to cause such Subsidiary to take such action and, after the Effective Time, on the part of the Surviving Corporation to cause such Subsidiary to take such action.  Whenever this Agreement requires a Subsidiary of US Airways to take any action, such requirement shall be deemed to include an undertaking on the part of US Airways to cause such Subsidiary to take such action.

7.11    Definitions.  Each of the terms set forth in Annex A is defined in the Section of this Agreement set forth opposite such term.

7.12    Severability.  The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

7.13    Interpretation; Construction.

(a)     The table of contents and headings herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.  Where a reference in this Agreement is made to a Section, Annex or Exhibit, such reference shall be to a Section of, or Annex or Exhibit to, this Agreement unless otherwise indicated.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  The term "made available" and words of similar import means that the relevant documents, instruments or materials were either (A) posted and made available to the other party or its designated Representatives on the Intralinks due diligence data site, with respect to American, or on the RR Donnelley due diligence data site, with respect to US Airways, as applicable, maintained by either

106

company for the purpose of the transactions contemplated by this Agreement, or (B) publicly available by virtue of the relevant party's filing of a publicly available final registration statement, prospectus, report, form, schedule or definitive proxy statement filed with the SEC pursuant to the Securities Act or the Exchange Act, in each case, prior to the date such documents, instruments or materials were represented by a party to have been made available to the other party.

(b)    The parties have participated jointly in negotiating and drafting this Agreement.  In the event that an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

(c)    Each of American and US Airways has or may have set forth information in its respective disclosure letter in a section thereof that corresponds to the section of this Agreement to which it relates.  A matter set forth in one section of a disclosure letter need not be set forth in any other section of the disclosure letter so long as its relevance to the latter section of the disclosure letter or section of the Agreement is readily apparent on the face of the information disclosed in the disclosure letter to the Person to which such disclosure is being made.  The fact that any item of information is disclosed in a disclosure letter to this Agreement shall not be construed to mean that such information is required to be disclosed by this Agreement.  Such information and the dollar thresholds set forth herein shall not be used as a basis for interpreting the terms "material," "American Material Adverse Effect," "US Airways Material Adverse Effect" or other similar terms in this Agreement.

(d)    The phrase "ordinary course of business" and words of similar import shall mean, when used with respect to American or its Subsidiaries, the ordinary course of business of American or its Subsidiaries as conducted prior to the commencement of the Cases (it being understood that the fact that the Debtors may seek Bankruptcy Court approval of any matter shall not, in and of itself, constitute a determination that such matter is not in the ordinary course of business for purposes of this Agreement).

7.14    <u>Assignment</u>.  This Agreement shall not be assignable by operation of law or otherwise.  Any purported assignment in violation of this Agreement will be void ab initio.

7.15    <u>Specific Performance</u>.  American, US Airways and Merger Sub agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that the parties hereto fail to perform the provisions of this Agreement in accordance with their specified terms or to take such actions as are required of them hereunder to consummate the Closing in accordance with the terms of this Agreement or otherwise breach such provisions.  American, US Airways and Merger Sub agree that the parties hereto shall be entitled to an injunction, specific performance and other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, including specific performance in connection with enforcing a party's obligation to consummate the Closing in accordance with the terms of this Agreement.  Each of American, US Airways and

Merger Sub agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief consistent with this Section 7.15 on the basis that the other parties have an adequate remedy at law.  A party seeking an injunction to prevent breaches of this Agreement or to enforce specifically the terms and provisions of this Agreement in accordance with this Section 7.15 shall not be required to provide any bond or other security in connection with any such order or injunction.

*[Remainder of Page Intentionally Left Blank.]*

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of the parties hereto as of the date first written above.

AMR CORPORATION

By: _____

Name: Thomas W. Horton
Title: Chairman, President and Chief
Executive Officer

AMR MERGER SUB, INC.

By: _____

Name: Thomas W. Horton
Title: President

US AIRWAYS GROUP, INC.

By: _____

Name: W. Douglas Parker
Title: Chairman and Chief Executive
Officer

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of the parties hereto as of the date first written above.

AMR CORPORATION

By: _____

     Name:  Thomas W. Horton
     Title:    Chairman, President and Chief
             Executive Officer

AMR MERGER SUB, INC.

By: _____

     Name:  Thomas W. Horton
     Title:    President

US AIRWAYS GROUP, INC.

By: _____

     Name:  W. Douglas Parker
     Title:    Chairman and Chief Executive
             Officer

## ANNEX A

## DEFINED TERMS

Terms                                                                    Section

7% Indenture ............................................................................ 4.22(a)
7.25% Base Indenture ............................................................. 4.22(a)
7.25% Indenture ..................................................................... 4.22(a)
7.25% Supplemental Indenture .............................................. 4.22(a)
ADs ...................................................................................... 3.1(i)(i)
affiliate .................................................................................. 3.1(w)
Agreement............................................................................ Preamble
American ............................................................................. Preamble
American Acquisition Proposal .............................................. 4.3(a)
American Aircraft .................................................................. 3.1(r)(i)
American Alternative Transaction Fee .................................... 6.7(b)
American Audit Date ............................................................. 3.1(e)(i)
American CBAs ..................................................................... 3.1(o)(i)
American Change in Recommendation ................................... 4.3(a)
American Common Stock............................................................2.3
American Compensation and Benefit Plan ............................. 3.1(h)(i)
American DB Plan ................................................................. 3.1(h)(v)
American Directors' Recommendation ................................. 4.20(a)(iii)
American Disclosure Letter ........................................................3.1
American Foreign Plans.......................................................3.1(h)(viii)
American Lease ..................................................................... 3.1(k)(ii)
American Leased Real Property ............................................. 3.1(k)(ii)
American Material Adverse Effect ......................................... 3.1(a)
American Material Contracts .................................................3.1(j)(iii)
American Maximum Premium .............................................. 4.12(c)
American NDA .........................................................................7.8
American No Vote Transaction Fee ....................................... 6.7(a)
American Owned Real Property ............................................. 3.1(k)(i)
American Real Property...........................................................3.1(k)(ii)
American Reports .................................................................. 3.1(e)(i)
American Routes.................................................................... 4.1(q)
American Slots ...................................................................... 3.1(s)
American Superior Proposal .................................................. 4.3(a)(ii)
American Termination Fee .................................................... 6.7(c)
American's Knowledge ......................................................... 3.1(e)(iv)
Automatic Transferred Employees ........................................ 4.10(l)
Bankruptcy Code ..................................................................Recitals
Bankruptcy Court..................................................................Recitals
Binding American Contract ...................................................3.1(d)(ii)
business day ..............................................................................1.2
Cases .....................................................................................Recitals

CERCLA .......................................................................................... 3.1(m)(iv)
Certificate ............................................................................................... 2.1(c)
Certificate of Merger ................................................................................... 1.3
Closing .................................................................................................... 1.2
Closing Date ............................................................................................. 1.2
Code ................................................................................................... Recitals
Computer Software ................................................................................ 3.1(p)
Confirmation Order .............................................................................. Recitals
Conforming Plan ................................................................................... 5.3(f)
Continuing Employee ............................................................................ 4.10(e)
Contract .......................................................................................... 3.1(d)(ii)
Converted Cash-Settled US Airways RSU ........................................ 4.21(a)(ii)(B)
Converted US Airways Equity Award ................................................ 4.21(a)(ii)
Converted US Airways Option .......................................................... 4.21(a)(i)
Converted US Airways Cash-Settled SAR .......................................... 4.21(a)(i)
Converted US Airways Stock-Settled SAR ......................................... 4.21(a)(i)
Converted US Airways 7% Convertible Note ......................................... 4.22(b)
Converted US Airways 7.25 Convertible Note ........................................ 4.22(a)
Copyrights .......................................................................................... 3.1(p)
Covered American Proposal ................................................................... 6.7(a)
Covered US Airways Proposal ............................................................... 6.6(a)
Creditors' Committee .......................................................................... Recitals
Creditors' Committee Change in Recommendation ................................... 6.3(e)
Creditors' Committee Recommendation ............................................ 4.20(a)(iii)
Debtor ............................................................................................... Recitals
Debtors .............................................................................................. Recitals
Deliberate Material Breach .................................................................... 6.6(f)
DGCL ..................................................................................................... 1.1
DHS ............................................................................................... 3.1(d)(i)
Disclosure Statement ....................................................................... 4.20(a)(ii)
Disclosure Statement Approval Date .................................................. 4.20(a)(iv)
Disclosure Statement Order .............................................................. 4.20(a)(iv)
DOT ............................................................................................... 3.1(d)(i)
Effective Time ........................................................................................ 1.3
Encumbrance .................................................................. 3.1(k)(iii), 3.2(k)(iii)
Environmental Laws ........................................................................ 3.1(m)(iii)
Environmental Liability .................................................................... 3.1(m)(iii)
ERISA ............................................................................................ 3.1(h)(ii)
EU Merger Regulation ........................................................................ 3.1(d)(i)
Exchange Act ................................................................................... 3.1(d)(i)
Exchange Agent .................................................................................... 2.2(a)
Exchange Fund ..................................................................................... 2.2(a)
FAA ............................................................................................... 3.1(d)(i)
FARs ............................................................................................. 3.1(i)(i)
FCC ............................................................................................... 3.1(d)(i)
Foreign Corrupt Practices Act ............................................................ 3.1(q)(i)

Form S-4 ............................................................................................... 4.7(a)
Form S-4 Documents ............................................................................. 4.7(a)
FSA Plans ........................................................................................... 4.10(e)
GAAP ........................................................................................... 3.1(e)(ii)
Governmental Entity ........................................................................ 3.1(d)(i)
Hazardous Substance ..................................................................... 3.1(m)(iv)
HSR Act ......................................................................................... 3.1(d)(i)
IATA ................................................................................................. 3.1(s)
Indemnified Parties ........................................................................... 4.12(a)
Independent Director ............................................................................ 1.8(a)
Intellectual Property ............................................................................. 3.1(p)
IRS ............................................................................................... 3.1(h)(ii)
IT Assets ............................................................................................. 3.1(p)
Knowing Material Breach ...................................................................... 6.6(f)
Laws ............................................................................................... 3.1(i)(i)
Licenses ......................................................................................... 3.1(i)(i)
Lien .............................................................................................. 3.1(d)(ii)
Major American Airports ...................................................................... 3.1(t)
Major US Airways Airports ................................................................... 3.2(t)
Material Adverse Effect ........................................................................ 3.1(a)
Maximum Shares ........................................................................... 2.1(d)(i)
Merger .............................................................................................. Recitals
Merger Consideration ........................................................................... 2.1(c)
Merger Sub ....................................................................................... Preamble
Merger Sub Common Stock .................................................................. 2.1(a)
Merger Support Motion .................................................................. 4.20(a)(i)
Merger Support Order ..................................................................... 4.20(a)(i)
NASDAQ ........................................................................................ 3.1(d)(i)
Newco ...................................................................................................... 1.1
Newco 2013 Incentive Award Plan .................................................... 4.10(c)
Newco By-Laws ................................................................................... 1.7(a)
Newco Charter ..................................................................................... 1.6(a)
Newco Common Certificates ................................................................ 2.2(a)
Newco Common Stock ......................................................................... 2.1(c)
Newco Fully Diluted Shares .................................................................. 2.1(d)
Newco Material Adverse Effect ........................................................... 4.7(e)
Newco Preferred Stock .................................................................... 2.1(d)(ii)
Non-Disclosure Agreements ...................................................................... 7.8
Non-Union Continuing Employees .................................................... 4.10(e)
Notice of American Change in Recommendation ............................... 4.3(a)(ii)
Notice of US Airways Change in Recommendation ............................ 4.4(a)(ii)
Notification Procedures Order ........................................................... 4.15(c)
NYSE .................................................................................................. 1.8(b)
OPEB ............................................................................................ 4.20(b)(ii)
Order ................................................................................................... 5.1(c)
Patents ................................................................................................ 3.1(p)

Person ........................................................................ 2.1(d)(iii)
Plan ............................................................................ 4.20(a)(ii)
Plan Related Documents .......................................... 4.20(a)(ix)
Plan Shares ................................................................ 2.1(d)(iv)
Post-Closing 401(k) Plan ................................................ 4.10(j)
Post-Closing FSA Plan ................................................... 4.10(e)
Preferred American D&O Tail Policy ............................ 4.12(c)
Preferred US Airways D&O Tail Policy ........................ 4.12(d)
Prospectus / Proxy Statement ........................................ 4.7(a)
Proxy Statement Documents ........................................... 4.7(a)
RCRA ......................................................................... 3.1(m)(iv)
reasonable best efforts ................................................... 4.7(e)
Release ........................................................................ 3.1(m)(v)
Removal, Remedial or Response Actions .................. 3.1(m)(vi)
Representatives .............................................................. 4.3(a)
SEC ............................................................................. 3.1(e)(i)
Second Request ............................................................. 4.7(b)
Securities Act ............................................................... 3.1(d)(i)
Share Determination Date ........................................... 2.1(d)(v)
SOX Act ...................................................................... 3.1(e)(i)
Standalone Plan ........................................................... Recitals
Stockholder Approval ........................................................ 4.6
Stockholders Meeting ......................................................... 4.6
Subsidiary ....................................................................... 3.1(a)
Surviving Corporation ......................................................... 1.1
Takeover Statute ............................................................. 3.1(l)
Tax .................................................................................. 3.1(n)
Tax Return ....................................................................... 3.1(n)
Taxes ............................................................................... 3.1(n)
Termination Date ................................................................ 6.2
Terms and Conditions of Employment ........................... 4.10(l)
Trade Secrets .................................................................. 3.1(p)
Trademarks ..................................................................... 3.1(p)
Transfer Taxes .................................................................. 4.14
Transition Committee ........................................................ 4.18
TSA .............................................................................. 3.1(d)(i)
UCC's Advisors ...................................................... 4.3(a)(ii)(B)
UCC's Legal Advisor ........................................................... 7.7
UK Bribery Act ........................................................... 3.1(q)(i)
US Airways ................................................................. Preamble
US Airways 401(k) Plan ............................................... 4.10(g)
US Airways 7% Convertible Notes .............................. 3.2(b)(i)
US Airways 7.25% Convertible Notes .......................... 3.2(b)(i)
US Airways Acquisition Proposal ................................... 4.4(a)
US Airways Aircraft ...................................................... 3.2(r)(i)
US Airways Alternative Transaction Fee ........................ 6.6(b)

US Airways Audit Date ............................................................................... 3.2(e)(i)
US Airways Cash-Settled RSUs ................................................................. 3.2(b)(i)
US Airways Cash-Settled SARs ................................................................. 3.2(b)(i)
US Airways CBAs ....................................................................................... 3.2(o)(i)
US Airways Change in Recommendation ................................................. 4.4(a)
US Airways Common Stock ........................................................................ 2.1(b)
US Airways Compensation and Benefit Plan ........................................... 3.2(h)(i)
US Airways Directors' Recommendation .................................................. 3.2(c)(ii)
US Airways Disclosure Letter .......................................................................... 3.2
US Airways Equity Awards......................................................................... 3.2(b)(i)
US Airways Equity Plans............................................................................ 3.2(b)(i)
US Airways Foreign Plans......................................................................... 3.2(h)(viii)
US Airways FSA Plan ................................................................................ 4.10(e)
US Airways Lease....................................................................................... 3.2(k)(ii)
US Airways Leased Real Property ............................................................ 3.2(k)(ii)
US Airways Material Adverse Effect ............................................................ 3.2(a)
US Airways Material Contracts .................................................................. 3.2(j)(iii)
US Airways Maximum Premium................................................................ 4.12(d)
US Airways NDA ................................................................................................7.8
US Airways No Vote Transaction Fee........................................................ 6.6(a)
US Airways Options .................................................................................... 3.2(b)(i)
US Airways Owned Real Property ............................................................. 3.2(k)(i)
US Airways Real Property..........................................................................3.2(k)(ii)
US Airways Reports ................................................................................... 3.2(e)(i)
US Airways Routes...................................................................................... 4.2(q)
US Airways RSUs........................................................................................ 3.2(b)(i)
US Airways SARs........................................................................................ 3.2(b)(i)
US Airways Slots ............................................................................................ 3.2(s)
US Airways Stock-Settled RSUs ............................................................... 3.2(b)(i)
US Airways Stock-Settled SARs ............................................................... 3.2(b)(i)
US Airways Superior Proposal .................................................................. 4.4(a)(i)
US Airways Termination Fee ...................................................................... 6.6(c)
US Airways' Knowledge ............................................................................. 3.2(e)(iv)

**EXHIBIT B**

FORM OF

CERTIFICATE OF DESIGNATIONS, POWERS, PREFERENCES AND RIGHTS

OF THE

SERIES A CONVERTIBLE PREFERRED STOCK

OF

AMERICAN AIRLINES GROUP INC.

------------------------------------

Pursuant to Sections 151(g) and 303 of the
General Corporation Law of the State of Delaware

------------------------------------

American Airlines Group Inc., a Delaware corporation (the "Corporation"), hereby certifies that pursuant to the Joint Chapter 11 Plan of Reorganization of AMR Corporation, dated [_____, 2013] (the "Plan"), which Plan was confirmed by order of the United States Bankruptcy Court for the Southern District of New York pursuant to Chapter 11 of the United States Bankruptcy Code and provides for the authorization and issuance of the Series A Preferred Stock (as defined below), and pursuant to the provisions of Sections 151(g) and 303 of the General Corporation Law of the State of Delaware (the "DGCL"), a series of preferred stock, par value $0.01 per share, of the Corporation, herein designated as "*Series A Convertible Preferred Stock,*" is hereby issued, designated, created, authorized and provided for on the terms and with the voting powers, designations, preferences and relative, participating, optional, or other special rights and the qualifications, limitations or restrictions set forth herein and (to the extent applicable to preferred stock of the Corporation) in the Corporation's Amended and Restated Certificate of Incorporation as in effect on the date hereof (the "Certificate of Incorporation"):

Capitalized terms that are used but are not otherwise defined in this Certificate of Designations, Preferences and Rights (this "Certificate") shall have the meanings ascribed to them in Section 8 below.

Section 1.        Designation; Stated Value; Form.

1.1.    Designation.  There is hereby created out of the authorized and unissued shares of Preferred Stock a series of Preferred Stock designated as "Series A Convertible Preferred Stock" (the "Series A Preferred Stock"), and the number of shares of Series A Preferred Stock (each a "Share" and, collectively, the "Shares") constituting such series shall be [_____ (____)].[1]  The voting powers, designations, preferences and relative, participating,

---

[1] Note to Draft:  Number of shares will be equal to the quotient of the Total Initial Stated Value (as defined in the term sheet attached as Exhibit A to the Support and Settlement Agreement dated February 13, 2013) divided by the Initial Stated Value per Share; the Certificate of Incorporation must be revised (from the form attached to the

optional or other special rights, and such qualifications, limitations or restrictions of the Series A Preferred Stock shall be as set forth herein.

1.2.    Stated Value.    The stated value of any Share, as of any date of determination, shall be equal to the sum of (i) $25 (the "Initial Stated Value") and (ii) the amount of the Accrued Stated Value (as defined below) with respect to such Share, calculated as of such date (the "Stated Value").

1.3.    Form.    The Corporation shall issue the Shares of Series A Preferred Stock in the form of one or more global certificates (each, a "Global Certificate") to be deposited in the facilities of DTC, and the beneficial interests in the Series A Preferred Stock will be reflected as electronic book-entry interests through the facilities of DTC and will transfer only via electronic book-entry interests through the facilities of DTC, and the procedures to be followed with respect to any Mandatory Conversion or Optional Conversion and any required increases or decreases to the number of Shares represented by the Global Certificate(s) will be in accordance with the applicable procedures of DTC; provided, that no such procedures shall adversely affect any of the rights of any Holder of the Shares as set forth in this Certificate.

Section 2.    Dividends.

2.1.    Accrual of Stated Value.    From and after the Plan Effective Date, the Stated Value of each Share of Series A Preferred Stock will automatically increase, without any action to be taken by the Corporation or its Board of Directors (the "Board of Directors") and whether or not there are funds legally available for the payment of dividends, in arrears on a daily basis at the rate of 6.25% per annum, using the actual number of days elapsed and a 360-day year, without compounding, on the Initial Stated Value of such Share to and excluding the applicable Conversion Date of such Share (the cumulative amount of such increase, as of any date or time of determination, the "Accrued Stated Value").    A schedule of the Stated Value of each Share on each day (the first through the 120th) following the Plan Effective Date, after giving effect to the amount of the Accrued Stated Value as of such day, is set forth as Exhibit A hereto.

2.2.    Participating Dividends.    In the event that, on or after the Plan Effective Date, the Corporation declares or pays any dividends or distributions with respect to the Common Stock (excluding any dividends or distributions paid in the form of additional shares of Common Stock), each Holder shall be entitled to receive, in addition to the Accrued Stated Value accrued pursuant to Section 2.1, a dividend or distribution per Share of Series A Preferred Stock equal to the dividend or distribution that such Holder would have received with respect to the Common Stock Equivalent Number of shares of Common Stock as of immediately prior to the record date for determining the stockholders of the Corporation eligible to receive such dividend or distribution (or if no record date is fixed, the date as of which the record holders of Common Stock entitled to such dividends is determined).

---

Agreement and Plan of Merger with US Airways Group) to increase sufficiently the authorized number of shares of preferred stock.

2

Section 3.    <u>Liquidation</u>.

3.1.    <u>Liquidation Event</u>.  Upon any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary (a "<u>Liquidation Event</u>"), each Holder shall be entitled to receive, with respect to each Share of Series A Preferred Stock, on a *pro rata* basis with the Common Stock and without preference with respect to the Common Stock, the distribution(s) that such Holder would have been entitled to receive as a result of such Liquidation Event with respect to the Common Stock Equivalent Number of shares of Common Stock as of immediately prior to such Liquidation Event.  For the avoidance of doubt, the merger or consolidation of the Corporation with any other Person, including a merger or consolidation in which the Holders receive cash, securities or other property for their Shares of Series A Preferred Stock, or the sale, lease or exchange for cash, securities or other property of all or substantially all of the assets of the Corporation, in each case, shall not, in and of itself, constitute a Liquidation Event.

3.2.    <u>Notice Requirement</u>.  The Corporation shall, within five (5) Business Days following the date the Board of Directors approves any Liquidation Event or within five (5) Business Days following the commencement of any involuntary bankruptcy or similar proceeding, whichever is earlier, give each Holder written notice of the event. Such written notice shall describe, to the extent known to the Corporation, the material terms and conditions of such event relating to the treatment of the Series A Preferred Stock and the Common Stock, including, to the extent known to the Corporation, a description of the stock, cash and property to be received by the Holders with respect to their Shares of Series A Preferred Stock and the Common Stock as a result of the event and the date of delivery thereof. If any material change in the facts set forth in the initial notice shall occur, the Corporation shall promptly give written notice to each Holder of such material change.

Section 4.    <u>Voting Rights</u>.

(i)    Each Share of Series A Preferred Stock shall entitle the Holder thereof to vote with the holders of Common Stock, voting together as a single class, with respect to any and all matters presented to the holders of Common Stock for their action, consideration or consent, whether at any special or annual meeting of stockholders, by written action of stockholders in lieu of a meeting (to the extent permitted by the Certificate of Incorporation and the DGCL), or otherwise.  With respect to any such vote, each Share of Series A Preferred Stock held on the record date for determining the stockholders of the Corporation eligible to participate in such vote shall entitle the Holder thereof to cast 2.2989 votes, subject to adjustment pursuant to <u>Section 6.1</u> (such number of votes, the "<u>Preferred Stock Voting Ratio</u>").

(ii)    For so long as any Shares of Series A Preferred Stock remain outstanding, the Corporation shall not, without the written consent or affirmative vote at a meeting called for such purpose, given in person or by proxy, by Holders holding, in the aggregate, at least a majority of the outstanding Shares of Series A Preferred Stock (excluding any Shares beneficially owned directly or indirectly by the Corporation or any of its Subsidiaries), voting as a separate class, amend, alter or repeal (including by means of a merger, consolidation or otherwise) any provision of the Certificate of Incorporation or this Certificate that would alter or

3

change the rights, preferences or privileges of the Series A Preferred Stock in a manner adverse to the holders of Shares of Series A Preferred Stock.  In any case in which the Holders of Series A Preferred Stock shall be entitled to vote as a separate class pursuant to this Certificate, the Certificate of Incorporation or Delaware law, each Holder shall be entitled to one vote for each Share of Series A Preferred Stock held on the record date for determining the stockholders of the Corporation eligible to vote thereon.

Section 5.    Conversion.

5.1.    Mandatory Conversion.  All Shares of Series A Preferred Stock, except to the extent previously converted pursuant to an Optional Conversion, shall automatically be converted into shares of Common Stock on the following terms and conditions (each such conversion, a "Mandatory Conversion").

(i)    On each Mandatory Conversion Date, a number of Shares of Series A Preferred Stock equal to the lesser of (a) [__][2] and (b) the number of Shares outstanding on such Mandatory Conversion Date shall automatically be converted into that number of shares of Common Stock for each Share of Series A Preferred Stock equal to the quotient of (A) the Stated Value of such Share on such Mandatory Conversion Date, divided by (B) the Conversion Price in effect on such Mandatory Conversion Date, with fractional shares of Common Stock rounded up or down as provided herein.  Each such Mandatory Conversion of Shares shall occur automatically without any further action by the relevant Holder or the Corporation.  Prior to 9:00 a.m. New York City time on the first Business Day after each Mandatory Conversion Date, the Corporation shall publish the Conversion Price in effect with respect to such Mandatory Conversion Date and the number of shares of Common Stock issuable per $1,000 in Stated Value of Shares that are converted pursuant to Mandatory Conversion on such Mandatory Conversion Date, by posting such information on the Corporation's website and issuing a press release that contains such information.

(ii)    Within two (2) Business Days following a Mandatory Conversion Date, the Corporation or Transfer Agent shall deliver by book-entry delivery via DTC to the accounts specified by DTC, a number of shares of Common Stock equal to the aggregate number of shares to be issued pursuant to the Mandatory Conversion of all Shares of Series A Preferred Stock converted by Mandatory Conversion with respect to such Mandatory Conversion Date.

(iii)    With respect to each Mandatory Conversion Date, the conversion of Shares of Series A Preferred Stock pursuant to Mandatory Conversion shall be effectuated by the Corporation *pro rata* among all Holders, based on the number of Shares outstanding as of 5:00 p.m., New York City time, on such Mandatory Conversion Date, after giving effect to any Optional Conversion that is effected on such Conversion Date pursuant to Section 5.2.

(iv)    For the avoidance of doubt, following the 120th day following the Plan Effective Date, Holders shall have no rights under the Series A Preferred Stock other than the

---

[2] Note to Draft:  Insert amount equal to 25% of the total number of Shares of Series A Preferred Stock issued pursuant to the Plan.

US_ACTIVE:\44239209\2\14013.0139

right to receive the shares of Common Stock into which their Shares of Series A Preferred Stock were converted pursuant to any Mandatory Conversion or Optional Conversion hereunder and the rights that a holder of shares of Common Stock would have corresponding thereto.

5.2.    <u>Optional Conversion</u>.  At any time following the fifth trading day after the Plan Effective Date, and from time to time prior to the final Mandatory Conversion Date, each Holder shall have the right, but not the obligation, to elect to convert all or any portion of such Holder's Shares into shares of Common Stock, on the following terms and conditions (any such conversion, an "<u>Optional Conversion</u>").

(i)    Any Holder may elect to convert all or any portion of its Shares of Series A Preferred Stock into that number of shares of Common Stock for each Share of Series A Preferred Stock equal to the quotient of (a) the Stated Value of such Share on the Optional Conversion Date (as defined below), divided by (b) the Conversion Price in effect on such Optional Conversion Date, with fractional shares of Common Stock rounded up or down as provided herein; <u>provided</u>, <u>however</u>, that the aggregate number of Shares converted by all Holders pursuant to Optional Conversion during any Conversion Period shall not exceed 10,000,000 Shares (the "<u>Optional Conversion Cap</u>").

(ii)    In order to effectuate an Optional Conversion of Shares of Series A Preferred Stock, the Holder of such Shares shall submit a written notice to the Corporation, duly executed by such Holder and in the form attached hereto as <u>Exhibit B</u>, or otherwise provide such notice as may be required by the applicable procedures of DTC, stating that such Holder irrevocably (subject to <u>Section 5.2(v)</u> below) elects to convert the number of Shares specified in such notice to the Corporation of the Shares of Series A Preferred Stock being converted (a "<u>Conversion Notice</u>").  An election to convert Shares of Series A Preferred Stock pursuant to an Optional Conversion shall be deemed to have been made as of the following dates (the "<u>Conversion Notice Date</u>"):  (a) on the date of such receipt, with respect to any Conversion Notice received by the Corporation at or prior to 5:00 p.m., New York City time, on any Business Day and (b) on the next Business Day following such receipt, with respect to any Conversion Notice received by the Corporation on a non-Business Day or after 5:00 p.m., New York City time, on any Business Day.  The conversion of all Shares of Series A Preferred Stock with respect to which an Optional Conversion election is made, and the issuance of all shares of Common Stock to be issued pursuant to such conversion, shall be effective as of the Conversion Notice Date for such election, subject to the Optional Conversion Cap and the provisions of <u>Section 5.2(iv)</u>.  As used herein, "<u>Optional Conversion Date</u>" means, with respect to any Share of Series A Preferred Stock for which an Optional Conversion election is made, the date on which the conversion of such Share becomes effective pursuant to the immediately preceding sentence.  As promptly as practicable (and in no event more than [three (3)] Business Days) following each Optional Conversion Date, the Corporation or the Transfer Agent shall deliver to the applicable Holder (or, if applicable, the name of such Holder's designee as stated in the Conversion Notice), by book-entry delivery via DTC to the account(s) specified by DTC, a number of shares of Common Stock equal to the number of shares to which such Holder is entitled pursuant to the Optional Conversion of the Shares of such Holder's Series A Preferred Stock that were converted as of such Optional Conversion Date.

US_ACTIVE:\44239209\2\14013.0139

(iii)    The Transfer Agent, if applicable, or the Corporation shall maintain a written record that lists each Optional Conversion election that is made from and after the Plan Effective Date and, with respect to each such election, (a) the electing Holder, (b) the number of Shares with respect which such election was made, (c) the Conversion Notice Date and (d) the extent applicable, the Optional Conversion Date(s) for the Shares of Series A Preferred Stock converted pursuant to such election and the number of shares of Common Stock issued pursuant to such Optional Conversion on each such Optional Conversion Date.

(iv)    During each Conversion Period, (a) the Carryover Conversion Shares with respect to such Conversion Period shall be entitled to be converted pursuant to Optional Conversion on a priority basis, and subject to <u>Section 5.2(iv)(b)</u> shall automatically be so converted, as of the first Business Day of such Conversion Period at the Conversion Price in effect on such date and (b) the Shares of Series A Preferred Stock that Holders elect to convert pursuant to Optional Conversion and for which the Conversion Notice Date occurs during such Conversion Period shall be converted on a "first come first serve" basis based on their respective Conversion Notice Dates, in each case subject to the Optional Conversion Cap and the terms and conditions of this <u>Section 5.2(iv)</u>.  Promptly (and in no event more than [three (3)] Business Days thereafter) after the Optional Conversion Cutoff Date with respect to a Conversion Period, the Corporation shall publish the fact that an Optional Conversion Cutoff Date has occurred and its date by posting such information on the Corporation's website and issuing a press release that contains such information.  If, at any time during any Conversion Period, the sum of (x) all Shares with respect to which Optional Conversion elections are made and the Conversion Notice Date occurs during such Conversion Period plus (y) all Carryover Conversion Shares converted during such Conversion Period pursuant to <u>Section 5.2(iv)</u> exceeds the Optional Conversion Cap, then:

(a)    any Optional Conversion election with a Conversion Notice Date that is after the Optional Conversion Cutoff Date shall not be given any effect;

(b)    if the aggregate number of Carryover Conversion Shares with respect to any Conversion Period exceeds the Optional Conversion Cap before giving effect to any Optional Conversion election that is made during such Conversion Period, then (A) such Carryover Conversion Shares shall be converted based on their respective Conversion Notice Dates, such that Shares with the earliest Conversion Notice Dates are converted first, and all Carryover Conversion Shares for which the Conversion Notice Date is the first date on which the sum of (x) the Carryover Conversion Shares with such Conversion Notice Date plus (y) the Carryover Conversion Shares with an earlier Conversion Notice Date exceeds the Optional Conversion Cap shall be cut back *pro rata*, to the extent practicable, to result in the number of Carryover Conversion Shares converted during such Conversion Period being equal to the Optional Conversion Cap, and no Carryover Conversion Shares with a later Conversion Notice Date will be converted pursuant to Optional Conversion during such Conversion Period and (B) no Optional Conversion election that is made during such Conversion Period shall be given any effect;

(c)    if the aggregate number of Carryover Conversion Shares with respect to such Conversion Period is less than the Optional Conversion Cap, then (x) all Shares

6

for which the Conversion Notice Date occurs prior to the Optional Conversion Cutoff Date shall be converted pursuant to Optional Conversion as of the Optional Conversion Date and (y) all Shares for which the Conversion Notice Date occurs on the Optional Conversion Cutoff Date shall be cut back *pro rata* among all such Shares, to the extent necessary to result in the aggregate number of Shares (including Carryover Conversion Shares) converted pursuant to Optional Conversion during such Conversion Period being equal to the Optional Conversion Cap; and

(d)    promptly (and in no event more than two (2) Business Days thereafter) after the Optional Conversion Cutoff Date with respect to a Conversion Period, the Corporation or Transfer Agent shall provide written notice to each Holder of Shares of Series A Preferred Stock that are Carryover Conversion Shares with respect to such Conversion Period or are the subject of an Optional Conversion election for which the Conversion Notice Date occurred on or prior to the Optional Conversion Cutoff Date during such Conversion Period and were not converted pursuant to Optional Conversion during such Conversion Period, as follows (each, an "Optional Conversion Cutoff Notice"): (x) if none of such Holder's Shares are converted pursuant to Optional Conversion during such Conversion Period, the Optional Conversion Cutoff Notice shall include a statement to such effect and shall provide that such Holder, at its election, shall be entitled to have such Shares treated as Carryover Conversion Shares in the next Conversion Period, if any, as provided in this Section 5.2(iv), and (y) if any of such Holder's Shares are cut back pursuant to clauses (b) or (c) of this Section 5.2(iv), the Optional Conversion Cutoff Notice shall include a statement setting forth the number of such Holder's Shares that were converted during such Conversion Period and describing how such cutbacks were calculated and, providing that such Holder, at its election, shall be entitled to have the portion of such Shares that were not converted treated as Carryover Conversion Shares in the next Conversion Period, if any, as provided in this Section 5.2(iv).

(v)    Subject to the applicable procedures of DTC, a Holder of Shares that would otherwise constitute Carryover Conversion Shares with respect to any Conversion Period may revoke its Optional Conversion election with respect to such Shares by giving written notice of such revocation to the Corporation within [five (5)] Business Days after such Holder's receipt of the Optional Conversion Cutoff Notice for the immediately preceding Conversion Period (a "Revocation Notice"), provided any such revocation must occur prior to [5:00 p.m.], New York City time, on the first Business Day of the next Conversion Period.  Any Shares for which the Holder thereof timely provides a Revocation Notice shall not constitute Carryover Conversion Shares for any purpose under this Agreement.

5.3.    General Conversion Provisions.

(i)    Effect of Conversion on Series A Preferred Stock.  All Shares of Series A Preferred Stock that are converted pursuant to Mandatory Conversion or Optional Conversion shall automatically, upon such conversion, be cancelled and retired and cease to exist, and shall not thereafter be reissued or sold and shall return to the status of authorized but unissued shares of Preferred Stock undesignated as to series.  Upon the conversion of Shares of Series A Preferred Stock pursuant to Mandatory Conversion or Optional Conversion, all such Shares shall thereupon cease to confer upon the Holder thereof any rights (other than the right to receive the

7

shares of Common Stock that such Holder is entitled to receive pursuant to such Mandatory Conversion or Optional Conversion) of a holder of Shares of Series A Preferred Stock, and the Person(s) in whose name the shares of Common Stock are to be issued upon such Mandatory Conversion or Optional Conversion shall be deemed to have become the holder(s) of record of such shares of Common Stock.

(ii)     Status of Common Stock. All shares of Common Stock delivered upon any Mandatory Conversion or Optional Conversion of Shares will, upon such conversion, be duly and validly authorized and issued, fully paid and nonassessable, free from all preemptive rights, free from all taxes, liens, security interests, charges and encumbrances (other than liens, security interests, charges or encumbrances created by or imposed upon the Holder or taxes in respect of any transfer occurring contemporaneously therewith) and shall not be subject to any legend restricting trading thereof other than as provided for in the Certificate of Incorporation or Section 7 hereof.

(iii)    No Charge or Payment. The issuance of shares of Common Stock upon conversion of Shares of Series A Preferred Stock pursuant to any Mandatory Conversion or Optional Conversion shall be made without payment of additional consideration by, or other charge, cost or tax to, the Holder in respect thereof; provided, however, that the Corporation shall not be required to pay any tax or other governmental charge that may be payable with respect to the issuance or delivery of any shares of Common Stock in the name of any Person other than the Holder of the converted Shares, and no such delivery shall be made unless and until the Person requesting such issuance has paid to the Corporation the amount of any such tax or charge, or has established to the satisfaction of the Corporation that such tax or charge has been paid or that no such tax or charge is due.

(iv)    Reservation of Common Stock.  The Corporation shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock, solely for the purpose of issuance upon conversion of the Shares of Series A Preferred Stock, such number of shares of Common Stock issuable upon the conversion of all outstanding Shares of Series A Preferred Stock pursuant to Mandatory Conversion and/or Optional Conversion at a Conversion Price equal to the Conversion Price Floor. The Corporation shall take all such actions as may be necessary to assure that all such shares of Common Stock may be so issued without violation of any applicable law or governmental regulation applicable to the Corporation or any requirements of any securities exchange upon which shares of Common Stock may be listed (except for official notice of issuance which shall be immediately delivered by the Corporation upon each such issuance).  The Corporation shall not take any action which would cause the number of authorized but unissued shares of Common Stock to be less than the number of such shares required to be reserved hereunder for issuance upon conversion of the Shares of Series A Preferred Stock.

(v)     No Fractional Shares of Common Stock.  No fractional shares of Common Stock shall be issued upon any Mandatory Conversion or Optional Conversion of Shares of Series A Preferred Stock.  In lieu of delivering a fractional share of Common Stock to any Holder in connection with any such conversion, the number of full shares of Common Stock that shall be issued upon conversion of Shares held by the same Holder (including any Holder of a

8

Global Certificate) shall be computed on the basis of the aggregate Stated Value of all Shares (or specified portion thereof) held by such Holder that is being converted and any fractional share of Common Stock shall be rounded up or down to the next whole number or zero, as applicable (with one-half being closer to the next lower whole number for this purpose).

Section 6.    Adjustments for Stock Splits, Business Combinations, etc.

6.1.    Stock Splits, Subdivisions, Reclassifications or Combinations.    In the event that the Corporation, at any time from and after the Plan Effective Date, (i) pays any dividends or distributions with respect to the Common Stock, in the form of additional shares of Common Stock or (ii) subdivides (by stock split, recapitalization or otherwise) the outstanding shares of Common Stock into a greater number of shares, the Conversion Price Cap, the Conversion Price Floor and the Preferred Stock Voting Ratio in effect immediately prior to any such event, shall be proportionally increased.    In the event that the Corporation, at any time from and after the Plan Effective Date, combines (by reverse stock split, recapitalization or otherwise) the outstanding Common Stock into a smaller number of shares, the Conversion Price Cap, the Conversion Price Floor and the Preferred Stock Voting Ratio in effect immediately prior to any such event shall be proportionally decreased.    Any adjustment under this Section 6.1 shall become effective at the close of business on the date the dividend, subdivision or combination becomes effective, and successive adjustments shall be made, without duplication, whenever any such dividend, subdivision or combination shall occur.

6.2.    Business Combinations.    In case of any Business Combination, at any time from and after the Plan Effective Date, lawful provision shall be made as part of the terms of such Business Combination whereby each Holder shall have the right thereafter to convert each Share held by it only into the kind and amount of securities, cash and other property receivable upon the Business Combination by a holder of a Common Stock Equivalent Number of shares of Common Stock as of immediately prior to such Business Combination.    The Corporation or the Person formed by the consolidation or resulting from the merger or which acquires such assets or which acquires the Corporation's shares, as the case may be, shall make provisions in its certificate or articles of incorporation or other constituent documents (each, a "Constituent Document") to establish such rights and to ensure that the dividend, voting, conversion and other rights of the Holders established herein are unchanged.    Such Constituent Documents or any amendment thereof in accordance with this paragraph shall contain terms as nearly equivalent as may be practicable to the terms provided for in this Certificate, including adjustments, which, for events subsequent to the effective date of such Constituent Documents, shall be as nearly equivalent as may be practicable to the adjustments provided for in this Section 6.

6.3.    Other Adjustments.    In the event that any transaction or event of the type contemplated by Sections 6.1 or 6.2 but not explicitly provided for in this Section 6 occurs with respect to the Common Stock, the Board of Directors shall take appropriate action as may be necessary or appropriate as determined in its reasonable good faith judgment to protect the rights of the Holders of Shares of Series A Preferred Stock in a manner consistent with the provisions of this Section 6.

9

6.4.    Statement Regarding Adjustments.  Promptly following any adjustment to the Conversion Price Cap, the Conversion Price Floor and/or the Preferred Stock Voting Ratio as provided in Section 6.1, or any other adjustment as provided in Section 6.2 or Section 6.3, the Corporation shall (i) file, at the principal office of the Corporation, a statement showing in reasonable detail the facts requiring such adjustment, and, as applicable, the Conversion Price Cap, the Conversion Price Floor and the Preferred Stock Voting Ratio that shall be in effect after such adjustment and (ii) deliver a copy of such statement to each Holder.

Section 7.    Registration of Transfer.

The Shares of Series A Preferred Stock shall be freely tradable and any Holder may, at any time, transfer, sell or otherwise dispose of all or any portion of its Shares, subject to applicable securities laws and the restrictions set forth in Article IV of the Certificate of Incorporation with respect to "Equity Securities" and "Corporation Securities."  The Corporation shall maintain and keep at its principal office a register or appoint a Transfer Agent to maintain a register for the registration and transfer of Shares of Series A Preferred Stock.  The Corporation may place such legend on any Global Certificate and/or provide such notices as may be required by applicable law, the Certificate of Incorporation or the applicable requirements of DTC.

Section 8.    Definitions.  As used in this Certificate, the following terms shall have the following meanings:

"Business Combination" means any (i) reorganization, consolidation, merger, share exchange or similar business combination transaction involving the Corporation with any third party other than the merger contemplated by the Merger Agreement or (ii) any sale, assignment, conveyance, transfer, lease or other disposition by the Corporation and/or any of its subsidiaries to a third party of all or substantially all of the Corporation's assets, or assets constituting all or substantially all of the assets of the Corporation and its subsidiaries on a consolidated basis.

"Business Day" means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

"Carryover Conversion Share" means, with respect to a Conversion Period, a Share of Series A Preferred Stock (excluding, for the avoidance of doubt, any such Share that is converted pursuant to Mandatory Conversion prior to such Conversion Period) with respect to which an Optional Conversion election was made and the Conversion Notice Date occurred during the immediately preceding Conversion Period or that was a Carryover Conversion Share with respect to the immediately preceding Conversion Period, and was not converted during the immediately preceding Conversion Period because of the Optional Conversion Cap, and with respect to which the Holder has not timely given a Revocation Notice pursuant to Section 5.2(v).

"Common Stock" means the common stock, par value $0.01 per share, of the Corporation.

10

"Common Stock Equivalent Number" means, as of any date of determination, the number of shares of Common Stock that a Holder of a Share of Series A Preferred Stock would have received assuming such Share was converted pursuant to an Optional Conversion, without regard to the Optional Conversion Cap, as of such date of determination.

"Conversion Date" means each Mandatory Conversion Date and each date on which Shares of Series A Preferred Stock are converted pursuant to an Optional Conversion.

"Conversion Period" means, with respect to any Mandatory Conversion Date, the period of time ending on such date and beginning on (i) the day following the immediately preceding Mandatory Conversion Date or (ii) the Plan Effective Date, in the case of the first Conversion Period.

"Conversion Price" means, with respect to any Conversion Date, an amount equal to 96.5% of the VWAP calculated with respect to such Conversion Date; provided, however, that such amount shall not be less than the Conversion Price Floor nor greater than the Conversion Price Cap.

"Conversion Price Cap" means the greater of (i) $19.00 and (ii) the Initial VWAP less the Conversion Price Floor plus the Initial VWAP, subject to adjustment as set forth in Section 6.1.[3]

"Conversion Price Floor" means $10.875 per share of Common Stock, subject to adjustment as set forth in Section 6.1.

"DTC" means The Depository Trust Company.

"Holder" means a holder of record of one or more Shares, as reflected in the stock records of the Corporation or the Transfer Agent, which may be treated by the Corporation and the Transfer Agent as the absolute owner of the Shares for all purposes.

"Initial VWAP" means the VWAP calculated as of the Plan Effective Date.

"Mandatory Conversion Date" means each of the 30th, 60th, 90th and 120th days following the Plan Effective Date.

"Merger Agreement" means that certain Agreement and Plan of Merger, dated as of February 13, 2013, by and among AMR Corporation ("AMR"), AMR Merger Sub, Inc., and US Airways Group, Inc.

"Optional Conversion Cutoff Date" means, with respect to any Conversion Period, the first date during such Conversion Period on which the sum of (i) all Shares of Series A Preferred Stock with respect to which Optional Conversion elections became effective during

---

[3] Note to Draft:  To be replaced with actual dollar amount (and Initial VWAP definition deleted), if amount can be calculated prior to filing this Certificate with the Delaware Secretary of State.

US_ACTIVE:\44239209\2\14013.0139

such Conversion Period, plus (ii) all Carryover Conversion Shares eligible for conversion during such Conversion Period is equal to or greater than the Optional Conversion Cap.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"Plan Effective Date" means the effective date of the Plan in accordance with the provisions of chapter 11 of the U.S. Bankruptcy Code.

"Total Initial Stated Value" means $[__],[4] the aggregate Initial Stated Value of all of the Shares issued by the Corporation pursuant to the Plan.

"trading day" means a trading day on the principal stock exchange on which the Common Stock is listed.

"Transfer Agent" means the transfer agent that may be appointed from time to time by the Corporation to maintain a register and record transfers of record ownership of the Shares.

"VWAP" means, with respect to any Conversion Date or any other date of determination, the volume weighted average price of Common Stock for the five (5) trading days ending on the last trading day immediately prior to such date; provided, however, that VWAP as of the Plan Effective Date and until the Common Stock is trading on a nationally recognized stock exchange shall be calculated as the volume weighted average price of the common stock of US Airways Group, Inc. for the five (5) trading days ending on the last trading day immediately prior to such date.  The VWAP shall be calculated by using the "VWAP" function on a Bloomberg terminal by typing either "LCC" or the stock symbol for Common Stock, as applicable, and then pressing the "EQUITY" key, typing "VWAP," and then pressing the "GO" key. Once directed to the VWAP screen, the beginning time and date shall be entered as 9:30 a.m. EST on the date five (5) trading days prior to the previous trading day and the ending time and date shall be entered as of 4:00 p.m. EST on the last trading day, and then pressing the "GO" key.

Section 9.        Amendment and Waiver.

Subject to any vote and approval of the Holders that may be required by Section 4(ii), this Certificate may be amended, modified, altered, repealed or waived, in full or in part, by the Corporation at any time, by a resolution duly adopted by the Board of Directors or a duly authorized committee of the Board of Directors.

---

[4] Note to Draft:  Amount to be calculated in accordance with the term sheet attached as Exhibit A to the Support and Settlement Agreement dated February 13, 2013.

US_ACTIVE:\44239209\2\14013.0139

Section 10.    <u>Notices</u>.

Except as otherwise expressly provided hereunder, all notices and other communications referred to herein shall be in writing and delivered personally or sent by first class mail, postage prepaid, or by reputable overnight courier service, charges prepaid:

(i)    If to the Corporation as follows, or as otherwise specified in a written notice given to each of the Holders in accordance with this <u>Section 10</u>:

American Airlines Group Inc.
4333 Amon Carter Blvd., Mail Drop 5618HDQ
Ft. Worth, Texas 76155
Attention: Gary Kennedy, Senior Vice President and General Counsel
Facsimile: 817- 967-2501
E-mail: gary.kennedy@aa.com

(ii)    If to any Holder, at such Holder's address as it appears in the stock records of the Corporation or as otherwise specified in a written notice given by such Holder to the Corporation or, at the Corporation's option with respect to any notice from the Corporation to a Holder, in accordance with customary DTC practice.

Any such notice or communication given as provided above shall be deemed received by the receiving party upon: actual receipt, if delivered personally; actual delivery, if delivered in accordance with customary DTC practice; five (5) Business Days after deposit in the mail, if sent by first class mail; or on the next Business Day after deposit with an overnight courier, if sent by an overnight courier.

Section 11.    <u>Severability</u>.

Whenever possible, each provision hereof shall be interpreted in a manner as to be effective and valid under applicable law, but if any provision hereof is held to be prohibited by or invalid under applicable law, then such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating or otherwise adversely affecting the remaining provisions hereof.  If a court of competent jurisdiction should determine that a provision hereof would be valid or enforceable if a period of time were extended or shortened or a particular percentage were increased or decreased, then such court may make such change as shall be necessary to render the provision in question effective and valid under applicable law.

Section 12.    <u>Headings</u>.

The headings of the various sections and subsections hereof are for convenience of reference only and shall not affect the interpretation of any of the provisions hereof.

[*Signature page follows*]

13

IN WITNESS WHEREOF, American Airlines Group Inc. has caused this Certificate of Designations of the Series A Convertible Preferred Stock to be signed by [_____], its authorized officer, this [___] day of [____], 2013.


AMERICAN AIRLINES GROUP INC.



By: _____
     Name:
     Title:


*[Signature Page to Certificate of Designations]*

<u>Exhibit A</u>

[Schedule of the Stated Values to come.]

Exhibit B

AMERICAN AIRLINES GROUP INC.

CONVERSION NOTICE

Reference is made to the Certificate of Designations, Powers, Preferences and Rights of the Series A Convertible Preferred Stock of American Airlines Group Inc. (the "Certificate of Designations"). In accordance with and pursuant to the Certificate of Designations, the undersigned hereby elects to convert the number of shares of Series A Convertible Preferred Stock, par value $0.01 per share (the "Series A Preferred Stock") of American Airlines Group Inc., a Delaware corporation (the "Corporation"), indicated below into shares of Common Stock, par value $0.01 per share (the "Common Stock") of the Corporation, as of the date specified below.

Date: _____

Number of Series A Preferred Stock to be converted: _____

Signature:        _____

Printed Name: _____

Address:          _____

_____

**EXHIBIT C**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------x
                                 :

In re                                 :         Chapter 11 Case No.
                                 :

AMR CORPORATION, *et al.*,        :         11-15463 (SHL)
                                 :

              Debtors.         :         (Jointly Administered)
                                 :

--------------------------------------------------------------x

### REVISED FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 362 ESTABLISHING NOTIFICATION PROCEDURES FOR SUBSTANTIAL CLAIMHOLDERS AND EQUITY SECURITY HOLDERS AND APPROVING RESTRICTIONS ON CERTAIN TRANSFERS OF INTERESTS IN THE DEBTORS' ESTATES

Upon the Motion, dated February 22, 2013 (the "**Motion**"),[1] of AMR Corporation

and its related debtors, as debtors and debtors in possession (collectively, the "**Debtors**"),

pursuant to sections 105(a) and 362 of title 11, United States Code (the "**Bankruptcy Code**"),

for entry of a revised order establishing notification procedures and approving restrictions on

certain transfers of Claims (as hereinafter defined) against and interests in the Debtors' estates,

all as more fully described in the Motion; and the Court having jurisdiction to consider the

Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and

Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and

consideration of the Motion and the relief requested therein being a core proceeding pursuant to

28 U.S.C. § 157(b); and due and proper notice of the Motion having been provided; and upon the

statement in support of the Motion filed by the UCC (ECF No. 7232); and a hearing having been

held to consider the relief requested in the Motion (the "**Hearing**"); upon the record of the

---

[1] Capitalized terms used herein and not initially defined shall have the meaning ascribed to such terms
(i) in Paragraph (a)(v) in the case of provisions relating to AMR Stock, (ii) in Paragraph (b)(vi) in the case
of provisions relating to Claims and Owned Interests, and (iii) if not otherwise defined herein, in the
Motion.

Hearing and all of the proceedings had before the Court; and the Court having found and

determined that the relief sought in the Motion is in the best interests of the Debtors, their

estates, creditors, and all parties in interest, and that the legal and factual bases set forth in the

Motion establish just cause for the relief granted herein; and after due deliberation and sufficient

cause appearing therefor, it is

FOUND that the Debtors' net operating loss carryforwards ("**NOLs**") and certain

other tax attributes (together with the NOLs, the "**Tax Attributes**") are property of the Debtors'

respective estates and are protected by section 362(a) of the Bankruptcy Code; and it is further

FOUND that to protect the potential value of the Debtors' Tax Attributes, this

Court entered an order on January 27, 2012 (ECF No. 890) (the "**Original Order**") imposing

certain procedures with respect to substantial equity holders of the Debtors, which procedures are

not being altered by this Revised Order, and certain other procedures with respect to the trading

and accumulation of Claims against the Debtors; and it is further

FOUND that the revised procedures under this revised order (the "**Revised**

**Order**") are necessary and proper to allow further flexibility of certain Claimholders while at the

same time preserving the potential value of the Debtors' Tax Attributes and are therefore in the

best interests of the Debtors, their estates, and their creditors; and it is further

FOUND that the relief requested in the Motion is authorized under sections

105(a) and 362 of the Bankruptcy Code.

THEREFORE, IT IS:

ORDERED that the Motion is granted as provided herein on a final basis; and it is

further

US_ACTIVE:\44135609\30\14013.0139

ORDERED that the Original Order is hereby superseded and replaced by the

terms of this Revised Order, and the provisions of this Revised Order shall be effective, nunc pro

tunc, to November 29, 2011 (the "**Commencement Date**"); and it is further

ORDERED that any acquisitions, dispositions, or trading of AMR Stock in

violation of the Procedures set forth in Paragraph (a) below shall be null and void *ab initio* as an

act in violation of the automatic stay under section 362 of the Bankruptcy Code and pursuant to

this Court's equitable powers under section 105(a) of the Bankruptcy Code; and it is further

ORDERED that any acquisitions, dispositions, or trading of Claims against the

Debtors in violation of the Procedures set forth in Paragraph (b)(iii) below shall be null and void

*ab initio* as an act in violation of the automatic stay under section 362 of the Bankruptcy Code

and pursuant to this Court's equitable powers under section 105(a) of the Bankruptcy Code, and

that any actions or inactions in violation of the other Procedures set forth in Paragraph (b) shall

be subject to sanctions as provided herein, as applicable; and it is further

ORDERED that the following revised procedures (the "**Procedures**") shall apply

to trading in AMR Stock and Claims and are approved:

> (a)    ***AMR Stock Ownership and Acquisition.***
>
> > (i)    <u>Notice of Substantial Stock Ownership</u>.  Any person or Entity (as such
> > term is defined in section 1.382-3(a) of the U.S. Department of Treasury
> > Regulations promulgated under the Tax Code (the "**Treasury
> > Regulations**"), including persons acting pursuant to a formal or informal
> > understanding among themselves to make a coordinated acquisition) that
> > beneficially owns, at any time on or after the Commencement Date, AMR
> > Stock in an amount sufficient to qualify such person or Entity as a
> > Substantial Equityholder (as hereinafter defined) shall file with this Court,
> > and serve upon the Debtors, the attorneys for the Debtors, and the
> > attorneys for any statutory committee of unsecured creditors appointed in
> > these cases (the "**Creditors' Committee**"), a Notice of Substantial Stock
> > Ownership (a "**Substantial Ownership Notice**"), in the form annexed
> > hereto as **Exhibit "B**," which describes in detail the AMR Stock
> > ownership of such person or Entity, on or before the date that is the later
> > of: (a) ten (10) business days after the entry of this Revised Order and (b)

3

ten (10) business days after that person or Entity qualifies as a Substantial Equityholder. At the election of the Substantial Equityholder, the Substantial Ownership Notice to be filed with this Court (but not the Substantial Ownership Notice that is served upon the Debtors, the attorneys for the Debtors, and the attorneys for the Creditors' Committee) may be redacted to exclude the Substantial Equityholder's taxpayer identification number and the number of shares of AMR Stock that the Substantial Equityholder beneficially owns.

(ii)    <u>Acquisition of AMR Stock or Options</u>. At least twenty (20) business days prior to the proposed date of any transfer of equity securities (including Options (as hereinafter defined) to acquire such securities) that would result in an increase in the amount of AMR Stock beneficially owned by any person or Entity that currently is a Substantial Equityholder or that would result in a person or Entity becoming a Substantial Equityholder (a "**Proposed Equity Acquisition Transaction**"), such person, Entity, or Substantial Equityholder (a "**Proposed Equity Transferee**") shall file with this Court, and serve upon the Debtors, the attorneys for the Debtors, and the attorneys for the Creditors' Committee, a Notice of Intent to Purchase, Acquire, or Otherwise Accumulate AMR Stock (an "**Equity Acquisition Notice**"), in the form annexed hereto as **Exhibit** "**C**," which describes in detail the proposed transaction in which AMR Stock is to be acquired. At the election of the Proposed Equity Transferee, the Equity Acquisition Notice that is filed with this Court (but not the Equity Acquisition Notice that is served upon the Debtors, the attorneys for the Debtors, and the attorneys for the Creditors' Committee) may be redacted to exclude the Proposed Equity Transferee's taxpayer identification number and the number of shares of AMR Stock that the Proposed Equity Transferee beneficially owns and proposes to purchase or otherwise acquire.

(iii)   <u>Approval Procedures</u>. The Debtors may determine, in furtherance of the purposes of the Procedures and in consultation with the attorneys for the Creditors' Committee, whether or not to approve a Proposed Equity Acquisition Transaction. If the Debtors do not approve an Equity Acquisition Notice in writing within fifteen (15) business days after the Equity Acquisition Notice is filed with the Court, the Equity Acquisition Notice shall be deemed rejected and the related Proposed Equity Acquisition Transaction shall not be effective, unless the Proposed Equity Transferee files a motion with this Court for approval of the Proposed Equity Acquisition Transaction, which motion is approved by a final and nonappealable order of this Court. If the Proposed Equity Acquisition Transaction is approved by the Debtors, then such Proposed Equity Acquisition Transaction may proceed solely as specifically described in the Equity Acquisition Notice. Any further Proposed Equity Acquisition Transaction must be the subject of additional Equity Acquisition Notices and approval procedures set forth in the Procedures.

4

    (iv)    <u>Unauthorized Transactions in AMR Stock or Options</u>.  Effective as of the Commencement Date and until further order of this Court to the contrary, any acquisition, disposition or other transfer of AMR Stock (including Options to acquire AMR Stock) of the Debtors in violation of the Procedures shall be null and void *ab initio* as an act in violation of the automatic stay under section 362 of the Bankruptcy Code.

    (v)    <u>Definitions</u>.  For purposes of this Revised Order, the following terms have the following meanings:

        (1)    <u>AMR Stock</u>.  "AMR Stock" means AMR's Common Stock.  For the avoidance of doubt, by operation of the definition of beneficial ownership (as hereinafter defined), an owner of an Option to acquire AMR Stock may be treated as the owner of such AMR Stock under certain circumstances.

        (2)    <u>Beneficial Ownership</u>.  "Beneficial ownership" (or any variation thereof) of AMR Stock (including constructive ownership by virtue of holding Options to acquire AMR Stock) shall be determined in accordance with applicable rules under section 382 of the Tax Code, Treasury Regulations, and rulings issued by the Internal Revenue Service (the "**IRS**"), and, thus, to the extent provided in those rules, from time to time shall include, without limitation, (A) direct and indirect ownership (e.g., a holding company would be considered to beneficially own all stock owned or acquired by its subsidiaries), (B) ownership by a holder's family members and any group of persons acting pursuant to a formal or informal understanding to make a coordinated acquisition of stock, and (C) to the extent set forth in Treasury Regulations section 1.382-4, the ownership of an Option to acquire AMR Stock.

        (3)    <u>Option</u>.  An "Option" includes any contingent purchase, warrant, convertible debt, put, stock subject to risk of forfeiture, contract to acquire stock, or similar interest regardless of whether it is contingent or otherwise not currently exercisable.

        (4)    <u>Substantial Equityholder</u>.  A "Substantial Equityholder" means any person or Entity that beneficially owns at least 14,964,345 shares of AMR Stock (representing approximately 4.5% of all AMR Stock issued and outstanding).

**(b)**    ***Trading in Claims.***

    (i)    <u>Disclosure of 382(l)(5) Plan</u>.

If the proponent of a plan and disclosure statement (a "**Plan Proponent**") determines that the reorganized Debtors likely will benefit from the application of section 382(l)(5) of the Tax Code and reasonably anticipates that the reorganized

<div align="center">5</div>

Debtors will invoke such section (a "**382(l)(5) Plan**"), then the Plan Proponent shall disclose in its proposed disclosure statement (the "**Proposed 382(l)(5) Disclosure Statement**"):

(1)     Adequate information about the incremental tax benefits anticipated from the use of section 382(l)(5) of the Tax Code that would not otherwise be available (taking into account the Debtors' anticipated net unrealized built-in gains or net unrealized built-in losses);

(2)     A summary of any restrictions expected to be imposed on the transferability of securities issued under the plan in order to preserve such incremental tax benefits;

(3)     (A) The dollar amount of Claims (by class or other applicable breakdown) expected to result in a one-percent interest in the equity of Post-Emergence AMR, and (B) the number of any of the specified interests ("**Owned Interests**") in AMR or other entities (such as, for example, equity interests in US Airways) expected to result in a one-percent interest in the equity of Post-Emergence AMR, in each case based upon then available information;

(4)     A specified date that is not less than ten (10) calendar days after the service of the notice of disclosure statement hearing with respect to the Proposed 382(l)(5) Disclosure Statement (the "**Initial Determination Date**");

(5)     A specified date (that is not less than five (5) calendar days after the Initial Determination Date) for the initial notice required under Paragraph (b)(ii) (the "**Initial Reporting Deadline**"); and

(6)     The relevant provisions of this Revised Order requiring Substantial Claimholders to file notices and to sell Claims, all as set forth below.

The disclosure statement as finally approved (the "**Final 382(l)(5) Disclosure Statement**") shall, in addition to the information set forth above, specify a date that is not less than ten (10) calendar days after the service thereof as the "**Final Determination Date**" and specify the date five (5) calendar days thereafter for the final notice required under Paragraph (b)(ii) (the "**Final Reporting Deadline**").

(ii)     Notice of Substantial Claim Ownership.

(1)     Any person or Entity (as such term is defined in Treasury Regulations section 1.382-3(a), including persons acting pursuant to a formal or informal understanding among themselves to make a coordinated acquisition) that beneficially owns either (1) more than

6

$190 million of Claims or (2) a lower amount of Claims which (based on the applicable information set forth in the Proposed 382(l)(5) Disclosure Statement or the Final 382(l)(5) Disclosure Statement, as applicable), when added to any Owned Interests beneficially owned by a holder of Claims (including under the aggregation rules described in the definition of "Substantial Claimholder" below), would result in such holder of Claims holding the Applicable Percentage of Post-Emergence AMR, in each case as of the Initial Determination Date or the Final Determination Date, shall serve upon the Plan Proponent, its attorneys, and the attorneys for the Creditors' Committee, a notice of such status (a "**Notice of Substantial Claim Ownership**"), in substantially the form annexed hereto as **Exhibit "D"** (or as adjusted and attached to the Proposed 382(l)(5) Disclosure Statement or the Final 382(l)(5) Disclosure Statement), with respect to each such determination date on which it beneficially owns such amounts, on or before the Initial Reporting Deadline and the Final Reporting Deadline, respectively. Such beneficial owner shall also set forth in the Notice of Substantial Claim Ownership its beneficial ownership, if any, of any Owned Interests and whether it agrees to refrain from acquiring beneficial ownership of additional Owned Interests (and Options to acquire the same) until after the effective date of the 382(l)(5) Plan.

(2)     In order to assist in determining their eligibility for section 382(l)(5) of the Tax Code, the Debtors may, if after consultation with their attorneys and advisors and the attorneys and advisors for the Creditors' Committee, the Debtors determine that the application of section 382(l)(5) of the Tax Code is likely to be beneficial to one or more of the reorganized Debtors (or any successors thereto), request, from any person or Entity that beneficially owns either (1) more than $190 million of Claims or (2) a lower amount of Claims which, when added to the Owned Interests beneficially owned by a holder of Claims (including under the aggregation rules described in the definition of "Substantial Claimholder" below), would result in such holder of Claims holding the Applicable Percentage of Post-Emergence AMR (for purposes of making this determination, such request shall include information comparable to the information that would be required in a Proposed 382(l)(5) Disclosure Statement pursuant to Paragraph (b)(i)(3)), in each case as of the date specified in such request, information regarding its beneficial ownership of Claims and Owned Interests (and Options to acquire the same) prior to the filing of the Proposed 382(l)(5) Disclosure Statement in a manner consistent with Paragraphs (b)(i)(3)-(5) (including identifying the applicable information described in Paragraph (b)(i)(3)) based on then available information and substituting "**twenty (20)**" for "**ten**

7

**(10)**" in Paragraph (b)(i)(4)). In addition, the Debtors shall disclose such request in a separate filing with the SEC on Form 8-K.

(3)    Any person or Entity that fails to comply with its notification obligations set forth in this Paragraph (b)(ii) shall, in addition to the consequences set forth in Paragraph (b)(iv)(8) below, be subject to such remedy as this Court may find appropriate upon motion by the Debtors after service upon such person or Entity and a hearing on notice in accordance with the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**"), including, without limitation, ordering such noncompliant person or Entity to divest itself promptly of any beneficial ownership of Claims to the extent of the ownership by such person or Entity of an Excess Amount (as defined in Paragraph (b)(iv)(2)) and monetary damages for any costs reasonably incurred by the Debtors caused by the violation and enforcement of this Paragraph (b)(ii).

(iii)    <u>Claims Trading Before and After Final Determination Date</u>.

(1)    Any person or Entity generally may trade freely and make a market in Claims until the Final Determination Date.

(2)    After the Final Determination Date, any acquisition of Claims by a Substantial Claimholder (or a person or Entity who would become a Substantial Claimholder as a result of the consummation of the contemplated transaction) shall not be effective unless consummated in compliance with Paragraphs (b)(iii)(3) and (4).

(3)    At least ten (10) business days prior to the proposed date of any transfer of Claims that would result in (A) an increase in the dollar amount of Claims beneficially owned by a Substantial Claimholder or (B) any person or Entity becoming a Substantial Claimholder (a "**Proposed Claims Acquisition Transaction**"), such person, Entity, or Substantial Claimholder (a "**Proposed Claims Transferee**") shall serve upon the Plan Proponent, its attorneys, and the attorneys for the Creditors' Committee, a Notice of Request to Purchase, Acquire, or Otherwise Accumulate a Claim (a "**Claims Acquisition Request**"), in the form annexed hereto as **Exhibit** "**E**," which describes in detail the intended acquisition of Claims, regardless of whether such transfer would be subject to the filing, notice, and hearing requirements set forth in Bankruptcy Rule 3001.

(4)    The Plan Proponent may determine, in consultation with the attorneys for the Creditors' Committee, whether or not to approve a Claims Acquisition Request. If the Plan Proponent does not

8

approve a Claims Acquisition Request in writing within eight (8) business days after the Claims Acquisition Request is filed with the Court, the Claims Acquisition Request shall be deemed rejected.

(iv)     <u>Creditor Conduct and Sell-Down</u>.

(1)     To permit reliance by the Debtors on Treasury Regulations section 1.382-9(d)(3), upon the entry of this Revised Order, any Substantial Claimholder that participates in formulating any chapter 11 plan of reorganization of or on behalf of the Debtors (which shall include, without limitation, making any suggestions or proposals to the Debtors or their advisors with regard to such a plan) shall not disclose or otherwise make evident to the Debtors that any Claims in which such holder has a beneficial ownership are Newly Traded Claims, unless compelled to do so by an order of a court of competent jurisdiction or some other applicable legal requirement; *provided, however*, that the following activities shall not constitute participation in formulating a plan of reorganization *if*, in pursuing such activities, the Substantial Claimholder does not disclose or otherwise make evident (unless compelled to do so by an order of a court of competent jurisdiction or some other applicable legal requirement) to the Debtors that such Substantial Claimholder has beneficial ownership of Newly Traded Claims: filing an objection to a proposed disclosure statement or to confirmation of a proposed plan of reorganization; voting to accept or reject a proposed plan of reorganization; reviewing or commenting on a proposed business plan; providing information on a confidential basis to the attorneys for the Debtors; general membership on an official committee or an *ad hoc* committee; or taking any action required by the order of this Court.

(2)     Following the Final Determination Date, if the Plan Proponent determines Substantial Claimholders must sell or transfer all or a portion of their beneficial ownership of Claims in order to reasonably ensure that the requirements of section 382(l)(5) of the Tax Code will be satisfied, the Plan Proponent may request, after notice to the Creditors' Committee and the relevant Substantial Claimholder(s) and a hearing, that this Court enter an order approving the issuance of a notice (each, a "**Sell-Down Notice**") that such Substantial Claimholder must sell, cause to sell, or otherwise transfer a specified amount of its beneficial ownership of Claims (by class or other applicable breakdown) equal to the excess of (x) the amount of Claims beneficially owned by such Substantial Claimholder over (y) the Maximum Amount for such Substantial Claimholder (such excess amount, an "**Excess Amount**"). The motion shall be heard on expedited notice such that this Court can render a decision at or before the hearing on

9

confirmation of the 382(l)(5) Plan. If this Court approves the Debtors' issuance of a Sell-Down Notice, the Debtors shall provide the Sell-Down Notice to the relevant Substantial Claimholder.

(3)    Notwithstanding anything to the contrary in this Revised Order, no Substantial Claimholder shall be required to sell, cause to sell, or otherwise transfer any beneficial ownership of Claims if such sale would result in the Substantial Claimholder having beneficial ownership of an aggregate amount of Claims (by class or other applicable breakdown) that is less than such Substantial Claimholder's Protected Amount.

(4)    Each Sell-Down Notice shall direct the Substantial Claimholder to sell, cause to sell, or otherwise transfer its beneficial ownership of the amount of Claims specified in the Sell-Down Notice to Permitted Transferees (the "**Sell-Down**"); *provided, however*, that such Substantial Claimholder shall not have a reasonable basis to believe that any such Permitted Transferee would own, immediately after the contemplated transfer, an Excess Amount of Claims; and *provided, further*, that a Substantial Claimholder that has properly notified the transferee of its Claims under Paragraph (b)(iv)(9) shall not be treated as having such reasonable basis in the absence of notification or actual knowledge that such transferee would own, after the transfer, an Excess Amount of Claims.

(5)    The "**Sell-Down Date**" shall be the later of (i) five (5) business days after the entry of an order approving the 382(l)(5) Plan and (ii) such other date specified in the Sell-Down Notice, as applicable, but before the effective date of the 382(l)(5) Plan. Each Substantial Claimholder subject to the Sell-Down shall, as a condition to receiving Affected Securities (as hereinafter defined), on or before the Sell-Down Date serve upon the Plan Proponent, its attorneys, and the attorneys for the Creditors' Committee, a notice substantially in the form annexed hereto as **Exhibit** "**F**" that such Substantial Claimholder has complied with the terms and conditions set forth in this Paragraph (b)(iv) and that such Substantial Claimholder does not and will not hold an Excess Amount of Claims as of the Sell-Down Date and at all times through the effective date of the 382(l)(5) Plan (the "**Notice of Compliance**"). Any Substantial Claimholder who fails to comply with this provision shall not receive Affected Securities with respect to any Excess Amount of Claims.

(6)    Provisions substantially identical to the sell-down procedures set forth in this Revised Order shall also be contained in the confirmed 382(l)(5) Plan and may be contained in the order confirming such plan.

US_ACTIVE:\44135609\30\14013.0139

(7)     Other than information that is public or in connection with an audit or other investigation by the IRS or other taxing authority, the Plan Proponent shall keep all Notices of Compliance and any additional information provided by a Substantial Claimholder pursuant to this Revised Order ("**Confidential Information**") strictly confidential and shall not disclose the Confidential Information to any other person or Entity; *provided, however*, that the Plan Proponent may disclose the identity of the Substantial Claimholder to its counsel and professional financial advisors and/or the counsel and professional financial advisors of the Creditors' Committee and of any other person(s) that are subject to a nondisclosure agreement with the Plan Proponent, each of whom shall keep all Confidential Information strictly confidential, subject to further order of this Court; and *provided, further*, that to the extent the Plan Proponent reasonably determines such Confidential Information is necessary to demonstrate to this Court the need for the issuance of a Sell-Down Notice, such Confidential Information (determined by, among other things, whether such information was redacted in any public filing) shall be filed under seal.

(8)     Any person or Entity that violates its obligations under Paragraph (b) or, if applicable, its agreement not to acquire beneficial ownership of Owned Interests (and Options to acquire the same) in its Notice of Substantial Claim Ownership shall, pursuant to this Revised Order, be precluded from receiving, directly or indirectly, any consideration consisting of a beneficial ownership of equity (including Options to acquire the same) of the Debtors (or any successor to the Debtors, including as determined for U.S. federal income tax purposes, and including Post-Emergence AMR) that is attributable to the Excess Amount of Claims for such person or Entity and, if applicable, to the Owned Interests (or Options to acquire the same) acquired in violation of such agreement by such person or Entity (or if the Owned Interests or Options acquired in violation of such agreement become beneficial ownership in the equity of the reorganized Debtors or any successor to the Debtors without the need to receive new equity interests, shall be precluded as a result of such violation (and, thus, in addition to any other amounts otherwise precluded hereunder) from receiving, directly or indirectly, any consideration consisting of a beneficial ownership of equity in the reorganized Debtor or any successor to the Debtor attributable to such person or Entity's Claims up to and including an amount equivalent to that represented by such Owned Interests and Options), in each case including any consideration in lieu thereof; *provided, however*, that such person or Entity may be entitled to receive any other consideration to which such person or Entity may be entitled by virtue of holding Claims (the "**Equity Forfeiture Provision**").  Any purported acquisition of, or other

11

increase in the beneficial ownership of, equity of the Debtors (or any successor) that is precluded by the Equity Forfeiture Provision will be an acquisition of "**Forfeited Equity.**" Any acquirer of Forfeited Equity shall, promptly upon becoming aware of such fact, return or cause to return the Forfeited Equity to the Debtors (or any successor to the Debtors, including Post-Emergence AMR) or, if all of the equity consideration properly issued to such acquirer and all or any portion of such Forfeited Equity shall have been sold prior to the time such acquirer becomes aware of such fact, such acquirer shall return or cause to return to the Debtors (or any successor to the Debtors, including Post-Emergence AMR) (A) any Forfeited Equity still held by such acquirer and (B) the proceeds attributable to the sale of Forfeited Equity, calculated by treating the most recently sold equity as Forfeited Equity. Any acquirer that receives Forfeited Equity and deliberately fails to comply with the preceding sentence shall be subject to such additional sanctions as this Court may determine. Any Forfeited Equity returned to the Debtors, including Post-Emergence AMR, shall be distributed (including a transfer to charity) or extinguished, in the Debtors' sole discretion, in furtherance of the 382(l)(5) Plan.

(9)     In effecting any sale or other transfer of Claims pursuant to a Sell-Down Notice, a Substantial Claimholder shall, to the extent that it is reasonably feasible to do so within the normal constraints of the market in which such sale takes place, notify the acquirer of such Claims of the existence of this Revised Order and the Equity Forfeiture Provision (it being understood that, in all cases in which there is direct communication between a salesperson and a customer, including, without limitation, communication via telephone, e-mail, and instant messaging, the existence of this Revised Order and the Equity Forfeiture Provision shall be included in such salesperson's summary of the transaction).

(v)     <u>Exception</u>.

(1)     No person or Entity shall be subject to the advance approval of acquisition provisions of Paragraphs (b)(iii)(2) to (4) herein or, in the case of Claims that are part of the transferor's Protected Amount, the sell down provisions of Paragraph (b)(iv) herein with respect to any transfer described in Treasury Regulations section 1.382-9(d)(5)(ii); *provided, however*, that such transfer is not for a principal purpose of obtaining stock in the reorganized Debtors (or any successor, including Post-Emergence AMR) or permitting the transferee to benefit from the losses of the Debtors within the meaning of Treasury Regulations section 1.382-9(d)(5)(iii); and *provided, further*, that any such transferee who becomes a

12

Substantial Claimholder following the filing of a Proposed 382(l)(5) Disclosure Statement shall serve upon the Plan Proponent, its attorneys, and the attorneys for the Creditors' Committee, a notice of such status, in the form annexed hereto as **Exhibit "D,"** as provided in Paragraph (b)(i) and (ii).

(2)     For the avoidance of doubt, the trustee of any trust, any indenture trustee, owner trustee, passthrough trustee, subordination agent, registrar, paying agent, transfer agent, loan or collateral agent, or any other entity serving in a similar capacity however designated (collectively, an "**Indenture Trustee**"), in each case for any Claim for any ownership interests, notes, bonds, debentures, PTCs, ETCs, EETCs (each as hereinafter defined), enhanced pass-through trust certificates, property or other debt securities or obligations (collectively, "**Debt Securities**") (A) issued by any of the Debtors, (B) issued by any governmental or quasi-governmental authority for the benefit of any of the Debtors, (C) secured by assets of any of the Debtors or agreements with respect to such assets or (D) secured by assets leased to any of the Debtors, shall not be treated as a "**Substantial Claimholder**" solely to the extent acting in the capacity described above; *provided, however*, that neither any transferee of Claims nor any equity or beneficial owner of a trust shall be excluded from this Revised Order solely by reason of this provision.

(3)     Without limiting the application of Paragraph (b)(v)(2), no Indenture Trustee shall be subject to the provisions hereof that are applicable to beneficial owners of Claims or have or incur any liability for noncompliance with this Revised Order (including to any third party in connection with a transfer voided in accordance with the terms of this Revised Order), to the extent such Indenture Trustee follows its standard practices or acts in accordance with its respective prepetition governing documents with respect to (i) any transfer of Debt Securities or ownership interests in assets leased to the Debtors, (ii) any payments relating thereto (including any payments made to a holder of a Debt Security involved in a transfer which is voided under the terms of this Revised Order), or (iii) any actions taken in accordance with the instructions of holders of Debt Securities or ownership interests for which such Indenture Trustee acts; provided, however, that an Indenture Trustee shall be subject to this Revised Order to the extent such Indenture Trustee at any time is treated as the owner for U.S. federal income tax purposes of Debt Securities; provided, further, however, that neither any transferee of Claims nor any equity or beneficial owner of a trust shall be excluded from this Revised Order solely by reason of this provision.

13

(vi)    Definitions.  For purposes of this Revised Order, the following terms have the following meanings:

(1)    Applicable Percentage.  "**Applicable Percentage**" means, if only one class of Affected Securities is to be issued pursuant to the terms of the 382(l)(5) Plan and holders within any class of Claims will receive a pro rata distribution of the Affected Securities, 4.5% of the number of such shares that the Debtors reasonably estimate will be outstanding immediately after the effective date of such 382(l)(5) Plan, as determined for U.S. federal income tax purposes. If more than one class of the common stock or any other equity securities (including securities that are treated as equity securities for U.S. federal income tax purposes) of Post-Emergence AMR, including Options (as hereinafter defined) to acquire the same (the "**Affected Securities**"), is to be distributed pursuant to the terms of the 382(l)(5) Plan or holders within a class of Claims may receive a disproportionate distribution of such securities relative to other holders in the same class, the Applicable Percentage shall be determined by the Debtors in their reasonable judgment in a manner consistent with the estimated range of values for the equity to be distributed reflected in the valuation analysis set forth in the 382(l)(5) Plan and disclosure statement, and shall be expressed in a manner that makes clear the number of shares or other interests in each class of Affected Securities that would constitute the Applicable Percentage.

(2)    Beneficial Ownership.  "Beneficial ownership" of a Claim or Owned Interest means:

(A)    the beneficial ownership of a Claim or Owned Interest as determined in accordance with applicable rules under section 382 of the Tax Code, the Treasury Regulations promulgated thereunder, and rulings issued by the IRS (for such purpose, treating a Claim as if it is stock), and, to the extent provided in those rules from time to time, shall include (A) direct and indirect ownership (e.g., a holding company would be considered to beneficially own all Claims or Owned Interests owned or acquired by its subsidiaries), and (B) ownership by a holder's family members and any group of persons acting pursuant to a formal or informal understanding to make a coordinated acquisition of Claims, Owned Interests, and/or stock; and

(B)    the beneficial ownership of an Option (irrespective of the purpose for which such Option was issued, created, or acquired) with respect to a Claim or Owned Interest.

14

For the avoidance of doubt, beneficial ownership of a Claim or Owned Interests also includes the beneficial ownership of any right to receive any equity consideration to be distributed in respect of a Claim or Owned Interests pursuant to a plan of reorganization or applicable Bankruptcy Court order.

(3)     Claim.  A "Claim" means any unsecured claim under which any of the Debtors is the obligor, which for this purpose shall include (i) the unsecured portion of the Tax-Exempt Bonds, and (ii) all ETCs, PTCs, and EETCs to the extent of their interest in any unsecured claims against the Debtors (other than as provided in Paragraph (b)(vi)(3)(C) below involving Leveraged Lease Structures).  In the case of a secured claim, that portion of the claim (including such portion attributable to accrued and unpaid interest) that exceeds the current fair market value of the security shall be considered an unsecured Claim.

For purposes of this Revised Order, (i) a "**Leveraged Lease Structure**" means a leveraged lease transaction involving the lease of aircraft to any of the Debtors; and (ii) "**PTCs,**" "**ETCs,**" and "**EETCs**" mean ownership interests, bonds, debentures, pass-through certificates ("**PTCs**"), equipment trust certificates ("**ETCs**"), or enhanced equipment trust certificates ("**EETCs**"), in each case (w) issued by any of the Debtors, (x) issued by any governmental or quasi-governmental authority for the benefit of any of the Debtors, (y) secured by assets of any of the Debtors or agreements with respect to such assets, or (z) secured by assets leased to any of the Debtors.

If a holder of Claims is uncertain as to whether it is a holder of ETCs, PTCs, and/or EETCs issued solely in a Leveraged Lease Structure or issued in a non-Leveraged Lease Structure, or as to the amount of Claims represented by any ETCs, PTCs, and/or EETCs that it holds, such holder may serve upon the Debtors and Debtors' counsel written notice of the holder's uncertainty along with a description of the underlying Claim; and within five (5) business days after actual receipt of such notice, the Debtors shall inform the holder whether the ETCs, PTCs, and/or EETCs were issued in a Leveraged Lease Structure or in a non-Leveraged Lease Structure, or of the amount of Claims represented by the ETCs, PTCs, and/or EETCs, as applicable, subject to the right of such holder to file an objection with this Court to seek a review of such determination.

In calculating the amount or determining the status of any Claims under the Procedures, the following rules shall apply:

15

(A)    Any applicable intercreditor agreements, including subordination agreements, shall be given effect in accordance with their terms.

(B)    The amount of any Claims arising from any lease of aircraft that is treated as a lease for U.S. federal income tax purposes (including any lease that is part of a Leveraged Lease Structure in which PTCs, ETCs, or EETCs were issued) shall, solely for purposes of this Revised Order and subject to the succeeding paragraph, be considered equal to (i) the net present value of all future rent payments under such lease after November 29, 2011, discounted at a rate of 8%, minus (ii) the net present value of all future rent payments under a hypothetical lease of the same term discounted at a rate of 8%, with hypothetical lease payments determined by multiplying the current market value for the type (and age) of aircraft and engines that are the subject of the lease as reported in the most recent paper or online edition of AVITAS as of the date of the proposed transfer by 0.67% (.0067) for monthly payments, by 2% (.02) for quarterly payments and by 4% (.04) for semi-annual payments.

In connection with determining whether to adjust the Threshold Amount, the Debtors may also adjust the hypothetical lease payment percentages with respect to any aircraft lease if the Debtors determine (in consultation with the Creditors' Committee) that the percentages do not fairly reflect the useful life of the leased aircraft.  Any such adjustment shall be disclosed in the same manner as would any change in the Threshold Amount (with specific notice being provided to the lessor of record and the Indenture Trustee to which rent is payable by the Debtors), and shall be effective in determining whether a person or Entity is a Substantial Claimholder from and after such time.

(C)    All debt instruments issued by an obligor (other than any of the Debtors) in a Leveraged Lease Structure, and all ETCs, PTCs, and/or EETCs issued solely in respect of a Leveraged Lease Structure (collectively, the "**Leveraged Lease Obligations**"), shall not be treated as Claims against the Debtors; *provided, however*, that Leveraged Lease Obligations shall be treated as Claims against the Debtors if and when the holder or the indenture trustee or agent acting on behalf of the holder of such Leveraged Lease Obligations, as the case may be, has acquired Claims against the Debtors from the equity participant or lessor pursuant to a foreclosure, a voluntary or involuntary transfer, or any other acquisition of collateral (but only to the extent of their interest in the acquired Claims).  After the occurrence of any such event following the filing of a Proposed 382(l)(5) Disclosure Statement,

16

any holder of Claims who becomes a Substantial Claimholder shall file a Notice of Substantial Claim Ownership as provided in Paragraph (b)(i) and (ii); *provided, however*, that the initial grant (or subsequent transfer) of a security interest in such Claims shall not be treated as a foreclosure, a voluntary or involuntary transfer, or any other acquisition for the above purpose.

(D)    The amount of any Claims secured by a mortgage (including any lease that is not treated as a lease for U.S. federal income tax purposes) on an aircraft owned by a Debtor shall, solely for purposes of this Revised Order, be considered equal to the amount of outstanding principal and accrued interest under such mortgage (or lease), minus the current market value reported for the specific type (and age) of the aircraft and engines that are the subject of the mortgage (or lease) in the most recent paper or online edition of AVITAS as of the date of the proposed transfer.

(E)    In the case of all Claims other than those Claims that are subject to the preceding clauses (B) and (D) above, the amount of the applicable Claim shall be the unsecured portion of such Claim, if any.

If a holder of a Claim is uncertain as to the extent to which such Claim is unsecured, such holder may serve upon the Debtors and Debtors' counsel written notice of the requesting holder's uncertainty along with a description of the underlying Claim; and within five (5) business days after actual receipt of such notice, the Debtors shall, in consultation with the requesting holder and the Creditors' Committee, reasonably determine the unsecured portion of the applicable Claim, subject to the right of such requesting holder to file an objection with this Court in order to seek a review of such determination; *provided, however*, that if the Claim to which the notice relates is a bond offering, PTC, ETC or EETC, the holder shall also serve such notice upon the applicable Indenture Trustee.  Thereafter, upon written request of the Indenture Trustee, the Debtors shall inform such trustee of the determination.

No such determination nor anything else contained in this Paragraph (b)(vi)(3) shall be deemed an admission of a party or be used by any party for any purpose (including with respect to establishing the amount or character of a Claim) other than compliance with this Revised Order and shall not constitute an admission or evidence by any party with respect to Claims made or to be made against the Debtors.

US_ACTIVE:\44135609\30\14013.0139

(4)     Entity.  "Entity" has the meaning set forth in Paragraph (b)(ii)(1) above.

(5)     Final Holdings Report.  "Final Holdings Report" means a Notice of Substantial Claim Ownership served in connection with a Final Determination Date.

(6)     Initial Holdings Report.  "Initial Holdings Report" means a Notice of Substantial Claim Ownership received with respect to the Initial Determination Date.

(7)     Maximum Amount.  The Debtors shall calculate the maximum amount of Claims (by class or other applicable breakdown of Claims) that may be held, as of the effective date of the 382(l)(5) Plan, by a Substantial Claimholder that was a Substantial Claimholder as of the Final Determination Date (the "**Maximum Amount**") as follows:

(A)     Based upon the information provided by the Substantial Claimholders in the Final Holdings Reports, the Debtors shall calculate the aggregate amount of Claims that all such Substantial Claimholders must sell as a group to effectuate the 382(l)(5) Plan (the "**Sell-Down Amount**");

(B)     If the Sell-Down Amount is less than or equal to the Total Incremental Holdings, the Debtors shall calculate the amount of each Substantial Claimholder's *pro rata* share of the Sell-Down Amount (i.e., the Sell-Down Amount multiplied by a fraction, the numerator of which is such Substantial Claimholder's Incremental Holdings (as defined below) and the denominator of which is the Total Incremental Holdings (as defined below));

(C)     If the Sell-Down Amount exceeds the Total Incremental Holdings, the Debtors shall calculate for each Substantial Claimholder the amount of such Substantial Claimholder's *pro rata* share of such excess (i.e., the total amount of such excess multiplied by a fraction, (x) the numerator of which is such Substantial Claimholder's Initial Holdings (as defined below) (if any) minus the greater of (A) the applicable Threshold Amount and (B) the Protected Amount for such Substantial Claimholder and (y) the denominator of which is the Total Initial Holdings (as defined below) in excess of the greater of (A) the aggregate applicable Threshold Amount for all Substantial Claimholders and (B) the aggregate Protected Amount of all Substantial Claimholders) and add to that the amount of such Substantial Claimholder's Incremental Holdings; and

18

(D)    For each such Substantial Claimholder, the Debtors shall subtract from the total Claims held by such Substantial Claimholder (as reported in the Final Holdings Report) such Substantial Claimholder's share of the Sell-Down Amount calculated in accordance with clause (B) or (C) above, as applicable.  The difference shall be the Maximum Amount.

With respect to a Substantial Claimholder (determined as of the Final Determination Date), "**Incremental Holdings**" means the amount, if any, of Claims identified in such Substantial Claimholder's Final Holdings Report in excess of the greatest of (x) the amount contained in such Substantial Claimholder's Initial Holdings Report, (y) the applicable Threshold Amount and (z) the Protected Amount of such Substantial Claimholder, and "**Initial Holdings**" means the amount, if any, of Claims identified in such Substantial Claimholder's Initial Holdings Report.

With respect to all Substantial Claimholders (determined as of the Final Determination Date), "**Total Incremental Holdings**" means the aggregate amount of all of the Substantial Claimholders' Incremental Holdings and "**Total Initial Holdings**" means the aggregate amount of all of the Substantial Claimholders' Initial Holdings.

(8)    Newly Traded Claims.  "**Newly Traded Claims**" means Claims (i) with respect to which a person or Entity acquired beneficial ownership after the date that was eighteen (18) months before the Commencement Date; and (ii) that are not "**ordinary course**" claims, within the meaning of Treasury Regulations section 1.382-9(d)(2)(iv), of which the same person or Entity has always had beneficial ownership.

(9)    Option.  An "**Option**" includes any contingent purchase, warrant, convertible debt, put, stock subject to risk of forfeiture, contract to acquire stock, or similar interest regardless of whether it is contingent or otherwise not currently exercisable.

(10)    Permitted Transferee.  A "**Permitted Transferee**" with respect to a Substantial Claimholder is a person or Entity whose holding of a Claim would not result in such Substantial Claimholder having beneficial ownership of such Claim.

(11)    Post-Emergence AMR.  "**Post-Emergence AMR**" means the reorganized Debtors or any successor thereto, including, in the case of a possible combination with US Airways in connection with emergence from bankruptcy protection, equity securities of US Airways.

19

(12)    Protected Amount.  "**Protected Amount**" means the amount of
Claims (by class or other applicable breakdown) of which a holder
had beneficial ownership on the Commencement Date, increased
by the amount of Claims of which such holder acquires, directly or
indirectly, beneficial ownership pursuant to trades entered into
before the Commencement Date that had not yet closed as of the
Commencement Date minus the amount of Claims of which such
holder sells, directly or indirectly, beneficial ownership pursuant to
trades entered into before the Commencement Date that had not
yet closed as of the Commencement Date.

(13)    Substantial Claimholder.  A "**Substantial Claimholder**" means
any person or Entity that beneficially owns an aggregate dollar
amount of Claims against the Debtors, or any Entity controlled by
such person or Entity through which such person or Entity
beneficially owns Claims against the Debtors, of more than the
Threshold Amount.

For the avoidance of doubt, section 382 of the Tax Code, the
Treasury Regulations promulgated thereunder, and all relevant IRS
and judicial authority shall apply in determining whether the
Claims of several persons and/or Entities must be aggregated when
testing for Substantial Claimholder status, treating Claims as if
they were stock.

(14)    Tax-Exempt Bonds.  The "**Tax-Exempt Bonds**" means those
securities set forth on **Schedule** "**A**" annexed hereto.

(15)    Threshold Amount.  "**Threshold Amount**" means the greater of
(x) the Minimum Threshold Amount, and (y) an amount of Claims
which, when added to the Owned Interests beneficially owned by a
holder of Claims (including under the aggregation rules described
in the definition of "Substantial Claimholder" above), would result
in such holder of Claims holding the Applicable Percentage of
Post-Emergence AMR.  For this purpose, any Option to purchase
Owned Interests shall also be counted as stock owned.

**Notwithstanding the foregoing**, if a beneficial owner of Claims
does not agree to refrain from acquiring beneficial ownership of
any Owned Interests (and Options to acquire the same) from and
after the date of the Motion in its Notice of Substantial Claim
Ownership as set forth in Paragraph (b)(ii)(1) above, or
immediately disposing of any such Owned Interests or Options (if
acquired prior to submitting its Notice of Substantial Claim
Ownership and so agreeing), the Threshold Amount for such
beneficial owner of Claims shall be the Minimum Threshold
Amount.

20

For this purpose, "**Minimum Threshold Amount**" shall be the lower of (x) $190 million and (y) the amount of Claims beneficially owned by a holder of Claims as of the date of the Motion.

(16)    US Airways. "US Airways" means US Airways Group, Inc., or any successor thereto.

### (c)    *Noncompliance with the Trading Procedures.*

Any purchase, sale, or other transfer of equity securities in the Debtors in violation of the Procedures, or of Claims against the Debtors in violation of Paragraph (b)(iii), shall be null and void *ab initio* and shall confer no rights on the transferee. Any purchase, sale, or other transfer of Claims against the Debtors in violation of the other Procedures of Paragraph (b) shall be subject to sanctions set forth in Paragraphs (b)(ii)(3) and (b)(iv)(8), as applicable.

### (d)    *Debtors' Right to Waive.*

The Debtors may waive, in writing, any and all restrictions, stays, and notification procedures contained in this Revised Order; *provided, however*, that after a 382(l)(5) Plan has been properly filed by a Plan Proponent other than by (or jointly with) the Debtors, and is still actively being pursued before this Court, the consent of such Plan Proponent shall also be necessary for any subsequent waiver to be effective.

and it is further

ORDERED that, with respect to equipment described in section 1110 of the

Bankruptcy Code, except as provided in such section, nothing contained in this Revised Order

shall prohibit or in any manner limit or otherwise affect the rights of a secured party or a lessor

or a conditional vendor under the Bankruptcy Code, including, but not limited to, section 1110 of

the Bankruptcy Code; and it is further

ORDERED that any person or Entity acquiring and/or disposing of AMR Stock

and/or Claims in violation of the restrictions set forth in the Procedures, or failing to comply with

the "Notice of Substantial Stock Ownership," "Notice of Intent to Purchase, Acquire, or

Otherwise Accumulate AMR Stock," "Notice of Substantial Claim Ownership," "Notice of

Request to Purchase, Acquire, or Otherwise Accumulate a Claim Against the Debtors," and

21

"Notice of Compliance with Sell-Down Notice" requirements, as may be the case, shall be subject to such sanctions as this Court may consider appropriate pursuant to this Court's equitable power prescribed in section 105(a) of the Bankruptcy Code; and it is further

ORDERED, that the notices substantially in the form annexed hereto as Exhibit "A," Exhibit "B," Exhibit "C," Exhibit "D*," Exhibit "E," Exhibit "F," and Exhibit "G" are approved; and it is further

ORDERED that nothing in this Revised Order shall preclude any party in interest from seeking appropriate relief from the provisions of this Revised Order; and it is further

ORDERED that the Debtors (or their agent) shall (i) serve the notice of the Revised Order, substantially in the form annexed hereto as Exhibit "G" (the "**Short-Form Notice**") on all creditors and equity security holders concurrently with the Notice of Hearing to Consider Approval of the Debtors' Proposed Disclosure Statement for the Debtors' Joint Chapter 11 Plan and (ii) publish the Short-Form Notice once in the national editions of *The Wall Street Journal* and *USA Today* contemporaneously therewith; and it is further

ORDERED that the Debtors (or their agent) shall make available the notice of Procedures, substantially in the form annexed hereto as Exhibit "A," on the website of the Debtors' claims and noticing agent, the Garden City Group, Inc., at http://amrcaseinfo.com; and it is further

ORDERED that nothing herein shall preclude any person or Entity desirous of purchasing or transferring any Claim or interest from requesting relief from this Revised Order in this Court subject to the Debtors' rights to oppose such relief; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good and sufficient notice of the Motion; and it is further

US_ACTIVE:\44135609\30\14013.0139

ORDERED that the requirements set forth in this Revised Order are in addition to the requirements of Bankruptcy Rule 3001(e), applicable securities, corporate, and other laws, and do not excuse compliance therewith; and it is further

ORDERED that the relief granted in this Revised Order is intended solely to allow further flexibility of certain Claimholders while at the same time permitting the Debtors to protect, preserve, and maximize the value of their Tax Attributes.  Accordingly, to the extent that the Revised Order expressly conditions or restricts trading in Claims against and interests in the Debtors, nothing in this Revised Order or in the Motion shall or shall be deemed to prejudice, impair, or otherwise alter or affect rights of any holders of Claims against or interests in the Debtors, including in connection with the treatment of any such interests under any plan of reorganization or any applicable Bankruptcy Court order; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to this Revised Order.

Dated:      New York, New York
            April 11, 2013


                                    /s/ Sean H. Lane
                                    United States Bankruptcy Judge

US_ACTIVE:\44135609\30\14013.0139

**SCHEDULE 1**

| AMR - Double-Dip General Unsecured Claims ($) | Applicable postpetition rate | Principal [1] | Prepetition accrued interest at Commencement Date | Postpetition accrued interest [2] | Interest on overdue interest [2] | Total Allowed General Unsecured Claim [3] |
|---|---|---|---|---|---|---|
| 6.25% Senior Convertible Notes, due October 15, 2014 | 6.250% | $460,000,000 | $3,513,889 | $50,696,832 | $2,099,254 | $516,309,975 |
| 7.875% Public Income Notes due July 13, 2039 | 7.875% | 150,000,000 | 918,750 | 20,798,490 | 1,284,133 | 173,001,373 |
| 9.0% Debentures, due August 1, 2012 | 9.000% | 75,759,000 | 2,234,890 | 12,284,038 | 559,889 | 90,837,817 |
| 9.0% Debentures, due September 15, 2016 | 9.000% | 60,943,156 | 1,127,448 | 9,776,120 | 587,512 | 72,434,236 |
| 10.0% Debentures due April 15, 2021 | 10.000% | 32,162,000 | 393,091 | 5,697,141 | 381,505 | 38,633,737 |
| 10.2% Debentures due March 15, 2020 | 10.200% | 17,525,500 | 367,451 | 3,193,892 | 218,278 | 21,305,121 |
| 9.75% Debentures due August 15, 2021 | 9.750% | 15,700,000 | 442,217 | 2,754,266 | 177,355 | 19,073,837 |
| 9.88% Debentures, due June 15, 2020 | 9.880% | 7,889,000 | 355,075 | 1,425,401 | 94,334 | 9,763,810 |
| 9.2% Series C Medium Term Notes, due January 30, 2012 | 9.200% | 7,701,000 | 27,552 | 1,280,476 | 70,728 | 9,079,756 |
| 9.8% Debentures, due October 1, 2021 | 9.800% | 5,065,000 | 79,971 | 882,362 | 57,872 | 6,085,205 |
| 10.55% Series B Medium Term Notes, due March 12, 2021 | 10.550% | 3,725,000 | 15,283 | 690,550 | 48,221 | 4,479,054 |
| 10.29% Series B Medium Term Notes, due March 8, 2021 | 10.290% | 2,365,000 | 9,464 | 427,582 | 29,101 | 2,831,147 |
| 9.14% Series D Medium Term Notes, due February 21, 2012 | 9.140% | 1,090,000 | 3,874 | 177,826 | 9,617 | 1,281,317 |
| 10.15% Series C Medium Term Notes, due May 15, 2020 | 10.150% | 913,000 | 3,604 | 162,812 | 10,926 | 1,090,342 |
| 10.125% Series C Medium Term Notes, due June 1, 2021 | 10.125% | 591,000 | 2,327 | 105,130 | 7,037 | 705,494 |
| 4.5% Senior Convertible Notes, due February 15, 2024 | 4.500% | 198,000 | 2,574 | 15,795 | 463 | 216,832 |
| **Total** | | **$841,626,656** | **$9,497,461** | **$110,368,712** | **$5,636,225** | **$967,129,054** |

**Notes**
(1) Excludes OID
(2) At applicable postpetition rate
(3) Allowed amount of each Double-Dip General Unsecured Claim as of the Commencement Date, plus interest thereon (including interest on overdue interest, to the extent provided for in the underlying documents) from the Commencement Date through the Effective Date (assumed August 31, 2013)

**SCHEDULE 2**

| American - Double-Dip General Unsecured Claims ($) | Applicable postpetition rate | Principal [1] | Prepetition accrued interest at Commencement Date | Postpetition accrued interest [2] | Interest on overdue interest [2] | Total Allowed General Unsecured Claim [3] |
|---|---|---|---|---|---|---|
| BNDES [4] | 0.150% | $650,938,804 | – | $1,795,845 | – | $652,734,649 |
| AllianceAirport - Series 2007 | 5.250% | 207,130,000 | 5,376,750 | 19,524,058 | 677,390 | 232,708,197 |
| AllianceAirport - Series 2007 | 5.750% | 150,000,000 | 4,264,583 | 15,522,874 | 590,722 | 170,378,179 |
| Dallas / Fort Worth - Series 2007 | 5.500% | 131,735,000 | 563,533 | 12,733,734 | 457,145 | 145,489,412 |
| Dallas / Fort Worth - Series 1995 | 6.000% | 126,240,000 | 589,120 | 13,317,058 | 522,270 | 140,668,448 |
| Puerto Rico - 1996 Series A | 6.250% | 115,600,000 | 3,572,361 | 13,034,477 | 539,946 | 132,746,785 |
| Chicago - Series 2007 | 5.500% | 108,675,000 | 2,955,357 | 10,744,422 | 390,816 | 122,765,594 |
| JFK - 1994 | 6.900% | 83,085,000 | 1,879,106 | 10,259,416 | 463,861 | 95,687,383 |
| JFK - 1990 | 5.400% | 71,150,000 | 1,579,530 | 4,581,960 | 88,844 | 77,400,334 |
| NAC [4] | 0.150% | 74,000,000 | – | 204,155 | – | 74,204,155 |
| AllianceAirport - Series 1991 | 7.000% | 49,525,000 | 1,714,115 | 6,276,792 | 291,852 | 57,807,759 |
| Puerto Rico - 1993 Series A | 6.300% | 39,705,000 | 1,236,811 | 4,513,835 | 188,507 | 45,644,152 |
| JFK - 1990 | 5.400% | 12,780,000 | 283,716 | 823,014 | 15,958 | 13,902,688 |
| Dallas / Fort Worth - Series 2002 | 8.250% | 7,110,000 | 45,623 | 1,033,093 | 56,057 | 8,244,772 |
| **Total** | | **$1,827,673,804** | **$24,060,605** | **$114,364,731** | **$4,283,367** | **$1,970,382,507** |

**Notes**
(1) Excludes OID
(2) At applicable postpetition rate
(3) Allowed amount of each Double-Dip General Unsecured Claim as of the Commencement Date, plus interest thereon (including interest on overdue interest, to the extent provided for in the underlying documents) from the Commencement Date through the Effective Date (assumed August 31, 2013)
(4) Postpetition interest and interest on overdue interest estimated assuming federal judgment rate for 1 year Treasury as of March 25, 2013 as listed by uscourts.gov; assumes all postpetition interest and interest on overdue interest is included in "Postpetition accrued interest"

**SCHEDULE 3**

| American - Single-Dip General Unsecured Claims - Funded debt only ($) | Applicable postpetition rate | Principal [1] | Prepetition accrued interest at Commencement Date | Postpetition accrued interest [2] | Interest on overdue interest [2] | Total Allowed General Unsecured Claim [3] |
|---|---|---|---|---|---|---|
| Dallas / Fort Worth - Series 1999 | 6.375% | $199,160,000 | $987,502 | $22,328,956 | $931,396 | $223,407,854 |
| Dallas / Fort Worth - Series 2000A3 | 9.125% | 103,000,000 | 731,014 | 16,564,546 | 996,542 | 121,292,103 |
| Compromised KFW A300 Mortgages [4] | 7.765% | 104,956,287 | – | 14,260,219 | 826,771 | 120,043,276 |
| Dallas / Fort Worth - Series 2000A2 | 9.000% | 65,000,000 | 455,000 | 10,309,163 | 611,504 | 76,375,667 |
| Puerto Rico - 1985 Series A | 6.450% | 36,160,000 | 1,153,203 | 4,211,728 | 180,157 | 41,705,087 |
| New Jersey - Economic Development | 7.100% | 17,855,000 | 98,599 | 2,230,735 | 103,839 | 20,288,173 |
| **Total** | | **$526,131,287** | **$3,425,318** | **$69,905,346** | **$3,650,210** | **$603,112,160** |

**Notes**
(1) Excludes OID
(2) At applicable postpetition rate
(3) Allowed amount of each Single-Dip General Unsecured Claim as of the Commencement Date, plus interest thereon (including interest on overdue interest, to the extent provided for in the underlying documents) from the Commencement Date through the Effective Date (assumed August 31, 2013)
(4) Represents weighted average rate on compromised mortgages

**SCHEDULE 4**

US_ACTIVE:\44195459\15\14013.0139

TO BE SUPPLIED

**SCHEDULE 5**

TO BE SUPPLIED

## EXHIBIT B

April 12, 2013

PRELIMINARY DRAFT

*Ownership and recovery assume constant share price between Effective Date and 120 days post-Effective Date*

# Illustrative allocation of equity based on various stock price assumptions[1]

## Based on proposed Plan of Reorganization

| ($ in millions, except share price) | Estimated Claims[2] | Illustrative New Common Stock price range | | | | |
|---|---|---|---|---|---|---|
| | | $12 | $14 | $16 | $18 | $20 |
| Double-Dip General Unsecured Claims[3] | **$2,938** | $3,084 | $3,084 | $3,084 | $3,084 | $3,084 |
| Single-Dip Preferred Allocation[3] | **1,254** | 1,317 | 1,317 | 1,317 | 1,317 | 1,317 |
| Single-Dip Non-Preferred Amount[4] | **1,376** | 285 | 1,066 | 1,482 | 1,482 | 1,482 |
| Sub-total (Single-Dip General Unsecured Claims) | **2,630** | 1,602 | 2,383 | 2,799 | 2,799 | 2,799 |
| Labor Common Stock Allocation[5] | **1,720** | 1,447 | 1,689 | 1,817 | 1,817 | 1,817 |
| Sub-total (Creditor New Common Stock Allocation) | **$7,287** | $6,133 | $7,155 | $7,700 | $7,700 | $7,700 |
| **Initial Old Equity Allocation**[6] | | 313 | 366 | 418 | 470 | 522 |
| **Market Based Old Equity Allocation**[7] | | – | – | 477 | 1,500 | 2,522 |
| **Sub-total (AMR Equity Interests)** | | **$313** | **$366** | **$895** | **$1,970** | **$3,044** |
| Total value to AMR stakeholders[8] | | $6,446 | $7,521 | $8,595 | $9,670 | $10,744 |

*Implied value to AMR stakeholders 120 days after Effective Date*

- Implied par plus accrued price of **$15.07 (Value Hurdle Price)**
- Minimum price at which additional shares are distributed to Market Based Old Equity Allocation

**Notes**

1  Subject in all respects to the terms and conditions of the Plan and the Merger Agreement; there can be no assurances that values can be realized at market prices and recoveries are subject to certain risks, including among other things, market risk and liquidity and transaction risk
2  For illustrative purposes only.  Assumes no dilution from AMR employee equity awards; if the ultimate allowed amount of Single-Dip General Unsecured Claims exceeds the estimated amount of $2.63 billion, the percentage recoveries to holders of Single-Dip General Unsecured Claims, in respect of the American Labor Allocation and to holders of AMR Equity Interests may be reduced
3  Includes principal, accrued interest and interest on overdue interest; includes 6.25% annual rate of accretion which is assumed to convert into New Common Stock; includes 96.5% VWAP discount
4  Includes principal, accrued interest and interest on overdue interest; includes 12.0% annual rate of accretion which is assumed to convert into New Common Stock; includes 96.5% VWAP discount
5  Labor recovery equal to 23.6% of Creditor New Common Stock Allocation
6  Includes 3.5% of New Common Stock
7  Value in excess of Value Hurdle Price allocated to AMR Equity Interests
8  Equity value for all illustrative scenarios based on fully diluted US Airways share count of 208.9m as of 3/28/13

1

April 12, 2013                                                                                                    PRELIMINARY DRAFT

Ownership and recovery
assume constant share price
between Effective Date and
120 days post-Effective Date

# Illustrative allocation of equity based on various stock price assumptions[1]

## Based on proposed Plan of Reorganization

| ($ in millions, except share price) | | | | | |
|---|---|---|---|---|---|
| | \multicolumn{5}{c}{**Illustrative New Common Stock price range**} |
| | **$12** | **$14** | **$16** | **$18** | **$20** |
| Double-Dip General Unsecured Claims[2] | 34.4% | 29.5% | 25.8% | 23.0% | 20.7% |
| Single-Dip Preferred Allocation[2] | 14.7% | 12.6% | 11.0% | 9.8% | 8.8% |
| Single-Dip Non-Preferred Amount[3] [4] | 3.2% | 10.2% | 12.4% | 11.0% | 9.9% |
| Sub-total (Single-Dip General Unsecured Claims) | 17.9% | 22.8% | 23.4% | 20.8% | 18.8% |
| Labor Common Stock Allocation[5] | 16.2% | 16.2% | 15.2% | 13.5% | 12.2% |
| Sub-total (Creditor New Common Stock Allocation) | 68.5% | 68.5% | 64.5% | 57.3% | 51.6% |
| **Initial Old Equity Allocation[6]** | **3.5%** | **3.5%** | **3.5%** | **3.5%** | **3.5%** |
| **Market Based Old Equity Allocation[7]** | **–** | **–** | **4.0%** | **11.2%** | **16.9%** |
| **Sub-total (AMR Equity Interests)** | **3.5%** | **3.5%** | **7.5%** | **14.7%** | **20.4%** |
| Total ownership of New AAG by AMR stakeholders[8] | 72.0% | 72.0% | 72.0% | 72.0% | 72.0% |

Ownership in
New AAG 120
days after
Effective Date

▪ Implied par plus accrued price of **$15.07** (**Value Hurdle Price**)

- Minimum price at which additional shares are distributed to Market Based Old Equity Allocation

**Notes**
1  Subject in all respects to the terms and conditions of the Plan and the Merger Agreement; there can be no assurances that values can be realized at market prices and recoveries are subject to certain risks, including among other things, market risk and liquidity and transaction risk
2  Includes principal, accrued interest and interest on overdue interest; includes 6.25% annual rate of accretion which is assumed to convert into New Common Stock; includes 96.5% VWAP discount
3  For illustrative purposes only.  Assumes no dilution from AMR employee equity awards; if the ultimate allowed amount of Single-Dip General Unsecured Claims exceeds the estimated amount of $2.63 billion, the percentage recoveries to holders of Single-Dip General Unsecured Claims, in respect of the American Labor Allocation and to holders of AMR Equity Interests may be reduced
4  Includes principal, accrued interest and interest on overdue interest; includes 12.0% annual rate of accretion which is assumed to convert into New Common Stock; includes 96.5% VWAP discount
5  Labor recovery equal to 23.6% of Creditor New Common Stock Allocation
6  Includes 3.5% of New Common Stock
7  Value in excess of Value Hurdle Price allocated to AMR Equity Interests
8  Ownership amounts will be diluted by the AMR employee equity awards contemplated by the Plan and the Merger Agreement; the aggregate value of such awards is approximately $140m, which includes vested and unvested portions; the actual number of shares of New Common Stock represented by the AMR employee equity awards and the dilutive impact of such shares are subject to the terms of the Merger Agreement and the Plan treatment and will vary depending upon the US Airways stock price as of the Share Determination Date

2

## EXHIBIT C

**AMR Corp. Debtors**
**Liquidation Analysis**
*(in US dollars, 000s)*

| Notes | ASSETS & ESTIMATED REALIZATION | Net Book Value December 31, 2012 | Forced Liquidation Value | | Orderly Liquidation Value | |
|---|---|---|---|---|---|---|
| | | | Estimated Value | Estimated Realization Rate | Estimated Value | Estimated Realization Rate |
| 1 | Cash | $ 299 | $ 299 | 100% | $ 299 | 100% |
| 1 | Short-Term Investments | (48) | - | N/A | - | N/A |
| 2 | Receivables - Net | (160) | - | N/A | - | N/A |
| 3 | Inventories - Net | - | - | N/A | - | N/A |
| 4 | Other Current Assets | (3,678) | - | N/A | - | N/A |
| 5 | Operating Flight Equipment - Net | - | - | N/A | - | N/A |
| 6 | Leased Operating Flight Equipment - Net | - | - | N/A | - | N/A |
| 7 | Purchase Deposits - Flight Equipment | - | - | N/A | - | N/A |
| 8 | Other Equipment and Property - Net | - | - | N/A | - | N/A |
| 9 | Leased Other Equipment and Property - Net | - | - | N/A | - | N/A |
| 10 | Noncurrent Receivables - Net | - | - | N/A | - | N/A |
| 11 | Routes, Airport Slots & Gate Costs - Net | - | - | N/A | - | N/A |
| 12 | Investment in Subs | (9,869,512) | 21,768 | N/A | 21,768 | N/A |
| 13 | Other Assets | 30,000 | 17,550 | 59% | 19,500 | 65% |
| 14 | Intangible Assets | - | - | N/A | - | N/A |
| 15 | I/C Notes Receivable | 2,438,403 | 0 | 0% | 29,381 | 1% |
| | **Total Assets / Proceeds (A)** | **$ (7,404,696)** | **$ 39,617** | **N/A** | **$ 70,948** | **N/A** |
| | **LIQUIDATION COSTS** | | | | | |
| 16 | Trustee Fees | | 1,180 | 3.0% | 1,238 | 3.0% |
| 17 | Counsel for the Trustee and Related | | 315 | 0.8% | 330 | 0.8% |
| 18 | Professional Fees | | 315 | 0.8% | 330 | 0.8% |
| 19 | Wind- Down Fees | | 944 | 2.4% | 990 | 2.4% |
| | **Total Liquidation Costs (B)** | | **$ 2,752** | | **$ 2,889** | |
| | **Net Proceeds Available to Creditors (A - B)** | | **$ 36,865** | | **$ 68,059** | |

| | ESTIMATED RECOVERY TO CREDITORS (CLAIMS) | Forced Liquidation Value | | | Orderly Liquidation Value | | |
|---|---|---|---|---|---|---|---|
| | | Estimated Allowed Claim | Estimated Total Amount Paid to Creditors | Estimated % of Allowed Claim Paid | Estimated Allowed Claim | Estimated Total Amount Paid to Creditors | Estimated % of Allowed Claim Paid |
| | Net Proceeds Available for Distribution: | | $ 36,865 | N/A | | $ 68,059 | N/A |
| | Net Proceeds Available to Secured, Admin, and Priority Creditors: | | 36,865 | N/A | | 68,059 | N/A |
| 20 | Secured Claims | - | - | N/A | - | - | N/A |
| 21 | Administrative Claims | 9,726 | 9,726 | 100% | 9,726 | 9,726 | 100% |
| 22 | Priority Claims | - | - | N/A | - | - | N/A |
| | Net Proceeds Available to Unsecured Creditors: | | 27,139 | | | 58,334 | |
| 23 | Pension Liability | 14,541,473 | 19,661 | 0.14% | 14,541,473 | 44,437 | 0.31% |
| 24 | Intercompany Unsecured Claims | 59,720 | 81 | 0.14% | 59,720 | 182 | 0.31% |
| 25 | Other Unsecured Claims | 5,470,872 | 7,397 | 0.14% | 4,487,717 | 13,714 | 0.31% |
| | **Total Unsecured Claims** | **$ 20,072,065** | **27,139** | **0.14%** | **$ 19,088,910** | **58,334** | **0.31%** |
| | **Excess Funds for Distribution** | | **$ -** | | | **$ -** | |

**American Airlines Debtors**
**Liquidation Analysis**
*(in US dollars, 000s)*

| Notes | Net Book Value December 31, 2012 | Forced Liquidation Value | | Orderly Liquidation Value | |
|---|---|---|---|---|---|
| | | Estimated Value | Estimated Realization Rate | Estimated Value | Estimated Realization Rate |
| | **ASSETS & ESTIMATED REALIZATION** | | | | |
| 1 | Cash | $ 474,365 | $ 289,589 | 61% | $ 376,922 | 79% |
| 1 | Short-Term Investments | 4,257,192 | 4,157,158 | 98% | 4,206,429 | 99% |
| 2 | Receivables - Net | 1,103,986 | 706,973 | 64% | 717,700 | 65% |
| 3 | Inventories - Net | 549,950 | 401,146 | 73% | 561,897 | 102% |
| 4 | Other Current Assets | 624,597 | 235,370 | 38% | 244,432 | 39% |
| 5 | Operating Flight Equipment - Net | 10,185,420 | 3,982,261 | 39% | 5,419,741 | 53% |
| 6 | Leased Operating Flight Equipment - Net | 222,188 | - | 0% | - | 0% |
| 7 | Purchase Deposits - Flight Equipment | 710,106 | - | 0% | - | 0% |
| 8 | Other Equipment and Property - Net | 2,079,869 | 186,304 | 9% | 208,643 | 10% |
| 9 | Leased Other Equipment and Property - Net | 59,992 | - | 0% | - | 0% |
| 10 | Noncurrent Receivables - Net | 1,211,775 | 1,085,150 | 90% | 1,089,274 | 90% |
| 11 | Routes, Airport Slots & Gate Costs - Net | 868,962 | 3,198,719 | 368% | 3,655,679 | 421% |
| 12 | Investment in Subs | 494,585 | 1,116 | 0% | 1,116 | 0% |
| 13 | Other Assets | 913,646 | 70,435 | 8% | 104,896 | 11% |
| 14 | Intangible Assets | - | 170,750 | N/A | 289,000 | N/A |
| 15 | I/C Notes Receivable | 80,920 | 47,525 | 59% | 54,991 | 68% |
| | **Total Assets / Proceeds (A)** | **$ 23,837,553** | **$ 14,532,497** | **61%** | **$ 16,930,720** | **71%** |
| | **LIQUIDATION COSTS** | | | | |
| 16 | Trustee Fees | | 301,147 | 3.0% | 368,771 | 3.0% |
| 17 | Counsel for the Trustee and Related | | 80,306 | 0.8% | 98,339 | 0.8% |
| 18 | Professional Fees | | 80,306 | 0.8% | 98,339 | 0.8% |
| 19 | Wind- Down Fees | | 240,917 | 2.4% | 295,017 | 2.4% |
| | **Total Liquidation Costs (B)** | | **$ 702,676** | | **$ 860,467** | |
| | **Net Proceeds Available to Creditors (A - B)** | | **$ 13,829,822** | | **$ 16,070,254** | |

| Notes | | Forced Liquidation Value | | | Orderly Liquidation Value | | |
|---|---|---|---|---|---|---|---|
| | | Estimated Allowed Claim | Estimated Total Amount Paid to Creditors | Estimated % of Allowed Claim Paid | Estimated Allowed Claim | Estimated Total Amount Paid to Creditors | Estimated % of Allowed Claim Paid |
| | **ESTIMATED RECOVERY TO CREDITORS (CLAIMS)** | | | | | | |
| | Net Proceeds Available for Distribution: | | $ 13,829,822 | N/A | | $ 16,070,254 | N/A |
| | **Net Proceeds Available to Secured, Admin, and Priority Creditors:** | | 13,829,822 | N/A | | 16,070,254 | N/A |
| 20 | Secured Claims | 7,569,478 | 5,647,460 | 75% | 7,569,478 | 6,659,254 | 88% |
| 21 | Administrative Claims | 9,041,101 | 8,182,361 | 91% | 8,977,810 | 8,977,810 | 100% |
| 22 | Priority Claims | - | - | N/A | - | - | N/A |
| | **Net Proceeds Available to Unsecured Creditors:** | | - | | | 433,190 | |
| 23 | Pension Liability | 14,541,473 | - | 0.00% | 14,541,473 | 226,102 | 1.55% |
| 24 | Intercompany Unsecured Claims | 2,816,638 | - | 0.00% | 2,816,638 | 43,795 | 1.55% |
| 25 | Other Unsecured Claims | 11,451,884 | - | 0.00% | 10,501,966 | 163,293 | 1.55% |
| | **Total Unsecured Claims** | **$ 28,809,995** | **-** | **0.00%** | **$ 27,860,077** | **433,190** | **1.55%** |
| | **Excess Funds for Distribution** | | **$ -** | | | **$ -** | |

**Eagle Holdings Debtors**
**Liquidation Analysis**
*(in US dollars, 000s)*

| Notes | ASSETS & ESTIMATED REALIZATION | Net Book Value December 31, 2012 | Forced Liquidation Value | | Orderly Liquidation Value | |
|---|---|---|---|---|---|---|
| | | | Estimated Value | Estimated Realization Rate | Estimated Value | Estimated Realization Rate |
| 1 | Cash | $ 2,427 | $ 2,427 | 100% | $ 2,427 | 100% |
| 1 | Short-Term Investments | 1,927 | 1,927 | 100% | 1,927 | 100% |
| 2 | Receivables - Net | 17,151 | 9,303 | 54% | 9,303 | 54% |
| 3 | Inventories - Net | 30,079 | 7,405 | 25% | 14,515 | 48% |
| 4 | Other Current Assets | 4,641 | - | 0% | - | 0% |
| 5 | Operating Flight Equipment - Net | 124,415 | 54,476 | 44% | 74,087 | 60% |
| 6 | Leased Operating Flight Equipment - Net | - | - | N/A | - | N/A |
| 7 | Purchase Deposits - Flight Equipment | - | - | N/A | - | N/A |
| 8 | Other Equipment and Property - Net | 18,260 | 10,775 | 59% | - | 0% |
| 9 | Leased Other Equipment and Property - Net | 1,107 | - | 0% | - | 0% |
| 10 | Noncurrent Receivables - Net | 1,660 | 415 | 25% | 830 | 50% |
| 11 | Routes, Airport Slots & Gate Costs - Net | - | - | N/A | - | N/A |
| 12 | Investment in Subs | 84,100 | - | 0% | - | 0% |
| 13 | Other Assets | 9,430 | 280 | 3% | 560 | 6% |
| 14 | Intangible Assets | - | - | N/A | - | N/A |
| 15 | I/C Notes Receivable | 378,235 | 52,510 | 14% | 62,454 | 17% |
| | **Total Assets / Proceeds (A)** | **$ 673,432** | **$ 139,518** | **21%** | **$ 166,103** | **25%** |
| | **LIQUIDATION COSTS** | | | | | |
| 16 | Trustee Fees | | 2,480 | 3.0% | 2,979 | 3.0% |
| 17 | Counsel for the Trustee and Related | | 661 | 0.8% | 794 | 0.8% |
| 18 | Professional Fees | | 661 | 0.8% | 794 | 0.8% |
| 19 | Wind- Down Fees | | 1,984 | 2.4% | 2,383 | 2.4% |
| | **Total Liquidation Costs (B)** | | **$ 5,786** | | **$ 6,951** | |
| | **Net Proceeds Available to Creditors (A - B)** | | **$ 133,733** | | **$ 159,152** | |

| | | Forced Liquidation Value | | | Orderly Liquidation Value | | |
|---|---|---|---|---|---|---|---|
| | ESTIMATED RECOVERY TO CREDITORS (CLAIMS) | Estimated Allowed Claim | Estimated Total Amount Paid to Creditors | Estimated % of Allowed Claim Paid | Estimated Allowed Claim | Estimated Total Amount Paid to Creditors | Estimated % of Allowed Claim Paid |
| | Net Proceeds Available for Distribution: | | $ 133,733 | N/A | | $ 159,152 | N/A |
| | Net Proceeds Available to Secured, Admin, and Priority Creditors: | | 133,733 | N/A | | 159,152 | N/A |
| 20 | Secured Claims | - | - | N/A | - | N/A |
| 21 | Administrative Claims | 159,086 | 133,733 | 84% | 147,626 | 147,626 | 100% |
| 22 | Priority Claims | - | - | N/A | - | - | N/A |
| | Net Proceeds Available to Unsecured Creditors: | | - | | | 11,526 | |
| 23 | Pension Liability | 14,541,473 | - | 0.00% | 14,541,473 | 11,482 | 0.08% |
| 24 | Intercompany Unsecured Claims | 21,200 | - | 0.00% | 21,200 | 17 | 0.08% |
| 25 | Other Unsecured Claims | 34,645 | - | 0.00% | 34,645 | 27 | 0.08% |
| | **Total Unsecured Claims** | **$ 14,597,318** | **-** | **0.00%** | **$ 14,597,318** | **11,526** | **0.08%** |
| | **Excess Funds for Distribution** | | **$ -** | | | **$ -** | |

# Notes to Liquidation Analysis of AMR and subsidiaries

1. <u>Cash and short-term investments</u>: Cash and Short-Term Investments include domestic and foreign bank accounts maintained by the Debtors. These balances include restricted cash, unrestricted cash, and short-term investments. Cash located in certain foreign bank accounts assumes some compromise due to capital control measures in certain jurisdictions. Restricted Cash primarily includes cash and/or security deposits posted with third parties on account of various obligations, including workers' compensation claims.

2. <u>Receivables – Net</u>: Receivables – net includes amounts owed to the Debtors by various parties. Receivables are categorized into five main sub-groups: "general traffic receivables", "travel agencies receivables", "credit cards receivables", "airfreight receivables" and "other receivables". "General traffic receivables" primarily include tickets sold by other airlines that incorporate AA flight segments. These transactions have clearinghouse guarantees. "Travel agencies receivables" include sales accrued before end of month processed on AA systems. "Credit card receivables" relates to receivables associated with various credit cards and offsets the air traffic liability. Most items in the "other receivables" category are for services already rendered.

3. <u>Inventories – Net</u>: Inventories – net include spare parts and other inventory, including approximately two weeks of fuel supply for AA. Recoveries for spare parts are based on third party appraisals market values. Fuel is assumed to have a high recovery rate.

4. <u>Other current assets</u>: Other current assets include assets held for sale, including aircraft, prepaid fuel and sundry. Prepaid fuel is expected to receive a high recovery. Most other items in this category (such as prepaid software licenses) are assumed to have zero recovery value.

5. <u>Operating Flight Equipment – Net</u>: Operating Flight Equipment includes encumbered and appraised aircraft in use by the airline, unencumbered aircraft in use by the airline, spare engines, simulators and flight assemblies. Encumbered aircraft recoveries are shown gross of amounts owed to secured creditors.

6. <u>Leased operating flight equipment – Net</u>: Leased operating flight equipment is assumed to generate zero recovery value.

7. <u>Purchase deposits – flight equipment</u>: Purchase deposits for flight equipment is assumed to generate zero recovery value. It is expected that deposits will be retained by manufacturers to cover expenses associated with repurposing aircraft under construction for American for resale to other customers.

8. Other equipment and property – Net: Other Property and Equipment includes land, buildings, ground equipment, miscellaneous other equipment (including furniture, fixtures and office equipment), leasehold improvements on ground equipment, and leasehold improvements on real property. Properties, including the corporate headquarters and other owned property, are forecast to be sold empty, and include discounts to appraised values to reflect level of market interest in properties currently for sale.

9. Leased other property and equipment – Net: Leased other property and equipment is assumed to generate zero recovery value.

10. Noncurrent Receivables – Net: Noncurrent Receivables includes 9/11-related receivables assumed to recover 100% of book value and other noncurrent receivables.

11. Routes, Airport Slots & Gate Costs – Net: Routes, airport slots & gate costs – net includes the value of the routes, landing slot rights and gates owned by the Debtors. The balance sheet carrying values of these items reflect the actual cost, net of accumulated amortization, apportioned to these assets. The Liquidation Analyses base the value of foreign route authorities and arrival/departure slots at Ronald Reagan Washington National, John F. Kennedy, and LaGuardia airports on factors such as location, time (peak versus non-peak), existence of open skies agreements, level of slot congestion, and usage (jet versus commuter). The Liquidation Analyses rely on the Debtor's extensive industry knowledge and third party appraisals to determine a range of realization rates on account of slots and foreign route authorities.

12. Investment in Subs: Investment in Subs includes surplus distributable value, if any, from debtor entity subsidiaries and net book value excluding intercompany payables and receivables for non-debtor entity subsidiaries, plus the value received from the liquidation of non-debtor entities.

13. Other Assets: Other Assets primarily consist of the Debtors' investments in certain joint ventures, capitalized software costs, non-operating property, deferred compensation, and miscellaneous investments. Other assets also include construction fund deposits with airport authorities related to certain municipal bond obligations.

14. Intangible Assets: Intangible Assets include customer databases, trade names, and trademarks. Given that the customer list was developed by AMR, there is no net book value on AMR's books and records as of December 31, 2012 for this asset. The analyses base their recovery assumptions for the Debtors' customer list on precedent analyses of similar assets in bankruptcy. The analyses also assume significant recoveries from the sale of the AA trade name based on the Debtors' recent appraisal of this asset and precedent transactions in other bankruptcies.

15. I/C Notes Receivable: Prepetition unsecured intercompany notes receivable are assumed to recover value on a *pari passu* basis with the counterparty entity's general

unsecured claim pool. Post-petition intercompany notes receivable are assumed to recover value on a *pari passu* basis with other administrative claims. The amount recovered for each I/C Note Receivable is the sum of the recovery from each of the entity's intercompany counterparties. Intercompany claims between two entities are not assumed to cancel out and are evaluated on an individual basis. Intercompany claims with non-debtor entities are included in the distributable value of each non-debtor subsidiary and are recognized in the "Investment in Subs" line above.

16. <u>Trustee Fees</u>: Trustee Fees include all fees to be paid for the Chapter 7 Trustee's services in Chapter 7 liquidation in accordance with the fee structure under Section 326 of the Bankruptcy Code. Based on certain benchmarks derived from the Debtors' analysis of such rates in other large Chapter 11 cases, the Liquidation Analyses allocate Trustee Fees to each of the Debtors at a rate of 3.0% of estimated liquidation proceeds, excluding Cash and short-term investments and Intercompany Receivables.

17. <u>Counsel for the Trustee and Related</u>: Counsel for the Trustee and Related Fees include an estimate of fees and expenses incurred by the Trustee's legal and other professionals associated with, among other things, liquidation and realization of assets, the wind-down of the Debtors' Estates, and Claims reconciliation. In the Liquidation Analyses, Counsel for the Trustee and Related Fees are assumed to be 0.8% of the estimated liquidation proceeds, excluding Cash and short-term investments and Intercompany Receivables.

18. <u>Professional Fees</u>: Professional Fees include an estimate of fees and expenses incurred by the Debtor's legal and other professionals associated with, among other things, liquidation and realization of assets, the wind-down of the Debtors' Estates, and Claims reconciliation. In the Liquidation Analyses, Professional Fees are assumed to be 0.8% of the estimated liquidation proceeds, excluding Cash and short-term investments and Intercompany Receivables.

19. <u>Wind-Down Fees</u>: Wind-Down Fees include expenses incurred during the Wind-Down Period and primarily relate to the storage and transportation of owned aircraft and flight equipment, auction fees, employee wages and benefits for personnel employed during the Wind-Down Period and general overhead costs. The Liquidation Analyses assumes that Wind-Down Fees will equal 2.4% of estimated liquidation proceeds, excluding Cash and short-term investments and Intercompany Receivables.

20. <u>Secured Claims</u>: Secured Claims include certain Secured Claims relating to Aircraft Equipment, Slots Gates & Routes and the Citi AAdvantage Mile Credit Card liability, but only to the extent of the value of the underlying collateral. In general, the allowed Secured Claim for any encumbered Aircraft Equipment is assumed to be equal to the liquidation proceeds realized from the sale of underlying aircraft collateral. Upon repossession and liquidation of such Aircraft Equipment, the secured creditors' only remaining Claim against the Debtors' Estates will be an unsecured deficiency claim for any shortfall from the sale of such collateral reflected in Line Item 25 (Other Unsecured

Claims), except for secured financings entered into after the Petition Date. Deficiency claims for post-petition secured financings are assumed to be treated as Administrative Claims.

21. <u>Administrative Claims</u>: Administrative Claims include Allowed Claims entitled to administrative expense priority under Section 503 of the Bankruptcy Code. Significant types of Administrative Claims include estimated unpaid post-petition employee wages and benefits, trade payables, air traffic liabilities, environmental clean-up costs, accrued aircraft rent and interest, taxes, reclamation claims, claims arising under Post-petition Aircraft Agreements, post-petition secured deficiency claims, and damages under assumed or Post-petition contracts and leases that the Trustee subsequently rejects or terminates.

22. <u>Priority Claims</u>: Priority Claims include state tax Claims (currently estimated at $0).

23. <u>Pension Liability</u>: The Liquidation Analyses assume that the Pension Benefit Guaranty Corporation ("PBGC") would assert a $14.5 billion, joint and several claim against all of the Debtors in a liquidation based on application of the discount rate set forth in PBGC's regulations for determining the unfunded status of a terminated defined benefit pension plan. This amount includes the claim already filed by the PBGC and an estimate for contributions due but unpaid after commencement of the case. Although the unsecured claims of the PBGC for termination of the Debtors' defined benefit pension plans are listed as a separate line item in the Liquidation Analyses, they are afforded the same priority as are Other Unsecured Claims.

24. <u>Intercompany Unsecured Claims</u>: Intercompany Unsecured Claims include all prepetition Intercompany Claims against any of the Debtors. These claims are assumed to rank *pari passu* with other unsecured claims.

25. <u>Other Unsecured Claims</u>: Significant additional Unsecured Claims include unsecured funded debt, secured deficiency claims, aircraft lease rejection claims, prepetition trade payables, non-residential lease and executory contract rejection claims and retiree and medical and other benefits.

**<u>EXHIBIT D</u>**

**Introduction**[1]

The following financial projections for the consolidated Debtors and New AAG ("**Consolidated Financial Projections**") are based on forecasts of operating results during the period ending December 31, 2017 (the "**Projected Period**"). These Consolidated Financial Projections include one month of the Debtors' and US Airways' actual financial results (January), seven months of the Debtors' and US Airways' projected financial results (February through August), and four months of New AAG's projected financial results (September through December) for 2013; and New AAG's projected financial results for each of the years ending December 31, 2014, 2015, 2016 and 2017. Also attached are the notes and assumptions to the Consolidated Financial Projections (in each case, the "**Notes**"). The Consolidated Financial Projections and the Notes should be read in conjunction with the Plan and the Disclosure Statement.

The Debtors, with the assistance of their advisors and US Airways, have prepared these Consolidated Financial Projections to assist the Bankruptcy Court in determining whether the Plan meets the feasibility test of section 1129(a)(11) of the Bankruptcy Code.  Certain financial information from US Airways was used in connection with the preparation of the Consolidated Financial Projections.

The Debtors generally do not publish their projections or their anticipated financial position or results of operations.  Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated projections to holders of Claims or Equity  Interests, or to include such information in documents required to be filed with the Securities and Exchange Commission or otherwise make public such information.

THE CONSOLIDATED FINANCIAL PROJECTIONS HAVE BEEN PREPARED BY THE MANAGEMENT OF THE DEBTORS, IN CONSULTATION WITH THE DEBTORS' FINANCIAL ADVISORS, ROTHSCHILD, INC. AND MCKINSEY RECOVERY & TRANSFORMATION SERVICES U.S., LLC., AND US AIRWAYS.  THE CONSOLIDATED FINANCIAL PROJECTIONS WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, AND BY THEIR NATURE ARE NOT FINANCIAL STATEMENTS PREPARED IN ACCORDANCE WITH ACCOUNTING PRINCIPLES GENERALLY ACCEPTED IN THE UNITED STATES OF AMERICA.

THE DEBTORS INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING CONSOLIDATED FINANCIAL PROJECTIONS AND ACCORDINGLY DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE CONSOLIDATED FINANCIAL PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE CONSOLIDATED FINANCIAL PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE CONSOLIDATED FINANCIAL PROJECTIONS.

THE CONSOLIDATED FINANCIAL PROJECTIONS DO NOT REFLECT THE IMPACT OF FRESH START REPORTING IN ACCORDANCE WITH AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS STATEMENT OF POSITION 90-7, FINANCIAL REPORTING BY ENTITIES IN REORGANIZATION UNDER THE BANKRUPTCY CODE . THE IMPACT OF FRESH START REPORTING, WHEN REFLECTED AT THE EFFECTIVE DATE, IS EXPECTED TO HAVE A

---

[1]    Capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Disclosure Statement to which this Appendix is attached

MATERIAL IMPACT ON THE DEBTORS' AND NEW AAG'S CONSOLIDATED BALANCE
SHEETS AND PROSPECTIVE RESULTS OF OPERATIONS.
FRESH START ADJUSTMENTS ARE NOT EXPECTED TO HAVE A MATERIAL IMPACT ON
THE PROJECTED RECOVERIES FOR CREDITORS.

THE CONSOLIDATED FINANCIAL PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT
ARE FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF THE PRIVATE
SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A
NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND
THE CONTROL OF THE DEBTORS AND NEW AAG, INCLUDING THE CONFIRMATION OF
THE PLAN ON THE PRESUMED EFFECTIVE DATE, THE CONTINUING AVAILABILITY OF
SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS,
ACHIEVING OPERATING EFFICIENCIES, FLUCTUATIONS IN FUEL PRICE, COVENANTS IN
NEW CREDIT FACILITIES, MAINTAINING GOOD EMPLOYEE RELATIONS, EXISTING AND
FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES,
ACTS OF TERRORISM OR WAR, INDUSTRY-SPECIFIC RISK FACTORS (AS DETAILED IN THE
DISCLOSURE STATEMENT IN THE SECTION ENTITLED RISKS RELATING TO THE DEBTORS
BUSINESS AND FINANCIAL CONDITION ) AND OTHER MARKET AND COMPETITIVE
CONDITIONS. HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE CAUTIONED THAT THE
FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT
GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY
DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE
FORWARD-LOOKING STATEMENTS, AND NEITHER THE DEBTORS NOR NEW AAG
UNDERTAKE ANY OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE CONSOLIDATED FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL
SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND
ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT
BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC,
COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES
AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS
AND NEW AAG. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR
ARE MADE AS TO THE ACCURACY OF THE CONSOLIDATED FINANCIAL PROJECTIONS OR
TO THE DEBTORS' OR NEW AAG'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME
ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND
CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE
CONSOLIDATED FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM
THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS
THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A
MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE DEBTORS AND
NEW AAG DO NOT INTEND AND DO NOT UNDERTAKE ANY OBLIGATION TO UPDATE OR
OTHERWISE REVISE THE CONSOLIDATED FINANCIAL PROJECTIONS TO REFLECT EVENTS
OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THESE CONSOLIDATED
FINANCIAL PROJECTIONS ARE INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF
UNANTICIPATED EVENTS. THEREFORE, THE CONSOLIDATED FINANCIAL PROJECTIONS
MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL
RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT
THE PLAN, HOLDERS OF CLAIMS OR EQUITY INTERESTS MUST MAKE THEIR OWN
DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE
RELIABILITY OF THE CONSOLIDATED FINANCIAL PROJECTIONS.

2

THESE CONSOLIDATED FINANCIAL PROJECTIONS WERE DEVELOPED FOR PURPOSES OF THE FORMULATION AND NEGOTIATION OF THE PLAN AND TO ENABLE THE HOLDERS OF CLAIMS AND EQUITY INTERESTS ENTITLED TO VOTE UNDER THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF SECURITIES OF, OR CLAIMS OR EQUITY INTERESTS IN, THE DEBTORS OR ANY OF THEIR AFFILIATES.

**General Assumptions In The Consolidated Financial Projections And The Notes**

The Consolidated Financial Projections have been prepared on the assumption that the Effective Date is August 31, 2013. The Consolidated Financial Projections are based on, and assume, among other things, the successful reorganization of the Debtors, the successful completion of the merger with US Airways Group, no payments for retiree medical and welfare benefits and implementation of the New AAG's emergence business plan.  Although the Debtors presently intend to cause the Effective Date to occur as soon as practical following Confirmation of the Plan, there can be no assurance as to when the Effective Date will actually occur. If the Effective Date is delayed, the Debtors will continue to incur reorganization costs, which may be considered significant, and will impact the ability of the Debtors to fully achieve all benefits of the Merger. The Consolidated Financial Projections and the Notes do not include any assumptions about AMR employee equity awards or any equity capital or debt financing transactions that New AAG, in its sole discretion, may decide to carry out after the Effective Date.

**CONSOLIDATED FINANCIAL PROJECTIONS**

**Projected Consolidated Statements of Operations[2]**
(unaudited); (in millions); (years ending December 31)

| | 2013[3] | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **Operating Revenue:** | | | | | |
| Passenger | 35,800 | 37,666 | 40,011 | 41,514 | 41,972 |
| Cargo | 869 | 904 | 948 | 976 | 992 |
| Other | 4,302 | 4,417 | 4,623 | 4,830 | 4,866 |
| **Total Operating Revenue** | **40,971** | **42,987** | **45,582** | **47,319** | **47,830** |
| **Operating Expenses:** | | | | | |
| Salaries and Benefits | 7,659 | 8,071 | 8,579 | 9,305 | 9,585 |
| Mainline Aircraft Fuel | 11,295 | 10,867 | 10,847 | 10,725 | 10,443 |
| Regional Aircraft Fuel | 2,124 | 2,274 | 2,492 | 2,636 | 2,662 |
| Aircraft Rent | 1,395 | 1,601 | 1,797 | 1,913 | 2,036 |
| Other Rent and Landing fees | 1,701 | 1,761 | 1,872 | 1,974 | 2,047 |
| Aircraft Maintenance | 1,950 | 1,836 | 1,903 | 1,990 | 1,917 |
| Depreciation and Amortization | 1,140 | 1,276 | 1,416 | 1,565 | 1,704 |
| Selling Expenses | 1,417 | 1,485 | 1,567 | 1,614 | 1,620 |
| Regional Expenses | 4,183 | 4,632 | 5,281 | 5,877 | 6,210 |
| Other Operating Expenses | 4,373 | 4,446 | 4,576 | 4,779 | 4,934 |
| **Total Operating Expenses** | **37,237** | **38,249** | **40,330** | **42,378** | **43,158** |
| | | | | | |
| **Operating Income** | **3,734** | **4,739** | **5,252** | **4,941** | **4,672** |
| | | | | | |
| Net Interest Expense | (1,087) | (898) | (783) | (633) | (455) |
| Other | (47) | (25) | (94) | (74) | (79) |
| Total Other | (1,135) | (923) | (877) | (707) | (534) |
| | | | | | |
| Pretax Income | 2,600 | 3,816 | 4,375 | 4,234 | 4,138 |
| Income tax | (1) | 0 | 0 | (779) | (1,498) |
| **Net Income** | **2,599** | **3,816** | **4,375** | **3,455** | **2,640** |

Please read in conjunction with associated Notes.

---

[2]   All periods include projected revenue and cost synergies and exclude special items, one-time transition
expenses, and reorganization items

[3]   2013 forecast includes the Debtors' actual results for January 2013, seven months of forecast for the Debtors,
and four months of forecast for New AAG.

**Projected Consolidated Balance Sheets**
(unaudited); (in millions); (years ending December 31)

| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and Short Term Investments | 8,615 | 9,779 | 10,435 | 10,374 | 10,506 |
| Restricted Cash (Current) | 840 | 740 | 740 | 740 | 740 |
| Other Current Assets | 3,577 | 3,642 | 3,763 | 3,829 | 3,898 |
| Plant, Property & Equipment | 19,716 | 21,199 | 23,835 | 26,003 | 28,430 |
| Other Long-Term Assets | 4,121 | 4,497 | 4,903 | 4,325 | 2,980 |
| **Total Assets** | **36,869** | **39,857** | **43,676** | **45,272** | **46,555** |
| | | | | | |
| **LIABILITIES** | | | | | |
| Current Liabilities & Current Maturities | 12,403 | 12,894 | 14,283 | 13,368 | 13,557 |
| Long Term Debt & Capital Leases less Current Maturities | 13,207 | 11,838 | 9,743 | 8,768 | 7,221 |
| Other Liabilities | 9,440 | 9,691 | 10,006 | 10,080 | 10,062 |
| **Total Liabilities** | **35,050** | **34,423** | **34,032** | **32,216** | **30,840** |
| | | | | | |
| **SHAREHOLDERS EQUITY** | | | | | |
| **Total Shareholders' Equity** | **1,820** | **5,434** | **9,644** | **13,055** | **15,715** |
| | | | | | |
| **Total Liabilities and Shareholders' Equity** | **36,869** | **39,857** | **43,676** | **45,272** | **46,555** |

Please read in conjunction with associated Notes

6

**Projected Consolidated Statements of Cash Flows**
(unaudited); (in millions); (years ending December 31)

|  | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **Cash Flow from Operations** | | | | | |
| Net Income (Loss) ex special items & transition expenses | 2,599 | 3,816 | 4,375 | 3,455 | 2,640 |
| Depreciation | 1,321 | 1,453 | 1,582 | 1,723 | 1,861 |
| Other (including cash transition expenses) | (381) | (455) | (241) | 606 | 1,330 |
| Change in Assets and Liabilities | | | | | |
|    Air Traffic Liability | (33) | 341 | 153 | 57 | 23 |
|    Other Working Capital | 128 | 31 | 349 | 165 | 81 |
| **Net Cash Provided by Operating Activities** | **3,634** | **5,187** | **6,218** | **6,006** | **5,936** |
| | | | | | |
| **Cash Flow from Investing** | | | | | |
| Capital Expenditures, including PDPs and one-time transition capital investments | (4,364) | (3,383) | (4,274) | (3,894) | (4,879) |
| Change in Restricted Cash | 267 | 97 | (1) | (0) | (1) |
| Other | (33) | 1 | 1 | 2 | (4) |
| **Net Cash Provided by Investing Activities** | **(4,130)** | **(3,286)** | **(4,274)** | **(3,892)** | **(4,885)** |
| | | | | | |
| **Cash Flow from Financing** | | | | | |
| Payments on Long-term Debt and Capital Leases | (4,331) | (1,674) | (1,366) | (2,204) | (949) |
| Debt Proceeds | 5,418 | 298 | 0 | 0 | 0 |
| Stock Offerings | 21 | 203 | 30 | 30 | 31 |
| Other | 1,736 | 437 | 48 | (1) | (1) |
| **Net Cash Provided by Financing Activities** | **2,844** | **(736)** | **(1,289)** | **(2,175)** | **(919)** |
| | | | | | |
| **Net Increase (Decrease) in Cash** | **2,347** | **1,165** | **655** | **(61)** | **132** |
| Total Unrestricted Cash at Beginning | 6,267 | 8,615 | 9,779 | 10,435 | 10,374 |
| **Total Unrestricted Cash at End** | **8,615** | **9,779** | **10,435** | **10,374** | **10,506** |

Please read in conjunction with associated Notes.

**A. Projected Consolidated Income Statement Assumptions**

1. *Operating Revenues*

*(a) Passenger Revenue*
Passenger Revenue includes revenue associated with mainline and regional aircraft operations. Mainline Passenger Revenue includes revenue flown on aircraft operated by American Airlines and US Airways. Regional Passenger Revenue includes revenue flown on aircraft operated by wholly-owned carriers and regional affiliates.

The Debtors and New AAG project passenger revenue of $35.8 billion for 2013, an increase of 5.4% over the Debtors' results for 2012. Over the Projection Period, Passenger revenue is forecast to increase at a compound annual rate of 4.3% to a total of $42.0 billion in 2017. The increase is due to capacity growth combined with an increase in unit revenues.

The Debtors and New AAG forecast consolidated Passenger Revenue per Available Seat Mile ("**PRASM**") of 13.8¢ for 2013, an increase of 3.5% over the Debtors' results for 2012. In the Projection Period, consolidated PRASM is forecast to increase at a compound annual rate of 1.4% from 2012 to 2017, such that consolidated PRASM in 2017 is forecast to be 14.3¢.

PRASM growth is forecasted using assumptions on supply, demand, inflation, fuel prices, planned company initiatives and synergies. Demand is forecasted using region specific third party GDP forecasts as passenger traffic has historically been highly correlated with economic growth across regions. Supply is forecasted using published schedules, announced aircraft orders and expected retirements demand forecast and management estimates. Inflation is forecasted using historical industry data. Company Initiatives include the full development of various partnerships, right-sizing of aircraft (gauge), product changes and impact of changes in regulations. Network revenue synergies driven by the Merger include an improved schedule and connectivity, an improved mix of high-yield business, and the redeployment of the combined fleet to better match capacity to customer demand.

The Debtors and New AAG project consolidated ASMs of 259.4 billion for 2013, an increase of 1.9% over the Debtors' results for 2012. In the Projection Period, consolidated capacity is forecasted to increase at a compound annual rate of 2.9%, such that consolidated capacity in 2017 is projected to be 294.2 billion ASMs.

*(b) Cargo Revenue*
Cargo Revenue includes freight and mail revenues generated by the cargo space on passenger aircraft. Cargo Revenue is forecasted to grow by an average annual rate of 3.8% during the Projection Period. This is largely driven by the increases in capacity.

*(c) Other Operating Revenue*
Other Operating Revenue includes lines of businesses related to their core scheduled passenger service operation, including AAdvantage®, Dividend Miles®, Admirals Clubs®, in-flight sales (liquor, entertainment and duty-free), training services, and other ancillary fees (baggage fees, change fees, etc.). The Debtors and New AAG anticipate total Other Revenue of $4.3 billion for 2013, an increase of 10.3% from 2012. Over the Projection Period, Other Revenue is projected to increase at a compound annual rate of 4.5%, such that Other Revenue in 2017 is projected to be $4.9 billion, a $1.0 billion increase compared to the Debtors' results for 2012. These various revenues are primarily assumed to grow with passenger revenues for the Projection Period.

8

2. *Operating Expenses*

*(a) Salaries and Benefits*

Mainline labor costs are projected to be the Debtors' and New AAG's second largest expense, representing approximately 25% of 2013 mainline operating expense. During the postpetition period, the Debtors lowered salary and benefits costs through headcount and pay rate reductions and also lowered the costs of benefit programs. During the Projection Period, these expenses are forecast based on anticipated operating levels, the impact of ongoing initiatives to improve productivity, the terms of the APA,USAPA, TWU, IAM, AFA and APFA contracts and agreements, and the projected wages and benefits for management and other non-unionized employees.

*(b) Fuel Expense*

Aircraft Fuel is projected to be the Debtors' and New AAG's largest expense. The Consolidated Financial Projections assume fuel prices based on the December 3, 2012 forward fuel curve using IPE Brent and the jet fuel crack spread. Using a historical average, the Consolidated Financial Projections include $0.03 per gallon premium for an assumed regional fuel. Fuel consumption is based on the forecasted level of operations for each aircraft type.  The fuel expense forecast includes the cost of using derivative fuel contracts on a portion of the expected consumption throughout the forecast and the impact of derivatives currently [in place at AMR and US Airways]. The total average mainline fuel price for the Debtors and New AAG is assumed to be $3.15 in 2013, $3.04 in 2014, $2.94 in 2015, $2.86 in 2016 and $2.80 in 2017.

*(c) Aircraft Rent*

Aircraft rent reflects the operating expense associated with the Debtors' New AAG's aircraft financed under operating leases and sale-leasebacks. The Consolidated Financial Projections include assumptions for lease renewals at estimated market rates, returns of leased aircraft, and lease financing for a portion of new aircraft deliveries.  During the postpetition period, the Debtors significantly reduced their aircraft-related obligations by rejecting certain aircraft leases and certain mortgaged aircraft, and renegotiating aircraft obligations for certain retained aircraft.  In addition, the Debtors operate, and New AAG will operate, various aircraft under debt financing and capital lease structures. Expenses related to these aircraft are included in depreciation and interest expense.

*(d) Other Rent and Landing Fees*

The Debtors lease, and New AAG will lease, various airport and non-airport facilities for which they incur rent expense and municipal bond servicing costs. The Consolidated Financial Projections reflect anticipated savings resulting from the planned restructuring of various municipal bond obligations and the Debtors' ongoing efforts to optimize their use of real estate. The Consolidated Financial Projections include escalation rates that anticipate known airport improvement projects.

Landing fees are incurred as a function of arrivals/departures, aircraft weight and rates established by the various airports. The Consolidated Financial Projections contemplate re-fleeting and the subsequent impact on landing fees at a number of the hub airports.

Other Rent and Landing Fees are forecasted to increase at an average annual rate of 4.6% in the Projection Period, which is mainly due to projected rate increases at hub airports due to the Debtors' undertaking of large capital projects at a number of hub airports.

*(e) Aircraft Maintenance*

Aircraft maintenance includes all insourced and outsourced mainline maintenance costs such as engine overhauls, airframe heavy check overhauls, engineering orders, repairs and materials.  It does not include internal labor.  Aircraft maintenance is forecasted to increase at an average annual rate of 1.2% during the

Projection Period. The projections include the benefit of replacing aging aircraft with new deliveries during the Projection Period as well as savings from restructuring vendor contracts.

*(f) Depreciation and Amortization*
The Consolidated Financial Projections include depreciation and amortization using the straight-line method over the estimated useful life of the property and equipment, primarily related to flight equipment. The useful life varies between three and 30 years depending on the fixed asset. In addition, the Debtors have, and New AAG will have, a variety of intangible assets for which they recognize amortization expense. The amortization expense attributable to these intangibles is also included in the Consolidated Financial Projections.

*(g) Selling Expenses*
Selling Expenses consist of booking fees, credit card fees, and travel agency commissions expense. These expenses tend to vary with revenue and passenger counts. Selling Expenses are forecasted to grow at an average annual rate of 3.4% in the Projection Period, which is consistent with the growth in revenues and passengers over the same period.

*(h) Regional Expenses*
Regional Expenses include all expenses associated with regional operations, whether wholly owned or capacity purchase agreements. Regional expenses, from both wholly owned and capacity purchase agreements are projected using the Debtors' existing contract rates and estimated contractual rate increases along with the forecasted level of operations.

*(i) Other Expenses*
Other Expenses are primarily comprised of outside services, communications, utilities, insurance, travel, and supplies. These expenses generally fluctuate with the size of the related activities and inflation. However, as a result of the Debtors' new ability to outsource maintenance, aggregate Other Expenses increases throughout the Projection Period.

*(j) Non-Operating Expenses*
Interest expense through the Projection Period is increased by the addition of debt from new aircraft purchases and reduced by scheduled principal payments on Long-Term Debt. Interest income and interest expense use the LIBOR forward curve to drive forecasted variable interest rates.

*(k) Income Taxes*
The Debtors and New AAG assume a statutory tax rate of approximately 36.7% throughout the Projection Period. Additionally, the Debtors and New AAG assume the valuation allowance recorded on deferred tax assets will be realized as Book income tax expense is generated based on projected Book Income during the Projection Period. New AAG expects to utilize federal net operating losses ("**NOLs**"), subject to statutory limitations, to offset substantially all of the Reorganized Debtors anticipated federal taxable income during the Projection Period. The utilization of federal NOLs will significantly reduce New AAG's cash burden with respect to the payment of income taxes. Application of alternative minimum tax requirements results in minor cash tax payments during the Projection Period.

**B. Notes to Projected Consolidated Balance Sheet Assumptions**

*1. Current Liabilities*
Current Liabilities is comprised of receivables, inventories (flight, maintenance, fuel, operating supplies), prepaid assets, accounts payable, advanced ticket sales (air traffic liability), and other accrued liabilities. Working capital balances are forecasted according to their historical relationships to revenue and expenses associated with the level of flying.

2. *Long-Term Debt*

The Debtors anticipate emerging from bankruptcy with approximately $14.0 billion in secured debt and capital leases remaining on the balance sheet.  The majority of this debt is collateralized by mainline and regional aircraft.  Additionally, the sum includes remaining facility bonds and capital leases.

3. *New Common Stock*

For purposes of the Consolidated Financial Projections, no value has been ascribed to the common equity of New AAG. To the extent the Debtors engage in any equity capital transactions, the proceeds would be incremental to any value ultimately ascribed to New AAG's common equity.

**C. Notes to Projected Consolidated Cash Flow Assumptions**

1. *Cash From Operating Activities*

The Debtors and New AAG project they will generate positive cash flow from operations throughout the Projection Period. Cash flow from operating activities is projected to increase from an estimated $2.3 billion cash inflow in 2012 to $6.2 billion cash inflow by 2015, before trending down to $5.9 billion in 2017.  The aggregate cash produced from operating activities during the Projection Period is nearly $27 billion. Improved cash flow is a result of, among other things, the projected growth in revenue throughout the Projection Period, coupled with reductions in salaries and related costs, reductions in aircraft rents, concessions from vendors and various other cost reduction initiatives implemented by the Debtors during the Chapter 11 restructuring.

2. *Cash From Investing Activities*

Net cash flow from investing activities is projected to use $20.5 billion over the Projection Period. The reflects non-aircraft capital expenditures of between $0.6 billion and $1.1 billion per year in 2013 to 2017 to sustain existing infrastructure, implement planned product improvements and support growth and $16.7 billion in aircraft capital expenditures.

3. *Cash Flow From Financing Activities*

The Consolidated Financial Projections anticipate the use of $10.5 billion during the Projection Period to meet required principal payments related to debt secured by aircraft and capital leases.  This sum is offset by $2.1 billion in sale lease back proceeds, $4.7 billion in long-term debt proceeds and $1.0 billion raised by the Latin Slots, Gates and Routes transaction.

**D. Financial Metrics**

|  | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **EBITDAR** [4] | **6,450** | **7,793** | **8,631** | **8,577** | **8,569** |
| **Adjusted Net Debt**[5] | | | | | |
| Total Debt & Capital Leases | 14,510 | 13,195 | 11,866 | 9,688 | 8,157 |
| Off Balance Sheet Debt | 407 | 303 | 301 | 298 | 295 |
| Capitalized Aircraft Operating Leases | 9,765 | 11,206 | 12,582 | 13,388 | 14,252 |
| Available Cash | (8,615) | (9,779) | (10,435) | (10,374) | (10,506) |
| **Adjusted Net Debt** | **16,066** | **14,925** | **14,314** | **12,999** | **12,198** |

---

[4]    EBITDAR is a non-GAAP financial measure defined as earnings before interest, taxes, depreciation, amortization, and mainline aircraft rent expense. EBITDAR excludes projected merger related costs incurred by the Debtors in connection with the Chapter 11 Cases, special items and one-time transition expenses of $371 million in 2013, $326 million in 2014, $173 million in 2015, and $50 million in 2016.

[5]    Adjusted net debt is a non-GAAP financial measure defined as total indebtedness less available unrestricted cash. Adjusted net debt includes capitalized rent based on mainline rent expense only, and other off balance sheet debt.

12