UNITED STATES BANKRUPTCY COURT             **Hearing Date: June 4, 2013**
SOUTHERN DISTRICT OF NEW YORK              **Hearing Time: 10:00 a.m.**
------------------------------------------------------x
                                          :
In re                                     :          Chapter 11
                                          :          Case No. 11-15463 (SHL)
AMR CORPORATION, et al.,                  :
                                          :          (Jointly Administered)
                          Debtors.        :
                                          :
------------------------------------------------------x


**OBJECTION OF THE UNITED STATES TRUSTEE TO
DEBTORS' MOTION FOR AN ORDER (I) APPROVING DISCLOSURE
STATEMENT; (II) ESTABLISHING A RECORD DATE; (III) ESTABLISHING
NOTICE AND OBJECTION PROCEDURES FOR CONFIRMATION
OF THE PLAN; (IV) APPROVING SOLICITATION PACKAGES
AND PROCEDURES FOR DISTRIBUTION THEREOF; (V) APPROVING
THE FORMS OF BALLOTS AND ESTABLISHING PROCEDURES FOR
VOTING ON THE PLAN; AND (VI) APPROVING THE FORM OF
<u>NOTICE TO NON-VOTING CLASSES UNDER THE PLAN</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

I.     INTRODUCTION ...............................................................................................1

II.    FACTS ................................................................................................................2
       A.    Background ..............................................................................................2
       B.    The "No Objection Provisions" of the Labor Agreements .....................3
       C.    The Merger...............................................................................................3
       D.    The Chapter 11 Pan .................................................................................6

III.   OBJECTIONS.....................................................................................................6
       A.    The Governing Law .................................................................................6
       B.    The Disclosure Statement Should Not Be Approved Because the
             Plan Is Not Confirmable ..........................................................................8
             1.    The Plan's Award of an Automatic Administrative Expense
                   to Committee Members and Indenture Trustees Violates
                   11 U.S.C. § 503.............................................................................9
                   a.   Violation of 11 U.S.C. § 503(b)(3) and (5)...........................9
                   b.   Violation of 11 U.S.C. § 503(b)(3)(F) and (b)(4)................11
                   c.   The Proposed Severance Payment to Mr. Horton Violates
                        11 U.S.C. § 503(c) ...............................................................13
             2.    Under the Supreme Court's Decision in RadLAX, the Debtors Cannot
                   Circumvent 11 U.S.C. § 503(b) and (c) by Relying on More
                   Generalized Provisions of the Bankruptcy Code .........................14
       C.    The Disclosure Statement Does Not Provide Adequate Information ...................16
             1.    The Disclosure Statement Should Be Amended to Provide Adequate
                   Information Concerning the 9019 Settlement...................................16
             2.    The Disclosure Statement Should Be Amended to Provide Adequate
                   Information Concerning the Bases for the Proposed Substantive
                   Consolidation of the Debtors .........................................................16
             3.    The Disclosure Statement Should Be Amended to Provide Adequate
                   Information Concerning (I) the Proposed Severance Payment to
                   Mr. Horton Under the Chairman Letter Agreement, (II) Severance to
                   Other Named Executive Officers and (III) the Discrepancy Between
                   the Plan and SEC Form S-4 ..........................................................17
             4.    The Disclosure Statement Should Be Amended to Provide Adequate
                   Information Concerning the No Objection Provisions in the Labor
                   Agreements ....................................................................................20
             5.    The Disclosure Statement Should Be Amended to Provide Adequate
                   Information Concerning the Proposed Non-Debtor Third-Party
                   Releases, Exculpations, Limitations of Liability and Injunctions ...................22

6.   The Disclosure Statement Should Be Amended to Provide Adequate
Information Concerning the Debtors' Obligation to Pay UST Fees
Through the Entry of a Final Decree, Dismissal or Conversion of Each
Debtor's Chapter 11 Case ...............................................................................26

IV.   OBJECTIONS TO CONFIRMATION ............................................................................27

V.   CONCLUSION....................................................................................................................27

# TABLE OF AUTHORITIES

**Cases**

In re Adelphia Commc'ns Corp., 441 B.R. 6 (Bankr. S.D.N.Y. 2010) ................................ *passim*

In re American Capital Equip., LLC, 688 F.3d 145, 156 (3d Cir. 2012)................................6

In re AMR Corp., ___ B.R. ___, 2013 WL 1749923 (Bankr. S.D.N.Y. Apr. 11, 2013)..............5, 6

In re Augie/Restivo Baking Company, Ltd., 860 F.2d 515 (2d Cir. 1988) ........................16

In re Best Prods. Co., 173 B.R. 862 (Bankr. S.D.N.Y. 1994)........................................10

In re Bethlehem Steel Corp., 479 F.3d 167 (2d Cir. 2007)...........................................10

In re Citadel Broadcasting Corp., No. 09-17442 (BRL), 2010 WL 2010808
    (Bankr. S.D.N.Y. May 19, 2010).................................................................26

In re Copy Crafters Quickprint, Inc., 92 B.R. 973 (Bankr. N.D.N.Y. 1988)..............................7, 8

In re Crowthers McCall Pattern, Inc., 120 B.R. 279 (Bankr. S.D.N.Y. 1990) ..............................8

In re Dana Corp., 351 B.R. 96 (Bankr. S.D.N.Y. 2006)..................................................13

In re DBSD North America, Inc., 419 B.R. 179 (Bankr. S.D.N.Y. 2009)............................22, 23

In re Dreier LLP, 429 B.R. 112 (Bankr. S.D.N.Y. 2010) ..........................................24, 25

In re Duratech Indus., 241 B.R. 291 (Bankr. E.D.N.Y. 1999).............................................8

In re Duratech Indus., 241 B.R. 283 (E.D.N.Y. 1999) ..................................................8

In re Granite Partners, L.P., 213 B.R. 440 (Bankr. S.D.N.Y. 1997)......................................10

In re GSC, Inc., 453 B.R. 132 (Bankr. S.D.N.Y. 2011)..................................................7, 9

In re Ferretti, 128 B.R. 16 (Bankr. D.N.H. 1991).......................................................8

In re Flight Transp. Corp. Secs. Litigation, 874 F.2d 576 (8th Cir. 1989) ................................10

In re Hooker Invs., Inc., 188 B.R. 117 (S.D.N.Y. 1995)..................................................10

In re Johns-Manville Corp., 517 F.3d 52 (2d Cir. 2008) ..........................................22, 25

In re Johns-Manville Corp., 557 U.S. 137 (2009) ................................................22, 23

In re Johns-Manville Corp., 600 F.3d 135 (2d Cir. 2010) ....................................22, 23, 25

In re Journal Register Co., 407 B.R. 520 (Bankr. S.D.N.Y. 2009).......................................15

In re Karta Corp., 342 B.R. 45 (S.D.N.Y. 2006) .......................................................24

In re Lehman Brothers Holdings Inc., 487 B.R. 181 (Bankr. S.D.N.Y. 2013)........................12, 15

In re Madison Ave. Ltd. P'ship, 213 B.R. 888 (Bankr. S.D.N.Y. 1997).......................................12

In re McLean Indus., Inc., 87 B.R. 830 (Bankr. S.D.N.Y. 1987) .........................................7

In re Metcalfe & Mansfield Alternative Invs., 421 B.R. 685 (Bankr. S.D.N.Y. 2010) ................25

In re Motors Liquidation Co., 477 B.R. 198 (Bankr. S.D.N.Y. 2011).......................................24

In re Oneida Ltd., 351 B.R. 79 (Bankr. S.D.N.Y. 2006) ................................................24

In re Quigley Co., 377 B.R. 110 (Bankr. S.D.N.Y. 2007)...............................................6, 7

In re Spiegel, Inc., No. 03-11540 (BRL), 2006 WL 2577825
    (Bankr. S.D.N.Y. Aug. 16, 2006) ...............................................................24

In re TCI 2 Holdings, LLC, et. al., 428 B.R. 117 (Bankr. D.N.J. 2010)...........................13, 14, 15

In re Washington Mutual, Inc., 442 B.R. 314 (Bankr. D. Del. 2011)......................................25

In re XO Commc'ns, Inc., 330 B.R. 394 (Bankr. S.D.N.Y. 2005)...........................................24

Century Glove, Inc. v. First American Bank of New York, 860 F.2d 94 (3d Cir. 1988) ...............8

Deutsche Bank AG v. Metromedia Fiber Network, Inc.
    (In re Metromedia Fiber Network, Inc.), 416 F. 3d 136 (2d Cir. 2005). ...........................23

Kunica v. St. Jean Fin., Inc., 233 B.R. 46 (S.D.N.Y. 1999) .........................................7

Lebron v. Mechem Financial, Inc., 27 F.3d 937, 946 (3rd Cir. 1994)..........................................10

Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.),
    25 F.3d 1132 (2d Cir. 1994); ...............................................................................7
RadLAX Gateway Hotel LLC v. Amalgamated Bank, 132 S. Ct. 2065 (2012).....................14, 15
Schwartz v. Aquatic Dev. Group, Inc. (In re Aquatic Dev. Group, Inc.),
    352 F.2d 671 (2d Cir. 2003)..............................................................................26
SEC v. Drexel Burnham Lambert Group, Inc.
    (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285 (2d Cir. 1992)....................23
United States Trustee v. Boulders on the River, Inc. (In re Boulders on the River, Inc.),
    218 B.R. 528 (D. Or. 1997) ..............................................................................26

## Statutes & Rules

8 Del. C. § 144(a)............................................................................................17
11 U.S.C. § 503(b) ................................................................................. *passim*
11 U.S.C. § 503(c) ................................................................................. *passim*
11 U.S.C. § 1123(a)(1)....................................................................................26
11 U.S.C. § 1125(a) ................................................................................ *passim*
11 U.S.C. § 1129(a) ................................................................................ *passim*
28 U.S.C. § 1930............................................................................................26
31 U.S.C. § 3717............................................................................................26

## Other Authorities

4 Collier on Bankruptcy ¶ 503.11[6] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).........11
H.R. Rep. No. 103-835 at 39 (1994); *reprinted in* 1994 U.S.C.C.A.N. 3340, 3348 ...............11, 12

TO:    THE HONORABLE SEAN H. LANE,
       UNITED STATES BANKRUPTCY JUDGE:

Tracy Hope Davis, the United States Trustee for Region 2 (the "United States Trustee" or

"UST"), respectfully submits this objection (the "Objection")[1] to the motion (the "Motion") of

AMR Corporation ("AMR") and its affiliated debtors (collectively, the "Debtors"), pursuant to

sections 105, 502, 1125, 1126 and 1128 of title 11, United States Code (the "Bankruptcy Code"),

for approval of the disclosure statement (the "Disclosure Statement") that describes the joint

chapter 11 plan of AMR and its affiliated Debtors dated April 15, 2013 (the "Plan").[2] See ECF

Doc. Nos. 7631, 7632 and 7633.  In support hereof, the United States Trustee respectfully states:

## I.  INTRODUCTION

The United States Trustee objects to the approval of the Disclosure Statement on two

grounds.  First, the Disclosure Statement cannot be approved because it is based on a Plan that

cannot meet the requirements of section 1129(a)(1) and as such, cannot be  confirmed.

Specifically, the Plan requires impermissible payments to be made for the reimbursement of

legal expenses of certain key creditors and to the Debtors' Chief Executive Officer, which

payments are either expressly prohibited by the Bankruptcy Code or permitted only if the

requirements of section 503(b) and/or 503(c) have been met.  Unless these provisions are

removed from the Plan, the Plan is not confirmable and neither the Plan nor the Disclosure

Statement may be approved.

Second, even if the Court declines to find that the Plan as proposed cannot be confirmed,

the United States Trustee objects to the approval of the Disclosure Statement because it does not

---

[1] The United States Trustee has been, and will continue, to meet with the Debtors in an attempt to narrow and resolve her Objection.
[2] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Disclosure Statement and Plan.

1

provide adequate information concerning the Plan.  As set forth below, the Debtors should be

required to provide further disclosure concerning:

- o the 9019 Settlement;

- o the legal and factual bases for the proposed substantive consolidation of the Debtors;

- o the approval process utilized by the Board of Directors and independent directors in connection with the proposed severance payments to Mr. Horton pursuant to the Chairman Letter Agreement;

- o the proposed severance agreements with "named executive officers" and whether these officers are insiders for purposes of Section 503(c);

- o the reasons for the discrepancy between the Plan and SEC Form S-4;

- o the justification for the proposed non-debtor third-party releases, exculpation provisions, limitations of liability and injunction; and

- o the Debtors' obligation to pay UST Fees through entry of a final decree, dismissal or conversion of each Debtor's Chapter 11 case.

Absent amendment of the Disclosure Statement and the Plan as set forth herein, the Disclosure

Statement fails to meet the requirements of section 1125 of the Bankruptcy Code and the Motion

should be denied.

## II.  FACTS

**A.**    **Background**

1.    On November 29, 2011, AMR Corporation ("AMR") and certain of its direct and

indirect subsidiaries (each a "Debtor" and collectively, the "Debtors") each filed petitions for

relief under chapter 11 of the Bankruptcy Code.  ECF Doc. No. 1.

2.    By Order dated November 29, 2011, the Debtors' cases are being jointly

administered.  ECF Doc. No. 46.

3.    On December 5, 2011, the United States Trustee appointed the Official

Committee of Unsecured Creditors (the "Creditors' Committee").  ECF Doc. No. 128.

4.      No trustee or examiner has been appointed in these cases.

5.      The Debtors continue to operate their respective businesses and manage their

properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.

**B.      The "No Objection Provisions" of the Labor Agreements**

6.      Beginning on August 22, 2012, the Debtors filed a series of motions seeking

approval of agreements (the "Labor Agreements") with two key labor unions: the Transport

Workers Union of America ("TWU") and the Association of Professional Flight Attendants (the

"APFA").  ECF Doc. Nos. 4131, 4161.  Each of the Labor Agreements incorporates the terms of

a Settlement Letter (collectively referred to as the "Union Settlement Letters").  One of the terms

contained in each of the Union Settlement Letters prohibits the signatory union from raising

objections before this Court to the compensation of the Debtors' management employees (the

"No Objection Provision").  For example, the APFA Settlement Letter provides:

> 9.      **Issuance of equity.**  Subject to the foregoing, APFA agrees not to object to or
> contest the issuance of equity or other consideration in the Bankruptcy Cases to the
> Company's non-union and management employees in respect of the sacrifices made by
> them in furtherance of the Company's effort to restructure or as incentive for the non-
> union and management employees' future service to the Company.

ECF Doc. No. 4161 at Exhibit C.  A substantially identical provision appears in the TWU

Settlement Letter.   ECF Doc. No. 4131 at Exhibit D.

9.      Each of the Labor Agreements was subsequently approved by the Court.    ECF

Doc. Nos. 4413, 4414.

**C.      The Merger**

10.      On February 22, 2013, the Debtors filed a motion (the "Merger Motion") seeking

the Court's approval of the merger (the "Merger") of AMR, AMR Merger Sub, Inc. ("Merger

Sub") and US Airways Group, Inc. ("US Airways").  ECF Doc. No. 6800.  The Merger Motion

provided that upon the confirmation and consummation of a chapter 11 plan of reorganization,

Merger Sub, a wholly owned subsidiary of AMR formed for the purpose of effecting the Merger,

will be merged with US Airways, with US Airways continuing as the surviving entity as a direct,

wholly owned subsidiary of AMR.  See Merger Motion at ¶ 1.  Upon the effective date of the

Merger, AMR will be named "American Airlines Group Inc." and the combined company will

operate under the "American Airlines" name.  Id. at ¶ 31.  The closing of the Merger and the

effectiveness of the Plan are to occur simultaneously.  Id.

11.     Among other relief, the Merger Motion sought the Court's approval of certain

employee compensation and benefit arrangements falling into three categories: (i) Ordinary

Course Changes which were to become effective prior to the Merger Closing, (ii) Employee

Arrangements and (iii) severance compensation of approximately $20 million in cash and stock

to Thomas Horton, the Debtors' CEO, pursuant to the Chairman Letter Agreement dated

February 13, 2013 (the "Chairman Letter Agreement"), which was attached as Exhibit G to the

Merger Agreement.  Id. at ¶¶ 33, 76, 86, 89 and Exhibit G.

12.     More specifically, the Chairman Letter Agreement provides, among other things,

that upon the Merger Closing, Mr. Horton's employment as the Chief Executive Officer of AMR

will terminate and he will be appointed as the Chairman of the Board of Directors for Newco

(defined as "New AAG" in the Disclosure Statement).  Id. at Exhibit G; Disclosure Statement at

III.D.5(g)(iii).  It further states that at the Merger Closing, Mr. Horton will be paid (i) "severance

compensation" of $19,875,000, which will be paid 50% in cash and 50% in New AAG common

stock (the "Proposed Severance Payment"); (ii) full vesting of all accrued benefits under the

Supplemental Executive Retirement Plan for Officers of American Airlines, Inc. ("SERP"); (iii)

lifetime flight and other travel benefits for his spouse and other survivor benefits; and (iv)

reimbursement of all legal fees associated with the above benefits.  Id.

13.     It is a condition precedent to the effectiveness of the Merger Agreement and Plan

that the Chairman Letter Agreement and the proposed payments and benefits thereunder be

approved by the Court.  Id.

14.     The United States Trustee objected to the Merger Motion on the grounds that the

Debtors (i) failed to meet their burden of proof that the Ordinary Course Changes and the

Employee Arrangements satisfied Bankruptcy Code section 503(c) and that (ii) the Proposed

Severance Payment to Mr. Horton violated section 503(c)(2).  ECF Doc. No. 7138.

15.     In response, the Debtors filed three declarations in support of the proposed

compensation arrangements.  ECF Doc. Nos. 7229, 7230, 7231.   The United States Trustee

subsequently filed a Sur-Reply in which she withdrew her objections to the first category of

Ordinary Course Changes and to all but four of the Employee Arrangements.  ECF Doc. No.

7262.

16.     A hearing on the Merger Motion was held on March 27, 2013 (the "Merger

Hearing").  At the Merger Hearing, counsel to the Debtors and to the Creditors Committee

described the terms of the Employee Arrangements and confirmed by proffer that the purpose of

the Employee Arrangements was to move towards compensation parity between the employees

of the Debtors and US Airways.  See In re AMR Corp., ___ B.R. ___, 2013 WL 1749923, *2

(Bankr. S.D.N.Y. Apr. 11, 2013).  ECF Doc. No. 7637.   On that basis, the United States Trustee

withdrew her objection to the Employee Arrangements subject to the Court's determination that

they did not violate section 503(c) of the Bankruptcy Code.

5

17.     The United States Trustee's sole remaining objection was to the Proposed

Severance Payment.   At the conclusion of the Merger Hearing, the Court approved the Merger,

except for Mr. Horton's severance, and informed the parties that it would render a decision to

address that issue.

18.     On April 11, 2013, the Court rendered a <u>Memorandum of Decision</u>, in which the

Court found that section 503(c) prohibited the authorization of the $20 million severance

payment to Mr. Horton.  <u>Id</u>. at *9.  The Court also rejected the Debtors' contention that the Court

could authorize the severance payment under section 363 of the Bankruptcy Code.[3]  <u>Id</u>.

19.     By Order dated May 10, 2013, the Court approved the Merger.  ECF Doc. No.

8096.

**D.     The Chapter 11 Plan**

20.     On April 15, 2013, the Debtors filed the proposed Joint Chapter 11 Plan of AMR

and its affiliated Debtors and related Disclosure Statement.  ECF Doc. No. 7631, 7632.

### III.  OBJECTION

**A.     The Governing Law**

Section 1125 of the Bankruptcy Code provides that a disclosure statement must contain

"adequate information" describing a confirmable plan.  11 U.S.C. § 1125; <u>see also</u> <u>In re Quigley

Co.</u>, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007).  The Court may consider the confirmability of a

plan at the disclosure statement stage.  <u>See</u> <u>In re American Capital Equip., LLC</u>, 688 F.3d 145,

156 (3d Cir. 2012) (holding that a bankruptcy court may address the issue of plan confirmation

where it is obvious at the disclosure statement stage that a later confirmation hearing would be

futile because the plan described by the disclosure statement is patently unconfirmable).  If the

---

[3] The Court did not rule on whether the Debtors could invoke section 1129(a)(4) as a basis to justify a post-
emergence payment to Mr. Horton.  <u>Id</u>. at n.16.

plan is patently unconfirmable on its face, the application to approve the disclosure statement

must be denied.  See In re GSC, Inc., 453 B.R. 132, 157, n.27 (Bankr. S.D.N.Y. 2011)(an

unconfirmable plan is grounds for rejection of the disclosure statement; a disclosure statement

that describes a plan patently unconfirmable on its face should not be approved) (citing Quigley,

377 B.R. at 115).

> The Bankruptcy Code defines "adequate information" as:
>
> Information of a kind, and in sufficient detail, as far as is reasonably practicable in
> light of the nature and history of the debtor and the condition of the debtor's
> books and records, including a discussion of the potential material Federal tax
> consequences of the plan to the debtor, any successor to the debtor, and a
> hypothetical investor typical of the holders of claims or interests in the case, that
> would enable such a hypothetical reasonable investor of the relevant class to make
> an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1); see also Momentum Mfg. Corp. v. Employee Creditors Comm. (In re

Momentum Mfg. Corp.), 25 F.3d 1132, 1136 (2d Cir. 1994); In re Adelphia Commc'ns Corp.,

352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006); Kunica v. St. Jean Fin., Inc., 233 B.R. 46, 54

(S.D.N.Y. 1999).

To be approved, a disclosure statement must include sufficient information to apprise

creditors of the risks and financial consequences of the proposed plan.  See In re McLean Indus.,

Inc., 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) ("substantial financial information with respect to

the ramifications of any proposed plan will have to be provided to, and digested by, the creditors

and other parties in interest in order to arrive at an informed decision concerning the acceptance

or rejection of a proposed plan"). Although the adequacy of the disclosure is determined on a

case-by-case basis, the disclosure must "contain simple and clear language delineating the

consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy Code]

alternatives . . . ."  In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 981 (Bankr. N.D.N.Y.

1988).

Section 1125 of the Bankruptcy Code is biased towards more disclosure rather than less.

See In re Crowthers McCall Pattern, Inc., 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990).  The

"adequate information" requirement merely establishes a floor, and not a ceiling for disclosure to

voting creditors.  Adelphia, 352 B.R. at 596 (citing Century Glove, Inc. v. First American Bank

of New York, 860 F.2d 94, 100 (3d Cir. 1988)).  Once the "adequate disclosure" floor is

satisfied, additional information can go into a disclosure statement too, at least so long as the

additional information is accurate and its inclusion is not misleading.  Adelphia, 352 B.R. at 596.

The purpose of the disclosure statement is to give creditors enough information so that they can

make an informed choice of whether to approve or reject the debtor's plan.  In re Duratech

Indus., 241 B.R. 291, 298 (Bankr. E.D.N.Y. 1999), aff'd, 241 B.R. 283 (E.D.N.Y. 1999).  The

disclosure statement must inform the average creditor what it is going to get and when, and what

contingencies there are that might intervene.  In re Ferretti, 128 B.R. 16, 19 (Bankr. D.N.H.

1991).  For the reasons set forth below, the Disclosure Statement does not provide sufficient

disclosures appropriate to the circumstances of these cases.

**B.      The Disclosure Statement Should Not Be Approved Because the Plan Is Not
          Confirmable**

In order for the Court to confirm the Debtors' Plan, it must make a finding that, among

other things, the Plan "complies with the applicable provisions" of the Bankruptcy Code.  11

U.S.C. § 1129(a)(1).  Under the current form of the Plan, no such finding is possible.  Two

provisions of the Plan, as currently drafted, render it patently unconfirmable: Articles 2.4 and

6.23, which purport to reimburse the attorney fees of certain creditors in violation of section

503(b); and Article 6.24, which requires approval of the Chairman Letter Agreement in violation

8

of section 503(c).  Because each of these provisions prevents confirmation of the Plan, the

Disclosure Statement may not be approved until and unless they are removed.  See GSC, 453

B.R. at 157, n.27.

>    1.    *The Plan's Award of an Automatic Administrative Expense to Committee*
>          *Members and Indenture Trustees Violates 11 U.S.C. § 503*

The Disclosure Statement provides that under the Plan, the Debtors intend to pay the

reasonable professional fees and expenses, including attorney fees, of (i) the indenture trustees

(to the extent payable pursuant to the terms of the applicable Bond Documents) and (ii) the

individual members of the Creditors' Committee (including professional fees in an amount to be

agreed upon by the Debtors and Creditors' Committee), in each case incurred in their capacities

as indenture trustee or members of the Creditors' Committee, and without any review by the

Bankruptcy Court.  Disclosure Statement at IV.D and IV.E.24; Plan at Art. 2.4 and 6.23.  The

Debtors propose to pay these fees as Allowed Administrative Expenses, which means that for the

Plan to be confirmed, they must be paid in cash, in full on the Effective Date.  11 U.S.C. §

1129(a)(9)(A).

These provisions conflict with the statutory standards and procedures for payment of

administrative expenses set forth by the Bankruptcy Code for at least two reasons.  First, they

authorize certain creditors to be paid administrative expenses without meeting their evidentiary

burden for payment under section 503.  Second, they authorize payment for the individual

attorney fees of Creditors' Committee members -- which the Debtors are prohibited from

reimbursing.

>    *(a) Violation of 11 U.S.C. § 503(b)(3) and (5)*

Section 503(b)(3) of the Bankruptcy Code authorizes the Court to allow, as an

administrative expense, "the actual, necessary expenses," incurred by a creditor or indenture

trustee who has made a "substantial contribution" in a Chapter 11 case. 11 U.S.C. §
503(b)(3)(D). In addition, section 503(b)(5) authorizes compensation "for services rendered by
an indenture trustee in making a substantial contribution." 11 U.S.C. § 503(b)(5). Importantly,
neither of these provisions authorizes creditors or indenture trustees to be compensated
automatically, but in both cases requires them to meet an evidentiary burden of establishing a
"substantial contribution." In re Bethlehem Steel Corp., 479 F.3d 167, 172 (2d Cir. 2007) ("the
burden of proving entitlement to priority payment as an administrative expense . . . rests with the
party requesting it").

    That burden is "particularly difficult." In re Hooker Invs., Inc., 188 B.R. 117, 120
(S.D.N.Y. 1995). Among other things, the creditor or indenture trustee must demonstrate that its
actions were "extraordinary" and resulted in a "direct, significant, and demonstrably positive
benefit upon the estate." In re Best Prods. Co., Inc., 173 B.R. 862, 865-66 (Bankr. S.D.N.Y.
1994). The mere act of participating in a successful reorganization process does not constitute a
substantial contribution, see In re Granite Partners, Inc., 213 B.R. 440, 449 (Bankr. S.D.N.Y.
1997), and a creditor is not entitled to compensation simply for performing its fiduciary duties.
See In re Flight Transp. Corp. Secs. Litigation, 874 F.2d 576, 581 (8th Cir. 1989) (denying
application of indenture trustee and holding that section 503(b) "must require something more
than satisfactory performance of fiduciary duties"). Finally, "efforts undertaken by creditors
solely to further their self-interest are not compensable under section 503(b)," Best Prods., 173
B.R. at 866, and a creditor will not be entitled to a substantial contribution award unless it rebuts
the presumption that its activities were primarily undertaken for its own private benefit. See
Hooker Invs., 188 B.R. at 120 (noting that creditors are presumed to act primarily in their own
interests); Lebron v. Mechem Financial, Inc., 27 F.3d 937, 946 (3rd Cir. 1994) (same).

10

Here, the proposed Plan violates section 503(b)(3) and (5) because it does not require the indenture trustees or Creditors' Committee members to establish a substantial contribution in order to be paid.  Rather, payment to these creditors will apparently be automatic, provided only that they are "reasonable," and they will not be required to meet any part of their evidentiary burden.  The Disclosure Statement does not identify any statutory or legal principle that permits the Debtors to ignore section 503(b).

*(b) Violation of 11 U.S.C. § 503(b)(3)(F) and (b)(4)*

As for members of the Creditors' Committee, while an individual member of the Creditors' Committee is entitled to an administrative expense claim for expenses incurred in the performance of committee duties (i.e., expenses for travel, lodging and meals), they may not be reimbursed for professional fees incurred in connection with committee service.  See 11 U.S.C. § 503(b)(4); 4 Collier on Bankruptcy ¶ 503.11[6] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).  Therefore, by providing for the payment of Creditor Committee member professional fees, the Plan violates section 503(b)(3)(F) and (b)(4) of the Bankruptcy Code.

The legislative history of section 503(b) and applicable case law, while limited, provides insight regarding Congress's intent regarding the administrative claim status for professional fees incurred by committee members as a result of serving on an official committee of unsecured creditors.  By way of background, Paragraph (F) was added to section 503(b)(3) by the Bankruptcy Reform Act of 1994.  The legislative history is instructive as to what should be included as a reimbursable expense, and makes clear that professional fees and expenses are not intended to be reimbursable under this section:

> The current Bankruptcy Code is silent regarding whether members of official committees appointed in Chapter 11 cases are entitled to reimbursement of out-of-pocket expenses (such as travel and lodging), and the courts have split on the question of allowing reimbursement.  This section of the bill amends

> section 503(b) of the Bankruptcy Code to specifically permit members of the Chapter 11 committees to receive court-approved reimbursement of their actual and necessary expenses. <u>The new provision would not allow the payment of compensation for services rendered by or to committee members</u>.

H.R. REP. NO. 103-835 at 39 (1994); *reprinted in* 1994 U.S.C.C.A.N. 3340, 3348 (footnote omitted) (emphasis added).

Any doubt that may have remained following the 1994 enactment of section 503(b)(3)(F) was clarified by the 2005 amendment to section 503(b)(4) enacted through the Bankruptcy Abuse Prevention and Consumer Protection Act. The 2005 amendment to section 503(b)(4) expressly excluded compensation of professionals for an entity whose expenses are reimbursable under subsection 503(b)(3)(F).

Here, the Plan purports to award the Creditors' Committee members their legal fees in their entirety—without regard to whether those fees were incurred in connection with or independently from their committee service. Although <u>In re Adelphia Commc'ns Corp.</u>, 441 B.R. 6 (Bankr. S.D.N.Y. 2010) and <u>In re Lehman Bros. Holdings Inc.</u>, 487 B.R. 181 (Bankr. S.D.N.Y. 2013), <u>appeal docketed</u>, 13-cv-02211-RJS (S.D.N.Y. Apr. 3, 2013) have held otherwise,[4] those decisions were wrongly decided, and are not binding upon this Court. <u>In re Madison Ave. Ltd. P'ship</u>, 213 B.R. 888, 890, n.2 (Bankr. S.D.N.Y. 1997). In sum, for the reasons stated above, the Plan conflicts with the express limitations of section 503(b)(4), and cannot be confirmed.

---

[4] In <u>Adelphia</u>, the court found that the reasonable professional fees of unsecured creditors that were incorporated as part of a global settlement and embodied in confirmed Chapter 11 plans could be paid absent a substantial contribution. In <u>Lehman</u>, the court found that although members of a creditors' committee might have been unable to obtain reimbursement under section 503(b) for legal fees incurred in connection with their service on committee, these expenses were permissible under section 1129(a)(4) if contained in a provision in a confirmed plan.

12

(c) *The Proposed Severance Payment to Mr. Horton Violates*
*11 U.S.C. § 503(c)*

One of the conditions of Plan Confirmation is that the Court must approve the Chairman

Letter Agreement, which specifically includes "severance compensation" to Mr. Horton in the

sum of approximately $20 million.  As the United States Trustee previously argued in connection

with her objection to the Merger Motion, and as the Court previously concluded, this payment

violates the Bankruptcy Code because it does not comply with the requirements for a permissible

insider severance payment under 11 U.S.C. § 503(c)(2).  ECF Doc. No. 7138.  That section

provides, in relevant part, that "there shall neither be allowed, nor paid . . . a severance payment

to an insider of the debtor" unless two criteria are met: (1) the payment must be part of a

program that is "generally applicable to all full-time employees," and (2) the amount of the

payment cannot exceed ten times the amount of the mean severance payment given to non-

management employees during the same calendar year.  11 U.S.C. § 503(c)(2)(A), (B).  Notably,

because section 503(c) speaks to the allowance as well as the payment of obligations, it applies

with equal force regardless of whether the payment is to be made by the debtor prior to plan

confirmation, or whether the successor of the debtor is directed to make such a payment after

emergence from bankruptcy.  See In re Dana Corp., 351 B.R. 96, 102 (Bankr. S.D.N.Y. 2006)

(applying 11 U.S.C. § 503(c) to bonus and severance payments that were to be made to debtor's

insider upon emergence from bankruptcy); In re TCI 2 Holdings, LLC, et. al., 428 B.R. 117, 171-

72 (Bankr. D.N.J. 2010) (holding severance provision invalid under section 503(c)(2)

notwithstanding fact that severance was to be paid after plan effective date by reorganized

debtor).

In this case, it is undisputed that Mr. Horton is an insider and that the Chairman Letter

Agreement specifically provides for "severance compensation" to Mr. Horton of approximately

$20 million.  See Ex. G at pg.1.  The Debtors have not, and presumably cannot, demonstrate that

the requirements of section 503(c)(2)(A) and (B) have been met.  Indeed, the only difference

between the current request for approval of the Chairman Letter Agreement and the previous

unsuccessful request in the Merger Motion is that the Debtors are now seeking that relief in

conjunction with a plan of reorganization.  But the terms of section 503(c) are equally applicable

in plan confirmation as elsewhere: the general prohibition of that section is that "there shall

neither be allowed, nor paid," certain transfers without qualification, and section 1129(a)(1)

provides that the Plan must comply with the remainder of the Bankruptcy Code, including

section 503(c).  The fact that the Chairman Letter Agreement is now being presented in a

different context does not cure its violation of section 503(c).[5]

> 2.  *Under the Supreme Court's Decision in RadLAX, the Debtors Cannot Circumvent 11 U.S.C. § 503(b) and (c) by Relying on More Generalized Provisions of the Bankruptcy Code*

The violation of sections 503(b) and (c) of the Bankruptcy Code prevents the Court from

confirming the Plan, and the Debtors cannot overcome this result by relying on a more

generalized provision of the Bankruptcy Code, such as section 1129(a)(4).  In particular,

although section 1129(a)(4) requires that certain payment in connection with plan confirmation

by disclosed and "approved . . . as reasonable," nothing in that section purports to override

specific prohibitions that exist elsewhere under the Bankruptcy Code.  See TCI, 428 B.R. at 145-

---

[5] It does not appear that the Bankruptcy Code would prevent the post-emergence successors of the Debtors from independently adopting a severance or compensation plan for Mr. Horton, provided that such was done in a manner consistent with their business judgment and applicable non-bankruptcy law.  But that is not what the Debtors are asking the Court to approve.  If approved -- either as part of the Plan or in connection with any other agreement arrived at during the pendency of these bankruptcy cases -- the Chairman Letter Agreement will be binding on the post-emergence successors of the Debtors, and it is the binding nature of this obligation that brings it within the purview of section 503(c) and the Bankruptcy Code.  The United States Trustee, however, acknowledges that even though the severance terms of the Chairman Letter Agreement violate the Bankruptcy Code, its disclosure by the Debtors is appropriate.

47 (holding that proponents of plan could not bypass section 503 by relying on section

1129(a)(4) as authorization for payments of creditor attorney fees).

Although certain reported decisions have construed section 1129(a)(4) as providing

authority to make payments under a plan that are not otherwise authorized under section 503,

see, e.g., Lehman; Adelphia; In re Journal Register Co., 407 B.R. 520, 535-36 (Bankr. S.D.N.Y.

2009) (approving post-emergence incentive payments under section 1129(a)(4)), those holdings

are questionable in light of the Supreme Court's decision in RadLAX Gateway Hotel, LLC v.

Amalgamated Bank, 132 S.Ct. 2065 (2012).   Indeed, Adelphia and Journal Register were

decided prior to RadLAX and in Lehman, which is currently on appeal, the court did not discuss

RadLAX.

In RadLAX, a plan proponent sought to bypass a specific requirement of the Bankruptcy

Code by relying on a more general provision that addressed the same subject matter.  The

Supreme Court rejected this strategy as "hyperliteral and contrary to common sense."  Id.

Noting the "commonplace of statutory construction that the specific governs the general," the

Court held that where "a general authorization and a more limited, specific, authorization exist

side by side . . . the terms of the specific authorization must be complied with."  Id. at 2071.

Moreover, this rule "is particularly true where . . . Congress has enacted a comprehensive

scheme and has deliberately target specific problems with specific solutions."  Id. (internal

citations omitted).  As such, RadLAX broadly stands for the proposition that the specific,

targeted sections of the Bankruptcy Code, including section 503(b) and (c), must be enforced

according to their terms and cannot be trumped by more generalized provisions, including

section 1129(a)(4).

15

C.      **The Disclosure Statement Does Not Provide Adequate Information**

1.      *The Disclosure Statement Should Be Amended to Provide Adequate Information Concerning the 9019 Settlement*

The Disclosure Statement provides that the Plan serves as a motion to approve the 9019 Settlement of (i) certain inter-creditor issues relating to the rights and benefits of holders of Double-Dip General Unsecured Claims, Single-Dip General Unsecured Claims, Triple-Dip General Unsecured Claims, and the DFW 1.5x Special Facility Revenue Bond Claim, (ii) the validity, enforceability, and priority of certain prepetition intercompany claims by and among AMR, American, and Eagle, (iii) claims that creditors have with respect to the marshaling of assets and liabilities of AMR, American, or Eagle Holding in determining relative entitlements to distributions under a plan, and (iv) the rights of holders of AMR Equity Interests to a distribution under a plan.  Disclosure Statement at IV.F.3; Plan at Art. 6.3.

The Disclosure Statement should be amended to more fully describe the details and terms of the settlement.

2.      *The Disclosure Statement Should Be Amended to Provide Adequate Information Concerning the Bases for the Proposed Substantive Consolidation of the Debtors*

The Disclosure Statement provides that the Plan serves as a motion for substantive consolidation of the Debtors, which are divided into three groups: AMR Plan Consolidation, American Plan Consolidation and Eagle Plan Consolidation.  Disclosure Statement at IV.F.5; Plan at Art. 6.5. "Substantive consolidation usually results in, *inter alia,* pooling the assets of, and claims against, the . . . entities; satisfying liabilities from the resultant common fund; eliminating inter-company claims; and combining the creditors of the . . . companies for purposes of voting on reorganization plans." See In re Augie/Restivo Baking Company, Ltd., 860 F.2d 515 (2d Cir. 1988) (setting forth a multi-pronged test for determining whether the proposed consolidation meets its sole purpose - to ensure the equitable treatment of all creditors).  The Disclosure Statement should be

16

amended to contain information demonstrating that the proposed substantive consolidation meets
those standards.

In addition, it is not clear whether as a result of the substantive consolidation the
remaining entities not included in the three groups will be dissolved post-Effective Date,
particularly in light of the provision that substantive consolidation will not affect the legal and
organizational structure of the Debtors, defenses to any Causes of Action and distributions out of
insurance policies.  Disclosure Statement at IV.F.5; Plan at Art. 6.5.

3.    *The Disclosure Statement Should Be Amended to Provide Adequate Information
      Concerning (I) the Proposed Severance Payment to Mr. Horton Under the Chairman
      Letter Agreement, (II) Severance to Other Named Executive Officers and (III) the
      Discrepancy Between the Plan and SEC Form S-4*

AMR is a Delaware corporation.  See Goren Aff. at ¶ 31.  Delaware Corporation Law
requires that transactions between interested directors and officers be approved by a majority of
disinterested directors.  See 8 Del. C. § 144(a) ("No contract or transaction between a
corporation and 1 or more of its directors or officers . . . shall be void or voidable . . . if: (1) The
material facts as to the director's or officer's relationship or interest and as to the contract or
transaction are disclosed or are known to the board of directors or the committee, and the board
or committee in good faith authorizes the contract or transaction by the affirmative votes of a
majority of the disinterested directors . . . .").

AMR and American Airlines are also public reporting companies under Section 12(b) of
the Securities and Exchange Act of 1934.  See Goren Aff. at ¶ 30.  Prior to the Petition Date,
AMR was publicly traded on the New York Stock Exchange.  Id.  Since January 5, 2012, the
AMR Corporation stock has been de-listed from the New York Stock Exchange and began
trading over-the-counter under the symbol "AAMRQ."  See Securities and Exchange
Commission ("SEC") Form S-4, at p. 20.

17

The Disclosure Statement fails to provide any information on whether AMR has complied with Section 144(a) of the Delaware Corporation Law by ensuring that independent directors approved the transaction between the corporation and Mr. Horton. The United States Trustee requests that the Debtors provide additional information on whether the proposed transaction with Mr. Horton was approved by disinterested directors.

Similarly, the Disclosure Statement fails to provide creditors with basic information on the method and criteria the Board of Directors implemented in determining Mr. Horton's proposed severance provisions. At a minimum, the Disclosure Statement should address whether: (i) the AMR Board of Directors used a compensation committee in determining the proposed severance; (ii) the AMR Board of Directors retained a compensation consultant; (iii) a compensation consultant designed the severance provisions; (iv) the compensation consultant issued a report on the proposed severance; and (v) specific criteria and methodology was used to determine the $20 million severance payment. Further, the Disclosure Statement fails to provide valuation estimates for the costs of the following severance provisions: (i) the full vesting of the SERP; (ii) the lifetime flight privileges for Mr. Horton and his spouse; and (iii) legal fee expense reimbursement.

The Disclosure Statement also fails to address the apparent inconsistencies between the Plan and AMR's April 15, 2013 filings with the SEC. For example, according to Form S-4, AMR disclosed that it previously conducted an analysis of its potential obligations to pay post-employment compensation to its five "named executive officers," including Mr. Horton. See Form S-4 at p. 242–44. According to this document, as of December 31, 2012, AMR was required to pay the following amounts to Mr. Horton in the event of retirement, voluntary separation, death, disability, or termination other than for cause:

18

| | Retirement ($) | Voluntary Separation ($) | Death ($) | Disability ($) | Termination Other Than For Cause ($) |
|---|---|---|---|---|---|
| Cash Severance Benefits | — | — | — | — | 618,135 |
| Long-Term Incentives | — | 0 | 231,814 | 231,814 | 309,656 |
| Pension Benefits (a) | 0 | 5,503,296 | 5,503,296 | 5,503,296 | 5,503,296 |
| Flight Privileges (b) | 6,540 | 6,540 | 6,540 | 6,540 | 6,540 |
| **Total** | 6,540 | 5,509,836 | 5,741,650 | 5,741,650 | 6,437,627 |

See Form S-4, at p. 243.  As depicted on this chart from the April 15, 2013 Form S-4, the highest

amount that AMR would be obligated to pay Mr. Horton in post-employment benefits would be

$6.43 million.   Under the Plan, AMR proposes to pay Mr. Horton a $20 million severance in

addition to other highly lucrative benefits.  The Disclosure Statement fails to address the

inconsistency between the Debtors Form S-4 and the Plan.

Moreover, according to the Form S-4, AMR will also enter into severance agreements

with each of its five "named executive officers."  Specifically, AMR states in pertinent part:

> In connection with the Merger and as contemplated by the Merger Agreement,
> AMR plans to enter into the AMR Merger Severance Agreements with each of its
> named executive officers. As further described in the subsection entitled "Merger
> Agreement" directly below, these agreements will only be effective upon the
> Closing, and AMR's named executive officers will waive their rights under the
> AMR Existing Severance Agreements in exchange for their rights under the AMR
> Merger Severance Agreements.

See SEC Form S-4, at p. 229.  Aside from the arrangement with Mr. Horton, the severance of the

"named executive officers" was not specifically described in the Disclosure Statement.  The

Disclosure Statement should be amended to provide additional information on each of the

proposed severance agreements with each of its "named executive officers," whether they are

19

insiders for purposes of section 503(c) and whether these severance provisions comply with section 503(c).

    4.   *The Disclosure Statement Should Be Amended to Provide Adequate Information Concerning the No Objection Provisions in the Labor Agreements*

Although the Disclosure Statement references the Debtors' intent to pay severance compensation to Mr. Horton of approximately $20 million, and although the Disclosure Statement briefly describes the Union Settlements, <u>see</u> Disclosure Statement at III.C.1(b) and 2(b), it does not advise creditors that provisions of the Labor Agreements preclude key constituencies from objecting to, or even criticizing, Mr. Horton's compensation. <u>Id</u>.

The failure to disclose the existence of the No Objection Provisions in the TWU and APFA Settlement Letters which are integral parts of the Labor Agreements with these two unions renders the Disclosure Statement incomplete and misleading in several important respects. First, the Disclosure Statement should contain information as to whether it is the Debtors' view that the No Objection Provisions of the Settlement Letters bar individual union members from raising objections to the Proposed Severance Payment to Mr. Horton or to other plan provisions that provide for compensation or other payments to non-union members or insiders of the Debtors. Further, the Disclosure Statement should provide information as to whether individual union members are permitted to vote against the Plan despite the Labor Agreements. Although it appears that the No Objection Provisions do not bar individual union members from filing objections to severance or other compensation arrangements, this information is relevant and material and the Disclosure Statement should be amended to address the impact of the No Objection Provisions on individual union members.

Second, in addition to the severance compensation of approximately $20 million, the Disclosure Statement also explains that under the Plan, as the future Chairman of the Board of

the Reorganized Debtors, Mr. Horton will be entitled to receive the same cash and equity

compensation established for service on the New AAG board as a non-employee director, and to

lifetime flight and other travel benefits (including spousal and survivor benefits).  Should the

Plan be confirmed, Mr. Horton will also be reimbursed by AMR for any legal fees he incurred in

connection with the Chairman Letter Agreement.  See Disclosure Statement at III.D.5(g)(iii).

Based on the United States Trustee's review of Mr. Horton's current compensation arrangements

and AMR filings with the SEC, supra, it may be that Mr. Horton's severance and other

compensation will be far greater under the Plan than under his current employment contract.

Because the Disclosure Statement provides that the Plan is in the best interest of creditors and

equity interest holders, and urges the holders of impaired claims to vote in favor of the Plan, the

fact that Mr. Horton and other "named executive officers" have a personal financial stake in Plan

confirmation may be a factor that will be weighed by those voting on the Plan.  Therefore, the

information regarding the Labor Agreements and the No Objection Provisions should be

addressed in the Disclosure Statement.

Third, at the hearing on the Merger Motion, the Debtors advised the Court that no party

with an economic interest in the cases had objected to the Merger Motion.  This assertion may

cause creditors to incorrectly conclude, based on the absence of a filed objection, that the TWU

and APFA Unions endorsed the substantive terms of the Chairman Letter Agreement.  Because

the Chairman Letter Agreement does not appear to have been negotiated prior to the time that the

No Objection Provisions went into effect, such an inference would be unwarranted and the facts

should be made clear in the Disclosure Statement.

Finally, the fact that key unions are barred from objecting to Mr. Horton's compensation

is a fact that may affect the decisions of other creditors on whether to raise their own objections.

In recent years, unions have played an important role in scrutinizing proposals for executive compensation, and have frequently litigated objections where such proposals did not comply with the Bankruptcy Code.  See, e.g., Dana, 351 B.R. 96 (denying motion to approve bonus to debtor's chief executive following objections by, among others, two labor unions).  If information describing the No Objection Provisions of the Labor Agreements is not contained in the Disclosure Statement, many creditors might wrongfully assume that the unions will take the lead in any challenges to Mr. Horton's compensation, and refrain from participating in these proceedings on the basis of that mistaken belief.[6]

For these reasons, approval of the Disclosure Statement should be denied unless it is amended to: (i) prominently advise creditors of the existence of the No Objection Provisions of the Labor Agreements;  (ii) clarify that, because of the No Objection Provisions, any failure of the unions to object to the Chairman Letter Agreement is not, and should not be construed as, an endorsement of its terms; and (iii) disclose any other similar agreements that may be in effect regarding the Chairman Letter Agreement or other executive compensation matters.

5.  *The Disclosure Statement Should be Amended to Provide Adequate Information Concerning the Proposed Non-Debtor Third-Party Releases, Exculpations, Limitations of Liability and Injunctions*

The Disclosure Statement contains no information as to how the broad exculpation and release provision in the Plan is consistent with the Second Circuit's decisions in In re Johns-Manville Corp., 517 F.3d 52 (2d Cir. 2008) ("Manville II"), vacated & remanded on other

---

[6] Only two of the Debtors' unions, the TWU and the APFA, have Labor Agreements with the No Objection Provisions.  In fact, at a March 20, 2013 Special Board of Directors meeting, the Allied Pilots Association (the "APA") voted to approve the following resolution: "[T]he APA Board of Directors 'opposes any plan to grant to AMR executives or managers any bonus payment, retention or severance payment/package, health care plan, travel privileges, or any other type of compensation or benefit that would exceed the payments, packages, compensation, benefits, or privileges available to APA pilots under the current Collective Bargaining Agreement.  Further, the APA Board of Directors supports the efforts of the U.S. Trustee for the AMR Bankruptcy to restrict such plans and payments.'" See APA Board of Directors Special Meeting Update, posted on March 20, 2013 19:12, available at http://public.alliedpilots.org/apa/AboutAPA/tabid/40/ctl/ArticleView/mid/1228/articleId/2803/APA-Board-of-Directors-special-meeting-update.aspx, last visited on May 23, 2013.

grounds, 557 U.S. 137 (2009), aff'g in part & rev'g in part, 600 F.3d 135 (2d Cir. 2010)

("Manville III") and Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia

Fiber Network, Inc.), 416 F. 3d 136, 141 (2d Cir. 2005).

In Metromedia, the Second Circuit held that non-debtor third-party releases are proper

only in "rare cases." Metromedia, 416 F. 3d at 141.  The Second Circuit articulated at least two

reasons for its reluctance to approve these releases:

> First, the only explicit authorization in the Code for non-debtor releases is 11
> U.S.C. § 524(g), which authorizes releases in asbestos cases when specified
> conditions are satisfied, including the creation of a trust to satisfy future claims,
> and [and] . . .
>
> Second, a non-debtor release is a device that lends itself to abuse.  By it, a non-
> debtor can shield itself from liability to third parties.  In form, it is a release; in
> effect it may operate as a bankruptcy discharge without a filing and without the
> safeguards of the Code.  The potential for abuse is heightened when releases
> afford blanket immunity.

Id. at 142.

The Second Circuit held that "[i]n bankruptcy cases, a Court may enjoin a creditor from

suing a third party, provided the injunction plays an important part in the Debtors' reorganization

plan." Id. at 141 (quoting SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham

Lambert Group, Inc.), 960 F.2d 285, 292 (2d Cir. 1992)).  The appellate court cautioned,

however, that a non-debtor third-party release is not considered to be adequately supported by

consideration simply because the non-debtor contributed something to the reorganization and the

enjoined creditor took something out.  Metromedia at 143.  Rather, "[a] non-debtor third-party

release should not be approved absent a finding by the court that 'truly unusual circumstances'

exist that render the release terms important to the success of the plan." Id.

Subsequent cases further clarify the Metromedia requirements.  For example, in In re

DBSD North America, Inc., the Court stated:

23

> As the Second Circuit's decision in <u>Metromedia</u> and my earlier decision in <u>Adelphia</u> provide, exculpation provisions (their first cousins, so-called "third party releases") are permissible under some circumstances, but not as a routine matter. They may be used in some cases, including those where the provisions are important to a debtor's plan; the claims are "channeled" to a settlement fund rather than extinguished; the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution; the released party provides substantial contribution; and where the plan otherwise provides for full payment of the enjoined claims.

<u>In re DBSD North America, Inc.</u>, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (emphasis in original) (footnotes omitted); <u>In re Motors Liquidation Co.</u>, 477 B.R. 198, 220 (Bankr. S.D.N.Y. 2011) ("Although (since the Code is silent on the matter) third-party releases aren't 'inconsistent with the applicable provisions of this title,' the Second Circuit has ruled that they're permissible only in rare cases, with appropriate consent or under circumstances that can be regarded as unique, some of which the Circuit listed. But where those circumstances haven't been shown, third-party releases can't be found to be appropriate.").[7]

Before a court considers whether the proponent of a plan has demonstrated the "truly unusual circumstances" mandated by <u>Metromedia</u>, it must first determine whether it has subject matter jurisdiction to approve the releases or injunctions provided for by and against non-debtor third-parties. <u>See</u> <u>Manville II</u>; <u>accord</u> <u>In re Dreier LLP</u>, 429 B.R. 112, 132 (Bankr. S.D.N.Y.

---

[7] Other examples include: (i) <u>Adelphia</u>, 368 B.R. at 268-69 (holding that three categories of non-debtor third-party releases are acceptable under <u>Metromedia</u>: (1) persons indemnified by the estate under by-laws, employment contracts, or loan agreements, (2) persons involved in unique transactions, such as a party who makes a substantial financial contribution to the estate; and (3) persons who consent to the releases); (ii) <u>In re Karta Corp.</u>, 342 B.R. 45 (S.D.N.Y. 2006) (framing inquiry as "whether a significant non-debtor financial contribution plus other unusual factors render a situation so "unique" that the non-debtor third-party releases are appropriate."). <u>Id.</u> at 55; (iii) <u>In re Oneida Ltd.</u>, 351 B.R. 79 (Bankr. S.D.N.Y. 2006) (the equity committee had raised, but then abandoned, an objection to the validity of the non-debtor third-party releases, and the court found that the releases in that case were acceptable because all of the affected creditors had consented by affirmatively checking a box on the ballot indicating their willingness to grant the releases); (iii) <u>In re Spiegel, Inc.</u>, No. 03-11540 (BRL), 2006 WL 2577825, *7 (Bankr. S.D.N.Y. Aug. 16, 2006) (plan's non-debtor third-party releases and injunctions were critical components of the settlement that played a "vital part in the plan" and "were necessary to the proposed reorganization of the Debtors and the successful administration of their estates"); and (iv) <u>In re XO Commc'ns, Inc.</u>, 330 B.R. 394, 440 (Bankr. S.D.N.Y. 2005) (non-debtor third-party releases were permissible where the non-debtors provided significant consideration, the non-debtors were integral to the plan, and the non-debtors' interests aligned with those of the debtors with regard to the claims).

2010); In re Metcalfe & Mansfield Alternative Invs., 421 B.R.685, 695 (Bankr. S.D.N.Y. 2010).

In Manville II, the Second Circuit held that "a bankruptcy court only has jurisdiction to enjoin

third-party non-debtor claims that directly affect the res of the bankruptcy estate." Manville II,

517 F.3d at 66; see also Dreier, 429 BR. at 133 (because the court lacks jurisdiction to enjoin

claims that do not affect property of the estate or the administration of the estate, non-debtor

third-party releases must be limited to claims that are derivative of the debtors).

The Plan contains an exculpation provision whereby the Plan proposes to release non-

debtor third-parties from various claims and liabilities and enjoin claims by and against non-

debtor third-parties.  Disclosure Statement at IV.I.1; Plan Arts. 10.6-10.8.

Because this release seeks to include the release of claims by non-debtor third- parties

against non-debtor third-parties, the Second Circuit's rulings in Manville II and Metromedia

govern the Court's determination as to whether this release may be approved.  It is now settled in

the Second Circuit that the Court does not have subject matter jurisdiction to approve this

provision because it seeks to release "direct" (non- derivative) claims that non-debtor third-

parties may have against other non-debtor third parties.  See Manville III, 600 F.3d at 153

(clarifying on remand that the bankruptcy court does not have jurisdiction to enjoin claims

against non-debtor insurers that are not derivative of the debtor).

The Debtors have also failed to explain why the exculpation provision, which extends to

third-parties who are not estate fiduciaries who served during the chapter 11 cases (such as the

estate professionals and the Committee and its members) is appropriate.  See In re Washington

Mutual, Inc., 442 B.R. 314, 350-51 (Bankr. D. Del. 2011) (limiting exculpation clause to estate

fiduciaries).  Further, the acts for which these parties are being exculpated are vague.

Accordingly, the Disclosure Statement should be amended to provide this information.

6.  *The Disclosure Statement Should be Amended to Provide Adequate Information
Concerning the Debtors' Obligation to Pay UST Fees Through the Entry of a
Final Decree, Dismissal or Conversion of Each Debtor's Chapter 11 Case*

The Disclosure Statement does not provide for the Debtors obligation to pay statutory

fees and charges to the United States Trustee ("UST Fees") on all disbursements pursuant to

Section 1930 of Title 28 with interest pursuant to Section 3717 of title 31 United States Code, if

applicable, through the entry of a final decree.  Disclosure Statement at IV.R; Plan at Art. 12.7.

The Debtors' obligations to pay UST Fees on all disbursements, including payments pursuant to

the Plan in and outside the ordinary course of the Debtors' business, continue through entry of a

final decree in each of the Debtors' cases, dismissal of a case or conversion of a case to a case

under Chapter 7 of the Bankruptcy Code.  See Schwartz v. Aquatic Dev. Group, Inc. (In re

Aquatic Dev. Group, Inc.), 352 F.2d 671, 675, n.4 (2d Cir. 2003) (quoting United States Trustee

v. Boulders on the River, Inc. (In re Boulders on the River, Inc.), 218 B.R. 528, 537 (D. Or.

1997)); see also In re Citadel Broadcasting Corp., No. 09-17442 (BRL), 2010 WL 2010808, *42

(Bankr. S.D.N.Y. May 19, 2010) (confirming plan that provided for payment of UST fees

through entry of a final decree, or dismissal or conversion of the Chapter 11 case).

Moreover, although UST Fees are excepted from class designation under Section

1123(a)(1) of the Bankruptcy Code, the Plan must separately provide for the payment of UST

Fees and must provide that UST Fees due and owing as of the Confirmation Date have been, or

will be paid in cash on the effective date of the Plan in order for the Plan to be confirmed.  11

U.S.C. § 1129(a)(9) and (12).  The Disclosure Statement similarly must disclose that each Debtor

has the obligation to pay UST Fees, and should include an estimate of what these fees will be for

each Debtor on the Effective Date.

26

Finally, as the disbursements relate to the entities that are not dissolved or substantively

consolidated, each entity must separately report its disbursements and comply with its

obligations to pay UST Fees.

Accordingly, the Disclosure Statement and Plan should be amended to provide this

information.

## IV.  OBJECTIONS TO CONFIRMATION

If applicable, the objections raised herein are, by way of this Objection, being asserted as

objections to confirmation of the Plan.  The United States Trustee reserves the right to object to

the Plan.

## V.  CONCLUSION

WHEREFORE, the United States Trustee respectfully submits that the Court (i) sustain

the Objection, (ii) direct the Debtors to amend the Disclosure Statement and Plan

to cure the informational inadequacies and to address the issues identified in the Objection and

(iii) grant such other relief as is just.

Dated: New York, New York
       May 24, 2013

                                Respectfully submitted,

                                TRACY HOPE DAVIS
                                UNITED STATES TRUSTEE

                                By      */s/ Susan D. Golden*
                                        Susan D. Golden
                                        Michael T. Driscoll
                                        Brian S. Masumoto
                                        Trial Attorneys
                                        33 Whitehall Street, 21st Floor
                                        New York, New York 10004
                                        Tel. No. (212) 510-0500
                                        Fax No. (212) 668-2255

27