**Joseph M. Alioto**
*Admitted Pro Hac Vice*
**ALIOTO LAW FIRM**
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone:  (415) 434-8900
Facsimile:  (415) 434-9200
Email:  jmalioto@aliotolaw.com
         jmiller@aliotolaw.com

*Attorneys for the Clayton Act Plaintiffs*
[ADDITIONAL COUNSEL LISTED ON LAST PAGE]

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re** | : | **Case No. 11-15463-SHL** |
| | : | |
| **AMR CORPORATION,** *et al.,* | : | **Chapter 11** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |
| **CAROLYN FJORD,** *et al.,* | : | **Adversary No. 13-01392-SHL** |
| | : | |
| **Plaintiffs,** | : | |
| vs. | : | |
| | : | |
| **AMR CORPORATION,** *et al.,* | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

**OPPOSITION TO MOTION OF DEBTORS FOR ENTRY OF ORDER REGARDING
CONSUMMATION OF MERGER PURSUANT TO SCHEDULING ORDER (ADV. PRO.
DOC. 44); AND OPPOSITION TO MOTION FOR ENTRY OF ORDER PURSUANT TO
BANKRUPTCY RULE 9019(a) APPROVING SETTLEMENT BETWEEN DEBTORS,
US AIRWAYS GROUP, INC., AND UNITED STATES DEPARTMENT OF JUSTICE,** *ET
AL.***; CROSS-MOTION FOR TEMPORARY RESTRAINING ORDER PENDING
HEARING ON MOTION FOR PRELIMINARY INJUNCTION OR TRIAL**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

I.      INTRODUCTION AND STATUS OF PROCEEDINGS. . . . . . . . . . . . . . . . . . . . . . . . . . 1

        A.      Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        B.      The Basic Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        C.      The Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        D.      Status of Motions in This Court. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        E.      Short Summary of What Debtors Are Seeking. . . . . . . . . . . . . . . . . . . . . . . . . . 10

II.     THE CLAYTON PLAINTIFFS ACTION PROCEEDS
        INDEPENDENT OF THE DOJ ACTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III.    THE MERGER MOTION IS A DISGUISED MOTION FOR
        SUMMARY JUDGMENT OR SUMMARY ADJUDICATION. . . . . . . . . . . . . . . . . . . 12

IV.      SELF-CREATED EXIGENCY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

V.      PLAINTIFFS CAN ESTABLISH THEIR ENTITLEMENT
        TO A TEMPORARY RESTRAINING ORDER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

VI.     CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

# TABLE OF AUTHORITIES

<u>Cases</u>

*Alliance for the Wild Rockies*, 613 F.3d 960 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Brown Shoe Co. v. United States*, 370 US 294 (1962). . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3, 20

*California v. American Stores Company*, 495 U.S. 271 (1990). . . . . . . . . . . . . . . . . . . . . . . . 10, 13

*Celotex Corp. v. Caltrett,* 477 U.S. 317, 106 S.Ct. 2548 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Federal Trade Commission v. Cement Institute*, 1948, 333 U.S. 683,
68 S.Ct. 793, 92 L.Ed. 1009. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*FTC v. Procter & Gamble Co.,* 386 U.S. 568 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967). . . . . . . . . 20

*Federal Trade Commission v. ProMedica Health System, Inc.,*
2011 U.S. Dist. LEXIS 33434 (N.D. Ohio March 29, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Fed. Trade Comm'n v. Staples, Inc.*, 970 F.Supp. 1066 (D.D.C. 1997). . . . . . . . . . . . . . . . . . . . 21

*Gulf & W. Industries, Inc. v. Great A. & Pac. Tea Co., Inc.,* 476 F.2d 687
(2nd Cir.1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18

*Hosp. Corp. of Am. v. F.T.C.*, 807 F.2d 1381 (7th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Aluminum Co. of America*, 377 US 271 (1964). . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

*United States v. Baker Hughes, Inc.*, 908 F.2d 981 (D.C.Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Bendix Home Appliances*, 10 F.R.D. 73 (S.D.N.Y. 1949). . . . . . . . . . . . . . . . . . 11

*United States v. Borden Co.,* 347 U.S. 514, 74 S. Ct. 1093, 98 L. Ed. 903 (1954). . . . . . . . . 10, 11

*United States v. E. I. du Pont de Nemours & Co.,* 353 U.S. 586 77 S.Ct. 872,
1 L. Ed.2d 1057 (1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Falstaff Brewing Co.*, 410 US 526 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

*United States v. Marine Bancorporation, Inc.,* 418 U.S. 602, 94 S.Ct. 2856,
41 L. Ed.2d 978 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Pabst Brewing Company*, 384 US 546 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

*United States v. Philadelphia National Bank*, 374 US 321 (1963). . . . . . . . . . . . . . . . . . . 1, 2, 17

*United States v. Syufy,* 903 F.2d 659 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States vs. US Airways Group, Inc.*, Case No. 1:13-cv-01236. . . . . . . . . . . . . . . . . . . . . 6

*United States v. Von's Grocery Co.*, 384 US 270 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

*Wallace v. Brownell Pontiac-GMC Co., Inc.,* 703 F.2d 525 (11th Cir. 1983). . . . . . . . . . . . . . . 13

*White Consolidated Industries, Inc. v. Whirlpool Corporation,* 781 F.2d 1224
(6th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Zenith Radio Corporation v. Matsushita Electrical Industrial Co., Ltd.,*
723 F.2d 238, rev'd on other grounds at 106 S.Ct. 1348. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13


Acts

Clayton Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

Clayton Act, Section 7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Clayton Act, Section 16. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Tunney Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 18, 19


Statutes

15 U.S.C. § 16. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14

15 U.S.C. § 18. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 10,17

15 U.S.C. § 26. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 10, 11

Rules

Fed. R. Bankr. P. 2002(a)................................................................ 9

Fed. R. Bankr. P. 7065................................................................... 9

Fed. R. Bankr. P. 9006(c)............................................................... 9

Fed. R. Bankr. P. 9019.................................................................. 11

Fed. R. Bankr. P. 9019(a)....................................................... 7, 9, 10, 12

Fed. R. Civ. P. 56.................................................................. 10, 12

Fed. R. Civ. P. 56(c)................................................................... 13

Fed. R. Civ. P. 56(d)................................................................... 13

Fed. R. Civ. P. 65.................................................................... 8, 9

Miscellaneous

S. Rep. No. 698, 63d Cong., 2d Sess. 42................................................ 11

# I.  INTRODUCTION AND STATUS OF PROCEEDINGS

**A.      Preliminary Statement.**

This is a private civil antitrust suit brought by the Fjord Plaintiffs under Section 16 of the

Clayton Antitrust Act (15 U.S.C. § 26) alleging that the merger between American Airlines and

US Airways – creating the largest airline in the United States, securing for itself and the other

three major airlines more than 90% of the capacity in the United States as measured by available

seat miles, and creating monopolies in at least 24 airport-pair markets, eliminates a significant

rival in over 1,665 airport-pairs affecting more than 53 million traveling Americans –  "may

substantially lessen competition or tend to create a monopoly in any section of the country" in

violation of Section 7 of the Clayton Antitrust Act (15 U.S.C. § 18).

The Plaintiffs allege that the proposed merger will create undue concentration in the

airline industry in the United States and "may" result in increases in fares, reduction of capacity

and availability of flights, reduced services, charges for amenities, loss of jobs, elimination of

consumer choice, and other anticompetitive practices and effects similar to those that followed

the mergers of Delta and Northwest in 2008, United and Continental in 2010, and Southwest and

AirTran in 2011.

This merger must be analyzed pursuant to the well-established and binding authority of

the Supreme Court of the United States in *Brown Shoe Co. v. United States*, 370 US 294 (1962),

*United States v. Philadelphia National Bank*, 374 US 321 (1963), *United States v. Aluminum Co.

of America*, 377 US 271 (1964), *United States v. Von's Grocery Co.*, 384 US 270 (1966), *United

States v. Pabst Brewing Company*, 384 US 546 (1966), and *United States v. Falstaff Brewing*

1

*Co.*, 410 US 526 (1973), all of which echo again and again the concluding salvo by the Court in

*Brown Shoe* at 346:

> We cannot avoid the mandate of Congress that tendencies toward concentration in
> industry are to be curbed in their incipiency, particularly when those tendencies
> are being accelerated through giant steps striding across a hundred cities at a time.
> In the light of the trends in this industry we agree with the Government and the
> court below that this is an appropriate place at which to call a halt.

The facts in the *Brown Shoe* case (number 3 in the market with 6% share acquires

number 12 in the market with 0.05% share creating number 3 in the market with 6% share, with

the 4 largest firms controlling 23% of the manufacturing market) and the other cited cases pale

and wither when compared to this case in which the number 4 airline is proposed to combine

with the number 5 airline to create the largest airline in the United States and the world.

The four largest companies would have more than 90% of the capacity, revenues, and the

assets in the airline industry.  The four largest firms in *Brown Shoe* controlled 23%.  The four

largest firms in *Philadelphia Bank* controlled 78% of the market.  The four largest firms in *Alcoa*

controlled 76% of the market.  The four largest firms in *Von's* controlled 28% of the market.

The four largest firms in *Pabst* controlled 59% of the market.  The four largest firms in *Falstaff*

controlled 60% of the market.

In none of these cases was the trend toward concentration so rapid as in this case.  Within

the last five years, the six largest airlines consolidated into three, eliminating actual and potential

competition.  This merger would reduce the industry by yet another significant, important and

effective competitor.  As the Supreme Court said in *Brown Shoe*: "In the light of the trends in

this industry ... this is an appropriate place at which to call a halt."

B.    **The Basic Facts.**

The Supreme Court has categorically and repeatedly determined that mergers such as that

proposed by the Defendants are "proscribed" by the Clayton Act:

> Because § 7 of the Clayton Act prohibits any merger which may substantially
> lessen competition "in *any* line of commerce" (emphasis supplied), it is necessary
> to examine the effects of a merger in each such economically significant
> submarket to determine if there is a reasonable probability that the merger will
> substantially lessen competition.  If such a probability is found to exist, the merger
> is proscribed.

*Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

The facts which compel the conclusion that the proposed merger violates the Clayton Act

are the following:[1]/

- The merger would result in the largest airline in the United States and the world
  and closely follows the 2008 merger of Delta and Northwest (which resulted in
  the then-largest airline in the U.S.), the 2010 merger of United and Continental
  (which resulted in the largest airline in the U.S.), the 2011 merger of Southwest
  and AirTran (which was the then-largest airline in terms of passengers).

- The four top airlines will control more than 90% of the market.

- The four top airlines will have more than 90% of the market in terms of total
  operating revenue.

- From 2008 to the present, capacity growth has not rebounded despite a
  strengthening economy and a growing demand for air travel.

- The combined American - US Airways would have 101,000 employees.

---

[1] Except as otherwise stated, the below facts are taken from the Government
Accountability Office report ("GAO Report") entitled AIRLINE MERGERS ISSUES RAISED BY THE
PROPOSED MERGER OF AMERICAN AIRLINES AND US AIRWAYS (June 19, 2013).  The GAO
Report, Report by the American Antitrust Institute ("AAI Report") and three Reports by the MIT
International Center for Air Transportation are annexed to the Declaration of Gil D. Messina as
Exhibits A, B and C, respectively.  These reports are also referred to in the Affidavit of Darren
Bush.

- United has 82,000 employees.

- Delta has 72,000 employees.

- Southwest has 45,000 employees.

- The combined American - US Airways has 12 overlapping non-stop routes, 7 of which will result in a monopoly.  Of the other 5 non-stop, overlapping routes, the combined airline will control between 50%-75% of those markets.

- The combined American - US Airways will have 24 connecting airport-pair markets that will result in a monopoly.

- The combined American - US Airways will have 475 airport-pair markets with a decrease from 3 to 2 effective competitors.

- The combined American - US Airways will have 749 airport-pair markets with a decrease from 4 to 3 effective competitors.

- On connecting flights, American and US Airways compete on more than 1,665 airport-pair markets affecting more than 53 million passengers.

- This merger will result in more than two times the number of airport-pairs losing an effective competitor than occurred in the United-Continental merger for airports with 1, 2 or 3 competitors.

- This merger would affect 567 more airport-pairs than were affected by United-Continental and 18 million more passengers.

- The two airlines do not share any airport hubs, consequently New York can serve as a better hub than Philadelphia, while Miami could serve as a better hub than Charlotte, which may result in the closing of one or more of these hubs as happened in prior mergers.  For example, in 2001, after American acquired TWA, St. Louis ceased to be an American hub.  Following the Delta - Northwest merger service at Delta's hub in Cincinnati and Northwest's hub in Memphis have been greatly reduced.

- The combined American - US Airways will control the following dominant percentages of the domestic passenger market in the following key airports:

  - Miami - 72%;
  - Charlotte - 70%;
  - Philadelphia - 54%;

4

- Chicago-O'Hare - 43%;
- Phoenix - 32%;
- LAX - 23%; and
- JFK - 18%.

- The merger of Southwest and its key rival AirTran has eliminated any constraint formerly imposed on pricing practices, therefore, the American - US Airways merger, if allowed, will increase fares without that constraint. Southwest has initiated 2 of the 3 price increases in the third quarter of 2012 and has consistently raised its prices since then with the network airlines. (USA TODAY, October 19, 2012).

- The weekend after the announcement of the proposed merger between American and US Airways, Delta, United, American, US Airways and Southwest substantially increased fares purchased by passengers within 7 days for domestic travel. The year before (2012) there were 7 successful price increases, in which Southwest participated, initiating 2. (USA TODAY, February 22, 2013).

- Several studies have shown that increased dominance at airports leads to higher fares and creates competitive barriers to entry.

- US Airways CEO, Douglas Parker, testified before Congress that there will not be new entrants into the airline industry because a new entrant cannot cover its cost of capital.

- American had consistently said it would emerge from bankruptcy as a new and powerful stand-alone company. Indeed, the CEO and Chairman of American, Tom Horton, in an article entitled "American Resists US Airways Pressure," and subtitled "CEO says airline can compete on its own," told USA TODAY'S editorial board: "This company is going to be very successful. I think that we have a very powerful company coming out of restructuring." Moreover, Horton stated, "Our company is only going to get more valuable." Furthermore, he rejected the notion by Mr. Parker that American lacked access to the East Coast. Horton said American satisfied the East Coast with its hubs in New York and Miami: "Those are the most important population centers and we are very strong in them. What that airline (US Airways) does is carry a lot of connecting traffic over Charlotte and does so in a way that I would suggest is somewhat unrewarding." (USA TODAY July 20, 2012).

- In July 2011, American placed a $40 billion order for 460 new aircraft.

- Prior to American considering a merger with US Airways, American announced it would increase capacity by 4%-5% in each the next 5 years after emerging from bankruptcy.

Additionally, the MIT Reports report the following:[2]/

- From 2007 to 2012, after the mergers of Delta-Northwest, United-Continental and Southwest-AirTran, scheduled domestic departures decreased by 14.3% at all airports.

    - Large Hub (-8.8%)
    - Medium Hub (-26.2%)
    - Small Hub (-18.2%)
    - Non-hub (-15.4%)

It is conceded that 7 out of the 12 non-stop overlapping flights will result in a monopoly. This fact alone, under the binding authority of the Supreme Court in *Brown Shoe* above requires that the merger be "proscribed."  In addition, according to the GAO, at least 24 connecting airport pairs will result in a monopoly.  Again, any one of these is sufficient to require this Court to "proscribe" this merger.[3]/

C.    **The Procedural History**.

Carolyn Fjord, *et al.* ("Plaintiffs") filed their Section 7 Clayton Action (15 U.S.C. § 18) in this Court entitled *Fjord, et al. v. AMR Corporation, et al.*, Adversary No. 13-01392 ("Clayton Plaintiffs Action").  Service of process has been effectuated, Defendants have answered, and the Court has issued a Scheduling Order (Doc. 44).

Thereafter, the United States filed a Section 7 Clayton Action in the U.S. District Court for the District of Columbia, entitled *United States of America vs. US Airways Group, Inc.*, Case

---

[2] TRENDS AND MARKET FORCES SHAPING SMALL COMMUNITY AIR SERVICE IN THE UNITED STATES by Michael D. Wittman and William S. Swelbar (MIT International Center for Air Transportation, May 2013).

[3] The antitrust analysis by the DOJ is performed according to *their* Merger Guidelines and is not binding on anyone, including the DOJ itself.  What the DOJ uses for its own analysis is not the law.

No. 1:13-cv-01236 (CKK) ("DOJ Action").  That action has been settled, subject, however,  to

compliance with the Tunney Act (15 U.S.C. § 16), which provides for public comment, the filing

of a Competitive Impact Statement by the government, supervision by the Court, publication in

the Federal Register, the government's response to public comments, any proposed change to the

terms of settlement following the public comments, the District Court's approval of the

settlement as being in the public interest, that Court's entry of a Final Judgment or, alternatively,

the government's withdrawal of the settlement itself.  15 U.S.C. § 16.

The Clayton Plaintiffs Action was the first complaint filed seeking to enjoin the proposed

merger.

On November 12, 2013, the DOJ publicly announced for the first time that it had reached

a settlement with the defendants in the DOJ action, the same Defendants as in this Adversary

Proceeding. *That same day*, November 12, 2013, the Defendants in this action – who, unlike the

Plaintiffs, were aware of the existence and terms of the settlement well before it was announced –

filed their motion to shorten time, to allow consummation of the merger and to approve the

settlement pursuant to Bankruptcy Rule 9019(a).  On November 13, 2013, the Court ordered

Plaintiffs to file this response by November 21, 2013, nine (9) days after the DOJ settlement was

announced.  (Doc. 48)

At the conference held in Court on November 20, 2013, the Court expressed surprise that

Plaintiffs had not yet filed a motion for a preliminary injunction, even though, the Court said, the

settlement was supposedly known "for weeks."  The Court also commented that a preliminary

injunction motion must be accompanied by evidence and a supporting brief.  However, the fact

of settlement and the terms thereof were not known to Plaintiffs until nine (9) days ago.  Further,

the Court declined to grant Plaintiffs' request to take the depositions needed to file a preliminary

injunction motion until after the DOJ action was concluded.  Instead, the Scheduling Order

prohibited Plaintiffs from even noticing depositions until one week after the DOJ action ended.

Scheduling Order ¶ 9 (Doc. 44).  This the Plaintiffs did at the earliest opportunity on November

19, 2013.

Finally, the Court had placed the merger "on hold," pending the outcome of the DOJ

action.  That was tantamount to a *de facto* injunction which precluded the filing of a preliminary

injunction motion, not only because needed discovery was prohibited, but there was not the

possibility of irreparable harm while the DOJ action remained pending.  Had Plaintiffs filed for

an injunction before the DOJ's settlement with the Defendants, the Defendants would have

justifiably objected and the Court would have denied or declined to hear that motion.

Now the Plaintiffs are whipsawed by the notion that the injunction motion they could not

have brought earlier, is somehow not timely now.

Furthermore, the Court has suggested that Plaintiffs must file a Motion to Shorten Time

in order to move for a temporary restraining order.  Yet, Fed. R. Civ. P. 65 does not require *any*

notice in order to file a motion for a temporary restraining order.[4]/   Nonetheless, Plaintiffs have

filed a concurrent motion to shorten time so that their Cross-motion for a Temporary Restraining

Order may heard on November 25, 2010, at the same time as Debtors' motions for approval of

the DOJ settlement and to consummate the merger.

---

[4]  Counsel had a meet and confer on November 18, 2013, which was requested by
Plaintiffs' counsel, pursuant to ¶ 7 of the Scheduling Order.  During the meet and confer,
Plaintiffs' counsel informed Defendants' counsel that Plaintiffs would move for a temporary
restraining order when they filed this response to the Defendants' motions.

8

### D.      Status of Motions in this Court.

The Debtors have filed in the main proceeding a Motion for Entry of Order Pursuant to Bankruptcy Rule 9019(a) Approving Settlement Between Debtors, US Airways Group, Inc., and United States Department of Justice, *et al*. ("9019 Motion").

The Debtors have filed in this Adversary Proceeding a Motion of Debtors for Entry of Order Regarding Consummation of Merger Pursuant to Scheduling Order (Adv. Pro. ECF No. 44) ("Merger Motion").

The Court has entered an Order Pursuant to Fed. R. Bankr. P. 2002(a) and 9006(c) to Shorten Notice Period, Schedule Hearing, and Approve Notice with Respect to (i) Motion of Debtors for Entry of Order Pursuant to Bankruptcy Rule 9019(a) Approving Settlement Between Debtors, US Airways Group, Inc., and United States Department of Justice, *et al.*, and (ii) Motion of Debtors for Entry of Order Regarding Consummation of Merger Pursuant to Scheduling Order (Adv. Pro. ECF No. 44).

Plaintiffs have filed in this Court a Motion to Shorten Time and to Schedule a Pretrial Conference (Doc. 49), as to which the Court has not yet acted.

By virtue of this filing, and for purposes of consolidation of many of these issues, Plaintiffs: 1) oppose the 9019 Motion, 2) oppose the Merger Motion, and 3) file a cross-motion for a temporary restraining order ("TRO") under Fed. R. Civ. P. 65, which is applicable hereto under Bankruptcy Rule 7065.

Plaintiffs consolidate their response into one filing, given the commonality of facts and issues.

9

**C.    Short summary of what the Debtors are seeking.**

Among other relief, the Debtors seek the following:

1.  A compromise of the controversy with the United States in the resolution of the DOJ Action under Rule 9019(a).

2.  Entry of an order consummating the AMR-US Airways merger ("Merger Motion").

3.  Implied disposition and dismissal of the injunctive relief sought by Plaintiffs under Section 16 of the Clayton Act ("Injunctive Relief").  The Debtors argue in their Merger Motion that the Clayton Plaintiffs Action will continue, with the sole remaining remedy being divestiture. (Merger Motion, ¶¶ 25, 26, 27 and 28, pp. 10-11).  While not clearly stated as such, the gist of the Merger Motion is to obtain a summary judgment under Fed. R. Civ. P. 56, in order to dismiss the statutory injunction action brought by Plaintiffs.

## II.  THE CLAYTON PLAINTIFFS ACTION PROCEEDS INDEPENDENT OF THE DOJ ACTION.

Plaintiffs are entitled to independently proceed with an injunction action under Section 16 of the Clayton Act, notwithstanding a settlement by Defendants with the DOJ.  (15 U.S.C. § 26).

The landmark case is *California v. American Stores Company*, 495 U.S. 271, 276 (1990), in which the "private" parties proceeded with their own Clayton action the day after the FTC gave final approval to the merger.  The Clayton Act "manifest[s] a clear intent to encourage vigorous private litigation against anticompetitive mergers.  Section 7 itself creates a relatively expansive definition of antitrust liability: To show that a merger is unlawful, a plaintiff need only prove that its effect 'may be substantially to lessen competition.'  Clayton Act § 7, 38 Stat. 731, 15 U.S.C. § 18."  *Id.* at 285.  *See also United States v. Borden Co.,* 347 U.S. 514, 518-19, 74 S.

Ct. 7093, 98 L.Ed. 903 (1954), in which the Court stated as follows:

> These private and public actions were designed to be cumulative, not mutually
> exclusive. S. Rep. No. 698, 63d Cong., 2d Sess. 42; *cf. Federal Trade
> Commission v. Cement Institute*, 1948, 333 U.S. 683, 694-695, 68 S.Ct. 793, 800,
> 92 L.Ed. 1009. '(T)he scheme of the statute is sharply to distinguish between
> Government suits, either criminal or civil, and private suits for injunctive relief or
> for treble damages. Different policy considerations govern each of these. They
> may proceed simultaneously or in disregard of each other.' *United States v.
> Bendix Home Appliances*, D.C.S.D.N.Y.1949, 10 F.R.D. 73, 77.

Accordingly, the 9019 Motion and the Merger Motion neither bar nor prohibit the

Clayton Plaintiffs from independently proceeding with their own action for injunctive relief

under the Section 16 of the Clayton Act.  This leads to the anomaly that, while the 9019 Motion

by the Debtors and their creditors might independently be meritorious, nonetheless, under *United

States v. Borden Co.* and its progeny, the settlement, as a matter of law, cannot bar, interfere

with, or usurp these Plaintiffs' independent rights to seek to enjoin the merger.  Accordingly, any

relief by the Court to approve a compromise of the controversy would necessarily leave

unresolved the Plaintiffs' statutory right to injunctive relief under Section 16 (15 U.S.C. § 26),

which remains unaffected by the settlement with the DOJ.

The Debtors cannot invoke a Rule 9019 settlement as a procedural device in order to

terminate Plaintiffs' rights of independent relief under Section 7 of the Clayton Act or the right

of an injunction under Section 16.  The purpose of Rule 9019 is to permit the Court to confirm a

compromise of controversy, as opposed to entering an order which would collaterally estop or

restrain a third party from seeking to enforce its own independent, stand alone rights.  There is

nothing in the Debtors' motion – and no authority cited – which authorizes this Court to

extinguish Plaintiffs' Section 16 injunction rights.

Similarly, the Debtors cannot craft a Merger Motion to prevent Plaintiffs from exercising

their right to seek injunctive relief, given that Plaintiffs' right is statutory and stands alone.

Moreover, this is implied by the Scheduling Order (Document 44) at paragraphs 7 and 11, which

anticipate the continuation of the Clayton Plaintiffs Action notwithstanding a settlement with the

DOJ.  Likewise, nothing in the Scheduling Order suggests or hints at the granting by this Court

of any right of AMR to merge and effectively extinguish the right to seek an injunction, one way

or another.

Accordingly, any compromise of the controversy under Rule 9019(a) would necessarily

exclude from its effect – and thereby preserve – the Plaintiffs' right to enjoin the merger under

Section 16 of the Clayton Act in this adversary proceeding.  This position is anticipated by the

Debtors who seek to extinguish the right to an injunction through the guise of the Merger

Motion.

### III.  THE MERGER MOTION IS A DISGUISED MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION.

The Merger Motion is nothing less than a disguised motion for summary judgment in

which AMR seeks an order from this Court ratifying the merger and effectively foreclosing any

right to injunctive relief due Plaintiffs.  The Merger Motion lacks the slightest authority which

would allow the Debtors, as Clayton Act defendants, to move for a summary judgment which

would extinguish the injunctive relief under Section 16 that is due a plaintiff, without basic

compliance with Rule 56.

A Court may not, by the premature resort to a Rule 56 motion, deprive a party resisting it

of a fair opportunity to present facts essential to its opposition.  *See In re Japanese Electronic*

*Products Antitrust Litigation (D.C. MDL No. 189). Zenith Radio Corporation v. Matsushita
Electrical Industrial Co., Ltd., etc.,* 723 F.2d 238, 259, rev'd on other grounds at 106 S.Ct. 1348.
Fed. R. Civ. P. 56(d) authorizes the Court to continue a summary judgment to enable a party to
marshal sufficient evidence to challenge the motion, as Plaintiffs have requested.

Plaintiffs have yet to conduct their own primary discovery, which consists of depositions
of Messrs. Horton and Parker, the Defendants' CEOs, and other key witnesses, including
Defendants' experts. Granting Debtors' motion would violate Plaintiffs due process rights to
meaningfully prepare for and respond to what amounts to a summary judgment motion. The
purpose of Fed. R. Civ. P. 56(d) is to protect a party from being railroaded by a premature motion
for a summary judgment. *Celotex Corp. v. Caltrett,* 477 U.S. 317, 106 S.Ct. 2548, 2554 (1986);
and *see Wallace v. Brownell Pontiac-GMC Co., Inc.,* 703 F.2d 525 (11th Cir. 1983).

Viewing the current Merger Motion as a virtual summary judgment motion, the Debtors
must fail because they have not demonstrated that they can prevail as a matter of law and that
there is no triable issue of material fact. The Debtors have not provided the Court with any
evidence, by way of declarations or otherwise, as required by Fed. R. Civ. P. 56( c). As indicated
above, the fact that the DOJ has settled is not admissible, nor even relevant, to a private party's
independent Clayton action. *See California v. American Stores Company, supra*, and its many
progeny.

Pursuant to the Scheduling Order, depositions have not begun although Plaintiffs sought
early-on the opportunity to take necessary depositions, but the Court declined to grant Plaintiffs'
request. Plaintiffs are consequently hobbled in their ability to meaningfully respond to what
amounts to a motion for summary judgment, and accordingly they should be entitled to proceed

13

with discovery in order to effectively preserve their right to seek injunctive relief, which is

statutorily authorized.  This is what the Scheduling Order says and what Plaintiffs relied upon

when they were required to await the outcome of the DOJ litigation.

## IV.  <u>SELF-CREATED EXIGENCY.</u>

Aside from the structural defects in the Merger Motion, the Debtors are seeking a hyper-

expedited hearing on the 9019 Motion and the Merger Motion.  The Court issued its Order

Shortening Time on November 13, 2013, compelling Plaintiffs to file their opposition on

November 21, 2013, confront a reply to be filed on Saturday, November 23, 2013, and attend a

hearing on the merits on November 25, 2013.  Plaintiffs will not have an opportunity to respond

to the reply, which may well include expert declarations and other factual claims.  Plaintiffs will

have no meaningful way to file a supplemental memorandum of points and authorities or

independently gather declarations, given filings due on Saturday, November 23, 2013.

The Defendants' settlement with the DOJ has initiated a settlement process that has a

lengthy time line.  Under the Tunney Act, the settlement is subject to public comment for a

period of 60 days (15 U.S.C. § 16), and the district court retains jurisdiction to ultimately

approve or disapprove the merger.  Therefore, the merger should not take place imminently and

Final Judgment will not be entered, if at all, until sometime in February 2014.

The Debtors have not claimed, nor can they claim, financial distress.  The Debtors do not

assert that, without this merger, the Debtors will fail.  The Debtors do not cite to nor claim any

prejudice by waiting another 30 days or even 60 days.  The Debtors do not claim or cite some

impending business transaction, opportunity, or for that matter, anything of significant import

that would justify shortened time, or alternatively, support any claim of prejudice.  The 9019

14

Motion does not suggest, nor even hint, that the merger is an immediate financial necessity, or

that without the merger, the Debtor will fail.

Conversely, in preserving Plaintiffs' right to seek an injunction, this Court is free to

manage its calendar and set a hearing on Plaintiffs' request for a preliminary injunction that is

consistent with the procedures and timing contemplated by the Scheduling Order.  Directly on

point is *Gulf & W. Industries, Inc. v. Great A. & Pac. Tea Co., Inc.,* 476 F.2d 687, 699 (2nd

Cir.1973), in which the Court, in considering an injunction under the Clayton Act, specifically

commented that the Court should promptly schedule a trial on the merits:

> Upon balancing the equities in accordance with the standard stated above, we hold
> that the record clearly supports the district court's order which granted a
> preliminary injunction enjoining consummation of the tender offer. Under all the
> circumstances, we suggest to the district court that it expedite further proceedings
> in this case, as it so commendably has done to date, with a view to the earliest
> possible date for trial on the merits consistent with the rights of the parties. We
> are confident that counsel will fully cooperate to that end.

Given the lack of any exigency supporting the 9019 Motion, much less the Merger

Motion, and in light of the inability of Plaintiffs, without discovery, to respond to a surrogate

motion for summary judgment, the remedy which this Court should grant, Plaintiffs respectfully

submit, is a TRO that postpones a ruling on the 9019 Motion and the Merger Motion until the

hearing on preliminary injunction motion and/or trial, a Scheduling Order allowing for expedited

discovery and setting dates for a pretrial conference and a trial.

The Court at the hearing on the motion for preliminary injunction or the trial would have

a comprehensive view of the entirety of the evidence in adjudicating the three key motions.

While the 9019 Motion and the Merger Motion would leave unimpaired the rights of Plaintiffs,

nonetheless, the consolidation of these motions would enable the Court to exercise management

over its docket and allow the parties to litigate key issues in an organized and harmonious

manner.  Despite the plethora of pleadings in this case, the core issue raised in the Clayton

Plaintiffs Action is that the proposed merger violates Section 7 of the Clayton Action, because it

it may lessen competition.

Setting an omnibus hearing would meet the expectations of the Debtors and related third

parties, given that the settlement with the DOJ remains subject to the Tunney Act and final

approval by the district court.  Moreover, had the Debtors gone to trial on November 25, 2013, as

anticipated, the Debtors would still be in a state of uncertainty about the outcome, which might

have lasted at least until mid-January 2014.  Setting this matter for an omnibus hearing would not

alter the course of these proceedings.

## V.  PLAINTIFFS CAN ESTABLISH THEIR ENTITLEMENT
## TO A TEMPORARY RESTRAINING ORDER.

The DOJ settlement is cosmetic, as Debtors readily admitted.  The Debtors will not suffer

any significant divestiture of assets, nor significant change of their business operations.  The

Debtors admit this in paragraph 35, page 25, of its 9019 Motion (Doc. 10610):

> 35.  In the context of this global business enterprise, the Settlement provides for
> the merged entity to relinquish 138 slots at DCA and LGA and a total of up to 17
> gates systemwide.  All of the required divestitures are expected to impact less than
> 3% of the total daily flights to be operated by the merged entity.  Further, it must
> be recognized that the slots and gates subject to the Settlement are not being
> forfeited.  Rather, they will be divested for fair value and the aircraft dedicated to
> the slots and gates will be re-deployed for other revenue generating flights, further
> mitigating the economic impact of the Settlement.

This statement demonstrates that the settlement with the DOJ did not result in any

wholesale changes in the Debtors' operation, but, rather, a minuscule change in its business

operation.  As indicated by the Affidavit of Professor Bush, the Debtors still retain enormous

16

market concentration in numerous city pairs, which serves as proof of the virtual certainty that

Plaintiffs will successfully prove that the effect of such merger may be substantially to lessen

competition, or tend to create a monopoly, as the Clayton Act forbids..

Plaintiffs are proceeding under Section 7 of the Clayton Act.  For purposes of the TRO,

Plaintiffs must demonstrate a probability of success, all for the purpose of demonstrating the

likelihood of prevailing.  Directly on point as to Plaintiffs' burden is *Hosp. Corp. of Am. v.

F.T.C.*, 807 F.2d 1381, 1389 (7th Cir. 1986), in which the court stated:

> ". . . Section 7 does not require proof that a merger or other acquisition has caused
> higher prices in the affected market.  All that is necessary is that the merger create
> an appreciable danger of such consequences in the future. A predictive judgment,
> necessarily probabilistic and judgmental rather than demonstrable (see *United
> States v. Philadelphia Nat' l Bank, supra,* 374 U.S. at 362, 83 S.Ct. at 1740), is
> called for."

Plaintiffs need demonstrate only the appreciable danger of anticompetitive dangers in the

future.  Plaintiffs need only demonstrate a predictive judgment under Section 7 of the Clayton

Act (15 U.S.C. § 18).

The normal principles of TROs necessarily predominate, except that Plaintiffs need only

demonstrate the likelihood of anticompetitive consequences, rather than that such will result to

an absolute certainty.  To obtain a TRO, Plaintiffs must demonstrate a likelihood of success by

showing that the merger may lessen competition or may tend to create a monopoly, the likelihood

of irreparable harm, the impact on the public interest, and the likelihood of substantial harm to

others.  *White Consolidated Industries, Inc. v. Whirlpool Corporation,* 781 F.2d 1224, 1227 (6th

Cir. 1986).

17

The fact, however, that the public interest is served weighs in favor of granting injunctive relief, at least for purposes of a TRO. *See Gulf & Western Industries, Inc. v. The Great Atlantic & Pacific Tea Company, Inc.*, 476 F.2d 687, 699 (2d Cir. 1973); *Alliance for the Wild Rockies*, 613 F.3d 960 (9th Cir. 2010). Creating the world's largest airline, which will have market power in many markets, would adversely affect millions of consumers and a temporary restraining order will serve the public interest.

The Tunney Act enables the general public the right to comment on the proposed merger. Depending upon the comments and ultimately public sentiment, the United States can withdraw its consent. Recent editorials in major newspapers, academics and travel experts have soundly criticized the DOJ merger as a whitewash. A review of the 9019 Motion at paragraphs 34-37 even suggests that the proposed merger is nothing more than a slight rearrangement of key elements of the original merger scheme. The fact of such outrage and a clear concession by the Debtors that they received what amounts to be, in their view, a "great deal," leads to an inference that the public retains an enormous interest in opposing this merger, which ultimately supports the public interest test for providing provisional relief under Section 16 of the Clayton Act. The Tunney Act is the statutory weathervane of public interest and, therefore, is relevant in this Court considering the grant of provisional relief.

The Tunney Act offers the American public's, and specifically the flying public's, settled expectations and a level of deep, resounding trust that the Debtors will refrain from a merger pending consideration by the United States and the district court of the responses from the public under the Tunney Act. The American public, and especially the flying public, would be startled

18

to learn that the Debtors abrogated their responsibility to allow meaningful consideration of the

public's sentiment before consummating the merger, as required under the Tunney Act.

Plaintiffs' burden is to demonstrate the likelihood of success.  The likelihood of success

is supported by the Supreme Court decisions cited above, the facts delineated above and in the

Affidavit of Plaintiffs' expert Dr. Darren Bush, who opines as follows:

"... . It is my opinion that even after the airlines' settlement with the Department of Justice, the "new" merger terms, which would continue to combine two of the four major "legacy" carriers, continues to violate the Clayton Act and suffer from many of the fatal flaws that both the Fjord Plaintiffs and the Government have alleged as being anticompetitive to the core.  The reasons for this are as follows:

1.      The merger will likely result in higher prices in the national airline market and at certain city-pairs;

2.      The merger will likely result in reductions in capacity;

3.      Small to medium sized hubs likely will continue to see a decrease in service and an increase in prices;

4.      Coordination in pricing will worsen due to a reduction in the number of competitors; and

5.      Amenities will decrease or increase in costs.

Plaintiffs seek contemporaneously a TRO, to be followed by a motion for a preliminary

injunction and trial.

Plaintiffs can make out a TRO at this time, given the following undisputed facts:

1.  This merger will create the world's largest airline, and per the Affidavit of Professor

Bush which is contemporaneously filed herewith, it will create a monopoly or undue

concentration in certain "city pairs," which will be controlled by the merged entity to such a level

of concentration as to effectively oust all other competitors.  The effect of this concentration will

be to permit the merged entity the ability to exercise market power by raising prices and excluding competition.

2.  Plaintiffs do not have an adequate remedy at law for this injury, given the national market and the number of sub-market city or airport-pairs involved and the fact that the rise in prices will be diffused over a broad segment of the flying public, flights will become unavailable or less frequent, and amenities and services will be cut.

3.  Notwithstanding the pending DOJ settlement, the "reconfigured merger" does not address any of the anticompetitive problems likely to be faced by the flying public.  The fact that Southwest and others are receiving slots does not militate against the probability of price increases, cuts in service, capacity, availability of flights, connections and routes.  *See Federal Trade Commission v. ProMedica Health System, Inc.*, 2011 U.S. Dist. LEXIS 33434 (N.D. Ohio March 29, 2011), where the court stated:

> Section 7 is "designed to arrest in its incipiency ... the substantial lessening of competition from the acquisition by one corporation of the whole or any part of the stock" or assets of a competing corporation. *United States v. E. I. du Pont de Nemours & Co.,* 353 U.S. 586, 589, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). The Supreme Court has explained that "Congress used the words '*may* be substantially to lessen competition' (emphasis supplied), to indicate that its concern was with probabilities, not certainties." *Brown Shoe Co. v. United States,* 370 U.S. 294, 323, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). *The government can satisfy its burden by establishing a "reasonable probability" of substantial anticompetitive effects. Du Pont,* 353 U.S. at 589, 77 S.Ct. 872, 1 L.Ed.2d 1057.  Section 7 "can *deal only with probabilities, not with certainties.*  And there is certainly no requirement that the anticompetitive power manifest itself in anticompetitive action before § 7 can be called into play.  If the enforcement of § 7 turned on the existence of actual anticompetitive practices, the congressional policy of thwarting such practices in their incipiency would be frustrated." *FTC v. Procter & Gamble Co.,* 386 U.S. 568, 577, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967) (citations omitted).  However, "ephemeral possibilities" will not satisfy the requirement of a reasonable probability. *United States v. Marine Bancorporation, Inc.,* 418 U.S. 602, 623, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974).

As indicated by the Affidavit of Professor Bush, the merged entity will control an unduly high percentage of city pairs, among other consequences, which meets the burden of proof of market concentration.  The elements of a Section 7 action are the product and geographic markets in which the transaction is to be assessed, and the transaction's probable effect on competition in the markets.  *See Fed. Trade Comm'n v. Staples, Inc.*, 970 F. Supp. 1066, 1072 (D.D.C. 1997).

After identifying the relevant markets, Plaintiffs are entitled to the presumption that the proposed merger may substantially lessen competition by making a statistical showing that the transaction will lead to an undue concentration in the market.  *See United States v. Baker Hughes, Inc.*, 908 F.2d 981, 982 (D.C.Cir. 1990; *State of California v. American Stores Co.*, 872 F.2d at 842; *United States v. Syufy,* 903 F.2d 659, 664 n.6 (9th Cir. 1990).

Plaintiffs burden in seeking a TRO is to demonstrate the probability of success on the merits, irreparable harm, should the TRO not be granted, a balancing of the equities in Plaintiffs' favor, and lack of a legal remedy.

As stated above, Plaintiffs can demonstrate irreparable harm by reason of capacity reductions, elimination of the "Advantage Fare", the loss of the benefits from AMR as a standalone company which intended to increase capacity with new aircraft, which in turn may lower prices and improve services.  The balancing of the equities favors Plaintiffs given, *e.g.*, that the beneficiaries of the TRO will be the general flying public, as well as communities that benefit from service to unprofitable routes that are often dumped following large airline mergers. Defendants, on the other hand, will suffer little or no prejudice, given that they should await Tunney Act approval rather than run the risk of merging before the public has commented and

21

the district court has ruled on the settlement.  Further, Defendants do not expect to receive their operating certificate that will enable them to operate as a single entity for at least a year.  Lastly, Defendants assumed – and prepared for – a trial with the DOJ in which they did not expect to receive a final judgment  – one way or the other – until approximately mid-January 2014.  Those parts of the Scheduling Order entered in this case that the Defendants requested reflect their preparedness to wait to litigate this case before consummating the merger.

Plaintiffs have been prompt and timely.  Plaintiffs previously sought to set this case for trial, even before the DOJ Action would have gone to trial, provided Plaintiffs received the discovery contemplated by the Scheduling Order.

Plaintiffs respectfully request that a temporary restraining order be entered until such time as a hearing can be scheduled and conducted for a preliminary injunction and/or trial.

## VI.  CONCLUSION.

Based upon the binding authority of the Supreme Court of the United States and the abundance of evidence demonstrating a trend toward concentration and dominance in the airline industry which "may" result in further increases in prices, further reductions of capacity and availability of service, this Court should consolidate the pending motions and set a schedule for an omnibus hearing for the consideration of all relief.  Pending the outcome of the omnibus hearing, the Court should grant a temporary restraining order prohibiting the Defendants from closing the merger.

Dated: San Francisco, CA
        November 21, 2013              By: s/ David J. Cook
                                          David J. Cook

Joseph M. Alioto
*Admitted Pro Hac Vice*
Alioto Law Firm
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone: (415) 434-8900
Facsimile:(415) 434-9200
Email: josephalioto@mac.com

David J. Cook
Cook Collection Attorneys
165 Fell Street
San Francisco, CA  94102
Telephone: (415) 989-4730
Facsimile:  (415) 989-0491
Email: davidcook@cookcollectionattorneys.com

Gil D. Messina
*Admitted Pro Hac Vice*
Messina Law Firm, P.C.
961 Holmdel Road
Holmdel, NJ 07733
Telephone: (742) 332-9300
Facsimile: (742) 332-9301
Email:  gmessina@messinalawfirm.com
        tmay@messinalawfirm.com

Derek G. Howard
*Pro Hac Vice Pending*
Minami Tamaki LLP
360 Post Street, 8th Floor
San Francisco, CA 94109
Telephone: (415) 788-9000
Facsimile: (415) 398-3887
Email: dhoward@minamitamaki.com

*Attorneys for the Clayton Act Plaintiffs*

## **PROOF OF SERVICE**

ALL PARTIES ON THE COURT'S DOCKET

     I declare:

     I am employed in the County of San Francisco, California. I am over the age of eighteen (18) years and not a party to the within cause. My business address is 165 Fell Street, San Francisco, CA 94102. On the date set forth below, I served the attached:

     OPPOSITION TO MOTION OF DEBTORS FOR ENTRY OF ORDER REGARDING CONSUMMATION OF MERGER PURSUANT TO SCHEDULING ORDER (ADV. PRO. ECF NO. 44); AND OPPOSITION TO MOTION FOR ENTRY OF ORDER PURSUANT TO BANKRUPTCY RULE 9019(a) APPROVING SETTLEMENT BETWEEN DEBTORS, US AIRWAYS GROUP, INC., AND UNITED STATES DEPARTMENT OF JUSTICE, ET AL.; AFFIDAVIT OF DARREN BUSH, DECLARATION OF GIL D. MESSINA, CROSS-MOTION FOR A TEMPORARY RESTRAINING ORDER PENDING A HEARING ON MOTION FOR PRELIMINARY INJUNCTION, MOTION TO SHORTEN TIME FOR MOTION FOR TEMPORARY RESTRAINING ORDER, PROPOSED FORM OF ORDER SHORTENING TIME AND PROPOSED FORM OF ORDER GRANTING A TEMPORARY RESTRAINING ORDER,

on the above-named person(s) by:

    __XXX__   Via the court's ECF notification system.

     I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 21, 2013.


                _s/ David J. Cook_____
                DAVID J. COOK