# ERRATA

# EXHIBIT A

# ANNEXED TO DECLARATION
# OF GIL D. MESSINA

## *FJORD, et al. v. AMR CORP., et al.*
## (Adversary Number 13-01392 (SHL))



**United States Government Accountability Office**

Testimony
Before the Subcommittee on Aviation
Operations, Safety, and Security,
Committee on Commerce, Science and
Transportation, U.S. Senate

For Release on Delivery
Expected at 2:30 pm EDT
Wednesday, June 19, 2013

# AIRLINE MERGERS

# Issues Raised by the Proposed Merger of American Airlines and US Airways

Statement of Gerald L. Dillingham, Ph.D.
Director, Physical Infrastructure Issues

# GAO Highlights

Highlights of GAO-13-403T, a testimony before the Subcommittee on Aviation Operations, Safety, and Security, Committee on Commerce, Science, and Transportation, U.S. Senate

**June 19, 2013**

## AIRLINE MERGERS

### Issues Raised by the Proposed Merger of American Airlines and US Airways

## Why GAO Did This Study

In February 2013, American and US Airways announced plans to merge the two airlines and entered into a merger agreement. Valued at $11 billion, the merged airline would retain the American name and be headquartered in Dallas-Fort Worth. This follows the mergers of United Airlines and Continental Airlines in 2010 and the acquisition of Northwest Airlines by Delta Air Lines (Delta) in 2008. This latest merger, if not challenged by DOJ, would surpass these prior mergers in scope to create the largest passenger airline in the United States. The passenger airline industry has struggled financially over the last decade and these two airlines believe a merger will strengthen them. However, as with any merger of this magnitude, this proposal will be examined by DOJ to determine if its potential benefits for consumers outweigh the potential negative effects.

This testimony focuses on (1) the role of federal authorities in reviewing merger proposals, (2) key factors motivating airline mergers in recent years, and (3) the implications of merging American and US Airways. To address these objectives, GAO drew from its previous reports on the potential effects of prior airline mergers and the financial condition of the airline industry issued from July 2008 through May 2010. GAO also analyzed DOT's airline operating and financial data, airline financial documents, and airline schedule information since 2002.

View GAO-13-403T. For more information, contact Dr. Gerald Dillingham at (202) 512-2834 or dillinghamg@gao.gov.

## What GAO Found

The Department of Justice's (DOJ) antitrust review will be a critical step in the proposed merger between American Airlines (American) and US Airways. DOJ uses an integrated analytical framework set forth in the *Horizontal Merger Guidelines* to determine whether the merger poses any antitrust concerns. Under that process, DOJ assesses, among other things, the extent of likely anticompetitive effects of the proposed merger in the relevant markets, in this case, airline city-pair markets, and the likelihood that other airlines may enter these markets and counteract any anticompetitive effects, such as higher fares. DOJ also considers efficiencies that a merger or acquisition could bring—for example, consumer benefits from an expanded route network. The Department of Transportation (DOT) aids DOJ's analysis.

Airlines seek mergers to reduce costs and improve revenues. GAO has previously reported that mergers can result in increased revenues by offering improved network connections and schedules, but also through higher fares on some routes. Cost savings can be generated by eliminating redundancies and operational efficiencies, including reducing service, but can be muted by problems in combining different aircraft, technologies, and labor forces. In the case of US Airways and American, they estimate that a merger would yield $1.4 billion in annual benefits from increased revenues and reduced costs.

If not challenged by DOJ, the merged American would surpass United to become the largest U.S. passenger airline by several measures. While US Airways and American overlap on only 12 nonstop routes, no other nonstop competitors exist on 7 of those 12. Our analysis of 2011 and 2012 ticket data also showed that combining these airlines would result in a loss of one effective competitor (defined as having at least 5 percent of total airport-pair traffic) in 1,665 airport-pair markets affecting more than 53 million passengers while creating a new effective competitor in 210 airport-pairs affecting 17.5 million passengers. However, the great majority of these markets also have other effective competitors.



**Change in Effective Competition from American-US Airways Combination (2012)**

Source: GAO analysis of DOT Origin & Destination (OD1B) ticket data.



U.S. GOVERNMENT ACCOUNTABILITY OFFICE

441 G St. N.W.
Washington, DC 20548

Chairman Cantwell, Ranking Member Ayotte, and Members of the Subcommittee:

I am pleased to be here today to discuss the potential implications of the merger proposal recently announced by American Airlines (American) and US Airways. In February 2013, these two airlines announced plans for American to merge with US Airways through a stock swap the airlines valued at $11 billion. This follows the acquisition of Northwest Airlines (Northwest) by Delta Air Lines (Delta) in 2008, the merger of United Airlines (United) and Continental Airlines (Continental) in 2010, and Southwest Airlines' (Southwest) acquisition of Air Tran Airways (AirTran), in 2011. If approved by the Department of Justice (DOJ), the American-US Airways merger would surpass United's in terms of number of employees, seat capacity, and operating revenues to create the largest passenger airline in the United States. However, as with any merger of this magnitude, this proposal is being examined by DOJ with assistance from the Department of Transportation (DOT) to determine if the potential benefits for consumers outweigh the potential negative effects.

Extensive research and the experience of millions of Americans underscore the benefits that have flowed to most consumers from the 1978 deregulation of the airline industry, including dramatic reductions in fares and expansion of service. These benefits are largely attributable to increased competition from the entry of new airlines into the industry and established airlines into new markets. At the same time, however, airline deregulation has not benefited everyone; some communities—especially smaller communities—have suffered from relatively high airfares and a loss of service. We have been analyzing aviation competition issues since enactment of the Airline Deregulation Act of 1978.[1] Our work since 2000 has focused on airline competition and industry performance, including the financial health of the passenger airline industry, the growth of low cost airlines, changing business models of airlines, and prior mergers.[2] In the airline context, DOJ has the primary responsibility to evaluate most

---

[1] Pub. L. No. 95-504, 92 Stat. 1705 (1978).

[2] See list of related GAO products attached to this statement.

GAO-13-403T

mergers in order to carry out its antitrust responsibilities.[3] In addition, American remains under Chapter 11 bankruptcy protection, however the bankruptcy court approved the merger with US Airways in May 2013.

My statement today presents the (1) role of federal authorities in reviewing merger proposals, (2) key factors motivating airline mergers in recent years, and (3) implications of merging American and US Airways. My testimony is based on several reports we previously prepared for this Committee—our 2008 report on the potential effects of the proposed merger between Delta and Northwest and our 2009 report on the financial condition of the airline industry and the various effects of the industry's contraction on passengers and communities—as well as our 2010 Statement for this Committee on the United-Continental merger[4] and other past work on aviation issues since 2000. In addition, we conducted analysis of the proposed American and US Airways merger, including some analysis of the airlines' financial, labor, fleet, and market conditions. To describe the role of federal authorities, in particular DOJ and DOT, in reviewing airline merger proposals we relied on information developed for our 2008 report and updated it as necessary.[5] For example, we reviewed new merger guidelines issued in 2010 and recent merger decisions. To provide an overview of the factors motivating airline mergers in recent years, we relied on information developed from past reports on the airline industry and updated it as necessary.[6] For example, we reviewed American Airlines bankruptcy and merger documents. To identify the implications of the proposed merger of American and US Airways, we reviewed airline documents about the merger, financial analyst reports,

---

[3]Under the Hart-Scott-Rodino Act, an acquisition of voting securities and/or assets above a set monetary amount must be reported to DOJ (or the Federal Trade Commission for certain industries) so the department can determine whether the merger or acquisition poses any antitrust concerns. 15 U.S.C. § 18a(d)(1). Both DOJ and the Federal Trade Commission have antitrust enforcement authority, including reviewing proposed mergers and acquisitions. DOJ is the antitrust enforcement authority charged with reviewing proposed mergers and acquisitions in the airline industry.

[4]GAO, *Airline Mergers: Issues Raised by the Proposed Merger of United and Continental Airlines,* GAO-10-778T (Washington, D.C.: May 27, 2010).

[5]GAO, *Airline Industry: Potential Mergers and Acquisitions Driven by Financial and Competitive Pressures,* GAO-08-845 (Washington, D.C.: July 31, 2008).

[6]*Commercial Aviation: Airline Industry Contraction Due to Volatile Fuel Prices and Falling Demand Affects Airports, Passengers, and Federal Government Revenues,* GAO-09-393 (Washington, D.C.: Apr. 21, 2009) and GAO-08-845.

GAO-13-403T

and analyzed data submitted by the airlines to DOT since 2002 (BTS Form 41 financial data, origin and destination ticket sample, and operations). We also analyzed airline schedule data. We assessed the reliability of these data by (1) performing electronic testing of required data elements, (2) reviewing existing information about the data and the system that produced them, and (3) interviewing agency officials knowledgeable about the data. We determined that the data were sufficiently reliable for the purposes of this testimony.

We conducted this work in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## Background

The airline industry has experienced considerable merger and acquisition activity since its early years; especially immediately following deregulation in 1978. Figure 1 provides a timeline of mergers and acquisitions for the four largest surviving airlines, assuming an American–US Airways merger, based on passengers served. A flurry of mergers and acquisitions occurred during the 1980s, when Delta and Western Airlines merged, United acquired Pan Am's Pacific routes, Northwest acquired Republic Airlines, and American and Air California merged. In 1988, merger and acquisition review authority was transferred from DOT to DOJ.[7] Since 2000, American acquired the bankrupt airline TWA in 2001, America West acquired US Airways in 2005, while the latter was in bankruptcy; Delta acquired Northwest in 2008; United acquired Continental in 2010; and Southwest acquired AirTran in 2011. Certain other attempts at merging since 2000 failed because of opposition from DOJ or employees and creditors. For example, in 2000, an agreement was reached that allowed Northwest to acquire a 50 percent stake in Continental (with limited voting power) to resolve the antitrust suit brought by DOJ against Northwest's proposed acquisition of a controlling interest in Continental.[8] A proposed merger of United and US Airways in 2000

[7]Civil Aeronautics Board Sunset Act, Pub. L. No. 98-443, 98 Stat. 1703 (1984).

[8]GAO, *Aviation Competition: Issues Related to the Proposed United Airlines-US Airways Merger*, GAO-01-212 (Washington, D.C.: Dec. 15, 2000) p. 10, footnote 6.

also resulted in opposition from DOJ, which found that in its view, the merger would violate antitrust laws by reducing competition, increasing air fares, and harming consumers on airline routes throughout the United States. Although DOJ expressed its intent to sue to block the transaction, the parties abandoned the transaction before a suit was filed. In 2006, the proposed merger of US Airways and Delta fell apart because of opposition from Delta's pilots and some of its creditors, as well as its senior management.

**Figure 1: Highlights of Domestic Airline Mergers and Acquisitions, 1920s – 2010s**

| Airline | 1920s | 1930s | 1940s | 1950s | 1960s | 1970s | 1980s | 1990s | 2000s | 2010s |
|---------|-------|-------|-------|-------|-------|-------|-------|-------|-------|-------|
| American | | 1934 | | | | 1970 Trans Caribbean Airways | 1986 Air California | 1990 Eastern Airlines Latin American routes | 1999 Reno Air | 2001 TWA | 2013 US Airways |
| Delta | 1929 | | | 1953 Chicago and Southern Air Lines | | 1972 Northeast Airlines | 1987 Western Airlines | 1991 Pan Am trans-atlantic routes and shuttle | 2000 ASA and Comair | 2008 Northwest | |
| Southwest | | | | | 1971 | | | 1994 Morris Air | | 2011 AirTran | |
| United | | 1934 | | | 1962 Capital Airlines | | 1986 Pan Am Pacific routes | 1990 Pan Am London routes | 1991 Pan Am Latin American routes | 2010 Continental | |

Ⓢ Acquisition or merger
● Company founded

Sources: Cathay Financial and airline company documents.

Since deregulation in 1978, the financial stability of the airline industry has become a considerable concern for the federal government due, in part, to the level of financial assistance it has provided to the industry through assuming terminated pension plans and other forms of assistance. From 1979 through 2012, there have been at least 194 airline bankruptcies, according to Airlines for America (A4A), an airline trade group. While most of these bankruptcies affected small airlines that were eventually liquidated, 4 of the more recent bankruptcies prior to American's (Delta, Northwest, United, and US Airways) are among the largest corporate bankruptcies ever, excluding financial services firms. During these bankruptcies, United and US Airways terminated the defined

GAO-13-403T

benefit pension plans for their labor groups and $9.7 billion in claims were shifted to the Pension Benefit Guarantee Corporation (PGBC).[9] Further, to respond to the financial shock to the industry from the September 11, 2001, terrorist attacks, the federal government provided airlines with $7.4 billion in direct assistance and authorized $1.6 billion (of $10 billion available) in loan guarantees to six airlines.[10]

Although the airline industry has experienced numerous mergers and bankruptcies since deregulation, growth of existing airlines and the entry of new airlines have contributed to a steady increase in capacity, as measured by available seat miles. Previously, we reported that although one airline may reduce capacity or leave the market, capacity returns relatively quickly through new airline entry and expansion of the remaining airlines.[11] However, in recent years this dynamic may be changing. Domestic capacity growth stalled in 2008 owing to the recession and high fuel prices and has not rebounded despite a strengthening economy and demand for air travel (see fig. 2).

---

[9]PBGC was established under the Employee Retirement Income Security Act of 1974 (Pub. L. No. 93-406, 88 Stat. 1003 (1974) (ERISA) and set forth standards and requirements that apply to defined benefit plans. PBGC was established to encourage the continuation and maintenance of voluntary private pension plans and to insure the benefits of workers and retirees in defined benefit plans should plan sponsors fail to pay benefits. PGBC operations are financed, for example, by insurance premiums paid by sponsors of defined benefit plans, investment income, and assets from pension plans trusted by PBGC, and recoveries from the companies formerly responsible for the plans.

[10]The six airlines receiving loan guarantees were Aloha, World, Frontier, US Airways, ATA, and America West.

[11]GAO, *Commercial Aviation: Bankruptcy and Pensions Problems Are Symptoms of Underlying Structural Issues*, GAO-05-945 (Washington, D.C.: Sept. 30, 2005).

GAO-13-403T



**Figure 2: Domestic Passenger Airline Capacity (Fiscal Years 2002 to 2012, Third Quarter)**

Available seat miles (in billions)

Fiscal year, 3rd quarter

Source: GAO analysis of DOT data.

In recent years, a key factor limiting capacity growth has been high fuel prices, according to industry analysts. In the early part of the last decade while network airlines[12] were restructuring their costs through bankruptcy, low cost airlines like Southwest and JetBlue expanded owing to lower costs, especially for labor (see fig. 3). As a result, while in 2002, network airlines offered 67 percent of domestic seat capacity versus 23 percent for low cost airlines, by October 2012, network airlines share of domestic seats had fallen to 52 percent and low cost airline's share had risen to 33 percent. However, the expansion of low cost airlines in recent years may

---

[12]Network (or legacy) airlines are essentially those airlines that were in operation before the Airline Deregulation Act of 1978 and whose goal is to provide service from "anywhere to everywhere." To meet that goal, these airlines support large, complex hub-and-spoke operations with thousands of employees and with hundreds of aircraft of various types, with service at numerous fare levels to domestic communities of all sizes and to international destinations. For purposes of this report, we have defined American, Continental, Delta, Northwest, United, and US Airways as network airlines and Allegiant, AirTran, Frontier, Midwest, JetBlue, Southwest, Spirit, and Sun Country as low cost airlines.

have slowed owing to higher fuel costs that diminished their relative cost advantage over network airlines. With fuel costs consuming a greater proportion of airline operating costs for all airlines, any cost advantage that low cost airlines had with respect to labor costs over network airlines is diluted.

**Figure 3: Total Operating Costs (Fiscal Years 2002 and 2012, Third Quarter)**



Source: GAO analysis of DOT Form 41 data.

Finally, DOJ and DOT's analysis of merger impacts have relied on an expectation that entry by low cost airlines, especially Southwest, would check airline fare increases following a merger. However, that practice might erode as Southwest expansion has slowed and it recently merged with a key low cost rival, reducing the number of low cost airlines that might challenge post merger fare increases. In 1993, DOT published a report entitled the The Southwest Effect that concluded that low cost airlines like Southwest lowered fares in markets they entered and that DOT policy should be to encourage the growth of Southwest and airlines like it.[13] Congressional action and DOT policy in subsequent years, especially in the award of operating rights called "slots" at congested airports like Washington Reagan and New York LaGuardia, favored new entrant airlines like Southwest. Similarly, DOJ cited the relinquishment of 36 slots by Continental to Southwest at Newark Liberty International Airport as alleviating its principle concerns in determining not to object to the United–Continental merger in 2010. A November 2008 paper by Goolsbee and Syverson, found that even the threat of entry by Southwest in a market helped to lower fares in that market, but only if Southwest already operated at one of the market endpoints.[14] More recently though, a 2013 study suggests that the Southwest Effect may not be as prominent following a merger. This study found that Southwest raised fares in markets following the mergers of Delta–Northwest and US Airways–America West more than average fare increases overall, unless another low cost airline was already in that market.[15] The merger of Southwest with a key rival in 2011 could further lessen the potential that Southwest would deter or counteract higher fares in markets following a merger.

---

[13]Randall Bennett and James Craun, U.S. Department of Transportation, *The Airline Deregulation Evolution Continues: The Southwest Effect*, May 1993.

[14]Austan Goolsbee and Chad Syverson, "How Do Incumbents Respond to the Threat of Entry? Evidence from the Major Airlines," *The Quarterly Journal of Economics,* (November 2008).

[15]Najmus Sakib bin Salam, *Is There Still A Southwest Effect?* Transportation Research Record publications, Volume no. 2325 (May 2013).

GAO-13-403T

## The Department of Justice's Antitrust Review Is a Critical Step in the Airline Merger and Acquisition Process

The DOJ's review of airline mergers and acquisitions is a key step for airlines hoping to consummate a merger. For airlines, as with other industries, DOJ uses an analytical framework set forth in the Horizontal Merger Guidelines (the Guidelines) to evaluate merger proposals.[16] In addition, DOT plays an advisory role for DOJ and, if the combination is consummated, may conduct financial and safety reviews of the combined entity under its regulatory authority.[17] Finally, because American has been under Chapter 11 bankruptcy protection since 2011, the merger also required federal bankruptcy court approval.

Most proposed airline mergers or acquisitions must be reviewed by DOJ as required by the Hart-Scott-Rodino Antitrust Improvements Act (Act).[18] In particular, under the Act, an acquisition of voting securities or assets above a set monetary amount must be reported to DOJ (or the FTC for certain industries) so the department can determine whether the merger or acquisition poses any antitrust concerns.[19] To analyze whether a proposed merger or acquisition raises antitrust concerns—whether the proposal will likely create, enhance, or entrench "market power" or facilitate its exercise[20]—DOJ follows an analytical process set forth in the Guidelines.[21] The commentary to the Guidelines identifies five factors that

---

[16]The *Guidelines* were jointly developed by DOJ's Antitrust Division and the Federal Trade Commission (FTC) and describe the inquiry process the two agencies follow in analyzing proposed mergers. The current version of the *Guidelines* was revised in August 2010.

[17]49 USC § 41110.

[18]Pub. L. No. 94–435, 90 Stat. 1383 (1976).

[19]See 15 U.S.C. § 18a(d)(1). Under the Hart-Scott-Rodino Act, DOJ has 30 days after the initial filing to notify companies that intend to merge whether DOJ requires additional information for its review. If DOJ does not request additional information, the firms can close their deal (15 U.S.C. § 18a(b)). If more information is required, however, the initial 30-day waiting period is followed by a second 30-day period, which starts to run after both companies have provided the requested information (15 USC § 18a(e)(2)). Companies often attempt to resolve DOJ competitive concerns, if possible, prior to the expiration of the second waiting period. Any restructuring of a transaction—e.g., through a divestiture—is included in a consent decree entered by a court, unless the competitive problem is unilaterally fixed by the parties prior to the expiration of the waiting period (called a "fix-it first").

[20]"Market power" is the ability to maintain prices profitably above competitive levels for a significant period of time.

[21]United States Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines* (Washington, D.C., rev. Aug. 19, 2010).

the department considers in reviewing a merger but notes that their importance varies according to the nature of the industry and the scope of the merger. The five factors considered by DOJ are:

- the relevant product and geographic markets in which the companies operate and whether the merger is likely to significantly increase concentration in those markets, which in the case of airlines principally applies to city-pair markets;
- the extent of potential adverse competitive effects of the merger, such as whether the merged entity will be able to charge higher prices or restrict output for the product or service it sells;
- whether other competitors are likely to enter the affected markets and whether they would counteract any potential anticompetitive effects that the merger might have posed;
- the verified "merger specific" efficiencies or other competitive benefits that may be generated by the merger and that cannot be obtained through any other means; and
- whether, absent the merger or acquisition, one of the firms is likely to fail, causing its assets to exit the market.

In making the decision whether the proposed merger is likely anticompetitive, DOJ considers the particular circumstances of the merger as it relates to the Guidelines' five-part analysis. The greater the potential anticompetitive effects, the greater the offsetting verifiable efficiencies for DOJ to clear a merger must be. However, according to the Guidelines, efficiencies almost never justify a merger if it would create a monopoly or near monopoly. If DOJ concludes that a merged airline threatens to deprive consumers of the benefits of competitive air service, then it will seek injunctive relief in a court proceeding to block the merger from being consummated. For example, a proposed merger of United Airlines and US Airways was opposed by DOJ, which found that, in its view, the merger would violate antitrust laws by reducing competition, increasing air fares, and harming consumers on airline routes throughout the United States. In some cases, the parties may agree to modify the proposal to address anticompetitive concerns identified by DOJ—for example, selling airport assets or giving up slots at congested airports—in which case DOJ ordinarily files a complaint with the court along with a consent decree that embodies the agreed-upon changes.

DOT conducts its own analyses of airline mergers and acquisitions. While DOJ is responsible for upholding antitrust laws, DOT reviews the merits of any airline merger or acquisition and submits its views and relevant information in its possession to DOJ. DOT also provides some essential

data—for example, the airlines' routes and passenger traffic—that DOJ
uses in its review. In addition, presuming the merger moves forward after
DOJ's review, DOT can undertake several other reviews if the situation
warrants. Before commencing operations, any new, acquired, or merged
airlines must obtain separate authorizations from DOT—"economic"
authority from the Office of the Secretary[22] and "safety" authority from the
Federal Aviation Administration (FAA).[23] The Office of the Secretary is
responsible for deciding whether applicants are fit, willing, and able to
perform the service or provide transportation. To make this decision, the
Secretary assesses whether the applicants have the managerial
competence, disposition to comply with regulations, and financial
resources necessary to operate a new airline. FAA is responsible for
certifying that the aircraft and operations conform to the safety standards
prescribed by the Administrator, for instance, that the applicants'
manuals, aircraft, facilities, and personnel meet federal safety standards.
Also, if a merger or other corporate transaction involves the transfer of
international route authority, DOT is responsible for assessing and
approving all transfers to ensure that they are consistent with the public
interest.[24]

In addition, American has been under federal bankruptcy protection since
November 2011.[25] In May 2013, the federal judge overseeing the
bankruptcy approved American's merger with US Airways as part of the

---

[22]49 U.S.C. § 41104.

[23]49 U.S.C. § 44702.

[24]49 U.S.C. § 41105. DOT must specifically consider the "transfer-of-certificate" authority's
impact on the financial viability of the parties to the transaction and on the trade position of
the United States in the international air transportation market, as well as on competition
in the domestic airline industry.

[25]11 U.S.C. § 1101 et seq. Chapter 11 of the United States code governs business
reorganizations. This chapter is designed to accommodate complicated reorganizations of
publicly held corporations. Among other things, it allows companies, with court approval,
to reject agreements made under collective bargaining and renegotiate contracts with
other creditors. With the approval of the bankruptcy courts (which administer the
bankruptcy laws), companies may also modify retiree benefits.

GAO-13-403T

reorganization.[26] Shareholders of US Airways must also approve the merger for it to be consummated.

## Financial Benefits to Shareholders Drive Airline Mergers

On February 13, 2013, American and US Airways announced an agreement to merge the two airlines. The airlines have also notified DOJ of their intent to merge. The new airline would retain the American name and headquarters in Dallas-Fort Worth while the current US Airways Chief Executive Officer would keep that title with the new airline, and the current American CEO would become Chairman of the new American. The proposed merger will be financed exclusively through an all stock transaction with a combined equity value of $11 billion split roughly with 72 percent ownership to American shareholders and 28 percent to US Airways shareholders. The airlines have not announced specific plans for changes in their networks or operations that would occur if the combination is consummated, but the airlines' conservatively estimate that the merger will result in $1.4 billion in annual benefits to shareholders of the new airline as outlined in table 1.

**Table 1: Estimated Annual Benefits and Costs from American—US Airways Merger (Dollars in Billions)**

| Benefit | Estimated value |
| --- | --- |
| Revenue (network) benefit | $1.12 |
| Cost benefits | .64 |
| Increased labor costs | (.36) |
| Total annual benefits | $1.40 |

Source: US Airways.

A key financial benefit that airlines consider in a merger is the potential for increased revenues through additional demand (generated by more seamless travel to more destinations), increased market share, and higher fares on some routes. As we reported in May 2010, mergers may generate additional demand by providing consumers more domestic and

---

[26]On April 15, American filed a formal restructuring plan to exit bankruptcy protection based on its merger with US Airways. On May 10, 2013, the presiding judge in the American Airlines bankruptcy signed an order approving the merger between American Airlines and US Airways. *In re AMR Corp.*, United States Bankruptcy Court for the Southern District of New York, No. 11-15463-SHL.

international city-pair destinations.[27] Airlines with expansive domestic and international networks and frequent flier benefits particularly appeal to business traffic, especially corporate accounts. The American–US Airways merger is estimated by airline executives to generate $1.12 billion in revenue synergies from improved network connectivity, increased corporate and frequent flier loyalty, and optimization in the use of their aircraft.

At the same time, capacity reductions in certain markets from a merger or acquisition could also serve to generate additional revenue through increased fares on some routes. Some studies of airline mergers and acquisitions during the 1980s showed that prices were higher on some routes from the airline's hubs soon after the combination was completed.[28] Several studies have also shown that increased airline dominance at an airport results in increased fare premiums, in part, because that dominance creates competitive barriers to entry.[29] At the same time, though, even if the combined airline is able to increase prices in some markets, the increase may be transitory if other airlines enter the markets with sufficient presence to counteract the price increase. In an empirical study of airline mergers and acquisitions up to 1992, Winston and Morrison suggest that being able to raise prices or stifle competition does not play a large role in airlines' merger and acquisition decisions.[30]

---

[27]GAO-10-778T.

[28]See Severin Borenstein, "Airline Mergers, Airport Dominance, and Market Power," *American Economic Review*, Vol. 80 (May 1990); Steven A. Morrison, "Airline Mergers: A Longer View," *Journal of Transport Economics and Policy* (September 1996); and Gregory J. Werden, Andrew J. Joskow, and Richard L. Johnson, "The Effects of Mergers on Price and Output: Two Case Studies from the Airline Industry," *Managerial and Decision Economics*, Vol. 12 (October 1991).

[29]See Severin Borenstein, "Hubs and High Fares: Dominance and Market Power in the U.S. Airline Industry," *RAND Journal of Economics*, 20, 344-365 (1989); GAO, *Airline Deregulation: Barriers to Entry Continue to Limit Competition in Several Key Markets*, GAO/RCED-97-4 (Washington, D.C.: Oct. 18, 1996); and GAO, *Airline Competition: Effects of Airline and Market Concentration and Barriers to Entry on Airfares*, GAO/RCED-91-101 (Washington, D.C.: Apr. 16, 1991).

[30]See Steven A. Morrison, and Clifford Winston, "The Remaining Role for Government Policy in the Deregulated Airline Industry." *Deregulation of Network Industries: What's Next? eds.* Sam Peltzman and Clifford Winston, (Washington, D.C., Brookings Institution Press 2000) pp. 1-40.

The other key financial benefit that airlines consider when merging with or acquiring another airline is the cost reduction that may result from combining complementary assets, eliminating duplicative activities, and reducing capacity. As we reported in May 2010, a merger or acquisition could enable the combined airline to reduce or eliminate duplicative operating costs, such as duplicative service, labor, and operations costs—including inefficient (or redundant) hubs or routes—or to achieve operational efficiencies by integrating computer systems and similar airline fleets.[31] By increasing the fleet size, airlines can increase their ability to match the size of aircraft with demand and adjust to seasonal shifts in demand. Other cost savings may stem from facility consolidation, procurement savings, and working capital and balance sheet restructuring, such as renegotiating aircraft leases. Airlines may also pursue mergers or acquisitions to more efficiently manage capacity—both to reduce operating costs and to generate revenue—in their networks. Given recent economic pressures, particularly increased fuel costs, the opportunity to lower costs by reducing redundant capacity may be especially appealing to airlines seeking to merge. In the case of the American–US Airways merger, airline executives estimate that the merger will allow $640 million in cost savings from reducing overlapping facilities at airports and in combining purchasing, technology, and corporate activities.

Despite these benefits, there are several potential barriers to successfully consummating a merger, potentially reducing the benefits and increasing the costs. As we reported in July 2008,[32] the most significant operational challenges involve the integration of workforces, organizational cultures, aircraft fleets, and information technology systems and processes, challenges that can be difficult, disruptive, and costly as the airlines integrate.[33] For example, in the case of the American–US Airways merger, with unions supporting the merger, pilots' and others' pay will increase by $360 million annually if the merger is completed. However, merging workforces can take time–for example, US Airways' pilot seniority lists have not been resolved following their merger with America West in 2005. Integrating technology, especially reservation systems, can

---

[31]GAO-10-778T.

[32]GAO-08-845.

[33]Airlines also face potential challenges to mergers and acquisitions from DOJ's antitrust review, which is discussed in the previous section.

also be difficult and costly. For example, United has struggled to integrate computer and reservation systems following its merger with Continental in 2010.

## The Proposed American and US Airways Merger Would Create The Largest U.S. Passenger Airline

If approved by DOJ, the merged American-US Airways would surpass United as the largest U.S. passenger airline. Table 2 shows that combining American and US Airways Airlines would create the largest U.S. airline based on data for the four quarters ending October 2012, as measured by capacity (available seat miles) and operating revenues. The combined airline would also have the largest workforce among U.S. airlines based on February 2013 employment statistics, with a combined 101,197 full-time equivalent employees (table 3). The airlines' workforces are represented by different unions, except dispatchers (table 4). Some of American's unions have already signed memorandums of understanding for future contracts if the airlines are merged. The combined airline would need to integrate 1,215 aircraft (table 5). American has a predominantly Boeing fleet, while US Airways has a largely Airbus fleet. In addition, in July 2011, American placed a $40 billion order for 200 Boeing 737 series and 260 Airbus A320 series aircraft. Despite its bankruptcy, the bankruptcy court allowed the order to proceed. American has also been trying to sell its regional airline, American Eagle, and its fleet of almost 280 aircraft.

**Table 2: Total Assets, Operating Revenue, and Capacity of Top U.S. Airlines (4 Quarters Ending October 2012)**

| Airline | Capacity as measured by available seat miles (thousands) | Total operating revenue (thousands)[a] | Total assets (thousands) |
|---|---|---|---|
| Combined American-US Airways | 226,545,216 | $38,847,509 | $130,928,916 |
| United | 218,563,833 | 37,470,318 | 154,554,977 |
| Delta | 200,931,079 | 36,615,819 | 144,019,527 |
| Southwest[b] | 128,365,001 | 17,023,282 | 75,640,126 |
| Alaska | 27,655,088 | 4,561,605 | 19,770,760 |

Source: Bureau of Transportation Statistics Form 41.

[a]Revenues include revenues from regional operations but assets exclude regional carrier assets unless wholly owned, as in the case of American Eagle.
[b]Includes AirTran.

GAO-13-403T

**Table 3: Full-Time Equivalent Employees of Top U.S. Airlines (February 2013)**

| Full-Time Equivalent Employees | |
| --- | --- |
| Airline | Total |
| Combined American–US Airways[a] | 101,197 |
| United | 82,212 |
| Delta | 73,320 |
| Southwest | 45,846 |
| JetBlue | 12,636 |
| SkyWest | 9,931 |
| Alaska | 9,279 |
| Hawaiian | 4,423 |

Source: Bureau of Transportation Statistics.

[a]Includes American Eagle.

**Table 4: Union Representation for Various Employee Groups**

| | Employee groups | | | |
| --- | --- | --- | --- | --- |
| | Pilots | Flight Attendants | Mechanics | Dispatchers |
| American | Allied Pilots Association (APA) | Association of Professional Flight Attendants (APFA) | Transport Workers Union (TWU) | TWU |
| US Airways | US Airline Pilots Association (USAPA) | Association of Flight Attendants (AFA) | International Association of Machinists and Aerospace Workers (IAM) | TWU |

Source: American Airlines and US Airways.

GAO-13-403T

Table 5: American and US Airways Aircraft Fleet (2013)

| Aircraft | American | US Airways | Merged |
|---|---|---|---|
| Embraer 190 | | 18 | 18 |
| Boeing 737 | 194 | 28 | 222 |
| Boeing 757 | 104 | 24 | 128 |
| Boeing 767 | 72 | 10 | 82 |
| Boeing 777 | 49 | | 49 |
| Airbus 319 | | 93 | 93 |
| Airbus 320 | | 72 | 72 |
| Airbus321 | | 75 | 75 |
| Airbus 330 | | 16 | 16 |
| MD-80 | 188 | | 188 |
| CRJ[a] | 59 | | 59 |
| E135[a] | 21 | | 21 |
| E140[a] | 74 | | 74 |
| E145[a] | 118 | | 118 |
| Total | 879 | 336 | 1215 |

Source: American Airlines and Dilo.

[a]American Eagle aircraft.

If approved by DOJ, the airlines would combine two distinct networks supported by different hubs, where the airlines connect traffic feeding from smaller airports. American's major hubs are in Chicago O'Hare (ORD), Dallas (DFW), New York (JFK), Los Angeles (LAX), and Miami (MIA), and US Airways has hubs in Charlotte (CLT), Philadelphia (PHL), Phoenix (PHX), and Washington D.C. (DCA), as shown in figures 4 and 5.

Figure 4: American Airlines Domestic Route Maps (January 2013)



Source: Innovata schedule data.

**Figure 5: US Airways Domestic Route Maps (January 2013)**



Source: Innovata schedule data.

A key concern for DOJ in reviewing an airline merger is the loss of a competitor on nonstop routes. The loss of a competitor that serves a market on a nonstop basis is significant from a competitive perspective because nonstop service is typically preferred by most passengers and routes that only have nonstop service do not benefit from the availability of alternative, albeit lower valued, connecting service. Based on October 2012 traffic data, the two airlines overlap on 12 nonstop airport-pair routes, which are listed in figure 6.[34] For 7 of these 12 nonstop overlapping airport-pairs (generally between an American hub and a US Airways hub) there are currently no other competitors on a nonstop basis

---

[34]This compares coincidently to the same number of nonstop overlapping airport pairs in the United—Continental merger.

and in only one instance is a low cost airline (Southwest) present. And unlike the United—Continental merger, where most of the endpoint cities had other airports in the region, fewer of these airport pairs have significant other airports in the region. This is especially true for the Charlotte (CLT)—Dallas (DFW) and Phoenix (PHX)—DFW pairs where few alternate options are available at either endpoint.

**Figure 6: Total Passengers on Overlapping Nonstop Airport Pairs (October 2012)**



Source: GAO analysis of DOT T-100 traffic data.

The amount of overlap in airport-pair combinations is far more when considering all connecting traffic; however, on most of the overlapping airport-pair markets, there is at least one other competitor. Based on

2011 and 2012 ticket sample data, for 13,963 airport-pairs[35] with a minimum level of passenger traffic per year, there would be a loss of one effective competitor in 1,665 airport pair markets affecting more than 53 million passengers by merging these airlines (see fig. 7).[36] As the figure shows, compared to the last major airline merger in 2010 between United and Continental, there would be 530 more airport pairs losing an effective competitor. This would affect 18 million more passengers compared to the merger between United and Continental. In addition, any effect on fares may be dampened by the presence of a low cost airline in 473 of the 1,665 airport pairs losing a competitor.[37] The combination of the two airlines would also create a new effective competitor with at least a combined 5 percent market share in 210 airport-pairs affecting 17.5 million passengers.

[35] It is generally preferable, time permitting, to assess city-pair, rather than airport-pair, changes in competition. Some larger U.S. cities (New York, Chicago, Los Angeles, Washington, D.C.) have more than one commercial airport that can compete for passenger traffic. DOJ generally considers the relevant market to be a city-pair combination, but also examines the airport pair if relevant.

[36] We assessed more than 96,000 airport pairs with any passenger traffic over the last 4 quarters ending October 2012, but eliminated any airport-pair with 520 or fewer annual passengers in one direction or 1,040 for two-way traffic because they would to be too small to ensure statistical accuracy. We defined an effective competitor as having at least 5 percent of total airport pair traffic. These are the same minimum passenger and market share that we have previously used to assess whether an airline has sufficient presence in a market to affect competition. See GAO-10-778T and GAO-08-845.

[37] We defined low cost airlines as JetBlue, Frontier/Midwest, AirTran, Allegiant, Spirit, Sun Country, and Southwest.

GAO-13-403T

**Figure 7: Change in Effective Competition from American-US Airways Combination (2012) Compared to United-Continental Merger (2010)**





American Airlines-US Airways

United-Continental

Source: GAO analysis of DOT Origin & Destination (OD1B) ticket data.

Note: All origin and destination airport pairs with at least 520 passengers in either direction. An effective competitor holds at least 5 percent of market share.

If approved by DOJ, the combined airline could be expected to rationalize its network over time, including where it maintains hubs. The two airlines do not share any airport hubs; therefore, the amount of airport market share overlap that currently exists at these hubs is relatively small but could grow at some hubs while contracting at others under a merger (see table 6). For example, New York could serve as a better hub and international gateway than Philadelphia in the Northeast, while Miami could be a better hub than Charlotte in the Southeast. In addition, 59 out of 116 domestic airports served by US Airways from Charlotte are also served by American from Miami (MIA). Closing hubs is not unprecedented, following the American acquisition of TWA in 2001, St Louis ceased to be an American hub and following the Delta–Northwest merger, service at Delta's hub in Cincinnati and Northwest's hub in Memphis has been greatly reduced.

GAO-13-403T

**Table 6: Domestic Passenger Market Share at Hub and Key Airports (4 Quarters Ending October 2012)**

| American airports | American share (%) | US Airways airports | US Airways share (%) | Total (%) |
|---|---|---|---|---|
| Dallas (DFW) | 67 | | 7 | 74 |
| Miami (MIA) | 66 | | 6 | 72 |
| | 7 | Charlotte (CLT) | 63 | 70 |
| | 5 | Philadelphia (PHL) | 49 | 54 |
| | 15 | Washington DC (DCA) | 34 | 49 |
| Chicago (ORD) | 36 | | 7 | 43 |
| New York (LGA) | 20 | | 14 | 34 |
| | 5 | Phoenix (PHX) | 27 | 32 |
| Los Angeles (LAX) | 18 | | 5 | 23 |
| New York (JFK) | 15 | | 3 | 18 |

Source: DOT origin and destination ticket sample data.

Note: Hub airports in bold.

Three of the airports noted in table 6 are slot-controlled airports with restricted access for new entrants or expanded service. As we reported last year, slot-controlled airports have more limited competition and tend to have higher fares compared to other hub airports.[38] Based on February 2012 slot holdings, a combined American and US Airways would control one-third of the slots at LaGuardia and two-thirds of the slots at Washington Reagan as noted in Table 7.

**Table 7: Slot Holdings of American and US Airways at Slot-Controlled Airports (February 2012)**

| Airports | American share (%) | US Airways share (%) | Combined American – US share (%) | United share (%) | Delta share (%) | Other share (%) |
|---|---|---|---|---|---|---|
| Washington DC (DCA) | 14 | 54 | 68 | 9 | 12 | 11 |
| New York LaGuardia (LGA) | 22 | 11 | 33 | 5 | 46 | 16 |
| New York (JFK) | 18 | 1 | 19 | 4 | 40 | 36 |
| Newark (EWR) | 5 | 3 | 8 | 81 | 6 | 6 |

Source: FAA.

---

[38]GAO, *Slot-Controlled Airports: FAA's Rules Could be Improved to Enhance Competition and Use of Available Capacity*, GAO-12-902 (Washington, D.C., Sept. 13, 2012).

Both American and US Airways have worldwide networks and serve many international destinations. Between the two airlines, they serve 107 international cities from airports in the United States, 37 of them in common, according to published February 2013 schedules. However, the two airlines do not directly compete on any of the same international city pair markets, though both serve slot-controlled London Heathrow airport with more than 830,000 passengers over the last year.[39] For international routes, U.S. airlines aggregate traffic from many domestic locations at a hub airport where passengers transfer onto international flights. In other words, at Philadelphia, where US Airways has a large hub, passengers traveling from many locations across the U.S. transfer onto US Airways' international flights. Likewise, American aggregates domestic traffic at New York's JFK for many of its international flights to some of the same destinations. As such, a passenger traveling from, for example Nashville, may view these alternative routes to a location in Europe as substitutable.

Whether service to international destinations from different domestic hubs will be viewed as a competitive concern will likely depend on a host of factors, such as the two airlines' market share of traffic to that destination and whether there are any barriers to new airlines entering or existing airlines expanding service at the international destination airports. US Airways is part of the larger Star Alliance, and American is a member of the smaller oneworld alliance.[40] US Airways has announced it will leave the Star Alliance and join American in oneworld as part of the merger. The DOT has authority to approve antitrust immunity applications,[41] but DOJ may also comment if it has antitrust concerns. According to a 2011 paper prepared by DOJ economists, "Over the past 17 years, DOT granted immunity to over 20 international alliance agreements, permitting participants in these alliances to collude on prices, schedules, and

---

[39]Of these 830,000 passengers, US Airways transported 52,000 and American Airlines transported 778,000.

[40]An airline alliance is an agreement between two or more airlines to cooperate on a substantial level. The three largest passenger airline alliances are the Star Alliance, SkyTeam and oneworld. Alliances provide a network of connectivity and convenience for international passengers. Alliances also provide convenient marketing branding to facilitate travelers making inter airline "codeshare" connections within countries.

[41]49 U.S.C. §§ 41308, 41309.

marketing."[42] They found that in granting immunity to larger groups of airlines in the three major international alliances, the number of independent competitors over the North Atlantic was significantly reduced adversely affecting consumers through higher fares. Because both airlines are already part of immunized alliances it is unclear what effect, if any, this merger might have on competition in international service. According to DOT officials responsible for reviewing and approving the immunity requests, the agency has analyzed and documented the impact of immunized alliances in its many public orders and has concluded that in its experience, integrated airline alliances enable a number of valuable consumer benefits, including lower prices for many travelers.

Chairman Cantwell, Ranking Member Ayotte, and Members of the Subcommittee, this concludes my prepared statement. I would be happy to answer any questions that you may have at this time.

## Contact and Acknowledgments

For further information on this testimony, please contact Gerald L. Dillingham, Ph.D. at (202) 512-2834 or by email at dillinghamg@gao.gov. In addition, contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this statement. Individuals making key contributions include Paul Aussendorf (Assistant Director); Amy Abramowitz; Susan Fleming; Dave Hooper; Delwen Jones; Brooke Leary; Dominic Nadarski; Josh Ormond; Gretchen Snoey; and Carrie Wilks.

---

[42]See William Gillespie and Oliver Richard, "Antitrust Immunity and International Airline Alliances", *Economic Analysis Group of the Department of Justice's Antitrust Division,* EAG 11-1, February 2011. The views are those of the authors and not the department.

# Related GAO Products

*Airline Mergers: Issues Raised by the Proposed Merger of United and Continental Airlines.* GAO-10-778T. Washington, D.C.: May 27, 2010.

*April 21, 2009. Commercial Aviation: Airline Industry Contraction Due to Volatile Fuel Prices and Falling Demand Affects Airports, Passengers, and Federal Government Revenues.* GAO-09-393. Washington, D.C.: April 21, 2009.

*Airline Industry: Potential Mergers and Acquisitions Driven by Financial Competitive Pressures.* GAO-08-845. Washington, D.C.: July 31, 2008.

*Airline Deregulation: Reregulating the Airline Industry Would Likely Reverse Consumer Benefits and Not Save Airline Pensions.* GAO-06-630. Washington, D.C.: June 9, 2005.

*Commercial Aviation: Bankruptcy and Pension Problems Are Symptoms of Underlying Structural Issues.* GAO-05-945. Washington, D.C.: Sept. 30, 2005.

*Commercial Aviation: Preliminary Observations on Legacy Airlines' Financial Condition, Bankruptcy, and Pension Issues.* GAO-05-835T. Washington, D.C.: June 22, 2005.

*Private Pensions: Airline Plans' Underfunding Illustrates Broader Problems with the Defined Benefit Pension System.* GAO-05-108T. Washington, D.C.: Oct. 7, 2004.

*Transatlantic Aviation: Effects of Easing Restrictions on U.S.-European Markets.* GAO-04-835. Washington, D.C.: Jul. 21, 2004.

*Commercial Aviation: Despite Industry Turmoil, Low-Cost Airlines Are Growing and Profitable.* GAO-04-837T. Washington, D.C.: June 3, 2004.

*Commercial Aviation: Legacy Airlines Must Further Reduce Costs to Restore Profitability.* GAO-04-836. Washington, D.C.: August 11, 2004.

*Commercial Aviation: Financial Condition and Industry Responses Affect Competition.* GAO-03-171T. Washington, D.C.: Oct. 2, 2002.

*Commercial Aviation: Air Service Trends at Small Communities since October 2000.* GAO-02-432. Washington, D.C.: March 29, 2002.

GAO-13-403T

**Related GAO Products**

*Proposed Alliance Between American Airlines and British Airways Raises Competition Concerns and Public Interest Issues.* GAO-02-293R. Washington, D.C: Dec. 21, 2001.

*Aviation Competition: Issues Related to the Proposed United Airlines-US Airways Merger.* GAO-01-212. Washington, D.C: Dec. 15, 2000.

This is a work of the U.S. government and is not subject to copyright protection in the
United States. The published product may be reproduced and distributed in its entirety
without further permission from GAO. However, because this work may contain
copyrighted images or other material, permission from the copyright holder may be
necessary if you wish to reproduce this material separately.

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's website (http://www.gao.gov). Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to http://www.gao.gov and select "E-mail Updates." |
| Order by Phone | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, http://www.gao.gov/ordering.htm. |
| | Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. |
| | Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or E-mail Updates. Listen to our Podcasts. Visit GAO on the web at www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact: <br><br> Website: http://www.gao.gov/fraudnet/fraudnet.htm <br> E-mail: fraudnet@gao.gov <br> Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Katherine Siggerud, Managing Director, siggerudk@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |



Please Print on Recycled Paper.