**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FOR PUBLICATION

------------------------------------------------------------------------x

In re:                                                                                    Chapter 11

AMR CORPORATION, *et al.*,                                    Case No. 11-15463 (SHL)

                                           Debtors.                      (Jointly Administered)

------------------------------------------------------------------------x

CAROLYN FJORD, *et al.*,

                                           Plaintiffs,

                      v.                                                          Adv. Pro. No. 13-01392 (SHL)

AMR CORPORATION, AMERICAN AIRLINES,
AMERICAN GROUP, INC. and AMERICAN, INC.,

                                           Defendants,


OFFICIAL COMMITTEE OF UNSECURED
CREDITORS,

                                           As Intervenor.

------------------------------------------------------------------------x


<u>**MEMORANDUM OF DECISION**</u>


A P P E A R A N C E S :

**WEIL, GOTSHAL & MANGES LLP**
*Counsel for Defendants and Debtors AMR Corporation*
*and American Airlines, Inc.*
767 Fifth Avenue
New York, NY 10153
By:     Stephen Karotkin, Esq.
          Alfredo R. Pérez, Esq.
          Stephen A. Youngman, Esq.

1

**SKADDEN ARPS SLATE MEAGHER & FLOM LLP**
*Counsel for Intervenor the Official Committee of Unsecured*
*Creditors*
Four Times Square
New York, New York 10036
By:    Jay M. Goffman, Esq.
         James A. Keyte, Esq.
         Kenneth B. Schwartz, Esq.


-and-

155 North Wacker Drive
Chicago, Illinois 60606
By:    John Wm. Butler, Jr., Esq.
         Albert L. Hogan III, Esq.


**LATHAM & WATKINS LLP**
*Counsel for Defendants US Airways Group, Inc.*
*and US Airways, Inc.*
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
By:    Daniel M. Wall, Esq.
         Alfred C. Pfeiffer, Jr., Esq.
         Sadik Huseny, Esq.


**ALIOTO LAW FIRM**
*Counsel for Clayton Plaintiffs*
One Sansome Street, 35th Floor
San Francisco, CA 94104
By:    Joseph M. Alioto, Esq.


**COOK COLLECTION ATTORNEYS**
*Counsel for Clayton Plaintiffs*
165 Fell Street
San Francisco, CA 94102
By:    David J. Cook, Esq.


**MESSINA LAW FIRM, P.C.**
*Counsel for Clayton Plaintiffs*
961 Holmdel Road
Holmdel, NJ 07733
By:    Gil D. Messina, Esq.

**MINAMI TAMAKI LLP**
*Counsel for Clayton Plaintiffs*
360 Post Street, 8th Floor
San Francisco, CA 94109
By:     Derek G. Howard, Esq.


**STEPTOE & JOHNSON LLP**
*Counsel for the Allied Pilots Association*
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
By:     Filiberto Agusti, Esq.
        Joshua Robert Taylor, Esq.


**JAMES & HOFFMAN, P.C.**
*Counsel for the Allied Pilots Association*
1130 Connecticut Avenue, N.W., Suite 950
Washington, D.C. 20036
By:     Edgar N. James, Esq.
        Kathy L. Krieger, Esq.
        David P. Dean, Esq.


**GUERRIERI, CLAYMAN, BARTOS & PARCELLI, P.C.**
*Counsel for the Association of Professional Flight Attendants*
1625 Massachusetts Avenue, N.W., Suite 700
Washington, D.C. 20036
By:     Robert S. Clayman, Esq.
        N. Skelly Harper, Esq.


**TRANSPORT WORKERS UNION OF AMERICA**
*General Counsel*
501 3rd Street, NW, 9th Floor
Washington, DC 20001
By:     David Rosen, Esq.


**O'DONNELL, SCHWARTZ & ANDERSON, P.C.**
*Counsel for the Transport Workers Union of America, AFL-CIO*
1300 L Street, N.W., Suite 1200
Washington, D.C. 20005
By:     Richard S. Edelman, Esq.

**LOWENSTEIN SANDLER PC**
*Counsel for the Transport Workers Union of America, AFL-CIO*
65 Livingston Avenue
Roseland, New Jersey 07068
By:     Sharon L. Levine, Esq.
        Jeffrey Blumenfeld, Esq.


**MILBANK, TWEED, HADLEY & McCLOY LLP**
*Counsel for the Ad Hoc Committee of AMR Corporation
Creditors*
1 Chase Manhattan Plaza
New York, NY 10005
By:     Gerard Uzzi, Esq.
        Erik  K. Stodola, Esq.


**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

## INTRODUCTION

Before the Court are three motions in the above-captioned Chapter 11 cases and

adversary proceeding.  All of the motions relate, on the one hand, to the Debtors' desire to

consummate their plan of reorganization by completing their merger with US Airways and, on

the other hand, the desire of the Plaintiffs in the adversary proceeding to block that event.

Turning first to the Debtors, they filed a motion on November 12, 2013, for approval of a

settlement under Bankruptcy Rule 9019 between AMR Corporation ("AMR"), US Airways

Group, Inc. ("US Airways," and together with AMR, the "DOJ Defendants"), the U.S.

Department of Justice (the "DOJ") and the states of Arizona, Florida, Tennessee, Michigan,

Pennsylvania, Virginia and the District of Columbia (collectively the "Plaintiff States," and

together with the DOJ, the "DOJ Plaintiffs").  Publicly announced on November 12, 2013, the

settlement resolves claims asserted in an antitrust action brought by the DOJ in the U.S. District

Court for the District of Columbia (the "DOJ Action") alleging that a merger between AMR and

4

US Airways would violate Section 7 of the Clayton Antitrust Act (the "Clayton Act").  The Debtors also seek a determination that entry into the settlement will not necessitate re-solicitation of the Debtors' second amended plan of reorganization that was previously confirmed by this Court.

On November 12, 2013, the Debtors also filed a related motion requesting that the Court permit the merger between AMR and US Airways to be consummated without delay, notwithstanding the pendency of an adversary proceeding brought by several individuals (the "Clayton Plaintiffs") under the private civil antitrust suit provision in Section 16 of the Clayton Act (the "Clayton Adversary").  The Debtors' major constituencies have filed statements in support of the relief requested by the Debtors, including the Allied Pilots Association, the Association of Professional Flight Attendants, the Transport Workers Union of America, AFL-CIO and an Ad Hoc Committee of AMR Corporation Creditors.  The Committee of Unsecured Creditors also supports the Debtors' motions.  The sole objection to Debtors' motions was filed by the Clayton Plaintiffs, who filed a motion for a temporary restraining order seeking to block the merger (the "TRO Motion").  The Plaintiffs filed the TRO Motion on Thursday November 21, 2013, as their opposition to the Debtors' motions.  The Debtors and Defendants in the Clayton Adversary filed their reply brief and opposition to the TRO Motion on Saturday November 23, 2013 (the "Reply"), and the Court held a hearing on all the motions on November 25, 2013.

For the reasons explained more fully below, the Court grants the Debtors' motions and denies the Clayton Plaintiffs' request for a TRO.

## BACKGROUND

The Debtors commenced their Chapter 11 cases on November 29, 2011.  During the pendency of the cases, the Debtors explored various strategic restructuring alternatives, including a plan of reorganization in which the Debtors would emerge as a stand-alone entity, without entering into a strategic business combination or obtaining new equity investments.  The Debtors, however, ultimately determined that a merger with US Airways would maximize value for the Debtors' stakeholders.

On February 13, 2013, the Debtors entered into an agreement and plan of merger with US Airways.  The agreement provides that the merger is to be effectuated pursuant to the Debtors' plan of reorganization and consummation of the merger is to take place contemporaneously with the effective date of the plan.  One of the conditions to the merger is that the parties obtain necessary regulatory approval.  On May 10, 2013, this Court entered an order approving the merger agreement.  On June 5, 2013 the Debtors filed the Second Amended Joint Chapter 11 Plan and accompanying Disclosure Statement.  The plan was predicated upon the merger.

On August 6, 2013, the Clayton Plaintiffs filed the Clayton Adversary in the Debtors' Chapter 11 cases.  The complaint filed in the Clayton Adversary alleges that the merger "may substantially lessen competition or tend to create a monopoly in any section of the country," thereby violating Section 7 of the Clayton Act.  15 U.S.C. § 18.  In their complaint, the Clayton Plaintiffs seek to enjoin the merger or to require divestiture.  *See* Compl. at 25.  The Clayton Plaintiffs also seek costs, including attorney's fees under Section 16 of the Clayton Act.  *See id.*

On August 13, 2013, the DOJ filed the DOJ Action alleging, among other things, that the merger would substantially lessen competition in violation of Section 7 of the Clayton Act.  The

DOJ Action also sought to permanently enjoin the merger.  Various states joined the DOJ Action as plaintiffs.  A trial in the DOJ Action was scheduled to commence on November 25, 2013.

On August 15, 2013, a hearing was held on confirmation of the Debtors' plan.  At the hearing, the Court requested additional submissions with respect to the impact of the DOJ Action on confirmation of the plan.  After considering those submissions, the Court subsequently determined that confirmation was appropriate notwithstanding the existence of the DOJ Action, and, therefore, the Court overruled the objection to confirmation filed by the Clayton Plaintiffs. *See* Hr'g Tr., Sept. 12, 2013 (ECF No. 10205).  After resolving other objections, *see In re AMR Corp.*, 497 B.R. 690 (Bankr. S.D.N.Y. 2013), the Court entered an order confirming the plan dated October 21, 2013.  (ECF No. 10367).  The Confirmation Order states that the sections of the Plan providing for the release of the Debtors, the discharge of claims, and plan injunctions do not apply to the claims asserted in the Clayton Adversary.

On November 12, 2013, a settlement of the DOJ Action was publicly announced.  The settlement includes and is incorporated in: (a) a proposed final judgment with the DOJ Plaintiffs, (b) an Asset Preservation Order and Stipulation entered by the District Court that consents to entry of the Proposed Final Judgment following compliance with the requirements of the Antitrust Procedures and Penalties Act, (c) a supplemental stipulated order with the Plaintiff States, and (d) an agreement between US Airways, AMR and the U.S. Department of Transportation.

The details of the settlement are too complicated to set forth here in detail.  But as a general matter, AMR and US Airways will divest their rights to 104 slots at Washington Reagan National Airport and 34 slots at New York LaGuardia Airport under the terms of the final judgment, along with accompanying gates.  Additionally, AMR and US Airways will divest two

gates each at Boston Logan International Airport, Chicago O'Hare International Airport, Dallas

Love Field, Los Angeles International Airport and Miami International Airport.  AMR and US

Airways will also divest their rights in the associated ground facilities, including ticket counters,

hold-rooms, leased jet bridges and operations space.

The divestitures will be made to acquiring entities that are approved by the United States

in consultation with the Plaintiff States.  Prior to divestiture of any assets, it must be

demonstrated to the satisfaction of the United States that the divested assets will remain viable,

and the divesture of such assets will remedy the competitive harm alleged in the DOJ Action.

The United States must also be satisfied that none of the terms of any agreement regarding the

divestiture of assets will give AMR and US Airways the ability to unreasonably raise the

acquirer's costs, to lower the acquirer's efficiency, or otherwise to interfere in the ability of the

acquirer to effectively compete.  AMR and US Airways may not reacquire any interest or part of

the divested assets for a period of ten years.

The stipulation between AMR, US Airways and the Plaintiff States, provides that the

newly merged entity (referred to as New American) will maintain hubs for a period of at least

three years at Charlotte Douglas International Airport, John F. Kennedy International Airport,

Los Angeles International Airport, Miami International Airport, Chicago O'Hare International

Airport, Philadelphia International Airport and Phoenix Sky Harbor International Airport.

Additionally New American will continue to provide daily scheduled service from one or more

of its hubs to certain airports in the Plaintiff States for a period of five years.

The agreement between AMR, US Airways and the Department of Transportation

requires New American to continue to serve certain medium, small and non-hub airports from

Washington Reagan National Airport for a period of at least five years.

5

The Asset Preservation Agreement provides that AMR and US Airways shall take all necessary steps to ensure that the assets proposed to be divested will be maintained until the divestitures have been completed.  AMR and US Airways have agreed not to cause the wasting or deterioration of the assets or to cause the assets to be operated in a manner inconsistent with applicable law.  AMR and US Airways have also agreed not to sell, transfer, encumber or otherwise impair the viability, marketability or competitiveness of the assets.

## DISCUSSION

**A.  The Relevant Legal Standards**

Section 16 of the Clayton Act authorizes private individuals to sue for injunctive relief for a violation of Section 7 of the Clayton Act.  In relevant part, Section 16 provides:

> Any person shall be entitled to sue for and have injunctive relief in any court of the United States having jurisdiction against threatened loss or damage by a violation of the antitrust laws including sections 13, 14, 18, and 19 of this title, when and under the same principles for injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity under rules governing the procedures, and upon execution of a proper bond, and showing that the danger of irreparable loss or damage is immediate a preliminary injunction may issue.

15 U.S.C. § 26.

Section 7 of the Clayton Act provides for the standard against which the purported violation should be measured:

> No person engaged in commerce or in any activity affecting commerce shall acquire the whole or any part of any of the stock….where the effect of such acquisition may be to substantially lessen competition or tend to create a monopoly.

15 U.S.C. § 18.

Federal Rule of Bankruptcy Procedure 7065 addresses injunctive relief by incorporating Federal Rule of Civil Procedure 65 in adversary proceedings, except that a temporary restraining

order or preliminary injunction may be issued on application of a debtor, trustee, or debtor in possession without compliance with Rule 65(c).[1]  The Rules require this Court, upon the issuance of a TRO, to set forth why it was issued, its specific terms, and the act or acts restrained or required in reasonable detail.

It is well established that "the basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Sampson v. Murray*, 415 U.S. 61, 88 (1974).  The Second Circuit has described the test for injunctive relief as (1) probable success on the merits and irreparable injury or (2) sufficiently serious questions as to the merits which constitute fair grounds for litigation and the balance of the hardships tips decidedly to the party requesting relief.[2]  *Vantico Holdings S.A. v. Apollo Mgmt.,* 247 F. Supp. 2d 437, 451 (S.D.N.Y. 2003) (citing *AIM Int'l Trading, LLC v. Valcucine SpA.*, 188 F. Supp. 2d 384, 387 (S.D.N.Y. 2002) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)); *Triebwasser and Katz v. AT&T*, 535 F.2d 1356, 1358 (2d Cir. 1976); *Consolidated Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252, 256 (2d Cir. 1989); *Gulf & Western Indus., Inc. v. Great Atlantic & Pacific Tea Co.,* 476 F.2d 687, 692 (2d Cir. 1973).  "Injunctive relief 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'"  *Air Line Pilots Ass'n v. U.A.L.*, 2011 WL 4543820 at *1 (E.D.N.Y. Sept. 29, 2011) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).  In the Second Circuit, all these principles have been reiterated time and time again, with the Circuit

---

[1]    Rule 65(c) provides for the posting of security to cover losses incurred by any party found to have been wrongfully restrained or enjoined.

[2]    The Defendants note a nuance in how courts in this Circuit have articulated the standard for injunctive relief.  Reply at 17, n.7 (Adv. Pro. ECF No. 64).  *See N.Y. Progress & Prot. PAC v. Walsh,* 2013 U.S. App. LEXIS 21579 at *4 (citing *Winter v. Natural Resource Defense Council, Inc.,* 555 U.S. 7, 20 (2008)) (stating that four elements all must be satisfied: irreparable harm, likelihood of success on the merits, balance of equities tips in the moving party's favor, and injunctive relief is in the public interest).  The Court notes that all the formulations include irreparable harm and a review of the merits.  The Court's result today would be the same regardless of which formulation of the test is used.

noting the broad level of discretion vested with the trial court in determining whether the extraordinary remedy of injunctive relief is appropriate in the context of antitrust litigation.  *See Moore v. Consol. Edison Co. of N.Y., Inc.,* 409 F.3d 506, 511 (2d Cir. 2005); *Green Party of N.Y. v. N.Y. State Bd. of Elections,* 389 F.3d 411, 418 (2d Cir. 2004); *Columbia Pictures Indus., Inc. v. Am. Broad. Cos.,* 501 F.2d 894, 897 (2d Cir. 1974).

Given the overlap of these motions, the Court will address the TRO Motion first, as it sets forth the only objection to the relief requested in the Debtors' motions.  The Court will discuss each element of the TRO inquiry separately.

### B.  The Requested TRO

#### 1.  Irreparable Harm

The Court turns first to the issue of irreparable harm, which is the most important prerequisite for injunctive relief.  *See Faiveley Transport Malmo AB v. Wabtec Corp.,* 559 F.3d 110, 118 (2d Cir. 2009)); s*ee also Ranger Oil Ltd. v. Petrobank Energy and Res., Ltd.*, 2000 U.S. Dist. LEXIS 7571 at *22 (S.D.N.Y May 23, 2000).  The irreparable harm requirement asks whether the alleged injury to be suffered is likely and imminent, as opposed to remote or speculative, and whether it is capable of being fully remedied by money damages.  *Faiveley*, 559 F.3d at 118.  When considering irreparable harm, "mere injuries, however substantial, in terms of time, money and energy expended in the absence of a stay are not enough.  The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."  *Sampson*, 415 U.S. at 90 (citing *Virginia Petroleum Jobbers Assn. v. FPC*, 259 F.2d 921 (D.C. 1958)).

Applying that standard here, the Court concludes that this factor weighs against the granting of a TRO for several reasons.  As a threshold matter, the Clayton Plaintiffs have failed

to demonstrate irreparable harm to them as individuals.  The Plaintiffs describe themselves as individuals who "are and will be direct purchasers of airline tickets from defendants."  Compl. at 2.  They are further identified as "passengers and travel agents who have purchased airline tickets from defendants in the past and who are expected to do so in the future."  Compl. at ¶ 5. The only other description of these individuals in the record before the hearing on these motions was a general statement made by Plaintiffs' counsel at the hearing on September 24, 2013:

> These are not just ordinary plaintiffs I want to point out, but they know about who they are.  These are people who have been in the industry and know a lot about the industry.

Hr'g. Tr., Sept. 24, 2013 at 55 (ECF No. 10248).

Despite these allegations, however, there are no affidavits or declarations from any of the Plaintiffs.  The Court has no evidence whatsoever regarding who the Plaintiffs are, what the nature of their interest in the airline industry is, or how they will be individually harmed by the proposed merger.[3]  In failing to provide such evidence, the Plaintiffs ignore a key requirement for the relief they seek.  As the Supreme Court has explained, a plaintiff seeking an injunction under Section 16 of the Clayton Act must show a threat of "antitrust injury" to fulfill the standing requirement.  *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 113 (1986) (cited in *Moore Corp. v. Wallace Computer Servs.*, 907 F. Supp. 1545, 1565 (D. Del. 1995)).  In this case, therefore, the Court need only "consider those injuries plaintiffs advance *that are personal to them* . . . and cannot consider any injuries that plaintiffs allege would be suffered by the general air carrier flying public as a whole."  *Malaney v. UAL Corp.,* 2010 U.S. Dist. LEXIS 106049 at *46 (N.D. Cal. Sept. 27, 2010) (emphasis added) (citing *United States v. Borden Co.,*

---

[3]      In responding to the Court's question about evidence at the hearing, Plaintiffs' counsel referred to information in the Plaintiffs' answers to interrogatories.  Of course, such discovery is not filed with the Court as a matter of course and only makes its way into the record if it is submitted by a party.  It was not submitted to the Court by the Plaintiffs here.

347 U.S. 514, 518 (1954)), *aff'd* 2011 U.S. App. LEXIS 10638 (9th Cir. May 23, 2011); *see also Levitch v. Columbia Broad. Sys., Inc.*, 495 F. Supp. 649, 669 (S.D.N.Y. 1980).[4]

The court in *Malaney* addressed this issue in an antitrust case filed by the same counsel representing the Plaintiffs here. *See Malaney*, 2010 U.S. Dist. LEXIS 106049 at *45-46. In *Malaney*, the plaintiffs sought to enjoin the airline merger of Continental and United. The plaintiffs provided evidence by affidavit and at an evidentiary hearing. The evidence included information about how and to what extent the individual plaintiffs purchased airline tickets, which airports they used, and their use of frequent flyer reward programs. But even armed with this evidence, the court in *Malaney* was not satisfied that the particular plaintiffs, given their posture in the market, would suffer the type of immediate irreparable injury sufficient to justify injunctive relief. *Id.* at *48. Notwithstanding the Malaney plaintiffs' allegation that the merger would adversely affect any consumer participating in the airline market, the court found that the plaintiffs still needed to establish how those effects were personal to them. Having failed to do so, the court rejected the request for injunctive relief.[5]

---

[4]    As the Second Circuit explained in *Daniel v. Am. Bd. of Emergency Med.,* 428 F.3d 408 (2d Cir. 2005),

> Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 534 (1983). Just as in common-law tort and contract litigation, concepts such as "foreseeability and proximate cause, directness of injury, certainty of damages, and privity of contract" circumscribe a party's right to recovery, so in antitrust actions "the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them," can limit the right to sue . . . The same logic applies to claims for injunctive relief under Section 16 of the Clayton Act.

*Id.* at 436; s*ee also National Auto Brokers Corp. v. General Motors Corp.*, 60 F.R.D. 476, 492 (S.D.N.Y. 1973) (to obtain injunctive relief, a plaintiff must demonstrate that "he is threatened with loss or damage . . . 'of a sort personal to the plaintiff.'") (quoting *United States v. Borden Co.*, 347 U.S. 514, 518, (1954)).

[5]    Notably, the alleged injury in that case is similar, if not identical to the injuries alleged in this case.

By contrast here, no evidence of individual harm has been provided by the Clayton Plaintiffs, thus leaving the Court in the dark as to the immediate and irreparable harm the merger might cause to these individuals. *See Air Line Pilots Ass'n v. United Air Lines, Inc.*, 2011 WL 4543820 at *2 (E.D.N.Y. Sept. 29, 2011) (stating that to obtain injunctive relief, plaintiffs need to show they would "personally suffer actual and imminent injury").[6] While the standard for such evidence is more relaxed in a TRO hearing than a hearing on the merits, it is problematic to simply present no evidence on such a crucial point. *Cf. University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits"). The Plaintiffs' failure on this score is particularly puzzling given the Court's prior comments to the Plaintiffs on this topic. *See*, Hr'g Tr., Aug. 15, 2013, at 55:9-20 (ECF No. 9903) (noting that a request for injunctive relief is "traditionally accompanied by declarations . . . It is highly unusual . . . and perhaps completely unprecedented for a successful application of that type to be without such things because that's what the law requires.").[7]

---

[6]    At the hearing, the Plaintiffs sought to excuse their failure to provide evidence for a variety of reasons. But the Court is unpersuaded. The Court is particularly skeptical of Plaintiffs' position because they have had access in the DOJ Action to millions of pages of documents, as well as numerous deposition transcripts.

[7]    At the hearing, the Clayton Plaintiffs requested to supplement their submission with additional documents. But the Court denied that request given all the circumstances in this case, including that the Plaintiffs waited until noon on Thursday November 23, 2013, to file their TRO Motion that they requested be heard on Monday, November 26, 2013. *Cf. SEC v. Frank*, 388 F.2d 486, 490 (2d Cir. 1968) ("One standard with respect to the taking of evidence derivable from this framework is that where interlocutory relief is truly needed, Rule 65 demands such but only such thoroughness as a burdened federal judiciary can reasonably be expected to attain within twenty days."); *Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 256 (2d Cir. 1989) ("There is no hard and fast rule in this circuit that oral testimony must be taken on a motion for a preliminary injunction or that the court can in no circumstances dispose of the motion on the papers before it.") (quoting *Redac Project 6426, Inc. v. Allstate Insurance Co.*, 402 F.2d 789, 790 (2d Cir. 1968)).

In the place of the requisite evidence, the TRO Motion contains a number of sweeping and conclusory allegations about the harm to these individual plaintiffs.  Even assuming that such statements had evidentiary support—and they do not—they would be insufficient to satisfy the irreparable harm element for purposes of the TRO motion.  For example, the TRO Motion states in conclusory fashion that "plaintiffs can demonstrate irreparable harm by reason of capacity reductions, elimination of the Advantage Fare, loss of benefits from AMR as a standalone company . . . ."  *See* TRO Motion at 21.  The Motion goes on to make other similarly broad allegations, including that "[c]reating the world's largest airlines . . . would adversely affect millions of consumers and a TRO will serve the public interest."  *Id.* at 18; *see also id.* at 20 ("There is no adequate remedy at law given the national market and the number of sub-market city or airport-pairs involved and the fact that the rise in prices will be diffused over a broad segment of the flying public, flights will become unavailable or less frequent, and amenities and services will be cut.").  But once again, there is nothing said of the harm to the individual Plaintiffs.

The only evidence submitted in support of the TRO Motion is a single declaration from Plaintiffs' expert, Mr. Darren Bush, together with a variety of documents.  These also fail to establish irreparable harm.  It is unclear whether Mr. Bush was tasked with addressing the question of irreparable harm to the Clayton Plaintiffs as his affidavit states:

> I have been asked to render an opinion regarding the probability that Carolyn Fjord and the other Private Plaintiffs in this matter are likely to succeed on the merits . . . .

Affidavit of Darren Bush ("Bush Aff."), at 2 (ECF No. 57-3).

In any event, Mr. Bush's testimony is insufficient to establish irreparable harm to justify the requested injunctive relief.  He fails to address the specific harm, in economic terms or

12

otherwise, that these specific Plaintiffs would suffer should the merger go forward.  Instead he

reiterates the broader allegations found in the Complaint and TRO Motion, as well as those

contained in the Amended DOJ Complaint.  Like the allegations in the TRO Motion itself, his

testimony on these broader allegations is largely conclusory with Mr. Bush presenting little

analysis of his own, instead citing to allegations made by the Government in the DOJ Action or

in various reports.

In addition, the Plaintiffs also fail to establish irreparable harm justifying the blocking of

the merger for another independent reason:  they have the alternative remedy of divestiture

available if they prevail on the merits of their lawsuit.  As the Supreme Court has explained:

"Section 16 [of the Clayton Act], construed to authorize a private divestiture remedy when

appropriate, in light of equitable principles, fits well in a statutory scheme that favors private

enforcement, subjects mergers to searching scrutiny, and regards divestiture as the remedy best

suited the redress the ills of an anticompetitive merger."  *California v. American Stores Co.* 495

U.S. 271, 274 (1990).  The Defendants explicitly concede the availability of the divestiture

remedy.  *See* Reply at 23 ¶¶ 62, 63 (Adv. Pro. ECF No. 64) (noting that "there are ample post-

consummation remedies available" if Plaintiffs succeed at trial, and that '[p]artial divestiture is

well-established in the law as a means of curing the potential Section 7 problems raised by a

merger, particularly where there are significant efficiencies and business justifications (as there

are there) for the overall transaction") (citations omitted).  The Plaintiffs have not alleged, much

less established, that divestiture is unavailable or somehow inadequate if they prevailed on the

merits of their lawsuit.[8]

---

[8]     Indeed, courts in the Southern District of New York have recognized divestiture as an appropriate remedy
for violations of the Clayton Act.  *See Julius Nasso Concrete Corp. v. DIC Concrete Corp.,* 467 F. Supp. 1016, 1025
(S.D.N.Y. 1979) ("Carving out an exception for divestiture from the general grant of power to fashion equitable
remedies is contrary to the general purpose behind section 7 and this Court agrees that there is not sufficient reason

13

Indeed, Plaintiffs have not established that an award of money damages would be inadequate for at least some of the alleged anticompetitive harms, including the alleged increase in airline ticket and fee prices that Plaintiffs contend will result from the merger.  *See* Compl. ¶ 165; *see Taleff v. Southwest Airlines Co.*, 828 F. Supp. 2d 1118, 1125 (N.D.Cal. 2011) (rejecting request for injunction where plaintiff represented by Alioto law firm alleged damages from Southwest-AirTran airline merger in form of higher ticket prices and diminished services and finding that plaintiffs had not demonstrated that monetary damages would be inadequate); *Blue Shield of VA v. Mccready*, 457 U.S. 465, 482-83 (1982) (noting that Clayton Act provides for damages for private antitrust plaintiffs as a form of redress for an increase in prices arising from unlawful anti-competitive behavior).

Finally, the Court notes that the Plaintiffs' claim of irreparable harm is undercut by their delay in seeking injunctive relief and by their general delay in bringing these issues to this Cir. Court. The Clayton Adversary was filed in early August, merely a few days before the start of the hearing on confirmation.  But that was months after this merger was approved by this Court without any objection.  And when Plaintiffs finally decided to act regarding the merger, they failed to seek injunctive relief by motion at the same time they filed the Complaint.[9]

Moreover, the Court and the parties explicitly discussed the posture of the Clayton Adversary in the event of the settlement of the DOJ Action, with each side reserving its rights to

---

to do so absent express Congressional mandate."); *Fuchs Sugars and Syrups, Inc., v. Amstar Corp.* 402 F. Supp. 636,  640 (S.D.N.Y. 1975) (concluding that divestiture is a potential remedy for private parties injured by violations of the Clayton Act); *see also Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.,* 754 F.2d 404, 417 (1st Cir. 1985).

[9]    Mr. Alioto actually filed a lawsuit in the Northern District of California challenging the merger in early July—without seeking a lifting of the bankruptcy stay—but then waited more than a month to file the Clayton Adversary.

seek relief.  *See generally* Hr'g. Tr. September 24, 2013, at 32, 62, 65, 67 (ECF No. 10248);[10] *see also* Order of Oct. 15, 2013, at ¶¶ 7, 12 (Adv. Proc. ECF No. 44).[11]  When the settlement finally happened, the Debtors immediately exercised their rights by filing these two motions with the Court.  By contrast, the Plaintiffs waited nine days to act.  While the Court can understand why a delay of nine days might be understandable in certain circumstances, there is no legitimate reason here.  There is nothing about the Plaintiffs' eventual submission that justifies such a delay.  Indeed, the vast majority of the documents relied upon in the TRO Motion predate the settlement of the DOJ Action by many months.  *See* American Antitrust Institute study published on August 8, 2012, Exh. B to Decl. of Gil Messina (Adv. Pro. ECF No. 58-2); MIT study published in May 2013 Exh. C to Decl. of Gil Messina (Adv. Pro. ECF No. 58-3); GAO Report, published June 19, 2013, Errata Exh. A to Decl. of Gil Messina (Adv. Pro. ECF No. 59).  *See also* Plaintiff's Original Complaint, Exh. 1 to Bush Aff. (Adv. Proc. ECF No. 57-4); DOJ Amended Complaint, Exh. 2 to Bush Aff. (Adv. Pro. ECF No. 57-5).  Moreover, there is little in-depth analysis provided in the TRO Motion or Mr. Bush's testimony on new developments such as why the settlement is insufficient or how it impacts Plaintiffs' claims.

For all these reasons, the Court finds that Plaintiffs have utterly failed to establish irreparable harm, a deficiency that standing alone dooms their request for injunctive relief.

---

[10]      Indeed, counsel for US Airways stated that if the DOJ action ended and the Clayton Plaintiffs "want to come in the next day and say that even though she's cleared the merger that you should stop it, they get that opportunity." *Id.* at 32.

[11]      The scheduling order in the Clayton Adversary provides that "[n]otwithstanding anything contained herein to the contrary, in the event of any resolution of the DOJ Action in favor of the Defendants, (a) Defendants reserve all of their rights to seek to consummate the merger . . . and (b) Plaintiffs reserve all of their rights to seek in this Court appropriate relief enjoining consummation of such merger, pending disposition of the Adversary Proceeding." *Id.*  at ¶ 12.

**2.** **Probability Of Success On The Merits**

In any event, the Plaintiffs also do not justify an injunction based on their likelihood of

success on the merits.  To establish a Section 7 violation, Plaintiffs must show that the Merger is

reasonably likely to cause anticompetitive effects.  *United States v. Oracle Corp.*, 331 F. Supp.

2d 1098, 1109-10 (N.D. Cal. 2004).  Section 7 deals in probabilities, not "ephemeral

possibilities."  *United States v. Marine Bancorporation*, 418 U.S. 602, 622-623 (citing *Brown*

*Shoe Co. v. United States*, 370 U.S. 294, 317 (1962)).  Ultimately, to prevail on a Section 7

claim, plaintiffs must show a loss of competition that is "sufficiently probable and imminent."

*Marine Bancorporation*, 418 U.S. at 623 n.22 (citing *United States v. Continental Can Co.*, 378

U.S. 441, 458 (1964)).  Merger review often relies on an analysis of competitive effects in light

of economic factors.  *See Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1386 (7th Cir. 1986).

Substantial competitive harm is likely to result if a merger creates or enhances "market

power," a term that has specific meaning in antitrust law.  *Id.*  Merger analysis begins with

defining the relevant market.  *See id.*; *see also PepsiCo, Inc. v. Coca-Cola Co.*, 315 F. 3d 101,

105 (2d Cir. 2002); *United States v. H&R Block*, 833 F. Supp. 2d 36, 50 (D.D.C. 2011).  A

relevant market has two components: the relevant product market and the relevant geographic

market.  *See PepsiCo*, 315 F.3d at 105; *Brown Shoe*, 370 U.S. at 324.  The relevant geographic

market identifies the geographic area in which the defendants compete in marketing their

products or services.  It is the area to which consumers can practically turn for alternative

sources of the product and in which the antitrust defendants face competition.  *California v.*

*Sutter Health Sys.*, 130 F. Supp. 2d 1109, 1120 (N.D. Cal. 2001).  The relevant product market, a

term specific to antitrust analysis, is "determined by the reasonable interchangeability of use [by

consumers] or the cross-elasticity of demand between the product itself and substitutes for it."

16

*Brown Shoe*, 370 U.S. at 325; *see also Chapman v. New York State Div. for Youth*, 546 F.3d 230,

237-38 (2d Cir. 2008).  Essentially, to be part of the same relevant product market, products must

be viable substitutes.  *United States v. Syufy Enters.*, 712 F. Supp. 1486, 1399 (N.D. Cal. 1989);

*see also Chapman*, 546 F.3d at 238 (products must be "roughly equivalent"); *In re Wireless Tel.*

*Svcs. Antitrust Litig.*, 2003 U.S. Dist. LEXIS 13886 (S.D.N.Y. Aug. 12, 2003) at *27-28

(products must be "acceptable substitutes").

   Once the relevant market is determined, courts then consider the transaction's possible

anticompetitive effects in that market.  "By showing that a transaction will lead to undue

concentration in the market for a particular product in a particular geographic area, the

government establishes a presumption that the transaction will substantially lessen competition."

*United States v. Baker Hughes*, 908 F. 2d 981, 982 (D.C. Cir. 1990); *United States v. Citizens &*

*Southern Nat'l Bank*, 422 U.S. 86, 120 (1975).  An antitrust defendant may rebut that

presumption by showing that the market-share statistics do not accurately demonstrate the

merger's probable effects on competition in the relevant market.  *Id.*  Although market share and

the overall concentration level of the industry are relevant in an antitrust review, these factors are

"not conclusive indicators of anticompetitive effects."  *United States v. Gen. Dynamics Corp.*,

415 U.S. 486, 498 (1974).  "Evidence of market concentration simply provides a convenient

starting point for a broader inquiry into future competitiveness . . . ."  *Baker Hughes*, 908 F. 2d at

984.  A transaction must "be functionally viewed, in the context of its particular industry."

*Brown Shoe*, 370 U.S. at 321-22.  A court may consider a host of factors including whether the

industry was fragmented or concentrated, whether it was dominated by a few leaders or

consistently distributed among participating companies, and whether new competition readily

enters the market or faces barriers.  *Id.*; *see also Baker Hughes*, 908 F. 2d at 985.  A court may

consider the market's structure, history, and probable future.  *Continental Can*, 378 U.S. at 458.[12]

While a final adjudication on the merits still remains, the evidence before the Court is insufficient to justify the requested relief, particularly when compared to the more fulsome record made by the Defendants.  Several of the deficiencies in Plaintiffs' submission are worthy of mention.

First, Plaintiffs' submission is largely conclusory, relying upon the work of others while presenting little independent analysis.  It is well established that an expert's opinion is entitled to less weight under such circumstances.  *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 434-35 (S.D.N.Y. 2009) ("An expert who simply regurgitates what a party has told him provides no assistance to the trier of fact through the application of specialized knowledge."); *see United States v. Scop*, 846 F.2d 135, 139 (2d Cir. 1988), *rev'd in part on reh'g on other grounds*, 856 F.2d 5 (2d Cir. 1988) ("Rule 704 [of the Federal Rules of Evidence] was not intended to allow experts to offer opinions embodying legal conclusions.").  Mr. Bush, the Plaintiffs' sole expert, relies heavily on the allegations in the complaint filed in the DOJ Action.[13]  In addition, Mr. Bush refers to a 2012 report issued by the American Antitrust Institute and Business Travel Coalition (the "AAI Report") and testimony from the United States Government Accountability

---

[12]    Based on Supreme Court decisions from the 1960s such as *Brown Shoe,* the Plaintiffs advocate a very stringent rule that market share alone can establish a successful Section 7 antitrust claim.  Defendants disagree, presenting a more comprehensive review of the subject that includes more recent case law.  As the Court is not ruling on the ultimate merits of the Section 7 claim here, the Court is not making any final determination now of the nuances of the standard to be applied on the merits.  But a quick review of the relevant antitrust case law suggests that antitrust law has evolved since the 1960s to encompass a more flexible, industry-specific analysis.  For purposes of the TRO request at issue, therefore, the Court uses the standard described above as a reference point to discuss the merits of Plaintiffs' case.

[13]    There was no trial or decision on the merits in the DOJ case.  Therefore, the allegations in the DOJ Complaint have not been proved true or false and remain merely allegations.

Office before the United States Senate on June 21, 2013 (the "GAO Report").  Mr. Bush offers

little in the way of original opinions and analysis.

One example of this problem lies in the discussion of market share.  Merger

concentration is typically measured by the Herfindahl-Hirschman Index ("HHI").[14]  Pursuant to

the Government's Merger Guidelines, a market is considered highly concentrated if the HHI is

greater than 2,500.  Any increase of more than 200 points is considered to be a significant

increase in concentration.  In addressing this issue, Mr. Bush simply quotes the DOJ Complaint,

stating that over 1,000 city-pair markets would have a post-merger HHI over 2,500 and an HHI

increase of over 200.  Bush does not elaborate on this point, offering no original opinion or

analysis.[15]

By relying so heavily on others' conclusions, the Plaintiffs also fail to sufficiently address

the merger in the context of the DOJ Settlement (the "New Merger"), which is the transaction

now before the Court.  *FTC v. Libbey, Inc.*, 211 F. Supp. 2d 34, 46 (D.D.C. 2002) (where parties

---

[14]     HHI is an index used to measure concentration in a market, which is calculated by squaring the market share of each firm competing in a market and then summing the resulting numbers.  *See* United States Department of Justice and Federal Trade Commission Horizontal Merger Guidelines, § 5.3 (August 19, 2010) *available at* www.justice.gov/atr/public/guidelines/hmg-2010.html#5 (the "Merger Guidelines").  The DOJ uses HHI numbers to determine thresholds for when an industry is considered highly concentrated or when potential mergers require investigation.  *Id.*

[15]     The HHI issue highlights the difficulties of relying too heavily upon other parties for one's analysis.  While the DOJ Complaint includes this information, the Court is mindful that the DOJ has, in fact, decided to settle its lawsuit.  So one must assume that the anticompetitive concerns raised by this HHI information have, in the opinion of the DOJ, been satisfactorily addressed by the terms of the settlement of the DOJ Action.  As Defendants' counsel pointed out at argument, the DOJ has specifically concluded that the settlement of the Government's antitrust case, complete with its contemplated divestitures, yields better results for the public than blocking the merger as originally proposed.  *See* Remarks as Prepared for Delivery by Assistant Attorney General Bill Baer at the Conference Call Regarding the Justice Department's Proposed Settlement with US Airways and American Airlines (November 12, 2013) http://www.justice.gov/atr/public/press_releases/2013/301626.htm ("this settlement . . . provides more competition than exists today in this industry"); *see also* Jack Nicas, Big Airline Merger Is Cleared to Fly, THE WALL STREET JOURNAL (Nov. 12, 2013) http://online.wsj.com/news/articles/SB10001424052702304644104579193804169829002 ("Bill Baer, the department's antitrust chief, said the settlement was better for competition than if the government had won a court injunction against the merger, because the concessions will allow low-cost carriers to expand at major airports.").  Without some independent analysis, it is difficult for the Court to draw conclusions from the statements and analysis of the Government upon which the Plaintiffs heavily rely, including the DOJ Complaint and the GAO Report.

to merger agreement have amended the agreement to alleviate government's antitrust concerns, a court must evaluate the new agreement in deciding whether to issue an injunction).  Mr. Bush and the Plaintiffs rely most heavily upon documents that predate the November 2013 DOJ Settlement.  While the DOJ Complaint, the 2012 AAI Report, and the GAO Report from June 2013 contemplate a merger between American and US Airways, none of those documents addresses the New Merger.

In addition to the lack of evidence, the Defendants raise several additional issues about the Plaintiffs' arguments.  For example, Plaintiffs assert that there are two markets—a national market based on competition between systems and other submarkets consisting of "certain city-pairs."  While the Defendants accept that city-pairs are the properly defined market, *see* Reply at 37 n.10 (Adv. Pro. ECF No. 64), neither Mr. Bush's report nor the Plaintiffs' pleadings identify which city-pairs are at issue in light of the New Merger.  In the same vein, the Defendants raise questions about the Plaintiffs' theory about a national market for airline travel.  A product market contemplates products that are viable substitutes for each other.  Plaintiffs' theory of a national market would require a conclusion that all flights compete with each other.  For example, a flight from Los Angeles to New York would compete with a flight from Detroit to Seattle.  Plaintiffs have not explained why that would be true here as Mr. Bush does not present any analysis to support such a conclusion.[16]  And Defendants have raised a legitimate question regarding why, even if a national market existed, such a market would not be deemed "highly concentrated" using the prevailing industry standards.[17]

---

[16]      One court has, in fact, rejected the Plaintiffs' theory that a national market exists for airline travel.  *See Malaney v. UAL Corp.*, 2011 U.S. App. LEXIS 10638 at *4-5 (9th Cir. May 23, 2011), *affirming* 2010 Dist. LEXIS 106049.

[17]      Defendants' expert calculated that the post-merger system-wide HHI will be 1768, which is below the Merger Guidelines threshold for highly concentrated markets.  Declaration of Janusz Ordover ¶ 71 (ECF No. 67).

The Court has a similar reaction when considering the Plaintiffs' analysis on a variety of other issues, including allegations regarding the loss of the US Airways Advantage Fare program, higher future fares due to coordinated interaction or tacit collusion among airline carriers, and reduction in capacity and service.  In each instance, Mr. Bush takes only a few paragraphs to summarily conclude that each of these harms is likely to happen, but Defendants raise significant questions on each of these points using detailed expert analysis.  While the Court is mindful once again that it is not called upon now to resolve these issues on the merits, the Court concludes for purposes of the requested TRO that Plaintiffs' analysis of the merits falls short of that necessary to justify injunctive relief.[18]

### 3.  **Balance Of Hardships/Public Interest**

The Court also finds that the Plaintiffs have failed to demonstrate that the balance of hardships and public interest tip in their favor.  Weighing Plaintiffs' failure to show irreparable harm against the harm defendants would suffer as a consequence of a TRO, the Court concludes that the balance of hardships tips against the granting of an injunction.

The Defendants provided the Court with voluminous declarations from various advisers, consultants, and executive management members attesting to the harm that would be suffered by the Defendants (and other parties) by virtue of a temporary restraining order.  Declarations were provided from: 1) Beverly Goulet, the SVP and Chief Integration Officer of AMR; 2) Gregg Polle, a managing director of Moelis and Company that serves as the investment advisor to the Creditor's Committee; and 3) Stephen Johnson, the Executive Vice President of Corporate and

---

[18]    At the hearing, Defendants' counsel focused his discussion of the likelihood of success on the role of low cost carriers ("LCCs") in the airline industry, a topic frequently discussed during the lengthy trial before the Court on the rejection of collective bargaining agreements under Section 1113.  Counsel stated that the existence of LCCs plays a significant role in, among other things, competitive pricing in the industry and that the settlement furthers the ability of LCCs to flourish by allowing them access to key airports where they previously were hampered by slot and gate restrictions.  Once again, the Plaintiffs have presented little analysis on that issue.

Government Affairs at US Airways.  *See* Goulet Decl. (Adv. Pro. ECF No. 61); Polle Decl.

(Adv. Pro. ECF No. 62); Johnson Decl. (Adv. Pro. ECF No. 63)).  As explained by these

witnesses, the delay of consummating the Merger would cause significant economic harm to the

Debtors in a variety of ways including:  a decline in stock prices with a 10% decline in price

equating to a $400 million dollar decline in shareholder value, Polle Decl. at ¶ 14; a loss of the

sunk costs invested in the planning, negotiation and financing of the Merger, Polle Decl. at ¶ 17;

and a negative impact on the value of potential recoveries for the Defendants' economic

stakeholders.  Goulet Decl. at 4, 5; Polle Decl. at ¶ 10.[19]

As these witnesses explain, delaying or enjoining the merger is also very likely to have a

significant negative impact on the employees at both AMR and US Airways.  *See* Goulet Decl. at

4 ("further delay in implementing the Merger . . . would only serve to exacerbate this anxiety and

uncertainty and adversely impact employee morale, with the potential negative impact on

performance, customer service, and the risk of losing critical employees."); *see also* Johnson

Decl. at 8 ("uncertainty associated with delay will inevitably mean the loss of valued

employees.").

For their part, the Plaintiffs contend that the Defendants will not suffer any harm from an

injunction.  TRO Motion at 21 ("Defendants, on the other hand, will suffer little or no prejudice,

given that they should await Tunney Act approval rather than run the risk of merging before the

public has commented and the district court has ruled on the settlement.  Further, Defendants do

not expect to receive their operating certificate that will enable them to operate as a single entity

for at least a year.  Lastly, Defendants assumed—and prepared for—a trial with the DOJ in

which they did not expect to receive a final judgment . . . until approximately mid-January

---

[19]        A more fulsome analysis of the calculations involved in quantifying the risk from delaying the merger is
contained in paragraphs 12, 15 and 16 of the Polle Declaration.

22

2014."). But that Court rejects Plaintiffs' argument given the evidence of harm described above.

Moreover, Plaintiffs' argument is based upon the faulty assumption that the Tunney bars

consummation of the merger and thus an injunction will not cause any additional delay.[20] But as

Defendants explain, "[n]othing in the Tunney Act" prevents consummation of the merger. *See*

*Edstrom v. Anheuser-Busch InBev SA/NV,* 2013 U.S. Dist. LEXIS 131386 at *24-25 (N.D. Cal.

Sept. 13, 2013) (rejecting notion that Tunney Act bars consummation of merger absent grant of

injunction); s*ee also United States v. SBC Commc'ns, Inc.,* 489 F. Supp. 2d 1, 8 (D.D.C. 2007).[21]

Finally, the Court notes that Plaintiffs have made no offer to post an appropriate bond, a

requirement clearly set out in Rule 65. *See, e.g., Ginsberg v. Inbev SA/NV,* 2008 U.S. Dist.

LEXIS 93636 at *17 (E.D. Mo. Nov. 18, 2008) (district court balanced potential harm to

defendants against the fact that the Alioto Firm "*neither posted, nor offered to post, any type of

bond to support their claims.*"). *See also* 15 U.S.C. § 26 (providing for injunctive relief in an

antitrust case upon execution of a proper bond).

### C.  The Motion Under Rule 9019

Having dispensed with the Clayton Plaintiffs' request for a TRO, the Court turns to the

Debtors' motions, the first of which seeks approval under Bankruptcy Rule 9019 of the

settlement in the DOJ Action.

Federal Rule of Bankruptcy Procedure 9019(a) proves that "[o]n motion by the [debtor in

possession] and after notice and a hearing, the court may approve a compromise or settlement."

In approving a settlement, a court must "review the reasonableness of the proposed settlement

---

[20]      *See* TRO Motion at 14 ("Under the Tunney Act, the settlement is subject to public comment for a period of
60 days, and the district court retains jurisdiction to ultimately approve or disapprove the merger.").

[21]      Indeed, the Court noted at the hearing that the Plaintiffs should seek redress from the United States District
Court for the District of Columbia to the extent the Plaintiffs claim there is anything about the DOJ Action that
prevents consummation of the Merger.

[and] . . . make an informed judgment as to whether the settlement is fair and equitable and in the

best interests of the estate." *In re Worldcom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006);

*see also Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.)*,

156 B.R. 414, 426 (S.D.N.Y. 1993).  The Court, however, need not "conduct a 'mini trial' on the

issue.  The Court need only 'canvass the issues' to determine if the 'settlement falls below the

lowest point in the range of reasonableness.'" *Worldcom*, 347 B.R. at 137 (quoting *In re

Teltronics Serv., Inc.*, 762 F.2d 185, 189 (2d Cir. 1985)).

   The factors to consider in approving a settlement include: (1) the balance between the

litigation's possibility of success and the settlement's future benefits; (2) the likelihood of

complex and protracted litigation, with its attendant expense, inconvenience, and delay,

including the difficulty in collecting on the judgment; (3) the paramount interests of the

creditors, including each affected class's relative benefits and the degree to which creditors either

do not object to or affirmatively support the proposed settlement; (4) whether other parties

in interest support the settlement; (5) the competency and experience of counsel supporting the

settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7)

the extent to which the settlement is the product of arm's length bargaining.  *In re Iridium

Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007).

   "Settlements or compromises are favored in bankruptcy and, in fact, encouraged . . . 'In

administering reorganization proceedings in an economical and practical manner it will often be

wise to arrange the settlement of claims as to which there are substantial and reasonable

doubts.'" *In re Adelphia Communs. Corp.*, 368 B.R. 140, 226 (Bankr. S.D.N.Y. 2007) (quoting

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390

U.S. 414, 424 (1968)).  "The decision whether to accept or reject a compromise lies within the

24

sound discretion of the court." *Adelphia*, 368 B.R. at 226.  And "[w]hile the bankruptcy court

may consider the objections lodged by parties in interest, such objections are not controlling.

Similarly, although weight should be given to the opinions of counsel for the debtors and any

creditors' committees on the reasonableness of the proposed settlement, the bankruptcy court

must still make informed and independent judgment.  The Court must consider whether the

proposed compromise is fair and equitable by appraising itself of all the factors relevant to an

'assessment of the wisdom of the proposed compromise.'"  *Worldcom*, 347 B.R. at 137 (quoting

*TMT Trailer*, 390 U.S. at 424).

Applying these standards to the present motion, the Court finds that the settlement easily

satisfies the requirements for approval under Rule 9019, as well as the immediate consummation

of the merger.  The balance between the litigation's possibility of success and the settlement's

future benefits weighs heavily in favor of approving the settlement.  The issues raised in the DOJ

Action are complex and the risks that would accompany the Debtors' failure to prevail in the

DOJ Action are substantial considering the history and position of these Chapter 11 cases.  Such

risks include: (1) the abandonment of the merger and the substantial value it creates, (2) the

continued administration of the Debtors' cases while another plan of reorganization is formulated

and pursued, at a huge expense to the estate and its creditors, and (iii) the delay in making

distributions to the Debtors' creditors and shareholders.

The Debtors' management and the AMR Board of Directors, in conjunction with the

Debtors' and Committee's professionals, have analyzed and vetted the terms of the settlement

and the effect that the divestiture will have.  They have concluded—and the Court concurs—that

the benefits to be derived from the settlement far outweigh the continued pursuit of the DOJ

Action and the risk and uncertainty associated therewith.  Such benefits include the ability of the

Debtors to promptly consummate the merger so that the value of the merger can be realized by the Debtors' creditors, employees and the AMR shareholders.  Furthermore, as discussed in detail below, the economics of the settlement do not materially or adversely change or alter the distributions under the Plan.

Rejection of the settlement will unquestionably result in complex, protracted and costly litigation in the form of the DOJ Action.  As the Debtors note, upon the commencement of the DOJ Action back in August, the parties were fully engaged in discovery and trial preparation.  This included the cumulative production by the parties of over 2 million documents and the deposition of 28 individuals.  The parties also have held weekly meetings with a special master appointed by the District Court to discuss discovery progress.  Trial in the DOJ Action was set to commence on November 25, 2013, and would surely move forward were the settlement to be rejected.

The paramount interests of the creditors clearly weigh in favor of approving the settlement, and thereby the merger.  As described above, numerous witnesses attest that a delay in consummation of the merger would cause great harm to the Debtors and their business enterprise, as well as the Debtors' employees, creditors and equity interest holders.  *See generally* Goulet Decl.; Polle Decl.; Johnson Decl.

Both creditors and equity holders will receive a recovery under the Debtors' confirmed plan.  *See* Polle Decl. ¶ 13.  General unsecured creditors are projected to receive a full recovery (including interest), while American's employees would receive an equity stake in New American valued at more than $2 billion and holders of American's equity would receive New American stock valued at more than $4 billion.  *See* Johnson Decl. ¶ 11; Polle Decl. ¶ 16.  Creditors are being paid through stock in the newly merged entity.  Specifically, 72% of the

26

equity of New American will be distributed to the Debtors' stakeholders.  *See* Polle Decl. ¶ 16.

Since the announcement of the merger, AMR's share value has risen more than 900%.  *See* Polle

Decl. ¶ 12.  A delay in the merger may have a negative impact on AMR's share price as well as

the share price of US Airways, which is being used as the reference security prior to the effective

date of the plan.  Even a 10% decline in share price could represent nearly a $400 million decline

in shareholder value.  *See* Polle Decl. ¶ 14.

Furthermore, a delay in the merger would subject these economic stakeholders to the

market risk associated with the securities they are to receive under the Plan, including the risk

that outside events will affect the airlines or the airline industry as a whole.  *See* Goulet Decl. ¶5;

Polle Decl. ¶ 16.  A delay in the merger will also delay a realization of the benefits flowing from

the synergies resulting from a combination of the business of the Debtors and US Airways,

which are projected at $1 billion by 2015.  *See* Goulet Decl. ¶5; Polle Decl. ¶ 18; Johnson Decl.

¶¶ 10 and 14.  These synergies include savings derived from the combination of headquarters,

airport locations and other facilities, the elimination of duplicate systems, improvements in

purchasing, reductions in advertising costs and rationalization in headcount.  *See* Polle Decl. ¶

18.  Delay in the merger would lead to millions of dollars per week in lost savings, which would

in turn cause a direct detriment to the Debtors' economic stakeholders who, as noted above, will

be the future stockholders of New American.  *See* Goulet Decl. ¶ 5; Polle Decl. ¶ 18.

The delay will also harm the Debtors' employees through a loss of increased

compensation, which is estimated to amount to approximately $400 million annually, or nearly

$1.1 million lost for every day of delay.  *See* Johnson Decl ¶ 14.  A delay in the merger would

also lead to a delay in the more than $2 billion equity stake for the employees promised by the

merger, as well as an exacerbation in the anxiety and uncertainty that has resulted from the

merger itself.  *See* Goulet Decl. ¶ 5; Johnson Decl. ¶¶ 13-14.  Further delay could adversely impact employee morale, which could in turn have a negative impact on performance, customer service and the loss of key personnel.  *See* Goulet Decl. ¶ 5; Johnson Decl. ¶ 14.

And finally, a delay in the merger, with its corresponding delay in the consummation of the plan, will harm the estate itself through the continued accrual of administrative costs and a negative impact on the Debtors' ability to re-establish normal business relationships with their vendors, suppliers and business partners.  *See* Goulet Decl. ¶ 5.

Both the Debtors' creditors and other parties in interest overwhelmingly support the settlement.  As noted above, the Debtors' major constituencies have voiced support for the settlement, including the Committee of Unsecured Creditors, Allied Pilots Association, the Association of Professional Flight Attendants, the Transport Workers Union of America, AFL-CIO and an Ad Hoc Committee of AMR Corporation Creditors.  The only objection to the settlement is from the Clayton Plaintiffs, who are neither creditors nor equity holders of the Debtors and who currently have no economic interest in the administration of the Debtors' estates.

Additionally, counsel supporting the settlement—including both Debtors' counsel and counsel for the creditors' committee—have demonstrated competence and experience throughout the pendency of these Chapter 11 cases.  The Debtors' professionals include attorneys with extensive experience in antitrust litigation and who are familiar with the legal and factual issues involved in the DOJ Action and the claims and defenses asserted therein.  The Court has no doubts regarding the ability of the professionals in these cases to reach a settlement that is the best result for the Debtors' estate and creditors.  Finally, the settlement is clearly the result of arms' length bargaining between the parties.  The parties in the DOJ Action were fully engaged

28

in discovery and trial preparation. At the same time, they were engaged in ongoing discussions to resolve the DOJ Action on a consensual basis. Over the last several weeks, those discussions intensified and culminated in the settlement, the result of protracted and good-faith negotiations. *See* Johnson Decl. ¶ 7.

For all these reasons, the Court finds that the settlement is fair and equitable and in the best interests of the estate and falls well above the lowest point in the range of reasonableness.

In the 9019 motion, the Debtors also seek a ruling that the settlement will not materially and adversely affect the creditors and equity holder such as to require re-solicitation of the plan. Such a request is contemplated by paragraph 36 of the Confirmation Order, which provides in relevant part:

> In the event that the Debtors and US Airways reach settlement in the DOJ Action, the Debtors shall file a motion with the Court seeking approval of the Debtors' execution of and entry into such settlement. In addition to determining whether to approve any such settlement under Bankruptcy Rule 9019(a), *the Court shall determine whether the settlement would materially and adversely affect the treatment of holders of Claims and AMR Equity Interests under the Plan such that the Court should require the re-solicitation of such holders' previous acceptances or rejections of the Plan.*

The Court finds that the settlement will not materially and adversely affect the treatment of the Debtors' claim holders and AMR Equity Interests and re-solicitation of the plan is therefore unnecessary. The settlement will not alter the treatment of holders of Claims and AMR Equity Interests under the plan. The settlement also maintains the relative priority and distribution scheme to holders of Claims and AMR Equity Interests under the plan. Additionally, the economic impact of the Settlement on the global business of New American will not adversely affect distributions under the plan.

Distribution value under the plan is based on the price of a reference security, which subsequent to the effective date of the plan will be the common stock of New American. The

plan includes a reference mechanic where, at certain measurement periods, additional

distributions will be made to holders of AMR Equity Interests when the volume-weighted

average price of the reference security trades above a price referred to as the value hurdle price.

*See* Plan § 1.247.  The value hurdle price indicates both the price at which additional value will

waterfall down to holders of AMR Equity Interests, as well as the price at which all holders of

allowed claims will receive a full recovery.  *See* Declaration of Homer Parkhill, dated November

22, 2013, ¶15.  The Debtors currently calculate, when making certain assumptions, that the value

hurdle price is approximately $16.64.  *Id.* at ¶ 16.

The trading market price of US Airways common stock is currently the best indicator of

the value of New American Common Stock.  *Id.* at ¶ 11.  Thus, the way in which the plan is

structured would indicate that the treatment of holders of Claims and AMR Equity Interests

under the plan is not materially and adversely affected by the settlement unless the trading price

for US Airways common stock falls below the value hurdle price of $16.64.  Indeed, the Court

need not even begin such an analysis until the stock falls below the value hurdle price.  On

August 7, 2013 the volume weighted average price of US Airways common stock was $19.11

per share.  *See* Parkhill Decl. ¶ 12.  As of November 21, 2013, that price has increased to $24.12

per share.  *Id.*  Based upon this trading market price of US Airways common stock, the aggregate

implied value to be distributed under the plan to holders of allowed claims, AMR equity interests

and recipients of employee equity awards has increased by approximately $2.7 billion since

August 7, 2013, six days to the commencement of the DOJ Action on August 13, 2013.  *See*

Parkhill Decl. ¶ 22.  Additionally, the trading value of AMR common stock has increased during

that time period from $5.85 on August 7, 2013 to $12.00 on November 21, 2013.  *Id.* at ¶ 23.

For these reasons, the Court finds that the settlement does not materially and adversely affect the treatment of holders of Claims and AMR Equity Interests under the Plan such that the Court should require the re-solicitation of such holders' previous acceptances or rejections of the Plan.[22]

### D. __Motion for Entry of an Order Regarding Consummation of the Merger__

Consistent with the Court's rulings above, the Court will also grant the Debtors' motion to permit the merger to be consummated without delay, despite the pendency of the Clayton Adversary. This request is consistent with the scheduling order entered in the Clayton Adversary, which states that "in the event of any resolution of the DOJ Action in favor of Defendants . . . Defendants reserve all rights to seek to consummate the merger that is the subject of the DOJ Action by filing a motion with the Bankruptcy Court on an expedited basis." Scheduling Order ¶ 12. For the reasons set forth above, the Court finds that the benefits to allowing the merger to proceed are numerous, the most important being the consummation of the plan and the resulting distribution to the creditors and stockholders with an economic stake in these cases.

---

[22]    To the extent that approval of the settlement is covered under Section 1127(b) of the Bankruptcy Code, the Court finds that the circumstances are warranted and this confirmed plan, when considered in light of the settlement, would satisfy Section 1129 of the Bankruptcy Code.

31

## **<u>CONCLUSION</u>**

For all the reasons set forth above, the Court denies the Plaintiffs' request for a temporary

restraining order and grants the Debtors' motions seeking approval of the settlement in the DOJ

Action and consummation of the merger.


Dated: New York, New York
        November 27, 2013



 */s/ Sean H. Lane*
UNITED STATES BANKRUPTCY JUDGE