**UNITED STATES BANKRUPTCY COURT**          <u>**FOR PUBLICATION**</u>
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------x

In re:                                                                    Chapter 11

AMR CORPORATION, *et al.*,                                                Case No. 11-15463 (SHL)

                      Debtors.                 (Jointly Administered)
-------------------------------------------------------------------------x

<u>**MEMORANDUM OF DECISION**</u>

**A P P E A R A N C E S :**

**WEIL, GOTSHAL & MANGES LLP**
*Counsel for Debtors and Reorganized Debtors*
767 Fifth Ave.
New York, NY 10153
By:     Stephen Karotkin, Esq.
        Alfredo R. Pérez, Esq.
        Stephen A. Youngman, Esq.

**STEPTOE & JOHNSON LLP**
*Counsel for the Allied Pilots Association*
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
By:     Filiberto Agusti, Esq.
        Joshua Robert Taylor, Esq.

**JAMES & HOFFMAN, P.C.**
*Counsel for the Allied Pilots Association*
1130 Connecticut Avenue, N.W., Suite 950
Washington, D.C. 20036
By:     Edgar N. James, Esq.
        Kathy L. Krieger, Esq.
        David P. Dean, Esq.
        Darin M. Dalmat, Esq.
        Daniel M. Rosenthal, Esq.

**GUERRIERI, CLAYMAN, BARTOS & PARCELLI, P.C.**
*Counsel for the Association of Professional Flight Attendants*
1900 M Street, N.W.
Washington, D.C. 20036
By:     Robert S. Clayman, Esq.

**MOONEY, GREEN, SAINDON, MURPHY & WELCH**
*Counsel for the Transport Workers Union of America, AFL-CIO*
1920 L Street, N.W.
Suite 400
Washington, D.C. 20036
By:    Richard S. Edelman, Esq.

**VEDDER PRICE P.C.**
*Counsel for Bank of America, N.A., Merrill Lynch Credit*
*Products, LLC and Global Principal Finance Company, LLC*
1633 Broadway, 47th Floor
New York, New York 10019
By:    Michael J. Edelman, Esq.

-and-

222 N. LaSalle St., Ste. 2600
Chicago, Illinois 60601
By:    Douglas J. Lipke, Esq.
       Jonathan E. Aberman, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are two motions seeking to enforce certain terms of the *Fourth Amended*

*Joint Chapter 11 Plan* [ECF No. 10367] (the "Plan") of the above-captioned debtors and

reorganized debtors (collectively, the "Debtors").  The motions were filed by (i) the Allied Pilots

Association, the Association of Professional Flight Attendants, the Transport Workers Union of

America, AFL-CIO (collectively, the "Unions") [ECF No. 12666], and (ii) the Bank of America,

N.A., Merrill Lynch Credit Products, LLC and Global Principal Finance Company, LLC

(collectively, "BAML," and together with the Unions, the "Movants") [ECF No. 12676].  The

Movants are claimants in these bankruptcy cases who argue that they are entitled to additional

distributions under the Plan—so called true-up payments—beyond the payments they already

received in the form of stock in the reorganized Debtors.  The true-up payments are necessary,

the Movants argue, for them to receive the same number of shares of stock as other claimants

who were paid earlier but did not bear the cost of certain subsequent tax payments.  The estate

2

made these tax payments from money held in reserve to be paid to creditors.  The Debtors assert

that the Movants are misinterpreting the terms of the Plan and that the Movants have been paid

in full based on the value of the stock that the Movants have already received.  Based on the

language of the Plan and for the reasons set forth below, the Movants' motions are granted.

## BACKGROUND

In November 2011, the Debtors filed voluntary petitions for relief under Chapter 11 of

the Bankruptcy Code.  In June 2013, the Debtors filed their *Disclosure Statement for Debtors'*

*Second Amended Joint Chapter 11 Plan* (the "Disclosure Statement") [ECF No. 8591], which

was approved by this Court.  [ECF No. 8614].  The Debtors subsequently established a

procedure for creating a reserve to pay claims that were disputed at the time of Plan confirmation

but that might later become allowed claims.  *See Order Establishing Maximum Amount of*

*Disputed Claims to be Utilized for Determining Disputed Claims Reserve Under Debtors'*

*Second Amended Joint Chapter 11 Plan and Approving Certain Procedures in Connection with*

*Disputed Claims Reserve* (the "Disputed Claims Order") [ECF No. 9560].  In October 2013, the

Court entered an order confirming the Plan (the "Confirmation Order") [ECF No. 10367-1].  The

Plan became effective on December 9, 2013 (the "Effective Date").  *See Notice of (I) Entry of*

*Order Confirming Plan and (II) Occurrence of Effective Date* [ECF No. 11402].[1]

Before addressing the Plan's treatment of claims, it is important to define a few terms.

The Plan refers generally to unsecured claims, with limited exceptions, as the "Single-Dip

General Unsecured Claims."  Plan § 1.206.[2]  For purposes of these motions, however, it is

---

[1]    These same issues were previously raised by the Movants when they objected to the Debtors' request to
release excess reserve funds.  [ECF Nos. 12491, 12510, 12516].  At that time, the Court determined the issue was
not yet ripe for adjudication.  *See* Hr'g Tr. 111:10-112:13, Apr. 15, 2015 [ECF No. 12552].  The parties rely on
certain statements made in the pleadings previously filed with the Court on that request and the Court does likewise.

[2]    The Plan also refers to "Double-Dip General Unsecured Claims," which are not relevant for purposes of
this decision.  *See* Plan § 1.100.

important to understand the distinction among such claims.  There are claims that have been allowed for payment ("Allowed Claims") and claims where payment is subject to disallowance ("Disputed Claims").  Moreover, not all claims were allowed at the same time.  Some claims were allowed as of the Effective Date ("Effective Date Allowed Claims"), while other claims became allowed later ("Post-Effective Date Allowed Claims").

The Movants here are all entitled to payment under the Plan as unsecured creditors whose claims have been allowed.  BAML is the holder of twelve Post-Effective Date Allowed Claims,[3] while the Unions are entitled to an allocation of the recovery for Post-Effective Date Allowed Claims pursuant to the terms of the Plan.[4]

## A.  Plan Distribution Scheme

Claimholders under the Plan do not receive the certainty of a fixed dollar recovery but rather are paid in shares of stock in the reorganized entity.  *See* Disclosure Statement § I.C.3 (discussing distribution mechanics).  Stated a slightly different way, the currency for payment of claims is shares of stock.  Seeking to avoid disputes and litigation over valuation issues, the Debtors choose to use the market to set the recovery for claimants.  As the Debtors have explained, "[a] central thesis of the Plan was a mechanism to distribute shares of New Common Stock among the stakeholders based on market factors rather than a designated value assigned to the shares."  *Debtors' Reply to the Response of (I) Bank of America, N.A., Merrill Lynch Credit Products, LLC and Global Principal Finance Company and (II) Commonwealth of Puerto Rico*

---

[3]        The claims of BAML were initially disputed by the Debtors, but were allowed subsequent to the Effective Date pursuant to two separate Settlement Agreements with the Debtors, dated September 19, 2014, and December 16, 2014, respectively.  *See Limited Objection to Motion for Entry of Order Authorizing Release of Excess Reserve Funds Held in Disputed Claims Reserve* ¶ 1 [ECF No. 12510]; *BAML Motion to Implement and Enforce True-Up Provisions of Debtors' Confirmed Chapter 11 Plan of Reorganization* ¶ 7 [ECF No. 12676].

[4]        Under the Plan, the Unions are entitled to receive a percentage of the stock distributions made on account of the Post-Effective Date Allowed Claims.  *See BAML Motion to Enforce Order Confirming Plan of Reorganization* at 1; *see also* Plan §§ 1.21, 4.12.

*to Debtors' Motion for Entry of Order Authorizing Release of Excess Reserve Funds Held in*

*Disputed Claims Reserve* ¶ 4 (the "Debtors' Reply to Post-Effective Claimholders") [ECF No.

12524]. Indeed, the Disclosure Statement specifically warned that "[n]otwithstanding

compliance by the Debtors or the Reorganized Debtors, as applicable, with their obligations

under the Plan, there can be no assurance that an active trading market for the New Common

Stock will develop or as to the prices at which the New Common Stock will trade." Disclosure

Statement § IV.E.3.

      The mechanism for determining the exact number of shares to be received by claimants

under the Plan is complex. Claims allowed as of the Effective Date received "New Mandatorily

Convertible Preferred Stock,"[5] which was subsequently converted to common stock on the 30th,

60th, 90th, and 120th days after the Effective Date (the "Mandatory Conversion Dates").[6] *See*

Disclosure Statement § I.C.3. The number of shares distributed to Allowed Claims during this

120-day period was determined through formulas that awarded the shares based on the stock

price on each Mandatory Conversion Date. *See* Disclosure Statement § I.C.3; Plan §§ 4.3, 4.4,

4.5, 4.10, 4.11, 4.12, 4.17, 7.3(b); Exh. B to Plan. These formulas did not distinguish between

claims allowed on the Effective Date of the Plan and those allowed after the Effective Date. *See*

Plan §§ 1.9, 7.3(b). The idea appears to have been to survey the value of the stock over this 120-

day period so as to arrive at the most appropriate value in shares that would constitute full

payment to unsecured creditors.[7] All parties agree that, during the 120-day period covering the

---

[5]    Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

[6]    The Plan defines "Mandatory Conversion Date" as "with respect to the New Mandatorily Convertible Preferred Stock, each of the thirtieth (30th), sixtieth (60th), ninetieth (90th), and one hundred twentieth (120th) days following the Effective Date." Plan § 1.146.

[7]    More specifically, on the last Mandatory Conversion Date—April 8, 2014—the Debtors

determined the distribution rate that would yield the Single-Dip Full Recovery Amount (*i.e.*, the distribution rate whereby holders of Allowed Single-Dip General Unsecured Claims would receive value equal to at least one hundred percent (100%) of their underlying claims, including applicable

Mandatory Conversion Dates, the formulas resulted in Effective Date Allowed Claims receiving 30.7553 shares of New Common Stock for each $1,000 of Allowed Claims.[8]  Important for purposes of these motions, the Plan specifically provided that after the 120th day following the Effective Date, there would be no further modification to this ratio for later allowed claims.  *See* Plan § 4.11; *see also* Exh. B to Plan at § 5.1(iv) ("For the avoidance of doubt, following the 120th day following the Plan Effective Date, Holders shall have no rights under the Series A Preferred Stock other than the right to receive the shares of Common Stock into which their shares of Series A Preferred Stock were converted pursuant to any Mandatory Conversion or Optional Conversion hereunder and the right that a holder of shares of Common Stock would have corresponding thereto."); *Debtors' Omnibus Response* ¶ 9 ("Since the Mandatory Conversion Date, the same distribution rate of 30.7553 shares of New Common Stock for each $1,000 of Allowed Claims (including applicable accrued interest) has applied to *each* distribution from the Disputed Claims Reserve . . . .").

Additionally, the Plan provided that the Debtors' old equity holders would receive an initial distribution on the Effective Date of 3.5% of the New Common Stock, with the right to receive additional shares on the Mandatory Conversion Dates allocated pursuant to the same formula used for Allowed Claims.  *See* Disclosure Statement § I.C.3; Plan §§ 4.5 (discussing

---

accrued interest).  The distribution rate established on the Mandatory Conversion Date that provided a full recovery was 30.7553 shares of New Common Stock for each $1,000 of Allowed Claims (including applicable accrued interest).

*Debtors' Omnibus Response to (I) Allied Pilots Association, Association of Professional Flight Attendants, and Transport Workers Union of America, AFL-CIO's Motion to Enforce Order Confirming Plan of Reorganization and (II) Bank of America, N.A., Merrill Lynch Credit Productions, LLC, and Global Principal Finance Company, LLC's (A) Motion to Implement and Enforce True-Up Provisions of Debtors' Confirmed Chapter 11 Plan of Reorganization and (B) Joinder to Allied Pilots Association, Association of Professional Flight Attendants, and Transport Workers Union of America, AFL-CIO's Motion to Enforce Order Confirming Plan of Reorganization* ¶ 8 (the "Debtors' Omnibus Response") [ECF No. 12683].

[8]      *See Unions' Motion to Enforce Order Confirming Plan* at 7 [ECF No. 12666]; *BAML Motion to Enforce Order Confirming Plan of Reorganization* ¶ 4; *Debtors' Omnibus Response* ¶ 8.

recovery for Class 5 – AMR Equity Interests); 1.131 (defining Initial Old Equity Allocation),

1.148 (defining Market-Based Old Equity Allocation).

**B.  Subsequent Distributions Under the Plan**

In addition to the initial distributions on the Effective Date, the Plan contemplates two

other types of distributions to holders of Allowed Claims: (1) distribution upon the allowance of

a Disputed Claim, and (2) distribution of excess shares held in reserve by the estate.

1.  Distributions Upon Allowance of Disputed Claims

On the Effective Date, the Debtors established a reserve for the payment of Disputed

Claims that would subsequently become Allowed Claims (the "Disputed Claims Reserve").

Shares are held in the Disputed Claims Reserve until they are paid to a claimholder when a

Disputed Claim is allowed.  Section 7.5(a) of the Plan governs the distribution of shares from the

Disputed Claims Reserve to Post-Effective Date Allowed Claims at the time of their allowance.

It provides, in part, that "[a]ll distributions made under this Section 7.5 on account of Allowed

Claims shall be made . . . as if such Allowed Claims had been Allowed Claims on the dates

distributions were previously made to holders of Allowed Claims in the applicable Class, but

shall be made net of any expenses relating thereto, including any taxes imposed thereon or

otherwise payable by the Disputed Claims Reserve."[9]

---

[9]     Section 7.5(a) of the Plan provides in full that:

To the extent that a Disputed Single-Dip General Unsecured Claim becomes an Allowed Claim
after the Effective Date, the Disbursing Agent shall, subsequent to the Final Mandatory
Conversion Date, distribute to the holder thereof the distribution, if any, of the shares of New
Common Stock to which such holder is entitled hereunder out of the Disputed Claims Reserve. All
distributions made under this Section 7.5 on account of Allowed Claims shall be made together
with any dividends, payments, or other distributions made on account of, as well as any
obligations arising from, the distributed property, then held in the Disputed Claims Reserve as if
such Allowed Claims had been Allowed Claims on the dates distributions were previously made
to holders of Allowed Claims in the applicable Class, but shall be made net of any expenses
relating thereto, including any taxes imposed thereon or otherwise payable by the Disputed Claims
Reserve. No interest shall be paid with respect to any Disputed Single-Dip General Unsecured
Claim that becomes an Allowed Claim after the Effective Date.

The Disputed Claims Reserve was formed as a "disputed ownership fund" under Treasury Regulation § 1.468B-9. *See* Plan § 7.3(d). While no tax liability accrued when assets were placed into the Disputed Claims Reserve, distributions from the Disputed Claims Reserve are treated as a taxable exchange by the IRS. *See* Disclosure Statement § VI.B.5; Treas. Reg. § 1.468B-9(c)(4). Because the value of the American stock has increased since the time it was placed in the Disputed Claims Reserve, a distribution from the Disputed Claims Reserve now results in a taxable gain. *See* IRC § 1001(a); Treas. Reg. § 1.468B-9(c)(4). Accordingly, these are taxes attributable to the Disputed Claims Reserve itself. *See* Disclosure Statement § VI.B.5 ("The Disputed Claims Reserve will be a separate taxable entity for U.S. federal income tax purposes subject to a separate entity-level tax at the maximum rate applicable to trusts and estates, and all distributions from the Disputed Claims Reserve will be taxable to such reserve as if sold at fair market value.").[10]

The Plan was drafted with the understanding that the Debtors' estate needed to pay taxes that might accrue, but there was no guarantee that sufficient shares would exist in the Disputed Claims Reserve to pay such taxes after distributions to claimants. Section 7.5(a) therefore provides that distributions made from the Disputed Claims Reserve to Post-Effective Date Allowed Claims would "be made net of any expenses relating thereto, including any taxes imposed thereon or otherwise payable by the Disputed Claims Reserve." Plan § 7.5(a). The reduction in distributions to pay the Disputed Claims Reserve's tax liabilities has resulted in Post-Effective Date Allowed Claims receiving up to 9.7% fewer shares than the shares received

---

Plan § 7.5(a).

[10]    The Movants assert that creditors that received a distribution from the Disputed Claims Reserve also accrue their own personal tax liabilities. Specifically, because creditors receive shares from the Disputed Claims Reserve at the fair market value of the assets at the time they are distributed, a creditor who receives appreciated stock would have received a payment exceeding his debt and would therefore owe his own tax on that appreciation. *See* Treas. Reg. § 1.468B-9(f); IRC §§ 1001(a), 1271(a).

by Effective Date Allowed Claims in the first 120 days.  More specifically, the Movants appear

to have received somewhere between 27.526 shares and 28.4351 shares per $1,000 of Allowed

Claims, rather than the 30.7553 shares paid on Effective Date Allowed Claims.[11]

2.  Distribution of Excess Shares from the Disputed Claims Reserve

Section 7.4 of the Plan provides for "true-up" payments when there are more shares in the

Disputed Claims Reserve than are needed to satisfy the remaining Disputed Claims.  As the

amount of Post-Effective Date Allowed Claims becomes known, the Plan provides that "true-up"

payments will be made from the excess shares to holders of allowed claims and interests, through

either "Interim True-Up" distributions  or a "Final True-Up" distribution when the case is ready

to be closed.  See Plan §§ 7.4(a), (b).  The "Final True-Up" provision states:

> On the Final Distribution Date, or as soon thereafter as reasonably practicable, all
> shares of New Common Stock remaining in the Disputed Claims Reserve (after
> making all distributions pursuant to Section 7.5(a) hereof on account of Disputed
> Single-Dip General Unsecured Claims that have become Allowed Single-Dip
> General Unsecured Claims prior to such date), shall be distributed on account of
> the American Labor Allocation, the Market-Based Old Equity Allocation, and to
> holders of Allowed Single-Dip General Unsecured Claims, as applicable, based
> upon how such shares of New Common Stock would have been distributed on the
> Initial Distribution Date and each Mandatory Conversion Date if on the Effective
> Date the aggregate amount of all Allowed Single-Dip General Unsecured Claims
> were in the amount of such Claims on the Final Distribution Date and there were
> no Disputed Single-Dip General Unsecured Claims on the Effective Date.

Plan § 7.4(b).

---

[11]    The Unions assert that Post-Effective Date Allowed Claims received approximately 28.4351 shares per
$1,000, whereas Effective Date Allowed Claims received 30.7553 shares of New Common Stock for each $1,000 of
Allowed Claims.  See Unions' Motion to Enforce Order Confirming Plan at 11.  BAML asserts that it received
27.525 shares for each $1,000 of claims.  See BAML Motion to Implement and Enforce True-up Provisions of
Debtors' Confirmed Chapter 11 Plan of Reorganization ¶ 8; see also Debtors' Omnibus Response ¶ 9 ("[T]o date,
the share price of the New Common Stock at each distribution date has been higher than the cost basis of the shares
distributed for a subsequently Allowed Claim or the American Labor Allocation.  Thus, distributions to holders of
subsequently Allowed Claims have been subject to reduction for tax liabilities incurred by the Disputed Claims
Reserve in accordance with the Plan and as described in the Disclosure Statement . . . .").

The Debtors initially assumed that the maximum allowed Single-Dip General Unsecured Claims would total $3.2 billion, based on approximately $2.44 billion of claims allowed by the Effective Date and $755 million as the estimated maximum of disputed claims that would be allowed Post-Effective Date. *See* Disputed Claims Order at 3. The Plan therefore set aside $755 million in stock in the Disputed Claims Reserve to cover the estimated maximum of Post-Effective Date Allowed Claims. But because certain Disputed Claims were disallowed, there will be more shares in the Disputed Claims Reserve than necessary to pay the actual Post-Effective Date Allowed Claims. Thus, there is money available for true-up payments.[12]

As holders of Post-Effective Date Allowed Claims, the Movants have received distributions that had been reduced by the taxes accrued by the Disputed Claims Reserve. The Movants argue that they should receive true-up payments under Section 7.4 of the Plan to make their recovery in shares of stock equal to that of the holders of Effective Date Allowed Claims, who received more shares of stock because there was no reduction to pay taxes. The Debtors disagree, arguing that the Movants have already received full value for their claims because the value of the shares increased after the Effective Date Allowed Claims were paid. The Debtors contend, therefore, that the excess funds in the Disputed Claims reserve should be passed on to the Debtors' old equity holders, a more junior class.

## DISCUSSION

### A.  The Applicable Legal Standards

"When interpreting a confirmed plan, the principles of contract law apply." *MF Glob. Holdings Ltd v. PricewaterhouseCoopers LLP*, 43 F. Supp. 3d 309, 313 (S.D.N.Y. 2014)

---

[12]    The parties specifically cite to the Second Circuit's affirmance of the District Court's decision upholding this Court's rejection of the $632 million claim of the Supplement B Pilot Beneficiaries. *See Supplement B Pilot Beneficiaries v. AMR Corp. (In re AMR Corp.)*, 622 F. App'x 64 (2d Cir. 2015).

(quoting *In re Dynegy Inc.*, 486 B.R. 585, 590 (Bankr. S.D.N.Y. 2013)).  "For purposes of interpretation, 'all documents which were confirmed together to form the contract' are added to the [p]lan itself."  *In re Worldcom, Inc.*, 352 B.R. 369, 377 (Bankr. S.D.N.Y. 2006) (quoting *Goldin Assocs., L.L.C. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 2004 U.S. Dist. LEXIS 9153, at *14 (S.D.N.Y May 20, 2004)).  Thus, a debtor's plan and disclosure statement "should be read together to ascertain the meaning of [p]lan provisions."  *In re Worldcom*, 352 B.R. at 377 (citing *Goldin*, 2004 U.S. Dist. LEXIS 9153, at *14-17).

Under New York law, "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms.  Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing[,]" unless the contract is ambiguous.[13] *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990).  A contract provision is ambiguous if it is "susceptible to more than one reasonable interpretation."  *Brad H. v. City of N.Y.*, 17 N.Y.3d 180, 186 (2011).  "Whether or not a writing is ambiguous is a question of law to be resolved by the courts . . . .  It is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face."  *Giancontieri*, 77 N.Y.2d at 162-63 (internal citations and quotations omitted).  Furthermore, contractual provisions "are not ambiguous merely because the parties interpret them differently."  *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 25 N.Y.3d 675, 680 (2015).

---

[13]    The Plan is governed by New York law, and the Court therefore refers to New York principles of contract law in its interpretation of the Plan.  *See* Plan § 12.12.

"A contract should be read as a whole to ensure that undue emphasis is not placed upon particular words and phrases. . . . Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Consedine v. Portville Cent. Sch. Dist.*, 12 N.Y.3d 286, 293 (2009) (internal citations omitted). "[S]pecific clauses of a contract are to be read consistently with the overall manifest purpose of the parties' agreement. Contracts are also to be interpreted to avoid inconsistencies and to give meaning to all of its terms." *Barrow v. Lawrence United Corp.*, 538 N.Y.S.2d 363, 365 (App. Div. 1989) (internal citations omitted).

## B. **The Movants Correctly Interpret Payment under the Plan as Share-Based, Not Value-Based**

In analyzing whether the Movants are entitled to receive a "true-up" distribution, both sides agree that the relevant provision is Section 7.4(b) of the Plan, which covers the final "true-up" distribution.[14] While it is clear that the true-up provision is designed to provide an additional payment to a claimant if necessary to ensure an appropriate recovery, the parties have a markedly different interpretation of how Section 7.4(b) works.

The Movants believe they are entitled to a true-up under Section 7.4(b) to reimburse them to the extent that the payment on their claims in stock was reduced to pay their share of the Disputed Claims Reserve's taxes. The Movants rely on the statement in Section 7.4(b) that excess shares in the final true-up "*shall be distributed* on account of the American Labor Allocation, the Market-Based Old Equity Allocation, and to holders of Allowed Single-Dip General Unsecured Claims, as applicable, *based upon how such shares of New Common Stock*

---

[14] The parties' pleadings argued about how to construe the interim true-up provision in Section 7.4(a) of the Plan. At oral argument, however, the parties agreed that the Court did not need to address the interim true-up because the final true-up provision of Section 7.4(b) would ultimately control what true-up, if any, is appropriate and, therefore, the final true-up encompasses all the issues that the Court needs to decide. *See* Hr'g Tr. 121:24-122:24, Feb. 23, 2016 [ECF No. 12702].

*would have been distributed* on the Initial Distribution Date and each Mandatory Conversion

Date . . . ."  Plan § 7.4(b) (emphasis added).  Thus, the final true-up harkens back to how a claim

would have been paid if it was allowed on the Effective Date.  On the Initial Distribution Date

and the Mandatory Conversion Dates, Effective Date Allowed Claims received 30.7553 shares

per $1,000.  But for the Post-Effective Date Allowed Claims that were paid later, the Movants

received fewer shares per $1,000—anywhere from 27.525 shares to 28.4351 shares—because

they had to first pay their pro rata shares of the taxes paid on the Disputed Claims Reserve.  If

the Movants' claims had been allowed on the Effective Date—and shares had been distributed to

them on the Initial Distribution Date and each Mandatory Conversion Date—the Movants would

have received a distribution of 30.7553 shares per $1,000.  Viewing Section 7.4 as part of a

share-based plan, the Movants see the "based upon" language as a reference to the way claims

were paid in shares.  Thus, if the true-up for Post-Effective Date Allowed Claims is "based upon

how such shares of New Common Stock would have been distributed on the Initial Distribution

Date and each Mandatory Conversion Date[,]" the Movants argue that such true-up distribution

must bring Post-Effective Date Allowed Claims up to the 30.7553 shares paid to claims allowed

on the Effective Date.  Plan § 7.4(b).

By contrast, the Debtors take a value-based approach to Section 7.4.  They assert that

Section 7.4 provides a true-up distribution to holders of Allowed Claims *only if* the holders of

Allowed Claims received less than 100% of the value of their claims.  *See* Hr'g Tr. 88:8-23, Feb.

23, 2016; *see also* Hr'g Tr. 92:8-14, Feb. 23, 2016 (Debtors' counsel) ("If, on that distribution

date, the value had been less than 100 cents, I have to go back and do a recalculation as I close

up the [Disputed Claims Reserve].  And I do that calculation based on what my claims pool has

finally been defined to be.  And I look at the share price that's distributed at that point in time,

and I distribute them a number of shares until they've received full value."). The Debtors view

Section 7.4 as referring to the treatment provisions of the Plan, which set forth a formula to

determine the allocation of stock to be distributed. *See* Hr'g Tr. 89:24-94:3, Feb. 23, 2016. The

Debtors interpret this language to anchor the payment of the Movants' claims to the monetary

value of the distribution received by the Single-Dip General Unsecured Claims on the Effective

Date, rather than the number of shares paid to those claimants. The Debtors believe that no true-

up distribution is required here because these Movants already received full value given the

subsequent increase in the share price after the Effective Date. *See id.* As the Movants received

value that was equal to at least 100% of their claims, the Debtors contend that the excess shares

remaining in the Disputed Claims Reserve should be given instead to equity holders. The

Debtors also argue that the taxes paid by the Disputed Claims Reserve were properly withheld

from the distribution to the Movants, who nonetheless received full value.

The Court finds the Movants' view to be the better interpretation of Section 7.4(b). As

the Debtors have previously conceded, the "central thesis of the Plan was a mechanism to

distribute shares of New Common Stock among the stakeholders based on market factors rather

than a designated value assigned to the shares." *Debtors' Reply to Post-Effective Claimholders* ¶

4. The Plan is share-based as it provides for recovery to holders of Post-Effective Date Allowed

Claims in the form of a set number of shares per $1,000 of claims. The Plan provides a complex

methodology based on the market over time to determine the appropriate number of shares per

$1,000 of claims. Importantly, the formulas used to determine the distribution of shares applies

to Allowed Claims generally, and do not distinguish between claims allowed on the Effective

Date of the Plan and those allowed later. *See* Plan §§ 1.9, 7.3(b). Moreover, there is no

provision to adjust the determination on the amount of shares to be paid per $1,000 of claims

14

once that determination has been made.  Against this back-drop, excess shares "shall be distributed [in the final true-up] . . . based upon how such shares of New Common Stock would have been distributed on the Initial Distribution Date and each Mandatory Conversion Date." Plan § 7.4(b).  There is no dispute that no taxes were deducted from these earlier distributions. There is nothing in Section 7.4 or elsewhere in the Plan that specifically supports the Debtors' contention that "[S]ection 7.4 of the Plan operates to provide an additional distribution to holders of Allowed Claims on the Final Distribution Date only if, on the Mandatory Conversion Date, holders of Allowed Claims received value that was equal to less than one hundred percent (100%) of their underlying claims."  *Debtors' Omnibus Response* ¶ 22.

The Debtors complain that the Movants' interpretation gives the Movants an improper windfall.  More specifically, the Debtors argue that the Movants' position overcompensates holders of Post-Effective Date Allowed Claims because they would receive more in dollar value than the holders of Effective Date Allowed Claims.[15]  But this argument misreads the Plan as a whole.  The Plan passes both the risk and the reward relating to share price onto the creditors, rather than promising any defined monetary value for recovery. Creditors holding disputed claims were at a higher level of risk because they would be paid later in the distribution process.  If the share price decreased during this time, these creditors were still tied to the agreed ratio of 30.7553 shares for each $1,000 of Allowed Claims.  Thus, the Movants and similarly situated creditors took on the risk of a lower stock valuation.  The benefit of this bargain is that these creditors were entitled to the appreciation in the value of their stock.  Of

---

[15]    The Debtors maintain that "[t]he resulting deduction for Gains Taxes is because the price per share of New Common Stock was lower on the Effective Date than it has been for each subsequent Distribution Date. . . . Thus, while holders of Allowed Claims on the Effective Date may have received a greater number of shares by the Mandatory Conversion Date, they actually received a lower recovery amount than holders of subsequently Allowed Claims."  *Debtors' Omnibus Response* ¶ 25.

course, Allowed Claims on the Effective Date that were paid earlier in these bankruptcy cases also got the benefit of any appreciation in the value of the stock they received, assuming that they decided to hold onto the stock.  It is just that this appreciation took place outside of the mechanism of the Plan.

The Plan's elegant balance of risk and reward does not work under the Debtors' value-based interpretation.  Imagine a circumstance where the stock price dropped significantly after the payment of Allowed Claims on the Effective Date but before the Movants were paid.  Given the same number of shares of stock, the Movants would recover far less in value for their claims. But even if the Movants subsequently sought a true-up payment in this scenerio, there was no guarantee in the Plan that sufficient funds would exist in the Claims Reserve for these Movants to receive the same value as other unsecured creditors paid earlier in the case, much less full value on their claims.[16]  Under this scenario, the Debtors' value-based interpretation of the Plan

---

[16]    It is important to evaluate the terms of the Plan at the time it was confirmed.  At that time, the parties did not know that there ultimately would be excess funds available for distribution in the Disputed Claims Reserve. Thus, the Court does not consider the existence of these excess funds now when interpreting the Plan.  *See Maxwell Macmillan Realization Liquidating Trust v. Aboff (In re Macmillan, Inc.)*, 204 B.R. 378, 401 (Bankr. S.D.N.Y. 1997) ("The objective in any question of the interpretation of a written contract, of course, is to determine . . . the intention of the parties as derived from the language employed.  That intent should be viewed from the time the parties executed and entered into the contract, not from hindsight.") (internal citations and quotations omitted); *cf. Lehman Bros. Holdings Inc.  v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.)*, 541 B.R. 551, 567 (S.D.N.Y. 2015) ("Although one could argue in hindsight that notice of several months or a year would have been preferable for an entity with Lehman's exposure, it is not the notice that Lehman bargained for, and the Court is not in a position to enhance Lehman's contractual rights after the fact."); *In re House Nursery, Ltd.*, 2016 WL 519626, at *4, *7 (Bankr. E.D. Tex. Feb. 9, 2016) (noting in the Chapter 11 context that "[b]ankruptcy plans are interpreted in accordance with the general rules of contract interpretation" and stating that "[t]hough it is now apparent that, with the benefit of hindsight, the Bank is not pleased with the deal it made because the results it expected from the negotiated marketing scheme have not materialized, the Bank cannot simply isolate chosen words now from the context from which they arose and thereby achieve a different result from that contemplated by the parties at the time of the confirmation of the plan.") (internal citations and quotations omitted); *In re Ness*, 1990 WL 1239805, at *4 (Bankr. D.N.D. Jan. 5, 1990) ("The fact that the deficiency was not contemplated by the Debtors or CCC at the time of confirmation has no effect on the result. . . . A bankruptcy court must give effect to the terms and legitimate expectations of the parties when interpreting a plan.  A plain reading of the Debtors' plan makes it reasonable to conclude that CCC expected their entire claim to be unimpaired. . . . Once a plan has been confirmed, neither a debtor nor a creditor can assert rights which are inconsistent with its terms.") (internal citations and

would not have provided equal value to claimants in the same class. The Debtors' position thus would saddle the Movants and similarly situated creditors with the risk of a drop in share value, while at the same time depriving them of any reward from appreciation in share value.[17]

The Debtors contend that their value-based interpretation is built into Section 7.4 through the operation of Section 7.5. The Debtors argue that the netting of taxes in Section 7.5 acts to ensure that Post-Effective Date Allowed Claims do not recover more than the dollar value of their claim because if there is a gain in the share price, the gain tax will be deducted from the distribution. *See* Hr'g Tr. 96:12-97:1, Feb. 23, 2016. The Debtors assert that the reason those claimants have deductions to pay tax on the gain is because those claimants were getting more in value than if they had received a distribution in the first 120 days of the case. *Id.* at 97:3-6. But this argument does not hold up. It does not logically follow that the mechanics of Section 7.5, which relates to initial distributions to Post-Effective Date Claims, would inform Section 7.4,

---

quotations omitted); *Hauck v. State*, 2 Misc. 3d 770, 773-774 (N.Y. Ct. Cl. 2003) ("Courts may not rewrite an agreement between parties and a court should not, under the guise of interpretation, make a new contract for the parties. Courts will not set aside a stipulation merely because in 'hindsight' a party decides that the terms of the stipulation were 'improvident.'") (internal citations and quotations omitted).

[17]    The Disclosure Statement confirms the risk and reward facing claimants. When discussing the recovery to equity holders pursuant to a settlement in the Plan, the Disclosure Statement recognized the uncertainty as to recovery:

> THE PLAN PROVIDES DISTRIBUTIONS BASED ON THE 9019 SETTLEMENT AS DESCRIBED ABOVE. DEPENDING ON THE TRADING PRICE OF THE NEW COMMMON STOCK UTILIZED IN THE FORMULAS TO DETERMINE DISTRIBUTIONS TO HOLDERS OF CLAIMS AND HOLDERS OF AMR EQUITY INTERESTS UNDER THE PLAN, SUCH DISTRIBUTIONS MAY NOT BE IN STRICT COMPLIANCE WITH THE ABSOLUTE PRIORITY RULE UNDER CERTAIN SCENERIOS.

Disclosure Statement, at 15-16 (capitalized text in original). The Disclosure Statement also recognized the potential upside as well:

> AS A RESULT, IN CERTAIN POTENTIAL SCENARIOS CERTAIN GENERAL UNSECURED CREDITORS MAY BE ALLOCATED ADDITIONAL SHARES IN EXCESS OF THE NUMBER OF SHARES REQUIRED FOR SUCH CREDITORS TO ACHIEVE PAR-PLUS-ACCRUED RECOVERIES.

*Id.* at 17 (capitalized text in original).

which relates to subsequent true-up payments.  Indeed, the netting of taxes in Section 7.5 takes

place before Section 7.4 ever becomes a factor in distributions.  There is no language in Section

7.4 referencing the netting of taxes because at the time of true-up payments, a determination has

already been made that there are excess shares available for distribution.

By contrast to the Debtors' strained interpretation, the Movants' position is more

consistent with the overall operation of the Plan and the Bankruptcy Code.  Under the Movants'

interpretation, the Court must examine only whether the Movants and similar claimants received

the recovery—as defined in shares—to which they are entitled under the Plan.  The true-up

provisions in Section 7.4 clearly reference the distribution of shares based on how they would

have hypothetically been distributed in the defined 120-day period.  Nothing in the plain

language of Section 7.4 places a limitation on true-up distributions based on stock appreciation

or the current market value of the stock.

By receiving the same number of shares, the Movants' interpretation of the Plan is also

consistent with the principle of equal treatment of claims within a class under the Bankruptcy

Code.  The Bankruptcy Code explicitly requires that a plan "provide the same treatment for each

claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a

less favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4).  While

disparate treatment within a class is permitted if the holder of a claim or interest agrees to less

favorable treatment, a plan in such circumstances must explicitly provide that particular creditors

are being treated in this manner so as to put such creditors on notice.  *See, e.g., Forklift LP Corp.

v. iS3C, Inc. (In re Forklift LP Corp.)*, 363 B.R. 388, 398 (Bankr. D. Del. 2007) ("[I]t would be

unfair to deprive creditors of their statutory rights to full payment under the Bankruptcy Code,

where plan provisions do not explicitly take those rights away. If a plan explicitly puts a creditor

18

on notice that it is in danger of losing its rights and the creditor fails to act to protect its rights, then rigid application of the plan seems justified.  However, where it is more difficult or impossible for the creditor to realize that the Plan threatens its statutory rights, it is inequitable to punish the creditor for failing to object."); *Terex Corp. v. Metro. Life Ins. Co. (In re Terex Corp.)*, 984 F.2d 170, 175 (6th Cir. 1993) ("[T]he plan itself could have been more specific by explicitly excluding 'post-petition interest,' rather than simply stating that secured claims would be paid in full—100%.  Under these facts we fault the debtor any ambiguity, not the creditor. The crucial point is that the plan was confirmed by the court.  It is the debtor's obligation when seeking the court's confirmation to specify as accurately as possible the amounts which it intends to pay the creditors.").  The Movants' interpretation ensures that all unsecured creditors receive the same number of shares, avoiding the disparate treatment of creditors in the same class.  By contrast, the Debtors' interpretation runs afoul of these concerns because the Plan does not clearly put these later allowed claimants on notice that they could ultimately receive fewer shares of stock.[18]

---

[18]    The Court's conclusion today is also consistent with *In re Mesa Air Group, Inc.*, 2011 Bankr. LEXIS 3855 (Bankr. S.D.N.Y. Jan. 20, 2011).  While not cited by the parties, the *Mesa* case explains that "the 'same treatment' standard of [S]ection 1123(a)(4) does not [necessarily] require that all claimants within a class receive the same amount of money. . . . Further, courts have recognized that the key inquiry under [Section] 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity."  *Id.* at *19 (internal citations and quotations omitted).  In the *Mesa* case, it was argued that creditors who were U.S. citizens were receiving less than equal treatment because non-U.S. creditors were receiving warrants for 110% of the shares of new common stock that was issued to U.S. citizens.  The court found that rather than indicating unequal treatment, the premium ensured equality of treatment under Section 1123(a)(4) because testimony showed that "the premium was necessary to equate the value between the New Common Stock and the New Warrants based on how the two securities would trade on the open market."  *Id.* at *22.  The court noted that "[t]he inquiry under [S]ection 1123(a)(4) is not whether U.S. Citizens and Non-U.S. Citizens receive the same amount of money, but whether U.S. Citizens and Non-U.S. Citizens are given the same opportunity."  *Id.* at *21 (internal citations and quotations omitted).  The concern identified in *Mesa* is easily distinguishable from the case at hand.  *Mesa* deals with two different types of financial instruments, whereas the parties here are both paid in shares.  Indeed, the Plan here is consistent with *Mesa* when viewed as providing claimants with an opportunity to receive the same number of shares of stock but would not be consistent with *Mesa* if viewed as providing claimants recovery as measured by monetary value.

19

The Plan does not support the Debtors' value-based interpretation for another reason:  it does not include provisions to ensure an equitable distribution of value to all unsecured creditors. If the Plan is value-based—rather than share-based—it would presumably provide for a recalculation of the number of shares for claims allowed after the Effective Date, given the fluctuating nature of the stock price.  And consistent with the Bankruptcy Code's requirement of equal treatment for claims in the same class, the Plan would presumably ensure equal treatment—meaning the value of the shares under the Debtors' interpretation—for all unsecured creditors regardless of when they were paid.  But there is no evidence that that the Plan is designed to accomplish this.  The Debtors rely on the provisions about the calculation of the share value within 120 days of the Effective Date.  *See* Hr'g Tr. 78:1-79:19, Feb. 23, 2016.  But these provisions say nothing about how the number of shares would be calculated for claimants being paid later or when such a recalculation would occur; at best, they merely reflect the deduction of taxes.  *See* Hr'g Tr. 86:7-24, Feb. 23, 2016.  The Plan provisions on the calculation of the share value within 120 days of the Effective Date are complex and extensive provisions; one would imagine that a mechanism for any later recalculation of the share value would be similarly complex and would set forth the subsequent recalculation methodology with specificity.  But there are no such provisions in the Plan.  The true-up provision of Section 7.4 as constituted does not perform that function.  It merely looks back to how the number of shares were initially calculated.  And crucially, the Debtors have identified no provision in the Plan that would guarantee that there would be enough money to pay Post-Effective Date Allowed Claims like the Movants the same value as was received by Allowed Claims on the Effective Date. Indeed, the Movants represent that the share price has decreased after peaking at a high of 56.20 a share in January 2015.  *See Unions' Motion to Enforce Order Confirming Plan* at 8 [ECF No.

12666].  Such continuing fluctuations in value highlight the need for the Plan to provide a reliable method to pay out equal value in shares to claimants if, in fact, it is a value-based plan.

The Debtors argue that their value-based interpretation is captured in a provision of the Disclosure Statement which sets out how the distribution mechanics worked,[19] and in a press release issued by the Debtors on April 8, 2014, which provided that through application of the formula "[a]llowed claims will receive 30.7553 shares, subject to reduction for expenses of the Disputed Claims Reserve, including tax liabilities, for each $1,000 of allowed claims."  Exh. A to *Debtors' Reply to Post-Effective Claimholders* [ECF No. 12524].[20]  It is true that the formulas

---

[19]    Specifically, the Debtors cite to page 12 of the Disclosure Statement, which provides:

As set forth in the Plan, *the amount of additional shares of New Common Stock that will be issued on the Mandatory Conversion Dates* to holders of Allowed AMR Other General Unsecured Claims, Allowed American Other General Unsecured Claims, Allowed Eagle General Unsecured Claim, and Allowed AMR Equity Interests *is determined by the [volume weighted average price] of the New Common Stock on the Mandatory Conversion Dates. Specifically, the amount of additional shares of New Common Stock distributable to the holders of Allowed Equity Interests depends on whether the price of the New Common Stock as of the relevant Mandatory Conversion Date exceeds the value which would imply that the New Common Stock distributable to holders of Allowed General Unsecured Claims is sufficient to effectively pay such Claims in full (i.e., par plus accrued interest thereon,* at the nondefault contract rate or federal judgment rate (as appropriate) from the Commencement Date through the Effective Date, including interest on overdue interest), and including certain additional value to address the market volatility and liquidity concerns during the 120-day period following the Effective Date, as discussed more fully below.  For illustration purposes only, a table reflecting various potential recovery estimates based upon numerous assumptions and a range of prices for the New Common Stock is annexed hereto as Exhibit "B."

Disclosure Statement § I.C.3 (emphasis added).

The Debtors then reference the chart attached as Exhibit B to the Disclosure Statement, which is an illustrative allocation of equity based on various stock price assumptions.  The Debtors assert that this shows "[t]he thesis of the plan was during that first 120 days after the effective date, market prices of the new common stock were going to drive what [creditor] recoveries were.  And that would be based on the trading prices of that stock, as measured on those dates. And the bar threshold was value in full to effectively pay such claims in full."  Hr'g Tr. 79:14-19, Feb. 23, 2016.

[20]    The Court notes that the press release is of probative value only to the extent that it is supported by the language of the Plan.  It is not part of the contract entered into by the parties.  "For purposes of interpretation, 'all documents which were confirmed together to form the contract' are added to the [p]lan itself."  *In re Worldcom, Inc.*, 352 B.R. at 377 (quoting *Goldin Assocs.*, 2004 U.S. Dist. LEXIS 9153, at *14).  Therefore the normal rules regarding extrinsic evidence apply.  Furthermore, even if the Court had found the Plan to be ambiguous, the press release would only be one piece of a body of extrinsic evidence that might need to be considered regarding interpretation of these terms in the Plan.

used were meant to capture the concept of full value in the initial distribution.  But that doesn't change the result here given that recovery for claimants was then ultimately frozen by the terms of the Plan at 30.7553 shares per $1,000 of claims and the Plan mechanism provides that creditors are to be paid in shares of stock.  *See* Plan § 4.11; *see also* Exh. B to Plan at § 5.1(iv) ("For the avoidance of doubt, following the 120th day following the Plan Effective Date, Holders shall have no rights under the Series A Preferred Stock other than the right to receive the shares of Common Stock into which their shares of Series A Preferred Stock were converted pursuant to any Mandatory Conversion or Optional Conversion hereunder and the right that a holder of shares of Common Stock would have corresponding thereto."); *Debtors' Omnibus Response* ¶ 9 ("Since the Mandatory Conversion Date, the same distribution rate of 30.7553 shares of New Common Stock for each $1,000 of Allowed Claims (including applicable accrued interest) has applied to *each* distribution from the Disputed Claims Reserve . . . .").

     To continue trying to readjust recoveries based on value would require the recalculation of this formula for later distributions, and no party contends that such continued recalculations here would have been feasible.  *See* Hr'g Tr. 109:9-110:12, Feb. 23, 2016.  Moreover, there is no evidence that the Plan requires that the estate go back and reinject value into the calculation for recovery after the stock price was set at 30.7553 shares per $1,000 of claims.  Such a position is inconsistent with the repeated warnings to creditors that "[n]otwithstanding compliance by the Debtors or the Reorganized Debtors, as applicable, with their obligations under the Plan, there can be no assurance that an active trading market for the New Common Stock will develop or as to the prices at which the New Common Stock will trade."  Disclosure Statement § IV.E.3.

     The Debtors point out that nowhere in the Plan or Disclosure Statement does it provide for a true-up for shares that were sold to pay gains taxes, and assert that the Movants and

similarly situated creditors would be unfairly reimbursed for taxes on their gains.  But the Court

finds this unpersuasive.  The Plan makes clear that these taxes are an obligation of the Disputed

Claims Reserve, not of the individuals recovering the distribution.  *See* Plan § 7.3(b) ("net of any

expenses relating thereto, including any taxes imposed thereon or otherwise payable by the

Disputed Claims Reserve"); Plan § 7.3(e) ("The Disbursing Agent shall be responsible for

payment, out of the assets of the Disputed Claims Reserve, of any taxes imposed on the Disputed

Claims Reserve or its assets. . . . [A]ssets of the Disputed Claims Reserve may be sold to pay

such taxes."); Plan § 7.5(a) ("All distributions made under this Section 7.5 on account of

Allowed Claims shall be made together with any dividends, payments, or other distributions

made on account of, as well as any obligations arising from, the distributed property, then held in

the Disputed Claims Reserve as if such Allowed Claims had been Allowed Claims on the dates

distributions were previously made to holders of Allowed Claims in the applicable Class, *but

shall be made net of any expenses relating thereto, including any taxes imposed thereon or

otherwise payable by the Disputed Claims Reserve.*"); Plan § 7.7 ("In the event that dividend

distributions have been made with respect to the New Common Stock distributable to a holder of

a Disputed Claim that later becomes Allowed, such holder shall be entitled to receive such

previously distributed dividends without any interest thereon (net of allocable expenses of the

Disputed Claims Reserve, including taxes).").  With the taxes seen as an obligation of the

Disputed Claims Reserve—and not of claimants like the Movants—the deduction of taxes is

simply a mechanism to pay the taxes up front to ensure that funds are available to pay estate

taxes, rather than a reallocation of value in the Plan.  The true-up provision thus provides for a

reimbursement of this expense of the estate to those claimants who initially bore that burden.[21]

---

[21]    Indeed, the Movants correctly note that creditors will have their own tax consequences upon receipt of
shares from the Disputed Claims Reserve.  Specifically, creditors receive the shares at the fair market value of the

This result is consistent with fundamental bankruptcy principles. As the Movants stress, the Debtors' interpretation results in the excess shares being distributed to the Debtors' old equity holders, which have already received over $9.5 billion worth of shares in the reorganized entity.[22] That result would raise a concern about absolute priority: namely, that a senior class of unsecured creditors would have to shoulder by themselves the administrative costs of the Disputed Claims Reserve's taxes while some of the benefits of that Claim Reserve would be passed along to the junior class of old equity security holders. Under bankruptcy priority principles, estate administrative expenses are paid "off the top" and the balance of the proceeds of the estate are then distributed in accordance with the priority scheme. *See* 11 U.S.C. § 503(b)(1)(A) (administrative expenses are "the actual, necessary costs and expenses of preserving the estate."); Collier on Bankruptcy ¶ 503.01 (noting that "preserving the estate is in the interest and for the benefit of every creditor," and that preserving the estate "should not be interpreted narrowly."); *see also* 11 U.S.C. § 507(a) (listing order of priorities with administrative expenses paid before claims); *cf. Dish Network Corp. v. DBSD N. Am., Inc. (In re*

---

assets at the time they are distributed. *See* Treas. Reg. § 1.468B-9(f); IRC § 1001(a). A payment made to a creditor with appreciated stock will exceed that creditor's debt and the creditor will therefore owe taxes on that appreciation. *See* IRC § 1001(a); IRC § 1271(a). Union members will receive this appreciation as additional ordinary income, which the Movants' represent will be taxed at the worker's marginal tax rate. *See Unions' Motion to Enforce Order Confirming Plan* at 12 (citing IRC § 61(a); *United States v. Gilmore*, 372 U.S. 39 (1963); *Soc. Sec. Bd. v. Nierotko*, 327 U.S. 358 (1946); *Hemelt v. United States*, 122 F.3d 204 (4th Cir. 1997)).

22      The Unions calculate this amount based on old equity having received 0.744 shares of New Common Stock for each share of old equity. *See* American Airlines Distribution, Distribution Information/Forms, Effective Date, Day 30, 60, 90 and 120 Mandatory Conversion Date Press Releases, http://amrcaseinfo.com/distribution.php. The Unions note that there were a total of 394.2 million shares of Old Equity, which would result in old equity having received 293.2848 million shares. *See* American Airlines Group Inc., Form 8-K (Dec. 9, 2013), http://www.sec.gov/Archives/edgar/data/4515/00011 9312513466914/d640288d8k.htm. The Unions state that this represents approximately 53.88% of the 544,361,824 shares available to American as a result of the merger. *See* News Release, American Airlines, American Airlines Group Equity Distribution Update: Share Determination Date Results (Dec. 2, 2013), http://phx.corporate-ir.net/phoenix.zhtml?c=1 17098&p=irol-newsArticle&TD=1881 249&highlight=. The Unions state that at 30.7553 shares per $1,000, each share has an approximate value of $32.51; at $32.51 per share, the 293.2848 shares received by old equity have a value of over $9.5 billion. The Unions postulate that at the $35.29 per share closing price prevalent on day 120, April 10, 2014, old equity would have a value of $10.35 billion.

*DBSD N. Am., Inc.*), 634 F.3d 79, 94-95 (2d Cir. 2011) (discussing principle of absolute priority).

### C. The Tax Provisions of the Disputed Claim Reserve Do Not Support the Debtors' Value-Based Approach

The Debtors argue that the Plan explicitly required that distributions from the Disputed Claim Reserve be made net of taxes and, therefore, the Movants cannot complain about their payments being reduced by these tax payments. *See e.g.* Plan §§ 7.3(b), 7.3(e), 7.5(a), 7.7. But there are two problems with this interpretation.

First, the Debtors' interpretation of the Plan essentially treats the Post-Effective Date Allowed Claims to be paid in full by "deeming" that these claimants have received as part of the payment of their claims the amounts American deducted for the payment of taxes. But as the Movants correctly note, there is nothing in the Plan that specifically "deems" the payment of taxes on the Disputed Claims Reserve to constitute part of the payout to any claimants. *See* Plan §§ 7.5(a), 7.4. This contrasts starkly with other parts of the Plan where such "deeming" language does exist. For example, Section 5.5(a) of the Plan authorizes the reduction of distributions for amounts owed for an employee's own taxes, but it provides that "[a]ny Cash or property withheld pursuant to this paragraph shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan." Plan § 5.5(a). Under the principle of contract construction *expression unius est exclusion alterius*, the presence of "deeming" language in one part of the Plan—Section 5.5—strongly suggests that the parties intended to exclude such "deeming" language from other parts of the Plan (Section 7.5(a)).[23] *See RG Steel,*

---

[23]       Relatedly, the Disclosure Statement reflects that the payment of taxes for distributions under Section 7.5(a) is permissive rather than mandatory. *See* Disclosure Statement § VI.B.5 ("[A] portion of the shares *may* be sold to pay any taxes expected to be incurred by the Disputed Claims Reserve on the release of the shares and the distribution to the holder of the subsequently allowed Claim will be reduced as a result.") (emphasis added). This

*LLC v. Severstal US Holdings, LLC*, 2014 U.S. Dist. LEXIS 5860, at \*30-31 (S.D.N.Y. Jan. 16, 2014) (citing *In re New York City Asbestos Litig.*, 838 N.Y.S.2d 76, 80 (App. Div. 1st Dep't 2007); *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 130-31 (2d Cir. 2001)); *see also Asbestos Settlement Trust v. City of New York (In re Celotex Corp.)*, 487 F.3d 1320, 1334 (11th Cir. 2007) (applying *expression unius est exclusion alterius* to plan documents).

The Debtors assert that the doctrine of *expression unius est exclusion alterius* is inapplicable here because the plain language of the Plan makes it clear that distributions from the Disputed Claims Reserve would be made net of taxes. They rely on several sections of the Plan for this argument. This includes Section 7.3(b), which provides that the Debtors set aside enough shares in the Disputed Claims Reserve to ensure that Disputed Claims that are subsequently allowed will receive the same recovery as if the claim had been allowed as of the Effective Date, but net of expenses, including taxes.[24] They also rely on Section 7.3(e), which similarly provides that the Disbursing Agent is authorized to sell assets from the Disputed

---

permissive language is inconsistent with the Debtors' characterization of such tax withholdings as a deemed distribution to these claimants.

[24]    Notably, the amount reserved is based on the number of the shares, rather than their actual value. Section 7.3(b) provides:

> There shall be withheld from the New Mandatorily Convertible Preferred Stock and the New Common Stock to be distributed to holders of Allowed Single-Dip General Unsecured Claims (i) the number of such shares that would be distributable with respect to any Disputed Single-Dip General Unsecured Claims had such Disputed Claims been Allowed on the Effective Date and (ii) such additional shares necessary to assure that, if all such Disputed Claims become Allowed Claims in full, sufficient shares are available to satisfy the American Labor Allocation (the "Disputed Claims Reserve"), together with all earnings thereon (*net of any expenses relating thereto, including any taxes imposed thereon or otherwise payable by the Disputed Claims Reserve*). The Disbursing Agent shall hold in the Disputed Claims Reserve all dividends, payments, and other distributions made on account of, as well as any obligations arising from, property held in the Disputed Claims Reserve, to the extent that such property continues to be so held at the time such distributions are made or such obligations arise, and such dividends, payments, or other distributions shall be held for the benefit of holders of Disputed Claims against any of the Debtors whose Claims are subsequently Allowed and for the benefit of other parties entitled thereto hereunder. . . .

Plan § 7.3(b) (emphasis added).

Claims Reserve to satisfy tax liabilities.[25]  And finally, they cite Section 7.5(a), which provides

for distributions after allowance, and states that distributions from the Disputed Claims Reserve

will be paid net of expenses, including taxes.[26]

But all these provisions simply allow for and carry out the deduction of taxes from the

stock distributions to Post-Effective Date Claims, a step needed to insure that the Disputed Tax

Reserve would have adequate funds to pay its tax obligations.   No party disputes that

distributions before the true-up are net of expenses such as taxes.  But as explained above, the

Plan's terms reflect that these taxes are borne by the Disputed Claims Reserve absent deeming

language, not the holders of Post-Effective Date Allowed Claims.  None of the provisions cited

by the Debtors address the true-up mechanism of Section 7.4 or direct the manner in which that

reconciliation should be conducted.  Section 7.4 does not contain any language relating to the

---

[25]    Section 7.3(e) provides:

*The Disbursing Agent shall be responsible for payment, out of the assets of the Disputed Claims Reserve, of any taxes imposed on the Disputed Claims Reserve or its assets.* In the event, and to the extent, any Cash in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of the Disputed Claims Reserve (including any income that may arise upon the distribution of the assets in the Disputed Claims Reserve), *assets of the Disputed Claims Reserve may be sold to pay such taxes.*

Plan § 7.3(e) (emphasis added).

[26]    Section 7.5(a) provides:

To the extent that a Disputed Single-Dip General Unsecured Claim becomes an Allowed Claim after the Effective Date, the Disbursing Agent shall, subsequent to the Final Mandatory Conversion Date, distribute to the holder thereof the distribution, if any, of the shares of New Common Stock to which such holder is entitled hereunder out of the Disputed Claims Reserve.  *All distributions made under this Section 7.5 on account of Allowed Claims shall be made together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property,* then held in the Disputed Claims Reserve as if such Allowed Claims had been Allowed Claims on the dates distributions were previously made to holders of Allowed Claims in the applicable Class, *but shall be made net of any expenses relating thereto, including any taxes imposed thereon or otherwise payable by the Disputed Claims Reserve.*

Plan § 7.5(a) (emphasis added); *see also* Disclosure Statement §§ IV.G.5 (distributions made from the Disputed Claims Reserve after allowance are net of taxes), VI.B.5 (illustrative example of how taxes will be paid).

netting of expenses, including taxes.  The Court cannot read into the sections relied upon by the

Debtors an unexpressed intent to limit the Plan's true-up provision that does not appear in the

text.  "Courts may not by construction add or excise terms, nor distort the meaning of those used

and thereby make a new contract for the parties under the guise of interpreting the writing."

*Consedine*, 12 N.Y.3d at 293 (internal citations and quotations omitted).[27]

    The second problem with Debtors' deemed tax argument is inconsistency.  A contract is

"to be interpreted to avoid inconsistencies and to give meaning to all of its terms."  *Barrow*, 538

N.Y.S.2d at 365 (internal citations omitted).  When read in the manner advocated by the

Movants, the provisions of the Plan do not come into conflict.  Sections 7.3, 7.5, and 7.7 of the

Plan provide for the deduction of taxes from the distributions to Post-Effective Date Allowed

Claims to ensure that enough value was available to pay those taxes.  The netting of taxes was

necessary at the time that these distributions were made because not all Disputed Claims had

been fully adjudicated and the estate was not yet certain that there would be enough shares left

for the payment of taxes.  To the extent that value is left in the Disputed Claims Reserve,

however, Section 7.4 then provides the mechanism for its distribution to the Post-Effective Date

Allowed Claims.  It is unnecessary for Section 7.4 to reference the netting of taxes because at the

time of true-up payments, a determination has already been made that there are excess shares

available for distribution.

    But if the provisions are read as advocated by the Debtors, an issue arises that cannot be

resolved under the Plan as currently drafted.  Under the Debtors' interpretation, there would be

---

[27]     The Debtors also rely on Section 7.7.  But that provision relates to the dividends and interest, and also does
not purport to affect how the true-up of Section 7.4 works.  *See* Plan § 7.7 ("In the event that dividend distributions
have been made with respect to the New Common Stock distributable to a holder of a Disputed Claim that later
becomes Allowed, such holder shall be entitled to receive such previously distributed dividends without any interest
thereon (net of allocable expenses of the Disputed Claims Reserve, including taxes).").

no way to distribute excess reserve funds in the Disputed Claims Reserve that were created by the over-withholding of taxes from distributions to Post-Effective Date Allowed Claims.[28]  As a general matter, such over-withholding might occur because the amount withheld from distribution is based on an estimate of the taxes owed but the actual tax due depends on the exact price of the shares when distributed.[29]  The Debtors concede that "the Movants are correct that [S]ection 7.4 would not operate to refund such amounts . . . ."  *Debtors' Omnibus Response* ¶ 26.  The Debtors shrug off this problem by stating that the Court need not rule on the issue at this time, and that they will talk to the parties and fashion a solution to reimburse them for any allocable portion of a loss that offsets a gain.  *See id.; see also* Hr'g Tr. 103:1-7, Feb. 23, 2016.  But "specific clauses of a contract are to be read consistently with the overall manifest purpose of the parties' agreement.  Contracts are also to be interpreted to avoid inconsistencies and to give meaning to all of its terms."  *Barrow*, 538 N.Y.S.2d at 365 (internal citations omitted).  To read the Plan provisions so narrowly that a solution must be created in such circumstances would create an unreasonable result, when the Movants' interpretation provides a result that does not raise such an inconsistency.  *See Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358 (2003) ("A written contract [should] be read as a whole, and every part will be interpreted with

---

[28]      The Movants argue that if Section 7.4 is inapplicable when Effective Date Allowed Claims are paid in full, then there would be no way to true-up payments after distributions were made under Section 7.5(a).  The Movants note that the amounts held back under Section 7.5 are only estimates of taxes and the actual taxes on the stock cannot be determined until after a distribution has occurred because the Disputed Claims Reserve's taxes would depend on the value of the shares at the moment of distribution.  But American would have already done the distribution by the time it ascertained how much tax the Reserve owes.  Any prior estimate would not equal the exact amount of tax liability.

[29]      Over-withholding might also occur where stock depreciation reduced the taxes owed by the Disputed Claims Reserve or resulted in a tax refund under IRS carryback rules because the stock dropped below the base price and distributions generated losses that reduced the Reserve's taxes.  The Movants argue that under American's interpretation, the estate would keep all amounts withheld under Section 7.5(a) and because there would be no distributions to Post-Effective Date Allowed Claims, there would be no opportunity for true-up payments relating to overwithholding of taxes or subsequent tax credits.  *See Unions' Motion to Enforce Order Confirming Plan* at 25-26.

reference to the whole; and if possible it will be so interpreted as to give effect to its general

purpose.  The meaning of a writing may be distorted where undue force is given to single words

or phrases.") (internal citations and quotations omitted).

## **CONCLUSION**

For the reasons set forth above, the Motion is granted.  The Movants are directed to settle

an order on three days' notice.  The proposed order must be submitted by filing a notice of the

proposed order on the Case Management/Electronic Case Filing docket, with a copy of the

proposed order attached as an exhibit to the notice.  A copy of the notice and proposed order

shall also be served upon counsel to the Debtors.


Dated: New York, New York
          December 23, 2016


                                        */s/ Sean H. Lane*_____
                                        UNITED STATES BANKRUPTCY JUDGE