UNITED STATES BANKRUPTCY COURT           **NOT FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
In re:                                                    Chapter 11

AMR CORPORATION, *et al.*,                                Case No. 11-15463 (SHL)

                   Reorganized Debtors.         (Confirmed)
-------------------------------------------------------------------x

### MODIFIED BENCH RULING ON (A) DEBTORS' OBJECTION TO PROOFS OF CLAIM NOS. 7639, 11037 AND 12520 FILED BY THE TRANSPORT WORKERS UNION OF AMERICA, AFL-CIO LOCAL 514 [ECF NO. 12975],[1] (B) DEBTORS' 194TH OMNIBUS OBJECTION TO CLAIMS (EMPLOYEE STOCK AND BENEFIT CLAIMS) [ECF NO. 13011], AND (C) DEBTORS' 189TH OMNIBUS OBJECTION TO CLAIMS (RETIREE BENEFIT CLAIMS) [ECF NO. 12910]

      Before the Court are the Debtors' objections to various claims that have been the subject of a number of hearings, including most recently a hearing on September 25, 2018. At the hearing on September 25, 2018, the Court ruled on some of the claim objections, but took others under advisement. The Court will now issue its ruling on the remaining matters.[2]

      Section 502(a) of the Bankruptcy Code provides that a filed proof of claim is "deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). If the claim is properly filed, it is prima facie evidence that the claim is valid. *See* Fed. R. Bankr. P. 3001(f). A party in interest may object to a proof of claim, and once an objection is made, the court must determine whether the objection is well founded. *See* 4 Collier on Bankruptcy ¶ 502.02[2] (16th ed. rev. 2013).

      Although Rule 3001(f) establishes the initial evidentiary effect of a filed claim, the burden of proof rests on different parties at different times. *See In re Allegheny Int'l, Inc.*, 954

---

[1]      Unless otherwise specified, references to the Case Management/Electronic Case Filing ("ECF") docket are to the above-captioned Chapter 11 case.

[2]      This written decision memorializes the Court's bench ruling that was read into the record on November 27, 2018. Because of its origins as a bench ruling, this decision has a more conversational tone.

F.2d 167, 173 (3d Cir. 1992).  Claims objections have a shifting burden of proof.  Correctly filed

proofs of claim "constitute prima facie evidence of the validity and amount of the claim . . . .  To

overcome this prima facie evidence, an objecting party must come forth with evidence which, if

believed, would refute at least one of the allegations essential to the claim."  *Sherman v. Novak*

*(In re Reilly)*, 245 B.R. 768, 773 (2d Cir. B.A.P. 2000).  By producing "evidence equal in force

to the prima facie case," an objector can negate a claim's presumptive legal validity, thereby

shifting the burden back to the claimant to "prove by a preponderance of the evidence that under

applicable law the claim should be allowed."  *Creamer v. Motors Liquidation Co. GUC Trust (In*

*re Motors Liquidation Co.)*, 2013 U.S. Dist. LEXIS 143957, at *12–13 (S.D.N.Y. Sept. 26,

2013) (internal quotation marks omitted); *see In re MF Global Holdings Ltd.*, 2012 WL

5499847, at * 3 (Bankr. S.D.N.Y. Nov. 13, 2012) ("A proof of claim is prima facie evidence of

the validity and amount of a claim, and the objector bears the initial burden of persuasion.  The

burden then shifts to the claimant if the objector produces evidence equal in force to the prima

facie case . . . which, if believed, would refute at least one of the allegations that is essential to

the claim's legal sufficiency."); *see also* 4 Collier on Bankruptcy ¶ 502.02 (16th rev. ed. 2013);

*In re Residential Capital, LLC*, 507 B.R. 477, 490 (Bankr. S.D.N.Y. 2014).

### A. <u>Stock Options Claims</u>

The Court first turns to the issue of the validity of claims based on a stock option

program that American began well before this bankruptcy in connection with earlier cost cutting

by the Company in 2003.  *See* Sept. 25 Hr'g Tr. 32:4-34:25 [ECF No 13076] (citing American

Exhibits 2 and 3, submitted at September 25, 2018 hearing).  The claims objections implicated

by this issue are:

- Debtors' Objection to Proofs of Claim Nos. 7639, 11037 and 12520 filed by the
  Transport Workers Union of America, AFL-CIO Local 514 [ECF No. 12975]

- Debtors' 194th Omnibus Objection to Claims (Employee Stock and Benefit Claims) [ECF No. 13011]

In 2003, American implemented a "Broad Based Stock Option Plan," which granted eligible employees options to purchase shares of AMR common stock.  *See* Aprey Letter, dated September 16, 2003 and the Employee Stock Incentive Plan (both attached as Exhibit 1 to the Supplement to Debtors' Objection to Proof of Claim Number 7639 and 194th Omnibus Objection to Claims [ECF No. 13086]).  The grant date for the stock options was April 17, 2003, with an expiration date ten years later on April 17, 2013.  *See* FAQ (attached as Exhibit 1 to the Supplement to Debtors' Objection to Proof of Claim Number 7639 and 194th Omnibus Objection to Claims).  The Debtors subsequently filed their Chapter 11 cases on November 29, 2011, or a little less than two years before the expiration date.  The strike price, or the price at which employees could exercise options and purchase shares of AMR common stock, was $5.00.  *See id.*

Several hearings were held and numerous sets of pleadings were filed by the parties with respect to this issue.  The Court notes that the arguments of the parties, both the Debtors and the claimants, evolved over time.  The Court will therefore address the arguments as they currently stand.

The Transport Workers Union, Local 514 ("Local 514") asserted that the stock option program was implemented in conjunction with the collective bargaining agreements that were in effect prior to the petition date.  Local 514 argued that the Transport Workers Union ("TWU") collective bargaining agreement was rejected in the Section 1113 process that took place during the Debtors' bankruptcy, and that the stock option program was terminated in connection with this rejection.  *See* Supplemental Response of Local 514 to Objection to Proof of Claim Number 7639 [ECF No. 13049].  Section 1113 of the Bankruptcy Code permits a debtor to abrogate a

collective bargaining agreement ("CBA") if it meets a certain set of conditions in the statute. *See*

11 U.S.C. § 1113; *see, e.g., In re AMR Corp.*, 477 B.R. 384 (Bankr. S.D.N.Y. 2012).  Local 514

asserted a claim on behalf of its members that were unable to exercise their stock options

because of this alleged termination of the stock option program prior to its expiration date of

April 17, 2013.  *See* Supplemental Response of Local 514 to Objection to Proof of Claim

Number 7639.  The Debtors countered that the program was independent of the CBAs and that

employees continued to be able to exercise their rights under the program until its expiration in

April 2013.

The Court rejects the position of Local 514 for three reasons.  As a threshold matter,

Local 514's position is factually flawed because the TWU did not abrogate its CBA under

Section 1113 of the Bankruptcy Code.  Instead, the TWU and the Debtors reached a consensual

agreement on a new CBA to replace the old CBA.  *See In re AMR Corp.*, 477 B.R. 384, 393, 405

n.12 (Bankr. S.D.N.Y. 2012); *see also* Sept. 25 Hr'g Tr. 36:19-47:9 (Court's explanation of case

history as to CBAs).  As such, any rights under the old CBA—as compared to the new CBA—

were the subject of a bargaining process and not a unilateral decision to abrogate or reject the

TWU CBA by the Debtors under the Bankruptcy Code.  Thus, there was no unilateral

termination of rights by the Debtors that would serve as a basis for the claim that Local 514

asserted as to the stock options program.

Second, Local 514's position is also legally flawed.  Even if the stock option plan had

been terminated through abrogation of the CBAs, it is well established in this jurisdiction that

abrogation under Section 1113 of the Bankruptcy Code does not create rejection claims pursuant

to Section 365.  *See Northwest Airlines Corp. v. Ass'n of Flight Attendants-CWA (In re*

*Northwest Airlines Corp.)*, 483 F.3d 160, 172 (2d Cir. 2007) ("We hold that Northwest, acting

pursuant the authority conferred to it by the bankruptcy court, *abrogated* its CBA. The purpose of § 1113—to permit CBA rejection in favor of alternate terms without fear of liability after a final negotiation before, and authorization from, a bankruptcy court—naturally leads to such a conclusion."); *In re Northwest Airlines Corp.*, 366 B.R. 270, 275-76 (Bankr. S.D.N.Y. 2007) ("[R]ejection under § 365 thus leads to a legal fiction at odds with the text of (and impetus behind) § 1113, and we thus conclude that a bankruptcy court acting pursuant to § 1113 may authorize a debtor to abrogate its CBA, effectively shielding it from a charge of breach.") (internal citations omitted).

Third and finally, Local 514's position is flawed based on the evidence. Considering the evidence under the shifting burden of proof for claims objections, the contemporaneous evidence indicates that the stock option program expired on April 17, 2013 in accordance with its terms and was not impacted by the CBA process. The Court asked both sides for copies of any relevant documents or sections of the CBAs that indicate a relationship between the stock option program and the CBAs. None of the relevant documents provided to the Court show a connection.

Local 514 relied upon a written statement submitted by D'Ann Johnson, an officer of Local 514. *See* Statement of Johnson, dated September 13, 2018 [ECF No. 13049-2]. But Ms. Johnson's statement only asserted generally that "under the 2003 collective bargaining agreements with American, the bargaining unit members received the right to stock options." *Id.* Ms. Johnson's statement attached sections of the Employee Stock Option Agreement Terms and Conditions and also the 2003 Employee Stock Incentive Plan. But neither of these documents stated that the stock option program was being implemented in conjunction with the CBAs;

indeed, neither document even referenced the CBAs.  *See* Exhibits 1 and 2 to Statement of

Johnson.

Instead, contemporaneous documents provided to the Court indicate that the stock option

program was implemented by American as a reward to its employees that was independent of the

CBAs and that this stock option right existed until April 17, 2013.  This evidence includes the

following:

- The Stock Option Incentive Plan stated that its purpose was to enable "AMR Corporation to retain and reward employees of the Company and its Subsidiaries and Affiliates, and strengthen the mutuality of interests between such employees and the Company's shareholders, by offering such employees equity-based incentives in the Company." Employee Stock Incentive Plan at Section 1 (attached as Exhibit 1 to the Supplement to Debtors' Objection to Proof of Claim Number 7639 and 194th Omnibus Objection to Claims).

- Similarly, the Terms and Conditions attached to the plan stated that the Board of Directors of AMR had approved the plan, had selected the individuals that were eligible to participate in the plan and found "that it is to the advantage and interest of the Corporation to grant the option provided . . . as an incentive for the Optionee to remain in the employ of the Corporation or one of its Subsidiaries or Affiliates, and to encourage ownership by the Optionee of the Corporation's Common Stock."  Employee Stock Option Agreement Terms and Conditions (attached as Exhibit 1 to the Supplement to Debtors' Objection to Proof of Claim Number 7639 and 194th Omnibus Objection to Claims).

- Letters sent out to notify eligible participants of the program characterized it as a "stock option award" and state that it was "granted to you in recognition of your participation in the recent cost restructuring process. . . ."  *See* Delewski Letter (American Exhibit 2, submitted at September 25, 2018 hearing).

Indeed, Local 514 informed its members that the stock option program existed, but that

employee rights under the program expired on April 17, 2013:

- On July 10, 2013, for example, Local 514 informed its members that "[t]hose of us that held AMR Stock Options, originally granted in 2003, do not qualify to vote because those stock options expired on April 17th, 2013."  TWU Local 514 Blog (attached as Exhibit 5 to Supplement to Debtors' Objection to Proof of Claim Number 7639 and 194h Omnibus Objection to Claims).

- Local 514 again stated on December 2, 2013 that "[a]ny options that were still outstanding irrevocably expired on April 17, 2013, and are not exercisable after that date. That means the 2003 Broad Based Stock Options do not have any remaining value, and the Plan of Reorganization does not provide for any payment in respect of such options." TWU Local 514 Blog (attached as Exhibit 4 to Supplement to Debtors' Objection to Proof of Claim Number 7639 and 194h Omnibus Objection to Claims).

- *See also* Association of Professional Flight Attendants ("APFA") Equity Creditor Information Page, dated August 15, 2013 (attached as Exhibit 6 to Supplement to Debtors' Objection to Proof of Claim Number 7639 and 194h Omnibus Objection to Claims) (stating that "[a]ny options that were still outstanding irrevocably expired on April 17, 2013 and are not exercisable after that date.").

Based upon the evidence that was submitted by the parties, the Court concludes that the Stock Option Program expired in accordance with its terms on April 17, 2013, that it was not connected to the CBAs, and that the treatment of the CBAs during the bankruptcy process had no impact upon the program.[3]

A separate issue was raised as to whether employees were prevented from exercising their stock options subsequent to the petition date. This issue was raised by Frank Cannizzaro

---

[3]     The parties raised the significance, if any, to language contained in an agreement between the Debtors and the TWU relating to the treatment of certain claims, which provided that certain proofs of claim filed by TWU-represented employees would be preserved notwithstanding the parties having entered into new CBAs and releasing certain claims. That language stated:

> any and all claims, interests, causes or demands (including all pending grievances) (collectively, the "TWU Claims"), TWU has or might arguably have, on behalf of itself or the Company's employees represented by the TWU pursuant to the Railway Labor Act ("RLA") and the terms of the existing collective bargaining agreements (the [Old CBAs]) . . . against the Debtors arising prior to the [e]ffective [d]ate . . . of this [l]etter [a]greement shall be automatically fully, finally, and completely released, expunged and extinguished. Notwithstanding the foregoing, (except for the claims listed on Exhibit A) the TWU Claims shall not include claims asserted in any proofs of claim actually filed in the Bankruptcy Cases by or on behalf of TWU represented employees (the "Excluded Claims"). The Excluded Claims shall be administered and resolved pursuant to the claims resolution process in the Bankruptcy Cases and the parties reserve all of their rights with respect to the Excluded Claims.

Letter re: Settlement Consideration and Bankruptcy Protections, dated August 22, 2012 (attached as Exhibit D to the Debtors' Objection to Proofs of Claim. Nos. 7639, 11037, and 12520). The Court finds that this language does not impact the validity of the claims in question. It does not provide that the preserved claims were otherwise valid or invalid. All the language means is that the preserved claims would now be subject to the claims process in these bankruptcy proceedings. *See* September 25 Hr'g Tr. 49:18-56:25.

and Angelo Balbo, two claimants under the 194th Omnibus Objection who are not members of

Local 514.  *See* September 25th Hr'g Tr. at 62:20-22.  They stated generally in identical letters

submitted in opposition to the 194th Omnibus objection that after American filed "we were told

by the Company that if we had not exercised the options prior to them filing we would no longer

be able to do so."  *See* ECF Nos. 13044, 13061.  This was also addressed before the Court at the

hearing on September 25, 2018 by Mr. Balbo, as well as in a pleading subsequently filed by him.

Initially at the hearing, Mr. Balbo stated that he had been told by Debtors' management

that if he "didn't exercise these stock options they wouldn't be able to be exercised."  Sept. 25

Hr'g Tr. 60:24-61:3.  In a subsequent pleading, however, Mr. Balbo clarified that shortly after

the Debtors' bankruptcy filing, he called the AA Benefit Service Center to inquire on the status

of his stock options and was told they could no longer be exercised.  *See* Supplement to the

Debtors Objection to Proof of Claim 194th Omnibus [ECF No. 13096].  He also stated that the

brokerage firm handling the options told him that they were no longer exercisable.  *See id.*  In

this pleading, Mr. Balbo made no reference to the Debtors' management or counsel directly

stating to him that he could not exercise his options and in fact stated that he believed the AA

Benefit Service Center may have been outsourced.  *See id.*

Local 514 subsequently latched onto this issue, seemingly suggesting that all claimants

that held stock options were similarly prevented by the Debtors from exercising their stock

options and that this was because the automatic stay prohibited them from enforcing their rights

against the Debtors.  Local 514 argued that this constituted a breach of contract.  *See* Second

Supplement of TWU, Local 514, Regarding Objection to Proof of Claim Number 7639 at 2-3

[ECF No. 13097].  But, as noted above, Local 514 provided no evidence that any of its own

members were prevented from exercising their stock options in similar fashion.  Indeed, prior

pleadings of Local 514 seemed to suggest that members could exercise their stock options subsequent to the petition date. *See* Supplemental Response of Local 514 to Objection to Proof of Claim Number 7639 at 4 (stating that "the claim over stock options, as modified in the objection process, relates only to those bargaining unit members who had vested and unexercised rights immediately before the filing of bankruptcy to stock options; such claim does not relate to persons who had exercised those rights, whether they continued to hold the stock at the time of bankruptcy. . . or persons who had exercised their options *and then sold their stock prior to bankruptcy (or after)*.") (emphasis added). Local 514 also provided no legal authority for the notion that the exercise of this employee benefit was somehow barred by the automatic stay.

In sum, no evidence was provided to the Court that anyone other than Mr. Balbo and Mr. Cannizzaro were prevented from exercising their stock options. Local 514 merely cited to the statements of Mr. Balbo at the September 25th hearing and to several pages of a Local 514 blog, which pages appear to have nothing to do with the stock option program itself but rather with stock distributions under the Debtors' Plan of Reorganization. *See* Second Supplement of TWU, Local 514, Regarding Objection to Proof of Claim Number 7639 at 2.

Indeed, contemporaneous evidence indicates that the Debtors operated with the understanding that employees were able to exercise stock options up until the expiration date of April 17, 2013 and, in fact, notified employees of the imminent expiration and that they must make a decision about whether to exercise their options prior to that date:

- For instance, the Debtors notified employees on April 1, 2013—well after the bankruptcy filing—that "[t]he majority of these options were exercised over the past ten years. Any options that are still outstanding will irrevocably expire on April 17, 2013, and cannot be exercised after that date. *The decision of whether to exercise a stock option is solely that of the option holder, and American is providing no advice or recommendation regarding that decision*." AMR Corp. Jetwire (Form 425) (emphasis added) (attached as Exhibit 2 to Supplement to Debtors' Objection to Proof of Claim Number 7639 and 194th Omnibus Objection to Claims).

- On April 10, 2013, the Debtors again informed employees that "[t]he options irrevocably expire on April 17, 2013, and cannot be exercised after that date. View this important information *to help you on your decision to exercise your stock option grants*." AMR Corp., Flight Service Update (Form 425) (emphasis added) (attached as Exhibit 3 to Supplement to Debtors' Objection to Proof of Claim Number 7639 and 194th Omnibus Objection to Claims).

While Mr. Balbo referred to "others" being told the same thing as him, no one else came forward with such assertions and no other evidence was provided to this Court that any other party was prevented from exercising their rights due to the automatic stay or otherwise. The pleadings submitted by Local 514 prior to September 25th based its claim for stock options upon a breach of contract/rejection damages theory, and that basis has been rejected by this Court. *See* Local 514 Supplemental Response to Objection to Proof of Claim Number 7639 at 2-8. Given that Local 514 provided no evidence that any of its members were prevented from exercising their stock options after the bankruptcy filing, and indeed there being evidence to the contrary, Local 514's claim based on the stock options is expunged. The Court therefore does not address the arguments raised by Local 514 at the September 25th hearing with respect to damages.[4]

As for Mr. Balbo's statements and those of Mr. Cannizzaro, there is no evidence that it was the Debtors themselves that prevented him from exercising his stock options:

- In his pleading, Mr. Balbo stated that he believed the American Benefit Service Center with which he inquired may have been outsourced. *See* Supplement to the Debtors Objection to Proof of Claim 194th Omnibus).

- He also stated that he spoke with a brokerage firm, but never stated that he spoke directly with an employee of the Debtors or with Debtors' counsel. *See id.*

---

[4]      As to damages, the Court notes that Local 514 did not provide an expert with respect to such damages arguments, and even if the Court were ruling with respect to Local 514's request for damages, it is exceedingly skeptical that any claim—much less one for $135 million—could exist when the stock price postpetition never rose above the $5.00 strike price prior to expiration of the stock option program. *See* September 25th Hr'g Tr. 79:8-13. In short, it is unclear how any person could be harmed if prevented from exercising stock options at a strike price of $5.00 when the market price never rose above $4.00 during the period in question.

- Mr. Balbo provided no documents to show that American itself prevented him from exercising his options or that it instituted a policy that prevented him from doing so.

Even if Mr. Balbo and Mr. Cannizzaro had a claim based on their inability to exercise their stock options after the bankruptcy filing, the Court has serious doubts that they could make an argument that they are entitled to damages.

- The stock options were not transferable, so an individual like Mr. Balbo could not have sold the options to another party. *See* Stock Option Agreement Terms and Conditions at 3 and FAQ at 8 (both attached as Exhibit 1 to the Supplement to Debtors' Objection to Proof of Claim Number 7639 and 194th Omnibus Objection to Claims); *see also* September 25th Hr'g Tr. 51:23-68:13.

- Additionally, the Debtors provided evidence that the stock price never reached the strike price of $5.00 between the petition date and the expiration date of April 17, 2013. *See* AMR Share Price Chart (attached as Exhibit A to Request For Judicial Notice [ECF No. 13058]); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (court may take judicial notice of well-publicized stock prices).

- Thus, if Mr. Balbo or Mr. Cannizzaro had exercised their own options after the Debtors' filing, they would have had to pay the difference between the price that the stock was selling at and the strike price, thus spending more than the actual share price of the stock in order to acquire it. As the stock price never got close to the $5.00 strike price during the applicable period of time, why wouldn't Mr. Balbo simply just buy the stock off the street as opposed to exercising his option? *See* September 25th Hr'g Tr. 64:10-16 (Court colloquy on damages).

Indeed, the Court made extensive observations on the issue of damages at the September 25th hearing. *See* September 25th Hr'g Tr. 64:10-84:20. Based on Mr. Balbo's comments, the Court suspects that his frustrations are based on the fact that the stock price—while never rising above $4.00 prior to the April 17, 2013 expiration date—subsequently rose far above that price. The Court sympathizes with his frustrations, but a claim such as this cannot be based on such hindsight. And the Court further notes that each of the major unions in this case—the TWU, the Allied Pilots Association and the APFA—received stock for their members as part of the Plan of Reorganization.

In sum, the Court determined at the September 25th hearing that it was not going to hold an evidentiary hearing on the issue of damages in an effort to simplify the matters that were on for hearing. *See id.* Given the current factual record, the claims of Mr. Balbo and Mr. Cannizzaro with respect to stock options will survive for the meantime and are subject to further factual development and discussion with respect to damages. The Court will provide an opportunity for the Debtors, Mr. Balbo and Mr. Cannizzaro to be heard further on the damages issue. Unless more is provided than was already stated at the September 25th hearing, however, the Court expects that the claims will be dismissed on the basis of damages. Mr. Balbo and Mr. Cannizzaro should speak with Debtors' counsel to discuss a schedule for the submission of anything additional with respect to damages.

### B. Medical Prefunding Claims

The Court next turns to the issue of the validity of claims based upon money contributed to a medical prefunding program that ended during the pendency of the Debtors' bankruptcy cases. The claims objection implicated by this issue are:

- Debtors' Objection to Proofs of Claim Nos. 7639, 11037 and 12520 filed by the Transport Workers Union of America, AFL-CIO Local 514

The retiree medical prefunding program was a benefit that was provided under the 2003 CBAs. The program was negotiated out of the CBAs signed in 2012 during the bankruptcy process. *See* AA/TWU CBA [ECF No. 3232-2]. Upon the program's elimination, the money that had been paid into the program by American's employees was refunded. *See* 12/27 Arbitration Opinion at 2 (attached as Exhibit 2 to Declaration of Douglas Cotton [ECF No. 13057]). Under the 2012 CBAs, the Debtors agreed that the company-matching funds American had paid into the program and which were being held in a retiree benefit trust, would be

distributed to employees if there was a "successful resolution of the 'Section 1114 Process.'"
*See id.* at 2-3.

Section 1114 of the Bankruptcy Code permits a debtor to modify its obligations to pay retire benefits under certain circumstances.  *See* 11 U.S.C. § 1114(e), (f) & (g).  In fact, the Debtors in this bankruptcy never sought relief under Section 1114.  But they did file an adversary proceeding arguing that certain retiree benefits had not vested and therefore could be terminated.  *See* September 25th Hr'g Tr. at 85:7-87:17; *see also* Adv. No. 12-01744.   As a practical matter, if the Debtors prevailed in their adversary proceeding, they would no longer have been obligated to pay those retiree benefits.  Perhaps for that reason, parties in this case sometimes referred to this adversary proceeding as a Section 1114 process, even if that title was technically inaccurate.

After receiving a partial ruling from the Court in the adversary proceeding, *see AMR Corp. v. Comm. of Retired E'ees (In re AMR Corp.)*, 508 B.R. 296 (Bankr. S.D.N.Y. 2014), American ultimately decided to voluntarily dismiss the adversary proceeding once it concluded that it was no longer going to be able to prevail.  This issue was discussed in some depth between the Debtors and the Retiree Committee when the adversary proceeding was being dismissed.  *See generally* Hr'g Tr. (July 11, 2018) [Adv. No. 12-01744, ECF No. 85]; Hr'g Tr. (July 24, 2018) [ECF No. 12981].  The TWU would not agree with the company that voluntary dismissal did not constitute "successful resolution of the Section 1114 process."  *See* 12/27 Arbitration Opinion at 4 (attached as Exhibit 2 to Declaration of Douglas Cotton).  That dispute ultimately went to arbitration, where the issue presented to the arbitrators was: "If American were to seek and obtain a voluntary dismissal of the Adversary Proceeding without further prosecution, would doing so trigger an obligation under the American-TWU collective bargaining agreements for

13

American to distribute the matching contributions at issue in this case to any of the active TWU-represented employees and/or post-October 31, 2012 TWU retirees who previously participated in the prefunding program?" *Id*. at 5.

On December 27, 2017, an arbitration opinion was issued stating that "[v]oluntary dismissal of the § 1114 process will not, in this case, trigger an obligation under the AA/TWU collective bargaining agreement to distribute the matching contributions at issue in this case to any of the active TWU-represented employees and/or post-October 31, 2012 TWU retirees who previously participated in the prefunding program." 12/27 Arbitration Opinion at 16 (attached as Exhibit 2 to Declaration of Douglas Cotton).

On July 25, 2018, this Court entered an Order granting American's motion to voluntarily dismiss the adversary proceeding. (Adv. No. 12-01744, ECF No. 86). That same day, the Court entered an Agreed Order on Debtors' 190th Omnibus Objection to Claims [ECF No. 12971], which expunged certain proofs of claim that had been filed by the Retiree Committee appointed in the case under to Section 1114. This agreed order stated that the Debtors would "continue to provide the 'retiree benefits' (as such term is defined in section 1114 of the Bankruptcy Code) claimed in the Retiree Benefit Claims . . . in accordance with the provisions of section 1129(a)(13) of the Bankruptcy Code, as set forth in section 8.44 of the Plan and in the Confirmation Order." *Id*.

Notwithstanding this extensive factual background, Local 514 did not and will not concede that there has not been a successful Section 1114 proceeding. Local 514 relied on the Statement of Sam Cirri, who stated that during the negotiations the discussion was that "as soon as the retiree medical issues were settled, then the company set aside was to be paid out to the employees. There was no mention at the table that the company planned to use that money to

14

pay for the retiree medical if they would be on the hook for that.  Nor were the employees who

approved the renegotiated CBAs told that.  Certainly, there was no criterion in the renegotiated

CBAs as to what kind of resolution would result in non-payment by the company; this is because

any resolution would result in the agreed-to payout.  Statement of Sam Cirri, dated September

11, 2018 [ECF No. 13049-1].  But the Court need not rely upon this parole evidence regarding

the negotiation process because the language of the final agreement between the parties is clear.

*See WWW.Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162-63 (1990) ("It is well settled that

extrinsic and parole evidence is not admissible to create an ambiguity in a written agreement

which is complete and clear and unambiguous upon its face.").  That document stated that

distribution of the matching funds to employees was "contingent on the successful resolution of

the Section 1114 process" and both the Debtors and the TWU agreed to arbitrate the issue of

whether voluntary dismissal constituted "successful resolution," an issue that the TWU lost

before the arbitrator.  *See* Appendices A, B, and C to the 12/27 Arbitration Opinion (attached as

Exhibit 2 to Declaration of Douglas Cotton); *see also* September 25th Hr'g Tr. 88:11-91:24.

Local 514 argued that the December 27th arbitration opinion reserved a ruling on the

successful resolution of the Section 1114 process to a later date, and that this Court's agreed

order expunging the Retiree Committee proofs of claim was somehow a "resolution of the

Section 1114 process."  Supplemental Response of Local 514 to Objection to Proof of Claim

Number 7639 at 10 or that it somehow triggered a new Section 1114 process.  *See* September

25th Hr'g Tr. 91:7-13.

The Court finds that there never has been a true Section 1114 process before this Court,

and that the one proceeding implicating Section 1114 rights—the adversary proceeding—was

voluntarily dismissed, a result that the arbitrator already determined did not trigger the release of

these funds.  Thus, the Debtors never received any relief in a court proceeding from their retiree

obligations and, therefore, there has not been a successful Section 1114 process.  As the Court

explained at the prior hearing on these issues, the language in the agreed order was provided as

comfort to the Retiree Committee to ensure that although their proofs of claim were being

expunged, the Debtors would continue to pay certain benefits in accordance with the Bankruptcy

Code and the terms of the Plan of Reorganization and Confirmation Order.  The agreed order

expunging the Retiree Committee's proofs of claim is and was not part of the Section 1114

process, and indeed acknowledged the dismissal of the Section 1114 adversary proceeding with

prejudice.  *See* ECF. No. 12971.  The Debtors simply agreed to continue to comply with the

terms of the Bankruptcy Code and their Plan of Reorganization, as they had been since the plan

was confirmed in 2013.  The agreed order does nothing more than maintain the status quo that

had been in place for years prior to the arbitration opinion being entered on December 27, 2017,

and to suggest that the agreed order was something new that happened or that something else

happened since the Section 1114 process ended with the Debtors voluntary dismissal in July of

2018 is nonsensical.

### C. <u>Supplemental Medical Plan Claim</u>

The Court now turns to the issue of the validity of claims seeking the return of premiums

paid by American's employees towards a supplemental medical plan that was discontinued by

the Debtors after their bankruptcy filing.  The claims objection implicated by this issue is:

- Debtors' 194th Omnibus Objection to Claims (Employee Stock and Benefit Claims)

Prior to September 22, 2010, the Debtors' active medical plans included a lifetime

maximum on the coverage provided to employees and their dependents.  *See* Letter from Dave

Levine, Managing Director HR Delivery, to Employees of American, dated September 22, 2010

(attached as Exhibit 7 to the Supplement to Debtors' Objection to Proof of Claim Number 7639 and 194th Omnibus Objection to Claims).  To supplement their coverage, eligible employees were permitted to enroll in the supplemental medical plan, which provided an additional $500,000 in benefits so long as premiums continued to be paid.  *See id.*

Upon its enactment, the Patient Protection and Affordable Care Act required that medical plans remove lifetime maximum coverage caps beginning on January 1, 2011.  *See id.*  Since the Debtors could no longer maintain lifetime maximum coverage caps in the medical plans they provided to their employees, the Debtors determined that the supplemental medical plan was no longer necessary to supplement employee's coverage.  *See id.*  The Debtors therefore discontinued the supplemental medical plan for active employees effective as of December 31, 2010.  *See id.*  The Debtors informed their employees of this in a letter dated September 22, 2010.  *See id.*

In that letter, the Debtors informed their employees that because the supplemental medical plan was an annual term policy, no refunds of premiums would be issued.  Specifically, the Debtors stated that "the Supplemental Medical Plan is an annual term policy, similar to automobile insurance; you are paying for coverage in the event you need to utilize the coverage during the policy period you are making your payments.  Like automobile insurance, if your policy is terminated, you are not refunded your premiums nor would your policy provide you with any coverage if you had a car accident after the policy was terminated."  *Id.*

Because the premiums were payments for an annual term policy and there is no dispute that the claimants' policies were in effect until the end of the annual term that they had paid for, the claims for return of the premiums paid are denied.

**D.  Retiree Benefit Claims**

The Court next turns to the issue of the validity of claims seeking damages for

termination of a medical prefunding program for retirement.  The claims objection implicated by

this issue is

- Debtors' 189th Omnibus Objection to Claims (Retiree Benefit Claims) [ECF No. 12910].
  Numerous responses were received to this objection, and the Court also heard argument
  from Ronnie Engles, Russell Hartman, Rita Huffstutler, Richard Irving, Jay Jackson and
  Patricia McCreary at several hearings.

The retiree medical funding program—under which employees made a monthly

contribution prior to retirement to help pay for, or prefund, their retiree medical coverage—was a

benefit provided starting in 2003 but was eliminated during the bankruptcy.  Claimants

complained about the high cost of replacing this kind of benefit.  At various hearings, it was

suggested that the Debtors may have terminated the retiree medical prefunding program

unilaterally.  But the evidence establishes that the retiree medical prefunding program was

terminated as a benefit under the old CBA when the new CBAs were entered into.  *See* CBA

Blackline [ECF No. 3232-2] (comparing the old CBA to the new CBA and indicating

elimination of prefunding retiree health care under new CBA).  On September 12, 2012, the

Court authorized the Debtors to enter into the new CBAs.  *See* ECF Nos. 4413, 4414.  A letter

was sent by the Debtors on or about that same day informing the applicable employees that the

prefunding program was being terminated and that employee contributions into the program

would be refunded.  *See* Letter of Denise Lynn, dated September 12, 2012 (attached as Exhibit O

to Supplement to Debtors' 189th Omnibus Objection to Claims [ECF No. 12982]).  While several

of the claimants stated that they received letters or information from the Debtors prior to the

Section 1113 process stating that the program was terminated, no evidence has been provided of

this, despite the Court providing the claimants with numerous opportunities to supplement their oppositions to the Debtors' claim objection.

The evidence establishes that the Debtors did not abrogate the TWU and APFA CBAs under Section 1113 of the Bankruptcy Code.  Instead, the TWU, the APFA and the Debtors reached a consensual agreement on a new CBA.  *See In re AMR Corp.*, 477 B.R. 384, 393, 405 n.12 (Bankr. S.D.N.Y. 2012); *In re AMR Corp.*, 478 B.R. 599, 602 (Bankr. S.D.N.Y. 2012).  As such, any rights under the old CBA—as compared to the new CBA—were the subject of a bargaining process and not a unilateral decision to abrogate or reject the CBA by the Debtors.  Thus, there was no unilateral termination of rights by the Debtors that would serve as a basis for the claim being asserted.

Even if this were not the case, termination of a CBA in the context of Section 1113 does not give rise for a claim to damages, as noted previously.  *See Northwest Airlines Corp. v. Ass'n of Flight Attendants-CWA (In re Northwest Airlines Corp.)*, 483 F.3d 160, 172 (2d Cir. 2007); *In re Northwest Airlines Corp.*, 366 B.R. 270, 275-76 (Bankr. S.D.N.Y. 2007).

And, as previously discussed, this retiree adversary proceeding was voluntarily dismissed by the Debtors with prejudice.  *See* Adv. Proc. No. 12-01744, ECF No. 78.  The plain language of the Plan and the Confirmation Order provide that upon termination of the Section 1114 retiree adversary proceed, any remaining vested retiree benefits would be treated in accordance with Section 1129(a)(13) of the Bankruptcy Code.  The Debtors reiterated that they will comply with Section 1129(a)(13), that expungement of these claims will not affect the rights of any affected individual retiree.[5]

---

[5] In addressing the claim relating to the medical prefunding benefits, the Court notes for the sake of clarity that the other employee benefits that were provided under the renegotiated 2012 CBAs were assumed by the Debtors under Paragraph 14(a) of the Confirmation Order and Section 8.4(a) of the Plan of Reorganization.  This assumption was qualified by the results of the Debtors' adversary proceeding on retiree benefits discussed earlier.

One claimant Ron Engles (Proof of Claim No. 9169), sought damages equal to the amount of company-match contributions originally contemplated by the retiree medical prefunding program. But as previously discussed above, the company-match contributions were the subject of arbitrations between American and the TWU and APFA and the arbitrators ruled that American had no obligation to return the company match contributions. *See* 3/1 Arbitration Opinion and 12/27 Arbitration Opinion (attached as Exhibit B and Exhibit C to American's Omnibus Reply to Responses to 189th Omnibus Objection to Claims [ECF No. 12953]).

Mr. Engles also argued that the Debtors could not take money that was being held in the name of the claimants. *See* September 25th Hr'g Tr. 99:15-101:8. But it appears that in making this argument, Mr. Engles relied on documents that don't have to do with medical prefunding or the claims to which the Debtors were objecting, but rather with a benefit that is not impacted by the Debtors' 189th Omnibus Claims Objection. *See* September 25th Hr'g Tr. 112:5-113:22.

Several other individuals made argument on issues that are beyond the scope of the 189th Omnibus Claims objection. For instance, Mr. Hartman argued that the employees did not have a separate committee representing them, similar to the Retiree Committee under Section 1114 of the Bankruptcy Code. The Court noted that retirees have a committee because the unions don't represent them, while current employees are represented by their unions, all of whom were very active participants in the bankruptcy. *See* September 25th Hr'g Tr. 104:13-105:11. Ms. McCreary argued that at the time of her retirement, the employees did not discuss or vote on their prefunding, but this again was something that was part of the negotiations the unions had with the Debtors that resulted in the new CBAs. *See* September 25th Hr'g Tr. 106:21-107:23.

The Court notes that for all of the claims objections, to the extent the Court has not specifically addressed an argument in this decision that was raised by any of the parties, such argument has been considered by the Court and rejected.

Last but not least, the Court would like to thank the individual employees and retirees who participated in the various hearings on these claim objections. They spent a considerable amount of time and effort on it and represented themselves well.  The Court regrets not having better news in connection with these claim objections.  Regrettably, a reorganization under Chapter 11 often leads to difficult results for employees of a company even where, as here, the company exits the bankruptcy process successfully.  Moreover, it can be difficult and confusing to follow the changes for employees during a case, particularly one as complicated as this where there were ongoing negotiations for years while new CBAs were being negotiated and before the Plan of Reorganization—and related merger—were approved.

The Debtors should serve a copy of this Modified Bench Ruling upon all the parties who submitted any filings in connection with any of these objections or who appeared at any of the hearings relating to these objections, either in person or telephonically.

The Court will enter a separate order consistent with this decision.

Dated: New York, New York
       December 10, 2018

                                        _/s/ Sean H. Lane_____
                                        UNITED STATES BANKRUPTCY JUDGE